LATHAM & WATKINS LLP
  Steven M. Bauer (Bar No. 135067)
    steven.bauer@lw.com
  Sadik Huseny (Bar No. 224659)
    sadik.huseny@lw.com
  Shannon D. Lankenau (Bar No. 294263)
    shannon.lankenau@lw.com
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: 415.391.0600
Facsimile: 415.395.8095

LATHAM & WATKINS LLP
  Richard P. Bress (admitted *pro hac vice*)
    rick.bress@lw.com
  Melissa Arbus Sherry (admitted *pro hac vice*)
    melissa.sherry@lw.com
  Anne W. Robinson (admitted *pro hac vice*)
    anne.robinson@lw.com
  Tyce R. Walters (admitted *pro hac vice*)
    tyce.walters@lw.com
  Genevieve P. Hoffman (admitted *pro hac vice*)
    genevieve.hoffman@lw.com
  Gemma Donofrio (admitted *pro hac vice*)
    gemma.donofrio@lw.com
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Telephone: 202.637.2200
Facsimile: 202.637.2201

LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
  Kristen Clarke (*pro hac vice*
forthcoming)
    kclarke@lawyerscommittee.org
  Jon M. Greenbaum (Bar No. 166733)
    jgreenbaum@lawyerscommittee.org
  Ezra D. Rosenberg (*pro hac vice*
forthcoming)
    erosenberg@lawyerscommittee.org
  Dorian L. Spence (*pro hac vice*
forthcoming)
    dspence@lawyerscommittee.org
  Ajay P. Saini (*pro hac vice* forthcoming)
    asaini@lawyerscommittee.org
  Maryum Jordan (Bar No. 325447)
    mjordan@lawyerscommittee.org
  Pooja Chaudhuri (Bar No. 314847)
    pchaudhuri@lawyerscommittee.org
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: 202.662.8600
Facsimile: 202.783.0857

*Additional counsel and representation
information listed in signature block*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

NATIONAL URBAN LEAGUE; LEAGUE OF
WOMEN VOTERS; BLACK ALLIANCE FOR
JUST IMMIGRATION; HARRIS COUNTY,
TEXAS; KING COUNTY, WASHINGTON;
CITY OF LOS ANGELES, CALIFORNIA;
CITY OF SALINAS, CALIFORNIA; CITY OF
SAN JOSE, CALIFORNIA; RODNEY ELLIS;
and ADRIAN GARCIA,

                Plaintiffs,

v.

WILBUR L. ROSS, JR., in his official capacity
as Secretary of Commerce; U.S. DEPARTMENT
OF COMMERCE; STEVEN DILLINGHAM, in
his official capacity as Director of the U.S.
Census Bureau; and U.S. CENSUS BUREAU,

                Defendants.

CASE NO. 5:20-cv-05799-LHK

**MOTION FOR STAY AND
PRELIMINARY INJUNCTION**

Date:     September 17, 2020
Time:    1:30 p.m.
Place:   Courtroom 8, 4th Floor, San Jose
Judge:  Hon. Lucy H. Koh

# NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Plaintiffs National Urban League, League of Women Voters, Black Alliance for Just Immigration, Harris County, Texas, King County, Washington, City of Los Angeles, California, City of San Jose, California, Rodney Ellis, and Adrian Garcia ("Plaintiffs") respectfully move the Court for a stay of agency action under 5 U.S.C. § 705, and a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure and Civil L.R. 7-2 of the Civil Local Rules of the U.S. District Court for the Northern District of California.  In light of the circumstances and timing issues addressed herein, and pursuant to stipulation by the parties, Plaintiffs respectfully request that the Court set the motion for hearing on Thursday, September 17, 2020, or as soon thereafter as may be reasonably heard by the Court, based on an agreed expedited briefing schedule whereby Defendants will file their opposition papers by September 4, 2020 and Plaintiffs will file their reply papers by September 10, 2020.  Plaintiffs have requested expedited resolution of this motion because Defendants have indicated that, under the plan that is the subject of Plaintiffs' challenge, Defendants will discontinue data collection after September 30, 2020.

# RELIEF SOUGHT

For the reasons discussed below, Plaintiffs respectfully request that the Court grant their motion and order relief as follows:

- A stay of the U.S. Census Bureau's August 3, 2020 plan and shortened timeline for accomplishing the 2020 United States Census ("Rush Plan"); and
- A preliminary injunction prohibiting Defendants Secretary of Commerce Wilber J. Ross ("Secretary Ross"), U.S. Department of Commerce, Director of the Census Bureau Steven Dillingham ("Director Dillingham"), and U.S. Census Bureau (collectively, "Defendants") from implementing the Rush Plan or otherwise shortening the preexisting timeline for conducting the 2020 Census under the April 13, 2020 Plan ("COVID-19 Plan").

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ..................................................................................................1

II. BACKGROUND ...................................................................................................3

    A.  After Years of Analysis, the Census Bureau Promulgated the 2018
        Operational Plan.....................................................................................................3

        1.  Data collection ...........................................................................5

        2.  Data processing .........................................................................7

    B.  In Response to the Pandemic, the Bureau Issued the COVID-19 Plan .................7

    C.  Defendants Blindside Everyone with the Rush Plan ...........................................11

III. LEGAL STANDARD...........................................................................................13

IV. DISCUSSION.......................................................................................................14

    A.  Plaintiffs are Likely to Succeed on the Merits........................................................14

        1.  The Rush Plan is a final agency action that violates the APA.................14

            a.  The Rush Plan is final agency action.............................................15

            b.  Defendants failed to adequately explain why the census
                should be shortened..........................................................................16

            c.  Defendants failed to consider important aspects of the
                problem ..............................................................................................18

            d.  The December 31, 2020 deadline does not justify the Rush
                Plan, and any reliance on that deadline is pretextual....................21

        2.  Defendants' decision to dramatically shorten Census timelines
            violates the Constitution's Enumeration Clause ........................................25

    B.  Enforcing the Rush Plan During the Pendency of this Lawsuit Would
        Irreparably Harm Plaintiffs .................................................................................28

    C.  The Remaining Factors Support Relief................................................................33

V.  CONCLUSION.....................................................................................................35

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NO. 5:20-cv-05799-LHK
MOTION FOR STAY AND PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*All. for Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ...................................................................14, 28, 34

*Am. Trucking Ass'n, Inc. v. City of L.A.*,
    559 F.3d 1046 (9th Cir. 2009) ..............................................................................14

*Bennett v. Spear*,
    520 U.S. 154 (1997) ..............................................................................................15

*Carey v. Klutznick*,
    637 F.2d 834 (2d Cir. 1980)...........................................................................23, 33

*Chevron Corp. v. Donziger*,
    833 F.3d 74 (2d Cir. 2016)....................................................................................33

*City of S.F. v. U.S. Citizenship & Immigration Servs.*,
    408 F. Supp. 3d 1057 (N.D. Cal. 2019) ...........................................................4, 28

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ................................................................................ *passim*

*Dep't of Commerce v. U.S. House of Reps.*,
    525 U.S. 316 (1999) ...........................................................................................4, 28

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
    140 S. Ct. 1891 (2020)................................................................................. *passim*

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016)....................................................................................16, 17

*Farris v. Seabrook*,
    677 F.3d 858 (9th Cir. 2012) ................................................................................34

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ........................................................................................16, 21

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ..............................................................................................23

*Ga. Coal. for Peoples' Agenda, Inc. v. Deal*,
    214 F. Supp. 3d 1344 (S.D. Ga.)..........................................................................23

*Hernandez v. Cty. of Monterey*,
    110 F. Supp. 3d 929 (N.D. Cal. 2015) ................................................................29

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Humane Society v. Locke,*
    626 F.3d at 1050 ..................................................................................................17

*Idaho v. Coeur d'Alene Tribe,*
    794 F.3d 1039 (9th Cir. 2015) ............................................................................33

*Int'l Snowmobile Mfrs. Ass'n. v. Norton,*
    304 F. Supp. 2d 1278 (D. Wyo. 2004)................................................................21

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) ..............................................................................29

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)..........................................................................14, 16, 17, 20

*Nat'l Wildlife Fed'n v. Burlington N.R.R., Inc.,*
    23 F.3d 1508 (9th Cir. 1994) ....................................................................4, 16, 28

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.,*
    465 F.3d 977 (9th Cir. 2006) ..............................................................................15

*Organized Vill. of Kake v. U.S. Dep't of Agriculture,*
    795 F.3d 956 (9th Cir. 2015) ........................................................................16, 17

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015)..............................................................................................14

*Philip Morris USA Inc. v. Scott,*
    561 U.S. 1301 (2010) (Scalia, J., in chambers) .................................................33

*Pimentel v. Dreyfus,*
    670 F.3d 1096 (9th Cir. 2012) ............................................................................14

*Shell Offshore, Inc. v. Greenpeace, Inc.,*
    709 F.3d 1281 (9th Cir. 2013) ............................................................................14

*State of N.Y v. U.S. Dep't of Commerce,*
    315 F. Supp. 3d 766 (S.D.N.Y. 2018)............................................................5, 30

*State of N.Y. v. U.S. Dep't of Commerce,*
    351 F. Supp. 3d 502 (S.D.N.Y. 2019), *aff'd in part, rev'd in part by* 139 S. Ct.
    2551 (2019)..........................................................................6, 15, 28, 31

*Utah v. Evans,*
    536 U.S. 452 (2002)..........................................................................22, 25, 27, 33

*Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv.,*
    629 F.3d 1024 (9th Cir. 2010) ............................................................................16

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..................................................................................................28

*Wisconsin v. City of N.Y.*,
    517 U.S. 1 (1996)............................................................................................*passim*

**STATUTES**

5 U.S.C. § 705 ......................................................................................................14

5 U.S.C. § 706(2)(A).............................................................................................14

13 U.S.C. §§ 2, 4, 21, 141(a) ..................................................................................4

13 U.S.C. § 141 ........................................................................................................7

**CONSITUTIONAL PROVISIONS**

Cal. Const. art. XXI, §§ 1-2 ...................................................................................30

Tex. Const. art. III, § 28 .........................................................................................30

**OTHER AUTHORITIES**

*Census Bureau Drop-Outs Complicate Door-Knocking Efforts*, Associated Press
    (Aug. 8, 2020), https://www.usnews.com/news/us/articles /2020-08-
    08/census-bureau-drop-outs-complicate-door-knocking-efforts ............................19

Gregory Wallace, *Watchdog Warns of Census Worker Shortage As Deadline
    Approaches*, CNN (Aug. 21, 2020),
    https://www.cnn.com/2020/08/21/politics/census-worker-shortage/index.html ...................19

Hansi Lo Wang (@hansilowang), Twitter (Aug. 5, 2020),
    https://twitter.com/hansilowang/status/1291198017882796034 ............................13

Hansi Lo Wang, *'Not Enough Time': Census Workers Fear Rushing Count Could
    Botch Results*, NPR (Aug. 11, 2020),
    https://www.npr.org/2020/08/11/901202892/not-enough-time-census-
    workers-fear-rushing-count-could-botch-results .........................................12, 13, 20

Hansi Lo Wang, *Trump Officials Ask To Delay Census Data For Voting Districts,
    House Seats*, NPR (Apr. 13, 2020),
    https://www.npr.org/2020/04/13/833546675/trump-officials-ask-to-delay-
    census-data-for-voting-districts-house-seats................................................................9

Letter from James Madison, President of U.S., to U.S. Congress (Nov. 13, 1811),
    https://founders.archives.gov/documents/Madison/03-04-02-0015 .......................23

