JEFFREY B. CLARK
Acting Assistant Attorney General
DAVID MORRELL
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Branch Director
DIANE KELLEHER
BRAD P. ROSENBERG
Assistant Branch Directors
M. ANDREW ZEE
ALEXANDER V. SVERDLOV
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
450 Golden Gate Avenue
San Francisco, CA 94102
Phone: (415) 436-6646
E-mail: m.andrew.zee@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

NATIONAL URBAN LEAGUE, *et al.*,

       Plaintiff,

    v.

WILBUR L. ROSS, JR., *et al.*,

       Defendants.

Case No. 5:20-cv-05799-LHK

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

Hearing Date: September 17, 2020
Time: 1:30 p.m.
Judge: Hon. Lucy H. Koh

1

2

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 3

I.      CONSTITUTIONAL AND STATUTORY AUTHORITY FOR THE CENSUS ............ 3

II.     2020 CENSUS PROCEDURES ...................................................................... 3

ARGUMENT .......................................................................................................... 4

I.      PLAINTIFFS' CLAIMS ARE BARRED BY THE POLITICAL QUESTION
        DOCTRINE ............................................................................................... 4

II.     PLAINTIFFS LACK STANDING ................................................................... 9

        A.      Plaintiffs' Alleged Injuries are Not Redressable by a Court Order ...................... 9

        B.      Plaintiffs' Alleged Injuries are Not Traceable to Defendants' Actions ............... 11

        C.      Plaintiffs' Injuries are too Speculative to Confer Standing ................................ 12

III.    PLAINTIFFS FAIL TO ESTABLISH A COGNIZABLE APA CLAIM ..................... 16

        A.      The Replan is not final agency action and therefore is not reviewable. .............. 16

                1.      The Replan is not "agency action" under the APA................................... 17

                2.      The Replan is not "final agency action" subject to judicial review .......... 19

        B.      The Bureau's Choices Regarding How to Meet the Statutory Deadline are
                Committed to Agency Discretion, and are Therefore Unreviewable .................. 21

        C.      Even Assuming the Replan Were Reviewable, and That Meaningful
                Standards for Such Review Could Somehow be Ascertained, the Replan
                Does Not Violate the APA.................................................................................. 23

IV.     PLAINTIFFS' ENUMERATION CLAUSE ARGUMENTS LACK MERIT ................. 28

V.      PLAINTIFFS FAIL TO SATISFY THE OTHER INJUNCTION FACTORS ............... 31

        A.      Plaintiffs Cannot Establish Any Imminent and Irreparable Harm ...................... 32

        B.      The Remaining Factors Weigh Against an Injunction......................................... 34

CONCLUSION....................................................................................................... 35

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Alaska Dep't of Envt'l Conservation v. EPA*,
   540 U.S. 461 (2004)........................................................................... 23

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
   729 F.3d 937 (9th Cir. 2013) ............................................................. 31

*Baker v. Carr*,
   369 U.S. 186 (1962)............................................................................. 4

*Bennett v. Spear*,
   520 U.S. 154 (1997)........................................................................... 16

*Biodiversity Legal Found. v. Badgley*,
   309 F.3d 1166 (9th Cir. 2002) ............................................................. 9

*California v. Ross*,
   362 F. Supp. 3d 727 (N.D. Cal. 2018) .............................................. 22

*Carey v. Klutznick*,
   637 F.2d 834 (2d Cir. 1980)................................................................. 9

*Carey v. Klutznick*,
   508 F. Supp. 420 (S.D.N.Y. 1980)....................................................... 9

*Carey v. Klutznick*,
   653 F.2d 732 (2d Cir. 1981)......................................................... 10, 29

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971)........................................................................... 21

*City of New York v. U.S. Dep't of Commerce*,
   34 F.3d 1114 (2d Cir. 1994), *re'v sub nom.*,
   *Wisconsin v. City of New York*, 517 U.S. 1 (1996) ............................ 29

*City of Phila. v. Klutznick*,
   503 F. Supp. 663 (E.D. Pa. 1980) ...................................................... 21

*City of Willacoochee v. Baldrige*,
   556 F. Supp. 551 (S.D. Ga. 1983)...................................................... 21

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)....................................................... 8, 12, 13, 14

*Confederacion de la Raza Unida v. Brown*,
  345 F. Supp. 909 (N.D. Cal. 1972) ............................................................... 19

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ..................................................................... *passim*

*Dep't of Commerce v. U.S. House of Representatives*,
  525 U.S. 316 (1999) ................................................................. 6, 14, 28

*Department of Homeland Security v. Regents of the University of California*,
  140 S. Ct. 1891 (2020) ................................................................. 24, 25

*Dist. of Columbia v. U.S. Dep't of Commerce*,
  789 F. Supp. 1179 (1992) ............................................................... 22

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) ................................................................... 23

*Fed'n for Am. Immigration Reform v. Klutznick*,
  486 F. Supp. 564 (D.D.C. 1980) ....................................................... 13

*Forest Guardians v. Babbitt*,
  174 F.3d 1178 (10th Cir. 1999) ......................................................... 9

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ......................................................................... *passim*

*Gaffney v. Cummings*,
  412 U.S. 735 (1973) ................................................................. 14, 29

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) ........................................................... 31

*Gonzalez v. Gorsuch*,
  688 F.2d 1263 (9th Cir. 1982) ........................................................... 9

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007) ......................................................... 31, 32

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ......................................................................... 20

*Humane Soc. of U.S. v. Locke*,
  626 F.3d 1040 (9th Cir. 2010) ......................................................... 23

*Indep. Min. Co. v. Babbitt*,
  105 F.3d 502 (9th Cir. 1997) ........................................................... 18

*Japan Whaling Ass'n v. Am. Cetacean Soc.*,
  478 U.S. 221 (1986).................................................................................................. 4, 6

*Karcher v. Daggett*,
  462 U.S. 725 (1983)................................................................................................. 7, 14

*Klutznick v. Carey*,
  449 U.S. 1068 (1980)............................................................................................ 10, 26

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)......................................................................................... 8, 10, 11

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990)..................................................................................................... 16

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997).............................................................................................. 31, 32

*McConnell v. FEC*,
  540 U.S. 93 (2003), *overruled on other grounds by*
  *Citizens United v. FEC*, 558 U.S. 310 (2010)........................................................... 9

*Munaf v. Geren*,
  553 U.S. 674 (2008)..................................................................................................... 30

*NAACP v. Bureau of Census*,
  945 F.3d 183 (4th Cir. 2019) ............................................................................. *passim*

*NAACP v. Bureau of Census*,
  --- F. Supp. 3d ---, 2020 WL 1890531 (D. Md. Apr. 16, 2020).............................. 30

*NAACP v. Bureau of the Census*,
  399 F. Supp. 3d 406 (D. Md. 2019),
  *aff'd in part rev'd on other grounds*, 945 F.3d 183 (4th Cir. 2019) .............. 5, 17, 18

*NAACP v. Bureau of the Census*,
  382 F. Supp. 3d 349 (D. Md. 2019)........................................................................... 22

*Nat'l Law Ctr. on Homelessness & Poverty v. Brown*,
  CIV. A. 92-2257-LFO, 1994 WL 521334 (D.D.C. Sept. 15, 1994) ........................ 19

*Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*,
  91 F.3d 178 (D.C. Cir. 1996)............................................................................... 10, 12

*Nken v. Holder*,
  556 U.S. 418 (2009)............................................................................................. 32, 33

*NLRB v. Noel Canning*,
  573 U.S. 513 (2014) ............................................................................ 7

*Norton v. S. Utah Wilderness, All.*,
  542 U.S. 55 (2004) .......................................................................... 16, 17

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
  465 F.3d 977 (9th Cir. 2006) ............................................................. 20

*Pacific Nw. Generating Co-op. v. Bonneville Power Admin.*,
  596 F.3d 1065 (9th Cir. 2010) ........................................................... 20

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*,
  636 F.3d 1150 (9th Cir. 2011) ........................................................... 31

*Raines v. Byrd*,
  521 U.S. 811 (1997) ............................................................................. 8

*Ridge v. Verity*,
  715 F. Supp. 1308 (W.D. Pa. 1989) ................................................... 12

*Rucho v. Common Cause*,
  139 S. Ct. 2484 (2019) ........................................................................ 4

*Safe Air for Everyone v. Meyer*,
  373 F.3d 1035 (9th Cir. 2004) ............................................................. 8

*San Luis Unit Food Producers v. United States*,
  709 F.3d 798 (9th Cir. 2013) ............................................................. 16

*Sharrow v. Brown*,
  447 F.2d 94 (2d Cir. 1971) ................................................................ 13

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) ............................................................................. 11

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ....................................................................... 11

*State v. U.S. Dep't of Commerce*,
  315 F. Supp. 3d 766 (S.D.N.Y. 2018) ................................................ 22

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ........................................................................... 11

*Tucker v. U.S. Dep't of Commerce*,
  958 F.2d 1411 (7th Cir. 1992) ........................................................ 7, 21

*U.S. Dep't of Commerce v. Montana*,
  503 U.S. 442 (1992) .................................................................. 6, 12, 28

*United States v. Munoz-Flores*,
  495 U.S. 385 (1990) .................................................................................. 4

*Utah v. Evans*,
  536 U.S. 452 (2002) ......................................................... 5, 14, 28, 29

*Vieth v. Jubelirer*,
  541 U.S. 267 (2004) .................................................................................. 4

*Warth v. Seldin,*
  422 U.S. 490 (1975) .................................................................................. 9

*Wesberry v. Sanders*,
  376 U.S. 1 (1964) ..................................................................................... 6

*Wild Fish Conservancy v. Jewell*,
  730 F.3d 791 (9th Cir. 2013) .......................................................... 16, 20

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .......................................................................... 30, 31, 32

*Wisconsin v. City of New York*,
  517 U.S. 1 (1996) ........................................................................... *passim*

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
  566 U.S. 189 (2012) ................................................................................. 4

**STATUTES**

2 U.S.C. § 2a ................................................................... 3, 5, 12, 26

5 U.S.C. § 551 ............................................................................... 16

5 U.S.C. § 701 ............................................................................... 20

13 U.S.C. § 2 ................................................................................... 3

13 U.S.C. § 4 ................................................................................... 3

13 U.S.C. § 6 ................................................................................. 21

13 U.S.C. § 141 ................................................................... *passim*

49 U.S.C. § 5305 ............................................................................ 12

Consolidated Appropriations Act, 2019,
   Pub. L. No. 116-6, 133 Stat. 13 ........................................................................... 5

Census Act of 1790,
   1 Stat. 101 ............................................................................................................. 5

An Act Supplementary to the Act Entitled "An Act Providing for the Taking of the Seventh and
   Subsequent Censuses,"
   9 Stat. 445 ............................................................................................................. 5

**REGULATIONS**

85 Fed. Reg. 44,679 (July 23, 2020) ........................................................................ 34

**UNITED STATES CONSTITUTION**

U.S. Const. art. 1 § 2 ..................................................................................... *passim*

