1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

NATIONAL URBAN LEAGUE, et al.,

　　　　　Plaintiffs,

　　v.

WILBUR L. ROSS, et al.,

　　　　　Defendants.

Case No. 20-CV-05799-LHK

**ORDER TO PRODUCE THE ADMINISTRATIVE RECORD**

Plaintiffs National Urban League; League of Women Voters; Black Alliance for Just Immigration; Harris County, Texas; King County, Washington; City of Los Angeles, California; City of Salinas, California; City of San Jose, California; Rodney Ellis; Adrian Garcia; National Association for the Advancement of Colored People; City of Chicago, Illinois; County of Los Angeles, California; Navajo Nation; and Gila River Indian Community (collectively, "Plaintiffs") sue Defendants Commerce Secretary Wilbur L. Ross, Jr.; the U.S. Department of Commerce; the Director of the U.S. Census Bureau Steven Dillingham, and the U.S. Census Bureau ("Bureau") (collectively, "Defendants") for violations of the Enumeration Clause and Administrative Procedure Act ("APA").

Plaintiffs seek to preliminarily enjoin Defendants from implementing Defendants' August 3, 2020 Replan. The Replan shortens census data collection and processing timelines from the eight months set forth in the Defendants' April 13, 2020 COVID-19 Plan to four months. Plaintiffs claim that the Replan's shortened timelines will unlawfully harm the accuracy of crucial census

1    data.

2        Before the Court are the parties' submissions regarding production of the administrative

3    record. Having considered the parties' submissions; the parties' oral arguments at the September 8,

4    2020 case management conference; the relevant law; and the record in this case, the Court

5    ORDERS the production of the administrative record.

6    **I.    BACKGROUND**

7        **A.  Factual Background**

8        Before addressing the merits of the parties' submissions, the Court briefly notes the factual

9    context. Defendants acknowledge that the Bureau's Census data collection and processing

10   responsibilities are "a 15.6 billion dollar operation years in the making." Defendants' Opp. to

11   Plaintiffs' Motion for Stay or Preliminary Injunction at 1 ("PI Opp."). The Bureau spent most of a

12   decade preparing the original operational plan for the 2020 Census, which was called the Final

13   Operational Plan and was issued in December 2018. Albert E. Fontenot, Jr., Associate Director for

14   Decennial Census Programs at the U.S. Census Bureau, describes the extensive work over a period

15   of many years that the Bureau performed to develop the Final Operational Plan, which the Bureau

16   also called Version 4.0. For example, Fontenot discusses eight significant census tests the Bureau

17   performed in 2013, 2014, 2015, 2016, and 2018 to improve their field operations. Fontenot Decl. ¶

18   71. Fontenot describes partnerships with stakeholders such as organizations and tribal and local

19   governments. *E.g.*, Fontenot Decl. ¶¶ 12, 28. The Final Operational Plan reflects the conclusions

20   of subject-matter experts such as statisticians, demographers, geographers, and linguists. *See, e.g.*,

21   ECF No. 37-5 at 79, 144 (2020 Census Operational Plan—Version 4.0).

22       The Final Operational Plan also set timeframes for three operations that especially affect

23   the quality of the count: (1) self-responses to census questionnaires, (2) non-response follow-up

24   ("NRFU"), and (3) post-data collection processing. First, the timeframe for self-responses refers to

25   when people may respond to census questionnaires on their own. Second, NRFU refers to the

26   process of "conduct[ing] in-person contact attempts at each and every housing unit that did not

27   self-respond to the decennial census questionnaire." Fontenot Decl. ¶ 48. "The NRFU Operation is

28

United States District Court
Northern District of California

1    entirely about hard-to-count populations." ECF No. 37-5 at 219. NRFU is thus "the most

2    important census operation to ensuring a fair and accurate count." Thompson Decl. ¶ 15. Lastly,

3    post-collection data processing refers to the Bureau's "procedures to summarize the individual and

4    household data that [the Bureau] collect[s] into usable, high quality tabulated data products."

5    Fontenot Decl. ¶ 66.

6         Under the Final Operational Plan issued in December 2018, self-responses spanned 20.5

7    weeks from March 12 to July 31, 2020. NRFU spanned 11.5 weeks from May 13 to July 31, 2020.

8    Data processing spanned 22 weeks from August 1 to December 31, 2020. These operational dates

9    would culminate in the Secretary of Commerce reporting (1) by December 31, 2020, "the

10   tabulation of total population by States" to the President for the purpose of Congressional

11   apportionment; and (2) by April 31, 2021, the same tabulation of population to the states for the

12   purpose of redistricting. 13 U.S.C. § 141(b).

13        On March 18, 2020, however, the Bureau announced that it would suspend all field

14   operations for two weeks because of the COVID-19 pandemic. *See* Press Release, U.S. Census

15   Bureau, *U.S. Census Bureau Director Steven Dillingham on Operational Updates* (Mar. 18,

16   2020), https://www.census.gov/newsroom/pressreleases/2020/operational-update.html. On March

17   28, 2020, the Bureau announced another two-week suspension. Press Release, *Census Bureau*

18   *Update on 2020 Census Field Operations* (Mar. 28, 2020),

19   https://www.census.gov/newsroom/press-releases/2020/update-on-2020-census-field-

20   operations.html. The Bureau halted all hiring and training of hundreds of thousands of Census

21   field staff known as "enumerators," who implement NRFU by trying to contact people who do not

22   respond to the Census questionnaire. Fontenot Decl. ¶ 49. The Bureau also experienced staffing

23   shortages at its call centers and the contractor responsible for printing the six mail-in self-response

24   forms. ECF No. 37-7 at 8 (GAO, *COVID-19 Presents Delays and Risks to Census Count* (June

25   2020)).

