562

1        (2) confer with Urban Indian organizations;

2    and

3        (3) coordinate with the Director of the Centers

4    for Disease Control and Prevention and the Director

5    of the National Institutes of Health.

6    (c) PROCESS.—Not later than 60 days after the date

7 of enactment of this Act, the Director of the Indian Health

8 Service shall establish a nationally representative panel to

9 establish processes and procedures for the research and

10 field studies conducted or supported under subsection (a).

11 The Director shall ensure that, at a minimum, the panel

12 consists of the following individuals:

13        (1) Elected Tribal leaders or their designees.

14        (2) Tribal public health practitioners and ex-

15    perts from the national and regional levels.

16    (d) DUTIES.—The panel established under subsection

17 (c) shall, at a minimum—

18        (1) advise the Director of the Indian Health

19    Service on the processes and procedures regarding

20    the design, implementation, and evaluation of, and

21    reporting on, research and field studies conducted or

22    supported under this section;

23        (2) develop and share resources on Tribal pub-

24    lic health data surveillance and reporting, including

25    best practices; and

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002867

563

1      (3) carry out such other activities as may be
2   appropriate to establish processes and procedures for
3   the research and field studies conducted or sup-
4   ported under subsection (a).

5   (e) REPORT.—Not later than 1 year after expending
6 all funds made available to carry out this section, the Di-
7 rector of the Indian Health Service, in coordination with
8 the panel established under subsection (c), shall submit
9 an initial report on the results of the research and field
10 studies under this section to—

11   (1) the Committee on Energy and Commerce
12   and the Committee on Natural Resources of the
13   House of Representatives; and

14   (2) the Committee on Indian Affairs and the
15   Committee on Health, Education, Labor and Pen-
16   sions of the Senate.

17   (f) TRIBAL DATA SOVEREIGNTY.—The Director of
18 the Indian Health Service shall ensure that all research
19 and field studies conducted or supported under this sec-
20 tion are tribally-directed and carried out in a manner
21 which ensures Tribal-direction of all data collected under
22 this section—

23   (1) according to Tribal best practices regarding
24   research design and implementation, including by

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002868

564

1    ensuring the consent of the Tribes involved to public

2    reporting of Tribal data;

3        (2) according to all relevant and applicable

4    Tribal, professional, institutional, and Federal

5    standards for conducting research and governing re-

6    search ethics;

7        (3) with the prior and informed consent of any

8    Indian Tribe participating in the research or sharing

9    data for use under this section; and

10        (4) in a manner that respects the inherent sov-

11    ereignty of Indian Tribes, including Tribal govern-

12    ance of data and research.

13    (g) FINAL REPORT.—Not later than December 31,

14    2023, the Director of the Indian Health Service shall—

15        (1) update and finalize the initial report under

16    subsection (e); and

17        (2) submit such final report to the committees

18    specified in such subsection.

19    (h) DEFINITIONS.—In this section:

20        (1) The terms ''Indian Tribe'' and ''Tribal or-

21    ganization'' have the meanings given to such terms

22    in section 4 of the Indian Self-Determination and

23    Education Assistance Act (25 U.S.C. 5304).

24        (2) The term ''Urban Indian organization'' has

25    the meaning given to such term in section 4 of the

565

1    Indian Health Care Improvement Act (25 U.S.C.

2    1603).

3    (i) AUTHORIZATION OF APPROPRIATIONS.—There is

4    authorized to be appropriated to carry out this section

5    $25,000,000, to remain available until expended.

6    CDC FIELD STUDIES PERTAINING TO SPECIFIC HEALTH

7    INEQUITIES

8    SEC. 30576.

9    (a) IN GENERAL.—Not later than 90 days after the

10   date of enactment of this Act, the Secretary, acting

11   through the Centers for Disease Control and Prevention,

12   in collaboration with State, local, and territorial health de-

13   partments, shall complete (by the reporting deadline in

14   subsection (b)) field studies to better understand health

15   inequities that are not currently tracked by the Secretary.

16   Such studies shall include an analysis of—

17       (1) the impact of socioeconomic status on

18       health care access and disease outcomes, including

19       COVID–19 outcomes;

20       (2) the impact of disability status on health

21       care access and disease outcomes, including COVID–

22       19 outcomes;

23       (3) the impact of language preference on health

24       care access and disease outcomes, including COVID–

25       19 outcomes;

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002870

566

1      (4) factors contributing to disparities in health

2    outcomes for the COVID–19 pandemic; and

3      (5) other topics related to disparities in health

4    outcomes for the COVID–19 pandemic, as deter-

5    mined by the Secretary.

6    (b) REPORT.—Not later than December 31, 2021,

7 the Secretary shall submit to the Committee on Energy

8 and Commerce of the House of Representatives and the

9 Committee on Health, Education, Labor and Pensions of

10 the Senate an initial report on the results of the field stud-

11 ies under this section.

12    (c) FINAL REPORT.—Not later than December 31,

13 2023, the Secretary shall—

14      (1) update and finalize the initial report under

15    subsection (b); and

16      (2) submit such final report to the committees

17    specified in such subsection.

18    (d) AUTHORIZATION OF APPROPRIATIONS.—There is

19 authorized to be appropriated to carry out this section

20 $25,000,000, to remain available until expended.

21 ADDITIONAL REPORTING TO CONGRESS ON THE RACE

22    AND ETHNICITY RATES OF COVID–19 TESTING, HOS-

23    PITALIZATIONS, AND MORTALITIES

24    SEC. 30577.

25    (a) IN GENERAL.—Not later than August 1, 2020,

26 the Secretary shall submit to the Committee on Appro-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002871

567

1 priations and the Committee on Energy and Commerce

2 of the House of Representatives and the Committee on

3 Appropriations and the Committee on Health, Education,

4 Labor and Pensions of the Senate an initial report—

5     (1) describing the testing, positive diagnoses,

6     hospitalization, intensive care admissions, and mor-

7     tality rates associated with COVID–19,

8     disaggregated by race, ethnicity, age, sex, gender,

9     geographic region, and other relevant factors as de-

10     termined by the Secretary;

11     (2) including an analysis of any variances of

12     testing, positive diagnoses, hospitalizations, and

13     deaths by demographic characteristics; and

14     (3) including proposals for evidenced-based re-

15     sponse strategies to reduce disparities related to

16     COVID–19.

17 (b) FINAL REPORT.—Not later than December 31,

18 2024, the Secretary shall—

19     (1) update and finalize the initial report under

20     subsection (a); and

21     (2) submit such final report to the committees

22     specified in such subsection.

23 (c) COORDINATION.—In preparing the report sub-

24 mitted under this section, the Secretary shall take into ac-

25 count and otherwise coordinate such report with reporting

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002872

568

1 required under section 30572 and under the heading "De-
2 partment of Health and Human Services—Office of the
3 Secretary—Public Health and Social Service Emergency
4 Fund" in title I of division B of the Paycheck Protection
5 Program and Health Care Enhancement Act (Public Law
6 116–139; 134 Stat. 620, 626).

7                    Subtitle F—Miscellaneous

8   TECHNICAL CORRECTIONS TO AMENDMENTS MADE BY

9                           CARES ACT

10  SEC. 30581.

11  (a) The amendments made by this section shall take
12 effect as if included in the enactment of the CARES Act
13 (Public Law 116–136).

14  (b) Section 3112 of division A of the CARES Act
15 (Public Law 116–136) is amended—

16       (1) in subsection (a)(2)(A), by striking the
17    comma before "or a permanent";

18       (2) in subsection (d)(1), by striking "and sub-
19    paragraphs (A) and (B)" and inserting "as subpara-
20    graphs (A) and (B)"; and

21       (3) in subsection (e), by striking "Drug, Cos-
22    metic Act" and inserting "Drug, and Cosmetic Act".

23  (c) Section 6001(a)(1)(D) of division F of the Fami-
24 lies First Coronavirus Response Act (Public Law 116–
25 127), as amended by section 3201 of division A of the

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002873

569

1 CARES Act (Public Law 116–136), is amended by strik-

2 ing "other test that".

3     (d) Subsection (k)(9) of section 543 of the Public

4 Health Service Act (42 U.S.C. 290dd–2), as added by sec-

5 tion 3221(d) of division A of the CARES Act (Public Law

6 116–136), is amended by striking "unprotected health in-

7 formation" and inserting "unsecured protected health in-

8 formation".

9     (e) Section 3401(2)(D) of division A of the CARES

10 Act (Public Law 116–136), is amended by striking "Not

11 Later than" and inserting "Not later than".

12     (f) Section 831(f) of the Public Health Service Act,

13 as redesignated by section 3404(a)(6)(E) and amended by

14 section 3404(a)(6)(G) of division A of the CARES Act

15 (Public Law 116–136), is amended by striking "a health

16 care facility, or a partnership of such a school and facil-

17 ity".

18     (g) Section 846(i) of the Public Health Service Act,

19 as amended by section 3404(i)(8)(C) of division A of the

20 CARES Act (Public Law 116–136), is amended by strik-

21 ing "871(b),," and inserting "871(b),".

22     (h) Section 3606(a)(1)(A) of division A of the

23 CARES Act (Public Law 116–136) is amended by striking

24 "In general" and inserting "IN GENERAL".

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002874

570

1    (i) Section 3856(b)(1) of division A of the CARES

2   Act (Public Law 116–136) is amended to read as follows:

3        "(1) IN GENERAL.—Section 905(b)(4) of the

4       FDA Reauthorization Act of 2017 (Public Law 115–

5       52) is amended by striking 'Section 744H(e)(2)(B)

6       of the Federal Food, Drug, and Cosmetic Act (21

7       U.S.C. 379j–52(e)(2)(B))' and inserting 'Section

8       744H(f)(2)(B) of the Federal Food, Drug, and Cos-

9       metic Act, as redesignated by section 403(c)(1) of

10      this Act,'.".

11    TITLE VI—PUBLIC HEALTH ASSISTANCE

12   Subtitle A—Assistance to Providers and Health System

13        HEALTH CARE PROVIDER RELIEF FUND

14   SEC. 30611.

15    (a) IN GENERAL.—Not later than 7 days after the

16   date of enactment of this Act, the Secretary, acting

17   through the Administrator of the Health Resources and

18   Services Administration, shall establish a program under

19   which the Secretary shall reimburse, through grants or

20   other mechanisms, eligible health care providers for eligi-

21   ble expenses or lost revenues occurring during calendar

22   quarters beginning on or after January 1, 2020, to pre-

23   vent, prepare for, and respond to COVID–19, in an

24   amount calculated under subsection (c).

25    (b) QUARTERLY BASIS.—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002875

571

1        (1) SUBMISSION OF APPLICATIONS.—The Sec-
2    retary shall give applicants a period of 7 calendar
3    days after the close of a quarter to submit applica-
4    tions under this section with respect to such quarter,
5    except that the Secretary shall give applicants a pe-
6    riod of 7 calendar days after the date of enactment
7    of this Act to submit applications with respect to the
8    quarter beginning on January 1, 2020, if the appli-
9    cant has not previously submitted an application
10   with the respect to such quarter.

11       (2) REVIEW AND PAYMENT.—The Secretary
12   shall—

13          (A) review applications and make awards
14       of reimbursement under this section on a quar-
15       terly basis; and

16          (B) award the reimbursements under this
17       section for a quarter not later than 14 calendar
18       days after the close of the quarter, except that
19       the Secretary shall award the reimbursements
20       under this section for the quarter beginning on
21       January 1, 2020, not later than 14 calendar
22       days after the date of enactment of this Act.

23   (c) CALCULATION.—

24       (1) IN GENERAL.—The amount of the reim-
25   bursement to an eligible health provider under this

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002876

572

1   section with respect to a calendar quarter shall

2   equal—

3       (A) the sum of—

4           (i) 100 percent of the eligible ex-

5       penses, as described in subsection (d), of

6       the provider during the quarter; and

7           (ii) subject to paragraph (3), 60 per-

8       cent of the lost revenues, as described in

9       subsection (e), of the provider during the

10      quarter; less

11      (B) any funds that are—

12          (i) received by the provider during the

13      quarter pursuant to the Coronavirus Pre-

14      paredness and Response Supplemental Ap-

15      propriations Act, 2020 (Public Law 116–

16      123), the Families First Coronavirus Re-

17      sponse Act (Public Law 116–127), the

18      CARES Act (Public Law 116–136), or the

19      Paycheck Protection Program and Health

20      Care Enhancement Act (Public Law 116–

21      139); and

22          (ii) not required to be repaid.

23      (2) CARRYOVER.—If the amount determined

24  under paragraph (1)(B) for a calendar quarter with

25  respect to an eligible health care provider exceeds

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002877

573

1    the amount determined under subparagraph (A)
2    with respect to such provider and quarter, the
3    amount of such difference shall be applied in making
4    the calculation under this subsection, over each sub-
5    sequent calendar quarter for which the eligible
6    health care provider seeks reimbursement under this
7    section.

8        (3) LOST REVENUE LIMITATION.—If the
9    amount determined under subsection (e) with re-
10   spect to the lost revenue of an eligible health care
11   provider for a calendar quarter does not exceed an
12   amount that equals 10 percent of the net patient
13   revenue (as defined in such subsection) of the pro-
14   vider for the corresponding quarter in 2019, the ad-
15   dend under paragraph (1)(A)(ii), in making the cal-
16   culation under paragraph (1), is deemed to be zero.

17       (d) ELIGIBLE EXPENSES.—Subject to subsection
18   (h)(1), expenses eligible for reimbursement under this sec-
19   tion include expenses for—

20       (1) building or construction of temporary struc-
21   tures;

22       (2) leasing of properties;

23       (3) medical supplies and equipment including
24   personal protective equipment;

g:\VHLC\051220\051220.072.xml        (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0002878

574

1    (4) in vitro diagnostic tests, serological tests, or
2    testing supplies;

3    (5) increased workforce and trainings;

4    (6) emergency operation centers;

5    (7) construction or retrofitting of facilities;

6    (8) mobile testing units;

7    (9) surge capacity;

8    (10) retention of workforce; and

9    (11) such other items and services as the Sec-
10   retary determines to be appropriate, in consultation
11   with relevant stakeholders.

12   (e) LOST REVENUES.—

13   (1) IN GENERAL.—Subject to subsection (h)(1),
14   for purposes of subsection (c)(1)(A)(ii), the lost rev-
15   enues of an eligible health care provider, with re-
16   spect to the calendar quarter involved, shall be equal
17   to—

18       (A) net patient revenue of the provider for
19       the corresponding quarter in 2019 minus net
20       patient revenue of the provider for such quar-
21       ter; less

22       (B) the savings of the provider during the
23       calendar quarter involved attributable to fore-
24       gone wages, payroll taxes, and benefits of per-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002879

575

1    sonnel who were furloughed or laid off by the

2    provider during that quarter.

3         (2) NET PATIENT REVENUE DEFINED.—For

4    purposes of paragraph (1)(A), the term "net patient

5    revenue", with respect to an eligible health care pro-

6    vider and a calendar quarter, means the sum of—

7              (A) 200 percent of the total amount of re-

8         imbursement received by the provider during

9         the quarter for all items and services furnished

10        under a State plan or a waiver of a State plan

11        under title XIX of the Social Security Act (42

12        U.S.C. 1396 et seq.);

13             (B) 125 percent of the total amount of re-

14        imbursement received by the provider during

15        the quarter for all items and services furnished

16        under title XVIII of the Social Security Act (42

17        U.S.C. 1395 et seq.); and

18             (C) 100 percent of the total amount of re-

19        imbursement not described in subparagraph (A)

20        or (B) received by the provider during the quar-

21        ter for all items and services.

22        (f) INSUFFICIENT FUNDS FOR A QUARTER.—If there

23    are insufficient funds made available to reimburse all eligi-

24    ble health care providers for all eligible expenses and lost

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002880

576

1    revenues for a quarter in accordance with this section, the

2    Secretary shall—

3        (1) prioritize reimbursement of eligible ex-

4        penses; and

5        (2) using the entirety of the remaining funds,

6        uniformly reduce the percentage of lost revenues

7        otherwise applicable under subsection (c)(1)(A)(ii) to

8        the extent necessary to reimburse a portion of the

9        lost revenues of all eligible health care providers ap-

10       plying for reimbursement.

11   (g) APPLICATION.—A health care provider seeking

12   reimbursement under this section for a calendar quarter

13   shall submit to the Secretary an application that—

14       (1) provides documentation demonstrating that

15       the health care provider is an eligible health care

16       provider;

17       (2) includes a valid tax identification number of

18       the health care provider;

19       (3) attests to the eligible expenses and lost rev-

20       enues of the health care provider, as described in

21       subsection (d), occurring during the calendar quar-

22       ter;

23       (4) includes an itemized listing of each such eli-

24       gible expense, including expenses incurred in pro-

25       viding uncompensated care;

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002881

577

1        (5) for purposes of subsection (c)(3), attests to

2    whether the amount determined under subsection (e)

3    with respect to the lost revenue of an eligible health

4    care provider for a calendar quarter exceeds an

5    amount that equals 10 percent of the net patient

6    revenue (as defined in such subsection) of the pro-

7    vider for the corresponding quarter in 2019;

8        (6) includes projections of the eligible expenses

9    and lost revenues of the health care provider, as de-

10   scribed in subsection (c), for the calendar quarter

11   that immediately follows the calendar for which re-

12   imbursement is sought; and

13       (7) indicates the dollar amounts described in

14   each of subparagraphs (A) and (B) of subsection

15   (e)(1) and subparagraphs (A), (B), and (C) of sub-

16   section (e)(2) for the calendar quarter.

17   (h) LIMITATIONS.—

18       (1) NO DUPLICATIVE REIMBURSEMENT.—The

19   Secretary may not provide, and a health care pro-

20   vider may not accept, reimbursement under this sec-

21   tion for expenses or losses with respect to which—

22           (A) the eligible health care provider is re-

23       imbursed from other sources; or

24           (B) other sources are obligated to reim-

25       burse the provider.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002882

578

1    (2) NO EXECUTIVE COMPENSATION.—Reim-
2    bursement for eligible expenses (as described in sub-
3    section (e)) and lost revenues (as described in sub-
4    section (f)) shall not include compensation or bene-
5    fits, including salary, bonuses, awards of stock, or
6    other financial benefits, for an officer or employee
7    described in section 4004(a)(2) of the CARES Act
8    (Public Law 116–136).

9    (i) NO BALANCE BILLING AS CONDITION OF RE-
10   CEIPT OF FUNDS.—

11   (1) PROTECTING INDIVIDUALS ENROLLED IN
12   HEALTH PLANS.—As a condition of receipt of reim-
13   bursement under this section, a health care provider,
14   in the case such provider furnishes during the emer-
15   gency period described in section 1135(g)(1)(B) of
16   the Social Security Act (42 U.S.C. 1320b–
17   5(g)(1)(B)) (whether before, on, or after, the date
18   on which the provider submits an application under
19   this section) a medically necessary item or service
20   described in subparagraph (A), (B), or (C) of para-
21   graph (3) to an individual who is described in such
22   subparagraph (A), (B), or (C), respectively, and en-
23   rolled in a group health plan or group or individual
24   health insurance coverage offered by a health insur-
25   ance issuer (including grandfathered health plans as

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002883

579

1    defined in section 1251(e) of the Patient Protection

2    and Affordable Care Act (42 U.S.C. 18011(e)) and

3    such provider is a nonparticipating provider with re-

4    spect to such plan or coverage and such plan or cov-

5    erage and such items and services would otherwise

6    be covered under such plan if furnished by a partici-

7    pating provider—

8        (A) may not bill or otherwise hold liable

9        such individual for a payment amount for such

10       item or service that is more than the cost-shar-

11       ing amount that would apply under such plan

12       or coverage for such item or service if such pro-

13       vider furnishing such service were a partici-

14       pating provider with respect to such plan or

15       coverage;

16       (B) shall reimburse such individual in a

17       timely manner for any amount for such item or

18       service paid by the individual to such provider

19       in excess of such cost-sharing amount;

20       (C) shall submit any claim for such item or

21       service directly to the plan or coverage; and

22       (D) shall not bill the individual for such

23       cost-sharing amount until such individual is in-

24       formed by the plan or coverage of the required

25       payment amount.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002884

580

1     (2) PROTECTING UNINSURED INDIVIDUALS.—

2 As a condition of receipt of reimbursement under

3 this section, a health care provider, in the case such

4 reimbursement is with respect to expenses incurred

5 in providing uncompensated care (as described in

6 subsection (g)(4)) with respect to a medically nec-

7 essary item or service described in subparagraph

8 (A), (B), or (C) of paragraph (3) furnished during

9 such emergency period (whether before, on, or after,

10 the date on which the provider submits an applica-

11 tion under this section) by the provider to an indi-

12 vidual who is described in such subparagraph (A),

13 (B), or (C), respectively—

14     (A) shall consider such reimbursement as

15 payment in full with respect to such item or

16 service so furnished to such individual;

17     (B) may not bill or otherwise hold liable

18 such individual for any payment for such item

19 or service so furnished to such individual; and

20     (C) shall reimburse such individual in a

21 timely manner for any amount for such item or

22 service paid by the individual to such provider.

23     (3) MEDICALLY NECESSARY ITEMS AND SERV-

24 ICES DESCRIBED.—For purposes of this subsection,

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002885

581

1      medically necessary items and services described in
2      this paragraph are—
3              (A) medically necessary items and services
4          (including in-person or telehealth visits in which
5          such items and services are furnished) that are
6          furnished to an individual who has been diag-
7          nosed with (or after provision of the items and
8          services is diagnosed with) COVID–19 to treat
9          or mitigate the effects of COVID–19;
10             (B) medically necessary items and services
11         (including in-person or telehealth visits in which
12         such items and services are furnished) that are
13         furnished to an individual who is presumed, in
14         accordance  with  paragraph  (4),  to  have
15         COVID–19 but is never diagnosed as such; and
16             (C) a diagnostic test (and administration
17         of such test) as described in section 6001(a) of
18         division F of the Families First Coronavirus
19         Response Act (42 U.S.C. 1320b–5 note) admin-
20         istered to an individual.
21     (4) PRESUMPTIVE CASE OF COVID–19.—For
22     purposes of paragraph (3)(B), an individual shall be
23     presumed to have COVID–19 if the medical record
24     documentation of the individual supports a diagnosis
25     of COVID–19, even if the individual does not have

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002886

582

1 a positive in vitro diagnostic test result in the med-

2 ical record of the individual.

3 (5) PENALTY.—In the case of an eligible health

4 care provider that is paid a reimbursement under

5 this section and that is in violation of paragraph (1)

6 or (2), in addition to any other penalties that may

7 be prescribed by law, the Secretary may recoup from

8 such provider up to the full amount of reimburse-

9 ment the provider receives under this section.

10 (6) DEFINITIONS.—In this subsection:

11 (A) NONPARTICIPATING PROVIDER.—The

12 term ''nonparticipating provider'' means, with

13 respect to an item or service and group health

14 plan or group or individual health insurance

15 coverage offered by a health insurance issuer, a

16 health care provider that does not have a con-

17 tractual relationship directly or indirectly with

18 the plan or issuer, respectively, for furnishing

19 such an item or service under the plan or cov-

20 erage.

21 (B) PARTICIPATING PROVIDER.—The term

22 ''participating provider'' means, with respect to

23 an item or service and group health plan or

24 group or individual health insurance coverage

25 offered by a health insurance issuer, a health

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002887

583

1 care provider that has a contractual relation-

2 ship directly or indirectly with the plan or

3 issuer, respectively, for furnishing such an item

4 or service under the plan or coverage.

5 (C) GROUP HEALTH PLAN, HEALTH INSUR-

6 ANCE COVERAGE.—The terms "group health

7 plan", "health insurance issuer", "group health

8 insurance coverage", and "individual health in-

9 surance coverage" shall have the meanings

10 given such terms under section 2791 of the

11 Public Health Service Act (42 U.S.C. 300gg–

12 91).

13 (j) REPORTS.—

14 (1) AWARD INFORMATION.—In making awards

15 under this section, the Secretary shall post in a

16 searchable, electronic format, a list of all recipients

17 and awards pursuant to funding authorized under

18 this section.

19 (2) REPORTS BY RECIPIENTS.—Each recipient

20 of an award under this section shall, as a condition

21 on receipt of such award, submit reports and main-

22 tain documentation, in such form, at such time, and

23 containing such information, as the Secretary deter-

24 mines is needed to ensure compliance with this sec-

25 tion.

584

1  (3) PUBLIC LISTING OF AWARDS.—The Sec-
2  retary shall—

3      (A) not later than 7 days after the date of
4      enactment of this Act, post in a searchable,
5      electronic format, a list of all awards made by
6      the Secretary under this section, including the
7      recipients and amounts of such awards; and

8      (B) update such list not less than every 7
9      days until all funds made available to carry out
10     this section are expended.

11  (4) INSPECTOR GENERAL REPORT.—

12     (A) IN GENERAL.—Not later than 3 years
13     after final payments are made under this sec-
14     tion, the Inspector General of the Department
15     of Health and Human Services shall transmit a
16     final report on audit findings with respect to
17     the program under this section to the Com-
18     mittee on Energy and Commerce and the Com-
19     mittee on Appropriations of the House of Rep-
20     resentatives and the Committee on Health,
21     Education, Labor and Pensions and the Com-
22     mittee on Appropriations of the Senate.

23     (B) RULE OF CONSTRUCTION.—Nothing in
24     this paragraph shall be construed as limiting
25     the authority of the Inspector General of the

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002889

585

1        Department of Health and Human Services or

2        the Comptroller General of the United States to

3        conduct audits of interim payments earlier than

4        the deadline described in subparagraph (A).

5        (k) ELIGIBLE HEALTH CARE PROVIDER DEFINED.—

6 In this section:

7        (1) IN GENERAL.—The term "eligible health

8        care provider" means a health care provider de-

9        scribed in paragraph (2) that provides diagnostic or

10       testing services or treatment to individuals with a

11       confirmed or presumptive diagnosis of COVID–19.

12       (2) HEALTH CARE PROVIDERS DESCRIBED.—A

13       health care provider described in this paragraph is

14       any of the following:

15       (A) A health care provider enrolled as a

16       participating provider under a State plan ap-

17       proved under title XIX of the Social Security

18       Act (42 U.S.C. 1396 et seq.) (or a waiver of

19       such a plan).

20       (B) A provider of services (as defined in

21       subsection (u) of section 1861 of the Social Se-

22       curity Act (42 U.S.C. 1395x)) or a supplier (as

23       defined in subsection (d) of such section) that

24       is enrolled as a participating provider of serv-

25       ices or participating supplier under the Medi-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002890

586

1    care program under title XVIII of such Act (42

2    U.S.C. 1395 et seq.).

3          (C) A public entity.

4          (D) Any other entity not described in this

5    paragraph as the Secretary may specify.

6    (l) FUNDING.—

7          (1) AUTHORIZATION OF APPROPRIATIONS.—

8    There is authorized to be appropriated for an addi-

9    tional    amount    to    carry    out    this    section

10   $100,000,000,000,    to    remain    available    until    ex-

11   pended.

12         (2) HEALTH CARE PROVIDER RELIEF FUND.—

13               (A) USE OF APPROPRIATED FUNDS.—

14                     (i) IN GENERAL.—In addition to

15               amounts    authorized    to    be    appropriated

16               pursuant to paragraph (1), the unobligated

17               balance of all amounts appropriated to the

18               Health Care Provider Relief Fund shall be

19               made available only to carry out this sec-

20               tion.

21                     (ii) AMOUNTS.—For    purposes    of

22               clause    (i),    the    following    amounts    are

23               deemed to be appropriated to the Health

24               Care Provider Relief Fund:

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002891

587

1              (I) The unobligated balance of
2          the          appropriation          of
3          $100,000,000,000 in the third para-
4          graph under the heading "Depart-
5          ment of Health and Human Serv-
6          ices—Office of the Secretary—Public
7          Health and Social Services Emergency
8          Fund" in division B of the CARES
9          Act (Public Law 116–136).

10             (II) The unobligated balance of
11         the appropriation under the heading
12         "Department of Health and Human
13         Services—Office of the Secretary—
14         Public Health and Social Services
15         Emergency Fund" in division B of the
16         Paycheck Protection Program and
17         Health Care Enhancement Act (Pub-
18         lic Law 116–139).

19         (B) LIMITATION.—Of the unobligated bal-
20     ances described in subparagraph (A)(ii), the
21     Secretary may not make available more than
22     $10,000,000,000 to reimburse eligible health
23     care providers for expenses incurred in pro-
24     viding uncompensated care.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002892

588

1        (C) FUTURE AMOUNTS.—Any appropria-
2      tion enacted subsequent to the date of enact-
3      ment of this Act that is made available for re-
4      imbursing eligible health care providers as de-
5      scribed in subsection (a) shall be made available
6      only to carry out this section.

7     PUBLIC HEALTH WORKFORCE LOAN REPAYMENT

8                PROGRAM

9    SEC. 30612.

10   Part D of title III of the Public Health Service Act
11 (42 U.S.C. 254b et seq.) is amended by adding at the end
12 the following new subpart:

13   **"Subpart XIII—Public Health Workforce**

14 **"SEC. 340J. LOAN REPAYMENT PROGRAM.**

15   "(a) ESTABLISHMENT.—The Secretary of Health
16 and Human Services shall establish a program to be
17 known as the Public Health Workforce Loan Repayment
18 Program (referred to in this section as the 'Program') to
19 assure an adequate supply of and encourage recruitment
20 of public health professionals to eliminate critical public
21 health workforce shortages in local, State, territorial, and
22 Tribal public health agencies.

23   "(b) ELIGIBILITY.—To be eligible to participate in
24 the Program, an individual shall—

25        "(1)(A) be accepted for enrollment, or be en-
26      rolled, as a student in an accredited academic edu-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002893

589

1   cational institution in a State or territory in the
2   final semester or equivalent of a course of study or
3   program leading to a public health degree, a health
4   professions degree or certificate, or a degree in com-
5   puter science, information science, information sys-
6   tems, information technology, or statistics and have
7   accepted employment with a local, State, territorial,
8   or Tribal public health agency, or a related training
9   fellowship, as recognized by the Secretary, to com-
10   mence upon graduation; or

11       ''(B)(i) have graduated, during the preceding
12   10-year period, from an accredited educational insti-
13   tution in a State or territory and received a public
14   health degree, a health professions degree or certifi-
15   cate, or a degree in computer science, information
16   science, information systems, information tech-
17   nology, or statistics; and

18       ''(ii) be employed by, or have accepted employ-
19   ment with, a local, State, territorial, or Tribal public
20   health agency or a related training fellowship, as
21   recognized by the Secretary;

22       ''(2) be a United States citizen;

23       ''(3)(A) submit an application to the Secretary
24   to participate in the Program; and

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002894

590

1    "(B) execute a written contract as required in

2    subsection (c); and

3        "(4) not have received, for the same service, a

4    reduction of loan obligations under section 428K or

5    428L of the Higher Education Act of 1965 (20

6    U.S.C. 1078–11, 1078–12).

7    "(c) CONTRACT.—The written contract referred to in

8    subsection (b)(3)(B) between the Secretary and an indi-

9    vidual shall contain—

10        "(1) an agreement on the part of the Secretary

11    that the Secretary will repay, on behalf of the indi-

12    vidual, loans incurred by the individual in the pur-

13    suit of the relevant degree or certificate in accord-

14    ance with the terms of the contract;

15        "(2) an agreement on the part of the individual

16    that the individual will serve in the full-time employ-

17    ment of a local, State, or Tribal public health agency

18    or a related fellowship program in a position related

19    to the course of study or program for which the con-

20    tract was awarded for a period of time equal to the

21    greater of—

22            "(A) 2 years; or

23            "(B) such longer period of time as deter-

24        mined appropriate by the Secretary and the in-

25        dividual;

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002895

591

1  ''(3) an agreement, as appropriate, on the part
2  of the individual to relocate to a priority service area
3  (as determined by the Secretary) in exchange for an
4  additional loan repayment incentive amount to be
5  determined by the Secretary;

6  ''(4) a provision that any financial obligation of
7  the United States arising out of a contract entered
8  into under this section and any obligation of the in-
9  dividual that is conditioned thereon, is contingent on
10  funds being appropriated for loan repayments under
11  this section;

12  ''(5) a statement of the damages to which the
13  United States is entitled, under this section for the
14  individual's breach of the contract; and

15  ''(6) such other statements of the rights and li-
16  abilities of the Secretary and of the individual as the
17  Secretary determines appropriate, not inconsistent
18  with this section.

19  ''(d) PAYMENTS.—

20  ''(1) IN GENERAL.—A loan repayment provided
21  for an individual under a written contract referred
22  to in subsection (b)(3)(B) shall consist of payment,
23  in accordance with paragraph (2), for the individual
24  toward the outstanding principal and interest on
25  education loans incurred by the individual in the

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002896

G:\CMTE\AP\16\FY20\_D\HEROES.XML

592

1    pursuit of the relevant degree in accordance with the

2    terms of the contract.

3    &ldquo;(2) EQUITABLE DISTRIBUTION.&mdash;In awarding

4    contracts under this section, the Secretary shall en-

5    sure&mdash;

6        &ldquo;(A) a certain percentage of contracts are

7        awarded to individuals who are not already

8        working in public health departments;

9        &ldquo;(B) an equitable distribution of funds

10       geographically; and

11       &ldquo;(C) an equitable distribution among

12       State, local, territorial, and Tribal public health

13       departments.

14   &ldquo;(3) PAYMENTS FOR YEARS SERVED.&mdash;For

15   each year of service that an individual contracts to

16   serve pursuant to subsection (c)(2), the Secretary

17   may pay not more than $35,000 on behalf of the in-

18   dividual for loans described in paragraph (1). With

19   respect to participants under the Program whose

20   total eligible loans are less than $105,000, the Sec-

21   retary shall pay an amount that does not exceed $\frac{1}{3}$

22   of the eligible loan balance for each year of such

23   service of such individual.

24   &ldquo;(4) TAX LIABILITY.&mdash;For purposes of the In-

25   ternal Revenue Code of 1986, a payment made

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002897

593

1    under this section shall be treated in the same man-

2    ner as an amount received under section 338B(g) of

3    this Act, as described in section 108(f)(4) of such

4    Code.

5    "(e) POSTPONING OBLIGATED SERVICE.—With re-

6    spect to an individual receiving a degree or certificate from

7    a health professions or other related school, the date of

8    the initiation of the period of obligated service may be

9    postponed as approved by the Secretary.

10    "(f) BREACH OF CONTRACT.—An individual who fails

11    to comply with the contract entered into under subsection

12    (c) shall be subject to the same financial penalties as pro-

13    vided for under section 338E of the Public Health Service

14    Act (42 U.S.C. 254o) for breaches of loan repayment con-

15    tracts under section 338B of such Act (42 U.S.C. section

16    254l–1).

17    "(g) DEFINITION.—For purposes of this section, the

18    term 'full-time' means full-time as such term is used in

19    section 455(m)(3) of the Higher Education Act of 1965.

20    "(h) AUTHORIZATION OF APPROPRIATIONS.—There

21    is authorized to be appropriated to carry out this section—

22        "(1) $100,000,000 for fiscal year 2020; and

23        "(2) $75,000,000 for fiscal year 2021.".

24    EXPANDING CAPACITY FOR HEALTH OUTCOMES

25    SEC. 30613.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002898

594

1    (a) IN GENERAL.—The Secretary, acting through the

2 Administrator of the Health Resources and Services Ad-

3 ministration, shall award grants to eligible entities to de-

4 velop and expand the use of technology-enabled collabo-

5 rative learning and capacity building models to respond

6 to ongoing and real-time learning, health care information

7 sharing, and capacity building needs related to COVID–

8 19.

9    (b) ELIGIBLE ENTITIES.—To be eligible to receive a

10 grant under this section, an entity shall have experience

11 providing technology-enabled collaborative learning and

12 capacity building health care services—

13        (1) in rural areas, frontier areas, health profes-

14    sional shortage areas, or medically underserved area;

15    or

16        (2) to medically underserved populations or In-

17    dian Tribes.

18    (c) USE OF FUNDS.—An eligible entity receiving a

19 grant under this section shall use funds received through

20 the grant—

21        (1) to advance quality of care in response to

22    COVID–19, with particular emphasis on rural and

23    underserved areas and populations;

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002899

595

1  (2) to protect medical personnel and first re-
2 sponders through sharing real-time learning through
3 virtual communities of practice;

4  (3) to improve patient outcomes for conditions
5 affected or exacerbated by COVID–19, including im-
6 provement of care for patients with complex chronic
7 conditions; and

8  (4) to support rapid uptake by health care pro-
9 fessionals of emerging best practices and treatment
10 protocols around COVID–19.

11  (d) OPTIONAL ADDITIONAL USES OF FUNDS.—An
12 eligible entity receiving a grant under this section may use
13 funds received through the grant for—

14  (1) equipment to support the use and expansion
15 of technology-enabled collaborative learning and ca-
16 pacity building models, including hardware and soft-
17 ware that enables distance learning, health care pro-
18 vider support, and the secure exchange of electronic
19 health information;

20  (2) the participation of multidisciplinary expert
21 team members to facilitate and lead technology-en-
22 abled collaborative learning sessions, and profes-
23 sionals and staff assisting in the development and
24 execution of technology-enabled collaborative learn-
25 ing;

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002900

596

1    (3) the development of instructional program-

2    ming and the training of health care providers and

3    other professionals that provide or assist in the pro-

4    vision of services through technology-enabled collabo-

5    rative learning and capacity building models; and

6    (4) other activities consistent with achieving the

7    objectives of the grants awarded under this section.

8    (e) TECHNOLOGY-ENABLED COLLABORATIVE LEARN-

9    ING AND CAPACITY BUILDING MODEL DEFINED.—In this

10   section, the term "technology-enabled collaborative learn-

11   ing and capacity building model" has the meaning given

12   that term in section 2(7) of the Expanding Capacity for

13   Health Outcomes Act (Public Law 114–270; 130 Stat.

14   1395).

15   (f) AUTHORIZATION OF APPROPRIATIONS.—There is

16   authorized to be appropriated to carry out this section

17   $20,000,000, to remain available until expended.

18   ADDITIONAL FUNDING FOR MEDICAL RESERVE CORPS

19   SEC. 30614.

20   Section 2813 of the Public Health Service Act (42

21   U.S.C. 300hh–15) is amended by striking "$11,200,000

22   for each of fiscal years 2019 through 2023" and inserting

23   "$31,200,000 for each of fiscal years 2020 and 2021 and

24   $11,200,000 for each of fiscal years 2022 and 2023".

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002901

597

1     GRANTS FOR SCHOOLS OF MEDICINE IN DIVERSE AND

2                    UNDERSERVED AREAS

3     SEC. 30615.

4         Subpart II of part C of title VII of the Public Health

5     Service Act is amended by inserting after section 749B

6     of such Act (42 U.S.C. 293m) the following:

7     **"SEC. 749C. SCHOOLS OF MEDICINE IN UNDERSERVED**

8                    **AREAS.**

9         "(a) GRANTS.—The Secretary, acting through the

10    Administrator of the Health Resources and Services Ad-

11    ministration, may award grants to institutions of higher

12    education (including multiple institutions of higher edu-

13    cation applying jointly) for the establishment, improve-

14    ment, and expansion of an allopathic or osteopathic school

15    of medicine, or a branch campus of an allopathic or osteo-

16    pathic school of medicine.

17        "(b) PRIORITY.—In selecting grant recipients under

18    this section, the Secretary shall give priority to institutions

19    of higher education that—

20            "(1) propose to use the grant for an allopathic

21        or osteopathic school of medicine, or a branch cam-

22        pus of an allopathic or osteopathic school of medi-

23        cine, in a combined statistical area with fewer than

24        200 actively practicing physicians per 100,000 resi-

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002902

598

1    dents according to the medical board (or boards) of

2    the State (or States) involved;

3        ''(2) have a curriculum that emphasizes care for

4    diverse and underserved populations; or

5        ''(3) are minority-serving institutions described

6    in the list in section 371(a) of the Higher Education

7    Act of 1965.

8    ''(c) USE OF FUNDS.—The activities for which a

9 grant under this section may be used include—

10       ''(1) planning and constructing—

11         ''(A) a new allopathic or osteopathic school

12        of medicine in an area in which no other school

13        is based; or

14         ''(B) a branch campus of an allopathic or

15        osteopathic school of medicine in an area in

16        which no such school is based;

17       ''(2) accreditation and planning activities for an

18    allopathic or osteopathic school of medicine or

19    branch campus;

20       ''(3) hiring faculty and other staff to serve at

21    an allopathic or osteopathic school of medicine or

22    branch campus;

23       ''(4) recruitment and enrollment of students at

24    an allopathic or osteopathic school of medicine or

25    branch campus;

DOC_0002903

599

1  "(5) supporting educational programs at an

2 allopathic or osteopathic school of medicine or

3 branch campus;

4  "(6) modernizing infrastructure or curriculum

5 at an existing allopathic or osteopathic school of

6 medicine or branch campus thereof;

7  "(7) expanding infrastructure or curriculum at

8 existing an allopathic or osteopathic school of medi-

9 cine or branch campus; and

10  "(8) other activities that the Secretary deter-

11 mines further the development, improvement, and

12 expansion of an allopathic or osteopathic school of

13 medicine or branch campus thereof.

14 "(d) DEFINITIONS.—In this section:

15  "(1) The term 'branch campus' means a geo-

16 graphically separate site at least 100 miles from the

17 main campus of a school of medicine where at least

18 one student completes at least 60 percent of the stu-

19 dent's training leading to a degree of doctor of medi-

20 cine.

21  "(2) The term 'institution of higher education'

22 has the meaning given to such term in section

23 101(a) of the Higher Education Act of 1965.

24 "(e) AUTHORIZATION OF APPROPRIATIONS.—To

25 carry out this section, there is authorized to be appro-

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002904

600

1 priated $1,000,000,000, to remain available until ex-

2 pended.''.

3    GAO STUDY ON PUBLIC HEALTH WORKFORCE

4    SEC. 30616.

5    (a) IN GENERAL.—The Comptroller General of the

6 United States shall conduct a study on the public health

7 workforce in the United States during the COVID–19

8 pandemic.

9    (b) TOPICS.—The study under subsection (a) shall

10 address—

11       (1) existing gaps in the Federal, State, local,

12    Tribal, and territorial public health workforce, in-

13    cluding—

14          (A) epidemiological and disease interven-

15       tion specialists needed during the pandemic for

16       contact tracing, laboratory technicians nec-

17       essary for testing, community health workers

18       for community supports and services, and other

19       staff necessary for contact tracing, testing, or

20       surveillance activities; and

21          (B) other personnel needed during the

22       COVID–19 pandemic;

23       (2) challenges associated with the hiring, re-

24    cruitment, and retention of the Federal, State, local,

25    Tribal, and territorial public health workforce; and

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002905

601

1      (3) recommended steps the Federal Government

2      should take to improve hiring, recruitment, and re-

3      tention of the public health workforce.

4    (c) REPORT.—Not later than December 1, 2021, the

5 Comptroller General shall submit to the Congress a report

6 on the findings of the study conducted under this section.

7    LONGITUDINAL STUDY ON THE IMPACT OF COVID–19 ON

8                 RECOVERED PATIENTS

9    SEC. 30617.

10    Part A of title IV of the Public Health Service Act

11 (42 U.S.C. 281 et seq.) is amended by adding at the end

12 the following:

13 **"SEC. 404O. LONGITUDINAL STUDY ON THE IMPACT OF**

14             **COVID–19 ON RECOVERED PATIENTS.**

15    "(a) IN GENERAL.—The Director of NIH, in con-

16 sultation with the Director of the Centers for Disease Con-

17 trol and Prevention, shall conduct a longitudinal study,

18 over not less than 10 years, on the full impact of SARS–

19 CoV–2 or COVID–19 on infected individuals, including

20 both short-term and long-term health impacts.

21    "(b) TIMING.—The Director of NIH shall begin en-

22 rolling patients in the study under this section not later

23 than 6 months after the date of enactment of this section.

24    "(c) REQUIREMENTS.—The study under this section

25 shall—

26      "(1) be nationwide;

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002906

602

1       ''(2) include diversity of enrollees to account for
2   gender,      age,     race,     ethnicity,     geography,
3   comorbidities, and underrepresented populations, in-
4   cluding pregnant and lactating women;

5       ''(3) study individuals with COVID–19 who ex-
6   perienced mild symptoms, such individuals who expe-
7   rienced moderate symptoms, and such individuals
8   who experienced severe symptoms;

9       ''(4) monitor the health outcomes and symp-
10  toms of individuals with COVID–19, or who had
11  prenatal exposure to SARS–CoV–2 or COVID–19,
12  including lung capacity and function, and immune
13  response, taking into account any pharmaceutical
14  interventions such individuals may have received;

15      ''(5) monitor the mental health outcomes of in-
16  dividuals with COVID–19, taking into account any
17  interventions that affected mental health; and

18      ''(6) monitor individuals enrolled in the study
19  not less frequently than twice per year after the first
20  year of the individual's infection with SARS–CoV–2.

21      ''(d) PUBLIC-PRIVATE RESEARCH NETWORK.—For
22  purposes of carrying out the study under this section, the
23  Director of NIH may develop a network of public-private
24  research partners, provided that all research, including the

g:\VHLC\051220\051220.072.xml      (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0002907

603

1 research carried out through any such partner, is available

2 publicly.

3   "(e) SUMMARIES OF FINDINGS.—The Director of

4 NIH shall make public a summary of findings under this

5 section not less frequently than once every 3 months for

6 the first 2 years of the study, and not less frequently than

7 every 6 months thereafter. Such summaries may include

8 information about how the findings of the study under this

9 section compare with findings from research conducted

10 abroad.

11   "(f) AUTHORIZATION OF APPROPRIATIONS.—There

12 is authorized to be appropriated to carry out this section

13 $200,000,000, to remain available until expended.".

14 RESEARCH ON THE MENTAL HEALTH IMPACT OF COVID–

15                              19

16   SEC. 30618.

17   (a) IN GENERAL.—The Secretary, acting through the

18 Director of the National Institute of Mental Health, shall

19 conduct or support research on the mental health con-

20 sequences of SARS–CoV–2 or COVID–19.

21   (b) USE OF FUNDS.—Research under subsection (a)

22 may include the following:

23       (1) Research on the mental health impact of

24       SARS–CoV–2 or COVID–19 on health care pro-

25       viders, including—

26           (A) traumatic stress;

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002908

604

1         (B) psychological distress; and

2         (C) psychiatric disorders.

3         (2) Research on the impact of SARS–CoV–2 or

4 COVID–19 stressors on mental health over time.

5         (3) Research to strengthen the mental health

6 response to SARS–CoV–2 or COVID–19, including

7 adapting to and maintaining or providing additional

8 services for new or increasing mental health needs.

9         (4) Research on the reach, efficiency, effective-

10 ness, and quality of digital mental health interven-

11 tions.

12         (5) Research on effectiveness of strategies for

13 implementation and delivery of evidence-based men-

14 tal health interventions and services for underserved

15 populations.

16         (6) Research on suicide prevention.

17 (c) RESEARCH COORDINATION.—The Secretary shall

18 coordinate activities under this section with similar activi-

19 ties conducted by national research institutes and centers

20 of the National Institutes of Health to the extent that

21 such institutes and centers have responsibilities that are

22 related to the mental health consequences of SARS–CoV–

23 2 or COVID–19.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002909

605

1    (d) AUTHORIZATION OF APPROPRIATIONS.—To carry

2 out this section, there is authorized to be appropriated

3 $200,000,000, to remain available until expended.

4    EMERGENCY MENTAL HEALTH AND SUBSTANCE USE

5    TRAINING AND TECHNICAL ASSISTANCE CENTER

6    SEC. 30619.

7    Subpart 3 of part B of title V of the Public Health

8 Service Act (42 U.S.C. 290bb–31 et seq.) is amended by

9 inserting after section 520A (42 U.S.C. 290bb–32) the fol-

10 lowing:

11 **"SEC. 520B. EMERGENCY MENTAL HEALTH AND SUB-**

12 **STANCE USE TRAINING AND TECHNICAL AS-**

13 **SISTANCE CENTER.**

14    "(a) ESTABLISHMENT.—The Secretary, acting

15 through the Assistant Secretary, shall establish or operate

16 a center to be known as the Emergency Mental Health

17 and Substance Use Training and Technical Assistance

18 Center (referred to in this section as the 'Center') to pro-

19 vide technical assistance and support—

20       "(1) to public or nonprofit entities seeking to

21    establish or expand access to mental health and sub-

22    stance use prevention, treatment, and recovery sup-

23    port services, and increase awareness of such serv-

24    ices; and

25       "(2) to public health professionals, health care

26    professionals and support staff, essential workers (as

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002910

606

1  defined by a State, Tribe, locality, or territory), and

2  members of the public to address the trauma, stress,

3  and mental health needs associated with an emer-

4  gency period.

5  "(b) ASSISTANCE AND SUPPORT.—The assistance

6  and support provided under subsection (a) shall include

7  assistance and support with respect to—

8      "(1) training on identifying signs of trauma,

9  stress, and mental health needs;

10     "(2) providing accessible resources to assist in-

11  dividuals and families experiencing trauma, stress,

12  or other mental health needs during and after an

13  emergency period;

14     "(3) providing resources for substance use dis-

15  order prevention, treatment, and recovery designed

16  to assist individuals and families during and after an

17  emergency period;

18     "(4) the provision of language access services,

19  including translation services, interpretation, or

20  other such services for individuals with limited

21  English speaking proficiency or people with disabil-

22  ities; and

23     "(5) evaluation and improvement, as necessary,

24  of the effectiveness of such services provided by pub-

25  lic or nonprofit entities.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002911

607

1    "(c) BEST PRACTICES.—The Center shall periodi-
2 cally issue best practices for use by organizations seeking
3 to provide mental health services or substance use disorder
4 prevention, treatment, or recovery services to individuals
5 during and after an emergency period.

6    "(d) EMERGENCY PERIOD.—In this section, the term
7 'emergency period' has the meaning given such term in
8 section 1135(g)(1)(A) of the Social Security Act.

9    "(e) AUTHORIZATION OF APPROPRIATIONS.—There
10 is authorized to be appropriated to carry out this section
11 $20,000,000 for each of fiscal years 2020 and 2021.".

12    IMPORTANCE OF THE BLOOD AND PLASMA SUPPLY

13    SEC. 30620.

14    (a) IN GENERAL.—Section 3226 of the CARES Act
15 (Public Law 116–136) is amended—

16        (1) in the section heading after "**BLOOD**" by
17    inserting "**AND PLASMA**"; and

18        (2) by inserting after "blood" each time it ap-
19    pears "and plasma".

20    (b) CONFORMING AMENDMENT.—The item relating
21 to section 3226 in the table of contents in section 2 of
22 the CARES Act (Public Law 116–136) is amended to read
23 as follows:

"Sec. 3226. Importance of the blood and plasma supply.".

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002912

608

1    Subtitle B—Assistance for Individuals and Families

2    REIMBURSEMENT FOR ADDITIONAL HEALTH SERVICES

3              RELATING TO CORONAVIRUS

4    SEC. 30631.

5    Title V of division A of the Families First

6  Coronavirus Response Act (Public Law 116–127) is

7  amended under the heading "Department of Health and

8  Human Services—Office of the Secretary—Public Health

9  and Social Services Emergency Fund" by inserting ", or

10  treatment related to SARS–CoV–2 or COVID–19 for un-

11  insured individuals" after "or visits described in para-

12  graph (2) of such section for uninsured individuals".

13    CENTERS FOR DISEASE CONTROL AND PREVENTION

14              COVID–19 RESPONSE LINE

15    SEC. 30632.

16    (a) IN GENERAL.—During the public health emer-

17  gency declared by the Secretary pursuant to section 319

18  of the Public Health Service Act (42 U.S.C. 247d) on Jan-

19  uary 31, 2020 with respect to COVID–19, the Secretary,

20  acting through the Director of the Centers for Disease

21  Control and Prevention, shall maintain a toll-free tele-

22  phone number to address public health queries, including

23  questions concerning COVID–19.

24    (b) AUTHORIZATION OF APPROPRIATIONS.—To carry

25  out this section, there is authorized to be appropriated

26  $10,000,000, to remain available until expended.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002913

609

1  GRANTS TO ADDRESS SUBSTANCE USE DURING COVID–19

2  Sec. 30633.

3  (a) In General.—The Assistant Secretary for Men-

4  tal Health and Substance Use of the Department of

5  Health and Human Services (in this section referred to

6  as the "Assistant Secretary"), in consultation with the Di-

7  rector of the Centers for Disease Control and Prevention,

8  shall award grants to States, political subdivisions of

9  States, Tribes, Tribal organizations, and community-based

10  entities to address the harms of drug misuse, including

11  by—

12      (1) preventing and controlling the spread of in-

13    fectious diseases, such as HIV/AIDS and viral hepa-

14    titis, and the consequences of such diseases for indi-

15    viduals with substance use disorder;

16      (2) connecting individuals at risk for or with a

17    substance use disorder to overdose education, coun-

18    seling, and health education; or

19      (3) encouraging such individuals to take steps

20    to reduce the negative personal and public health

21    impacts of substance use or misuse during the emer-

22    gency period.

23  (b) Considerations.—In awarding grants under

24  this section, the Assistant Secretary shall prioritize grants

25  to applicants proposing to serve areas with—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002914

610

1          (1) a high proportion of people who meet cri-
2     teria for dependence on or abuse of illicit drugs who
3     have not received any treatment;

4          (2) high drug overdose death rates;

5          (3) high telemedicine infrastructure needs; and

6          (4) high behavioral health and substance use
7     disorder workforce needs.

8     (c) DEFINITION.—In this section, the term "emer-
9 gency period" has the meaning given to such term in sec-
10 tion 1135(g)(1)(B) of the Social Security Act (42 U.S.C.
11 1320b–5(g)(1)(B))).

12    (d) AUTHORIZATION OF APPROPRIATIONS.—To carry
13 out this section, there is authorized to be appropriated
14 $10,000,000, to remain available until expended.

15       GRANTS TO SUPPORT INCREASED BEHAVIORAL HEALTH

16                    NEEDS DUE TO COVID–19

17    SEC. 30634.

18    (a) IN GENERAL.—The Secretary, acting through the
19 Assistant Secretary of Mental Health and Substance Use,
20 shall award grants to States, political subdivisions of
21 States, Indian Tribes and Tribal organizations, commu-
22 nity-based entities, and primary care and behavioral
23 health organizations to address behavioral health needs
24 caused by the public health emergency declared pursuant
25 to section 319 of the Public Health Service Act (42 U.S.C.
26 247d) with respect to COVID–19.

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002915

611

1    (b) USE OF FUNDS.—An entity that receives a grant

2 under subsection (a) may use funds received through such

3 grant to—

4        (1) increase behavioral health treatment and

5    prevention capacity, including to—

6            (A) promote coordination among local enti-

7        ties;

8            (B) train the behavioral health workforce,

9        relevant stakeholders, and community members;

10           (C) upgrade technology to support effective

11       delivery of health care services through tele-

12       health modalities;

13           (D) purchase medical supplies and equip-

14       ment for behavioral health treatment entities

15       and providers;

16           (E) address surge capacity for behavioral

17       health needs such as through mobile units; and

18           (F) promote collaboration between primary

19       care and mental health providers; and

20       (2) support or enhance behavioral health serv-

21   ices, including—

22           (A) emergency crisis intervention, includ-

23       ing mobile crisis units, 24/7 crisis call centers,

24       and medically staffed crisis stabilization pro-

25       grams;

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002916

G:\CMTE\AP\16\FY20\_D\HEROES.XML

612

1     (B) screening, assessment, diagnosis, and

2 treatment;

3     (C) mental health awareness trainings;

4     (D) evidence-based suicide prevention;

5     (E) evidence-based integrated care models;

6     (F) community recovery supports;

7     (G) outreach to underserved and minority

8 communities; and

9     (H) for front line health care workers.

10    (c) PRIORITY.—The Secretary shall give priority to

11 applicants proposing to serve areas with a high number

12 of COVID–19 cases.

13    (d) EVALUATION.—An entity that receives a grant

14 under this section shall prepare and submit an evaluation

15 to the Secretary at such time, in such manner, and con-

16 taining such information as the Secretary may reasonably

17 require, including—

18     (1) an evaluation of activities carried out with

19 funds received through the grant; and

20     (2) a process and outcome evaluation.

21    (e) AUTHORIZATION OF APPROPRIATIONS.—To carry

22 out this section, there is authorized to be appropriated

23 $50,000,000 for each of fiscal years 2020 and 2021, to

24 remain available until expended.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002917

613

1    Subtitle C—Assistance to Tribes

2 IMPROVING STATE, LOCAL, AND TRIBAL PUBLIC HEALTH

3    SECURITY

4    SEC. 30641.

5    Section 319C–1 of the Public Health Service Act (42

6 U.S.C. 247d–3a) is amended—

7        (1) in the section heading, by striking "**AND**

8    **LOCAL**" and inserting "**, LOCAL, AND TRIBAL**";

9        (2) in subsection (b)—

10           (A) in paragraph (1)—

11               (i) in subparagraph (B), by striking

12           "or" at the end;

13               (ii) in subparagraph (C), by striking

14           "and" at the end and inserting "or"; and

15               (iii) by adding at the end the fol-

16           lowing:

17           "(D) be an Indian Tribe, Tribal organiza-

18       tion, or a consortium of Indian Tribes or Tribal

19       organizations; and"; and

20           (B) in paragraph (2)—

21               (i) in the matter preceding subpara-

22           graph (A), by inserting ", as applicable"

23           after "including";

24               (ii) in subparagraph (A)(viii)—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002918

614

1          (I) by inserting "and Tribal"
2      after "with State";
3          (II) by striking "(as defined in
4      section 8101 of the Elementary and
5      Secondary Education Act of 1965)"
6      and inserting "and Tribal educational
7      agencies (as defined in sections 8101
8      and 6132, respectively, of the Elemen-
9      tary and Secondary Education Act of
10     1965)"; and
11         (III) by inserting "and Tribal"
12     after "and State";
13         (iii) in subparagraph (G), by striking
14     "and tribal" and inserting "Tribal, and
15     urban Indian organization"; and
16         (iv) in subparagraph (H), by inserting
17     ", Indian Tribes, and urban Indian organi-
18     zations" after "public health";
19     (3) in subsection (e), by inserting "Indian
20 Tribes, Tribal organizations, urban Indian organiza-
21 tions," after "local emergency plans,";
22     (4) in subsection (g)(1), by striking "tribal offi-
23 cials" and inserting "Tribal officials";
24     (5) in subsection (h)—
25         (A) in paragraph (1)(A)—

g:\VHLC\051220\051220.072.xml       (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0002919

615

1    (i) by striking "through 2023" and
2   inserting "and 2020"; and

3    (ii) by inserting before the period ";
4   and $690,000,000 for each of fiscal years
5   2021 through 2023 for awards pursuant to
6   paragraph (3) (subject to the authority of
7   the Secretary to make awards pursuant to
8   paragraphs (4) and (5)) and paragraph
9   (8), of which not less than $5,000,000
10   shall be reserved each fiscal year for
11   awards under paragraph (8)";

12   (B) in subsection (h)(2)(B), by striking
13  "tribal public" and inserting "Tribal public";

14   (C) in the heading of paragraph (3), by in-
15  serting "FOR STATES" after "AMOUNT"; and

16   (D) by adding at the end the following:

17  "(8) TRIBAL ELIGIBLE ENTITIES.—

18   "(A) DETERMINATION OF FUNDING
19  AMOUNT.—

20   "(i) IN GENERAL.—The Secretary
21   shall award at least 10 cooperative agree-
22   ments under this section, in amounts not
23   less than the minimum amount determined
24   under clause (ii), to eligible entities de-
25   scribed in subsection (b)(1)(D) that sub-

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002920

616

1    mits to the Secretary an application that
2    meets the criteria of the Secretary for the
3    receipt of such an award and that meets
4    other reasonable implementation conditions
5    established by the Secretary, in consulta-
6    tion with Indian Tribes, for such awards.
7    If the Secretary receives more than 10 ap-
8    plications under this section from eligible
9    entities described in subsection (b)(1)(D)
10   that meet the criteria and conditions de-
11   scribed in the previous sentence, the Sec-
12   retary, in consultation with Indian Tribes,
13   may make additional awards under this
14   section to such entities.

15       ''(ii) MINIMUM AMOUNT.—In deter-
16   mining the minimum amount of an award
17   pursuant to clause (i), the Secretary, in
18   consultation with Indian Tribes, shall first
19   determine an amount the Secretary con-
20   siders appropriate for the eligible entity.

21       ''(B) AVAILABLE UNTIL EXPENDED.—
22   Amounts provided to a Tribal eligible entity
23   under a cooperative agreement under this sec-
24   tion for a fiscal year and remaining unobligated
25   at the end of such year shall remain available

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002921

617

1     to such entity during the entirety of the per-

2     formance period, for the purposes for which

3     said funds were provided.

4         ''(C) NO MATCHING REQUIREMENT.—Sub-

5     paragraphs (B), (C), and (D) of paragraph (1)

6     shall not apply with respect to cooperative

7     agreements awarded under this section to eligi-

8     ble entities described in subsection (b)(1)(D).'';

9     and

10     (6) by adding at the end the following:

11   ''(l) SPECIAL RULES RELATED TO TRIBAL ELIGIBLE

12 ENTITIES.—

13     ''(1) MODIFICATIONS.—After consultation with

14     Indian Tribes, the Secretary may make necessary

15     and appropriate modifications to the program under

16     this section to facilitate the use of the cooperative

17     agreement program by eligible entities described in

18     subsection (b)(1)(D).

19     ''(2) WAIVERS.—

20         ''(A) IN GENERAL.—Except as provided in

21     subparagraph (B), the Secretary may waive or

22     specify alternative requirements for any provi-

23     sion of this section (including regulations) that

24     the Secretary administers in connection with

25     this section if the Secretary finds that the waiv-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002922

618

1    er or alternative requirement is necessary for

2    the effective delivery and administration of this

3    program with respect to eligible entities de-

4    scribed in subsection (b)(1)(D).

5        ''(B) EXCEPTION.—The Secretary may not

6    waive or specify alternative requirements under

7    subparagraph (A) relating to labor standards or

8    the environment.

9        ''(3) CONSULTATION.—The Secretary shall con-

10    sult with Indian Tribes and Tribal organizations on

11    the design of this program with respect to such

12    Tribes and organizations to ensure the effectiveness

13    of the program in enhancing the security of Indian

14    Tribes with respect to public health emergencies.

15        ''(4) REPORTING.—

16        ''(A) IN GENERAL.—Not later than 2 years

17    after the date of enactment of this subsection,

18    and as an addendum to the biennial evaluations

19    required under subsection (k), the Secretary, in

20    coordination with the Director of the Indian

21    Health Service, shall—

22        ''(i) conduct a review of the implemen-

23    tation of this section with respect to eligi-

24    ble entities described in subsection

DOC_0002923

619

1  (b)(1)(D), including any factors that may

2  have limited its success; and

3      "(ii) submit a report describing the

4  results of the review described in clause (i)

5  to—

6          "(I) the Committee on Indian Af-

7      fairs, the Committee on Health, Edu-

8      cation, Labor and Pensions, and the

9      Committee on Appropriations of the

10     Senate; and

11         "(II) the Subcommittee for In-

12     digenous Peoples of the United States

13     of the Committee on Natural Re-

14     sources, the Committee on Energy

15     and Commerce, and the Committee on

16     Appropriations of the House of Rep-

17     resentatives.

18  "(B) ANALYSIS OF TRIBAL PUBLIC

19  HEALTH EMERGENCY INFRASTRUCTURE LIMI-

20  TATION.—The Secretary shall include in the

21  initial report submitted under subparagraph (A)

22  a description of any public health emergency in-

23  frastructure limitation encountered by eligible

24  entities described in subsection (b)(1)(D).".

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002924

620

PROVISION OF ITEMS TO INDIAN PROGRAMS AND

FACILITIES

SEC. 30642.

(a) STRATEGIC NATIONAL STOCKPILE.—Section 319F–2(a)(3)(G) of the Public Health Service Act (42 U.S.C. 247d–6b(a)(3)(G)) is amended by inserting ", and, in the case that the Secretary deploys the stockpile under this subparagraph, ensure, in coordination with the applicable States and programs and facilities, that appropriate drugs, vaccines and other biological products, medical devices, and other supplies are deployed by the Secretary directly to health programs or facilities operated by the Indian Health Service, an Indian Tribe, a Tribal organization (as those terms are defined in section 4 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5304)), or an inter-Tribal consortium (as defined in section 501 of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 5381)) or through an urban Indian organization (as defined in section 4 of the Indian Health Care Improvement Act), while avoiding duplicative distributions to such programs or facilities" before the semicolon.

(b) DISTRIBUTION OF QUALIFIED PANDEMIC OR EPIDEMIC PRODUCTS TO IHS FACILITIES.—Title III of the

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002925

621

1  Public Health Service Act (42 U.S.C. 241 et seq.) is

2  amended by inserting after section 319F–4 the following:

3  **"SEC. 319F–5. DISTRIBUTION OF QUALIFIED PANDEMIC OR**

4            **EPIDEMIC PRODUCTS TO INDIAN PROGRAMS**

5            **AND FACILITIES.**

6        "In the case that the Secretary distributes qualified

7  pandemic or epidemic products (as defined in section

8  319F–3(i)(7)) to States or other entities, the Secretary

9  shall ensure, in coordination with the applicable States

10  and programs and facilities, that, as appropriate, such

11  products are distributed directly to health programs or fa-

12  cilities operated by the Indian Health Service, an Indian

13  Tribe, a Tribal organization (as those terms are defined

14  in section 4 of the Indian Self-Determination and Edu-

15  cation Assistance Act (25 U.S.C. 5304)), or an inter-Trib-

16  al consortium (as defined in section 501 of the Indian

17  Self-Determination and Education Assistance Act (25

18  U.S.C. 5381)) or through an urban Indian organization

19  (as defined in section 4 of the Indian Health Care Im-

20  provement Act), while avoiding duplicative distributions to

21  such programs or facilities.".

22  HEALTH CARE ACCESS FOR URBAN NATIVE VETERANS

23        SEC. 30643.

24        Section 405 of the Indian Health Care Improvement

25  Act (25 U.S.C. 1645) is amended—

DOC_0002926

622

1   (1) in subsection (a)(1), by inserting "urban In-

2 dian organizations," before "and tribal organiza-

3 tions"; and

4   (2) in subsection (c)—

5     (A) by inserting "urban Indian organiza-

6   tion," before "or tribal organization"; and

7     (B) by inserting "an urban Indian organi-

8   zation," before "or a tribal organization".

9 PROPER AND REIMBURSED CARE FOR NATIVE VETERANS

10  SEC. 30644.

11  Section 405(c) of the Indian Health Care Improve-

12 ment Act (25 U.S.C. 1645(c)) is amended by inserting be-

13 fore the period at the end the following: ", regardless of

14 whether such services are provided directly by the Service,

15 an Indian tribe, or tribal organization, through contract

16 health services, or through a contract for travel described

17 in section 213(b)".

18   AMENDMENT TO THE INDIAN HEALTH CARE

19     IMPROVEMENT ACT

20  SEC. 30645.

21  Section 409 of the Indian Health Care Improvement

22 Act (25 U.S.C. 1647b) is amended by inserting "or the

23 Tribally Controlled Schools Act of 1988 (25 U.S.C. 2501

24 et seq.)" after "(25 U.S.C. 450 et seq.)".

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002927

623

# DIVISION D—RETIREMENT PROVISIONS

**SEC. 40001. SHORT TITLE.**

This division may be cited as the "Emergency Pension Plan Relief Act of 2020".

# TITLE I—RELIEF FOR MULTIEMPLOYER PENSION PLANS

**SEC. 40101. SPECIAL PARTITION RELIEF.**

(a) APPROPRIATION.—Section 4005 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1305) is amended by adding at the end the following:

"(i)(1) An eighth fund shall be established for partition assistance to multiemployer pension plans, as provided under section 4233A, and to pay for necessary administrative and operating expenses relating to such assistance.

"(2) There is appropriated from the general fund such amounts as necessary for the costs of providing partition assistance under section 4233A and necessary administrative and operating expenses. The eighth fund established under this subsection shall be credited with such amounts from time to time as the Secretary of the Treasury determines appropriate, from the general fund of the Treasury, and such amounts shall remain available until expended.".

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002928

624

1    (b) SPECIAL PARTITION AUTHORITY.—The Em-
2  ployee Retirement Income Security Act of 1974 (29
3  U.S.C. 1001 et seq.) is amended by inserting after section
4  4233 the following:

**"SEC. 4233A. SPECIAL PARTITION RELIEF.**

6    "(a) SPECIAL PARTITION AUTHORITY.—

7        "(1) IN GENERAL.—Upon the application of a
8    plan sponsor of an eligible multiemployer plan for
9    partition of the plan under this section, the corpora-
10   tion shall order a partition of the plan in accordance
11   with this section.

12       "(2) INAPPLICABILITY OF CERTAIN REPAYMENT
13   OBLIGATION.—A plan receiving partition assistance
14   pursuant to this section shall not be subject to re-
15   payment obligations under section 4261(b)(2).

16   "(b) ELIGIBLE PLANS.—

17       "(1) IN GENERAL.—For purposes of this sec-
18   tion, a multiemployer plan is an eligible multiem-
19   ployer plan if—

20           "(A) the plan is in critical and declining
21       status (within the meaning of section
22       305(b)(6)) in any plan year beginning in 2020
23       through 2024;

24           "(B) a suspension of benefits has been ap-
25       proved with respect to the plan under section

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002929

G:\CMTE\AP\16\FY20\_D\HEROES.XML

625

1    305(e)(9) as of the date of the enactment of
2    this section;

3         ''(C) in any plan year beginning in 2020
4    through 2024, the plan is certified by the plan
5    actuary to be in critical status (within the
6    meaning of section 305(b)(2)), has a modified
7    funded percentage of less than 40 percent, and
8    has a ratio of active to inactive participants
9    which is less than 2 to 3; or

10        ''(D) the plan is insolvent for purposes of
11   section 418E of the Internal Revenue Code of
12   1986 as of the date of enactment of this sec-
13   tion, if the plan became insolvent after Decem-
14   ber 16, 2014, and has not been terminated by
15   such date of enactment.

16        ''(2) MODIFIED FUNDED PERCENTAGE.—For
17   purposes of paragraph (1)(C), the term 'modified
18   funded percentage' means the percentage equal to a
19   fraction the numerator of which is current value of
20   plan assets (as defined in section 3(26) of such Act)
21   and the denominator of which is current liabilities
22   (as defined in section 431(c)(6)(D) of such Code and
23   section 304(c)(6)(D) of such Act).

24   ''(c) APPLICATIONS FOR SPECIAL PARTITION.—

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002930

626

1      ''(1) GUIDANCE.—The corporation shall issue
2    guidance setting forth requirements for special parti-
3    tion applications under this section not later than
4    120 days after the date of the enactment of this sec-
5    tion. In such guidance, the corporation shall—

6          ''(A) limit the materials required for a spe-
7       cial partition application to the minimum nec-
8       essary to make a determination on the applica-
9       tion; and

10         ''(B) provide for an alternate application
11      for special partition under this section, which
12      may be used by a plan that has been approved
13      for a partition under section 4233 before the
14      date of enactment of this section.

15     ''(2) TEMPORARY PRIORITY CONSIDERATION OF
16   APPLICATIONS.—

17         ''(A) IN GENERAL.—The corporation may
18      specify in guidance under paragraph (1) that,
19      during the first 2 years following the date of
20      enactment of this section, special partition ap-
21      plications will be provided priority consider-
22      ation, if—

23             ''(i) the plan is likely to become insol-
24          vent within 5 years of the date of enact-
25          ment of this section;

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002931

G:\CMTE\AP\16\FY20\_D\HEROES.XML

627

1         "(ii) the corporation projects a plan to

2     have a present value of financial assistance

3     payments under section 4261 that exceeds

4     $1,000,000,000 if the special partition is

5     not ordered;

6         "(iii) the plan has implemented ben-

7     efit suspensions under section 305(e)(9) as

8     of the date of the enactment of this sec-

9     tion; or

10        "(iv) the corporation determines it ap-

11    propriate based on other circumstances.

12    "(B) No effect on amount of assist-

13    ance.—A plan that is approved for special par-

14    tition assistance under this section shall not re-

15    ceive reduced special partition assistance on ac-

16    count of not receiving priority consideration

17    under subparagraph (A).

18    "(3) Actuarial assumptions and other in-

19    formation.—The corporation shall accept assump-

20    tions incorporated in a multiemployer plan's deter-

21    mination that it is in critical status or critical and

22    declining status (within the meaning of section

23    305(b)), or that the plan's modified funded percent-

24    age is less than 40 percent, unless such assumptions

25    are clearly erroneous. The corporation may require

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002932

628

1    such other information as the corporation deter-
2    mines appropriate for making a determination of eli-
3    gibility and the amount of special partition assist-
4    ance necessary under this section.

5        ''(4) APPLICATION DEADLINE.—Any application
6    by a plan for special partition assistance under this
7    section shall be submitted no later than December
8    31, 2026, and any revised application for special
9    partition assistance shall be submitted no later than
10    December 31, 2027.

11        ''(5) NOTICE OF APPLICATION.—Not later than
12    120 days after the date of enactment of this section,
13    the corporation shall issue guidance requiring multi-
14    employer plans to notify participants and bene-
15    ficiaries that the plan has applied for partition
16    under this section, after the corporation has deter-
17    mined that the application is complete. Such notice
18    shall reference the special partition relief internet
19    website described in subsection (p).

20        ''(d) DETERMINATIONS ON APPLICATIONS.—A plan's
21    application for special partition under this section that is
22    timely filed in accordance with guidance issued under sub-
23    section (c)(1) shall be deemed approved and the corpora-
24    tion shall issue a special partition order unless the cor-
25    poration notifies the plan within 120 days of the filing

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002933

629

1  of the application that the application is incomplete or the

2  plan is not eligible under this section. Such notice shall

3  specify the reasons the plan is ineligible for a special parti-

4  tion or information needed to complete the application. If

5  a plan is denied partition under this subsection, the plan

6  may submit a revised application under this section. Any

7  revised application for special partition submitted by a

8  plan shall be deemed approved unless the corporation noti-

9  fies the plan within 120 days of the filing of the revised

10  application that the application is incomplete or the plan

11  is not eligible under this section. A special partition order

12  issued by the corporation shall be effective no later than

13  120 days after a plan's special partition application is ap-

14  proved by the corporation or deemed approved.

15     "(e) AMOUNT AND MANNER OF SPECIAL PARTITION

16  ASSISTANCE.—

17        "(1) IN GENERAL.—The liabilities of an eligible

18     multiemployer plan that the corporation assumes

19     pursuant to a special partition order under this sec-

20     tion shall be the amount necessary for the plan to

21     meet its funding goals described in subsection (g).

22        "(2) NO CAP.—Liabilities assumed by the cor-

23     poration pursuant to a special partition order under

24     this section shall not be capped by the guarantee

DOC_0002934

G:\CMTE\AP\16\FY20\_D\HEROES.XML

630

1    under section 4022A. The corporation shall have dis-

2    cretion on how liabilities of the plan are partitioned.

3    ''(f) SUCCESSOR PLAN.—

4        ''(1) IN GENERAL.—The plan created by a spe-

5    cial partition order under this section is a successor

6    plan to which section 4022A applies.

7        ''(2) PLAN SPONSOR AND ADMINISTRATOR.—

8    The plan sponsor of an eligible multiemployer plan

9    prior to the special partition and the administrator

10   of such plan shall be the plan sponsor and the ad-

11   ministrator, respectively, of the plan created by the

12   partition.

13   ''(g) FUNDING GOALS.—

14       ''(1) IN GENERAL.—The funding goals of a

15   multiemployer plan eligible for partition under this

16   section are both of the following:

17           ''(A) The plan will remain solvent over 30

18       years with no reduction in a participant's or

19       beneficiary's accrued benefit (except to the ex-

20       tent of a reduction in accordance with section

21       305(e)(8) adopted prior to the plan's applica-

22       tion for partition under this section).

23           ''(B) The funded percentage of the plan

24       (disregarding partitioned benefits) at the end of

25       the 30-year period is projected to be 80 percent.

DOC_0002935

631

1    "(2) BASIS.—The funding projections under
2    paragraph (1) shall be performed on a deterministic
3    basis.

4    "(h) RESTORATION OF BENEFIT SUSPENSIONS.—An
5    eligible multiemployer plan that is partitioned under this
6    section shall—

7        "(1) reinstate any benefits that were suspended
8        under section 305(e)(9) or section 4245(a), effective
9        as of the first month the special partition order is
10       effective, for participants or beneficiaries as of the
11       effective date of the partition; and

12       "(2) provide payments equal to the amount of
13       benefits previously suspended to any participants or
14       beneficiaries in pay status as of the effective date of
15       the special partition, payable in the form of a lump
16       sum within 3 months of such effective date or in
17       equal monthly installments over a period of 5 years,
18       with no adjustment for interest.

19   "(i) ADJUSTMENT OF SPECIAL PARTITION ASSIST-
20   ANCE.—

21       "(1) IN GENERAL.—Every 5 years, the corpora-
22       tion shall adjust the special partition assistance de-
23       scribed in subsection (e) as necessary for the eligible
24       multiemployer plan to satisfy the funding goals de-
25       scribed in subsection (g). If the 30 year period de-

DOC_0002936

632

1    scribed in subsection (g) has lapsed, in applying this

2    paragraph, 5 years shall be substituted for 30 years.

3        ''(2) SUBMISSION OF INFORMATION.—An eligi-

4    ble multiemployer plan that is the subject of a spe-

5    cial partition order under subsection (a) shall submit

6    such information as the corporation may require to

7    determine the amount of the adjustment under para-

8    graph (1).

9        ''(3) CESSATION OF ADJUSTMENTS.—Adjust-

10   ments under this subsection with respect to special

11   partition assistance for an eligible multiemployer

12   plan shall cease and the corporation shall perma-

13   nently assume liability for payment of any benefits

14   transferred to the successor plan (subject to sub-

15   section (l)) beginning with the first plan year that

16   the funded percentage of the eligible multiemployer

17   plan (disregarding partitioned benefits) is at least

18   80 percent and the plan's projected funded percent-

19   age for each of the next 10 years is at least 80 per-

20   cent. Any accumulated funding deficiency of the

21   plan (within the meaning of section 304(a)) shall be

22   reduced to zero as of the first day of the plan year

23   for which partition assistance is permanent under

24   this paragraph.

25   ''(j) CONDITIONS ON PLANS DURING PARTITION.—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002937

633

1       "(1) IN GENERAL.—The corporation may im-

2 pose, by regulation, reasonable conditions on an eli-

3 gible multiemployer plan that is partitioned under

4 section (a) relating to increases in future accrual

5 rates and any retroactive benefit improvements, allo-

6 cation of plan assets, reductions in employer con-

7 tribution rates, diversion of contributions to, and al-

8 location of, expenses to other retirement plans, and

9 withdrawal liability.

10       "(2) LIMITATIONS.—The corporation shall not

11 impose conditions on an eligible multiemployer plan

12 as a condition of or following receipt of such parti-

13 tion assistance under this section relating to—

14       "(A) any reduction in plan benefits (in-

15 cluding benefits that may be adjusted pursuant

16 to section 305(e)(8));

17       "(B) plan governance, including selection

18 of, removal of, and terms of contracts with,

19 trustees, actuaries, investment managers, and

20 other service providers; or

21       "(C) any funding rules relating to the plan

22 that is partitioned under this section.

23       "(3) CONDITION.—An eligible multiemployer

24 plan that is partitioned under subsection (a) shall

25 continue to pay all premiums due under section

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002938

634

1    4007 for participants and beneficiaries in the plan
2    created by a special partition order until the plan
3    year beginning after a cessation of adjustments ap-
4    plies under subsection (i).

5    "(k) WITHDRAWAL LIABILITY.—An employer's with-
6  drawal liability for purposes of this title shall be calculated
7  taking into account any plan liabilities that are partitioned
8  under subsection (a) until the plan year beginning after
9  the expiration of 15 calendar years from the effective date
10  of the partition.

11    "(l) CESSATION OF PARTITION ASSISTANCE.—If a
12  plan that receives partition assistance under this section
13  becomes insolvent for purposes of section 418E of the In-
14  ternal Revenue Code of 1986, the plan shall no longer be
15  eligible for assistance under this section and shall be eligi-
16  ble for assistance under section 4261.

17    "(m) REPORTING.—An eligible multiemployer plan
18  that receives partition assistance under this section shall
19  file with the corporation a report, including the following
20  information, in such manner (which may include electronic
21  filing requirements) and at such time as the corporation
22  requires:

23        "(1) The funded percentage (as defined in sec-
24        tion 305(j)(2)) as of the first day of such plan year,
25        and the underlying actuarial value of assets and li-

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002939

635

1     abilities taken into account in determining such per-

2     centage.

3        ''(2) The market value of the assets of the plan

4     (determined as provided in paragraph (1)) as of the

5     last day of the plan year preceding such plan year.

6        ''(3) The total value of all contributions made

7     by employers and employees during the plan year

8     preceding such plan year.

9        ''(4) The total value of all benefits paid during

10     the plan year preceding such plan year.

11        ''(5) Cash flow projections for such plan year

12     and the 9 succeeding plan years, and the assump-

13     tions used in making such projections.

14        ''(6) Funding standard account projections for

15     such plan year and the 9 succeeding plan years, and

16     the assumptions relied upon in making such projec-

17     tions.

18        ''(7) The total value of all investment gains or

19     losses during the plan year preceding such plan year.

20        ''(8) Any significant reduction in the number of

21     active participants during the plan year preceding

22     such plan year, and the reason for such reduction.

23        ''(9) A list of employers that withdrew from the

24     plan in the plan year preceding such plan year, the

636

1 payment schedule with respect to such withdrawal li-

2 ability, and the resulting reduction in contributions.

3 ''(10) A list of employers that paid withdrawal

4 liability to the plan during the plan year preceding

5 such plan year and, for each employer, a total as-

6 sessment of the withdrawal liability paid, the annual

7 payment amount, and the number of years remain-

8 ing in the payment schedule with respect to such

9 withdrawal liability.

10 ''(11) Any material changes to benefits, accrual

11 rates, or contribution rates during the plan year pre-

12 ceding such plan year, and whether such changes re-

13 late to the conditions of the partition assistance.

14 ''(12) Details regarding any funding improve-

15 ment plan or rehabilitation plan and updates to such

16 plan.

17 ''(13) The number of participants and bene-

18 ficiaries during the plan year preceding such plan

19 year who are active participants, the number of par-

20 ticipants and beneficiaries in pay status, and the

21 number of terminated vested participants and bene-

22 ficiaries.

23 ''(14) The information contained on the most

24 recent annual funding notice submitted by the plan

25 under section 101(f).

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0002941

637

1 &ldquo;(15) The information contained on the most

2 recent annual return under section 6058 of the In-

3 ternal Revenue Code of 1986 and actuarial report

4 under section 6059 of such Code of the plan.

5 &ldquo;(16) Copies of the plan document and amend-

6 ments, other retirement benefit or ancillary benefit

7 plans relating to the plan and contribution obliga-

8 tions under such plans, a breakdown of administra-

9 tive expenses of the plan, participant census data

10 and distribution of benefits, the most recent actu-

11 arial valuation report as of the plan year, financial

12 reports, and copies of the portions of collective bar-

13 gaining agreements relating to plan contributions,

14 funding coverage, or benefits, and such other infor-

15 mation as the corporation may reasonably require.

16 Any information disclosed by a plan to the corporation

17 that could identify individual employers shall be confiden-

18 tial and not subject to publication or disclosure.

19 &ldquo;(n) REPORT TO CONGRESS.—

20 &ldquo;(1) IN GENERAL.—Not later than 1 year after

21 the date of enactment of this section and annually

22 thereafter, the board of directors of the corporation

23 shall submit to the Committee on Health, Edu-

24 cation, Labor, and Pensions and the Committee on

25 Finance of the Senate and the Committee on Edu-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002942

638

1 cation and Labor and the Committee on Ways and

2 Means of the House of Representatives a detailed re-

3 port on the implementation and administration of

4 this section. Such report shall include—

5        ''(A) information on the name and number

6       of multiemployer plans that have applied for

7       partition assistance under this section;

8       ''(B) the name and number of such plans

9       that have been approved for partition assistance

10       under this section and the name and number of

11       the plans that have not been approved for spe-

12       cial partition assistance;

13       ''(C) a detailed rationale for any decision

14       by the corporation to not approve an applica-

15       tion for special partition assistance;

16       ''(D) the amount of special partition as-

17       sistance provided to eligible multiemployer

18       plans (including amounts provided on an indi-

19       vidual plan basis and in the aggregate);

20       ''(E) the name and number of the multi-

21       employer plans that restored benefit suspen-

22       sions and provided lump sum or monthly in-

23       stallment payments to participants or bene-

24       ficiaries;

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002943

639

1          "(F) the amount of benefits that were re-
2     stored and lump sum or monthly installment
3     payments that were paid (including amounts
4     provided on an individual plan basis and in the
5     aggregate);

6          "(G) the name and number of the plans
7     that received adjustments to partition assist-
8     ance under subsection (i);

9          "(H) a list of, and rationale for, each rea-
10    sonable condition imposed by the corporation on
11    plans approved for special partition assistance
12    under this section;

13         "(I) the contracts that have been awarded
14    by the corporation to implement or administer
15    this section;

16         "(J) the number, purpose, and dollar
17    amounts of the contracts that have been award-
18    ed to implement or administer the section;

19         "(K) a detailed summary of the reports re-
20    quired under subsection (m); and

21         "(L) a detailed summary of the feedback
22    received on the pension relief internet website
23    established under subsection (p).

24    "(2) PBGC CERTIFICATION.—The board of di-
25    rectors of the corporation shall include with the re-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002944

640

1  port under paragraph (1) a certification and affir-
2  mation that the amount of special partition assist-
3  ance provided to each plan under this section is the
4  amount necessary to meet its funding goals under
5  subsection (g), including, if applicable, any adjust-
6  ment of special partition assistance as determined
7  under subsection (i).

8      ''(3) CONFIDENTIALITY.—Congress may pub-
9  licize the reports received under paragraph (1) only
10  after redacting all sensitive or proprietary informa-
11  tion.

12      ''(o) GAO REPORT.—Not later than 1 year after the
13  first partition application is approved by the corporation
14  under this section, and biennially thereafter, the Comp-
15  troller General of the United States shall submit to the
16  Committee on Health, Education, Labor, and Pensions
17  and the Committee on Finance of the Senate and the
18  Committee on Education and Labor and the Committee
19  on Ways and Means of the House of Representatives a
20  detailed report on the actions of the corporation to imple-
21  ment and administer this section, including an examina-
22  tion of the contracts awarded by such corporation to carry
23  out this section and an analysis of such corporation's com-
24  pliance with subsections (e) and (g).

25      ''(p) SPECIAL PARTITION RELIEF WEBSITE.—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002945

641

1          ''(1) ESTABLISHMENT.—Not later than 120

2      days after the date of enactment of this section, the

3      corporation shall establish and maintain a user-

4      friendly, public-facing internet website to foster

5      greater accountability and transparency in the im-

6      plementation and administration of this section.

7          ''(2) PURPOSE.—The internet website estab-

8      lished and maintained under paragraph (1) shall be

9      a portal to key information relating to this section

10     for multiemployer plan administrators and trustees,

11     plan participants, beneficiaries, participating em-

12     ployers, other stakeholders, and the public.

13         ''(3) CONTENT AND FUNCTION.—The internet

14     website established under paragraph (1) shall—

15             ''(A) describe the nature and scope of the

16         special partition authority and assistance under

17         this section in a manner calculated to be under-

18         stood by the average plan participant;

19             ''(B) include published guidance, regula-

20         tions, and all other relevant information on the

21         implementation and administration of this sec-

22         tion;

23             ''(C) include, with respect to plan applica-

24         tions for special partition assistance—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002946

642

1    &ldquo;(i) a general description of the proc-
2    ess by which eligible plans can apply for
3    special partition assistance, information on
4    how and when the corporation will process
5    and consider plan applications;

6    &ldquo;(ii) information on how the corpora-
7    tion will address any incomplete applica-
8    tions as specified in under this section;

9    &ldquo;(iii) a list of the plans that have ap-
10   plied for special partition assistance and,
11   for each application, the date of submis-
12   sion of a completed application;

13   &ldquo;(iv) the text of each plan's completed
14   application for special partition assistance
15   with appropriate redactions of personal,
16   proprietary, or sensitive information;

17   &ldquo;(v) the estimated date that a deci-
18   sion will be made by the corporation on
19   each application;

20   &ldquo;(vi) the actual date when such deci-
21   sion is made;

22   &ldquo;(vii) the corporation's decision on
23   each application; and

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002947

643

1              "(viii) as applicable, a detailed ration-
2         ale for any decision not to approve a plan's
3         application for special partition assistance;
4              "(D) provide detailed information on each
5         contract solicited and awarded to implement or
6         administer this section;
7              "(E) include reports, audits, and other rel-
8         evant oversight and accountability information
9         on this section, including the annual reports
10        submitted by the board of directors of the cor-
11        poration to Congress required under subsection
12        (n), the Office of the Inspector General audits,
13        correspondence, and publications, and the Gov-
14        ernment Accountability Office reports under
15        subsection (o);
16             "(F) provide a clear means for multiem-
17        ployer plan administrators, plan participants,
18        beneficiaries, other stakeholders, and the public
19        to contact the corporation and provide feedback
20        on the implementation and administration of
21        this section; and
22             "(G) be regularly updated to carry out the
23        purposes of this subsection.
24    "(q) OFFICE OF INSPECTOR GENERAL.—There is au-
25 thorized to be appropriated to the corporation's Office of

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0002948

644

1 Inspector General $24,000,000 for fiscal year 2020, which
2 shall remain available through September 30, 2028, for
3 salaries and expenses necessary for conducting investiga-
4 tions and audits of the implementation and administration
5 of this section.

6    "(r) APPLICATION OF EXCISE TAX.—During the pe-
7 riod that a plan is subject to a partition order under this
8 section and prior to a cessation of adjustments pursuant
9 to subsection (i)(3), the plan shall not be subject to section
10 4971 of the Internal Revenue Code of 1986.".

11 **SEC. 40102. REPEAL OF BENEFIT SUSPENSIONS FOR MULTI-**
12            **EMPLOYER PLANS IN CRITICAL AND DECLIN-**
13            **ING STATUS.**

14    (a) AMENDMENT TO INTERNAL REVENUE CODE OF
15 1986.—Paragraph (9) of section 432(e) of the Internal
16 Revenue Code of 1986 is repealed.

17    (b) AMENDMENT TO EMPLOYEE RETIREMENT IN-
18 COME SECURITY ACT OF 1974.—Paragraph (9) of section
19 305(e) of the Employee Retirement Income Security Act
20 of 1974 (29 U.S.C. 1085(e)) is repealed.

21    (c) EFFECTIVE DATE.—The repeals made by this
22 section shall not apply to plans that have been approved
23 for a suspension of benefit under section 432(e)(9)(G) of
24 the Internal Revenue Code of 1986 and section
25 305(e)(9)(G) of the Employee Retirement Income Security

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002949

645

1 Act of 1974 (29 U.S.C. 1085(e)(9)(G)) before the date

2 of the enactment of this Act.

**SEC. 40103. TEMPORARY DELAY OF DESIGNATION OF MUL-**

**TIEMPLOYER PLANS AS IN ENDANGERED,**

**CRITICAL, OR CRITICAL AND DECLINING STA-**

**TUS.**

7 (a) IN GENERAL.—Notwithstanding the actuarial

8 certification under section 305(b)(3) of the Employee Re-

9 tirement Income Security Act of 1974 and section

10 432(b)(3) of the Internal Revenue Code of 1986, if a plan

11 sponsor of a multiemployer plan elects the application of

12 this section, then, for purposes of section 305 of such Act

13 and section 432 of such Code—

14 (1) the status of the plan for its first plan year

15 beginning during the period beginning on March 1,

16 2020, and ending on February 28, 2021, or the next

17 succeeding plan year (as designated by the plan

18 sponsor in such election), shall be the same as the

19 status of such plan under such sections for the plan

20 year preceding such designated plan year, and

21 (2) in the case of a plan which was in endan-

22 gered or critical status for the plan year preceding

23 the designated plan year described in paragraph (1),

24 the plan shall not be required to update its plan or

25 schedules under section 305(c)(6) of such Act and

646

1    section 432(e)(6) of such Code, or section

2    305(e)(3)(B) of such Act and section 432(e)(3)(B)

3    of such Code, whichever is applicable, until the plan

4    year following the designated plan year described in

5    paragraph (1).

6 If section 305 of the Employee Retirement Income Secu-

7 rity Act of 1974 and section 432 of the Internal Revenue

8 Code of 1986 did not apply to the plan year preceding

9 the designated plan year described in paragraph (1), the

10 plan actuary shall make a certification of the status of

11 the plan under section 305(b)(3) of such Act and section

12 432(b)(3) of such Code for the preceding plan year in the

13 same manner as if such sections had applied to such pre-

14 ceding plan year.

15    (b) EXCEPTION FOR PLANS BECOMING CRITICAL

16 DURING ELECTION.—If—

17    (1) an election was made under subsection (a)

18    with respect to a multiemployer plan, and

19    (2) such plan has, without regard to such elec-

20    tion, been certified by the plan actuary under section

21    305(b)(3) of the Employee Retirement Income Secu-

22    rity Act of 1974 and section 432(b)(3) of the Inter-

23    nal Revenue Code of 1986 to be in critical status for

24    the designated plan year described in subsection

25    (a)(1), then such plan shall be treated as a plan in

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002951

G:\CMTE\AP\16\FY20\_D\HEROES.XML

647

1    critical status for such plan year for purposes of ap-
2    plying section 4971(g)(1)(A) of such Code, section
3    302(b)(3) of such Act (without regard to the second
4    sentence thereof), and section 412(b)(3) of such
5    Code (without regard to the second sentence there-
6    of).

7    (c) ELECTION AND NOTICE.—

8        (1) ELECTION.—An election under subsection
9    (a)—

10        (A) shall be made at such time and in such
11        manner as the Secretary of the Treasury or the
12        Secretary's delegate may prescribe and, once
13        made, may be revoked only with the consent of
14        the Secretary, and

15        (B) if made—

16            (i) before the date the annual certifi-
17            cation is submitted to the Secretary or the
18            Secretary's delegate under section
19            305(b)(3) of such Act and section
20            432(b)(3) of such Code, shall be included
21            with such annual certification, and

22            (ii) after such date, shall be submitted
23            to the Secretary or the Secretary's delegate
24            not later than 30 days after the date of the
25            election.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002952

648

1  (2) NOTICE TO PARTICIPANTS.—

2      (A) IN GENERAL.—Notwithstanding sec-

3  tion 305(b)(3)(D) of the Employee Retirement

4  Income Security Act of 1974 and section

5  432(b)(3)(D) of the Internal Revenue Code of

6  1986, if the plan is neither in endangered nor

7  critical status by reason of an election made

8  under subsection (a)—

9          (i) the plan sponsor of a multiem-

10      ployer plan shall not be required to provide

11      notice under such sections, and

12          (ii) the plan sponsor shall provide to

13      the participants and beneficiaries, the bar-

14      gaining parties, the Pension Benefit Guar-

15      anty Corporation, and the Secretary of

16      Labor a notice of the election under sub-

17      section (a) and such other information as

18      the Secretary of the Treasury (in consulta-

19      tion with the Secretary of Labor) may re-

20      quire—

21              (I) if the election is made before

22          the date the annual certification is

23          submitted to the Secretary or the Sec-

24          retary's delegate under section

25          305(b)(3) of such Act and section

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002953

649

1           432(b)(3) of such Code, not later than

2           30 days after the date of the certifi-

3           cation, and

4               (II) if the election is made after

5               such date, not later than 30 days

6               after the date of the election.

7          (B) NOTICE OF ENDANGERED STATUS.—

8        Notwithstanding section 305(b)(3)(D) of such

9        Act and section 432(b)(3)(D) of such Code, if

10       the plan is certified to be in critical status for

11       any plan year but is in endangered status by

12       reason of an election made under subsection

13       (a), the notice provided under such sections

14       shall be the notice which would have been pro-

15       vided if the plan had been certified to be in en-

16       dangered status.

17 **SEC. 40104. TEMPORARY EXTENSION OF THE FUNDING IM-**

18               **PROVEMENT AND REHABILITATION PERIODS**

19               **FOR MULTIEMPLOYER PENSION PLANS IN**

20               **CRITICAL AND ENDANGERED STATUS FOR**

21               **2020 OR 2021.**

22      (a) IN GENERAL.—If the plan sponsor of a multiem-

23 ployer plan which is in endangered or critical status for

24 a plan year beginning in 2020 or 2021 (determined after

25 application of section 4) elects the application of this sec-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002954

650

1 tion, then, for purposes of section 305 of the Employee

2 Retirement Income Security Act of 1974 and section 432

3 of the Internal Revenue Code of 1986—

4     (1) except as provided in paragraph (2), the

5     plan's funding improvement period or rehabilitation

6     period, whichever is applicable, shall be 15 years

7     rather than 10 years, and

8     (2) in the case of a plan in seriously endan-

9     gered status, the plan's funding improvement period

10     shall be 20 years rather than 15 years.

11   (b) DEFINITIONS AND SPECIAL RULES.—For pur-

12 poses of this section—

13     (1) ELECTION.—An election under this section

14     shall be made at such time, and in such manner and

15     form, as (in consultation with the Secretary of

16     Labor) the Secretary of the Treasury or the Sec-

17     retary's delegate may prescribe.

18     (2) DEFINITIONS.—Any term which is used in

19     this section which is also used in section 305 of the

20     Employee Retirement Income Security Act of 1974

21     and section 432 of the Internal Revenue Code of

22     1986 shall have the same meaning as when used in

23     such sections.

24   (c) EFFECTIVE DATE.—This section shall apply to

25 plan years beginning after December 31, 2019.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002955

651

1  **SEC. 40105. ADJUSTMENTS TO FUNDING STANDARD AC-**
2      **COUNT RULES.**

3  (a) ADJUSTMENTS.—

4      (1) AMENDMENT TO EMPLOYEE RETIREMENT
5  INCOME SECURITY ACT OF 1974.—Section 304(b)(8)
6  of the Employee Retirement Income Security Act of
7  1974 (29 U.S.C. 1084(b)) is amended by adding at
8  the end the following new subparagraph:

9          "(F) RELIEF FOR 2020 AND 2021.—A mul-
10      tiemployer plan with respect to which the sol-
11      vency test under subparagraph (C) is met as of
12      February 29, 2020, may elect to apply this
13      paragraph by substituting 'February 29, 2020'
14      for 'August 31, 2008' each place it appears in
15      subparagraphs (A)(i), (B)(i)(I), and (B)(i)(II)
16      (without regard to whether such plan previously
17      elected the application of this paragraph). The
18      preceding sentence shall not apply to a plan
19      with respect to which a partition order is in ef-
20      fect under section 4233A.".

21      (2) AMENDMENT TO INTERNAL REVENUE CODE
22  OF 1986.—Section 431(b)(8) of the Internal Revenue
23  Code of 1986 is amended by adding at the end the
24  following new subparagraph:

25          "(F) RELIEF FOR 2020 AND 2021.—A mul-
26      tiemployer plan with respect to which the sol-

DOC_0002956

652

1         vency test under subparagraph (C) is met as of

2         February 29, 2020, may elect to apply this

3         paragraph by substituting 'February 29, 2020'

4         for 'August 31, 2008' each place it appears in

5         subparagraphs (A)(i), (B)(i)(I), and (B)(i)(II)

6         (without regard to whether such plan previously

7         elected the application of this paragraph). The

8         preceding sentence shall not apply to a plan

9         with respect to which a partition order is in ef-

10        fect under section 4233A of the Employee Re-

11        tirement Income Security Act of 1974.''.

12    (b) EFFECTIVE DATES.—

13         (1) IN GENERAL.—The amendments made by

14         this section shall take effect as of the first day of

15         the first plan year ending on or after February 29,

16         2020, except that any election a plan makes pursu-

17         ant to this section that affects the plan's funding

18         standard account for the first plan year beginning

19         after February 29, 2020, shall be disregarded for

20         purposes of applying the provisions of section 305 of

21         the Employee Retirement Income Security Act of

22         1974 and section 432 of the Internal Revenue Code

23         of 1986 to such plan year.

24         (2) RESTRICTIONS ON BENEFIT INCREASES.—

25         Notwithstanding paragraph (1), the restrictions on

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002957

653

1  plan amendments increasing benefits in sections
2  304(b)(8)(D) of such Act and 431(b)(8)(D) of such
3  Code, as applied by the amendments made by this
4  section, shall take effect on the date of enactment of
5  this Act.

6  **SEC. 40106. PBGC GUARANTEE FOR PARTICIPANTS IN MUL-**
7  **TIEMPLOYER PLANS.**

8  Section 4022A(c)(1) of the Employee Retirement In-
9  come Security Act of 1974 (29 U.S.C. 1322a(c)(1)) is
10  amended by striking subparagraphs (A) and (B) and in-
11  serting the following:

12  "(A) 100 percent of the accrual rate up to
13  $15, plus 75 percent of the lesser of—
14  "(i) $70; or
15  "(ii) the accrual rate, if any, in excess
16  of $15; and
17  "(B) the number of the participant's years
18  of credited service.

19  For each calendar year after the first full calendar
20  year following the date of the enactment of the
21  Emergency Pension Plan Relief Act of 2020, the ac-
22  crual rates in subparagraph (A) shall increase by the
23  national average wage index (as defined in section
24  209(k)(1) of the Social Security Act). For purposes
25  of this subsection, the rates applicable for deter-

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002958

654

1    mining the guaranteed benefits of the participants of

2    any plan shall be the rates in effect for the calendar

3    year in which the plan becomes insolvent under sec-

4    tion 4245 or the calendar year in which the plan is

5    terminated, if earlier.''.

# TITLE II—RELIEF FOR SINGLE EMPLOYER PENSION PLANS

**SEC. 40201. EXTENDED AMORTIZATION FOR SINGLE EM-PLOYER PLANS.**

10    (a) 15-YEAR AMORTIZATION UNDER THE INTERNAL

11 REVENUE CODE OF 1986.—Section 430(c) of the Internal

12 Revenue Code of 1986 is amended by adding at the end

13 the following new paragraph:

14    ''(8) 15-YEAR AMORTIZATION.—With respect to

15    plan years beginning after December 31, 2019—

16        ''(A) the shortfall amortization bases for

17        all plan years preceding the first plan year be-

18        ginning after December 31, 2019 (and all

19        shortfall amortization installments determined

20        with respect to such bases) shall be reduced to

21        zero, and

22        ''(B) subparagraphs (A) and (B) of para-

23        graph (2) shall each be applied by substituting

24        '15-plan-year period' for '7-plan-year period'.''.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002959

655

1    (b) 15-YEAR AMORTIZATION UNDER THE EMPLOYEE

2 RETIREMENT INCOME SECURITY ACT OF 1974.—Section

3 303(c) of the Employee Retirement Income Security Act

4 of 1974 (29 U.S.C. 1083(c)) is amended by adding at the

5 end the following new paragraph:

6    "(8) 15-YEAR AMORTIZATION.—With respect to

7    plan years beginning after December 31, 2019—

8        "(A) the shortfall amortization bases for

9        all plan years preceding the first plan year be-

10       ginning after December 31, 2019 (and all

11       shortfall amortization installments determined

12       with respect to such bases) shall be reduced to

13       zero, and

14       "(B) subparagraphs (A) and (B) of para-

15       graph (2) shall each be applied by substituting

16       '15-plan-year period' for '7-plan-year period'.".

17    (c) EFFECTIVE DATE.—The amendments made by

18 this section shall apply to plan years beginning after De-

19 cember 31, 2019.

20 **SEC. 40202. EXTENSION OF PENSION FUNDING STABILIZA-**

21         **TION PERCENTAGES FOR SINGLE EMPLOYER**

22         **PLANS.**

23    (a) AMENDMENTS TO INTERNAL REVENUE CODE OF

24 1986.—

DOC_0002960

G:\CMTE\AP\16\FY20\_D\HEROES.XML

656

1       (1) IN GENERAL.—The table contained in sub-

2     clause (II) of section 430(h)(2)(C)(iv) of the Inter-

3     nal Revenue Code of 1986 is amended to read as fol-

4     lows:

| "If the calendar year is: | The applicable minimum percentage is: | The applicable maximum percentage is: |
|---|---|---|
| Any year in the period starting in 2012 and ending in 2019 | 90% | 110% |
| Any year in the period starting in 2020 and ending in 2025 | 95% | 105% |
| 2026 | 90% | 110% |
| 2027 | 85% | 115% |
| 2028 | 80% | 120% |
| 2029 | 75% | 125% |
| After 2029 | 70% | 130%.". |

5       (2) FLOOR ON 25-YEAR AVERAGES.—Subclause

6     (I) of section 430(h)(2)(C)(iv) of such Code is

7     amended by adding at the end the following: "Not-

8     withstanding anything in this subclause, if the aver-

9     age of the first, second, or third segment rate for

10     any 25-year period is less than 5 percent, such aver-

11     age shall be deemed to be 5 percent.".

12    (b) AMENDMENTS TO EMPLOYEE RETIREMENT IN-

13 COME SECURITY ACT OF 1974.—

14       (1) IN GENERAL.—The table contained in sub-

15     clause (II) of section 303(h)(2)(C)(iv) of the Em-

16     ployee Retirement Income Security Act of 1974 (29

17     U.S.C. 1083(h)(2)(C)(iv)(II)) is amended to read as

18     follows:

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002961

G:\CMTE\AP\16\FY20\_D\HEROES.XML

657

| "If the calendar year is: | The applicable minimum percentage is: | The applicable maximum percentage is: |
|---|---|---|
| Any year in the period starting in 2012 and ending in 2019 .......................................................... | 90% | 110% |
| Any year in the period starting in 2020 and ending in 2025 .......................................................... | 95% | 105% |
| 2026 ...................................................................... | 90% | 110% |
| 2027 ...................................................................... | 85% | 115% |
| 2028 ...................................................................... | 80% | 120% |
| 2029 ...................................................................... | 75% | 125% |
| After 2029 ............................................................ | 70% | 130%.". |

1  (2) CONFORMING AMENDMENTS.—

2    (A) IN GENERAL.—Section 101(f)(2)(D) of

3    such Act (29 U.S.C. 1021(f)(2)(D)) is amend-

4    ed—

5       (i) in clause (i) by striking "and the

6       Bipartisan Budget Act of 2015" both

7       places it appears and inserting ", the Bi-

8       partisan Budget Act of 2015, and the

9       Emergency Pension Plan Relief Act of

10      2020", and

11      (ii) in clause (ii) by striking "2023"

12      and inserting "2029".

13    (B)  STATEMENTS.—The  Secretary  of

14    Labor  shall  modify  the  statements  required

15    under  subclauses  (I)  and  (II)  of  section

16    101(f)(2)(D)(i) of such Act to conform to the

17    amendments made by this section.

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0002962

658

1  (3) FLOOR ON 25-YEAR AVERAGES.—Subclause

2 (I) of section 303(h)(2)(C)(iv) of such Act (29

3 U.S.C. 1083(h)(2)(C)(iv)(II)) is amended by adding

4 at the end the following: "Notwithstanding anything

5 in this subclause, if the average of the first, second,

6 or third segment rate for any 25-year period is less

7 than 5 percent, such average shall be deemed to be

8 5 percent.".

9  (c) EFFECTIVE DATE.—The amendments made by

10 this section shall apply with respect to plan years begin-

11 ning after December 31, 2019.

# TITLE III—OTHER RETIREMENT RELATED PROVISIONS

**SEC. 40301. WAIVER OF REQUIRED MINIMUM DISTRIBU-TIONS FOR 2019.**

16  (a) IN GENERAL.—Section 401(a)(9)(I)(i) of the In-

17 ternal Revenue Code of 1986 is amended by striking "cal-

18 endar year 2020" and inserting "calendar years 2019 and

19 2020".

20  (b) ELIGIBLE ROLLOVER DISTRIBUTIONS.—Section

21 402(c)(4) of such Code is amended by striking "2020"

22 each place it appears in the last sentence and inserting

23 "2019 or 2020".

24  (c) CONFORMING AMENDMENTS.—Section

25 401(a)(9)(I) of such Code is amended—

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002963

659

1      (1) by striking clause (ii) and redesignating
2   clause (iii) as clause (ii), and

3      (2) by striking "calendar year 2020" in clause
4   (ii)(II), as so redesignated, and inserting "calendar
5   years 2019 and 2020".

6   (d) EFFECTIVE DATE.—The amendments made by
7   this section shall take effect as if included in the enact-
8   ment of section 2203 of the Coronavirus Aid, Relief, and
9   Economic Security Act, except that subparagraph (c)(1)
10  thereof shall be applied by substituting "December 31,
11  2018" for "December 31, 2019".

12  **SEC. 40302. WAIVER OF 60-DAY RULE IN CASE OF ROLL-**
13  **OVER OF OTHERWISE REQUIRED MINIMUM**
14  **DISTRIBUTIONS IN 2019 OR 2020.**

15  (a) QUALIFIED TRUSTS.—402(c)(3) of the Internal
16  Revenue Code of 1986 is amended by adding at the end
17  the following new subparagraph:

18         "(D) EXCEPTION FOR ROLLOVER OF OTH-
19      ERWISE REQUIRED MINIMUM DISTRIBUTIONS IN
20      2019 OR 2020.—In the case of an eligible roll-
21      over distribution described in the second sen-
22      tence of paragraph (4), subparagraph (A) shall
23      not apply to any transfer of such distribution
24      made before December 1, 2020.".

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002964

660

1　　(b) INDIVIDUAL RETIREMENT ACCOUNTS.—Section

2　408(d)(3) of such Code is amended by adding at the end

3　the following new subparagraph:

4　　　　　　　"(J) WAIVER OF 60-DAY RULE AND ONCE

5　　　　　　　PER-YEAR LIMITATION FOR CERTAIN 2019 AND

6　　　　　　　2020 ROLLOVERS.—In the case of a distribu-

7　　　　　　　tion during 2019 or 2020 to which, under sub-

8　　　　　　　paragraph (E), this paragraph would not have

9　　　　　　　applied had the minimum distribution require-

10　　　　　　ments of section 401(a)(9) applied during such

11　　　　　　years, the 60-day requirement under subpara-

12　　　　　　graph (A) and the limitation under subpara-

13　　　　　　graph (B) shall not apply to such distribution

14　　　　　　to the extent the amount is paid into an indi-

15　　　　　　vidual retirement account, individual retirement

16　　　　　　annuity (other than an endowment contract), or

17　　　　　　eligible retirement plan (as defined in subpara-

18　　　　　　graph (A)) as otherwise required under such

19　　　　　　subparagraph before December 1, 2020.".

20　　(c) EFFECTIVE DATE.—The amendments made by

21　this section shall apply to taxable years beginning after

22　December 31, 2018.

661

SEC. 40303. EMPLOYEE CERTIFICATION AS TO ELIGIBILITY
        FOR INCREASED CARES ACT LOAN LIMITS
        FROM EMPLOYER PLAN.

(a) IN GENERAL.—Section 2202(b) of the Coronavirus Aid, Relief, and Economic Security Act is amended by adding at the end the following new paragraph:

"(4) EMPLOYEE CERTIFICATION.—The administrator of a qualified employer plan may rely on an employee's certification that the requirements of subsection (a)(4)(A)(ii) are satisfied in determining whether the employee is a qualified individual for purposes of this subsection.".

(b) EFFECTIVE DATE.—The amendment made by this section shall take effect as if included in the enactment of section 2202(b) of the Coronavirus Aid, Relief, and Economic Security Act.

SEC. 40304. EXCLUSION OF BENEFITS PROVIDED TO VOL-
        UNTEER FIREFIGHTERS AND EMERGENCY
        MEDICAL RESPONDERS MADE PERMANENT.

(a) IN GENERAL.—Section 139B of the Internal Revenue Code of 1986 is amended by striking subsection (d).

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to taxable years beginning after December 31, 2020.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002966

662

## SEC. 40305. APPLICATION OF SPECIAL RULES TO MONEY PURCHASE PENSION PLANS.

Section 2202(a)(6)(B) of the Coronavirus Aid, Relief, and Economic Security Act is amended by inserting '', and, in the case of a money purchase pension plan, a coronavirus-related distribution which is an in-service withdrawal shall be treated as meeting the distribution rules of section 401(a) of such Code'' before the period.

## SEC. 40306. GRANTS TO ASSIST LOW-INCOME WOMEN AND SURVIVORS OF DOMESTIC VIOLENCE IN OBTAINING QUALIFIED DOMESTIC RELATIONS ORDERS.

(a) AUTHORIZATION OF GRANT AWARDS.—The Secretary of Labor, acting through the Director of the Women's Bureau and in conjunction with the Assistant Secretary of the Employee Benefits Security Administration, shall award grants, on a competitive basis, to eligible entities to enable such entities to assist low-income women and survivors of domestic violence in obtaining qualified domestic relations orders and ensuring that those women actually obtain the benefits to which they are entitled through those orders.

(b) DEFINITION OF ELIGIBLE ENTITY.—In this section, the term ''eligible entity'' means a community-based organization with proven experience and expertise in serv-

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002967

663

1 ing women and the financial and retirement needs of
2 women.

3    (c) APPLICATION.—An eligible entity that desires to
4 receive a grant under this section shall submit an applica-
5 tion to the Secretary of Labor at such time, in such man-
6 ner, and accompanied by such information as the Sec-
7 retary of Labor may require.

8    (d) MINIMUM GRANT AMOUNT.—The Secretary of
9 Labor shall award grants under this section in amounts
10 of not less than $250,000.

11    (e) USE OF FUNDS.—An eligible entity that receives
12 a grant under this section shall use the grant funds to
13 develop programs to offer help to low-income women or
14 survivors of domestic violence who need assistance in pre-
15 paring, obtaining, and effectuating a qualified domestic re-
16 lations order.

17    (f) AUTHORIZATION OF APPROPRIATIONS.—There is
18 authorized to be appropriated to carry out this section
19 $100,000,000 for fiscal year 2020 and each succeeding
20 fiscal year.

21 **SEC. 40307. MODIFICATION OF SPECIAL RULES FOR MIN-**
22           **IMUM FUNDING STANDARDS FOR COMMU-**
23           **NITY NEWSPAPER PLANS.**

24    (a) AMENDMENT TO INTERNAL REVENUE CODE OF
25 1986.—Subsection (m) of section 430 of the Internal Rev-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002968

664

1 enue Code of 1986, as added by the Setting Every Com-

2 munity Up for Retirement Enhancement Act of 2019, is

3 amended to read as follows:

4  "(m) SPECIAL RULES FOR COMMUNITY NEWSPAPER

5 PLANS.—

6      "(1) IN GENERAL.—An eligible newspaper plan

7   sponsor of a plan under which no participant has

8   had the participant's accrued benefit increased

9   (whether because of service or compensation) after

10   April 2, 2019, may elect to have the alternative

11   standards described in paragraph (4) apply to such

12   plan.

13      "(2) ELIGIBLE NEWSPAPER PLAN SPONSOR.—

14   The term 'eligible newspaper plan sponsor' means

15   the plan sponsor of—

16          "(A) any community newspaper plan, or

17          "(B) any other plan sponsored, as of April

18       2, 2019, by a member of the same controlled

19       group of a plan sponsor of a community news-

20       paper plan if such member is in the trade or

21       business of publishing 1 or more newspapers.

22      "(3) ELECTION.—An election under paragraph

23   (1) shall be made at such time and in such manner

24   as prescribed by the Secretary. Such election, once

25   made with respect to a plan year, shall apply to all

DOC_0002969

665

1    subsequent plan years unless revoked with the con-
2    sent of the Secretary.

3        ''(4) ALTERNATIVE MINIMUM FUNDING STAND-
4    ARDS.—The alternative standards described in this
5    paragraph are the following:

6            ''(A) INTEREST RATES.—

7                ''(i) IN GENERAL.—Notwithstanding
8            subsection (h)(2)(C) and except as pro-
9            vided in clause (ii), the first, second, and
10           third segment rates in effect for any
11           month for purposes of this section shall be
12           8 percent.

13               ''(ii) NEW BENEFIT ACCRUALS.—Not-
14           withstanding subsection (h)(2), for pur-
15           poses of determining the funding target
16           and normal cost of a plan for any plan
17           year, the present value of any benefits ac-
18           crued or earned under the plan for a plan
19           year with respect to which an election
20           under paragraph (1) is in effect shall be
21           determined on the basis of the United
22           States Treasury obligation yield curve for
23           the day that is the valuation date of such
24           plan for such plan year.

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0002970

666

1         "(iii) UNITED STATES TREASURY OB-

2     LIGATION YIELD CURVE.—For purposes of

3     this subsection, the term 'United States

4     Treasury obligation yield curve' means,

5     with respect to any day, a yield curve

6     which shall be prescribed by the Secretary

7     for such day on interest-bearing obligations

8     of the United States.

9     "(B) SHORTFALL AMORTIZATION BASE.—

10         "(i) PREVIOUS SHORTFALL AMORTIZA-

11     TION BASES.—The shortfall amortization

12     bases determined under subsection (c)(3)

13     for all plan years preceding the first plan

14     year to which the election under paragraph

15     (1) applies (and all shortfall amortization

16     installments determined with respect to

17     such bases) shall be reduced to zero under

18     rules similar to the rules of subsection

19     (c)(6).

20         "(ii) NEW SHORTFALL AMORTIZATION

21     BASE.—Notwithstanding subsection (c)(3),

22     the shortfall amortization base for the first

23     plan year to which the election under para-

24     graph (1) applies shall be the funding

25     shortfall of such plan for such plan year

DOC_0002971

667

1 (determined using the interest rates as

2 modified under subparagraph (A)).

3 ''(C) DETERMINATION OF SHORTFALL AM-

4 ORTIZATION INSTALLMENTS.—

5 ''(i) 30-YEAR PERIOD.—Subpara-

6 graphs (A) and (B) of subsection (c)(2)

7 shall be applied by substituting '30-plan-

8 year' for '7-plan-year' each place it ap-

9 pears.

10 ''(ii) NO SPECIAL ELECTION.—The

11 election under subparagraph (D) of sub-

12 section (c)(2) shall not apply to any plan

13 year to which the election under paragraph

14 (1) applies.

15 ''(D) EXEMPTION FROM AT-RISK TREAT-

16 MENT.—Subsection (i) shall not apply.

17 ''(5) COMMUNITY NEWSPAPER PLAN.—For pur-

18 poses of this subsection—

19 ''(A) IN GENERAL.—The term 'community

20 newspaper plan' means any plan to which this

21 section applies maintained as of December 31,

22 2018, by an employer which—

23 ''(i) maintains the plan on behalf of

24 participants and beneficiaries with respect

25 to employment in the trade or business of

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002972

668

1  publishing 1 or more newspapers which

2  were published by the employer at any

3  time during the 11-year period ending on

4  the date of the enactment of this sub-

5  section,

6  ''(ii)(I) is not a company the stock of

7  which is publicly traded (on a stock ex-

8  change or in an over-the-counter market),

9  and is not controlled, directly or indirectly,

10  by such a company, or

11  ''(II) is controlled, directly or indi-

12  rectly, during the entire 30-year period

13  ending on the date of the enactment of this

14  subsection by individuals who are members

15  of the same family, and does not publish or

16  distribute a daily newspaper that is car-

17  rier-distributed in printed form in more

18  than 5 States, and

19  ''(iii) is controlled, directly or indi-

20  rectly—

21  ''(I) by 1 or more persons resid-

22  ing primarily in a State in which the

23  community newspaper has been pub-

24  lished on newsprint or carrier-distrib-

25  uted,

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002973

669

1         "(II) during the entire 30-year

2         period ending on the date of the en-

3         actment of this subsection by individ-

4         uals who are members of the same

5         family,

6         "(III) by 1 or more trusts, the

7         sole trustees of which are persons de-

8         scribed in subclause (I) or (II), or

9         "(IV) by a combination of per-

10         sons described in subclause (I), (II),

11         or (III).

12     "(B) NEWSPAPER.—The term 'newspaper'

13 does not include any newspaper (determined

14 without regard to this subparagraph) to which

15 any of the following apply:

16         "(i) Is not in general circulation.

17         "(ii) Is published (on newsprint or

18         electronically) less frequently than 3 times

19         per week.

20         "(iii) Has not ever been regularly

21         published on newsprint.

22         "(iv) Does not have a bona fide list of

23         paid subscribers.

24     "(C) CONTROL.—A person shall be treated

25 as controlled by another person if such other

DOC_0002974

670

1 person possesses, directly or indirectly, the

2 power to direct or cause the direction and man-

3 agement of such person (including the power to

4 elect a majority of the members of the board of

5 directors of such person) through the ownership

6 of voting securities.

7 "(6) CONTROLLED GROUP.—For purposes of

8 this subsection, the term 'controlled group' means all

9 persons treated as a single employer under sub-

10 section (b), (c), (m), or (o) of section 414 as of the

11 date of the enactment of this subsection.".

12 (b) AMENDMENT TO EMPLOYEE RETIREMENT IN-

13 COME SECURITY ACT OF 1974.—Subsection (m) of section

14 303 of the Employee Retirement Income Security Act of

15 1974 (29 U.S.C. 1083(m)), as added by the Setting Every

16 Community Up for Retirement Enhancement Act of 2019,

17 is amended to read as follows:

18 "(m) SPECIAL RULES FOR COMMUNITY NEWSPAPER

19 PLANS.—

20 "(1) IN GENERAL.—An eligible newspaper plan

21 sponsor of a plan under which no participant has

22 had the participant's accrued benefit increased

23 (whether because of service or compensation) after

24 April 2, 2019, may elect to have the alternative

G:\CMTE\AP\16\FY20\_D\HEROES.XML

671

1    standards described in paragraph (4) apply to such

2    plan.

3    "(2) ELIGIBLE NEWSPAPER PLAN SPONSOR.—

4    The term 'eligible newspaper plan sponsor' means

5    the plan sponsor of—

6        "(A) any community newspaper plan, or

7        "(B) any other plan sponsored, as of April

8        2, 2019, by a member of the same controlled

9        group of a plan sponsor of a community news-

10       paper plan if such member is in the trade or

11       business of publishing 1 or more newspapers.

12    "(3) ELECTION.—An election under paragraph

13    (1) shall be made at such time and in such manner

14    as prescribed by the Secretary of the Treasury. Such

15    election, once made with respect to a plan year, shall

16    apply to all subsequent plan years unless revoked

17    with the consent of the Secretary of the Treasury.

18    "(4) ALTERNATIVE MINIMUM FUNDING STAND-

19    ARDS.—The alternative standards described in this

20    paragraph are the following:

21        "(A) INTEREST RATES.—

22            "(i) IN GENERAL.—Notwithstanding

23            subsection (h)(2)(C) and except as pro-

24            vided in clause (ii), the first, second, and

25            third segment rates in effect for any

DOC_0002976

672

1   month for purposes of this section shall be

2   8 percent.

3       ''(ii) NEW BENEFIT ACCRUALS.—Not-

4   withstanding subsection (h)(2), for pur-

5   poses of determining the funding target

6   and normal cost of a plan for any plan

7   year, the present value of any benefits ac-

8   crued or earned under the plan for a plan

9   year with respect to which an election

10   under paragraph (1) is in effect shall be

11   determined on the basis of the United

12   States Treasury obligation yield curve for

13   the day that is the valuation date of such

14   plan for such plan year.

15       ''(iii) UNITED STATES TREASURY OB-

16   LIGATION YIELD CURVE.—For purposes of

17   this subsection, the term 'United States

18   Treasury obligation yield curve' means,

19   with respect to any day, a yield curve

20   which shall be prescribed by the Secretary

21   of the Treasury for such day on interest-

22   bearing obligations of the United States.

23   ''(B) SHORTFALL AMORTIZATION BASE.—

24       ''(i) PREVIOUS SHORTFALL AMORTIZA-

25   TION BASES.—The shortfall amortization

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002977

673

1       bases determined under subsection (c)(3)

2       for all plan years preceding the first plan

3       year to which the election under paragraph

4       (1) applies (and all shortfall amortization

5       installments determined with respect to

6       such bases) shall be reduced to zero under

7       rules similar to the rules of subsection

8       (c)(6).

9            "(ii) NEW SHORTFALL AMORTIZATION

10       BASE.—Notwithstanding subsection (c)(3),

11       the shortfall amortization base for the first

12       plan year to which the election under para-

13       graph (1) applies shall be the funding

14       shortfall of such plan for such plan year

15       (determined using the interest rates as

16       modified under subparagraph (A)).

17       "(C) DETERMINATION OF SHORTFALL AM-

18       ORTIZATION INSTALLMENTS.—

19            "(i) 30-YEAR PERIOD.—Subpara-

20       graphs (A) and (B) of subsection (c)(2)

21       shall be applied by substituting '30-plan-

22       year' for '7-plan-year' each place it ap-

23       pears.

24            "(ii) NO SPECIAL ELECTION.—The

25       election under subparagraph (D) of sub-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002978

674

1 section (c)(2) shall not apply to any plan

2 year to which the election under paragraph

3 (1) applies.

4  "(D) EXEMPTION FROM AT-RISK TREAT-

5 MENT.—Subsection (i) shall not apply.

6  "(5) COMMUNITY NEWSPAPER PLAN.—For pur-

7 poses of this subsection—

8   "(A) IN GENERAL.—The term 'community

9  newspaper plan' means a plan to which this sec-

10  tion applies maintained as of December 31,

11  2018, by an employer which—

12   "(i) maintains the plan on behalf of

13   participants and beneficiaries with respect

14   to employment in the trade or business of

15   publishing 1 or more newspapers which

16   were published by the employer at any

17   time during the 11-year period ending on

18   the date of the enactment of this sub-

19   section,

20   "(ii)(I) is not a company the stock of

21   which is publicly traded (on a stock ex-

22   change or in an over-the-counter market),

23   and is not controlled, directly or indirectly,

24   by such a company, or

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002979

G:\CMTE\AP\16\FY20\_D\HEROES.XML

675

1                  "(II) is controlled, directly, or indi-

2             rectly, during the entire 30-year period

3             ending on the date of the enactment of this

4             subsection by individuals who are members

5             of the same family, and does not publish or

6             distribute a daily newspaper that is car-

7             rier-distributed in printed form in more

8             than 5 States, and

9                  "(iii) is controlled, directly, or indi-

10            rectly—

11                  "(I) by 1 or more persons resid-

12              ing primarily in a State in which the

13              community newspaper has been pub-

14              lished on newsprint or carrier-distrib-

15              uted,

16                "(II) during the entire 30-year

17              period ending on the date of the en-

18              actment of this subsection by individ-

19              uals who are members of the same

20              family,

21                "(III) by 1 or more trusts, the

22              sole trustees of which are persons de-

23              scribed in subclause (I) or (II), or

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002980

G:\CMTE\AP\16\FY20\_D\HEROES.XML

676

1        "(IV) by a combination of per-

2            sons described in subclause (I), (II),

3            or (III).

4        "(B) NEWSPAPER.—The term 'newspaper'

5    does not include any newspaper (determined

6    without regard to this subparagraph) to which

7    any of the following apply:

8        "(i) Is not in general circulation.

9        "(ii) Is published (on newsprint or

10            electronically) less frequently than 3 times

11            per week.

12        "(iii) Has not ever been regularly

13            published on newsprint.

14        "(iv) Does not have a bona fide list of

15            paid subscribers.

16        "(C) CONTROL.—A person shall be treated

17    as controlled by another person if such other

18    person possesses, directly or indirectly, the

19    power to direct or cause the direction and man-

20    agement of such person (including the power to

21    elect a majority of the members of the board of

22    directors of such person) through the ownership

23    of voting securities.

24        "(6) CONTROLLED GROUP.—For purposes of

25    this subsection, the term 'controlled group' means all

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002981

677

1    persons treated as a single employer under sub-
2    section (b), (c), (m), or (o) of section 414 of the In-
3    ternal Revenue Code of 1986 as of the date of the
4    enactment of this subsection.

5        "(7) EFFECT ON PREMIUM RATE CALCULA-
6    TION.—Notwithstanding any other provision of law
7    or any regulation issued by the Pension Benefit
8    Guaranty Corporation, in the case of a plan for
9    which an election is made to apply the alternative
10   standards described in paragraph (3), the additional
11   premium under section 4006(a)(3)(E) shall be deter-
12   mined as if such election had not been made.".

13   (c) EFFECTIVE DATE.—The amendments made by
14   this section shall apply to plan years ending after Decem-
15   ber 31, 2017.

16   **SEC. 40308. MINIMUM RATE OF INTEREST FOR CERTAIN DE-**
17        **TERMINATIONS RELATED TO LIFE INSUR-**
18        **ANCE CONTRACTS.**

19   (a) MODIFICATION OF MINIMUM RATE FOR PUR-
20   POSES OF CASH VALUE ACCUMULATION TEST.—

21        (1) IN GENERAL.—Section 7702(b)(2)(A) of the
22   Internal Revenue Code of 1986 is amended by strik-
23   ing "an annual effective rate of 4 percent" and in-
24   serting "the applicable accumulation test minimum
25   rate".

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002982

678

1       (2) APPLICABLE ACCUMULATION TEST MIN-
2   IMUM RATE.—Section 7702(b) of such Code is
3   amended by adding at the end the following new
4   paragraph:

5       "(3) APPLICABLE ACCUMULATION TEST MIN-
6   IMUM RATE.—For purposes of paragraph (2)(A), the
7   term 'applicable accumulation test minimum rate'
8   means the lesser of—

9           "(A) an annual effective rate of 4 percent,
10          or

11          "(B) the insurance interest rate (as de-
12          fined in subsection (f)(11)) in effect at the time
13          the contract is issued.".

14  (b) MODIFICATION OF MINIMUM RATE FOR PUR-
15  POSES OF GUIDELINE PREMIUM REQUIREMENTS.—

16      (1) IN GENERAL.—Section 7702(c)(3)(B)(iii) of
17  such Code is amended by striking "an annual effec-
18  tive rate of 6 percent" and inserting "the applicable
19  guideline premium minimum rate".

20      (2) APPLICABLE GUIDELINE PREMIUM MIN-
21  IMUM RATE.—Section 7702(c)(3) of such Code is
22  amended by adding at the end the following new
23  subparagraph:

24          "(E) APPLICABLE GUIDELINE PREMIUM
25          MINIMUM RATE.—For purposes of subpara-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002983

679

1  graph (B)(iii), the term 'applicable guideline
2  premium minimum rate' means the applicable
3  accumulation test minimum rate (as defined in
4  subsection (b)(3)) plus 2 percentage points.''.

5  (c) APPLICATION OF MODIFIED MINIMUM RATES TO
6  DETERMINATION OF GUIDELINE LEVEL PREMIUM.—Sec-
7  tion 7702(c)(4) of such Code is amended—

8  (1) by striking ''4 percent'' and inserting ''the
9  applicable accumulation test minimum rate'', and

10  (2) by striking ''6 percent'' and inserting ''the
11  applicable guideline premium minimum rate''.

12  (d) INSURANCE INTEREST RATE.—Section 7702(f)
13  of such Code is amended by adding at the end the fol-
14  lowing new paragraph:

15  ''(11) INSURANCE INTEREST RATE.—For pur-
16  poses of this section—

17  ''(A) IN GENERAL.—The term 'insurance
18  interest rate' means, with respect to any con-
19  tract issued in any calendar year, the lesser
20  of—

21  ''(i) the section 7702 valuation inter-
22  est rate for such calendar year (or, if such
23  calendar year is not an adjustment year,
24  the most recent adjustment year), or

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002984

680

1      "(ii) the section 7702 applicable Fed-

2    eral interest rate for such calendar year

3    (or, if such calendar year is not an adjust-

4    ment year, the most recent adjustment

5    year).

6      "(B) SECTION 7702 VALUATION INTEREST

7    RATE.—The term 'section 7702 valuation inter-

8    est rate' means, with respect to any adjustment

9    year, the prescribed U.S. valuation interest rate

10   for life insurance with guaranteed durations of

11   more than 20 years (as defined in the National

12   Association of Insurance Commissioners' Stand-

13   ard Valuation Law) as effective in the calendar

14   year immediately preceding such adjustment

15   year.

16     "(C) SECTION 7702 APPLICABLE FEDERAL

17   INTEREST RATE.—The term 'section 7702 ap-

18   plicable Federal interest rate' means, with re-

19   spect to any adjustment year, the average

20   (rounded to the nearest whole percentage point)

21   of the applicable Federal mid-term rates (as de-

22   fined in section 1274(d) but based on annual

23   compounding) effective as of the beginning of

24   each of the calendar months in the most recent

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002985

G:\CMTE\AP\16\FY20\_D\HEROES.XML

681

1     60-month period ending before the second cal-

2     endar year prior to such adjustment year.

3         ''(D) ADJUSTMENT YEAR.—The term 'ad-

4     justment year' means the calendar year fol-

5     lowing any calendar year that includes the ef-

6     fective date of a change in the prescribed U.S.

7     valuation interest rate for life insurance with

8     guaranteed durations of more than 20 years (as

9     defined in the National Association of Insur-

10     ance Commissioners' Standard Valuation Law).

11         ''(E)   TRANSITION   RULE.—Notwith-

12     standing subparagraph (A), the insurance inter-

13     est rate shall be 2 percent in the case of any

14     contract which is issued during the period

15     that—

16         ''(i) begins on January 1, 2021, and

17         ''(i) ends immediately before the be-

18     ginning of the first adjustment year that

19     beings after December 31, 2021.''.

20   (e) EFFECTIVE DATE.—The amendments made by

21 this section shall apply to contracts issued after December

22 31, 2020.

DOC_0002986

682

# DIVISION E—CONTINUED AS-SISTANCE TO UNEMPLOYED WORKERS

### SEC. 50001. EXTENSION OF FEDERAL PANDEMIC UNEM-PLOYMENT COMPENSATION.

(a) IN GENERAL.—Section 2104(e) of the CARES Act (Public Law 116–136) is amended to read as follows:

"(e) APPLICABILITY.—

"(1) IN GENERAL.—An agreement entered into under this section shall apply to weeks of unemployment—

"(A) beginning after the date on which such agreement is entered into; and

"(B) ending on or before January 31, 2021.

"(2) TRANSITION RULE FOR INDIVIDUALS REMAINING ENTITLED TO REGULAR COMPENSATION AS OF JANUARY 31, 2021.—In the case of any individual who, as of the date specified in paragraph (1)(B), has not yet exhausted all rights to regular compensation under the State law of a State with respect to a benefit year that began before such date, Federal Pandemic Unemployment Compensation shall continue to be payable to such individual for any week beginning on or after such date for which

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002987

683

1 the individual is otherwise eligible for regular com-
2 pensation with respect to such benefit year.

3     "(3) TERMINATION.—Notwithstanding any
4 other provision of this subsection, no Federal Pan-
5 demic Unemployment Compensation shall be payable
6 for any week beginning after March 31, 2021.".

7 (b) LIMITATION ON APPLICATION OF TRANSITION
8 RULE.—Section 2104(g) of such Act is amended by in-
9 serting "(except for subsection (e)(2))" after "the pre-
10 ceding provisions of this section".

11 (c) DISREGARD OF FEDERAL PANDEMIC UNEMPLOY-
12 MENT COMPENSATION FOR CERTAIN PURPOSES.—Section
13 2104(h) of such Act is amended to read as follows:

14     "(h) DISREGARD OF FEDERAL PANDEMIC UNEM-
15 PLOYMENT COMPENSATION FOR PURPOSES OF ALL FED-
16 ERAL AND FEDERALLY ASSISTED PROGRAMS.—A Federal
17 Pandemic Unemployment Compensation payment shall
18 not be regarded as income and shall not be regarded as
19 a resource for the month of receipt and the following 9
20 months, for purposes of determining the eligibility of the
21 recipient (or the recipient's spouse or family) for benefits
22 or assistance, or the amount or extent of benefits or assist-
23 ance, under any Federal program or under any State or
24 local program financed in whole or in part with Federal
25 funds.".

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002988

G:\CMTE\AP\16\FY20\_D\HEROES.XML

684

1 **SEC. 50002. EXTENSION AND BENEFIT PHASEOUT RULE**
2 **FOR PANDEMIC UNEMPLOYMENT ASSIST-**
3 **ANCE.**

4 Section 2102(c) of the CARES Act (Public Law 116–
5 136) is amended—

6 (1) in paragraph (1)—

7 (A) by striking "paragraph (2)" and in-
8 serting "paragraphs (2) and (3)"; and

9 (B) in subparagraph (A)(ii), by striking
10 "December 31, 2020" and inserting "January
11 31, 2021"; and

12 (2) by redesignating paragraph (3) as para-
13 graph (4); and

14 (3) by inserting after paragraph (2) the fol-
15 lowing:

16 "(3) TRANSITION RULE FOR INDIVIDUALS RE-
17 MAINING ENTITLED TO PANDEMIC UNEMPLOYMENT
18 ASSISTANCE AS OF JANUARY 31, 2021.—

19 "(A) IN GENERAL.—In the case of any in-
20 dividual who, as of the date specified in para-
21 graph (1)(A)(ii), is receiving Pandemic Unem-
22 ployment Assistance but has not yet exhausted
23 all rights to such assistance under this section,
24 Pandemic Unemployment Assistance shall con-
25 tinue to be payable to such individual for any
26 week beginning on or after such date for which

685

1 the individual is otherwise eligible for Pandemic

2 Unemployment Assistance.

3   "(B) TERMINATION.—Notwithstanding

4 any other provision of this subsection, no Pan-

5 demic Unemployment Assistance shall be pay-

6 able for any week beginning after March 31,

7 2021.".

**SEC. 50003. EXTENSION AND BENEFIT PHASEOUT RULE**

   **FOR PANDEMIC EMERGENCY UNEMPLOY-**

   **MENT COMPENSATION.**

11 Section 2107(g) of the CARES Act (Public Law 116–

12 136) is amended to read as follows:

13 "(g) APPLICABILITY.—

14   "(1) IN GENERAL.—An agreement entered into

15 under this section shall apply to weeks of unemploy-

16 ment—

17   "(A) beginning after the date on which

18 such agreement is entered into; and

19   "(B) ending on or before January 31,

20 2021.

21   "(2) TRANSITION RULE FOR INDIVIDUALS RE-

22 MAINING ENTITLED TO PANDEMIC EMERGENCY UN-

23 EMPLOYMENT COMPENSATION AS OF JANUARY 31,

24 2021.—In the case of any individual who, as of the

25 date specified in paragraph (1)(A)(ii), is receiving

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002990

686

1     Pandemic Emergency Unemployment Compensation

2     but has not yet exhausted all rights to such assist-

3     ance under this section, Pandemic Emergency Un-

4     employment Compensation shall continue to be pay-

5     able to such individual for any week beginning on or

6     after such date for which the individual is otherwise

7     eligible for Pandemic Emergency Unemployment

8     Compensation.

9     "(3) TERMINATION.—Notwithstanding any

10     other provision of this subsection, no Pandemic

11     Emergency Unemployment Compensation shall be

12     payable for any week beginning after March 31,

13     2021.".

14 **SEC. 50004. EXTENSION OF FULL FEDERAL FUNDING OF**

15              **THE FIRST WEEK OF COMPENSABLE REG-**

16              **ULAR UNEMPLOYMENT FOR STATES WITH NO**

17              **WAITING WEEK.**

18     Section 2105(e)(2) of the CARES Act (Public Law

19     116–136) is amended by striking "December 31, 2020"

20     and inserting "January 31, 2021".

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002991

687

**SEC. 50005. EXTENSION OF EMERGENCY RELIEF AND TECH-**
            **NICAL CORRECTIONS FOR GOVERNMENTAL**
            **ENTITIES AND NONPROFIT ORGANIZATIONS.**

Section 903(i)(1) of the Social Security Act, as added by section 2103 of the CARES Act (Public Law 116–136), is amended—

   (1) in subparagraph (A), by striking "during the applicable period" and inserting "with respect to the applicable period";

   (2) in subparagraph (B), by striking "section 3309(a)(1)" and inserting "section 3309(a)";

   (3) in subparagraph (C), by striking "shall be used exclusively" and all that follows through the end and inserting "shall be used exclusively to reduce the amounts required to be paid in lieu of contributions into the State unemployment fund pursuant to such section by governmental entities and other organizations described in section 3309(a) of such Code"; and

   (4) in subparagraph (D), by striking "December 31, 2020" and inserting "January 31, 2021".

**SEC. 50006. REDUCTION OF STATE ADMINISTRATIVE BUR-**
            **DEN IN DETERMINATION OF AMOUNT OF**
            **PANDEMIC UNEMPLOYMENT ASSISTANCE.**

Section 2102(d) of the CARES Act (Public Law 116–136) is amended by adding at the end the following:

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002992

688

1       ''(4) STATE FLEXIBILITY IN ESTABLISHING IN-

2 COME.—In determining the income of an individual

3 for purposes of an application for assistance author-

4 ized under subsection (b), a State may rely on such

5 wage and self-employment data as the State may

6 elect, including any applicable data with respect to

7 an individual's electronically mediated employment.''.

**8 SEC. 50007. EXTENSION OF TEMPORARY ASSISTANCE FOR**

**9            STATES WITH ADVANCES.**

10     Section 1202(b)(10)(A) of the Social Security Act

11 (42 U.S.C. 1322(b)(10)(A)) is amended by striking ''De-

12 cember 31, 2020'' and inserting ''June 30, 2021''.

**13 SEC. 50008. EXTENSION OF FULL FEDERAL FUNDING OF EX-**

**14            TENDED UNEMPLOYMENT COMPENSATION.**

15     Section 4105 of the Families First Coronavirus Re-

16 sponse Act (Public Law 116–127) is amended by striking

17 ''December 31, 2020'' each place it appears and inserting

18 ''June 30, 2021''.

**19 SEC. 50009. EXTENSION OF TEMPORARY FINANCING OF**

**20            SHORT-TIME COMPENSATION PAYMENTS IN**

**21            STATES WITH PROGRAMS IN LAW.**

22     Section 2108(b)(2) of the CARES Act (Public Law

23 116–136) is amended by striking ''December 31, 2020''

24 and inserting ''January 31, 2021''.

689

1 **SEC. 50010. EXTENSION OF TEMPORARY FINANCING OF**
2 **SHORT-TIME COMPENSATION AGREEMENTS.**

3    Section 2109(d)(2) of the CARES Act (Public Law
4 116–136) is amended by striking "December 31, 2020"
5 and inserting "January 31, 2021".

6 **SEC. 50011. GRACE PERIOD FOR FULL FINANCING OF**
7 **SHORT-TIME COMPENSATION PROGRAMS.**

8    Section 2108(c) of the CARES Act (Public Law 116–
9 136) is amended by striking "shall be eligible" and all that
10 follows through the end and inserting the following: "

11    "shall be eligible—

12    "(1) for payments under subsection (a) for
13    weeks of unemployment beginning after the effective
14    date of such enactment; and

15    "(2) for an additional payment equal to the
16    total amount of payments for which the State is eli-
17    gible pursuant to an agreement under section 2109
18    for weeks of unemployment before such effective
19    date.".

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002994

690

1 **DIVISION F—ASSISTANCE TO AGRICUL-**
2 **TURAL PRODUCERS AND OTHER MAT-**
3 **TERS RELATING TO AGRICULTURE**

4 **SEC. 60001. DEFINITIONS.**

5    In this division:

6        (1) The term ''COVID–19'' means the disease

7    caused by SARS–CoV–2, or any viral strain mutat-

8    ing therefrom with pandemic potential.

9        (2) The term ''Secretary'' means the Secretary

10   of Agriculture.

11                    TITLE I—LIVESTOCK

12 **SEC. 60101. ESTABLISHMENT OF TRUST FOR BENEFIT OF**
13        **UNPAID CASH SELLERS OF LIVESTOCK.**

14   The Packers and Stockyards Act, 1921, is amended

15 by inserting after section 317 (7 U.S.C. 217a) the fol-

16 lowing new section:

17 **''SEC. 318. STATUTORY TRUST ESTABLISHED; DEALER.**

18   ''(a) ESTABLISHMENT.—

19        ''(1) IN GENERAL.—All livestock purchased by

20   a dealer in cash sales and all inventories of, or re-

21   ceivables or proceeds from, such livestock shall be

22   held by such dealer in trust for the benefit of all un-

23   paid cash sellers of such livestock until full payment

24   has been received by such unpaid cash sellers.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002995

691

1    "(2) EXEMPTION.—Any dealer whose average

2    annual purchases of livestock do not exceed

3    $100,000 shall be exempt from the provisions of this

4    section.

5    "(3) EFFECT OF DISHONORED INSTRU-

6    MENTS.—For purposes of determining full payment

7    under paragraph (1), a payment to an unpaid cash

8    seller shall not be considered to have been made if

9    the unpaid cash seller receives a payment instrument

10    that is dishonored.

11    "(b) PRESERVATION OF TRUST.—An unpaid cash

12    seller shall lose the benefit of a trust under subsection (a)

13    if the unpaid cash seller has not preserved the trust by

14    giving written notice to the dealer involved and filing such

15    notice with the Secretary—

16    "(1) within 30 days of the final date for mak-

17    ing a payment under section 409 in the event that

18    a payment instrument has not been received; or

19    "(2) within 15 business days after the date on

20    which the seller receives notice that the payment in-

21    strument promptly presented for payment has been

22    dishonored.

23    "(c) NOTICE TO LIEN HOLDERS.—When a dealer re-

24    ceives notice under subsection (b) of the unpaid cash sell-

25    er's intent to preserve the benefits of the trust, the dealer

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002996

692

1 shall, within 15 business days, give notice to all persons

2 who have recorded a security interest in, or lien on, the

3 livestock held in such trust.

4     "(d) Cash Sales Defined.—For the purpose of

5 this section, a cash sale means a sale in which the seller

6 does not expressly extend credit to the buyer.

7     "(e) Purchase of Livestock Subject to

8 Trust.—

9         "(1) In general.—A person purchasing live-

10 stock subject to a dealer trust shall receive good title

11 to the livestock if the person receives the livestock—

12             "(A) in exchange for payment of new

13 value; and

14             "(B) in good faith without notice that the

15 transfer is a breach of trust.

16         "(2) Dishonored payment instrument.—

17 Payment shall not be considered to have been made

18 if a payment instrument given in exchange for the

19 livestock is dishonored.

20         "(3) Transfer in satisfaction of ante-

21 cedent debt.—A transfer of livestock subject to a

22 dealer trust is not for value if the transfer is in sat-

23 isfaction of an antecedent debt or to a secured party

24 pursuant to a security agreement.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002997

1 "(f) ENFORCEMENT.—Whenever the Secretary has

2 reason to believe that a dealer subject to this section has

3 failed to perform the duties required by this section or

4 whenever the Secretary has reason to believe that it will

5 be in the best interest of unpaid cash sellers, the Secretary

6 shall do one or more of the following—

7     "(1) appoint an independent trustee to carry

8     out the duties required by this section, preserve

9     trust assets, and enforce the trust;

10     "(2) serve as independent trustee, preserve

11     trust assets, and enforce the trust; or

12     "(3) file suit in the United States district court

13     for the district in which the dealer resides to enjoin

14     the dealer's failure to perform the duties required by

15     this section, preserve trust assets, and to enforce the

16     trust. Attorneys employed by the Secretary may,

17     with the approval of the Attorney General, represent

18     the Secretary in any such suit. Nothing herein shall

19     preclude unpaid sellers from filing suit to preserve

20     or enforce the trust.".

21 **SEC. 60102. EMERGENCY ASSISTANCE FOR MARKET-READY**

22         **LIVESTOCK AND POULTRY LOSSES.**

23 (a) IN GENERAL.—The Secretary shall make pay-

24 ments to covered producers to offset losses related to the

25 intentional depopulation of market-ready livestock and

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002998

694

1  poultry due to insufficient regional processing access re-

2  lated to the COVID–19 public health emergency, as deter-

3  mined by the Secretary.

4      (b) PAYMENT RATE FOR COVERED PRODUCERS.—

5          (1) PAYMENTS FOR FIRST 30-DAY PERIOD.—

6          For a period of 30 days beginning, with respect to

7          a covered producer, on the initial date of depopula-

8          tion described in subsection (a) of the market-ready

9          livestock or poultry of the covered producer, the Sec-

10         retary shall reimburse such covered producer for 85

11         percent of the value of losses as determined under

12         subsection (c).

13         (2) SUBSEQUENT 30-DAY PERIODS.—For each

14         30-day period subsequent to the 30-day period de-

15         scribed in paragraph (1), the Secretary shall reduce

16         the value of the losses as determined under sub-

17         section (c) with respect to a covered producer by 10

18         percent.

19     (c) VALUATION.—In calculating the amount of losses

20  for purposes of the payment rates under subsection (b),

21  the Secretary shall use the average fair market value, as

22  determined by the Secretary in collaboration with the

23  Chief Economist of the Department of Agriculture and the

24  Administrator of the Agricultural Marketing Service, for

25  market-ready livestock, where applicable, and market-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0002999

695

1 ready poultry, where applicable, during the period begin-
2 ning March 1, 2020, and ending on the date of the enact-
3 ment of this section. In no case shall a payment made
4 under subsection (b) exceed the average market value of
5 market-ready livestock or poultry on the date of depopula-
6 tion.

7 (d) PACKER-OWNED ANIMALS EXCLUDED.—The Sec-
8 retary may not make payments under this section for the
9 losses of packer-owned animals.

10 (e) DEFINITIONS.—In this section:

11 (1) COVERED PRODUCER.—The term "covered
12 producer" means a person or legal entity that as-
13 sumes the production and market risks associated
14 with the agricultural production of livestock and
15 poultry (as such terms are defined in section 2(a) of
16 the Packers and Stockyards Act, 1921 (7 U.S.C.
17 183(a)).

18 (2) PACKER.—The term "packer" has the
19 meaning given the term in section 201 of the Pack-
20 ers and Stockyards Act, 1921 (7 U.S.C. 191).

21 (3) SECRETARY.—The term "Secretary" means
22 the Secretary of Agriculture.

23 (f) FUNDING.—There is appropriated, out of any
24 funds in the Treasury not otherwise appropriated, such
25 sums as may be necessary to carry out this section.

g:\VHLC\051220\051220.072.xml        (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003000

696

1  **SEC. 60103. ANIMAL DISEASE PREVENTION AND MANAGE-**

2  **MENT RESPONSE.**

3  Out of any amounts in the Treasury not otherwise

4  appropriated, there is appropriated to carry out section

5  10409A of the Animal Health Protection Act (7 U.S.C.

6  8308A) $300,000,000, to remain available until expended.

7  TITLE II—DAIRY

8  **SEC. 60201. DAIRY DIRECT DONATION PROGRAM.**

9  (a) DEFINITIONS.—In this section:

10  (1) ELIGIBLE DAIRY ORGANIZATION.—The term

11  "eligible dairy organization" is defined in section

12  1431(a) of the Agricultural Act of 2014 (7 U.S.C.

13  9071(a)).

14  (2) ELIGIBLE DISTRIBUTOR.—The term "eligi-

15  ble distributor" means a public or private nonprofit

16  organization that distributes donated eligible dairy

17  products to recipient individuals and families.

18  (3) ELIGIBLE DAIRY PRODUCTS.—The term

19  "eligible dairy products" means products primarily

20  made from milk produced and processed within a

21  Federal Milk Marketing Order.

22  (4) ELIGIBLE PARTNERSHIP.—The term "eligi-

23  ble partnership" means a partnership between an el-

24  igible dairy organization and an eligible distributor.

25  (b) ESTABLISHMENT AND PURPOSES.—Not later

26  than 45 days after the enactment of this Act, the Sec-

DOC_0003001

697

1 retary shall establish and administer a direct dairy dona-

2 tion program for the purposes of—

3     (1) facilitating the timely donation of eligible

4 dairy products and

5     (2) preventing and minimizing food waste.

6 (c) DONATION AND DISTRIBUTION PLANS.—

7     (1) IN GENERAL.—To be eligible to receive re-

8 imbursement under this section, an eligible partner-

9 ship shall submit to the Secretary a donation and

10 distribution plan that describes the process that the

11 eligible partnership will use for the donation, proc-

12 essing, transportation, temporary storage, and dis-

13 tribution of eligible dairy products.

14     (2) REVIEW AND APPROVAL.—No later than 15

15 business days after receiving a plan described in

16 paragraph (1), the Secretary shall—

17         (A) review such plan; and

18         (B) issue an approval or disapproval of

19 such plan.

20 (d) REIMBURSEMENT.—

21     (1) IN GENERAL.—On receipt of appropriate

22 documentation under paragraph (2), the Secretary

23 shall reimburse an eligible dairy organization at a

24 rate equal to the current Class I milk price multi-

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003002

698

1 plied by the volume of milk required to make the do-
2 nated product.

3 (2) SPECIAL CASE.—In the case of donated
4 Class I products, the Secretary shall reimburse an
5 eligible dairy organization at a rate equal to the cur-
6 rent Class I milk price plus 5 percent multiplied by
7 the volume of milk required to make the donated
8 Class I product.

9 (3) DOCUMENTATION.—

10 (A) IN GENERAL.—An eligible dairy orga-
11 nization shall submit to the Secretary such doc-
12 umentation as the Secretary may require to
13 demonstrate the eligible dairy product produc-
14 tion and donation to the eligible distributor.

15 (B) VERIFICATION.—The Secretary may
16 verify the accuracy of documentation submitted.

17 (3) RETROACTIVE REIMBURSEMENT.—In pro-
18 viding reimbursements under paragraph (1), the
19 Secretary may provide reimbursements for milk
20 costs incurred before the date on which the donation
21 and distribution plan for the applicable participating
22 partnership was approved by the Secretary.

23 (e) PROHIBITION ON RESALE OF PRODUCTS.—

24 (1) IN GENERAL.—An eligible distributor that
25 receives eligible dairy products donated under this

DOC_0003003

699

1   section may not sell the products into commercial

2   markets.

3       (2) PROHIBITION ON FUTURE PARTICIPA-

4   TION.—An eligible distributor that the Secretary de-

5   termines has violated paragraph (1) shall not be eli-

6   gible for any future participation in the program es-

7   tablished under this section.

8       (f) REVIEWS.—The Secretary shall conduct appro-

9   priate reviews or audits to ensure the integrity of the pro-

10  gram established under this section.

11      (g) PUBLICATION OF DONATION ACTIVITY.—The

12  Secretary, acting through the Agricultural Marketing

13  Service, shall publish on the publicly accessible website of

14  such agency periodic reports containing donation activity

15  under this section.

16      (h) SUPPLEMENTAL REIMBURSEMENTS.—

17      (1) IN GENERAL.—The Secretary may make a

18      supplemental reimbursement to an eligible dairy or-

19      ganization for an approved donation and distribution

20      plan in accordance with the milk donation program

21      established under section 1431 of the Agricultural

22      Act of 2014 (7 U.S.C. 9071).

23      (2) REIMBURSEMENT CALCULATION.—A sup-

24      plemental reimbursement described in paragraph (1)

25      shall be equal to the value of—

DOC_0003004

700

1 (A) the sum of—

2 (i) the Class IV milk price for the ap-

3 plicable month, plus

4 (ii) 5 percent of the Class I price for

5 the applicable month, multiplied by

6 (B) the volume of eligible milk under such

7 approved donation plan.

8 (i) FUNDING.—Out of the amounts of the Treasury

9 not otherwise appropriated, the Secretary shall use to

10 carry out this section $500,000,000 to remain available

11 until expended.

12 **SEC. 60202. SUPPLEMENTAL DAIRY MARGIN COVERAGE**

13  **PAYMENTS.**

14 (a) IN GENERAL.—The Secretary shall provide sup-

15 plemental dairy margin coverage payments to eligible

16 dairy operations described in subsection (b)(1) whenever

17 the average actual dairy production margin (as defined in

18 section 1401 of the Agricultural Act of 2014 (7 U.S.C.

19 9051)) for a month is less than the coverage level thresh-

20 old selected by such eligible dairy operation under such

21 section 1406.

22 (b) ELIGIBLE DAIRY OPERATION DESCRIBED.—

23 (1) IN GENERAL.—An eligible dairy operation

24 described in this subsection is a dairy operation

25 that—

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003005

701

1         (A) is located in the United States; and

2         (B) during a calendar year in which such

3     dairy operation is a participating dairy oper-

4     ation (as defined in section 1401 of the Agricul-

5     tural Act of 2014 (7 U.S.C. 9051)), has a pro-

6     duction history established under the dairy

7     margin coverage program under section 1405 of

8     the Agricultural Act of 2014 (7 U.S.C. 9055)

9     of less than 5 million pounds, as determined in

10    accordance with subsection (c) of such section

11    1405.

12     (2) LIMITATION ON ELIGIBILITY.—An eligible

13   dairy operation shall only be eligible for payments

14   under this section during a calendar year in which

15   such eligible dairy operation is enrolled in the dairy

16   margin coverage (as defined in section 1401 of the

17   Agricultural Act of 2014 (7 U.S.C. 9051)).

18   (c) SUPPLEMENTAL PRODUCTION HISTORY CAL-

19 CULATION.—For purposes of determining the production

20 history of an eligible dairy operation under this section,

21 such dairy operation's production history shall be equal

22 to—

23     (1) the production volume of such dairy oper-

24   ation for the 2019 milk marketing year; minus

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003006

702

1      (2) the dairy margin coverage production his-
2    tory of such dairy operation established under sec-
3    tion 1405 of the Agricultural Act of 2014 (7 U.S.C.
4    9055).

5    (d) COVERAGE PERCENTAGE.—

6      (1) IN GENERAL.—For purposes of calculating
7    payments to be issued under this section during a
8    calendar year, an eligible dairy operation's coverage
9    percentage shall be equal to the coverage percentage
10    selected by such eligible dairy operation with respect
11    to such calendar year under section 1406 of the Ag-
12    ricultural Act of 2014 (7 U.S.C. 9056).

13      (2) 5-MILLION POUND LIMITATION.—

14        (A) IN GENERAL.—The Secretary shall not
15      provide supplemental dairy margin coverage on
16      an eligible dairy operation's actual production
17      for a calendar year such that the total covered
18      production history of such dairy operation ex-
19      ceeds 5 million pounds.

20        (B) DETERMINATION OF AMOUNT.—In cal-
21      culating the total covered production history of
22      an eligible dairy operation under subparagraph
23      (A), the Secretary shall multiply the coverage
24      percentage selected by such operation under

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003007

G:\CMTE\AP\16\FY20\_D\HEROES.XML

703

1    section 1406 of the Agricultural Act of 2014 (7

2    U.S.C. 9056) by the sum of—

3           (i) the supplemental production his-

4           tory calculated under subsection (c) with

5           respect to such dairy operation; and

6           (ii) the dairy margin coverage produc-

7           tion history described in subsection (c)(2)

8           with respect to such dairy operation.

9    (e) PREMIUM COST.—The premium cost for an eligi-

10   ble dairy operation under this section for a calendar year

11   shall be equal to the product of multiplying—

12          (1) the Tier I premium cost calculated with re-

13          spect to such dairy operation for such year under

14          section 1407(b) of the Agricultural Act of 2014 (7

15          12 U.S.C. 9057(b)); by

16          (2) the production history calculation with re-

17          spect to such dairy operation determined under sub-

18          section (c) (such that total covered production his-

19          tory does not exceed 5 million pounds).

20   (f) REGULATIONS.—Not later than 45 days after the

21   date of the enactment of this section, the Secretary shall

22   issue regulations to carry out this section.

23   (g) PROHIBITION WITH RESPECT TO DAIRY MARGIN

24   COVERAGE ENROLLMENT.—The Secretary may not re-

25   open or otherwise provide a special enrollment for dairy

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003008

704

1  margin coverage (as defined in section 1401 of the Agri-
2  cultural Act of 2014 (7 U.S.C. 9051)) for purposes of es-
3  tablishing eligibility for supplemental dairy margin cov-
4  erage payments under this section.

5     (h) RETROACTIVE APPLICATION FOR CALENDAR
6  YEAR 2020.—The Secretary shall make payments under
7  this section to eligible dairy operations described in sub-
8  section (b)(1) for months after and including January,
9  2020.

10    (i) SUNSET.—The authority to make payments under
11  this section shall terminate on December 31, 2023.

12    (j) FUNDING.—Out of any amounts in the Treasury
13  not otherwise appropriated, there are made available such
14  sums as may be necessary to carry out this program.

15  **SEC. 60203. RECOURSE LOAN PROGRAM FOR COMMERCIAL**
16           **PROCESSORS OF DAIRY PRODUCTS.**

17    (a) IN GENERAL.—The Secretary shall make re-
18  course loans available to qualified applicants during the
19  COVID–19 pandemic.

20    (b) AMOUNT OF LOAN.—

21       (1) IN GENERAL.—A recourse loan made under
22    this section shall be provided to qualified applicants
23    up to the value of the eligible dairy product inven-
24    tory of the applicant as determined by the Secretary
25    and consistent with subsection (c).

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003009

1  (2) VALUATION.—For purposes of making re-
2 course loans under this section, the Secretary shall
3 conduct eligible dairy product valuations to provide,
4 to the maximum extent practicable, funds to con-
5 tinue the operations of qualified applicants.

6 (c) INVENTORY USED AS COLLATERAL.—Eligible
7 dairy product inventory used as collateral for the recourse
8 loan program under this section shall be pledged on a ro-
9 tating basis to prevent spoilage of perishable products.

10 (d) TERM OF LOAN.—A recourse loan under this sec-
11 tion may be made for a period as determined by the Sec-
12 retary, except that no such recourse loan may end after
13 the date that is 24 months after the date of the enactment
14 of this section.

15 (e) FUNDING AND AUTHORITIES.—Out of any
16 amounts in the Treasury not otherwise appropriated, there
17 is made available $500,000,000 to carry out this section.

18 (f) DEFINITIONS.—In this section:

19  (1) ELIGIBLE DAIRY PRODUCTS.—The term
20 "eligible dairy products" means all dairy products
21 whether in base commodity or finished product form.

22  (2) QUALIFIED APPLICANT.—The term "quali-
23 fied applicant" means any commercial processors,
24 packagers, merchants, marketers, wholesalers, and

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003010

706

1    distributors of eligible dairy products impacted by

2    COVID–19.

**SEC. 60204. DAIRY MARGIN COVERAGE PREMIUM DIS-**

**COUNT FOR 3-YEAR SIGNUP.**

5        The Secretary shall provide a 15 percent discount for

6    the premiums described in subsections (b) and (c) of sec-

7    tion 1407 of the Agricultural Act of 2014 (7 U.S.C. 9051)

8    and the premium described in section 60202(e) for a dairy

9    operation (as defined in 1401 of such Act (7 U.S.C.

10   9051)) that makes a 1-time, three-year election to enroll

11   in dairy margin coverage under part I of subtitle D of

12   such Act for calendar years 2021 through 2023.

13        TITLE III—SPECIALTY CROPS AND OTHER

14                    COMMODITIES

**SEC. 60301. SUPPORT FOR SPECIALTY CROP SECTOR.**

16        Section 101(l) of the Specialty Crops Competitiveness

17   Act of 2004 (7 U.S.C. 1621 note) is amended by adding

18   at the end the following:

19        ''(3) COVID–19 OUTBREAK RELIEF.—

20            ''(A) IN GENERAL.—The Secretary shall

21        make grants to States eligible to receive a grant

22        under this section to assist State efforts to sup-

23        port the specialty crop sector for impacts re-

24        lated to the COVID–19 public health emer-

25        gency.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003011

707

1    "(B) FUNDING.—There is appropriated,
2    out of any funds in the Treasury not otherwise
3    appropriated, to carry out subparagraph (A)
4    not less than $100,000,000, to remain available
5    until expended.".

6  **SEC. 60302. SUPPORT FOR LOCAL AGRICULTURAL MAR-**
7              **KETS.**

8        Section 210A(i) of the Agricultural Marketing Act of
9    1946 (7 U.S.C. 1627c(d)) is amended by adding at the
10   end the following:

11       "(4) GRANTS FOR COVID–19 LOSSES.—

12            "(A) IN GENERAL.—In addition to grants
13       made under the preceding provisions of this
14       subsection, the Secretary shall make grants to
15       eligible entities specified in subsection (d)(6)(B)
16       to provide assistance in response to the
17       COVID–19 pandemic.

18            "(B) MATCHING FUNDS APPLICABILITY.—
19       The Secretary may not require a recipient of a
20       grant under subparagraph (A) to provide any
21       nonFederal matching funds.

22            "(F) FUNDING.—There is appropriated,
23       out of any funds in the Treasury not otherwise
24       appropriated, to carry out this paragraph,

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003012

708

1         $50,000,000, to remain available until ex-

2         pended.''.

### SEC. 60303. SUPPORT FOR FARMING OPPORTUNITIES TRAINING AND OUTREACH.

5     Section 2501 of the Food, Agriculture, Conservation,

6 and Trade Act of 1990 (7 U.S.C. 2279) is amended by

7 adding at the end the following:

8     ''(m) ADDITIONAL FUNDING.—

9       ''(1) IN GENERAL.—The Secretary shall make

10    grants to, or enter into cooperative agreements or

11    contracts with, eligible entities specified in sub-

12    section (c)(1) to provide training, outreach, and

13    technical assistance on operations, financing, and

14    marketing to beginning farmers and ranchers, so-

15    cially disadvantaged farmers and ranchers, and vet-

16    eran farmers and ranchers.

17       ''(2) MATCHING FUNDS APPLICABILITY.—The

18    Secretary may not require a recipient of a grant

19    under this subsection to provide any nonFederal

20    matching funds.

21       ''(3) FUNDING.—There is appropriated, out of

22    any funds in the Treasury not otherwise appro-

23    priated, to carry out this subsection, $50,000,000, to

24    remain available until expended.''.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003013

709

## SEC. 60304. SUPPORT FOR FARM STRESS PROGRAMS.

1    (a) IN GENERAL.—The Secretary shall make grants

2  to State departments of agriculture (or such equivalent

3  department) to expand or sustain stress assistance pro-

4  grams for individuals who are engaged in farming, ranch-

5  ing, and other agriculture-related occupations, including—

6        (1) programs that meet the criteria specified in

7        section 7522(b)(1) of the Food, Conservation, and

8        Energy Act of 2008 (7 U.S.C. 5936(b)(1)); and

9        (2) any State initiatives carried out as of the

10       date of the enactment of this Act that provide stress

11       assistance for such individuals.

12    (b) GRANT TIMING AND AMOUNT.—In making grants

13  under subsection (a), not later than 60 days after the date

14  of the enactment of this Act and subject to subsection (c),

15  the Secretary shall—

16       (1) make awards to States submitting State

17       plans that meet the criteria specified in paragraph

18       (1)(A) of such subsection within the time period

19       specified by the Secretary, in an amount not to ex-

20       ceed, $500,000 for each State; and

21       (2) of the amounts made available under sub-

22       section (f), allocate among such States, an amount

23       to be determined by the Secretary.

24    (c) STATE PLAN.—

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003014

710

1 (1) IN GENERAL.—A State department of agri-
2 culture seeking a grant under subsection (b) shall
3 submit to the Secretary a State plan to initiate, ex-
4 pand, or sustain stress assistance programs de-
5 scribed in subsection (a) that includes—

6 (A) a description of each activity and the
7 estimated amount of funding to support each
8 program and activity carried out through such
9 a program;

10 (B) an estimated timeline for the operation
11 of each such program and activity;

12 (C) the total amount of funding sought;
13 and

14 (D) an assurance that the State depart-
15 ment of agriculture will comply with the report-
16 ing requirement under subsection (e).

17 (2) GUIDANCE.—Not later than 20 days after
18 the date of the enactment of this Act, the Secretary
19 shall issue guidance for States with respect to the
20 submission of a State plan under paragraph (1) and
21 the allocation criteria under subsection (b).

22 (3) REALLOCATION.—If, after the first grants
23 are awarded pursuant to allocation under subsection
24 (b), any funds made available under subsection (f)

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003015

711

1   to carry out this subsection remain unobligated, the

2   Secretary shall—

3        (A) inform States that submit plans as de-

4        scribed in subsection (b), of such availability;

5        and

6        (B) reallocate such funds among such

7        States, as the Secretary determines to be ap-

8        propriate and equitable.

9   (d) COLLABORATION.—The Secretary may issue

10  guidance to encourage State departments of agriculture

11  to use funds provided under this section to support pro-

12  grams described in subsection (a) that are operated by—

13       (1) Indian tribes (as defined in section 4 of the

14       Indian Self-Determination and Education Assistance

15       Act (25 U.S.C. 5304));

16       (2) State cooperative extension services; and

17       (3) nongovernmental organizations.

18  (e) REPORTING.—Not later than 180 days after the

19  public health emergency declared under section 319 of the

20  Public Health Services Act (42 U.S.C. 247d) on January

21  31, 2020, is terminated, each State receiving additional

22  grants under subsection (b) shall submit a report to the

23  Secretary describing—

24       (1) the activities conducted using such funds;

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003016

1 (2) the amount of funds used to support each

2 such activity; and

3 (3) the estimated number of individuals served

4 by each such activity.

5 (f) FUNDING.—Out of any money not otherwise ap-

6 propriated, there is appropriated to carry out this section

7 $28,000,000, to remain available until expended.

8 (g) STATE DEFINED.—In this section, the term

9 "State" means—

10 (1) a State;

11 (2) the District of Columbia;

12 (3) the Commonwealth of Puerto Rico; and

13 (4) any other territory or possession of the

14 United States.

15 **SEC. 60305. SUPPORT FOR PROCESSED COMMODITIES.**

16 (a) RENEWABLE FUEL REIMBURSEMENT PRO-

17 GRAM.—

18 (1) IN GENERAL.—The Secretary shall make

19 payments in accordance with this subsection to eligi-

20 ble entities that experienced unexpected market

21 losses as a result of the COVID–19 pandemic during

22 the applicable period.

23 (2) DEFINITIONS.—In this section:

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003017

G:\CMTE\AP\16\FY20\_D\HEROES.XML

713

1        (A) APPLICABLE PERIOD.—The term "ap-
2    plicable period" means January 1, 2020,
3    through May 1, 2020.

4        (B) ELIGIBLE ENTITY.—The term "eligible
5    entity" means any domestic entity or facility
6    that produced any qualified fuel in the calendar
7    year 2019.

8        (C) QUALIFIED FUEL.—The term "quali-
9    fied fuel" means any renewable fuel or ad-
10   vanced biofuel (as such terms are defined in
11   section 211(o)(1) of the Clean Air Act), includ-
12   ing renewable fuel from corn starch feedstock.

13   (3) AMOUNT OF PAYMENT.—The amount of the
14   payment payable to an eligible entity shall be the
15   sum of—

16       (A) $0.45 multiplied by the number of gal-
17   lons of qualified fuel produced by the eligible
18   entity during the applicable period; and

19       (B) if the Secretary determines that the el-
20   igible entity was unable to produce any quali-
21   fied fuel throughout 1 or more calendar months
22   during the applicable period due to the
23   COVID–19 pandemic, $0.45 multiplied by 50
24   percent of the number of gallons produced by

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003018

714

1     the eligible entity in the corresponding month

2     or months in calendar year 2019.

3     (4) REPORT.—Not later than 180 days after

4     the date of the enactment of this Act, the Secretary

5     shall submit to the Committee on Agriculture of the

6     House of Representatives and the Committee on Ag-

7     riculture, Nutrition, and Forestry of the Senate a

8     report on the payments made under this subsection,

9     including the identity of each payment recipient and

10     the amount of the payment paid to the payment re-

11     cipient.

12     (5) FUNDING.—There is made available, out of

13     any funds in the Treasury not otherwise appro-

14     priated, such sums as may be necessary for pay-

15     ments to eligible entities under this subsection.

16     (6) ADMINISTRATION.—

17         (A) IN GENERAL.—The Secretary shall use

18         the funds, facilities, and authorities of the Com-

19         modity Credit Corporation to carry out this

20         subsection.

21         (B) REGULATIONS.—

22             (i) IN GENERAL.—Except as otherwise

23             provided in this subsection, not later than

24             30 days after the date of the enactment of

25             this Act, the Secretary and the Commodity

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003019

715

Credit Corporation, as appropriate, shall
prescribe such regulations as are necessary
to carry out this subsection.

(ii) PROCEDURE.—The promulgation
of regulations under, and administration
of, this subsection shall be made without
regard to—

(I) the notice and comment pro-
visions of section 553 of title 5,
United States Code; and

(II) chapter 35 of title 44,
United States Code (commonly known
as the ''Paperwork Reduction Act'').

(b) EMERGENCY ASSISTANCE FOR TEXTILE
MILLS.—

(1) IN GENERAL.—The Secretary shall make
emergency assistance available to domestic users of
upland cotton and extra long staple cotton in the
form of a payment in an amount determined under
paragraph (2), regardless of the origin of such up-
land cotton or extra long staple cotton, during the
10-month period beginning on March 1, 2020.

(2) CALCULATION OF ASSISTANCE.—The
amount of the assistance provided under paragraph

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003020

716

1   (1) to a domestic user described in such paragraph

2   shall be equal to 10 multiplied by the product of—

3        (A) the domestic user's historical monthly

4      average consumption; and

5        (B) 6 cents per pound so consumed.

6   (3) ALLOWABLE USE.—Any emergency assist-

7   ance provided under this section shall be made avail-

8   able only to domestic users of upland cotton and

9   extra long staple cotton that certify that the assist-

10   ance shall be used only for operating expenses.

11   (4) HISTORICAL MONTHLY AVERAGE CONSUMP-

12   TION DEFINED.—The term "historical monthly aver-

13   age consumption" means the average consumption

14   for each month occurring during the period begin-

15   ning on January 1, 2017, and ending on December

16   31, 2019.

17   (5) SUNSET.—The Secretary may not provide

18   emergency assistance under this section on or after

19   December 31, 2020.

20   (6) FUNDING.—There is made available, out of

21   any funds in the Treasury not otherwise appro-

22   priated, such sums as may be necessary to carry out

23   this section.

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003021

717

**SEC. 60306. DIRECT PAYMENTS TO AGRICULTURAL PRO-DUCERS.**

1   (a) IN GENERAL.—The Secretary shall make direct

2   payments to producers of specialty crops, livestock, and

3   other commodities, to cover losses in response to the

4   COVID–19 pandemic.

5   (b) PAYMENT CALCULATIONS.—Payment under sub-

6   section (a), shall be calculated as follows:

7        (1) SPECIALTY CROPS, LIVESTOCK, AND OTHER

8        COMMODITIES COVERED BY CORONAVIRUS FOOD AS-

9        SISTANCE PROGRAM.—In the case of losses of spe-

10       cialty crops, livestock, and other commodities in-

11       curred during the first quarter of calendar year

12       2020 and eligible to receive direct payments under

13       the Department of Agriculture's final rule for the

14       Coronavirus Food Assistance program of the De-

15       partment of Agriculture, payments under subsection

16       (a) shall be made to producers to ensure that they

17       are compensated for 85 percent of the second quar-

18       ter actual losses estimated by the Secretary.

19       (2) SPECIALTY CROPS, LIVESTOCK, AND OTHER

20       COMMODITIES NOT COVERED BY CORONAVIRUS FOOD

21       ASSISTANCE PROGRAM.—In the case of losses of spe-

22       cialty crops, livestock, and other commodities for

23       which a producer is ineligible to receive direct pay-

24       ments under the program referred to in paragraph

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003022

718

1     (1), payments under subsection (a) shall be equal to
2 85 percent of the actual losses estimated by the Sec-
3 retary for the first and second quarters of calendar
4 year 2020 for their commodity.

5     (c) ADJUSTMENT.—In calculating the amount of a
6 payment under subsection (b)(2), the Secretary shall ac-
7 count for price differentiation factors for a given com-
8 modity based on location, specialized varieties, and farm-
9 ing practices such as certified organic products, by
10 using—

11     (1) differentiated prices, as determined by the
12 Risk Management Agency for purposes of the Fed-
13 eral crop insurance program under the Federal Crop
14 Insurance Act (7 U.S.C. 1501 et seq.), when avail-
15 able; and

16     (2) other data from the Department of Agri-
17 culture and colleges and universities, to determine
18 estimated prices.

19     (d) ADJUSTED GROSS INCOME LIMITATIONS.—A
20 payment under this section shall be deemed to be a cov-
21 ered benefit under section 1001D(b)(2) of the Food Secu-
22 rity Act of 1985 (7 U.S.C. 1308–3a(b)(2)), unless at least
23 75 percent of the adjusted gross income of the recipient
24 of the payment is derived from farming, ranching, or for-
25 estry-related activities.

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003023

719

1    (e) PAYMENTS.—The Secretary shall make payments
2 under subsection (a) not later than 60 days after the date
3 of the enactment of this section.

4    (f) FUNDING.—There is made available, out of any
5 funds in the Treasury not otherwise appropriated, to carry
6 out this section $16,500,000,000, to remain available until
7 December 31, 2020.

8    (g) NOTIFICATION.—Any obligation or expenditure
9 under this section shall be subject to the requirements de-
10 scribed in section 20 of the Commodity Credit Corporation
11 Charter Act, as added by section 60402.

12    (h) REPORT TO CONGRESS.—Not later than one year
13 after the date of the enactment of this Act, the Secretary
14 shall submit to the Committee on Agriculture of the House
15 of Representatives and the Committee on Agriculture, Nu-
16 trition, and Forestry of the Senate a report specifying how
17 price losses were calculated for each crop and crop dif-
18 ferentiation factor, and evaluating the implementation,
19 costs, and general effectiveness of this section and the
20 Coronavirus Food Assistance program of the Department
21 of Agriculture.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003024

720

1    TITLE IV—COMMODITY CREDIT CORPORATION

2    **SEC. 60401. EMERGENCY ASSISTANCE.**

3    Section 5 of the Commodity Credit Corporation Char-

4    ter Act (15 U.S.C. 714c) is amended by redesignating sub-

5    section (h) as subsection (j) and inserting the following:

6    "(h) Remove and dispose of or aid in the removal or

7    disposition of surplus livestock and poultry due to signifi-

8    cant supply chain interruption during an emergency pe-

9    riod.

10    "(i) Aid agricultural processing plants to ensure sup-

11    ply chain continuity during an emergency period.".

12    **SEC. 60402. CONGRESSIONAL NOTIFICATION.**

13    The Commodity Credit Corporation Charter Act (15

14    U.S.C. 714 et seq.) is amended by adding at the end the

15    following new section:

16    **"SEC. 20. CONGRESSIONAL NOTIFICATION AND OVERSIGHT**

17    **ON SPENDING.**

18    "(a) IN GENERAL.—The Secretary shall notify in

19    writing, by first-class mail and electronic mail, the Com-

20    mittee on Agriculture of the House of Representatives and

21    the Committee on Agriculture, Nutrition, and Forestry of

22    the Senate at least 90 calendar days (not counting any

23    day on which both the House of Representatives and Sen-

24    ate are not in session) in advance of any obligation or ex-

25    penditure authorized under this Act.

DOC_0003025

721

1    "(b) WRITTEN NOTICE.—A written notice required

2  under subsection (a) shall specify—

3        "(1) the commodities that will be affected;

4        "(2) the maximum financial benefit per com-

5    modity;

6        "(3) the nature of the support, including—

7            "(A) direct payments;

8            "(B) technical and financial assistance;

9            "(C) marketing assistance; and

10           "(D) purchases;

11        "(4) the expected legal entities or individuals

12    that would receive financial benefits;

13        "(5) the intended policy goals;

14        "(6) the legal justification specifying the au-

15    thority of this Act utilized; and

16        "(7) the projected impacts to commodity mar-

17    kets.

18    "(c) MONITORING OR OVERSIGHT.—The Comptroller

19  General of the United States shall conduct monitoring and

20  oversight of the exercise of authorities, the receipt, dis-

21  bursement, and use of funds for which a report is required

22  under subsection (a).

23    "(d) REPORTS.—In conducting monitoring and over-

24  sight under subsection (c), the Comptroller General shall

25  publish reports regarding the ongoing monitoring and

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003026

722

1   oversight efforts, which, along with any audits and inves-

2   tigations conducted by the Comptroller General, shall be

3   submitted to the Committee on Agriculture of the House

4   of Representatives and the Committee on Agriculture, Nu-

5   trition, and Forestry of the Senate and posted on the

6   website of the Government Accountability Office—

7        ''(1) not later than 90 days after the initial ob-

8       ligation or expenditure of funds subject to subsection

9       (a), and every other month thereafter for as long as

10      such obligations or expenditures continue; and

11       ''(2) submit to the Committee on Agriculture of

12      the House of Representatives and the Committee on

13      Agriculture, Nutrition, and Forestry of the Senate

14      additional reports as warranted by the findings of

15      the monitoring and oversight activities of the Comp-

16      troller General.

17   ''(e) ACCESS TO INFORMATION.—

18       ''(1) RIGHT OF ACCESS.—In conducting moni-

19      toring and oversight activities under subsection (c),

20      the Comptroller General shall have access to records,

21      upon request, of any Federal, State, or local agency,

22      contractor, grantee, recipient, or subrecipient per-

23      taining to any obligations or expenditures subject to

24      subsection (a), including private entities receiving

25      such assistance.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003027

723

1       "(2) COPIES.—The Comptroller General may

2 make and retain copies of any records accessed

3 under paragraph (1) as the Comptroller General de-

4 termines appropriate.

5       "(3) INTERVIEWS.—In addition to such other

6 authorities as are available, the Comptroller General

7 or a designee of the Comptroller General may inter-

8 view Federal, State, or local officials, contractor

9 staff, grantee staff, recipients, or subrecipients per-

10 taining to any obligations or expenditures subject to

11 subsection (a), including private entities receiving

12 such assistance.

13       "(4) INSPECTION OF FACILITIES.—As deter-

14 mined necessary by the Comptroller General, the

15 Government Accountability Office may inspect facili-

16 ties at which Federal, State, or local officials, con-

17 tractor staff, grantee staff, or recipients or sub-

18 recipients carry out their responsibilities related to

19 obligations or expenditures subject to subsection (a).

20       "(5) ENFORCEMENT.—Access rights under this

21 subsection shall be subject to enforcement consistent

22 with section 716 of title 31, United States Code.

23       "(f) RELATIONSHIP TO EXISTING AUTHORITY.—

24 Nothing in this section shall be construed to limit, amend,

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003028

G:\CMTE\AP\16\FY20\_D\HEROES.XML

724

1 supersede, or restrict in any manner any existing author-

2 ity of the Comptroller General.

3 "(g) EXCEPTION TO WAITING PERIOD.—Subsection

4 (a) shall not apply if, prior to obligating or spending any

5 funding described in such subsection, the Secretary ob-

6 tains approval in writing from at least three of the fol-

7 lowing individuals—

8       "(1) the Chair of the Committee on Agriculture

9    of the House of Representatives,

10      "(2) the Ranking Member of the Committee on

11   Agriculture of the House of Representatives,

12      "(3) the Chair of the Committee on Agri-

13   culture, Nutrition, and Forestry of the Senate; and

14      "(4) the Ranking Member of the Committee on

15   Agriculture, Nutrition, and Forestry of the Senate.

16 "(h) EXCLUSION FOR PREEXISTING AUTHORIZA-

17 TIONS.—This section shall not apply to obligations and ex-

18 penditures authorized in the Agriculture Improvement Act

19 of 2018 (Public Law 115–334).".

20           TITLE V—CONSERVATION

21 **SEC. 60501. EMERGENCY SOIL HEALTH AND INCOME PRO-**

22              **TECTION PILOT PROGRAM.**

23 (a) DEFINITION OF ELIGIBLE LAND.—In this sec-

24 tion, the term "eligible land" means cropland that—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003029

1  (1) is selected by the owner or operator of the
2 land for proposed enrollment in the pilot program
3 under this section; and

4  (2) as determined by the Secretary, had a crop-
5 ping history or was considered to be planted during
6 each of the 3 crop years preceding enrollment.

7 (b) ESTABLISHMENT.—

8  (1) IN GENERAL.—The Secretary shall establish
9 a voluntary emergency soil health and income pro-
10 tection pilot program under which eligible land is en-
11 rolled through the use of contracts to assist owners
12 and operators of eligible land to conserve and im-
13 prove the soil, water, and wildlife resources of the el-
14 igible land.

15  (2) DEADLINE FOR PARTICIPATION.—Eligible
16 land may be enrolled in the program under this sec-
17 tion through December 31, 2021.

18 (c) CONTRACTS.—

19  (1) REQUIREMENTS.—A contract described in
20 subsection (b) shall—

21   (A) be entered into by the Secretary, the
22 owner of the eligible land, and (if applicable)
23 the operator of the eligible land; and

24   (B) provide that, during the term of the
25 contract—

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003030

726

(i) the lowest practicable cost peren-
nial conserving use cover crop for the eligi-
ble land, as determined by the applicable
State conservationist after considering the
advice of the applicable State technical
committee, shall be planted on the eligible
land;

(ii) subject to paragraph (4), the eligi-
ble land may be harvested for seed, hayed,
or grazed outside the primary nesting sea-
son established for the applicable county;

(iii) the eligible land may be eligible
for a walk-in access program of the appli-
cable State, if any; and

(iv) a nonprofit wildlife organization
may provide to the owner or operator of
the eligible land a payment in exchange for
an agreement by the owner or operator not
to harvest the conserving use cover.

(2) PAYMENTS.—

(A) RENTAL RATE.—Except as provided in
paragraph (4)(B)(ii), the annual rental rate for
a payment under a contract described in sub-
section (b) shall be $70 per acre.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003031

727

1      (B) ADVANCE PAYMENT.—At the request

2  of the owner and (if applicable) the operator of

3  the eligible land, the Secretary shall make all

4  rental payments under a contract entered into

5  under this section within 30 days of entering

6  into such contract.

7      (C) COST SHARE PAYMENTS.—A contract

8  described in subsection (b) shall provide that,

9  during the term of the contract, the Secretary

10  shall pay, of the actual cost of establishment of

11  the conserving use cover crop under paragraph

12  (1)(B)(i), not more than $30 per acre.

13  (3) TERM.—

14      (A) IN GENERAL.—Except as provided in

15  subparagraph (B), each contract described in

16  subsection (b) shall be for a term of 3 years.

17      (B) EARLY TERMINATION.—

18         (i) SECRETARY.—The Secretary may

19  terminate a contract described in sub-

20  section (b) before the end of the term de-

21  scribed in subparagraph (A) if the Sec-

22  retary determines that the early termi-

23  nation of the contract is appropriate.

24         (ii) OWNERS AND OPERATORS.—An

25  owner and (if applicable) an operator of el-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003032

728

1                    igible land enrolled in the pilot program

2                    under this section may terminate a con-

3                    tract described in subsection (b) before the

4                    end of the term described in subparagraph

5                    (A) if the owner and (if applicable) the op-

6                    erator pay to the Secretary an amount

7                    equal to the amount of rental payments re-

8                    ceived under the contract.

9          (4) HARVESTING, HAYING, AND GRAZING OUT-

10    SIDE APPLICABLE PERIOD.—The harvesting for

11    seed, haying, or grazing of eligible land under para-

12    graph (1)(B)(ii) outside of the primary nesting sea-

13    son established for the applicable county shall be

14    subject to the conditions that—

15                    (A) with respect to eligible land that is so

16                    hayed or grazed, adequate stubble height shall

17                    be maintained to protect the soil on the eligible

18                    land, as determined by the applicable State con-

19                    servationist after considering the advice of the

20                    applicable State technical committee; and

21                    (B) with respect to eligible land that is so

22                    harvested for seed—

23                        (i) the eligible land shall not be eligi-

24                        ble to be insured or reinsured under the

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003033

729

1                      Federal Crop Insurance Act (7 U.S.C.

2                      1501 et seq.); and

3                            (ii) the annual rental rate for a pay-

4                        ment under a contract described in sub-

5                        section (b) shall be $52.50 per acre.

6    (d) ACREAGE LIMITATION.—Not more than

7 5,000,000 total acres of eligible land may be enrolled

8 under the pilot program under this section.

9    (e) FUNDING.—There is appropriated, out of any

10 funds in the Treasury not otherwise appropriated, such

11 sums as may be necessary to carry out this section.

12                  TITLE VI—NUTRITION

**13    SEC. 60601. DEFINITIONS.**

14    In this title:

15    (1) COVID–19 PUBLIC HEALTH EMERGENCY.—

16 The term ''COVID–19 public health emergency''

17 means the public health emergency declared by the

18 Secretary of Health and Human Services under sec-

19 tion 319 of the Public Health Services Act (42

20 U.S.C. 247d) on January 31, 2020, with respect to

21 COVID–19.

22    (2) SUPPLEMENTAL NUTRITION ASSISTANCE

23 PROGRAM.—The term ''supplemental nutrition as-

24 sistance program'' has the meaning given such term

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003034

730

1     in section 3(t) of the Food and Nutrition Act of

2     2008 (7 U.S.C. 2012(t)).

3 **SEC. 60602. ENHANCED PROJECTS TO HARVEST, PROCESS,**

4                 **PACKAGE, OR TRANSPORT DONATED COM-**

5                 **MODITIES.**

6     (a) DEFINITIONS.—In this section:

7         (1) EMERGENCY FEEDING ORGANIZATION.—

8     The term "emergency feeding organization" has the

9     meaning given the term in section 201A of the

10     Emergency Food Assistance Act of 1983 (7 U.S.C.

11     7501).

12         (2) PROJECT.—The term "project" has the

13     meaning given the term in section 203D(d)(1) of the

14     Emergency Food Assistance Act of 1983 (7 U.S.C.

15     7507(d)(1)).

16         (3) PRIORITY AGRICULTURAL PRODUCT.—The

17     term "priority agricultural product" means a dairy,

18     meat, or poultry product, or a specialty crop—

19         (A) packaged or marketed for sale to com-

20         mercial or food service industries;

21         (B) for which decreased demand exists for

22         such a product due to the COVID–19 outbreak;

23         and

24         (C) the repurposing of which would be im-

25         practical for grocery or retail sale.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003035

731

1       (4) STATE.—The term "State" has the mean-

2   ing given the term in section 203D of the Emer-

3   gency Food Assistance Act of 1983 (7 U.S.C. 7507).

4       (5) STATE AGENCY.—The term "State agency"

5   has the meaning given the term in section 203D of

6   the Emergency Food Assistance Act of 1983 (7

7   U.S.C. 7507).

8   (b) ENHANCED PROJECTS.—

9       (1) IN GENERAL.—Subject to paragraphs (3)

10   and (4), using funds made available under sub-

11   section (d), the Secretary may provide funds to

12   States to pay for harvesting, processing, packaging,

13   or transportation costs of carrying out a project.

14       (2) GUIDANCE.—Not later than 30 days after

15   the date of enactment of this Act, the Secretary

16   shall issue guidance to States—

17       (A) to carry out this section;

18       (B) to inform States of their allocations

19      under paragraph (3); and

20       (C) to encourage States to carry out

21      projects that work with agricultural producers,

22      processors, and distributors with priority agri-

23      cultural products.

24   (3) ALLOCATION.—

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003036

732

1   (A) ELIGIBILITY FOR ALLOCATION.—The
2   Secretary shall allocate funds made available
3   under subsection (d) based on the formula in
4   effect under section 214(a) of the Emergency
5   Food Assistance Act of 1983 (7 U.S.C.
6   7515(a)), among States that timely submit a
7   State plan of operation for a project that in-
8   cludes—

9       (i) a list of emergency feeding organi-
10      zations in the State that will operate the
11      project in partnership with the State agen-
12      cy;

13      (ii) at the option of the State, a list
14      of priority agricultural products located in
15      the State that are for donation to emer-
16      gency feeding organizations and ready for
17      transport;

18      (iii) a description of how the project
19      will meet the purposes described in section
20      203D(d)(3) of the Emergency Food Assist-
21      ance Act of 1983 (7 U.S.C. 7507(d)(3));
22      and

23      (iv) a timeline of when the project will
24      begin operating.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003037

733

1         (B) REALLOCATION.—If the Secretary de-
2 termines that a State will not expend all the
3 funds allocated to the State under subpara-
4 graph (A), the Secretary shall reallocate the un-
5 expended funds to other eligible States.

6         (C) REPORT.—Each State that receives
7 funds allocated under this paragraph shall sub-
8 mit to the Secretary financial reports on a reg-
9 ular basis describing the use of the funds.

10 (4) USE OF FUNDS.—

11         (A) IN GENERAL.—A State that receives
12 funds under section 203D(d)(5) of the Emer-
13 gency Food Assistance Act of 1983 (7 U.S.C.
14 7507(d)(5)) may—

15             (i) receive funds under this section;
16 and

17             (ii) use funds received under this sec-
18 tion—

19                 (I) to expand projects for which
20 funds are received under such section
21 203D(d)(5);

22                 (II) to carry out new projects
23 with agricultural producers, proc-
24 essors, or distributors participating in

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003038

734

1        projects for which funds are received

2        under such section 203D(d)(5); and

3            (III) to carry out projects with

4        agricultural producers, processors, or

5        distributors not participating in

6        projects for which funds are received

7        under such section 203D(d)(5).

8      (B) FEDERAL SHARE.—Funds received

9    under this section shall not be subject to the

10    Federal share limitation described in section

11    203D(d)(2)(B) of the Emergency Food Assist-

12    ance Act of 1983 (7 U.S.C. 7507(d)(2)(B)).

13  (c) COOPERATIVE AGREEMENTS.—

14    (1) IN GENERAL.—A State agency that carries

15  out a project using Federal funds received under

16  this section may enter into cooperative agreements

17  with State agencies of other States under section

18  203B(d) of the Emergency Food Assistance Act of

19  1983 (7 U.S.C. 7507(d)) to maximize the use of

20  commodities donated under the project.

21    (2) SUBMISSION.—Not later than 15 days after

22  entering into a cooperative agreement under para-

23  graph (1), a State agency shall submit such agree-

24  ment to the Secretary.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003039

735

1     (d) APPROPRIATION OF FUNDS.—Out of funds in the
2 Treasury not otherwise appropriated, there is appro-
3 priated to carry out this section $25,000,000 to remain
4 available until the September 30, 2021.

5     (e) PUBLIC AVAILABILITY.—Not later than 10 days
6 after the date of the receipt or issuance of each document
7 listed in paragraphs (1), (2), or (3) of this subsection, the
8 Secretary shall make publicly available on the website of
9 the Department of Agriculture the following documents:

10        (1) Any guidance issued under subsection
11        (b)(2).

12        (2) A State plan of operation or report sub-
13        mitted in accordance with subsection (b)(3).

14        (3) A cooperative agreement submitted in ac-
15        cordance with subsection (c).

16 **SEC. 60603. EMERGENCY FOOD ASSISTANCE PROGRAM**
17            **FLEXIBILITIES.**

18     (a) IN GENERAL.—Notwithstanding any other provi-
19 sion of law, the Secretary of Agriculture shall issue guid-
20 ance to waive the non-Federal match requirement under
21 section 204(a)(4)(A) of the Emergency Food Assistance
22 Act of 1983 for funding appropriated in title I of division
23 A of this Act for costs associated with the distribution of
24 commodities.

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003040

736

1    (b) PUBLIC AVAILABILITY.—The Secretary shall
2  make available the guidance document issued under sub-
3  section (a) on the public website of the Department of Ag-
4  riculture not later than 10 days after the date of the
5  issuance of such guidance.

6    (c) EFFECTIVE PERIOD.—The authority under this
7  section shall expire 30 days after the termination of the
8  COVID–19 public health emergency.

9  **SEC. 60604. FLEXIBILITIES FOR SENIOR FARMERS' MARKET**
10       **PROGRAM.**

11    (a) AUTHORITY TO MODIFY OR WAIVE RULES.—
12  Notwithstanding any other provision of law and if re-
13  quested by a State agency, the Secretary of Agriculture
14  may modify or waive any rule issued under section 4402
15  of the Farm Security and Rural Investment Act of 2002
16  (7 U.S.C. 3007) that applies to such State agency if the
17  Secretary determines that—

18       (1) such State agency is unable to comply with
19     such rule as a result of COVID–19, and

20       (2) the requested modification or waiver is nec-
21     essary to enable such State agency to provide assist-
22     ance to low-income seniors under such section.

23    (b) PUBLIC AVAILABILITY.—Not later than 10 days
24  after the date of the receipt or issuance of each document
25  listed in paragraphs (1) and (2) of this subsection, the

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003041

1 Secretary shall make publicly available on the website of

2 the Department of Agriculture the following documents:

3     (1) Any request submitted by State agencies

4     under subsection (a).

5     (2) The Secretary's approval or denial of each

6     such request.

7     (c) DEFINITION OF STATE AGENCY.—The term

8 "State agency" has the meaning given such term in sec-

9 tion 249.2 of 18 title 7 of the Code of Federal Regula-

10 tions.

11     (d) EFFECTIVE PERIOD.—Subsection (a) shall be in

12 effect during the period that begins on the date of the

13 enactment of this Act and ends 30 days after the termi-

14 nation of the COVID–19 public health emergency.

15 **SEC. 60605. FLEXIBILITIES FOR THE FOOD DISTRIBUTION**

16     **PROGRAM ON INDIAN RESERVATIONS.**

17     (a) WAIVER OF NON-FEDERAL SHARE REQUIRE-

18 MENT.—Funds provided in division B of the Coronavirus

19 Aid, Relief, and Economic Security Act (Public Law 116–

20 136) for the food distribution program on Indian reserva-

21 tions authorized by section 4(b) of the Food and Nutrition

22 Act of 2008 (7 U.S.C. 2013(b)) shall not be subject to

23 the payment of the non-Federal share requirement de-

24 scribed in section 4(b)(4)(A) of such Act (7 U.S.C.

25 2013(b)(4)(A)).

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003042

738

1 (b) FLEXIBILITIES FOR CERTAIN HOUSEHOLDS.—

2 (1) IN GENERAL.—Notwithstanding any other
3 provision of law, the Secretary of Agriculture may
4 issue guidance to waive or adjust section 4(b)(2)(C)
5 of the Food and Nutrition Act of 2008 (7 U.S.C.
6 2013(b)(2)(C)) for any Tribal organization (as de-
7 fined in section 3(v) of such Act (7 U.S.C. 2012(v)),
8 or for an appropriate State agency administering the
9 program established under section 4(b) of such Act
10 (7 U.S.C. 2013(b)), to ensure that households on
11 the Indian reservation who are participating in the
12 supplemental nutrition assistance program and who
13 are unable to access approved retail food stores due
14 to the outbreak of COVID–19 have access to com-
15 modities distributed under section 4(b) of such Act.

16 (2) PUBLIC AVAILABILITY.—The Secretary
17 shall make available the guidance document issued
18 under paragraph (1) on the public website of the
19 Department of Agriculture not later than 10 days
20 after the date of the issuance of such guidance.

21 (3) SUNSET.—The authority under this sub-
22 section shall expire 30 days after the termination of
23 the COVID–19 public health emergency.

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003043

739

1  **SEC. 60606. SUPPLEMENTAL NUTRITION ASSISTANCE PRO-**

2     **GRAM.**

3     (a) VALUE OF BENEFITS.—Notwithstanding any

4  other provision of law, beginning on June 1, 2020, and

5  for each subsequent month through September 30, 2021,

6  the value of benefits determined under section 8(a) of the

7  Food and Nutrition Act of 2008 (7 U.S.C. 2017(a)), and

8  consolidated block grants for Puerto Rico and American

9  Samoa determined under section 19(a) of such Act (7

10  U.S.C. 2028(a)), shall be calculated using 115 percent of

11  the June 2019 value of the thrifty food plan (as defined

12  in section 3 of such Act (7 U.S.C. 2012)) if the value of

13  the benefits and block grants would be greater under that

14  calculation than in the absence of this subsection.

15     (b) MINIMUM AMOUNT.—

16        (1) IN GENERAL.—The minimum value of bene-

17     fits determined under section 8(a) of the Food and

18     Nutrition Act of 2008 (7 U.S.C. 2017(a)) for a

19     household of not more than 2 members shall be $30.

20        (2) EFFECTIVENESS.—Paragraph (1) shall re-

21     main in effect until the date on which 8 percent of

22     the value of the thrifty food plan for a household

23     containing 1 member, rounded to the nearest whole

24     dollar increment, is equal to or greater than $30.

25     (c) REQUIREMENTS FOR THE SECRETARY.—In car-

26  rying out this section, the Secretary shall—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003044

740

1    (1) consider the benefit increases described in
2    each of subsections (a) and (b) to be a "mass
3    change";
4    (2) require a simple process for States to notify
5    households of the increase in benefits;
6    (3) consider section 16(c)(3)(A) of the Food
7    and Nutrition Act of 2008 (7 U.S.C. 2025(c)(3)(A))
8    to apply to any errors in the implementation of this
9    section, without regard to the 120-day limit de-
10   scribed in that section;
11   (4) disregard the additional amount of benefits
12   that a household receives as a result of this section
13   in determining the amount of overissuances under
14   section 13 of the Food and Nutrition Act of 2008
15   (7 U.S.C. 2022); and
16   (5) set the tolerance level for excluding small
17   errors for the purposes of section 16(c) of the Food
18   and Nutrition Act of 2008 (7 U.S.C. 2025(c)) at
19   $50 through September 30, 2021.
20   (d) PROVISIONS FOR IMPACTED WORKERS.—Not-
21   withstanding any other provision of law, the requirements
22   under subsections (d)(1)(A)(ii) and (o) of section 6 of the
23   Food and Nutrition Act of 2008 (7 U.S.C. 2015) shall
24   not be in effect during the period beginning on June 1,

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003045

741

1 2020, and ending 2 years after the date of enactment of

2 this Act.

3     (e) ADMINISTRATIVE EXPENSES.—

4         (1) IN GENERAL.—For the costs of State ad-

5     ministrative expenses associated with carrying out

6     this section and administering the supplemental nu-

7     trition assistance program established under the

8     Food and Nutrition Act of 2008 (7 U.S.C. 2011 et

9     seq.), the Secretary shall make available

10     $150,000,000 for fiscal year 2020 and

11     $150,000,000 for fiscal year 2021.

12         (2) TIMING FOR FISCAL YEAR 2020.—Not later

13     than 60 days after the date of the enactment of this

14     Act, the Secretary shall make available to States

15     amounts for fiscal year 2020 under paragraph (1).

16         (3) ALLOCATION OF FUNDS.—Funds described

17     in paragraph (1) shall be made available as grants

18     to State agencies for each fiscal year as follows:

19         (A) 75 percent of the amounts available

20         for each fiscal year shall be allocated to States

21         based on the share of each State of households

22         that participate in the supplemental nutrition

23         assistance program as reported to the Depart-

24         ment of Agriculture for the most recent 12-

25         month period for which data are available, ad-

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003046

742

1 justed by the Secretary (as of the date of the

2 enactment of this Act) for participation in dis-

3 aster programs under section 5(h) of the Food

4 and Nutrition Act of 2008 (7 U.S.C. 2014(h));

5 and

6     (B) 25 percent of the amounts available

7 for each fiscal year shall be allocated to States

8 based on the increase in the number of house-

9 holds that participate in the supplemental nu-

10 trition assistance program as reported to the

11 Department of Agriculture over the most recent

12 12-month period for which data are available,

13 adjusted by the Secretary (as of the date of the

14 enactment of this Act) for participation in dis-

15 aster programs under section 5(h) of the Food

16 and Nutrition Act of 2008 (7 U.S.C. 2014(h)).

17 (f) SNAP RULES.—No funds (including fees) made

18 available under this Act or any other Act for any fiscal

19 year may be used to finalize, implement, administer, en-

20 force, carry out, or otherwise give effect to—

21     (1) the final rule entitled "Supplemental Nutri-

22 tion Assistance Program: Requirements for Able-

23 Bodied Adults Without Dependents" published in

24 the Federal Register on December 5, 2019 (84 Fed.

25 Reg. 66782);

743

1          (2) the proposed rule entitled "Revision of Cat-
2     egorical Eligibility in the Supplemental Nutrition
3     Assistance Program (SNAP)" published in the Fed-
4     eral Register on July 24, 2019 (84 Fed. Reg.
5     35570); or

6          (3) the proposed rule entitled "Supplemental
7     Nutrition Assistance Program: Standardization of
8     State Heating and Cooling Standard Utility Allow-
9     ances" published in the Federal Register on October
10    3, 2019 (84 Fed. Reg. 52809).

11    (g) CERTAIN EXCLUSIONS FROM SNAP INCOME.—
12 A Federal pandemic unemployment compensation pay-
13 ment made to an individual under section 2104 of the
14 CARES Act (Public Law 116–136) shall not be regarded
15 as income and shall not be regarded as a resource for the
16 month of receipt and the following 9 months, for the pur-
17 pose of determining eligibility for such individual or any
18 other individual for benefits or assistance, or the amount
19 of benefits or assistance, under any programs authorized
20 under the Food and Nutrition Act of 2008 (7 U.S.C. 2011
21 et seq.).

22    (h) PUBLIC AVAILABILITY.—Not later than 10 days
23 after the date of the receipt or issuance of each document
24 listed below, the Secretary shall make publicly available

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003048

744

1 on the website of the Department of Agriculture the fol-

2 lowing documents:

3     (1) Any State agency request to participate in

4     the supplemental nutrition assistance program on-

5     line program under section 7(k).

6     (2) Any State agency request to waive, adjust,

7     or modify statutory or regulatory requirements

8     under the Food and Nutrition Act of 2008 related

9     to the COVID–19 outbreak.

10     (3) The Secretary's approval or denial of each

11     such request under paragraphs (1) or (2).

12 (i) FUNDING.—There are hereby appropriated to the

13 Secretary, out of any money not otherwise appropriated,

14 such sums as may be necessary to carry out this section.

**15 SEC. 60607. SNAP HOT FOOD PURCHASES.**

16 During the period beginning 10 days after the date

17 of the enactment of this Act and ending on the termi-

18 nation date of the COVID–19 public health emergency,

19 the term ''food'', as defined in section 3 of the Food and

20 Nutrition Act of 2008 (7 U.S.C. 2012), shall be deemed

21 to exclude ''hot foods or hot food products ready for imme-

22 diate consumption other than those authorized pursuant

23 to clauses (3), (4), (5), (7), (8), and (9) of this sub-

24 section,'' for purposes of such Act, except that such exclu-

25 sion is limited to retail food stores authorized to accept

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003049

745

1   and redeem supplemental nutrition assistance program

2   benefits as of the date of enactment of this Act.

**SEC. 60608. SNAP NUTRITION EDUCATION FLEXIBILITY.**

4       (a) IN GENERAL.—Notwithstanding any other provi-

5   sion of law, the Secretary may issue nationwide guidance

6   to allow funding allocated under section 28 of the Food

7   and Nutrition Act (7 U.S.C. 2036a) to be used for individ-

8   uals distributing food in a non-congregate setting under

9   commodity distribution programs and child nutrition pro-

10  grams administered by the Food and Nutrition Service of

11  the Department of Agriculture in States affected by the

12  COVID–19 outbreak, provided that any individuals who

13  distribute school meals under—

14          (1) the school lunch program established under

15      the Richard B. Russell National School Lunch Act

16      (42 U.S.C. 1751 et seq.); and

17          (2) the school breakfast program established

18      under section 4 of the Child Nutrition Act of 1966

19      (42 U.S.C. 1773);

20  using funds allocated under section 28 of the Food and

21  Nutrition Act of 2008 (7 U.S.C. 2036a) supplement, not

22  supplant, individuals who are employed by local edu-

23  cational authorities as of the date of enactment of this

24  Act.

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003050

G:\CMTE\AP\16\FY20\_D\HEROES.XML

746

1      (b) SUNSET.—The authority for this section shall ex-

2  pire 30 days after the COVID–19 public health emergency

3  is terminated.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003051

747

# DIVISION G—ACCOUNTABILITY AND GOVERNMENT OPERATIONS
# TITLE I—ACCOUNTABILITY

**SEC. 70101. MEMBERSHIP OF THE PANDEMIC RESPONSE ACCOUNTABILITY COMMITTEE.**

Section 15010(c) of the CARES Act (Public Law 116–136) is amended—

(1) in paragraph (1), by striking "and (D)" and inserting "(D), and (E)"; and

(2) in paragraph (2)(E), by inserting "of the Council" after "Chairperson".

**SEC. 70102. CONGRESSIONAL NOTIFICATION OF CHANGE IN STATUS OF INSPECTOR GENERAL.**

(a) CHANGE IN STATUS OF INSPECTOR GENERAL OF OFFICES.—Section 3(b) of the Inspector General Act of 1978 (5 U.S.C. App.) is amended—

(1) by inserting ", is placed on paid or unpaid non-duty status," after "is removed from office";

(2) by inserting ", change in status," after "any such removal"; and

(3) by inserting ", change in status," after "before the removal".

(b) CHANGE IN STATUS OF INSPECTOR GENERAL OF DESIGNATED FEDERAL ENTITIES.—Section 8G(e)(2) of

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003052

748

1 the Inspector General Act of 1978 (5 U.S.C. App.) is

2 amended—

3       (1) by inserting ", is placed on paid or unpaid

4    non-duty status," after "office";

5       (2) by inserting ", change in status," after

6    "any such removal"; and

7       (3) by inserting ", change in status," after "be-

8    fore the removal".

9    (c) EFFECTIVE DATE.—The amendments made by

10 this section shall take effect 30 days after the date of the

11 enactment of this Act.

12 **SEC. 70103. PRESIDENTIAL EXPLANATION OF FAILURE TO**

13                    **NOMINATE AN INSPECTOR GENERAL.**

14    (a) IN GENERAL.—Subchapter III of chapter 33 of

15 title 5, United States Code, is amended by inserting after

16 section 3349d the following new section:

17 **"§ 3349e. Presidential explanation of failure to nomi-**

18                    **nate an Inspector General**

19    "If the President fails to make a formal nomination

20 for a vacant Inspector General position that requires a for-

21 mal nomination by the President to be filled within the

22 period beginning on the date on which the vacancy oc-

23 curred and ending on the day that is 210 days after that

24 date, the President shall communicate, within 30 days

25 after the end of such period, to Congress in writing—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003053

749

1  ''(1) the reasons why the President has not yet

2  made a formal nomination; and

3  ''(2) a target date for making a formal nomina-

4  tion.''.

5 (b) CLERICAL AMENDMENT.—The table of sections

6 for chapter 33 of title 5, United States Code, is amended

7 by inserting after the item relating to 3349d the following

8 new item:

''3349e. Presidential explanation of failure to nominate an Inspector General.''.

9 (c) EFFECTIVE DATE.—The amendment made by

10 subsection (a) shall take effect on the date of the enact-

11 ment of this Act and shall apply to any vacancy first oc-

12 curring on or after that date.

**13 SEC. 70104. INSPECTOR GENERAL INDEPENDENCE.**

14 (a) SHORT TITLE.—This section may be cited as the

15 ''Inspector General Independence Act''.

16 (b) AMENDMENT.—The Inspector General Act of

17 1978 (5 U.S.C. App.) is amended—

18  (1) in section 3(b)—

19   (A) by striking ''An Inspector General''

20   and inserting ''(1) An Inspector General'';

21   (B) by inserting after ''by the President''

22   the following: ''in accordance with paragraph

23   (2)''; and

24   (C) by inserting at the end the following

25   new paragraph:

DOC_0003054

G:\CMTE\AP\16\FY20\_D\HEROES.XML

750

1        "(2) The President may remove an Inspector

2    General only for any of the following grounds:

3            "(A) Permanent incapacity.

4            "(B) Inefficiency.

5            "(C) Neglect of duty.

6            "(D) Malfeasance.

7            "(E) Conviction of a felony or conduct in-

8        volving moral turpitude.

9            "(F) Knowing violation of a law, rule, or

10        regulation.

11            "(G) Gross mismanagement.

12            "(H) Gross waste of funds.

13            "(I) Abuse of authority."; and

14        (2) in section 8G(e)(2), by adding at the end

15    the following new sentence: "An Inspector General

16    may be removed only for any of the following

17    grounds:

18            "(A) Permanent incapacity.

19            "(B) Inefficiency.

20            "(C) Neglect of duty.

21            "(D) Malfeasance.

22            "(E) Conviction of a felony or conduct in-

23        volving moral turpitude.

24            "(F) Knowing violation of a law, rule, or

25        regulation.

g:\VHLC\051220\051220.072.xml        (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003055

751

1          ''(G) Gross mismanagement.

2          ''(H) Gross waste of funds.

3          ''(I) Abuse of authority.''.

**4  SEC. 70105. USPS INSPECTOR GENERAL OVERSIGHT RE-**

**5          SPONSIBILITIES.**

6          The Inspector General of the United States Postal

7  Service shall—

8          (1) conduct oversight, audits, and investigations

9      of projects and activities carried out with funds pro-

10     vided in division A of this Act to the United States

11     Postal Service; and

12         (2) not less than 90 days after the Postal Serv-

13     ice commences use of funding provided by division A

14     of this Act, and annually thereafter, initiate an audit

15     of the Postal Service's use of appropriations and

16     borrowing authority provided by any division of this

17     Act, including the use of funds to cover lost reve-

18     nues, costs due to COVID–19, and expenditures,

19     and submit a copy of such audit to the Committee

20     on Homeland Security and Governmental Affairs of

21     the Senate, the Committee on Oversight and Reform

22     of the House of Representatives, and the Commit-

23     tees on Appropriations of the House of Representa-

24     tives and the Senate.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003056

752

1     TITLE II—CENSUS MATTERS

2     **SEC. 70201. MODIFICATION OF 2020 CENSUS DEADLINES**

3                 **AND TABULATION OF POPULATION.**

4         (a) DEADLINE MODIFICATION.—Notwithstanding the

5     timetables provided in sections 141(b) and (c) of title 13,

6     United States Code, and section 22(a) of the Act entitled

7     "An Act to provide for the fifteenth and subsequent decen-

8     nial censuses and to provide for an apportionment of Rep-

9     resentatives in Congress", approved June 18, 1929 (2

10    U.S.C. 2a(a)), for the 2020 decennial census of the popu-

11    lation—

12        (1) the tabulation of total population by States

13        required by section 141(a) of such title for the ap-

14        portionment of Representatives in Congress among

15        the several States shall be completed and reported

16        by the Secretary to the President within 13 months

17        after the decennial census date of April 1, 2020, and

18        shall be made public by the Secretary no later than

19        the date on which it is reported to the President;

20        (2) the President shall transmit to the Congress

21        a statement showing the whole number of persons in

22        each State, and the number of Representatives to

23        which each State would be entitled under an appor-

24        tionment of the then existing number of Representa-

25        tives, as required by such section 22(a), and deter-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003057

753

1   mined solely as described therein, within 14 days

2   after receipt of the tabulation reported by the Sec-

3   retary; and

4   (3) the tabulations of populations required by

5   section 141(c) of such title shall be completed by the

6   Secretary as expeditiously as possible after the cen-

7   sus date of April 1, 2020, taking into account each

8   State's deadlines for legislative apportionment or

9   districting, and reported to the Governor of the

10  State involved and to the officers or public bodies

11  having responsibility for legislative apportionment or

12  districting of such State, except that such tabula-

13  tions of population of each State requesting a tab-

14  ulation plan, and basic tabulations of population of

15  each other State, shall be completed, reported, and

16  transmitted to each respective State within 16

17  months after the decennial census date of April 1,

18  2020.

19  (b) QUALITY.—Data products and tabulations pro-

20  duced by the Bureau of the Census pursuant to sections

21  141(b) or (c) of title 13, United States Code, in connection

22  with the 2020 decennial census shall meet the same or

23  higher data quality standards as similar products pro-

24  duced by the Bureau of the Census in connection with the

25  2010 decennial census.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003058

754

**SEC. 70202. REPORTING REQUIREMENTS FOR 2020 CENSUS.**

1    On the first day of each month during the period be-

2  tween the date of enactment of this Act and July 1, 2021,

3  the Director of the Bureau of the Census shall submit,

4  to the Committee on Oversight and Reform of the House

5  of Representatives, the Committee on Homeland Security

6  and Governmental Affairs of the Senate, and the Commit-

7  tees on Appropriations of the House and the Senate, a

8  report regarding the 2020 decennial census of population

9  containing the following information:

10      (1) The total number of field staff, sorted by

11      category, hired by the Bureau compared to the num-

12      ber of field staff the Bureau estimated was nec-

13      essary to carry out such census.

14      (2) Retention rates of such hired field staff.

15      (3) Average wait time for call center calls and

16      average wait time for each language provided.

17      (4) Anticipated schedule of such census oper-

18      ations.

19      (5) Total tabulated responses, categorized by

20      race and Hispanic origin.

21      (6) Total appropriations available for obligation

22      for such census and a categorized list of total dis-

23      bursements.

24      (7) Non-Response Follow-Up completion rates

25      by geographic location.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003059

755

1   (8) Update/Enumerate and Update/Leave com-
2   pletion rates by geographic location.

3   (9) Total spending to date on media, advertise-
4   ments, and partnership specialists, including a geo-
5   graphic breakdown of such spending.

6   (10) Post-enumeration schedule and subsequent
7   data aggregation and delivery progress.

## SEC. 70203. PROVIDING BUREAU OF THE CENSUS ACCESS TO INFORMATION FROM INSTITUTIONS OF HIGHER EDUCATION.

11   (a) IN GENERAL.—Notwithstanding any other provi-
12   sion of law, including section 444 of the General Edu-
13   cation Provisions Act (commonly known as the "Family
14   Educational Rights and Privacy Act of 1974"), an institu-
15   tion of higher education may, in furtherance of a full and
16   accurate decennial census of population count, provide to
17   the Bureau of the Census information requested by the
18   Bureau for purposes of enumeration for the 2020 decen-
19   nial census of population.

20   (b) APPLICATION.—

21   (1) INFORMATION.—Only information requested
22   on the official 2020 decennial census of population
23   form may be provided to the Bureau of the Census
24   pursuant to this section. No institution of higher
25   education may provide any information to the Bu-

DOC_0003060

756

1    reau on the immigration or citizenship status of any

2    individual.

3    (2) NOTICE REQUIRED.—Before information

4    can be provided to the Bureau, the institution of

5    higher education shall give public notice of the cat-

6    egories of information which it plans to provide and

7    shall allow 10 days after such notice has been given

8    for a student to inform the institution that any or

9    all of the information designated should not be re-

10   leased without the student's prior consent. No insti-

11   tution of higher education shall provide the Bureau

12   with the information of any individual who has ob-

13   jected to the provision of such information.

14   (3) USE OF INFORMATION.—Information pro-

15   vided to the Bureau pursuant to this section may

16   only be used for the purposes of enumeration for the

17   2020 decennial census of population.

18   (c) DEFINITION OF INSTITUTION OF HIGHER EDU-

19   CATION.—In this section, the term "institution of higher

20   education" has the meaning given that term in section 102

21   of the Higher Education Act of 1965 (20 U.S.C. 1002).

22   (d) SUNSET.—The authority provided in this section

23   shall expire at the conclusion of 2020 census operations.

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003061

757

1    **SEC. 70204. LIMITATION ON TABULATION OF CERTAIN**
2          **DATA.**

3        (a) LIMITATION.—The Bureau of the Census may

4    not compile or produce any data product or tabulation as

5    part of, in combination with, or in connection with, the

6    2020 decennial census of population or any such census

7    data produced pursuant to section 141(c) of title 13,

8    United States Code, that is based in whole or in part on

9    data that is not collected in such census.

10       (b) EXCEPTION.—The limitation in subsection (a)

11   shall not apply to any data product or tabulation that is

12   required by sections 141(b) or (c) of such title, that uses

13   the same or substantially similar methodology and data

14   sources as a decennial census data product produced by

15   the Bureau of the Census before January 1, 2019, or that

16   uses a methodology and data sources that the Bureau of

17   the Census finalized and made public prior to January 1,

18   2018.

19       TITLE III—FEDERAL WORKFORCE

20   **SEC. 70301. COVID–19 TELEWORKING REQUIREMENTS FOR**

21          **FEDERAL EMPLOYEES.**

22       (a) MANDATED TELEWORK.—

23           (1) IN GENERAL.—Effective immediately upon

24       the date of enactment of this Act, the head of any

25       Federal agency shall require any employee of such

26       agency who is authorized to telework under chapter

758

1    65 of title 5, United States Code, or any other provi-
2    sion of law to telework during the period beginning
3    on the date of enactment of this Act and ending on
4    December 31, 2020.

5        (2) DEFINITIONS.—In this subsection—
6            (A) the term "employee" means—
7                (i) an employee of the Library of Con-
8            gress;
9                (ii) an employee of the Government
10           Accountability Office;
11               (iii) a covered employee as defined in
12           section 101 of the Congressional Account-
13           ability Act of 1995 (2 U.S.C. 1301), other
14           than an applicant for employment;
15               (iv) a covered employee as defined in
16           section 411(c) of title 3, United States
17           Code;
18               (v) a Federal officer or employee cov-
19           ered under subchapter V of chapter 63 of
20           title 5, United States Code; or
21               (vi) any other individual occupying a
22           position in the civil service (as that term is
23           defined in section 2101(1) of title 5,
24           United States Code); and

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003063

759

1      (B) the term "telework" has the meaning

2      given that term in section 6501(3) of such title.

3  (b) TELEWORK PARTICIPATION GOALS.—Chapter 65

4 of title 5, United States Code, is amended as follows:

5      (1) In section 6502—

6      (A) in subsection (b)—

7         (i) in paragraph (4), by striking

8         "and" at the end;

9         (ii) in paragraph (5), by striking the

10        period at the end and inserting a semi-

11        colon; and

12         (iii) by adding at the end the fol-

13        lowing:

14      "(6) include annual goals for increasing the

15 percent of employees of the executive agency partici-

16 pating in teleworking—

17        "(A) three or more days per pay period;

18        "(B) one or 2 days per pay period;

19        "(C) once per month; and

20        "(D) on an occasional, episodic, or short-

21        term basis; and

22      "(7) include methods for collecting data on, set-

23 ting goals for, and reporting costs savings to the ex-

24 ecutive agency achieved through teleworking, con-

760

1 sistent with the guidance developed under section

2 70302 (c) of the HEROES Act.''; and

3   (B) by adding at the end the following:

4 ''(d) NOTIFICATION FOR REDUCTION IN TELE-

5 WORKING PARTICIPATION.—Not later than 30 days before

6 the date that an executive agency implements or modifies

7 a teleworking plan that would reduce the percentage of

8 employees at the agency who telework, the head of the ex-

9 ecutive agency shall provide written notification, including

10 a justification for the reduction in telework participation

11 and a description of how the agency will pay for any in-

12 creased costs resulting from that reduction, to—

13   ''(1) the Director of the Office of Personnel

14   Management;

15   ''(2) the Committee on Oversight and Reform

16   of the House of Representatives; and

17   ''(3) the Committee on Homeland Security and

18   Governmental Affairs of the Senate.

19 ''(e) PROHIBITION ON AGENCY-WIDE LIMITS ON

20 TELEWORKING.—An agency may not prohibit any delin-

21 eated period of teleworking participation for all employees

22 of the agency, including the periods described in subpara-

23 graphs (A) through (D) of subsection (b)(6). The agency

24 shall make any teleworking determination with respect to

761

1  an employee or group of employees at the agency on a

2  case-by-case basis.''.

3      (2) In section 6506(b)(2)—

4          (A) in subparagraph (F)(vi), by striking

5          ''and'' at the end;

6          (B) in subparagraph (G), by striking the

7          period at the end and inserting a semicolon;

8          and

9          (C) by adding at the end the following:

10          ''(H) agency cost savings achieved through

11          teleworking, consistent with the guidance devel-

12          oped under section 2(c) of the Telework Metrics

13          and Cost Savings Act; and

14          ''(I) a detailed explanation of a plan to in-

15          crease the Government-wide teleworking partici-

16          pation rate above such rate applicable to fiscal

17          year 2016, including agency-level plans to main-

18          tain or imparove such rate for each of the tele-

19          working frequency categories listed under sub-

20          paragraph (A)(iii).''.

21  (c) GUIDANCE.—Not later than 90 days after the

22  date of the enactment of this Act, the Director of the Of-

23  fice of Personnel Management, in collaboration with the

24  Chief Human Capital Officer Council, shall establish uni-

25  form guidance for agencies on how to collect data on, set

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003066

762

1 goals for, and report cost savings achieved through, tele-
2 working. Such guidance shall account for cost savings re-
3 lated to travel, energy use, and real estate.

4    (d) TECHNICAL CORRECTION.—Section 6506(b)(1)
5 of title 5, United States Code, is amended by striking
6 "with Chief" and inserting "with the Chief".

## SEC. 70302. RETIREMENT FOR CERTAIN EMPLOYEES.

8    (a) CSRS.—Section 8336(c) of title 5, United States
9 Code, is amended by adding at the end the following:

10        "(3)(A) In this paragraph—

11            "(i) the term 'affected individual'
12        means an individual covered under this
13        subchapter who—

14            "(I) is performing service in a
15        covered position;

16            "(II) is diagnosed with COVID–
17        19 before the date on which the indi-
18        vidual becomes entitled to an annuity
19        under paragraph (1) of this sub-
20        section or subsection (e), (m), or (n),
21        as applicable;

22            "(III) because of the illness de-
23        scribed in subclause (II), is perma-
24        nently unable to render useful and ef-
25        ficient service in the employee's cov-

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003067

763

1     ered position, as determined by the

2     agency in which the individual was

3     serving when such individual incurred

4     the illness; and

5         ''(IV) is appointed to a position

6         in the civil service that—

7             ''(aa) is not a covered posi-

8             tion; and

9             ''(bb) is within an agency

10             that regularly appoints individ-

11             uals to supervisory or administra-

12             tive positions related to the ac-

13             tivities of the former covered po-

14             sition of the individual;

15         ''(ii) the term 'covered position' means

16     a position as a law enforcement officer,

17     customs and border protection officer, fire-

18     fighter, air traffic controller, nuclear mate-

19     rials courier, member of the Capitol Police,

20     or member of the Supreme Court Police;

21     and

22         ''(iii) the term 'COVID–19' means the

23     2019 Novel Coronavirus or 2019-nCoV.

24     ''(B) Unless an affected individual files an

25     election described in subparagraph (E), cred-

DOC_0003068

764

1   itable service by the affected individual in a po-

2   sition described in subparagraph (A)(i)(IV)

3   shall be treated as creditable service in a cov-

4   ered position for purposes of this chapter and

5   determining the amount to be deducted and

6   withheld from the pay of the affected individual

7   under section 8334.

8       ''(C) Subparagraph (B) shall only apply if

9   the affected employee transitions to a position

10   described in subparagraph (A)(i)(IV) without a

11   break in service exceeding 3 days.

12       ''(D) The service of an affected individual

13   shall no longer be eligible for treatment under

14   subparagraph (B) if such service occurs after

15   the individual—

16           ''(i) is transferred to a supervisory or

17       administrative position related to the ac-

18       tivities of the former covered position of

19       the individual; or

20           ''(ii) meets the age and service re-

21       quirements that would subject the indi-

22       vidual to mandatory separation under sec-

23       tion 8335 if such individual had remained

24       in the former covered position.

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003069

765

1          "(E) In accordance with procedures estab-
2      lished by the Director of the Office of Personnel
3      Management, an affected individual may file an
4      election to have any creditable service per-
5      formed by the affected individual treated in ac-
6      cordance with this chapter without regard to
7      subparagraph (B).

8          "(F) Nothing in this paragraph shall be
9      construed to apply to such affected individual
10     any other pay-related laws or regulations appli-
11     cable to a covered position.".

12  (b) FERS.—

13      (1) IN GENERAL.—Section 8412(d) of title 5,
14  United States Code, is amended—

15          (A) by redesignating paragraphs (1) and
16      (2) as subparagraphs (A) and (B), respectively;

17          (B) by inserting "(1)" before "An em-
18      ployee"; and

19          (C) by adding at the end the following:

20      "(2)(A) In this paragraph—

21              "(i) the term 'affected individual'
22          means an individual covered under this
23          chapter who—

24                  "(I) is performing service in a
25              covered position;

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003070

766

1      "(II) is diagnosed with COVID–

2      19 before the date on which the indi-

3      vidual becomes entitled to an annuity

4      under paragraph (1) of this sub-

5      section or subsection (e), as applica-

6      ble;

7      "(III) because of the illness de-

8      scribed in subclause (II), is perma-

9      nently unable to render useful and ef-

10     ficient service in the employee's cov-

11     ered position, as determined by the

12     agency in which the individual was

13     serving when such individual incurred

14     the illness; and

15     "(IV) is appointed to a position

16     in the civil service that—

17          "(aa) is not a covered posi-

18          tion; and

19          "(bb) is within an agency

20          that regularly appoints individ-

21          uals to supervisory or administra-

22          tive positions related to the ac-

23          tivities of the former covered po-

24          sition of the individual;

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003071

767

1              "(ii) the term 'covered position' means

2         a position as a law enforcement officer,

3         customs and border protection officer, fire-

4         fighter, air traffic controller, nuclear mate-

5         rials courier, member of the Capitol Police,

6         or member of the Supreme Court Police;

7         and

8              "(iii) the term 'COVID–19' means the

9         2019 Novel Coronavirus or 2019-nCoV.

10        "(B) Unless an affected individual files an

11   election described in subparagraph (E), cred-

12   itable service by the affected individual in a po-

13   sition described in subparagraph (A)(i)(IV)

14   shall be treated as creditable service in a cov-

15   ered position for purposes of this chapter and

16   determining the amount to be deducted and

17   withheld from the pay of the affected individual

18   under section 8422.

19        "(C) Subparagraph (B) shall only apply if

20   the affected employee transitions to a position

21   described in subparagraph (A)(i)(IV) without a

22   break in service exceeding 3 days.

23        "(D) The service of an affected individual

24   shall no longer be eligible for treatment under

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003072

768

1 subparagraph (B) if such service occurs after

2 the individual—

3         "(i) is transferred to a supervisory or

4         administrative position related to the ac-

5         tivities of the former covered position of

6         the individual; or

7         "(ii) meets the age and service re-

8         quirements that would subject the indi-

9         vidual to mandatory separation under sec-

10        tion 8425 if such individual had remained

11        in the former covered position.

12        "(E) In accordance with procedures estab-

13    lished by the Director of the Office of Personnel

14    Management, an affected individual may file an

15    election to have any creditable service per-

16    formed by the affected individual treated in ac-

17    cordance with this chapter without regard to

18    subparagraph (B).

19        "(F) Nothing in this paragraph shall be

20    construed to apply to such affected individual

21    any other pay-related laws or regulations appli-

22    cable to a covered position.".

23        (2) TECHNICAL AND CONFORMING AMEND-

24    MENTS.—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003073

769

1     (A) Chapter 84 of title 5, United States

2     Code, is amended—

3          (i) in section 8414(b)(3), by inserting

4     "(1)" after "subsection (d)";

5          (ii) in section 8415—

6               (I) in subsection (e), in the mat-

7          ter preceding paragraph (1), by in-

8          serting "(1)" after "subsection (d)";

9          and

10               (II) in subsection (h)(2)(A), by

11          striking    "(d)(2)"    and    inserting

12          "(d)(1)(B)";

13          (iii) in section 8421(a)(1), by insert-

14     ing "(1)" after "(d)";

15          (iv) in section 8421a(b)(4)(B)(ii), by

16     inserting "(1)" after "section 8412(d)";

17          (v) in section 8425, by inserting "(1)"

18     after "section 8412(d)" each place it ap-

19     pears; and

20          (vi) in section 8462(c)(3)(B)(ii), by

21     inserting "(1)" after "subsection (d)".

22     (B) Title VIII of the Foreign Service Act

23     of 1980 (22 U.S.C. 4041 et seq.) is amended—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003074

770

1          (i) in section 805(d)(5) (22 U.S.C.

2          4045(d)(5)), by inserting ''(1)'' after ''or

3          8412(d)''; and

4          (ii) in section 812(a)(2)(B) (22

5          U.S.C. 4052(a)(2)(B)), by inserting ''(1)''

6          after ''or 8412(d)''.

7 (c) CIA EMPLOYEES.—Section 302 of the Central In-

8 telligence Agency Retirement Act (50 U.S.C. 2152) is

9 amended by adding at the end the following:

10 ''(d) EMPLOYEES DISABLED ON DUTY.—

11    ''(1) DEFINITIONS.—In this subsection—

12        ''(A) the term 'affected employee' means

13        an employee of the Agency covered under sub-

14        chapter II of chapter 84 of title 5, United

15        States Code, who—

16            ''(i) is performing service in a position

17            designated under subsection (a);

18            ''(ii) is diagnosed with COVID–19 be-

19            fore the date on which the employee be-

20            comes entitled to an annuity under section

21            233 of this Act or section 8412(d)(1) of

22            title 5, United States Code;

23            ''(iii) because of the illness described

24            in clause (ii), is permanently unable to

25            render useful and efficient service in the

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003075

771

1 employee's covered position, as determined

2 by the Director; and

3     ''(iv) is appointed to a position in the

4 civil service that is not a covered position

5 but is within the Agency;

6 ''(B) the term 'covered position' means a

7 position as—

8     ''(i) a law enforcement officer de-

9 scribed in section 8331(20) or 8401(17) of

10 title 5, United States Code;

11     ''(ii) a customs and border protection

12 officer described in section 8331(31) or

13 8401(36) of title 5, United States Code;

14     ''(iii) a firefighter described in section

15 8331(21) or 8401(14) of title 5, United

16 States Code;

17     ''(iv) an air traffic controller described

18 in section 8331(30) or 8401(35) of title 5,

19 United States Code;

20     ''(v) a nuclear materials courier de-

21 scribed in section 8331(27) or 8401(33) of

22 title 5, United States Code;

23     ''(vi) a member of the United States

24 Capitol Police;

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003076

772

1         "(vii) a member of the Supreme Court

2         Police;

3         "(viii) an affected employee; or

4         "(ix) a special agent described in sec-

5       tion 804(15) of the Foreign Service Act of

6       1980 (22 U.S.C. 4044(15)); and

7       "(C) the term 'COVID–19' means the

8     2019 Novel Coronavirus or 2019-nCoV.

9     "(2) TREATMENT OF SERVICE AFTER DIS-

10 ABILITY.—Unless an affected employee files an elec-

11 tion described in paragraph (3), creditable service by

12 the affected employee in a position described in

13 paragraph (1)(A)(iv) shall be treated as creditable

14 service in a covered position for purposes of this Act

15 and chapter 84 of title 5, United States Code, in-

16 cluding eligibility for an annuity under section 233

17 of this Act or 8412(d)(1) of title 5, United States

18 Code, and determining the amount to be deducted

19 and withheld from the pay of the affected employee

20 under section 8422 of title 5, United States Code.

21     "(3) BREAK IN SERVICE.—Paragraph (2) shall

22 only apply if the affected employee transitions to a

23 position described in paragraph (1)(A)(iv) without a

24 break in service exceeding 3 days.

773

1  "(4) LIMITATION ON TREATMENT OF SERV-
2  ICE.—The service of an affected employee shall no
3  longer be eligible for treatment under paragraph (2)
4  if such service occurs after the employee is trans-
5  ferred to a supervisory or administrative position re-
6  lated to the activities of the former covered position
7  of the employee.

8  "(5) OPT OUT.—An affected employee may file
9  an election to have any creditable service performed
10  by the affected employee treated in accordance with
11  chapter 84 of title 5, United States Code, without
12  regard to paragraph (2).".

13  (d) FOREIGN SERVICE RETIREMENT AND DIS-
14  ABILITY SYSTEM.—Section 806(a)(6) of the Foreign Serv-
15  ice Act of 1980 (22 U.S.C. 4046(a)(6)) is amended by
16  adding at the end the following:

17      "(D)(i) In this subparagraph—

18          "(I) the term 'affected special
19          agent' means an individual covered
20          under this subchapter who—

21              "(aa) is performing service
22              as a special agent;

23              "(bb) is diagnosed with
24              COVID–19 before the date on
25              which the individual becomes en-

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003078

774

1    titled to an annuity under section

2    811;

3         ''(cc) because of the illness

4    described in item (bb), is perma-

5    nently unable to render useful

6    and efficient service in the em-

7    ployee's covered position, as de-

8    termined by the Secretary; and

9         ''(dd) is appointed to a posi-

10    tion in the Foreign Service that

11    is not a covered position;

12    ''(II) the term 'covered position'

13    means a position as—

14         ''(aa) a law enforcement of-

15    ficer   described   in   section

16    8331(20) or 8401(17) of title 5,

17    United States Code;

18         ''(bb) a customs and border

19    protection officer described in

20    section 8331(31) or 8401(36) of

21    title 5, United States Code;

22         ''(cc) a firefighter described

23    in section 8331(21) or 8401(14)

24    of title 5, United States Code;

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003079

775

1          ''(dd) an air traffic con-
2      troller described in section
3      8331(30) or 8401(35) of title 5,
4      United States Code;
5          ''(ee) a nuclear materials
6      courier described in section
7      8331(27) or 8401(33) of title 5,
8      United States Code;
9          ''(ff) a member of the
10      United States Capitol Police;
11          ''(gg) a member of the Su-
12      preme Court Police;
13          ''(hh) an employee of the
14      Agency designated under section
15      302(a) of the Central Intelligence
16      Agency Retirement Act (50
17      U.S.C. 2152(a)); or
18          ''(ii) a special agent; and
19          ''(III) the term 'COVID–19'
20      means the 2019 Novel Coronavirus or
21      2019-nCoV.
22      ''(ii) Unless an affected special agent files
23      an election described in clause (iv), creditable
24      service by the affected special agent in a posi-
25      tion described in clause (i)(I)(dd) shall be treat-

DOC_0003080

776

1     ed as creditable service as a special agent for

2     purposes of this subchapter, including deter-

3     mining the amount to be deducted and withheld

4     from the pay of the individual under section

5     805.

6         ''(iii) Clause (ii) shall only apply if the spe-

7     cial agent transitions to a position described in

8     clause (i)(I)(dd) without a break in service ex-

9     ceeding 3 days.

10        ''(iv) The service of an affected employee

11     shall no longer be eligible for treatment under

12     clause (ii) if such service occurs after the em-

13     ployee is transferred to a supervisory or admin-

14     istrative position related to the activities of the

15     former covered position of the employee.

16        ''(v) In accordance with procedures estab-

17     lished by the Secretary, an affected special

18     agent may file an election to have any cred-

19     itable service performed by the affected special

20     agent treated in accordance with this sub-

21     chapter, without regard to clause (ii).''.

22   (e) IMPLEMENTATION.—

23     (1) OFFICE OF PERSONNEL MANAGEMENT.—

24   The Director of the Office of Personnel Management

DOC_0003081

777

1   shall promulgate regulations to carry out the amend-
2   ments made by subsections (a) and (b).

3   (2) CIA EMPLOYEES.—The Director of the
4   Central Intelligence Agency shall promulgate regula-
5   tions to carry out the amendment made by sub-
6   section (c).

7   (3) FOREIGN SERVICE RETIREMENT AND DIS-
8   ABILITY SYSTEM.—The Secretary of State shall pro-
9   mulgate regulations to carry out the amendment
10   made by subsection (d).

11   (4) AGENCY REAPPOINTMENT.—The regula-
12   tions promulgated to carry out the amendments
13   made by this section shall ensure that, to the great-
14   est extent possible, the head of each agency appoints
15   affected employees or special agents to supervisory
16   or administrative positions related to the activities of
17   the former covered position of the employee or spe-
18   cial agent.

19   (5) TREATMENT OF SERVICE.—The regulations
20   promulgated to carry out the amendments made by
21   this section shall ensure that the creditable service
22   of an affected employee or special agent (as the case
23   may be) that is not in a covered position pursuant
24   to an election made under such amendments shall be
25   treated as the same type of service as the covered

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003082

778

1    position in which the employee or agent suffered the

2    qualifying illness.

3    (f) EFFECTIVE DATE; APPLICABILITY.—The amend-

4    ments made by this section—

5        (1) shall take effect on the date of enactment

6        of this section; and

7        (2) shall apply to an individual who suffers an

8        illness described in section 8336(c)(3)(A)(i)(II) or

9        section 8412(d)(2)(A)(i)(II) of title 5, United States

10       Code (as amended by this section), section

11       302(d)(1)(A)(ii) of the Central Intelligence Agency

12       Retirement Act (as amended by this section), or sec-

13       tion 806(a)(6)(D)(i)(I)(bb) of the Foreign Service

14       Act of 1980 (as amended by this section), on or

15       after the date that is 2 years after the date of enact-

16       ment of this section.

17   **SEC. 70303. PRESUMPTION OF ELIGIBILITY FOR WORKERS'**

18           **COMPENSATION BENEFITS FOR FEDERAL**

19           **EMPLOYEES DIAGNOSED WITH**

20           **CORONAVIRUS.**

21   (a) IN GENERAL.—An employee who is diagnosed

22   with COVID–19 during the period described in subsection

23   (b)(2)(A) shall, with respect to any claim made by or on

24   behalf of the employee for benefits under subchapter I of

25   chapter 81 of title 5, United States Code, be deemed to

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003083

G:\CMTE\AP\16\FY20\_D\HEROES.XML

779

1  have an injury proximately caused by exposure to
2  coronavirus arising out of the nature of the employee's em-
3  ployment and be presumptively entitled to such benefits,
4  including disability compensation, medical services, and
5  survivor benefits.

6      (b) DEFINITIONS.—In this section—

7      (1) the term "coronavirus" means SARS–
8      CoV–2 or another coronavirus with pandemic poten-
9      tial; and

10      (2) the term "employee"—

11          (A) means an employee as that term is de-
12          fined in section 8101(1) of title 5, United
13          States Code, (including an employee of the
14          United States Postal Service, the Transpor-
15          tation Security Administration, or the Depart-
16          ment of Veterans Affairs, including any indi-
17          vidual appointed under chapter 73 or 74 of title
18          38, United States Code) employed in the Fed-
19          eral service at anytime during the period begin-
20          ning on January 27, 2020, and ending on Jan-
21          uary 30, 2022—

22              (i) who carried out duties requiring
23              contact with patients, members of the pub-
24              lic, or co-workers; or

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003084

780

1         (ii) whose duties include a risk of ex-
2         posure to the coronavirus; and
3       (B) does not include any employee other-
4       wise covered by subparagraph (A) who is tele-
5       working on a full-time basis during all of such
6       period.

7     TITLE IV—FEDERAL CONTRACTING
8              PROVISIONS

9 **SEC. 70401. MANDATORY TELEWORK.**

10     (a) IN GENERAL.—During the emergency period, the
11 Director of the Office of Management and Budget shall
12 direct agencies to allow telework for all contractor per-
13 sonnel to the maximum extent practicable. Additionally,
14 the Director shall direct contracting officers to document
15 any decision to not allow telework during the emergency
16 period in the contract file.

17     (b) EMERGENCY PERIOD DEFINED.—In this section,
18 the term "emergency period" means the period that—

19       (1) begins on the date that is not later than 15
20       days after the date of the enactment of this Act; and

21       (2) ends on the date that the public health
22       emergency declared pursuant to section 319 of the
23       Public Health Service Act (42 U.S.C. 247d) as re-
24       sult of COVID–19, including any renewal thereof,
25       expires.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003085

781

## SEC. 70402. GUIDANCE ON THE IMPLEMENTATION OF SEC-TION 3610 OF THE CARES ACT.

Not later than 15 days after the date of the enactment of this Act, the Director of the Office of Management and Budget shall issue guidance to ensure uniform implementation across agencies of section 3610 of the CARES Act (Public Law 116–136). Any such guidance shall—

(1) limit the basic requirements for reimbursement to those included in such Act and the effective date for such reimbursement shall be January 31, 2020; and

(2) clarify that the term ''minimum applicable contract billing rates'' as used in such section includes the financial impact incurred as a consequence of keeping the employees or subcontractors of the contractor in a ready state (such as the base hourly wage rate of an employee, plus indirect costs, fees, and general and administrative expenses).

## SEC. 70403. PAST PERFORMANCE RATINGS.

Section 1126 of title 41, United States Code, is amended by adding at the end the following new subsection:

''(c) EXCEPTION FOR FAILURE TO DELIVER GOODS OR COMPLETE WORK DUE TO COVID–19.—If the head of an executive agency determines that a contractor failed

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003086

782

1 to deliver goods or complete work as a result of measures
2 taken as a result of COVID–19 under a contract with the
3 agency by the date or within the time period imposed by
4 the contract, any information relating to such failure may
5 not be—

6      ''(1) included in any past performance database
7      used by executive agencies for making source selec-
8      tion decisions; or

9      ''(2) evaluated unfavorably as a factor of past
10     contract performance.''.

## SEC. 70404. ACCELERATED PAYMENTS.

12     Not later than 10 days after the date of the enact-
13 ment of this Act and ending on the expiration of the public
14 health emergency declared pursuant to section 319 of the
15 Public Health Service Act (42 U.S.C. 247d) as a result
16 of COVID–19, including any renewal thereof, the Director
17 of the Office of Management and Budget shall direct con-
18 tracting officers to establish an accelerated payment date
19 for any prime contract (as defined in section 8701 of title
20 41, United States Code) with payments due 15 days after
21 the receipt of a proper invoice.

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003087

783

1    TITLE V—DISTRICT OF COLUMBIA

2    **SEC. 70501. SPECIAL BORROWING BY THE DISTRICT OF CO-**

3    **LUMBIA.**

4    (a) AUTHORIZING BORROWING UNDER MUNICIPAL

5    LIQUIDITY FACILITY OF FEDERAL RESERVE BOARD AND

6    SIMILAR FACILITIES OR PROGRAMS.—The Council of the

7    District of Columbia (hereafter in this section referred to

8    as the "Council") may by act authorize the issuance of

9    bonds, notes, and other obligations, in amounts deter-

10   mined by the Chief Financial Officer of the District of

11   Columbia to meet cash-flow needs of the District of Co-

12   lumbia government, for purchase by the Board of Gov-

13   ernors of the Federal Reserve under the Municipal Liquid-

14   ity Facility of the Federal Reserve or any other facility

15   or program of the Federal Reserve or another entity of

16   the Federal government which is established in response

17   to the COVID–19 Pandemic.

18   (b) REQUIRING ISSUANCE TO BE COMPETITIVE

19   WITH OTHER FORMS OF BORROWING.—The Council may

20   authorize the issuance of bonds, notes, or other obligations

21   under subsection (a) only if the issuance of such bonds,

22   notes, and other obligations is competitive with other

23   forms of borrowing in the financial market.

24   (c) TREATMENT AS GENERAL OBLIGATION.—Any

25   bond, note, or other obligation issued under subsection (a)

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003088

784

1  shall, if provided in the act of the Council, be a general

2  obligation of the District.

3      (d) PAYMENTS NOT SUBJECT TO APPROPRIATION.—

4  No appropriation is required to pay—

5          (1) any amount (including the amount of any

6      accrued interest or premium) obligated or expended

7      from or pursuant to subsection (a) for or from the

8      sale of any bonds, notes, or other obligation under

9      such subsection;

10          (2) any amount obligated or expended for the

11      payment of principal of, interest on, or any premium

12      for any bonds, notes, or other obligations issued

13      under subsection (a);

14          (3) any amount obligated or expended pursuant

15      to provisions made to secure any bonds, notes, or

16      other obligations issued under subsection (a); or

17          (4) any amount obligated or expended pursuant

18      to commitments, including lines of credit or costs of

19      issuance, made or entered in connection with the

20      issuance of any bonds, notes, or other obligations for

21      operating or capital costs financed under subsection

22      (a).

23      (e) RENEWAL.—Any bond, note, or other obligation

24  issued under subsection (a) may be renewed if authorized

25  by an act of the Council.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003089

785

1    (f) PAYMENT.—Any bonds, notes, or other obliga-
2  tions issued under subsection (a), including any renewal
3  of such bonds, notes, or other obligations, shall be due
4  and payable on such terms and conditions as are con-
5  sistent with the terms and conditions of the Municipal Li-
6  quidity Facility or other facility or program referred to
7  in subsection (a).

8    (g) INCLUSION OF PAYMENTS IN ANNUAL BUDG-
9  ET.—The Council shall provide in each annual budget for
10  the District of Columbia government sufficient funds to
11  pay the principal of and interest on all bonds, notes, or
12  other obligations issued under subsection (a) of this sec-
13  tion becoming due and payable during such fiscal year.

14    (h) OBLIGATION TO PAY.—The Mayor of the District
15  of Columbia shall ensure that the principal of and interest
16  on all bonds, notes, or other obligations issued under sub-
17  section (a) are paid when due, including by paying such
18  principal and interest from funds not otherwise legally
19  committed.

20    (i) SECURITY INTEREST IN DISTRICT REVENUES.—
21  The Council may by act provide for a security interest in
22  any District of Columbia revenues as additional security
23  for the payment of any bond, note, or other obligation
24  issued under subsection (a).

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003090

G:\CMTE\AP\16\FY20\_D\HEROES.XML

786

1          TITLE VI—OTHER MATTERS

2  SEC.   70601.   ESTIMATES   OF   AGGREGATE   ECONOMIC

3          GROWTH ACROSS INCOME GROUPS.

4      (a) SHORT TITLE.—This section may be cited as the

5  ''Measuring Real Income Growth Act of 2020''.

6      (b) DEFINITIONS.—In this section:

7      (1) BUREAU.—The term ''Bureau'' means the

8  Bureau of Economic Analysis of the Department of

9  Commerce.

10      (2) GROSS  DOMESTIC  PRODUCT  ANALYSIS.—

11  The term ''gross domestic product analysis''—

12          (A) means a quarterly or annual analysis

13      conducted by the Bureau with respect to the

14      gross domestic product of the United States;

15      and

16          (B) includes a revision prepared by the

17      Bureau of an analysis described in subpara-

18      graph (A).

19      (3) RECENT ESTIMATE.—The term ''recent es-

20  timate'' means the most recent estimate described in

21  subsection (c) that is available on the date on which

22  the gross domestic product analysis with which the

23  estimate is to be included is conducted.

24      (c) INCLUSION IN REPORTS.—Beginning in 2020, in

25  each gross domestic product analysis conducted by the Bu-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003091

787

1 reau, the Bureau shall include a recent estimate of, with

2 respect to specific percentile groups of income, the total

3 amount that was added to the economy of the United

4 States during the period to which the recent estimate per-

5 tains, including in—

6      (1) each of the 10 deciles of income; and

7      (2) the highest 1 percent of income.

8     (d) AUTHORIZATION OF APPROPRIATIONS.—There

9 are authorized to be appropriated to the Secretary of Com-

10 merce such sums as are necessary to carry out this sec-

11 tion.

12 **SEC. 70602. WAIVER OF MATCHING FUNDS REQUIREMENT**

13           **FOR THE DRUG FREE COMMUNITIES SUP-**

14           **PORT PROGRAM.**

15     The matching funds requirement under paragraphs

16 (1)(A)(i), (1)(A)(iii), and (3)(D) of section 1032(b) of the

17 Anti-Drug Abuse Act of 1988 (21 U.S.C. 1532(b)) may

18 be modified or waived by the Administrator if a grantee

19 or applicant is unable to meet the requirement as a result

20 of the public health emergency declared pursuant to sec-

21 tion 319 of the Public Health Service Act (42 U.S.C.

22 247d) as a result of COVID–19.

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003092

788

1   **SEC. 70603. UNITED STATES POSTAL SERVICE BORROWING**

2                **AUTHORITY.**

3      Subsection (b)(2) of section 6001 of the Coronavirus

4   Aid, Relief, and Economic Security Act (Public Law 116–

5   136) is amended to read as follows:

6           ''(2) the Secretary of the Treasury shall lend up

7       to the amount described in paragraph (1) at the re-

8       quest of the Postal Service subject to the terms and

9       conditions of the note purchase agreement between

10      the Postal Service and the Federal Financing Bank

11      in effect on September 29, 2018.''.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003093

789

# DIVISION H—VETERANS AND SERVICEMEMBERS PROVISIONS

**SEC. 80001. MODIFICATION OF PAY LIMITATION FOR CERTAIN HIGH-LEVEL EMPLOYEES AND OFFICERS OF THE DEPARTMENT OF VETERANS AFFAIRS.**

(a) MODIFICATION.—Section 7404(d) of title 38, United States Code, is amended by inserting ''and except for individuals appointed under 7401(4) and 7306 of this title,'' after ''section 7457 of this title,''.

(b) WAIVERS.—

(1) IN GENERAL.—The Secretary of Veterans Affairs may waive the limitation described in section 7404(d) of such title, as in effect on the day before the date of the enactment of this Act, on the amount of basic pay payable to individuals appointed under section 7401(4) or 7306 of such title for basic pay payable during the period—

(A) beginning on November 1, 2010; and

(B) ending on the day before the date of the enactment of this Act.

(2) FORM.—The Secretary shall prescribe the form for requesting a waiver under paragraph (1).

(3) TREATMENT OF WAIVER.—A decision not to grant a waiver under paragraph (1) shall not be

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003094

790

1    treated as an adverse action and is not subject to

2    further appeal, third-party review, or judicial review.

**SEC. 80002. INCREASE OF AMOUNT OF CERTAIN DEPART-**

**MENT OF VETERANS AFFAIRS PAYMENTS**

**DURING EMERGENCY PERIOD RESULTING**

**FROM COVID–19 PANDEMIC.**

7    (a) IN GENERAL.—During the covered period, the

8    Secretary of Veterans Affairs shall apply each of the fol-

9    lowing provisions of title 38, United States Code, by sub-

10   stituting for each of the dollar amounts in such provision

11   the amount equal to 125 percent of the dollar amount that

12   was in effect under such provision on the date of the en-

13   actment of this Act:

14       (1) Subsections (l), (m), (r), and (t) of section

15       1114.

16       (2) Paragraph (1)(E) of section 1115.

17       (3) Subsection (c) of section 1311.

18       (4) Subsection (g) of section 1315.

19       (5) Paragraphs (1) and (2) of subsection (d) of

20       section 1521.

21       (6) Paragraphs (2) and (4) of subsection (f) of

22       section 1521.

23   (b) TREATMENT OF AMOUNTS.—Any amount payable

24   to an individual under subsection (a) in excess of the

25   amount otherwise in effect shall be in addition to any

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003095

791

1 other benefit or any other amount payable to that indi-
2 vidual under any provision of law referred to in subsection
3 (a) or any other provision of law administered by the Sec-
4 retary of Veterans Affairs.

5     (c) COVERED PERIOD.—In this section, the covered
6 period is the period that begins on the date of the enact-
7 ment of this Act and ends 60 days after the last day of
8 the emergency period (as defined in section 1135(g)(1) of
9 the Social Security Act (42 U.S.C. 1320b-5(g)(1))) result-
10 ing from the COVID–19 pandemic.

11 **SEC. 80003. PROHIBITION ON COPAYMENTS AND COST**
12              **SHARING FOR VETERANS RECEIVING PRE-**
13              **VENTIVE SERVICES RELATING TO COVID–19.**

14     (a) PROHIBITION.—The Secretary of Veterans Af-
15 fairs may not require any copayment or other cost sharing
16 under chapter 17 of title 38, United States Code, for
17 qualifying coronavirus preventive services. The require-
18 ment described in this subsection shall take effect with
19 respect to a qualifying coronavirus preventive service on
20 the specified date.

21     (b) DEFINITIONS.—In this section, the terms "quali-
22 fying coronavirus preventive service" and "specified date"
23 have the meaning given those terms in section 3203 of
24 the CARES Act (Public Law 116–136).

DOC_0003096

792

**SEC. 80004. MODIFICATION OF CALCULATION OF AMOUNTS**

**OF PER DIEM GRANTS.**

Section 2012(a)(2)(B) of title 38, United States Code, is amended—

(1) in clause (i), by inserting ''or (iii)'' after ''clause (ii)''; and

(2) by adding at the end the following new clause:

''(iii) With respect to a homeless veteran who has care of a minor dependent while receiving services from the grant recipient or eligible entity, the daily cost of care shall be the sum of the daily cost of care determined under subparagraph (A) plus, for each such minor dependent, an amount that equals 50 percent of such daily cost of care.''.

**SEC. 80005. EMERGENCY TREATMENT FOR VETERANS DURING COVID–19 EMERGENCY PERIOD.**

(a) EMERGENCY TREATMENT.—Notwithstanding section 1725 or 1728 of title 38, United States Code, or any other provision of law administered by the Secretary of Veterans Affairs pertaining to furnishing emergency treatment to veterans at non-Department facilities, during the period of a covered public health emergency, the Secretary of Veterans Affairs shall furnish to an eligible veteran emergency treatment at a non-Department facility in accordance with this section.

DOC_0003097

793

1    (b) AUTHORIZATION NOT REQUIRED.—The Sec-
2 retary may not require an eligible veteran to seek author-
3 ization by the Secretary for emergency treatment fur-
4 nished to the veteran pursuant to subsection (a).

5    (c) PAYMENT RATES.—

6    (1) DETERMINATION.—The rate paid for emer-
7    gency treatment furnished to eligible veterans pursu-
8    ant to subsection (a) shall be equal to the rate paid
9    by the United States to a provider of services (as de-
10    fined in section 1861(u) of the Social Security Act
11    (42 U.S.C. 1395x(u))) or a supplier (as defined in
12    section 1861(d) of such Act (42 U.S.C. 1395x(d)))
13    under the Medicare program under title XI or title
14    XVIII of the Social Security Act (42 U.S.C. 1301 et
15    seq.), including section 1834 of such Act (42 U.S.C.
16    1395m), for the same treatment.

17    (2) FINALITY.—A payment in the amount pay-
18    able under paragraph (1) for emergency treatment
19    furnished to an eligible veteran pursuant to sub-
20    section (a) shall be considered payment in full and
21    shall extinguish the veteran's liability to the provider
22    of such treatment, unless the provider rejects the
23    payment and refunds to the United States such
24    amount by not later than 30 days after receiving the
25    payment.

DOC_0003098

794

1    (d) CLAIMS PROCESSED BY THIRD PARTY ADMINIS-

2  TRATORS.—

3        (1) REQUIREMENT.—Not later than 30 days

4        after the date of the enactment of this Act, the Sec-

5        retary shall seek to award a contract to one or more

6        entities, or to modify an existing contract, to process

7        claims for payment for emergency treatment fur-

8        nished to eligible veterans pursuant to subsection

9        (a).

10       (2) PROMPT PAYMENT STANDARD.—Section

11       1703D of title 38, United States Code, shall apply

12       with respect to claims for payment for emergency

13       treatment furnished to eligible veterans pursuant to

14       subsection (a).

15  (e) PRIMARY PAYER.—The Secretary shall be the pri-

16  mary payer with respect to emergency treatment furnished

17  to eligible veterans pursuant to subsection (a), and with

18  respect to the transportation of a veteran by ambulance.

19  In any case in which an eligible veteran is furnished such

20  emergency treatment for a non-service-connected disability

21  described in subsection (a)(2) of section 1729 of title 38,

22  United States Code, the Secretary shall recover or collect

23  reasonable charges for such treatment from a health plan

24  contract described in such section 1729 in accordance with

25  such section.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003099

795

1    (f) APPLICATION.—This section shall apply to emer-

2 gency treatment furnished to eligible veterans during the

3 period of a covered public health emergency, regardless of

4 whether treatment was furnished before the date of the

5 enactment of this Act.

6    (g) DEFINITIONS.—In this section:

7    (1) The term "covered public health emer-

8 gency" means the declaration—

9    (A) of a public health emergency, based on

10 an outbreak of COVID–19 by the Secretary of

11 Health and Human Services under section 319

12 of the Public Health Service Act (42 U.S.C.

13 247d); or

14    (B) of a domestic emergency, based on an

15 outbreak of COVID–19 by the President, the

16 Secretary of Homeland Security, or a State or

17 local authority.

18    (2) The term "eligible veteran" means a vet-

19 eran enrolled in the health care system established

20 under section 1705 of title 38, United States Code.

21    (3) The term "emergency treatment" means

22 medical care or services rendered in a medical emer-

23 gency of such nature that a prudent layperson rea-

24 sonably expects that delay in seeking immediate

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003100

796

1 medical attention would be hazardous to life or
2 health.

3  (4) The term "non-Department facility" has
4 the meaning given that term in section 1701 of title
5 38, United States Code.

6 **SEC. 80006. FLEXIBILITY FOR THE SECRETARY OF VET-**
7    **ERANS AFFAIRS IN CARING FOR HOMELESS**
8    **VETERANS DURING A COVERED PUBLIC**
9    **HEALTH EMERGENCY.**

10 (a) GENERAL SUPPORT.—

11  (1) USE OF FUNDS.—During a covered public
12 health emergency, the Secretary of Veterans Affairs
13 may use amounts appropriated or otherwise made
14 available to the Department of Veterans Affairs to
15 carry out sections 2011, 2012, and 2061 of title 38,
16 United States Code, to provide to homeless veterans
17 the following:

18   (A) Food.

19   (B) Shelter.

20   (C) Basic supplies (such as clothing, blan-
21  kets, and toiletry items).

22   (D) Transportation.

23   (E) Communications equipment and re-
24  quired capabilities (such as smartphones, dis-
25  posable phones, and phone service plans).

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003101

G:\CMTE\AP\16\FY20\_D\HEROES.XML

797

(F) Such other assistance as the Secretary determines appropriate.

(2) HOMELESS VETERANS ON LAND OF THE DEPARTMENT.—

(A) USE OF REVOLVING FUND.—During a covered public health emergency, the Secretary may use amounts in the revolving fund under section 8109(h) of title 38, United States Code, to alter parking facilities of the Department to facilitate the use of such facilities as temporary shelter locations for homeless veterans.

(B) PARTNERSHIPS.—During a covered public health emergency, the Secretary may partner with one or more organizations to manage land of the Department used by homeless veterans for sleeping.

(C) EQUIPMENT.—During a covered public health emergency, the Secretary shall not be responsible for furnishing outdoor equipment necessary for sleeping on land of the Department.

(b) GRANT AND PER DIEM PROGRAM.—

(1) MAXIMUM PER DIEM RATE.—Notwithstanding paragraph (2) of section 2012(a) of title 38, United States Code, during a covered public health emergency, the maximum rate of per diem

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003102

798

1 authorized under such section is 300 percent of the
2 rate authorized for State homes for domiciliary care
3 under subsection (a)(1)(A) of section 1741 of such
4 title, as the Secretary may increase from time to
5 time under subsection (c) of that section.

6 (2) USE OF PER DIEM PAYMENTS.—During a
7 covered public health emergency, a recipient of a
8 grant or an eligible entity under the grant and per
9 diem program of the Department (in this subsection
10 referred to as the ''program'') may use per diem
11 payments under sections 2012 and 2061 of title 38,
12 United States Code, to provide food and basic sup-
13 plies for—

14 (A) homeless veterans in the program; and
15 (B) formerly homeless veterans in the com-
16 munity who experienced homelessness during
17 the one-year period ending on the date of the
18 enactment of this Act.

19 (3) ADDITIONAL TRANSITIONAL HOUSING.—

20 (A) IN GENERAL.—During a covered pub-
21 lic health emergency, the Secretary may provide
22 amounts for grants and per diem payments
23 under the program for additional transitional
24 housing beds to facilitate access to housing and
25 services provided to homeless veterans.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003103

799

1      (B) NOTICE; COMPETITION; PERIOD OF
2  PERFORMANCE.—The Secretary may provide
3  amounts under subparagraph (A)—

4          (i) without notice or competition; and
5          (ii) for a period of performance deter-
6      mined by the Secretary.

7      (4) INSPECTIONS AND LIFE SAFETY CODE RE-
8  QUIREMENTS.—

9          (A) IN GENERAL.—During a covered pub-
10     lic health emergency, the Secretary may waive
11     any requirement under subsection (b) or (c) of
12     section 2012 of title 38, United States Code, in
13     order to allow the recipient of a grant or an eli-
14     gible entity under the program—

15             (i) to quickly identify temporary alter-
16         nate sites of care for homeless veterans
17         that are suitable for habitation;

18             (ii) to facilitate social distancing or
19         isolation needs; or

20             (iii) to facilitate activation or continu-
21         ation of a program for which a grant has
22         been awarded.

23         (B) LIMITATION.—The Secretary may
24     waive a requirement pursuant to the authority
25     provided by subparagraph (A) with respect to a

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003104

800

1    facility of a recipient of a grant or an eligible

2    entity under the program only if the facility

3    meets applicable local safety requirements, in-

4    cluding fire safety requirements.

5    (c) HEALTH CARE FOR HOMELESS VETERANS.—

6    (1) COMMUNITY-BASED TREATMENT FACILI-

7    TIES.—During a covered public health emergency,

8    the Secretary may use amounts as authorized under

9    subsection (a)(1) notwithstanding any requirement

10    under subsection (a)(2) of section 2031 of title 38,

11    United States Code, that community-based treat-

12    ment facilities provide care, treatment, and rehabili-

13    tative services to veterans described in such section.

14    (2) REPORT TO CONGRESS ON REDUCTION OF

15    CARE, TREATMENT, AND REHABILITATIVE SERV-

16    ICES.—During a covered public health emergency, if

17    the Secretary reduces the care, treatment, and reha-

18    bilitative services provided to homeless veterans

19    under section 2031(a)(2) of title 38, United States

20    Code, the Secretary shall submit to Congress month-

21    ly reports on the reduction of such care, treatment,

22    and services for the duration of the covered public

23    health emergency.

24    (3) INSPECTION AND LIFE SAFETY CODE RE-

25    QUIREMENTS.—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003105

801

(A) IN GENERAL.—During a covered public health emergency, the Secretary may waive any inspection or life safety code requirement under subsection (c) of section 2032 of title 38, United States Code—

(i) to allow quick identification of temporary alternate sites of care for homeless veterans that are suitable for habitation;

(ii) to facilitate social distancing or isolation needs; or

(iii) to facilitate the operation of housing under such section.

(B) LIMITATION.—The Secretary may waive a requirement pursuant to the authority provided by subparagraph (A) with respect to a residence or facility referred to in such section 2032 only if the residence or facility, as the case may be, meets applicable local safety requirements, including fire safety requirements.

(d) ACCESS OF HOMELESS VETERANS TO DEPARTMENT OF VETERANS AFFAIRS TELEHEALTH SERVICES.—During a covered public health emergency, the Secretary may make available telehealth capabilities to homeless veterans who—

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003106

802

1    (1) are receiving services provided under chap-
2 ter 20 of title 38, United States Code; or

3    (2) are participating in a program under such
4 chapter.

5 (e) DEFINITIONS.—In this section:

6    (1) COVERED PUBLIC HEALTH EMERGENCY.—
7 The term "covered public health emergency" means
8 an emergency with respect to COVID–19 declared
9 by a Federal, State, or local authority.

10    (2) HOMELESS VETERAN; VETERAN.—The
11 terms "homeless veteran" and "veteran" have the
12 meanings given those terms in section 2002 of title
13 38, United States Code.

14    (3) PARKING FACILITY.—The term "parking fa-
15 cility" has the meaning given that term in section
16 8109(a) of such title.

17    (4) TELEHEALTH.—

18    (A) IN GENERAL.—The term "telehealth"
19 means the use of electronic information and
20 telecommunications technologies to support and
21 promote long-distance clinical health care, pa-
22 tient and professional health-related education,
23 public health, and health administration.

24    (B) TECHNOLOGIES.—For purposes of
25 subparagraph (A), "telecommunications tech-

g:\VHLC\051220\051220.072.xml    (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003107

803

1   nologies'' include video conferencing, the inter-

2   net, streaming media, and terrestrial and wire-

3   less communications.

4 **SEC. 80007. HUD–VASH PROGRAM.**

5   The Secretary of Housing and Urban Development

6 shall take such actions with respect to the supported hous-

7 ing program carried out under section 8(o)(19) of the

8 United States Housing Act of 1937 (42 U.S.C.

9 1437f(o)(19)) in conjunction with the Department of Vet-

10 erans Affairs (commonly referred to as ''HUD–VASH''),

11 and shall require public housing agencies administering

12 assistance under such program to take such actions, as

13 may be appropriate to facilitate the issuance and utiliza-

14 tion of vouchers for rental assistance under such program

15 during the period of the covered public health emergency

16 (as such term is defined in section 1 of this Act), including

17 the following actions:

18   (1) Establishing mechanisms and procedures

19   providing for referral and application documents

20   used under such program to be received by fax, elec-

21   tronic mail, drop box, or other means not requiring

22   in-person contact.

23   (2) Establishing mechanisms and procedures

24   for processing applications for participation in such

25   program that do not require identification or

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003108

804

1    verification of identity by social security number or

2    photo ID in cases in which closure of governmental

3    offices prevents confirmation or verification of iden-

4    tity by such means.

5        (3) Providing for waiver of requirements to con-

6    duct housing quality standard inspections with re-

7    spect to dwelling units for which rental assistance is

8    provided under such program.

9    **SEC. 80008. EXTENSION OF LEASE PROTECTIONS FOR**

10        **SERVICEMEMBERS UNDER STOP MOVEMENT**

11        **ORDERS IN RESPONSE TO LOCAL, NATIONAL,**

12        **OR GLOBAL EMERGENCY.**

13    (a) TERMINATION.—Subsection (a)(1) of section 305

14    of the Servicemembers Civil Relief Act (50 U.S.C. 3955)

15    is amended—

16        (1) in subparagraph (A), by striking "; or" and

17    inserting a semicolon;

18        (2) in subparagraph (B), by striking the period

19    at the end and inserting "; or"; and

20        (3) by adding at the end the following new sub-

21    paragraph:

22        "(C) the date of the lessee's stop move-

23        ment order described in paragraph (1)(C) or

24        (2)(C) of subsection (b), as the case may be.".

25    (b) COVERED LEASES.—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003109

805

1          (1) LEASES OF PREMISES.—Paragraph (1) of
2     subsection (b) of such section is amended—

3               (A) in subparagraph (A), by striking ";
4          or" and inserting a semicolon;

5               (B) in subparagraph (B), by striking the
6          period at the end and inserting "; or"; and

7               (C) by adding at the end the following new
8          subparagraph:

9               "(C) the servicemember, while in military
10         service—

11                   "(i) executes a lease upon receipt of
12              military orders for a permanent change of
13              station or to deploy with a military unit, or
14              as an individual in support of a military
15              operation, for a period of not less than 90
16              days; and

17                   "(ii) thereafter receives a stop move-
18              ment order issued by the Secretary of De-
19              fense in response to a local, national, or
20              global emergency, effective for an indefi-
21              nite period or for a period of not less than
22              30 days, which prevents the servicemember
23              or servicemember's dependents from occu-
24              pying the lease for a residential, profes-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003110

806

1          sional, business, agricultural, or similar

2          purpose.''.

3          (2) LEASES OF MOTOR VEHICLES.—Paragraph

4      (2) of such subsection is amended—

5          (A) in subparagraph (A), by striking ";

6          or" and inserting a semicolon;

7          (B) in subparagraph (B)(ii), by striking

8          the period at the end and inserting "; or"; and

9          (C) by adding at the end the following new

10     subparagraph:

11          "(C) the servicemember, while in military

12     service—

13             "(i) executes a lease upon receipt of

14             military orders described in subparagraph

15             (B); and

16             "(ii) thereafter receives a stop move-

17             ment order issued by the Secretary of De-

18             fense in response to a local, national, or

19             global emergency, effective for an indefi-

20             nite period or for a period of not less than

21             30 days, which prevents the servicemem-

22             ber, or the servicemember's dependents,

23             from using the vehicle for personal or busi-

24             ness transportation.''.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003111

807

1    (c) EFFECTIVE DATE OF TERMINATION.—Paragraph

2  (1) of subsection (d) of such section is amended to read

3  as follows:

4        "(1) LEASE OF PREMISES.—

5            "(A) ENTRANCE TO MILITARY SERVICE,

6        PERMANENT CHANGE OF STATION, OR DEPLOY-

7        MENT.—In the case of a lease described in sub-

8        paragraph (A) or (B) of subsection (b)(1) that

9        provides for monthly payment of rent, termi-

10       nation of the lease under subsection (a) is effec-

11       tive 30 days after the first date on which the

12       next rental payment is due and payable after

13       the date on which the notice under subsection

14       (c) is delivered. In the case of any other lease

15       described in subparagraphs (A) and (B) of sub-

16       section (b)(1) termination of the lease under

17       subsection (a) is effective on the last day of the

18       month following the month in which the notice

19       is delivered.

20           "(B) STOP MOVEMENT ORDERS.—In the

21       case of a lease described in subsection

22       (b)(1)(C), termination of the lease under sub-

23       section (a) is effective on the date on which the

24       requirements of subsection (c) are met for such

25       termination.".

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003112

808

1    (d) Technical Correction.—Subsection (i) is
2 amended, in the matter before paragraph (1), by inserting
3 "In this section:" after "Definitions.—".

4    (e) Retroactive Application.—The amendments
5 made by this section shall apply to stop movement orders
6 issued on or after March 1, 2020.

7 **SEC. 80009. TERMINATION OF TELEPHONE, MULTICHANNEL**
8 **VIDEO PROGRAMMING, AND INTERNET AC-**
9 **CESS SERVICE CONTRACTS BY**
10 **SERVICEMEMBERS WHO ENTER INTO CON-**
11 **TRACTS AFTER RECEIVING MILITARY OR-**
12 **DERS FOR PERMANENT CHANGE OF STATION**
13 **BUT THEN RECEIVE STOP MOVEMENT OR-**
14 **DERS DUE TO AN EMERGENCY SITUATION.**

15    (a) In General.—Section 305A(a)(1) of the
16 Servicemembers Civil Relief Act (50 U.S.C. 3956) is
17 amended—

18        (1) by striking "after the date the servicemem-
19    ber receives military orders to relocate for a period
20    of not less than 90 days to a location that does not
21    support the contract." and inserting "after—"; and

22        (2) by adding at the end the following new sub-
23    paragraphs:

24            "(A) the date the servicemember receives
25        military orders to relocate for a period of not

DOC_0003113

809

1  less than 90 days to a location that does not

2  support the contract; or

3  ''(B) the date the servicemember, while in

4  military service, receives military orders for a

5  permanent change of station, thereafter enters

6  into the contract, and then after entering into

7  the contract receives a stop movement order

8  issued by the Secretary of Defense in response

9  to a local, national, or global emergency, effec-

10  tive for an indefinite period or for a period of

11  not less than 30 days, which prevents the serv-

12  icemember from using the services provided

13  under the contract.''.

14  (b) RETROACTIVE APPLICATION.—The amendments

15  made by this section shall apply to stop movement orders

16  issued on or after March 1, 2020.

17  **SEC. 80010. TERMINATION OF CONTRACTS FOR TELE-**

18  **PHONE, MULTICHANNEL VIDEO PROGRAM-**

19  **MING, OR INTERNET ACCESS SERVICE BY**

20  **CERTAIN INDIVIDUALS UNDER**

21  **SERVICEMEMBERS CIVIL RELIEF ACT.**

22  Section 305A(a) of the Servicemembers Civil Relief

23  Act (50 U.S.C. 3956(a)) is amended by adding at the end

24  the following new paragraph:

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003114

810

1            "(4) ADDITIONAL INDIVIDUALS COVERED.—For

2    purposes of this section, the following individuals

3    shall be treated as a servicemember covered by para-

4    graph (1):

5            "(A) A spouse or dependent of a service-

6            member who dies while in military service or a

7            spouse or dependent of a member of the reserve

8            components who dies while performing duty de-

9            scribed in subparagraph (C).

10           "(B) A spouse or dependent of a service-

11           member who incurs a catastrophic injury or ill-

12           ness (as that term is defined in section 439(g)

13           of title 37, United States Code), if the service-

14           member incurs the catastrophic injury or illness

15           while in military service or performing duty de-

16           scribed in subparagraph (C).

17           "(C) A member of the reserve components

18           performing military service or performing full-

19           time National Guard duty, active Guard and

20           Reserve duty, or inactive-duty training (as such

21           terms are defined in section 101(d) of title 10,

22           United States Code).".

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003115

811

1   SEC. 80011. CLARIFICATION OF TERMINATION OF LEASES

2            OF PREMISES AND MOTOR VEHICLES OF

3            SERVICEMEMBERS    WHO    INCUR    CATA-

4            STROPHIC  INJURY  OR  ILLNESS  OR  DIE

5            WHILE IN MILITARY SERVICE.

6       (a) CATASTROPHIC INJURIES AND ILLNESSES.—

7   Paragraph (4) of section 305(a) of the Servicemembers

8   Civil Relief Act (50 U.S.C. 3955(a)), as added by section

9   545 of the National Defense Authorization Act for Fiscal

10  Year 2020 (Public Law 116–92), is amended to read as

11  follows:

12       "(4) CATASTROPHIC INJURY OR ILLNESS OF

13       LESSEE.—

14            "(A) TERMINATION.—If the lessee on a

15            lease described in subsection (b) incurs a cata-

16            strophic injury or illness during a period of

17            military service or while performing covered

18            service, during the one-year period beginning on

19            the date on which the lessee incurs such injury

20            or illness—

21                 "(i) the lessee may terminate the

22                 lease; or

23                 "(ii) in the case of a lessee who lacks

24                 the mental capacity to contract or to man-

25                 age his or her own affairs (including dis-

26                 bursement of funds without limitation) due

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003116

812

1      to such injury or illness, the spouse or de-
2      pendent of the lessee may terminate the
3      lease.

4          ''(B) DEFINITIONS.—In this paragraph:

5              ''(i) The term 'catastrophic injury or
6          illness' has the meaning given that term in
7          section 439(g) of title 37, United States
8          Code.

9              ''(ii) The term 'covered service' means
10         full-time National Guard duty, active
11         Guard and Reserve duty, or inactive-duty
12         training (as such terms are defined in sec-
13         tion 101(d) of title 10, United States
14         Code).''.

15     (b) DEATHS.—Paragraph (3) of such section is
16 amended by striking ''The spouse of the lessee'' and in-
17 serting ''The spouse or dependent of the lessee''.

18 **SEC. 80012. DEFERRAL OF CERTAIN DEBTS ARISING FROM**
19              **BENEFITS UNDER LAWS ADMINISTERED BY**
20              **THE SECRETARY OF VETERANS AFFAIRS.**

21     (a) IN GENERAL.—During the covered period, the
22 Secretary of Veterans Affairs may not—

23         (1) take any action to collect a covered debt (in-
24     cluding the offset of any payment by the Secretary);

25         (2) record a covered debt;

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003117

813

1     (3) issue notice of a covered debt to a person

2  or a consumer reporting agency;

3     (4) allow any interest to accrue on a covered

4  debt; or

5     (5) apply any administrative fee to a covered

6  debt.

7  (b) EXCEPTION.—Notwithstanding subsection (a),

8 the Secretary may collect a payment regarding a covered

9 debt (including interest or any administrative fee) from

10 a person (or the fiduciary of that person) who elects to

11 make such a payment during the covered period.

12  (c) DEFINITIONS.—In this section:

13     (1) The term "consumer reporting agency" has

14  the meaning given that term in section 5701 of title

15  38, United States Code.

16     (2) The term "covered debt" means a debt—

17          (A) owed by a person (including a fidu-

18     ciary) to the United States;

19          (B) arising from a benefit under a covered

20     law; and

21          (C) that is not subject to recovery under—

22              (i) section 3729 of title 31, United

23        States Code;

24              (ii) section 1729 of title 38, United

25        States Code; or

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003118

814

1           (iii) Public Law 87–693 (42 U.S.C.

2       2651).

3       (3) The term "covered law" means any law ad-

4  ministered by the Secretary of Veterans Affairs

5  through—

6           (A) the Under Secretary for Health; or

7           (B) the Under Secretary for Benefits.

8       (4) The term "covered period" means—

9           (A) the COVID–19 emergency period; and

10         (B) the 60 days immediately following the

11    date of the end of the COVID–19 emergency

12    period.

13      (5) The term "COVID–19 emergency period"

14  means the emergency period described in section

15  1135(g)(1)(B) of the Social Security Act (42 U.S.C.

16  1320b-5(g)(1)(B)).

**17  SEC. 80013. TOLLING OF DEADLINES RELATING TO CLAIMS**

**18          FOR   BENEFITS  ADMINISTERED  BY  SEC-**

**19          RETARY OF VETERANS AFFAIRS.**

20  (a) REQUIRED TOLLING.—With respect to claims

21 and appeals made by a claimant, the covered period shall

22 be excluded in computing the following:

23      (1) In cases where an individual expresses an

24  intent to file a claim, the period in which the indi-

25  vidual is required to file the claim in order to have

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003119

815

1    the effective date of the claim be determined based

2    on the date of such intent, as described in section

3    3.155(b)(1) of title 38, Code of Federal Regulations.

4        (2) The period in which the claimant is re-

5    quired to take an action pursuant to section 5104C

6    of title 38, United States Code.

7        (3) The period in which the claimant is re-

8    quired to appeal a change in service-connected or

9    employability status or change in physical condition

10    described in section 5112(b)(6) of such title.

11        (4) The period in which an individual is re-

12    quired to file a notice of appeal under section 7266

13    of such title.

14        (5) Any other period in which a claimant or

15    beneficiary is required to act with respect to filing,

16    perfecting, or appealing a claim, as determined ap-

17    propriate by the Secretary of Veterans Affairs.

18    (b) USE OF POSTMARK DATES.—With respect to

19    claims filed using nonelectronic means and appeals made

20    during the covered period, the Secretary of Veterans Af-

21    fairs and the Court of Appeals for Veterans Claims, as

22    the case may be, shall administer the provisions of title

23    38, United States Code, as follows:

24        (1) In section 5110—

25            (A) in subsection (a)—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003120

816

1               (i) in paragraph (1), by substituting

2           "the earlier of the date of receipt of appli-

3           cation therefor and the date of the post-

4           mark or other official proof of mailing date

5           of the application therefor" for "the date

6           of receipt of application therefor"; and

7               (ii) in paragraph (3), by substituting

8           "the earlier of the date of receipt of the

9           supplemental claim and the date of the

10          postmark or other official proof of mailing

11          date of the supplemental claim" for "the

12          date of receipt of the supplemental claim";

13          and

14           (B) in subsection (b)(2)(A), by sub-

15         stituting "the earlier of the date of receipt of

16         application and the date of the postmark or

17         other official proof of mailing date of the appli-

18         cation" for "the date of receipt of the applica-

19         tion".

20       (2) In section 7266, without regard to sub-

21    section (d).

22    (c) DEFINITIONS.—In this section:

23       (1) The term "claimant" has the meaning given

24    that term in section 5100 of title 38, United States

25    Code.

DOC_0003121

817

1        (2) The term "covered period" means the pe-
2  riod beginning on the date of the emergency period
3  (as defined in section 1135(g)(1) of the Social Secu-
4  rity Act (42 U.S.C. 1320b-5(g)(1))) resulting from
5  the COVID–19 pandemic and ending 90 days after
6  the last day of such emergency period.

**7  SEC. 80014. PROVISION OF DEPARTMENT OF VETERANS AF-**
**8             FAIRS HOSPITAL CARE AND MEDICAL SERV-**
**9             ICES TO CERTAIN VETERANS WHO ARE UN-**
**10           EMPLOYED OR LOST EMPLOYER-SPONSORED**
**11           HEALTH CARE COVERAGE BY REASON OF A**
**12           COVERED PUBLIC HEALTH EMERGENCY.**

13     (a) IN GENERAL.—During the 12-month period be-
14  ginning on the date of the enactment of this Act, the Sec-
15  retary of Veterans Affairs shall consider a covered veteran
16  to be unable to defray the expenses of necessary care for
17  purposes of section 1722 of title 38, United States Code,
18  and shall furnish to such veteran hospital care and med-
19  ical services under chapter 17 of title 38, United States
20  Code.

21     (b) COVERED VETERAN.—For purposes of this sec-
22  tion, a covered veteran is a veteran—

23        (1) who—

24            (A) is unemployed; or

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003122

818

1    (B) has lost access to a group health plan

2    or group health insurance coverage by reason of

3    a covered public health emergency; and

4   (2) whose projected attributable income for the

5 12-month period beginning on the date of applica-

6 tion for hospital care or medical services under this

7 section is not more than the amount in effect under

8 section 1722(b) of title 38, United States Code.

9 (c) DEFINITIONS.—In this section:

10   (1) The term ''covered public health emer-

11 gency'' means the declaration—

12    (A) of a public health emergency, based on

13    an outbreak of COVID–19 by the Secretary of

14    Health and Human Services under section 319

15    of the Public Health Service Act (42 U.S.C.

16    247d); or

17    (B) of a domestic emergency, based on an

18    outbreak of COVID–19 by the President, the

19    Secretary of Homeland Security, or State, or

20    local authority.

21   (2) The terms ''group health plan'' and ''group

22 health insurance coverage'' have the meaning given

23 such terms in section 2701 of the Public Health

24 Service Act (42 U.S.C. 300gg-3).

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003123

819

SEC. 80015. PROHIBITION ON COPAYMENTS AND COST SHARING FOR VETERANS RECEIVING COVID–19 TREATMENT FURNISHED BY DEPARTMENT OF VETERANS AFFAIRS.

(a) IN GENERAL.—Section 6006(b) of the Families First Coronavirus Response Act (Public Law 116–127; 38 U.S.C. 1701 note) is amended by striking "or visits described in paragraph (2) of such section" and inserting ", visits described in paragraph (2) of such section, or hospital care or medical services to treat COVID–19".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect as if included in the enactment of the Families First Coronavirus Response Act (Public Law 116–127).

SEC. 80016. EXPANSION OF VET CENTER SERVICES TO VETERANS AND MEMBERS OF THE ARMED FORCES WHO PERFORM CERTAIN SERVICE IN RESPONSE TO COVERED PUBLIC HEALTH EMERGENCY.

Section 1712A of title 38, United States Code, is amended—

(1) by striking "clauses (i) through (iv)" both places it appears and inserting "clauses (i) through (v)";

(2) by striking "in clause (v)" both places it appears and inserting "in clause (vi)";

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003124

G:\CMTE\AP\16\FY20\_D\HEROES.XML

820

1       (3) in subsection (a)(1)(C)—

2           (A) by redesignating clauses (iv) and (v) as

3       clauses (v) and (vi), respectively; and

4           (B) by inserting after clause (iii) the fol-

5       lowing new clause (iv):

6       ''(iv) Any individual who is a veteran or mem-

7       ber of the Armed Forces (including the reserve com-

8       ponents), who, in response to a covered public health

9       emergency, performed active service or State active

10       duty for a period of at least 14 days.''; and

11       (4) in subsection (h), by adding at the end the

12       following new paragraphs:

13       ''(4) The term 'active service' has the meaning

14       given that term in section 101 of title 10.

15       ''(5) The term 'covered public health emer-

16       gency' means the declaration—

17           ''(A) of a public health emergency, based

18       on an outbreak of COVID–19, by the Secretary

19       of Health and Human Services under section

20       319 of the Public Health Service Act (42

21       U.S.C. 247d); or

22           ''(B) of a domestic emergency, based on an

23       outbreak of COVID–19, by the President, the

24       Secretary of Homeland Security, or a State or

25       local authority.''.

DOC_0003125

821

# DIVISION I—SMALL BUSINESS PROVISIONS

**SEC. 90001. AMENDMENTS TO THE PAYCHECK PROTECTION PROGRAM.**

(a) EXTENSION OF COVERED PERIOD.—Section 7(a)(36)(A)(iii) of the Small Business Act (15 U.S.C. 636(a)(36)(A)(iii)) is amended by striking "June 30, 2020" and inserting "December 31, 2020".

(b) TRIBAL BUSINESS CONCERNS.—Section 7(a)(36)(D) of the Small Business Act (15 U.S.C. 636(a)(36)(D)) is amended by striking "described in section 31(b)(2)(C)" each place it appears.

(c) INCLUSION OF CRITICAL ACCESS HOSPITALS IN THE PAYCHECK PROTECTION PROGRAM.—Section 7(a)(36)(D) of the Small Business Act (15 U.S.C. 636(a)(36)(D)) is amended by adding at the end the following new clause:

"(vii) INCLUSION OF CRITICAL ACCESS HOSPITALS.—During the covered period, any nonprofit organization that is a critical access hospital (as defined in section 1861(mm) of the Social Security Act (42 U.S.C. 1395x(mm))) shall be eligible to receive a covered loan, regardless of the status of such a hospital as a debtor in a case

g:\VHLC\051220\051220.072.xml        (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003126

822

1          under chapter 11 of title 11, Unites States

2          Code, or the status of any debts owed by

3          such a hospital to the Federal Govern-

4          ment.''.

5     (d) NONPROFIT ORGANIZATIONS.—Section 7(a)(36)

6 of the Small Business Act (15 U.S.C. 636(a)(36))—

7          (1) in subparagraph (A)(vii), by striking ''sec-

8      tion 501(c)(3)'' and inserting ''section 501(c)''; and

9          (2) in subparagraph (D)—

10          (A) by striking ''nonprofit organization,''

11      each place it appears;

12          (B) in clause (iv)—

13          (i) in subclause (II), by striking ''

14      and'' at the end;

15          (ii) in subclause (III), by striking the

16      period at the end and inserting ''; and'';

17      and

18          (iii) by adding at the end the fol-

19      lowing new subclause:

20          ''(IV) any nonprofit organiza-

21          tion.''; and

22          (C) in clause (vi), by striking ''a nonprofit

23      organization and''.

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003127

823

1     (e) APPLICATION TO CERTAIN LOCAL NEWS

2 MEDIA.—Section 7(a)(36)(D) of the Small Business Act

3 (15 U.S.C. 636(a)(36)(D)) is amended—

4        (1) in clause (iii)—

5           (A) by striking "business concern that em-

6          ploys" and inserting the following: "business

7          concern that—

8             "(I) employs";

9          (B) in subclause (I), by striking the period

10          at the end and inserting "; and"; and

11          (C) by adding at the end the following:

12             "(II) is assigned a North American Indus-

13          try Classification System code beginning with

14          511110, 515112, or 515120 and the individual

15          physical location at the time of disbursal does

16          not exceed the size standard established by the

17          Administrator for the applicable code shall be

18          eligible to receive a covered loan for expenses

19          associated with an individual physical location

20          of that business concern to support the contin-

21          ued provision of local news, information, con-

22          tent, or emergency information, and, at the

23          time of disbursal, the individual physical loca-

24          tion.";

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003128

824

1      (2) in clause (iv) (as amended by subsection

2    (d))—

3          (A) in subclause (III), by striking "and" at

4      the end;

5          (B) in subclause (IV), by striking the pe-

6      riod at the end and inserting "; and"; and

7          (C) by adding at the end the following:

8              "(V) an individual physical loca-

9              tion of a business concern described in

10              clause (iii)(II), if such concern shall

11              not pay, distribute, or otherwise pro-

12              vide any portion of the covered loan to

13              any other entity other than the indi-

14              vidual physical location that is the in-

15              tended recipient of the covered loan.";

16              and

17      (3) by adding at the end the following new

18    clause:

19          "(vii) ADDITIONAL REQUIREMENTS

20          FOR NEWS BROADCAST ENTITIES.—

21              "(I) IN GENERAL.—With respect

22              to an individual physical location of a

23              business concern described in clause

24              (iii)(II), each such location shall be

25              treated as an independent, non-

DOC_0003129

825

1      affiliated entity for purposes of this
2      paragraph.

3          ''(II)   DEMONSTRATION   OF
4      NEED.—Any such location that is a
5      franchise or affiliate of, or owned or
6      controlled by a parent company, in-
7      vestment company, or the manage-
8      ment thereof, shall demonstrate, upon
9      request of the Administrator, the need
10     for a covered loan to support the con-
11     tinued provision of local news, infor-
12     mation, content, or emergency infor-
13     mation, and, at the time of disbursal,
14     the individual physical location.

15         ''(III)   REPORT.—The Adminis-
16     trator and Secretary of the Treasury
17     shall submit to the Committee on
18     Small Business of the House of Rep-
19     resentatives, the Committee on Small
20     Business and Entrepreneurship of the
21     Senate, and the Congressional Over-
22     sight Commission established under
23     section 4020 of the CARES Act a re-
24     port including information on loans

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003130

826

1          made to an entity described under

2          this clause.''.

3    (f) APPLICATION OF CERTAIN TERMS THROUGH

4 LIFE OF COVERED LOAN.—Section 7(a)(36) of the Small

5 Business Act (15 U.S.C. 636(a)(36)) is amended—

6       (1) in subparagraph (H), by striking ''During

7   the covered period, with'' and inserting ''With'';

8       (2) in subparagraph (I), by striking ''During

9   the covered period, the'' and inserting ''The'';

10      (3) in subparagraph (J), by striking ''During

11   the covered period, with'' and inserting ''With'';

12      (4) in subparagraph (M)—

13         (A) in clause (ii), by striking ''During the

14     covered period, the'' and inserting ''The''; and

15         (B) in clause (iii), by striking ''During the

16     covered period, with'' and inserting ''With''.

17   (g) LOAN MATURITY.—Section 7(a)(36)(K)(ii) of the

18 Small Business Act (15 U.S.C. 636(a)(36)(K)(ii)) is

19 amended by inserting ''minimum maturity of 5 years'' be-

20 fore ''maximum maturity''.

21   (h) INTEREST CALCULATION.—Section 7(a)(36)(L)

22 of the Small Business Act (15 U.S.C. 636(a)(36)(L)) is

23 amended by inserting '', calculated on a non-compounding,

24 non-adjustable basis'' after ''4 percent''.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003131

G:\CMTE\AP\16\FY20\_D\HEROES.XML

827

1     (i) FUNDING FOR THE PAYCHECK PROTECTION PRO-

2 GRAM.—

3        (1) IN GENERAL.—Section 7(a)(36)(S) of the

4 Small Business Act (15 U.S.C. 636(a)(36)(S)) is

5 amended to read as follows:

6           "(S) SET ASIDE FOR CERTAIN ENTITIES.—

7 The Administrator shall provide for the cost to

8 guarantee covered loans made under this para-

9 graph—

10          "(i) a set aside of not less than 25

11 percent of each such amount for covered

12 loans made to eligible recipients with 10 or

13 fewer employees; and

14          "(ii) a set aside of 25 percent of each

15 such amount for covered loans made to

16 nonprofit organizations, of which not more

17 than 12.5 percent of each such amount set

18 aside may be used to make covered loans

19 to nonprofit organizations with 500 or

20 more employees.".

21       (2) SET ASIDE FOR COMMUNITY FINANCIAL IN-

22 STITUTIONS.—Of amounts appropriated by the Pay-

23 check Protection Program and Health Care En-

24 hancement Act (Public Law 116–139) under the

25 heading "Small Business Administration—Business

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003132

828

1    Loans Program Account, CARES Act'' that have

2    not been obligated or expended, the lesser of 25 per-

3    cent of such amounts or \$10,000,000,000 shall be

4    set aside for the cost to guarantee covered loans

5    made under section 7(a)(36) of the Small Business

6    Act (15 U.S.C. 636(a)(36)) by community financial

7    institutions (as such term is defined in subpara-

8    graph (A)(xi) of such section).

9    (3) AMOUNTS RETURNED.—Section 7(a)(36) of

10    the Small Business Act (15 U.S.C. 636(a)(36)) is

11    amended by adding at the end the following new

12    subparagraph:

13    ''(T) AMOUNTS RETURNED.—Any amounts

14    returned to the Secretary of the Treasury due

15    to the cancellation of a covered loan shall be

16    solely used for the cost to guarantee covered

17    loans made to eligible recipients with 10 or

18    fewer employees.''.

19    (j) TREATMENT OF CERTAIN CRIMINAL VIOLA-

20    TIONS.—

21    (1) IN GENERAL.—Section 7(a)(36) of the

22    Small Business Act (15 U.S.C. 636(a)(36)), as

23    amended by subsection (h), is further amended by

24    adding at the end the following new subparagraph:

DOC_0003133

829

1                "(U) TREATMENT OF CERTAIN CRIMINAL

2       VIOLATIONS.—

3                 "(i) FINANCIAL FRAUD OR DECEP-

4         TION.—A entity that is a business, organi-

5         zation, cooperative, or enterprise may not

6         receive a covered loan if an owner of 20

7         percent or more of the equity of such enti-

8         ty, during the 5-year period preceding the

9         date on which such entity applies for a cov-

10        ered loan, has been convicted of a felony of

11        financial fraud or deception under Federal,

12        State, or Tribal law.

13                 "(ii) ARRESTS OR CONVICTIONS.—An

14         entity that is a business, organization, co-

15         operative, or enterprise shall be an eligible

16         recipient notwithstanding a prior arrest or

17         conviction under Federal, State, or Tribal

18         law of an owner of 20 percent or more of

19         the equity of such entity, unless such

20         owner is currently incarcerated.

21                 "(iii) WAIVER.—The Administrator

22         may waive the requirements of clause (i).".

23      (2) RULEMAKING.—Not later than 15 days

24    after the date of enactment of this Act, the Adminis-

25    trator of the Small Business Administration shall

g:\VHLC\051220\051220.072.xml     (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003134

830

1 make necessary revisions to any rules to carry out
2 the amendment made by this subsection.

3 (k) TECHNICAL ASSISTANCE FOR COMMUNITY FI-
4 NANCIAL INSTITUTIONS.—Section 7(a)(36) of the Small
5 Business Act (15 U.S.C. 636(a)(36)), as amended by sub-
6 section (i), is further amended by adding at the end the
7 following new subparagraph:

8            "(V) TECHNICAL ASSISTANCE FOR COMMU-
9        NITY FINANCIAL INSTITUTIONS.—Of amounts
10       appropriated to carry out this paragraph, the
11       Secretary of the Treasury, in consultation with
12       the Administrator, shall use $1,000,000,000 of
13       such amounts to provide grants to community
14       financial institutions, insured depository institu-
15       tions with consolidated assets of less than
16       $10,000,000,000, and credit unions with con-
17       solidated assets of less than $10,000,000,000,
18       to ensure such institutions can update their sys-
19       tems (including updates related to compliance
20       with the Bank Secrecy Act) and efficiently pro-
21       vide loans that are guaranteed under this para-
22       graph.".

23 (l) TECHNICAL AMENDMENT.—Section 7(a)(36)(G)
24 of the Small Business Act (15 U.S.C. 636(a)(36)) is
25 amended—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003135

831

1       (1) in the subparagraph heading, by striking

2 "BORROWER REQUIREMENTS" and all that follows

3 through "eligible recipient applying" and inserting

4 "BORROWER CERTIFICATION REQUIREMENTS.—An

5 eligible recipient applying"; and

6       (2) by redesignating subclauses (I) through

7 (IV) as clauses (i) through (iv), respectively.

**8 SEC. 90002. COMMITMENTS FOR PAYCHECK PROTECTION**

**9          PROGRAM.**

10       Section 1102(b) of the CARES Act (Public Law 116–

11 136) is amended by striking "June 30, 2020" and all that

12 follows through the period at the end and inserting "De-

13 cember 31, 2020, the amount authorized for commitments

14 for loans made under paragraph (36) of section 7(a) of

15 the Small Business Act, as added by subsection (a), shall

16 be $659,000,000,000. The amount authorized under this

17 section for commitments for loans made under section

18 7(a)(36) of the Small Business Act shall be in addition

19 to the amount authorized under the heading 'Small Busi-

20 ness Administration—Business Loans Program Account'

21 in the Financial Services and General Government Appro-

22 priations Act, 2020 (division C of Public Law 116–93)

23 for commitments for general business loans made under

24 section 7(a) of the Small Business Act.".

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003136

832

1   **SEC. 90003. INCLUSION OF SCORE AND VETERAN BUSINESS**

2           **OUTREACH CENTERS IN ENTREPRENEURIAL**

3           **DEVELOPMENT PROGRAMS.**

4       (a) IN GENERAL.—Section 1103(a)(2) of the CARES

5   Act (Public Law 116–136) is amended—

6           (1) in subparagraph (A), by striking ''and'' at

7       the end;

8           (2) by adding at the end the following new sub-

9       paragraphs:

10              ''(C) a Veteran Business Outreach Center

11           (as described under section 32(d) of the Small

12           Business Act); and

13              ''(D) the Service Corps of Retired Execu-

14           tives Association, or any successor or other or-

15           ganization, that receives a grant from the Ad-

16           ministrator to operate the SCORE program es-

17           tablished under section 8(b)(2)(A) of the Small

18           Business Act;''.

19       (b) FUNDING.—Section 1107(a)(4) of the CARES

20   Act (Public Law 116–136) is amended—

21           (1) in subparagraph (A)—

22              (A) by striking ''$240,000,000'' and in-

23           serting ''$220,000,000'';

24              (B) by striking ''and'' at the end; and

25           (2) by adding at the end the following new sub-

26       paragraphs:

DOC_0003137

833

1                "(C) $10,000,000 shall be for a Veteran
2        Business Outreach Center described in section
3        1103(a)(2)(C) of this Act to carry out activities
4        under such section; and

5                "(D) $10,000,000 shall be for the Service
6        Corps of Retired Executives Association de-
7        scribed in section 1103(a)(2)(D) of this Act to
8        carry out activities under such section;".

**SEC. 90004. AMENDMENTS TO PAYCHECK PROTECTION PROGRAM LOAN FORGIVENESS.**

11 (a) COVERED PERIOD.—

12        (1) IN GENERAL.—Section 1106(a)(3) of the
13 CARES Act (Public Law 116–136) is amended to
14 read as follows:

15        "(3) the term 'covered period' means the period
16 beginning on the date of the origination of a covered
17 loan and ending on the earlier of—

18                "(A) the date that is 24 weeks after such
19        date of origination; or

20                "(B) December 31, 2020;".

21        (2) EXEMPTION FOR REHIRES.—Section
22 1106(d)(5)(B) of such Act is amended by striking
23 "June 30, 2020" each place it appears and inserting
24 "December 31, 2020".

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003138

834

1      (b) DEFINITION OF EXPECTED FORGIVENESS

2   AMOUNT.—

3          (1) DEFINITION OF EXPECTED FORGIVENESS

4      AMOUNT.—Section 1106(a)(7) of the CARES Act

5      (Public Law 116–136) is amended—

6              (A) in subparagraph (C), by striking

7          "and" at the end;

8              (B) in subparagraph (D), by striking

9          "and" at the end; and

10             (C) by adding at the end the following new

11         subparagraphs:

12                 "(E) interest on any other debt obligations

13             that were incurred before the covered period;

14             and

15                 "(F) any amount that was a loan made

16             under subsection (b)(2) that was refinanced as

17             part of a covered loan and authorized by section

18             7(a)(36)(F)(iv) of the Small Business Act;

19             and".

20         (2) FORGIVENESS.—Section 1106(b) of the

21     CARES Act (Public Law 116–136) is amended by

22     adding at the end the following new paragraphs:

23         "(5) Any payment of interest on any other debt

24     obligations that were incurred before the covered pe-

25     riod.

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003139

835

1        "(6) Any amount that was a loan made under

2 section 7(b)(2) of the Small Business Act that was

3 refinanced as part of a covered loan and authorized

4 by section 7(a)(36)(F)(iv) of such Act.".

5      (3) CONFORMING AMENDMENTS.—Section 1106

6 of the CARES Act (Public Law 116–136) is amend-

7 ed—

8          (A) in subsection (e)—

9             (i) in paragraph (2), by striking "pay-

10 ments on covered mortgage obligations,

11 payments on covered lease obligations, and

12 covered utility payments" and inserting

13 "payments or amounts refinanced de-

14 scribed under subsection (b) (other than

15 payroll costs)";

16             (ii) in paragraph (3)(B), by striking

17 ", make interest payments" and all that

18 follows through "or make covered utility

19 payments" and inserting ", make pay-

20 ments described under subsection (b), or

21 that was refinanced as part of a covered

22 loan and authorized by section

23 7(a)(36)(F)(iv) of the Small Business

24 Act"; and

836

1        (B) in subsection (h), by striking "pay-
2    ments for payroll costs, payments on covered
3    mortgage obligations, payments on covered
4    lease obligations, or covered utility payments"
5    each place it appears and inserting "payments
6    or amounts refinanced described under sub-
7    section (b)".

8   (c) APPLICATION REQUIREMENTS FOR PAYCHECK
9 PROTECTION PROGRAM LOAN FORGIVENESS.—Section
10 1106(e) of the CARES Act (Public Law 116–136) is
11 amended—

12    (1) in paragraph (3)(B), by striking "and" at
13    the end;

14    (2) by redesignating paragraph (4) as para-
15    graph (6); and

16    (3) by inserting after paragraph (3) the fol-
17    lowing new paragraphs:

18    "(4) information on the veteran status, gender,
19 race, and ethnicity, as reported on Form 1919 of the
20 Administration or any similar loan application form
21 of the Administration, of the eligible recipient;

22    "(5) the number of full-time equivalent employ-
23 ees of the eligible recipient—

24    "(A) on February 15, 2020;

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003141

1     "(B) on the day the eligible recipient sub-

2    mitted an application for a covered loan; and

3     "(C) on the day the eligible recipient sub-

4    mitted an application for forgiveness of a cov-

5    ered loan under this section; and".

6  (d) HOLD HARMLESS FOR ELIGIBLE RECIPIENTS.—

7 Section 1106(d) of the CARES Act (Public Law 116–136)

8 is amended by adding at the end the following new para-

9 graph:

10   "(7) EXEMPTION BASED ON EMPLOYEE AVAIL-

11  ABILITY.—During the period beginning on February

12  15, 2020 and ending on December 31, 2020, the

13  amount of loan forgiveness under this section shall

14  be determined without regard to a reduction in the

15  number of full-time equivalent employees if an eligi-

16  ble recipient—

17    "(A) is unable rehire an individual who

18    was an employee of the eligible recipient on or

19    before February 15, 2020; or

20    "(B) is able to demonstrate an inability to

21    find similarly qualified employees on or before

22    December 31, 2020.".

23  (e) PROHIBITION ON LIMITING FORGIVENESS.—Sec-

24 tion 1106(d) of the CARES Act (Public Law 116–136),

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003142

838

1 as amended by subsection (e), is further amended by add-

2 ing at the end the following new paragraph:

3       "(8) NO LIMITATIONS.—In carrying out this

4       section, the Administrator may not limit the non-

5       payroll portion of a forgivable covered loan

6       amount.".

7     (f) HOLD HARMLESS.—Section 1106(h) of the

8 CARES Act (Public Law 116–136), is amended by strik-

9 ing "If a lender" and all that follows through "during cov-

10 ered period" inserting the following: "If a lender has re-

11 ceived any documentation required under this Act related

12 to payments made by an eligible recipient attesting that

13 the eligible recipient has accurately verified such pay-

14 ments".

15 **SEC. 90005. IMPROVED COORDINATION BETWEEN PAY-**

16           **CHECK PROTECTION PROGRAM AND EM-**

17           **PLOYEE RETENTION TAX CREDIT.**

18     (a) AMENDMENT TO PAYCHECK PROTECTION PRO-

19 GRAM.—Section 1106(a)(8) of the Cares Act is amended

20 by inserting ", except that such costs shall not include

21 qualified wages taken into account in determining the

22 credit allowed under section 2301 of this Act" before the

23 period at the end.

24     (b) AMENDMENTS TO EMPLOYEE RETENTION TAX

25 CREDIT.—

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003143

839

1    (1) IN GENERAL.—Section 2301(g) of the

2  CARES Act is amended to read as follows:

3  "(g) ELECTION TO NOT TAKE CERTAIN WAGES INTO

4  ACCOUNT.—

5    "(1) IN GENERAL.—This section shall not apply

6    to qualified wages paid by an eligible employer with

7    respect to which such employer makes an election

8    (at such time and in such manner as the Secretary

9    may prescribe) to have this section not apply to such

10    wages.

11    "(2) COORDINATION WITH PAYCHECK PROTEC-

12    TION PROGRAM.—The Secretary, in consultation

13    with the Administrator of the Small Business Ad-

14    ministration, shall issue guidance providing that

15    payroll costs paid or incurred during the covered pe-

16    riod shall not fail to be treated as qualified wages

17    under this section by reason of an election under

18    paragraph (1) to the extent that a covered loan of

19    the eligible employer is not forgiven by reason of a

20    decision under section 1106(g). Terms used in the

21    preceding sentence which are also used in section

22    1106 shall have the same meaning as when used in

23    such section.".

24    (2) CONFORMING AMENDMENTS.—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003144

840

1         (A) Section 2301 of the CARES Act is

2     amended by striking subsection (j).

3         (B) Section 2301(l) of the CARES Act is

4     amended by striking paragraph (3) and by re-

5     designating paragraphs (4) and (5) as para-

6     graphs (3) and (4), respectively.

7   (c) EFFECTIVE DATE.—The amendments made by

8 this section shall take effect as if included in the provisions

9 of the CARES Act to which they relate.

**10 SEC. 90006. TAXABILITY OF SUBSIDY FOR CERTAIN LOAN**

**11        PAYMENTS.**

12   Section 1112 of the CARES Act (Public Law 116–

13 136) is amended by inserting at the end the following new

14 subsection:

15   "(g) TAXABILITY.—For purposes of the Internal

16 Revenue Code of 1986, any payment under this section

17 shall not be included in the gross income of the taxpayer

18 on whose behalf such payment is made.".

**19 SEC. 90007. PROHIBITING CONFLICTS OF INTEREST FOR**

**20        SMALL BUSINESS PROGRAMS UNDER THE**

**21        CARES ACT.**

22   Section 4019 of the CARES Act (Public Law 116–

23 136) is amended—

24        (1) in subsection (a), by adding at the end the

25     following:

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003145

G:\CMTE\AP\16\FY20\_D\HEROES.XML

841

1    ''(7) SMALL BUSINESS ASSISTANCE.—The term
2    'small business assistance' means assistance pro-
3    vided under—

4        ''(A) paragraph (36) of section 7(a) of the
5        Small Business Act (15 U.S.C. 636(a)), as
6        added by section 1102 of this Act;

7        ''(B) subsection (b) or (c) of section 1103
8        of this Act;

9        ''(C) section 1110 of this Act; or

10        ''(D) section 1112 of this Act.'';

11    (2) in subsection (b)—

12        (A) by inserting ''or provisions relating to
13        small business assistance'' after ''this subtitle'';
14        and

15        (B) by inserting ''or for any small business
16        assistance'' before the period at the end; and

17    (3) in subsection (c)—

18        (A) by inserting ''or seeking any small
19        business assistance'' after ''4003'';

20        (B) by inserting ''or small business assist-
21        ance'' after ''that transaction'';

22        (C) by inserting ''or the Administrator of
23        the Small Business Administration, as applica-
24        ble,'' after ''System''; and

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003146

842

1        (D) by inserting "or receive the small busi-
2  ness assistance" after "in that transaction".

3  **SEC. 90008. FLEXIBILITY IN DEFERRAL OF PAYMENTS OF**
4          **7(A) LOANS.**

5      Section 7(a)(7) of the Small Business Act (15 U.S.C.
6  636(a)(7)) is amended—

7      (1) by striking "The Administration" and in-
8  serting "(A) IN GENERAL.—The Administrator";

9      (2) by inserting "and interest" after "prin-
10  cipal"; and

11      (3) by adding at the end the following new sub-
12  paragraphs:

13      "(B) DEFERRAL REQUIREMENTS.—With re-
14  spect to a deferral provided under this paragraph,
15  the Administrator—

16          "(i) shall require lenders under this sub-
17  section to provide full payment deferment relief
18  (including payment of principal and interest)
19  for a period of not less than 1 year; and

20          "(ii) may allow lenders under this sub-
21  section provide an additional deferment period
22  if the borrower provides documentation justi-
23  fying such additional deferment.

24      "(C) SECONDARY MARKET.—If an investor de-
25  clines to approve a deferral or additional deferment

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003147

843

1 requested by a lender under subparagraph (B), the
2 Administrator shall exercise the authority to pur-
3 chase the loan so that the borrower may receive full
4 payment deferment relief (including payment of
5 principal and interest) or an additional deferment as
6 described under subparagraph (B).''.

7 **SEC. 90009. CERTAIN CRIMINAL VIOLATIONS AND DIS-**
8    **ASTER LOAN APPLICATIONS.**

9 (a) IN GENERAL.—The flush matter following sub-
10 paragraph (E) of section 7(b)(2) of the Small Business
11 Act (15 U.S.C. 636(b)(2)) is amended by striking the pe-
12 riod at the end and inserting the following: '': *Provided*
13 *further*, That any application for a loan or guarantee made
14 pursuant to this paragraph (2) shall include a statement
15 that an applicant is not ineligible for assistance under this
16 paragraph solely because of the applicant's involvement in
17 the criminal justice system.''

18 (b) RULEMAKING.—Not later than 15 days after the
19 date of enactment of this Act, the Administrator of the
20 Small Business Administration shall make necessary revi-
21 sions to any rules to carry out the amendment made by
22 this section.

23 **SEC. 90010. TEMPORARY FEE REDUCTIONS.**

24 (a) ADMINISTRATIVE FEE WAIVER.—

DOC_0003148

844

1          (1) IN GENERAL.—During the period beginning

2     on the date of enactment of this Act and ending on

3     September 30, 2021, and to the extent that the cost

4     of such elimination or reduction of fees is offset by

5     appropriations, with respect to each loan guaranteed

6     under section 7(a) of the Small Business Act (15

7     U.S.C. 636(a)) (including a recipient of assistance

8     under the Community Advantage Pilot Program of

9     the Administration) for which an application is ap-

10    proved or pending approval on or after the date of

11    enactment of this Act, the Administrator shall—

12          (A) in lieu of the fee otherwise applicable

13       under section 7(a)(23)(A) of the Small Busi-

14       ness Act (15 U.S.C. 636(a)(23)(A)), collect no

15       fee or reduce fees to the maximum extent pos-

16       sible; and

17          (B) in lieu of the fee otherwise applicable

18       under section 7(a)(18)(A) of the Small Busi-

19       ness Act (15 U.S.C. 636(a)(18)(A)), collect no

20       fee or reduce fees to the maximum extent pos-

21       sible.

22          (2) APPLICATION OF FEE ELIMINATIONS OR RE-

23    DUCTIONS.—To the extent that amounts are made

24    available to the Administrator for the purpose of fee

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003149

845

1    eliminations or reductions under paragraph (1), the

2    Administrator shall—

3        (A) first use any amounts provided to

4        eliminate or reduce fees paid by small business

5        borrowers under clauses (i) through (iii) of sec-

6        tion 7(a)(18)(A) of the Small Business Act (15

7        U.S.C. 636(a)(18)(A)), to the maximum extent

8        possible; and

9        (B) then use any amounts provided to

10       eliminate or reduce fees under 7(a)(23)(A) of

11       the Small Business Act (15 U.S.C.

12       636(a)(23)(A)).

13   (c) TEMPORARY FEE ELIMINATION FOR THE 504

14   LOAN PROGRAM.—

15       (1) IN GENERAL.—During the period beginning

16   on the date of enactment of this section and ending

17   on September 30, 2021, and to the extent the cost

18   of such elimination in fees is offset by appropria-

19   tions, with respect to each project or loan guaran-

20   teed by the Administrator pursuant to title V of the

21   Small Business Investment Act of 1958 (15 U.S.C.

22   695 et seq.) for which an application is approved or

23   pending approval on or after the date of enactment

24   of this section—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003150

846

1          (A) the Administrator shall, in lieu of the

2        fee otherwise applicable under section 503(d)(2)

3        of the Small Business Investment Act of 1958

4        (15 U.S.C. 697(d)(2)), collect no fee; and

5          (B) a development company shall, in lieu

6        of the processing fee under section

7        120.971(a)(1) of title 13, Code of Federal Reg-

8        ulations (relating to fees paid by borrowers), or

9        any successor thereto, collect no fee.

10       (2) REIMBURSEMENT FOR WAIVED FEES.—

11         (A) IN GENERAL.—To the extent that the

12      cost of such payments is offset by appropria-

13      tions, the Administrator shall reimburse each

14      development company that does not collect a

15      processing fee pursuant to paragraph (1)(B).

16         (B) AMOUNT.—The payment to a develop-

17      ment company under subparagraph (A) shall be

18      in an amount equal to 1.5 percent of the net

19      debenture proceeds for which the development

20      company does not collect a processing fee pur-

21      suant to paragraph (1)(B).

22  **SEC. 90011. GUARANTEE AMOUNTS.**

23     (a) 7(a) LOAN GUARANTEES.—

24        (1) IN GENERAL.—Section 7(a)(2)(A) of the

25    Small Business Act (15 U.S.C. 636(a)(2)(A)) is

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003151

847

1 amended by striking ''), such participation by the
2 Administration shall be equal to'' and all that fol-
3 lows through the period at the end and inserting ''or
4 the Community Advantage Pilot Program of the Ad-
5 ministration), such participation by the Administra-
6 tion shall be equal to 90 percent of the balance of
7 the financing outstanding at the time of disburse-
8 ment of the loan.''.

9 (2) TERMINATION.—Effective September 30,
10 2021, section 7(a)(2)(A) of the Small Business Act
11 (15 U.S.C. 636(a)(2)(A)), as amended by paragraph
12 (1), is amended to read as follows:

13 ''(A) IN GENERAL.—Except as provided in
14 subparagraphs (B), (D), (E), and (F), in an
15 agreement to participate in a loan on a deferred
16 basis under this subsection (including a loan
17 made under the Preferred Lenders Program),
18 such participation by the Administration shall
19 be equal to—

20 ''(i) 75 percent of the balance of the
21 financing outstanding at the time of dis-
22 bursement of the loan, if such balance ex-
23 ceeds $150,000; or

24 ''(ii) 85 percent of the balance of the
25 financing outstanding at the time of dis-

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003152

848

1             bursement of the loan, if such balance is

2             less than or equal to $150,000.''.

3   (b) EXPRESS LOAN GUARANTEE AMOUNTS.—

4      (1) TEMPORARY MODIFICATION.—Section

5   7(a)(31)(A)(iv) of the Small Business Act (15

6   U.S.C. 636(a)(31)(A)(iv)) is amended by striking

7   ''with a guaranty rate of not more than 50 percent.''

8   and inserting the following: ''with a guarantee

9   rate—

10        ''(I) for a loan in an amount less

11        than or equal to $350,000, of not

12        more than 90 percent; and

13        ''(II) for a loan in an amount

14        greater than $350,000, of not more

15        than 75 percent.''.

16      (2) PROSPECTIVE REPEAL.—Effective January

17   1, 2021, section 7(a)(31)(A)(iv) of the Small Busi-

18   ness Act (15 U.S.C. 636(a)(31)), as amended by

19   paragraph (1), is amended by striking ''guarantee

20   rate'' and all that follows through the period at the

21   end and inserting ''guarantee rate of not more than

22   50 percent.''.

23 **SEC. 90012. MAXIMUM LOAN AMOUNT FOR 7(a) LOANS.**

24   During the period beginning on the date of enactment

25 of this section and ending on September 30, 2021, with

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003153

849

1 respect to any loan guaranteed under section 7(a) of the
2 Small Business Act (15 U.S.C. 636(a)) for which an appli-
3 cation is approved or pending approval on or after the date
4 of enactment of this section, the maximum loan amount
5 shall be $10,000,000.

**SEC. 90013. MAXIMUM LOAN AMOUNT FOR 504 LOANS.**

7 (a) TEMPORARY INCREASE.—During the period be-
8 ginning on the date of enactment of this section and end-
9 ing on September 30, 2021, with respect to each project
10 or loan guaranteed by the Administrator pursuant to title
11 V of the Small Business Investment Act of 1958 (15
12 U.S.C. 695 et seq.) for which an application is approved
13 or pending approval on or after the date of enactment of
14 this section, the maximum loan amount shall be
15 $10,000,000.

16 (b) PERMANENT INCREASE FOR SMALL MANUFAC-
17 TURERS.—Effective on October 1, 2021, section
18 502(2)(A)(iii) of the Small Business Investment Act of
19 1958 (15 U.S.C. 696(2)(A)(iii)) is amended by striking
20 "$5,500,000" and inserting "$10,000,000".

21 (c) LOW-INTEREST REFINANCING UNDER THE
22 LOCAL DEVELOPMENT BUSINESS LOAN PROGRAM.—

23 (1) REPEAL.—Section 521(a) of division E of
24 the Consolidated Appropriations Act, 2016 (Public

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003154

850

1    Law 114–113; 129 Stat. 2463; 15 U.S.C. 696 note)

2    is repealed.

3        (2) REFINANCING.—Section 502(7) of the

4    Small Business Investment Act of 1958 (15 U.S.C.

5    696(7)) is amended by adding at the end the fol-

6    lowing new subparagraph:

7            "(C) REFINANCING NOT INVOLVING EX-

8        PANSIONS.—

9                "(i) DEFINITIONS.—In this subpara-

10            graph—

11                    "(I) the term 'borrower' means a

12                small business concern that submits

13                an application to a development com-

14                pany for financing under this sub-

15                paragraph;

16                    "(II) the term 'eligible fixed

17                asset' means tangible property relat-

18                ing to which the Administrator may

19                provide financing under this section;

20                and

21                    "(III) the term 'qualified debt'

22                means indebtedness that—

23                        "(aa) was incurred not less

24                    than 6 months before the date of

DOC_0003155

851

1        the application for assistance

2        under this subparagraph;

3              ''(bb) is a commercial loan;

4              ''(cc) the proceeds of which

5        were used to acquire an eligible

6        fixed asset;

7              ''(dd) was incurred for the

8        benefit of the small business con-

9        cern; and

10              ''(ee) is collateralized by eli-

11        gible fixed assets; and

12        ''(ii) AUTHORITY.—A project that

13        does not involve the expansion of a small

14        business concern may include the refi-

15        nancing of qualified debt if—

16              ''(I) the amount of the financing

17        is not more than 90 percent of the

18        value of the collateral for the financ-

19        ing, except that, if the appraised value

20        of the eligible fixed assets serving as

21        collateral for the financing is less than

22        the amount equal to 125 percent of

23        the amount of the financing, the bor-

24        rower may provide additional cash or

852

1    other collateral to eliminate any defi-

2    ciency;

3         ''(II) the borrower has been in

4    operation for all of the 2-year period

5    ending on the date the loan applica-

6    tion is submitted; and

7         ''(III) for a financing for which

8    the Administrator determines there

9    will be an additional cost attributable

10    to the refinancing of the qualified

11    debt, the borrower agrees to pay a fee

12    in an amount equal to the anticipated

13    additional cost.

14       ''(iii) FINANCING FOR BUSINESS EX-

15    PENSES.—

16         ''(I) FINANCING FOR BUSINESS

17    EXPENSES.—The Administrator may

18    provide financing to a borrower that

19    receives financing that includes a refi-

20    nancing of qualified debt under clause

21    (ii), in addition to the refinancing

22    under clause (ii), to be used solely for

23    the payment of business expenses.

DOC_0003157

853

1           "(II) APPLICATION FOR FINANC-

2       ING.— An application for financing

3       under subclause (I) shall include—

4               "(aa) a specific description

5           of the expenses for which the ad-

6           ditional financing is requested;

7           and

8               "(bb) an itemization of the

9           amount of each expense.

10          "(III) CONDITION ON ADDI-

11      TIONAL FINANCING.—A borrower may

12      not use any part of the financing

13      under this clause for non-business

14      purposes.

15  "(iv) LOANS BASED ON JOBS.—

16          "(I) JOB CREATION AND RETEN-

17      TION GOALS.—

18              "(aa) IN GENERAL.—The

19          Administrator may provide fi-

20          nancing under this subparagraph

21          for a borrower that meets the job

22          creation goals under subsection

23          (d) or (e) of section 501.

24              "(bb) ALTERNATE JOB RE-

25          TENTION GOAL.—The Adminis-

g:\VHLC\051220\051220.072.xml        (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003158

854

1           trator may provide financing

2           under this subparagraph to a

3           borrower that does not meet the

4           goals described in item (aa) in an

5           amount that is not more than the

6           product obtained by multiplying

7           the number of employees of the

8           borrower by $75,000.

9                "(II) NUMBER OF EMPLOYEES.—

10          For purposes of subclause (I), the

11          number of employees of a borrower is

12          equal to the sum of—

13                "(aa) the number of full-

14          time employees of the borrower

15          on the date on which the bor-

16          rower applies for a loan under

17          this subparagraph; and

18                "(bb) the product obtained

19          by multiplying—

20                  "(AA) the number of

21          part-time employees of the

22          borrower on the date on

23          which the borrower applies

24          for a loan under this sub-

25          paragraph, by

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003159

855

1           "(BB) the quotient ob-
2               tained by dividing the aver-
3               age number of hours each
4               part time employee of the
5               borrower works each week
6               by 40.

7        "(vi) TOTAL AMOUNT OF LOANS.—
8        The Administrator may provide not more
9        than a total of $7,500,000,000 of financ-
10       ing under this subparagraph for each fiscal
11       year.".

12   (d) REFINANCING SENIOR PROJECT DEBT.—During
13 the 1-year period beginning after the date of the enact-
14 ment of this Act, a development company described under
15 title V of the Small Business Investment Act of 1958 (15
16 U.S.C. 695 et seq.) is authorized to allow the refinancing
17 of a senior loan on an existing project in an amount that,
18 when combined with the outstanding balance on the devel-
19 opment company loan, is not more than 90 percent of the
20 total value of the senior loan. Proceeds of such refinancing
21 can be used to support business operating expenses of
22 such development company.

23 **SEC. 90014. RECOVERY ASSISTANCE UNDER THE**
24 **MICROLOAN PROGRAM.**

25   (a) LOANS TO INTERMEDIARIES.—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003160

G:\CMTE\AP\16\FY20\_D\HEROES.XML

856

1    (1) IN GENERAL.—Section 7(m) of the Small

2   Business Act (15 U.S.C. 636(m)) is amended—

3        (A) in paragraph (3)(C)—

4            (i) by striking "and $6,000,000" and

5       inserting "$10,000,000, in the aggre-

6       gate,"; and

7            (ii) by inserting before the period at

8       the end the following: ", and $4,500,000 in

9       any of those remaining years";

10       (B) in paragraph (4)—

11            (i) in subparagraph (A), by striking

12       "subparagraph (C)" each place that term

13       appears and inserting "subparagraphs (C)

14       and (G)";

15            (ii) in subparagraph (C), by amending

16       clause (i) to read as follows:

17            "(i) IN GENERAL.—In addition to

18       grants made under subparagraph (A) or

19       (G), each intermediary shall be eligible to

20       receive a grant equal to 5 percent of the

21       total outstanding balance of loans made to

22       the intermediary under this subsection if—

23            "(I) the intermediary provides

24       not less than 25 percent of its loans

25       to small business concerns located in

DOC_0003161

857

1 or owned by one or more residents of

2 an economically distressed area; or

3   ''(II) the intermediary has a

4 portfolio of loans made under this

5 subsection—

6   ''(aa) that averages not

7 more than $10,000 during the

8 period of the intermediary's par-

9 ticipation in the program; or

10   ''(bb) of which not less than

11 25 percent is serving rural areas

12 during the period of the

13 intermediary's participation in

14 the program.''; and

15 (iii) by adding at the end the fol-

16 lowing:

17 ''(G) GRANT AMOUNTS BASED ON APPRO-

18 PRIATIONS.—In any fiscal year in which the

19 amount appropriated to make grants under

20 subparagraph (A) is sufficient to provide to

21 each intermediary that receives a loan under

22 paragraph (1)(B)(i) a grant of not less than 25

23 percent of the total outstanding balance of

24 loans made to the intermediary under this sub-

25 section, the Administration shall make a grant

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003162

858

1 under subparagraph (A) to each intermediary
2 of not less than 25 percent and not more than
3 30 percent of that total outstanding balance for
4 the intermediary."; and

5     (C) by striking paragraph (7) and insert-
6 ing the following:

7     "(7) PROGRAM FUNDING FOR MICROLOANS.—
8 Under the program authorized by this subsection,
9 the Administration may fund, on a competitive basis,
10 not more than 300 intermediaries.".

11     (2) PROSPECTIVE AMENDMENT.—Effective on
12 October 1, 2021, section 7(m)(3)(C) of the Small
13 Business Act (15 U.S.C. 636(m)(3)(C)), as amended
14 by paragraph (1)(A), is further amended—

15     (A) by striking "$10,000,000" and by in-
16 serting "$7,000,000"; and

17     (B) by striking "$4,500,000" and insert-
18 ing "$3,000,000".

19 (b) TEMPORARY WAIVER OF TECHNICAL ASSIST-
20 ANCE GRANTS MATCHING REQUIREMENTS AND FLEXI-
21 BILITY ON PRE- AND POST-LOAN ASSISTANCE.—During
22 the period beginning on the date of enactment of this sec-
23 tion and ending on September 30, 2021, the Administra-
24 tion shall waive—

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003163

859

1      (1) the requirement to contribute non-Federal

2      funds under section 7(m)(4)(B) of the Small Busi-

3      ness Act (15 U.S.C. 636(m)(4)(B)); and

4      (2) the limitation on amounts allowed to be ex-

5      pended to provide information and technical assist-

6      ance under clause (i) of section 7(m)(4)(E) of the

7      Small Business Act (15 U.S.C. 636(m)(4)(E)) and

8      enter into third-party contracts to provide technical

9      assistance under clause (ii) of such section

10      7(m)(4)(E).

11    (c) TEMPORARY DURATION OF LOANS TO BOR-

12  ROWERS.—

13      (1) IN GENERAL.—During the period beginning

14      on the date of enactment of this section and ending

15      on September 30, 2021, the duration of a loan made

16      by an eligible intermediary under section 7(m) of the

17      Small Business Act (15 U.S.C. 636(m))—

18      (A) to an existing borrower may be ex-

19      tended to not more than 8 years; and

20      (B) to a new borrower may be not more

21      than 8 years.

22    (2) REVERSION.—On and after October 1,

23  2021, the duration of a loan made by an eligible

24  intermediary to a borrower under section 7(m) of

25  the Small Business Act (15 U.S.C. 636(m)) shall be

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003164

860

1    7 years or such other amount established by the Ad-

2    ministrator.

3    (d) FUNDING.—Section 20 of the Small Business Act

4    (15 U.S.C. 631 note) is amended by adding at the end

5    the following:

6    "(h) MICROLOAN PROGRAM.—For each of fiscal

7    years 2021 through 2025, the Administration is author-

8    ized to make—

9        "(1) $80,000,000 in technical assistance grants,

10    as provided in section 7(m); and

11        "(2) $110,000,000 in direct loans, as provided

12    in section 7(m).".

13    (e) AUTHORIZATION OF APPROPRIATIONS.—In addi-

14    tion to amounts provided under the Consolidated Appro-

15    priations Act, 2020 (Public Law 116–93) for the program

16    established under section 7(m) of the Small Business Act

17    (15 U.S.C. 636(m)), there is authorized to be appro-

18    priated for fiscal year 2020, to remain available until ex-

19    pended—

20        (1) $50,000,000 to provide technical assistance

21    grants under such section 7(m); and

22        (2) $7,000,000 to provide direct loans under

23    such section 7(m).

861

## SEC. 90015. CYBERSECURITY AWARENESS REPORTING.

Section 10 of the Small Business Act (15 U.S.C. 639) is amended by inserting after subsection (a) the following:

"(b) CYBERSECURITY REPORTS.—

"(1) ANNUAL REPORT.—Not later than 180 days after the date of enactment of this subsection, and every year thereafter, the Administrator shall submit a report to the appropriate congressional committees that includes—

"(A) an assessment of the information technology (as defined in section 11101 of title 40, United States Code) and cybersecurity infrastructure of the Administration;

"(B) a strategy to increase the cybersecurity infrastructure of the Administration;

"(C) a detailed account of any information technology equipment or interconnected system or subsystem of equipment of the Administration that was manufactured by an entity that has its principal place of business located in the People's Republic of China; and

"(D) an account of any cybersecurity risk or incident that occurred at the Administration during the 2-year period preceding the date on which the report is submitted, and any action

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003166

862

1       taken by the Administrator to respond to or re-
2       mediate any such cybersecurity risk or incident.

3       ''(2) ADDITIONAL REPORTS.—If the Adminis-
4       trator determines that there is a reasonable basis to
5       conclude that a cybersecurity risk or incident oc-
6       curred at the Administration, the Administrator
7       shall—

8               ''(A) not later than 7 days after the date
9           on which the Administrator makes that deter-
10          mination, notify the appropriate congressional
11          committees of the cybersecurity risk or incident;
12          and

13              ''(B) not later than 30 days after the date
14          on which the Administrator makes a determina-
15          tion under subparagraph (A)—

16                  ''(i) provide notice to individuals and
17              small business concerns affected by the cy-
18              bersecurity risk or incident; and

19                  ''(ii) submit to the appropriate con-
20              gressional committees a report, based on
21              information available to the Administrator
22              as of the date which the Administrator
23              submits the report, that includes—

24                      ''(I) a summary of information
25                  about the cybersecurity risk or inci-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003167

G:\CMTE\AP\16\FY20\_D\HEROES.XML

863

1 dent, including how the cybersecurity

2 risk or incident occurred; and

3 ''(II) an estimate of the number

4 of individuals and small business con-

5 cerns affected by the cybersecurity

6 risk or incident, including an assess-

7 ment of the risk of harm to affected

8 individuals and small business con-

9 cerns.

10 ''(3) RULE OF CONSTRUCTION.—Nothing in

11 this subsection shall be construed to affect the re-

12 porting requirements of the Administrator under

13 chapter 35 of title 44, United States Code, in par-

14 ticular the requirement to notify the Federal infor-

15 mation security incident center under section

16 3554(b)(7)(C)(ii) of such title, or any other provi-

17 sion of law.

18 ''(4) DEFINITIONS.—In this subsection:

19 ''(A) APPROPRIATE CONGRESSIONAL COM-

20 MITTEES.—The term 'appropriate congressional

21 committees' means—

22 ''(i) the Committee on Small Business

23 and Entrepreneurship of the Senate; and

24 ''(ii) the Committee on Small Busi-

25 ness of the House of Representatives.

DOC_0003168

864

1 ''(B) CYBERSECURITY RISK; INCIDENT.—
2 The terms 'cybersecurity risk' and 'incident'
3 have the meanings given such terms, respec-
4 tively, under section 2209(a) of the Homeland
5 Security Act of 2002.''.

6 **SEC. 90016. REPORTING ON SMALL BUSINESS PROGRAMS**
7 **UNDER THE CARES ACT.**

8 (a) DEFINITIONS.—In this section—

9 (1) the terms ''Administration'' and ''Adminis-
10 trator'' mean the Small Business Administration
11 and the Administrator thereof;

12 (2) the term ''appropriate congressional com-
13 mittees'' means—

14 (A) Committee on Appropriations and the
15 Committee on Small Business and Entrepre-
16 neurship of the Senate; and

17 (B) the Committee on Appropriations and
18 the Committee on Small Business of the House
19 of Representatives;

20 (3) the term ''covered assistance'' means—

21 (A) loans made under section 7(a)(36) of
22 the Small Business Act (15 U.S.C. 636(a)(36));

23 (B) an advance on a loan made under sec-
24 tion 1110(e) of the CARES Act (Public Law
25 116–136);

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003169

1       (C) loans made under section 7(b)(2) of

2       the Small Business Act (15 U.S.C. 636(b)(2)),

3       including those made in accordance with section

4       1110 of the CARES Act (Public Law 116–

5       136);

6       (D) loan forgiveness under section 1106 of

7       the CARES Act (Public Law 116–136); and

8       (E) the payment of principal, interest, and

9       fees under section 1112(c) of the CARES Act

10       (Public Law 116–136);

11      (4) the term "covered loan" has the meaning

12     given the term in section 1112(a) of the CARES Act

13     (Public Law 116–136);

14      (5) the term "demographics" means veteran

15     status, gender, race, and ethnicity, as reported on

16     Form 1919 of the Administration or any similar

17     loan application form of the Administration; and

18      (6) the term "State"—

19       (A) means any State of the United States,

20       the District of Columbia, the Commonwealth of

21       Puerto Rico, the United States Virgin Islands,

22       Guam, American Samoa, the Commonwealth of

23       the Northern Mariana Islands, and any posses-

24       sion of the United States; and

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003170

866

1     (B) includes an Indian tribe, as defined in

2     section 4 of the Indian Self-Determination and

3     Education Assistance Act (25 U.S.C. 450b).

4     (b) DAILY REPORTING.—

5     (1) IN GENERAL.—During the period beginning

6     on the day after the date of enactment of this Act

7     and ending on the date on which loan, advance, or

8     payment activity described in this subsection related

9     to COVID–19 has ceased, the Administrator shall,

10    on a daily basis, report to Congress on—

11    (A) the total number and dollar amount of

12    loans or advances, broken down by loans and

13    grants approved and loans and grants dis-

14    bursed, under—

15    (i) section 7(a)(36) of the Small Busi-

16    ness Act (15 U.S.C. 636(a)(36));

17    (ii) section 1110(e) of the CARES Act

18    (Public Law 116–136); and

19    (iii) section 7(b)(2) of the Small Busi-

20    ness Act (15 U.S.C. 636(b)(2));

21    (B) for loans made under section 7(a)(36)

22    of the Small Business Act (15 U.S.C.

23    636(a)(36))—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003171

867

1      (i) the amount of remaining authority

2  for the loans, in dollar amount and as a

3  percentage; and

4      (ii) an estimate of the date on which

5  the net and gross dollar amount of loans

6  will reach the maximum amount author-

7  ized for commitments for such loans;

8  (C) for advances made under section

9  1110(e) of the CARES Act (Public Law 116–

10  136)—

11      (i) the amount of remaining funds ap-

12  propriated for the advances, in dollar

13  amount and as a percentage; and

14      (ii) an estimate of the date on which

15  the funds will be expended; and

16  (D) for loans made under section 7(b)(2)

17  of the Small Business Act (15 U.S.C.

18  636(b)(2))—

19      (i) the amount of remaining authority

20  for the loans, in dollar amount and as a

21  percentage; and

22      (ii) an estimate of the date on which

23  the net and gross dollar amount of loans

24  will reach the maximum amount author-

25  ized for commitments for such loans.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003172

868

1    (2) REPORTING ON DEBT RELIEF FOR

2    MICROLOANS, 7(A) LOANS, AND 504 LOANS.—The Ad-

3    ministrator shall include in each daily report sub-

4    mitted under paragraph (1), and update on a

5    monthly basis until the date described in paragraph

6    (1), with respect to payments made on covered loans

7    under section 1112(c) of the CARES Act (Public

8    Law 116–136)—

9        (A) the amount of remaining funds appro-

10       priated for the payments, in dollar amount and

11       as a percentage; and

12       (B) an estimate of the date on which the

13       funds will be expended.

14   (c) WEEKLY REPORTING.—

15       (1) IN GENERAL.—Not later than 1 week after

16   the date of enactment of this Act, and every week

17   thereafter until the date on which loan, advance, or

18   payment activity described in this subsection related

19   to COVID–19 has ceased, the Administrator shall

20   submit to Congress a report on—

21       (A) loans made under section 7(a)(36) of

22       the Small Business Act (15 U.S.C. 636(a)(36)),

23       which shall include—

24           (i) the number and dollar amount of

25           loans approved for or disbursed to all bor-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003173

869

rowers, including a breakout of loans by
State, congressional district, demographics,
industry, and loan size;

(ii) the number and dollar amount of
loans approved for or disbursed to business
concerns assigned a North American In-
dustry Classification System code begin-
ning with 72, including a breakout of loans
by State, congressional district, demo-
graphics, and loan size;

(iii) the number and dollar amount of
loans approved for or disbursed to non-
profit organizations and veterans organiza-
tions (as those terms are defined in section
7(a)(36)(A) of the Small Business Act (15
U.S.C. 636(a)(36)(A)), including religious
institutions, including a breakout of loans
by State, congressional district, industry,
and loan size;

(iv) for each category of borrowers de-
scribed in clauses (i), (ii), and (iii)—

(I) the number of full-time equiv-
alent employees at the time at which
the borrower submits a loan applica-
tion;

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003174

G:\CMTE\AP\16\FY20\_D\HEROES.XML

870

1     (II) the number of full-time

2     equivalent employees at the time at

3     which the borrower receives loan for-

4     giveness under section 1106 of the

5     CARES Act (Public Law 116–136);

6     and

7     (III) the number of full-time

8     equivalent employees expected for bor-

9     rowers in the 6-month period fol-

10     lowing forgiveness of the loan;

11    (v) the number and dollar amount of

12   loans fully forgiven under section 1106 of

13   the CARES Act (Public Law 116–136), as

14   compared to the number and dollar

15   amount of loans made as of the date of the

16   report;

17    (vi) the number and dollar amount of

18   loans not fully forgiven under section 1106

19   of the CARES Act (Public Law 116–136),

20   and the proportion of that dollar amount

21   of loans that become term loans guaran-

22   teed by the Administration under section

23   7(a)(36) of the Small Business Act (15

24   U.S.C. 636(a)(36));

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

871

(vii) the total amount of the lender compensation fees paid to lenders; and

(viii) the total amount lenders paid in broker fees; and

(B) loans made under section 7(b)(2) of the Small Business Act (15 U.S.C. 636(b)(2)) and advances made under section 1110(e) of the CARES Act (Public Law 116–136), which shall include—

(i) the number and dollar amount of loans approved for or disbursed to all borrowers, including a breakout of loans by State, congressional district, demographics, industry, and loan size;

(ii) the number and dollar amount of advances approved for or disbursed to grantees, including a breakout of loans by State, congressional district, demographics, industry, and grant size;

(iii) the number and dollar amount of advances approved for or disbursed to private nonprofit organizations, including a breakout by State, congressional district, industry, and loan or grant size;

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003176

G:\CMTE\AP\16\FY20\_D\HEROES.XML

872

1      (iv) for each category of recipients,

2      the number of full-time equivalent employ-

3      ees of the recipient at the time at which an

4      application is submitted for the loan or ad-

5      vance, and the number of jobs created or

6      retained because of the loan or advance;

7      (v) loan processing times, including

8      processing times for application to ap-

9      proval and approval to disbursement; and

10      (vi) advance processing times, includ-

11      ing the percentage of advances that were

12      provided within 3 days of submission of

13      the application, as required under section

14      1110(e)(1) of the CARES Act (Public Law

15      116–136).

16   (2) REPORTING ON DEBT RELIEF FOR

17  MICROLOANS, 7(A) LOANS, AND 504 LOANS.—The Ad-

18  ministrator shall include in each weekly report sub-

19  mitted under paragraph (1), and update on a

20  monthly basis until the date described in paragraph

21  (1), with respect to payments made on covered loans

22  under section 1112(c) of the CARES Act (Public

23  Law 116–136)—

24     (A) the total dollar amount approved and

25     the total amount disbursed by the Administra-

DOC_0003177

G:\CMTE\AP\16\FY20\_D\HEROES.XML

873

1     tion and the number of borrowers receiving as-
2     sistance under such section 1112(c), including a
3     breakdown by—
4                (i) each type of covered loan described
5          in subparagraph (A) and (B) of paragraph
6          (1) and paragraph (2) of such section
7          1112(a); and
8                (ii) whether the borrower is—
9                     (I) an existing borrower of a cov-
10               ered loan, as described in subpara-
11               graph (A) or (B) of such section
12               1112(c)(1); or
13                    (II) a new borrower of a covered
14               loan, as described in subparagraph
15               (C) of such section 1112(c)(1);
16        (B) the total dollar amount approved and
17     the total amount disbursed by the Administra-
18     tion by the Administration and number of bor-
19     rowers receiving assistance under such section
20     1112(c) broken out by State and congressional
21     district, including a breakdown by each type of
22     covered loan described in subparagraph (A) and
23     (B) of paragraph (1) and paragraph (2) of such
24     section 1112(a); and

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003178

874

           1           (C) the total number and amount of new

   2           covered loans by approval and disbursement

   3           broken out by lending institution, including a

   4           breakout of loans by State, congressional dis-

   5           trict, demographics, industry, and loan size.

   6    (d) REPORT ON WASTE, FRAUD AND ABUSE.—Not

   7 later than 30 days after the date of enactment of this Act,

   8 the Administrator and the Secretary of the Treasury shall

   9 submit to Congress a joint report on steps that the Admin-

  10 istration and the Department of the Treasury are taking

  11 to identify and prevent potential instances of waste, fraud,

  12 and abuse relating to covered assistance, including bor-

  13 rower compliance with any loan deferment, relief, or for-

  14 giveness provided through covered assistance.

  15    (e) REPORT ON JOBS FOR THE DEBT RELIEF PRO-

  16 GRAM.—

  17        (1) IN GENERAL.—To the extent practicable,

  18        with respect to each type of covered loan described

  19        in subparagraphs (A) and (B) of paragraph (1) and

  20        paragraph (2) of section 1112(a) of the CARES Act

  21        (Public Law 116–136), the Administrator shall sub-

  22        mit to Congress a report on—

  23           (A) the number of full-time equivalent em-

  24           ployees—

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003179

875

1          (i) for existing borrowers of a covered

2      loan, as described in subparagraph (A) or

3      (B) of such section 1112(c)(1) at the start

4      of the debt relief under such section

5      1112(c); and

6          (ii) for new borrowers of a covered

7      loan, as described in subparagraph (C) of

8      such section 1112(c)(1), at the time of ap-

9      plication for the covered loan; and

10          (B) the number of jobs created or retained

11      because of the covered loan or the debt relief.

12      (2) TIMING.—The Administrator shall, to the

13  extent practicable, submit to Congress the report re-

14  quired under paragraph (1) not later than October

15  1, 2020, with an updated version submitted not later

16  than January 31, 2021.

17      (f) REPORT ON CARES ACT SALARIES AND EX-

18  PENSES FUNDING.—Not later than 30 days after the date

19  of enactment of this Act, the Administrator shall submit

20  to the appropriate congressional committees a report that

21  includes the plans of the Administrator to use the

22  $675,000,000 provided in section 1107(a)(2) of the

23  CARES Act (Public Law 116–136) for salaries and ex-

24  penses, and the $2,100,000,000 provided in title II of the

25  Paycheck Protection Program and Health Care Enhance-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003180