876

ment Act (Public Law 116–139) for salaries and expenses
(including staff hired, the use of outside consultants, pro-
gram improvements, and system upgrades), to carry out
the provisions of title I of division A of the CARES Act
(Public Law 116–136).

(g) COLLECTION OF ADDITIONAL DATA.—The Ad-
ministrator shall collect and make publically available—

(1) the number and dollar amount of loans ap-
proved and for or disbursed under 7(a)(36) of the
Small Business Act (15 U.S.C. 636(a)(36)) to bor-
rowers broken out by lending institution, including a
breakout of loans made by the lending institution by
State, congressional district, demographics, industry,
and loan size, and the number and percent of loan
applicants that were new or existing customers of
the lender;

(2) the total amount of the lender compensation
fees paid to each lender under such section 7(a)(36);

(3) the total amount each lender paid in broker
fees under such section 7(a)(36); and

(4) to the extent practicable, detailed informa-
tion on processing times for—

(A) loan approvals and loan disbursements
under such section 7(a)(36); and

DOC_0003181

877

1    (B) notices of forgiveness of the loans

2    under section 1106 of the CARES Act (Public

3    Law 116–136) to borrowers.

4  (h) FORMAT OF REPORTED DATA.—Not later than

5 30 days after the date of enactment of this Act, the Ad-

6 ministrator shall make available on a publicly available

7 website in a standardized and downloadable format, and

8 update on a monthly basis, any data contained in a report

9 submitted under this section.

10 **SEC. 90017. FUNDING FOR RESOURCES AND SERVICES IN**

11     **LANGUAGES OTHER THAN ENGLISH.**

12  Of the unobligated balances of amounts appropriated

13 for salaries and expenses by section 1107(a)(2) of the

14 CARES Act, $25,000,000 shall be made available to carry

15 out the requirements of section 1111 of such Act.

16 **SEC. 90018. DIRECT APPROPRIATION.**

17  There is appropriated, out of amounts in the Treas-

18 ury not otherwise appropriated, for the fiscal year ending

19 September 30, 2020, to remain available until September

20 30, 2021—

21    (1) $500,000,000 under the heading "Small

22    Business Administration—Business Loans Program

23    Account" to carry out the requirements of sections

24    90010, 90011, and 90012 of this division; and

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003182

G:\CMTE\AP\16\FY20\_D\HEROES.XML

878

1    (2) $7,000,000 under the heading "Small Busi-
2    ness Administration—Business Loans Program Ac-
3    count" to carry out the requirements of section
4    90014 of this division; and

5    (3) $50,000,000 under the heading "Small
6    Business Administration—Entrepreneurial Develop-
7    ment Programs" for technical assistance grants, as
8    authorized under section 90014 of this division.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003183

879

# DIVISION J—SUPPORT FOR ESSENTIAL WORKERS, AT-RISK INDIVIDUALS, FAMILIES, AND COMMUNITIES
## TITLE I—FAMILY CARE FOR ESSENTIAL WORKERS

**SEC. 100101. FAMILY CARE FOR ESSENTIAL WORKERS.**

(a) INCREASE IN FUNDING.—

(1) IN GENERAL.—The amount specified in subsection (c) of section 2003 of the Social Security Act for purposes of subsections (a) and (b) of such section is deemed to be $12,150,000,000 for fiscal year 2020, of which $850,000,000 shall be obligated by States during calendar year 2020 in accordance with subsection (b) of this section.

(2) APPROPRIATION.—Out of any money in the Treasury of the United States not otherwise appropriated, there are appropriated $850,000,000 for fiscal year 2020 to carry out this section.

(b) RULES GOVERNING USE OF ADDITIONAL FUNDS.—

(1) IN GENERAL.—Funds are used in accordance with this subsection if—

(A) the funds are used for—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003184

G:\CMTE\AP\16\FY20\_D\HEROES.XML

880

1           (i) child care services for a child of an
2       essential worker; or
3           (ii) daytime care services or other
4       adult protective services for an individual
5       who—
6               (I) is a dependent, or a member
7           of the household of, an essential work-
8           er; and
9               (II) requires the services;
10      (B) the funds are provided to reimburse an
11  essential worker for the cost of obtaining the
12  services (including child care services obtained
13  on or after the date the Secretary of Health
14  and Human Services declared a public health
15  emergency pursuant to section 319 of the Pub-
16  lic Health Service Act on January 31, 2020, en-
17  titled ''Determination that a Public Health
18  Emergency Exists Nationwide as the Result of
19  the 2019 Novel Coronavirus''), to a provider of
20  child care services, or to establish a temporary
21  child care facility operated by a State or local
22  government;
23      (C) eligibility for the funds or services, and
24  the amount of funds or services provided, is not
25  conditioned on a means test;

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003185

G:\CMTE\AP\16\FY20\_D\HEROES.XML

881

1    (D) the funds are used subject to the limi-
2    tations in section 2005 of the Social Security
3    Act, except that, for purposes of this subpara-
4    graph—

5        (i) paragraphs (3), (5), and (8) of sec-
6        tion 2005(a) of such Act shall not apply;
7        and

8        (ii)(I) the limitation in section
9        2005(a)(7) of such Act shall not apply
10       with respect to any standard which the
11       State involved determines would impede
12       the ability of the State to provide emer-
13       gency temporary care to a child, depend-
14       ent, or household member referred to in
15       subparagraph (A) of this paragraph; and

16       (II) if the State determines that such
17       a standard would be so impeding, the
18       State shall report the determination to the
19       Secretary, separately from the annual re-
20       port to the Secretary by the State;

21   (E) the funds are used to supplement, not
22   supplant, State general revenue funds for child
23   care assistance; and

24   (F) the funds are not used for child care
25   costs that are—

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003186

G:\CMTE\AP\16\FY20\_D\HEROES.XML

882

1                 (i) covered by funds provided under

2                 the Child Care and Development Block

3                 Grant Act of 1990 or section 418 of the

4                 Social Security Act; or

5                 (ii) reimbursable by the Federal

6                 Emergency Management Agency.

7         (2) ESSENTIAL WORKER DEFINED.—In para-

8 graph (1), the term "essential worker" means—

9                 (A) a health sector employee;

10                 (B) an emergency response worker;

11                 (C) a sanitation worker;

12                 (D) a worker at a business which a State

13 or local government official has determined

14 must remain open to serve the public during the

15 emergency referred to in paragraph (1)(B); and

16                 (E) any other worker who cannot telework,

17 and whom the State deems to be essential dur-

18 ing the emergency referred to in paragraph

19 (1)(B).

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003187

# TITLE II—PANDEMIC EMER-GENCY ASSISTANCE AND SERVICES

### SEC. 100201. FUNDING TO STATES, LOCALITIES, AND COM-MUNITY-BASED ORGANIZATIONS FOR EMER-GENCY AID AND SERVICES.

(a) FUNDING FOR STATES.—

(1) INCREASE IN FUNDING FOR SOCIAL SERV-ICES BLOCK GRANT PROGRAM.—

(A) APPROPRIATION.—Out of any money in the Treasury of the United States not otherwise appropriated, there are appropriated $9,600,000,000, which shall be available for payments under section 2002 of the Social Security Act.

(B) DEADLINE FOR DISTRIBUTION OF FUNDS.—Within 45 days after the date of the enactment of this Act, the Secretary of Health and Human Services shall distribute the funds made available by this paragraph, which shall be made available to States on an emergency basis for immediate obligation and expenditure.

(C) SUBMISSION OF REVISED PRE-EX-PENDITURE REPORT.—Within 90 days after a State receives funds made available by this

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003188

884

1 paragraph, the State shall submit to the Sec-

2 retary a revised pre-expenditure report pursu-

3 ant to title XX of the Social Security Act that

4 describes how the State plans to administer the

5 funds.

6 (D) OBLIGATION OF FUNDS BY STATES.—

7 A State to which funds made available by this

8 paragraph are distributed shall obligate the

9 funds not later than December 31, 2020.

10 (E) EXPENDITURE OF FUNDS BY

11 STATES.—A grantee to which a State (or a sub-

12 grantee to which a grantee) provides funds

13 made available by this paragraph shall expend

14 the funds not later than December 31, 2021.

15 (2) RULES GOVERNING USE OF ADDITIONAL

16 FUNDS.—A State to which funds made available by

17 paragraph (1)(B) are distributed shall use the funds

18 in accordance with the following:

19 (A) PURPOSE.—

20 (i) IN GENERAL.—The State shall use

21 the funds only to support the provision of

22 emergency services to disadvantaged chil-

23 dren, families, and households.

24 (ii) DISADVANTAGED DEFINED.—In

25 this paragraph, the term ''disadvantaged''

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003189

885

1      means, with respect to an entity, that the

2      entity—

3                  (I) is an individual, or is located

4           in a community, that is experiencing

5           material hardship;

6                  (II) is a household in which there

7           is a child (as defined in section 12(d)

8           of the Richard B. Russell National

9           School Lunch Act) or a child served

10          under section 11(a)(1) of such Act,

11          who, if not for the closure of the

12          school attended by the child during a

13          public health emergency designation

14          and due to concerns about a COVID–

15          19 outbreak, would receive free or re-

16          duced price school meals pursuant to

17          such Act;

18                 (III) is an individual, or is lo-

19          cated in a community, with barriers to

20          employment; or

21                 (IV) is located in a community

22          that, as of the date of the enactment

23          of this Act, is not experiencing a 56-

24          day downward trajectory of—

25                      (aa) influenza-like illnesses;

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003190

G:\CMTE\AP\16\FY20\_D\HEROES.XML

886

1         (bb) COVID-like syndromic

2         cases;

3         (cc) documented COVID–19

4         cases; or

5         (dd) positive test results as

6         a percentage of total COVID–19

7         tests.

8     (B) PASS-THROUGH TO LOCAL ENTI-

9 TIES.—

10       (i) In the case of a State in which a

11 county administers or contributes finan-

12 cially to the non-Federal share of the

13 amounts expended in carrying out a State

14 program funded under title IV of the So-

15 cial Security Act, the State may pass funds

16 so made available through to—

17       (I) the chief elected official of the

18 city or urban county that administers

19 the program; or

20       (II) local government and com-

21 munity-based organizations.

22       (ii) In the case of any other State, the

23 State shall—

24       (I) pass the funds through to—

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003191

887

      (aa)(AA) local governments
that will expend or distribute the
funds in consultation with com-
munity-based organizations with
experience serving disadvantaged
families or individuals; or

      (BB) community-based or-
ganizations with experience serv-
ing disadvantaged families and
individuals; and

      (bb) sub-State areas in pro-
portions based on the population
of disadvantaged individuals liv-
ing in the areas; and

    (II) report to the Secretary on
how the State determined the
amounts passed through pursuant to
this clause.

(C) METHODS.—

    (i) IN GENERAL.—The State shall use
the funds only for—

      (I) administering emergency serv-
ices;

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003192

888

1          (II) providing short-term cash,
2     non-cash, or in-kind emergency dis-
3     aster relief;
4          (III) providing services with dem-
5     onstrated need in accordance with ob-
6     jective criteria that are made available
7     to the public;
8          (IV) operational costs directly re-
9     lated to providing services described
10    in subclauses (I), (II), and (III);
11         (V) local government emergency
12    social service operations; and
13         (VI) providing emergency social
14    services to rural and frontier commu-
15    nities that may not have access to
16    other emergency funding streams.
17    (ii) ADMINISTERING EMERGENCY
18    SERVICES DEFINED.—In clause (i), the
19    term ''administering emergency services''
20    means—
21         (I) providing basic disaster relief,
22    economic, and well-being necessities to
23    ensure communities are able to safely
24    observe shelter-in-place and social
25    distancing orders;

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003193

889

1          (II) providing necessary supplies

2        such as masks, gloves, and soap, to

3        protect the public against infectious

4        disease; and

5          (III) connecting individuals, chil-

6        dren, and families to services or pay-

7        ments for which they may already be

8        eligible.

9     (D) PROHIBITIONS.—

10        (i) NO INDIVIDUAL ELIGIBILITY DE-

11      TERMINATIONS BY GRANTEES OR SUB-

12      GRANTEES.—Neither a grantee to which

13      the State provides the funds nor any sub-

14      grantee of such a grantee may exercise in-

15      dividual eligibility determinations for the

16      purpose of administering short-term, non-

17      cash, in-kind emergency disaster relief to

18      communities.

19        (ii) APPLICABILITY OF CERTAIN SO-

20      CIAL SERVICES BLOCK GRANT FUNDS USE

21      LIMITATIONS.—The State shall use the

22      funds subject to the limitations in section

23      2005 of the Social Security Act, except

24      that, for purposes of this clause, section

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003194

890

1                2005(a)(2) and 2005(a)(8) of such Act

2                shall not apply.

3                     (iii) NO SUPPLANTATION OF CERTAIN

4                STATE FUNDS.—The State may use the

5                funds to supplement, not supplant, State

6                general revenue funds for social services.

7                     (iv) BAN ON USE FOR CERTAIN COSTS

8                REIMBURSABLE BY FEMA.—The State may

9                not use the funds for costs that are reim-

10               bursable by the Federal Emergency Man-

11               agement Agency, under a contract for in-

12               surance, or by self-insurance.

13       (b) FUNDING FOR FEDERALLY RECOGNIZED INDIAN

14 TRIBES AND TRIBAL ORGANIZATIONS.—

15         (1) GRANTS.—

16             (A) IN GENERAL.—Within 90 days after

17            the date of the enactment of this Act, the Sec-

18            retary of Health and Human Services shall

19            make grants to federally recognized Indian

20            Tribes and Tribal organizations.

21             (B) AMOUNT OF GRANT.—The amount of

22            the grant for an Indian Tribe or Tribal organi-

23            zation shall bear the same ratio to the amount

24            appropriated by paragraph (3) as the total

25            amount of grants awarded to the Indian Tribe

g:\VHLC\051220\051220.072.xml     (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003195

891

1      or Tribal organization under the Low-Income
2      Home Energy Assistance Act of 1981 and the
3      Community Service Block Grant for fiscal year
4      2020 bears to the total amount of grants
5      awarded to all Indian Tribes and Tribal organi-
6      zations under such Act and such Grant for the
7      fiscal year.

8          (2) RULES GOVERNING USE OF FUNDS.—An
9      entity to which a grant is made under paragraph (1)
10     shall obligate the funds not later than December 31,
11     2020, and the funds shall be expended by grantees
12     and subgrantees not later than December 31, 2021,
13     and used in accordance with the following:

14         (A) PURPOSE.—

15             (i) IN GENERAL.—The grantee shall
16         use the funds only to support the provision
17         of emergency services to disadvantaged
18         households.

19             (ii) DISADVANTAGED DEFINED.—In
20         clause (i), the term ''disadvantaged''
21         means, with respect to an entity, that the
22         entity—

23                 (I) is an individual, or is located
24             in a community, that is experiencing
25             material hardship;

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003196

892

1                  (II) is a household in which there

2             is a child (as defined in section 12(d)

3             of the Richard B. Russell National

4             School Lunch Act) or a child served

5             under section 11(a)(1) of such Act,

6             who, if not for the closure of the

7             school attended by the child during a

8             public health emergency designation

9             and due to concerns about a COVID–

10            19 outbreak, would receive free or re-

11            duced price school meals pursuant to

12            such Act;

13                (III) is an individual, or is lo-

14            cated in a community, with barriers to

15            employment; or

16                (IV) is located in a community

17            that, as of the date of the enactment

18            of this Act, is not experiencing a 56-

19            day downward trajectory of—

20                  (aa) influenza-like illnesses;

21                  (bb) COVID-like syndromic

22            cases;

23                  (cc) documented COVID–19

24            cases; or

DOC_0003197

G:\CMTE\AP\16\FY20\_D\HEROES.XML

893

<div style="margin-left: 2em;">

1         (dd) positive test results as

2         a percentage of total COVID–19

3         tests.

4    (B) METHODS.—

5       (i) IN GENERAL.—The grantee shall

6  use the funds only for—

7         (I) administering emergency serv-

8         ices;

9         (II) providing short-term, non-

10         cash, in-kind emergency disaster re-

11         lief; and

12         (III) tribal emergency social serv-

13         ice operations.

14       (ii) ADMINISTERING EMERGENCY

15  SERVICES DEFINED.—In clause (i), the

16  term "administering emergency services"

17  means—

18         (I) providing basic economic and

19         well-being necessities to ensure com-

20         munities are able to safely observe

21         shelter-in-place and social distancing

22         orders;

23         (II) providing necessary supplies

24         such as masks, gloves, and soap, to

</div>

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003198

G:\CMTE\AP\16\FY20\_D\HEROES.XML

894

1 protect the public against infectious
2 disease; and

3 (III) connecting individuals, chil-
4 dren, and families to services or pay-
5 ments for which they may already be
6 eligible.

7 (C) PROHIBITIONS.—

8 (i) NO INDIVIDUAL ELIGIBILITY DE-
9 TERMINATIONS BY GRANTEES OR SUB-
10 GRANTEES.—Neither the grantee nor any
11 subgrantee may exercise individual eligi-
12 bility determinations for the purpose of ad-
13 ministering short-term, non-cash, in-kind
14 emergency disaster relief to communities.

15 (ii) BAN ON USE FOR CERTAIN COSTS
16 REIMBURSABLE BY FEMA.—The grantee
17 may not use the funds for costs that are
18 reimbursable by the Federal Emergency
19 Management Agency, under a contract for
20 insurance, or by self-insurance.

21 (3) APPROPRIATION.—Out of any money in the
22 Treasury of the United States not otherwise appro-
23 priated, there are appropriated to the Secretary of
24 Health and Human Services $400,000,000 to carry
25 out this subsection.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003199

895

1 **SEC. 100202. EMERGENCY ASSISTANCE TO OLDER FOSTER**

2 **YOUTH.**

3 (a) FUNDING INCREASES.—

4 (1) GENERAL PROGRAM.—The dollar amount

5 specified in section 477(h)(1) of the Social Security

6 Act for fiscal year 2020 is deemed to be

7 $193,000,000.

8 (2) EDUCATION AND TRAINING VOUCHERS.—

9 The dollar amount specified in section 477(h)(2) of

10 such Act for fiscal year 2020 is deemed to be

11 $78,000,000.

12 (b) PROGRAMMATIC FLEXIBILITY.—With respect to

13 the period that begins on March 1, 2020, and ends Janu-

14 ary 31, 2021:

15 (1) ELIMINATION OF AGE LIMITATIONS ON ELI-

16 GIBILITY FOR ASSISTANCE.—Eligibility for services

17 or assistance under a State program operated pursu-

18 ant to section 477 of the Social Security Act shall

19 be provided without regard to the age of the recipi-

20 ent.

21 (2) SUSPENSION OF WORK AND EDUCATION RE-

22 QUIREMENTS UNDER THE EDUCATION AND TRAIN-

23 ING VOUCHER PROGRAM.—Section 477(i)(3) of the

24 Social Security Act shall be applied and adminis-

25 tered without regard to any work or education re-

26 quirement.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003200

896

1        (3) AUTHORITY TO WAIVE LIMITATION ON PER-
2    CENTAGE OF FUNDS USED FOR HOUSING ASSIST-
3    ANCE.—The Secretary of Health and Human Serv-
4    ices (in this subsection referred to as the "Sec-
5    retary") may apply and administer section 477 of
6    the Social Security Act without regard to subsection
7    (b)(3)(B) of such section.

8        (4) ELIMINATION OF EDUCATION AND EMPLOY-
9    MENT REQUIREMENTS FOR CERTAIN FOSTER
10    YOUTH.—The Secretary may waive the applicability
11    of subclauses (I) through (IV) of section
12    475(8)(B)(iv) of the Social Security Act.

13    (c) STATE DEFINED.—In subsection (a), the term
14  "State" has the meaning given the term in section
15  1101(a) of the Social Security Act for purposes of title
16  IV of such Act, and includes an Indian tribe, tribal organi-
17  zation, or tribal consortium with an application and plan
18  approved under section 477(j) of such Act for fiscal year
19  2020.

20  **SEC. 100203. EMERGENCY ASSISTANCE TO FAMILIES**
21          **THROUGH HOME VISITING PROGRAMS.**

22    (a) IN GENERAL.—For purposes of section 511 of the
23  Social Security Act, during the period that begins on Feb-
24  ruary 1, 2020, and ends January 31, 2021—

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003201

1    (1) a virtual home visit shall be considered a
2    home visit;

3    (2) funding for, and staffing levels of, a pro-
4    gram conducted pursuant to such section shall not
5    be reduced on account of reduced enrollment in the
6    program; and

7    (3) funds provided for such a program may be
8    used—

9        (A) to train home visitors in conducting a
10       virtual home visit and in emergency prepared-
11       ness and response planning for families served;

12       (B) for the acquisition by families enrolled
13       in the program of such technological means as
14       are needed to conduct and support a virtual
15       home visit;

16       (C) to provide emergency supplies (such as
17       diapers, formula, non-perishable food, water,
18       hand soap and hand sanitizer) to families
19       served; and

20       (D) to provide prepaid debit cards to an el-
21       igible family (as defined in section 511(k)(2) of
22       such Act) for the purpose of enabling the family
23       to meet the emergency needs of the family.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003202

898

1    (b) VIRTUAL HOME VISIT DEFINED.—In subsection

2    (a), the term "virtual home visit" means a visit that is

3    conducted solely by electronic means.

4    (c) AUTHORITY TO DELAY DEADLINES.—

5        (1) IN GENERAL.—The Secretary of Health and

6        Human Services may extend the deadline by which

7        a requirement of section 511 of the Social Security

8        Act must be met, by such period of time as the Sec-

9        retary deems appropriate.

10        (2) GUIDANCE.—The Secretary shall provide to

11        eligible entities funded under section 511 of the So-

12        cial Security Act information on the parameters

13        used in extending a deadline under paragraph (1) of

14        this subsection.

15    (d) SUPPLEMENTAL APPROPRIATION.—In addition

16    to amounts otherwise appropriated, out of any money in

17    the Treasury of the United States not otherwise appro-

18    priated, there are appropriated to the Secretary of Health

19    and Human Services $100,000,000, to enable eligible enti-

20    ties to conduct programs funded under section 511 of the

21    Social Security Act pursuant to this section, which shall

22    remain available for obligation not later than January 31,

23    2021.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003203

899

# TITLE III—PROGRAM FLEXI-BILITY DURING THE PANDEMIC

### SEC. 100301. EMERGENCY FLEXIBILITY FOR CHILD WELFARE PROGRAMS.

(a) IN GENERAL.—With respect to the period that begins on March 1, 2020, and ends January 31, 2021:

(1) AUTHORITY OF STATES TO DETERMINE HOW DAILY ACTIVITIES MAY BE CONDUCTED REMOTELY.—The Secretary of Health and Human Services may allow a State to determine how daily activities under the State plan developed under part B of title IV of the Social Security Act and the State program funded under section 477 of such Act may be conducted through electronic means to comply with public health guidelines relating to social distancing, including conducting any required court proceedings pertaining to children in care. In making any such determination, the State shall work to ensure that the safety and health of each child in care remains paramount.

(2) COUNTING OF REMOTE CASEWORKER VISITS AS IN-PERSON VISITS.—In the case of a foster child who has attained 18 years of age and with respect to whom foster care maintenance payments are

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003204

1 being made under a State plan approved under part

2 E of title IV of the Social Security Act, caseworker

3 contact with the child that includes visual and audi-

4 tory contact and which is conducted solely by elec-

5 tronic means is deemed an in-person visit to the

6 child by the caseworker for purposes of section

7 424(f)(1)(A) of such Act if the child is visited by the

8 caseworker in person not less than once every 6

9 months while in such care.

10 (b) STATE DEFINED.—In subsection (a), the term

11 "State" has the meaning given the term in section

12 1101(a) of the Social Security Act for purposes of title

13 IV of such Act, and includes an Indian tribe, tribal organi-

14 zation, or tribal consortium with an application and plan

15 approved under this section 477(j) of such Act for fiscal

16 year 2020.

## 17 SEC. 100302. EMERGENCY FLEXIBILITY FOR CHILD SUP-
## 18        PORT PROGRAMS.

19 (a) IN GENERAL.—With respect to the period that

20 begins on March 1, 2020, and ends January 31, 2021:

21     (1) Sections 408(a)(2), 409(a)(5), and

22     409(a)(8) of the Social Security Act shall have no

23     force or effect.

24     (2) Notwithstanding section 466(d) of such Act,

25     the Secretary of Health and Human Services (in this

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003205

1    subsection referred to as the "Secretary") may ex-

2    empt a State from any requirement of section 466

3    of such Act to respond to the COVID–19 pandemic,

4    except that the Secretary may not exempt a State

5    from any requirement to—

6        (A) provide a parent with notice of a right

7        to request a review and, if appropriate, adjust-

8        ment of a support order; or

9        (B) afford a parent the opportunity to

10       make such a request.

11    (3) The Secretary may not impose a penalty or

12    take any other adverse action against a State pursu-

13    ant to section 452(g)(1) of such Act for failure to

14    achieve a paternity establishment percentage of less

15    than 90 percent.

16    (4) The Secretary may not find that the pater-

17    nity establishment percentage for a State is not

18    based on reliable data for purposes of section

19    452(g)(1) of such Act, and the Secretary may not

20    determine that the data which a State submitted

21    pursuant to section 452(a)(4)(C)(i) of such Act and

22    which is used in determining a performance level is

23    not complete or reliable for purposes of section

24    458(b)(5)(B) of such Act, on the basis of the failure

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003206

902

1  of the State to submit OCSE Form 396 or 34 in a
2  timely manner.

3  　　(5) The Secretary may not impose a penalty or
4  take any other adverse action against a State for
5  failure to comply with section 454A(g)(1)(A)(i) of
6  such Act.

7  　　(6) The Secretary may not disapprove a State
8  plan submitted pursuant to part D of title IV of
9  such Act for failure of the plan to meet the require-
10  ment of section 454(1) of such Act, and may not im-
11  pose a penalty or take any other adverse action
12  against a State with such a plan that meets that re-
13  quirement for failure to comply with that require-
14  ment.

15  　　(7) To the extent that a preceding provision of
16  this section applies with respect to a provision of law
17  applicable to a program operated by an Indian tribe
18  or tribal organization (as defined in subsections (e)
19  and (l) of section 4 of the Indian Self-Determination
20  and Education Assistance Act (25 U.S.C. 450b)),
21  that preceding provision shall apply with respect to
22  the Indian tribe or tribal organization.

23  　　(b) STATE DEFINED.—In subsection (a), the term
24  "State" has the meaning given the term in section

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003207

903

1 1101(a) of the Social Security Act for purposes of title

2 IV of such Act.

**SEC. 100303. EMERGENCY FLEXIBILITY FOR STATE TANF**

**PROGRAMS.**

5    (a) STATE PROGRAMS.—Sections 407(a), 407(e)(1),

6 and 408(a)(7)(A) of the Social Security Act shall have no

7 force or effect during the applicable period, and para-

8 graphs (3), (9), (14), and (15) of section 409(a) of such

9 Act shall not apply with respect to conduct engaged in

10 during the period.

11    (b) TRIBAL PROGRAMS.—The minimum work partici-

12 pation requirements and time limits established under sec-

13 tion 412(c) of the Social Security Act shall have no force

14 or effect during the applicable period, and the penalties

15 established under such section shall not apply with respect

16 to conduct engaged in during the period.

17    (c) PENALTY FOR NONCOMPLIANCE.—

18       (1) IN GENERAL.—If the Secretary of Health

19       and Human Services finds that a State or an Indian

20       tribe has imposed a work requirement as a condition

21       of receiving assistance, or a time limit on the provi-

22       sion of assistance, under a program funded under

23       part A of title IV of the Social Security Act or any

24       program funded with qualified State expenditures

25       (as defined in section 409(a)(7)(B)(i) of such Act)

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003208

904

1    during the applicable period, or has imposed a pen-

2    alty for failure to comply with a work requirement

3    during the period, the Secretary shall reduce the

4    grant payable to the State under section 403(a)(1)

5    of such Act or the grant payable to the tribe under

6    section 412(a)(1) of such Act, as the case may be,

7    for fiscal year 2021 by an amount equal to 5 percent

8    of the State or tribal family assistance grant, as the

9    case may be.

10    (2) APPLICABILITY OF CERTAIN PROVISIONS.—

11    For purposes of section 409(d) of the Social Secu-

12    rity Act, paragraph (1) of this subsection shall be

13    considered to be included in section 409(a) of such

14    Act.

15    (d) DEFINITIONS.—In this section:

16    (1) APPLICABLE PERIOD.—The term ''applica-

17    ble period'' means the period that begins on March

18    1, 2020, and ends January 31, 2021.

19    (2) WORK REQUIREMENT.—The term ''work re-

20    quirement'' means a requirement to engage in a

21    work activity (as defined in section 407(d) of the So-

22    cial Security Act)or other work-related activity as

23    defined by a State or tribal program funded under

24    part A of title IV of such Act.

DOC_0003209

905

1     (3) OTHER TERMS.—Each other term has the

2   meaning given the term in section 419 of the Social

3   Security Act.

906

# DIVISION K—COVID–19 HERO ACT

1

**SEC. 110001. SHORT TITLE; TABLE OF CONTENTS.**

2

3    This division may be cited as the "COVID–19 Hous-

4    ing, Economic Relief, and Oversight Act" or the "COVID–

5    19 HERO Act".

6    TITLE I—PROVIDING   MEDICAL   EQUIPMENT

7         FOR FIRST RESPONDERS AND ESSENTIAL

8         WORKERS

**SEC. 110101. COVID–19 EMERGENCY MEDICAL SUPPLIES EN-**

9

**HANCEMENT.**

10

11    (a) DETERMINATION ON EMERGENCY SUPPLIES AND

12    RELATIONSHIP TO STATE AND LOCAL EFFORTS.—

13         (1) DETERMINATION.—For the purposes of sec-

14         tion 101 of the Defense Production Act of 1950 (50

15         U.S.C. 4511), the following materials shall be

16         deemed to be scarce and critical materials essential

17         to the national defense and otherwise meet the re-

18         quirements of section 101(b) of such Act during the

19         COVID–19 emergency period:

20              (A) Diagnostic tests, including serological

21              tests, for COVID–19 and the reagents and

22              other materials necessary for producing or con-

23              ducting such tests.

24              (B) Personal protective equipment, includ-

25              ing face shields, N–95 respirator masks, and

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003211

907

1    any other masks determined by the Secretary of

2    Health and Human Services to be needed to re-

3    spond to the COVID–19 pandemic, and the ma-

4    terials to produce such equipment.

5        (C) Medical ventilators, the components

6    necessary to make such ventilators, and medi-

7    cines needed to use a ventilator as a treatment

8    for any individual who is hospitalized for

9    COVID–19.

10        (D) Pharmaceuticals and any medicines

11    determined by the Food and Drug Administra-

12    tion or another Government agency to be effec-

13    tive in treating COVID–19 (including vaccines

14    for COVID–19) and any materials necessary to

15    produce or use such pharmaceuticals or medi-

16    cines (including self-injection syringes or other

17    delivery systems).

18        (E) Any other medical equipment or sup-

19    plies determined by the Secretary of Health and

20    Human Services or the Secretary of Homeland

21    Security to be scarce and critical materials es-

22    sential to the national defense for purposes of

23    section 101 of the Defense Production Act of

24    1950 (50 U.S.C. 4511).

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003212

908

1     (2) EXERCISE OF TITLE I AUTHORITIES IN RE-

2 LATION TO CONTRACTS BY STATE AND LOCAL GOV-

3 ERNMENTS.—In exercising authorities under title I

4 of the Defense Production Act of 1950 (50 U.S.C.

5 4511 et seq.) during the COVID–19 emergency pe-

6 riod, the President (and any officer or employee of

7 the United States to which authorities under such

8 title I have been delegated)—

9     (A) may exercise the prioritization or allo-

10 cation authority provided in such title I to ex-

11 clude any materials described in paragraph (1)

12 ordered by a State or local government that are

13 scheduled to be delivered within 15 days of the

14 time at which—

15     (i) the purchase order or contract by

16 the Federal Government for such materials

17 is made; or

18     (ii) the materials are otherwise allo-

19 cated by the Federal Government under

20 the authorities contained in such Act; and

21     (B) shall, within 24 hours of any exercise

22 of the prioritization or allocation authority pro-

23 vided in such title I—

24     (i) notify any State or local govern-

25 ment if the exercise of such authorities

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003213

909

1    would delay the receipt of such materials

2    ordered by such government; and

3    (ii) take such steps as may be nec-

4    essary to ensure that such materials or-

5    dered by such government are delivered in

6    the shortest possible period.

7    (3) UPDATE TO THE FEDERAL ACQUISITION

8    REGULATION.—Not later than 15 days after the

9    date of the enactment of this Act, the Federal Ac-

10    quisition Regulation shall be revised to reflect the

11    requirements of paragraph (2)(A).

12    (b) ENGAGEMENT WITH THE PRIVATE SECTOR.—

13    (1) SENSE OF CONGRESS.—The Congress—

14    (A) appreciates the willingness of private

15    companies not traditionally involved in pro-

16    ducing items for the health sector to volunteer

17    to use their expertise and supply chains to

18    produce essential medical supplies and equip-

19    ment;

20    (B) encourages other manufacturers to re-

21    view their existing capacity and to develop ca-

22    pacity to produce essential medical supplies,

23    medical equipment, and medical treatments to

24    address the COVID–19 emergency; and

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003214

910

1    (C) commends and expresses deep appre-
2    ciation to individual citizens who have been pro-
3    ducing personal protective equipment and other
4    materials for, in particular, use at hospitals in
5    their community.

6    (2) OUTREACH REPRESENTATIVE.—

7    (A) DESIGNATION.—Consistent with the
8    authorities in title VII of the Defense Produc-
9    tion Act of 1950 (50 U.S.C. 4551 et seq.), the
10   Administrator of the Federal Emergency Man-
11   agement Agency, in consultation with the Sec-
12   retary of Health and Human Services, shall
13   designate or shall appoint, pursuant to section
14   703 of such Act (50 U.S.C. 4553), an indi-
15   vidual to be known as the "Outreach Rep-
16   resentative". Such individual shall—

17       (i) be appointed from among individ-
18       uals with substantial experience in the pri-
19       vate sector in the production of medical
20       supplies or equipment; and

21       (ii) act as the Government-wide single
22       point of contact during the COVID–19
23       emergency for outreach to manufacturing
24       companies and their suppliers who may be
25       interested in producing medical supplies or

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003215

911

1    equipment, including the materials de-
2    scribed under subsection (a).

3    (B) ENCOURAGING PARTNERSHIPS.—The
4    Outreach Representative shall seek to develop
5    partnerships between companies, in coordina-
6    tion with the Supply Chain Stabilization Task
7    Force or any overall coordinator appointed by
8    the President to oversee the response to the
9    COVID–19 emergency, including through the
10   exercise of the authorities under section 708 of
11   the Defense Production Act of 1950 (50 U.S.C.
12   4558).

13   (c) ENHANCEMENT OF SUPPLY CHAIN PRODUC-
14   TION.—In exercising authority under title III of the De-
15   fense Production Act of 1950 (50 U.S.C. 4531 et seq.)
16   with respect to materials described in subsection (a), the
17   President shall seek to ensure that support is provided to
18   companies that comprise the supply chains for reagents,
19   components, raw materials, and other materials and items
20   necessary to produce or use the materials described in sub-
21   section (a).

22   (d) OVERSIGHT OF CURRENT ACTIVITY AND
23   NEEDS.—

24   (1) RESPONSE TO IMMEDIATE NEEDS.—

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003216

912

1          (A) IN GENERAL.—Not later than 7 days
2     after the date of the enactment of this Act, the
3     President, in coordination with the National
4     Response Coordination Center of the Federal
5     Emergency Management Agency, the Adminis-
6     trator of the Defense Logistics Agency, the Sec-
7     retary of Health and Human Services, the Sec-
8     retary of Veterans Affairs, and heads of other
9     Federal agencies (as appropriate), shall submit
10    to the appropriate congressional committees a
11    report assessing the immediate needs described
12    in subparagraph (B) to combat the COVID–19
13    pandemic and the plan for meeting those imme-
14    diate needs.

15          (B) ASSESSMENT.—The report required by
16    this paragraph shall include—

17              (i) an assessment of the needs for
18          medical supplies or equipment necessary to
19          address the needs of the population of the
20          United States infected by the virus SARS–
21          CoV–2 that causes COVID–19 and to pre-
22          vent an increase in the incidence of
23          COVID–19 throughout the United States,
24          including diagnostic tests, serological tests,
25          medicines that have been approved by the

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003217

G:\CMTE\AP\16\FY20\_D\HEROES.XML

913

Food and Drug Administration to treat COVID–19, and ventilators and medicines needed to employ ventilators;

(ii) based on meaningful consultations with relevant stakeholders, an assessment of the need for personal protective equipment and other supplies (including diagnostic tests) required by—

(I) health professionals, health workers, and hospital staff;

(II) workers in industries and sectors described in the "Advisory Memorandum on Identification of Essential Critical Infrastructure Workers during the COVID–19 Response" issued by the Director of Cybersecurity and Infrastructure Security Agency of the Department of Homeland Security on April 17, 2020 (and any expansion of industries and sectors included in updates to such advisory memorandum); and

(III) other workers determined to be essential based on such consultation;

DOC_0003218

914

1             (iii) an assessment of the quantities of

2 equipment and supplies in the Strategic

3 National Stockpile (established under sec-

4 tion 319F–2 of the Public Health Service

5 Act ((42 U.S.C. 247d–6b(a)(1))) as of the

6 date of the report, and the projected gap

7 between the quantities of equipment and

8 supplies identified as needed in the assess-

9 ment under clauses (i) and (ii) and the

10 quantities in the Strategic National Stock-

11 pile;

12             (iv) an identification of the industry

13 sectors and manufacturers most ready to

14 fulfill purchase orders for such equipment

15 and supplies (including manufacturers that

16 may be incentivized) through the exercise

17 of authority under section 303(e) of the

18 Defense Production Act of 1950 (50

19 U.S.C. 4533(e)) to modify, expand, or im-

20 prove production processes to manufacture

21 such equipment and supplies to respond

22 immediately to a need identified in clause

23 (i) or (ii);

24             (v) an identification of Government-

25 owned and privately-owned stockpiles of

DOC_0003219

915

such equipment and supplies not included in the Strategic National Stockpile that could be repaired or refurbished;

(vi) an identification of previously distributed critical supplies that can be redistributed based on current need;

(vii) a description of any exercise of the authorities described under paragraph (1)(E) or (2)(A) of subsection (a); and

(viii) an identification of critical areas of need, by county and by areas identified by the Indian Health Service, in the United States and the metrics and criteria for identification as a critical area.

(C) PLAN.—The report required by this paragraph shall include a plan for meeting the immediate needs to combat the COVID–19 pandemic, including the needs described in subparagraph (B). Such plan shall include—

(i) each contract the Federal Government has entered into to meet such needs, including the purpose of each contract, the type and amount of equipment, supplies, or services to be provided under the contract,

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003220

G:\CMTE\AP\16\FY20\_D\HEROES.XML

916

1       the entity performing such contract, and

2       the dollar amount of each contract;

3       (ii) each contract that the Federal

4       Government intends to enter into within

5       14 days after submission of such report,

6       including the information described in sub-

7       paragraph (B) for each such contract; and

8       (iii) whether any of the contracts de-

9       scribed in clause (i) or (ii) have or will

10      have a priority rating under the Defense

11      Production Act of 1950 (50 U.S.C. 4501

12      et seq.), including purchase orders pursu-

13      ant to Department of Defense Directive

14      4400.1 (or any successor directive), sub-

15      part A of part 101 of title 45, Code of

16      Federal Regulations, or any other applica-

17      ble authority.

18     (D) ADDITIONAL REQUIREMENTS.—The

19    report required by this paragraph, and each up-

20    date required by subparagraph (E), shall in-

21    clude—

22       (i) any requests for equipment and

23       supplies from State or local governments

24       and Indian Tribes, and an accompanying

DOC_0003221

917

1    list of the employers and unions consulted
2    in developing these requests;

3        (ii) any modeling or formulas used to
4    determine allocation of equipment and sup-
5    plies, and any related chain of command
6    issues on making final decisions on alloca-
7    tions;

8        (iii) the amount and destination of
9    equipment and supplies delivered;

10       (iv) an explanation of why any portion
11   of any contract, whether to replenish the
12   Strategic National Stockpile or otherwise,
13   will not be filled;

14       (v) of products procured under this
15   section, the percentage of such products
16   that are used to replenish the Strategic
17   National Stockpile, that are targeted to
18   COVID–19 hotspots, and that are used for
19   the commercial market;

20       (vi) metrics, formulas, and criteria
21   used to determine COVID–19 hotspots or
22   areas of critical need for a State, county,
23   or an area identified by the Indian Health
24   Service;

g:\VHLC\051220\051220.072.xml        (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003222

918

1        (vii)   production   and   procurement
2        benchmarks, where practicable; and
3            (viii)  results  of  the  consultation  with
4        the  relevant  stakeholders  required  by  sub-
5        paragraph (B)(ii).
6        (E) UPDATES.—The President, in coordi-
7    nation with the National Response Coordination
8    Center of the Federal Emergency Management
9    Agency, the Administrator of the Defense Lo-
10   gistics  Agency,  the  Secretary  of  Health  and
11   Human Services, the Secretary of Veterans Af-
12   fairs, and heads of other Federal agencies (as
13   appropriate), shall update such report every 14
14   days.
15       (F) PUBLIC AVAILABILITY.—The President
16   shall  make  the  report  required  by  this  para-
17   graph  and  each  update  required  by  subpara-
18   graph (E) available to the public, including on
19   a Government website.
20   (2) RESPONSE TO LONGER-TERM NEEDS.—
21       (A) IN GENERAL.—Not later than 14 days
22   after  the  date  of  enactment  of  this  Act,  the
23   President,  in  coordination  with  the  National
24   Response  Coordination  Center  of  the  Federal
25   Emergency Management Agency, the Adminis-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003223

919

1    trator of the Defense Logistics Agency, the Sec-
2    retary of Health and Human Services, the Sec-
3    retary of Veterans Affairs, and heads of other
4    Federal agencies (as appropriate), shall submit
5    to the appropriate congressional committees a
6    report containing an assessment of the needs
7    described in subparagraph (B) to combat the
8    COVID–19 pandemic and the plan for meeting
9    such needs during the 6-month period begin-
10   ning on the date of submission of the report.

11        (B) ASSESSMENT.—The report required by
12   this paragraph shall include—

13             (i) an assessment of the elements de-
14        scribe in clauses (i) through (v) and clause
15        (viii) of paragraph (1)(B); and

16             (ii) an assessment of needs related to
17        COVID–19 vaccines and any additional
18        services to address the COVID–19 pan-
19        demic, including services related to health
20        surveillance to ensure that the appropriate
21        level of contact tracing related to detected
22        infections is available throughout the
23        United States.

24        (C) PLAN.—The report required by this
25   paragraph shall include a plan for meeting the

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003224

920

1    longer-term needs to combat the COVID–19

2    pandemic, including the needs described in sub-

3    paragraph (B). This plan shall include—

4          (i) a plan to exercise authorities under

5    the Defense Production Act of 1950 (50

6    U.S.C. 4501 et seq.) necessary to increase

7    the production of the medical equipment,

8    supplies, and services that are essential to

9    meeting the needs identified in subpara-

10    graph (B), including the number of N–95

11    respirator masks and other personal pro-

12    tective equipment needed, based on mean-

13    ingful consultations with relevant stake-

14    holders, by the private sector to resume

15    economic activity and by the public and

16    nonprofit sectors to significantly increase

17    their activities;

18          (ii) results of the consultations with

19    the relevant stakeholders required by

20    clause (i)(II);

21          (iii) an estimate of the funding and

22    other measures necessary to rapidly ex-

23    pand manufacturing production capacity

24    for such equipment and supplies, includ-

25    ing—

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003225

G:\CMTE\AP\16\FY20\_D\HEROES.XML

921

1          (I) any efforts to expand, retool,
2      or reconfigure production lines;

3          (II) any efforts to establish new
4      production lines through the purchase
5      and installation of new equipment; or

6          (III) the issuance of additional
7      contracts, purchase orders, purchase
8      guarantees, or other similar measures;

9          (iv) each contract the Federal Govern-
10     ment has entered into to meet such needs
11     or expand such production, the purpose of
12     each contract, the type and amount of
13     equipment, supplies, or services to be pro-
14     vided under the contract, the entity per-
15     forming such contract, and the dollar
16     amount of each contract;

17         (v) each contract that the Federal
18     Government intends to enter into within
19     14 days after submission of such report,
20     including the information described in
21     clause (iv) for each such contract;

22         (vi) whether any of the contracts de-
23     scribed in clause (iv) or (v) have or will
24     have a priority rating under the Defense
25     Production Act of 1950 (50 U.S.C. 4501

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003226

922

1       et seq.), including purchase orders pursu-
2       ant to Department of Defense Directive
3       4400.1 (or any successor directive), sub-
4       part A of part 101 of title 45, Code of
5       Federal Regulations, or any other applica-
6       ble authority; and

7             (vii) the manner in which the Defense
8       Production Act of 1950 (50 U.S.C. 4501
9       et seq.) could be used to increase services
10      necessary to combat the COVID–19 pan-
11      demic, including services described in sub-
12      paragraph (B)(ii).

13      (D) UPDATES.—The President, in coordi-
14      nation with the National Response Coordination
15      Center of the Federal Emergency Management
16      Agency, the Administrator of the Defense Lo-
17      gistics Agency, the Secretary of Health and
18      Human Services, the Secretary of Veterans Af-
19      fairs, and heads of other Federal agencies (as
20      appropriate), shall update such report every 14
21      days.

22      (E) PUBLIC AVAILABILITY.—The Presi-
23      dent shall make the report required by this sub-
24      section and each update required by subpara-

g:\VHLC\051220\051220.072.xml       (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003227

923

 1          graph (D) available to the public, including on

 2          a Government website.

 3          (3) REPORT ON EXERCISING AUTHORITIES

 4      UNDER THE DEFENSE PRODUCTION ACT OF 1950.—

 5              (A) IN GENERAL.—Not later than 14 days

 6          after the date of the enactment of this Act, the

 7          President, in consultation with the Adminis-

 8          trator of the Federal Emergency Management

 9          Agency, the Secretary of Defense, and the Sec-

10          retary of Health and Human Services, shall

11          submit to the appropriate congressional com-

12          mittees a report on the exercise of authorities

13          under titles I, III, and VII of the Defense Pro-

14          duction Act of 1950 (50 U.S.C. 4501 et seq.)

15          prior to the date of such report.

16              (B)  CONTENTS.—The  report  required

17          under subparagraph (A) and each update re-

18          quired under subparagraph (C) shall include,

19          with respect to each exercise of such author-

20          ity—

21                  (i) an explanation of the purpose of

22              the applicable contract, purchase order, or

23              other exercise of authority (including an

24              allocation of materials, services, and facili-

25              ties under section 101(a)(2) of the Defense

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003228

924

Production Act of 1950 (50 U.S.C. 4511(a)(2));

(ii) the cost of such exercise of authority; and

(iii) if applicable—

(I) the amount of goods that were purchased or allocated;

(II) an identification of the entity awarded a contract or purchase order or that was the subject of the exercise of authority; and

(III) an identification of any entity that had shipments delayed by the exercise of any authority under the Defense Production Act of 1950 (50 U.S.C. 4501 et seq.).

(C) UPDATES.—The President shall update the report required under subparagraph (A) every 14 days.

(D) PUBLIC AVAILABILITY.—The President shall make the report required by this subsection and each update required by subparagraph (C) available to the public, including on a Government website.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003229

925

1        (4) QUARTERLY REPORTING.—The President

2    shall submit to Congress, and make available to the

3    public (including on a Government website), a quar-

4    terly report detailing all expenditures made pursuant

5    to titles I, III, and VII of the Defense Production

6    Act of 1950 50 U.S.C. 4501 et seq.).

7        (5) SUNSET.—The requirements of this sub-

8    section shall terminate on the later of—

9            (A) December 31, 2021; or

10           (B) the end of the COVID–19 emergency

11       period.

12   (e) ENHANCEMENTS TO THE DEFENSE PRODUCTION

13   ACT OF 1950.—

14       (1) HEALTH EMERGENCY AUTHORITY.—Section

15   107 of the Defense Production Act of 1950 (50

16   U.S.C. 4517) is amended by adding at the end the

17   following:

18   ''(c) HEALTH EMERGENCY AUTHORITY.—With re-

19   spect to a public health emergency declaration by the Sec-

20   retary of Health and Human Services under section 319

21   of the Public Health Service Act, or preparations for such

22   a health emergency, the Secretary of Health and Human

23   Services and the Administrator of the Federal Emergency

24   Management Agency are authorized to carry out the au-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003230

926

1  thorities provided under this section to the same extent

2  as the President.''.

3        (2) EMPHASIS ON BUSINESS CONCERNS OWNED

4  BY WOMEN, MINORITIES, VETERANS, AND NATIVE

5  AMERICANS.—Section 108 of the Defense Produc-

6  tion Act of 1950 (50 U.S.C. 4518) is amended—

7        (A) in the heading, by striking ''**MOD-**

8  **ERNIZATION OF SMALL BUSINESS SUP-**

9  **PLIERS**'' and inserting ''**SMALL BUSINESS**

10  **PARTICIPATION AND FAIR INCLUSION**'';

11        (B) by amending subsection (a) to read as

12  follows:

13  ''(a) PARTICIPATION AND INCLUSION.—

14        ''(1) IN GENERAL.—In providing any assistance

15  under this Act, the President shall accord a strong

16  preference for subcontractors and suppliers that

17  are—

18              ''(A) small business concerns; or

19              ''(B) businesses of any size owned by

20        women, minorities, veterans, and the disabled.

21        ''(2) SPECIAL CONSIDERATION.—To the max-

22  imum extent practicable, the President shall accord

23  the preference described under paragraph (1) to

24  small business concerns and businesses described in

25  paragraph (1)(B) that are located in areas of high

927

1    unemployment or areas that have demonstrated a

2    continuing pattern of economic decline, as identified

3    by the Secretary of Labor.''; and

4            (C) by adding at the end the following:

5    ''(c) MINORITY DEFINED.—In this section, the term

6    'minority'—

7            ''(1) has the meaning given the term in section

8        308(b) of the Financial Institutions Reform, Recov-

9        ery, and Enforcement Act of 1989; and

10           ''(2) includes any indigenous person in the

11       United States, including any territories of the

12       United States.''.

13           (3) ADDITIONAL INFORMATION IN ANNUAL RE-

14       PORT.—Section 304(f)(3) of the Defense Production

15       Act of 1950 (50 U.S.C. 4534(f)(3)) is amended by

16       striking ''year.'' and inserting ''year, including the

17       percentage of contracts awarded using Fund

18       amounts to each of the groups described in section

19       108(a)(1)(B) (and, with respect to minorities,

20       disaggregated by ethnic group), and the percentage

21       of the total amount expended during such fiscal year

22       on such contracts.''.

23           (4) DEFINITION OF NATIONAL DEFENSE.—Sec-

24       tion 702(14) of the Defense Production Act of 1950

25       is amended by striking ''and critical infrastructure

DOC_0003232

928

1 protection and restoration'' and inserting '', critical

2 infrastructure protection and restoration, and health

3 emergency preparedness and response activities''.

4 (f) SECURING ESSENTIAL MEDICAL MATERIALS.—

5 (1) STATEMENT OF POLICY.—Section 2(b) of

6 the Defense Production Act of 1950 (50 U.S.C.

7 4502) is amended—

8 (A) by redesignating paragraphs (3)

9 through (8) as paragraphs (4) through (9), re-

10 spectively; and

11 (B) by inserting after paragraph (2) the

12 following:

13 ''(3) authorities under this Act should be used

14 when appropriate to ensure the availability of med-

15 ical materials essential to national defense, including

16 through measures designed to secure the drug sup-

17 ply chain, and taking into consideration the impor-

18 tance of United States competitiveness, scientific

19 leadership and cooperation, and innovative capac-

20 ity;''.

21 (2) STRENGTHENING DOMESTIC CAPABILITY.—

22 Section 107 of the Defense Production Act of 1950

23 (50 U.S.C. 4517) is amended—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003233

929

1          (A) in subsection (a), by inserting "(in-
2      cluding medical materials)" after "materials";
3      and

4          (B) in subsection (b)(1), by inserting "(in-
5      cluding medical materials such as drugs to di-
6      agnose, cure, mitigate, treat, or prevent disease
7      that essential to national defense)" after "es-
8      sential materials".

9      (3) STRATEGY ON SECURING SUPPLY CHAINS
10    FOR MEDICAL ARTICLES.—Title I of the Defense
11    Production Act of 1950 (50 U.S.C. 4511 et seq.) is
12    amended by adding at the end the following:

13    **"SEC. 109. STRATEGY ON SECURING SUPPLY CHAINS FOR**
14                **MEDICAL MATERIALS.**

15    "(a) IN GENERAL.—Not later than 180 days after
16    the date of the enactment of this section, the President,
17    in consultation with the Secretary of Health and Human
18    Services, the Secretary of Commerce, the Secretary of
19    Homeland Security, and the Secretary of Defense, shall
20    transmit a strategy to the appropriate Members of Con-
21    gress that includes the following:

22        "(1) A detailed plan to use the authorities
23      under this title and title III, or any other provision
24      of law, to ensure the supply of medical materials (in-
25      cluding drugs to diagnose, cure, mitigate, treat, or

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003234

930

1 prevent disease) essential to national defense, to the

2 extent necessary for the purposes of this Act.

3 "(2) An analysis of vulnerabilities to existing

4 supply chains for such medical articles, and rec-

5 ommendations to address the vulnerabilities.

6 "(3) Measures to be undertaken by the Presi-

7 dent to diversify such supply chains, as appropriate

8 and as required for national defense; and

9 "(4) A discussion of—

10 "(A) any significant effects resulting from

11 the plan and measures described in this sub-

12 section on the production, cost, or distribution

13 of vaccines or any other drugs (as defined

14 under section 201 of the Federal Food, Drug,

15 and Cosmetic Act (21 U.S.C. 321));

16 "(B) a timeline to ensure that essential

17 components of the supply chain for medical ma-

18 terials are not under the exclusive control of a

19 foreign government in a manner that the Presi-

20 dent determines could threaten the national de-

21 fense of the United States; and

22 "(C) efforts to mitigate any risks resulting

23 from the plan and measures described in this

24 subsection to United States competitiveness,

25 scientific leadership, and innovative capacity,

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003235

931

1    including efforts to cooperate and proactively

2    engage with United States allies.

3    "(b) PROGRESS REPORT.—Following submission of

4  the strategy under subsection (a), the President shall sub-

5  mit to the appropriate Members of Congress an annual

6  progress report evaluating the implementation of the

7  strategy, and may include updates to the strategy as ap-

8  propriate. The strategy and progress reports shall be sub-

9  mitted in unclassified form but may contain a classified

10 annex.

11    "(c) APPROPRIATE MEMBERS OF CONGRESS.—The

12 term 'appropriate Members of Congress' means the

13 Speaker, majority leader, and minority leader of the

14 House of Representatives, the majority leader and minor-

15 ity leader of the Senate, the Chairman and Ranking Mem-

16 ber of the Committees on Armed Services and Financial

17 Services of the House of Representatives, and the Chair-

18 man and Ranking Member of the Committees on Armed

19 Services and Banking, Housing, and Urban Affairs of the

20 Senate.".

21    (g) GAO REPORT.—

22      (1) IN GENERAL.—Not later than 270 days

23    after the date of the enactment of this Act, and an-

24    nually thereafter, the Comptroller General of the

25    United States shall submit to the appropriate con-

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003236

932

1  gressional committees a report on ensuring that the

2  United States Government has access to the medical

3  supplies and equipment necessary to respond to fu-

4  ture pandemics and public health emergencies, in-

5  cluding recommendations with respect to how to en-

6  sure that the United States supply chain for diag-

7  nostic tests (including serological tests), personal

8  protective equipment, vaccines, and therapies is bet-

9  ter equipped to respond to emergencies, including

10  through the use of funds in the Defense Production

11  Act Fund under section 304 of the Defense Produc-

12  tion Act of 1950 (50 U.S.C. 4534) to address short-

13  ages in that supply chain.

14      (2) REVIEW OF ASSESSMENT AND PLAN.—

15          (A) IN GENERAL.—Not later than 30 days

16      after each of the submission of the reports de-

17      scribed in paragraphs (1) and (2) of subsection

18      (d), the Comptroller General of the United

19      States shall submit to the appropriate congres-

20      sional committees an assessment of such re-

21      ports, including identifying any gaps and pro-

22      viding any recommendations regarding the sub-

23      ject matter in such reports.

24          (B) MONTHLY REVIEW.—Not later than a

25      month after the submission of the assessment

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003237

933

1 under subparagraph (A), and monthly there-
2 after, the Comptroller General shall issue a re-
3 port to the appropriate congressional commit-
4 tees with respect to any updates to the reports
5 described in paragraph (1) and (2) of sub-
6 section (d) that were issued during the previous
7 1-month period, containing an assessment of
8 such updates, including identifying any gaps
9 and providing any recommendations regarding
10 the subject matter in such updates.

11 (h) DEFINITIONS.—In this section:

12 (1) APPROPRIATE CONGRESSIONAL COMMIT-
13 TEES.—The term "appropriate congressional com-
14 mittees" means the Committees on Appropriations,
15 Armed Services, Energy and Commerce, Financial
16 Services, Homeland Security, and Veterans' Affairs
17 of the House of Representatives and the Committees
18 on Appropriations, Armed Services, Banking, Hous-
19 ing, and Urban Affairs, Health, Education, Labor,
20 and Pensions, Homeland Security and Governmental
21 Affairs, and Veterans' Affairs of the Senate.

22 (2) COVID–19 EMERGENCY PERIOD.—The
23 term "COVID–19 emergency period" means the pe-
24 riod beginning on the date of enactment of this Act
25 and ending after the end of the incident period for

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003238

934

1 the emergency declared on March 13, 2020, by the

2 President under Section 501 of the Robert T. Staf-

3 ford Disaster Relief and Emergency Assistance Act

4 (42 U.S.C. 4121 et seq.) relating to the Coronavirus

5 Disease 2019 (COVID–19) pandemic.

6  (3) RELEVANT STAKEHOLDER.—The term "rel-

7 evant stakeholder" means—

8   (A) representative private sector entities;

9   (B) representatives of the nonprofit sector;

10  and

11   (C) representatives of labor organizations

12  representing workers, including unions that rep-

13  resent health workers, manufacturers, public

14  sector employees, and service sector workers.

15  (4) STATE.—The term "State" means each of

16 the several States, the District of Columbia, the

17 Commonwealth of Puerto Rico, and any territory or

18 possession of the United States.

19 TITLE II—PROTECTING RENTERS AND HOME-

20  OWNERS FROM EVICTIONS AND FORE-

21  CLOSURES

22 **SEC. 110201. EMERGENCY RENTAL ASSISTANCE.**

23  (a) AUTHORIZATION OF APPROPRIATIONS.—There is

24 authorized to be appropriated to the Secretary of Housing

25 and Urban Development (referred to in this section as the

935

1 ''Secretary'') $100,000,000,000 for an additional amount
2 for grants under the Emergency Solutions Grants pro-
3 gram under subtitle B of title IV of the McKinney-Vento
4 Homeless Assistance Act (42 U.S.C. 11371 et seq.), to
5 remain available until expended (subject to subsections (d)
6 and (n) of this section), to be used for providing short-
7 or medium-term assistance with rent and rent-related
8 costs (including tenant-paid utility costs, utility- and rent-
9 arrears, fees charged for those arrears, and security and
10 utility deposits) in accordance with paragraphs (4) and (5)
11 of section 415(a) of such Act (42 U.S.C. 11374(a)) and
12 this section.

13     (b) DEFINITION OF AT RISK OF HOMELESSNESS.—
14 Notwithstanding section 401(1) of the McKinney-Vento
15 Homeless Assistance Act (42 U.S.C. 11360(1)), for pur-
16 poses of assistance made available with amounts made
17 available pursuant to subsection (a), the term ''at risk of
18 homelessness'' means, with respect to an individual or
19 family, that the individual or family—

20         (1) has an income below 80 percent of the me-
21     dian income for the area as determined by the Sec-
22     retary; and

23         (2) has an inability to attain or maintain hous-
24     ing stability or has insufficient resources to pay for
25     rent or utilities due to financial hardships.

DOC_0003240

G:\CMTE\AP\16\FY20\_D\HEROES.XML

936

1    (c) INCOME TARGETING AND CALCULATION.—For

2 purposes of assistance made available with amounts made

3 available pursuant to subsection (a)—

4        (1) each recipient of such amounts shall use—

5            (A) not less than 40 percent of the

6        amounts received only for providing assistance

7        for individuals or families experiencing home-

8        lessness, or for persons or families at risk of

9        homelessness who have incomes not exceeding

10       30 percent of the median income for the area

11       as determined by the Secretary;

12           (B) not less than 70 percent of the

13       amounts received only for providing assistance

14       for individuals or families experiencing home-

15       lessness, or for persons or families at risk of

16       homelessness who have incomes not exceeding

17       50 percent of the median income for the area

18       as determined by the Secretary; and

19           (C) the remainder of the amounts received

20       only for providing assistance to individuals or

21       families experiencing homelessness, or for per-

22       sons or families at risk of homelessness who

23       have incomes not exceeding 80 percent of the

24       median income for the area as determined by

25       the Secretary, but such recipient may establish

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003241

937

1    a higher percentage limit for purposes of sub-

2    section (b)(1), which shall not in any case ex-

3    ceed 120 percent of the area median income, if

4    the recipient states that it will serve such popu-

5    lation in its plan; and

6    (2) in determining the income of a household

7    for homelessness prevention assistance—

8    (A) the calculation of income performed at

9    the time of application for such assistance, in-

10    cluding arrearages, shall consider only income

11    that the household is currently receiving at such

12    time and any income recently terminated shall

13    not be included;

14    (B) any calculation of income performed

15    with respect to households receiving ongoing as-

16    sistance (such as medium-term rental assist-

17    ance) 3 months after initial receipt of assist-

18    ance shall consider only the income that the

19    household is receiving at the time of such re-

20    view; and

21    (C) the calculation of income performed

22    with respect to households receiving assistance

23    for arrearages shall consider only the income

24    that the household was receiving at the time

25    such arrearages were incurred.

DOC_0003242

938

1    (d) 3-YEAR AVAILABILITY.—

2       (1) IN GENERAL.—Each recipient of amounts

3   made available pursuant to subsection (a) shall—

4          (A) expend not less than 60 percent of

5       such grant amounts within 2 years of the date

6       that such funds became available to the recipi-

7       ent for obligation; and

8          (B) expend 100 percent of such grant

9       amounts within 3 years of such date.

10      (2) REALLOCATION AFTER 2 YEARS.—The Sec-

11   retary may recapture any amounts not expended in

12   compliance with paragraph (1)(A) and reallocate

13   such amounts to recipients in compliance with the

14   formula referred to in subsection (h)(1)(A).

15    (e) RENT RESTRICTIONS.—

16      (1) INAPPLICABILITY.—Section 576.106(d) of

17   title 24, Code of Federal Regulations, shall not

18   apply with respect to homelessness prevention assist-

19   ance made available with amounts made available

20   under subsection (a).

21      (2) AMOUNT OF RENTAL ASSISTANCE.—In pro-

22   viding homelessness prevention assistance with

23   amounts made available under subsection (a), the

24   maximum amount of rental assistance that may be

25   provided shall be the greater of—

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003243

939

 1          (A) 120 percent of the higher of—

 2                  (i) the Fair Market Rent established

 3          by the Secretary for the metropolitan area

 4          or county; or

 5                  (ii) the applicable Small Area Fair

 6          Market Rent established by the Secretary;

 7          or

 8          (B) such higher amount as the Secretary

 9          shall determine is needed to cover market rents

10          in the area.

11      (f) SUBLEASES.—A recipient shall not be prohibited

12  from providing assistance authorized under subsection (a)

13  with respect to subleases that are valid under State law.

14      (g) HOUSING RELOCATION OR STABILIZATION AC-

15  TIVITIES.—A recipient of amounts made available pursu-

16  ant to subsection (a) may expend up to 25 percent of its

17  allocation for activities under section 415(a)(5) of the

18  McKinney-Vento Homeless Assistance Act (42 U.S.C.

19  11374(a)(5)), except that notwithstanding such section,

20  activities authorized under this subsection may be pro-

21  vided only for individuals or families who have incomes

22  not exceeding 50 percent of the area median income and

23  meet the criteria in subsection (b)(2) of this section or

24  section 103 of the McKinney-Vento Homeless Assistance

25  Act (42 U.S.C. 11302). This subsection shall not apply

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003244

940

1 to rent-related costs that are specifically authorized under

2 subsection (a) of this section.

3     (h) ALLOCATION OF ASSISTANCE.—

4         (1) IN GENERAL.—In allocating amounts made

5     available pursuant to subsection (a), the Secretary

6     shall—

7         (A)(i) for any purpose authorized in this

8         section—

9             (I) allocate 2 percent of such amount

10             for Indian tribes and tribally designated

11             housing entities (as such terms are defined

12             in section 4 of the Native American Hous-

13             ing Assistance and Self-Determination Act

14             of 1996 (25 U.S.C. 4103)) under the for-

15             mula established pursuant to section 302

16             of such Act (25 U.S.C. 4152), except that

17             0.3 percent of the amount allocated under

18             this clause shall be allocated for the De-

19             partment of Hawaiian Home Lands; and

20             (II) allocate 0.3 percent of such

21             amount for the Virgin Islands, Guam,

22             American Samoa, and the Northern Mar-

23             iana Islands;

24         (ii) not later than 30 days after the date

25         of enactment of this Act, obligate and disburse

DOC_0003245

941

1          the amounts allocated pursuant to clause (i) in

2          accordance with such allocations and provide

3          such recipient with any necessary guidance for

4          use of the funds; and

5                 (B)(i) not later than 7 days after the date

6          of enactment of this Act and after setting aside

7          amounts under subparagraph (A), allocate 50

8          percent of any such remaining amounts under

9          the formula specified in subsections (a), (b),

10         and (e) of section 414 of the McKinney-Vento

11         Homeless Assistance Act (42 U.S.C. 11373)

12         for, and notify, each State, metropolitan city,

13         and urban county that is to receive a direct

14         grant of such amounts; and

15                (ii) not later than 30 days after the date

16         of enactment of this Act, obligate and disburse

17         the amounts allocated pursuant to clause (i) in

18         accordance with such allocations and provide

19         such recipient with any necessary guidance for

20         use of the funds; and

21                (C)(i) not later than 45 days after the date

22         of enactment of this Act, allocate any remaining

23         amounts for eligible recipients according to a

24         formula to be developed by the Secretary that

25         takes into consideration the formula referred to

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003246

942

1    in subparagraph (A) and the need for emer-

2    gency rental assistance under this section, in-

3    cluding the severe housing cost burden among

4    extremely low- and very low-income renters and

5    disruptions in housing and economic conditions,

6    including unemployment; and

7    (ii) not later than 30 days after the date

8    of the allocation of such amounts pursuant to

9    clause (i), obligate and disburse such amounts

10    in accordance with such allocations.

11    (2) ALLOCATIONS TO STATES.—

12    (A) IN GENERAL.—Notwithstanding sub-

13    section (a) of section 414 of the McKinney-

14    Vento Homeless Assistance Act (42 U.S.C.

15    11373(a)) and section 576.202(a) of title 24,

16    Code of Federal Regulations, a State recipient

17    of an allocation under this section may elect to

18    use up to 100 percent of its allocation to carry

19    out activities eligible under this section directly.

20    (B) REQUIREMENT.—Any State recipient

21    making an election described in subparagraph

22    (A) shall serve households throughout the entire

23    State, including households in rural commu-

24    nities and small towns.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003247

943

1  (3) ELECTION NOT TO ADMINISTER.—If a re-
2 cipient other than a State elects not to receive funds
3 under this section, such funds shall be allocated to
4 the State recipient in which the recipient is located.

5  (4) PARTNERSHIPS, SUBGRANTS, AND CON-
6 TRACTS.—A recipient of a grant under this section
7 may distribute funds through partnerships, sub-
8 grants, or contracts with an entity, such as a public
9 housing agency (as such term is defined in section
10 3(b) of the United States Housing Act of 1937 (42
11 U.S.C. 1437a(b))), that is capable of carrying activi-
12 ties under this section.

13  (5) REVISION TO RULE.—The Secretary shall
14 revise section 576.3 of tile 24, Code of Federal Reg-
15 ulations, to change the set aside for allocation to the
16 territories to exactly 0.3 percent.

17 (i) INAPPLICABILITY OF MATCHING REQUIRE-
18 MENT.—Subsection (a) of section 416 of the McKinney-
19 Vento Homeless Assistance Act (42 U.S.C. 11375(a))
20 shall not apply to any amounts made available pursuant
21 to subsection (a) of this section.

22 (j) REIMBURSEMENT OF ELIGIBLE ACTIVITIES.—
23 Amounts made available pursuant to subsection (a) may
24 be used by a recipient to reimburse expenditures incurred

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003248

944

1  for eligible activities under this section after March 27,
2  2020.

3      (k) PROHIBITION ON PREREQUISITES.—None of the
4  funds made available pursuant to this section may be used
5  to require any individual receiving assistance under the
6  program under this section to receive treatment or per-
7  form any other prerequisite activities as a condition for
8  receiving shelter, housing, or other services.

9      (l) WAIVERS AND ALTERNATIVE REQUIREMENTS.—
10         (1) IN GENERAL.—
11             (A) AUTHORITY.—In administering the
12         amounts made available pursuant to subsection
13         (a), the Secretary may waive, or specify alter-
14         native requirements for, any provision of any
15         statute or regulation that the Secretary admin-
16         isters in connection with the obligation by the
17         Secretary or the use by the recipient of such
18         amounts (except for requirements related to fair
19         housing, nondiscrimination, labor standards,
20         prohibition on prerequisites, minimum data re-
21         porting, and the environment), if the Secretary
22         finds that good cause exists for the waiver or
23         alternative requirement and such waiver or al-
24         ternative requirement is necessary to expedite
25         the use of funds made available pursuant to

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003249

945

1  this section, to respond to public health orders
2  or conditions related to the COVID-19 emer-
3  gency, or to ensure that eligible individuals can
4  attain or maintain housing stability.

5  (B) PUBLIC NOTICE.—The Secretary shall
6  notify the public through the Federal Register
7  or other appropriate means of any waiver or al-
8  ternative requirement under this paragraph,
9  and that such public notice shall be provided, at
10  a minimum, on the internet at the appropriate
11  Government website or through other electronic
12  media, as determined by the Secretary.

13  (C) ELIGIBILITY REQUIREMENTS.—Eligi-
14  bility for rental assistance or housing relocation
15  and stabilization services shall not be restricted
16  based upon the prior receipt of assistance under
17  the program during the preceding three years.
18  (2) PUBLIC HEARINGS.—

19  (A) INAPPLICABILITY OF IN-PERSON HEAR-
20  ING REQUIREMENTS DURING THE COVID-19
21  EMERGENCY.—

22  (i) IN GENERAL.—A recipient under
23  this section shall not be required to hold
24  in-person public hearings in connection
25  with its citizen participation plan, but shall

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003250

G:\CMTE\AP\16\FY20\_D\HEROES.XML

946

1 provide citizens with notice, including pub-
2 lication of its plan for carrying out this
3 section on the internet, and a reasonable
4 opportunity to comment of not less than 5
5 days.

6 (ii) RESUMPTION OF IN-PERSON
7 HEARING REQUIREMENTS.—After the pe-
8 riod beginning on the date of enactment of
9 this Act and ending on the date of the ter-
10 mination by the Federal Emergency Man-
11 agement Agency of the emergency declared
12 on March 13, 2020, by the President
13 under the Robert T. Stafford Disaster Re-
14 lief and Emergency Assistance Act (42
15 U.S.C. 4121 et seq.) relating to the
16 Coronavirus Disease 2019 (COVID-19)
17 pandemic, and after the period described
18 in subparagraph (B), the Secretary shall
19 direct recipients under this section to re-
20 sume pre-crisis public hearing require-
21 ments.

22 (B) VIRTUAL PUBLIC HEARINGS.—

23 (i) IN GENERAL.—During the period
24 that national or local health authorities
25 recommend social distancing and limiting

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003251

1            public gatherings for public health reasons,
2            a recipient may fulfill applicable public
3            hearing requirements for all grants from
4            funds made available pursuant to this sec-
5            tion by carrying out virtual public hear-
6            ings.

7            (ii) REQUIREMENTS.—Any virtual
8            hearings held under clause (i) by a recipi-
9            ent under this section shall provide reason-
10           able notification and access for citizens in
11           accordance with the recipient's certifi-
12           cations, timely responses from local offi-
13           cials to all citizen questions and issues,
14           and public access to all questions and re-
15           sponses.

16     (m) CONSULTATION.—In addition to any other cit-
17 izen participation and consultation requirements, in devel-
18 oping and implementing a plan to carry out this section,
19 each recipient of funds made available pursuant to this
20 section shall consult with the applicable Continuum or
21 Continuums of Care for the area served by the recipient
22 and organizations representing underserved communities
23 and populations and organizations with expertise in af-
24 fordable housing, fair housing, and services for people with
25 disabilities.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003252

948

1    (n) ADMINISTRATION.—

2       (1) BY SECRETARY.—Of any amounts made

3  available pursuant to subsection (a)—

4          (A) not more than the lesser of 0.5 per-

5       cent, or $15,000,000, may be used by the Sec-

6       retary for staffing, training, technical assist-

7       ance, technology, monitoring, research, and

8       evaluation activities necessary to carry out the

9       program carried out under this section, and

10      such amounts shall remain available until Sep-

11      tember 30, 2024; and

12         (B) not more than $2,000,000 shall be

13      available to the Office of the Inspector General

14      for audits and investigations of the program au-

15      thorized under this section.

16    (2) BY RECIPIENTS.—Notwithstanding section

17  576.108 of title 24 of the Code of Federal Regula-

18  tions, with respect to amounts made available pursu-

19  ant to this section, a recipient may use up to 10 per-

20  cent of the recipient's grant for payment of adminis-

21  trative costs related to the planning and execution of

22  activities.

23  **SEC. 110202. HOMEOWNER ASSISTANCE FUND.**

24    (a) DEFINITIONS.—In this section:

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003253

949

1      (1) FUND.—The term "Fund" means the

2 Homeowner Assistance Fund established under sub-

3 section (b).

4      (2) SECRETARY.—The term "Secretary" means

5 the Secretary of the Treasury.

6      (3) STATE.—The term "State" means any

7 State of the United States, the District of Columbia,

8 any territory of the United States, Puerto Rico,

9 Guam, American Samoa, the Virgin Islands, and the

10 Northern Mariana Islands.

11    (b) ESTABLISHMENT OF FUND.—There is estab-

12 lished at the Department of the Treasury a Homeowner

13 Assistance Fund to provide such funds as are made avail-

14 able under subsection (g) to State housing finance agen-

15 cies for the purpose of preventing homeowner mortgage

16 defaults, foreclosures, and displacements of individuals

17 and families experiencing financial hardship after January

18 21, 2020.

19    (c) ALLOCATION OF FUNDS.—

20      (1) ADMINISTRATION.—Of any amounts made

21 available for the Fund, the Secretary of the Treas-

22 ury may allocate, in the aggregate, an amount not

23 exceeding 5 percent—

24         (A) to the Office of Financial Stability es-

25 tablished under section 101(a) of the Emer-

DOC_0003254

950

1     gency Economic Stabilization Act of 2008 (12

2     U.S.C. 5211(a)) to administer and oversee the

3     Fund, and to provide technical assistance to

4     States for the creation and implementation of

5     State programs to administer assistance from

6     the Fund; and

7         (B) to the Inspector General of the De-

8     partment of the Treasury for oversight of the

9     program under this section.

10     (2) FOR STATES.—The Secretary shall establish

11     such criteria as are necessary to allocate the funds

12     available within the Fund for each State. The Sec-

13     retary shall allocate such funds among all States

14     taking into consideration the number of unemploy-

15     ment claims within a State relative to the nationwide

16     number of unemployment claims.

17     (3) SMALL STATE MINIMUM.—The amount allo-

18     cated for each State shall not be less than

19     $250,000,000.

20     (4) SET-ASIDE FOR INSULAR AREAS.—Notwith-

21     standing any other provision of this section, of the

22     amounts appropriated under subsection (g), the Sec-

23     retary shall reserve $200,000,000 to be disbursed to

24     Guam, American Samoa, the Virgin Islands, and the

25     Northern Mariana Islands based on each such terri-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003255

951

1  tory's share of the combined total population of all

2  such territories, as determined by the Secretary. For

3  the purposes of this paragraph, population shall be

4  determined based on the most recent year for which

5  data are available from the United States Census

6  Bureau.

7  (5) SET-ASIDE FOR INDIAN TRIBES AND NATIVE

8  HAWAIIANS.——

9  (A) INDIAN TRIBES.—Notwithstanding any

10  other provision of this section, of the amounts

11  appropriated under subsection (g), the Sec-

12  retary shall use 5 percent to make grants in ac-

13  cordance with subsection (f) to eligible recipi-

14  ents for the purposes described in subsection

15  (e)(1).

16  (B) NATIVE HAWAIIANS.— Of the funds

17  set aside under subparagraph (A), the Sec-

18  retary shall use 0.3 percent to make grants to

19  the Department of Hawaiian Home Lands in

20  accordance with subsection (f) for the purposes

21  described in subsection (e)(1).

22  (d) DISBURSEMENT OF FUNDS.—

23  (1) ADMINISTRATION.—Except for amounts

24  made available for assistance under subsection (f),

25  State housing finance agencies shall be primarily re-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003256

952

1  sponsible for administering amounts disbursed from
2  the Fund, but may delegate responsibilities and sub-
3  allocate amounts to community development finan-
4  cial institutions and State agencies that administer
5  Low-Income Home Energy Assistance Program of
6  the Department of Health and Human Services.

7      (2) NOTICE OF FUNDING.—The Secretary shall
8  provide public notice of the amounts that will be
9  made available to each State and the method used
10  for determining such amounts not later than the ex-
11  piration of the 14-day period beginning on the date
12  of the enactment of this Act of enactment.

13      (3) SHFA PLANS.—

14          (A) ELIGIBILITY.—To be eligible to receive
15      funding allocated for a State under the section,
16      a State housing finance agency for the State
17      shall submit to the Secretary a plan for the im-
18      plementation of State programs to administer,
19      in part or in full, the amount of funding the
20      state is eligible to receive, which shall provide
21      for the commencement of receipt of applications
22      by homeowners for assistance, and funding of
23      such applications, not later than the expiration
24      of the 6-month period beginning upon the ap-
25      proval under this paragraph of such plan.

DOC_0003257

953

1    (B) MULTIPLE PLANS.—. A State housing
2    finance agency may submit multiple plans, each
3    covering a separate portion of funding for
4    which the State is eligible.

5    (C) TIMING.— The Secretary shall approve
6    or disapprove a plan within 30 days after the
7    plan's submission and, if disapproved, explain
8    why the plan could not be approved.

9    (D) DISBURSEMENT UPON APPROVAL.—
10   The Secretary shall disburse to a State housing
11   finance agency the appropriate amount of fund-
12   ing upon approval of the agency's plan.

13   (E) AMENDMENTS.—A State housing fi-
14   nance agency may subsequently amend a plan
15   that has previously been approved, provided
16   that any plan amendment shall be subject to
17   the approval of the Secretary. The Secretary
18   shall approve any plan amendment or dis-
19   approve such amendment explain why the plan
20   amendment could not be approved within 45
21   days after submission to the Secretary of such
22   amendment.

23   (F) TECHNICAL ASSISTANCE.—The Sec-
24   retary shall provide technical assistance for any

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003258

G:\CMTE\AP\16\FY20\_D\HEROES.XML

954

1 State housing finance agency that twice fails to
2 have a submitted plan approved.

3 (4) PLAN TEMPLATES.—The Secretary shall,
4 not later than 30 days after the date of the enact-
5 ment of this Act, publish templates that States may
6 utilize in drafting the plans required under para-
7 graph (3)(A). The template plans shall include
8 standard program terms and requirements, as well
9 as any required legal language, which State housing
10 finance agencies may modify with the consent of the
11 Secretary.

12 (e) PERMISSIBLE USES OF FUND.—

13 (1) IN GENERAL.—Funds made available to
14 State housing finance agencies pursuant to this sec-
15 tion may be used for the purposes established under
16 subsection (b), which may include—

17 (A) mortgage payment assistance, includ-
18 ing financial assistance to allow a borrower to
19 reinstate their mortgage or to achieve a more
20 affordable mortgage payment, which may in-
21 clude principal reduction or rate reduction, pro-
22 vided that any mortgage payment assistance is
23 tailored to a borrower's needs and their ability
24 to repay, and takes into consideration the loss
25 mitigation options available to the borrower;

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003259

G:\CMTE\AP\16\FY20\_D\HEROES.XML

955

1          (B) assistance with payment of taxes, haz-
2     ard insurance, flood insurance, mortgage insur-
3     ance, or homeowners' association fees;

4          (C) utility payment assistance, including
5     electric, gas, water, and internet service, includ-
6     ing broadband internet access service (as such
7     term is defined in section 8.1(b) of title 47,
8     Code of Federal Regulations (or any successor
9     regulation));

10          (D) reimbursement of funds expended by a
11     State or local government during the period be-
12     ginning on January 21, 2020, and ending on
13     the date that the first funds are disbursed by
14     the State under the Fund, for the purpose of
15     providing housing or utility assistance to indi-
16     viduals or otherwise providing funds to prevent
17     foreclosure or eviction of a homeowner or pre-
18     vent mortgage delinquency or loss of housing or
19     critical utilities as a response to the coronavirus
20     disease 2019 (COVID–19) pandemic; and

21          (E) any other assistance for homeowners
22     to prevent eviction, mortgage delinquency or de-
23     fault, foreclosure, or the loss of essential utility
24     services.

25     (2) TARGETING.—

DOC_0003260

G:\CMTE\AP\16\FY20\_D\HEROES.XML

956

1           (A) REQUIREMENT.—Not less than 60 per-
2       cent of amounts made available for each State
3       or other entity allocated amounts under sub-
4       section (c) shall be used for activities under
5       paragraph (1) that assist homeowners having
6       incomes equal to or less than 80 percent of the
7       area median income.

8           (B) DETERMINATION OF INCOME.— In de-
9       termining the income of a household for pur-
10      poses of this paragraph, income shall be consid-
11      ered to include only income that the household
12      is receiving at the time of application for assist-
13      ance from the Fund and any income recently
14      terminated shall not be included, except that for
15      purposes of households receiving assistance for
16      arrearages income shall include only the income
17      that the household was receiving at the time
18      such arrearages were incurred.

19          (C) LANGUAGE ASSISTANCE.—Each State
20      housing finance agency or other entity allocated
21      amounts under subsection (c) shall make avail-
22      able to each applicant for assistance from
23      amounts from the Fund language assistance in
24      any language that such language assistance is
25      available in and shall provide notice to each

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003261

957

1    such applicant that such language assistance is

2    available.

3    (3) ADMINISTRATIVE EXPENSES.—Not more

4    than 15 percent of the amount allocated to a State

5    pursuant to subsection (c) may be used by a State

6    housing financing agency for administrative ex-

7    penses. Any amounts allocated to administrative ex-

8    penses that are no longer necessary for administra-

9    tive expenses may be used in accordance with para-

10    graph (1).

11    (f) TRIBAL AND NATIVE HAWAIIAN ASSISTANCE.—

12    (1) DEFINITIONS.—In this subsection:

13    (A) DEPARTMENT OF HAWAIIAN HOME

14    LANDS.—The term ''Department of Hawaiian

15    Home Lands'' has the meaning given the term

16    in section 801 of the Native American Housing

17    Assistance and Self-Determination Act of 1996

18    (42 U.S.C. 4221).

19    (B) ELIGIBLE RECIPIENT.—The term ''eli-

20    gible recipient'' means any entity eligible to re-

21    ceive a grant under section 101 of the Native

22    American Housing Assistance and Self-Deter-

23    mination Act of 1996 (25 U.S.C. 4111).

24    (2) REQUIREMENTS.—

DOC_0003262

958

1          (A) ALLOCATION.—Except for the funds
2       set aside under subsection (c)(5)(B), the Sec-
3       retary shall allocate the funds set aside under
4       subsection (c)(5)(A) using the allocation for-
5       mula described in subpart D of part 1000 of
6       title 24, Code of Federal Regulations (or any
7       successor regulations).

8          (B) NATIVE HAWAIIANS.—The Secretary
9       shall use the funds made available under sub-
10      section (c)(5)(B) in accordance with part 1006
11      of title 24, Code of Federal Regulations (or suc-
12      cessor regulations).

13      (3) TRANSFER.—The Secretary shall transfer
14   any funds made available under subsection (c)(5)
15   that have not been allocated by an eligible recipient
16   or the Department of Hawaiian Home Lands, as ap-
17   plicable, to provide the assistance described in sub-
18   section (e)(1) by December 31, 2030, to the Sec-
19   retary of Housing and Urban Development to carry
20   out the Native American Housing Assistance and
21   Self-Determination Act of 1996 (25 U.S.C. 4101 et
22   seq.).

23   (g) FUNDING.—There is appropriated, out of any
24 funds in the Treasury not otherwise appropriated, to the
25 Homeowner Assistance Fund established under subsection

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003263

959

1  (b), $75,000,000,000, to remain available until expended

2  or transferred or credited under subsection (i).

3    (h) USE OF HOUSING FINANCE AGENCY INNOVATION

4  FUND FOR THE HARDEST HIT HOUSING MARKETS

5  FUNDS.—A State housing finance agency may reallocate

6  any administrative or programmatic funds it has received

7  as an allocation from the Housing Finance Agency Inno-

8  vation Fund for the Hardest Hit Housing Markets created

9  pursuant to section 101(a) of the Emergency Economic

10  Stabilization Act of 2008 (12 U.S.C. 5211(a)) that have

11  not been otherwise allocated or disbursed as of the date

12  of enactment of this Act to supplement any administrative

13  or programmatic funds received from the Housing Assist-

14  ance Fund. Such reallocated funds shall not be considered

15  when allocating resources from the Housing Assistance

16  Fund using the process established under subsection (c)

17  and shall remain available for the uses permitted and

18  under the terms and conditions established by the contract

19  with Secretary created pursuant to subsection (d)(1) and

20  the terms of subsection (i).

21    (i) REPORTING REQUIREMENTS.—The Secretary

22  shall provide public reports not less frequently than quar-

23  terly regarding the use of funds provided by the Home-

24  owner Assistance Fund. Such reports shall include the fol-

25  lowing data by State and by program within each State,

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003264

960

1 both for the past quarter and throughout the life of the

2 program—

3         (1) the amount of funds allocated;

4         (2) the amount of funds disbursed;

5         (3) the number of households and individuals

6     assisted;

7         (4) the acceptance rate of applicants;

8         (5) the type or types of assistance provided to

9     each household;

10         (6) whether the household assisted had a feder-

11     ally backed loan and identification of the Federal en-

12     tity backing such loan;

13         (7) the average amount of funding provided per

14     household receiving assistance and per type of as-

15     sistance provided;

16         (8) the average number of monthly payments

17     that were covered by the funding amount that a

18     household received, as applicable, disaggregated by

19     type of assistance provided;

20         (9) the income level of each household receiving

21     assistance; and

22         (10) the outcome 12 months after the house-

23     hold has received assistance.

24 Each report under this subsection shall disaggregate the

25 information provided under paragraphs (3) through (10)

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003265

961

1 by State, zip code, racial and ethnic composition of the
2 household, and whether or not the person from the house-
3 hold applying for assistance speaks English as a second
4 language.

**SEC. 110203. PROTECTING RENTERS AND HOMEOWNERS**
**FROM EVICTIONS AND FORECLOSURES.**

7    (a) EVICTION MORATORIUM.—The CARES Act is
8 amended by striking section 4024 (15 U.S.C. 9058; Public
9 Law 116-136; 134 Stat. 492) and inserting the following
10 new section:

**"SEC. 4024. TEMPORARY MORATORIUM ON EVICTION FIL-**
**INGS.**

13    "(a) CONGRESSIONAL FINDINGS.—The Congress
14 finds that—

15        "(1) according to the 2018 American Commu-
16    nity Survey, 36 percent of households in the United
17    States—more than 43 million households—are rent-
18    ers;

19        "(2) in 2019 alone, renters in the United States
20    paid $512 billion in rent;

21        "(3) according to the Joint Center for Housing
22    Studies of Harvard University, 20.8 million renters
23    in the United States spent more than 30 percent of
24    their incomes on housing in 2018 and 10.9 million

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003266

962

1    renters spent more than 50 percent of their incomes

2    on housing in the same year;

3        ''(4) according to data from the Department of

4    Labor, more than 30 million people have filed for

5    unemployment since the COVID-19 pandemic began;

6        ''(5) the impacts of the spread of COVID-19,

7    which is now considered a global pandemic, are ex-

8    pected to negatively impact the incomes of poten-

9    tially millions of renter households, making it dif-

10   ficult for them to pay their rent on time; and

11       ''(6) evictions in the current environment would

12   increase homelessness and housing instability which

13   would    be    counterproductive    towards    the    public

14   health goals of keeping individuals in their homes to

15   the greatest extent possible.

16   ''(b) MORATORIUM.—During the period beginning on

17   the date of the enactment of this Act and ending 12

18   months after such date of enactment, the lessor of a cov-

19   ered dwelling located in such State may not make, or

20   cause to be made, any filing with the court of jurisdiction

21   to initiate a legal action to recover possession of the cov-

22   ered dwelling from the tenant for nonpayment of rent or

23   other fees or charges.

24   ''(c) DEFINITIONS.—For purposes of this section, the

25   following definitions shall apply:

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003267

963

1  "(1) COVERED DWELLING.—The term 'covered

2 dwelling' means a dwelling that is occupied by a ten-

3 ant—

4    "(A) pursuant to a residential lease; or

5    "(B) without a lease or with a lease ter-

6   minable at will under State law.

7  "(2) DWELLING.—The term 'dwelling' has the

8 meaning given such term in section 802 of the Fair

9 Housing Act (42 U.S.C. 3602) and includes houses

10 and dwellings described in section 803(b) of such

11 Act (42 U.S.C. 3603(b)).

12 "(d) NOTICE TO VACATE AFTER MORATORIUM EXPI-

13 RATION DATE.—After the expiration of the period de-

14 scribed in subsection (b), the lessor of a covered dwelling

15 may not require the tenant to vacate the covered dwelling

16 by reason of nonpayment of rent or other fees or charges

17 before the expiration of the 30-day period that begins

18 upon the provision by the lessor to the tenant, after the

19 expiration of the period described in subsection (b), of a

20 notice to vacate the covered dwelling.".

21 (b) MORTGAGE RELIEF.—

22  (1) FORBEARANCE AND FORECLOSURE MORA-

23 TORIUM FOR COVERED MORTGAGE LOANS.—Section

24 4022 of the CARES Act (15 U.S.C. 9056) is

25 amended—

964

1     (A) by striking "Federally backed mort-
2     gage loan" each place such term appears and
3     inserting "covered mortgage loan"; and
4         (B) in subsection (a)—
5             (i) by amending paragraph (2) to read
6             as follows:
7     "(2) COVERED MORTGAGE LOAN.—The term
8     'covered mortgage loan' means any credit trans-
9     action that is secured by a mortgage, deed of trust,
10    or other equivalent consensual security interest on a
11    1- to 4-unit dwelling or on residential real property
12    that includes a 1- to 4-unit dwelling, except that it
13    shall not include a credit transaction under an open
14    end credit plan other than a reverse mortgage."; and
15            (ii) by adding at the end the fol-
16            lowing:
17    "(3) COVERED PERIOD.—With respect to a
18    loan, the term 'covered period' means the period be-
19    ginning on the date of enactment of this Act and
20    ending 12 months after such date of enactment.".
21    (2) AUTOMATIC FORBEARANCE FOR DELIN-
22    QUENT BORROWERS.—Section 4022(c) of the
23    CARES Act (15 U.S.C. 9056(c)), as amended by
24    paragraph (5) of this subsection, is further amended
25    by adding at the end the following:

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003269

965

1            "(9) AUTOMATIC FORBEARANCE FOR DELIN-

2    QUENT BORROWERS.—

3                  "(A) IN GENERAL.—Notwithstanding any

4         other law governing forbearance relief—

5                      "(i) any borrower whose covered mort-

6            gage loan became 60 days delinquent be-

7            tween March 13, 2020, and the date of en-

8            actment of this paragraph, and who has

9            not already received a forbearance under

10           subsection (b), shall automatically be

11           granted a 60-day forbearance that begins

12           on the date of enactment of this para-

13           graph, provided that a borrower shall not

14           be considered delinquent for purposes of

15           this paragraph while making timely pay-

16           ments or otherwise performing under a

17           trial modification or other loss mitigation

18           agreement; and

19                      "(ii) any borrower whose covered

20           mortgage loan becomes 60 days delinquent

21           between the date of enactment of this

22           paragraph and the end of the covered pe-

23           riod, and who has not already received a

24           forbearance under subsection (b), shall

25           automatically be granted a 60-day forbear-

DOC_0003270

966

1   ance that begins on the 60th day of delin-
2   quency, provided that a borrower shall not
3   be considered delinquent for purposes of
4   this paragraph while making timely pay-
5   ments or otherwise performing under a
6   trial modification or other loss mitigation
7   agreement.

8   ''(B) INITIAL EXTENSION.—An automatic
9   forbearance provided under subparagraph (A)
10  shall be extended for up to an additional 120
11  days upon the borrower's request, oral or writ-
12  ten, submitted to the borrower's servicer affirm-
13  ing that the borrower is experiencing a financial
14  hardship that prevents the borrower from mak-
15  ing timely payments on the covered mortgage
16  loan due, directly or indirectly, to the COVID–
17  19 emergency.

18  ''(C) SUBSEQUENT EXTENSION.—A for-
19  bearance extended under subparagraph (B)
20  shall be extended for up to an additional 180
21  days, up to a maximum of 360 days (including
22  the period of automatic forbearance), upon the
23  borrower's request, oral or written, submitted to
24  the borrower's servicer affirming that the bor-
25  rower is experiencing a financial hardship that

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003271

1    prevents the borrower from making timely pay-

2    ments on the covered mortgage loan due, di-

3    rectly or indirectly, to the COVID–19 emer-

4    gency.

5        "(D) RIGHT TO ELECT TO CONTINUE MAK-

6    ING PAYMENTS.—With respect to a forbearance

7    provided under this paragraph, the borrower of

8    such loan may elect to continue making regular

9    payments on the loan. A borrower who makes

10    such election shall be offered a loss mitigation

11    option pursuant to subsection (d) within 30

12    days of resuming regular payments to address

13    any payment deficiency during the forbearance.

14        "(E) RIGHT TO SHORTEN FORBEAR-

15    ANCE.—At a borrower's request, any period of

16    forbearance provided under this paragraph may

17    be shortened. A borrower who makes such a re-

18    quest shall be offered a loss mitigation option

19    pursuant to subsection (d) within 30 days of re-

20    suming regular payments to address any pay-

21    ment deficiency during the forbearance.

22        "(10) AUTOMATIC FORBEARANCE FOR CERTAIN

23    REVERSE MORTGAGE LOANS.—

24        "(A) IN GENERAL.—When any covered

25    mortgage loan which is also a federally-insured

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003272

968

1    reverse mortgage loan, during the covered pe-

2    riod, is due and payable due to the death of the

3    last borrower or end of a deferral period or eli-

4    gible to be called due and payable due to a

5    property charge default, or if the borrower de-

6    faults on a property charge repayment plan, or

7    if the borrower defaults for failure to complete

8    property repairs, or if an obligation of the bor-

9    rower under the Security Instrument is not per-

10    formed, the mortgagee automatically shall be

11    granted a six-month extension of—

12          "(i) the mortgagee's deadline to re-

13          quest due and payable status from the De-

14          partment of Housing and Urban Develop-

15          ment;

16          "(ii) the mortgage's deadline to send

17          notification to the mortgagor or his or her

18          heirs that the loan is due and payable;

19          "(iii) the deadline to initiate fore-

20          closure;

21          "(iv) any reasonable diligence period

22          related to foreclosure or the Mortgagee Op-

23          tional Election;

24          "(v) if applicable, the deadline to ob-

25          tain the due and payable appraisal; and

DOC_0003273

G:\CMTE\AP\16\FY20\_D\HEROES.XML

969

1          ''(vi) any claim submission deadline,

2      including the 6-month acquired property

3      marketing period.

4          ''(B) FORBEARANCE PERIOD.—The mort-

5      gagee shall not request due and payable status

6      from the Secretary of Housing and Urban De-

7      velopment nor initiate foreclosure during this

8      six-month period described under subparagraph

9      (A), which shall be considered a forbearance pe-

10     riod.

11         ''(C) EXTENSION.—A forbearance provided

12     under subparagraph (B) and related deadline

13     extension authorized under subparagraph (A)

14     shall be extended for an additional 180 days

15     upon—

16             ''(i) the borrower's request, oral or

17         written, submitted to the borrower's

18         servicer affirming that the borrower is ex-

19         periencing a financial hardship that pre-

20         vents the borrower from making payments

21         on property charges, completing property

22         repairs, or performing an obligation of the

23         borrower under the Security Instrument

24         due, directly or indirectly, to the COVID–

25         19 emergency;

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

970

1        "(ii) a non-borrowing spouse's re-
2    quest, oral or written, submitted to the
3    servicer affirming that the non-borrowing
4    spouse has been unable to satisfy all cri-
5    teria for the Mortgagee Optional Election
6    program due, directly or indirectly, to the
7    COVID-19 emergency, or to perform all
8    actions necessary to become an eligible
9    non-borrowing spouse following the death
10   of all borrowers; or

11       "(iii) a successor-in-interest of the
12   borrower's request, oral or written, sub-
13   mitted to the servicer affirming the heir's
14   difficulty satisfying the reverse mortgage
15   loan due, directly or indirectly, to the
16   COVID-19 emergency.

17   "(D) CURTAILMENT OF DEBENTURE IN-
18   TEREST.—Where any covered mortgage loan
19   which is also a federally insured reverse mort-
20   gage loan is in default during the covered pe-
21   riod and subject to a prior event which provides
22   for curtailment of debenture interest in connec-
23   tion with a claim for insurance benefits, the
24   curtailment of debenture interest shall be sus-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003275

1    pended during any forbearance period provided

2    herein.''.

3    (3) ADDITIONAL FORECLOSURE AND REPOSSES-

4    SION PROTECTIONS.—Section 4022(c) of the

5    CARES Act (15 U.S.C. 9056(c)) is amended—

6         (A) in paragraph (2), by striking ''may not

7         initiate any judicial or non-judicial foreclosure

8         process, move for a foreclosure judgment or

9         order of sale, or execute a foreclosure-related

10        eviction or foreclosure sale for not less than the

11        60-day period beginning on March 18, 2020''

12        and inserting ''may not initiate or proceed with

13        any judicial or non-judicial foreclosure process,

14        schedule a foreclosure sale, move for a fore-

15        closure judgment or order of sale, execute a

16        foreclosure related eviction or foreclosure sale

17        for six months after the date of enactment of

18        the COVID–19 HERO Act''; and

19        (B) by adding at the end the following:

20    ''(3) REPOSSESSION MORATORIUM.—In the case

21    of personal property, including any recreational or

22    motor vehicle, used as a dwelling, no person may use

23    any judicial or non-judicial procedure to repossess or

24    otherwise take possession of such property for six

25    months after date of enactment of this paragraph.''.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003276

972

1  (4) MORTGAGE FORBEARANCE REFORMS.—Sec-

2  tion 4022 of the CARES Act (15 U.S.C. 9056) is

3  amended—

4      (A) in subsection (b), by striking para-

5      graphs (1), (2), and (3) and inserting the fol-

6      lowing:

7      "(1) IN GENERAL.—During the covered period,

8  a borrower with a covered mortgage loan who has

9  not obtained automatic forbearance pursuant to this

10  section and who is experiencing a financial hardship

11  that prevents the borrower from making timely pay-

12  ments on the covered mortgage loan due, directly or

13  indirectly, to the COVID–19 emergency may request

14  forbearance on the loan, regardless of delinquency

15  status, by—

16      "(A) submitting a request, orally or in

17      writing, to the servicer of the loan; and

18      "(B) affirming that the borrower is experi-

19      encing a financial hardship that prevents the

20      borrower from making timely payments on the

21      covered mortgage loan due, directly or indi-

22      rectly, to the COVID–19 emergency.

23      "(2) DURATION OF FORBEARANCE.—

24      "(A) IN GENERAL.—Upon a request by a

25      borrower to a servicer for forbearance under

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003277

973

1    paragraph (1), such forbearance shall be grant-
2    ed by the servicer for the period requested by
3    the borrower, up to an initial length of 180
4    days, the length of which shall be extended by
5    the servicer, at the request of the borrower for
6    the period or periods requested, for a total for-
7    bearance period of up to 12-months.

8        ''(B)    MINIMUM    FORBEARANCE
9    AMOUNTS.—For purposes of granting a forbear-
10   ance under this paragraph, a servicer may
11   grant an initial forbearance with a term of not
12   less than 90 days, provided that it is automati-
13   cally extended for an additional 90 days unless
14   the servicer confirms the borrower does not
15   want to renew the forbearance or that the bor-
16   rower is no longer experiencing a financial
17   hardship that prevents the borrower from mak-
18   ing timely mortgage payments due, directly or
19   indirectly, to the COVID–19 emergency.

20       ''(C)   RIGHT   TO   SHORTEN   FORBEAR-
21   ANCE.—At a borrower's request, any period of
22   forbearance described under this paragraph
23   may be shortened. A borrower who makes such
24   a request shall be offered a loss mitigation op-
25   tion pursuant to subsection (d) within 30 days

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003278

974

1          of resuming regular payments to address any

2          payment deficiency during the forbearance.

3          "(3) ACCRUAL OF INTEREST OR FEES.—A

4     servicer shall not charge a borrower any fees, pen-

5     alties, or interest (beyond the amounts scheduled or

6     calculated as if the borrower made all contractual

7     payments on time and in full under the terms of the

8     mortgage contract) in connection with a forbearance,

9     provided that a servicer may offer the borrower a

10    modification option at the end of a forbearance pe-

11    riod granted hereunder that includes the capitaliza-

12    tion of past due principal and interest and escrow

13    payments as long as the borrower's principal and in-

14    terest payment under such modification remains at

15    or below the contractual principal and interest pay-

16    ments owed under the terms of the mortgage con-

17    tract before such forbearance period except as the

18    result of a change in the index of an adjustable rate

19    mortgage.

20         "(4) COMMUNICATION WITH SERVICERS.—Any

21    communication between a borrower and a servicer

22    described under this section may be made in writing

23    or orally, at the borrower's choice.

24         "(5) COMMUNICATION WITH BORROWERS WITH

25    A DISABILITY.—Upon request from a borrower,

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003279

975

1    servicers shall communicate with borrowers who

2    have a disability in the borrower's preferred method

3    of communication. For purposes of this paragraph,

4    the term 'disability' has the meaning given that term

5    in the Fair Housing Act, the Americans with Dis-

6    abilities Act of 1990, or the Rehabilitation Act of

7    1973."; and

8        (B) in subsection (c), by amending para-

9        graph (1) to read as follows:

10   "(1) No DOCUMENTATION REQUIRED.—A

11   servicer of a covered mortgage loan shall not require

12   any documentation with respect to a forbearance

13   under this section other than the borrower's affirma-

14   tion (oral or written) to a financial hardship that

15   prevents the borrower from making timely payments

16   on the covered mortgage loan due, directly or indi-

17   rectly, to the COVID–19 emergency. An oral request

18   for forbearance and oral affirmation of hardship by

19   the borrower shall be sufficient for the borrower to

20   obtain or extend a forbearance.".

21       (5) OTHER SERVICER REQUIREMENTS DURING

22   FORBEARANCE.—Section 4022(c) of the CARES Act

23   (15 U.S.C. 9056(c)), as amended by paragraph (3)

24   of this subsection, is further amended by adding at

25   the end the following:

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003280

976

1       "(4) FORBEARANCE TERMS NOTICE.—Within

2 30 days of a servicer of a covered mortgage loan

3 providing forbearance to a borrower under sub-

4 section (b) or paragraph (9) or (10), or 10 days if

5 the forbearance is for a term of less than 60 days,

6 but only where the forbearance was provided in re-

7 sponse to a borrower's request for forbearance or

8 when an automatic forbearance was initially pro-

9 vided under paragraph (9) or (10), and not when an

10 existing forbearance is automatically extended, the

11 servicer shall provide the borrower with a notice in

12 accordance with the terms in paragraph (5).

13       "(5) CONTENTS OF NOTICE.—The written no-

14 tice required under paragraph (4) shall state in

15 plain language—

16           "(A) the specific terms of the forbearance;

17           "(B) the beginning and ending dates of the

18 forbearance;

19           "(C) that the borrower is eligible for up to

20 12 months of forbearance;

21           "(D) that the borrower may request an ex-

22 tension of the forbearance unless the borrower

23 will have reached the maximum period at the

24 end of the forbearance;

DOC_0003281

G:\CMTE\AP\16\FY20\_D\HEROES.XML

977

1        ''(E) that the borrower may request that

2    the initial or extended period be shortened at

3    any time;

4        ''(F) that the borrower should contact the

5    servicer before the end of the forbearance pe-

6    riod;

7        ''(G) a description of the loss mitigation

8    options that may be available to the borrower at

9    the end of the forbearance period based on the

10   borrower's specific loan;

11       ''(H) information on how to find a housing

12   counseling agency approved by the Department

13   of Housing and Urban Development;

14       ''(I) in the case of a forbearance provided

15   pursuant to paragraph (9) or (10), that the for-

16   bearance was automatically provided and how

17   to contact the servicer to make arrangements

18   for further assistance, including any renewal;

19   and

20       ''(J) where applicable, that the forbearance

21   is subject to an automatic extension including

22   the terms of any such automatic extensions and

23   when any further extension would require a bor-

24   rower request.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

978

1       "(6) TREATMENT OF ESCROW ACCOUNTS.—

2 During any forbearance provided under this section,

3 a servicer shall pay or advance funds to make dis-

4 bursements in a timely manner from any escrow ac-

5 count established on the covered mortgage loan.

6       "(7) NOTIFICATION FOR BORROWERS.—During

7 the period that begins 90 days after the date of the

8 enactment of this paragraph and ends at the end of

9 the covered period, each servicer of a covered mort-

10 gage loan shall be required to—

11       "(A) make available in a clear and con-

12       spicuous manner on their webpage accurate in-

13       formation, in English and Spanish, for bor-

14       rowers regarding the availability of forbearance

15       as provided under subsection (b); and

16       "(B) notify every borrower whose pay-

17       ments on a covered mortgage loan are delin-

18       quent in any oral communication with or to the

19       borrower that the borrower may be eligible to

20       request forbearance as provided under sub-

21       section (b), except that such notice shall not be

22       required if the borrower already has requested

23       forbearance under subsection (b).

24       "(8) CERTAIN TREATMENT UNDER RESPA.—As

25 long as a borrower's payment on a covered mortgage

DOC_0003283

979

1     loan was not more than 30 days delinquent on

2     March 13, 2020, a servicer may not deem the bor-

3     rower as delinquent while a forbearance granted

4     under subsection (b) is in effect for purposes of the

5     application of sections 6 and 10 of the Real Estate

6     Settlement Procedures Act and any applicable regu-

7     lations.''.

8        (6) POST-FORBEARANCE LOSS MITIGATION.—

9           (A) AMENDMENT TO CARES ACT.—Section

10         4022 of the CARES Act (15 U.S.C. 9056) is

11         amended by adding at the end the following:

12     ''(d) POST-FORBEARANCE LOSS MITIGATION.—

13        ''(1) NOTICE OF AVAILABILITY OF ADDITIONAL

14     FORBEARANCE.—With respect to any covered mort-

15     gage loan as to which forbearance under this section

16     has been granted and not otherwise extended, in-

17     cluding by automatic extension, a servicer shall, no

18     later than 30 days before the end of the forbearance

19     period, in writing, notify the borrower that addi-

20     tional forbearance may be available and how to re-

21     quest such forbearance, except that no such notice

22     is required where the borrower already has requested

23     an extension of the forbearance period, is subject to

24     automatic extension pursuant to subsection

25     (b)(2)(B), or no additional forbearance is available.

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

G:\CMTE\AP\16\FY20\_D\HEROES.XML

980

1　　　　"(2) Loss mitigation offer before expira-
2　　tion of forbearance.—No later than 30 days be-
3　　fore the end of any forbearance period that has not
4　　been extended or 30 days after a request by a con-
5　　sumer to terminate the forbearance, which time shall
6　　be before the servicer initiates or engages in any
7　　foreclosure activity listed in subsection (c)(2), in-
8　　cluding incurring or charging to a borrower any fees
9　　or corporate advances related to a foreclosure, the
10　　servicer shall, in writing—

11　　　　　　"(A) offer the borrower a loss mitigation
12　　　　　option, without the charging of any fees or pen-
13　　　　　alties other than interest, such that the bor-
14　　　　　rower's principal and interest payment remains
15　　　　　the same as it was prior to the forbearance,
16　　　　　subject to any adjustment of the index pursuant
17　　　　　to the terms of an adjustable rate mortgage,
18　　　　　and that either—

19　　　　　　　　"(i) defers the payment of total ar-
20　　　　　　　rearages, including any escrow advances,
21　　　　　　　to the end of the existing term of the loan,
22　　　　　　　without the charging or collection of any
23　　　　　　　additional interest on the deferred
24　　　　　　　amounts; or

g:\VHLC\051220\051220.072.xml　　　　(763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003285

981

1          "(ii) extends the term of the mortgage

2             loan, and capitalizes, defers, or forgives all

3             escrow advances and other arrearages;

4       provided, however, that the servicer may offer

5       the borrower a loss mitigation option that re-

6       duces the principal and interest payment on the

7       loan and capitalizes, defers, or forgives all es-

8       crow advances or arrearages if the servicer has

9       information indicating that the borrower cannot

10      resume the pre-forbearance mortgage payments;

11      and

12          "(B) concurrent with the loss mitigation

13      offer in subparagraph (A), notify the borrower

14      that the borrower has the right to be evaluated

15      for other loss mitigation options if the borrower

16      is not able to make the payment under the op-

17      tion offered in subparagraph (A).

18      "(3) EVALUATION FOR LOSS MITIGATION PRIOR

19  TO  FORECLOSURE  INITIATION.—Before  a  servicer

20  may initiate or engage in any foreclosure activity

21  listed in subsection (c)(2), including incurring or

22  charging to a borrower any fees or corporate ad-

23  vances related to a foreclosure on the basis that the

24  borrower has failed to perform under the loss miti-

25  gation offer in paragraph (2)(A) within the first 90

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003286

G:\CMTE\AP\16\FY20\_D\HEROES.XML

982

1    days after the option is offered, including a failure

2    to accept the loss mitigation offer in paragraph

3    (2)(A), the servicer shall—

4        ''(A) unless the borrower has already sub-

5        mitted a complete application that the servicer

6        is reviewing—

7            ''(i) notify the borrower in writing of

8            the documents and information, if any,

9            needed by the servicer to enable the

10           servicer to consider the borrower for all

11           available loss mitigation options;

12           ''(ii) exercise reasonable diligence to

13           obtain the documents and information

14           needed to complete the borrower's loss

15           mitigation application;

16        ''(B) upon receipt of a complete applica-

17        tion or if, despite the servicer's exercise of rea-

18        sonable diligence, the loss mitigation application

19        remains incomplete sixty days after the notice

20        in paragraph (2)(A) is sent, conduct an evalua-

21        tion of the complete or incomplete loss mitiga-

22        tion application without reference to whether

23        the borrower has previously submitted a com-

24        plete loss mitigation application and offer the

25        borrower all available loss mitigation options for

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003287

983

1 which the borrower qualifies under applicable

2 investor guidelines, including guidelines regard-

3 ing required documentation.

4  "(4) EFFECT ON FUTURE REQUESTS FOR LOSS

5 MITIGATION REVIEW.—An application, offer, or eval-

6 uation for loss mitigation under this section shall

7 not be the basis for the denial of a borrower's appli-

8 cation as duplicative or for a reduction in the bor-

9 rower's appeal rights under Regulation X (12 C.F.R.

10 1024) in regard to any loss mitigation application

11 submitted after the servicer has complied with the

12 requirements of paragraphs (2) and (3).

13  "(5) SAFE HARBOR.—Any loss mitigation op-

14 tion authorized by the Federal National Mortgage

15 Association, the Federal Home Loan Corporation, or

16 the Federal Housing Administration that either—

17   "(A) defers the payment of total arrear-

18   ages, including any escrow advances, to the end

19   of the existing term of the loan, without the

20   charging or collection of any additional interest

21   on the deferred amounts, or

22   "(B) extends the term of the mortgage

23   loan, and capitalizes, defers, or forgives all es-

24   crow advances and other arrearages, without

25   the charging of any fees or penalties beyond in-

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003288

G:\CMTE\AP\16\FY20\_D\HEROES.XML

984

1      terest on any amount capitalized into the loan

2      principal,

3  shall be deemed to comply with the requirements of

4  paragraph (1)(B).

5      "(6) HOME RETENTION OPTIONS FOR CERTAIN

6  REVERSE MORTGAGE LOANS.—

7         "(A) IN GENERAL.—For a covered mort-

8         gage loan which is also a federally-insured re-

9         verse mortgage loan, a servicer's conduct shall

10        be deemed to comply with this section provided

11        that if the loan is eligible to be called due and

12        payable due to a property charge default, the

13        mortgagee shall, as a precondition to sending a

14        due and payable request to the Secretary or ini-

15        tiating or continuing a foreclosure process—

16            "(i) make a good faith effort to com-

17            municate with the borrower regarding

18            available home retention options to cure

19            the property charge default, including en-

20            couraging the borrower to apply for home

21            retention options; and

22            "(ii) consider the borrower for all

23            available home retention options as allowed

24            by the Secretary.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003289

985

1        "(B) Permissible repayment plans.—

2    The Secretary shall amend its allowable home

3    retention options to permit a repayment plan of

4    up to 120 months in length, and to permit a re-

5    payment plan without regard to prior defaults

6    on repayment plans.

7        "(C) Limitation on interest curtail-

8    ment.—The Secretary may not curtail interest

9    paid to mortgagees who engage in loss mitiga-

10    tion or home retention actions through interest

11    curtailment during such loss mitigation or home

12    retention review or during the period when a

13    loss mitigation or home retention plan is in ef-

14    fect and ending 90 days after any such plan

15    terminates.".

16    (B) Amendment to housing act of

17    1949.—Section 505 of the Housing Act of 1949

18    (42 U.S.C. 1475) is amended—

19        (i) by striking the section heading and

20        inserting "Loss mitigation and fore-

21        closure procedures";

22        (ii) in subsection (a), by striking the

23        section designation and all that follows

24        through "During any" and inserting the

25        following:

DOC_0003290

986

1       "SEC. 505. (a) Moratorium— (1) In determining a
2   borrower's eligibility for relief, the Secretary shall make
3   all eligibility decisions based on the borrower's household's
4   income, expenses, and circumstances.

5       "(2) During any".

6                   (iii) by redesignating subsection (b) as
7               subsection (c); and

8                   (iv) by inserting after subsection (a)
9               the following new subsection:

10      "(b) LOAN MODIFICATION.— (1) Notwithstanding
11  any other provision of this title, for any loan made under
12  section 502 or 504, the Secretary may modify the interest
13  rate and extend the term of such loan for up to 30 years
14  from the date of such modification.

15      "(2) At the end of any moratorium period granted
16  under this section or under the COVID–19 HERO Act,
17  the Secretary shall determine whether the borrower can
18  reasonably resume making principal and interest pay-
19  ments after the Secretary modifies the borrower's loan ob-
20  ligations in accordance with paragraph (1).".

21                  (7) MULTIFAMILY MORTGAGE FORBEARANCE.—
22              Section 4023 of the CARES Act (15 U.S.C. 9057)
23              is amended—

24                      (A) by striking "Federally backed multi-
25                  family mortgage loan" each place such term ap-

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003291

987

1   pears and inserting "multifamily mortgage

2   loan";

3     (B) in subsection (b), by striking "during"

4   and inserting "due, directly or indirectly, to";

5     (C) in subsection (c)(1)—

6       (i) in subparagraph (A), by adding

7   "and" at the end;

8       (ii) by striking subparagraphs (B) and

9   (C) and inserting the following:

10     "(B) provide the forbearance for up to the

11   end of the period described under section

12   4024(b)."; and

13     (D) by redesignating subsection (f) as sub-

14   section (g);

15     (E) by inserting after subsection (e) the

16   following:

17 "(f) TREATMENT AFTER FORBEARANCE.—With re-

18 spect to a multifamily mortgage loan provided a forbear-

19 ance under this section, the servicer of such loan—

20   "(1) shall provide the borrower with a 12-

21   month period beginning at the end of such forbear-

22   ance to become current on the payments under such

23   loan;

24   "(2) may not charge any late fees, penalties, or

25   other charges with respect to payments on the loan

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003292

988

1  that were due during the forbearance period, if such
2  payments are made before the end of the 12-month
3  period; and

4       ''(3) may not report any adverse information to
5  a credit rating agency (as defined under section 603
6  of the Fair Credit Reporting Act with respect to any
7  payments on the loan that were due during the for-
8  bearance period, if such payments are made before
9  the end of the 12-month period.).''; and

10            (F) in subsection (g), as so redesignated—
11                 (i) in paragraph (2)—
12                      (I) by striking ''that—'' and all
13                      that follows through ''(A) is secured
14                      by'' and inserting ''that is secured
15                      by'';
16                      (II) by striking ''; and'' and in-
17                      serting a period; and
18                      (III) by striking subparagraph
19                      (B); and
20                 (ii) by amending paragraph (5) to
21                 read as follows:

22       ''(5) COVERED PERIOD.—With respect to a
23  loan, the term 'covered period' has the meaning
24  given that term under section 4022(a)(3).''.

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003293

989

1     (8) RENTER PROTECTIONS DURING FORBEAR-

2 ANCE PERIOD.— A borrower that receives a forbear-

3 ance pursuant to section 4022 or 4023 of the

4 CARES Act (15 U.S.C. 9056 or 9057) may not, for

5 the duration of the forbearance—

6     (A) evict or initiate the eviction of a tenant

7 solely for nonpayment of rent or other fees or

8 charges; or

9     (B) charge any late fees, penalties, or

10 other charges to a tenant for late payment of

11 rent.

12     (9) EXTENSION OF GSE PATCH.—

13     (A) NON-APPLICABILITY OF EXISTING

14 SUNSET.—Section 1026.43(e)(4)(iii)(B) of title

15 12, Code of Federal Regulations, shall have no

16 force or effect.

17     (B) EXTENDED SUNSET.—The special

18 rules in section 1026.43(e)(4) of title 12, Code

19 of Federal Regulations, shall apply to covered

20 transactions consummated prior to June 1,

21 2022, or such later date as the Director of the

22 Bureau of Consumer Financial Protection may

23 determine, by rule.

24     (10) SERVICER SAFE HARBOR FROM INVESTOR

25 LIABILITY.—

DOC_0003294

G:\CMTE\AP\16\FY20\_D\HEROES.XML

990

1     (A) SAFE HARBOR.—

2         (i) IN GENERAL.—A servicer of cov-

3         ered mortgage loans or multifamily mort-

4         gage loans shall be deemed not to have vio-

5         lated any duty or contractual obligation

6         owed to investors or other parties regard-

7         ing such mortgage loans on account of of-

8         fering or implementing in good faith for-

9         bearance during the covered period or of-

10         fering or implementing in good faith post-

11         forbearance loss mitigation (including after

12         the expiration of the covered period) in ac-

13         cordance with the terms of sections 4022

14         and 4023 of the CARES Act to borrowers,

15         respectively, on covered or multifamily

16         mortgage loans that it services and shall

17         not be liable to any party who is owed such

18         a duty or obligation or subject to any in-

19         junction, stay, or other equitable relief to

20         such party on account of such offer or im-

21         plementation of forbearance or post-for-

22         bearance loss mitigation.

23         (ii) OTHER PERSONS.—Any person,

24         including a trustee of a securitization vehi-

25         cle or other party involved in a

DOC_0003295

991

1      securitization or other investment vehicle,

2      who in good faith cooperates with a

3      servicer of covered or multifamily mortgage

4      loans held by that securitization or invest-

5      ment vehicle to comply with the terms of

6      section 4022 and 4023 of the CARES Act,

7      respectively, to borrowers on covered or

8      multifamily mortgage loans owned by the

9      securitization or other investment vehicle

10      shall not be liable to any party who is owed

11      such a duty or obligation or subject to any

12      injunction, stay, or other equitable relief to

13      such party on account of its cooperation

14      with an offer or implementation of forbear-

15      ance during the covered period or post-for-

16      bearance loss mitigation, including after

17      the expiration of the covered period.

18      (B) STANDARD INDUSTRY PRACTICE.—

19      During the covered period, notwithstanding any

20      contractual restrictions, it is deemed to be

21      standard industry practice for a servicer to

22      offer forbearance or loss mitigation options in

23      accordance with the terms of sections 4022 and

24      4023 of the CARES Act to borrowers, respec-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003296

G:\CMTE\AP\16\FY20\_D\HEROES.XML

992

1    tively, on all covered or multifamily mortgage

2    loans it services.

3    (C) RULE OF CONSTRUCTION.—Nothing in

4    this paragraph may be construed as affecting

5    the liability of a servicer or other person for ac-

6    tual fraud in the servicing of a mortgage loan

7    or for the violation of a State or Federal law.

8    (D) DEFINITIONS.—In this paragraph:

9    (i) COVERED MORTGAGE LOAN.—The

10    term "covered mortgage loan" has the

11    meaning given that term under section

12    4022(a) of the CARES Act.

13    (ii) COVERED PERIOD.—The term

14    "covered period" has the meaning given

15    that term under section 4023(g) of the

16    CARES Act.

17    (iii) MULTIFAMILY MORTGAGE

18    LOAN.—The term "multifamily mortgage

19    loan" has the meaning given that term

20    under section 4023(g) of the CARES Act.

21    (iv) SERVICER.—The term

22    "servicer"—

23    (I) has the meaning given the

24    term under section 6(i) of the Real

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003297

993

1        Estate Settlement Procedures Act of

2        1974 (12 U.S.C. 2605(i)); and

3               (II) means a master servicer and

4        a subservicer, as such terms are de-

5        fined, respectively, under section

6        1024.31 of title 12, Code of Federal

7        Regulations.

8               (v) SECURITIZATION VEHICLE.—The

9        term "securitization vehicle" has the

10       meaning give that term under section

11       129A(f) of the Truth in Lending Act (15

12       U.S.C. 1639a(f)).

13  (c) BANKRUPTCY PROTECTIONS.—

14       (1) BANKRUPTCY PROTECTIONS FOR FEDERAL

15  CORONAVIRUS RELIEF PAYMENTS.—Section 541(b)

16  of title 11, United States Code, is amended—

17          (A) in paragraph (9), in the matter fol-

18       lowing subparagraph (B), by striking "or";

19          (B) in paragraph (10)(C), by striking the

20       period at the end and inserting "; or"; and

21          (C) by inserting after paragraph (10) the

22       following:

23       "(11) payments made under Federal law relat-

24  ing to the national emergency declared by the Presi-

25  dent under the National Emergencies Act (50

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003298

994

1    U.S.C. 1601 et seq.) with respect to the coronavirus

2    disease 2019 (COVID–19).''.

3        (2) PROTECTION AGAINST DISCRIMINATORY

4    TREATMENT OF HOMEOWNERS IN BANKRUPTCY.—

5    Section 525 of title 11, United States Code, is

6    amended by adding at the end the following:

7    ''(d) A person may not be denied any forbearance,

8    assistance, or loan modification relief made available to

9    borrowers by a mortgage creditor or servicer because the

10   person is or has been a debtor, or has received a discharge,

11   in a case under this title.''.

12       (3) INCREASING THE HOMESTEAD EXEMP-

13   TION.—Section 522 of title 11, United States Code,

14   is amended—

15           (A) in subsection (d)(1), by striking

16       ''$15,000'' and inserting ''$100,000''; and

17           (B) by adding at the end the following:

18   ''(r) Notwithstanding any other provision of applica-

19   ble nonbankruptcy law, a debtor in any State may exempt

20   from property of the estate the property described in sub-

21   section (d)(1) not to exceed the value in subsection (d)(1)

22   if the exemption for such property permitted by applicable

23   nonbankruptcy law is lower than that amount.''.

24       (4) EFFECT OF MISSED MORTGAGE PAYMENTS

25   ON DISCHARGE.—Section 1328 of title 11, United

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003299

995

1    States Code, is amended by adding at the end the

2    following:

3    "(i) A debtor shall not be denied a discharge under

4    this section because, as of the date of discharge, the debtor

5    did not make 6 or fewer payments directly to the holder

6    of a debt secured by real property.

7    "(j) Notwithstanding subsections (a) and (b), upon

8    the debtor's request, the court shall grant a discharge of

9    all debts provided for in the plan that are dischargeable

10    under subsection (a) if the debtor—

11    "(1) has made payments under a confirmed

12    plan for at least 1 year; and

13    "(2) is experiencing or has experienced a mate-

14    rial financial hardship due, directly or indirectly, to

15    the coronavirus disease 2019 (COVID–19) pan-

16    demic.".

17    (5) EXPANDED ELIGIBILITY FOR CHAPTER

18    13.—Section 109(e) of title 11, United States Code,

19    is amended—

20    (A) by striking "$250,000" each place the

21    term appears and inserting "$850,000"; and

22    (B) by striking "$750,000" each place the

23    term appears and inserting "$2,600,000".

24    (6) EXTENDED CURE PERIOD FOR HOME-

25    OWNERS HARMED BY COVID–19 PANDEMIC.—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003300

996

1         (A) IN GENERAL.—Chapter 13 of title 11,

2         United States Code, is amended by adding at

3         the end thereof the following:

4 **"§ 1331. Special provisions related to COVID–19 pan-**

5         **demic**

6     "(a) Notwithstanding subsections (b)(2) and (d) of

7 section 1322, if the debtor is experiencing or has experi-

8 enced a material financial hardship due, directly or indi-

9 rectly, to the coronavirus disease 2019 (COVID–19) pan-

10 demic, a plan may provide for the curing of any default

11 within a reasonable time, not to exceed 7 years after the

12 time that the first payment under the original confirmed

13 plan was due, and maintenance of payments while the case

14 is pending on any unsecured claim or secured claim on

15 which the last payment is due after the expiration of such

16 time. Any such plan provision shall not affect the applica-

17 ble commitment period under section 1325(b).

18     "(b) For purposes of sections 1328(a) and 1328(b),

19 any cure or maintenance payments under subsection (a)

20 that are made after the end of the period during which

21 the plan provides for payments (other than payments

22 under subsection (a)) shall not be treated as payments

23 under the plan.

24     "(c) Notwithstanding section 1329(c), a plan modi-

25 fied under section 1329 at the debtor's request may pro-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003301

997

1  vide for cure or maintenance payments under subsection

2  (a) over a period that is not longer than 7 years after

3  the time that the first payment under the original con-

4  firmed plan was due.

5      "(d) Notwithstanding section 362(c)(2), during the

6  period after the debtor receives a discharge and the period

7  during which the plan provides for the cure of any default

8  and maintenance of payments under the plan, section

9  362(a) shall apply to the holder of a claim for which a

10  default is cured and payments are maintained under sub-

11  section (a) and to any property securing such claim.

12      "(e) Notwithstanding section 1301(a)(2), the stay of

13  section 1301(a) terminates upon the granting of a dis-

14  charge under section 1328 with respect to all creditors

15  other than the holder of a claim for which a default is

16  cured and payments are maintained under subsection

17  (a).".

18          (B) TABLE OF CONTENTS.—The table of

19          sections of chapter 13, title 11, United States

20          Code, is amended by adding at the end thereof

21          the following:

"Sec. 1331. Special provisions related to COVID–19 Pandemic.".

22          (C)   APPLICATION.—The   amendments

23          made by this paragraph shall apply only to any

24          case under title 11, United States Code, com-

25          menced before 3 years after the date of enact-

998

1  ment of this Act and pending on or commenced

2  after such date of enactment, in which a plan

3  under chapter 13 of title 11, United States

4  Code, was not confirmed before March 27,

5  2020.

6 **SEC. 110204. LIQUIDITY FOR MORTGAGE SERVICERS AND**

7  **RESIDENTIAL RENTAL PROPERTY OWNERS.**

8  (a) IN GENERAL.—Section 4003 of the CARES Act

9 (15 U.S.C. 9042), is amended by adding at the end the

10 following:

11  "(i) LIQUIDITY FOR MORTGAGE SERVICERS.—

12   "(1) IN GENERAL.—Subject to paragraph (2),

13  the Secretary shall ensure that servicers of covered

14  mortgage loans (as defined under section 4022) and

15  multifamily mortgage loans (as defined under sec-

16  tion 4023) are provided the opportunity to partici-

17  pate in the loans, loan guarantees, or other invest-

18  ments made by the Secretary under this section. The

19  Secretary shall ensure that servicers are provided

20  with access to such opportunities under equitable

21  terms and conditions regardless of their size.

22   "(2) MORTGAGE SERVICER ELIGIBILITY.—In

23  order to receive assistance under subsection (b)(4),

24  a mortgage servicer shall—

999

1          ''(A) demonstrate that the mortgage
2     servicer has established policies and procedures
3     to use such funds only to replace funds used for
4     borrower assistance, including to advance funds
5     as a result of forbearance or other loss mitiga-
6     tion provided to borrowers;

7          ''(B) demonstrate that the mortgage
8     servicer has established policies and procedures
9     to provide forbearance, post-forbearance loss
10    mitigation, and other assistance to borrowers in
11    compliance with the terms of section 4022 or
12    4023, as applicable;

13         ''(C) demonstrate that the mortgage
14    servicer has established policies and procedures
15    to ensure that forbearance and post-forbearance
16    assistance is available to all borrowers in a non-
17    discriminatory fashion and in compliance with
18    the Fair Housing Act, the Equal Credit Oppor-
19    tunity Act, and other applicable fair housing
20    and fair lending laws; and

21         ''(D) comply with the limitations on com-
22    pensation set forth in section 4004.

23    ''(3) MORTGAGE SERVICER REQUIREMENTS.—A
24    mortgage servicer receiving assistance under sub-
25    section (b)(4) may not, while the servicer is under

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003304

G:\CMTE\AP\16\FY20\_D\HEROES.XML

<center>1000</center>

1  any obligation to repay funds provided or guaran-

2  teed under this section—

3      ''(A) pay dividends with respect to the

4  common stock of the mortgage servicer or pur-

5  chase an equity security of the mortgage

6  servicer or any parent company of the mortgage

7  servicer if the security is listed on a national se-

8  curities exchange, except to the extent required

9  under a contractual obligation that is in effect

10  on the date of enactment of this subsection; or

11      ''(B) prepay any debt obligation.''.

12  (b) CREDIT FACILITY FOR RESIDENTIAL RENTAL

13  PROPERTY OWNERS.—

14      (1) IN GENERAL.—The Board of Governors of

15  the Federal Reserve System shall—

16      (A) establish a facility, using amounts

17  made available under section 4003(b)(4) of the

18  CARES Act (15 U.S.C. 9042(b)(4)), to make

19  long-term, low-cost loans to residential rental

20  property owners as to temporarily compensate

21  such owners for documented financial losses

22  caused by reductions in rent payments; and

23      (B) defer such owners' required payments

24  on such loans until after six months after the

25  date of enactment of this Act.

DOC_0003305

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1001

1     (2) REQUIREMENTS.—A borrower that receives

2     a loan under this subsection may not, for the dura-

3     tion of the loan—

4          (A) evict or initiate the eviction of a tenant

5          solely for nonpayment of rent or other fees or

6          charges;

7          (B) charge any late fees, penalties, or

8          other charges to a tenant for late payment of

9          rent; and

10         (C) with respect to a person or entity de-

11         scribed under paragraph (4), discriminate on

12         the basis of source of income.

13    (3) REPORT ON RESIDENTIAL RENTAL PROP-

14    ERTY OWNERS.—The Board of Governors shall issue

15    a report to the Congress containing the following,

16    with respect to each property owner receiving a loan

17    under this subsection:

18         (A) The number of borrowers that received

19         assistance under this subsection.

20         (B) The average total loan amount that

21         each borrower received.

22         (C) The total number of rental units that

23         each borrower owned.

24         (D) The average rent charged by each bor-

25         rower.

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003306

G:\CMTE\AP\16\FY20\_D\HEROES.XML

<center>1002</center>

1      (4) REPORT ON LARGE RESIDENTIAL RENTAL

2    PROPERTY OWNERS.—The Board of Governors shall

3    issue a report to Congress that identifies any person

4    or entity that in aggregate owns or holds a control-

5    ling interest in any entity that, in aggregate, owns—

6        (A) more than 100 rental units that are lo-

7        cated within in a single Metropolitan Statistical

8        Area;

9        (B) more than 1,000 rental units nation-

10       wide; or

11       (C) rental units in three or more States.

12   (c) AMENDMENTS TO NATIONAL HOUSING ACT.—

13 Section 306(g)(1) of the National Housing Act (12 U.S.C.

14 1721(a)) is amended—

15    (1) in the fifth sentence, by inserting after

16    "issued" the following: ", subject to any pledge or

17    grant of security interest of the Federal Reserve

18    under section 4003(a) of the CARES Act (Public

19    Law 116-136; 134 Stat. 470; 15 U.S.C. 9042(a))

20    and to any such mortgage or mortgages or any in-

21    terest therein and the proceeds thereon, which the

22    Association may elect to approve"; and

23    (2) in the sixth sentence—

24        (A) by striking "or (C)" and inserting

25        "(C)"; and

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003307

1003

1        (B) by inserting before the period the fol-
2    lowing: ", or (D) its approval and honoring of
3    any pledge or grant of security interest of the
4    Federal Reserve under section 4003(a) of the
5    CARES Act and to any such mortgage or mort-
6    gages or any interest therein and proceeds
7    thereon as".

8    **SEC. 110205. RURAL RENTAL ASSISTANCE.**

9        There is authorized to be appropriated for fiscal year
10   2020 $309,000,000 for rural rental assistance, which shall
11   remain available until September 30, 2021, of which—

12       (1) up to $25,000,000 million may be used for
13   an additional amount for rural housing vouchers for
14   any low-income households (including those not re-
15   ceiving rental assistance) residing in a property fi-
16   nanced with a section 515 loan which has been pre-
17   paid after September 30, 2005, or has matured after
18   September 30, 2019; and

19       (2) the remainder shall be used for an addi-
20   tional amount for rural rental assistance agreements
21   entered into or renewed pursuant to section
22   521(a)(2) of the Housing Act of 1949 (42 U.S.C.
23   1490a(a)(2)) to—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003308

1004

1  (A) supplement the rental assistance of

2  households on whose behalf assistance is being

3  provided; and

4  (B) provide rental assistance on behalf of

5  households who are not being assisted with such

6  rental assistance but who qualify for such as-

7  sistance.

## SEC. 110206. FUNDING FOR PUBLIC HOUSING AND TENANT-BASED RENTAL ASSISTANCE.

10  (a) PUBLIC HOUSING OPERATING FUND.—There is

11  authorized to be appropriated for an additional amount

12  for fiscal year 2020 for the Public Housing Operating

13  Fund under section 9(e) of the United States Housing Act

14  of 1937 (42 U.S.C. 1437g(e)) $2,000,000,000, to remain

15  available until September 30, 2021.

16  (b) TENANT-BASED SECTION 8 RENTAL ASSIST-

17  ANCE.—There is authorized to be appropriated for an ad-

18  ditional amount for fiscal year 2020 for the tenant-based

19  rental assistance under section 8(o) of the United States

20  Housing   Act   of   1937   (42   U.S.C.   1437f(o))

21  $3,000,000,000, to remain available until September 30,

22  2021, of which not more than $500,000,000 may be used

23  for administrative fees under section 8(q) of such Act (42

24  U.S.C. 1437f(q)).

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003309

1005

1    (c) APPLICABILITY OF WAIVERS.—Any waiver or al-
2  ternative requirement made by the Secretary of Housing
3  and Urban Development pursuant to the heading "Ten-
4  ant-Based Rental Assistance" or "Public Housing Oper-
5  ating Fund" in title XII of division B of the CARES Act
6  (Public Law 116-136) shall apply with respect to amounts
7  made available pursuant to this section.

8  **SEC. 110207. SUPPLEMENTAL FUNDING FOR SUPPORTIVE**
9              **HOUSING FOR THE ELDERLY, SUPPORTIVE**
10             **HOUSING FOR PERSONS WITH DISABILITIES,**
11             **SUPPORTIVE HOUSING FOR PERSONS WITH**
12             **AIDS, AND PROJECT-BASED SECTION 8 RENT-**
13             **AL ASSISTANCE.**

14    (a) AUTHORIZATION OF APPROPRIATIONS.—There is
15  authorized to be appropriated $500,000,000 for fiscal year
16  2020 for additional assistance for supportive housing for
17  the elderly, of which—

18         (1) $200,000,000 shall be for rental assistance
19      under section 202 of the Housing Act of 1959 (12
20      U.S.C. 1701q) or section 8 of the United States
21      Housing Act of 1937 (42 U.S.C. 1437f), as appro-
22      priate, and for hiring additional staff and for serv-
23      ices and costs, including acquiring personal protec-
24      tive equipment, to prevent, prepare for, or respond
25      to    the    public    health    emergency    relating    to

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003310

1006

1 Coronavirus Disease 2019 (COVID-19) pandemic;

2 and

3     (2) $300,000,000 shall be for grants under sec-

4 tion 676 of the Housing and Community Develop-

5 ment Act of 1992 (42 U.S.C. 13632) for costs of

6 providing service coordinators for purposes of coordi-

7 nating services to prevent, prepare for, or respond to

8 the public health emergency relating to Coronavirus

9 Disease 2019 (COVID-19).

10 Any provisions of, and waivers and alternative require-

11 ments issued by the Secretary pursuant to, the heading

12 "Department of Housing and Urban Development—Hous-

13 ing Programs—Housing for the Elderly" in title XII of

14 division B of the CARES Act (Public Law 116-136) shall

15 apply with respect to amounts made available pursuant

16 to this subsection.

17     (b) ELIGIBILITY OF SUPPORTIVE HOUSING FOR PER-

18 SONS WITH DISABILITIES.—Subsection (a) of section 676

19 of the Housing and Community Development Act of 1992

20 (42 U.S.C. 13632(a)) shall be applied, for purposes of

21 subsection (a) of this section, by substituting "(G), and

22 (H)" for " and (G)".

23     (c) SERVICE COORDINATORS.—

24     (1) HIRING.—In the hiring of staff using

25 amounts made available pursuant to this section for

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003311

1007

1    costs of providing service coordinators, grantees

2    shall consider and hire, at all levels of employment

3    and to the greatest extent possible, a diverse staff,

4    including by race, ethnicity, gender, and disability

5    status. Each grantee shall submit a report to the

6    Secretary of Housing and Urban Development de-

7    scribing compliance with the preceding sentence not

8    later than the expiration of the 120-day period that

9    begins upon the termination of the emergency de-

10   clared on March 13, 2020, by the President under

11   the Robert T. Stafford Disaster Relief and Emer-

12   gency Assistance Act (42 U.S.C. 4121 et seq.) relat-

13   ing to the Coronavirus Disease 2019 (COVID-19)

14   pandemic.

15       (2) ONE-TIME GRANTS.—Grants made using

16   amounts made available pursuant to subsection (a)

17   for costs of providing service coordinators shall not

18   be renewable.

19       (3) ONE-YEAR AVAILABILITY.—Any amounts

20   made available pursuant to this section for costs of

21   providing service coordinators that are allocated for

22   a grantee and remain unexpended upon the expira-

23   tion of the 12-month period beginning upon such al-

24   location shall be recaptured by the Secretary.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003312

1008

1    (d) FUNDING FOR SUPPORTIVE HOUSING FOR PER-

2 SONS WITH DISABILITIES.—There is authorized to be ap-

3 propriated $200,000,000 for fiscal year 2020 for addi-

4 tional assistance for supportive housing for persons with

5 disabilities under section 811 of the Cranston-Gonzalez

6 National Affordable Housing Act (42 U.S.C. 8013). Any

7 provisions of, and waivers and alternative requirements

8 issued by the Secretary pursuant to, the heading "Depart-

9 ment of Housing and Urban Development—Housing Pro-

10 grams—Housing for Persons With Disabilities" in title

11 XII of division B of the CARES Act (Public Law 116-

12 136) shall apply with respect to amounts made available

13 pursuant to this subsection.

14    (e) FUNDING FOR HOUSING OPPORTUNITIES FOR

15 PEOPLE WITH AIDS PROGRAM.—There is authorized to

16 be appropriated $15,000,000 for fiscal year 2020 for addi-

17 tional assistance for the Housing Opportunities for Per-

18 sons with AIDS program under the AIDS Housing Oppor-

19 tunity Act (42 U.S.C. 12901 et seq.). Any provisions of,

20 and waivers and alternative requirements issued by the

21 Secretary pursuant to, the heading "Department of Hous-

22 ing and Urban Development—Community Planning and

23 Development—Housing Opportunities for Persons With

24 AIDS" in title XII of division B of the CARES Act (Pub-

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003313

1009

1 lic Law 116-136) shall apply with respect to amounts

2 made available pursuant to this subsection.

3     (f) FUNDING FOR PROJECT-BASED SECTION 8 RENT-

4 AL ASSISTANCE.—There is authorized to be appropriated

5 $750,000,000 for fiscal year 2020 for additional assist-

6 ance for project-based rental assistance under section 8

7 of the United States Housing Act of 1937 (42 U.S.C.

8 1437f). Any provisions of, and waivers and alternative re-

9 quirements issued by the Secretary pursuant to, the head-

10 ing "Department of Housing and Urban Development—

11 Housing Programs—Project-Based Rental Assistance" in

12 title XII of division B of the CARES Act (Public Law

13 116-136) shall apply with respect to amounts made avail-

14 able pursuant to this subsection.

15 **SEC. 110208. FAIR HOUSING.**

16     (a) DEFINITION OF COVID–19 EMERGENCY PE-

17 RIOD.— For purposes of this Act, the term "COVID–19

18 emergency period" means the period that begins upon the

19 date of the enactment of this Act and ends upon the date

20 of the termination by the Federal Emergency Manage-

21 ment Agency of the emergency declared on March 13,

22 2020, by the President under the Robert T. Stafford Dis-

23 aster Relief and Emergency Assistance Act (42 U.S.C.

24 4121 et seq.) relating to the Coronavirus Disease 2019

25 (COVID–19) pandemic.

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003314

1010

1    (b) Fair Housing Activities.—

2       (1) Authorization of appropriations.—To

3 ensure existing grantees have sufficient resource for

4 fair housing activities and for technology and equip-

5 ment needs to deliver services through use of the

6 Internet or other electronic or virtual means in re-

7 sponse to the public health emergency related to the

8 Coronavirus Disease 2019 (COVID-19) pandemic,

9 there is authorized to be appropriated $4,000,000

10 for Fair Housing Organization Initiative grants

11 through the Fair Housing Initiatives Program under

12 section 561 of the Housing and Community Devel-

13 opment Act of 1987 (42 U.S.C. 3616a).

14       (2) 3-year availability.—Any amounts made

15 available pursuant paragraph (1) that are allocated

16 for a grantee and remain unexpended upon the expi-

17 ration of the 3-year period beginning upon such allo-

18 cation shall be recaptured by the Secretary.

19    (c) Fair Housing Education.—There is authorized

20 to be appropriated $10,000,000 for the Office of Fair

21 Housing and Equal Opportunity of the Department of

22 Housing and Urban Development to carry out a national

23 media campaign and local education and outreach to edu-

24 cate the public of increased housing rights during

g:\VHLC\051220\051220.072.xml   (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003315

1011

1 COVID–19 emergency period, that provides that informa-
2 tion and materials used in such campaign are available—

3     (1) in the languages used by communities with
4     limited English proficiency; and

5     (2) to persons with disabilities.

**6 SEC. 110209. FUNDING FOR HOUSING COUNSELING SERV-**
**7          ICES.**

8     (a) CONGRESSIONAL FINDINGS.—The Congress finds
9 that—

10     (1) the spread of Coronavirus Disease 2019
11     (COVID–19), which is now considered a global pan-
12     demic, is expected to negatively impact the incomes
13     of potentially millions of homeowners, renters, indi-
14     viduals experiencing homelessness, and individuals at
15     risk of homelessness, making it difficult for them to
16     pay their mortgages or rents on time;

17     (2) housing counseling is critical to ensuring
18     that homeowners, renters, individuals experiencing
19     homelessness, and individuals at risk of homeless-
20     ness have the resources they need to manage finan-
21     cial hardships from the COVID-19 crisis;

22     (3) loan preservation and foreclosure mitigation
23     services are also critical to address the needs of
24     homeowners who lose employment and income be-
25     cause of the pandemic and who face serious delin-

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003316

1012

1    quency or home loan default, or are in foreclosing

2    proceedings during this period;

3    (4) evaluations from the National Foreclosure

4    Mitigation Counseling program revealed that home-

5    owners at risk of or facing foreclosure are better

6    served when they have access to a housing counselor

7    and a range of tools and resources to help them

8    avoid losing their home and have the support they

9    need to tailor the best possible response to their sit-

10    uation.

11    (b) AUTHORIZATION OF APPROPRIATIONS.—There is

12  authorized to be appropriated to the Neighborhood Rein-

13  vestment Corporation (in this section referred to as the

14  "Corporation") established under the Neighborhood Rein-

15  vestment Corporation Act (42 U.S.C. 8101 et seq.)

16  $100,000,000 for fiscal year 2020 for housing counseling

17  services, which shall remain available until September 30,

18  2023.

19    (c) PRIORITIZATION OF HOUSING COUNSELING

20  SERVICES.—Of any grant funds made available pursuant

21  to subsection (b), not less than 40 percent shall be pro-

22  vided to counseling organizations that target counseling

23  services to minority and low-income homeowners, renters,

24  individuals experiencing homelessness, and individuals at

25  risk of homelessness or provide such services in neighbor-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003317

1013

1 hoods with high concentrations of minority and low-in-

2 come homeowners, renters, individuals experiencing home-

3 lessness, and individuals at risk of homelessness.

4     (d) ELIGIBLE USES.—Amounts made available pur-

5 suant to subsection (b) may be used in such amounts as

6 the Corporation determines for costs of—

7         (1) public education and outreach;

8         (2) direct services, including the full range of

9         services provided by housing counselors to assist

10         homeowners, including manufactured homeowners,

11         regardless of financing type, renters, individuals ex-

12         periencing homelessness, and individuals at risk of

13         homelessness, including the practices, tools, and in-

14         novations in foreclosure mitigation that were utilized

15         in the National Foreclosure Mitigation Counseling

16         Program, and financial capability, credit counseling,

17         homeless counseling, and rental counseling;

18         (3) equipment and technology, including

19         broadband internet and equipment upgrades needed

20         to ensure timely and effective service delivery;

21         (4) training, including capacitating housing

22         counseling staff in various modes of counseling, in-

23         cluding rental and foreclosure, delivery of remote

24         counseling utilizing improved technology, enhanced

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003318

1014

1 network security, and supportive options for the de-
2 livery of client services; and

3     (5) administration and oversight of the program
4 in accordance with the Corporation's rate for pro-
5 gram administration.

6 (e) DISBURSEMENT.—The Corporation shall disburse
7 all grant funds made available pursuant to subsection (b)
8 as expeditiously as possible, through grants to housing
9 counseling intermediaries approved by the Department of
10 Housing and Urban Development, State housing finance
11 agencies, and NeighborWorks organizations. The aggre-
12 gate amount provided to NeighborWorks organizations
13 shall not exceed 15 percent of the total of grant funds
14 made available pursuant to subsection (b).

15     TITLE III—PROTECTING PEOPLE
16     EXPERIENCING HOMELESSNESS

17 **SEC. 110301. HOMELESS ASSISTANCE FUNDING.**

18 (a) EMERGENCY HOMELESS ASSISTANCE.—

19     (1) AUTHORIZATION OF APPROPRIATIONS.—
20 There is authorized to be appropriated under the
21 Emergency Solutions Grants program under subtitle
22 B of title IV of the McKinney-Vento Homeless As-
23 sistance Act (42 U.S.C. 11371 et seq.)
24 $11,500,000,000 for grants under such subtitle in
25 accordance with this subsection to respond to needs

g:\VHLC\051220\051220.072.xml         (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003319

1015

1    arising from the public health emergency relating to

2    Coronavirus Disease 2019 (COVID-19). Of such

3    amounts made available, $4,000,000,000 shall be al-

4    located in accordance with sections 413 and 414 of

5    the McKinney-Vento Homeless Assistance Act (42

6    U.S.C. 11372, 11373).

7        (2) FORMULA.—Notwithstanding sections 413

8    and 414 of the McKinney-Vento Homeless Assist-

9    ance Act (42 U.S.C. 11372, 11373), the Secretary

10   of Housing and Urban Development (in this Act re-

11   ferred to as the ''Secretary'') shall allocate any

12   amounts remaining after amounts are allocated pur-

13   suant to paragraph (1) in accordance with a formula

14   to be established by the Secretary that takes into

15   consideration the following factors:

16        (A) Risk of transmission of coronavirus in

17       a jurisdiction.

18        (B) Whether a jurisdiction has a high

19       number or rate of sheltered and unsheltered

20       homeless individuals and families.

21        (C) Economic and housing market condi-

22       tions in a jurisdiction.

23        (3) ELIGIBLE ACTIVITIES.—In addition to eligi-

24   ble activities under section 415(a) of the McKinney-

25   Vento   Homeless   Assistance   Act   (42   U.S.C.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003320

1016

1   11374(a), amounts made available pursuant to para-

2   graph (1) may also be used for costs of the following

3   activities:

4       (A) Providing training on infectious dis-

5       ease prevention and mitigation.

6       (B) Providing hazard pay, including for

7       time worked before the effectiveness of this sub-

8       paragraph, for staff working directly to prevent

9       and mitigate the spread of coronavirus or

10      COVID-19 among people experiencing or at

11      risk of homelessness.

12      (C) Reimbursement of costs for eligible ac-

13      tivities (including activities described in this

14      paragraph) relating to preventing, preparing

15      for, or responding to the coronavirus or

16      COVID-19 that were accrued before the date of

17      the enactment of this Act.

18      (D) Notwithstanding 24 CFR

19      576.102(a)(3), providing a hotel or motel

20      voucher for a homeless individual or family.

21  Use of such amounts for activities described in this

22  paragraph shall not be considered use for adminis-

23  trative purposes for purposes of section 418 of the

24  McKinney-Vento Homeless Assistance Act (42

25  U.S.C. 11377).

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003321

1017

1    (4) INAPPLICABILITY OF PROCUREMENT
2  STANDARDS.—To the extent amounts made available
3  pursuant to paragraph (1) are used to procure goods
4  and services relating to activities to prevent, prepare
5  for, or respond to the coronavirus or COVID-19, the
6  standards and requirements regarding procurement
7  that are otherwise applicable shall not apply.

8    (5) INAPPLICABILITY OF HABITABILITY AND
9  ENVIRONMENTAL REVIEW STANDARDS.—Any Fed-
10  eral standards and requirements regarding habit-
11  ability and environmental review shall not apply with
12  respect to any emergency shelter that is assisted
13  with amounts made available pursuant to paragraph
14  (1) and has been determined by a State or local
15  health official, in accordance with such requirements
16  as the Secretary shall establish, to be necessary to
17  prevent and mitigate the spread of coronavirus or
18  COVID-19, such shelters.

19    (6) INAPPLICABILITY OF CAP ON EMERGENCY
20  SHELTER ACTIVITIES.—Subsection (b) of section
21  415 of the McKinney-Vento Homeless Assistance
22  Act shall not apply to any amounts made available
23  pursuant to paragraph (1) of this subsection.

24    (7) INITIAL ALLOCATION OF ASSISTANCE.—Sec-
25  tion 417(b) of the McKinney-Vento Homeless Assist-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003322

1018

1    ance Act (42 U.S.C. 11376(b)) shall be applied with

2    respect to amounts made available pursuant to para-

3    graph (1) of this subsection by substituting "30-

4    day" for "60-day".

5    (8) WAIVERS AND ALTERNATIVE REQUIRE-

6    MENTS.—

7        (A) AUTHORITY.—In administering

8    amounts made available pursuant to paragraph

9    (1), the Secretary may waive, or specify alter-

10    native requirements for, any provision of any

11    statute or regulation (except for any require-

12    ments related to fair housing, nondiscrimina-

13    tion, labor standards, and the environment)

14    that the Secretary administers in connection

15    with the obligation or use by the recipient of

16    such amounts, if the Secretary finds that good

17    cause exists for the waiver or alternative re-

18    quirement and such waiver or alternative re-

19    quirement is consistent with the purposes de-

20    scribed in this subsection.

21        (B) NOTIFICATION.—The Secretary shall

22    notify the public through the Federal Register

23    or other appropriate means 5 days before the

24    effective date of any such waiver or alternative

25    requirement, and any such public notice may be

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003323

1019

1     provided on the Internet at the appropriate

2     Government web site or through other elec-

3     tronic media, as determined by the Secretary.

4         (C) EXEMPTION.—The use of amounts

5     made available pursuant to paragraph (1) shall

6     not be subject to the consultation, citizen par-

7     ticipation, or match requirements that other-

8     wise apply to the Emergency Solutions Grants

9     program, except that a recipient shall publish

10    how it has and will utilize its allocation at a

11    minimum on the Internet at the appropriate

12    Government web site or through other elec-

13    tronic media.

14     (9) INAPPLICABILITY OF MATCHING REQUIRE-

15    MENT.—Subsection (a) of section 416 of the McKin-

16    ney-Vento Homeless Assistance Act (42 U.S.C.

17    11375(a)) shall not apply to any amounts made

18    available pursuant to paragraph (1) of this sub-

19    section.

20     (10) PROHIBITION ON PREREQUISITES.—None

21    of the funds authorized under this subsection may

22    be used to require people experiencing homelessness

23    to receive treatment or perform any other pre-

24    requisite activities as a condition for receiving shel-

25    ter, housing, or other services.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003324

1020

1  (b) CONTINUUM OF CARE PROGRAM.—Due to the
2  emergency relating to the Coronavirus Disease 2019
3  (COVID-19) pandemic, the Notice of Funding Availability
4  (NOFA) for fiscal year 2020 for the Continuum of Care
5  program under subtitle C of title IV of the McKinney-
6  Vento Homeless Assistance Act (42 U.S.C. 11381 et seq.)
7  shall have no force or effect and the Secretary of Housing
8  and Urban Development shall distribute amounts made
9  available for such fiscal year for such program based on
10  the results of the competition for amounts made available
11  for such program for fiscal year 2019 (FR-6300-–25), ex-
12  cept that grant amounts may be adjusted to account for
13  changes in fair market rents.

14  **SEC. 110302. EMERGENCY RENTAL ASSISTANCE VOUCHER**
15  **PROGRAM.**

16  (a) AUTHORIZATION OF APPROPRIATIONS.—There is
17  authorized to be appropriated to the Secretary of Housing
18  and Urban Development (in this section referred to as the
19  ''Secretary''), $1,000,000,000 for fiscal year 2020, to re-
20  main available until expended, for incremental emergency
21  vouchers under subsection (b).

22  (b) EMERGENCY VOUCHERS.—

23  (1) IN GENERAL.—The Secretary shall provide
24  emergency rental assistance vouchers under this sub-
25  section, which shall be tenant-based rental assistance

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003325

1021

1 under section 8(o) the United States Housing Act of

2 1937 (42 U.S.C. 1437f(o)).

3    (2) SELECTION OF FAMILIES.—

4      (A) MANDATORY PREFERENCES.—Each

5 public housing agency administering assistance

6 under this section shall provide preference for

7 such assistance to eligible families that are—

8      (i) homeless (as such term is defined

9 in section 103(a) of the McKinney-Vento

10 Homeless Assistance Act (42 U.S.C.

11 11302(a));

12      (ii) at risk of homelessness (as such

13 term is defined in section 401 of the

14 McKinney-Vento Homeless Assistance Act

15 (42 U.S.C. 11360); or

16      (iii) fleeing, or attempting to flee, do-

17 mestic violence, dating violence, sexual as-

18 sault, or stalking.

19      (B) ALLOCATION.—In allocating amounts

20 made available under this section, the Secretary

21 shall—

22      (i) not later than 60 days after the

23 date of the enactment of this Act, allocate

24 at least 50 percent of such amounts to

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003326

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1022

public housing agencies in accordance with a formula that considers—

    (I) the capability of public housing agencies to promptly use emergency vouchers provided under this section; and

    (II) the need for emergency vouchers provided under this section in the geographical area, based on factors determined by the Secretary, including risk of transmission of coronavirus, high numbers or rates of sheltered and unsheltered homelessness, and economic and housing market conditions;

    (ii) allocate remaining amounts in accordance with a formula that considers—

    (I) the criteria under clause (i) and the success of a public housing agency in promptly utilizing vouchers awarded under clause (i); and

    (II) the capability of the public housing agency to create and manage structured partnerships with service

DOC_0003327

1023

1            providers for the delivery of appro-

2            priate community-based services; and

3            (iii) designate the number of vouchers

4            under this section that each public housing

5            agency that is awarded funds under this

6            section is authorized to administer.

7        (C) ELECTION NOT TO ADMINISTER.—If a

8 public housing agency elects not to administer

9 amounts under this section, the Secretary shall

10 award such amounts to other public housing

11 agencies according to the criteria in subpara-

12 graph (B).

13        (D) FAILURE TO USE VOUCHERS PROMPT-

14 LY.—If a public housing agency fails to issue

15 all of its authorized vouchers under this section

16 on behalf of eligible families within a reasonable

17 period of time as determined by the Secretary,

18 the Secretary shall reallocate any unissued

19 vouchers and associated funds to others public

20 housing agencies according to the criteria under

21 subparagraph (B)(ii).

22    (3) WAIVERS AND ALTERNATIVE REQUIRE-

23 MENTS.—Any waiver or alternative requirement that

24 the Secretary makes available to all public housing

25 agencies in connection with assistance made avail-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003328

1024

1 able under the heading ''Tenant-Based Rental As-
2 sistance'' in title XII of division B of the CARES
3 Act (Public Law 116-136; 134 Stat.601) shall apply
4 to assistance under this section until the expiration
5 of such waiver or alternative requirement.

6 (4) TERMINATION OF VOUCHERS UPON TURN-
7 OVER.—

8 (A) IN GENERAL.—A public housing agen-
9 cy may not reissue any vouchers made available
10 under this section when assistance for the fam-
11 ily initially assisted is terminated.

12 (B) REALLOCATION.—Upon termination of
13 assistance for one or more families assisted by
14 a public housing agency under this section, the
15 Secretary shall reallocate amounts that are no
16 longer needed by such public housing agency
17 for assistance under this section to another
18 public housing agency for the renewal of vouch-
19 ers previously authorized under this section.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003329

1025

1 TITLE IV—SUSPENDING NEGATIVE CREDIT RE-
2     PORTING   AND   STRENGTHENING   CON-
3     SUMER AND INVESTOR PROTECTIONS

4 **SEC. 110401. REPORTING OF INFORMATION DURING MAJOR**
5         **DISASTERS.**

6     (a) IN GENERAL.—The CARES Act (Public Law
7 116–136) is amended by striking section 4021 and insert-
8 ing the following:

9 **"SEC. 4021. REPORTING OF INFORMATION DURING MAJOR**
10         **DISASTERS.**

11     "(a) PURPOSE.—The purpose of this Act, and the
12 amendments made by this Act, is to protect consumers'
13 credit from negative impacts as a result of financial hard-
14 ship due to the coronavirus disease (COVID–19) outbreak
15 and future major disasters.

16     "(b) REPORTING OF INFORMATION DURING MAJOR
17 DISASTERS.—

18         "(1) IN GENERAL.—The Fair Credit Reporting
19     Act is amended by inserting after section 605B the
20     following:

21 **"§ 605C. Reporting of information during major dis-**
22         **asters**

23     " "(a) DEFINITIONS.—In this section:

24         " "(1) CONSUMER.—With respect to a covered
25     period, the term "consumer" shall only include a

g:\VHLC\051220\051220.072.xml        (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003330

1026

1     consumer who is a resident of the affected area cov-

2     ered by the applicable disaster or emergency declara-

3     tion.

4         ""(2) COVERED MAJOR DISASTER PERIOD.—

5     The term "covered major disaster period" means the

6     period—

7             ""(A) beginning on the date on which a

8         major disaster is declared by the President

9         under—

10             ""(i) section 401 of the Robert T.

11             Stafford Disaster Relief and Emergency

12             Assistance Act (42 U.S.C. 5170), under

13             which assistance is authorized under sec-

14             tion 408 of such Act (42 U.S.C. 5174); or

15                ""(ii) section 501 of such Act; and

16             ""(B) ending on the date that is 120 days

17         after the end of the incident period for such

18         disaster.

19         ""(3) COVERED PERIOD.—The term "covered

20     period" means the COVID–19 emergency period or

21     a covered major disaster period.

22         ""(4) COVID–19 EMERGENCY PERIOD.—The

23     term "COVID–19 emergency period" means the pe-

24     riod beginning on March 13, 2020 (the date the

25     President declared the emergency under section 501

DOC_0003331

1027

1 of the Robert T. Stafford Disaster Relief and Emer-

2 gency Assistance Act (42 U.S.C. 4121 et seq.) relat-

3 ing to the Coronavirus Disease 2019 (COVID-19)

4 pandemic) and ending on the later of—

5     ‘‘‘(A) 120 days after the date of enact-

6     ment of this section; or

7     ‘‘‘(B) 120 days after the end of the inci-

8     dent period for such emergency.

9     ‘‘‘(5) MAJOR DISASTER.—The term ‘‘major dis-

10 aster’’ means a major disaster declared by the Presi-

11 dent under—

12     ‘‘‘(A) section 401 of the Robert T. Staf-

13     ford Disaster Relief and Emergency Assistance

14     Act (42 U.S.C. 5170),   under which assistance

15     is authorized under section 408 of such Act (42

16     U.S.C. 5174); or

17     ‘‘‘(B) section 501 of such Act.

18     ‘‘‘(b) MORATORIUM ON FURNISHING ADVERSE IN-

19 FORMATION DURING COVERED PERIOD.—No person may

20 furnish any adverse item of information (except informa-

21 tion related to a felony criminal conviction) relating to a

22 consumer that was the result of any action or inaction that

23 occurred during a covered period.

24     ‘‘‘(c) INFORMATION EXCLUDED FROM CONSUMER

25 REPORTS.—In addition to the information described in

1028

1  section 605(a), no consumer reporting agency may make

2  any consumer report containing an adverse item of infor-

3  mation (except information related to a felony criminal

4  conviction) relating to a consumer that was the result of

5  any action or inaction that occurred during a covered pe-

6  riod.

7      " "(d) SUMMARY OF RIGHTS.—Not later than 60 days

8  after the date of enactment of this section, the Director

9  of the Bureau shall update the model summary of rights

10  under section 609(c)(1) to include a description of the

11  right of a consumer to—

12          " "(1) request the deletion of adverse items of

13       information under subsection (e); and

14          " "(2) request a consumer report or score, with-

15       out charge to the consumer, under subsection (f).

16      " "(e) DELETION OF ADVERSE ITEMS OF INFORMA-

17  TION RESULTING FROM THE CORONAVIRUS DISEASE

18  (COVID–19) OUTBREAK AND MAJOR DISASTERS.—

19          " "(1) REPORTING.—

20              " "(A) IN GENERAL.—Not later than 60

21          days after the date of enactment of this sub-

22          section, the Director of the Bureau shall create

23          a website for consumers to report, under pen-

24          alty of perjury, economic hardship as a result of

25          the coronavirus disease (COVID–19) outbreak

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003333

1029

1     or a major disaster for the purpose of providing

2     credit report protections under this subsection.

3         '''(B) DOCUMENTATION.—The Director of

4     the Bureau shall—

5         '''(i) not require any documentation

6         from a consumer to substantiate the eco-

7         nomic hardship; and

8         '''(ii) provide notice to the consumer

9         that a report under subparagraph (A) is

10         under penalty of perjury.

11         '''(C) REPORTING PERIOD.—A consumer

12     may report economic hardship under subpara-

13     graph (A) during a covered period and for 60

14     days thereafter.

15     '''(2) DATABASE.—The Director of the Bureau

16     shall establish and maintain a secure database

17     that—

18         '''(A) is accessible to each consumer re-

19     porting agency described in section 603(p) and

20     nationwide specialty consumer reporting agency

21     for purposes of fulfilling their duties under

22     paragraph (3) to check and automatically delete

23     any adverse item of information (except infor-

24     mation related to a felony criminal conviction)

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003334

1030

1 reported that occurred during a covered period

2 with respect to a consumer; and

3 "''(B) contains the information reported

4 under paragraph (1).

5 "''(3) DELETION OF ADVERSE ITEMS OF INFOR-

6 MATION BY NATIONWIDE CONSUMER REPORTING

7 AND NATIONWIDE SPECIALTY CONSUMER REPORT-

8 ING AGENCIES.—

9 "''(A) IN GENERAL.—Each consumer re-

10 porting agency described in section 603(p) and

11 each nationwide specialty consumer reporting

12 agency shall, using the information contained in

13 the database established under paragraph (2),

14 delete from the file of each consumer named in

15 the database each adverse item of information

16 (except information related to a felony criminal

17 conviction) that was a result of an action or in-

18 action that occurred during a covered period or

19 in the 270-day period following the end of a

20 covered period.

21 "''(B) TIMELINE.—Each consumer report-

22 ing agency described in section 603(p) and each

23 nationwide specialty consumer reporting agency

24 shall check the database at least weekly and de-

25 lete adverse items of information as soon as

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003335

1031

1  practicable after information that is reported
2  under paragraph (1) appears in the database
3  established under paragraph (2).

4  ""(4) REQUEST FOR DELETION OF ADVERSE
5  ITEMS OF INFORMATION.—

6      ""(A) IN GENERAL.—A consumer who has
7  filed a report of economic hardship with the
8  Bureau may submit a request, without charge
9  to the consumer, to a consumer reporting agen-
10  cy described in section 603(p) or nationwide
11  specialty consumer reporting agency to delete
12  from the consumer's file an adverse item of in-
13  formation (except information related to a fel-
14  ony criminal conviction) that was a result of an
15  action or inaction that occurred during a cov-
16  ered period or in the 270-day period following
17  the end of a covered period.

18      ""(B) TIMING.—A consumer may submit a
19  request under subparagraph (A), not later than
20  the end of the 270-day period described in that
21  subparagraph.

22      ""(C) REMOVAL AND NOTIFICATION.—
23  Upon receiving a request under this paragraph
24  to delete an adverse item of information, a con-
25  sumer reporting agency described in section

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003336

1032

1   603(p) or nationwide specialty consumer report-

2   ing agency shall—

3   " "(i) delete the adverse item of infor-

4   mation (except information related to a fel-

5   ony criminal conviction) from the con-

6   sumer's file; and

7   " "(ii) notify the consumer and the

8   furnisher of the adverse item of informa-

9   tion of the deletion.

10   " "(f) FREE CREDIT REPORT AND SCORES.—

11   " "(1) IN GENERAL.—During the period between

12   the beginning of a covered period and ending 12-

13   months after the end of the covered period, each

14   consumer reporting agency described under section

15   603(p) and each nationwide specialty consumer re-

16   porting agency shall make all disclosures described

17   under section 609 upon request by a consumer, by

18   mail or online, without charge to the consumer and

19   without limitation as to the number of requests.

20   Such a consumer reporting agency shall also supply

21   a consumer, upon request and without charge, with

22   a credit score that—

23   " "(A) is derived from a credit scoring

24   model that is widely distributed to users by the

25   consumer reporting agency for the purpose of

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003337

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1033

1  any extension of credit or other transaction des-
2  ignated by the consumer who is requesting the
3  credit score; or

4      ‘‘(B) is widely distributed to lenders of
5  common consumer loan products and predicts
6  the future credit behavior of a consumer.

7  ‘‘(2) TIMING.—A file disclosure or credit score
8  under paragraph (1) shall be provided to the con-
9  sumer not later than—

10      ‘‘(A) 7 days after the date on which the
11  request is received if the request is made by
12  mail; and

13      ‘‘(B) not later than 15 minutes if the re-
14  quest is made online.

15  ‘‘(3) ADDITIONAL REPORTS.—A file disclosure
16  provided under paragraph (1) shall be in addition to
17  any disclosure requested by the consumer under sec-
18  tion 612(a).

19  ‘‘(4) PROHIBITION.—A consumer reporting
20  agency that receives a request under paragraph (1)
21  may not request or require any documentation from
22  the consumer that demonstrates that the consumer
23  was impacted by the coronavirus disease (COVID–
24  19) outbreak or a major disaster (except to verify
25  that the consumer is a resident of the affected area

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003338

1034

1 covered by the applicable disaster or emergency dec-

2 laration) as a condition of receiving the file disclo-

3 sure or score.

4 "''(g) POSTING OF RIGHTS.—Not later than 30 days

5 after the date of enactment of this section, each consumer

6 reporting agency described under section 603(p) and each

7 nationwide specialty consumer reporting agency shall

8 prominently post and maintain a direct link on the home-

9 page of the public website of the consumer reporting agen-

10 cy information relating to the right of consumers to—

11 "''(1) request the deletion of adverse items of

12 information (except information related to a felony

13 criminal conviction) under subsection (e); and

14 "''(2) request consumer file disclosures and

15 scores, without charge to the consumer, under sub-

16 section (f).

17 "''(h) BAN ON REPORTING MEDICAL DEBT INFOR-

18 MATION RELATED TO COVID–19 OR A MAJOR DIS-

19 ASTER.—

20 "''(1) FURNISHING BAN.—No person shall fur-

21 nish adverse information to a consumer reporting

22 agency related to medical debt if such medical debt

23 is with respect to medical expenses related to treat-

24 ments arising from COVID–19 or a major disaster

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003339

1035

1   (whether or not the expenses were incurred during

2   a covered period).

3        "'(2) CONSUMER REPORT BAN.—No consumer

4      reporting agency may make a consumer report con-

5      taining adverse information related to medical debt

6      if such medical debt is with respect to medical ex-

7      penses related to treatments arising from COVID–

8      19 or a major disaster (whether or not the expenses

9      were incurred during a covered period).

10      "'(i) CREDIT SCORING MODELS.—A person that cre-

11  ates and implements credit scoring models may not treat

12  the absence, omission, or deletion of any information pur-

13  suant to this section as a negative factor or negative value

14  in credit scoring models created or implemented by such

15  person.'.

16      "(2) TECHNICAL AND CONFORMING AMEND-

17      MENT.—The table of contents for the Fair Credit

18      Reporting Act is amended by inserting after the

19      item relating to section 605B the following:

"'605C. Reporting of information during major disasters.'.

20  **"SEC. 4021A. LIMITATIONS ON NEW CREDIT SCORING MOD-**

21      **ELS DURING THE COVID–19 EMERGENCY AND**

22      **MAJOR DISASTERS.**

23     "The Fair Credit Reporting Act (15 U.S.C. 1681 et

24  seq.) is amended—

25      "(1) by adding at the end the following:

DOC_0003340

1036

1  "**"§ 630. Limitations on new credit scoring models**

2  **during the COVID–19 emergency and**

3  **major disasters**

4  " 'With respect to a person that creates and imple-

5  ments credit scoring models, such person may not, during

6  a covered period (as defined under section 605C), create

7  or implement a new credit scoring model (including a revi-

8  sion to an existing scoring model) if the new credit scoring

9  model would identify a significant percentage of con-

10  sumers as being less creditworthy when compared to the

11  previous credit scoring models created or implemented by

12  such person.'; and

13  "(2) in the table of contents for such Act, by

14  adding at the end the following new item:

" '630. Limitations on new credit scoring models during the COVID–19 emer-
gency and major disasters.'.

15  (b) CLERICAL AMENDMENT.—The table of contents

16  in section 2 of the CARES Act is amended by striking

17  the item relating to section 4021 and inserting the fol-

18  lowing:

"Sec. 4021. Reporting of information during major disasters.
"Sec. 4021A. Limitations on new credit scoring models during the COVID–19
emergency and major disasters.".

19  (c) CONFORMING AMENDMENT.—Subparagraph (F)

20  of section 623(a)(1) of the Fair Credit Reporting Act (15

21  U.S.C. 1681s–2(a)(1)) is hereby repealed.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003341

1037

1  SEC. 110402. RESTRICTIONS ON COLLECTIONS OF CON-
2              SUMER DEBT DURING A NATIONAL DISASTER
3              OR EMERGENCY.

4      (a) In General.—The Fair Debt Collection Prac-
5  tices Act (15 U.S.C. 1692 et seq.) is amended by inserting
6  after section 812 (15 U.S.C. 1692j) the following:

7  "§ 812A. Restrictions on collections of consumer debt
8              during a national disaster or emergency

9      "(a) Definitions.—In this section:

10         "(1) Covered period.—The term 'covered pe-
11     riod' means the period beginning on the date of en-
12     actment of this section and ending 120 days after
13     the end of the incident period for the emergency de-
14     clared on March 13, 2020, by the President under
15     section 501 of the Robert T. Stafford Disaster Relief
16     and Emergency Assistance Act (42 U.S.C. 4121 et
17     seq.) relating to the Coronavirus Disease 2019
18     (COVID-19) pandemic.

19         "(2) Creditor.—The term 'creditor' means
20     any person—

21             "(A) who offers or extends credit creating
22         a debt or to whom a debt is owed; or

23             "(B) to whom any obligation for payment
24         is owed.

25         "(3) Debt.—The term 'debt'—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003342

1038

1     ''(A) means any obligation or alleged obli-

2  gation that is or during the covered period be-

3  comes past due, other than an obligation aris-

4  ing out of a credit agreement entered into after

5  the effective date of this section, that arises out

6  of a transaction with a consumer; and

7    ''(B) does not include a mortgage loan.

8  ''(4) DEBT COLLECTOR.—The term 'debt col-

9  lector' means a creditor and any other person or en-

10  tity that engages in the collection of debt, including

11  the Federal Government and a State government, ir-

12  respective of whether the applicable debt is allegedly

13  owed to or assigned to such creditor, person, or enti-

14  ty.

15  ''(5) MORTGAGE LOAN.—The term 'mortgage

16  loan' means a covered mortgage loan (as defined

17  under section 4022 of the CARES Act) and a multi-

18  family mortgage loan (as defined under section 4023

19  of the CARES Act).

20  ''(b) PROHIBITIONS.—

21  ''(1) IN GENERAL.—Notwithstanding any other

22  provision of law, no debt collector may, during a cov-

23  ered period—

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003343

1039

1          ''(A) enforce a security interest securing a
2     debt through repossession, limitation of use, or
3     foreclosure;
4          ''(B) take or threaten to take any action to
5     deprive an individual of their liberty as a result
6     of nonpayment of or nonappearance at any
7     hearing relating to an obligation owed by a con-
8     sumer;
9          ''(C) collect any debt, by way of garnish-
10    ment, attachment, assignment, deduction, off-
11    set, or other seizure, from—
12               ''(i) wages, income, benefits, bank,
13          prepaid or other asset accounts; or
14               ''(ii) any assets of, or other amounts
15          due to, a consumer;
16          ''(D) commence or continue an action to
17    evict a consumer from real or personal property
18    for nonpayment;
19          ''(E) disconnect or terminate service from
20    a utility service, including electricity, natural
21    gas, telecommunications or broadband, water,
22    or sewer, for nonpayment; or
23          ''(F) threaten to take any of the foregoing
24    actions.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003344

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1040

1       "(2) RULE OF CONSTRUCTION.—Nothing in

2     this section may be construed to prohibit a consumer

3     from voluntarily paying, in whole or in part, a debt.

4     "(e) LIMITATION ON FEES AND INTEREST.—After

5 the expiration of a covered period, a debt collector may

6 not add to any past due debt any interest on unpaid inter-

7 est, higher rate of interest triggered by the nonpayment

8 of the debt, or fee triggered prior to the expiration of the

9 covered period by the nonpayment of the debt.

10     "(e) VIOLATIONS.—Any person or government entity

11 that violates this section shall be liable to the applicable

12 consumer as provided under section 813, except that, for

13 purposes of applying section 813—

14       "(1) such person or government entity shall be

15     deemed a debt collector, as such term is defined for

16     purposes of section 813; and

17       "(2) each dollar figure in such section shall be

18     deemed to be 10 times the dollar figure specified.

19     "(f) TOLLING.—Any applicable time limitations for

20 exercising an action prohibited under subsection (b) shall

21 be tolled during a covered period.

22     "(g) PREDISPUTE ARBITRATION AGREEMENTS.—

23 Notwithstanding any other provision of law, no predispute

24 arbitration agreement or predispute joint-action waiver

25 shall be valid or enforceable with respect to a dispute

DOC_0003345

1041

1 brought under this section, including a dispute as to the

2 applicability of this section, which shall be determined

3 under Federal law.''.

4     (b) CLERICAL AMENDMENT.—The table of contents

5 for the Fair Debt Collection Practices Act is amended by

6 inserting after the item relating to section 812 the fol-

7 lowing:

> ''812A. Restrictions on collections of consumer debt during a national disaster
> or emergency.''.

## 8 SEC. 110403. REPAYMENT PERIOD AND FORBEARANCE FOR

## 9         CONSUMERS.

10     Section 812A of the Fair Debt Collection Practices

11 Act (15 U.S.C. 1692 et seq.), as added by section 110402,

12 is amended—

13     (1) by inserting after subsection (c) the fol-

14     lowing:

15     ''(d) REPAYMENT PERIOD.—After the expiration of

16 a covered period, a debt collector shall comply with the

17 following:

18         ''(1) DEBT ARISING FROM CREDIT WITH A DE-

19     FINED PAYMENT PERIOD.—For any debt arising

20     from credit with a defined term, the debt collector

21     shall extend the time period to repay any past due

22     balance of the debt by—

23         ''(A) 1 payment period for each payment

24         that a consumer missed during the covered pe-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003346

1042

1     riod, with the payments due in the same

2     amounts and at the same intervals as the pre-

3     existing payment schedule; and

4         ''(B) 1 payment period in addition to the

5     payment periods described under subparagraph

6     (A).

7         ''(2) DEBT ARISING FROM AN OPEN END CRED-

8     IT PLAN.—For debt arising from an open end credit

9     plan, as defined in section 103 of the Truth in

10     Lending Act (15 U.S.C. 1602), the debt collector

11     shall allow the consumer to repay the past-due bal-

12     ance in a manner that does not exceed the amounts

13     permitted by the methods described in section

14     171(c) of the Truth in Lending Act (15 U.S.C.

15     1666i–1(c)) and regulations promulgated under that

16     section.

17         ''(3) DEBT ARISING FROM OTHER CREDIT.—

18         ''(A) IN GENERAL.—For debt not de-

19     scribed under paragraph (2) or (3), the debt

20     collector shall—

21         ''(i) allow the consumer to repay the

22     past-due balance of the debt in substan-

23     tially equal payments over time; and

24         ''(ii) provide the consumer with—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003347

1043

1        "(I) for past due balances of
2        $2,000 or less, 12 months to repay, or
3        such longer period as the debt col-
4        lector may allow;

5        "(II) for past due balances be-
6        tween $2,001 and $5,000, 24 months
7        to repay, or such longer period as the
8        debt collector may allow; or

9        "(III) for past due balances
10       greater than $5,000, 36 months to
11       repay, or such longer period as the
12       debt collector may allow.

13       "(B) ADDITIONAL PROTECTIONS.—The Di-
14       rector of the Bureau may issue rules to provide
15       greater repayment protections to consumers
16       with debts described under subparagraph (A).

17       "(C) RELATION TO STATE LAW.—This
18       paragraph shall not preempt any State law that
19       provides for greater consumer protections than
20       this paragraph."; and

21       (2) by adding at the end the following:

22       "(h) FORBEARANCE FOR AFFECTED CONSUMERS.—

23       "(1) FORBEARANCE PROGRAM.—Each debt col-
24       lector that makes use of the credit facility described

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003348

1044

1 in paragraph (4) shall establish a forbearance pro-

2 gram for debts available during the covered period.

3 "(2) AUTOMATIC GRANT OF FORBEARANCE

4 UPON REQUEST.—Under a forbearance program re-

5 quired under paragraph (1), upon the request of a

6 consumer experiencing a financial hardship due, di-

7 rectly or indirectly, to COVID–19, the debt collector

8 shall grant a forbearance on payment of debt for

9 such time as needed until the end of the covered pe-

10 riod, with no additional documentation required

11 other than the borrower's attestation to a financial

12 hardship caused by COVID–19 and with no fees,

13 penalties, or interest (beyond the amounts scheduled

14 or calculated as if the borrower made all contractual

15 payments on time and in full under the terms of the

16 loan contract) charged to the borrower in connection

17 with the forbearance.

18 "(3) EXCEPTION FOR CERTAIN MORTGAGE

19 LOANS SUBJECT TO THE CARES ACT.—This sub-

20 section shall not apply to a mortgage loan subject to

21 section 4022 or 4023 of the CARES Act.".

22 **SEC. 110404. CREDIT FACILITY.**

23 Section 812A(h) of the Fair Debt Collection Prac-

24 tices Act (15 U.S.C. 1692 et seq.), as added by section

25 110403, is amended by adding at the end the following:

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003349

1045

1      "(4) CREDIT FACILITY.—The Board of Gov-

2 ernors of the Federal Reserve System shall—

3      "(A) establish a facility, using amounts

4 made available under section 4003(b)(4) of the

5 CARES Act (15 U.S.C. 9042(b)(4)), to make

6 long-term, low-cost loans to debt collectors to

7 temporarily compensate such debt collectors for

8 documented financial losses caused by forbear-

9 ance of debt payments under this subsection;

10 and

11      "(B) defer debt collectors' required pay-

12 ments on such loans until after consumers' debt

13 payments resume.".

14 TITLE V—FORGIVING STUDENT LOAN DEBT

15   AND PROTECTING STUDENT BORROWERS

16 **SEC. 110501. PAYMENTS FOR PRIVATE EDUCATION LOAN**

17         **BORROWERS AS A RESULT OF THE COVID–19**

18         **NATIONAL EMERGENCY.**

19 (a) IN GENERAL.—Section 140 of the Truth in Lend-

20 ing Act (15 U.S.C. 1650) is amended by adding at the

21 end the following new subsection:

22 "(h) COVID–19 NATIONAL EMERGENCY PRIVATE

23 EDUCATION LOAN REPAYMENT ASSISTANCE.—

24      "(1) AUTHORITY.—

1046

1         "(A) IN GENERAL.—Effective on the date

2     of the enactment of this section, until the end

3     of September 2021, the Secretary of the Treas-

4     ury shall, for each borrower of a private edu-

5     cation loan, pay the total amount due for such

6     month on the loan, based on the payment plan

7     selected by the borrower or the borrower's loan

8     status.

9         "(B) LIMITATION ON PAYMENTS.—The

10    maximum amount of aggregate payments that

11    the Secretary of the Treasury may make under

12    subparagraph (A) with respect to an individual

13    borrower is $10,000.

14    "(2) NO CAPITALIZATION OF INTEREST.—With

15    respect to any loan in repayment until the end of

16    September 2021, interest due on a private education

17    loan during such period shall not be capitalized at

18    any time until the end of September 2021.

19    "(3) REPORTING TO CONSUMER REPORTING

20    AGENCIES.—Until the end of the September 2021—

21        "(A) during the period in which the Sec-

22    retary of the Treasury is making payments on

23    a loan under paragraph (1), the Secretary shall

24    ensure that, for the purpose of reporting infor-

25    mation about the loan to a consumer reporting

DOC_0003351

1047

1     agency, any payment made by the Secretary is

2     treated as if it were a regularly scheduled pay-

3     ment made by a borrower; and

4         ''(B) no adverse credit information may be

5     furnished to a consumer reporting agency for

6     any private education loan.

7     ''(4) NOTICE OF PAYMENTS AND PROGRAM.—

8     Not later than 15 days following the date of enact-

9     ment of this subsection, and monthly thereafter until

10     the end of September 2021, the Secretary of the

11     Treasury shall provide a notice to all borrowers of

12     private education loans—

13         ''(A) informing borrowers of the actions

14     taken under this subsection;

15         ''(B) providing borrowers with an easily

16     accessible method to opt out of the benefits pro-

17     vided under this subsection; and

18         ''(C) notifying the borrower that the pro-

19     gram under this subsection is a temporary pro-

20     gram and will end at the end of September

21     2021.

22     ''(5) SUSPENSION OF INVOLUNTARY COLLEC-

23     TION.—Until the end of September 2021, the holder

24     of a private education loan shall immediately take

DOC_0003352

1048

1  action to halt all involuntary collection related to the

2  loan.

3  ''(6) MANDATORY FORBEARANCE.—During the

4  period in which the Secretary of the Treasury is

5  making payments on a loan under paragraph (1),

6  the servicer of such loan shall grant the borrower

7  forbearance as follows:

8  ''(A) A temporary cessation of all pay-

9  ments on the loan other than the payments of

10  interest and principal on the loan that are made

11  under paragraph (1).

12  ''(B) For borrowers who are delinquent

13  but who are not yet in default before the date

14  on which the Secretary begins making payments

15  under paragraph (1), the retroactive application

16  of forbearance to address any delinquency.

17  ''(7) DATA TO IMPLEMENT.—Holders and

18  servicers of private education loans shall report, to

19  the satisfaction of the Secretary of the Treasury, the

20  information necessary to calculate the amount to be

21  paid under this subsection.''.

22  (b) APPROPRIATION.—Notwithstanding any other

23  provision of law, there is appropriated to the Secretary

24  of the Treasury, out of amounts in the Treasury not other-

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003353

1049

1 wise appropriated, $45,000,000,000 to carry out this title

2 and the amendments made by this title.

**SEC. 110502. ADDITIONAL PROTECTIONS FOR PRIVATE STU-**
**DENT LOAN BORROWERS.**

5 (a) IN GENERAL.—

6     (1) REPAYMENT PLAN AND FORGIVENESS

7 TERMS.—Each private education loan holder who re-

8 ceives a monthly payment pursuant to section

9 140(h) of the Truth in Lending Act shall modify all

10 private education loan contracts that it holds to pro-

11 vide for the same repayment plan and forgiveness

12 terms available to Direct Loans borrowers under

13 section 685.209(c) of title 34, Code of Federal Reg-

14 ulations, in effect as of January 1, 2020.

15     (2) TREATMENT OF STATE STATUTES OF LIMI-

16 TATION.—For a borrower who has defaulted on a

17 private education loan under the terms of the prom-

18 issory note prior to any loan payment made or for-

19 bearance granted under section 140(h) of the Truth

20 in Lending Act, no payment made or forbearance

21 granted under such section 140(h) shall be consid-

22 ered an event that impacts the calculation of the ap-

23 plicable State statutes of limitation.

24     (3) PROHIBITION ON PRESSURING BOR-

25 ROWERS.—

DOC_0003354

1050

1　　　(A) IN GENERAL.—A private education

2　　loan debt collector or creditor may not pressure

3　　a borrower to elect to apply any amount re-

4　　ceived pursuant to subsection (b) to any private

5　　education loan.

6　　　(B) VIOLATIONS.—A violation of this para-

7　　graph is deemed—

8　　　　　(i) an unfair, deceptive, or abusive act

9　　　　or practice under Federal law in connec-

10　　　　tion with any transaction with a consumer

11　　　　for a consumer financial product or service

12　　　　under section 1031 of the Consumer Fi-

13　　　　nancial Protection Act of 2010 (12 U.S.C.

14　　　　5531); and

15　　　　　(ii) with respect to a violation by a

16　　　　debt collector, an unfair or unconscionable

17　　　　means to collect or attempt to collect any

18　　　　debt under section 808 of the Federal

19　　　　Debt Collection Practices Act (15 U.S.C.

20　　　　1692f).

21　　　(C) PRESSURE DEFINED.—In this para-

22　　graph, the term "pressure" means any commu-

23　　nication, recommendation, or other similar com-

24　　munication, other than providing basic informa-

25　　tion about a borrower's options, urging a bor-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003355

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1051

1 rower to make an election described under sub-

2 section (b).

3 (b) RELIEF FOR PRIVATE STUDENT LOAN BOR-

4 ROWERS AS A RESULT OF THE COVID–19 NATIONAL

5 EMERGENCY.—

6 (1) STUDENT LOAN RELIEF AS A RESULT OF

7 THE COVID–19 NATIONAL EMERGENCY.—Not later

8 than 90 days after the end of September 2021, the

9 Secretary of the Treasury shall carry out a program

10 under which a borrower, with respect to the private

11 education loans of such borrower, shall receive in ac-

12 cordance with paragraph (3) an amount equal to the

13 lesser of—

14  (A) the total amount of each private edu-

15  cation loan of the borrower; or

16  (B) $10,000, reduced by the aggregate

17  amount of all payments made by the Secretary

18  of the Treasury with respect to such borrower

19  under section 140(h) of the Truth in Lending

20  Act.

21 (2) NOTIFICATION OF BORROWERS.—Not later

22 than 90 days after the end of September 2021, the

23 Secretary of the Treasury shall notify each borrower

24 of a private education loan of—

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003356

1052

1        (A) the requirements to provide loan relief

2     to such borrower under this section; and

3        (B) the opportunity for such borrower to

4     make an election under paragraph (3)(A) with

5     respect to the application of such loan relief to

6     the private education loans of such borrower.

7    (3) DISTRIBUTION OF FUNDING.—

8        (A) ELECTION BY BORROWER.—Not later

9     than 45 days after a notice is sent under para-

10     graph (2), a borrower may elect to apply the

11     amount determined with respect to such bor-

12     rower under paragraph (1) to any private edu-

13     cation loan of the borrower.

14        (B) AUTOMATIC PAYMENT.—

15        (i) IN GENERAL.—In the case of a

16     borrower who does not make an election

17     under subparagraph (A) before the date

18     described in such subparagraph, the Sec-

19     retary of the Treasury shall apply the

20     amount determined with respect to such

21     borrower under paragraph (1) in order of

22     the private education loan of the borrower

23     with the highest interest rate.

24        (ii) EQUAL INTEREST RATES.—In

25     case of two or more private education loans

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003357

1053

1      described in clause (i) with equal interest
2      rates, the Secretary of the Treasury shall
3      apply the amount determined with respect
4      to such borrower under paragraph (1) first
5      to the loan with the highest principal.

6  (c) DEFINITIONS.—In this section:

7      (1) FAIR DEBT COLLECTION PRACTICES ACT
8  TERMS.—The terms "creditor" and "debt collector"
9  have the meaning given those terms, respectively,
10  under section 803 of the Fair Debt Collection Prac-
11  tices Act (15 U.S.C. 1692a).

12      (2) PRIVATE EDUCATION LOAN.—The term
13  "private education loan" has the meaning given the
14  term in section 140 of the Truth in Lending Act (15
15  U.S.C. 1650).

16  TITLE VI—STANDING UP FOR SMALL BUSI-
17      NESSES, MINORITY-OWNED BUSINESSES,
18      AND NON-PROFITS

19  **SEC. 110601. RESTRICTIONS ON COLLECTIONS OF SMALL**
20          **BUSINESS AND NONPROFIT DEBT DURING A**
21          **NATIONAL DISASTER OR EMERGENCY.**

22  (a) IN GENERAL.—The Fair Debt Collection Prac-
23  tices Act (15 U.S.C. 1692 et seq.), as amended by section
24  110402, is further amended by inserting after section
25  812A the following:

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003358

1054

1 **"§ 812B. Restrictions on collections of small business**

2 **and nonprofit debt during a national dis-**

3 **aster or emergency**

4    "(a) DEFINITIONS.—In this section:

5        "(1) COVERED PERIOD.—The term 'covered pe-

6    riod' means the period beginning on the date of en-

7    actment of this section and ending 120 days after

8    the end of the incident period for the emergency de-

9    clared on March 13, 2020, by the President under

10    section 501 of the Robert T. Stafford Disaster Relief

11    and Emergency Assistance Act (42 U.S.C. 4121 et

12    seq.) relating to the Coronavirus Disease 2019

13    (COVID-19) pandemic.

14        "(2) CREDITOR.—The term 'creditor' means

15    any person—

16            "(A) who offers or extends credit creating

17        a debt or to whom a debt is owed; or

18            "(B) to whom any obligation for payment

19        is owed.

20        "(3) DEBT.—The term 'debt'—

21            "(A) means any obligation or alleged obli-

22        gation that is or during the covered period be-

23        comes past due, other than an obligation aris-

24        ing out of a credit agreement entered into after

25        the effective date of this section, that arises out

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003359

1055

1    of a transaction with a nonprofit organization

2    or small business; and

3      ''(B) does not include a mortgage loan.

4    ''(4) DEBT COLLECTOR.—The term 'debt col-

5   lector' means a creditor and any other person or en-

6   tity that engages in the collection of debt, including

7   the Federal Government and a State government, ir-

8   respective of whether the applicable debt is allegedly

9   owed to or assigned to such creditor, person, or enti-

10   ty.

11    ''(5) MORTGAGE LOAN.—The term 'mortgage

12   loan' means a covered mortgage loan (as defined

13   under section 4022 of the CARES Act) and a multi-

14   family mortgage loan (as defined under section 4023

15   of the CARES Act).

16    ''(6) NONPROFIT ORGANIZATION.—The term

17   'nonprofit organization' means an organization that

18   is described in section 501(c)(3) of the Internal Rev-

19   enue Code of 1986 and that is exempt from taxation

20   under section 501(a) of such Code.

21    ''(7) SMALL BUSINESS.—The term 'small busi-

22   ness' has the meaning given the term 'small business

23   concern' in section 3 of the Small Business Act (15

24   U.S.C. 632).

25   ''(b) PROHIBITIONS.—

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003360

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1056

1   "(1) IN GENERAL.—Notwithstanding any other

2   provision of law, no debt collector may, during a cov-

3   ered period—

4       "(A) enforce a security interest securing a

5   debt through repossession, limitation of use, or

6   foreclosure;

7       "(B) take or threaten to take any action to

8   deprive an individual of their liberty as a result

9   of nonpayment of or nonappearance at any

10  hearing relating to an obligation owed by a

11  small business or nonprofit organization;

12      "(C) collect any debt, by way of garnish-

13  ment, attachment, assignment, deduction, off-

14  set, or other seizure, from—

15          "(i) wages, income, benefits, bank,

16      prepaid or other asset accounts; or

17          "(ii) any assets of, or other amounts

18      due to, a small business or nonprofit orga-

19      nization;

20      "(D) commence or continue an action to

21  evict a small business or nonprofit organization

22  from real or personal property for nonpayment;

23      "(E) disconnect or terminate service from

24  a utility service, including electricity, natural

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003361

1057

1    gas, telecommunications or broadband, water,

2    or sewer, for nonpayment; or

3        ''(F) threaten to take any of the foregoing

4    actions.

5    ''(2) RULE OF CONSTRUCTION.—Nothing in

6    this section may be construed to prohibit a small

7    business or nonprofit organization from voluntarily

8    paying, in whole or in part, a debt.

9    ''(e) LIMITATION ON FEES AND INTEREST.—After

10  the expiration of a covered period, a debt collector may

11  not add to any past due debt any interest on unpaid inter-

12  est, higher rate of interest triggered by the nonpayment

13  of the debt, or fee triggered prior to the expiration of the

14  covered period by the nonpayment of the debt.

15  ''(e) VIOLATIONS.—Any person or government entity

16  that violates this section shall be liable to the applicable

17  small business or nonprofit organization as provided under

18  section 813, except that, for purposes of applying section

19  813—

20    ''(1) such person or government entity shall be

21    deemed a debt collector, as such term is defined for

22    purposes of section 813; and

23    ''(2) such small business or nonprofit organiza-

24    tion shall be deemed a consumer, as such term is de-

25    fined for purposes of section 813.

g:\VHLC\051220\051220.072.xml    (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003362

1058

1    "(f) TOLLING.—Any applicable time limitations for
2    exercising an action prohibited under subsection (b) shall
3    be tolled during a covered period.

4    "(g) PREDISPUTE ARBITRATION AGREEMENTS.—
5    Notwithstanding any other provision of law, no predispute
6    arbitration agreement or predispute joint-action waiver
7    shall be valid or enforceable with respect to a dispute
8    brought under this section, including a dispute as to the
9    applicability of this section, which shall be determined
10   under Federal law.".

11   (b) CLERICAL AMENDMENT.—The table of contents
12   for the Fair Debt Collection Practices Act, as amended
13   by section 110402, is further amended by inserting after
14   the item relating to section 812A the following:

"812B. Restrictions on collections of small business and nonprofit debt during
a national disaster or emergency.".

## SEC. 110602. REPAYMENT PERIOD AND FORBEARANCE FOR SMALL BUSINESSES AND NONPROFIT ORGANIZATIONS.

18   Section 812B of the Fair Debt Collection Practices
19   Act (15 U.S.C. 1692 et seq.), as added by section 110601,
20   is amended—

21       (1) by inserting after subsection (c) the fol-
22       lowing:

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003363

1059

1    "(d) REPAYMENT PERIOD.—After the expiration of
2  a covered period, a debt collector shall comply with the
3  following:

4        "(1) DEBT ARISING FROM CREDIT WITH A DE-
5      FINED PAYMENT PERIOD.—For any debt arising
6      from credit with a defined term, the debt collector
7      shall extend the time period to repay any past due
8      balance of the debt by—

9            "(A) 1 payment period for each payment
10          that a small business or nonprofit organization
11          missed during the covered period, with the pay-
12          ments due in the same amounts and at the
13          same intervals as the pre-existing payment
14          schedule; and

15            "(B) 1 payment period in addition to the
16          payment periods described under subparagraph
17          (A).

18        "(2) DEBT ARISING FROM AN OPEN END CRED-
19      IT PLAN.—For debt arising from an open end credit
20      plan, as defined in section 103 of the Truth in
21      Lending Act (15 U.S.C. 1602), the debt collector
22      shall allow the small business or nonprofit organiza-
23      tion to repay the past-due balance in a manner that
24      does not exceed the amounts permitted by the meth-
25      ods described in section 171(c) of the Truth in

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003364

1060

1    Lending Act (15 U.S.C. 1666i–1(c)) and regulations

2    promulgated under that section.

3        "(3) DEBT ARISING FROM OTHER CREDIT.—

4            "(A) IN GENERAL.—For debt not de-

5        scribed under paragraph (2) or (3), the debt

6        collector shall—

7                "(i) allow the small business or non-

8            profit organization to repay the past-due

9            balance of the debt in substantially equal

10           payments over time; and

11               "(ii) provide the small business or

12           nonprofit organization with—

13                   "(I) for past due balances of

14               $2,000 or less, 12 months to repay, or

15               such longer period as the debt col-

16               lector may allow;

17                   "(II) for past due balances be-

18               tween $2,001 and $5,000, 24 months

19               to repay, or such longer period as the

20               debt collector may allow; or

21                   "(III) for past due balances

22               greater than $5,000, 36 months to

23               repay, or such longer period as the

24               debt collector may allow.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003365

1061

1      "(B) ADDITIONAL PROTECTIONS.—The Di-

2 rector of the Bureau may issue rules to provide

3 greater repayment protections to small busi-

4 nesses and nonprofit organizations with debts

5 described under subparagraph (A).

6      "(C) RELATION TO STATE LAW.—This

7 paragraph shall not preempt any State law that

8 provides for greater small business or nonprofit

9 organization protections than this paragraph.";

10 and

11      (2) by adding at the end the following:

12 "(h) FORBEARANCE FOR AFFECTED SMALL BUSI-

13 NESSES AND NONPROFIT ORGANIZATIONS.—

14      "(1) FORBEARANCE PROGRAM.—Each debt col-

15 lector that makes use of the credit facility described

16 in paragraph (4) shall establish a forbearance pro-

17 gram for debts available during the covered period.

18      "(2) AUTOMATIC GRANT OF FORBEARANCE

19 UPON REQUEST.—Under a forbearance program re-

20 quired under paragraph (1), upon the request of a

21 small business or nonprofit organization experi-

22 encing a financial hardship due, directly or indi-

23 rectly, to COVID–19, the debt collector shall grant

24 a forbearance on payment of debt for such time as

25 needed until the end of the covered period, with no

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003366

1062

1     additional documentation required other than the

2     small business or nonprofit organization's attestation

3     to a financial hardship caused by COVID–19 and

4     with no fees, penalties, or interest (beyond the

5     amounts scheduled or calculated as if the borrower

6     made all contractual payments on time and in full

7     under the terms of the loan contract) charged to the

8     borrower in connection with the forbearance.

9     "(3) EXCEPTION FOR CERTAIN MORTGAGE

10     LOANS SUBJECT TO THE CARES ACT.—This sub-

11     section shall not apply to a mortgage loan subject to

12     section 4022 or 4023 of the CARES Act.".

13 **SEC. 110603. CREDIT FACILITY.**

14     Section 812B(h) of the Fair Debt Collection Prac-

15     tices Act (15 U.S.C. 1692 et seq.), as added by section

16     110602, is amended by adding at the end the following:

17     "(4) CREDIT FACILITY.—The Board of Gov-

18     ernors of the Federal Reserve System shall—

19     "(A) establish a facility, using amounts

20     made available under section 4003(b)(4) of the

21     CARES Act (15 U.S.C. 9042(b)(4)), to make

22     long-term, low-cost loans to debt collectors to

23     temporarily compensate such debt collectors for

24     documented financial losses caused by forbear-

DOC_0003367

1063

1 ance of debt payments under this subsection;

2 and

3 　　　"(B) defer debt collectors' required pay-

4 ments on such loans until after small businesses

5 or nonprofit organizations' debt payments re-

6 sume.".

## SEC. 110604. MAIN STREET LENDING PROGRAM REQUIRE-

## MENTS.

9 (a) IN GENERAL.—Section 4003(c)(3)(D)(ii) of the

10 CARES Act (15 U.S.C. 9042(c)(3)(D)(ii)) is amended—

11 (1) by striking "Nothing in this subparagraph

12 shall limit the discretion of the Board of Governors

13 of the Federal Reserve System to" and inserting the

14 following:

15 　　　　"(I) IN GENERAL.—The Board of

16 Governors of the Federal Reserve Sys-

17 tem shall"; and

18 (2) by adding at the end the following:

19 　　　　"(II) REQUIREMENTS.—In car-

20 rying out subclause (I), the Board of

21 Governors of the Federal Reserve Sys-

22 tem—

23 　　　　　"(aa) shall make non-profit

24 organizations eligible for any pro-

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003368

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1064

1  gram or facility established under

2  such subclause;

3      ''(bb) shall create a low-cost

4      loan option tailored to the unique

5      needs of non-profit organizations,

6      including the ability to defer pay-

7      ments and, solely for non-profit

8      organizations that are ineligible

9      to receive a covered loan under

10     section 7(a)(36) of the Small

11     Business Act (15 U.S.C.

12     636(a)(36)) and that predomi-

13     nantly serve low-income commu-

14     nities, as determined by the Fed-

15     eral Reserve, have the loans for-

16     given by the Department of the

17     Treasury for a similar purpose to

18     maintain payroll and operations

19     provided under the Paycheck

20     Protection Program, notwith-

21     standing section 4003(d)(3) of

22     the CARES Act;''.

23   (b) DEADLINE.—Not later than the end of the 5-day

24 period beginning on the date of enactment of this Act, the

25 Board of Governors of the Federal Reserve System shall

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003369

1065

1 issue such rules or take such other actions as may be nec-

2 essary to implement the requirements made by the amend-

3 ments made by this section.

4 **SEC. 110605. OPTIONS FOR SMALL BUSINESSES AND NON-**

5 **PROFITS UNDER THE MAIN STREET LENDING**

6 **PROGRAM.**

7 (a) IN GENERAL.—Section (c)(3)(D)(ii)(II) of the

8 CARES Act (15 U.S.C. 9042(c)(3)(D)(ii)(II)), as added

9 by section 110604, is further amended by adding at the

10 end the following:

11 "(cc) shall provide at least

12 one low-cost loan option that

13 small businesses and small non-

14 profits are eligible for that does

15 not have a minimum loan size;".

16 (b) DEADLINE.—Not later than the end of the 5-day

17 period beginning on the date of enactment of this Act, the

18 Board of Governors of the Federal Reserve System shall

19 issue such rules or take such other actions as may be nec-

20 essary to implement the requirements made by the amend-

21 ments made by this section.

22 **SEC. 110606. SAFE BANKING.**

23 (a) SHORT TITLE; PURPOSE.—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003370

G:\CMTE\AP\16\FY20\_D\HEROES.XML

<div align="center">1066</div>

1     (1) SHORT TITLE.—This section may be cited

2     as the ''Secure And Fair Enforcement Banking Act

3     of 2020'' or the ''SAFE Banking Act of 2020''.

4     (2) PURPOSE.—The purpose of this section is

5     to increase public safety by ensuring access to finan-

6     cial services to cannabis-related legitimate businesses

7     and service providers and reducing the amount of

8     cash at such businesses.

9     (b) SAFE HARBOR FOR DEPOSITORY INSTITU-

10    TIONS.—

11     (1) IN GENERAL.—A Federal banking regulator

12    may not—

13        (A) terminate or limit the deposit in-

14        surance or share insurance of a depository

15        institution under the Federal Deposit In-

16        surance Act (12 U.S.C. 1811 et seq.), the

17        Federal Credit Union Act (12 U.S.C. 1751

18        et seq.), or take any other adverse action

19        against a depository institution under sec-

20        tion 8 of the Federal Deposit Insurance

21        Act (12 U.S.C. 1818) solely because the

22        depository institution provides or has pro-

23        vided financial services to a cannabis-re-

24        lated legitimate business or service pro-

25        vider;

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003371

1067

(B) prohibit, penalize, or otherwise discourage a depository institution from providing financial services to a cannabis-related legitimate business or service provider or to a State, political subdivision of a State, or Indian Tribe that exercises jurisdiction over cannabis-related legitimate businesses;

(C) recommend, incentivize, or encourage a depository institution not to offer financial services to an account holder, or to downgrade or cancel the financial services offered to an account holder solely because—

(i) the account holder is a cannabis-related legitimate business or service provider, or is an employee, owner, or operator of a cannabis-related legitimate business or service provider;

(ii) the account holder later becomes an employee, owner, or operator of a cannabis-related legitimate business or service provider; or

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003372

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1068

1        (iii) the depository institution

2        was not aware that the account holder

3        is an employee, owner, or operator of

4        a cannabis-related legitimate business

5        or service provider;

6        (D) take any adverse or corrective su-

7        pervisory action on a loan made to—

8        (i) a cannabis-related legitimate

9        business or service provider, solely be-

10       cause the business is a cannabis-re-

11       lated legitimate business or service

12       provider;

13       (ii) an employee, owner, or oper-

14       ator of a cannabis-related legitimate

15       business or service provider, solely be-

16       cause the employee, owner, or oper-

17       ator is employed by, owns, or operates

18       a cannabis-related legitimate business

19       or service provider, as applicable; or

20       (iii) an owner or operator of real

21       estate or equipment that is leased to

22       a cannabis-related legitimate business

23       or service provider, solely because the

24       owner or operator of the real estate or

25       equipment leased the equipment or

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1069

1     real estate to a cannabis-related legiti-

2     mate business or service provider, as

3     applicable; or

4     (E) prohibit or penalize a depository

5     institution (or entity performing a financial

6     service for or in association with a deposi-

7     tory institution) for, or otherwise discour-

8     age a depository institution (or entity per-

9     forming a financial service for or in asso-

10     ciation with a depository institution) from,

11     engaging in a financial service for a can-

12     nabis-related legitimate business or service

13     provider.

14  (2) SAFE HARBOR APPLICABLE TO DE NOVO IN-

15 STITUTIONS.—Paragraph (1) shall apply to an insti-

16 tution applying for a depository institution charter

17 to the same extent as such subsection applies to a

18 depository institution.

19 (c) PROTECTIONS FOR ANCILLARY BUSINESSES.—

20 For the purposes of sections 1956 and 1957 of title 18,

21 United States Code, and all other provisions of Federal

22 law, the proceeds from a transaction involving activities

23 of a cannabis-related legitimate business or service pro-

24 vider shall not be considered proceeds from an unlawful

25 activity solely because—

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003374

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1070

1 (1) the transaction involves proceeds from a
2 cannabis-related legitimate business or service pro-
3 vider; or

4 (2) the transaction involves proceeds from—

5 (A) cannabis-related activities described in
6 subsection (n)(4)(B) conducted by a cannabis-
7 related legitimate business; or

8 (B) activities described in subsection
9 (n)(13)(A) conducted by a service provider.

10 (d) PROTECTIONS UNDER FEDERAL LAW.—

11 (1) IN GENERAL.—With respect to providing a
12 financial service to a cannabis-related legitimate
13 business or service provider within a State, political
14 subdivision of a State, or Indian country that allows
15 the cultivation, production, manufacture, sale, trans-
16 portation, display, dispensing, distribution, or pur-
17 chase of cannabis pursuant to a law or regulation of
18 such State, political subdivision, or Indian Tribe
19 that has jurisdiction over the Indian country, as ap-
20 plicable, a depository institution, entity performing a
21 financial service for or in association with a deposi-
22 tory institution, or insurer that provides a financial
23 service to a cannabis-related legitimate business or
24 service provider, and the officers, directors, and em-
25 ployees of that depository institution, entity, or in-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003375

1071

1    surer may not be held liable pursuant to any Federal

2    law or regulation—

3        (A) solely for providing such a financial

4        service; or

5        (B) for further investing any income de-

6        rived from such a financial service.

7    (2) PROTECTIONS FOR FEDERAL RESERVE

8    BANKS AND FEDERAL HOME LOAN BANKS.—With

9    respect to providing a service to a depository institu-

10    tion that provides a financial service to a cannabis-

11    related legitimate business or service provider (where

12    such financial service is provided within a State, po-

13    litical subdivision of a State, or Indian country that

14    allows the cultivation, production, manufacture, sale,

15    transportation, display, dispensing, distribution, or

16    purchase of cannabis pursuant to a law or regulation

17    of such State, political subdivision, or Indian Tribe

18    that has jurisdiction over the Indian country, as ap-

19    plicable), a Federal reserve bank or Federal Home

20    Loan Bank, and the officers, directors, and employ-

21    ees of the Federal reserve bank or Federal Home

22    Loan Bank, may not be held liable pursuant to any

23    Federal law or regulation—

24        (A) solely for providing such a service; or

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003376

1072

1      (B) for further investing any income de-
2      rived from such a service.

3      (3) PROTECTIONS FOR INSURERS.—With re-
4      spect to engaging in the business of insurance within
5      a State, political subdivision of a State, or Indian
6      country that allows the cultivation, production, man-
7      ufacture, sale, transportation, display, dispensing,
8      distribution, or purchase of cannabis pursuant to a
9      law or regulation of such State, political subdivision,
10      or Indian Tribe that has jurisdiction over the Indian
11      country, as applicable, an insurer that engages in
12      the business of insurance with a cannabis-related le-
13      gitimate business or service provider or who other-
14      wise engages with a person in a transaction permis-
15      sible under State law related to cannabis, and the
16      officers, directors, and employees of that insurer
17      may not be held liable pursuant to any Federal law
18      or regulation—

19      (A) solely for engaging in the business of
20      insurance; or

21      (B) for further investing any income de-
22      rived from the business of insurance.

23      (4) FORFEITURE.—

24      (A) DEPOSITORY INSTITUTIONS.—A depos-
25      itory institution that has a legal interest in the

g:\VHLC\051220\051220.072.xml    (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003377

1073

1 collateral for a loan or another financial service
2 provided to an owner, employee, or operator of
3 a cannabis-related legitimate business or service
4 provider, or to an owner or operator of real es-
5 tate or equipment that is leased or sold to a
6 cannabis-related legitimate business or service
7 provider, shall not be subject to criminal, civil,
8 or administrative forfeiture of that legal inter-
9 est pursuant to any Federal law for providing
10 such loan or other financial service.

11 (B) FEDERAL RESERVE BANKS AND FED-
12 ERAL HOME LOAN BANKS.—A Federal reserve
13 bank or Federal Home Loan Bank that has a
14 legal interest in the collateral for a loan or an-
15 other financial service provided to a depository
16 institution that provides a financial service to a
17 cannabis-related legitimate business or service
18 provider, or to an owner or operator of real es-
19 tate or equipment that is leased or sold to a
20 cannabis-related legitimate business or service
21 provider, shall not be subject to criminal, civil,
22 or administrative forfeiture of that legal inter-
23 est pursuant to any Federal law for providing
24 such loan or other financial service.

25 (e) RULES OF CONSTRUCTION.—

DOC_0003378

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1074

1     (1) NO REQUIREMENT TO PROVIDE FINANCIAL

2 SERVICES.—Nothing in this section shall require a

3 depository institution, entity performing a financial

4 service for or in association with a depository insti-

5 tution, or insurer to provide financial services to a

6 cannabis-related legitimate business, service pro-

7 vider, or any other business.

8     (2) GENERAL EXAMINATION, SUPERVISORY,

9 AND ENFORCEMENT AUTHORITY.—Nothing in this

10 section may be construed in any way as limiting or

11 otherwise restricting the general examination, super-

12 visory, and enforcement authority of the Federal

13 banking regulators, provided that the basis for any

14 supervisory or enforcement action is not the provi-

15 sion of financial services to a cannabis-related legiti-

16 mate business or service provider.

17     (f) REQUIREMENTS FOR FILING SUSPICIOUS ACTIV-

18 ITY REPORTS.—Section 5318(g) of title 31, United States

19 Code, is amended by adding at the end the following:

20     "(5) REQUIREMENTS FOR CANNABIS-RELATED

21 LEGITIMATE BUSINESSES.—

22     "(A) IN GENERAL.—With respect to a fi-

23 nancial institution or any director, officer, em-

24 ployee, or agent of a financial institution that

25 reports a suspicious transaction pursuant to

DOC_0003379

1075

1  this subsection, if the reason for the report re-

2  lates to a cannabis-related legitimate business

3  or service provider, the report shall comply with

4  appropriate guidance issued by the Financial

5  Crimes Enforcement Network. The Secretary

6  shall ensure that the guidance is consistent with

7  the purpose and intent of the SAFE Banking

8  Act of 2020 and does not significantly inhibit

9  the provision of financial services to a cannabis-

10  related legitimate business or service provider in

11  a State, political subdivision of a State, or In-

12  dian country that has allowed the cultivation,

13  production, manufacture, transportation, dis-

14  play, dispensing, distribution, sale, or purchase

15  of cannabis pursuant to law or regulation of

16  such State, political subdivision, or Indian

17  Tribe that has jurisdiction over the Indian

18  country.

19      ''(B) DEFINITIONS.—For purposes of this

20  paragraph:

21          ''(i) CANNABIS.—The term 'cannabis'

22      has the meaning given the term 'mari-

23      huana' in section 102 of the Controlled

24      Substances Act (21 U.S.C. 802).

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003380

1076

1                 ''(ii) CANNABIS-RELATED LEGITIMATE

2        BUSINESS.—The term 'cannabis-related le-

3        gitimate business' has the meaning given

4        that term in subsection (n) of the SAFE

5        Banking Act of 2020.

6               ''(iii) INDIAN COUNTRY.—The term

7        'Indian country' has the meaning given

8        that term in section 1151 of title 18.

9               ''(iv) INDIAN TRIBE.—The term 'In-

10       dian Tribe' has the meaning given that

11       term in section 102 of the Federally Rec-

12       ognized Indian Tribe List Act of 1994 (25

13       U.S.C. 479a).

14               ''(v) FINANCIAL SERVICE.—The term

15       'financial service' has the meaning given

16       that term in subsection (n) of the SAFE

17       Banking Act of 2020.

18               ''(vi) SERVICE PROVIDER.—The term

19       'service provider' has the meaning given

20       that term in subsection (n) of the SAFE

21       Banking Act of 2020.

22               ''(vii) STATE.—The term 'State'

23       means each of the several States, the Dis-

24       trict of Columbia, Puerto Rico, and any

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003381

1077

1    territory or possession of the United

2    States.''.

3  (g) GUIDANCE AND EXAMINATION PROCEDURES.—

4 Not later than 180 days after the date of enactment of

5 this Act, the Financial Institutions Examination Council

6 shall develop uniform guidance and examination proce-

7 dures for depository institutions that provide financial

8 services to cannabis-related legitimate businesses and

9 service providers.

10  (h) ANNUAL DIVERSITY AND INCLUSION REPORT.—

11 The Federal banking regulators shall issue an annual re-

12 port to Congress containing—

13    (1) information and data on the availability of

14    access to financial services for minority-owned and

15    women-owned cannabis-related legitimate businesses;

16    and

17    (2) any regulatory or legislative recommenda-

18    tions for expanding access to financial services for

19    minority-owned and women-owned cannabis-related

20    legitimate businesses.

21  (i) GAO STUDY ON DIVERSITY AND INCLUSION.—

22    (1) STUDY.—The Comptroller General of the

23    United States shall carry out a study on the barriers

24    to marketplace entry, including in the licensing proc-

25    ess, and the access to financial services for potential

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003382

1078

1  and existing minority-owned and women-owned can-
2  nabis-related legitimate businesses.

3      (2) REPORT.—The Comptroller General shall
4  issue a report to the Congress—

5          (A) containing all findings and determina-
6      tions made in carrying out the study required
7      under paragraph (1); and

8          (B) containing any regulatory or legislative
9      recommendations for removing barriers to mar-
10     ketplace entry, including in the licensing proc-
11     ess, and expanding access to financial services
12     for potential and existing minority-owned and
13     women-owned cannabis-related legitimate busi-
14     nesses.

15  (j) GAO STUDY ON EFFECTIVENESS OF CERTAIN
16  REPORTS ON FINDING CERTAIN PERSONS.—Not later
17  than 2 years after the date of the enactment of this Act,
18  the Comptroller General of the United States shall carry
19  out a study on the effectiveness of reports on suspicious
20  transactions filed pursuant to section 5318(g) of title 31,
21  United States Code, at finding individuals or organiza-
22  tions suspected or known to be engaged with transnational
23  criminal organizations and whether any such engagement
24  exists in a State, political subdivision, or Indian Tribe that
25  has jurisdiction over Indian country that allows the cul-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003383

1079

1 tivation, production, manufacture, sale, transportation,

2 display, dispensing, distribution, or purchase of cannabis.

3 The study shall examine reports on suspicious trans-

4 actions as follows:

5     (1) During the period of 2014 until the date of

6     the enactment of this Act, reports relating to mari-

7     juana-related businesses.

8     (2) During the 1-year period after date of the

9     enactment of this Act, reports relating to cannabis-

10    related legitimate businesses.

11 (k) BANKING SERVICES FOR HEMP BUSINESSES.—

12    (1) FINDINGS.—The Congress finds that—

13        (A) the Agriculture Improvement Act of

14        2018 (Public Law 115–334) legalized hemp by

15        removing it from the definition of "marihuana"

16        under the Controlled Substances Act;

17        (B) despite the legalization of hemp, some

18        hemp businesses (including producers, manufac-

19        turers, and retailers) continue to have difficulty

20        gaining access to banking products and serv-

21        ices; and

22        (C) businesses involved in the sale of

23        hemp-derived cannabidiol ("CBD") products

24        are particularly affected, due to confusion about

25        their legal status.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003384

1080

1    (2) FEDERAL BANKING REGULATOR HEMP
2    BANKING GUIDANCE.—Not later than the end of the
3    90-day period beginning on the date of enactment of
4    this Act, the Federal banking regulators shall jointly
5    issue guidance to financial institutions—

6     (A) confirming the legality of hemp, hemp-
7     derived CBD products, and other hemp-derived
8     cannabinoid products, and the legality of engag-
9     ing in financial services with businesses selling
10    hemp, hemp-derived CBD products, and other
11    hemp-derived cannabinoid products, after the
12    enactment of the Agriculture Improvement Act
13    of 2018; and

14    (B) to provide recommended best practices
15    for financial institutions to follow when pro-
16    viding financial services and merchant proc-
17    essing services to businesses involved in the sale
18    of hemp, hemp-derived CBD products, and
19    other hemp-derived cannabinoid products.

20   (3) FINANCIAL INSTITUTION DEFINED.—In this
21   section, the term "financial institution" means any
22   person providing financial services.

23   (l) APPLICATION OF SAFE HARBORS TO HEMP AND
24   CBD PRODUCTS.—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003385

1081

1     (1) IN GENERAL.—Except as provided under
2 paragraph (2), the provisions of this section (other
3 than subsections (f) and (j)) shall apply to hemp (in-
4 cluding hemp-derived cannabidiol and other hemp-
5 derived cannabinoid products) in the same manner
6 as such provisions apply to cannabis.

7     (2) RULE OF APPLICATION.—In applying the
8 provisions of this section described under paragraph
9 (1) to hemp, the definition of "cannabis-related le-
10 gitimate business" shall be treated as excluding any
11 requirement to engage in activity pursuant to the
12 law of a State or political subdivision thereof.

13     (3) HEMP DEFINED.—In this subsection, the
14 term "hemp" has the meaning given that term
15 under section 297A of the Agricultural Marketing
16 Act of 1946 (7 U.S.C. 1639o).

17 (m) REQUIREMENTS FOR DEPOSIT ACCOUNT TERMI-
18 NATION REQUESTS AND ORDERS.—

19     (1) TERMINATION REQUESTS OR ORDERS MUST
20 BE VALID.—

21         (A) IN GENERAL.—An appropriate Federal
22 banking agency may not formally or informally
23 request or order a depository institution to ter-
24 minate a specific customer account or group of
25 customer accounts or to otherwise restrict or

1082

1   discourage a depository institution from enter-
2   ing into or maintaining a banking relationship
3   with a specific customer or group of customers
4   unless—

5         (i) the agency has a valid reason for
6      such request or order; and

7         (ii) such reason is not based solely on
8      reputation risk.

9   (B) TREATMENT OF NATIONAL SECURITY
10  THREATS.—If an appropriate Federal banking
11  agency believes a specific customer or group of
12  customers is, or is acting as a conduit for, an
13  entity which—

14        (i) poses a threat to national security;

15        (ii) is involved in terrorist financing;

16        (iii) is an agency of the Government
17     of Iran, North Korea, Syria, or any coun-
18     try listed from time to time on the State
19     Sponsors of Terrorism list;

20        (iv) is located in, or is subject to the
21     jurisdiction of, any country specified in
22     clause (iii); or

23        (v) does business with any entity de-
24     scribed in clause (iii) or (iv), unless the ap-
25     propriate Federal banking agency deter-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003387

1083

1    mines that the customer or group of cus-
2    tomers has used due diligence to avoid
3    doing business with any entity described in
4    clause (iii) or (iv),
5    such belief shall satisfy the requirement under
6    subparagraph (A).
7    (2) NOTICE REQUIREMENT.—
8        (A) IN GENERAL.—If an appropriate Fed-
9    eral banking agency formally or informally re-
10   quests or orders a depository institution to ter-
11   minate a specific customer account or a group
12   of customer accounts, the agency shall—
13       (i) provide such request or order to
14       the institution in writing; and
15       (ii) accompany such request or order
16       with a written justification for why such
17       termination is needed, including any spe-
18       cific laws or regulations the agency believes
19       are being violated by the customer or
20       group of customers, if any.
21       (B) JUSTIFICATION REQUIREMENT.—A
22   justification described under subparagraph
23   (A)(ii) may not be based solely on the reputa-
24   tion risk to the depository institution.
25   (3) CUSTOMER NOTICE.—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003388

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1084

1  (A) NOTICE REQUIRED.—Except as pro-
2  vided under subparagraph (B) or as otherwise
3  prohibited from being disclosed by law, if an ap-
4  propriate Federal banking agency orders a de-
5  pository institution to terminate a specific cus-
6  tomer account or a group of customer accounts,
7  the depository institution shall inform the spe-
8  cific customer or group of customers of the jus-
9  tification for the customer's account termi-
10  nation described under paragraph (2).
11  (B) NOTICE PROHIBITED.—
12  (i) NOTICE PROHIBITED IN CASES OF
13  NATIONAL SECURITY.—If an appropriate
14  Federal banking agency requests or orders
15  a depository institution to terminate a spe-
16  cific customer account or a group of cus-
17  tomer accounts based on a belief that the
18  customer or customers pose a threat to na-
19  tional security, or are otherwise described
20  under subsection (a)(2), neither the deposi-
21  tory institution nor the appropriate Fed-
22  eral banking agency may inform the cus-
23  tomer or customers of the justification for
24  the customer's account termination.

DOC_0003389

1085

1         (ii) NOTICE PROHIBITED IN OTHER

2         CASES.—If an appropriate Federal banking

3         agency determines that the notice required

4         under subparagraph (A) may interfere

5         with an authorized criminal investigation,

6         neither the depository institution nor the

7         appropriate Federal banking agency may

8         inform the specific customer or group of

9         customers of the justification for the cus-

10         tomer's account termination.

11    (4) REPORTING REQUIREMENT.—Each appro-

12 priate Federal banking agency shall issue an annual

13 report to the Congress stating—

14         (A) the aggregate number of specific cus-

15         tomer accounts that the agency requested or or-

16         dered a depository institution to terminate dur-

17         ing the previous year; and

18         (B) the legal authority on which the agen-

19         cy relied in making such requests and orders

20         and the frequency on which the agency relied

21         on each such authority.

22    (5) DEFINITIONS.—For purposes of this sub-

23 section:

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003390

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1086

1     (A) APPROPRIATE FEDERAL BANKING

2     AGENCY.—The term "appropriate Federal

3     banking agency" means—

4          (i) the appropriate Federal banking

5          agency, as defined under section 3 of the

6          Federal Deposit Insurance Act (12 U.S.C.

7          1813); and

8          (ii) the National Credit Union Admin-

9          istration, in the case of an insured credit

10         union.

11    (B) DEPOSITORY INSTITUTION.—The term

12    "depository institution" means—

13         (i) a depository institution, as defined

14         under section 3 of the Federal Deposit In-

15         surance Act (12 U.S.C. 1813); and

16         (ii) an insured credit union.

17   (n) DEFINITIONS.—In this Act:

18   (1) BUSINESS OF INSURANCE.—The term

19   "business of insurance" has the meaning given such

20   term in section 1002 of the Dodd-Frank Wall Street

21   Reform and Consumer Protection Act (12 U.S.C.

22   5481).

23   (2) CANNABIS.—The term "cannabis" has the

24   meaning given the term "marihuana" in section 102

25   of the Controlled Substances Act (21 U.S.C. 802).

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003391

1087

1  (3) CANNABIS PRODUCT.—The term "cannabis
2  product" means any article which contains cannabis,
3  including an article which is a concentrate, an edi-
4  ble, a tincture, a cannabis-infused product, or a top-
5  ical.

6  (4) CANNABIS-RELATED LEGITIMATE BUSI-
7  NESS.—The term "cannabis-related legitimate busi-
8  ness" means a manufacturer, producer, or any per-
9  son or company that—

10      (A) engages in any activity described in
11      subparagraph (B) pursuant to a law established
12      by a State or a political subdivision of a State,
13      as determined by such State or political subdivi-
14      sion; and

15      (B) participates in any business or orga-
16      nized activity that involves handling cannabis or
17      cannabis products, including cultivating, pro-
18      ducing, manufacturing, selling, transporting,
19      displaying, dispensing, distributing, or pur-
20      chasing cannabis or cannabis products.

21  (5) DEPOSITORY INSTITUTION.—The term "de-
22  pository institution" means—

23      (A) a depository institution as defined in
24      section 3(c) of the Federal Deposit Insurance
25      Act (12 U.S.C. 1813(c));

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003392

1088

1  (B) a Federal credit union as defined in
2  section 101 of the Federal Credit Union Act
3  (12 U.S.C. 1752); or

4  (C) a State credit union as defined in sec-
5  tion 101 of the Federal Credit Union Act (12
6  U.S.C. 1752).

7  (6) FEDERAL BANKING REGULATOR.—The
8  term ''Federal banking regulator'' means each of the
9  Board of Governors of the Federal Reserve System,
10  the Bureau of Consumer Financial Protection, the
11  Federal Deposit Insurance Corporation, the Federal
12  Housing Finance Agency, the Financial Crimes En-
13  forcement Network, the Office of Foreign Asset
14  Control, the Office of the Comptroller of the Cur-
15  rency, the National Credit Union Administration,
16  the Department of the Treasury, or any Federal
17  agency or department that regulates banking or fi-
18  nancial services, as determined by the Secretary of
19  the Treasury.

20  (7) FINANCIAL SERVICE.—The term ''financial
21  service''—

22  (A) means a financial product or service,
23  as defined in section 1002 of the Dodd-Frank
24  Wall Street Reform and Consumer Protection
25  Act (12 U.S.C. 5481);

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003393

1089

1     (B) includes the business of insurance;

2     (C) includes, whether performed directly or

3    indirectly, the authorizing, processing, clearing,

4    settling, billing, transferring for deposit, trans-

5    mitting, delivering, instructing to be delivered,

6    reconciling, collecting, or otherwise effectuating

7    or facilitating of payments or funds, where such

8    payments or funds are made or transferred by

9    any means, including by the use of credit cards,

10   debit cards, other payment cards, or other ac-

11   cess devices, accounts, original or substitute

12   checks, or electronic funds transfers;

13    (D) includes acting as a money transmit-

14   ting business which directly or indirectly makes

15   use of a depository institution in connection

16   with effectuating or facilitating a payment for

17   a cannabis-related legitimate business or service

18   provider in compliance with section 5330 of

19   title 31, United States Code, and any applicable

20   State law; and

21    (E) includes acting as an armored car

22   service for processing and depositing with a de-

23   pository institution or a Federal reserve bank

24   with respect to any monetary instruments (as

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003394

1090

1 defined under section 1956(c)(5) of title 18,

2 United States Code.

3 (8) INDIAN COUNTRY.—The term "Indian coun-

4 try" has the meaning given that term in section

5 1151 of title 18.

6 (9) INDIAN TRIBE.—The term "Indian Tribe"

7 has the meaning given that term in section 102 of

8 the Federally Recognized Indian Tribe List Act of

9 1994 (25 U.S.C. 479a).

10 (10) INSURER.—The term "insurer" has the

11 meaning given that term under section 313(r) of

12 title 31, United States Code.

13 (11) MANUFACTURER.—The term "manufac-

14 turer" means a person who manufactures, com-

15 pounds, converts, processes, prepares, or packages

16 cannabis or cannabis products.

17 (12) PRODUCER.—The term "producer" means

18 a person who plants, cultivates, harvests, or in any

19 way facilitates the natural growth of cannabis.

20 (13) SERVICE PROVIDER.—The term "service

21 provider"—

22 (A) means a business, organization, or

23 other person that—

24 (i) sells goods or services to a can-

25 nabis-related legitimate business; or

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003395

1091

1        (ii) provides any business services, in-
2        cluding the sale or lease of real or any
3        other property, legal or other licensed serv-
4        ices, or any other ancillary service, relating
5        to cannabis; and

6     (B) does not include a business, organiza-
7     tion, or other person that participates in any
8     business or organized activity that involves han-
9     dling cannabis or cannabis products, including
10     cultivating, producing, manufacturing, selling,
11     transporting, displaying, dispensing, distrib-
12     uting, or purchasing cannabis or cannabis prod-
13     ucts.

14     (14) STATE.—The term "State" means each of
15 the several States, the District of Columbia, Puerto
16 Rico, and any territory or possession of the United
17 States.

18     (o) DISCRETIONARY SURPLUS FUNDS.—Section
19 7(a)(3)(A) of the Federal Reserve Act (12 U.S.C.
20 289(a)(3)(A)) is amended by striking "$6,825,000,000"
21 and inserting "$6,821,000,000".

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003396

1092

## TITLE VII—EMPOWERING COMMUNITY
## FINANCIAL INSTITUTIONS

**SEC. 110701. COMMUNITY DEVELOPMENT FINANCIAL INSTI-**
**TUTIONS FUND.**

(a) IN GENERAL.—There is authorized to be appropriated to the Community Development Financial Institutions Fund, out of amounts in the general fund not otherwise appropriated, $2,000,000,000 for fiscal year 2020, for providing financial assistance and technical assistance under subparagraphs (A) and (B) of section 108(a)(1) of the Community Development Banking and Financial Institutions Act of 1994 (12 U.S.C. 4707(a)(1)), except that subsections (d) and (e) of such section 108 shall not apply to the provision of such assistance, for the Bank Enterprise Award program, and for financial assistance, technical assistance, training, and outreach programs designed to benefit Native American, Native Hawaiian, and Alaska Native communities and provided primarily through qualified community development lender organizations with experience and expertise in community development banking and lending in Indian country, Native American organizations, Tribes and Tribal organizations, and other suitable providers. Of the amount appropriated pursuant to this heading, not less than $800,000,000 shall be for providing financial assistance, technical assistance, awards, training,

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003397

1093

1 and outreach programs described above to recipients that
2 are minority lending institutions.

3  (b) DEFINITIONS.—For purposes of this section:

4   (1) MINORITY LENDING INSTITUTION.—The
5  term "minority lending institution" means any de-
6  pository institution, loan fund, or other financial in-
7  stitution that—

8    (A) if a privately-owned institution, 51 per-
9   cent is owned by one or more socially and eco-
10   nomically disadvantaged individuals;

11    (B) if publicly-owned, 51 percent of the
12   stock is owned by one or more socially and eco-
13   nomically disadvantaged individuals; and

14    (C) in the case of a mutual institution,
15   where the majority of the Board of Directors,
16   account holders, and the community which it
17   services is predominantly minority.

18   (2) MINORITY.—The term "minority" means
19  any black American, Native American, Hispanic
20  American, or Asian American.

21 **SEC. 110702. ENSURING DIVERSITY IN COMMUNITY BANK-**
22  **ING.**

23  (a) SHORT TITLE.—This section may be cited as the
24 "Ensuring Diversity in Community Banking Act of
25 2020".

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003398

1094

1    (b) COMMUNITY DEVELOPMENT FINANCIAL INSTI-

2  TUTION.—In this section, the term "community develop-

3  ment financial institution" has the meaning given under

4  section 103 of the Riegle Community Development and

5  Regulatory Improvement Act of 1994 (12 U.S.C. 4702).

6    (c) MINORITY DEPOSITORY INSTITUTION.—In this

7  section, the term "minority depository institution" has the

8  meaning given under section 308 of the Financial Institu-

9  tions Reform, Recovery, and Enforcement Act of 1989 (12

10  U.S.C. 1463 note), as amended by this section.

11    (d) INCLUSION OF WOMEN'S BANKS IN THE DEFINI-

12  TION OF MINORITY DEPOSITORY INSTITUTION.—Section

13  308(b)(1) of the Financial Institutions Reform, Recovery,

14  and Enforcement Act of 1989 (12 U.S.C. 1463 note) is

15  amended—

16    (1) by redesignating subparagraphs (A), (B),

17    and (C) as clauses (i), (ii), and (iii), respectively;

18    (2) by striking "means any" and inserting the

19    following: "means—

20    "(A) any"; and

21    (3) in clause (iii) (as so redesignated), by strik-

22    ing the period at the end and inserting "; or"; and

23    (4) by inserting at the end the following new

24    subparagraph:

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003399

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1095

1         ''(B) any bank described in clause (i), (ii),

2             or (iii) of section 19(b)(1)(A) of the Federal

3             Reserve Act—

4                 ''(i) more than 50 percent of the out-

5                 standing shares of which are held by 1 or

6                 more women; and

7                 ''(ii) the majority of the directors on

8                 the board of directors of which are

9                 women.''.

10    (e) ESTABLISHMENT OF IMPACT BANK DESIGNA-

11    TION.—

12        (1) IN GENERAL.—Each appropriate Federal

13    banking agency shall establish a program under

14    which a depository institution with total consolidated

15    assets of less than $10,000,000,000 may elect to be

16    designated as an impact bank if the total dollar

17    value of the loans extended by such depository insti-

18    tution to low-income borrowers is greater than or

19    equal to 50 percent of the assets of such bank.

20        (2) DESIGNATION.—Based on data obtained

21    through examinations, an appropriate Federal bank-

22    ing agency shall submit a notification to a depository

23    institution stating that the depository institution

24    qualifies for designation as an impact bank.

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003400

1096

1      (3) APPLICATION.—A depository institution

2    that does not receive a notification described in

3    paragraph (2) may submit an application to the ap-

4    propriate Federal banking agency demonstrating

5    that the depository institution qualifies for designa-

6    tion as an impact bank.

7        (4) ADDITIONAL DATA OR OVERSIGHT.—A de-

8    pository institution is not required to submit addi-

9    tional data to an appropriate Federal banking agen-

10    cy or be subject to additional oversight from such an

11    agency if such data or oversight is related specifi-

12    cally and solely for consideration for a designation

13    as an impact bank.

14        (5) REMOVAL OF DESIGNATION.—If an appro-

15    priate Federal banking agency determines that a de-

16    pository institution designated as an impact bank no

17    longer meets the criteria for such designation, the

18    appropriate Federal banking agency shall rescind

19    the designation and notify the depository institution

20    of such rescission.

21        (6) RECONSIDERATION OF DESIGNATION; AP-

22    PEALS.—A depository institution may—

23           (A) submit to the appropriate Federal

24    banking agency a request to reconsider a deter-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003401

1097

1       mination that such depository institution no

2       longer meets the criteria for the designation; or

3           (B) file an appeal in accordance with pro-

4       cedures established by the appropriate Federal

5       banking agency.

6           (7) RULEMAKING.—Not later than 1 year after

7       the date of the enactment of this Act, the appro-

8       priate Federal banking agencies shall jointly issue

9       rules to carry out the requirements of this para-

10      graph, including by providing a definition of a low-

11      income borrower.

12          (8) REPORTS.—Each appropriate Federal bank-

13      ing agency shall submit an annual report to the

14      Congress containing a description of actions taken to

15      carry out this paragraph.

16          (9) FEDERAL DEPOSIT INSURANCE ACT DEFINI-

17      TIONS.—In this subsection, the terms "depository

18      institution" and "appropriate Federal banking agen-

19      cy" have the meanings given such terms, respec-

20      tively, in section 3 of the Federal Deposit Insurance

21      Act (12 U.S.C. 1813).

22      (f) MINORITY DEPOSITORY INSTITUTIONS ADVISORY

23  COMMITTEES.—

24          (1) ESTABLISHMENT.—Each covered regulator

25      shall establish an advisory committee to be called the

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003402

1098

1     "Minority Depository Institutions Advisory Com-

2 mittee".

3         (2) DUTIES.—Each Minority Depository Insti-

4 tutions Advisory Committee shall provide advice to

5 the respective covered regulator on meeting the goals

6 established by section 308 of the Financial Institu-

7 tions Reform, Recovery, and Enforcement Act of

8 1989 (12 U.S.C. 1463 note) to preserve the present

9 number of covered minority institutions, preserve the

10 minority character of minority-owned institutions in

11 cases involving mergers or acquisitions, provide tech-

12 nical assistance, and encourage the creation of new

13 covered minority institutions. The scope of the work

14 of each such Minority Depository Institutions Advi-

15 sory Committee shall include an assessment of the

16 current condition of covered minority institutions,

17 what regulatory changes or other steps the respec-

18 tive agencies may be able to take to fulfill the re-

19 quirements of such section 308, and other issues of

20 concern to minority depository institutions.

21         (3) MEMBERSHIP.—

22             (A) IN GENERAL.—Each Minority Deposi-

23 tory Institutions Advisory Committee shall con-

24 sist of no more than 10 members, who—

25                 (i) shall serve for one two-year term;

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003403

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1099

1   (ii) shall serve as a representative of

2   a depository institution or an insured cred-

3   it union with respect to which the respec-

4   tive covered regulator is the covered regu-

5   lator of such depository institution or in-

6   sured credit union; and

7   (iii) shall not receive pay by reason of

8   their service on the advisory committee,

9   but may receive travel or transportation

10   expenses in accordance with section 5703

11   of title 5, United States Code.

12   (B) DIVERSITY.—To the extent prac-

13   ticable, each covered regulator shall ensure that

14   the members of Minority Depository Institu-

15   tions Advisory Committee of such agency reflect

16   the diversity of depository institutions.

17   (4) MEETINGS.—

18   (A) IN GENERAL.—Each Minority Deposi-

19   tory Institutions Advisory Committee shall meet

20   not less frequently than twice each year.

21   (B) INVITATIONS.—Each Minority Deposi-

22   tory Institutions Advisory Committee shall in-

23   vite the attendance at each meeting of the Mi-

24   nority Depository Institutions Advisory Com-

25   mittee of—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003404

1100

             (i) one member of the majority party
and one member of the minority party of
the Committee on Financial Services of the
House of Representatives and the Com-
mittee on Banking, Housing, and Urban
Affairs of the Senate; and

             (ii) one member of the majority party
and one member of the minority party of
any relevant subcommittees of such com-
mittees.

(5) NO TERMINATION OF ADVISORY COMMIT-
TEES.—The termination requirements under section
14 of the Federal Advisory Committee Act (5 U.S.C.
app.) shall not apply to a Minority Depository Insti-
tutions Advisory Committee established pursuant to
this section.

(6) DEFINITIONS.—In this paragraph:

    (A) COVERED REGULATOR.—The term
"covered regulator" means the Comptroller of
the Currency, the Board of Governors of the
Federal Reserve System, the Federal Deposit
Insurance Corporation, and the National Credit
Union Administration.

    (B) COVERED MINORITY INSTITUTION.—
The term "covered minority institution" means

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003405

1101

1    a minority depository institution (as defined in

2    section 308(b) of the Financial Institutions Re-

3    form, Recovery, and Enforcement Act of 1989

4    (12 U.S.C. 1463 note)) or a minority credit

5    union (as defined in section 1204(c) of the Fi-

6    nancial Institutions Reform, Recovery, and En-

7    forcement Act of 1989, as amended by this

8    Act).

9    (C) DEPOSITORY INSTITUTION.—The term

10    ''depository institution'' has the meaning given

11    under section 3 of the Federal Deposit Insur-

12    ance Act (12 U.S.C. 1813).

13    (D) INSURED CREDIT UNION.—The term

14    ''insured credit union'' has the meaning given

15    in section 101 of the Federal Credit Union Act

16    (12 U.S.C. 1752).

17    (7) TECHNICAL AMENDMENT.—Section 308(b)

18    of the Financial Institutions Reform, Recovery, and

19    Enforcement Act of 1989 (12 U.S.C. 1463 note) is

20    amended by adding at the end the following new

21    paragraph:

22    ''(3) DEPOSITORY INSTITUTION.—The term 'de-

23    pository institution' means an 'insured depository in-

24    stitution' (as defined in section 3 of the Federal De-

25    posit Insurance Act (12 U.S.C. 1813)) and an in-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003406

1102

1    sured credit union (as defined in section 101 of the

2    Federal Credit Union Act (12 U.S.C. 1752)).".

3    (g) FEDERAL DEPOSITS IN MINORITY DEPOSITORY

4    INSTITUTIONS.—

5        (1) IN GENERAL.—Section 308 of the Financial

6    Institutions Reform, Recovery, and Enforcement Act

7    of 1989 (12 U.S.C. 1463 note) is amended—

8            (A) by adding at the end the following new

9        subsection:

10   "(d) FEDERAL DEPOSITS.—The Secretary of the

11   Treasury shall ensure that deposits made by Federal agen-

12   cies in minority depository institutions and impact banks

13   are collateralized or insured, as determined by the Sec-

14   retary. Such deposits shall include reciprocal deposits, as

15   defined under section 29(i)(2) of the Federal Deposit In-

16   surance Act (12 U.S.C. 1831f(i)(2)).''; and

17           (B) in subsection (b), as amended by sec-

18        tion 6(g), by adding at the end the following

19        new paragraph:

20       "(4) IMPACT BANK.—The term 'impact bank'

21       means a depository institution designated by an ap-

22       propriate Federal banking agency pursuant to sub-

23       section (e) of the Ensuring Diversity in Community

24       Banking Act of 2020.".

DOC_0003407

1103

1     (2) TECHNICAL AMENDMENTS.—Section 308 of

2     the Financial Institutions Reform, Recovery, and

3     Enforcement Act of 1989 (12 U.S.C. 1463 note) is

4     amended—

5          (A) in the matter preceding paragraph (1),

6          by striking "section—" and inserting "sec-

7          tion:"; and

8          (B) in the paragraph heading for para-

9          graph (1), by striking "FINANCIAL" and insert-

10         ing "DEPOSITORY".

11    (h) MINORITY BANK DEPOSIT PROGRAM.—

12         (1) IN GENERAL.—Section 1204 of the Finan-

13    cial Institutions Reform, Recovery, and Enforcement

14    Act of 1989 (12 U.S.C. 1811 note) is amended to

15    read as follows:

16  **"SEC. 1204. EXPANSION OF USE OF MINORITY BANKS AND**

17                **MINORITY CREDIT UNIONS.**

18    "(a) MINORITY BANK DEPOSIT PROGRAM.—

19         "(1) ESTABLISHMENT.—There is established a

20    program to be known as the 'Minority Bank Deposit

21    Program' to expand the use of minority banks and

22    minority credit unions.

23         "(2) ADMINISTRATION.—The Secretary of the

24    Treasury, acting through the Fiscal Service, shall—

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003408

1104

1       ''(A) on application by a depository institu-

2     tion or credit union, certify whether such depos-

3     itory institution or credit union is a minority

4     bank or minority credit union;

5       ''(B) maintain and publish a list of all de-

6     pository institutions and credit unions that have

7     been certified pursuant to subparagraph (A);

8     and

9       ''(C) periodically distribute the list de-

10     scribed in subparagraph (B) to—

11       ''(i) all Federal departments and

12     agencies;

13       ''(ii) interested State and local govern-

14     ments; and

15       ''(iii) interested private sector compa-

16     nies.

17     ''(3) INCLUSION OF CERTAIN ENTITIES ON

18 LIST.—A depository institution or credit union that,

19 on the date of the enactment of this section, has a

20 current certification from the Secretary of the

21 Treasury stating that such depository institution or

22 credit union is a minority bank or minority credit

23 union shall be included on the list described under

24 paragraph (2)(B).

1105

1  "(b) EXPANDED USE AMONG FEDERAL DEPART-
2  MENTS AND AGENCIES.—

3      "(1) IN GENERAL.—Not later than 1 year after
4  the establishment of the program described in sub-
5  section (a), the head of each Federal department or
6  agency shall develop and implement standards and
7  procedures to ensure, to the maximum extent pos-
8  sible as permitted by law and consistent with prin-
9  ciples of sound financial management, the use of mi-
10  nority banks and minority credit unions to hold the
11  deposits of each such department or agency.

12      "(2) REPORT TO CONGRESS.—Not later than 2
13  years after the establishment of the program de-
14  scribed in subsection (a), and annually thereafter,
15  the head of each Federal department or agency shall
16  submit to Congress a report on the actions taken to
17  increase the use of minority banks and minority
18  credit unions hold the deposits of each such depart-
19  ment or agency.

20  "(c) DEFINITIONS.—For purposes of this section:

21      "(1) CREDIT UNION.—The term 'credit union'
22  has the meaning given the term 'insured credit
23  union' in section 101 of the Federal Credit Union
24  Act (12 U.S.C. 1752).

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003410

1106

1       "(2) DEPOSITORY INSTITUTION.—The term 'de-

2    pository institution' has the meaning given in section

3    3 of the Federal Deposit Insurance Act (12 U.S.C.

4    1813).

5       "(3) MINORITY.—The term 'minority' means

6    any Black American, Native American, Hispanic

7    American, or Asian American.

8       "(4) MINORITY BANK.—The term 'minority

9    bank' means a minority depository institution as de-

10    fined in section 308 of this Act.

11       "(5) MINORITY CREDIT UNION.—The term 'mi-

12    nority credit union' means any credit union for

13    which more than 50 percent of the membership (in-

14    cluding board members) of such credit union are mi-

15    nority individuals, as determined by the National

16    Credit Union Administration pursuant to section

17    308 of this Act.".

18       (2) CONFORMING AMENDMENTS.—The fol-

19    lowing provisions are amended by striking

20    "1204(c)(3)" and inserting "1204(c)":

21       (A) Section 808(b)(3) of the Community

22    Reinvestment Act of 1977 (12 U.S.C.

23    2907(b)(3)).

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003411

1107

1  (B) Section 40(g)(1)(B) of the Federal De-

2  posit Insurance Act (12 U.S.C.

3  1831q(g)(1)(B)).

4  (C) Section 704B(h)(4) of the Equal Cred-

5  it Opportunity Act (15 U.S.C. 1691c–2(h)(4)).

6  (i) DIVERSITY REPORT AND BEST PRACTICES.—

7  (1) ANNUAL REPORT.—Each covered regulator

8  shall submit to Congress an annual report on diver-

9  sity including the following:

10  (A) Data, based on voluntary self-identi-

11  fication, on the racial, ethnic, and gender com-

12  position of the examiners of each covered regu-

13  lator, disaggregated by length of time served as

14  an examiner.

15  (B) The status of any examiners of cov-

16  ered regulators, based on voluntary self-identi-

17  fication, as a veteran.

18  (C) Whether any covered regulator, as of

19  the date on which the report required under

20  this section is submitted, has adopted a policy,

21  plan, or strategy to promote racial, ethnic, and

22  gender diversity among examiners of the cov-

23  ered regulator.

24  (D) Whether any special training is devel-

25  oped and provided for examiners related specifi-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003412

1108

1    cally to working with banks that serve commu-
2    nities that are predominantly minorities, low in-
3    come, or rural, and the key focus of such train-
4    ing.

5    (2) BEST PRACTICES.—Each Office of Minority
6    and Women Inclusion of a covered regulator shall
7    develop, provide to the head of the covered regulator,
8    and make publicly available best practices—

9        (A) for increasing the diversity of can-
10       didates applying for examiner positions, includ-
11       ing through outreach efforts to recruit diverse
12       candidate to apply for entry-level examiner posi-
13       tions; and

14       (B) for retaining and providing fair consid-
15       eration for promotions within the examiner
16       staff for purposes of achieving diversity among
17       examiners.

18   (3) COVERED REGULATOR DEFINED.—In this
19   subsection, the term "covered regulator" means the
20   Comptroller of the Currency, the Board of Gov-
21   ernors of the Federal Reserve System, the Federal
22   Deposit Insurance Corporation, and the National
23   Credit Union Administration.

24   (j) INVESTMENTS IN MINORITY DEPOSITORY INSTI-
25   TUTIONS AND IMPACT BANKS.—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003413

1109

1     (1) CONTROL FOR CERTAIN INSTITUTIONS.—

2 Section 7(j)(8)(B) of the Federal Deposit Insurance

3 Act (12 U.S.C. 1817(j)(8)(B)) is amended to read

4 as follows:

5     "(B) 'control' means the power, directly or indi-

6 rectly—

7         "(i) to direct the management or policies

8 of an insured depository institution; or

9         "(ii)(I) with respect to an insured deposi-

10 tory institution, of a person to vote 25 per cen-

11 tum or more of any class of voting securities of

12 such institution; or

13         "(II) with respect to an insured depository

14 institution that is an impact bank (as des-

15 ignated pursuant to subsection (e) of the En-

16 suring Diversity in Community Banking Act of

17 2020) or a minority depository institution (as

18 defined in section 308(b) of the Financial Insti-

19 tutions Reform, Recovery, and Enforcement Act

20 of 1989), of an individual to vote 30 percent or

21 more of any class of voting securities of such an

22 impact bank or a minority depository institu-

23 tion.".

24     (2) RULEMAKING.—The appropriate Federal

25 banking agency (as defined in section 3 of the Fed-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003414

1110

1     eral Deposit Insurance Act (12 U.S.C. 1813)) shall

2     jointly issue rules for de novo minority depository in-

3     stitutions and de novo impact banks (as designated

4     pursuant to subsection (e)) to allow 3 years to meet

5     the capital requirements otherwise applicable to mi-

6     nority depository institutions and impact banks.

7     (3) REPORT.—Not later than 1 year after the

8     date of the enactment of this Act, the appropriate

9     Federal banking agencies shall jointly submit to

10     Congress a report on—

11         (A) the principal causes for the low num-

12         ber of de novo minority depository institutions

13         during the 10-year period preceding the date of

14         the report;

15         (B) the main challenges to the creation of

16         de novo minority depository institutions and de

17         novo impact banks; and

18         (C) regulatory and legislative consider-

19         ations to promote the establishment of de novo

20         minority depository institutions and de novo im-

21         pact banks.

22     (k) REPORT ON COVERED MENTOR-PROTEGE PRO-

23     GRAMS.—

24     (1) REPORT.—Not later than 6 months after

25     the date of the enactment of this Act and annually

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003415

1111

1 thereafter, the Secretary of the Treasury shall sub-
2 mit to Congress a report on participants in a cov-
3 ered mentor-protege program, including—

4     (A) an analysis of outcomes of such pro-
5 gram;

6     (B) the number of minority depository in-
7 stitutions that are eligible to participate in such
8 program but do not have large financial institu-
9 tion mentors; and

10     (C) recommendations for how to match
11 such minority depository institutions with large
12 financial institution mentors.

13 (2) DEFINITIONS.—In this subsection:

14     (A)   COVERED   MENTOR-PROTEGE   PRO-
15 GRAM.—The term "covered mentor-protege pro-
16 gram" means a mentor-protege program estab-
17 lished by the Secretary of the Treasury pursu-
18 ant to section 45 of the Small Business Act (15
19 U.S.C. 657r).

20     (B) LARGE FINANCIAL INSTITUTION.—The
21 term "large financial institution" means any
22 entity—

23         (i) regulated by the Comptroller of the
24 Currency, the Board of Governors of the
25 Federal Reserve System, the Federal De-

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003416

1112

1 posit Insurance Corporation, or the Na-

2 tional Credit Union Administration; and

3   (ii) that has total consolidated assets

4   greater than or equal to $50,000,000,000.

5 (l) CUSTODIAL DEPOSIT PROGRAM FOR COVERED

6 MINORITY DEPOSITORY INSTITUTIONS AND IMPACT

7 BANKS.—

8  (1) IN GENERAL.—Not later than one year

9 after the date of the enactment of this Act, the Sec-

10 retary of the Treasury shall issue rules establishing

11 a custodial deposit program under which a covered

12 bank may receive deposits from a qualifying account.

13  (2) REQUIREMENTS.—In issuing rules under

14 paragraph (1), the Secretary of the Treasury shall—

15   (A) ensure each covered bank participating

16   in the program established under this sub-

17   section—

18     (i) has appropriate policies relating to

19     management of assets, including measures

20     to ensure the safety and soundness of each

21     such covered bank; and

22     (ii) is compliant with applicable law;

23    and

24   (B) ensure, to the extent practicable that

25   the rules do not conflict with goals described in

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003417

1113

1        section 308(a) of the Financial Institutions Re-

2        form, Recovery, and Enforcement Act of 1989

3        (12 U.S.C. 1463 note).

4        (3) REPORT.—Each quarter, the Secretary of

5 the Treasury shall submit to Congress a report on

6 the implementation of the program established under

7 this subsection including information identifying

8 participating covered banks and the total amount of

9 deposits received by covered banks under the pro-

10 gram.

11        (4) DEFINITIONS.—In this subsection:

12        (A) COVERED BANK.—The term "covered

13        bank" means—

14               (i) a minority depository institution

15               that is well capitalized, as defined by the

16               Federal Deposit Insurance Corporation or

17               the National Credit Union Administration,

18               as appropriate; or

19               (ii) a depository institution designated

20               pursuant to subsection (e) that is well cap-

21               italized, as defined by the Federal Deposit

22               Insurance Corporation.

23        (B) QUALIFYING ACCOUNT.—The term

24        "qualifying account" means any account estab-

DOC_0003418

1114

1    lished in the Department of the Treasury

2    that—

3        (i) is controlled by the Secretary; and

4        (ii) is expected to maintain a balance

5        greater than $200,000,000 for the fol-

6        lowing 24-month period.

7    (m) STREAMLINED COMMUNITY DEVELOPMENT FI-

8    NANCIAL INSTITUTION APPLICATIONS AND REPORTING.—

9        (1) APPLICATION PROCESSES.—Not later than

10    12 months after the date of the enactment of this

11    Act and with respect to any person having assets

12    under $3,000,000,000 that submits an application

13    for deposit insurance with the Federal Deposit In-

14    surance Corporation that could also become a com-

15    munity development financial institution, the Fed-

16    eral Deposit Insurance Corporation, in consultation

17    with the Administrator of the Community Develop-

18    ment Financial Institutions Fund, shall—

19        (A) develop systems and procedures to

20        record necessary information to allow the Ad-

21        ministrator to conduct preliminary analysis for

22        such person to also become a community devel-

23        opment financial institution; and

24        (B) develop procedures to streamline the

25        application and annual certification processes

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003419

1115

1 and to reduce costs for such person to become,

2 and maintain certification as, a community de-

3 velopment financial institution.

4 (2) IMPLEMENTATION REPORT.—Not later than

5 18 months after the date of the enactment of this

6 Act, the Federal Deposit Insurance Corporation

7 shall submit to Congress a report describing the sys-

8 tems and procedures required under paragraph (1).

9 (3) ANNUAL REPORT.—

10 (A) IN GENERAL.—Section 17(a)(1) of the

11 Federal Deposit Insurance Act (12 U.S.C.

12 1827(a)(1)) is amended—

13 (i) in subparagraph (E), by striking

14 "and" at the end;

15 (ii) by redesignating subparagraph

16 (F) as subparagraph (G);

17 (iii) by inserting after subparagraph

18 (E) the following new subparagraph:

19 "(F) applicants for deposit insurance that

20 could also become a community development fi-

21 nancial institution (as defined in section 103 of

22 the Riegle Community Development and Regu-

23 latory Improvement Act of 1994), a minority

24 depository institution (as defined in section 308

25 of the Financial Institutions Reform, Recovery,

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003420

1116

1     and Enforcement Act of 1989), or an impact

2     bank (as designated pursuant to subsection (e)

3     of the Ensuring Diversity in Community Bank-

4     ing Act of 2020); and''.

5         (B) APPLICATION.—The amendment made

6     by this paragraph shall apply with respect to

7     the first report to be submitted after the date

8     that is 2 years after the date of the enactment

9     of this Act.

10  (n) TASK FORCE ON LENDING TO SMALL BUSINESS

11 CONCERNS.—

12     (1) IN GENERAL.—Not later than 6 months

13     after the date of the enactment of this Act, the Ad-

14     ministrator of the Small Business Administration

15     shall establish a task force to examine methods for

16     improving relationships between the Small Business

17     Administration and community development finan-

18     cial institutions, minority depository institutions,

19     and Impact Banks to increase the volume of loans

20     provided by such institutions to small business con-

21     cerns (as defined under section 3 of the Small Busi-

22     ness Act (15 U.S.C. 632)).

23     (2) REPORT TO CONGRESS.—Not later than 18

24     months after the establishment of the task force de-

25     scribed in paragraph (1), the Administrator of the

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003421

1117

1    Small Business Administration shall submit to Con-
2    gress a report on the findings of such task force.

3    (o) ASSISTANCE TO MINORITY DEPOSITORY INSTITU-
4    TIONS AND IMPACT BANKS.—The Secretary of the Treas-
5    ury shall establish a program to provide assistance to a
6    minority depository institution or an impact bank (as des-
7    ignated pursuant to subsection (e)) to support growth and
8    development of such minority depository institutions and
9    impact banks, including by providing assistance with ob-
10   taining or converting a charter, bylaw amendments, field-
11   of-membership expansion requests, and online training
12   and resources.

13   TITLE    VIII—PROVIDING    ASSISTANCE    FOR
14        STATE, TERRITORY, TRIBAL, AND LOCAL
15        GOVERNMENTS

16   **SEC. 110801. EMERGENCY RELIEF FOR STATE, TERRI-**
17        **TORIAL, TRIBAL, AND LOCAL GOVERNMENTS.**

18   (a) PURCHASE OF COVID–19 RELATED MUNICIPAL
19   ISSUANCES.—Section 14(b) of the Federal Reserve Act
20   (12 U.S.C. 355) is amended by adding at the end the fol-
21   lowing new paragraph:

22   "(3) UNUSUAL AND EXIGENT CIRCUMSTANCES.—
23   Under unusual and exigent circumstances, to buy any
24   bills, notes, revenue bonds, and warrants issued by any
25   State, county, district, political subdivision, municipality,

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003422

1118

1 or entity that is a combination of any of the several States,
2 the District of Columbia, or any of the territories and pos-
3 sessions of the United States. In this paragraph, the term
4 'State' means each of the several States, the District of
5 Columbia, each territory and possession of the United
6 States, and each federally recognized Indian Tribe.''.

7 (b) FEDERAL RESERVE AUTHORIZATION TO PUR-
8 CHASE COVID–19 RELATED MUNICIPAL ISSUANCES.—
9 Within 7 days after the date of the enactment of this sub-
10 section, the Board of Governors of the Federal Reserve
11 System shall modify the Municipal Liquidity Facility (es-
12 tablished on April 9, 2020, pursuant to section 13(3) of
13 the Federal Reserve Act (12 U.S.C. 343(3))) to—

14 (1) ensure such facility is operational until De-
15 cember 31, 2021;

16 (2) allow for the purchase of bills, notes, bonds,
17 and warrants with maximum maturity of 10 years
18 from the date of such purchase;

19 (3) ensure that any purchases made are at an
20 interest rate equal to the discount window primary
21 credit interest rate most recently published on the
22 Federal Reserve Statistical Release on selected inter-
23 est rates (daily or weekly), commonly referred to as
24 the ''H.15 release'' or the ''Federal funds rate'';

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003423

1119

1    (4) ensure that an eligible issuer does not need

2    to attest to an inability to secure credit elsewhere;

3    and

4    (5) include in the list of eligible issuers for such

5    purchases—

6        (A) any of the territories and possessions

7        of the United States;

8        (B) a political subdivision of a State with

9        a population of more than 50,000 residents;

10       and

11       (C) an entity that is a combination of any

12       of the several States, the District of Columbia,

13       or any of the territories and possessions of the

14       United States.

**SEC. 110802. COMMUNITY DEVELOPMENT BLOCK GRANTS.**

16   (a) FUNDING AND ALLOCATIONS.—

17   (1) AUTHORIZATION OF APPROPRIATIONS.—

18   There is authorized to be appropriated

19   $5,000,000,000 for assistance in accordance with

20   this section under the community development block

21   grant program under title I of the Housing and

22   Community Development Act of 1974 (42 U.S.C.

23   5301 et seq.), which shall remain available until

24   September 30, 2023.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003424

1120

1  (2) ALLOCATION.—Amounts made available

2 pursuant to paragraph (1) shall be distributed pur-

3 suant to section 106 of such Act (42 U.S.C. 5306)

4 to grantees and such allocations shall be made with-

5 in 30 days after the date of the enactment of this

6 Act.

7 (b) TIME LIMITATION ON EMERGENCY GRANT PAY-

8 MENTS.—Paragraph (4) of section 570.207(b) of the Sec-

9 retary's regulations (24 C.F.R. 570.207(b)(4)) shall be

10 applied with respect to grants with amounts made avail-

11 able pursuant to subsection (a), by substituting "121 con-

12 secutive months" for "3 consecutive months".

13 (c) MATCHING OF AMOUNTS USED FOR ADMINISTRA-

14 TIVE COSTS.—Any requirement for a State to match or

15 supplement amounts expended for program administration

16 of State grants under section 106(d) of the Housing and

17 Community Development Act of 1974 (42 U.S.C.

18 5306(d)) shall not apply with respect to amounts made

19 available pursuant to subsection (a).

20 (d) CAPER INFORMATION.—During the period that

21 begins on the date of enactment of this Act and ends on

22 the date of the termination by the Federal Emergency

23 Management Agency of the emergency declared on March

24 13, 2020, by the President under the Robert T. Stafford

25 Disaster Relief and Emergency Assistance Act (42 U.S.C.

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003425

1121

1 4121 et seq.) relating to the Coronavirus Disease 2019
2 (COVID-19) pandemic, the Secretary shall make all infor-
3 mation included in Consolidated Annual Performance and
4 Evaluation Reports relating to assistance made available
5 pursuant to this section publicly available on its website
6 on a quarterly basis.

7     (e) AUTHORITY; WAIVERS.—Any provisions of, and
8 waivers and alternative requirements issued by the Sec-
9 retary pursuant to, the heading "Department of Housing
10 and Urban Development—Community Planning and De-
11 velopment —Community Development Fund" in title XII
12 of division B of the CARES Act (Public Law 116-136)
13 shall apply with respect to amounts made available pursu-
14 ant to subsection (a) of this section.

15     TITLE IX—PROVIDING OVERSIGHT AND
16         PROTECTING TAXPAYERS

17 **SEC. 110901. MANDATORY REPORTS TO CONGRESS.**

18     (a) DISCLOSURE OF TRANSACTION REPORTS.—Sec-
19 tion 4026(b)(1)(A)(iii) of the CARES Act (Public Law
20 116–136) is amended—

21         (1) in subclause (IV)—

22             (A) by inserting "and the justification for
23         such exercise of authority" after "authority";
24         and

25             (B) by striking "and" at the end;

DOC_0003426

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1122

1    (2) in subclause (V), by striking the period at

2  the end and inserting "; and"; and

3    (3) by adding at the end the following:

4        "(VI) the identity of each recipi-

5        ent of a loan or loan guarantee de-

6        scribed in subclause (I);

7        "(VII) the date and amount of

8        each such loan or loan guarantee and

9        the form in which each such loan or

10        loan guarantee was provided;

11        "(VIII) the material terms of

12        each such loan or loan guarantee, in-

13        cluding—

14            "(aa) duration;

15            "(bb) collateral pledged and

16            the value thereof;

17            "(cc) all interest, fees, and

18            other revenue or items of value to

19            be received in exchange for such

20            loan or loan guarantee;

21            "(dd) any requirements im-

22            posed on the recipient with re-

23            spect to employee compensation,

24            distribution of dividends, or any

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003427

1123

1  other corporate decision in ex-
2  change for the assistance; and

3       ''(ee) the expected costs to
4  the Federal Government with re-
5  spect to such loans or loan guar-
6  antees.''.

7  (b) REPORTS BY THE SECRETARY OF THE TREAS-
8  URY.—Section 4018 of the CARES Act (Public Law 116–
9  136) is amended by adding at the end the following:

10  ''(k) REPORTS BY THE SECRETARY.—Not later than
11  7 days after the last day of each month, the Secretary
12  shall submit to the Special Inspector General, the Com-
13  mittee on Financial Services of the House of Representa-
14  tives, and the Committee on Banking, Housing, and
15  Urban Affairs of the Senate a report that includes the in-
16  formation specified in subparagraphs (A) through (E) of
17  subsection (e)(1) with respect to the making, purchase,
18  management, and sale of loans, loan guarantees, and other
19  investments made by the Secretary under any program es-
20  tablished by the Secretary under this Act.''.

21  **SEC. 110902. DISCRETIONARY REPORTS TO CONGRESS.**

22  Section 4020(b) of the CARES Act (Public Law 116–
23  136) is amended by adding at the end the following:

24       ''(3) DISCRETIONARY REPORTS TO CON-
25  GRESS.—In addition to the reports required under

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003428

1124

1     paragraph (2), the Oversight Commission may sub-

2     mit other reports to Congress at such time, in such

3     manner, and containing such information as the

4     Oversight Commission determines appropriate.''.

**SEC. 110903. DEFINITION OF APPROPRIATE CONGRES-**
5

**SIONAL COMMITTEES.**
6

7     (a) PANDEMIC RESPONSE ACCOUNTABILITY COM-

8 MITTEE.—Section 15010(a)(2) of the CARES Act (Public

9 Law 116–136) is amended—

10     (1) by redesignating subparagraphs (B)

11     through (D) as subparagraphs (D) through (F), re-

12     spectively; and

13     (2) by inserting after subparagraph (A) the fol-

14     lowing:

15         ''(B) the Committee on Banking, Housing,

16         and Urban Affairs of the Senate;

17         ''(C) the Committee on Financial Services

18         of the House of Representatives;''.

19     (b) OVERSIGHT AND AUDIT AUTHORITY.—Section

20 19010(a)(1) of the CARES Act (Public Law 116–136) is

21 amended—

22     (1) by redesignating subparagraphs (B)

23     through (G) as subparagraphs (D) through (I), re-

24     spectively; and

1125

1 (2) by inserting after subparagraph (A) the fol-

2 lowing:

3   ''(B) the Committee on Banking, Housing,

4   and Urban Affairs of the Senate;

5   ''(C) the Committee on Financial Services

6   of the House of Representatives;''.

7 **SEC. 110904. REPORTING BY INSPECTORS GENERAL.**

8 (a) DEFINITION OF COVERED AGENCY.—In this sec-

9 tion, the term ''covered agency'' means—

10  (1) the Department of the Treasury;

11  (2) the Federal Deposit Insurance Corporation;

12  (3) the Office of the Comptroller of the Cur-

13 rency;

14  (4) the Board of Governors of the Federal Re-

15 serve System;

16  (5) the National Credit Union Administration;

17  (6) the Bureau of Consumer Financial Protec-

18 tion;

19  (7) the Department of Housing and Urban De-

20 velopment;

21  (8) the Department of Agriculture, Rural Hous-

22 ing Service;

23  (9) the Securities and Exchange Commission;

24 and

25  (10) the Federal Housing Finance Agency.

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003430

1126

1    (b) REPORT.—The Inspector General of each covered

2  agency shall include in each semiannual report submitted

3  by the Inspector General the findings of the Inspector

4  General on the effectiveness of—

5        (1) rulemaking by the covered agency related to

6        COVID–19; and

7        (2) supervision and oversight by the covered

8        agency of institutions and entities that participate in

9        COVID–19-related relief, funding, lending, or other

10       programs of the covered agency.

11  (c) SUBMISSION.—The Inspector General of each cov-

12  ered agency shall submit the information required to be

13  included in each semiannual report under subsection (b)

14  to—

15       (1) the Special Inspector General for Pandemic

16       Recovery appointed under section 4018 of division A

17       of the CARES Act (Public Law 116–136);

18       (2) the Pandemic Response Accountability

19       Committee established under section 15010 of divi-

20       sion B of the CARES Act (Public Law 116–136);

21       and

22       (3) the Congressional Oversight Commission es-

23       tablished under section 4020 of division A of the

24       CARES Act (Public Law 116–136).

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003431

1127

# DIVISION L—FAMILIES, WORK-ERS, AND COMMUNITY SUP-PORT PROVISIONS

# TITLE I—AMENDMENTS TO EMERGENCY FAMILY AND MEDICAL LEAVE EXPANSION ACT AND EMERGENCY PAID SICK LEAVE ACT

## Subtitle A—Emergency Family and Medical Leave Expansion Act Amendments

**SEC. 120101. REFERENCES.**

Except as otherwise expressly provided, whenever in this subtitle an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Family and Medical Leave Act of 1993 (29 U.S.C. 2601 et seq.), as amended by the Emergency Family and Medical Leave Expansion Act (Public Law 116–127).

**SEC. 120102. EMPLOYEE ELIGIBILITY AND EMPLOYER CLARIFICATION.**

(a) EMPLOYEE ELIGIBILITY.—Section 101(2) is amended by adding at the end the following:

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003432

1128

1        "(F) ALTERNATIVE ELIGIBILITY FOR

2        COVID–19 PUBLIC HEALTH EMERGENCY .—For

3        the period beginning on the date of enactment

4        of the HEROES Act and ending on December

5        31, 2022—

6            "(i) subparagraph (A)(i) shall be ap-

7            plied by substituting '90 days' for '12

8            months'; and

9            "(ii) subparagraph (A)(ii) shall not

10            apply.".

11    (b) EMPLOYER CLARIFICATION.—Section 101(4) is

12 amended by adding at the end the following:

13        "(C)     CLARIFICATION.—Subparagraph

14        (A)(i) shall not apply with respect to a public

15        agency described in subparagraph (A)(iii).".

16 **SEC. 120103. EMERGENCY LEAVE EXTENSION.**

17    Section 102(a)(1)(F) is amended by striking "De-

18 cember 31, 2020" and inserting "December 31, 2021".

19 **SEC. 120104. EMERGENCY LEAVE DEFINITIONS.**

20    (a) ELIGIBLE EMPLOYEE.—Section 110(a)(1) is

21 amended in subparagraph (A), by striking "sections

22 101(2)(A) and 101(2)(B)(ii)" and inserting "section

23 101(2)".

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003433

1129

1    (b) EMPLOYER THRESHOLD.—Section 110(a)(1)(B)

2 is amended by striking "fewer than 500 employees" and

3 inserting "1 or more employees".

4    (c) PARENT.—Section 110(a)(1) is amended by add-

5 ing at the end the following:

6            "(C) PARENT.—In lieu of the definition in

7        section 101(7), the term 'parent', with respect

8        to an employee, means any of the following:

9                "(i) A biological, foster, or adoptive

10            parent of the employee.

11                "(ii) A stepparent of the employee.

12                "(iii) A parent-in-law of the employee.

13                "(iv) A parent of a domestic partner

14            of the employee.

15                "(v) A legal guardian or other person

16            who stood in loco parentis to an employee

17            when the employee was a child.".

18    (d) QUALIFYING NEED RELATED TO A PUBLIC

19 HEALTH EMERGENCY.—Section 110(a)(2)(A) is amended

20 to read as follows:

21            "(A) QUALIFYING NEED RELATED TO A

22        PUBLIC   HEALTH   EMERGENCY.—The   term

23        'qualifying need related to a public health emer-

24        gency', with respect to leave, means that the

25        employee is unable to perform the functions of

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003434

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1130

1    the position of such employee due to a need for

2    leave for any of the following:

3          ''(i) To self-isolate because the em-

4          ployee is diagnosed with COVID–19.

5          ''(ii) To obtain a medical diagnosis or

6          care if such employee is experiencing the

7          symptoms of COVID–19.

8          ''(iii) To comply with a recommenda-

9          tion or order by a public official with juris-

10          diction or a health care provider to self iso-

11          late, without regard to whether such rec-

12          ommendation or order is specific to the

13          employee, on the basis that the physical

14          presence of the employee on the job would

15          jeopardize the employee's health, the

16          health of other employees, or the health of

17          an individual in the household of the em-

18          ployee because of—

19              ''(I) the possible exposure of the

20              employee to COVID–19; or

21              ''(II) exhibition of symptoms of

22              COVID–19 by the employee.

23          ''(iv) To care for or assist a family

24          member of the employee, without regard to

25          whether another individual other than the

DOC_0003435

1131

1 employee is available to care for or assist

2 such family member, because—

3  ''(I) such family member—

4   ''(aa) is self-isolating be-

5   cause such family member has

6   been diagnosed with COVID–19;

7   or

8   ''(bb) is experiencing symp-

9   toms of COVID–19 and needs to

10   obtain medical diagnosis or care;

11   or

12  ''(II) a public official with juris-

13  diction or a health care provider

14  makes a recommendation or order

15  with respect to such family member,

16  without regard to whether such deter-

17  mination is specific to such family

18  member, that the presence of the fam-

19  ily member in the community would

20  jeopardize the health of other individ-

21  uals in the community because of—

22   ''(aa) the possible exposure

23   of such family member to

24   COVID–19; or

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003436

1132

1          "(bb) exhibition of symp-
2              toms of COVID–19 by such fam-
3              ily member.

4          "(v) To care for the son or daughter
5      of such employee if the school or place of
6      care has been closed, or the child care pro-
7      vider of such son or daughter is unavail-
8      able, due to COVID–19.

9          "(vi) To care for a family member
10     who is incapable of self-care because of a
11     mental or physical disability or is a senior
12     citizen, without regard to whether another
13     individual other than the employee is avail-
14     able to care for such family member, if the
15     place of care for such family member is
16     closed or the direct care provider is un-
17     available due to COVID–19.".

18     (e) FAMILY MEMBER.—Section 110(a)(2) is amended
19 by adding at the end the following:

20          "(E) FAMILY MEMBER.—The term 'family
21     member', with respect to an employee, means
22     any of the following:

23          "(i) A parent of the employee.
24          "(ii) A spouse of the employee.
25          "(iii) A sibling of the employee.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003437

1133

1       "(iv) Next of kin of the employee or

2    a person for whom the employee is next of

3    kin.

4       "(v) A son or daughter of the em-

5    ployee.

6       "(vi) A grandparent or grandchild of

7    the employee.

8       "(vii) A domestic partner of the em-

9    ployee.

10       "(viii) Any other individual related by

11    blood or affinity whose close association

12    with the employee is the equivalent of a

13    family relationship.

14    "(F) DOMESTIC PARTNER.—

15       "(i) IN GENERAL.—The term 'domes-

16    tic partner', with respect to an individual,

17    means another individual with whom the

18    individual is in a committed relationship.

19       "(ii) COMMITTED RELATIONSHIP DE-

20    FINED.—The term 'committed relationship'

21    means a relationship between 2 individuals,

22    each at least 18 years of age, in which

23    each individual is the other individual's

24    sole domestic partner and both individuals

25    share responsibility for a significant meas-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003438

1134

1       ure of each other's common welfare. The

2       term includes any such relationship be-

3       tween 2 individuals that is granted legal

4       recognition by a State or political subdivi-

5       sion of a State as a marriage or analogous

6       relationship, including a civil union or do-

7       mestic partnership.''.

8 **SEC. 120105. REGULATORY AUTHORITIES.**

9     (a) IN GENERAL.—Section 110(a) is amended by

10 striking paragraph (3).

11     (b) FORCE OR EFFECT OF REGULATIONS.—Any reg-

12 ulation issued under section 110(a)(3), as in effect on the

13 day before the date of the enactment of this Act, shall

14 have no force or effect.

15 **SEC. 120106. PAID LEAVE.**

16     Section 110(b) of the Family and Medical Leave Act

17 of 1993 is amended—

18       (1) in the heading, by striking ''Relationship

19     to'';

20       (2) by amending paragraph (1) to read as fol-

21     lows:

22       ''(1) EMPLOYEE ELECTION.—

23          ''(A) IN GENERAL.—An employee may

24          elect to substitute any vacation leave, personal

25          leave, or medical or sick leave for paid leave

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003439

1135

1 under section 102(a)(1)(F) in accordance with
2 section 102(d)(2)(B).

3     "(B) EMPLOYER REQUIREMENT.—An em-
4 ployer may not require an employee to sub-
5 stitute any leave described in subparagraph (A)
6 for leave under section 102(a)(1)(F).

7     "(C) RELATIONSHIP TO OTHER FAMILY
8 AND MEDICAL LEAVE.—Leave taken under sub-
9 paragraph (F) of section 102(a)(1) shall not
10 count towards the 12 weeks of leave to which
11 an employee is entitled under subparagraphs
12 (A) through (E) of such section.

13     "(D) RELATIONSHIP TO LIMITATION.—
14 Compensation for any vacation leave, personal
15 leave, or medical or sick leave that is sub-
16 stituted for leave under section 102(a)(1)(F)
17 shall not count toward the limitation under
18 paragraph (2)(B)(ii)."; and

19     (3) in paragraph (2)(A), by striking "that an
20 employee takes" and all that follows through "10
21 days".

22 **SEC. 120107. WAGE RATE.**

23     Section 110(b)(2)(B) is amended—

24     (1) by amending clause (i)(I) to read as follows:

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003440

1136

1                                                   "(I) an amount that is not less

2 than the greater of—

3 "(aa) the minimum wage

4 rate in effect under section

5 6(a)(1) of the Fair Labor Stand-

6 ards Act of 1938 (29 U.S.C.

7 206(a)(1));

8 "(bb) the minimum wage

9 rate in effect for such employee

10 in the applicable State or locality,

11 whichever is greater, in which the

12 employee is employed; or

13 "(cc) two thirds of an em-

14 ployee's regular rate of pay (as

15 determined under section 7(e) of

16 the Fair Labor Standards Act of

17 1938 (29 U.S.C. 207(e)); and"; and

18 and

19 (2) in clause (ii), by striking "$10,000" and in-

20 serting "$12,000".

**SEC. 120108. NOTICE.**

22 Section 110(c) is amended by striking "for the pur-

23 pose described in subsection (a)(2)(A)".

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003441

1 **SEC. 120109. INTERMITTENT LEAVE.**

2    Section 110 is amended by adding at the end the fol-

3 lowing:

4    "(e) LEAVE TAKEN INTERMITTENTLY OR ON A RE-

5 DUCED WORK SCHEDULE.—Leave under section

6 102(a)(1)(F) may be taken by an employee intermittently

7 or on a reduced work schedule, without regard to whether

8 the employee and the employer of the employee have an

9 agreement with respect to whether such leave may be

10 taken intermittently or on a reduced work schedule.".

11 **SEC. 120110. CERTIFICATION.**

12    Section 110 is further amended by adding at the end

13 the following:

14    "(f) CERTIFICATION.—

15       "(1) IN GENERAL.—If an employer requires

16    that a request for leave under section 102(a)(1)(F)

17    be certified, the employer may require documenta-

18    tion for certification not earlier than 5 weeks after

19    the date on which the employee takes such leave.

20       "(2) SUFFICIENT CERTIFICATION.—The fol-

21    lowing documentation shall be sufficient for certifi-

22    cation:

23          "(A) With respect to leave taken for the

24       purposes described in clauses (i) through (iv) of

25       subsection (a)(2)(A)—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003442

1138

1             "(i) a recommendation or order from

2         a public official having jurisdiction or a

3         health care provider that the employee or

4         relevant family member has symptoms of

5         COVID–19 or should self-isolate; or

6             "(ii) documentation or evidence, in-

7         cluding an oral or written statement from

8         an employee, that the employee or relevant

9         family member has been exposed to

10         COVID–19.

11     "(B) With respect to leave taken for the

12 purposes described in clause (v) or (vi) of sub-

13 section (a)(2)(A), notice from the school, place

14 of care, or child care or direct care provider of

15 the son or daughter or other family member of

16 the employee of closure or unavailability.".

17 **SEC. 120111. AUTHORITY OF THE DIRECTOR OF THE OF-**

18            **FICE OF MANAGEMENT AND BUDGET TO EX-**

19            **CLUDE CERTAIN EMPLOYEES.**

20     Section 110(a) is amended by striking paragraph (4).

21 **SEC. 120112. TECHNICAL AMENDMENTS.**

22     (a) Section 110(a)(1)(A) is amended by striking

23 "(ii)" before "SPECIAL RULE" and inserting "(iii)".

24     (b) Section 19008 of the CARES Act is amended—

25         (1) by striking "—" after "amended";

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003443

1139

1    (2) by striking paragraph (1); and

2    (3) by striking "(2)" before "by adding at the

3  end".

### SEC. 120113. AMENDMENTS TO THE EMERGENCY FAMILY AND MEDICAL LEAVE EXPANSION ACT.

6    The Emergency Family and Medical Leave Expan-

7  sion Act (Public Law 116–127) is amended—

8        (1) in section 3103(b), by striking "Employees"

9    and    inserting,    "Notwithstanding    section

10    102(a)(1)(A) of the Family and Medical Leave Act

11    of 1993 (29 U.S.C. 2612(a)(1)(A)), employees"; and

12        (2) by striking sections 3104 and 3105.

# Subtitle B—Emergency Paid Sick Leave Act Amendments

### SEC. 120114. REFERENCES.

16    Except as otherwise expressly provided, whenever in

17  this subtitle an amendment or repeal is expressed in terms

18  of an amendment to, or repeal of, a section or other provi-

19  sion, the reference shall be considered to be made to a

20  section or other provision of division E of the Families

21  First Coronavirus Response Act (Public Law 116–127).

### SEC. 120115. PAID SICK TIME REQUIREMENT.

23    (a) USES.—Section 5102(a) is amended to read as

24  follows:

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003444

1140

1    "(a) IN GENERAL.—An employer shall provide to

2 each employee employed by the employer paid sick time

3 for any qualifying need related to a public health emer-

4 gency (as defined in section 110(a)(2)(A) of the Family

5 and   Medical   Leave   Act   of   1993   (29   U.S.C.

6 2620(a)(2)(A)).".

7    (b) RECURRENCE.—Section 5102(b) is amended by

8 striking "An" and inserting "During any 12-month pe-

9 riod, an".

10    (c) EMPLOYERS WITH EXISTING POLICIES.—Section

11 5102 is amended by striking subsection (f) and inserting

12 the following:

13    "(f) EMPLOYERS WITH EXISTING POLICIES.—With

14 respect to an employer that provides paid leave on the day

15 before the date of enactment of this Act—

16        "(1) the paid sick time under this Act shall be

17    made available to employees of the employer in addi-

18    tion to such paid leave; and

19        "(2) the employer may not change such paid

20    leave on or after such date of enactment to avoid

21    being subject to paragraph (1).".

22    (d) INTERMITTENT LEAVE.—Section 5102 is further

23 amended by adding at the end the following:

24    "(g) LEAVE TAKEN INTERMITTENTLY OR ON A RE-

25 DUCED WORK SCHEDULE.—Leave under section 5102

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003445

1141

1 may be taken by an employee intermittently or on a re-
2 duced work schedule, without regard to whether the em-
3 ployee and the employer of the employee have an agree-
4 ment with respect to whether such leave may be taken
5 intermittently or on a reduced work schedule.''.

6 (e) CERTIFICATION.—Section 5102 is further amend-
7 ed by adding at the end the following:

8 ''(h) CERTIFICATION.—If an employer requires that
9 a request for paid sick time under this section be cer-
10 tified—

11 ''(1) the documentation described in paragraph
12 (2) of section 110(f) of the Family and Medical
13 Leave Act of 1993 (29 U.S.C. 2620(f)) shall be suf-
14 ficient for certification; and

15 ''(2) an employer may not require such certifi-
16 cation unless—

17 ''(A) the employee takes not less than 3
18 consecutive days of paid sick time; and

19 ''(B) the employer requires documents for
20 such certification not earlier than 7 workdays
21 after the employee returns to work after such
22 paid sick time.''.

23 (f) NOTICE.—Section 5102 is further amended by
24 adding at the end the following:

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003446

1142

1     "(i) NOTICE.—In any case where the necessity for

2  leave under this section is foreseeable, an employee shall

3  provide the employer with such notice of leave as is prac-

4  ticable.".

5     (g) LEAVE TRANSFER TO NEW EMPLOYER.—Section

6  5102 is further amended by adding at the end the fol-

7  lowing:

8     "(j) LEAVE TRANSFER TO NEW EMPLOYER.—A cov-

9  ered employee who begins employment with a new covered

10  employer shall be entitled to the full amount of leave under

11  section 5102 with respect to such employer.".

12     (h) RESTORATION TO POSITION.—

13         (1) IN GENERAL.—Section 5102 is further

14     amended by adding at the end the following:

15     "(k) RESTORATION TO POSITION.—Any covered em-

16  ployee who takes paid sick time under this section, on re-

17  turn from such paid sick time, shall be entitled—

18         "(1) to be restored by the employer to the posi-

19     tion of employment held by the employee when the

20     leave commenced; or

21         "(2) if such position is not available, to be re-

22     stored to an equivalent position with equivalent em-

23     ployment benefits, pay, and other terms and condi-

24     tions of employment.".

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003447

1143

1    (2) ENFORCEMENT.—Section 5105 is amend-
2    ed—

3        (A) by amending subsection (a) to read as
4        follows:

5    "(a) UNPAID SICK LEAVE.—Subject to subsection
6    (b), a violation of section 5102 shall be deemed a violation
7    of section 7 of the Fair Labor Standards Act of 1938 (29
8    U.S.C. 207) and unpaid amounts shall be treated as un-
9    paid overtime compensation under such section for the
10   purposes of sections 15 and 16 of such Act (29 U.S.C.
11   215 and 216).''; and

12       (B) in subsection (b), by inserting "section
13       5102(k) or'' before "section 5104''.

14   **SEC. 120116. SUNSET.**

15   Section 5109 is amended by striking "December 31,
16   2020'' and inserting "December 31, 2021''.

17   **SEC. 120117. DEFINITIONS.**

18   (a) EMPLOYER.—Section 5110(2)(B) is amended—

19       (1) by striking "terms'' and inserting "term'';

20       (2) by amending subclause (I) of clause (i) to
21   read as follows:

22           "(I) means any person engaged
23           in commerce or in any industry or ac-
24           tivity affecting commerce that employs
25           1 or more employees;''; and

DOC_0003448

1144

1  (3) by amending clause (ii) to read as follows:

2  "(ii) PUBLIC AGENCY AND NON-PROF-

3  IT ORGANIZATIONS.—For purposes of

4  clause (i)(III) and (i)(I), a public agency

5  and a nonprofit organization shall be con-

6  sidered to be a person engaged in com-

7  merce or in an industry or activity affect-

8  ing commerce.".

9  (b) FMLA TERMS.—Section 5110(4) is amended to

10  read as follows:

11  "(4) FMLA TERMS.—

12  "(A) SECTION 101.—The terms 'health

13  care provider', 'next of kin', 'son or daughter',

14  and 'spouse' have the meanings given such

15  terms in section 101 of the Family and Medical

16  Leave Act of 1993 (29 U.S.C. 2611).

17  "(B) SECTION 110.—The terms 'child care

18  provider', 'domestic partner', 'family member',

19  'parent', and 'school' have the meanings given

20  such terms in section 110(a)(2) of the Family

21  and Medical and Leave Act of 1993.".

22  (c) PAID SICK TIME.—Section 5110(5) is amended—

23  (1) in subparagraph (A)—

24  (A) in clause (i), by striking "reason de-

25  scribed in any paragraph of section 2(a)" and

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003449

1145

1    inserting "qualifying need related to a public

2    health emergency"; and

3        (B) in clause (ii), by striking "exceed" and

4    all that follows and inserting "exceed $511 per

5    day and $5,110 in the aggregate.";

6    (2) in subparagraph (B)—

7        (A) by striking the following:

8        "(B) REQUIRED COMPENSATION.—

9            "(i) IN GENERAL.—Subject to sub-

10           paragraph (A)(ii),"; and inserting the fol-

11           lowing:

12       "(B) REQUIRED COMPENSATION.—Subject

13       to subparagraph (A)(ii),"; and

14       (B) by striking clause (ii); and

15   (3) in subparagraph (C), by striking " section

16   2(a)" and inserting "section 5102(a)".

17   (d) QUALIFYING NEED RELATED TO A PUBLIC

18   HEALTH EMERGENCY.—Section 5110 is amended by add-

19   ing at the end the following:

20       "(1) QUALIFYING NEED RELATED TO A PUBLIC

21       HEALTH EMERGENCY.—The term 'qualifying need

22       related to a public health emergency' has the mean-

23       ing given such term in section 110(a)(2)(A) of the

24       Family and Medical Leave Act of 1993 (29 U.S.C.

25       2620(a)(2)(A)).".

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003450

1146

1  SEC. 120118. EMERGENCY PAID SICK LEAVE FOR EMPLOY-

2          EES OF THE DEPARTMENT OF VETERANS AF-

3          FAIRS AND THE TRANSPORTATION SECURITY

4          ADMINISTRATION FOR PURPOSES RELATING

5          TO COVID–19.

6      Section 5110(1) is further amended—

7          (1) in subparagraph (E) by striking ''or'' after

8      ''Code;'';

9          (2) by redesignating subparagraph (F) as sub-

10     paragraph (H); and

11         (3) by inserting after subparagraph (E) the fol-

12     lowing:

13             ''(F) notwithstanding sections 7421(a) or

14         7425(b) of title 38, United States Code, or any

15         other provision of law, an employee of the De-

16         partment of Veterans Affairs (including employ-

17         ees under chapter 74 of such title);

18             ''(G) any employee of the Transportation

19         Security Administration, including an employee

20         under 111(d) of the Aviation and Transpor-

21         tation Security Act (49 U.S.C. 44935 note);

22         or''.

23  SEC. 120119. AUTHORITY OF THE DIRECTOR OF THE OF-

24          FICE OF MANAGEMENT AND BUDGET TO EX-

25          CLUDE CERTAIN EMPLOYEES.

26     Division E is amended by striking section 5112.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003451

1147

SEC. 120120. REGULATORY AUTHORITIES.

1. 
2.     (a) In General.—Division E is amended by striking
3. section 5111.

4.     (b) Force or Effect of Regulations.—Any reg-
5. ulation issued under section 5111 of division E of the
6. Families First Coronavirus Response Act (Public Law
7. 116–127), as in effect on the day before the date of the
8. enactment of this Act, shall have no force or effect.

# TITLE II—COVID–19 WORKFORCE DEVELOPMENT RESPONSE ACTIVITIES

SEC. 120201. DEFINITIONS AND SPECIAL RULE.

13.     (a) Definitions.—

14.         (1) In general.—Except as otherwise pro-
15.     vided, the terms in this title have the meanings
16.     given the terms in section 3 of the Workforce Inno-
17.     vation and Opportunity Act (29 U.S.C. 3102).

18.         (2) Apprenticeship; apprenticeship pro-
19.     gram.—The terms "apprenticeship" or "apprentice-
20.     ship program" mean an apprenticeship program reg-
21.     istered under the Act of August 16, 1937 (commonly
22.     known as the "National Apprenticeship Act") (50
23.     Stat. 664, chapter 663; 29 U.S.C. 50 et seq.), in-
24.     cluding any requirement, standard, or rule promul-
25.     gated under such Act, as such requirement, stand-
26.     ard, or rule was in effect on December 30, 2019.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003452

1148

1     (3) CORONAVIRUS.—The term "coronavirus"

2 means coronavirus as defined in section 506 of the

3 Coronavirus Preparedness and Response Supple-

4 mental Appropriations Act, 2020 (Public Law 116–

5 123).

6     (4) COVID–19 NATIONAL EMERGENCY.—The

7 term "COVID–19 national emergency" means the

8 national emergency declared by the President under

9 the National Emergencies Act (50 U.S.C. 1601 et

10 seq.) on March 13, 2020, with respect to the

11 coronavirus.

12     (5) SECRETARY.—The term "Secretary" means

13 the Secretary of Labor.

14 (b) SPECIAL RULE.—For purposes of this Act, in fis-

15 cal years 2020 and 2021, funds are authorized to be ap-

16 propriated for activities under the Workforce Innovation

17 and Opportunity Act, except that funds are only author-

18 ized to support apprenticeship programs as defined under

19 subsection (a)(2) of this section, including any funds

20 awarded for the purposes of grants, contracts, or coopera-

21 tive agreements, or the development, implementation, or

22 administration, of an apprenticeship or an apprenticeship

23 program.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003453

1149

1 **SEC. 120202. JOB CORPS RESPONSE TO THE COVID–19 NA-**
2        **TIONAL EMERGENCY.**

3     In order to provide for the successful continuity of

4 services and enrollment periods during the COVID–19 na-

5 tional emergency, additional flexibility shall be provided

6 for Job Corps operators, providers of eligible activities,

7 and practitioners, including the following:

8     (1) ELIGIBILITY.—Notwithstanding the age re-

9     quirements for enrollment under section 144(a)(1)

10     of the Workforce Innovation and Opportunity Act

11     (29 U.S.C. 3194(a)(1)), an individual seeking to en-

12     roll in Job Corps and who turns 25 during the

13     COVID–19 national emergency is eligible for such

14     enrollment.

15     (2) ENROLLMENT LENGTH.—Notwithstanding

16     section 146(b) of the Workforce Innovation and Op-

17     portunity Act (29 U.S.C. 3196(b)), an individual en-

18     rolled in Job Corps during the COVID–19 national

19     emergency may extend their period of enrollment for

20     more than 2 years as long as such extension does

21     not exceed a 2-year, continuous period of enrollment

22     after the COVID–19 national emergency.

23     (3) ADVANCED CAREER TRAINING PROGRAMS.—

24     Notwithstanding paragraph (2), with respect to ad-

25     vanced career training programs under section

26     148(c) of the Workforce Innovation and Opportunity

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003454

1150

1 Act (29 U.S.C. 3198(c)) in which the enrollees may
2 continue to participate for a period not to exceed 1
3 year in addition to the period of participation to
4 which the enrollees would otherwise be limited, the
5 COVID–19 national emergency shall not be consid-
6 ered as any portion of such additional 1-year partici-
7 pation period.

8 (4) COUNSELING, JOB PLACEMENT, AND AS-
9 SESSMENT.—The counseling, job placement, and as-
10 sessment services described in section 149 of the
11 Workforce Innovation and Opportunity Act (29
12 U.S.C. 3199) shall be available to former enrollees—

13 (A) whose enrollment was interrupted due
14 to the COVID–19 national emergency;

15 (B) who graduated from Job Corps on or
16 after January 1, 2020; or

17 (C) who graduated from Job Corps not
18 later than 3 months after the COVID–19 na-
19 tional emergency.

20 (5) SUPPORT.—The Secretary shall provide ad-
21 ditional support for the transition periods described
22 in section 150 of the Workforce Innovation and Op-
23 portunity Act (29 U.S.C. 3200), including the fol-
24 lowing:

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003455

1151

1    (A) TRANSITION ALLOWANCES.—The Sec-
2    retary shall provide, subject to the availability
3    of appropriations, for the provision of additional
4    transition allowances as described in subsection
5    (b) of such section 150 (29 U.S.C. 3200) for
6    Job Corps students who graduate during the
7    periods described in subparagraph (B) or (C) of
8    paragraph (4) of this paragraph.

9    (B) TRANSITION SUPPORT.—The Secretary
10   shall consider the period during the COVID–19
11   national emergency and the three month period
12   following the conclusion of the COVID–19 na-
13   tional emergency as the period in which the
14   provision of employment services as described in
15   subsection (c) of such section 150 (29 U.S.C.
16   3200) shall be provided to graduates who have
17   graduated in 2020.

18 **SEC. 120203. NATIVE AMERICAN PROGRAMS RESPONDING**
19           **TO THE COVID–19 NATIONAL EMERGENCY.**

20   As a result of challenges faced by the COVID–19 na-
21 tional emergency, the Secretary may extend, by 1 fiscal
22 year, the 4-year period for grants, contracts, and coopera-
23 tive agreements that will be awarded in fiscal year 2021
24 under subsection (c) of section 166 of the Workforce Inno-
25 vation and Opportunity Act (29 U.S.C. 3221) for funds

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003456

1152

1 under such grants, contracts, and cooperative agreements
2 to be used to carry out the activities described in sub-
3 section (d) of such section through fiscal year 2025.

**SEC. 120204. MIGRANT AND SEASONAL FARMWORKER PRO-**
**GRAM RESPONSE.**

6    (a) COMPETITIVE GRANT AWARDS.—As a result of
7 challenges faced by the COVID–19 national emergency,
8 the Secretary may extend, by 1 fiscal year, the 4-year pe-
9 riod for grants and contracts that will be awarded in fiscal
10 year 2021 under subsection (a) of section 167 of the
11 Workforce Innovation and Opportunity Act (29 U.S.C.
12 3222) for funds under such grants and contracts to be
13 used to carry out the activities described in subsection (d)
14 of such section through fiscal year 2025.

15    (b) ELIGIBLE MIGRANT AND SEASONAL FARM-
16 WORKER.—Notwithstanding the definition of "eligible sea-
17 sonal farmworker" in section 167(i)(3) of the Workforce
18 Innovation and Opportunity Act (29 U.S.C. 3222(i)(3)),
19 an individual seeking to enroll in a program funded under
20 section 167 of the Workforce Innovation and Opportunity
21 Act (29 U.S.C. 3222) during the COVID–19 national
22 emergency is eligible for such enrollment if such individual
23 is a member of a family with a total family income equal
24 to or less than 150 percent of the poverty line.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003457

1153

## SEC. 120205. YOUTHBUILD ACTIVITIES RESPONDING TO THE COVID–19 NATIONAL EMERGENCY.

During the COVID–19 national emergency, the Secretary shall provide for flexibility for YouthBuild participants and entities carrying out YouthBuild programs, including the following:

(1) ELIGIBILITY.— Notwithstanding the age requirements for enrollment under section 171(e)(1)(A)(i) of the Workforce Innovation and Opportunity Act (29 U.S.C. 3226(e)(1)(A)(i)), an individual seeking to participate in a YouthBuild program and who turns 25 during the COVID–19 national emergency is eligible for such participation.

(2) PARTICIPATION LENGTH.—Notwithstanding section 171(e)(2) of the Workforce Innovation and Opportunity Act (29 U.S.C. 3226(e)(2)), the period of participation in a YouthBuild program may extend beyond 24 months for an individual participating in such program during the COVID–19 national emergency, as long as such extension does not exceed a 24 month, continuous period of enrollment after the COVID–19 national emergency.

## SEC. 120206. APPRENTICESHIP SUPPORT DURING THE COVID–19 NATIONAL EMERGENCY.

Not later than 30 days after the date of enactment of this Act, the Secretary shall identify and disseminate

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003458

1154

1 strategies and tools to support virtual and online learning

2 and training in apprenticeship programs.

# TITLE III—COVID–19 EVERY WORKER PROTECTION ACT OF 2020

**SEC. 120301. SHORT TITLE.**

7 This title may be cited as the "COVID–19 Every

8 Worker Protection Act of 2020".

**SEC. 120302. EMERGENCY TEMPORARY AND PERMANENT STANDARDS.**

11 (a) EMERGENCY TEMPORARY STANDARD.—

12 (1) IN GENERAL.—In consideration of the grave

13 danger presented by COVID–19 and the need to

14 strengthen protections for employees, notwith-

15 standing the provisions of law and the Executive or-

16 ders listed in paragraph (7), not later than 7 days

17 after the date of enactment of this Act, the Sec-

18 retary of Labor shall promulgate an emergency tem-

19 porary standard to protect from occupational expo-

20 sure to SARS–CoV–2—

21 (A) employees of health care sector em-

22 ployers;

23 (B) employees of employers in the para-

24 medic and emergency medical services, includ-

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003459

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1155

1 ing such services provided by firefighters and

2 other emergency responders; and

3    (C) other employees at occupational risk of

4 such exposure.

5 (2) CONSULTATION.—In developing the stand-

6 ard under this subsection, the Secretary of Labor—

7    (A) shall consult with—

8       (i) the Director of the Centers for

9       Disease Control and Prevention;

10       (ii) the Director of the National Insti-

11       tute for Occupational Safety and Health;

12       and

13    (B) may consult with the professional asso-

14    ciations and representatives of the employees in

15    the occupations and sectors described in sub-

16    paragraphs (A) through (C) of paragraph (1).

17 (3) ENFORCEMENT DISCRETION.—If the Sec-

18 retary of Labor determines it is not feasible for an

19 employer to comply with a requirement of the stand-

20 ard promulgated under this subsection (such as a

21 shortage of the necessary personal protective equip-

22 ment), the Secretary may exercise discretion in the

23 enforcement of such requirement if the employer

24 demonstrates that the employer—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003460

1156

1       (A) is exercising due diligence to come into
2       compliance with such requirement; and

3       (B) is implementing alternative methods
4       and measures to protect employees.

5       (4) EXTENSION OF STANDARD.—Notwith-
6   standing paragraphs (2) and (3) of section 6(c) of
7   the Occupational Safety and Health Act of 1970 (29
8   U.S.C. 655(c)), the emergency temporary standard
9   promulgated under this subsection shall be in effect
10  until the date on which the final standard promul-
11  gated under subsection (b) is in effect.

12      (5) STATE PLAN ADOPTION.—With respect to a
13  State with a State plan that has been approved by
14  the Secretary of Labor under section 18 of the Oc-
15  cupational Safety and Health Act of 1970 (29
16  U.S.C. 667), not later than 14 days after the date
17  of enactment of this Act, such State shall promul-
18  gate an emergency temporary standard that is at
19  least as effective in protecting from occupational ex-
20  posure to SARS–CoV–2 the employees in the occu-
21  pations and sectors described in subparagraphs (A)
22  through (C) of paragraph (1) as the emergency tem-
23  porary standard promulgated under this subsection.

24      (6) EMPLOYER DEFINED.—For purposes of the
25  standard promulgated under this subsection, the

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003461

1157

1   term "employer" (as defined in section 3 of the Oc-
2   cupational Safety and Health Act of 1970 (29
3   U.S.C. 652)) includes any State or political subdivi-
4   sion of a State, except for a State or political sub-
5   division of a State already subject to the jurisdiction
6   of a State plan approved under section 18(b) of the
7   Occupational Safety and Health Act of 1970 (29
8   U.S.C. 667(b)).

9       (7) INAPPLICABLE PROVISIONS OF LAW AND
10   EXECUTIVE ORDER.—The provisions of law and the
11   Executive orders list in this paragraph are as fol-
12   lows:

13       (A) The requirements of chapter 6 of title
14       5, United States Code (commonly referred to as
15       the "Regulatory Flexibility Act").

16       (B) Subchapter I of chapter 35 of title 44,
17       United States Code (commonly referred to as
18       the "Paperwork Reduction Act").

19       (C) The Unfunded Mandates Reform Act
20       of 1995 (2 U.S.C. 1501 et seq.).

21       (D) Executive Order 12866 (58 Fed. Reg.
22       190; relating to regulatory planning and re-
23       view), as amended.

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003462

1158

1    (E) Executive Order 13771 (82 Fed. Reg.

2        9339, relating to reducing regulation and con-

3        trolling regulatory costs).

4    (b) PERMANENT STANDARD.—Not later than 24

5 months after the date of enactment of this Act, the Sec-

6 retary of Labor shall, pursuant to section 6 of the Occupa-

7 tional Safety and Health Act (29 U.S.C. 655), promulgate

8 a final standard—

9        (1) to protect employees in the occupations and

10       sectors described in subparagraphs (A) through (C)

11       of subsection (a)(1) from occupational exposure to

12       infectious pathogens, including novel pathogens; and

13       (2) that shall be effective and enforceable in the

14       same manner and to the same extent as a standard

15       promulgated under section 6(b) of the Occupational

16       Safety and Health Act of 1970 (29 U.S.C. 655(b)).

17   (c) REQUIREMENTS.—Each standard promulgated

18 under this section shall include—

19       (1) a requirement that the employers of the em-

20       ployees in the occupations and sectors described in

21       subparagraphs (A) through (C) of subsection

22       (a)(1)—

23           (A) develop and implement a comprehen-

24           sive infectious disease exposure control plan,

25           with the input and involvement of employees or,

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003463

1159

1   where applicable, the representatives of employ-
2   ees, as appropriate, to address the risk of occu-
3   pational exposure in such sectors and occupa-
4   tions; and

5        (B) record and report each work-related
6   COVID–19 infection and death, as set forth in
7   part 1904 of title 29, Code of Federal Regula-
8   tions (as in effect on the date of enactment of
9   this Act);

10  (2) no less protection for novel pathogens than
11  precautions mandated by standards adopted by a
12  State plan that has been approved by the Secretary
13  of Labor under section 18 of the Occupational Safe-
14  ty and Health Act of 1970 (29 U.S.C. 667); and

15  (3) the incorporation, as appropriate, of—

16       (A) guidelines issued by the Centers for
17  Disease Control and Prevention, the National
18  Institute for Occupational Safety and Health,
19  and the Occupational Safety and Health Ad-
20  ministration which are designed to prevent the
21  transmission of infectious agents in health care
22  or other occupational settings; and

23       (B) relevant scientific research on novel
24  pathogens.

25  (d) ANTI-RETALIATION.—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003464

1160

1      (1) POLICY.—Each standard promulgated

2    under this section shall require employers to adopt

3    a policy prohibiting the discrimination and retalia-

4    tion described in paragraph (2) by any person (in-

5    cluding an agent of the employer).

6      (2) PROHIBITION.—No employer (including an

7    agent of the employer) shall discriminate or retaliate

8    against an employee for—

9        (A) reporting to the employer, to a local,

10      State, or Federal government agency, or to the

11      media or on a social media platform—

12          (i) a violation of a standard promul-

13        gated pursuant to this Act;

14          (ii) a violation of an infectious disease

15        exposure control plan described in sub-

16        section (c)(1); or

17          (iii) a good faith concern about a

18        workplace infectious disease hazard;

19      (B) seeking assistance or intervention from

20      the employer or a local, State, or Federal gov-

21      ernment agency with respect to such a report;

22      (C) voluntary use of personal protective

23      equipment with a higher level of protection than

24      is provided by the employer; or

DOC_0003465

1161

1     (D) exercising any other right under the

2   Occupational Safety and Health Act of 1970

3   (29 U.S.C. 651 et seq.).

4     (3) ENFORCEMENT.—This subsection shall be

5   enforced in the same manner and to the same extent

6   as any standard promulgated under section 6(b) of

7   the Occupational Safety and Health Act of 1970 (29

8   U.S.C. 655(b)).

9  **SEC. 120303. SURVEILLANCE, TRACKING, AND INVESTIGA-**

10         **TION OF WORK-RELATED CASES OF COVID–19.**

11   The Director of the Centers for Disease Control and

12  Prevention, in conjunction with the Director of the Na-

13  tional Institute for Occupational Safety and Health,

14  shall—

15     (1) collect and analyze case reports, including

16   information on the work status, occupation, and in-

17   dustry classification of an individual, and other data

18   on COVID–19, to identify and evaluate the extent,

19   nature, and source of COVID–19 among employees

20   in the occupations and sectors described in subpara-

21   graphs (A) through (C) of section 120302(a)(1);

22     (2) investigate, as appropriate, individual cases

23   of COVID–19 among such employees to evaluate the

24   source of exposure and adequacy of infection and ex-

25   posure control programs and measures;

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003466

1162

1   (3) provide regular periodic reports on COVID–

2   19 among such employees to the public; and

3   (4) based on such reports and investigations,

4   make recommendations on needed actions or guid-

5   ance to protect such employees.

# TITLE IV—COMMUNITY AND FAMILY SUPPORT

**SEC. 120401. MATCHING FUNDS WAIVER FOR FORMULA GRANTS AND SUBGRANTS UNDER THE FAMILY VIOLENCE PREVENTION AND SERVICES ACT.**

12   (a) WAIVER OF MATCHING FUNDS FOR AWARDED

13   GRANTS AND SUBGRANTS.—The Secretary of Health and

14   Human Services shall waive—

15   (1) the non-Federal contributions requirement

16   under subsection (c)(4) of section 306 of the Family

17   Violence Prevention and Services Act (42 U.S.C.

18   10406) with respect to the grants and subgrants

19   awarded in fiscal years 2019 and 2020 to each State

20   (as defined in section 302 of such Act (42 U.S.C.

21   10402)) and the eligible entities within such State

22   under such section or section 308 of such Act (42

23   U.S.C. 10408); and

DOC_0003467

1163

1   (2) the reporting requirements required under

2   such grants and subgrants that relate to such non-

3   Federal contributions requirement.

4   (b) WAIVER OF MATCHING FUNDS FOR GRANTS

5   AWARDED AFTER DATE OF ENACTMENT.—

6   (1) IN GENERAL.—Subsection (c)(4) of section

7   306 of the Family Violence Prevention and Services

8   Act (42 U.S.C. 10406) shall not apply to a qualified

9   grant during the period of a public health emergency

10   declared pursuant to section 319 of the Public

11   Health Service Act (42 U.S.C. 247d) resulting from

12   the COVID–19 pandemic.

13   (2) QUALIFIED GRANT DEFINED.—In this sub-

14   section, the term "qualified grant" means a grant or

15   subgrant awarded—

16   (A) after the date of the enactment of this

17   section; and

18   (B) under section 306, 308, or 309 of the

19   Family Violence Prevention and Services Act

20   (42 U.S.C. 10406; 10408; 10409).

21   **SEC. 120402. DISTRIBUTION OF CERTAIN FUNDS APPRO-**

22   **PRIATED FOR THE COMMUNITY SERVICES**

23   **BLOCK GRANT ACT.**

24   (a) DISTRIBUTION OF CARES ACT FUNDS TO

25   STATES.—Section 675B(b)(3) of the Community Services

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003468

1164

1 Block Grant Act (42 U.S.C. 9906(b)(3)) shall not apply

2 with respect to funds appropriated by the CARES Act

3 (Public Law 116–136) to carry out the Community Serv-

4 ices Block Grant Act (42 U.S.C.9901 et seq.).

5    (b) INCREASED POVERTY LINE.—For purposes of

6 carrying out the Community Services Block Grant Act (42

7 U.S.C. 9901 et seq.) with any funds appropriated for fis-

8 cal year 2020 for such Act, the term "poverty line" as

9 defined in section 673(2) of such Act (42 U.S.C. 9902(2))

10 means 200 percent of the poverty line otherwise applicable

11 under such section (excluding the last sentence of such

12 section) without regard to this subsection.

**13 SEC. 120403. USE OF LIHEAP SUPPLEMENTAL APPROPRIA-**

**14           TIONS.**

15    Notwithstanding the Low-Income Home Energy As-

16 sistance Act of 1981, with respect to amounts appro-

17 priated under title VI of division A of this Act to carry

18 out the Low-Income Home Energy Assistance Act of

19 1981, each State, the Commonwealth of Puerto Rico,

20 Guam, American Samoa, the Virgin Islands of the United

21 States, the Commonwealth of the Northern Mariana Is-

22 lands, and each Indian Tribe, as applicable, that receives

23 an allotment of funds from such amounts—

24      (1) shall, in using such funds, for purposes of

25      income eligibility, accept proof of job loss or severe

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003469

1165

1     income loss dated after February 29, 2020, such as

2     a layoff or furlough notice or verification of applica-

3     tion for unemployment benefits, as sufficient to dem-

4     onstrate lack of income for an individual or house-

5     hold; and

6          (2) may use not more than 12.5 percent of such

7     funds for administrative costs.

# TITLE V—COVID–19 PROTEC-TIONS UNDER LONGSHORE AND HARBOR WORKERS' COMPENSATION ACT

## SEC. 120501. COMPENSATION PURSUANT TO THE LONGSHORE AND HARBOR WORKERS' COMPENSATION ACT.

15    (a) ENTITLEMENT TO COMPENSATION.—

16         (1) IN GENERAL.—A covered employee who re-

17    ceives a diagnosis or is subject to an order described

18    in paragraph (2)(B) and who provides notice of or

19    files a claim relating to such diagnosis or order

20    under section 12 or 13 of the Longshore and Harbor

21    Workers' Compensation Act (33 U.S.C. 912, 913),

22    respectively, shall—

23              (A) be deemed to have an injury arising

24         out of or in the course of employment for which

25         compensation is payable under the Longshore

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003470

1166

1    and Harbor Workers' Compensation Act (33

2    U.S.C. 901 et seq.); and

3        (B) be paid the compensation to which the

4    employee is entitled under such Act (33 U.S.C.

5    901 et seq.).

6        (2) COVERED EMPLOYEE.—In this section, the

7    term "covered employee" means an employee who—

8        (A) at any time during the period begin-

9    ning on January 27, 2020, and ending on Jan-

10    uary 27, 2022, was engaged in maritime em-

11    ployment; and

12        (B) was—

13        (i) at any time during the period be-

14    ginning on January 27, 2020, and ending

15    on February 27, 2022, diagnosed with

16    COVID–19; or

17        (ii) at any time during the period de-

18    scribed in subparagraph (A), ordered not

19    to return to work by the employee's em-

20    ployer or by a local, State, or Federal

21    agency because of exposure, or the risk of

22    exposure, to 1 or more individuals diag-

23    nosed with COVID–19 in the workplace.

24    (b) REIMBURSEMENT.—

25        (1) IN GENERAL.—

g:\VHLC\051220\051220.072.xml    (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003471

1167

1  (A) ENTITLEMENT.—Subject to subpara-
2  graph (B), an employer of a covered employee
3  or the employer's carrier shall be entitled to re-
4  imbursement for any compensation paid with
5  respect to a notice or claim described in sub-
6  section (a), including disability benefits, funeral
7  and burial expenses, medical or other related
8  costs for treatment and care, and reasonable
9  and necessary allocated claims expenses.

10  (B) SAFETY AND HEALTH REQUIRE-
11  MENTS.—To be entitled to reimbursement
12  under subparagraph (A)—

13  (i) an employer shall be in compliance
14  with all applicable safety and health guide-
15  lines and standards that are related to the
16  prevention of occupational exposure to
17  COVID–19, including such guidelines and
18  standards issued by the Occupational Safe-
19  ty and Health Administration, State plans
20  approved under section 18 of the Occupa-
21  tional Safety and Health Act of 1970 (29
22  U.S.C. 667), the Coast Guard, and Fed-
23  eral, State or local public health authori-
24  ties; and

25  (ii) a carrier—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003472

1168

1     (I) shall be a carrier for an em-
2    ployer that is in compliance with
3    clause (i); and

4     (II) shall not adjust the experi-
5    ence rating or the annual premium of
6    the employer based upon the com-
7    pensation paid by the carrier with re-
8    spect to a notice or claim described in
9    subparagraph (A).

10  (2) REIMBURSEMENT PROCEDURES.—To re-
11 ceive reimbursement under paragraph (1)—

12    (A) a claim for such reimbursement shall
13    be submitted to the Secretary of Labor—

14     (i) not later than one year after the
15    final payment of compensation to a covered
16    employee pursuant to this section; and

17     (ii) in the same manner as a claim for
18    reimbursement is submitted in accordance
19    with part 61 of title 20, Code of Federal
20    Regulations (as in effect on the date of en-
21    actment of this Act); and

22    (B) an employer and the employer's carrier
23    shall make, keep, and preserve such records,
24    make such reports, and provide such informa-

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003473

1169

1   tion, as the Secretary of Labor determines nec-

2   essary or appropriate to carry out this section.

3 (c) SPECIAL FUND.—

4   (1) IN GENERAL.—A reimbursement under

5  paragraph (1) shall be paid out of the special fund

6  established in section 44 of Longshore and Harbor

7  Workers' Compensation Act (33 U.S.C. 944).

8   (2) FUNDING.—There are authorized to be ap-

9  propriated, and there are appropriated, such funds

10  as may be necessary to reimburse the special fund

11  described in paragraph (1) for each reimbursement

12  paid out of such fund under paragraph (1).

13 (d) REPORT.—Not later than 60 days after the end

14 of fiscal year 2020, 2021, and 2022, the Secretary of

15 Labor shall submit to the Committee on Education and

16 Labor of the House of Representatives and the Committee

17 on Health, Education, Labor and Pensions of the Senate,

18 an annual report enumerating—

19   (1) the number of claims filed pursuant to sec-

20  tion (a)(1);

21   (2) of such filed claims—

22    (A) the number and types of claims ap-

23   proved under section 13 of the Longshore and

24   Harbor Workers' Compensation Act (33 U.S.C.

25   913);

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003474

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1170

1        (B) the number and types of claims denied

2        under such section;

3        (C) the number and types of claims pend-

4        ing under such section; and

5      (3) the amounts and the number of claims for

6    reimbursement paid out of the special fund under

7    subsection (c)(1) for the fiscal year for which the re-

8    port is being submitted.

9    (e) REGULATIONS.—The Secretary of Labor may

10  promulgate such regulations as may be necessary to carry

11  out this section.

12    (f) LHWCA TERMS.—In this section, the terms "car-

13  rier", "compensation", "employee", and "employer" have

14  the meanings given the terms in section 2 of the

15  Longshore and Harbor Workers' Compensation Act (33

16  U.S.C. 902).

DOC_0003475

1171

# DIVISION M—CONSUMER PRO-TECTION AND TELE-COMMUNICATIONS PROVI-SIONS

## TITLE I—COVID–19 PRICE GOUGING PREVENTION

**SEC. 130101. SHORT TITLE.**

This title may be cited as the "COVID–19 Price Gouging Prevention Act".

**SEC. 130102. PREVENTION OF PRICE GOUGING.**

(a) IN GENERAL.—For the duration of a public health emergency declared pursuant to section 319 of the Public Health Service Act (42 U.S.C. 247d) as a result of confirmed cases of 2019 novel coronavirus (COVID–19), including any renewal thereof, it shall be unlawful for any person to sell or offer for sale a good or service at a price that—

(1) is unconscionably excessive; and

(2) indicates the seller is using the circumstances related to such public health emergency to increase prices unreasonably.

(b) FACTORS FOR CONSIDERATION.—In determining whether a person has violated subsection (a), there shall be taken into account, with respect to the price at which

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003476

1172

1 such person sold or offered for sale the good or service,

2 factors that include the following:

3     (1) Whether such price grossly exceeds the av-

4 erage price at which the same or a similar good or

5 service was sold or offered for sale by such person—

6         (A) during the 90-day period immediately

7     preceding January 31, 2020; or

8         (B) during the period that is 45 days be-

9     fore or after the date that is one year before

10     the date such good or service is sold or offered

11     for sale under subsection (a).

12     (2) Whether such price grossly exceeds the av-

13 erage price at which the same or a similar good or

14 service was readily obtainable from other similarly

15 situated competing sellers before January 31, 2020.

16     (3) Whether such price reasonably reflects addi-

17 tional costs, not within the control of such person,

18 that were paid, incurred, or reasonably anticipated

19 by such person, or reasonably reflects the profit-

20 ability of forgone sales or additional risks taken by

21 such person, to produce, distribute, obtain, or sell

22 such good or service under the circumstances.

23 (c) ENFORCEMENT.—

24     (1) ENFORCEMENT BY FEDERAL TRADE COM-

25 MISSION.—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003477

1173

1          (A) UNFAIR OR DECEPTIVE ACTS OR PRAC-
2      TICES.—A violation of subsection (a) shall be
3      treated as a violation of a regulation under sec-
4      tion 18(a)(1)(B) of the Federal Trade Commis-
5      sion Act (15 U.S.C. 57a(a)(1)(B)) regarding
6      unfair or deceptive acts or practices.

7          (B) POWERS OF COMMISSION.—The Com-
8      mission shall enforce subsection (a) in the same
9      manner, by the same means, and with the same
10     jurisdiction, powers, and duties as though all
11     applicable terms and provisions of the Federal
12     Trade Commission Act (15 U.S.C. 41 et seq.)
13     were incorporated into and made a part of this
14     section. Any person who violates such sub-
15     section shall be subject to the penalties and en-
16     titled to the privileges and immunities provided
17     in the Federal Trade Commission Act.

18     (2) EFFECT ON OTHER LAWS.—Nothing in this
19     section shall be construed in any way to limit the
20     authority of the Commission under any other provi-
21     sion of law.

22     (3) ENFORCEMENT BY STATE ATTORNEYS GEN-
23     ERAL.—

24         (A) IN GENERAL.—If the chief law en-
25     forcement officer of a State, or an official or

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003478

1174

 1    agency designated by a State, has reason to be-

 2    lieve that any person has violated or is violating

 3    subsection (a), the attorney general, official, or

 4    agency of the State, in addition to any author-

 5    ity it may have to bring an action in State

 6    court under its consumer protection law, may

 7    bring a civil action in any appropriate United

 8    States district court or in any other court of

 9    competent jurisdiction, including a State court,

10    to—

11          (i) enjoin further such violation by

12       such person;

13          (ii) enforce compliance with such sub-

14       section;

15          (iii) obtain civil penalties; and

16          (iv) obtain damages, restitution, or

17       other compensation on behalf of residents

18       of the State.

19      (B) NOTICE AND INTERVENTION BY THE

20    FTC.—The attorney general of a State shall

21    provide prior written notice of any action under

22    subparagraph (A) to the Commission and pro-

23    vide the Commission with a copy of the com-

24    plaint in the action, except in any case in which

25    such prior notice is not feasible, in which case

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003479

1175

1   the attorney general shall serve such notice im-

2   mediately upon instituting such action. The

3   Commission shall have the right—

4       (i) to intervene in the action;

5       (ii) upon so intervening, to be heard

6   on all matters arising therein; and

7       (iii) to file petitions for appeal.

8   (C) LIMITATION ON STATE ACTION WHILE

9   FEDERAL ACTION IS PENDING.—If the Commis-

10  sion has instituted a civil action for violation of

11  this section, no State attorney general, or offi-

12  cial or agency of a State, may bring an action

13  under this paragraph during the pendency of

14  that action against any defendant named in the

15  complaint of the Commission for any violation

16  of this section alleged in the complaint.

17  (D)  RELATIONSHIP  WITH  STATE-LAW

18  CLAIMS.—If the attorney general of a State has

19  authority to bring an action under State law di-

20  rected at acts or practices that also violate this

21  section, the attorney general may assert the

22  State-law claim and a claim under this section

23  in the same civil action.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003480

1176

1  (4) SAVINGS CLAUSE.—Nothing in this section

2  shall preempt or otherwise affect any State or local

3  law.

4  (d) DEFINITIONS.—In this section:

5  (1) COMMISSION.—The term "Commission"

6  means the Federal Trade Commission.

7  (2) GOOD OR SERVICE.—The term "good or

8  service" means a good or service offered in com-

9  merce, including—

10  (A) food, beverages, water, ice, a chemical,

11  or a personal hygiene product;

12  (B) any personal protective equipment for

13  protection from or prevention of contagious dis-

14  eases, filtering facepiece respirators, medical

15  equipment and supplies (including medical test-

16  ing supplies), a drug as defined in section

17  201(g)(1) of the Federal Food, Drug, and Cos-

18  metic Act (21 U.S.C. 321(g)(1)), cleaning sup-

19  plies, disinfectants, sanitizers; or

20  (C) any healthcare service, cleaning serv-

21  ice, or delivery service.

22  (3) STATE.—The term "State" means each of

23  the several States, the District of Columbia, each

24  commonwealth, territory, or possession of the United

25  States, and each federally recognized Indian Tribe.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003481

1177

# TITLE II—E-RATE SUPPORT FOR WI-FI HOTSPOTS, OTHER EQUIPMENT, AND CON-NECTED DEVICES

**SEC. 130201. E-RATE SUPPORT FOR WI-FI HOTSPOTS, OTHER EQUIPMENT, AND CONNECTED DE-VICES DURING EMERGENCY PERIODS RELAT-ING TO COVID–19.**

(a) REGULATIONS REQUIRED.—Not later than 7 days after the date of the enactment of this Act, the Commission shall promulgate regulations providing for the provision, from amounts made available from the Emergency Connectivity Fund established under subsection (i)(1), of support under section 254(h)(1)(B) of the Communications Act of 1934 (47 U.S.C. 254(h)(1)(B)) to an elementary school, secondary school, or library (including a Tribal elementary school, Tribal secondary school, or Tribal library) eligible for support under such section, for the purchase during an emergency period described in subsection (e) (including any portion of such a period occurring before the date of the enactment of this Act) of equipment described in subsection (c), advanced telecommunications and information services, or equipment described in such subsection and advanced telecommunications and information services, for use by—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003482

1178

1     (1) in the case of a school, students and staff

2 of such school at locations that include locations

3 other than such school; and

4     (2) in the case of a library, patrons of such li-

5 brary at locations that include locations other than

6 such library.

7 (b) TRIBAL ISSUES.—

8     (1) RESERVATION FOR TRIBAL LANDS.—The

9 Commission shall reserve not less than 5 percent of

10 the amounts available to the Commission under sub-

11 section (i)(3) to provide support under the regula-

12 tions required by subsection (a) to schools and li-

13 braries that serve persons who are located on Tribal

14 lands.

15     (2) ELIGIBILITY OF TRIBAL LIBRARIES.—For

16 purposes of determining the eligibility of a Tribal li-

17 brary for support under the regulations required by

18 subsection (a), the portion of paragraph (4) of sec-

19 tion 254(h) of the Communications Act of 1934 (47

20 U.S.C. 254(h)) relating to eligibility for assistance

21 from a State library administrative agency under the

22 Library Services and Technology Act shall not apply.

23 (c) EQUIPMENT DESCRIBED.—The equipment de-

24 scribed in this subsection is the following:

25     (1) Wi-Fi hotspots.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003483

1179

1    (2) Modems.

2    (3) Routers.

3    (4) Devices that combine a modem and router.

4    (5) Connected devices.

5    (d) PRIORITIZATION OF SUPPORT.—The Commission

6  shall provide in the regulations required by subsection (a)

7  for a mechanism to require a school or library to prioritize

8  the provision of equipment described in subsection (c), ad-

9  vanced telecommunications and information services, or

10 equipment described in such subsection and advanced tele-

11 communications and information services, for which sup-

12 port is received under such regulations, to students and

13 staff or patrons (as the case may be) that the school or

14 library believes do not have access to equipment described

15 in subsection (c), do not have access to advanced tele-

16 communications and information services, or have access

17 to neither equipment described in subsection (c) nor ad-

18 vanced telecommunications and information services, at

19 the residences of such students and staff or patrons.

20   (e) EMERGENCY PERIODS DESCRIBED.—An emer-

21 gency period described in this subsection is a period

22 that—

23       (1) begins on the date of a determination by the

24    Secretary of Health and Human Services pursuant

25    to section 319 of the Public Health Service Act (42

g:\VHLC\051220\051220.072.xml        (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003484

1180

1  U.S.C. 247d) that a public health emergency exists

2  as a result of COVID–19; and

3      (2) ends on the June 30 that first occurs after

4  the date on which such determination (including any

5  renewal thereof) terminates.

6      (f) TREATMENT OF EQUIPMENT AFTER EMERGENCY

7  PERIOD.—The Commission shall provide in the regula-

8  tions required by subsection (a) that, in the case of a

9  school or library that purchases equipment described in

10  subsection (c) using support received under such regula-

11  tions, such school or library—

12      (1) may, after the emergency period with re-

13  spect to which such support is received, use such

14  equipment for such purposes as such school or li-

15  brary considers appropriate, subject to any restric-

16  tions provided in such regulations (or any successor

17  regulation); and

18      (2) may not sell or otherwise transfer such

19  equipment in exchange for any thing (including a

20  service) of value, except that such school or library

21  may exchange such equipment for upgraded equip-

22  ment of the same type.

23      (g) RULE OF CONSTRUCTION.—Nothing in this sec-

24  tion shall be construed to affect any authority the Com-

25  mission may have under section 254(h)(1)(B) of the Com-

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003485

1181

1 munications Act of 1934 (47 U.S.C. 254(h)(1)(B)) to

2 allow support under such section to be used for the pur-

3 poses described in subsection (a) other than as required

4 by such subsection.

5   (h) PROCEDURAL MATTERS.—

6     (1) PART 54 REGULATIONS.—Nothing in this

7     section shall be construed to prevent the Commission

8     from providing that the regulations in part 54 of

9     title 47, Code of Federal Regulations (or any suc-

10    cessor regulation), shall apply in whole or in part to

11    support provided under the regulations required by

12    subsection (a), shall not apply in whole or in part to

13    such support, or shall be modified in whole or in

14    part for purposes of application to such support.

15     (2) EXEMPTION FROM CERTAIN RULEMAKING

16    REQUIREMENTS.—Subsections (b), (c), and (d) of

17    section 553 of title 5, United States Code, shall not

18    apply to a regulation promulgated under subsection

19    (a) of this section or a rulemaking to promulgate

20    such a regulation.

21     (3) PAPERWORK REDUCTION ACT EXEMP-

22    TION.—A collection of information conducted or

23    sponsored under the regulations required by sub-

24    section (a), or under section 254 of the Communica-

25    tions Act of 1934 (47 U.S.C. 254) in connection

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003486

1182

1 with support provided under such regulations, shall

2 not constitute a collection of information for the

3 purposes of subchapter I of chapter 35 of title 44,

4 United States Code (commonly referred to as the

5 Paperwork Reduction Act).

6 (i) EMERGENCY CONNECTIVITY FUND.—

7 (1) ESTABLISHMENT.—There is established in

8 the Treasury of the United States a fund to be

9 known as the Emergency Connectivity Fund.

10 (2) AUTHORIZATION OF APPROPRIATIONS.—

11 There is authorized to be appropriated to the Emer-

12 gency Connectivity Fund $5,000,000,000 for fiscal

13 year 2020, to remain available through fiscal year

14 2021.

15 (3) USE OF FUNDS.—Amounts in the Emer-

16 gency Connectivity Fund shall be available to the

17 Commission to provide support under the regula-

18 tions required by subsection (a).

19 (4) RELATIONSHIP TO UNIVERSAL SERVICE

20 CONTRIBUTIONS.—Support provided under the regu-

21 lations required by subsection (a) shall be provided

22 from amounts made available under paragraph (3)

23 and not from contributions under section 254(d) of

24 the Communications Act of 1934 (47 U.S.C.

25 254(d)).

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003487

1183

1  (j) DEFINITIONS.—In this section:

2  (1) ADVANCED TELECOMMUNICATIONS AND IN-

3  FORMATION SERVICES.—The term "advanced tele-

4  communications and information services" means

5  advanced telecommunications and information serv-

6  ices, as such term is used in section 254(h) of the

7  Communications Act of 1934 (47 U.S.C. 254(h)).

8  (2) COMMISSION.—The term "Commission"

9  means the Federal Communications Commission.

10  (3) CONNECTED DEVICE.—The term "con-

11  nected device" means a laptop computer, tablet com-

12  puter, or similar device that is capable of connecting

13  to advanced telecommunications and information

14  services.

15  (4) LIBRARY.—The term "library" includes a

16  library consortium.

17  (5) TRIBAL LAND.—The term "Tribal land"

18  means—

19  (A) any land located within the boundaries

20  of—

21  (i) an Indian reservation, pueblo, or

22  rancheria; or

23  (ii) a former reservation within Okla-

24  homa;

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003488

1184

(B) any land not located within the bound-
aries of an Indian reservation, pueblo, or
rancheria, the title to which is held—

(i) in trust by the United States for
the benefit of an Indian Tribe or an indi-
vidual Indian;

(ii) by an Indian Tribe or an indi-
vidual Indian, subject to restriction against
alienation under laws of the United States;
or

(iii) by a dependent Indian commu-
nity;

(C) any land located within a region estab-
lished pursuant to section 7(a) of the Alaska
Native Claims Settlement Act (43 U.S.C.
1606(a));

(D) Hawaiian Home Lands, as defined in
section 801 of the Native American Housing
Assistance and Self-Determination Act of 1996
(25 U.S.C. 4221); or

(E) those areas or communities designated
by the Assistant Secretary of Indian Affairs of
the Department of the Interior that are near,
adjacent, or contiguous to reservations where fi-
nancial assistance and social service programs

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003489

1185

1   are provided to Indians because of their status

2   as Indians.

3   (6) TRIBAL LIBRARY.—The term "Tribal li-

4   brary" means, only during an emergency period de-

5   scribed under subsection (e), a facility owned by an

6   Indian Tribe, serving Indian Tribes, or serving

7   American Indians, Alaskan Natives, or Native Ha-

8   waiian communities, including—

9    (A) a Tribal library or Tribal library con-

10    sortium; or

11    (B) a Tribal government building, chapter

12    house, longhouse, community center, or other

13    similar public building.

14   (7) WI-FI.—The term "Wi-Fi" means a wire-

15   less networking protocol based on Institute of Elec-

16   trical and Electronics Engineers standard 802.11

17   (or any successor standard).

18   (8) WI-FI HOTSPOT.—The term "Wi-Fi

19   hotspot" means a device that is capable of—

20    (A) receiving mobile advanced tele-

21    communications and information services; and

22    (B) sharing such services with another de-

23    vice through the use of Wi-Fi.

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003490

1186

# TITLE III—EMERGENCY BENEFIT FOR BROADBAND SERVICE

### SEC. 130301. BENEFIT FOR BROADBAND SERVICE DURING EMERGENCY PERIODS RELATING TO COVID–19.

(a) PROMULGATION OF REGULATIONS REQUIRED.—Not later than 7 days after the date of the enactment of this Act, the Commission shall promulgate regulations implementing this section.

(b) REQUIREMENTS.—The regulations promulgated pursuant to subsection (a) shall establish the following:

(1) EMERGENCY BROADBAND BENEFIT.—During an emergency period, a provider shall provide an eligible household with an internet service offering, upon request by a member of such household. Such provider shall discount the price charged to such household for such internet service offering in an amount equal to the emergency broadband benefit for such household.

(2) VERIFICATION OF ELIGIBILITY.—To verify whether a household is an eligible household, a provider shall either—

(A) use the National Lifeline Eligibility Verifier; or

g:\VHLC\051220\051220.072.xml        (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003491

1187

1           (B) rely upon an alternative verification

2           process of the provider, if the Commission finds

3           such process to be sufficient to avoid waste,

4           fraud, and abuse.

5        (3) USE OF NATIONAL LIFELINE ELIGIBILITY

6 VERIFIER.—The Commission shall—

7           (A) expedite the ability of all providers to

8           access the National Lifeline Eligibility Verifier

9           for purposes of determining whether a house-

10          hold is an eligible household; and

11           (B) ensure that the National Lifeline Eligi-

12           bility Verifier approves an eligible household to

13           receive the emergency broadband benefit not

14           later than two days after the date of the sub-

15           mission of information necessary to determine if

16           such household is an eligible household.

17        (4) EXTENSION OF EMERGENCY PERIOD.—An

18 emergency period may be extended within a State or

19 any portion thereof if the State, or in the case of

20 Tribal land, a Tribal government, provides written,

21 public notice to the Commission stipulating that an

22 extension is necessary in furtherance of the recovery

23 related to COVID–19. The Commission shall, within

24 48 hours after receiving such notice, post the notice

25 on the public website of the Commission.

g:\VHLC\051220\051220.072.xml    (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003492

G:\CMTE\AP\16\FY20\_D\HEROES.XML

<center>1188</center>

1  (5) REIMBURSEMENT.—From the Emergency

2  Broadband Connectivity Fund established in sub-

3  section (h), the Commission shall reimburse a pro-

4  vider in an amount equal to the emergency

5  broadband benefit with respect to an eligible house-

6  hold that receives such benefit from such provider.

7  (6) REIMBURSEMENT FOR CONNECTED DE-

8  VICE.—A provider that, in addition to providing the

9  emergency broadband benefit to an eligible house-

10  hold, supplies such household with a connected de-

11  vice may be reimbursed up to $100 from the Emer-

12  gency Broadband Connectivity Fund established in

13  subsection (h) for such connected device, if the

14  charge to such eligible household is more than $10

15  but less than $50 for such connected device, except

16  that a provider may receive reimbursement for no

17  more than one connected device per eligible house-

18  hold.

19  (7) NO RETROACTIVE REIMBURSEMENT.—A

20  provider may not receive a reimbursement from the

21  Emergency Broadband Connectivity Fund for pro-

22  viding an internet service offering discounted by the

23  emergency broadband benefit, or for supplying a

24  connected device, that was provided or supplied (as

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003493

1189

1  the case may be) before the date of the enactment
2  of this Act.

3    (8) CERTIFICATION REQUIRED.—To receive a
4  reimbursement under paragraph (5) or (6), a pro-
5  vider shall certify to the Commission the following:

6      (A) That the amount for which the pro-
7    vider is seeking reimbursement from the Emer-
8    gency Broadband Connectivity Fund for an
9    internet service offering to an eligible household
10   is not more than the normal rate.

11     (B) That each eligible household for which
12   a provider is seeking reimbursement for pro-
13   viding an internet service offering discounted by
14   the emergency broadband benefit—

15       (i) has not been and will not be
16     charged—

17         (I) for such offering, if the nor-
18       mal rate for such offering is less than
19       or equal to the amount of the emer-
20       gency broadband benefit for such
21       household; or

22         (II) more for such offering than
23       the difference between the normal rate
24       for such offering and the amount of

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003494

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1190

1   the emergency broadband benefit for
2   such household;

3   (ii) will not be required to pay an
4   early termination fee if such eligible house-
5   hold elects to enter into a contract to re-
6   ceive such internet service offering if such
7   household later terminates such contract;
8   and

9   (iii) was not subject to a mandatory
10  waiting period for such internet service of-
11  fering based on having previously received
12  broadband internet access service from
13  such provider.

14  (C) A description of the process used by
15  the provider to verify that a household is an eli-
16  gible household, if the provider elects an alter-
17  native verification process under paragraph
18  (2)(B), and that such verification process was
19  designed to avoid waste, fraud, and abuse.

20  (9) AUDIT REQUIREMENTS.—The Commission
21  shall adopt audit requirements to ensure that pro-
22  viders are in compliance with the requirements of
23  this section and to prevent waste, fraud, and abuse
24  in the emergency broadband benefit program estab-
25  lished under this section.

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)