Letter from James Madison, U.S. Sec'y of State, to Thomas Jefferson, President
of U.S. (Dec. 8, 1801),
https://founders.archives.gov/?q=%22second%20census%22&s=1111311111 ....................23

Letter from U.S. Philanthropy Leaders to Sec'y Ross & Dir. Dillingham (Aug. 5,
2020), https://funderscommittee.org/wp-content/uploads/2020/08/Letter-
Philanthropic-Leaders-on-Census-Being-Cut-Short-8-5.pdf;..................................13

Michael Wines, *It's the Official Start to the 2020 Census. But No One Counted on
a Pandemic*, N.Y. Times (Apr. 3, 2020),
https://www.nytimes.com/article/census-2020.html...............................................8

Mike Schneider, *Census Bureau Drop-Outs Complicate Door-Knocking Efforts*,
Associated Press (Aug. 8, 2020), https://www.usnews.com/news/us/articles
/2020-08-08/census-bureau-drop-outs-complicate-door-knocking-efforts...........................19

Mike Schneider, *Census Bureau Site Goes Live As Counting Begins in Earnest*
(Mar. 10, 2020), https://apnews.com/3fc59096ab138fdd4795386a2987c573 .......................7

Press Release, Census Bureau Update on 2020 Field Operations, Release No.
CB20-RTQ.14 (Mar. 28, 2020), https://www.census.gov/newsroom/press-
releases/2020/update-on-2020-census-field-operations.html ....................................8

Press Release, Former Census Bureau Directors*, On the Importance of Extending
the 2020 Census Statutory Deadlines to Achieve a Fair and Accurate
Enumeration of the United States* (Aug. 4, 2020),
https://www.documentcloud.org/documents/7013550-Aug-4-2020-Statement-
By-Former-U-S-Census-Bureau.html...................................................................12, 13, 26

Press Release, Leadership Conf. on Civ. & Human Rights, Trump Plans to
Sabotage 2020 Census by Cutting Short Operations (July 31, 2020),
https://civilrights.org/2020/07/31/trump-plans-to-sabotage-2020-census-by-
cutting-short-operations/ ....................................................................................13

Press Release, U.S. Census Bureau Director Steven Dillingham on Operational
Updates, Release No. CB20-RTQ.08 (Mar. 18, 2020),
https://www.census.gov/newsroom/press-releases/2020/operational-
update.html...........................................................................................................8

Press Release, U.S. Census Bureau, *Door-to-Door Visits Begin Nationwide for
2020 Census* (Aug. 11, 2020), https://www.census.gov/newsroom/press-
releases/2020/door-to-door-visits-begin-nationwide.html.......................................10

Remarks by President Trump Before Marine One Departure (July 5, 2019),
https://www.whitehouse.gov/briefings-statements/remarks-president-trump-
marine-one-departure-51/ ...................................................................................21

U.S. Census Bureau, Decennial Census Official Publications,
https://www.census.gov/programs-surveys/decennial-census/decade/
decennial-publications.1810.html (last visited Aug. 24, 2020) ..............................23

U.S. Census Bureau, Decennial Census Official Publications,
https://www.census.gov/programs-surveys/decennial-
census/decade/decennial-publications.1800.html (last visited Aug. 24, 2020) .......................23

U.S. Census Bureau, *Importance of the Data*, https://2020census.gov/en/census-
data.html (last visited Aug. 24, 2020) ....................................................................................33

U.S. Census Bureau, Operational Press Briefing – 2020 Census Update (July 8,
2020), https://www.census.gov/content/dam/Census/newsroom/press-
kits/2020/news-briefing-program-transcript-july8.pdf .....................................................10, 19

U.S. Census Bureau, *Response Rates*, https://2020census.gov/en/response-
rates.html (last updated Aug. 24, 2020) ..................................................................................19

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

vii

CASE NO. 5:20-cv-05799-LHK
MOTION FOR STAY AND PRELIMINARY INJUNCTION

# I.    INTRODUCTION

Conducting the United States decennial census is a massive undertaking, with weighty constitutional implications and substantial effects on the lives of hundreds of millions of Americans.  It forms the basis for the distribution of political power at the federal, state, and local levels, dictates the distribution of $1.5 trillion in federal funding, and is relied on by a host of businesses, governments, and non-profits for critical operations.  Given these stakes, the census takes time to do right: time to plan, time to implement, time to gather information from over a hundred million households, and time to turn that raw data into reliable results.  The Census Bureau spent more than a decade creating a detailed plan (the "2018 Operational Plan") to conduct each and every step of this crucial and complicated endeavor.  That plan reflected the Bureau's considered conclusions as to how long each of the various 2020 Census processes would take, with appropriate timelines set out for completion.

Then the COVID-19 pandemic threw all of this careful planning into disarray.  With the pandemic halting critical census operations, the Bureau recognized that it had no choice but to adjust the timelines to ensure a full and fair Census.  In April of this year, the Bureau issued a revised plan (the "COVID-19 Plan") which extended the overall timeline for accomplishing the 2020 Census but largely preserved the same amount of time for accomplishing each step in the census process.  This COVID-19 Plan, the Bureau explained, was intended to "[e]nsure a complete and accurate count of all communities."  Ex. 3 at 1 (Rush Plan Operational Adjustments Timeline).  The Bureau immediately proceeded to implement the COVID-19 Plan through the spring and summer.  And as late as July, officials reaffirmed that the ongoing COVID-19 pandemic and its resulting disruptions had made it impossible to complete an accurate count on the earlier 2018 Operational Plan's schedule.

On August 3, Defendants reversed course and issued a new plan (the "Rush Plan").  Although the COVID-19 pandemic had only worsened in the interim, the Rush Plan shortens the timelines and severely curtails the time devoted to the most important census operations.  In announcing this new plan, Defendants made no effort to justify their abrupt change of position.  They did not say that the Bureau was wrong about the timing assessments underlying the

COVID-19 Plan. They did not explain why Defendants now believed the Bureau could accomplish an accurate count in half the time (compressing eight and a half months of work into four months), even as the pandemic continued to surge. And they failed to examine many of the key aspects of the problem before them—most obviously, the devastating impact a shortened count would have on the accuracy and reliability of the resulting data.

Indeed, the Rush Plan does not explain the reason for the about-face *at all*. And although it references the December 31, 2020 statutory deadline for providing apportionment counts to the President, that deadline can neither explain nor excuse the Bureau's change of position. Defendants did not rely on that deadline to justify their decision then and cannot, under established principles of administrative law, do so now. In any event, the Bureau had been implementing the COVID-19 Plan for months despite that statutory deadline, and just prior to announcement of the Rush Plan, officials confirmed that it is now impossible to meet that statutory deadline in any event because of delays caused by the pandemic—a tacit acknowledgment that any pre-pandemic statutory timeline must necessarily bow to the constitutional duty to conduct an accurate census.

In fact, the Rush Plan's true motivation has nothing to do with Congress. Just two weeks before the Bureau's August 3 reversal, the President issued a "Memorandum on Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census" (the "Apportionment Exclusion Order"), intended to remove undocumented immigrants from the apportionment counts. The Rush Plan is meant to ensure that President Trump retains control over the final apportionment figures—regardless of the impact on the accuracy of the 2020 Census. The statutory deadline is (at best) pretext.

Defendants' promulgation of the Rush Plan violates the minimum standards of reasoned decisionmaking required by the Administrative Procedure Act ("APA"). And it continues the administration's pattern of acting first (in furtherance of political ends) and explaining later (in furtherance of a post-hoc justification that might hold up in court). *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019) (holding that Secretary Ross's stated rationale for adding citizenship question to 2020 Census was pretextual and violated APA); *Dep't of*

*Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) (holding that agency failed to adequately address the consequences of its rescission of Deferred Action for Childhood Arrivals ("DACA"), in violation of the APA).

Defendants' actions also violate the Constitution. The Enumeration Clause requires that decisions about how to conduct the census bear a "reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census." *Wisconsin v. City of N.Y.*, 517 U.S. 1, 20 (1996). But the decision to cut short the 2020 Census is directly adverse to the core constitutional goal of producing an accurate count, with particularly pronounced effects among communities of color and other harder-to-count groups. While the Bureau has considerable latitude in determining how to conduct the census, that discretion does not extend to taking actions directly contrary to an accurate count—and contrary to its own admissions of what is required for that accurate count.

Preliminary relief is necessary to prevent irreparable harm caused by the Rush Plan. Absent a stay of the Rush Plan, and an injunction preventing Defendants from finding another way to shorten the preexisting timelines for the 2020 Census under the COVID-19 Plan, Plaintiffs will suffer constitutional harm—by definition irreparable—due to the loss of political representation. They will lose out on federal funding tied to census data. They will be forced to expend additional, unrecoverable resources trying to ensure that their residents and members are counted. And Plaintiffs' core activities and programs—many of which depend on accurate census data to be successful—will be harmed for the next decade.

## II. BACKGROUND

### A. After Years of Analysis, the Census Bureau Promulgated the 2018 Operational Plan

The Constitution imposes "the responsibility to conduct an 'actual Enumeration' of the American public every 10 years, with the primary purpose of providing a basis for apportioning political representation among the States." *Wisconsin*, 517 U.S. at 24. The census's principal constitutional purpose is political apportionment, but its importance extends far beyond that use. Census data is the "linchpin of the federal statistical system." *Dep't of Commerce v. U.S. House*

*of Reps.*, 525 U.S. 316, 341 (1999) (citation omitted).  It is key to the redistricting process at the state and local level, to allocating trillions of dollars in federal grants and programs that provide basic support to communities nationwide, and to the decision-making of local governments, businesses, and non-profit organizations that rely on accurate census data to conduct their activities.  *See, e.g.*, Ex. 5 at 5 (2018 Operational Plan, Version 4.0); Thompson Decl. ¶ 4.[1]

Congress has delegated its constitutional responsibility to conduct an "actual enumeration" to the Secretary of Commerce, who in turn oversees the Census Bureau in conducting the decennial census. 13 U.S.C. §§ 2, 4, 21, 141(a).  The Bureau has stated that its goal for the 2020 Census is to "count everyone once, only once, and in the right place."  Ex. 5 at 5.  Accomplishing that enormous task for a population exceeding 300 million requires years of careful planning, followed by many months of sustained work.  To this end, the Bureau spent most of a decade creating an operational plan to guide the 2020 Census.  The Bureau's subject-matter experts—including survey methodologists, statisticians, demographers, and mathematicians—consulted with outside experts, members of the Census Scientific Advisory Committee and the National Advisory Committee, and a range of stakeholders in formulating its 2020 plans. Ex. 5 at 204.  The Bureau also conducted at least fifteen tests between 2012 and 2018, which it used to further refine its processes.  *Id.* at 31-55.