**OTHER AUTHORITIES**

13A Charles Alan Wright et al., *Federal Practice & Procedure* (3d ed. Apr. 2018 update) ..... 8, 9

H.R. 6800, 116th Cong. (2020) ........................................................................ 3, 6, 8

H.R. 7034, 116th Cong. (2020) ........................................................................ 3, 6, 8

H.R. 7974, 116th Cong. (2020) ........................................................................ 3, 6, 8

S. 4048, 116th Cong. (2020) ................................................................................ 3, 6,

**INTRODUCTION**

The Constitution "vests Congress with virtually unlimited discretion in conducting the decennial" census. *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996). Exercising that discretion, Congress has promulgated a statute that entrusts the Secretary of Commerce with "tak[ing] a decennial census of population . . . in such form and content as he may determine"— but *requires* that the Secretary report results to the President before the census year's end. 13 U.S.C. § 141(a), (b). At the Commerce Department and Census Bureau's request, Congress has considered extending the December 31, 2020 deadline in light of the disruptions caused by the COVID-19 pandemic. But Congress has not yet acted. Accordingly, the Secretary, with the Bureau, have developed a plan to meet the end-of-year deadline. And, as senior Bureau officials have assured Congress and the public, the Bureau is confident that, following this plan, it can deliver a full and complete census within the allotted time. Clearly, Plaintiffs harbor concerns about the Bureau's plan and the timeline, but they should take those concerns to the branch of Government in position to address them: Congress. Contrary to what Plaintiffs may think, the Bureau is not free to disregard a statutory deadline in pursuit of some ethereal notion of a better census. And this Court—a court of limited jurisdiction—should not set aside the Bureau's entire operational plan for completing the census, a 15.6-billion dollar operation years in the making, on the basis of Plaintiffs' frustration with Congress' processes.

Decisions about how and when to complete a census turn on policy choices that are unreviewable political questions. The manner and means of conducting the census is constitutionally committed to Congress, and neither the Constitution nor any other statute sets forth a judicially discoverable or manageable standard for evaluating the Bureau's complex operational plans for a decennial census. Article III tribunals are simply not equipped to weigh and evaluate the myriad decisions and complicated tradeoffs that define how a census is to be performed—in the midst of a pandemic or otherwise.

Separately, even if disputes about the timing and operation of a census were theoretically justiciable, Plaintiffs' claims are not cognizable here, because they fail to establish standing. Specifically, because all of their concerns arise from the statutory timeline under which the Bureau

must complete the census—a statutory timeline they do not challenge—Plaintiffs fail to establish concrete, particularized injury that is traceable to the Bureau's actions, or redressable by a favorable Court ruling.  Absent an extension of the deadline in § 141(b), the Bureau has no choice but to meet that statutory requirement.

Beyond these fatal threshold defects, Plaintiffs' efforts to shoehorn their policy disagreements into an Administrative Procedure Act ("APA") framework fail as a legal matter. The APA permits review only of final agency action that is circumscribed and discrete; as other courts have recognized, the Bureau's general operational plans do not fit that framework.  Plaintiffs thus cannot use the APA to redirect a massive, nationwide effort of enormous complexity.  Nor can Plaintiffs repackage what amounts to a lobbying brief as a legal challenge under the Enumeration Clause.  The Enumeration Clause requires only that the population must be determined through a person-by-person headcount, rather than through estimates or conjecture. Despite Plaintiffs' suggestions otherwise, that Clause does not speak in any way to the degree of accuracy required in the enumeration that is performed.

Separate from the unlikelihood of success on their claims, Plaintiffs also fail to establish the other elements required for an injunction:  irreparable injury or that the harms weigh in their favor.  The balance of harms and public interest instead weigh squarely against forcing the Census Bureau to replan a massive operation that is designed and run by scientists and statisticians to achieve the best possible results within Congress's established parameters.  Compelling the Bureau by mandatory injunction—disfavored relief under any scenario—to reshuffle its operations at this late juncture would risk undermining the Bureau's ability to meet its statutory deadline.  Plaintiffs cite no authority for the proposition that a litigant can successfully petition a court to compel a federal agency to violate its statutory obligations, and so far as Defendants are aware there is none. Simply put, Plaintiffs are not entitled to an injunction requiring the Bureau to flout the law.

1

## **BACKGROUND**

2

## **I.    CONSTITUTIONAL AND STATUTORY AUTHORITY FOR THE CENSUS**

3

4

5

6

7

8

The Constitution's Enumeration Clause requires that an "actual Enumeration" of the population be conducted every ten years and vests Congress with the authority to conduct that census "in such Manner as they shall by Law direct." U.S. Const. art. I, § 2, cl. 3.  Through the Census Act, Congress has delegated to the Secretary of Commerce the responsibility to conduct the decennial census "in such form and content as he may determine." 13 U.S.C. § 141(a).  The Census Bureau assists the Secretary in the performance of this responsibility. *See id.* §§ 2, 4.

9

10

11

12

13

14

15

Notably, however, Congress has required the Secretary to provide in a report to the President the "tabulation of total population by States . . . within 9 months after the census date," defined as April 1 of the census year. 13 U.S.C. § 141(b).  That is, the Secretary must provide the final census report to the President by December 31 of this year.  After receiving the Secretary's report, the President, under a different statutory provision, calculates "the number of Representatives to which each State would be entitled," and transmits the resulting information to Congress.  2 U.S.C. § 2a(a).

16

## **II.    2020 CENSUS PROCEDURES**

17

18

19

20

21

22

As detailed in the declaration submitted by Albert E. Fontenot, Jr., Associate Director for Decennial Census Programs at the Census Bureau ("Fontenot Decl."), the operational plan for the 2020 Census is a massive undertaking.  It entails a budget estimate of $15.6 billion, Fontenot Decl. ¶ 15, and is tailored to enumerate all persons, and contains components designed to reach hard-to-count populations, *id.* ¶ 12.  The latest version of the Bureau's operational plan is Version 4.0, which was issued in December 2018. *See* ECF No. 37-5.

23

24

25

26

27

28

In March 2020, as the gravity of the COVID-19 pandemic emerged, it became clear to the Census Bureau that it would need to change its operational plans for the census.  Fontenot Decl. ¶¶ 77-78.  The Bureau accordingly undertook an effort to re-plan operations contingent on obtaining an extension of § 141(b)'s deadline until April 30, 2021. *Id.* ¶ 79.  The Secretary and Bureau Director announced, on April 13, 2020, a new schedule for the census and that they were formally requesting scheduling relief from Congress. *Id.* ¶ 80.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION
Case No. 5:20-cv-05799-LHK

Once it became apparent that Congress was not likely to grant an extension, the Census Bureau in late July began replanning census operations so that the end-of-year deadline could be met. *Id.* ¶ 81. The Secretary further directed the Bureau to present a plan for how it could accelerate operations to meet the deadline. *Id.* Senior managers in the Bureau worked to consider how it could effectively replan operations, formalized that plan, and presented that plan to the Secretary on August 3, 2020. *Id.* The Secretary approved the Bureau's proposal, and Director Dillingham announced the adjusted plan, referred to as the "Replan," later that afternoon. *Id.* Since that time the Bureau has been working to conduct the census under the Replan, mindful of its need to meet the statutory deadline. *Id.* ¶ 91. In designing the Replan, the Bureau "evaluated the risks and quality implications of each suggested time saving measure and selected those that [it] believed presented the best combination of changes to allow [it] to meet the statutory deadline without compromising quality to an undue degree." *Id.* ¶ 82. The Bureau "is confident that it can achieve a complete and accurate census and report apportionment counts by the statutory deadline following the Replan Schedule." *Id.* ¶ 91.

Since the onset of the COVID-19 pandemic, legislation has been introduced to modify the § 141(b) deadline for the 2020 Census. *See* H.R. 6800, 116th Cong. § 70201(a) (2020) (extending deadline for 2020 Census under § 141(b) from December 31, 2020 to April 30, 2021); H.R. 7974, 116th Cong., § 2 (2020) (same); H.R. 7034, 116th Cong., § 2 (2020) (same); S. 4048, 116th Cong., § 2 (2020) (same). None of those proposals has been enacted into law.

## ARGUMENT

## I.   PLAINTIFFS' CLAIMS ARE BARRED BY THE POLITICAL QUESTION DOCTRINE

All of the harms Plaintiffs claim in this case rest on their view that the Bureau's efforts to comply with the statutory deadline in § 141 will lead to an incomplete or inaccurate census. *See, e.g.*, Compl. ¶¶ 1, 4, 245, 264, 271;[1] Mot. for Stay & Prelim. Inj., 26-32, 35, ECF No. 36 ("Mot.")

---

[1]  Although Plaintiffs have amended their Complaint by adding new parties since filing their preliminary-injunction motion, *see* ECF No. 61, Plaintiffs have stipulated that they "will not rely on the New Parties, including any allegations of harm or injury to the New Parties, in briefing or at the hearing on the [m]otion," ECF No. 60. Accordingly, for simplicity, Defendants rely on Plaintiffs' initial Complaint for purposes of this response and argument.

26-32, 35 (arguing that the count will be inaccurate and asking for an injunction that would extend the census schedule).  The Court need not—and indeed cannot—entertain the merits of this view. Determining what timeline will ensure sufficient accuracy for the census is an inherently political question committed to the other branches, and not appropriate for judicial review.

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  The doctrine is "primarily a function of the separation of powers," *Baker v. Carr*, 369 U.S. 186, 210 (1962), and "is designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government," *United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990).  The Supreme Court has identified several defining hallmarks of non-justiciable political questions.  *Id.*  Foremost among these are "[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving" the dispute.  *Vieth v. Jubelirer*, 541 U.S. 267, 277-78 (2004) (internal citation omitted); *see also Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012); *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) (finding partisan gerrymandering not justiciable for lack of discernible and administrable standards to apply).  When it comes to evaluating the timing and design of census operations, these two factors are inseparable.

As a textual matter, the Enumeration Clause grants Congress the authority to conduct the required "actual Enumeration" "in such Manner as they shall by Law direct."  U.S. Const. art. I, § 2, cl. 3.  This language is remarkable in its breadth.   As the Supreme Court has recognized, it "vests Congress with virtually unlimited discretion in conducting the decennial 'actual Enumeration.'"  *Wisconsin*, 517 U.S. at 19; *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019) (Congress has "broad authority over the census, as informed by long and consistent historical practice"); *see also NAACP v. Bureau of the Census*, 399 F. Supp. 3d 406, 418 (D. Md. 2019) ("[T]he Founders clearly intended Congress to have paramount authority in both the design and execution of the census") *aff'd in part, rev'd on other grounds*, 945 F.3d 183 (4th Cir. 2019).