26        As a result, on April 13, 2020, the Bureau issued an adjustment to its Final Operational

27   Plan to account for the impact of COVID-19 (the "COVID-19 Plan"). ECF No. 37-3 (April 13,

28

3

1    2020 statement of Secretary of Commerce Wilbur Ross and Census Bureau Director Steven

2    Dillingham). The COVID-19 Plan extended the operational deadlines.

3        Specifically, first, the COVID-19 Plan expanded the timeframe for self-responses from

4    20.5 weeks to 33.5 weeks (March 12 to October 31, 2020) to account for the pandemic's

5    disruptions to Bureau operations and the public's ability to respond to the census. For instance, the

6    Bureau had to adapt to staffing shortages at call centers and the self-response printer. ECF No. 37-

7    7 at 8. The Bureau also had to cope with "delays to the Update Leave operation, in which [census]

8    field staff hand-deliver questionnaires," *id.* at 6, to "areas where the majority of the housing units

9    do not have mail delivery . . . or the mail delivery information for the housing unit cannot be

10    verified." Fontenot Decl. ¶ 46. In sum, as of June 2020, "self-response rates var[ied] widely across

11    states and counties," with "markedly different operational environments and challenges" facing

12    the Bureau "from one locale to another." ECF No. 37-7 at 6 (citing self-response rates "below 3

13    percent" in counties in Alaska, Texas, Utah, and South Dakota).

14        Second, NRFU likewise expanded from 11.5 weeks (May 13 to July 31, 2020) to 12 weeks

15    (August 11 to October 31, 2020). The pandemic disrupted NRFU in at least two ways. One, the

16    pandemic made it harder to hire and retain enumerators to contact households. *See, e.g.*, Gurmilan

17    Decl. ¶ 13 ("Monterey County is still advertising for census enumerator job listings because

18    traditional applicant groups like senior citizens have concerns about the risk of catching COVID-

19    19"). Two, "door-to-door visits for NRFU interviewing may be less effective" during a pandemic.

20    ECF No. 37-7 at 18.

21        Third, given the pandemic's effects on "the quality of the data, especially for groups that

22    are less likely to self-respond (often hard to count populations)," post-data collection quality

23    control was deemed especially important. ECF No. 37-7 at 18. Data processing for Congressional

24    apportionment thus expanded from 22 weeks (August 1 to December 31, 2020) to 26 weeks

25    (November 1, 2020 to April 30, 2021). The processing was to include an independent review of

26    the final address list, analysis by subject-matter experts, and the remediation of software errors.

27    Fontenot Decl. ¶ 89.

28

United States District Court
Northern District of California

Lastly, the press release announcing the COVID-19 Plan stated that "the Census Bureau is seeking statutory relief from Congress of 120 additional calendars days to deliver apportionment counts." ECF No. 37-3 at 3. The COVID-19 Plan would thus "extend the window for field data collection and self-response to October 31, 2020, which will allow for apportionment counts to be delivered to the President by April 30, 2021, and redistricting data to be delivered to the states no later than July 31, 2021." *Id.*

Although these delays would result in the Bureau missing statutory deadlines, Bureau officials publicly stated that meeting the December 31, 2020 deadline would be impossible in any event. For instance, on May 26, 2020, the Bureau's head of field operations, Tim Olson, stated that "[w]e have passed the point where we could even meet the current legislative requirement of December 31. We can't do that anymore. We -- we passed that for quite a while now." Nat'l Conf. of Am. Indians, 2020 Census Webinar: American Indian/Alaska Native at 1:17:30–1:18:30, YouTube (May 26, 2020), https://www.youtube.com/watch?v=F6IyJMtDDgY. Similarly, on July 8, Associate Director Fontenot confirmed that the Bureau is "past the window of being able to get" accurate counts to the President by December 31, 2020. U.S. Census Bureau, *Operational Press Briefing – 2020 Census Update* at 20–21 (July 8, 2020), https://www.census.gov/content/dam/Census/newsroom/press-kits/2020/news-briefing-program-transcript-july8.pdf.

On July 21, 2020, President Donald J. Trump issued a memorandum declaring the United States' policy to exclude unlawful immigrants from the congressional apportionment base.

On July 31, 2020, the Bureau removed from its website the October 31, 2020 deadlines for self-responses and NRFU. *Compare* ECF No. 37-8 (July 30 Operational Adjustments Timeline), *with* ECF No. 37-9 (July 31 Operational Adjustments Timeline).

On August 3, 2020, the Bureau issued a press release announcing the Replan. ECF No. 37-1. In Fontenot's declaration, Fontenot avers that the Secretary approved the Replan on the day it was announced. Fontenot Decl. ¶ 85.

The Replan accelerated and compressed the Bureau's data collection and processing

Case No. 20-CV-05799-LHK
ORDER TO PRODUCE THE ADMINISTRATIVE RECORD

United States District Court
Northern District of California

timeframes from eight months to four months. Specifically, self-response compressed from 33.5 weeks to 29 weeks, with the deadline advancing from October 31 to September 30. *Id.* ¶ 100. NRFU compressed from 11.5 weeks to 7.5 weeks, with the deadline advancing from October 31 to September 30. Lastly, data processing was halved from 26 weeks to 13 weeks with the deadline advancing from April 30, 2021 to December 31, 2020.