On December 31, 2018, the Bureau promulgated the final version of its operational plan, which the Bureau called "Version 4.0"  Ex. 5.  The 2018 Operational Plan—together with a series of "detailed operational plans"—comprises the 2020 Census, determining both what needs to be done and how long the Bureau needs to do it.  *See, e.g.*, Ex. 5 at 51-53 (charts of dates for various census operations).  Most important, the Plan included detailed provisions governing

---

[1] Plaintiffs' motion is supported by a trio of experts with the knowledge and experience to analyze the Rush Plan's impact on the 2020 Census.  Mr. John Thompson, a former Director of the Census Bureau who previously oversaw all phases of the 2000 Census, concludes that the Rush Plan will have grave consequences because it sets unreasonable deadlines and will not allow the Bureau to deliver high-quality and accurate results.  Dr. Sunshine Hillygus, who has published extensively on census participation, surveys, and data quality, concludes the Rush Plan will likely exacerbate differential undercounts of hard-to-count populations and lead to inaccuracies in enumeration.  And Dr. Thomas Louis, a former Associate Director for Research and Methodology and Chief Scientist at the Bureau, who is intimately familiar with the statistical processes needed for generating high-quality census data, concludes that the Rush Plan will force the Bureau to cut corners in processing, leading to inaccurate and unreliable census data.

how the Bureau would go about counting individuals and obtaining the necessary information about their characteristics (data collection), and how it would transform that raw data into usable, reliable information (data processing).

### 1. Data collection

The 2018 Operational Plan specified how the Bureau would engage in data collection. The Bureau deploys many methods for data collection, but two are crucial here. The "self-response" method is the primary methodology for the 2020 Census. Heads of households provide their 2020 Census responses directly to the Bureau by mailing back a paper form, filling out an online form, or calling into Bureau telephone hotlines. Ex. 5 at 208. Such responses generate the highest quality data. But self-response has never, by itself, sufficed to count everyone, because many households fail to return mailed forms or to complete online forms. That problem is particularly pronounced in historically hard-to-count populations, including communities of color, young children, non-English speakers, low-income persons, persons experiencing homelessness, undocumented immigrants, and persons with mental and physical disabilities. *Id.* at 202.

According to the 2018 Operational Plan, for the tens of millions of households that do not respond on their own, the Bureau must engage in "non-response follow up" or "NRFU." During this phase, the Bureau sends its employee enumerators directly to housing units so they can attempt to speak with an occupant and obtain information. *See* Ex. 5 at 12; *see also State of N.Y v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 784 (S.D.N.Y. 2018) (noting Bureau's argument that "the non-response followup could cure any diminished self-response"). As the Bureau has explained, the "NRFU Operation is entirely about hard-to-count populations," including people of color, non-English speakers and individuals experiencing homelessness—the same populations that have disproportionately low self-response rates. Ex. 5 at 212; Hillygus Decl. ¶ 19. Under the 2018 Operational Plan, enumerators would generally conduct up to six visits to a household in an attempt to obtain the necessary data—and "cases in hard-to-count areas [could] receive more than six attempts to achieve a consistent response rate for all geographic areas." Ex. 5 at 212.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

If, after several attempts to contact the household, enumerators had not yet succeeded, they could seek to obtain information from a "proxy," such as a neighbor or landlord, able to report on the status of the household and its members. *State of N.Y. v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 521 (S.D.N.Y. 2019), *aff'd in part, rev'd in part by* 139 S. Ct. 2551 (2019); Ex. 5 at 129. Similarly, if the Bureau had high-quality administrative records for a housing unit, enumerators could—after an initial contact attempt—use those records to fill in responses for that unit. Ex. 5 at 129. But use of proxies and many administrative records are less accurate than direct contact between enumerators and households. Hillygus Decl. ¶¶ 21-29. And both tend to increase disparities in the count—*e.g.*, undocumented immigrants and persons of color are significantly less likely to have accurate administrative records. Hillygus Decl. ¶¶ 22-23.

If enumerators were unable to obtain the necessary information during their (at least) six visits, and high-quality administrative records and proxies were not available, the 2018 Operational Plan stated that the Bureau would resort to "imputation": essentially, assuming that a household's characteristics are the same as those of nearby households. Thompson Decl. ¶ 20d; *State of N.Y.*, 351 F. Supp. 3d at 521 ("In other words, the Census Bureau will use a formula to extrapolate what it does not know about the population from what it already knows."). Imputation is less accurate than other methods, since it depends on making assumptions—and becomes even less so the more widely it is used, since the "average" data used to fill in blanks will be based on a diminishing sample size. Louis Decl. ¶ 22 ("[T]he less data the Bureau has about housing units in a given geography, the more difficult it becomes for the Bureau to correctly impute households."); Hillygus Decl. ¶¶ 34-37. Thus, the 2018 Operational Plan called for using these alternative methods, including imputation, selectively and only after direct contact has failed.

During the non-response follow up period, the Bureau also engages in other vital operations, such as following up with self-responders who failed to enter certain information and correcting information that was reported erroneously. Ex. 5 at 123. And the Bureau engages in "Self-Response Quality Assurance" by re-collecting some census responses to ensure that the original submissions were accurate (thus protecting against enumerators falsifying information).

*Id.* In all, the 2018 Operational Plan specified that the Bureau would require eleven and a half weeks for the various aspects of non-response follow up. Ex. 15 at 43-44 (2020 Detailed Operational Plan For Nonresponse Followup, Version 2.0).

### 2. Data processing

The 2018 Operational Plan also detailed how the Bureau would engage in data processing. Once the raw data is collected, it must be processed in order to be usable. *See* Louis Decl. ¶¶ 15, 25-28. Experts at the Bureau must perform a wide variety of operations designed to transform written responses into computer-readable code, weed out redundant data, detect and fix over- or under-counts among groups, and generally identify errors, check for accuracy, and ensure that the data collected rises to the quality level of useful information that can reliably form the basis of apportionment, redistricting, and a host of federal, state, municipal, and private activities. *Id.* As just one example, once outlier data is identified, Bureau staff must devote time and resources to determining whether it is idiosyncratic or a marker for a more general problem, decide if it can be fixed or the data adjusted, and then revisit the resulting data looking for new and additional issues. *Id.* ¶ 28. The 2018 Operational Plan afforded the Bureau five months to process data for congressional reapportionment, and an additional three months to process census data for redistricting. And, in accordance with statutory deadlines set out in the Census Act, the Bureau planned to report apportionment data to the President by December 31, 2020, and redistricting data to the states by April 1, 2021. Ex. 5 at 9; *see* 13 U.S.C. § 141 (designating December 31, 2020, nine months after "the census day" of April 1, 2020, as the date to report apportionment data to the President, and April 31, 2021, as the date to report redistricting data).

### B. In Response to the Pandemic, the Bureau Issued the COVID-19 Plan

On March 10, 2020, in accordance with the 2018 Operational Plan, the Bureau began to accept self-responses on its website. *See* Mike Schneider, *Census Bureau Site Goes Live As Counting Begins in Earnest* (Mar. 10, 2020).[2] Then, the COVID-19 pandemic surged and lockdowns became nearly universal. The Bureau was forced to confront the fact that the 2020 Census could not proceed as usual. On March 18, the Bureau announced it would suspend all

---

[2] https://apnews.com/3fc59096ab138fdd4795386a2987c573.

field operations for two weeks to "protect the health and safety of the American public." Press Release, U.S. Census Bureau Director Steven Dillingham on Operational Updates, Release No. CB20-RTQ.08 (Mar. 18, 2020).[3] That suspension was extended for an additional two weeks. Press Release, Census Bureau Update on 2020 Field Operations, Release No. CB20-RTQ.14 (Mar. 28, 2020).[4] During these suspensions, the Bureau halted all training and hiring of the hundreds of thousands of enumerators it needed to conduct non-response follow up, froze all background checks and fingerprinting required for hiring, and decreased office staff at regional centers responsible for processing mail-in self-response forms and the Bureau's call centers. *See* Michael Wines, *It's the Official Start to the 2020 Census. But No One Counted on a Pandemic*, N.Y. Times (Apr. 3, 2020).[5] The Bureau was also unable to conduct other crucial operations such as counting individuals experiencing homelessness, and delivering self-response forms to remote communities. *See* Ex. 12 at 2 (August 17 Review of Operational Plan).

On April 13, 2020, Director Dillingham and Secretary Ross amended the 2018 Operational Plan to "[e]nsure a complete and accurate count of all communities," "[p]rotect the health and safety of the American public and Census Bureau employees," and "[i]mplement guidance from federal, state, and local authorities regarding COVID-19." Ex. 3 at 1 (April 13 COVID-19 Plan Statement); Ex. 4 at 1 (COVID-19 Plan Operational Adjustments Timeline). The amended plan shifted the timeline for data-collection and data-processing operations, to account for the delays caused by the pandemic. Under that COVID-19 Plan, the Bureau did not shorten any of those operations; it merely moved the timeline for their accomplishment deeper into the year in light of the pandemic.

For instance, the deadline for self-response, which was originally set to close July 31, 2020, was changed to allow private households to submit data until October 31. Ex. 4 at 1. Non-response follow up—originally set to begin May 13, 2020 and conclude July 31—was

---

[3] https://www.census.gov/newsroom/press-releases/2020/operational-update.html.

[4] https://www.census.gov/newsroom/press-releases/2020/update-on-2020-census-field-operations.html.

[5] https://www.nytimes.com/article/census-2020.html.

shifted to begin on August 11 and conclude October 31.  Ex. 4 at 2.  This change preserved the same total time for the crucial non-response follow up process.  Ex. 7 at 2-6 (June 2020 GAO Census Report) (detailing changes).

In fact, the timelines in the COVID-19 Plan differed from those in the 2018 Operational Plan in only one material respect: The Bureau granted itself an additional month to process data for apportionment (six months rather than five), recognizing the difficulties that the pandemic had introduced.  Ex. 4 at 3; Hillygus Decl. ¶¶ 16-17 (detailing difficulties introduced by COVID-19).  To that end, the COVID-19 Plan gave the Bureau until April 2021 to report state-populations to the President.  *See* Ex. 4 at 2 (stating that under "New Schedule" the Bureau will deliver apportionment counts to the President "by April 30, 2021").  The following chart summarizes the timeline shifts in the COVID-19 Plan:



Because this new timeline necessarily extended into 2021, Secretary Ross and Director Dillingham requested that Congress formally extend the December 31, 2020 statutory deadline for reporting the state-populations to the President, and the March 30, 2021 statutory deadline for delivering redistricting data to the states.  The President publicly took the position that an extension of the statutory deadlines was appropriate, but not necessary, for the Bureau to shift its operational and data-delivery timelines.  *See* Hansi Lo Wang, *Trump Officials Ask To Delay*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Census Data For Voting Districts, House Seats*, NPR (Apr. 13, 2020).[6]  In the President's words: "I don't know that you even have to ask them [Congress].  This is called an act of God. . . . They have to give it.  I think 120 days isn't nearly enough."  *Id.*

Without awaiting any action from Congress, the Bureau immediately began implementing the COVID-19 Plan, and continued to do so through the end of July.  For instance, the Bureau did not undertake any non-response follow-up in most of the country between May 13 and July 31, the original timeframe in the 2018 Operational Plan.  Ex. 4 at 3.  Instead, the Bureau "soft-launched" door-knocking in a few regions in mid-July, and did not even plan to begin door-knocking across most of the country until August 9, 2020.  Press Release, U.S. Census Bureau, *Door-to-Door Visits Begin Nationwide for 2020 Census* (Aug. 11, 2020).[7]  The Bureau continually communicated to the public and local partners that self-responses would be accepted until October 31, and non-response follow up would continue until at least that date.  Ex. 3 at 2; Ex. 4 at 1-2.