Congress has historically exercised this authority in a variety of ways from the earliest days of our Republic. *See, e.g.*, Census Act of 1790, 1 Stat. 101 (1790) (directing that the census would commence on August 2, 1790 and end on May 2, 1791); An Act Supplementary to the Act Entitled "An Act Providing for the Taking of the Seventh and Subsequent Censuses," 9 Stat. 445 (1850). And while the Census Act now delegates many aspects of Congress's "broad authority over the census to the Secretary," *Wisconsin*, 517 U.S. at 5, 19, Congress continues to exercise ultimate control over the census by, among other things, setting the level of funding available and the date by which the Secretary must report the results, so that it can reapportion House seats and provide redistricting information to the States. *See, e.g.*, 13 U.S.C. § 141(b); 2 U.S.C. § 2a; *see also* Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13 (appropriating $3.5 billion to the Census Bureau for use through 2021). Congress's deliberations over whether to extend the § 141(b) deadline in light of the COVID-19 pandemic, confirm that Congress knows that the power to set a census deadline is its alone to wield. *See* H.R. 6800, § 70201(a) (extending deadline for 2020 Census under § 141(b) from December 31, 2020 to April 30, 2021); H.R. 7974, § 2 (same); H.R. 7034, § 2 (same); S. 4048, § 2 (same).[2]

How is a Court to evaluate whether Congress's decisions about time or funding limits are appropriate? There is no evident standard. In prior cases involving the census, courts entertained challenges to discrete statistical methodologies or data-collection decisions made by the Secretary. *See, e.g.*, *New York*, 139 S. Ct. 2551 (evaluating re-instatement of citizenship question on census form); *Utah v. Evans*, 536 U.S. 452, 452 (2002) (holding that "hot-deck imputation"—a process which imputes characteristics of households based upon the characteristics of neighbors—does not violate the Enumeration Clause); *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) (holding that statistical sampling violates the Census Act and declining to reach the

---

[2] As the Chairwoman of the House Committee on Oversight and Reform stated in a letter just this week, "it is more urgent than ever that the Senate act." *See* Letter from Carolyn B. Maloney to Mitch McConnell et al. (Sept. 2, 2020), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/2020-09-02.CBM%20to%20%20House%20and%20Senate%20Leadership%20re%20Census.pdf. That letter conspicuously did not chide the Bureau, but rather spurred Congress to take action: "Congress has a solemn responsibility under the Constitution to help ensure an accurate and complete count, and there is bipartisan support in the Senate for extending these deadlines." *Id.*

Enumeration Clause claim); *Wisconsin v. City of New York*, 517 U.S. 1 (1996) (holding that Secretary did not violate Enumeration Clause by declining to correct a census undercount with data from a post-enumeration survey); *Franklin v. Massachusetts*, 505 U.S. 788 (1992) (confirming that allocating federal employees serving overseas to their home States did not violate Enumeration Clause). Each of those cases involved a discrete policy choice that could, at least, be compared against an alternative: *e.g.*, to omit a citizenship question, to decline the use of statistical sampling or adjustment, to allocate overseas personnel to their home states. And the legality of most of those policy choices could be resolved by looking to whether this or that statistical method constituted a person-by-person enumeration or an impermissible form of statistical estimate.[3]   *See, e.g.*, *House of Representatives*, 525 U.S. at 343-44; *Franklin*, 505 U.S. at 806. Not so here.

Like funding decisions, a reporting deadline necessarily limits the possible range of the Bureau's operations—and requires the Bureau to perform careful and complex balancing of numerous considerations such as cost, testing, training, effectiveness, timing, informational need, and accuracy. These tradeoffs are quintessentially "policy choices and value determinations constitutionally committed for resolution to the halls of Congress [and] the confines of the Executive Branch." *Japan Whaling*, 478 U.S. at 230. A litigant could *always* posit, as Plaintiffs do here, that some alleged deficiency can be cured with more time, staff, money, or by a better design. Positing that, however, does not provide any vehicle by which a court (as opposed to Congress) can evaluate the myriad policy choices and tradeoffs that Congress has made to establish a deadline and the Bureau has made in designing a census to meet that deadline. Nor does it illuminate any constitutional floor or standard which a Court could deem to be violated. *Cf. Tucker v. U.S. Dep't of Commerce*, 958 F.2d 1411, 1418 (7th Cir. 1992) (Plaintiffs seeking statistical adjustment "are asking [courts] to take sides in a dispute among statisticians, demographers, and

---

[3] Similarly, the Supreme Court has routinely decided cases involving congressional districting by States on the theory that the Constitution requires "equal representation for equal numbers of people." *See Wesberry v. Sanders*, 376 U.S. 1, 18 (1964). And, based on those precedents, the Court has similarly decided that challenges to the way in which Congress allocates congressional seats are justiciable. *U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 459 (1992). But the nature of those controversies provided an easily administrable standard for courts to apply: the number of people in each congressional district. No such standard is available here.

census officials concerning the desirability of making a statistical adjustment to the census headcount").  As a result, there is no rule or standard that a Court could apply to determine when census operations are too limited or too curtailed.  Indeed, "you might as well turn [this case] over to a panel of statisticians and political scientists and let them make the decision, for all that a court could do to add to its rationality or fairness."  *Id.* at 1417-18.

Plaintiffs suggest that, pursuant to the Enumeration Clause, decisions about the census can be assessed to determine whether they further count accuracy.  Mot. 25, 28.  But the Supreme Court has recently rejected the idea that the Enumeration Clause commands accuracy, *New York*, 139 S. Ct. at 2565-66, and the argument is likewise nonsensical here.[4]  Because no census is ever complete or perfect—and every census can, presumably, be made better with more time or resources—the setting of *any* deadline can be said to be inimical to Plaintiffs' purported standard, and thus improper.  *See, e.g.*, *Wisconsin*, 517 U.S. at 6; *see also Karcher v. Daggett*, 462 U.S. 725, 732 (1983).  Yet, as we noted above, Congress has long set deadlines by which a census should be completed, and Defendants are unaware of any case finding those deadlines improper.  The Court should "decline [Plaintiffs'] invitation to measure the constitutionality" of a census plan "by a standard that would seem to render every census since 1790 unconstitutional."  *New York*, 139 S. Ct. at 2567; *see also NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (noting that the Supreme Court has long adhered to James Madison's view that "a regular course of practice" may "liquidate & settle the meaning" of constitutional provisions).

Given the explicit textual commitment of the means of conducting the census to Congress and the lack of any discernible standards, this Court should not wade into the territory of evaluating the propriety of the Replan or the census deadline.  Congress itself is considering the issue, but has so far declined to grant relief.  *See* H.R. 6800, § 70201(a); H.R. 7974, § 2 (same); H.R. 7034, § 2 (same); S. 4048, § 2.  Plaintiffs may well believe that completing the census before the end of the

---

[4]  The "reasonable relationship" test applied in *Wisconsin*, on which Plaintiffs rely, speaks only to the requirement that the census be performed via an actual person-by-person headcount, rather than by statistical sampling techniques.  517 U.S. at 20.  Whether a method used by the Bureau constitutes a headcount is a justiciable question, with a readily-administrable standard— but that is not the question in this case where no one disputes that the Bureau is, in fact, conducting a headcount.  The language in *Wisconsin* identifies no other administrable standard.

year will prove difficult; and they may further believe that § 141, which in its current form has governed the last four censuses, needs to change.  But this is a request Plaintiffs should take to Congress.  That Congress has declined to alter the deadline is not a basis to enlist the aid of an Article III court ill-equipped to resolve these policy disagreements.  Plaintiffs' claims present issues barred by the political question doctrine, and their Motion should therefore be denied.

## II.   PLAINTIFFS LACK STANDING

Even if disputes about the timing of census operations were theoretically justiciable, Plaintiffs would still not be entitled to any remedy here, because they have failed to establish standing.  The "irreducible constitutional minimum" of standing under Article III has three elements:  (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly trace[able] to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  Plaintiffs bear the burden of establishing each of these elements, *id.*, and the Court "may review evidence beyond the complaint" to determine whether Plaintiffs have carried that burden.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  The standing inquiry is "'especially rigorous when reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.'"  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)).  Yet Plaintiffs here fail to meet any of the required elements.

### A.   Plaintiffs' Alleged Injuries are Not Redressable by a Court Order

Plaintiffs must establish redressability by demonstrating "that some personal benefit will result from a remedy *that the court is prepared to give*."  13A Charles Alan Wright et al., *Federal Practice & Procedure* § 3531.6 (3d ed. Apr. 2018 update) (emphasis added).  That is, a plaintiff must show that "the court has the power to right or to prevent the claimed injury."  *Gonzalez v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982) (Kennedy, J.).  Where a plaintiff requests prospective relief in the form of an injunction, the plaintiff must show that "prospective relief will remove the harm" and the plaintiff "personally would benefit in a tangible way from the court's

intervention." *Warth v. Seldin,* 422 U.S. 490, 505, 508 (1975).  If the court cannot order relief that would remedy the plaintiff's alleged injury, redressability—and thus Article III standing—are lacking.  *See McConnell v. FEC*, 540 U.S. 93, 229 (2003) (no redressability because court "has no power to adjudicate a challenge to the [allegedly unconstitutional] FECA limits in this litigation"), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010).

Plaintiffs here have not mounted a challenge to § 141, the statutory deadline Congress has established.  *See generally* Compl. ¶¶ 330-60; Mot. 2-3, 35.  And wisely so.  The "virtually unlimited discretion" that the Constitution vests in Congress to "conduct[] the decennial" census, *Wisconsin*, 517 U.S. at 19, includes the power to set a deadline for completion of the census.  Indeed, setting such a deadline is part and parcel of establishing the "Manner" of conducting the census, which the Constitution grants Congress the power to "direct."  U.S. Const. art. I, § 2, cl. 3.

It is beyond cavil that, "when Congress by organic statute sets a specific deadline for agency action, neither the agency nor any court has discretion.  The agency must act by the deadline."  *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999).  Ignoring the statutory deadline, or granting relief that compels the Bureau to miss it, "would be an affront to our tradition of legislative supremacy and constitutionally separated powers."  *Id.*; *see also Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002).  *Carey v. Klutznick*, 637 F.2d 834, 837-38 (2d Cir. 1980)—a case Plaintiffs proffer for the proposition that the statutory deadline is somehow optional—shows as much.  *See* Mot. 23, 34.  In *Carey*, the Second Circuit affirmed a district court order—later made permanent—that required the Census Bureau to take actions "to compensate for [a] disproportionate undercount" and declared § 141(b)'s December 31 deadline "directory and not mandatory."  508 F. Supp. 420, 433 (S.D.N.Y. 1980).  Within days, the Supreme Court reinstated the statutory deadline.  It stayed that part of the district court order that precluded the Bureau "from certifying to the President the population totals for New York and the state-by-state census tabulations, on December 31, 1980, as mandated by 13 U.S.C. § 141(b)."  *Klutznick v. Carey*, 449 U.S. 1068, 1068 (1980).  Following the stay order, moreover, the district court's judgment was reversed on appeal.  *Carey v. Klutznick*, 653 F.2d 732,

736 (2d Cir. 1981).  *Carey* thus illustrates that § 141(b)'s December 31 mandate is absolute, and cannot be overridden by a judicial remedy.