### B. Procedural History

On August 18, 2020, Plaintiffs filed suit to challenge the Replan's advancement of the deadlines for self-responses, field operations to attempt to count NRFU, and data processing. To allow Plaintiffs to effectively challenge the Replan, including the September 30, 2020 end of field operations, the parties stipulated to a briefing schedule and hearing date of September 17, 2020 on Plaintiffs' motion for stay and preliminary injunction (hereafter, "motion for preliminary injunction" or "Mot."). ECF No. 35. Pursuant to that schedule, Plaintiffs filed a motion for a preliminary injunction on August 25, 2020 based on their claims under the Enumeration Clause and the APA. ECF No. 36.

On August 26, 2020, the Court held a case management conference. At that conference, the Court asked Defendants whether there was an administrative record for the purposes of APA review. Defendants repeatedly denied the existence of an administrative record. *E.g.*, ECF No. 65 at 9:22–:24 (Q: "Is there an administrative record in this case?" A: "No, Your Honor. On behalf of the Defendants, no, there's not."), 10:17–:18 ("[A]t this point there is no administrative record."). Rather, Defendants suggested that the only document that provided the contemporaneous reasons for the Replan was the Bureau's August 3, 2020 press release. *Id.* at 20:6–:7 ("[A]t this point I'm not aware of any other documents, but I would propose that I check with my client . . . ."). Even so, the Court instructed Defendants that "[i]f there's an administrative record, it should be produced. [The Court] will need it to make a decision in this case." *Id.* at 10:13–:14.

To assist the Court in determining by what date a ruling on Plaintiffs' motion for preliminary injunction must be issued, Defendants agreed to file a statement by September 2, 2020 as to when the winding down of field operations would begin relative to the September 30, 2020

Case No. 20-CV-05799-LHK
ORDER TO PRODUCE THE ADMINISTRATIVE RECORD

United States District Court
Northern District of California

deadline for ending data collection. Defendants filed the following statement:

> [T]he Census Bureau has already begun taking steps to conclude field operations. Those operations are scheduled to be wound-down throughout September by geographic regions based on response rates within those regions. As will be described in Defendants' forthcoming filing on Friday, September 4, 2020, any order by the Court to extend field operations, regardless of whether those operations in a particular geographic location are scheduled to be wound-down by September 30 or by a date before then, could not be implemented at this point without significant costs and burdens to the Census Bureau.

ECF No. 63. Based on Defendants' statement, Plaintiffs moved on September 3, 2020 for a temporary restraining order to preserve the status quo for 12 days until the September 17, 2020 preliminary injunction hearing. ECF No. 66. On September 4, 2020, Defendants opposed the motion, and the Court held a hearing on the motion.

At the hearing on the motion for a temporary restraining order, Defendants reiterated their position that no administrative record existed, ECF No. 82 at 33:13–:15, but disclosed that there were documents contemporaneously explaining the Replan. Defendants stated:

> The Census Bureau generates documents as part of its analysis and as part of its decisions and as part of its deliberations. And there are documents that the Replan was not cooked up in a vacuum, it was part of the agency's ongoing deliberations. And so certainly there are going to be documents that reflect those documents.

*Id.* at 33:2–:7. That said, Defendants said no administrative record technically existed because "the documents that fed into the operational plans and the operational decisions are internal documents that are subject to the deliberative process privilege." *Id.* at 32:14–:16.

Only a few minutes later, however, Defendants retracted their assertion of deliberative process privilege. *Id.* at 36:15–:17 ("[T]o be clear, we are not asserting the deliberative process privilege because there is no record and there's nothing to consider."). Defendants conceded that "[i]f there is final agency action that is reviewable and the APA applies, we would have an obligation to produce the administrative record." *Id.* at 35:24–36:1. Defendants instead urged the Court to rely solely on a declaration that Defendants would file that night with Defendants' opposition to the motion for preliminary injunction. *E.g.*, *id.* at 16:21–:23 ("We will not be filing documents in addition to the declaration.").

7

Later on September 4, 2020, Defendants filed their opposition to Plaintiffs' motion for preliminary injunction. As Defendants stated at the TRO hearing, Defendants' sole evidence against Plaintiffs' motion for temporary restraining order and motion for preliminary injunction is the declaration of Albert E. Fontenot, Jr., Associate Director for Decennial Census Programs at the U.S. Census Bureau.

On September 5, 2020, the Court granted a temporary restraining order until the September 17, 2020 preliminary injunction hearing. On September 8, 2020, Defendants filed a notice regarding compliance with the TRO. ECF No. 86.

Also on September 8, 2020, the Court held another case management conference. At that conference, Defendants again stated that "there is no administrative record in this case because there is no APA action." ECF No. __ (forthcoming) at 62:15–:16. Even so, Defendants confirmed their statements from the TRO hearing that the Replan is "indeed codified." *Id.* at 21:7. The Replan simply was "not necessarily codified in one particular document." *Id.* at 21:9–:10. Accordingly, Plaintiffs asked the Court to order Defendants to produce the administrative record. *E.g.*, id. at 43:16–:17. The parties briefed the issue on September 8 and 9, 2020. *See* ECF Nos. 88–89, 92.

## II.    DISCUSSION

The Court first addresses threshold issues raised by Defendants. However, the Court notes that the cases that require determinations of those threshold issues before production of the administrative record are distinguishable from the instant case. Thereafter, the Court explains why the administrative record must be produced. Given the September 17, 2020 hearing and the Census Bureau's September 30, 2020 deadline for data collection, the analysis herein is necessarily brief. The Court will provide a more fulsome analysis in its ruling on Plaintiffs' motion for preliminary injunction promptly after the September 17, 2020 hearing. Thus, the Court's conclusions herein are provisional and may be subject to change after production of Defendants' administrative record.