Meanwhile, top Bureau officials repeatedly recognized that meeting the original deadlines set out in the 2018 Operational Plan—including the December 31 statutory deadline—would be impossible.  In late May, Tim Olson, head of field operations for the 2020 Census, stated "[w]e have passed the point where we could even meet the current legislative requirement of December 31.  We can't do that anymore."  Nat'l Conf. of Am. Indians, 2020 Census Webinar: American Indian/Alaska Native, YouTube (May 26, 2020).[8]  Similarly, on July 8, Al Fontenot, Jr., another top Bureau official, affirmed that the Bureau is "past the window of being able to get" accurate counts to the President by December 31, 2020.  U.S. Census Bureau, Operational Press Briefing – 2020 Census Update at 21 (July 8, 2020).[9]  Relying on these

---

[6] https://www.npr.org/2020/04/13/833546675/trump-officials-ask-to-delay-census-data-for-voting-districts-house-seats.

[7] https://www.census.gov/newsroom/press-releases/2020/door-to-door-visits-begin-nationwide.html.

[8] https://www.youtube.com/watch?v=F6IyJMtDDgY.

[9] https://www.census.gov/content/dam/Census/newsroom/press-kits/2020/news-briefing-program-transcript-july8.pdf.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

statements—and the Bureau's actions—Plaintiffs publicized the changes to the plan deadlines, letting constituents and members know that households had until October 31, 2020 to self-respond. *See, e.g.*, Gyamfi Decl. ¶¶ 12-13; Green Decl. ¶ 14; Briggs Decl. ¶¶ 12-14; Stewart Decl. ¶ 11; M. Garcia Decl. ¶ 14.

### C. Defendants Blindside Everyone with the Rush Plan

On July 21, while the Bureau was well into the implementation of its COVID-19 Plan, President Trump issued a Presidential Memorandum, declaring that it was the administration's policy to remove undocumented persons from the apportionment count, and ordering Secretary Ross to estimate the number of undocumented persons in the United States when reporting total population counts to the President for purposes of apportionment. Memorandum on Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census, (the "Apportionment Exclusion Order").

The first suggestion that Defendants would depart from the COVID-19 Plan came just nine days later, when the Bureau removed notifications on its website that non-responsive households would have until October 31 to respond, and that it would engage in non-response follow up until that date. *Cf.* Ex. 8 (July 30 Operational Adjustments Timeline), *with* Ex. 9 (July 31 Operational Adjustments Timeline).

The following Monday, on August 3, 2020, Defendants abandoned the COVID-19 Plan and announced the Rush Plan, with dramatically shortened timelines for multiple operations. *See* Ex. 1 (August 3 Rush Plan Statement). The Rush Plan took the form of a statement from Director Dillingham, and called for the Bureau to complete eight and a half months of data collection and data processing in half the time. The Rush Plan shortens the time under which households are entitled to self-respond by a full month, providing that mail-in responses postmarked after September 30—which previously would have been timely until the October 31 deadline—will no longer be counted. *Id.* The Rush Plan similarly shortens the period for non-response follow up from October 31 to September 30, despite the fact that enumerators did not begin knocking on doors in most communities until early August. Ex. 2 at 3 (Rush Plan Operational Timeline). And the Rush Plan shortens the data-processing time to three months—

two months less than the Bureau deemed necessary under the COVID-19 Plan and a month less than the Bureau had deemed necessary even under the 2018 Operational Plan. *Id.; supra* at 8-9. In its later elaborations on the Rush Plan, the Bureau has appeared to entirely omit several data-processing operations that it had previously determined were necessary to ensure an accurate census. Louis Decl. ¶¶ 30-34. The Rush Plan ultimately calls for the Bureau to complete data collection and data processing by December 31, 2020—four months earlier than the COVID-19 Plan, and in time to guarantee President Trump receives the reapportionment data. Ex. 1.

Director Dillingham's three-page statement did not explain why Defendants decided to suddenly abandon the COVID-19 Plan; why the Bureau no longer believed the timelines set out in the COVID-19 Plan (which preserved, for each operation, at least the amount of time called for in the 2018 Operational Plan) were necessary to ensure an accurate count; or how, if at all, the Bureau intends to communicate those shortened deadlines to private households. And although the Rush Plan alluded to the December 31 statutory deadline for delivering apportionment counts to the President, Director Dillingham's statement did not explain why the Bureau now believed that an accurate count could be accomplished by that date—or why the previous statements by officials throughout the summer saying the exact opposite were wrong. *Id.*

The sudden decision to scrap the COVID-19 Plan and issue the Rush Plan surprised Bureau officials as well as the public. An official at the Government Accountability Office (GAO) confirmed that Bureau officials were given "hours rather than days or weeks" to adjust their plans and prepare to finish data-collection by September. Hansi Lo Wang, *'Not Enough Time': Census Workers Fear Rushing Count Could Botch Results*, NPR (Aug. 11, 2020).[10] Four former Census Bureau Directors—who had publicly endorsed the COVID-19 Plan—issued a statement saying that failing to extend census operations through April 30, 2021 "will result in seriously incomplete enumerations in many areas across our country." Press Release, Former Census Bureau Directors,

---

[10] https://www.npr.org/2020/08/11/901202892/not-enough-time-census-workers-fear-rushing-count-could-botch-results.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NO. 5:20-cv-05799-LHK
MOTION FOR STAY AND PRELIMINARY INJUNCTION

*On the Importance of Extending the 2020 Census Statutory Deadlines to Achieve a Fair and Accurate Enumeration of the United States* (Aug. 4, 2020).[11]  These former Directors further asserted that the end result of the shortening "will be under-representation of those persons that NRFU was expected to reach, and at even greater rates for traditionally hard-to-count populations and over-representation of all other populations with potentially extreme differential undercounts." *Id.*  Even the Bureau's own field workers confirmed the Rush Plan's disastrous nature, with one current census supervisor stating "[t]here's just not enough time to do all the work that needs to be done," while another asked, "'Are we working on the same team?" because "[i]t does not feel like we have the same mission in mind.  We're trying to get a complete count.  I'm not sure everyone on the team has the same mission."  Hansi Lo Wang, *'Not Enough Time': Census Workers Fear Rushing Count Could Botch Results*, NPR (Aug. 11, 2020).[12]

The Bureau's decision shocked Congress as well, which opened multiple investigations into Defendants' decision and referred the matter to the Department of Commerce's Inspector General.  *See* Ex. 11 (August 10 Referral to Office of Inspector General).  The President of the American Statistical Association, a coalition of prominent businesses, a group of 450 nonpartisan philanthropic organizations, and prominent civil-rights groups similarly condemned the plan.[13]

## III.     LEGAL STANDARD

Plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction would be in the public interest.

---

[11] https://www.documentcloud.org/documents/7013550-Aug-4-2020-Statement-By-Former-U-S-Census-Bureau.html.

[12] https://www.npr.org/2020/08/11/901202892/not-enough-time-census-workers-fear-rushing-count-could-botch-results.

[13] *See* Hansi Lo Wang (@hansilowang), Twitter (Aug. 5, 2020), https://twitter.com/hansilowang/status/1291198017882796034 ("There is no scientific rationale to curtail the data-collection period for this constitutionally mandated activity, and the premature cessation of census enumeration will produce flawed counts."); Letter from U.S. Philanthropy Leaders to Sec'y Ross & Dir. Dillingham (Aug. 5, 2020), https://funderscommittee.org/wp-content/uploads/2020/08/Letter-Philanthropic-Leaders-on-Census-Being-Cut-Short-8-5.pdf; Press Release, Leadership Conf. on Civ. & Human Rights, Trump Plans to Sabotage 2020 Census by Cutting Short Operations (July 31, 2020), https://civilrights.org/2020/07/31/trump-plans-to-sabotage-2020-census-by-cutting-short-operations/.

*See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Am. Trucking Ass'n, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). The Ninth Circuit uses a "sliding scale" approach, under which "a stronger showing of one element may offset a weaker showing of another." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (citation omitted). Thus, if Plaintiffs establish irreparable harm and the "balance of hardships tips *sharply* in [their] favor," they need "only show that there are 'serious questions going to the merits.'" *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (citation omitted); *see also All. for Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131 (9th Cir. 2011) ("a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits"). The "factors considered" when determining whether to issue a stay of agency action under the APA "substantially overlap with the *Winter* factors for a preliminary injunction." *City of S.F. v. U.S. Citizenship & Immigration Servs.*, 408 F. Supp. 3d 1057, 1078 (N.D. Cal. 2019); *see* 5 U.S.C. § 705.

## IV.    DISCUSSION

### A.    Plaintiffs are Likely to Succeed on the Merits

#### 1.    The Rush Plan is a final agency action that violates the APA

The Administrative Procedure Act requires courts to set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under that standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). And in evaluating an agency's rationale for its actions, courts will "[c]onsider[] only contemporaneous explanations." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020). An agency's change in policy may be "arbitrary and capricious" when it "rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015). Relatedly, agency action is necessarily arbitrary and capricious if the agency "entirely failed to

consider an important aspect of the problem." *Id.* And, in order to permit effective judicial review, an agency "must 'disclose the basis' of its action." *Dep't of Commerce*, 139 S. Ct. at 2573. When an agency offers an explanation that is "contrived" or pretextual, that explanation cannot justify the agency's action. *Id.* at 2575.

The Rush Plan violates the APA in all of these respects. Defendants failed to provide any contemporaneous explanation why this shortened timeline was necessary, or how the new timeline could possibly produce an accurate count—particularly given the Bureau's previous findings that more time was required due to the (still surging) pandemic. Defendants failed to consider key aspects of the problem, including how the revised timeline could feasibly produce anything close to an accurate count given current conditions as well as the public's reliance on the previously announced deadlines. And any post-hoc attempt to use the statutory deadline as a cover for these patent failures would be pretextual and unjustified in its own right. There is every reason to think that the Rush Plan was designed to ensure that apportionment data is presented to the President Trump while he remains in office, so that *this* administration—not a potential successor—can carry out the Apportionment Exclusion Order. The Rush Plan's many failures fall far short of what the APA demands.

### a. The Rush Plan is final agency action

For an agency action to be "final" under the APA, it must mark the "consummation of the agency's decisionmaking process" and be one "by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). The Rush Plan satisfies both requirements. *See New York*, 351 F. Supp. 3d at 645 (noting government's concession that adding citizenship question to census was final agency action).

The Rush Plan had every indicia of finality. It made clear that the dates outlined in the COVID-19 Plan would no longer be followed; that it was "announcing updates to our plan"; and that the "Census Bureau's new plan" would now govern. Ex. 1 at 1; *see Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 985 (9th Cir. 2006) ("It is the effect of the action and not its label that must be considered," and finality must thus "be interpreted 'in a pragmatic way.'"

(citations omitted)).  The Rush Plan also directly affected rights and obligations.  It changed the deadline for self-responses, such that persons who previously had until October 31, 2020 to submit their responses would now have only until September 30, 2020.  *See id.* at 987 (it is enough that agency action "fix *some* legal relationship as a consummation of the administrative process" (citation omitted)).  And the legal consequences of a truncated census count (as detailed throughout this motion) are hard to overstate: the census results will affect apportionment, funding, and myriad other critical decisions for the next decade.  *See supra* at 3-4.

### b. Defendants failed to adequately explain why the census should be shortened

Neither the Rush Plan nor any other contemporaneous document explains why the Bureau suddenly saw fit to cut the count short.  The Court can search the Rush Plan, and the Director's contemporaneous statement, in vain for an explanation—there is none.  In short, Defendants completely failed to articulate "a rational connection between the facts found and the choice made."  *Dep't of Commerce,* 139 S. Ct. at 2569 (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43); *see also Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv.*, 629 F.3d 1024, 1037 (9th Cir. 2010) (holding that agency action approving building of water structures violated APA, where "the key question—whether water structures were necessary at all—remains entirely unanswered and unexplained by the record").