But given this statutory deadline, it is unclear how Plaintiffs' broad (albeit speculative) programmatic challenge to ongoing census operations could ever be redressable.  For all their criticism of the Bureau's current plan, Plaintiffs have no alternative proposal—none—for how the Bureau is to complete a better census by the statutory deadline.  In fact, they seem to categorically reject the idea.  *See, e.g.*, Mot. 22.  That alone should be dispositive.  *Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 183 (D.C. Cir. 1996) (alleged enumeration injury not redressable where plaintiffs "do not even ask that [] alternative methodologies . . . be employed in a recount" and the court has no basis to find "that a commission of as-yet unnamed persons, using as-yet unidentified methodologies, will devise a better [] count that will redound to appellants' benefit").  Even were the Court to grant the requested relief and set aside the Replan, the statutory deadline would still exist, and the Bureau would need to meet it.  Plaintiffs' injuries would thus persist, unremedied by the Court—indeed, they would be made worse because, if enjoined, the Bureau could not use what time remains to conduct the census in the manner it has deemed most accurate and efficient.

### B.    Plaintiffs' Alleged Injuries are Not Traceable to Defendants' Actions

For similar reasons, Plaintiffs fail to establish the requisite "causal connection between" their alleged injury and the Replan they challenge.  *Defs. of Wildlife*, 504 U.S. at 560.  To establish such a connection, Plaintiffs must show more than that their populations may be undercounted under the plan the Bureau has developed.  They must establish that their populations will be "improperly undercounted by [a particular] methodology *as compared to a feasible, alternative methodology*," *Kantor*, 91 F.3d at 183 (emphasis in original)—and further, that the difference between the two methodologies is sufficiently large to produce some kind of harm, *id.* at 185-86.  *See also Franklin*, 505 U.S. at 802 (plurality) (challengers to the allocation of overseas employees among states had "neither alleged nor shown . . . that [they] would have had an additional Representative if the allocation had been done using some other source of 'more accurate' data"

1 and accordingly did not have standing "to challenge the accuracy of the data used in making that
2 allocation").  Plaintiffs have not done so.

3        As noted above, Plaintiffs complain that the current census plan will result in an undercount
4 of people in their communities, but they have identified *no* other feasible method by which the
5 Bureau could meet the end-of-year deadline—much less one that can produce a supposedly more-
6 accurate result.  Absent such an alternative, Plaintiffs cannot meaningfully contend that any alleged
7 undercount of their communities is, in fact, caused by the Bureau's plan, rather than by an
8 independent factor, such as the COVID-19 pandemic, the statutory deadline, or both.

9        In fact, all of Plaintiffs' efforts to extol an alternative plan that *disregards* the statutory
10 deadline only emphasize that their alleged injuries derive, first and foremost, from *Congress's*
11 decision not to extend the census deadline, rather than from the Bureau's adoption of the Replan.
12 That is fatal to their standing.  *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)
13 (Federal courts have jurisdiction only if the plaintiff's injury "fairly can be traced to the challenged
14 [conduct] of the defendant, and [does] not … result[] from the independent action of some third
15 party not before the court.").  Since congressional inaction is the source of their injuries, Plaintiffs
16 should petition Congress, not this Court.  Plaintiffs cannot seek redress against the Bureau for
17 choosing to follow the law.

18        **C.    Plaintiffs' Injuries are too Speculative to Confer Standing**

19        Separate from redressability and causation, Article III also requires that Plaintiffs establish
20 "injury in fact" by showing that they "ha[ve] sustained or [are] immediately in danger of sustaining
21 a direct injury" as a result of the challenged action.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552
22 (2016).  The injury must be "concrete and particularized," *Defs. of Wildlife*, 504 U.S. at 560, and
23 not "merely 'conjectural' or 'hypothetical' or otherwise speculative." *Summers v. Earth Island
24 Inst.*, 555 U.S. 488, 505 (2009).  An alleged future injury must be "*certainly impending*" and cannot
25 rely on a "highly attenuated chain of possibilities"; "'[a]llegations of *possible* future injury' are
26 not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 410 (2013) (quoting *Whitmore
27 v. Arkansas*, 495 U.S. 149, 158 (1990)).  Yet Plaintiffs' alleged injuries rest on exactly that kind
28 of speculative chain.

As detailed in the Fontenot Declaration, the Replan was designed to provide "the best combination of" procedures to allow the Bureau "to meet the statutory deadline without compromising quality to an undue degree." Fontenot Decl. ¶¶ 82, 86-91. Among other things, the plan "intends to improve the speed of the [non response follow up] operations without sacrificing completeness." *Id.* ¶ 86. The Bureau "is confident that it can achieve a complete and accurate census and report apportionment counts by the statutory deadline following the" Replan. *Id.* ¶ 91. Plaintiffs appear to disagree with that assessment. But neither they nor their declarants have the same insight into the details and implementation of the Bureau's Replan that Mr. Fontenot and his colleagues in the Census Bureau do as a result of their development and execution of that Replan. The Bureau is in best position to speak to the likely effects of its operational choices, and generalized assertions to the contrary by Plaintiffs' declarants must be discounted accordingly.

But even crediting Plaintiffs' allegations, establishing the likelihood of an undercount would only be the beginning. The number of congressional seats for each geographical area is affected not only by that area's *own* total population, but also by the population of *every other* area in the country. *See* 2 U.S.C. § 2a(a); https://www.census.gov/population/apportionment/about/computing.html; *U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 461 (1992). Likewise, the allocation of federal funds is not directly proportional to population; instead, it is a function of multiple factors, often including the populations of *other* states. *See, e.g.*, 49 U.S.C. § 5305(d)(1) (certain transportation funding). An undercount may thus be immaterial if it is replicated elsewhere, or does not exceed a certain threshold. *See, e.g.*, *Kantor*, 91 F.3d at 183. Accordingly, to have standing, Plaintiffs must actually demonstrate that any alleged undercount will be so severe and disproportionate that it will cause them to lose legislative seats or funding. *Id.* at 185 (no standing because court could not determine "what effect any methodology for counting the homeless would have on the federal funding of any particular appellant," since "if a more accurate count would have enlarged some communities' shares, it likely would have reduced the shares of other communities"); *Ridge v. Verity*, 715 F. Supp. 1308, 1318 (W.D. Pa. 1989) (no standing because "none of the plaintiffs in this case can show which states would gain and which would lose representation in Congress"); *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp.

564, 570 (D.D.C. 1980) (no standing because "none of the plaintiffs are able to allege that the weight of his or her vote in the next decade will be affected" since plaintiffs "can do no more than speculate as to which states might gain and which might lose representation," which depends on "the interplay of all the other population factors which affect apportionment"); *see also Sharrow v. Brown*, 447 F.2d 94, 97 (2d Cir. 1971) (no standing to challenge apportionment method because plaintiff "would have to show, at least approximately, the apportionment his interpretation . . . would yield, not only for New York but *for every other State as well*" (emphasis added)).

Plaintiffs have made no such showing.  To the contrary, they contend that the Replan will lead to "lower-quality data across the board," Mot. 27, implying that all jurisdictions, not just theirs, may be equally affected.  And indeed, while Plaintiffs complain of potential undercount in Los Angeles and other cities with allegedly low rates of self-response, Mot. 26-27, Compl. ¶¶ 23-40, their own expert notes that self-response rates are *also* "disproportionately lower . . . in some rural areas."  Decl. of John Thompson ¶ 20, ECF No. 36-2 ("Thompson Decl."); *see also* Decl. of D. Sunshine Hillygus ¶ 17, ECF No. 36-3 (noting that "[t]he majority of states, counties, cities, districts, tracts, and tribal lands [currently] have lower self-response rates . . . compared to 2010").  In fact, Plaintiffs' expert notes that (1) those rural areas have a response rate under 35 percent, Thompson Decl. ¶ 20, which is *substantially* lower than the 49.6 to 61 percent range that Plaintiffs identify in their constituent communities, Compl. ¶¶ 295-97, and (2) this exceedingly low response rate is "likely" to result in "increased undercounts" for these rural areas, Thompson Decl. ¶ 20.  Yet Plaintiffs completely fail to consider how any potential undercount in such rural communities, or any other communities beyond theirs, could affect Plaintiffs' share of funding or apportionment of legislative seats.  *See* Mot. 29-31 (contending that Plaintiffs' communities may be undercounted, but offering no evidence regarding how any such undercount may relate to counts in other jurisdictions).  As a result, the Court would have to guess whether and how those undercounts could affect Plaintiffs.  Such guesswork does not support jurisdiction, much less an injunction.  *See Clapper*, 568 U.S. at 414 n.5 (no Article III standing exists if a plaintiff's theory of injury rests on an "attenuated chain of inferences necessary to find harm").

To be sure, Plaintiffs contend that the possibility of *any* inaccuracy or undercount in the census is injurious because it (1) decreases the quality of data they use for various purposes, and (2) leads them to "expend additional resources in an attempt to mitigate the undercounting." Mot. 31; *see also* Compl. ¶¶ 319-29.  But Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416.  And any suggestion that census inaccuracy is a *per se* harm must be rejected.  Despite the constitutional significance of the census, "no census is recognized as having been wholly successful in achieving" accuracy.  *Wisconsin*, 517 U.S. at 6; *see also Karcher v. Daggett*, 462 U.S. 725, 732 (1983) (recognizing that "census data are not perfect," and that "population counts for particular localities are outdated long before they are completed"); *Gaffney v. Cummings*, 412 U.S. 735, 745 (1973) (census data "are inherently less than absolutely accurate").  "Despite consistent efforts to improve the quality of the count, errors persist." *Wisconsin*, 517 U.S. at 6.  Indeed, "it is widely acknowledged that each decennial Census inevitably results in an 'undercount' of the American public." *NAACP v. Bureau of the Census*, 945 F.3d 183, 186 (4th Cir. 2019).  Under Plaintiffs' theory, this systemic and persistent undercount would mean that any state, locality, or organization would *always* have standing to challenge the census and its procedures and design.

The Supreme Court has never endorsed such a framework.  To the contrary, it has scrutinized claims of harm in census cases to ensure that prospective litigants have demonstrated that whatever methodology they challenge is material to an actual or likely injury.  *See, e.g.*, *Utah*, 536 U.S. at 458 (noting that the challenged methodology indisputably changed which state received a Representative); *House of Representatives*, 525 U.S. at 330 (noting that plaintiffs produced evidence showing that under the challenged plan a state would lose a representative compared to the prior method).

The Supreme Court's recent decision in *New York* demonstrates that fact clearly.  139 S. Ct. at 2565.  In evaluating whether the plaintiffs had standing to challenge the reinstatement of a citizenship question on the census form, the Supreme Court noted that evidence at trial showed that several state plaintiffs would "lose out on federal funds" "if noncitizen households [were]

undercounted by as little as 2%," which was less than half of the undercount the district court estimated to result from inclusion of the question. *Id.* Here, by contrast, Plaintiffs present no such particulars and demonstrate no thresholds. *See* Mot. 30-32; Compl. ¶¶ 294-329. Instead, they make generalized allegations that they will be injured by an undercount—seemingly no matter how small. That falls far short of the requisite standard.