Case No. 20-CV-05799-LHK
ORDER TO PRODUCE THE ADMINISTRATIVE RECORD

United States District Court
Northern District of California

United States District Court
Northern District of California

### A. The Instant Case is Reviewable.

Defendants argue that the instant case is unreviewable on four grounds: (1) the Replan presents a political question; (2) Plaintiffs lack standing; (3) the Replan is not final agency action, and (4) the Replan is committed to agency discretion by law. The Court addresses each ground in turn.

### 1. The Replan does not present a political question.

A "political question" is one which is "outside the courts' competence and therefore beyond the courts' jurisdiction." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019). "Among the political question cases the Court has identified are those that lack 'judicially discoverable and manageable standards for resolving [them].'" *Id.* at 2494 (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

Defendants argue that whether the Replan violates the Administrative Procedure Act is a political question. Their argument is essentially the following syllogism. *First*, Congress has "virtually unlimited discretion in conducting the decennial 'actual enumeration.'" *Wisconsin*, 517 U.S. at 19. *Second*, Congress has used that discretion to set a statutory deadline of December 31, 2020 for when the Secretary must report a "tabulation of total population" to the President. 13 U.S.C. § 141(b). *Third*, Defendants replaced the COVID-19 Plan with the Replan in order to meet the statutory deadline. *Therefore*, the promulgation of the Replan is under Congress' virtually unlimited discretion; there "is no evident standard" for review; and the Replan poses a political question. PI Opp. 6.

The Court disagrees. Defendants' syllogism breaks down at its third step and conclusion. To start, the whole reason why the Court and Plaintiffs need the administrative record is to identify the contemporaneous justifications for the Replan. Only then can those justifications be reviewed under the deferential standard that the APA provides. That deferential APA review, as discussed in Section C below, includes determining if the agency considered—and gave a contemporaneous explanation of—all relevant aspects of a problem before taking action. Here, Congress has set forth more than just the December 31, 2020 statutory deadline as a relevant

United States District Court
Northern District of California

aspect of the census. The Census Act also "imposes 'a duty to conduct a census that is accurate and that fairly accounts for the crucial representational rights that depend on the census and the apportionment.'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (quoting *Franklin*, 505 U.S. at 819–820 (Stevens, J., concurring in part and concurring in judgment)) (discussing 2 U.S.C. § 2a). Similarly, the text, structure, and history of the Constitution evinces "a strong constitutional interest in accuracy." *Utah v. Evans*, 536 U.S. 452, 479 (2002).

Thus, in its decision on the census citizenship question last year, the Supreme Court rejected Defendants' claim that there is "no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Commerce v. New York*, 139 S. Ct. at 2568 (quoting *Weyerhaeuser Co. v. United States Fish and Wildlife Serv.*, 139 S. Ct. 361, 370 (2018)). The standard is provided by the Census Act, the Constitution, and APA. Accordingly, it is no surprise that the overwhelming weight of authority rejects applying the political question doctrine to census-related decisionmaking. *See, e.g., U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 458–59 (1992) (holding that "political question doctrine presents no bar"); *Franklin v. Massachusetts*, 505 U.S. 788, 801 n.2 (1992) (noting that the Court "recently rejected a similar argument" in *Montana* that "the courts have no subject-matter jurisdiction over this case because it involves a 'political question'"); *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (per curiam) (rejecting the Census Bureau's argument that "allegations as to mismanagement of the census made in the complaint involve a political question," and holding the case reviewable under the Constitution and APA); *New York v. United States Dep't of Commerce*, 315 F. Supp. 3d 766, 791 (S.D.N.Y. 2018) (rejecting political question doctrine in citizenship question litigation; and collecting cases); *Young v. Klutznick*, 497 F. Supp. 1318, 1326 (E.D. Mich. 1980) (rejecting political question doctrine), *rev'd on other grounds*, 652 F.2d 617 (6th Cir. 1981); *City of Philadelphia v. Klutznick*, 503 F. Supp. 663, 674 (E.D. Pa. 1980) (same); *Texas v. Mosbacher*, 783 F. Supp. 308, 312 (S.D. Tex. 1992) (same); *District of Columbia v. U.S. Dep't of Commerce*, 789 F. Supp. 1179, 1185 (D.D.C. 1992) (same); *City of N.Y. v. U.S. Dep't of Commerce*, 739 F. Supp. 761, 764 (E.D.N.Y. 1990) (same); *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 95

10

(D.D.C. 1998) (three-judge court) (same; and stating "the court sees no reason to withdraw from litigation concerning the census"), *aff'd*, 525 U.S. 316 (1999); *see also Utah v. Evans*, 536 U.S. 452 (2002) (engaging in review without noting any jurisdictional defect stemming from political question doctrine); *Wisconsin v. City of N.Y.*, 517 U.S. 1 (1996) (same); *Morales v. Daley*, 116 F. Supp. 2d 801 (S.D. Tex. 2000) (same), *aff'd sub nom. Morales v. Evans*, 275 F.3d 45 (5th Cir. 2001) (unpublished); *Prieto v. Stans*, 321 F. Supp. 420, 421 (N.D. Cal. 1970) (finding jurisdiction over a motion to preliminarily enjoin the census's "mail-out, mail-back procedure" and "community education and follow-up procedures"). In sum, the political question doctrine does not bar the Court from ordering Defendants to produce the administrative record.

### 2. Plaintiffs have standing to challenge the Replan.

"To have standing, a plaintiff must 'present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling.'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019). Plaintiffs here allege—and support with affidavits—the same injuries that the Supreme Court found supported standing in the citizenship question case: "[1] diminishment of political representation, [2] loss of federal funds, [3] degradation of census data, and [4] diversion of resources." *Id.* at 2565 (agreeing that "at least some" plaintiffs had standing).