These explanatory failures are particularly egregious because of what came before.  Agencies may change their policy positions, but they must give a reasoned explanation for doing so, and that means the agency must "'display awareness that it is changing position' . . . and 'show that there are good reasons for the new policy.'"  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)); *see also Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015) (vacating agency action that "rest[ed] upon factual findings that contradict those which underlay its prior policy," and where agency failed to "provide a 'reasoned explanation for disregarding' the 'facts and circumstances' that underlay its previous decision" (ellipsis omitted) (quoting *FCC*, 556 U.S. at 516).  As the Supreme Court and the Ninth Circuit have repeatedly

held, failure to do so renders the agency action arbitrary and capricious.  *See Encino Motorcars*,

136 S. Ct. at 2127 (agency action was arbitrary and capricious for failure to explain change of

position); *Motor Vehicle Mfrs.*, 463 U.S. at 42-43 (same); *Organized Vill. of Kake*, 795 F.3d at

968 (same).   In *Humane Society v. Locke*, for example, an agency had previously found that a

plan permitting fisheries to take certain fish species would have "minimal adverse effects" on the

listed species, while later finding that sea lions responsible for comparable mortality would have

a "significant negative impact."  626 F.3d 1040, 1049-50 (9th Cir. 2010).  Because the agency

had not "offered a rationale to explain the disparate findings," the Ninth Circuit held the agency

action must be vacated.  *Id.* at 1050; *see also, e.g.*, *Organized Vill. of Kake*, 795 F.3d at 968

(vacating agency action).

Here, the Bureau failed to even acknowledge that the Rush Plan contradicts the prior

findings and conclusions reached in the COVID-19 Plan—and in the 2018 Operational Plan.

Just four months earlier, the Bureau had found that a significant delay (and corresponding

extension) in census operations was necessary to "[e]nsure a complete and accurate count of all

communities." Ex. 3 at 1.  That decision was based on nearly a decade of analysis, testing, and

data that went into the 2018 Operational Plan's findings about how long each census operation

would need to produce an accurate count.  The Rush Plan ignores all of that.  It fails to explain

how multiple operations of the 2020 Census can now be accomplished in significantly less time

than called for in both the COVID-19 Plan *and* the 2018 Operational Plan—despite additional

complications caused by the pandemic.  Specifically, it does not explain how a non-response

follow up operation that the Bureau previously determined would require three months can now

be accomplished in two; or why complex data processing that the Bureau previously found

would require six months can now be completed in only three.[14]  And it does not explain how a

_____

[14] Court filings, too, emphasize the change in the government's position.  In cases earlier this
year, the Department of Justice extolled the Bureau's plan to "send an enumerator to [a non-
responsive] housing unit again up to six times"; its intention to deploy "somewhere between
320,000 and 500,000 enumerators" to conduct such visits; and its "ability to be flexible and
devote resources where needed" in response to "unforeseen disruptions."  Bureau's Opp. to Pls.'
Prelim.-Inj. Mot. at 4-6, *NAACP v. Bureau of the Census*, No. 8:18-cv-00891 (D. Md. Feb. 11,
2020), ECF No. 170.  Indeed, it promised that the Bureau's count would be accurate precisely

timeline that census officials, employees, nonpartisan experts, former Census Directors, and even the President deemed impossible just weeks prior suddenly became possible. *See supra* at 10-11.

Since then, Defendants have attempted to backfill these critical missing pieces of the administrative record. On August 17, 2020, the Bureau released a 19-slide Powerpoint purporting to provide more detail on its plans. Ex. 12. But that post-hoc explanation *cannot* cure the Rush Plan's failures. *See Dep't of Homeland Sec.*, 140 S. Ct. at 1909 (explanation must be contemporaneous). Nor does it. The slideshow still fails to explain why Defendants changed their position, to address prior contrary findings, or to even offer non-fanciful proposals as to how the count could be accurately completed on the Rush Plan's timelines.

In the end, Defendants have failed to offer any adequate explanation for changing their as to how long each operation of the 2020 Census would take and whether delay due to the current health crisis is necessary. That alone renders the Rush Plan unlawful.

**c.** **Defendants failed to consider important aspects of the problem**

Relatedly, Defendants also failed to consider important aspects of the problem. Specifically, the agency failed to consider two key issues: (1) how, exactly, it plans to accomplish an accurate count on such an abbreviated timeline, and (2) the public's reliance interests.

*First*, the Bureau wholly failed to consider the Rush Plan's feasibility in light of the exceptional circumstances at hand.

Let's start with staffing. More staff will certainly be required to complete the non-response follow up process in the shortened time period. Thompson Decl. ¶ 19. When non-response follow up began across the country on August 9, nearly 37% of households had not yet responded and thus needed to be contacted by enumerators. Ex. 2 at 2; U.S. Census Bureau,

---

*because* it "plans to deploy the number of enumerators needed to complete the NRFU workload." *Id.* at 13. Yet the Rush Plan dramatically shortened the timeline for that admittedly crucial operation, even while the Bureau lacked anywhere near the number of enumerators it previously promised to employ. *Compare* Ex. 5 at 25 (hiring 516,000 enumerations under 2018 Operational Plan), *with* Ex. 13 at 2 (August 18 Letter from Office of Inspector General) (220,000 enumerators trained and ready to start working).

*Response Rates* (select August 9, 2020).[15]  The 2018 Operational Plan had called for the Bureau to spend eleven and a half weeks canvassing a non-response follow-up universe comprised of as much as 39.5% of all households nationally—timelines preserved in the COVID-19 Plan.  Ex. 5 at 132.  The Rush Plan thus requires completing nearly the same amount of work in just 65% of the scheduled time.

Yet the Rush Plan calls for the Bureau to maintain staffing at levels determined before the pandemic—and staffing at the time the Rush Plan was promulgated (and now) remains well below even those levels.  *Id.*; Thompson Decl. ¶ 20.  As of the week of August 18, the Bureau was 80,000 enumerators below its target, with only 73% of needed staff.  *See* Gregory Wallace, *Watchdog Warns of Census Worker Shortage As Deadline Approaches*, CNN (Aug. 21, 2020)[16]; Ex. 13 (as of August 18, 2020 Bureau has only 73% of needed field staff).  That is unsurprising since, as one official explained, "[a]bout a third of our [enumerator] applicants are older persons considered at high risk of the virus."[17]  Director Dillingham himself admitted just days before instituting the Rush Plan that "the pandemic is estimated to increase the number of no shows to training sessions, as well as the number of employees who complete training but decline to show up for work."  *Id.*

And while the Rush Plan states that the Bureau will "conduct additional training sessions and provide awards to enumerators" for working extra hours, Ex. 1 at 1, it gives no hint as to how offering "awards" will allow a huge influx of enumerators to be hired, undergo background checks, receive government-issued iPhones, complete training, and accomplish their work—all

---

[15] https://2020census.gov/en/response-rates.html (last visited Aug. 24, 2020).

[16] https://www.cnn.com/2020/08/21/politics/census-worker-shortage/index.html (80,000 enumerators short on August 21).

[17] *See* Census Bureau, Operational Press Briefing – 2020 Census Update at 13 (July 8, 2020), https://www.census.gov/content/dam/Census/newsroom/press-kits/2020/news-briefing-program-transcript-july8.pdf; *see also* Mike Schneider, *Census Bureau Drop-Outs Complicate Door-Knocking Efforts*, Associated Press (Aug. 8, 2020), https://www.usnews.com/news/us/articles/2020-08-08/census-bureau-drop-outs-complicate-door-knocking-efforts (Bureau's Assistant Director for Decennial Programs confirming, in early August, that potential enumerators were "a little hesitant because of the COVID environment.").

1    before September 30, 2020.  *See* Thompson Decl. ¶ 20; Hillygus Decl. ¶ 16 (at 12).[18]  This

2    failure "to consider an important aspect of the problem"—for one of the very few specific

3    initiatives offered as to how the Bureau will meet its shortened timelines—is just one example of

4    why the Plan is unlawful.  *Motor Vehicle Mfrs.*, 463 U.S. at 43.

5         But this is not the Rush Plan's only failing.  The reduced staff combined with the

6    shortened schedule will result in a higher level of proxy enumerations, increased reliance on

7    administrative records, and an increased use of imputation—all of which are less reliable than in-

8    person enumerations.  Thompson Decl. ¶¶ 19, 21.  This, in turn, leads to problems with data

9    processing, which will be exacerbated by the shortened processing timeline.  Under ordinary

10   circumstances, a massive expenditure of time and effort is required to render the raw data fit for

11   use.  Louis Decl. ¶¶ 13-16.  But incomplete or substandard data *collection* increases the need to

12   impute missing values in the data, and check for and correct errors—thus requiring more time,

13   not to mention staffing—for data *processing*.  Louis Decl. ¶¶ 25-29.  The Rush Plan does the

14   opposite, cutting the time for data processing nearly in half.  All of these issues are likely to

15   result in reduced quality in the census data and less accurate results.   Louis Decl. ¶¶ 1, 3.  And,

16   again, Defendants have utterly failed to consider these critical aspects of the new policy

17   articulated in the Rush Plan, to address the impact of shortened data collection on the necessary

18   time required for data processing, or to articulate how the Rush Plan compensates for these

19   issues.

20        These flaws likely stem from other inadequacies in the truncated decisionmaking process.

21   As GAO recently noted, Bureau officials had been "given 'hours rather than days or weeks' to

22   revise their plans to finish counting by the end of September."  Hansi Lo Wang, *'Not Enough*

23   *Time': Census Workers Fear Rushing Count Could Botch Results*, NPR (Aug. 11, 2020) (Chris

24   Mihm, managing director of strategic issues at GAO).  But making a decision first, and

25   considering its impact and how to implement it only later, is the antithesis of "[r]easoned

26   _____

27   [18] Difficulties in training new hires are also more than theoretical.  One census field supervisor
     working in the mid-Atlantic told NPR that, given the rushed timeline and lack of sufficient
     staff, "[w]e're just sending bodies out regardless of whether they're ready or not."  Hansi Lo
28   Wang, *'Not Enough Time': Census Workers Fear Rushing Count Could Botch Results*, NPR
     (Aug. 11, 2020).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

decisionmaking under the Administrative Procedure Act." *Dep't of Commerce*, 139 S. Ct. at 2576; *see Int'l Snowmobile Mfrs. Ass'n v. Norton*, 304 F. Supp. 2d 1278, 1292 (D. Wyo. 2004) ("The rushed nature of the [agency's] actions indicates both a violation of the NEPA process and an arbitrary and capricious, predetermined decision on the part of the [agency] . . . .").

*Second*, the Rush Plan fails to acknowledge or take into account the public's reliance on the timeline set out in the COVID-19 Plan. When an agency's prior policy has engendered "serious reliance interests," an agency would be "arbitrary or capricious to ignore such matters" and must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC*, 556 U.S. at 515-16. Here, the Bureau had publicized for months that non-response follow up and the self-response period would continue until October 31, 2020—promises that remained on the Bureau's website as late as July 30, 2020. Households across the United States had been told that they could return their census responses throughout October. And Plaintiffs too—along with many other local governments and non-profit organizations—relied on the COVID-19 Plan's timeline in structuring their efforts to increase response rates, to inform their members and residents of key dates, and to ensure that all individuals were counted. *See infra* at 31. Yet the Rush Plan nowhere mentions, much less "provides a . . . detailed justification" for contravening, these "serious reliance interests." *Id.*

Just this year, in ruling on the administration's rescission of DACA, the Supreme Court emphasized that an agency's failure to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns" justified vacatur of the agency decision. *Dep't of Homeland Sec.*, 140 S. Ct. at 1915. So too here: If Defendants had weighed reliance interests against competing policy concerns, they might have altered their decision to cut short the COVID-19 Plan in whole or in part.