*   *   *

Plaintiffs are not entitled to a judicial remedy merely because they have generalized concerns about census accuracy. They are certainly not entitled to a remedy setting aside the Replan when their alleged injuries are not traceable to that plan, nor redressable if it were invalidated. Because they lack standing, Plaintiffs' request for an injunction should be rejected on threshold jurisdictional grounds.

## III.   PLAINTIFFS FAIL TO ESTABLISH A COGNIZABLE APA CLAIM

Even assuming Plaintiffs could overcome the threshold deficiencies of the political question doctrine and a lack of Article III standing, their claims are nonetheless unlikely to succeed on the merits. To start, their APA claims likewise suffer from threshold deficiencies, in that Plaintiffs have launched a wholesale programmatic attack on the Census Bureau's plans to complete the 2020 Census, which fails both the discreteness and finality requirements for judicial review under the APA. And there is furthermore no standard in the Census Act by which the Court could determine, for example, whether the decision to close field operations by September 30, as opposed to some other day, is contrary to law. Instead, Congress, which the Constitution entrusts with the "Manner" of carrying out the decennial census, has delegated to the Secretary the authority to 'take a decennial census of population . . . in such form and content as he may determine." 13 U.S.C. § 141(a). Regardless, even were the merits of Plaintiffs' claims reviewable, they do not show that the Replan fails the APA's arbitrary-and-capricious standard, particularly given the looming end-of-year deadline to complete the count and report results to the President.

### A.   The Replan is Not Final Agency Action and Therefore Is Not Reviewable.

"To maintain a cause of action under the APA, a plaintiff must challenge 'agency action' that is 'final.'" *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800 (9th Cir. 2013) (citing *Norton*

*v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 61-62 (2004)).  Congress defined "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  And "final" agency action within the meaning of § 704 of the APA, requires that two conditions be met: "First, the action must mark the 'consummation' of the agency's decision–making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  The Replan is neither "agency action" nor, of necessity, "final agency action," and Plaintiffs' APA claims therefore fail at the outset.

### 1.    The Replan is not "agency action" under the APA.

The Supreme Court has held that, to satisfy the "agency action" requirement, 5 U.S.C. § 551(13), the matter at issue must be a "circumscribed, discrete agency action[]" that exhibits a "characteristic of discreteness." *SUWA*, 542 U.S. at 62-63.  This statutory limitation, the Court explained, "precludes [a] broad programmatic attack" on an agency's operations. *Id.* at 64.  Thus, the APA does not permit a plaintiff to attack an agency program "consisting of . . . many individual actions" simply by characterizing it as "agency action" under the APA.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990).  A plaintiff seeking improvement or changes to an agency program must seek it in "the halls of Congress, where programmatic improvements are normally made," rather than by "court decree." *Id.* at 891; *see also San Luis Unit Food Producers v. United States*, 709 F.3d 798, 808 (9th Cir. 2013) (holding that "a broad, programmatic challenge to [an agency's] operation and management of [a statutory obligation] . . . [is] not cognizable under the APA") .

That Plaintiffs have leveled an improper, programmatic attack on the Bureau's efforts to conduct the 2020 Census could not be more obvious.  By Plaintiffs' own account, they challenge the Bureau's choices "in determining how to conduct the census," Mot. 3, and seek to have this Court dictate, according to Plaintiffs' preferences, how the Bureau carries out and completes the census, *see* Compl. ¶ 358 (demanding that Court enjoin Defendants from "unlawfully interfering with the COVID-19 Plan").  Like similar attempts to wrest operational control of the census away

from the Bureau, Plaintiffs' requested emergency relief would undoubtedly entail "a sweeping overhaul to the [Replan], which exceeds the scope of reviewable 'agency action.'" *NAACP*, 399 F. Supp. 3d at 422 (D. Md.), *aff'd in part, rev'd in part on other grounds and remanded*, 945 F.3d 183 (4th Cir. 2019)

In attacking the Replan, Plaintiffs focus primarily on the alleged insufficiency of the timeline for completing field operations and non-response follow-up operations and data processing.  Mot. 17-18.  But Plaintiffs' challenge does not end there, as they further assail "reduced staffing," "increased reliance on administrative records," "increased use of imputation," "problems with data processing," and a "shortened processing timeline."  Mot. 19-20.  In short, Plaintiffs contend that it is both the totality of these asserted insufficiencies, and their interrelationship and "exacerbat[ion]" of one another, that, on the whole, "are likely to result in reduced quality in the census data and less accurate results."  Mot. 20.

The Fourth Circuit recently rejected a strikingly similar challenge to the Census Bureau's operational plan for the 2020 Census because the challenged actions were not "'circumscribed' and 'discrete.'"  *NAACP*, 945 F.3d at 190.  The operational plans that the plaintiffs there sought to set aside were, the court concluded, not cognizable discrete agency actions because "the various 'design choices' being challenged expressly are tied to one another."  *Id.* at 191.  "'Setting aside' one or more of these 'choices'  necessarily would impact the efficacy of the others, and inevitably would lead to court involvement in 'hands-on' management of the Census Bureau's operations."  *Id.*  (citing *SUWA*, 542 U.S. at 66-67).  That outcome, the court concluded, "is precisely the result that the 'discreteness' requirement of the APA is deigned to avoid."  *Id.* (rejecting the "broad, sweeping nature of the allegations that the plaintiffs have elected to assert under the APA").

Precisely the same conclusion is warranted here, particularly where Plaintiffs make no effort to reconcile their broadside attack on the Replan with the "agency action" requirement. Entertaining Plaintiffs' challenge to the Replan would embroil the Court not only in difficult— indeed, unanswerable—questions concerning what operational and scheduling measures the law purportedly requires, but also in potential monitoring of the Bureau's efforts going forward.  *See Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 506 (9th Cir. 1997) (denying relief "which would

require reaching into an agency of the executive branch and dictating the details of its internal operations" (quotation omitted)).  That is all the more so when Plaintiffs' action is treated, as it could be, as one to *compel* agency action, since Plaintiffs can point to no discrete requirements to conduct field operations or data processing for a certain duration, to maintain staffing at certain levels, or to rely to some specified degree of in-person enumeration rather than administrative records, proxies, or imputation—let alone any requirement to do all of these things.  *NAACP*, 399 F. Supp. 3d at 423 (challenged actions by Census Bureau neither "discrete in character" not "required by law" and therefore not proper subjects of APA relief).

### 2.    The Replan is not "final agency action" subject to judicial review

Even if all the various facets of the Replan could be considered an "agency action," it is not "final" agency action that is subject to judicial review under § 704.  In *Franklin*, the Supreme Court held that the Secretary's transmission of a final census report to the President under 13 U.S.C. § 141—a report compiled after the execution of the overall census operational plan—is *itself* not final agency action.  505 U.S. at 798 ("[T]he 'decennial census' still presents a moving target, even after the Secretary reports to the President.").  Given this holding, it would make no sense to find the Bureau's antecedent operations, which are still being implemented and will only lead to a report sometime in the future, to be judicially reviewable.

Indeed, the Replan is nothing more than an interlocutory announcement of how it intends to complete the count within the time remaining under the existing statutory deadline.  Director Dillingham made clear in his August 3 statement that the Bureau was "announcing updates" and that it "continues to evaluate its operational plans."  Huseny Decl., Ex. 1 at 1, ECF No. 37-1; *see id.*, Ex. 2 at 2, ECF No. 37-2 (Bureau noting that it is 'continually assess[ing] [its] operational plans" and that it remains "ready to adapt to challenges in the environment").  This is not, as Plaintiffs summarily put it, a final decisional statement that the elements of the Replan "would now govern," Mot. 15, but instead is an acknowledgment by the Bureau of the need for adaptability in the face of the unprecedented challenge of conducting a census during a pandemic when congressional relief from the deadline is not forthcoming.  That announcement merely confirms how interlocutory the Bureau's operations are.

Similarly, Plaintiffs' claim that the Replan affects legal rights and obligations could not be more barebones.  Mot. 16.  (summarily contending that the Replan "directly affected rights and obligations").  Spanning two sentences, Plaintiffs advance two unconvincing reasons for this summary contention.  Initially, they say that the Replan affects legal rights because the self-response options now close on September 30, 2020.  Mot. 16; Fontenot Decl. ¶ 47 ("The total self-response period for the 2020 Census will be longer than the 2010 self-response period").  To begin, this argument concerns only the change in the close of field operations, and cannot be used to bootstrap finality for the Plaintiffs' more comprehensive attack on the entire Replan.  Even then, the Bureau's determination that the existing congressional deadline necessitated closing self-response options on September 30 does not affect any legal right because a respondent has no individualized legal "right" to any particular timetable to respond to the census questionnaire, and Plaintiffs identify none.  And insofar as Plaintiffs would resort to a more inchoate "right" to be counted—although their papers make no such mention—the Bureau fully intends to account for non-responding households through imputations, administrative records, or other methods, just as it would have done under an October 31 close of self-response.  *See Confederacion de la Raza Unida v. Brown*, 345 F. Supp. 909, 910 (N.D. Cal. 1972) ("Plaintiffs do not contend, and correctly so, that they have an absolute right to be counted [in the census].");  *Nat'l Law Ctr. on Homelessness & Poverty v. Brown*, CIV. A. 92-2257-LFO, 1994 WL 521334, at *8 (D.D.C. Sept. 15, 1994) ("The Constitution does not provide individuals with a right to be counted . . . .").

Plaintiffs' only other claim to finality is in asserting that the Replan has legal consequences because, in Plaintiffs' speculative estimation, "the census *results* will affect apportionment, funding, and myriad other critical decisions."  Mot. 16 (emphasis added).  That claim to finality fails just as it did in *NAACP*.  The *NAACP* plaintiffs argued that the Bureau's operational decisions violated the APA because the alleged shortcomings of those decisions, according to the plaintiffs, "would create a disproportional impact on undercounted communities."  *NAACP*, 945 F.3d at 191.  The court firmly rejected this argument on finality grounds, holding that such "attenuated allegations amount to little more than a 'best guess' regarding the consequences of cancelling the tests at issue."  *Id.*  Indeed, the Supreme Court has held that even the Secretary's census report to

the President "serves more like a tentative recommendation than a final and binding determination" and therefore "carries no direct consequences for the reapportionment." *Franklin*, 505 U.S. at 798. Finality is no more present in the Replan just because the 2020 Census, like any other, will have downstream effects on apportionment and federal funding.

In sum, the Replan sets protocols for the Census Bureau's own internal operations, and does not require anyone to do, or not do, anything. *See Wild Fish Conservancy*, 730 F.3d at 801 ("day-to-day operations that merely implement operational plans" are not final); *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 987 (9th Cir. 2006) (action can be final if it "has the status of law or comparable legal force, and whether immediate compliance with its terms is expected"). Final agency action is lacking, and Plaintiffs cannot prevail on their APA claims.