First, Plaintiffs allege that "[t]he undercount resulting from the Rush Plan will likely result in an unfair apportionment that will cause local government Plaintiffs, individual Plaintiffs, and members of multiple organizational Plaintiffs, to lose their fair share of representation." Mot. at 29. For example, given the historically low census response rates in the City of Los Angeles and City of Salinas in California, and in Harris County, Texas, the Replan creates a substantial risk that their residents will not be counted, and a substantial risk of diminished political representation. *See* M. Garcia Decl. ¶¶ 8–15; Briggs Decl. ¶¶ 7, 15–17; Gurmilan Decl. ¶¶ 6, 8–14. Specifically, 57% of the residents in the City of Los Angeles, which is home to roughly 4 million people, live in census block groups that are hard or very hard to count. M. Garcia Decl. ¶ 7. Similarly, the City of Salinas comprises 38.5% of Monterey County's hard to count population, and the City's response

United States District Court
Northern District of California

rate is 9.5% below its response rate from the 2010 Census. *Id.* ¶ 6. The Replan's shortened

schedule for data collection imposes a substantial risk that the hard to count populations will be

undercounted, and that therefore their political representation will be diminished.

Second, local government Plaintiffs are recipients of multiple sources of federal funding

that turn on census data. For example, King County, Washington and the City of Los Angeles

receive Community Development Block Grants and other funds in the millions of dollars; and

Seattle received over $108 million in Transit Formula Grants. Dively Decl. ¶ 7; Westall Decl. ¶¶

34–36. The Replan will likely diminish both localities' funding because both localities have many

hard to count persons who risk being undercounted because of the Replan's shortened schedule for

data collection. M. Garcia Decl. ¶¶ 7–8; Dively Decl. ¶ 5; Hillygus Decl. ¶¶ 12, 19, 39. As another

example, "approximately $90,529,359 of the grants expended by Harris County in FY2019

depended on accurate census data." Wilden Decl. ¶ 5. In fact, as the Supreme Court found last

year, undercounting even a subset of the hard to count population can result in the loss of federal

funding. *See Dep't of Commerce v. New York*, 139 S. Ct. at 2565 (finding standing, in the context

of state-wide undercounting, because "if noncitizen households are undercounted by as little as 2%

. . . [states] will lose out on federal funds").

Third, the local government Plaintiffs allege that the Replan will degrade granular census

data that they rely on to deploy services and allocate capital. For instance, King County,

Washington uses census data to place public health clinics, plan transportation routes, and mitigate

hazards. Dively Decl. ¶ 6. The City of Los Angeles uses "reliable, precise, and accurate population

count data" to deploy the fire department, schedule trash-pickups, and acquire or improve park

properties. Westall Decl. ¶ 32.

Lastly, Plaintiffs will divert resources to mitigate the undercounting that will likely result

from the Replan. For instance, the City of Salinas already promoted the October 31 deadline "on

social media and in thousands of paper flyers." Gurmilan Decl. ¶¶ 11–12. Thus, "some residents

who received the City's messaging will fail to respond before the R[eplan] deadline because the

City has limited remaining resources to correct what is now misinformation." *Id.* ¶ 12. Moreover,

Case No. 20-CV-05799-LHK
ORDER TO PRODUCE THE ADMINISTRATIVE RECORD

United States District Court
Northern District of California

the City "is still advertising for census enumerator job listings because traditional applicant groups like senior citizens have concerns about the risk of catching COVID-19. With fewer enumerators working, every extra day the City has to use the existing staff to support the count." *Id.* ¶ 13.

As more examples, Harris County "participated in over 150 events," including "food distribution events," during which it "announced the October 31, 2020 deadline for the 2020 Census." Briggs Decl. ¶ 12. "Harris County will be forced to expend additional resources to clear confusion about the last date for self-response during the Census, to ensure that people who have not responded are counted in time." *Id.* ¶ 16. The Black Alliance for Just Immigration already "publicized the October 31 deadline for self-response during digital events between April and July" and is diverting resources to publicize the new September 30 deadline. Gyamfi Decl. ¶¶ 13–14. The League of Women Voters "has already had to spend time and financial resources" developing and distributing public education materials on the Replan timeline. Stewart Decl. ¶ 12. The National Urban League has similarly had "to divert resources from other programs and projects" to "alleviate the confusion" about the change in deadlines. Green Decl. ¶ 15. Indeed, even now, the Census Bureau boasts of how its communications program was "more integrated than ever before" with Plaintiffs such as National Urban League. Fontenot Decl. ¶ 40. Mitigating those now-counterproductive education campaigns and a likely undercount will only be harder in the midst of a pandemic. *E.g.*, M. Garcia Decl. ¶¶ 14–14; Gurmilan Decl. ¶¶ 11–14; Briggs Decl. ¶¶ 11–12, 15–17.

The above harms are "concrete, particularized, and actual or imminent." *Dep't of Commerce v. New York*, 139 S. Ct. at 2565 (quoting *Davis*, 554 U.S. at 733). They are also "fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling.'" *Id.* (quoting *Davis*, 554 U.S. at 733). As the Supreme Court stressed last year, "Article III 'requires no more than de facto causality.'" *Id.* at 2566 (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)). Here, Plaintiffs' theory of standing rests "on the predictable effect of Government action on the decisions of third parties"—specifically, the predictable harms of accelerating census deadlines, without warning, after months of publicly operating under a plan

United States District Court
Northern District of California

tailored to COVID-19. *Id.* Accordingly, enjoining the Replan's last-minute change in deadlines would redress those harms. *See, e.g.*, *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 328–34 (1999) (affirming injunction against the planned use of statistical sampling to prevent apportionment harms, among others); *New York v. United States Dep't of Commerce*, 351 F. Supp. 3d 502, 675 (S.D.N.Y.) (issuing injunction to prevent "the loss of political representation and the degradation of information"), *aff'd in part, rev'd in part and remanded sub nom. Dep't of Commerce v. New York*, 139 S. Ct. 2551.