> **d. The December 31, 2020 deadline does not justify the Rush Plan, and any reliance on that deadline is pretextual**

As explained, Defendants failed to provide any contemporaneous explanation as to why they departed from the COVID-19 Plan or otherwise decided to cut short the 2020 Census. The Rush Plan does, however, briefly mention the Census Act's statutory deadline of December 31,

2020 to deliver apportionment counts to the President.  To the extent Defendants seek to justify their actions based on that deadline, that attempt must fail for multiple reasons.

*First*, Defendants did not justify their decision on the basis of the December 31 deadline.  That by itself should end the matter: "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to the 'the grounds that the agency invoked when it took the action.'"  *Dep't of Homeland Sec.*, 140 S. Ct. at 1907 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)).

*Second*, even if Defendants *had* articulated the December 31 deadline as a reason for changing course, that explanation would not withstand scrutiny.  Defendants were fully aware of the statutory deadline when they adopted the COVID-19 Plan on April 13, 2020—yet that plan expressly called for data collection to continue through October 31, 2020, and data processing to continue through April 2021.  To be sure, Defendants also requested that Congress extend the statutory deadline.  *See* Ex. 3 at 2.  But the COVID-19 Plan nowhere stated that its revised timelines would apply only if that extension were granted.  The President himself took the position that such a request was unnecessary.  *Supra* at 10.  And Defendants immediately proceeded to implement the COVID-19 Plan, and continued to do so for nearly four months, from April 13 to August 3, 2020.  In short, the statutory deadline did not stop the Bureau in April, May, June, or July—and it cannot justify Defendants' sudden change of position in August.

*Third*, the constitutional interest in accuracy outweighs any (post-hoc) interest in complying with the statutory deadline.  As explained below, *infra* at 25-26, Congress (and, by delegation, Defendants) have a constitutional duty to conduct an accurate enumeration.  Congress plainly could not enact a statute giving the Bureau only a single week to conduct the census.  In the extraordinary circumstances of the COVID-19 pandemic, enforcing the December 31 deadline is similarly unconstitutional and would contravene the "strong constitutional interest in accuracy," *Utah v. Evans*, 536 U.S. 452, 478 (2002), and the duty to conduct an actual "enumeration[] of the population, keeping in mind the constitutional purpose of the census," *Wisconsin*, 517 U.S. at 20.  That is especially true because the Bureau had already suspended

census operations for months under the COVID-19 Plan, and Bureau officials had *already* made clear that it would be impossible to both conduct an accurate census and meet the December 31 deadline. *See supra* at 10-11. In short, when a statutory deadline conflicts with a constitutional duty, the Constitution prevails. *See, e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 797-98 (1992); *Carey v. Klutznick*, 637 F.2d 834, 837-38 (2d Cir. 1980); *Ga. Coal. for Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1445 (S.D. Ga.) (enjoining voter-registration deadline based on claims that its application in the midst of hurricane evacuations violated First and Fourteenth Amendments).

Even in less exceptional circumstances, the Second Circuit has upheld a preliminary injunction that might have caused the Census Bureau to miss the December 31 deadline, explaining that "[w]e see nothing sacred in the due date of the filing, especially when the work of the Census Bureau, at least as preliminarily demonstrated below, is incomplete." *Klutznick*, 637 F.2d at 837-38. The Supreme Court has similarly held that the data presented to the President remains subject to correction until it is reported to Congress, underscoring the non-finality of the December 31 deadline. *Franklin*, 505 U.S. at 797-98. Historically, too, the federal government often took well over a year from Census Day to report apportionment results.[19] This "long and consistent historical practice" underscores that the accuracy of the enumeration is far more important than any particular date. *Dep't of Commerce*, 139 S. Ct. at 2567.

*Fourth*, and at bottom, any reliance by Defendants on the December 31 deadline is pretextual. On July 21, 2020, the President issued the Apportionment Exclusion Order, directing the administration to exclude undocumented immigrants from the apportionment count. Two

---

[19] *See, e.g.*, U.S. Census Bureau, Decennial Census Official Publications, https://www.census.gov/programs-surveys/decennial-census/decade/decennial-publications.1800.html (last visited Aug. 24, 2020) (establishing enumeration for 1800 Census to begin on August 4, 1800); Letter from James Madison, U.S. Sec'y of State, to Thomas Jefferson, President of U.S. (Dec. 8, 1801), https://founders.archives.gov/?q=%22second%20census%22&s=1111311111&sa=&r=10&sr= (reporting totals from 1800 Census on December 8, 1801); U.S. Census Bureau, Decennial Census Official Publications, https://www.census.gov/programs-surveys/decennial-census/decade/ decennial-publications.1810.html (last visited Aug. 24, 2020) (establishing enumeration to begin on August 6, 1810); Letter from James Madison, President of U.S., to U.S. Congress (Nov. 13, 1811), https://founders.archives.gov/documents/Madison/03-04-02-0015 (reporting totals from 1810 Census to Congress based on results received same day from Secretary of State).

weeks later (with no previous indication that the Bureau was considering revising the census timelines), Defendants promulgated the Rush Plan. That timing is telling.

In recent weeks, "it was widely reported in the press that the Trump Administration was looking to rush the 2020 Decennial Census operations in order to allow the Secretary of Commerce to transmit the apportionment counts to the president by December 31, 2020." Ex. 11. Shortening the census timeline ensures that, regardless of the outcome of the November election, this President will have the opportunity to implement his Apportionment Exclusion Order. Delaying reporting until spring—as the COVID-19 Plan did—leaves open the possibility that the President will no longer be in office when data is provided, and thus will be unable to effectuate the Apportionment Exclusion Order. But a desire to effectuate the Apportionment Exclusion Order while a particular president remains in office cannot justify the Rush Plan. It bears no reasonable relationship to the achievement of a fair and accurate Census, and will in fact undermine that goal. Indeed, multiple suits challenging that Exclusion Order have explained that excluding undocumented persons from apportionment counts contravenes constitutional text, structure, and history, and would inflict significant damage on the census. *See, e.g.*, Complaint, *San Jose v. Trump*, No. 5:20-cv-05167 (N.D. Cal. July 27, 2020).

In short, the factual circumstances surrounding adoption of the Rush Plan does not match any belated reliance on the statutory deadline. And this would not be the first time the administration has used a pretextual rationale to support its decisions about the 2020 Census. *See Dep't of Commerce*, 139 S. Ct. at 2575. Beginning in 2017, Secretary Ross attempted to add an untested citizenship question to the 2020 Census, claiming that the question was necessary to better enforce the Voting Rights Act. That decision was litigated and enjoined by three district courts. Ultimately, the Supreme Court found that Defendant Ross's rationale was "contrived" and "incongruent with what the record reveals about the agency's priorities and decision-making process." *Id.* at 2575. Because Secretary Ross's decision "rested on a pretextual basis," the Supreme Court held that it must be set aside. *Id.* at 2573.

Following the Supreme Court's decision, President Trump confirmed the true motivation—and fully justified the Court's holding that Secretary Ross's rationale was

pretextual—when he stated that the administration sought a citizenship question, not to enforce the Voting Rights Act, but "for districting" and "for appropriations." Remarks by President Trump Before Marine One Departure (July 5, 2019).[20] In an attempt to advance his plan notwithstanding the Supreme Court's decision, the President has declared his intention through the Apportionment Exclusion Order to factor citizenship data into apportionment, and Defendants adopted the Rush Plan to enable the President to accomplish that goal. And once again, Defendants have tried to obscure the motivations for their action—this time, by refusing to concede that the Rush Plan was intended to implement the Apportionment Exclusion Order before the end of the President's term in office. That "political chicanery" has no place in the census. *Utah*, 536 U.S. at 500-01 (Thomas, J., concurring and dissenting in part). And the Bureau's pretextual explanation is entitled to no weight under the APA.

### 2. Defendants' decision to dramatically shorten Census timelines violates the Constitution's Enumeration Clause

As the Supreme Court has explained, the Constitution, by requiring an "actual enumeration," evinces "a strong constitutional interest in accuracy." *Utah*, 536 U.S. at 478; *see also Dep't of Commerce*, 139 S. Ct. at 2584 (Breyer, J., concurring in part and dissenting in part) (explaining that accuracy of the enumeration is "the sole constitutional function of the census and a task of great practical importance"). In keeping with that interest, the Enumeration Clause requires that decisions as to how to conduct the census bear a "reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census," which is to fairly and accurately "determine the apportionment of the Representatives among the States." *Wisconsin*, 517 U.S. at 20; *see also Dep't of Commerce,* 139 S. Ct. at 2566. That standard vests considerable discretion in the Bureau to make good-faith decisions as to how to conduct the decennial census. But it does not afford leeway to adopt a plan that will actively undercut an accurate enumeration, and which does not even purport to further the ultimate goal of improving the count.

---

[20] https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-departure-51/.

Public figures and experts have denounced the likely disastrous effects of the Rush Plan. The same four former Census Bureau Directors who endorsed the COVID-19 Plan issued a statement saying that "our expert opinion is that failing to extend the deadlines to April 30, 2021 will result in seriously incomplete enumerations in many areas across our country."[21] The venerable American Statistical Association similarly confirmed there is "no scientific rationale to curtail the data-collection period . . . and the premature cessation of census enumeration will produced flawed counts." Ex. 10 at 2 (Letter From American Statistical Association).

In addition, testimony in this case, including testimony from a former Bureau Director and former Bureau Chief Scientist, make clear that enforcing the Rush Plan will "severely compromise the quality, accuracy, reliability, and indeed the legitimacy of the 2020 Census numbers." Louis Decl. ¶ 1; *see* Thompson Decl. ¶¶ 5, 21-27 (noting that "reducing the time for data collection at this late date will have grave and material consequences for the 2020 Census"); Hillygus Decl. ¶¶ 5, 39-42 (noting that "a reduction in the duration of the NRFU operation is almost certain to increase the number of hard-to-count households that will be inaccurately enumerated"). For example, as of August 21st, the City of Los Angeles's self-response rate was 13.5 percentage points lower than in 2010. M. Garcia Decl. ¶ 8. Texas, too, enters the non-response follow up operation with a self-response rate 6.2 percentage points behind 2010. Hillygus Decl. ¶ 20. The shortened non-response follow up period will fail to cure that disparity, and in fact will exacerbate it. Hillygus Decl. ¶ 20. The shortened timeline will thus create severe undercounts compared to previous censuses, as well as an exacerbated overcount of the White population. *See* Thompson Decl. ¶¶ 20-21; Louis Decl. ¶¶ 13, 39; Hillygus Decl. ¶¶ 12, 20-26, 33-34, 37-39; *see also* M. Garcia Decl. ¶ 8. Moreover, the undercount will disproportionately impact hard-to-count groups, which typically have lower rates of self-response and therefore require more non-response follow-ups. Thompson Decl. ¶¶ 20-21; Hillygus Decl. ¶¶ 12-13, 19-39; Louis Decl. ¶¶ 14, 22-23; *see also* M. Garcia Decl. ¶ 8.