## B.     The Bureau's Choices Regarding How to Meet The Statutory Deadline are Committed to Agency Discretion, and are Therefore Unreviewable

Even assuming a plaintiff has challenged final agency action, APA review is nonetheless unavailable when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "An agency action is 'committed to [its] discretion by law' where a 'statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion'— *i.e.*, where it is 'drawn in such broad terms that in a given case there is no law to apply.'" *Pac. Nw. Generating Co-op. v. Bonneville Power Admin.*, 596 F.3d 1065, 1075 n.7 (9th Cir. 2010) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). This bar against judicial review applies, moreover, even when "the agency gives a 'reviewable' reason for otherwise unreviewable action." *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987).

In the Census Act, Congress directed the Secretary to "take a decennial census of population . . . in such form and content as he may determine," 13 U.S.C. § 141(a), thereby providing the Secretary, and in turn the Census Bureau, with abundant discretion in how to carry out the census. As the Supreme Court has put it, "Congress has delegated its broad authority over the census to the Secretary," which entails Congress's "virtually unlimited discretion in conducting the decennial 'actual Enumeration.'" *Wisconsin*, 517 U.S. at 19 (quoting U.S. Const., art. I, § 2, cl. 3). Wholly absent from the Census Act or any other statute is a "meaningful standard' against

which this Court could assess the legality of the multiple discretionary planning choices by the Census Bureau that Plaintiffs challenge here.  Neither the Census Act nor any of the Census Bureau's or Commerce Department's regulations have anything to say about timetables for field operations, data processing requirements, staffing levels, or staff training requirements—and Plaintiffs tellingly fail to cite any such provision.  It is difficult to imagine a statute that could more easily meet the test of being "'drawn in such broad terms that . . . there is no law to apply.'"  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971).

Courts considering challenges to the broad operations of census-taking agree.  As the Seventh Circuit explained, "[i]t might be different if the apportionment clause, the census statutes, or the Administrative Procedure Act contained guidelines for an accurate decennial census[.] . . . There is nothing of that sort, and the inference is that these enactments do not create justiciable rights."  *Tucker*, 958 F.2d at 1417.  In fact, the court addressed Plaintiffs' design-of-the-census allegations, explaining that the census statutes simply "specify a timetable, and a procedure for translating fractional into whole seats" but "they say nothing about *how to conduct a census* or what to do about undercounts."  *Id.* (emphasis added); *see id.* at 1419 (Ripple, J., concurring) (stating that the census decision at issue was "committed to agency discretion").  True, the Supreme Court in *New York* held the decision to add a citizenship question was *not* committed to agency discretion.  139 S. Ct. at 2568-69.  But there, the Court relied on specific statutory provisions that spoke, for example, to limitations on the Secretary's power "to collect information through direct inquiries when administrative records are available."  *Id.* at 2568 (citing 13 U.S.C. § 6(c)).  Here, by contrast, there are no provisions that meaningfully constrain or direct the Census Bureau on the timing, staffing, or sequencing of census-taking, or the processing of data—except, that is, the deadline to deliver the final census report by December 31.  Plaintiffs ask the Bureau to ignore that deadline, and there is no meaningful standard by which to review that request.

Even district courts that found census-related issues reviewable under the APA—like the accuracy of the final census count—have recognized that the mechanics of actually conducting the census are committed to agency discretion.  *See City of Willacoochee v. Baldrige*, 556 F. Supp. 551, 555 (S.D. Ga. 1983) (noting that the accuracy of the count is not committed to agency

discretion, but that "the grant of discretion in 13 U.S.C. § 141(a) appears to encompass the methods used by the defendants to compile the census"); *City of Phila. v. Klutznick,* 503 F. Supp. 663, 678 (E.D. Pa. 1980) (dismissing a claim that the Census Bureau failed to hire skilled enumerators as committed to agency discretion because "[r]eview of this allegation would involve the [c]ourt in second-guessing the managerial decisions of the Bureau").[5]

The Court should follow these cases and hold that Plaintiffs' APA claims are unreviewable because they are committed to agency discretion by law.  As the district court in *NAACP* pointed out last year in a challenge to the Bureau's original Operational Plan, there has never been a lawsuit that "has resulted in the sweeping relief" of a judicially-enforceable directive to conduct the census in a particular manner, which "speaks volumes about the authority (not to mention ability) of courts to second-guess the Secretary's planning of the decennial census as it is taking place, or the standards under which they might attempt to do so."  *NAACP v. Bureau of the Census*, 382 F. Supp. 3d 349, 373 (D. Md. 2019).

### C. Even Assuming the Replan Were Reviewable, and That Meaningful Standards for Such Review Could Somehow be Ascertained, the Replan Does Not Violate the APA.

Were the Court to reject these threshold APA limitations on judicial review, emergency injunctive relief would nonetheless be improper because Plaintiffs are unlikely to prevail on the merits of their APA claims.  None of their attacks on the Replan suffices to permit the Court to conclude that it is arbitrary and capricious, or that it was undertaken as a "pretext" for some ulterior goal.

At the outset, Plaintiffs appear to have conflated the Replan itself—a set of internal operating protocols for the Bureau to satisfy its statutory obligations under the Census Act—with

---

[5] Although other courts have concluded that the APA permits judicial review of certain census-related actions, none of those decisions involved the sweeping nature of Plaintiffs' request here—to dictate, through a judicial injunction, to the Census Bureau that it cannot exercise its discretion to plan and complete the 2020 Census. *See, e.g.*, *California v. Ross*, 362 F. Supp. 3d 727, 746 (N.D. Cal. 2018) (reviewing addition of citizenship question to 2020 census questionnaire); *State v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 796 (S.D.N.Y. 2018) (same); *Dist. of Columbia v. U.S. Dep't of Commerce*, 789 F. Supp. 1179, 1188 n.16 (1992) (reviewing decision to count as in-state residents inmates held in a prison in a different state).

1    the Director's August 3 announcement.  *See* Mot. 19 (criticizing Director's August 3 statement for

2    "giv[ing] no hint" of how to meet various minute staffing matters); *id.* at 20-21 (contending that

3    Defendants failed to consider various data processing issues "in the Rush Plan").  It has never been

4    the case, even for reviewable actions under the APA, that the agency's announcement of a decision

5    must provide a fulsome articulation of the agency's rationale.  Instead, where it applies, the APA

6    requires only that the "agency's path may reasonably be discerned," which the Fontenot

7    Declaration is more than sufficient to satisfy.[6]  *See Alaska Dep't of Envtl. Conservation v. EPA*,

8    540 U.S. 461, 497 (2004).  That Plaintiffs cannot discern from the August 3 statement the answers

9    to the particularized questions they have rushed to pose in this Court does not amount to a violation

10   of the APA.

11          *"Policy Change"*:  Plaintiffs err in supposing that the Replan reflects a change in agency

12   policy.  The Census Bureau's policy remains the same as it was in 2018 when it issued its final

13   operation plan, and just as it is for every decennial census: to "[e]nsure a complete and accurate

14   count of all communities."  Huseny Decl., Ex. 2 at 1; Fontenot Decl. ¶ 91 ("The 2020 Census

15   operational design is tailored to enumerate all persons, including hard-to-count populations."); *id.*

16   ¶ 104.  A modification of operational plans is nothing like the true policy reversals in the cases

17   Plaintiffs cite.  The Replan is not, for example, the reversal of a "decades-old" practice of treating

18   automobile service advisors as exempt from FLSA coverage, *see Encino Motorcars, LLC v.*

19   *Navarro*, 136 S. Ct. 2117, 2123 (2016), or an agency's authorization, for the first time, for States

20   to kill otherwise protected sea lions based on increased predation by those animals, *see Humane*

21   *Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1044 (9th Cir. 2010).

22          *Express reference to the statutory deadline*:  Plaintiffs also err in contending that the

23   Bureau did not give any explanation for the Replan.  Director Dillingham stated that the Replan

24   measures would be taken in order to complete "data collection and apportionment counts by our

25   statutory deadline of December 31, 2020, as required by law and directed by the Secretary of

26          [6] Because there is no "final agency action," there is no administrative record for the Replan.
27   Defendants have, however, submitted the Fontenot Declaration to oppose Plaintiffs' requested
     relief, and the Court may rely upon it to the extent necessary to consider Plaintiffs' APA
28   arguments.

Commerce." Huseny Decl., Ex. 1 at 1. Indeed, the Director's statement removes any doubt that there was any "policy change." The Replan, he stated, "reflects our *continued commitment* to conduct a complete count, provide accurate apportionment data, and protect the health and safety of the public and our workforce." *Id.*[7]

*Staffing and data processing*: Plaintiffs are flatly incorrect that the Bureau failed to consider staffing concerns before issuing the Replan. Fontenot Decl. ¶¶ 82-85. And while Plaintiffs argue that not enough enumerators are on staff for the Bureau to complete its non-response follow-up operations, Mot. 18-19, they cite no legal requirement to have some minimum level of enumerators staffed for this purpose. Plaintiffs also speculate that the Replan will result in a reliance on "a higher level of proxy enumerations, increased reliance on administrative records, and an increased use of imputation," Mot. 20, but there is nothing unlawful about relying on these methods and resources, nor any maximum "level" of permissible reliance. These methods have been used in past censuses when in-person counting was not possible. *E.g.*, *Utah*, 536 U.S. at 477.

*"Reliance interests"*: Plaintiffs also contend that the Bureau's statements earlier this year that census responses would be accepted until October 31, 2020 created "reliance interests." Mot. 21. But the Bureau did consider the public's expectations. Fontenot Decl. ¶¶ 82-85. And Plaintiffs cite no evidence of any census respondent who, in purported reliance on the October 31 timetable, has arranged their affairs such that it is no longer possible for that person to respond by September 30. And those who might have given self-responses after September 30 can always be accounted for by other methods; for that reason, a close of self-response is necessary in every census. While

---

[7] Plaintiffs mischaracterize the Secretary and the Director's joint statement of April 13, 2020 as stating that "a significant delay (and corresponding extension) in census operations was necessary to '[e]nsure a complete and accurate count of all communities.'" Mot. 17. Rather, the statement simply acknowledged that congressional relief was necessary to effectuate the COVID-19 Plan, and that the COVID-19 Plan would "ensure the completeness and accuracy of the 2020 Census." Huseny Decl., Ex. 3 at 2, ECF No. 37-3. The statement never said that an extension was "necessary" to complete the 2020 Census, much less that "a significant delay" was "necessary," as Plaintiffs erroneously contend, Mot. 17. In any event, any ambiguity is put to rest by Mr. Fontenot's statement that the Bureau "is confident that it can achieve a complete and accurate census and report apportionment counts by the statutory deadline." Fontenot Decl. ¶ 91.