### 3. The Replan constitutes final agency action.

The Replan constitutes final agency action. "To maintain a cause of action under the APA, a plaintiff must challenge 'agency action' that is 'final.'" *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800 (9th Cir. 2013) (citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61–62 (2004)).

Courts should take a "'pragmatic' approach" to finality. *U.S. Army Corps of Engineers v. Hawkes Co., Inc.,* 136 S. Ct. 1807, 1815 (2016) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)). For an agency's action to be final, two conditions must be met. First, the action "must mark the consummation of the agency's decisionmaking process —it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Second, the action "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id*. Five years earlier, the Supreme Court found that the same two requirements applied in a census case. *Franklin*, 505 U.S. at 797 (the central question "is [1] whether the agency has completed its decisionmaking process, and [2] whether the result of that process is one that will directly affect the parties.").

The Replan meets both criteria. First, the Replan marks the consummation of the agency's decisionmaking process. *Id*. An agency action marks the consummation of the agency's decisionmaking process when the decision is "not subject to further agency review." *Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012); *see also Hawkes*, 136 S. Ct. at 1813–14 (holding that an agency action was final because the determination was "typically not revisited"); *Fairbanks North Star*

14

United States District Court
Northern District of California

United States District Court
Northern District of California

1    *Borough v. U.S. Army Corps of Engineers*, 543 F.3d 586, 593 (9th Cir. 2008) (holding that an

2    agency's action was final where "[n]o further agency decisionmaking on the issue can be

3    expected"). According to Fontenot's declaration, the Secretary approved the Replan. Fontenot

4    Decl. ¶ 85. No further agency decisionmaking will be conducted on the Replan. These facts

5    support the conclusion that the agency has reached a definite position that the census will be

6    conducted according to the schedule set forth in the Replan. *Fairbanks*, 543 F.3d at 593.

7         Second, the Replan is a decision by which rights or obligations have been determined. The

8    Replan determines the rights and obligations of the Census Bureau because it determines the dates

9    on which the Census Bureau will end its data collection and processing. The Replan also

10   determines the rights and obligations of people who seek to participate in the census by preventing

11   them from participating in the census after September 30, 2020. *See Sackett*, 566 U.S. at 126

12   (holding that an agency action determined rights and obligations of property owners where it

13   "severely limit[ed] [the owners'] ability to obtain a permit . . . from [the agency]"); *Alaska, Dep't*

14   *of Environmental Conservation v. E.P.A.*, 244 F.3d 748, 750 (9th Cir. 2001) (holding that an

15   agency action determined rights and obligations where its effect was to halt construction at a mine

16   facility). These people will be unable to participate despite the Census Bureau's previous

17   representations that they could participate until October 31, 2020. Because the Replan determines

18   rights and obligations, the Replan constitutes final agency action.

19        Disputing this conclusion, Defendants rely on the Supreme Court's decision in *Franklin v.*

20   *Massachusetts*, 505 U.S. 788 (1992). That case concerned the Secretary of Commerce's

21   transmission of the census report to the President. *Franklin*, 505 U.S. at 797–98. The data

22   presented to the President was still subject to correction by the Secretary. *Id*. In addition, the

23   President could instruct the Secretary to reform the census. *Id*. at 798. Accordingly, the report was

24   a "moving [target]" or a "tentative recommendation," rather than a "final and binding

25   determination," so it carried "no direct consequences for the reapportionment." *Id*. Based on these

26   characteristics, the Supreme Court held that the transmission of the census report was not final

27   agency action. *Id*. at 798.

28

Case No. 20-CV-05799-LHK
ORDER TO PRODUCE THE ADMINISTRATIVE RECORD

United States District Court
Northern District of California

1    Defendants argue that the Replan also does not constitute final agency action. However,

2   *Franklin* underscores why the Replan constitutes final agency action. The Replan is not a tentative

3   recommendation that will be revisited by the agency, or reviewed by a higher official. Rather, no

4   further review of the Replan will be conducted. Moreover, the Replan does have direct

5   consequences for the reapportionment. The Replan determines the date on which data collection

6   will end, past which people can no longer participate in the census. Thus, the Replan constitutes

7   final agency action.

8    Defendants also argue that the Replan does not constitute agency action at all. Agency

9   action includes "the whole or part of an agency rule, order, license, sanction, relief, or the

10  equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). To satisfy this requirement, the

11  matter must be a "circumscribed, discrete agency action[]." *S. Utah Wilderness All.*, 542 U.S. at

12  62–63. This requirement "precludes [a] broad programmatic attack" on an agency's operations. *Id*.

13  at 64.

14   Defendants analogize this case to *NAACP v. Bureau of the Census*. 945 F.3d 183 (4th Cir.

15  2019). In *NAACP*, the plaintiffs brought a challenge in 2018 to the census "methods and means,"

16  which the Fourth Circuit repeatedly referred to as "design choices." *NAACP*, 945 F.3d at 186. The

17  plaintiffs' complaint alleged insufficient numbers of enumerators, insufficient networks of area

18  census offices, the insufficiency of the Bureau's plan to rely on administrative records, and

19  insufficient partnership program staffing. *Id*. at 190. Each of these factors was "expressly . . . tied

20  to one another." *Id*. at 191. As a result of these relationships, "'[s]etting aside' one or more of

21  these 'choices' necessarily would impact the efficacy of the others, and inevitably would lead to

22  court involvement in 'hands-on' management of the Census Bureau's operations." *Id*. (citing *S.