---

[21] Press Release, Former Census Bureau Directors, *On the Importance of Extending the 2020 Census Statutory Deadlines to Achieve a Fair and Accurate Enumeration of the United States* (Aug. 4, 2020), https://www.documentcloud.org/documents/7013550-Aug-4-2020-Statement-By-Former-U-S-Census-Bureau.html.

Lacking time to count households in person, enumerators will have to try to address non-responses using proxies, administrative records, and imputation. These are not only less accurate methods of enumeration, but are particularly inaccurate for hard-to-count groups—exacerbating undercounts and threatening the basic integrity of the census. Thompson Decl. ¶¶ 20-22; Hillygus Decl. ¶¶ 19-39; Louis Decl. ¶¶ 21-23, 35-39. Moreover, the non-response follow up period is also critical in resolving issues that cannot be resolved as well (or at all), in the data processing phase, for example, correcting inaccurate data or incomplete data and resolving duplicated data. Louis Decl. ¶ 24. These errors will be further compounded by a data-processing period that the Rush Plan cuts in half, thus reducing the time in which census officials will be able to check for and correct errors. Louis Decl. ¶¶ 25-40; *see supra* at 9. Nor do the additional details released by the Bureau in its August 17, 2020 PowerPoint give any cause for comfort: Many of the proposals in that PowerPoint were *already* part of earlier plans (and thus cannot remedy shortening the timelines in those plans), and others—such as hiring more enumerators and offering "awards" for extra hours worked, when the Bureau has been unable to retain even the enumerators it has—are plainly unworkable. Thompson Decl. ¶ 20; *see supra* at 19-20. In short, the result of the Rush Plan will be lower-quality data across the board that fails to accurately capture the population of the United States—the entire purpose of census. Louis Decl. ¶¶ 1, 5, 30-40; Thompson Decl. ¶¶ 1, 5, 20-22, 27; Hillygus Decl. ¶¶ 5, 38-42.

These errors will not be run-of-the-mill imperfections; they are likely to have "grave and material consequences" that will "undermin[e] the legitimacy of the count." Thompson Decl. ¶ 5; *see also* Louis Decl. ¶ 3; Hillygus Decl. ¶ 5. By undermining the processes used to assess data quality and ensure reliability, the Rush Plan will also undermine public faith in the legitimacy of the enumeration and resulting political outcomes. Thompson Decl. ¶¶ 5, 23, 25-26; Hillygus Decl. ¶¶ 39-42; Louis Decl. ¶¶ 40-44. What is at stake is not just accuracy for its own sake: the Census underlies our system of political representation. Where integrity is lacking in the enumeration, resulting legislative apportionment and redistricting, which rely on census data, Louis Decl. ¶¶ 41-43; Hillygus Decl. ¶ 40, will also be called into question, further harming the core constitutional interests at stake.

A plan that leads to such outcomes simply cannot be reconciled with the requirements of the Enumeration Clause. And the decision to adopt such a plan certainly cannot be justified as bearing a "reasonable relationship to the accomplishment of an actual enumeration of the population." *Wisconsin,* 517 U.S. at 20. Moreover, Defendants have offered little indication that they have a plan in place to ameliorate these problems, beyond vague blandishments about ensuring an accurate count. That is not enough to satisfy the Constitution, and Plaintiffs will likely prevail on this claim as well.

**B.    Enforcing the Rush Plan During the Pendency of this Lawsuit Would Irreparably Harm Plaintiffs**

Preliminary relief is appropriate because irreparable harm to Plaintiffs "is likely in the absence of" a stay of the Rush Plan. *Winter,* 555 U.S. at 22; *All. for Wild Rockies,* 632 F.3d at 1131; *City of S.F.,* 408 F. Supp. 3d at 1078 (noting that considerations for stay of agency action under the APA "substantially overlap with the *Winter* factors for a preliminary injunction"). Indeed, although the Ninth Circuit requires a plaintiff seeking preliminary relief to show only a "threat of future harm," and does not "require that future harm be shown with certainty before an injunction may issue," *Nat'l Wildlife Fed'n v. Burlington N.R.R., Inc.,* 23 F.3d 1508, 1512 & n.8 (9th Cir. 1994), irreparable harm is all but certain in this case absent preliminary relief. Among other harms, the undercounts caused by the Rush Plan will lead to constitutional harms from lack of representation, decreased federal funding benefitting Plaintiffs, the need for Plaintiffs to expend additional resources in an attempt to minimize undercounts, and damage to Plaintiffs' operations that rely on accurate census data. These are precisely the harms that have justified relief in previous census litigation. *See, e.g., New York,* 351 F. Supp. 3d at 675 (enjoining Secretary Ross from adding a citizenship under vacated memorandum, or "any reasoning that is substantially similar to the reasoning contained in that memorandum," based on "lost political representation, lost federal funding, and the degradation of information that is an important tool of state sovereignty"); *House of Reps.,* 525 U.S. at 328-34 (affirming injunction barring the use of statistical sampling in census, and noting interstate apportionment harms, and intrastate apportionment and redistricting harms).

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

*First,* Plaintiffs will suffer irreparable harm in the absence of preliminary relief because an inaccurate apportionment will violate their constitutional rights to political representation.  It is "well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Hernandez v. Cty. of Monterey*, 110 F. Supp. 3d 929, 956 (N.D. Cal. 2015).  As discussed above, the Rush Plan will not accurately achieve "an actual enumeration of the population," as required by the Constitution.  But the constitutional harm extends further.  Because the census is used to apportion congressional representatives to each state, not just accuracy, but distributional accuracy, is needed in the census data to ensure a fair apportionment of representatives.  Hillygus Decl. ¶¶ 11-13, 39-40; Louis Decl. ¶¶ 40-44.  It is not enough for the total count to be accurate; the proportional distribution of the population by geography and population group must also be accurate.  Hillygus Decl. ¶¶ 11-13.  If the census undercounts the number of people living in Los Angeles, for example, the census could result in an unfair apportionment of congressional representatives to California—even if the census accurately counts the number of people living in the United States overall. Hillygus Decl. ¶¶ 11-13; Louis Decl. ¶¶ 40-43.

Moreover, census data is typically used to redraw district boundaries for federal, state, and even local legislatures.  *See* Louis Decl. ¶ 43; Thompson Decl. ¶ 23; *see, e.g.*, Westall Decl. ¶¶ 13-29 (noting use of census data to redraw political boundaries); Dively Decl. ¶ 9 (same); Soto Decl. ¶¶ 4-11.  The harm to apportionment and representation caused by an undercount will thus extend well beyond the federal level, even if the total count on a state level does not result in the loss of United States representatives.  In short, the Rush Plan will "compromise the success of the apportionment count" and "severely compromise the quality of the redistricting data." Louis Decl. ¶ 43.

The undercount resulting from the Rush Plan will likely result in an unfair apportionment that will cause local government Plaintiffs, individual Plaintiffs, and members of multiple organizational Plaintiffs, to lose their fair share of representation.  *See* Westall Decl. ¶¶ 27-29; Dively Decl. ¶ 9; Soto Decl. ¶¶ 8-11; Stewart Decl. ¶¶ 15-16; Gyamfi Decl. ¶¶ 5, 10, 18-19;

Green Decl. ¶¶ 21-24; A. Garcia ¶¶ 10-12.  For example, based on the 2020 Census response rate in the City of Los Angeles and City of Salinas so far, historically low response rates in Harris County, and the Rush Plan's curtailment of the activities that might remedy those tendencies, the residents of these Plaintiffs will likely be undercounted.  M. Garcia Decl. ¶¶ 8-15; Briggs Decl. ¶¶ 7, 15-17; Gurmilan Decl. ¶¶ 6, 8-14.  In addition, because both California and Texas redrew their electoral districts based on the census data, Plaintiffs will not receive proportionate legislative representation in their respective state legislatures either.  *See* Cal. Const. art. XXI, §§ 1-2; Tex. Const. art. III, § 28.  The same is true of individual Plaintiffs, who reside in these communities and will be deprived of their fair share of representation.  *See* Ellis Decl. ¶¶ 12-14; A. Garcia Decl. ¶¶ 10-12.  That harm, too, justifies preliminary relief.  *See, e.g.*, *Dep't of Commerce*, 139 S. Ct. at 2565; *State of N.Y.*, 315 F. Supp. 3d at 783.

*Second*, Plaintiffs will be deprived of vital federal funding.  Local government Plaintiffs are direct recipients of multiple sources of funding that turn on census data.  *See* Ex. 6 at 3-7; Shah Decl. ¶ 8; Dively Decl. ¶¶ 7-8; Wilden Decl. ¶¶ 4-5; Westall Decl. ¶¶ 34-36.  King County, Washington, for example, receives Community Development Block Grants (CDBG), HOME Investment Partnership Program, and Emergency Solutions Grants (ESG) Program funding from the U.S. Department of Housing and Urban Development (HUD), all of which are distributed proportionately based on census counts.  Dively Decl. ¶ 7.  In 2020, King County received $9,852,719 for the three HUD programs.  *Id.*  An undercount of the County's population in the 2020 Census will reduce the amount of federal funding the County receives from these programs.  *Id.*  The City of Los Angeles likewise receives CDBG and Federal Transit Administration funds based in part on census data, and therefore stands to lose this funding as a result of an undercount.  Westall Decl. ¶¶ 34-36.  Because both localities have large numbers of hard-to-count individuals, both are likely to suffer undercounts due to the shortened timeline for enumeration, and therefore lose valuable funding.  *See* M. Garcia Decl. ¶¶ 7-8; Dively Decl. ¶ 5; Hillygus Decl. ¶¶ 12, 19, 39.  Indeed, courts have recognized that even a "remarkably low net undercount" would "prompt the . . . losses of [federal] funding."  *New York*, 351 F. Supp. 3d at 610; *see Dep't of Commerce*, 139 S. Ct. at 2565 (noting that "if noncitizen households are

undercounted by as little as 2%," plaintiffs would "lose out on federal funds").

Other Plaintiffs are similarly situated. Harris County likewise relies on federal funding that is based on census data, and has a large, hard-to-count population with typically low self-response rates, and therefore stands to lose funding as a result of a likely undercount. Wilden Decl. ¶¶ 4-6; Briggs Decl. ¶ 7; Shah Decl. ¶ 8; Hillygus Decl. ¶¶ 12, 19, 39. Individual Plaintiffs in these hard-to-count areas will suffer from decreased funding for local government services on which these Plaintiffs rely, like public schools, and road and highway maintenance. Ellis Decl. ¶¶ 4-11; A. Garcia Decl. ¶¶ 4-9; *see also* Green Decl. ¶¶ 25-26 (noting that members will be harmed by loss of funding). "Los[ing] out on federal funds" constitutes a "concrete and imminent injury." *Dep't of Commerce*, 139 S. Ct. at 2565 (affirming standing based on likely loss of funds stemming from lower census response rates). Moreover, there is no realistic prospect for redressing this injury once it has occurred, as it will be an additional ten years before new census data is available to guide the distribution of federal and state funding, and damages are of course not available against the federal government for these harms.