Plaintiffs rely on *Department of Homeland Security v. Regents of the University of California*, the purported reliance interests here pale in comparison to individuals "enroll[ing] in degree programs, embark[ing] on careers, start[ing] businesses, purchas[ing] homes, and even marr[ying] and ha[ving] children, all in reliance on the DACA program."  140 S. Ct. 1891, 1914 (2020).  Indeed, as explained above, the timing of the close of self-response is not for the respondent's benefit, but for the Census Bureau's, so that it can analyze and compile data for apportionment purposes. Respondents have no substantive rights in connection with the timing of the decennial census that could conceivably underlie such reliance interests.

*Statutory deadline*: Plaintiffs advance the bizarre contention that honoring December 31, 2020 deadline set forth in § 141(b) amounts to a *per se* APA violation.  Mot. 21-25.  Perhaps unsurprisingly, Plaintiffs have no authority for the novel proposition that an agency somehow violates the APA by attempting to comply with the statutory requirements Congress has imposed on it.  As Mr. Fontenot explains, that statutory deadline was the critical driver of the replanning efforts.  Fontenot Decl. ¶¶ 81, 84, 91.

Plaintiffs' apparent argument is that the Census Bureau somehow unilaterally waived the statutory deadline when it announced a COVID-19 Plan.  Mot. 22 (arguing that Defendants were "fully aware" of the deadline when the released the COIVD-19 Plan).  But that makes little sense. As Plaintiffs acknowledge, the COVID-19 Plan was issued in connection with the Bureau's request for a deadline extension from Congress.  Mot. 22.  The Bureau was thus well aware that the COVID-19 Plan would be workable *only if* the extension were granted.  *See* Fontenot Decl. ¶ 79 ("This schedule required Congress to provide  legislative relief from the statutory deadlines . . . ."); Huseny Decl., Ex. 3 at 1 ("Under this plan, the Census Bureau *would* extend the window for field data collection and self-response to October 31, 2020 . . . ." (emphasis added)); *see also* Huseny Decl., Ex. 8 at 1, ECF NO. 37-8 (requested supplemental "funding *would* allow for supplemental hiring, pay incentives, additional outreach and advertising, and replenished contingency funding to provide needed flexibility as the Census Bureau conducts its largest component of the field operation, Nonresponse Follow-up" (emphasis added)).  That the Bureau began to implement the COVID-19 Plan on an optimistic view that Congress might grant the extension request, does not

mean that the deadline would no longer apply, or that the Bureau itself assumed authority to change the statutory deadline.[8]  There is no authority for this novel view of the APA.

Plaintiffs' attempt to rehash this same argument under constitutional guise gets them no further.  Mot. 22-23.  As detailed *infra*, the Replan does not violate the Enumeration Clause as Plaintiffs summarily assume.  And *Carey v. Klutznick*, on which Plaintiffs place great weight, not only does not authorize the Bureau to ignore the deadline as Plaintiffs demand, but culminated in the precise opposite outcome.  449 U.S. at 1068.  The *Carey* plaintiffs moreover sought relief specific to one State which, in Plaintiffs' own words, "*might* have caused the Census Bureau to miss the December 31 deadline."  Mot. 23 (emphasis added).  By contrast, what Plaintiffs seek to compel is the wholesale forfeiture of the Census Bureau's duty to deliver the *entire* census by to the statutory deadline, and they further seek to enlist the Court to *mandate* that outcome.  That would be an unprecedented step.[9]

*"Pretext"*:  Finally, Plaintiffs see something untoward—which in their view is apparently enough to violate the APA—in the "telling" timing of the President's July 21, 2020 Memorandum, Mot. 24, which requires the Secretary, to the extent feasible, to identify the numbers of illegal aliens counted in the census for potential exclusion from the apportionment base.  85 Fed. Reg. 44,679 (July 21, 2020).  But there is nothing amiss with an Administration adopting a policy that it wishes to see implemented within the existing legal framework.  That is the ordinary stuff of Government policymaking and the history of the census is replete with policy choices.  And Plaintiffs' allegations of "political chicanery" notwithstanding, Mot. 25, the Bureau must meet a statutory deadline regardless of whether the President had issued the Memorandum.  Plaintiffs may

---

[8]  The fact that the President said "I don't know that you even have to ask them [Congress]" is entirely irrelevant.  Mot. 10.  Even if the Court were to indulge Plaintiffs' interpretation of this remark as some sort of official view that an extension "request was unnecessary," Mot. 22, such a statement by the President is not sufficient to supersede a statute, as Plaintiffs are no doubt aware.

[9]  Plaintiffs also mischaracterize *Franklin* when they contend it licenses treating the December 31 deadline as "non-final."  Mot. 23.  *Franklin* concerned not the Secretary's report to the President, but the actions of the President prior to transmitting the apportionment figures to Congress under 2 U.S.C. § 2a, a separate statutory provision with a separate deadline.  505 U.S. at 797-98.  Nothing in *Franklin* remotely suggests that a Court can waive the deadline of § 141(b), as Plaintiffs here demand.

want the Census Bureau to flout the statutory deadline to leave room for the prospect, as Plaintiffs see it, "that the President will no longer be in office when data is provided." Mot. 24.  That politically tinged view of the APA cannot prevail.  Just because Plaintiffs dislike the President's policy announced in the Memorandum does not mean that the Census Bureau *must* ignore the December 31 deadline, as Plaintiffs' motion demands.  Invalidating agency actions under the APA simply because they bear some connection to a policy advanced by a different Government entity or actor—in this case the President—is a theory of liability wholly untethered from the text of the APA or any of its judicial precedents.[10]

## IV.   PLAINTIFFS' ENUMERATION CLAUSE ARGUMENTS LACK MERIT

If the Court finds it justiciable, Plaintiffs are not likely to succeed on their Enumeration Clause claim either.  The Constitution's reference to "actual Enumeration" is simple: population is to be determined through a person-by-person headcount, rather than through estimates or conjecture.  The Replan endeavors to do just that, and spells out no intention to rely on prohibited estimates or guesswork.  Plaintiffs tacitly acknowledge as much, and focus not on any alleged violation of the Constitution's "actual Enumeration" command, but on speculative claims that inadequate field operations will necessitate methodologies entailing the use of administrative records or imputation, which will in turn fall below some unspecified floor of constitutionally mandated accuracy.  But no judicial decision has articulated a viable standard by which to assess the constitutional muster of various counting methodologies.  Despite Plaintiffs' protestations that the Replan will "undercut" accuracy, Mot. 25, they fail to establish any meaningful metric governing such accuracy concerns that the Replan fails to meet.  That Plaintiffs have subjectively prejudged the 2020 Census to be a failure is not sufficient to prevail on their Enumeration Clause claim.

Initially, Plaintiffs are wrong that the "reasonable relationship" standard applied in *Wisconsin* likewise applies here.  The *Wisconsin* Court considered an Enumeration Clause challenge to the Secretary's decision not to make statistical adjustments following the 1990 census

---

[10]   Plaintiffs also cannot tar the Census Bureau's Replan with a "pretextual" rationale simply by referring to a different decision, by Secretary Ross, more than two years ago to add a citizenship question to the questionnaire.  Mot. 25.

to rectify alleged differential undercounts.  517 U.S. at 10-11.  The Court cited the "virtually unlimited discretion" the Constitution grants to Congress "in conducting the decennial 'actual Enumeration,'" and explained that Congress had in turn delegated its "broad authority" to the Secretary.  *Id.* at 19.  It then announced that the Secretary's decision not to adjust the census count "need bear only a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census."  *Id.* at 20.  The Court observed that a similar standard had been applied in *Montana* and *Franklin*, both of which similarly involved Executive Branch decisions to adjust the census counts *after* the census had been conducted.  *See Franklin*, 505 U.S. at 804 (reviewing the Secretary's decision to allocate overseas federal personnel to their home States); *Montana*, 503 U.S. at 460 (challenge to method used to apportion House seats among the States).

Last Term, the Court in *New York* confirmed the limited applicability of the "reasonable relationship" standard by clarifying that it is to be applied only in cases which "concern[] decisions about the population count itself."  139 S. Ct. at 2566.  By "the population count itself" the Court referred to census data *already collected* by the Bureau.  Were it otherwise, and the "reasonable relationship" standard applicable to questions of how the final census count is generated, that standard would have been applied in *Utah v. Evans*, which concerned the use of an imputation methodology, not to mention in *New York* itself.   *See Utah*, 536 U.S. at 464 (foregoing the *Wisconsin* standard in determining the constitutionality of imputation); *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 346-47 (1999) (Scalia, J., concurring in part) (discussing the constitutionality of statistical sampling without reference to the *Wisconsin* reasonable-relationship standard); *id.* at 363 (Stevens, J., dissenting) (same).

Plaintiffs' Enumeration Clause claim here, by contrast, challenges detailed operational aspects of the Census Bureau's plans to actually *conduct* the census, well before "the population count itself" has been determined.  Plaintiffs cite no case in which this type of pre-count claim was brought and the "reasonable relationship" standard applied.  Plaintiffs' Enumeration Clause claim should instead be assessed against Congress's, and by delegation the Secretary's, "virtually

1   unlimited discretion" *Wisconsin*, 517 U.S. at 19, to conduct the census "in such Manner as they

2   shall by Law direct," U.S. Const., art. 1, § 2, cl. 3.

3          Measured against that standard, Plaintiffs' claim is exceedingly unlikely to prevail.

4   Choices over how, in the face of a pandemic, to allocate resources, conduct data processing, and

5   manage timetables all in order to meet a statutory deadline are prototypical questions about the

6   "Manner" in which an actual enumeration should be conducted and fall well within the scope of

7   the Secretary's "broad authority over the census." *Wisconsin*, 517 U.S. at 17.  Nowhere do Plaintiff

8   allege, for example, that Defendants are conducting something other than an "actual Enumeration,"

9   such as an estimate or conjecture of the population.

10         Plaintiffs' constitutional argument is not that Defendants are failing to conduct an actual

11  enumeration, but rather that Defendants aren't doing a good enough job of it.  They argue, for

12  example, that the Replan will produce "flawed counts" and, specifically, an undercount that

13  "disproportionately impact[s] hard-to-count groups."  Mot. 26 (asserting that the Replan will lead

14  to "an exacerbated overcount of the White population").  But the possibility of flaws or an

15  undercount exists in every census, and does not inherently violate the Enumeration Clause—the

16  Constitution does not require perfection.  *See Utah*, 536 U.S. at 504 (Thomas, J., concurring in

17  part and dissenting in part) (canvassing the history of census undercounts, including the first

18  Census in 1790); *Wisconsin*, 517 U.S. at 6 ("Although each [of the 20 past censuses] was designed

19  with the goal of accomplishing an 'actual Enumeration' of the population, no census is recognized

20  as having been wholly successful in achieving that goal."); *Gaffney,* 412 U.S. at 745  (census data

21  "are inherently less than absolutely accurate").  Moreover, Plaintiffs' declarants acknowledge that

22  even differential undercounts are commonplace in the census.  Thompson Decl. ¶ 21; Hillygus

23  Decl. ¶ 11; *see City of New York v. U.S. Dep't of Commerce*, 34 F.3d 1114, 1117 (2d Cir. 1994)

24  ("This phenomenon, known as the 'differential undercount,' has skewed every census since at least

25  1940.  The Census Bureau started measuring the differential undercount in that year."), *rev'd sub*

26  *nom. Wisconsin*, 517 U.S. at 1.  As long as the Secretary has established pre-census procedures for

27  individually counting every resident of the United States, any undercount is the constitutionally

28

permissible result of attempting to enumerate upwards of 330 million people across 3.8 million square miles.  *See* https://www.census.gov/popclock/.