23  Utah Wilderness All.*, 542 U.S. at 66–67). The Fourth Circuit further held that the cancellation of a

24  specific field test in 2016 did not give rise to legal consequences, rights or obligations. *Id*. In

25  concluding that there was not final agency action, the Fourth Circuit emphasized that its holding

26  was "based on the broad, sweeping nature of the allegations that the plaintiffs have elected to

27  assert under the APA." *Id*. at 192.

28

16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*NAACP* is inapposite. The instant case does not challenge the census "methods and means" or "design choices." The instant case does not challenge multiple aspects of the census that are expressly tied to one another such that the Court must engage in "hands-on" management of the Census Bureau's operations. The Replan itself concerns only one aspect of the Bureau's operations—the census schedule. The Replan does give rise to legal consequences, rights, and obligations. In addition, the Replan was announced in a single press release. *See* ECF No. 37-1. These facts support the conclusion that the Replan is a circumscribed, discrete agency action.

### 4.   The Replan is not committed to agency discretion by law.

The Replan is not committed to agency discretion. The APA creates a "strong presumption favoring judicial review of administrative action." *Weyerhaeuser*, 139 S. Ct. at 370 (quoting *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 489 (2015)). However, the APA precludes courts from reviewing actions that are committed to agency discretion by law. 5 U.S.C. § 701(a)(2). Courts have read this exception "quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Weyerhaeuser*, 139 S. Ct. at 370 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).

The Replan does not fit into this narrow exception. In *Department of Commerce v. New York*, the Supreme Court explained that "[t]he taking of the census is not one of those areas traditionally committed to agency discretion," acknowledging that "courts have entertained both constitutional and statutory challenges to census-related decisionmaking." 139 S. Ct. at 2568. The Supreme Court explained that there were meaningful standards against which to judge the agency's action, including the Census Act, which requires that the agency "conduct a census that is accurate and that fairly accounts for the crucial representational rights that depend on the census and the apportionment." *Id.* at 2568–69 (citing *Franklin*, 505 U.S. at 819–20 (Stevens, J., concurring in part and concurring in judgment)). Therefore, there are meaningful standards against which to judge the Replan, and the Replan is not committed to agency discretion.

Case No. 20-CV-05799-LHK
ORDER TO PRODUCE THE ADMINISTRATIVE RECORD

**B. Although Defendants rely on cases holding that reviewability must be decided before production of the record, those cases are distinguishable.**

Defendants argue that the Court cannot order production of the administrative record before deciding whether the case is reviewable. For the reasons stated below, the Court disagrees. The cases cited by Defendants are readily distinguishable. Furthermore, several district courts have ordered production of the administrative record prior to deciding reviewability.

Defendants rely on *In re United States*, a mandamus action stemming from challenges to the termination of the Deferred Action for Childhood Arrivals (DACA) program. 138 S. Ct. 443 (2017). In that case, the Supreme Court reversed a district court order requiring the government to complete the administrative record and concluded that the district court should have first decided whether the case was reviewable. *Id*. at 445.

However, *In re United States* is easily distinguishable from this case for at least three reasons. First, the government had already produced an administrative record. *Id.* at 444. Accordingly, *In re United States* addressed completion of the administrative record, and not whether an administrative record must be produced in the first instance. *Id.* As explained below, the government is always required to produce an administrative record for the purposes of APA review. Second, *In re United States* concerned the government's assertions of the deliberative process privilege. *Id.* By contrast, in the instant case, the government initially asserted deliberative process privilege, but then immediately withdrew such assertion and has not asserted any other privilege. ECF No. 82 at 32:14–:16; 36:15–:17. Finally, *In re United States* concerned an overly broad district court order, which compelled the production of "all DACA-related materials considered by persons (anywhere in the government) who thereafter provided [the Secretary] with written advice or input . . . [or] verbal input" on the decision. *In re United States*, 138 S. Ct. at 444. Such an overly broad order is not at issue here. In light of the Supreme Court's instruction that *In re United States* be cabined to "the specific facts of [the] case," we cannot apply its ruling here. *Id*. at 145.

Defendants additionally rely on *NAACP v. Bureau of the Census*, --- F. Supp. 3d ---, 2020 WL 1890531 (D. Md. Apr. 16, 2020). In that case, the Fourth Circuit resolved threshold issues

18

Case No. 20-CV-05799-LHK
ORDER TO PRODUCE THE ADMINISTRATIVE RECORD

before an administrative record was produced and concluded that there was not final agency

action. *NAACP v. Bureau of the Census*, 945 F.3d 183, 190 (4th Cir. 2019). However, *NAACP* is

distinguishable from this case in at least two respects. First, in *NAACP*, the plaintiffs initially

brought only an Enumeration Clause claim, not APA claims. *Id*. at 187–88. Second, in *NAACP*,

the plaintiffs had access to information outside of the administrative record, including discovery

that had already been ordered on the Enumeration Clause claim and a public record. *See NAACP v.

Bureau of the Census*, 382 F. Supp. 3d 349, 356 (D. Md. 2019) (ordering discovery on the

plaintiffs' constitutional claims). In the instant case, Defendants have produced only a single

declaration drafted for this litigation, which attempts to give contemporaneous reasons for the

agency action.

Moreover, while the Fourth Circuit ruled on reviewability before the production of the

administrative record, other courts have demanded the production of the administrative record

before deciding reviewability. *See Ctr. for Popular Democracy Action v. Bureau of the Census*,

No. 1:19-cv-10917-AKH (S.D.N.Y. Jan. 9, 2020) (granting motion to expedite production of

administrative record before deciding reviewability); *see also Doe # 1 v. Trump,* 423 F. Supp. 3d

1040, 1046 (D. Ore. 2019) (holding that production of administrative record was appropriate

because the court required the administrative record to determine whether the agency action is

final); *Friends of the River v. U.S. Army Corps of Engineers*, 870 F. Supp. 2d 966, 976 (E.D. Cal.