*Third*, Plaintiffs will be irreparably injured because they will need to expend additional resources in an attempt to mitigate the undercounting that will result from the Rush Plan. Based on the non-response follow-up timeline outlined in the COVID-19 Plan, local government Plaintiffs and organizational Plaintiffs planned efforts to ensure effective counting of historically undercounted communities. M. Garcia Decl. ¶¶ 9-12, 14; Briggs Decl. ¶¶ 4-9, 13-14; Gyamfi Decl. ¶¶ 12-13, 15-16; Stewart Decl. ¶¶ 6-11; Green Decl. ¶¶ 7-17; Gurmilan Decl. ¶¶ 6-12. For instance, City of Los Angeles planned mobile outreach events each weekend of October—plans that will necessarily be frustrated or rendered ineffective under the Rush Plan. M. Garcia Decl. ¶ 13. Moreover, Los Angeles and its community partners—relying on the Bureau's COVID-19 Plan—have already conducted a public education campaign publicizing the October 31, 2020 date for self-response. M. Garcia Decl. ¶ 14. The City—and other Plaintiffs in similar positions—must now expend additional resources to try to undo that campaign and inform residents and members that they must provide self-responses a month earlier—a task that will be harder because of the shortened timeline and the public health emergency. M. Garcia Decl. ¶¶

14-15; Gurmilan Decl. ¶¶ 11-14; Briggs Decl. ¶¶ 11-12, 15-17; Stewart Decl. ¶¶ 11-14; *see also* Gyamfi Decl. ¶¶ 11-17; Green Decl. ¶¶ 15, 19.

*Fourth*, Plaintiffs' usual activities will harmed, and their expenses will increase, due to the lowered quality of census data that is likely to result from the Rush Plan. Local government Plaintiffs use granular census data to deploy fire department, emergency management, and sanitation resources, engage in urban planning, address transportation infrastructure needs, and direct investment decisions. Westall Decl. ¶¶ 30-33; Dively Decl. ¶¶ 5-6; Gurmilan Decl. ¶ 7. For example, Public Health Seattle-King County uses census data to identify where public health clinics should be located and plan the types of services patients are likely to need, and the King County Department of Local Services relies on census data to provide demographics that inform neighborhood and transportation planning. Dively Decl. ¶ 6. King County Emergency Management relies on census data for hazard mitigation and recovery planning. *Id.* Inaccurate census data will lead to a misallocation of resources needed for these and other urban planning activities. Westall Decl. ¶¶ 30-33; Dively Decl. ¶¶ 5-6; Gurmilan Decl. ¶ 7.

In addition, local governments Plaintiffs use census data to fulfill redistricting responsibilities under local, state, and federal law and to ensure fair representation in local government legislative districts, like city councils. Westall Decl. ¶¶ 17-29; Dively Decl. ¶ 9; Soto Decl. ¶¶ 6-13. An inaccurate census will affect how these boundary lines are drawn. Dively Decl. ¶ 9; Westall Decl. ¶¶ 24-29; Soto Decl. ¶¶ 8-11. And Harris County uses the census data to inform public health policies, including responses to the COVID-19 pandemic, and receives funding for its public health department that is often based on population data. Shah Decl. ¶¶ 5-8. Without accurate Census data, Harris County will struggle to receive funding and ensure that public health policies are appropriately tailored to the population. Shah Decl. ¶ 8.

These harms are also irreparable. "Normally the mere payment of money is not considered irreparable . . . but that is because money can usually be recovered from the person to whom it is paid. If expenditures cannot be recouped, the resulting loss may be irreparable." *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers); *Chevron*

*Corp. v. Donziger*, 833 F.3d 74, 142-43 (2d Cir. 2016); *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (recognizing that harm was irreparable where a tribe's "sovereign immunity likely would bar the State from recovering monetary damages incurred during the course" of litigation due to tribe's alleged violations of law).  Here, of course, Plaintiffs have no avenue to recoup from the federal government the expenses they will incur in seeking to seeking to alleviate the undercount that will be caused by the Rush Plan, or to remedy the decreased effectiveness and increased expense necessary for undertaking core programs and functions.

### C.    The Remaining Factors Support Relief

The final two factors, the balance of equities and the public interest, also strongly favor preliminary relief.

As discussed, Plaintiffs stand to suffer significant, irreparable harm from the inaccurate count that will result from the Rush Plan.  *See supra* at 28-33.  But these harms will not be limited to the Plaintiffs in this case.  Given the importance of the census nationally, the harms Plaintiffs will suffer from an inaccurate count are likely to play out over and over again across the country.  Hillygus Decl. ¶¶ 38-40; Louis Decl. ¶¶ 37, 40-44; Thompson Decl. ¶¶ 3, 19-23. Indeed, states, local governments, businesses, and non-profits all depend on accurate census data to obtain funds and conduct a host of vital operations—and of course, to determine political representation.  *See* U.S. Census Bureau, *Importance of the Data*.[22]  Courts accordingly recognize that, with respect to the Census, "the public interest . . . requires obedience to the Constitution and to the requirement that Congress be fairly apportioned, based on accurate census figures.  Furthermore, it is in the public interest that the federal government distribute its funds . . . on the basis of accurate census data."  *Carey*, 637 F.2d at 839.  There can be little question that the public has a vital interest in the accuracy of the census, or that this interest has constitutional significance.  *Utah*, 536 U.S. at 478; *see also Dep't of Commerce*, 139 S. Ct. at 2584 (Breyer, J., concurring and dissenting in part).  Thus, not only Plaintiffs' harms, but the public interest, weigh strongly in favor of preliminary relief.

---

[22] https://2020census.gov/en/census-data.html (last visited Aug. 24, 2020).

The harm to the government's interest, on the other hand, will be minimal. If the Rush Plan is stayed, the government will be able to carry on census operations under its own previously promulgated COVID-19 Plan, which gives the government more time to complete the critical stages of the count. In addition, the government and public interest in having the census conclude by December 31, 2020—rather than a few months later—is marginal at best. There is no constitutional requirement that the census conclude by the end of the year, and any government or public interest in the agency's compliance with the statutory deadline is outweighed by the constitutional harm that will result from the Rush Plan. *See supra* at 22-28; *see also Klutznick*, 637 F.2d at 837-38 (upholding injunction despite possibility it would cause Bureau to miss deadline); *Farris v. Seabrook*, 677 F.3d 858, 868 (9th Cir. 2012) (district court did not abuse its discretion in concluding that public interest in upholding constitutional rights outweighed the government's interest in enforcing the challenged policy); *All. for Wild Rockies*, 632 F.3d at 1138-39 (balancing competing public interests and finding that public interest in issuing injunction outweighed public interest in enforcing the challenged policy). This is particularly true given that Bureau officials have already acknowledged that it is too late to meet the statutory deadline. *See supra* at 10-11. Accordingly, equity and the public interest strongly favor preliminary relief. *See, e.g.*, *All. for Wild Rockies*, 632 F.3d at 1139 (granting preliminary injunction where plaintiff demonstrated likelihood of irreparable injury, raised "serious questions" on the merits, and where the balance of hardships and public interest favored plaintiff).

A final public interest bears discussion. The absence of granular data due to shortened non-response follow up, the reduced insights into the accuracy of the data caused by curtailed data-processing operations, the elimination of transparency, and the widespread understanding that the 2020 Census is fatally inaccurate will degrade trust in the ultimate results, and thus in the democratic legitimacy of the decisions and political apportionment that flow from them. *See* Thompson Decl. ¶¶ 24-26; Hillygus Decl. ¶¶ 39-42. Preliminary relief is both necessary and appropriate to prevent the tarnishing of one of the few sources of information on whose legitimacy Americans of all stripes and persuasions can still depend.

## V.     CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request that this Court grant this Motion, stay the Rush Plan for the 2020 Census, and enjoin Defendants from implementing the Rush Plan or otherwise shortening the timelines set out in the COVID-19 Plan, pending final judgment in this lawsuit.

Dated: August 25, 2020

**LATHAM & WATKINS** LLP

By:  /s/ Sadik Huseny
Steven M. Bauer (Bar No. 135067)
Sadik Huseny (Bar No. 224659)
Shannon D. Lankenau (Bar. No. 294263)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone:  415.391.0600
Facsimile:  415.395.8095

Richard P. Bress (*pro hac vice*)
Melissa Arbus Sherry (*pro hac vice*)
Anne W. Robinson (*pro hac vice*)
Tyce R. Walters (*pro hac vice*)
Genevieve P. Hoffman (*pro hac vice*)
Gemma Donofrio (*pro hac vice*)
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Telephone:  202.637.2200
Facsimile:  202.637.2201

*Attorneys for Plaintiffs National Urban League;*
*League of Women Voters; Black Alliance for*
*Just Immigration; Harris County, Texas; King*
*County, Washington; City of San Jose,*
*California; Rodney Ellis, and Adrian Garcia*

**LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW**

By:  /s/ Jon M. Greenbaum
Kristen Clarke (*pro hac vice* pending)
Jon M. Greenbaum (Bar No. 166733)

**CITY ATTORNEY FOR THE CITY OF LOS ANGELES**

By:  /s/ Danielle Goldstein
Michael N. Feuer (Bar No. 111529)
    mike.feuer@lacity.org

Ezra D. Rosenberg (*pro hac vice* pending)
Dorian L. Spence (*pro hac vice* pending)
Ajay P. Saini (*pro hac vice* pending)
Maryum Jordan (Bar No. 325447)
Pooja Chaudhuri (Bar No. 314847)
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone:  202.662.8600
Facsimile:  202.783.0857

*Attorneys for Plaintiffs National Urban League; League of Women Voters; Black Alliance for Just Immigration; Harris County, Texas; King County, Washington; City of San Jose, California; Rodney Ellis, and Adrian Garcia*

**BRENNAN CENTER FOR JUSTICE**

By:____*/s/ Wendy R. Weiser*____
Wendy R. Weiser (*pro hac vice*)
     weiserw@brennan.law.nyu.edu
Thomas P. Wolf (*pro hac vice*)
     wolf@brennan.law.nyu.edu
Kelly M. Percival (*pro hac vice*)
     percivalk@brennan.law.nyu.edu
120 Broadway, Suite 1750
New York, NY 10271
Telephone: 646.292.8310
Facsimile: 212.463.7308

*Attorneys for Plaintiffs National Urban League; League of Women Voters; Black Alliance for Just Immigration; Harris County, Texas; King County, Washington; City of San Jose, California; Rodney Ellis, and Adrian Garcia*

Kathleen Kenealy (Bar No. 212289)
     kathleen.kenealy@lacity.org
Danielle Goldstein (Bar No. 257486)
     danielle.goldstein@lacity.org
Michael Dundas (Bar No. 226930)
     mike.dundas@lacity.org
200 N. Main Street, 8th Floor
Los Angeles, CA 90012
Telephone: 213.473.3231
Facsimile: 213.978.8312

*Attorneys for Plaintiff City of Los Angeles*

**CITY OF SALINAS**

By:____*/s/ Christopher A. Callihan*____
Christopher A. Callihan (Bar No. 203010)
     legalwebmail@ci.salinas.ca.us
Michael Mutalipassi (Bar No. 274858)
     michaelmu@ci.salinas.ca.us
200 Lincoln Avenue
Salinas, CA 93901
Telephone: 831.758.7256
Facsimile: 831.758.7257

*Attorneys for Plaintiff City of Salinas*

**PUBLIC COUNSEL**

By:____*/s/ Mark Rosenbaum*____
Mark Rosenbaum (Bar No. 59940)
     mrosenbaum@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone:  213.385.2977
Facsimile:  213.385.9089

*Attorneys for Plaintiff City of San Jose*

# ATTESTATION OF CONCURRENCE IN THE FILING

I, Sadik Huseny, am the ECF user whose user ID and password authorized the filing of this document.  Under Civil L.R. 5-1(i)(3), I attest that all signatories to this document have concurred in this filing.

Dated: August 25, 2020

**LATHAM & WATKINS** LLP

By: _/s/ Sadik Huseny_
Sadik Huseny