No matter how much Plaintiffs take issue with the particulars of how Defendants intend to use certain methodologies, none of those methodologies—imputation, administrative records, or proxies—are themselves unlawful, and Plaintiffs rightly do not bother to argue as much.  Plaintiffs have not plausibly established that any aspect of the Replan falls outside the bounds of the "Manner' in which the census is to be conducted, and their Enumeration Clause claim is unlikely to succeed.[11]

## V.    PLAINTIFFS FAIL TO SATISFY THE OTHER INJUNCTION FACTORS

The Supreme Court has made clear that the "extraordinary remedy" of a preliminary injunction may not be awarded when a plaintiff fails to demonstrate a likelihood of success on the merits.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 32-33 (2008); *see also see Munaf v. Geren*, 553 U.S. 674, 690 (2008) (likelihood of success requires far more than identifying "serious,

---

[11]  Notably, Plaintiffs' Enumeration Clause claim would fail even if the Court were to apply the *Wisconsin* standard to ask whether the Bureau's planned operations bear a "reasonable relationship to the accomplishment of an actual enumeration."  517 U.S. at 19.  Notably, Defendants are aware of no decision finding a violation of that standard, and this should not be the first.  *See NAACP v. Bureau of Census*, --- F. Supp. 3d ---, 2020 WL 1890531, at *6 (D. Md. Apr. 16, 2020) ("I have located no case where a court has found a violation of the *Wisconsin* reasonable relationship standard . . . .").

Plaintiffs principally target the "shortened non-response follow up period," Mot. 26, but the Bureau reasonably chose to divide what available time remains before the statutory deadline between completing field operations and necessary data processing to ameliorate any consequences of a differential undercount.  Fontenot Decl. ¶ 82; Huseny Decl., Ex. 1 at 1 (commencing data processing after September 30 permits "the Census Bureau . . . to meet a similar level of household responses as collected in prior censuses, including outreach to hard-to-count communities").  Plaintiffs also claim that the Replan risks "lower-quality data across the board," Mot. 27, but perfection is not the relevant metric for the decennial census, and in any event, a claim of reduced quality "across the board" cuts against Plaintiffs' simultaneous contention that they and their constituencies will suffer particularized differential harms.  Finally, Plaintiffs' abstract attack on the perceived "legitimacy" of the Census is no more than speculation about the subjective reaction of unspecified third-parties to a census count that does not yet exist.  Moreover, whether certain members of the public may harbor opinions about whether a particular census is "legitimate" or not says nothing about the question of whether a particular counting methodology reasonably relates to conducting the enumeration.

substantial, difficult, and doubtful" questions); *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (internal quotes and citations omitted; emphasis in original)).  Accordingly, Plaintiffs' failure to establish a cognizable APA or Enumeration Clause claim—to say nothing of justiciability or jurisdiction—is a basis to deny the injunction request outright.  *See, e.g.*, *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris,* 729 F.3d 937, 944 (9th Cir. 2013) (when "a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three [*Winter* elements]" (quotation omitted).

And Plaintiffs' position grows only more tenuous if the Court proceeds further.  Because Plaintiffs are seeking an injunction that would compel the Census Bureau to re-configure and extend its operations, Mot. 35, theirs would be a mandatory injunction.  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (injunction is a mandatory one if it requires defendant "to take affirmative action").  Such injunctions are "particularly disfavored," and require Plaintiffs to meet the "doubly demanding" burden of showing that "the law and facts *clearly favor* [their] position." *Id.* (emphasis in original); *see also Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust,* 636 F.3d 1150, 1160 (9th Cir. 2011) (mandatory injunctions should not issue in "doubtful cases").  Just as they fail to establish a likelihood of success on the merits, Plaintiffs cannot satisfy this demanding standard with respect to the remaining injunction factors:  irreparable injury, balance of harms, and the public interest.  *See Winter*, 555 U.S. at 20.

A.      **Plaintiffs Cannot Establish Any Imminent and Irreparable Harm**

Most significantly, Plaintiffs fail to establish that they are "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  Plaintiffs cannot "demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).  Because a preliminary injunction "is one of the most drastic

1   tools in the arsenal of judicial remedies," *id.*, Plaintiffs' burden to show irreparable harm is

2   necessarily higher than what is required to establish standing. *See, e.g.*, *Mazurek*, 520 U.S. at 972.

3        Here, Plaintiffs fail this test for all the same reasons that they fail to establish standing:

4   they cannot show that they stand to suffer any imminent and certain injury. As explained above,

5   Plaintiffs' assertions that their communities are likely to be undercounted as a result of the Replan

6   are speculative. They are also inconsistent with the evidence presented by Mr. Fontenot. *See*

7   Fontenot Decl. ¶ 91 ("[T]he Census Bureau is confident that it can achieve a complete and accurate

8   census and report apportionment counts by the statutory deadline following" the Replan).

9        Even more significant, however, is Plaintiffs' failure to connect any alleged undercount in

10  their communities to potential undercounts in other jurisdictions. Because Plaintiffs are competing

11  for dollars and legislative seats with other communities in their states and across the country, they

12  can only be injured by inaccuracies that affect their members disproportionately. Unlike in the

13  other cases they cite, there is no evidence in the record here to establish (1) what the undercount

14  in Plaintiffs' communities will be; (2) how that undercount compares with undercounts in other

15  communities; and (3) how that comparison will result in some appreciable funding or

16  representational loss for Plaintiffs. Absent this evidence, Plaintiffs cannot be said to establish

17  anything more than the abstract "possibility of irreparable injury." *Nken v. Holder*, 556 U.S. 418,

18  434 (2009). But, as the Supreme Court has emphasized, the "'possibility' standard is too lenient"

19  a basis upon which to issue the drastic remedy of a preliminary injunction. *Winter*, 555 U.S. at

20  22. Given that irreparable harm is an indispensable element for a preliminary injunction, *id.*,

21  Plaintiffs' failure to establish anything more than the theoretical possibility of harm is sufficient

22  basis to deny the injunction they seek.

23       Once again, Plaintiffs appear to suggest that *any* inaccuracy in the census could cause them

24  injury by decreasing the quality of the data they plan to use for various purposes. *See* Mot. 28-32.

25  But, as noted above, such a *per se* rule, which would grant standing to anyone who asks for it, is

26  inconsistent with the Supreme Court's census precedents. And it is doubly inappropriate in the

27  context of a preliminary injunction, which is reserved for use only as an "extraordinary remedy."

28  *Winter*, 555 U.S. at 376. Simply put, adopting Plaintiffs' argument would enable any locality or

1    organization who comes to Court complaining of census operations and the mere prospect of an

2    inaccurate undercount, to obtain an injunction as a matter of course.  That is not—and cannot be—

3    the standard.

4         **B.       The Remaining Factors Weigh Against an Injunction**

5         On the other side of the ledger, the harm to the government and to the public interest from

6    an injunction would be great, and immediate.  *See Nken*, 556 U.S. at 435 (explaining that harm to

7    opposing party and weighing the public interest "merge" when relief is sought against the

8    government).  As a legal matter, a judicial injunction would intrude on Congress's and the

9    Executive's discretion over the census.  *See supra* Section I.  And as a practical matter, the

10   requested injunction may make it *more* difficult to execute the census.  Fontenot Decl. ¶¶ 93-101.

11        There is no denying that the end-of-year statutory deadline for completing the census

12   presents a number of challenges.  However, were the Court to set aside the Replan, the Bureau

13   would have to generate a *new* plan to comply with § 141(b)'s deadline or, if the Court somehow

14   deems that statutory provision null, whatever new timelines the Court may choose to impose.  *See*

15   *id*.  This would require re-planning yet again the timing of various operations and staffing

16   allocations of a nationwide census whose field operations are nearing completion.  *See id*.  And all

17   of that would presumably have to be done in a matter of a few weeks, if not days, with the

18   congressional clock ticking away without relief in sight.

19        Even if the Court were to waive or disregard § 141(b)'s deadline, there is no certainty that

20   a compulsory replan would be any better than the Replan at reducing undercount or achieving

21   some abstract notion of better accuracy.  Indeed, by the logic Plaintiffs apply in this very matter,

22   such a plan would be worse.  Plaintiffs complain that the Replan was developed too quickly,

23   without sufficient input from stakeholders, and did not account for a variety of factors such as

24   whether the plan is feasible.  *See* Mot. 18-21.  What would Plaintiffs and their experts make of a

25   plan compiled in *less* time, subject to *more* funding constraints, and focused on achieving

26   compliance with a Court decree rather than the Bureau's longstanding standards and practices?

27   The Court should not order the Bureau to find the answer.

28

1   With "the decennial census [ ] again generat[ing] a number of [ ] controversies," *Franklin*,

2   505 U.S. at 790, and the extraordinary disruption caused by the COVID-19 pandemic, the public

3   interest favors allowing the Bureau to complete the census under its current plan—the only plan

4   that complies with the congressional deadline.  The Bureau is confident that this plan will produce

5   the best possible census under the circumstances.  Plaintiffs can ask for, and obtain, no more from

6   this Court.

7                                                   **CONCLUSION**

8          For these reasons, the Court should deny the Motion for Stay or Preliminary Injunction.

9

10  DATED:  September 4, 2020                        Respectfully submitted,

11

12                                                   JEFFREY B. CLARK
                                                     Acting Assistant Attorney General
13

14                                                   DAVID MORRELL
                                                     Deputy Assistant Attorney General
15

16                                                   ALEXANDER K. HAAS
                                                     Branch Director
17

18                                                   DIANE KELLEHER
                                                     BRAD P. ROSENBERG
19                                                   Assistant Branch Directors

20                                                   */s/ M. Andrew Zee*
                                                     M. ANDREW ZEE (CA Bar No. 272510)
21                                                   ALEXANDER V. SVERDLOV
                                                       (NY Bar No. 4918793)
22                                                   Trial Attorneys
                                                     U.S. Department of Justice
23                                                   Civil Division, Federal Programs Branch
                                                     450 Golden Gate Avenue
24                                                   San Francisco, CA 94102
                                                     Phone: (415) 436-6646
25                                                   E-mail: m.andrew.zee@usdoj.gov
26

27

28                                                   *Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of September, 2020, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing.


*/s/ M. Andrew Zee*
M. ANDREW ZEE