2012) ("Determining whether [the challenged actions] are final agency actions in the instant case

requires a review of the full administrative record, because . . . 'the question of jurisdiction is

dependent on the resolution of factual issues going to the merits' of [the] action.").

### C.  Defendants must produce the administrative record.

Defendants' position that they need not produce the administrative record must be

evaluated in the context of the APA. Under the APA, "judicial review of agency action is limited

to 'the grounds that the agency invoked when it took the action.'" *Dep't of Homeland Security v.

Regents of the Univ. of Ca.*, 140 S. Ct. 1891, 1907 (2020). The agency cannot provide new reasons

after the action is taken because such reasons would be "post hoc rationalization[s]" that do not

Case No. 20-CV-05799-LHK
ORDER TO PRODUCE THE ADMINISTRATIVE RECORD

represent the agency's reasons for acting. *Id.* at 1908 (quoting *Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1972)).

To permit the Court to review the agency's reasons for acting, the agency must produce an administrative record, which consists of "all documents and materials directly or indirectly considered by agency decision-makers" at the time of the decision. *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989). The Court must then use the administrative record to evaluate Plaintiffs' APA claims. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (explaining that "[t]he focal point for judicial review [of APA claims] should be the administrative record"), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Overton Park*, 401 U.S. at 420 (holding that "[APA] review is to be based on the full administrative record that was before the Secretary at the time he made his decision").

Defendants argue that this Court should instead decide the APA claims based on Fontenot's declaration. However, this Court cannot engage in APA review based on "[a] new record made initially in the reviewing court," especially a declaration drafted for litigation, because the declaration would be an impermissible post hoc rationalization that does not reveal the agency's reasons for acting at the time of the action. *Camp*, 411 U.S. at 142. Accordingly, the Supreme Court has held that a district court erred in relying on litigation affidavits, which were impermissible "post hoc rationalizations." *Overton Park*, 401 U.S. at 419; *see also Cmty. for Creative Non-Violence v. Lujan*, 908 F.2d 992, 998 (D.C. Cir. 1990) (R. Ginsburg, Thomas, Sentelle, JJ.) (concluding that relying on litigation affidavits is "manifestly inappropriate"). In *Overton Park*, the Supreme Court remanded in order for the district court to conduct its review based on the administrative record. *Overton Park*, 401 U.S. at 419–20; *see also Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 580 (D.C. Cir. 2001) (vacating and remanding because the district court should have required the FDA to file the administrative record and the circuit court could not "tell on what basis the Food and Drug Administration took the agency action the plaintiff seeks to enjoin"). In accordance with this case law, the Court must require the agency to file an administrative record on which it can review Plaintiffs' APA claims.

Case No. 20-CV-05799-LHK
ORDER TO PRODUCE THE ADMINISTRATIVE RECORD

1     If the agency claims that some parts of the administrative record are privileged, the

2 Defendants shall produce a privilege log according to the same production deadlines. *See Ctr. for*

3 *Food Safety v. Vilsack*, No. 15-cv-01590, 2017 WL 1709318, at *5 (N.D. Cal. May 3, 2017)

4 (requiring the production of a privilege log when the agency asserted privilege); *Inst. For*

5 *Fisheries Res. v. Burwell*, No. 16-cv-01574-VC, 2017 WL 89003, at *1 (N.D. Cal. Jan. 10, 2017)

6 (same).

### III.     CONCLUSION

8     For the foregoing reasons, the Court orders Defendants to produce an administrative

9 record. For the purposes of the immediate production of the administrative record for the

10 preliminary injunction motion, the administrative record shall be limited by subject matter, date

11 range, and custodians in the following ways:

12     By September 13, 2020, Defendants Bureau Director Steven Dillingham and Secretary of

13 Commerce Wilbur Ross and all of their direct reports/subordinates shall file the following, and a

14 privilege log for any privileged documents: All documents comprising the Replan and its various

15 components for conducting the 2020 Census in a shortened time period, including guidance,

16 directives, and communications regarding same. The date range of the documents is April 13,

17 2020 to August 3, 2020. These custodians can limit their review to documents and materials

18 directly or indirectly considered during these four months.

19     By September 16, 2020, Associate Director Fontenot, his subordinates, and the individuals

20 engaged with Fontenot to consider and prepare the Replan shall file the following, and a privilege

21 log for any privileged documents: All documents and materials directly or indirectly considered

22 when making the decision to replace the COVID-19 Plan with the Replan. The date range of the

23 documents is April 13, 2020 to August 3, 2020. These custodians can limit their review to

24 documents and materials directly or indirectly considered during these four months.

25     Plaintiffs' reply in support of their motion for preliminary injunction shall be filed on

26 September 15, 2020.

27     The administrative record cannot be artificially constrained in time. If the Replan was

28

Case No. 20-CV-05799-LHK
ORDER TO PRODUCE THE ADMINISTRATIVE RECORD

1     informed by the Bureau's prior planning, then such documents must be included. Thus, the Court

2     will consult with the parties on a schedule for the production of the complete administrative record

3     after the Court's ruling on Plaintiffs' motion for preliminary injunction.

4     **IT IS SO ORDERED.**

5

6     Dated: September 10, 2020

7

8                                                                LUCY H. KOH
                                                                 United States District Judge

9

10

11

12

United States District Court
Northern District of California

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 20-CV-05799-LHK
ORDER TO PRODUCE THE ADMINISTRATIVE RECORD