1191

1     (c) ELIGIBLE PROVIDERS.—Notwithstanding sub-
2 section (e) of this section, the Commission shall provide
3 a reimbursement to a provider under this section without
4 requiring such provider to be designated as an eligible tele-
5 communications carrier under section 214(e) of the Com-
6 munications Act of 1934 (47 U.S.C. 214(e)).

7     (d) RULE OF CONSTRUCTION.—Nothing in this sec-
8 tion shall affect the collection, distribution, or administra-
9 tion of the Lifeline Assistance Program governed by the
10 rules set forth in subpart E of part 54 of title 47, Code
11 of Federal Regulations (or any successor regulation).

12     (e) PART 54 REGULATIONS.—Nothing in this section
13 shall be construed to prevent the Commission from pro-
14 viding that the regulations in part 54 of title 47, Code
15 of Federal Regulations (or any successor regulation), shall
16 apply in whole or in part to support provided under the
17 regulations required by subsection (a), shall not apply in
18 whole or in part to such support, or shall be modified in
19 whole or in part for purposes of application to such sup-
20 port.

21     (f) ENFORCEMENT.—A violation of this section or a
22 regulation promulgated under this section, including the
23 knowing or reckless denial of an internet service offering
24 discounted by the emergency broadband benefit to an eligi-
25 ble household that requests such an offering, shall be

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003496

1192

1 treated as a violation of the Communications Act of 1934

2 (47 U.S.C. 151 et seq.) or a regulation promulgated under

3 such Act. The Commission shall enforce this section and

4 the regulations promulgated under this section in the same

5 manner, by the same means, and with the same jurisdic-

6 tion, powers, and duties as though all applicable terms and

7 provisions of the Communications Act of 1934 were incor-

8 porated into and made a part of this section.

9 (g) EXEMPTIONS.—

10     (1) NOTICE AND COMMENT RULEMAKING RE-

11     QUIREMENTS.—Section 553 of title 5, United States

12     Code, shall not apply to a regulation promulgated

13     under subsection (a) or a rulemaking to promulgate

14     such a regulation.

15     (2) PAPERWORK REDUCTION ACT REQUIRE-

16     MENTS.—A collection of information conducted or

17     sponsored under the regulations required by sub-

18     section (a) shall not constitute a collection of infor-

19     mation for the purposes of subchapter I of chapter

20     35 of title 44, United States Code (commonly re-

21     ferred to as the Paperwork Reduction Act).

22 (h) EMERGENCY BROADBAND CONNECTIVITY

23 FUND.—

24     (1) ESTABLISHMENT.—There is established in

25     the Treasury of the United States a fund to be

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003497

1193

1    known as the Emergency Broadband Connectivity

2    Fund.

3        (2) AUTHORIZATION OF APPROPRIATIONS.—

4    There is authorized to be appropriated to the Emer-

5    gency Broadband Connectivity Fund $8,800,000,000

6    for fiscal year 2020, to remain available through fis-

7    cal year 2021.

8        (3) USE OF FUNDS.—Amounts in the Emer-

9    gency Broadband Connectivity Fund shall be avail-

10   able to the Commission for reimbursements to pro-

11   viders under the regulations required by subsection

12   (a).

13       (4) RELATIONSHIP TO UNIVERSAL SERVICE

14   CONTRIBUTIONS.—Reimbursements provided under

15   the regulations required by subsection (a) shall be

16   provided from amounts made available under this

17   subsection and not from contributions under section

18   254(d) of the Communications Act of 1934 (47

19   U.S.C. 254(d)), except the Commission may use

20   such contributions if needed to offset expenses asso-

21   ciated with the reliance on the National Lifeline Eli-

22   gibility Verifier to determine eligibility of households

23   to receive the emergency broadband benefit.

24   (i) DEFINITIONS.—In this section:

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003498

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1194

1        (1) BROADBAND INTERNET ACCESS SERVICE.—

2    The term "broadband internet access service" has

3    the meaning given such term in section 8.1(b) of

4    title 47, Code of Federal Regulations (or any suc-

5    cessor regulation).

6        (2) CONNECTED DEVICE.—The term "con-

7    nected device" means a laptop or desktop computer

8    or a tablet.

9        (3) ELIGIBLE HOUSEHOLD.—The term "eligible

10    household" means, regardless of whether the house-

11    hold or any member of the household receives sup-

12    port under subpart E of part 54 of title 47, Code

13    of Federal Regulations (or any successor regulation),

14    and regardless of whether any member of the house-

15    hold has any past or present arrearages with a pro-

16    vider, a household in which—

17        (A) at least one member of the household

18        meets the qualifications in subsection (a) or (b)

19        of section 54.409 of title 47, Code of Federal

20        Regulations (or any successor regulation);

21        (B) at least one member of the household

22        has applied for and been approved to receive

23        benefits under the free and reduced price lunch

24        program under the Richard B. Russell National

25        School Lunch Act (42 U.S.C. 1751 et seq.) or

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003499

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1195

1    the school breakfast program under section 4 of

2    the Child Nutrition Act of 1966 (42 U.S.C.

3    1773); or

4        (C) at least one member of the household

5        has experienced a substantial loss of income

6        since February 29, 2020, documented by layoff

7        or furlough notice, application for unemploy-

8        ment insurance benefits, or similar documenta-

9        tion.

10    (4) EMERGENCY BROADBAND BENEFIT.—The

11    term "emergency broadband benefit" means a

12    monthly discount for an eligible household applied to

13    the normal rate for an internet service offering, in

14    an amount equal to such rate, but not more than

15    $50, or, if an internet service offering is provided to

16    an eligible household on Tribal land, not more than

17    $75.

18    (5) EMERGENCY PERIOD.—The term "emer-

19    gency period" means a period that—

20        (A) begins on the date of a determination

21        by the Secretary of Health and Human Services

22        pursuant to section 319 of the Public Health

23        Service Act (42 U.S.C. 247d) that a public

24        health emergency exists as a result of COVID–

25        19; and

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003500

1196

1         (B) ends on the date that is 6 months

2         after the date on which such determination (in-

3         cluding any renewal thereof) terminates, except

4         as such period may be extended under sub-

5         section (b)(4).

6         (6) INTERNET SERVICE OFFERING.—The term

7 "internet service offering" means, with respect to a

8 provider, broadband internet access service provided

9 by such provider to a household, offered in the same

10 manner, and on the same terms, as described in any

11 of such provider's advertisements for broadband

12 internet access service to such household, as on May

13 1, 2020.

14         (7) NORMAL RATE.—The term "normal rate"

15 means, with respect to an internet service offering

16 by a provider, the advertised monthly retail rate, as

17 of May 1, 2020, including any applicable promotions

18 and excluding any taxes or other governmental fees.

19         (8) PROVIDER.—The term "provider" means a

20 provider of broadband internet access service.

21 **SEC. 130302. ENHANCED LIFELINE BENEFITS DURING**

22         **EMERGENCY PERIODS.**

23         (a) ENHANCED MINIMUM SERVICE STANDARDS FOR

24 LIFELINE BENEFITS DURING EMERGENCY PERIODS.—

25 During an emergency period—

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003501

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1197

1      (1) the minimum service standard for Lifeline
2   supported mobile voice service shall provide an un-
3   limited number of minutes per month;

4      (2) the minimum service standard for Lifeline
5   supported mobile data service shall provide an un-
6   limited data allowance each month and 4G speeds,
7   where available; and

8      (3) the Basic Support Amount and Tribal
9   Lands Support Amount, as described in section
10   54.403 of title 47, Code of Federal Regulations (or
11   any successor regulation), shall be increased by an
12   amount necessary, as determined by the Commis-
13   sion, to offset any incremental increase in cost asso-
14   ciated with the requirements in paragraphs (1) and
15   (2).

16   (b) EXTENSION OF EMERGENCY PERIOD.—An emer-
17   gency period may be extended within a State or any por-
18   tion thereof for a maximum of six months, if the State,
19   or in the case of Tribal land, a Tribal government, pro-
20   vides written, public notice to the Commission stipulating
21   that an extension is necessary in furtherance of the recov-
22   ery related to COVID–19. The Commission shall, within
23   48 hours after receiving such notice, post the notice on
24   the public website of the Commission.

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003502

1198

1  (c) REGULATIONS.—The Commission shall adopt, on

2  an expedited basis, any regulations needed to carry out

3  this section.

4  (d) EMERGENCY PERIOD DEFINED.—In this section,

5  the term "emergency period" means a period that—

6      (1) begins on the date of a determination by the

7      Secretary of Health and Human Services pursuant

8      to section 319 of the Public Health Service Act (42

9      U.S.C. 247d) that a public health emergency exists

10     as a result of COVID–19; and

11     (2) ends on the date that is 6 months after the

12     date on which such determination (including any re-

13     newal thereof) terminates, except as such period

14     may be extended under subsection (b).

**15  SEC. 130303. GRANTS TO STATES TO STRENGTHEN NA-**

**16                TIONAL LIFELINE ELIGIBILITY VERIFIER.**

17  (a) IN GENERAL.—From amounts appropriated

18  under subsection (d), the Commission shall, not later than

19  7 days after the date of the enactment of this Act, make

20  a grant to each State, in an amount in proportion to the

21  population of such State, for the purpose of connecting

22  the database used by such State for purposes of the sup-

23  plemental nutrition assistance program under the Food

24  and Nutrition Act of 2008 (7 U.S.C. 2011 et seq.) to the

25  National Lifeline Eligibility Verifier, so that the receipt

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003503

1199

1 by a household of benefits under such program is reflected

2 in the National Lifeline Eligibility Verifier.

3     (b) DISBURSEMENT OF GRANT FUNDS.—Funds

4 under each grant made under subsection (a) shall be dis-

5 bursed to the State receiving such grant not later than

6 7 days after the date of the enactment of this Act.

7     (c) CERTIFICATION TO CONGRESS.—Not later than

8 21 days after the date of the enactment of this Act, the

9 Commission shall certify to the Committee on Energy and

10 Commerce of the House of Representatives and the Com-

11 mittee on Commerce, Science, and Transportation of the

12 Senate that the grants required by subsection (a) have

13 been made and that funds have been disbursed as required

14 by subsection (b).

15     (d) AUTHORIZATION OF APPROPRIATIONS.—There is

16 authorized to be appropriated $200,000,000 to carry out

17 this section for fiscal year 2020, to remain available

18 through fiscal year 2021.

19 **SEC. 130304. DEFINITIONS.**

20     In this title:

21     (1) COMMISSION.—The term "Commission"

22 means the Federal Communications Commission.

23     (2) NATIONAL LIFELINE ELIGIBILITY

24 VERIFIER.—The term "National Lifeline Eligibility

25 Verifier" has the meaning given such term in section

DOC_0003504

1200

1   54.400 of title 47, Code of Federal Regulations (or

2   any successor regulation).

3       (3) STATE.—The term "State" has the mean-

4   ing given such term in section 3 of the Communica-

5   tions Act of 1934 (47 U.S.C. 153).

# TITLE IV—CONTINUED CONNECTIVITY

**SEC. 130401. CONTINUED CONNECTIVITY DURING EMER-**

**GENCY PERIODS RELATING TO COVID–19.**

10  Title VII of the Communications Act of 1934 (47

11  U.S.C. 601 et seq.) is amended by adding at the end the

12  following:

13  **"SEC. 723. CONTINUED CONNECTIVITY DURING EMER-**

14  **GENCY PERIODS RELATING TO COVID–19.**

15  "(a) IN GENERAL.—During an emergency period de-

16  scribed in subsection (b), it shall be unlawful—

17       "(1) for a provider of advanced telecommuni-

18  cations service or voice service to—

19           "(A) terminate, reduce, or change such

20       service provided to any individual customer or

21       small business because of the inability of the in-

22       dividual customer or small business to pay for

23       such service if the individual customer or small

24       business certifies to such provider that such in-

25       ability to pay is a result of disruptions caused

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003505

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1201

1 by the public health emergency to which such

2 emergency period relates; or

3  "(B) impose late fees on any individual

4 customer or small business because of the in-

5 ability of the individual customer or small busi-

6 ness to pay for such service if the individual

7 customer or small business certifies to such pro-

8 vider that such inability to pay is a result of

9 disruptions caused by the public health emer-

10 gency to which such emergency period relates;

11  "(2) for a provider of advanced telecommuni-

12 cations service to, during such emergency period—

13  "(A) employ a limit on the amount of data

14 allotted to an individual customer or small busi-

15 ness during such emergency period, except that

16 such provider may engage in reasonable net-

17 work management; or

18  "(B) charge an individual customer or

19 small business an additional fee for exceeding

20 the limit on the data allotted to an individual

21 customer or small business; or

22  "(3) for a provider of advanced telecommuni-

23 cations service that had functioning Wi-Fi hotspots

24 available to subscribers in public places on the day

25 before the beginning of such emergency period to

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1202

1     fail to make service provided by such Wi-Fi hotspots

2     available to the public at no cost during such emer-

3     gency period.

4     "(b) WAIVER.—Upon a petition by a provider ad-

5     vanced telecommunications service or voice service, the

6     provisions in subsection (a) may be suspended or waived

7     by the Commission at any time, in whole or in part, for

8     good cause shown.

9     "(c) EMERGENCY PERIODS DESCRIBED.—An emer-

10    gency period described in this subsection is any portion

11    beginning on or after the date of the enactment of this

12    section of the duration of a public health emergency de-

13    clared pursuant to section 319 of the Public Health Serv-

14    ice Act (42 U.S.C. 247d) as a result of COVID–19, includ-

15    ing any renewal thereof.

16    "(d) DEFINITIONS.—In this section:

17        "(1) ADVANCED TELECOMMUNICATIONS SERV-

18        ICE.—The term 'advanced telecommunications serv-

19        ice' means a service that provides advanced tele-

20        communications capability (as defined in section 706

21        of the Telecommunications Act of 1996 (47 U.S.C.

22        1302)).

23        "(2) BROADBAND INTERNET ACCESS SERV-

24        ICE.—The term 'broadband internet access service'

25        has the meaning given such term in section 8.1(b)

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003507

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1203

1    of title 47, Code of Federal Regulations (or any suc-

2    cessor regulation).

3        "(3) INDIVIDUAL CUSTOMER.—The term 'indi-

4    vidual customer' means an individual who contracts

5    with a mass-market retail provider of advanced tele-

6    communications service or voice service to provide

7    service to such individual.

8        "(4) REASONABLE NETWORK MANAGEMENT.—

9    The term 'reasonable network management'—

10            "(A) means the use of a practice that—

11                "(i) has a primarily technical network

12            management justification; and

13                "(ii) is primarily used for and tailored

14            to achieving a legitimate network manage-

15            ment purpose, taking into account the par-

16            ticular network architecture and tech-

17            nology of the service; and

18            "(B) does not include other business prac-

19        tices.

20        "(5) SMALL BUSINESS.—The term 'small busi-

21    ness' has the meaning given such term under section

22    601(3) of title 5, United States Code.

23        "(6) VOICE SERVICE.—The term 'voice service'

24    has the meaning given such term under section

DOC_0003508

1204

1    227(e)(8) of the Communications Act of 1934 (47
2    U.S.C. 227(e)(8)).

3        ''(7) WI-FI.—The term 'Wi-Fi' means a wire-
4    less networking protocol based on Institute of Elec-
5    trical and Electronics Engineers standard 802.11
6    (or any successor standard).

7        ''(8)   WI-FI   HOTSPOT.—The   term   'Wi-Fi
8    hotspot' means a device that is capable of—

9            ''(A) receiving mobile broadband internet
10       access service; and

11           ''(B) sharing such service with another de-
12       vice through the use of Wi-Fi.''.

# TITLE V—DON'T BREAK UP THE T–BAND

**SEC. 130501. REPEAL OF REQUIREMENT TO REALLOCATE AND AUCTION T–BAND SPECTRUM.**

17   (a) REPEAL.—Section 6103 of the Middle Class Tax
18   Relief and Job Creation Act of 2012 (47 U.S.C. 1413)
19   is repealed.

20   (b) CLERICAL AMENDMENT.—The table of contents
21   in section 1(b) of such Act is amended by striking the
22   item relating to section 6103.

DOC_0003509

1205

# TITLE VI—NATIONAL SUICIDE HOTLINE DESIGNATION

**SEC. 130601. FINDINGS.**

Congress finds the following:

(1) According to the American Foundation for Suicide Prevention, on average, there are 129 suicides per day in the United States.

(2) To prevent future suicides, it is critical to transition the cumbersome, existing 10-digit National Suicide Hotline to a universal, easy-to-remember, 3-digit phone number and connect people in crisis with life-saving resources.

(3) It is essential that people in the United States have access to a 3-digit national suicide hotline across all geographic locations.

(4) The designated suicide hotline number will need to be both familiar and recognizable to all people in the United States.

**SEC. 130602. UNIVERSAL TELEPHONE NUMBER FOR NATIONAL SUICIDE PREVENTION AND MENTAL HEALTH CRISIS HOTLINE SYSTEM.**

(a) IN GENERAL.—Section 251(e) of the Communications Act of 1934 (47 U.S.C. 251(e)) is amended by adding at the end the following:

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003510

1206

1       "(4) UNIVERSAL TELEPHONE NUMBER FOR NA-

2 TIONAL SUICIDE PREVENTION AND MENTAL HEALTH

3 CRISIS HOTLINE SYSTEM.—9–8–8 is designated as

4 the universal telephone number within the United

5 States for the purpose of the national suicide pre-

6 vention and mental health crisis hotline system oper-

7 ating through the National Suicide Prevention Life-

8 line maintained by the Assistant Secretary for Men-

9 tal Health and Substance Use under section 520E–

10 3 of the Public Health Service Act (42 U.S.C.

11 290bb–36c) and through the Veterans Crisis Line

12 maintained by the Secretary of Veterans Affairs

13 under section 1720F(h) of title 38, United States

14 Code.".

15 (b) EFFECTIVE DATE.—The amendment made by

16 subsection (a) shall take effect on the date that is 1 year

17 after the date of the enactment of this Act.

18 (c) REQUIRED REPORT.—Not later than 180 days

19 after the date of the enactment of this Act, the Assistant

20 Secretary for Mental Health and Substance Use and the

21 Secretary of Veterans Affairs shall jointly submit a report

22 that details the resources necessary to make the use of

23 9–8–8, as designated under paragraph (4) of section

24 251(e) of the Communications Act of 1934 (47 U.S.C.

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003511

1207

1   251(e)), as added by subsection (a) of this section, oper-

2   ational and effective across the United States to—

3           (1) the Committee on Commerce, Science, and

4   Transportation of the Senate;

5           (2) the Committee on Appropriations of the

6   Senate;

7           (3) the Committee on Energy and Commerce of

8   the House of Representatives; and

9           (4) the Committee on Appropriations of the

10   House of Representatives.

11 **SEC. 130603. STATE AUTHORITY OVER FEES.**

12   (a) AUTHORITY.—

13           (1) IN GENERAL.—Nothing in this Act, any

14   amendment made by this Act, the Communications

15   Act of 1934 (47 U.S.C. 151 et seq.), or any Com-

16   mission regulation or order may prevent the imposi-

17   tion and collection of a fee or charge applicable to

18   a voice service specifically designated by a State, a

19   political subdivision of a State, an Indian Tribe, or

20   a village or regional corporation serving a region es-

21   tablished pursuant to the Alaska Native Claims Set-

22   tlement Act (43 U.S.C. 1601 et seq.) for the support

23   or implementation of 9–8–8 services, if the fee or

24   charge is held in a sequestered account to be obli-

25   gated or expended only in support of 9–8–8 services,

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003512

1208

1 or enhancements of such services, as specified in the

2 provision of State or local law adopting the fee or

3 charge.

4  (2) USE OF 9–8–8 FEES.—A fee or charge col-

5 lected under this subsection shall only be imposed,

6 collected, and used to pay expenses that a State, a

7 political subdivision of a State, an Indian Tribe, or

8 a village or regional corporation serving a region es-

9 tablished pursuant to the Alaska Native Claims Set-

10 tlement Act (43 U.S.C. 1601 et seq.) is expected to

11 incur that are reasonably attributable to—

12  (A) ensuring the efficient and effective

13  routing of calls made to the 9–8–8 national sui-

14  cide prevention and mental health crisis hotline

15  to an appropriate crisis center; or

16  (B) the provision of acute mental health,

17  crisis outreach, and stabilization services di-

18  rectly responding to the 9–8–8 national suicide

19  prevention and mental health crisis hotline.

20 (b) FEE ACCOUNTABILITY REPORT.—To ensure effi-

21 ciency, transparency, and accountability in the collection

22 and expenditure of a fee or charge for the support or im-

23 plementation of 9–8–8 services, not later than 2 years

24 after the date of the enactment of this Act, and annually

25 thereafter, the Commission shall submit to the Commit-

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003513

1209

1 tees on Commerce, Science, and Transportation and Ap-

2 propriations of the Senate and the Committees on Energy

3 and Commerce and Appropriations of the House of Rep-

4 resentatives a report that—

5     (1) details the status in each State, political

6 subdivision of a State, Indian Tribe, or village or re-

7 gional corporation serving a region established pur-

8 suant to the Alaska Native Claims Settlement Act

9 (43 U.S.C. 1601 et seq.) of the collection and dis-

10 tribution of such fees or charges, including a de-

11 tailed report about how those fees or charges are

12 being used to support 9–8–8 services; and

13     (2) includes findings on the amount of revenues

14 obligated or expended by each State, political sub-

15 division of a State, Indian Tribe, or village or re-

16 gional corporation serving a region established pur-

17 suant to the Alaska Native Claims Settlement Act

18 (43 U.S.C. 1601 et seq.) for any purpose other than

19 the purpose for which any such fees or charges are

20 specified.

21 (c) DEFINITIONS.—In this section:

22     (1) COMMISSION.—The term ''Commission''

23 means the Federal Communications Commission.

24     (2) STATE.—The term ''State'' has the mean-

25 ing given that term in section 7 of the Wireless

DOC_0003514

1210

1   Communications and Public Safety Act of 1999 (47

2   U.S.C. 615b).

3       (3) VOICE SERVICE.—The term ''voice service''

4   has the meaning given that term in section

5   227(e)(8) of the Communications Act of 1934 (47

6   U.S.C. 227(e)(8)).

**7   SEC. 130604. LOCATION IDENTIFICATION REPORT.**

8       (a) IN GENERAL.—Not later than 180 days after the

9   date of the enactment of this Act, the Federal Commu-

10  nications Commission shall submit to the appropriate com-

11  mittees a report that examines the feasibility and cost of

12  including an automatic dispatchable location that would

13  be conveyed with a 9–8–8 call, regardless of the techno-

14  logical platform used and including with calls from multi-

15  line telephone systems (as defined in section 6502 of the

16  Middle Class Tax Relief and Job Creation Act of 2012

17  (47 U.S.C. 1471)).

18      (b) DEFINITIONS.—In this section:

19          (1) APPROPRIATE COMMITTEES.—The term

20      ''appropriate committees'' means the following:

21              (A) The Committee on Commerce, Science,

22          and Transportation of the Senate.

23              (B) The Committee on Health, Education,

24          Labor, and Pensions of the Senate.

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003515

1211

1    (C) The Committee on Energy and Com-
2    merce of the House of Representatives.

3    (2) DISPATCHABLE LOCATION.—The term
4    "dispatchable location" means the street address of
5    the calling party and additional information such as
6    room number, floor number, or similar information
7    necessary to adequately identify the location of the
8    calling party.

## 9    SEC. 130605. REPORT ON CERTAIN TRAINING PROGRAMS.

10    (a) SENSE OF THE CONGRESS.—It is the sense of the
11    Congress that—

12        (1) youth who are lesbian, gay, bisexual,
13    transgender, or queer (referred to in this section as
14    "LGBTQ") are more than 4 times more likely to
15    contemplate suicide than their peers;

16        (2) 1 in 5 LGBTQ youth and more than 1 in
17    3 transgender youth report attempting suicide this
18    past year; and

19        (3) the Substance Abuse and Mental Health
20    Services Administration must be equipped to provide
21    specialized resources to this at-risk community.

22    (b) REPORT.—Not later than 180 days after the date
23    of the enactment of this Act, the Assistant Secretary for
24    Mental Health and Substance Use shall submit to the
25    Committee on Commerce, Science, and Transportation of

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003516

1212

the Senate, the Committee on Health, Education, Labor,
and Pensions of the Senate, and the Committee on Energy
and Commerce of the House of Representatives a report
that—

    (1) details a strategy, to be developed in con-
sultation with 1 or more organizations with expertise
in suicide of LGBTQ youth as well as 1 or more or-
ganizations with expertise in suicide of other high
risk populations, for the Substance Abuse and Men-
tal Health Services Administration to offer, support,
or provide technical assistance to training programs
for National Suicide Prevention Lifeline counselors
to increase competency in serving LGBTQ youth
and other high risk populations; and

    (2) includes recommendations regarding—

        (A) the facilitation of access to services
that are provided to specially trained staff and
partner organizations for LGBTQ individuals
and other high risk populations; and

        (B) a strategy for optimally implementing
an Integrated Voice Response, or other equally
effective mechanism, to allow National Suicide
Prevention Lifeline callers who are LGBTQ
youth or members of other high risk popu-
lations to access specialized services.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003517

1213

# TITLE VII—COVID–19 COMPAS-SION AND MARTHA WRIGHT PRISON PHONE JUSTICE

**SEC. 130701. FINDINGS.**

Congress finds the following:

(1) Prison, jails, and other confinement facili-ties in the United States have unique telecommuni-cations needs due to safety and security concerns.

(2) Unjust and unreasonable charges for tele-phone and advanced communications services in con-finement facilities negatively impact the safety and security of communities in the United States by damaging relationships between incarcerated persons and their support systems, thereby exacerbating re-cidivism.

(3) The COVID–19 pandemic has greatly inten-sified these concerns. Jails and prisons have become epicenters for the spread of the virus, with incarcer-ated persons concentrated in small, confined spaces and often without access to adequate health care. At Cook County jail alone, hundreds of incarcerated persons and jail staff have tested positive for the virus since its outbreak.

(4) To prevent the spread of the virus, many jails and prisons across the country suspended pub-

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003518

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1214

1   lie visitation, leaving confinement facility commu-

2   nications services as the only way that incarcerated

3   persons can stay in touch with their families.

4      (5) All people in the United States, including

5   anyone who pays for confinement facility commu-

6   nications services, should have access to communica-

7   tions services at charges that are just and reason-

8   able.

9      (6) Unemployment has risen sharply as a result

10  of the COVID–19 pandemic, straining the incomes

11  of millions of Americans and making it even more

12  difficult for families of incarcerated persons to pay

13  the high costs of confinement facility communica-

14  tions services.

15     (7) Certain markets for confinement facility

16  communications services are distorted due to reverse

17  competition, in which the financial interests of the

18  entity making the buying decision (the confinement

19  facility) are aligned with the seller (the provider of

20  confinement facility communications services) and

21  not the consumer (the incarcerated person or a

22  member of his or her family). This reverse competi-

23  tion occurs because site commission payments to the

24  confinement facility from the provider of confine-

25  ment facility communications services are the chief

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003519

1215

1     criterion many facilities use to select their provider
2     of confinement facility communications services.

3     (8) Charges for confinement facility commu-
4     nications services that have been shown to be unjust
5     and unreasonable are often a result of site commis-
6     sion payments that far exceed the costs incurred by
7     the confinement facility in accommodating these
8     services.

9     (9) Unjust and unreasonable charges have been
10     assessed for both audio and video services and for
11     both intrastate and interstate communications from
12     confinement facilities.

13     (10) Though Congress enacted emergency legis-
14     lation to allow free communications in Federal pris-
15     ons during the pandemic, it does not cover commu-
16     nications to or from anyone incarcerated in State
17     and local prisons or jails.

18     (11) Mrs. Martha Wright-Reed led a campaign
19     for just communications rates for incarcerated peo-
20     ple for over a decade.

21     (12) Mrs. Wright-Reed was the lead plaintiff in
22     Wright v. Corrections Corporation of America, CA
23     No. 00–293 (GK) (D.D.C. 2001).

DOC_0003520

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1216

1   (13) That case ultimately led to the Wright Pe-
2   tition at the Federal Communications Commission,
3   CC Docket No. 96–128 (November 3, 2003).

4   (14) As a grandmother, Mrs. Wright-Reed was
5   forced to choose between purchasing medication and
6   communicating with her incarcerated grandson.

7   (15) Mrs. Wright-Reed passed away on Janu-
8   ary 18, 2015, before fully realizing her dream of just
9   communications rates for all people.

10  **SEC. 130702. REQUIREMENTS FOR CONFINEMENT FACILITY**
11  **COMMUNICATIONS SERVICES, DURING THE**
12  **COVID–19 PANDEMIC AND OTHER TIMES.**

13  (a) IN GENERAL.—Section 276 of the Communica-
14  tions Act of 1934 (47 U.S.C. 276) is amended by adding
15  at the end the following:

16  "(e) ADDITIONAL REQUIREMENTS FOR CONFINE-
17  MENT FACILITY COMMUNICATIONS SERVICES.—

18  "(1) AUTHORITY.—

19  "(A) IN GENERAL.—All charges, practices,
20  classifications, and regulations for and in con-
21  nection with confinement facility communica-
22  tions services shall be just and reasonable, and
23  any such charge, practice, classification, or reg-
24  ulation that is unjust or unreasonable is de-
25  clared to be unlawful.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003521

1217

1       "(B) RULEMAKING REQUIRED.—Not later
2       than 18 months after the date of the enactment
3       of this subsection, the Commission shall issue
4       rules to adopt, for the provision of confinement
5       facility communications services, rates and an-
6       cillary service charges that are just and reason-
7       able, which shall be the maximum such rates
8       and charges that a provider of confinement fa-
9       cility communications services may charge for
10      such services. In determining rates and charges
11      that are just and reasonable, the Commission
12      shall adopt such rates and charges based on the
13      average industry costs of providing such serv-
14      ices using data collected from providers of con-
15      finement facility communications services.

16      "(C) BIENNIAL REVIEW.—Not less fre-
17      quently than every 2 years following the
18      issuance of rules under subparagraph (B), the
19      Commission shall—

20          "(i) determine whether the rates and
21          ancillary service charges authorized by the
22          rules issued under such subparagraph re-
23          main just and reasonable; and

24          "(ii) if the Commission determines
25          under clause (i) that any such rate or

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003522

1218

1             charge does not remain just and reason-

2             able, revise such rules so that such rate or

3             charge is just and reasonable.

4          "(2) INTERIM RATE CAPS.—Until the Commis-

5   sion issues the rules required by paragraph (1)(B),

6   a provider of confinement facility communications

7   services may not charge a rate for any voice service

8   communication using confinement facility commu-

9   nications services that exceeds the following:

10          "(A) For debit calling or prepaid calling,

11          $0.04 per minute.

12          "(B) For collect calling, $0.05 per minute.

13          "(3) ASSESSMENT ON PER-MINUTE BASIS.—Ex-

14   cept as provided in paragraph (4), a provider of con-

15   finement facility communications services—

16          "(A) shall assess all charges for a commu-

17          nication using such services on a per-minute

18          basis for the actual duration of the communica-

19          tion, measured from communication acceptance

20          to termination, rounded up to the next full

21          minute, except in the case of charges for serv-

22          ices that the confinement facility offers free of

23          charge or for amounts below the amounts per-

24          mitted under this subsection; and

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003523

1219

1  "(B) may not charge a per-communication

2  or per-connection charge for a communication

3  using such services.

4  "(4) ANCILLARY SERVICE CHARGES.—

5    "(A) GENERAL PROHIBITION.—A provider

6  of confinement facility communications services

7  may not charge an ancillary service charge

8  other than—

9    "(i) if the Commission has not yet

10  issued the rules required by paragraph

11  (1)(B), a charge listed in subparagraph

12  (B) of this paragraph; or

13    "(ii) a charge authorized by the rules

14  adopted by the Commission under para-

15  graph (1).

16  "(B) PERMITTED CHARGES AND RATES.—

17  If the Commission has not yet issued the rules

18  required by paragraph (1)(B), a provider of

19  confinement facility communications services

20  may not charge a rate for an ancillary service

21  charge in excess of the following:

22    "(i) In the case of an automated pay-

23  ment fee, 2.9 percent of the total charge

24  on which the fee is assessed.

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003524

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1220

1    "(ii) In the case of a fee for single-call

2    and related services, the exact transaction

3    fee charged by the third-party provider,

4    with no markup.

5    "(iii) In the case of a live agent fee,

6    $5.95 per use.

7    "(iv) In the case of a paper bill or

8    statement fee, $2 per use.

9    "(v) In the case of a third-party fi-

10   nancial transaction fee, the exact fee, with

11   no markup, charged by the third party for

12   the transaction.

13   "(5) PROHIBITION ON SITE COMMISSIONS.—A

14   provider of confinement facility communications

15   services may not assess a site commission.

16   "(6) RELATIONSHIP TO STATE LAW.—A State

17   or political subdivision of a State may not enforce

18   any law, rule, regulation, standard, or other provi-

19   sion having the force or effect of law relating to con-

20   finement facility communications services that allows

21   for higher rates or other charges to be assessed for

22   such services than is permitted under any Federal

23   law or regulation relating to confinement facility

24   communications services.

25   "(7) DEFINITIONS.—In this subsection:

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003525

1221

1                "(A) ANCILLARY SERVICE CHARGE.—The

2     term 'ancillary service charge' means any

3     charge a consumer may be assessed for the set-

4     ting up or use of a confinement facility commu-

5     nications service that is not included in the per-

6     minute charges assessed for individual commu-

7     nications.

8                "(B) AUTOMATED PAYMENT FEE.—The

9     term 'automated payment fee' means a credit

10    card payment, debit card payment, or bill proc-

11    essing fee, including a fee for a payment made

12    by means of interactive voice response, the

13    internet, or a kiosk.

14            "(C) COLLECT CALLING.—The term 'col-

15    lect calling' means an arrangement whereby a

16    credit-qualified party agrees to pay for charges

17    associated with a communication made to such

18    party using confinement facility communica-

19    tions services and originating from within a

20    confinement facility.

21            "(D) CONFINEMENT FACILITY.—The term

22    'confinement facility'—

23                "(i) means a jail or a prison; and

24                "(ii) includes any juvenile, detention,

25    work release, or mental health facility that

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003526

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1222

1  is used primarily to hold individuals who

2  are—

3      ''(I)  awaiting  adjudication  of

4      criminal  charges  or  an  immigration

5      matter; or

6      ''(II)  serving  a  sentence  for  a

7      criminal conviction.

8  ''(E) CONFINEMENT FACILITY COMMU-

9  NICATIONS SERVICE.—The term 'confinement

10  facility communications service' means a service

11  that allows incarcerated persons to make elec-

12  tronic  communications  (whether  intrastate,

13  interstate, or international and whether made

14  using video, audio, or any other communicative

15  method,  including  advanced  communications

16  services) to individuals outside the confinement

17  facility, or to individuals inside the confinement

18  facility, where the incarcerated person is being

19  held, regardless of the technology used to de-

20  liver the service.

21  ''(F) CONSUMER.—The  term  'consumer'

22  means the party paying a provider of confine-

23  ment facility communications services.

24  ''(G) DEBIT CALLING.—The  term  'debit

25  calling' means a presubscription or comparable

g:\VHLC\051220\051220.072.xml        (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003527

1  service which allows an incarcerated person, or

2  someone acting on an incarcerated person's be-

3  half, to fund an account set up through a pro-

4  vider that can be used to pay for confinement

5  facility communications services originated by

6  the incarcerated person.

7  "(H) FEE FOR SINGLE-CALL AND RE-

8  LATED SERVICES.—The term 'fee for single-call

9  and related services' means a billing arrange-

10  ment whereby communications made by an in-

11  carcerated person using collect calling are billed

12  through a third party on a per-communication

13  basis, where the recipient does not have an ac-

14  count with the provider of confinement facility

15  communications services.

16  "(I) INCARCERATED PERSON.—The term

17  'incarcerated person' means a person detained

18  at a confinement facility, regardless of the du-

19  ration of the detention.

20  "(J) JAIL.—The term 'jail'—

21  "(i) means a facility of a law enforce-

22  ment agency of the Federal Government or

23  of a State or political subdivision of a

24  State that is used primarily to hold indi-

25  viduals who are—

DOC_0003528

1224

1                 "(I) awaiting adjudication of

2 criminal charges;

3                 "(II) post-conviction and com-

4 mitted to confinement for sentences of

5 one year or less; or

6                 "(III) post-conviction and await-

7 ing transfer to another facility; and

8                 "(ii) includes—

9                 "(I) city, county, or regional fa-

10 cilities that have contracted with a

11 private company to manage day-to-

12 day operations;

13                 "(II) privately-owned and oper-

14 ated facilities primarily engaged in

15 housing city, county, or regional in-

16 carcerated persons; and

17                 "(III) facilities used to detain in-

18 dividuals pursuant to a contract with

19 U.S. Immigration and Customs En-

20 forcement.

21         "(K) LIVE AGENT FEE.—The term 'live

22 agent fee' means a fee associated with the op-

23 tional use of a live operator to complete a con-

24 finement facility communications service trans-

25 action.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003529

1225

1     ''(L) PAPER BILL OR STATEMENT FEE.—
2     The term 'paper bill or statement fee' means a
3     fee associated with providing a consumer an op-
4     tional paper billing statement.
5         ''(M) PER-COMMUNICATION OR PER-CON-
6     NECTION CHARGE.—The term 'per-communica-
7     tion or per-connection charge' means a one-time
8     fee charged to a consumer at the initiation of
9     a communication.
10        ''(N) PREPAID CALLING.—The term 'pre-
11    paid calling' means a calling arrangement that
12    allows a consumer to pay in advance for a spec-
13    ified amount of confinement facility commu-
14    nications services.
15        ''(O) PRISON.—The term 'prison'—
16            ''(i) means a facility operated by a
17        State or Federal agency that is used pri-
18        marily to confine individuals convicted of
19        felonies and sentenced to terms in excess
20        of one year; and
21            ''(ii) includes—
22                ''(I) public and private facilities
23            that provide outsource housing to
24            State or Federal agencies such as

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003530

1226

1   State Departments of Correction and

2   the Federal Bureau of Prisons; and

3   ''(II) facilities that would other-

4   wise be jails but in which the majority

5   of incarcerated persons are post-con-

6   viction or are committed to confine-

7   ment for sentences of longer than one

8   year.

9   ''(P) PROVIDER OF CONFINEMENT FACIL-

10   ITY COMMUNICATIONS SERVICES.—The term

11   'provider of confinement facility communica-

12   tions services' means any communications serv-

13   ice provider that provides confinement facility

14   communications services, regardless of the tech-

15   nology used.

16   ''(Q) SITE COMMISSION.—The term 'site

17   commission' means any monetary payment, in-

18   kind payment, gift, exchange of services or

19   goods, fee, technology allowance, or product

20   that a provider of confinement facility commu-

21   nications services or an affiliate of a provider of

22   confinement facility communications services

23   may pay, give, donate, or otherwise provide

24   to—

DOC_0003531

1227

1       "(i) an entity that operates a confine-
2   ment facility;

3       "(ii) an entity with which the provider
4   of confinement facility communications
5   services enters into an agreement to pro-
6   vide confinement facility communications
7   services;

8       "(iii) a governmental agency that
9   oversees a confinement facility;

10      "(iv) the State or political subdivision
11  of a State where a confinement facility is
12  located; or

13      "(v) an agent or other representative
14  of an entity described in any of clauses (i)
15  through (iv).

16  "(R) THIRD-PARTY FINANCIAL TRANS-
17  ACTION FEE.—The term 'third-party financial
18  transaction fee' means the exact fee, with no
19  markup, that a provider of confinement facility
20  communications services is charged by a third
21  party to transfer money or process a financial
22  transaction to facilitate the ability of a con-
23  sumer to make an account payment via a third
24  party.

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003532

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1228

1        "(S) VOICE SERVICE.—The term 'voice

2    service'—

3            "(i) means any service that is inter-

4        connected with the public switched tele-

5        phone network and that furnishes voice

6        communications to an end user using re-

7        sources from the North American Num-

8        bering Plan or any successor to the North

9        American Numbering Plan adopted by the

10       Commission under section 251(e)(1); and

11           "(ii) includes—

12               "(I) transmissions from a tele-

13           phone facsimile machine, computer, or

14           other device to a telephone facsimile

15           machine; and

16               "(II) without limitation, any

17           service that enables real-time, two-way

18           voice communications, including any

19           service that requires internet protocol-

20           compatible customer premises equip-

21           ment (commonly known as 'CPE')

22           and permits out-bound calling, wheth-

23           er or not the service is one-way or

24           two-way voice over internet protocol.".

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003533

1229

1     (b) CONFORMING AMENDMENT.—Section 276(d) of

2 the Communications Act of 1934 (47 U.S.C. 276(d)) is

3 amended by striking "inmate telephone service in correc-

4 tional institutions" and inserting "confinement facility

5 communications services (as defined in subsection

6 (e)(7))".

7     (c) EXISTING CONTRACTS.—

8         (1) IN GENERAL.—In the case of a contract

9         that was entered into and under which a provider of

10         confinement facility communications services was

11         providing such services at a confinement facility on

12         or before the date of the enactment of this Act—

13             (A) paragraphs (1) through (5) of sub-

14             section (e) of section 276 of the Communica-

15             tions Act of 1934, as added by subsection (a)

16             of this section, shall apply to the provision of

17             confinement facility communications services by

18             such provider at such facility beginning on the

19             earlier of—

20                 (i) the date that is 60 days after such

21                 date of enactment; or

22                 (ii) the date of the termination of the

23                 contract; and

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003534

1230

1      (B) the terms of such contract may not be

2      extended after such date of enactment, whether

3      by exercise of an option or otherwise.

4      (2) DEFINITIONS.—In this subsection, the

5  terms "confinement facility", "confinement facility

6  communications service", and "provider of confine-

7  ment facility communications services" have the

8  meanings given such terms in paragraph (7) of sub-

9  section (e) of section 276 of the Communications

10  Act of 1934, as added by subsection (a) of this sec-

11  tion.

12 **SEC. 130703. AUTHORITY.**

13  Section 2(b) of the Communications Act of 1934 (47

14 U.S.C. 152(b)) is amended by inserting "section 276,"

15 after "227, inclusive,".

# 16 TITLE VIII—HEALTHCARE
# 17 BROADBAND EXPANSION
# 18 DURING COVID–19

19 **SEC. 130801. EXPANSION OF RURAL HEALTH CARE PRO-**

20       **GRAM OF FCC IN RESPONSE TO COVID–19.**

21  (a) PROMULGATION OF REGULATIONS REQUIRED.—

22 Not later than 7 days after the date of the enactment of

23 this Act, the Commission shall promulgate regulations

24 modifying the requirements in subpart G of part 54 of

DOC_0003535

1231

1 title 47, Code of Federal Regulations, in the following

2 manner:

3     (1) A health care provider not located in a rural

4 area shall be treated as a rural health care provider

5 for the purposes of the Healthcare Connect Fund

6 Program.

7     (2) The discount rate for an eligible expense

8 through the Healthcare Connect Fund Program (as

9 described in section 54.611(a) of title 47, Code of

10 Federal Regulations, or any successor regulation)

11 shall be increased to 85 percent in funding years

12 2019, 2020, and 2021 for eligible equipment pur-

13 chased or eligible services rendered in such funding

14 years (including for eligible equipment, upfront pay-

15 ments, and multi-year commitments without limita-

16 tion).

17     (3) A temporary, mobile, or satellite health care

18 delivery site shall be treated as a health care pro-

19 vider or an eligible site of a health care provider for

20 purposes of determining eligibility for the Healthcare

21 Connect Fund Program or the Telecommunications

22 Program.

23     (4) The waiver of the application window speci-

24 fied in section 54.621(a) of title 47, Code of Federal

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003536

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1232

1 Regulations (or any successor regulation), for fund-
2 ing year 2019.

3     (5) The adoption and implementation of a roll-
4 ing application process to allow a health care pro-
5 vider to apply for funding.

6     (6) The following changes to certain bidding re-
7 quirements:

8     (A) A waiver of any requirement under
9 section 54.622 of title 47, Code of Federal Reg-
10 ulations (or any successor regulation), for a
11 health care provider upgrading an existing sup-
12 ported service at a particular location, effective
13 as of the date of declaration of the public health
14 emergency pursuant to section 319 of the Pub-
15 lic Health Service Act (42 U.S.C. 247d) as a
16 result of confirmed cases of COVID–19, if the
17 health care provider maintains the same eligible
18 service provider to provide the upgraded service
19 at such location.

20     (B) Reduction of the 28-day waiting period
21 described in section 54.622(g) of title 47, Code
22 of Federal Regulations (or any successor regu-
23 lation), to a 14-day waiting period.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003537

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1233

1               (C) Modification of the requirements in

2          section 54.622 of title 47, Code of Federal Reg-

3          ulations (or any successor regulation), to—

4                (i) provide that bid evaluation criteria

5             may give additional consideration to the

6             speed with which an eligible service pro-

7             vider can initiate service; and

8                (ii) encourage applicants to consider

9             bids from different providers to provide

10          service to different locations of such appli-

11          cants, if considering bids in this manner

12          would expedite the overall timeline for ini-

13          tiating or expanding service to individual

14          locations.

15       (7) Issuance of a decision on each application

16  for funding not later than 60 days after the date on

17  which the application is filed.

18       (8) Release of funding not later than 30 days

19  after the date on which an invoice is submitted with

20  respect to an application that is approved, applicable

21  services have been provided, and required invoices

22  have been submitted as required under program

23  rules.

24    (b) ADDITIONAL CHANGES TO RURAL HEALTH CARE

25  PROGRAM.—

DOC_0003538

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1234

1      (1) RELEASE OF FUNDING FOR OUTSTANDING
2      FUNDING REQUESTS.—

3          (A) IN GENERAL.—The Commission shall
4          ensure the release of funding for all requests
5          (outstanding as of the date of the enactment of
6          this Act) under the Rural Health Care Program
7          not later than 60 days after the date of the en-
8          actment of this Act, except that for outstanding
9          funding requests that are subject to a review of
10         the applicable urban and rural rates, the Com-
11         mission shall ensure the release of interim fund-
12         ing not later than 60 days after the date of the
13         enactment of this Act, disbursed at 65 percent
14         of the funding request, subject to a true-up fol-
15         lowing the completion of such review.

16         (B) LIMITATION.—This paragraph shall
17         not apply to any party or successor-in-interest
18         to any party to which the Commission, during
19         the period beginning on the date that is 1 year
20         before the date of the enactment of this Act
21         and ending on January 31, 2020, has issued a
22         Letter of Inquiry, Notice of Apparent Liability,
23         or Forfeiture Order relating to the party's par-
24         ticipation in the Rural Health Care Program,

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003539

1235

1   pursuant to section 503(b) of the Communica-
2   tions Act of 1934 (47 U.S.C. 503(b)).

3      (C) REQUIRED REPAYMENT.—In the case
4   of an eligible service provider that receives
5   funding through the Rural Health Care Pro-
6   gram pursuant to this paragraph to which such
7   provider is not entitled, the Commission shall
8   require such provider to repay such funds.

9      (2) DELAY OF IMPLEMENTATION SCHEDULE.—
10  The Commission shall—

11     (A) delay by one year the implementation
12  of sections 54.604 and 54.605 of title 47, Code
13  of Federal Regulations (or any successor regu-
14  lation), as adopted in the Report and Order in
15  the matter of Promoting Telehealth in Rural
16  America (FCC 19–78) that was adopted by the
17  Commission on August 1, 2019; and

18     (B) delay application of the new definition
19  of ''similar services'' as described in paragraphs
20  14 to 20 of such Report and Order until the
21  implementation of such sections.

22  (c) EFFECTIVE DATE OF REGULATIONS.—The regu-
23  lations required under subsection (a) shall take effect on
24  the date on which such regulations are promulgated.

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003540

1236

1 (d) TERMINATION OF REGULATIONS.—Except to the

2 extent that the Commission determines that some or all

3 of the regulations promulgated under subsection (a)

4 should remain in effect (excluding any regulation promul-

5 gated under paragraph (1) of such subsection), such regu-

6 lations shall terminate on the later of—

7     (1) the earlier of—

8         (A) the date that is 60 days after the ter-

9         mination of the declaration, or any renewal

10        thereof, of the public health emergency pursu-

11        ant to section 319 of the Public Health Service

12        Act (42 U.S.C. 247d) as a result of confirmed

13        cases of COVID–19; and

14        (B) the date of the expiration of the appro-

15        priation in subsection (f)(2); and

16     (2) the date that is 9 months after the date of

17     the enactment of this Act.

18 (e) EXEMPTIONS.—

19     (1) NOTICE AND COMMENT RULEMAKING RE-

20     QUIREMENTS.—Subsections (b), (c), and (d) of sec-

21     tion 553 of title 5, United States Code, shall not

22     apply to a regulation promulgated under subsection

23     (a) or a rulemaking to promulgate such a regulation.

24     (2) PAPERWORK REDUCTION ACT REQUIRE-

25     MENTS.—A collection of information conducted or

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003541

1237

1     sponsored under the regulations required by sub-

2     section (a), or under section 254 of the Communica-

3     tions Act of 1934 (47 U.S.C. 254) in connection

4     with universal service support provided under such

5     regulations, shall not constitute a collection of infor-

6     mation for the purposes of subchapter I of chapter

7     35 of title 44, United States Code (commonly re-

8     ferred to as the Paperwork Reduction Act).

9     (f) EMERGENCY RURAL HEALTH CARE

10 CONNECTIVITY FUND.—

11     (1) ESTABLISHMENT.—There is established in

12     the Treasury of the United States a fund to be

13     known as the Emergency Rural Health Care

14     Connectivity Fund.

15     (2) AUTHORIZATION OF APPROPRIATIONS.—

16     There is authorized to be appropriated to the Emer-

17     gency Rural Health Care Connectivity Fund

18     $2,000,000,000 for fiscal year 2020, to remain

19     available through fiscal year 2022.

20     (3) USE OF FUNDS.—Amounts in the Emer-

21     gency Rural Health Care Connectivity Fund shall be

22     available to the Commission to carry out the Rural

23     Health Care Program, as modified by the regula-

24     tions promulgated under subsection (a).

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003542

1238

1 (4) RELATIONSHIP TO UNIVERSAL SERVICE

2 CONTRIBUTIONS.—Support provided under the regu-

3 lations required by paragraphs (1) through (3) of

4 subsection (a) shall be provided from amounts made

5 available under paragraph (3) of this subsection and

6 not from contributions under section 254(d) of the

7 Communications Act of 1934 (47 U.S.C. 254(d)).

8 Such support shall be in addition to, and not in re-

9 placement of, funds authorized by the Commission

10 for the Rural Health Care Program as of the date

11 of the enactment of this Act from contributions

12 under section 254(d) of the Communications Act of

13 1934 (47 U.S.C. 254(d)).

14 (g) DEFINITIONS.—In this section:

15 (1) COMMISSION.—The term "Commission"

16 means the Federal Communications Commission.

17 (2) ELIGIBLE EQUIPMENT.—The term "eligible

18 equipment" means the equipment described in sec-

19 tion 54.613 of title 47, Code of Federal Regulations

20 (or any successor regulation).

21 (3) ELIGIBLE SERVICE PROVIDER.—The term

22 "eligible service provider" means a provider de-

23 scribed in section 54.608 of title 47, Code of Federal

24 Regulations (or any successor regulation).

DOC_0003543

1239

1  (4) FUNDING YEAR.—The term "funding year"

2 has the meaning given such term in section

3 54.600(a) of title 47, Code of Federal Regulations

4 (or any successor regulation).

5  (5) HEALTH CARE PROVIDER.—The term

6 "health care provider" has the meaning given such

7 term in section 54.600(b) of title 47, Code of Fed-

8 eral Regulations (or any successor regulation).

9  (6) HEALTHCARE CONNECT FUND PROGRAM.—

10 The term "Healthcare Connect Fund Program" has

11 the meaning given such term in section 54.602(b) of

12 title 47, Code of Federal Regulations (or any suc-

13 cessor regulation).

14  (7) MULTI-YEAR COMMITMENTS.—The term

15 "multi-year commitments" means the commitments

16 described in section 54.620(c) of title 47, Code of

17 Federal Regulations (or any successor regulation).

18  (8) RURAL AREA.—The term "rural area" has

19 the meaning given such term in section 54.600(e) of

20 title 47, Code of Federal Regulations (or any suc-

21 cessor regulation).

22  (9) RURAL HEALTH CARE PROGRAM.—The

23 term "Rural Health Care Program" means the pro-

24 gram described in subpart G of part 54 of title 47,

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003544

1240

1 Code of Federal Regulations (or any successor regu-

2 lation).

3     (10) RURAL HEALTH CARE PROVIDER.—The

4 term "rural health care provider" has the meaning

5 given such term in section 54.600(f) of title 47,

6 Code of Federal Regulations (or any successor regu-

7 lation).

8     (11) TELECOMMUNICATIONS PROGRAM.—The

9 term "Telecommunications Program" has the mean-

10 ing given such term in section 54.602(a) of title 47,

11 Code of Federal Regulations (or any successor regu-

12 lation).

13     (12) UPFRONT PAYMENTS.—The term "upfront

14 payments" means the payments described in section

15 54.616 of title 47, Code of Federal Regulations (or

16 any successor regulation).

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003545

1241

# DIVISION N—GIVING RETIRE-MENT OPTIONS TO WORKERS ACT

**SEC. 140001. SHORT TITLE.**

This division may be cited as the "Giving Retirement Options to Workers Act of 2020" or the "GROW Act".

**SEC. 140002. COMPOSITE PLANS.**

(a) AMENDMENT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974.—

(1) IN GENERAL.—Title I of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1001 et seq.) is amended by adding at the end the following:

## "PART 8—COMPOSITE PLANS AND LEGACY PLANS

**"SEC. 801. COMPOSITE PLAN DEFINED.**

"(a) IN GENERAL.—For purposes of this Act, the term 'composite plan' means a pension plan—

"(1) which is a multiemployer plan that is neither a defined benefit plan nor a defined contribution plan;

"(2) the terms of which provide that the plan is a composite plan for purposes of this title with respect to which not more than one multiemployer defined benefit plan is treated as a legacy plan within

g:\VHLC\051220\051220.072.xml    (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003546

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1242

1    the meaning of section 805, unless there is more

2    than one legacy plan following a merger of composite

3    plans under section 806;

4        ''(3) which provides systematically for the pay-

5    ment of benefits—

6            ''(A) objectively calculated pursuant to a

7        formula enumerated in the plan document with

8        respect to plan participants after retirement,

9        for life; and

10           ''(B) in the form of life annuities, except

11       for benefits which under section 203(e) may be

12       immediately distributed without the consent of

13       the participant;

14       ''(4) for which the plan contributions for the

15   first plan year are at least 120 percent of the nor-

16   mal cost for the plan year;

17       ''(5) which requires—

18           ''(A) an annual valuation of the liability of

19       the plan as of a date within the plan year to

20       which the valuation refers or within one month

21       prior to the beginning of such year;

22           ''(B) an annual actuarial determination of

23       the plan's current funded ratio and projected

24       funded ratio under section 802(a);

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003547

1243

1         ''(C) corrective action through a realign-

2 ment program pursuant to section 803 when-

3 ever the plan's projected funded ratio is below

4 120 percent for the plan year; and

5         ''(D) an annual notification to each partici-

6 pant describing the participant's benefits under

7 the plan and explaining that such benefits may

8 be subject to reduction under a realignment

9 program pursuant to section 803 based on the

10 plan's funded status in future plan years; and

11     ''(6) the board of trustees of which includes at

12 least one retiree or beneficiary in pay status during

13 each plan year following the first plan year in which

14 at least 5 percent of the participants in the plan are

15 retirees or beneficiaries in pay status.

16   ''(b) TRANSITION FROM A MULTIEMPLOYER DE-

17 FINED BENEFIT PLAN.—

18     ''(1) IN GENERAL.—The plan sponsor of a de-

19 fined benefit plan that is a multiemployer plan may,

20 subject to paragraph (2), amend the plan to incor-

21 porate the features of a composite plan as a compo-

22 nent of the multiemployer plan separate from the

23 defined benefit plan component, except in the case of

24 a defined benefit plan for which the plan actuary has

25 certified under section 305(b)(3) that the plan is or

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003548

1244

1 will be in critical status for the plan year in which

2 such amendment would become effective or for any

3 of the succeeding 5 plan years.

4     "(2) REQUIREMENTS.—Any amendment pursu-

5 ant to paragraph (1) to incorporate the features of

6 a composite plan as a component of a multiemployer

7 plan shall—

8         "(A) apply with respect to all collective

9 bargaining agreements providing for contribu-

10 tions to the multiemployer plan on or after the

11 effective date of the amendment;

12         "(B) apply with respect to all participants

13 in the multiemployer plan for whom contribu-

14 tions are made to the multiemployer plan on or

15 after the effective date of the amendment;

16         "(C) specify that the effective date of the

17 amendment is—

18             "(i) the first day of a specified plan

19 year following the date of the adoption of

20 the amendment, except that the plan spon-

21 sor may alternatively provide for a sepa-

22 rate effective date with respect to each col-

23 lective bargaining agreement under which

24 contributions to the multiemployer plan

25 are required, which shall occur on the first

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003549

1245

1    day of the first plan year beginning after
2    the termination, or if earlier, the re-open-
3    ing, of each such agreement, or such ear-
4    lier date as the parties to the agreement
5    and the plan sponsor of the multiemployer
6    plan shall agree to; and

7        ''(ii) not later than the first day of the
8        fifth plan year beginning on or after the
9        date of the adoption of the amendment;

10    ''(D) specify that, as of the amendment's
11    effective date, no further benefits shall accrue
12    under the defined benefit component of the
13    multiemployer plan; and

14    ''(E) specify that, as of the amendment's
15    effective date, the plan sponsor of the multiem-
16    ployer plan shall be the plan sponsor of both
17    the composite plan component and the defined
18    benefit plan component of the plan.

19    ''(3) SPECIAL RULES.—If a multiemployer plan
20    is amended pursuant to paragraph (1)—

21        ''(A) the requirements of this title and title
22        IV shall be applied to the composite plan com-
23        ponent and the defined benefit plan component
24        of the multiemployer plan as if each such com-
25        ponent were maintained as a separate plan; and

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003550

1246

1    "(B) the assets of the composite plan com-
2    ponent and the defined benefit plan component
3    of the plan shall be held in a single trust form-
4    ing part of the plan under which the trust in-
5    strument expressly provides—

6        "(i) for separate accounts (and appro-
7        priate records) to be maintained to reflect
8        the interest which each of the plan compo-
9        nents has in the trust, including separate
10       accounting for additions to the trust for
11       the benefit of each plan component, dis-
12       bursements made from each plan compo-
13       nent's account in the trust, investment ex-
14       perience of the trust allocable to that ac-
15       count, and administrative expenses (wheth-
16       er direct expenses or shared expenses allo-
17       cated proportionally), and permits, but
18       does not require, the pooling of some or all
19       of the assets of the two plan components
20       for investment purposes; and

21       "(ii) that the assets of each of the two
22       plan components shall be held, invested,
23       reinvested, managed, administered and dis-
24       tributed for the exclusive benefit of the
25       participants and beneficiaries of each such

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003551

1247

1          plan component, and in no event shall the
2          assets of one of the plan components be
3          available to pay benefits due under the
4          other plan component.

5     ''(4) NOT A TERMINATION EVENT.—Notwith-
6     standing section 4041A, an amendment pursuant to
7     paragraph (1) to incorporate the features of a com-
8     posite plan as a component of a multiemployer plan
9     does not constitute termination of the multiemployer
10    plan.

11        ''(5) NOTICE TO THE SECRETARY.—

12            ''(A) NOTICE.—The plan sponsor of a
13            composite plan shall provide notice to the Sec-
14            retary of the intent to establish the composite
15            plan (or, in the case of a composite plan incor-
16            porated as a component of a multiemployer
17            plan as described in paragraph (1), the intent
18            to amend the multiemployer plan to incorporate
19            such composite plan) at least 30 days prior to
20            the effective date of such establishment or
21            amendment.

22            ''(B) CERTIFICATION.—In the case of a
23            composite plan incorporated as a component of
24            a multiemployer plan as described in paragraph
25            (1), such notice shall include a certification by

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003552

1248

1 the plan actuary under section 305(b)(3) that

2 the effective date of the amendment occurs in

3 a plan year for which the multiemployer plan is

4 not in critical status for that plan year and any

5 of the succeeding 5 plan years.

6 "(6) REFERENCES TO COMPOSITE PLAN COM-

7 PONENT.—As used in this part, the term 'composite

8 plan' includes a composite plan component added to

9 a defined benefit plan pursuant to paragraph (1).

10 "(7) RULE OF CONSTRUCTION.—Paragraph

11 (2)(A) shall not be construed as preventing the plan

12 sponsor of a multiemployer plan from adopting an

13 amendment pursuant to paragraph (1) because some

14 collective bargaining agreements are amended to

15 cease any covered employer's obligation to contribute

16 to the multiemployer plan before or after the plan

17 amendment is effective. Paragraph (2)(B) shall not

18 be construed as preventing the plan sponsor of a

19 multiemployer plan from adopting an amendment

20 pursuant to paragraph (1) because some partici-

21 pants cease to have contributions made to the multi-

22 employer plan on their behalf before or after the

23 plan amendment is effective.

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003553

1249

1 "(c) COORDINATION WITH FUNDING RULES.—Ex-
2 cept as otherwise provided in this title, sections 302, 304,
3 and 305 shall not apply to a composite plan.

4 "(d) TREATMENT OF A COMPOSITE PLAN.—For pur-
5 poses of this Act (other than sections 302 and 4245), a
6 composite plan shall be treated as if it were a defined ben-
7 efit plan unless a different treatment is provided for under
8 applicable law.

9 **"SEC. 802. FUNDED RATIOS; ACTUARIAL ASSUMPTIONS.**

10     "(a) CERTIFICATION OF FUNDED RATIOS.—

11         "(1) IN GENERAL.—Not later than the one-
12     hundred twentieth day of each plan year of a com-
13     posite plan, the plan actuary of the composite plan
14     shall certify to the Secretary, the Secretary of the
15     Treasury, and the plan sponsor the plan's current
16     funded ratio and projected funded ratio for the plan
17     year.

18         "(2) DETERMINATION OF CURRENT FUNDED
19     RATIO AND PROJECTED FUNDED RATIO.—For pur-
20     poses of this section:

21             "(A) CURRENT FUNDED RATIO.—The cur-
22         rent funded ratio is the ratio (expressed as a
23         percentage) of—

24                 "(i) the value of the plan's assets as
25             of the first day of the plan year; to

DOC_0003554

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1250

1               "(ii) the plan actuary's best estimate

2            of the present value of the plan liabilities

3            as of the first day of the plan year.

4            "(B) PROJECTED FUNDED RATIO.—The

5 projected funded ratio is the current funded

6 ratio projected to the first day of the fifteenth

7 plan year following the plan year for which the

8 determination is being made.

9        "(3) CONSIDERATION OF CONTRIBUTION RATE

10 INCREASES.—For purposes of projections under this

11 subsection, the plan sponsor may anticipate con-

12 tribution rate increases beyond the term of the cur-

13 rent collective bargaining agreement and any agreed-

14 to supplements, up to a maximum of 2.5 percent per

15 year, compounded annually, unless it would be un-

16 reasonable under the circumstances to assume that

17 contributions would increase by that amount.

18        "(b) ACTUARIAL ASSUMPTIONS AND METHODS.—

19 For purposes of this part:

20            "(1) IN GENERAL.—All costs, liabilities, rates

21 of interest and other factors under the plan shall be

22 determined for a plan year on the basis of actuarial

23 assumptions and methods—

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003555

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1251

1          ''(A) each of which is reasonable (taking

2     into account the experience of the plan and rea-

3     sonable expectations);

4          ''(B) which, in combination, offer the actu-

5     ary's best estimate of anticipated experience

6     under the plan; and

7          ''(C) with respect to which any change

8     from the actuarial assumptions and methods

9     used in the previous plan year shall be certified

10    by the plan actuary and the actuarial rationale

11    for such change provided in the annual report

12    required by section 103.

13        ''(2) FAIR MARKET VALUE OF ASSETS.—The

14    value of the plan's assets shall be taken into account

15    on the basis of their fair market value.

16        ''(3) DETERMINATION OF NORMAL COST AND

17    PLAN LIABILITIES.—A plan's normal cost and liabil-

18    ities shall be based on the most recent actuarial

19    valuation required under section 801(a)(5)(A) and

20    the unit credit funding method.

21        ''(4) TIME WHEN CERTAIN CONTRIBUTIONS

22    DEEMED MADE.—Any contributions for a plan year

23    made by an employer after the last day of such plan

24    year, but not later than two and one-half months

25    after such day, shall be deemed to have been made

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003556

1252

1    on such last day. For purposes of this paragraph,

2    such two and one-half month period may be ex-

3    tended for not more than six months under regula-

4    tions prescribed by the Secretary of the Treasury.

5        "(5) ADDITIONAL ACTUARIAL ASSUMPTIONS.—

6    Except where otherwise provided in this part, the

7    provisions of section 305(b)(3)(B) shall apply to any

8    determination or projection under this part.

9    **"SEC. 803. REALIGNMENT PROGRAM.**

10       "(a) REALIGNMENT PROGRAM.—

11         "(1) ADOPTION.—In any case in which the plan

12    actuary certifies under section 802(a) that the plan's

13    projected funded ratio is below 120 percent for the

14    plan year, the plan sponsor shall adopt a realign-

15    ment program under paragraph (2) not later than

16    210 days after the due date of the certification re-

17    quired under such section 802(a). The plan sponsor

18    shall adopt an updated realignment program for

19    each succeeding plan year for which a certification

20    described in the preceding sentence is made.

21       "(2) CONTENT OF REALIGNMENT PROGRAM.—

22         "(A) IN GENERAL.—A realignment pro-

23    gram adopted under this paragraph is a written

24    program which consists of all reasonable meas-

25    ures, including options or a range of options to

1253

1  be undertaken by the plan sponsor or proposed
2  to the bargaining parties, formulated, based on
3  reasonably anticipated experience and reason-
4  able actuarial assumptions, to enable the plan
5  to achieve a projected funded ratio of at least
6  120 percent for the following plan year.

7      ''(B) INITIAL PROGRAM ELEMENTS.—Rea-
8  sonable measures under a realignment program
9  described in subparagraph (A) may include any
10 of the following:

11          ''(i) Proposed contribution increases.

12          ''(ii) A reduction in the rate of future
13      benefit accruals, so long as the resulting
14      rate is not less than 1 percent of the con-
15      tributions on which benefits are based as
16      of the start of the plan year (or the equiva-
17      lent standard accrual rate as described in
18      section 305(e)(6)).

19          ''(iii) A modification or elimination of
20      adjustable benefits of participants that are
21      not in pay status before the date of the no-
22      tice required under subsection (b)(1).

23          ''(iv) Any other lawfully available
24      measures not specifically described in this
25      subparagraph or subparagraph (C) or (D)

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003558

1254

1     that the plan sponsor determines are rea-

2     sonable.

3     ''(C) ADDITIONAL PROGRAM ELEMENTS.—

4     If the plan sponsor has determined that all rea-

5     sonable measures available under subparagraph

6     (B) will not enable the plan to achieve a pro-

7     jected funded ratio of at least 120 percent for

8     the following plan year, such reasonable meas-

9     ures may also include—

10         ''(i) a reduction of accrued benefits

11         that are not in pay status by the date of

12         the notice required under subsection

13         (b)(1); or

14         ''(ii) a reduction of any benefits of

15         participants that are in pay status before

16         the date of the notice required under sub-

17         section (b)(1) other than core benefits as

18         defined in paragraph (4).

19     ''(D) ADDITIONAL REDUCTIONS.—In the

20     case of a composite plan for which the plan

21     sponsor has determined that all reasonable

22     measures available under subparagraphs (B)

23     and (C) will not enable the plan to achieve a

24     projected funded ratio of at least 120 percent

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1255

1      for the following plan year, such reasonable

2      measures may also include—

3              ''(i) a further reduction in the rate of

4              future benefit accruals without regard to

5              the limitation applicable under subpara-

6              graph (B)(ii); or

7              ''(ii) a reduction of core benefits;

8      provided that such reductions shall be equitably

9      distributed across the participant and bene-

10     ficiary population, taking into account factors,

11     with respect to participants and beneficiaries

12     and their benefits, that may include one or

13     more of the factors listed in subclauses (I)

14     through (X) of section 305(e)(9)(D)(vi), to the

15     extent necessary to enable the plan to achieve

16     a projected funded ratio of at least 120 percent

17     for the following plan year, or at the election of

18     the plan sponsor, a projected funded ratio of at

19     least 100 percent for the following plan year

20     and a current funded ratio of at least 90 per-

21     cent.

22     ''(3) ADJUSTABLE BENEFIT DEFINED.—For

23     purposes of this part, the term 'adjustable benefit'

24     means—

DOC_0003560

1256

1     ''(A) benefits, rights, and features under
2     the plan, including post-retirement death bene-
3     fits, 60-month guarantees, disability benefits
4     not yet in pay status, and similar benefits;

5     ''(B) any early retirement benefit or retire-
6     ment-type subsidy (within the meaning of sec-
7     tion 204(g)(2)(A)) and any benefit payment op-
8     tion (other than the qualified joint and survivor
9     annuity); and

10    ''(C) benefit increases that were adopted
11    (or, if later, took effect) less than 60 months
12    before the first day such realignment program
13    took effect.

14    ''(4) CORE BENEFIT DEFINED.—For purposes
15    of this part, the term 'core benefit' means a partici-
16    pant's accrued benefit payable in the normal form of
17    an annuity commencing at normal retirement age,
18    determined without regard to—

19    ''(A) any early retirement benefits, retire-
20    ment-type subsidies, or other benefits, rights, or
21    features that may be associated with that ben-
22    efit; and

23    ''(B) any cost-of-living adjustments or ben-
24    efit increases effective after the date of retire-
25    ment.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003561

1257

1     "(5) Coordination with contribution in-
2    creases.—

3        "(A) In general.—A realignment pro-
4       gram may provide that some or all of the ben-
5       efit modifications described in the program will
6       only take effect if the bargaining parties fail to
7       agree to specified levels of increases in contribu-
8       tions to the plan, effective as of specified dates.

9        "(B) Independent benefit modifica-
10      tions.—If a realignment program adopts any
11      changes to the benefit formula that are inde-
12      pendent of potential contribution increases,
13      such changes shall take effect not later than
14      180 days after the first day of the first plan
15      year that begins following the adoption of the
16      realignment program.

17        "(C) Conditional benefit modifica-
18      tions.—If a realignment program adopts any
19      changes to the benefit formula that take effect
20      only if the bargaining parties fail to agree to
21      contribution increases, such changes shall take
22      effect not later than the first day of the first
23      plan year beginning after the third anniversary
24      of the date of adoption of the realignment pro-
25      gram.

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003562

1258

1    ''(D) REVOCATION OF CERTAIN BENEFIT

2     MODIFICATIONS.—Benefit modifications de-

3     scribed in subparagraph (C) may be revoked, in

4     whole or in part, and retroactively or prospec-

5     tively, when contributions to the plan are in-

6     creased, as specified in the realignment pro-

7     gram, including any amendments thereto. The

8     preceding sentence shall not apply unless the

9     contribution increases are to be effective not

10    later than the fifth anniversary of the first day

11    of the first plan year that begins after the

12    adoption of the realignment program.

13  ''(b) NOTICE.—

14    ''(1) IN GENERAL.—In any case in which it is

15  certified under section 802(a) that the projected

16  funded ratio is less than 120 percent, the plan spon-

17  sor shall, not later than 30 days after the date of

18  the certification, provide notification of the current

19  and projected funded ratios to the participants and

20  beneficiaries, the bargaining parties, and the Sec-

21  retary. Such notice shall include—

22    ''(A) an explanation that contribution rate

23    increases or benefit reductions may be nec-

24    essary;

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003563

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1259

1             "(B) a description of the types of benefits

2         that might be reduced; and

3             "(C) an estimate of the contribution in-

4         creases and benefit reductions that may be nec-

5         essary to achieve a projected funded ratio of

6         120 percent.

7       "(2) NOTICE OF BENEFIT MODIFICATIONS.—

8             "(A) IN GENERAL.—No modifications may

9         be made that reduce the rate of future benefit

10        accrual or that reduce core benefits or adjust-

11        able benefits unless notice of such reduction has

12        been given at least 180 days before the general

13        effective date of such reduction for all partici-

14        pants and beneficiaries to—

15                 "(i) plan participants and bene-

16            ficiaries;

17                 "(ii) each employer who has an obliga-

18            tion to contribute to the composite plan;

19            and

20                 "(iii) each employee organization

21            which, for purposes of collective bar-

22            gaining, represents plan participants em-

23            ployed by such employers.

24             "(B) CONTENT OF NOTICE.—The notice

25         under subparagraph (A) shall contain—

DOC_0003564

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1260

1            "(i) sufficient information to enable

2       participants and beneficiaries to under-

3       stand the effect of any reduction on their

4       benefits, including an illustration of any

5       affected benefit or subsidy, on an annual

6       or monthly basis that a participant or ben-

7       eficiary would otherwise have been eligible

8       for as of the general effective date de-

9       scribed in subparagraph (A); and

10           "(ii) information as to the rights and

11       remedies of plan participants and bene-

12       ficiaries as well as how to contact the De-

13       partment of Labor for further information

14       and assistance, where appropriate.

15       "(C) FORM AND MANNER.—Any notice

16 under subparagraph (A)—

17           "(i) shall be provided in a form and

18       manner prescribed in regulations of the

19       Secretary of Labor;

20           "(ii) shall be written in a manner so

21       as to be understood by the average plan

22       participant.

23       "(3) MODEL NOTICES.—The Secretary shall—

24       "(A) prescribe model notices that the plan

25 sponsor of a composite plan may use to satisfy

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003565

1261

1   the notice requirements under this subsection;
2   and

3       ''(B) by regulation enumerate any details
4       related to the elements listed in paragraph (1)
5       that any notice under this subsection must in-
6       clude.

7   ''(4) DELIVERY METHOD.—Any notice under
8   this part shall be provided in writing and may also
9   be provided in electronic form to the extent that the
10  form is reasonably accessible to persons to whom the
11  notice is provided.

12  **''SEC. 804. LIMITATION ON INCREASING BENEFITS.**

13  ''(a) LEVEL OF CURRENT FUNDED RATIOS.—Except
14  as provided in subsections (c), (d), and (e), no plan
15  amendment increasing benefits or establishing new bene-
16  fits under a composite plan may be adopted for a plan
17  year unless—

18      ''(1) the plan's current funded ratio is at least
19      110 percent (without regard to the benefit increase
20      or new benefits);

21      ''(2) taking the benefit increase or new benefits
22      into account, the current funded ratio is at least 100
23      percent and the projected funded ratio for the cur-
24      rent plan year is at least 120 percent;

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003566

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1262

1    "(3) in any case in which, after taking the ben-
2    efit increase or new benefits into account, the cur-
3    rent funded ratio is less than 140 percent and the
4    projected funded ratio is less than 140 percent, the
5    benefit increase or new benefits are projected by the
6    plan actuary to increase the present value of the
7    plan's liabilities for the plan year by not more than
8    3 percent; and

9    "(4) expected contributions for the current plan
10   year are at least 120 percent of normal cost for the
11   plan year, determined using the unit credit funding
12   method and treating the benefit increase or new ben-
13   efits as in effect for the entire plan year.

14   "(b) ADDITIONAL REQUIREMENTS WHERE CORE
15   BENEFITS REDUCED.—If a plan has been amended to re-
16   duce core benefits pursuant to a realignment program
17   under section 803(a)(2)(D), such plan may not be subse-
18   quently amended to increase core benefits unless the
19   amendment—

20   "(1) increases the level of future benefit pay-
21   ments only; and

22   "(2) provides for an equitable distribution of
23   benefit increases across the participant and bene-
24   ficiary population, taking into account the extent to

g:\VHLC\051220\051220.072.xml        (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003567

1263

1     which the benefits of participants were previously re-

2     duced pursuant to such realignment program.

3     "(c) EXCEPTION TO COMPLY WITH APPLICABLE

4 LAW.—Subsection (a) shall not apply in connection with

5 a plan amendment if the amendment is required as a con-

6 dition of qualification under part I of subchapter D of

7 chapter 1 of the Internal Revenue Code of 1986 or to com-

8 ply with other applicable law.

9     "(d) EXCEPTION WHERE MAXIMUM DEDUCTIBLE

10 LIMIT APPLIES.—Subsection (a) shall not apply in con-

11 nection with a plan amendment if and to the extent that

12 contributions to the composite plan would not be deduct-

13 ible for the plan year under section 404(a)(1)(E) of the

14 Internal Revenue Code of 1986 if the plan amendment is

15 not adopted.

16     "(e) EXCEPTION FOR CERTAIN BENEFIT MODIFICA-

17 TIONS.—Subsection (a) shall not apply in connection with

18 a plan amendment under section 803(a)(5)(C), regarding

19 conditional benefit modifications.

20     "(f) TREATMENT OF PLAN AMENDMENTS.—For pur-

21 poses of this section—

22         "(1) if two or more plan amendments increas-

23     ing benefits or establishing new benefits are adopted

24     in a plan year, such amendments shall be treated as

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003568

1264

1  a single amendment adopted on the last day of the

2  plan year;

3      ''(2) all benefit increases and new benefits

4  adopted in a single amendment are treated as a sin-

5  gle benefit increase, irrespective of whether the in-

6  creases and new benefits take effect in more than

7  one plan year; and

8      ''(3) increases in contributions or decreases in

9  plan liabilities which are scheduled to take effect in

10  future plan years may be taken into account in con-

11  nection with a plan amendment if they have been

12  agreed to in writing or otherwise formalized by the

13  date the plan amendment is adopted.

14  **"SEC. 805. COMPOSITE PLAN RESTRICTIONS TO PRESERVE**

15          **LEGACY PLAN FUNDING.**

16    ''(a) TREATMENT AS A LEGACY PLAN.—

17      ''(1) IN GENERAL.—For purposes of this part

18  and parts 2 and 3, a defined benefit plan shall be

19  treated as a legacy plan with respect to the com-

20  posite plan under which the employees who were eli-

21  gible to accrue a benefit under the defined benefit

22  plan become eligible to accrue a benefit under such

23  composite plan.

24      ''(2) COMPONENT PLANS.—In any case in

25  which a defined benefit plan is amended to add a

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003569

1265

1 composite plan component pursuant to section

2 801(b), paragraph (1) shall be applied by sub-

3 stituting 'defined benefit component' for 'defined

4 benefit plan' and 'composite plan component' for

5 'composite plan'.

6 "(3) ELIGIBLE TO ACCRUE A BENEFIT.—For

7 purposes of paragraph (1), an employee is consid-

8 ered eligible to accrue a benefit under a composite

9 plan as of the first day in which the employee com-

10 pletes an hour of service under a collective bar-

11 gaining agreement that provides for contributions to

12 and accruals under the composite plan in lieu of ac-

13 cruals under the legacy plan.

14 "(4) COLLECTIVE BARGAINING AGREEMENT.—

15 As used in this part, the term 'collective bargaining

16 agreement' includes any agreement under which an

17 employer has an obligation to contribute to a plan.

18 "(5) OTHER TERMS.—Any term used in this

19 part which is not defined in this part and which is

20 also used in section 305 shall have the same mean-

21 ing provided such term in such section.

22 "(b) RESTRICTIONS ON ACCEPTANCE BY COMPOSITE

23 PLAN OF AGREEMENTS AND CONTRIBUTIONS.—

24 "(1) IN GENERAL.—The plan sponsor of a com-

25 posite plan shall not accept or recognize a collective

DOC_0003570

1266

1 bargaining agreement (or any modification to such

2 agreement), and no contributions may be accepted

3 and no benefits may be accrued or otherwise earned

4 under the agreement—

5       ''(A) in any case in which the plan actuary

6     of any defined benefit plan that would be treat-

7     ed as a legacy plan with respect to such com-

8     posite plan has certified under section

9     305(b)(3) that such defined benefit plan is or

10     will be in critical status for the plan year in

11     which such agreement would take effect or for

12     any of the succeeding 5 plan years; and

13       ''(B) unless the agreement requires each

14     employer who is a party to such agreement, in-

15     cluding employers whose employees are not par-

16     ticipants in the legacy plan, to provide contribu-

17     tions to the legacy plan with respect to such

18     composite plan in a manner that satisfies the

19     transition contribution requirements of sub-

20     section (d).

21     ''(2) NOTICE.—Not later than 30 days after a

22 determination by a plan sponsor of a composite plan

23 that an agreement fails to satisfy the requirements

24 described in paragraph (1), the plan sponsor shall

DOC_0003571

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1267

1    provide notification of such failure and the reasons

2    for such determination—

3          ''(A) to the parties to the agreement;

4          ''(B) to active participants of the com-

5      posite plan who have ceased to accrue or other-

6      wise earn benefits with respect to service with

7      an employer pursuant to paragraph (1); and

8          ''(C) to the Secretary, the Secretary of the

9      Treasury, and the Pension Benefit Guaranty

10     Corporation.

11     ''(3) LIMITATION ON RETROACTIVE EFFECT.—

12   This subsection shall not apply to benefits accrued

13   before the date on which notice is provided under

14   paragraph (2).

15   ''(c) RESTRICTION ON ACCRUAL OF BENEFITS

16 UNDER A COMPOSITE PLAN.—

17     ''(1) IN GENERAL.—In any case in which an

18   employer, under a collective bargaining agreement

19   entered into after the date of enactment of the Giv-

20   ing Retirement Options to Workers Act of 2020,

21   ceases to have an obligation to contribute to a multi-

22   employer defined benefit plan, no employees em-

23   ployed by the employer may accrue or otherwise earn

24   benefits under any composite plan, with respect to

25   service with that employer, for a 60-month period

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003572

1268

1   beginning on the date on which the employer entered

2   into such collective bargaining agreement.

3   &ldquo;(2) NOTICE OF CESSATION OF OBLIGATION.—

4   Within 30 days of determining that an employer has

5   ceased to have an obligation to contribute to a leg-

6   acy plan with respect to employees employed by an

7   employer that is or will be contributing to a com-

8   posite plan with respect to service of such employees,

9   the plan sponsor of the legacy plan shall notify the

10   plan sponsor of the composite plan of that cessation.

11   &ldquo;(3) NOTICE OF CESSATION OF ACCRUALS.—

12   Not later than 30 days after determining that an

13   employer has ceased to have an obligation to con-

14   tribute to a legacy plan, the plan sponsor of the

15   composite plan shall notify the bargaining parties,

16   the active participants affected by the cessation of

17   accruals, the Secretary, the Secretary of the Treas-

18   ury, and the Pension Benefit Guaranty Corporation

19   of the cessation of accruals, the period during which

20   such cessation is in effect, and the reasons therefor.

21   &ldquo;(4) LIMITATION ON RETROACTIVE EFFECT.—

22   This subsection shall not apply to benefits accrued

23   before the date on which notice is provided under

24   paragraph (3).

25   &ldquo;(d) TRANSITION CONTRIBUTION REQUIREMENTS.—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003573

1269

1     "(1) IN GENERAL.—A collective bargaining

2 agreement satisfies the transition contribution re-

3 quirements of this subsection if the agreement—

4     "(A) authorizes payment of contributions

5 to a legacy plan at a rate or rates equal to or

6 greater than the transition contribution rate es-

7 tablished by the legacy plan under paragraph

8 (2); and

9     "(B) does not provide for—

10     "(i) a suspension of contributions to

11 the legacy plan with respect to any period

12 of service; or

13     "(ii) any new direct or indirect exclu-

14 sion of younger or newly hired employees

15 of the employer from being taken into ac-

16 count in determining contributions owed to

17 the legacy plan.

18     "(2) TRANSITION CONTRIBUTION RATE.—

19     "(A) IN GENERAL.—The transition con-

20 tribution rate for a plan year is the contribution

21 rate that, as certified by the actuary of the leg-

22 acy plan in accordance with the principles in

23 section 305(b)(3)(B), is reasonably expected to

24 be adequate—

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003574

1270

1       "(i) to fund the normal cost for the

2       plan year;

3           "(ii) to amortize the plan's unfunded

4       liabilities in level annual installments over

5       25 years, beginning with the plan year in

6       which the transition contribution rate is

7       first established; and

8           "(iii) to amortize any subsequent

9       changes in the legacy plan's unfunded li-

10      ability due to experience gains or losses

11      (including investment gains or losses, gains

12      or losses due to contributions greater or

13      less than the contributions made under the

14      prior transition contribution rate, and

15      other actuarial gains or losses), changes in

16      actuarial assumptions, changes to the leg-

17      acy plan's benefits, or changes in funding

18      method over a period of 15 plan years be-

19      ginning with the plan year in which such

20      change in unfunded liability is incurred.

21   The transition contribution rate for any plan

22   year may not be less than the transition con-

23   tribution rate for the plan year in which such

24   rate is first established.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003575

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1271

1      "(B) MULTIPLE RATES.—If different rates

2      of contribution are payable to the legacy plan

3      by different employers or for different classes of

4      employees, the certification shall specify a tran-

5      sition contribution rate for each such employer.

6           "(C) RATE APPLICABLE TO EMPLOYER.—

7                "(i) IN GENERAL.—Except as pro-

8           vided by clause (ii), the transition con-

9           tribution rate applicable to an employer for

10          a plan year is the rate in effect for the

11          plan year of the legacy plan that com-

12          mences on or after 180 days before the

13          earlier of—

14                "(I) the effective date of the col-

15                lective bargaining agreement pursuant

16                to which the employer contributes to

17                the legacy plan; or

18                "(II) 5 years after the last plan

19                year for which the transition contribu-

20                tion rate applicable to the employer

21                was established or updated.

22                "(ii) EXCEPTION.—The transition

23          contribution rate applicable to an employer

24          for the first plan year beginning on or

25          after the commencement of the employer's

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003576

1272

obligation to contribute to the composite
plan is the rate in effect for the plan year
of the legacy plan that commences on or
after 180 days before such first plan year.

''(D) EFFECT OF LEGACY PLAN FINANCIAL
CIRCUMSTANCES.—If the plan actuary of the
legacy plan has certified under section 305 that
the plan is in endangered or critical status for
a plan year, the transition contribution rate for
the following plan year is the rate determined
with respect to the employer under the legacy
plan's funding improvement or rehabilitation
plan under section 305, if greater than the rate
otherwise determined, but in no event greater
than 75 percent of the sum of the contribution
rates applicable to the legacy plan and the com-
posite plan for the plan year.

''(E) OTHER ACTUARIAL ASSUMPTIONS
AND METHODS.—Except as provided in sub-
paragraph (A), the determination of the transi-
tion contribution rate for a plan year shall be
based on actuarial assumptions and methods
consistent with the minimum funding deter-
minations made under section 304 (or, if appli-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003577

1273

1     cable, section 305) with respect to the legacy

2     plan for the plan year.

3         ''(F) ADJUSTMENTS IN RATE.—The plan

4     sponsor of a legacy plan from time to time may

5     adjust the transition contribution rate or rates

6     applicable to an employer under this paragraph

7     by increasing some rates and decreasing others

8     if the actuary certifies that such adjusted rates

9     in combination will produce projected contribu-

10    tion income for the plan year beginning on or

11    after the date of certification that is not less

12    than would be produced by the transition con-

13    tribution rates in effect at the time of the cer-

14    tification.

15        ''(G) NOTICE OF TRANSITION CONTRIBU-

16    TION RATE.—The plan sponsor of a legacy plan

17    shall provide notice to the parties to collective

18    bargaining agreements pursuant to which con-

19    tributions are made to the legacy plan of

20    changes to the transition contribution rate re-

21    quirements at least 30 days before the begin-

22    ning of the plan year for which the rate is effec-

23    tive.

24        ''(H) NOTICE TO COMPOSITE PLAN SPON-

25    SOR.—Not later than 30 days after a deter-

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003578

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1274

1        mination by the plan sponsor of a legacy plan
2        that a collective bargaining agreement provides
3        for a rate of contributions that is below the
4        transition contribution rate applicable to one or
5        more employers that are parties to the collective
6        bargaining agreement, the plan sponsor of the
7        legacy plan shall notify the plan sponsor of any
8        composite plan under which employees of such
9        employer would otherwise be eligible to accrue
10       a benefit.

11              ''(3) CORRECTION PROCEDURES.—Pursuant to
12       standards prescribed by the Secretary, the plan
13       sponsor of a composite plan shall adopt rules and
14       procedures that give the parties to the collective bar-
15       gaining agreement notice of the failure of such
16       agreement to satisfy the transition contribution re-
17       quirements of this subsection, and a reasonable op-
18       portunity to correct such failure, not to exceed 180
19       days from the date of notice given under subsection
20       (b)(2).

21              ''(4) SUPPLEMENTAL CONTRIBUTIONS.—A col-
22       lective bargaining agreement may provide for supple-
23       mental contributions to the legacy plan for a plan
24       year in excess of the transition contribution rate de-
25       termined under paragraph (2), regardless of whether

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003579

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1275

1 the legacy plan is in endangered or critical status for

2 such plan year.

3 "(e) NONAPPLICATION OF COMPOSITE PLAN RE-

4 STRICTIONS.—

5     "(1) IN GENERAL.—The provisions of sub-

6     sections (a), (b), and (c) shall not apply with respect

7     to a collective bargaining agreement, to the extent

8     the agreement, or a predecessor agreement, provides

9     or provided for contributions to a defined benefit

10     plan that is a legacy plan, as of the first day of the

11     first plan year following a plan year for which the

12     plan actuary certifies that the plan is fully funded,

13     has been fully funded for at least three out of the

14     immediately preceding 5 plan years, and is projected

15     to remain fully funded for at least the following 4

16     plan years.

17     "(2) DETERMINATION OF FULLY FUNDED.—A

18     plan is fully funded for purposes of paragraph (1)

19     if, as of the valuation date of the plan for a plan

20     year, the value of the plan's assets equals or exceeds

21     the present value of the plan's liabilities, determined

22     in accordance with the rules prescribed by the Pen-

23     sion Benefit Guaranty Corporation under sections

24     4219(c)(1)(D) and 4281 for multiemployer plans

25     terminating by mass withdrawal, as in effect for the

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003580

1276

1 date of the determination, except the plan's reason-

2 able assumption regarding the starting date of bene-

3 fits may be used.

4  "(3) OTHER APPLICABLE RULES.—Except as

5 provided in paragraph (2), actuarial determinations

6 and projections under this section shall be based on

7 the rules in section 305(b)(3) and section 802(b).

8 **"SEC. 806. MERGERS AND ASSET TRANSFERS OF COM-**

9   **POSITE PLANS.**

10  "(a) IN GENERAL.—Assets and liabilities of a com-

11 posite plan may only be merged with, or transferred to,

12 another plan if—

13  "(1) the other plan is a composite plan;

14  "(2) the plan or plans resulting from the merg-

15 er or transfer is a composite plan;

16  "(3) no participant's accrued benefit or adjust-

17 able benefit is lower immediately after the trans-

18 action than it was immediately before the trans-

19 action; and

20  "(4) the value of the assets transferred in the

21 case of a transfer reasonably reflects the value of the

22 amounts contributed with respect to the participants

23 whose benefits are being transferred, adjusted for al-

24 locable distributions, investment gains and losses,

25 and administrative expenses.

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003581

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1277

1     "(b) LEGACY PLAN.—

2        "(1) IN GENERAL.—After a merger or transfer

3   involving a composite plan, the legacy plan with re-

4   spect to an employer that is obligated to contribute

5   to the resulting composite plan is the legacy plan

6   that applied to that employer immediately before the

7   merger or transfer.

8        "(2) MULTIPLE LEGACY PLANS.—If an em-

9   ployer is obligated to contribute to more than one

10   legacy plan with respect to employees eligible to ac-

11   crue benefits under more than one composite plan

12   and there is a merger or transfer of such legacy

13   plans, the transition contribution rate applicable to

14   the legacy plan resulting from the merger or trans-

15   fer with respect to that employer shall be determined

16   in accordance with the provisions of section

17   805(d)(2)(B).".

18     (2) PENALTIES.—

19        (A) CIVIL ENFORCEMENT OF FAILURE TO

20   COMPLY WITH REALIGNMENT PROGRAM.—Sec-

21   tion 502(a) of such Act (29 U.S.C. 1132(a)) is

22   amended—

23        (i) in paragraph (10), by striking "or"

24   at the end;

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003582

1278

1              (ii) in paragraph (11), by striking the

2              period at the end and inserting "; or"; and

3              (iii) by adding at the end the fol-

4              lowing:

5       "(12) in the case of a composite plan required

6 to adopt a realignment program under section 803,

7 if the plan sponsor—

8         "(A) has not adopted a realignment pro-

9         gram under that section by the deadline estab-

10         lished in such section; or

11         "(B) fails to update or comply with the

12         terms of the realignment program in accordance

13         with the requirements of such section,

14 by the Secretary, by an employer that has an obliga-

15 tion to contribute with respect to the composite plan,

16 or by an employee organization that represents ac-

17 tive participants in the composite plan, for an order

18 compelling the plan sponsor to adopt a realignment

19 program, or to update or comply with the terms of

20 the realignment program, in accordance with the re-

21 quirements of such section and the realignment pro-

22 gram.".

23       (B) CIVIL PENALTIES.—Section 502(c) of

24       such Act (29 U.S.C. 1132(c)) is amended—

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003583

1279

1    (i) by moving paragraphs (8), (10),
2    and (12) each 2 ems to the left;

3    (ii) by redesignating paragraphs (9)
4    through (12) as paragraphs (12) through
5    (15), respectively; and

6    (iii) by inserting after paragraph (8)
7    the following:

8    ''(9) The Secretary may assess against any plan
9    sponsor of a composite plan a civil penalty of not
10   more than $1,100 per day for each violation by such
11   sponsor—

12       ''(A) of the requirement under section
13       802(a) on the plan actuary to certify the plan's
14       current or projected funded ratio by the date
15       specified in such subsection; or

16       ''(B) of the requirement under section 803
17       to adopt a realignment program by the deadline
18       established in that section and to comply with
19       its terms.

20   ''(10)(A) The Secretary may assess against any
21   plan sponsor of a composite plan a civil penalty of
22   not more than $100 per day for each violation by
23   such sponsor of the requirement under section
24   803(b) to provide notice as described in such section,
25   except that no penalty may be assessed in any case

DOC_0003584

1280

1   in which the plan sponsor exercised reasonable dili-

2   gence to meet the requirements of such section

3   and—

4        ''(i) the plan sponsor did not know that the

5   violation existed; or

6        ''(ii) the plan sponsor provided such notice

7   during the 30-day period beginning on the first

8   date on which the plan sponsor knew, or in ex-

9   ercising reasonable due diligence should have

10  known, that such violation existed.

11       ''(B) In any case in which the plan sponsor ex-

12  ercised reasonable diligence to meet the require-

13  ments of section 803(b)—

14       ''(i) the total penalty assessed under this

15  paragraph against such sponsor for a plan year

16  may not exceed $500,000; and

17       ''(ii) the Secretary may waive part or all of

18  such penalty to the extent that the payment of

19  such penalty would be excessive or otherwise in-

20  equitable relative to the violation involved.

21       ''(11) The Secretary may assess against any

22  plan sponsor of a composite plan a civil penalty of

23  not more than $100 per day for each violation by

24  such sponsor of the notice requirements under sec-

25  tions 801(b)(5) and 805(b)(2).''.

1281

(3) CONFORMING AMENDMENT.—The table of contents in section 1 of such Act (29 U.S.C. 1001 note) is amended by inserting after the item relating to section 734 the following:

"PART 8—COMPOSITE PLANS AND LEGACY PLANS

"Sec. 801. Composite plan defined.
"Sec. 802. Funded ratios; actuarial assumptions.
"Sec. 803. Realignment program.
"Sec. 804. Limitation on increasing benefits.
"Sec. 805. Composite plan restrictions to preserve legacy plan funding.
"Sec. 806. Mergers and asset transfers of composite plans.".

(b) AMENDMENT TO THE INTERNAL REVENUE CODE OF 1986.—

(1) IN GENERAL.—Part III of subchapter D of chapter 1 of the Internal Revenue Code of 1986 is amended by adding at the end the following:

**"Subpart C—Composite Plans and Legacy Plans**

"Sec. 437. Composite plan defined.
"Sec. 438. Funded ratios; actuarial assumptions.
"Sec. 439. Realignment program.
"Sec. 440. Limitation on increasing benefits.
"Sec. 440A. Composite plan restrictions to preserve legacy plan funding.
"Sec. 440B. Mergers and asset transfers of composite plans.

**"SEC. 437. COMPOSITE PLAN DEFINED.**

"(a) IN GENERAL.—For purposes of this title, the term 'composite plan' means a pension plan—

"(1) which is a multiemployer plan that is neither a defined benefit plan nor a defined contribution plan,

"(2) the terms of which provide that the plan is a composite plan for purposes of this title with re-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003586

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1282

1    spect to which not more than one multiemployer de-
2    fined benefit plan is treated as a legacy plan within
3    the meaning of section 440A, unless there is more
4    than one legacy plan following a merger of composite
5    plans under section 440B,

6        "(3) which provides systematically for the pay-
7    ment of benefits—

8            "(A) objectively calculated pursuant to a
9        formula enumerated in the plan document with
10       respect to plan participants after retirement,
11       for life, and

12           "(B) in the form of life annuities, except
13       for benefits which under section 411(a)(11)
14       may be immediately distributed without the
15       consent of the participant,

16       "(4) for which the plan contributions for the
17   first plan year are at least 120 percent of the nor-
18   mal cost for the plan year,

19       "(5) which requires—

20           "(A) an annual valuation of the liability of
21       the plan as of a date within the plan year to
22       which the valuation refers or within one month
23       prior to the beginning of such year,

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003587

1283

1         "(B) an annual actuarial determination of

2         the plan's current funded ratio and projected

3         funded ratio under section 438(a),

4         "(C) corrective action through a realign-

5         ment program pursuant to section 439 when-

6         ever the plan's projected funded ratio is below

7         120 percent for the plan year, and

8         "(D) an annual notification to each partici-

9         pant describing the participant's benefits under

10         the plan and explaining that such benefits may

11         be subject to reduction under a realignment

12         program pursuant to section 439 based on the

13         plan's funded status in future plan years, and

14         "(6) the board of trustees of which includes at

15 least one retiree or beneficiary in pay status during

16 each plan year following the first plan year in which

17 at least 5 percent of the participants in the plan are

18 retirees or beneficiaries in pay status.

19 "(b) TRANSITION FROM A MULTIEMPLOYER DE-

20 FINED BENEFIT PLAN.—

21         "(1) IN GENERAL.—The plan sponsor of a de-

22 fined benefit plan that is a multiemployer plan may,

23 subject to paragraph (2), amend the plan to incor-

24 porate the features of a composite plan as a compo-

25 nent of the multiemployer plan separate from the

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003588

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1284

1   defined benefit plan component, except in the case of

2   a defined benefit plan for which the plan actuary has

3   certified under section 432(b)(3) that the plan is or

4   will be in critical status for the plan year in which

5   such amendment would become effective or for any

6   of the succeeding 5 plan years.

7       ''(2) REQUIREMENTS.—Any amendment pursu-

8   ant to paragraph (1) to incorporate the features of

9   a composite plan as a component of a multiemployer

10  plan shall—

11          ''(A) apply with respect to all collective

12      bargaining agreements providing for contribu-

13      tions to the multiemployer plan on or after the

14      effective date of the amendment,

15          ''(B) apply with respect to all participants

16      in the multiemployer plan for whom contribu-

17      tions are made to the multiemployer plan on or

18      after the effective date of the amendment,

19          ''(C) specify that the effective date of the

20      amendment is—

21              ''(i) the first day of a specified plan

22          year following the date of the adoption of

23          the amendment, except that the plan spon-

24          sor may alternatively provide for a sepa-

25          rate effective date with respect to each col-

DOC_0003589

1285

1    lective bargaining agreement under which
2    contributions to the multiemployer plan
3    are required, which shall occur on the first
4    day of the first plan year beginning after
5    the termination, or if earlier, the re-open-
6    ing, of each such agreement, or such ear-
7    lier date as the parties to the agreement
8    and the plan sponsor of the multiemployer
9    plan shall agree to, and

10       ''(ii) not later than the first day of the
11    fifth plan year beginning on or after the
12    date of the adoption of the amendment,

13       ''(D) specify that, as of the amendment's
14    effective date, no further benefits shall accrue
15    under the defined benefit component of the
16    multiemployer plan, and

17       ''(E) specify that, as of the amendment's
18    effective date, the plan sponsor of the multiem-
19    ployer plan shall be the plan sponsor of both
20    the composite plan component and the defined
21    benefit plan component of the plan.

22       ''(3) SPECIAL RULES.—If a multiemployer plan
23    is amended pursuant to paragraph (1)—

24       ''(A) the requirements of this title shall be
25    applied to the composite plan component and

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003590

1286

1    the defined benefit plan component of the mul-
2    tiemployer plan as if each such component were
3    maintained as a separate plan, and

4        ''(B) the assets of the composite plan com-
5        ponent and the defined benefit plan component
6        of the plan shall be held in a single trust form-
7        ing part of the plan under which the trust in-
8        strument expressly provides—

9            ''(i) for separate accounts (and appro-
10           priate records) to be maintained to reflect
11           the interest which each of the plan compo-
12           nents has in the trust, including separate
13           accounting for additions to the trust for
14           the benefit of each plan component, dis-
15           bursements made from each plan compo-
16           nent's account in the trust, investment ex-
17           perience of the trust allocable to that ac-
18           count, and administrative expenses (wheth-
19           er direct expenses or shared expenses allo-
20           cated proportionally), and permits, but
21           does not require, the pooling of some or all
22           of the assets of the two plan components
23           for investment purposes, and

24           ''(ii) that the assets of each of the two
25           plan components shall be held, invested,

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003591

1287

1    reinvested, managed, administered and dis-
2    tributed for the exclusive benefit of the
3    participants and beneficiaries of each such
4    plan component, and in no event shall the
5    assets of one of the plan components be
6    available to pay benefits due under the
7    other plan component.

8    ''(4) NOT A TERMINATION EVENT.—Notwith-
9    standing section 4041A of the Employee Retirement
10   Income Security Act of 1974, an amendment pursu-
11   ant to paragraph (1) to incorporate the features of
12   a composite plan as a component of a multiemployer
13   plan does not constitute termination of the multiem-
14   ployer plan.

15   ''(5) NOTICE TO THE SECRETARY.—

16   ''(A) NOTICE.—The plan sponsor of a
17   composite plan shall provide notice to the Sec-
18   retary of the intent to establish the composite
19   plan (or, in the case of a composite plan incor-
20   porated as a component of a multiemployer
21   plan as described in paragraph (1), the intent
22   to amend the multiemployer plan to incorporate
23   such composite plan) at least 30 days prior to
24   the effective date of such establishment or
25   amendment.

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003592

1288

1       "(B) CERTIFICATION.—In the case of a
2 composite plan incorporated as a component of
3 a multiemployer plan as described in paragraph
4 (1), such notice shall include a certification by
5 the plan actuary under section 432(b)(3) that
6 the effective date of the amendment occurs in
7 a plan year for which the multiemployer plan is
8 not in critical status for that plan year and any
9 of the succeeding 5 plan years.

10     "(6) REFERENCES TO COMPOSITE PLAN COM-
11 PONENT.—As used in this subpart, the term 'com-
12 posite plan' includes a composite plan component
13 added to a defined benefit plan pursuant to para-
14 graph (1).

15     "(7) RULE OF CONSTRUCTION.—Paragraph
16 (2)(A) shall not be construed as preventing the plan
17 sponsor of a multiemployer plan from adopting an
18 amendment pursuant to paragraph (1) because some
19 collective bargaining agreements are amended to
20 cease any covered employer's obligation to contribute
21 to the multiemployer plan before or after the plan
22 amendment is effective. Paragraph (2)(B) shall not
23 be construed as preventing the plan sponsor of a
24 multiemployer plan from adopting an amendment
25 pursuant to paragraph (1) because some partici-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003593

1289

1     pants cease to have contributions made to the multi-

2     employer plan on their behalf before or after the

3     plan amendment is effective.

4     "(c) COORDINATION WITH FUNDING RULES.—Ex-

5 cept as otherwise provided in this title, sections 412, 431,

6 and 432 shall not apply to a composite plan.

7     "(d) TREATMENT OF A COMPOSITE PLAN.—For pur-

8 poses of this title (other than sections 412 and 418E),

9 a composite plan shall be treated as if it were a defined

10 benefit plan unless a different treatment is provided for

11 under applicable law.

**12 "SEC. 438. FUNDED RATIOS; ACTUARIAL ASSUMPTIONS.**

13     "(a) CERTIFICATION OF FUNDED RATIOS.—

14         "(1) IN GENERAL.—Not later than the one-

15         hundred twentieth day of each plan year of a com-

16         posite plan, the plan actuary of the composite plan

17         shall certify to the Secretary, the Secretary of

18         Labor, and the plan sponsor the plan's current fund-

19         ed ratio and projected funded ratio for the plan

20         year.

21         "(2) DETERMINATION OF CURRENT FUNDED

22         RATIO AND PROJECTED FUNDED RATIO.—For pur-

23         poses of this section—

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003594

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1290

1         "(A) CURRENT FUNDED RATIO.—The cur-

2 rent funded ratio is the ratio (expressed as a

3 percentage) of—

4         "(i) the value of the plan's assets as

5 of the first day of the plan year, to

6         "(ii) the plan actuary's best estimate

7 of the present value of the plan liabilities

8 as of the first day of the plan year.

9         "(B) PROJECTED FUNDED RATIO.—The

10 projected funded ratio is the current funded

11 ratio projected to the first day of the fifteenth

12 plan year following the plan year for which the

13 determination is being made.

14         "(3) CONSIDERATION OF CONTRIBUTION RATE

15 INCREASES.—For purposes of projections under this

16 subsection, the plan sponsor may anticipate con-

17 tribution rate increases beyond the term of the cur-

18 rent collective bargaining agreement and any agreed-

19 to supplements, up to a maximum of 2.5 percent per

20 year, compounded annually, unless it would be un-

21 reasonable under the circumstances to assume that

22 contributions would increase by that amount.

23         "(b) ACTUARIAL ASSUMPTIONS AND METHODS.—

24 For purposes of this part—

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003595

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1291

1          ''(1) IN GENERAL.—All costs, liabilities, rates

2    of interest, and other factors under the plan shall be

3    determined for a plan year on the basis of actuarial

4    assumptions and methods—

5          ''(A) each of which is reasonable (taking

6          into account the experience of the plan and rea-

7          sonable expectations),

8          ''(B) which, in combination, offer the actu-

9          ary's best estimate of anticipated experience

10         under the plan, and

11         ''(C) with respect to which any change

12         from the actuarial assumptions and methods

13         used in the previous plan year shall be certified

14         by the plan actuary and the actuarial rationale

15         for such change provided in the annual report

16         required by section 6058.

17    ''(2) FAIR MARKET VALUE OF ASSETS.—The

18    value of the plan's assets shall be taken into account

19    on the basis of their fair market value.

20    ''(3) DETERMINATION OF NORMAL COST AND

21    PLAN LIABILITIES.—A plan's normal cost and liabil-

22    ities shall be based on the most recent actuarial

23    valuation required under section 437(a)(5)(A) and

24    the unit credit funding method.

DOC_0003596

1292

1       "(4) TIME WHEN CERTAIN CONTRIBUTIONS

2     DEEMED MADE.—Any contributions for a plan year

3     made by an employer after the last day of such plan

4     year, but not later than two and one-half months

5     after such day, shall be deemed to have been made

6     on such last day. For purposes of this paragraph,

7     such two and one-half month period may be ex-

8     tended for not more than six months under regula-

9     tions prescribed by the Secretary.

10       "(5) ADDITIONAL ACTUARIAL ASSUMPTIONS.—

11     Except where otherwise provided in this subpart, the

12     provisions of section 432(b)(3)(B) shall apply to any

13     determination or projection under this subpart.

14 **"SEC. 439. REALIGNMENT PROGRAM.**

15     "(a) REALIGNMENT PROGRAM.—

16       "(1) ADOPTION.—In any case in which the plan

17     actuary certifies under section 438(a) that the plan's

18     projected funded ratio is below 120 percent for the

19     plan year, the plan sponsor shall adopt a realign-

20     ment program under paragraph (2) not later than

21     210 days after the due date of the certification re-

22     quired under section 438(a). The plan sponsor shall

23     adopt an updated realignment program for each suc-

24     ceeding plan year for which a certification described

25     in the preceding sentence is made.

DOC_0003597

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1293

1    "(2) CONTENT OF REALIGNMENT PROGRAM.—

2        "(A) IN GENERAL.—A realignment pro-
3    gram adopted under this paragraph is a written
4    program which consists of all reasonable meas-
5    ures, including options or a range of options to
6    be undertaken by the plan sponsor or proposed
7    to the bargaining parties, formulated, based on
8    reasonably anticipated experience and reason-
9    able actuarial assumptions, to enable the plan
10   to achieve a projected funded ratio of at least
11   120 percent for the following plan year.

12       "(B) INITIAL PROGRAM ELEMENTS.—Rea-
13   sonable measures under a realignment program
14   described in subparagraph (A) may include any
15   of the following:

16           "(i) Proposed contribution increases.

17           "(ii) A reduction in the rate of future
18       benefit accruals, so long as the resulting
19       rate shall not be less than 1 percent of the
20       contributions on which benefits are based
21       as of the start of the plan year (or the
22       equivalent standard accrual rate as de-
23       scribed in section 432(e)(6)).

24           "(iii) A modification or elimination of
25       adjustable benefits of participants that are

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1294

1   not in pay status before the date of the no-

2   tice required under subsection (b)(1).

3       ''(iv) Any other legally available meas-

4   ures not specifically described in this sub-

5   paragraph or subparagraph (C) or (D)

6   that the plan sponsor determines are rea-

7   sonable.

8       ''(C) ADDITIONAL PROGRAM ELEMENTS.—

9   If the plan sponsor has determined that all rea-

10  sonable measures available under subparagraph

11  (B) will not enable the plan to achieve a pro-

12  jected funded ratio of at least 120 percent the

13  following plan year, such reasonable measures

14  may also include—

15      ''(i) a reduction of accrued benefits

16  that are not in pay status by the date of

17  the notice required under subsection

18  (b)(1), or

19      ''(ii) a reduction of any benefits of

20  participants that are in pay status before

21  the date of the notice required under sub-

22  section (b)(1) other than core benefits as

23  defined in paragraph (4).

24      ''(D) ADDITIONAL REDUCTIONS.—In the

25  case of a composite plan for which the plan

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003599

1295

1    sponsor has determined that all reasonable
2    measures available under subparagraphs (B)
3    and (C) will not enable the plan to achieve a
4    projected funded ratio of at least 120 percent
5    for the following plan year, such reasonable
6    measures may also include—

7          "(i) a further reduction in the rate of
8          future benefit accruals without regard to
9          the limitation applicable under subpara-
10          graph (B)(ii), or

11          "(ii) a reduction of core benefits,
12    provided that such reductions shall be equitably
13    distributed across the participant and bene-
14    ficiary population, taking into account factors,
15    with respect to participants and beneficiaries
16    and their benefits, that may include one or
17    more of the factors listed in subclauses (I)
18    through (X) of section 432(e)(9)(D)(vi), to the
19    extent necessary to enable the plan to achieve
20    a projected funded ratio of at least 120 percent
21    for the following plan year, or at the election of
22    the plan sponsor, a projected funded ratio of at
23    least 100 percent for the following plan year
24    and a current funded ratio of at least 90 per-
25    cent.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003600

1296

1 "(3) ADJUSTABLE BENEFIT DEFINED.—For

2 purposes of this subpart, the term 'adjustable ben-

3 efit' means—

4        "(A) benefits, rights, and features under

5     the plan, including post-retirement death bene-

6     fits, 60-month guarantees, disability benefits

7     not yet in pay status, and similar benefits,

8        "(B) any early retirement benefit or retire-

9     ment-type subsidy (within the meaning of sec-

10     tion 411(d)(6)(B)(i)) and any benefit payment

11     option (other than the qualified joint and sur-

12     vivor annuity), and

13        "(C) benefit increases that were adopted

14     (or, if later, took effect) less than 60 months

15     before the first day such realignment program

16     took effect.

17 "(4) CORE BENEFIT DEFINED.—For purposes

18 of this subpart, the term 'core benefit' means a par-

19 ticipant's accrued benefit payable in the normal form

20 of an annuity commencing at normal retirement age,

21 determined without regard to—

22        "(A) any early retirement benefits, retire-

23     ment-type subsidies, or other benefits, rights, or

24     features that may be associated with that ben-

25     efit, and

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003601

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1297

1      ''(B) any cost-of-living adjustments or ben-

2      efit increases effective after the date of retire-

3      ment.

4      ''(5) COORDINATION WITH CONTRIBUTION IN-

5      CREASES.—

6          ''(A) IN GENERAL.—A realignment pro-

7          gram may provide that some or all of the ben-

8          efit modifications described in the program will

9          only take effect if the bargaining parties fail to

10         agree to specified levels of increases in contribu-

11         tions to the plan, effective as of specified dates.

12         ''(B) INDEPENDENT BENEFIT MODIFICA-

13         TIONS.—If a realignment program adopts any

14         changes to the benefit formula that are inde-

15         pendent of potential contribution increases,

16         such changes shall take effect not later than

17         180 days following the first day of the first

18         plan year that begins following the adoption of

19         the realignment program.

20         ''(C) CONDITIONAL BENEFIT MODIFICA-

21         TIONS.—If a realignment program adopts any

22         changes to the benefit formula that take effect

23         only if the bargaining parties fail to agree to

24         contribution increases, such changes shall take

25         effect not later than the first day of the first

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003602

1298

1    plan year beginning after the third anniversary

2    of the date of adoption of the realignment pro-

3    gram.

4        "(D) REVOCATION OF CERTAIN BENEFIT

5    MODIFICATIONS.—Benefit modifications de-

6    scribed in paragraph (3) may be revoked, in

7    whole or in part, and retroactively or prospec-

8    tively, when contributions to the plan are in-

9    creased, as specified in the realignment pro-

10   gram, including any amendments thereto. The

11   preceding sentence shall not apply unless the

12   contribution increases are to be effective not

13   later than the fifth anniversary of the first day

14   of the first plan year that begins after the

15   adoption of the realignment program.

16   "(b) NOTICE.—

17       "(1) IN GENERAL.—In any case in which it is

18   certified under section 438(a) that the projected

19   funded ratio is less than 120 percent, the plan spon-

20   sor shall, not later than 30 days after the date of

21   the certification, provide notification of the current

22   and projected funded ratios to the participants and

23   beneficiaries, the bargaining parties, and the Sec-

24   retary. Such notice shall include—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003603

1299

1         ''(A) an explanation that contribution rate

2   increases or benefit reductions may be nec-

3   essary,

4         ''(B) a description of the types of benefits

5   that might be reduced, and

6         ''(C) an estimate of the contribution in-

7   creases and benefit reductions that may be nec-

8   essary to achieve a projected funded ratio of

9   120 percent.

10   ''(2) NOTICE OF BENEFIT MODIFICATIONS.—

11         ''(A) IN GENERAL.—No modifications may

12   be made that reduce the rate of future benefit

13   accrual or that reduce core benefits or adjust-

14   able benefits unless notice of such reduction has

15   been given at least 180 days before the general

16   effective date of such reduction for all partici-

17   pants and beneficiaries to—

18         ''(i) plan participants and bene-

19         ficiaries,

20         ''(ii) each employer who has an obliga-

21         tion to contribute to the composite plan,

22         and

23         ''(iii) each employee organization

24         which, for purposes of collective bar-

DOC_0003604

1300

1      gaining, represents plan participants em-

2      ployed by such employers.

3      ''(B) CONTENT OF NOTICE.—The notice

4      under subparagraph (A) shall contain—

5      ''(i) sufficient information to enable

6      participants and beneficiaries to under-

7      stand the effect of any reduction on their

8      benefits, including an illustration of any

9      affected benefit or subsidy, on an annual

10      or monthly basis that a participant or ben-

11      eficiary would otherwise have been eligible

12      for as of the general effective date de-

13      scribed in subparagraph (A), and

14      ''(ii) information as to the rights and

15      remedies of plan participants and bene-

16      ficiaries as well as how to contact the De-

17      partment of Labor for further information

18      and assistance, where appropriate.

19      ''(C) FORM AND MANNER.—Any notice

20      under subparagraph (A)—

21      ''(i) shall be provided in a form and

22      manner prescribed in regulations of the

23      Secretary of Labor,

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003605

1301

1          "(ii) shall be written in a manner so
2          as to be understood by the average plan
3          participant.
4      "(3) MODEL NOTICES.—The Secretary shall—
5          "(A) prescribe model notices that the plan
6          sponsor of a composite plan may use to satisfy
7          the notice requirements under this subsection,
8          and
9          "(B) by regulation enumerate any details
10         related to the elements listed in paragraph (1)
11         that any notice under this subsection must in-
12         clude.
13     "(4) DELIVERY METHOD.—Any notice under
14     this part shall be provided in writing and may also
15     be provided in electronic form to the extent that the
16     form is reasonably accessible to persons to whom the
17     notice is provided.

18 **"SEC. 440. LIMITATION ON INCREASING BENEFITS.**

19     "(a) LEVEL OF CURRENT FUNDED RATIOS.—Except
20 as provided in subsections (c), (d), and (e), no plan
21 amendment increasing benefits or establishing new bene-
22 fits under a composite plan may be adopted for a plan
23 year unless—

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003606

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1302

1        ''(1) the plan's current funded ratio is at least

2    110 percent (without regard to the benefit increase

3    or new benefits),

4        ''(2) taking the benefit increase or new benefits

5    into account, the current funded ratio is at least 100

6    percent and the projected funded ratio for the cur-

7    rent plan year is at least 120 percent,

8        ''(3) in any case in which, after taking the ben-

9    efit increase or new benefits into account, the cur-

10   rent funded ratio is less than 140 percent or the

11   projected funded ratio is less than 140 percent, the

12   benefit increase or new benefits are projected by the

13   plan actuary to increase the present value of the

14   plan's liabilities for the plan year by not more than

15   3 percent, and

16       ''(4) expected contributions for the current plan

17   year are at least 120 percent of normal cost for the

18   plan year, determined using the unit credit funding

19   method and treating the benefit increase or new ben-

20   efits as in effect for the entire plan year.

21   ''(b) ADDITIONAL REQUIREMENTS WHERE CORE

22   BENEFITS REDUCED.—If a plan has been amended to re-

23   duce core benefits pursuant to a realignment program

24   under section 439(a)(2)(D), such plan may not be subse-

DOC_0003607

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1303

1 quently amended to increase core benefits unless the

2 amendment—

3     "(1) increases the level of future benefit pay-

4     ments only, and

5     "(2) provides for an equitable distribution of

6     benefit increases across the participant and bene-

7     ficiary population, taking into account the extent to

8     which the benefits of participants were previously re-

9     duced pursuant to such realignment program.

10 "(c) EXCEPTION TO COMPLY WITH APPLICABLE

11 LAW.—Subsection (a) shall not apply in connection with

12 a plan amendment if the amendment is required as a con-

13 dition of qualification under part I of subchapter D of

14 chapter 1 or to comply with other applicable law.

15 "(d) EXCEPTION WHERE MAXIMUM DEDUCTIBLE

16 LIMIT APPLIES.—Subsection (a) shall not apply in con-

17 nection with a plan amendment if and to the extent that

18 contributions to the composite plan would not be deduct-

19 ible for the plan year under section 404(a)(1)(E) if the

20 plan amendment is not adopted. The Secretary of the

21 Treasury shall issue regulations to implement this para-

22 graph.

23 "(e) EXCEPTION FOR CERTAIN BENEFIT MODIFICA-

24 TIONS.—Subsection (a) shall not apply in connection with

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003608

1304

1 a plan amendment under section 439(a)(5)(C), regarding

2 conditional benefit modifications.

3     "(f) TREATMENT OF PLAN AMENDMENTS.—For pur-

4 poses of this section—

5         "(1) if two or more plan amendments increas-

6         ing benefits or establishing new benefits are adopted

7         in a plan year, such amendments shall be treated as

8         a single amendment adopted on the last day of the

9         plan year,

10         "(2) all benefit increases and new benefits

11         adopted in a single amendment are treated as a sin-

12         gle benefit increase, irrespective of whether the in-

13         creases and new benefits take effect in more than

14         one plan year, and

15         "(3) increases in contributions or decreases in

16         plan liabilities which are scheduled to take effect in

17         future plan years may be taken into account in con-

18         nection with a plan amendment if they have been

19         agreed to in writing or otherwise formalized by the

20         date the plan amendment is adopted.

21 **"SEC. 440A. COMPOSITE PLAN RESTRICTIONS TO PRE-**

22         **SERVE LEGACY PLAN FUNDING.**

23     "(a) TREATMENT AS A LEGACY PLAN.—

24         "(1) IN GENERAL.—For purposes of this sub-

25         chapter, a defined benefit plan shall be treated as a

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003609

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1305

1   legacy plan with respect to the composite plan under

2   which the employees who were eligible to accrue a

3   benefit under the defined benefit plan become eligi-

4   ble to accrue a benefit under such composite plan.

5       "(2) COMPONENT PLANS.—In any case in

6   which a defined benefit plan is amended to add a

7   composite plan component pursuant to section

8   437(b), paragraph (1) shall be applied by sub-

9   stituting 'defined benefit component' for 'defined

10   benefit plan' and 'composite plan component' for

11   'composite plan'.

12      "(3) ELIGIBLE TO ACCRUE A BENEFIT.—For

13   purposes of paragraph (1), an employee is consid-

14   ered eligible to accrue a benefit under a composite

15   plan as of the first day in which the employee com-

16   pletes an hour of service under a collective bar-

17   gaining agreement that provides for contributions to

18   and accruals under the composite plan in lieu of ac-

19   cruals under the legacy plan.

20      "(4) COLLECTIVE BARGAINING AGREEMENT.—

21   As used in this subpart, the term 'collective bar-

22   gaining agreement' includes any agreement under

23   which an employer has an obligation to contribute to

24   a plan.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003610

1306

1    ''(5) OTHER TERMS.—Any term used in this

2    subpart which is not defined in this part and which

3    is also used in section 432 shall have the same

4    meaning provided such term in such section.

5    ''(b) RESTRICTIONS ON ACCEPTANCE BY COMPOSITE

6    PLAN OF AGREEMENTS AND CONTRIBUTIONS.—

7        ''(1) IN GENERAL.—The plan sponsor of a com-

8    posite plan shall not accept or recognize a collective

9    bargaining agreement (or any modification to such

10    agreement), and no contributions may be accepted

11    and no benefits may be accrued or otherwise earned

12    under the agreement—

13        ''(A) in any case in which the plan actuary

14        of any defined benefit plan that would be treat-

15        ed as a legacy plan with respect to such com-

16        posite    plan    has    certified    under    section

17        432(b)(3) that such defined benefit plan is or

18        will be in critical status for the plan year in

19        which such agreement would take effect or for

20        any of the succeeding 5 plan years, and

21        ''(B) unless the agreement requires each

22        employer who is a party to such agreement, in-

23        cluding employers whose employees are not par-

24        ticipants in the legacy plan, to provide contribu-

25        tions to the legacy plan with respect to such

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003611

1307

1 composite plan in a manner that satisfies the
2 transition contribution requirements of sub-
3 section (d).

4 "(2) NOTICE.—Not later than 30 days after a
5 determination by a plan sponsor of a composite plan
6 that an agreement fails to satisfy the requirements
7 described in paragraph (1), the plan sponsor shall
8 provide notification of such failure and the reasons
9 for such determination to—

10 "(A) the parties to the agreement,

11 "(B) active participants of the composite
12 plan who have ceased to accrue or otherwise
13 earn benefits with respect to service with an
14 employer pursuant to paragraph (1), and

15 "(C) the Secretary of Labor, the Secretary
16 of the Treasury, and the Pension Benefit Guar-
17 anty Corporation.

18 "(3) LIMITATION ON RETROACTIVE EFFECT.—
19 This subsection shall not apply to benefits accrued
20 before the date on which notice is provided under
21 paragraph (2).

22 "(c) RESTRICTION ON ACCRUAL OF BENEFITS
23 UNDER A COMPOSITE PLAN.—

24 "(1) IN GENERAL.—In any case in which an
25 employer, under a collective bargaining agreement

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003612

1308

1    entered into after the date of enactment of the Giv-

2    ing Retirement Options to Workers Act of 2020,

3    ceases to have an obligation to contribute to a multi-

4    employer defined benefit plan, no employees em-

5    ployed by the employer may accrue or otherwise earn

6    benefits under any composite plan, with respect to

7    service with that employer, for a 60-month period

8    beginning on the date on which the employer entered

9    into such collective bargaining agreement.

10    "(2) NOTICE OF CESSATION OF OBLIGATION.—

11    Within 30 days of determining that an employer has

12    ceased to have an obligation to contribute to a leg-

13    acy plan with respect to employees employed by an

14    employer that is or will be contributing to a com-

15    posite plan with respect to service of such employees,

16    the plan sponsor of the legacy plan shall notify the

17    plan sponsor of the composite plan of that cessation.

18    "(3) NOTICE OF CESSATION OF ACCRUALS.—

19    Not later than 30 days after determining that an

20    employer has ceased to have an obligation to con-

21    tribute to a legacy plan, the plan sponsor of the

22    composite plan shall notify the bargaining parties,

23    the active participants affected by the cessation of

24    accruals, the Secretary, the Secretary of Labor, and

25    the Pension Benefit Guaranty Corporation of the

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003613

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1309

1 cessation of accruals, the period during which such
2 cessation is in effect, and the reasons therefor.

3      "(4) LIMITATION ON RETROACTIVE EFFECT.—
4 This subsection shall not apply to benefits accrued
5 before the date on which notice is provided under
6 paragraph (3).

7 "(d) TRANSITION CONTRIBUTION REQUIREMENTS.—
8      "(1) IN GENERAL.—A collective bargaining
9 agreement satisfies the transition contribution re-
10 quirements of this subsection if the agreement—

11           "(A) authorizes for payment of contribu-
12           tions to a legacy plan at a rate or rates equal
13           to or greater than the transition contribution
14           rate established under paragraph (2), and

15           "(B) does not provide for—

16                "(i) a suspension of contributions to
17                the legacy plan with respect to any period
18                of service, or

19                "(ii) any new direct or indirect exclu-
20                sion of younger or newly hired employees
21                of the employer from being taken into ac-
22                count in determining contributions owed to
23                the legacy plan.

24      "(2) TRANSITION CONTRIBUTION RATE.—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003614

1310

"(A) IN GENERAL.—The transition con-
tribution rate for a plan year is the contribution
rate that, as certified by the actuary of the leg-
acy plan in accordance with the principles in
section 432(b)(3)(B), is reasonably expected to
be adequate—

"(i) to fund the normal cost for the
plan year,

"(ii) to amortize the plan's unfunded
liabilities in level annual installments over
25 years, beginning with the plan year in
which the transition contribution rate is
first established, and

"(iii) to amortize any subsequent
changes in the legacy plan's unfunded li-
ability due to experience gains or losses
(including investment gains or losses, gains
or losses due to contributions greater or
less than the contributions made under the
prior transition contribution rate, and
other actuarial gains or losses), changes in
actuarial assumptions, changes to the leg-
acy plan's benefits, or changes in funding
method over a period of 15 plan years be-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003615

1311

1  ginning with the plan year in which such
2  change in unfunded liability is incurred.
3  The transition contribution rate for any plan
4  year may not be less than the transition con-
5  tribution rate for the plan year in which such
6  rate is first established.
7  ''(B) MULTIPLE RATES.—If different rates
8  of contribution are payable to the legacy plan
9  by different employers or for different classes of
10  employees, the certification shall specify a tran-
11  sition contribution rate for each such employer.
12  ''(C) RATE APPLICABLE TO EMPLOYER.—
13  ''(i) IN GENERAL.—Except as pro-
14  vided by clause (ii), the transition con-
15  tribution rate applicable to an employer for
16  a plan year is the rate in effect for the
17  plan year of the legacy plan that com-
18  mences on or after 180 days before the
19  earlier of—
20  ''(I) the effective date of the col-
21  lective bargaining agreement pursuant
22  to which the employer contributes to
23  the legacy plan, or
24  ''(II) 5 years after the last plan
25  year for which the transition contribu-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003616

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1312

1 tion rate applicable to the employer
2 was established or updated.
3     "(ii) EXCEPTION.—The transition
4 contribution rate applicable to an employer
5 for the first plan year beginning on or
6 after the commencement of the employer's
7 obligation to contribute to the composite
8 plan is the rate in effect for the plan year
9 of the legacy plan that commences on or
10 after 180 days before such first plan year.
11     "(D) EFFECT OF LEGACY PLAN FINANCIAL
12 CIRCUMSTANCES.—If the plan actuary of the
13 legacy plan has certified under section 432 that
14 the plan is in endangered or critical status for
15 a plan year, the transition contribution rate for
16 the following plan year is the rate determined
17 with respect to the employer under the legacy
18 plan's funding improvement or rehabilitation
19 plan under section 432, if greater than the rate
20 otherwise determined, but in no event greater
21 than 75 percent of the sum of the contribution
22 rates applicable to the legacy plan and the com-
23 posite plan for the plan year.
24     "(E) OTHER ACTUARIAL ASSUMPTIONS
25 AND METHODS.—Except as provided in sub-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003617

1313

1     paragraph (A), the determination of the transi-

2     tion contribution rate for a plan year shall be

3     based on actuarial assumptions and methods

4     consistent with the minimum funding deter-

5     minations made under section 431 (or, if appli-

6     cable, section 432) with respect to the legacy

7     plan for the plan year.

8         ''(F) ADJUSTMENTS IN RATE.—The plan

9     sponsor of a legacy plan from time to time may

10     adjust the transition contribution rate or rates

11     applicable to an employer under this paragraph

12     by increasing some rates and decreasing others

13     if the actuary certifies that such adjusted rates

14     in combination will produce projected contribu-

15     tion income for the plan year beginning on or

16     after the date of certification that is not less

17     than would be produced by the transition con-

18     tribution rates in effect at the time of the cer-

19     tification.

20         ''(G) NOTICE OF TRANSITION CONTRIBU-

21     TION RATE.—The plan sponsor of a legacy plan

22     shall provide notice to the parties to collective

23     bargaining agreements pursuant to which con-

24     tributions are made to the legacy plan of

25     changes to the transition contribution rate re-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003618

1314

1  quirements at least 30 days before the begin-
2  ning of the plan year for which the rate is effec-
3  tive.

4      ''(H) NOTICE TO COMPOSITE PLAN SPON-
5  SOR.—Not later than 30 days after a deter-
6  mination by the plan sponsor of a legacy plan
7  that a collective bargaining agreement provides
8  for a rate of contributions that is below the
9  transition contribution rate applicable to one or
10  more employers that are parties to the collective
11  bargaining agreement, the plan sponsor of the
12  legacy plan shall notify the plan sponsor of any
13  composite plan under which employees of such
14  employer would otherwise be eligible to accrue
15  a benefit.

16      ''(3) CORRECTION PROCEDURES.—Pursuant to
17  standards prescribed by the Secretary of Labor, the
18  plan sponsor of a composite plan shall adopt rules
19  and procedures that give the parties to the collective
20  bargaining agreement notice of the failure of such
21  agreement to satisfy the transition contribution re-
22  quirements of this subsection, and a reasonable op-
23  portunity to correct such failure, not to exceed 180
24  days from the date of notice given under subsection
25  (b)(2).

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003619

1315

1  "(4) SUPPLEMENTAL CONTRIBUTIONS.—A col-
2  lective bargaining agreement may provide for supple-
3  mental contributions to the legacy plan for a plan
4  year in excess of the transition contribution rate de-
5  termined under paragraph (2), regardless of whether
6  the legacy plan is in endangered or critical status for
7  such plan year.

8  "(e) NONAPPLICATION OF COMPOSITE PLAN RE-
9  STRICTIONS.—

10  "(1) IN GENERAL.—The provisions of sub-
11  sections (a), (b), and (c) shall not apply with respect
12  to a collective bargaining agreement, to the extent
13  the agreement, or a predecessor agreement, provides
14  or provided for contributions to a defined benefit
15  plan that is a legacy plan, as of the first day of the
16  first plan year following a plan year for which the
17  plan actuary certifies that the plan is fully funded,
18  has been fully funded for at least three out of the
19  immediately preceding 5 plan years, and is projected
20  to remain fully funded for at least the following 4
21  plan years.

22  "(2) DETERMINATION OF FULLY FUNDED.—A
23  plan is fully funded for purposes of paragraph (1)
24  if, as of the valuation date of the plan for a plan
25  year, the value of the plan's assets equals or exceeds

DOC_0003620

1316

1    the present value of the plan's liabilities, determined

2    in accordance with the rules prescribed by the Pen-

3    sion Benefit Guaranty Corporation under sections

4    4219(c)(1)(D) and 4281 of Employee Retirement

5    Income and Security Act for multiemployer plans

6    terminating by mass withdrawal, as in effect for the

7    date of the determination, except the plan's reason-

8    able assumption regarding the starting date of bene-

9    fits may be used.

10    ''(3) OTHER APPLICABLE RULES.—Except as

11    provided in paragraph (2), actuarial determinations

12    and projections under this section shall be based on

13    the rules in section 432(b)(3) and section 438(b).

14  **''SEC. 440B. MERGERS AND ASSET TRANSFERS OF COM-**

15         **POSITE PLANS.**

16    ''(a) IN GENERAL.—Assets and liabilities of a com-

17  posite plan may only be merged with, or transferred to,

18  another plan if—

19    ''(1) the other plan is a composite plan,

20    ''(2) the plan or plans resulting from the merg-

21    er or transfer is a composite plan,

22    ''(3) no participant's accrued benefit or adjust-

23    able benefit is lower immediately after the trans-

24    action than it was immediately before the trans-

25    action, and

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003621

1317

1    ''(4) the value of the assets transferred in the
2    case of a transfer reasonably reflects the value of the
3    amounts contributed with respect to the participants
4    whose benefits are being transferred, adjusted for al-
5    locable distributions, investment gains and losses,
6    and administrative expenses.

7    ''(b) LEGACY PLAN.—

8        ''(1) IN GENERAL.—After a merger or transfer
9    involving a composite plan, the legacy plan with re-
10   spect to an employer that is obligated to contribute
11   to the resulting composite plan is the legacy plan
12   that applied to that employer immediately before the
13   merger or transfer.

14       ''(2) MULTIPLE LEGACY PLANS.—If an em-
15   ployer is obligated to contribute to more than one
16   legacy plan with respect to employees eligible to ac-
17   crue benefits under more than one composite plan
18   and there is a merger or transfer of such legacy
19   plans, the transition contribution rate applicable to
20   the legacy plan resulting from the merger or trans-
21   fer with respect to that employer shall be determined
22   in accordance with the provisions of section
23   440A(d)(2)(B).''.

24       (2) CLERICAL AMENDMENT.—The table of sub-
25   parts for part III of subchapter D of chapter 1 of

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003622

1318

1 the Internal Revenue Code of 1986 is amended by
2 adding at the end the following new item:

"SUBPART C. COMPOSITE PLANS AND LEGACY PLANS".

3 (c) EFFECTIVE DATE.—The amendments made by
4 this section shall apply to plan years beginning after the
5 date of the enactment of this Act.

**6 SEC. 140003. APPLICATION OF CERTAIN REQUIREMENTS TO**
**7 COMPOSITE PLANS.**

8 (a) AMENDMENTS TO THE EMPLOYEE RETIREMENT
9 INCOME SECURITY ACT OF 1974.—

10 (1) TREATMENT FOR PURPOSES OF FUNDING
11 NOTICES.—Section 101(f) of the Employee Retire-
12 ment Income Security Act of 1974 (29 U.S.C.
13 1021(f)) is amended—

14 (A) in paragraph (1) by striking "title IV
15 applies" and inserting "title IV applies or which
16 is a composite plan"; and

17 (B) by adding at the end the following:

18 "(5) APPLICATION TO COMPOSITE PLANS.—The
19 provisions of this subsection shall apply to a com-
20 posite plan only to the extent prescribed by the Sec-
21 retary in regulations that take into account the dif-
22 ferences between a composite plan and a defined
23 benefit plan that is a multiemployer plan.".

24 (2) TREATMENT FOR PURPOSES OF ANNUAL
25 REPORT.—Section 103 of the Employee Retirement

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003623

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1319

1 Income Security Act of 1974 (29 U.S.C. 1023) is

2 amended—

3   (A) in subsection (d) by adding at the end

4   the following sentence: ''The provisions of this

5   subsection shall apply to a composite plan only

6   to the extent prescribed by the Secretary in reg-

7   ulations that take into account the differences

8   between a composite plan and a defined benefit

9   plan that is a multiemployer plan.'';

10   (B) in subsection (f) by adding at the end

11   the following:

12 ''(3) ADDITIONAL INFORMATION FOR COM-

13 POSITE PLANS.—With respect to any composite

14 plan—

15   ''(A) the provisions of paragraph (1)(A)

16   shall apply by substituting 'current funded ratio

17   and projected funded ratio (as such terms are

18   defined in section 802(a)(2))' for 'funded per-

19   centage' each place it appears; and

20   ''(B) the provisions of paragraph (2) shall

21   apply only to the extent prescribed by the Sec-

22   retary in regulations that take into account the

23   differences between a composite plan and a de-

24   fined benefit plan that is a multiemployer

25   plan.''; and

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003624

1320

1  (C) by adding at the end the following:

2  ''(h) COMPOSITE PLANS.—A multiemployer plan that

3  incorporates the features of a composite plan as provided

4  in section 801(b) shall be treated as a single plan for pur-

5  poses of the report required by this section, except that

6  separate financial statements and actuarial statements

7  shall be provided under paragraphs (3) and (4) of sub-

8  section (a) for the defined benefit plan component and for

9  the composite plan component of the multiemployer

10  plan.''.

11  (3) TREATMENT FOR PURPOSES OF PENSION

12  BENEFIT STATEMENTS.—Section 105(a) of the Em-

13  ployee Retirement Income Security Act of 1974 (29

14  U.S.C. 1025(a)) is amended by adding at the end

15  the following:

16  ''(4) COMPOSITE PLANS.—For purposes of this

17  subsection, a composite plan shall be treated as a

18  defined benefit plan to the extent prescribed by the

19  Secretary in regulations that take into account the

20  differences between a composite plan and a defined

21  benefit plan that is a multiemployer plan.''.

22  (b) AMENDMENTS TO THE INTERNAL REVENUE

23  CODE OF 1986.—Section 6058 of the Internal Revenue

24  Code of 1986 is amended by redesignating subsection (f)

g:\VHLC\051220\051220.072.xml        (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003625

1321

1   as subsection (g) and by inserting after subsection (e) the

2   following:

3       "(f) COMPOSITE PLANS.—A multiemployer plan that

4   incorporates the features of a composite plan as provided

5   in section 437(b) shall be treated as a single plan for pur-

6   poses of the return required by this section, except that

7   separate financial statements shall be provided for the de-

8   fined benefit plan component and for the composite plan

9   component of the multiemployer plan.".

10      (c) EFFECTIVE DATE.—The amendments made by

11  this section shall apply to plan years beginning after the

12  date of the enactment of this Act.

13  **SEC. 140004. TREATMENT OF COMPOSITE PLANS UNDER**

14                **TITLE IV.**

15      (a) DEFINITION.—Section 4001(a) of the Employee

16  Retirement Income Security Act of 1974 (29 U.S.C.

17  1301(a)) is amended by striking the period at the end of

18  paragraph (21) and inserting a semicolon and by adding

19  at the end the following:

20          "(22) COMPOSITE PLAN.—The term 'composite

21      plan' has the meaning set forth in section 801.".

22      (b) COMPOSITE PLANS DISREGARDED FOR CALCU-

23  LATING PREMIUMS.—Section 4006(a) of such Act (29

24  U.S.C. 1306(a)) is amended by adding at the end the fol-

25  lowing:

DOC_0003626

1322

1  "(9) The composite plan component of a multi-
2  employer plan shall be disregarded in determining
3  the premiums due under this section from the multi-
4  employer plan.".

5  (c) COMPOSITE PLANS NOT COVERED.—Section
6  4021(b)(1) of such Act (29 U.S.C. 1321(b)(1)) is amend-
7  ed by striking "Act" and inserting "Act, or a composite
8  plan, as defined in paragraph (43) of section 3 of this
9  Act".

10  (d) NO WITHDRAWAL LIABILITY.—Section 4201 of
11  such Act (29 U.S.C. 1381) is amended by adding at the
12  end the following:

13  "(c) Contributions by an employer to the composite
14  plan component of a multiemployer plan shall not be taken
15  into account for any purpose under this title.".

16  (e) NO WITHDRAWAL LIABILITY FOR CERTAIN
17  PLANS.—Section 4201 of such Act (29 U.S.C. 1381) is
18  further amended by adding at the end the following:

19  "(d) Contributions by an employer to a multiem-
20  ployer plan described in the except clause of section 3(35)
21  of this Act pursuant to a collective bargaining agreement
22  that specifically designates that such contributions shall
23  be allocated to the separate defined contribution accounts
24  of participants under the plan shall not be taken into ac-
25  count with respect to the defined benefit portion of the

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003627

G:\CMTE\AP\16\FY20\_D\HEROES.XML

<center>1323</center>

1 plan for any purpose under this title (including the deter-
2 mination of the employer's highest contribution rate under
3 section 4219), even if, under the terms of the plan, partici-
4 pants have the option to transfer assets in their separate
5 defined contribution accounts to the defined benefit por-
6 tion of the plan in return for service credit under the de-
7 fined benefit portion, at rates established by the plan
8 sponsor.

9    "(e) A legacy plan created under section 805 shall
10 be deemed to have no unfunded vested benefits for pur-
11 poses of this part, for each plan year following a period
12 of 5 consecutive plan years for which—

13        "(1) the plan was fully funded within the mean-
14    ing of section 805 for at least 3 of the plan years
15    during that period, ending with a plan year for
16    which the plan is fully funded;

17        "(2) the plan had no unfunded vested benefits
18    for at least 3 of the plan years during that period,
19    ending with a plan year for which the plan is fully
20    funded; and

21        "(3) the plan is projected to be fully funded
22    and to have no unfunded vested benefits for the fol-
23    lowing four plan years.".

24    (f) NO WITHDRAWAL LIABILITY FOR EMPLOYERS
25 CONTRIBUTING TO CERTAIN FULLY FUNDED LEGACY

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003628

1324

1 PLANS.—Section 4211 of such Act (29 U.S.C. 1382) is
2 amended by adding at the end the following:

3    "(g) No amount of unfunded vested benefits shall be
4 allocated to an employer that has an obligation to con-
5 tribute to a legacy plan described in subsection (e) of sec-
6 tion 4201 for each plan year for which such subsection
7 applies.".

8    (g) No OBLIGATION TO CONTRIBUTE.—Section
9 4212 of such Act (29 U.S.C. 1392) is amended by adding
10 at the end the following:

11    "(d) No OBLIGATION TO CONTRIBUTE.—An em-
12 ployer shall not be treated as having an obligation to con-
13 tribute to a multiemployer defined benefit plan within the
14 meaning of subsection (a) solely because—

15       "(1) in the case of a multiemployer plan that
16    includes a composite plan component, the employer
17    has an obligation to contribute to the composite plan
18    component of the plan;

19       "(2) the employer has an obligation to con-
20    tribute to a composite plan that is maintained pur-
21    suant to one or more collective bargaining agree-
22    ments under which the multiemployer defined ben-
23    efit plan is or previously was maintained; or

24       "(3) the employer contributes or has contrib-
25    uted under section 805(d) to a legacy plan associ-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003629

1325

1  ated with a composite plan pursuant to a collective

2  bargaining agreement but employees of that em-

3  ployer were not eligible to accrue benefits under the

4  legacy plan with respect to service with that em-

5  ployer.''.

6  (h) NO INFERENCE.—Nothing in the amendment

7  made by subsection (e) shall be construed to create an in-

8  ference with respect to the treatment under title IV of the

9  Employee Retirement Income Security Act of 1974, as in

10  effect before such amendment, of contributions by an em-

11  ployer to a multiemployer plan described in the except

12  clause of section 3(35) of such Act that are made before

13  the effective date of subsection (e) specified in subsection

14  (h)(2).

15  (i) EFFECTIVE DATE.—

16     (1) IN GENERAL.—Except as provided in sub-

17     paragraph (2), the amendments made by this section

18     shall apply to plan years beginning after the date of

19     the enactment of this Act.

20     (2) SPECIAL RULE FOR SECTION 414(k) MULTI-

21     EMPLOYER PLANS.—The amendment made by sub-

22     section (e) shall apply only to required contributions

23     payable for plan years beginning after the date of

24     the enactment of this Act.

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003630

1326

1 **SEC. 140005. CONFORMING CHANGES.**

2     (a) DEFINITIONS.—Section 3 of the Employee Re-

3 tirement Income Security Act of 1974 (29 U.S.C. 1002)

4 is amended—

5         (1) in paragraph (35), by inserting "or a com-

6         posite plan" after "other than an individual account

7         plan"; and

8         (2) by adding at the end the following:

9     "(43) The term 'composite plan' has the mean-

10 ing given the term in section 801(a).".

11     (b) SPECIAL FUNDING RULE FOR CERTAIN LEGACY

12 PLANS.—

13         (1) AMENDMENT TO EMPLOYEE RETIREMENT

14         INCOME SECURITY ACT OF 1974.—Section 304(b) of

15         the Employee Retirement Income Security Act of

16         1974 (29 U.S.C. 1084(b)) is amended by adding at

17         the end the following:

18     "(9) SPECIAL FUNDING RULE FOR CERTAIN

19 LEGACY PLANS.—In the case of a multiemployer de-

20 fined benefit plan that has adopted an amendment

21 under section 801(b), in accordance with which no

22 further benefits shall accrue under the multiem-

23 ployer defined benefit plan, the plan sponsor may

24 combine the outstanding balance of all charge and

25 credit bases and amortize that combined base in

26 level annual installments (until fully amortized) over

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003631

1327

1    a period of 25 plan years beginning with the plan

2    year following the date all benefit accruals ceased.''.

3        (2) AMENDMENT TO INTERNAL REVENUE CODE

4    OF 1986.—Section 431(b) of the Internal Revenue

5    Code of 1986 is amended by adding at the end the

6    following:

7        ''(9) SPECIAL FUNDING RULE FOR CERTAIN

8    LEGACY PLANS.—In the case of a multiemployer de-

9    fined benefit plan that has adopted an amendment

10    under section 437(b), in accordance with which no

11    further benefits shall accrue under the multiem-

12    ployer defined benefit plan, the plan sponsor may

13    combine the outstanding balance of all charge and

14    credit bases and amortize that combined base in

15    level annual installments (until fully amortized) over

16    a period of 25 plan years beginning with the plan

17    year following the date on which all benefit accruals

18    ceased.''.

19    (c) BENEFITS AFTER MERGER, CONSOLIDATION, OR

20    TRANSFER OF ASSETS.—

21        (1) AMENDMENT TO EMPLOYEE RETIREMENT

22    INCOME SECURITY ACT OF 1974.—Section 208 of the

23    Employee Retirement Income Security Act of 1974

24    (29 U.S.C. 1058) is amended—

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003632

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1328

1         (A) by striking so much of the first sen-
2 tence as precedes "may not merge" and insert-
3 ing the following:
4       "(1) IN GENERAL.—Except as provided in para-
5 graph (2), a pension plan may not merge, and"; and
6         (B) by striking the second sentence and
7 adding at the end the following:
8       "(2) SPECIAL REQUIREMENTS FOR MULTIEM-
9 PLOYER PLANS.—Paragraph (1) shall not apply to
10 any transaction to the extent that participants either
11 before or after the transaction are covered under a
12 multiemployer plan to which title IV of this Act ap-
13 plies or a composite plan.".
14     (2) AMENDMENTS TO INTERNAL REVENUE
15 CODE OF 1986.—
16         (A) QUALIFICATION REQUIREMENT.—Sec-
17 tion 401(a)(12) of the Internal Revenue Code
18 of 1986 is amended—
19            (i) by striking "(12) A trust" and in-
20 serting the following:
21       "(12) BENEFITS AFTER MERGER, CONSOLIDA-
22 TION, OR TRANSFER OF ASSETS.—
23         "(A) IN GENERAL.—Except as provided in
24 subparagraph (B), a trust";

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003633

1329

1        (ii) by striking the second sentence;

2     and

3        (iii) by adding at the end the fol-

4     lowing:

5   "(B) SPECIAL REQUIREMENTS FOR MULTI-

6 EMPLOYER PLANS.—Subparagraph (A) shall

7 not apply to any multiemployer plan with re-

8 spect to any transaction to the extent that par-

9 ticipants either before or after the transaction

10 are covered under a multiemployer plan to

11 which title IV of the Employee Retirement In-

12 come Security Act of 1974 applies or a com-

13 posite plan.".

14     (B) ADDITIONAL QUALIFICATION REQUIRE-

15 MENT.—Paragraph (1) of section 414(l) of such

16 Code is amended—

17        (i) by striking "(1) IN GENERAL" and

18     all that follows through "shall not con-

19     stitute" and inserting the following:

20   "(1) BENEFIT PROTECTIONS: MERGER, CON-

21 SOLIDATION, TRANSFER.—

22     "(A) IN GENERAL.—Except as provided in

23     subparagraph (B), a trust which forms a part

24     of a plan shall not constitute"; and

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003634

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1330

1         (ii) by striking the second sentence;

2         and

3         (iii) by adding at the end the fol-

4         lowing:

5         ''(B) SPECIAL REQUIREMENTS FOR MULTI-

6         EMPLOYER PLANS.—Subparagraph (A) does not

7         apply to any multiemployer plan with respect to

8         any transaction to the extent that participants

9         either before or after the transaction are cov-

10        ered under a multiemployer plan to which title

11        IV of the Employee Retirement Income Secu-

12        rity Act of 1974 applies or a composite plan.''.

13   (d) REQUIREMENTS FOR STATUS AS A QUALIFIED

14 PLAN.—

15       (1) REQUIREMENT THAT ACTUARIAL ASSUMP-

16       TIONS BE SPECIFIED.—Section 401(a)(25) of the In-

17       ternal Revenue Code of 1986 is amended by insert-

18       ing ''(in the case of a composite plan, benefits objec-

19       tively calculated pursuant to a formula)'' after ''defi-

20       nitely determinable benefits''.

21       (2) MISSING PARTICIPANTS IN TERMINATING

22       COMPOSITE PLAN.—Section 401(a)(34) of the Inter-

23       nal Revenue Code of 1986 is amended by striking '',

24       a trust'' and inserting ''or a composite plan, a

25       trust''.

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003635

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1331

1    (e) DEDUCTION FOR CONTRIBUTIONS TO A QUALI-

2  FIED PLAN.—Section 404(a)(1) of the Internal Revenue

3  Code of 1986 is amended by redesignating subparagraph

4  (E) as subparagraph (F) and by inserting after subpara-

5  graph (D) the following:

6           ''(E) COMPOSITE PLANS.—

7               ''(i) IN GENERAL.—In the case of a

8           composite plan, subparagraph (D) shall

9           not apply and the maximum amount de-

10          ductible for a plan year shall be the excess

11          (if any) of—

12               ''(I) 160 percent of the greater

13          of—

14               ''(aa) the current liability of

15               the plan determined in accord-

16               ance with the principles of sec-

17               tion 431(c)(6)(D), or

18               ''(bb) the present value of

19               plan liabilities as determined

20               under section 438, over

21               ''(II) the fair market value of the

22          plan's assets, projected to the end of

23          the plan year.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003636

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1332

1           "(ii) SPECIAL RULES FOR PREDE-

2         CESSOR MULTIEMPLOYER PLAN TO COM-

3         POSITE PLAN.—

4                "(I) IN GENERAL.—Except as

5             provided in subclause (II), if an em-

6             ployer contributes to a composite plan

7             with respect to its employees, con-

8             tributions by that employer to a mul-

9             tiemployer defined benefit plan with

10            respect to some or all of the same

11            group of employees shall be deductible

12            under sections 162 and this section,

13            subject to the limits in subparagraph

14            (D).

15                "(II) TRANSITION CONTRIBU-

16            TION.—The full amount of a contribu-

17            tion to satisfy the transition contribu-

18            tion requirement (as defined in sec-

19            tion 440A(d)) and allocated to the

20            legacy defined benefit plan for the

21            plan year shall be deductible for the

22            employer's taxable year ending with or

23            within the plan year.".

24     (f) MINIMUM VESTING STANDARDS.—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003637

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1333

1      (1) YEARS OF SERVICE UNDER COMPOSITE

2      PLANS.—

3           (A) EMPLOYEE RETIREMENT INCOME SE-

4           CURITY ACT OF 1974.—Section 203 of the Em-

5           ployee Retirement Income Security Act of 1974

6           (29 U.S.C. 1053) is amended by inserting after

7           subsection (f) the following:

8      "(g) SPECIAL RULES FOR COMPUTING YEARS OF

9  SERVICE UNDER COMPOSITE PLANS.—

10      "(1) IN GENERAL.—In determining a qualified

11      employee's years of service under a composite plan

12      for purposes of this section, the employee's years of

13      service under a legacy plan shall be treated as years

14      of service earned under the composite plan. For pur-

15      poses of such determination, a composite plan shall

16      not be treated as a defined benefit plan pursuant to

17      section 801(d).

18      "(2) QUALIFIED EMPLOYEE.—For purposes of

19      this subsection, an employee is a qualified employee

20      if the employee first completes an hour of service

21      under the composite plan (determined without re-

22      gard to the provisions of this subsection) within the

23      12-month period immediately preceding or the 24-

24      month period immediately following the date the em-

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003638

1334

1    ployee ceased to accrue benefits under the legacy

2    plan.

3    &ldquo;(3) CERTIFICATION OF YEARS OF SERVICE.—

4    For purposes of paragraph (1), the plan sponsor of

5    the composite plan shall rely on a written certifi-

6    cation by the plan sponsor of the legacy plan of the

7    years of service the qualified employee completed

8    under the defined benefit plan as of the date the em-

9    ployee satisfies the requirements of paragraph (2),

10   disregarding any years of service that had been for-

11   feited under the rules of the defined benefit plan be-

12   fore that date.

13   &ldquo;(h) SPECIAL RULES FOR COMPUTING YEARS OF

14   SERVICE UNDER LEGACY PLANS.—

15   &ldquo;(1) IN GENERAL.—In determining a qualified

16   employee's years of service under a legacy plan for

17   purposes of this section, and in addition to any serv-

18   ice under applicable regulations, the employee's

19   years of service under a composite plan shall be

20   treated as years of service earned under the legacy

21   plan. For purposes of such determination, a com-

22   posite plan shall not be treated as a defined benefit

23   plan pursuant to section 801(d).

24   &ldquo;(2) QUALIFIED EMPLOYEE.—For purposes of

25   this subsection, an employee is a qualified employee

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003639

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1335

1  if the employee first completes an hour of service

2  under the composite plan (determined without re-

3  gard to the provisions of this subsection) within the

4  12-month period immediately preceding or the 24-

5  month period immediately following the date the em-

6  ployee ceased to accrue benefits under the legacy

7  plan.

8      ''(3) CERTIFICATION OF YEARS OF SERVICE.—

9  For purposes of paragraph (1), the plan sponsor of

10  the legacy plan shall rely on a written certification

11  by the plan sponsor of the composite plan of the

12  years of service the qualified employee completed

13  under the composite plan after the employee satisfies

14  the requirements of paragraph (2), disregarding any

15  years of service that has been forfeited under the

16  rules of the composite plan.''.

17      (B) INTERNAL REVENUE CODE OF 1986.—

18      Section 411(a) of the Internal Revenue Code of

19      1986 is amended by adding at the end the fol-

20      lowing:

21      ''(14) SPECIAL RULES FOR DETERMINING

22  YEARS OF SERVICE UNDER COMPOSITE PLANS.—

23          ''(A) IN GENERAL.—In determining a

24      qualified employee's years of service under a

25      composite plan for purposes of this subsection,

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003640

1336

1     the employee's years of service under a legacy

2     plan shall be treated as years of service earned

3     under the composite plan. For purposes of such

4     determination, a composite plan shall not be

5     treated as a defined benefit plan pursuant to

6     section 437(d).

7         "(B) QUALIFIED EMPLOYEE.—For pur-

8     poses of this paragraph, an employee is a quali-

9     fied employee if the employee first completes an

10     hour of service under the composite plan (deter-

11     mined without regard to the provisions of this

12     paragraph) within the 12-month period imme-

13     diately preceding or the 24-month period imme-

14     diately following the date the employee ceased

15     to accrue benefits under the legacy plan.

16         "(C) CERTIFICATION OF YEARS OF SERV-

17     ICE.—For purposes of subparagraph (A), the

18     plan sponsor of the composite plan shall rely on

19     a written certification by the plan sponsor of

20     the legacy plan of the years of service the quali-

21     fied employee completed under the legacy plan

22     as of the date the employee satisfies the re-

23     quirements of subparagraph (B), disregarding

24     any years of service that had been forfeited

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003641

1337

1    under the rules of the defined benefit plan be-
2    fore that date.
3    "(15) SPECIAL RULES FOR COMPUTING YEARS
4    OF SERVICE UNDER LEGACY PLANS.—
5         "(A) IN GENERAL.—In determining a
6    qualified employee's years of service under a
7    legacy plan for purposes of this section, and in
8    addition to any service under applicable regula-
9    tions, the employee's years of service under a
10    composite plan shall be treated as years of serv-
11    ice earned under the legacy plan. For purposes
12    of such determination, a composite plan shall
13    not be treated as a defined benefit plan pursu-
14    ant to section 437(d).
15         "(B) QUALIFIED EMPLOYEE.—For pur-
16    poses of this paragraph, an employee is a quali-
17    fied employee if the employee first completes an
18    hour of service under the composite plan (deter-
19    mined without regard to the provisions of this
20    paragraph) within the 12-month period imme-
21    diately preceding or the 24-month period imme-
22    diately following the date the employee ceased
23    to accrue benefits under the legacy plan.
24         "(C) CERTIFICATION OF YEARS OF SERV-
25    ICE.—For purposes of subparagraph (A), the

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003642

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1338

1    plan sponsor of the legacy plan shall rely on a

2    written certification by the plan sponsor of the

3    composite plan of the years of service the quali-

4    fied employee completed under the composite

5    plan after the employee satisfies the require-

6    ments of subparagraph (B), disregarding any

7    years of service that has been forfeited under

8    the rules of the composite plan.''.

9    (2) REDUCTION OF BENEFITS.—

10       (A) EMPLOYEE RETIREMENT INCOME SE-

11   CURITY ACT OF 1974.—Section 203(a)(3)(E)(ii)

12   of the Employee Retirement Income Security

13   Act of 1974 (29 U.S.C. 1053(a)(3)(E)(ii)) is

14   amended—

15           (i) in subclause (I) by striking

16       ''4244A'' and inserting ''305(e), 803,'';

17       and

18           (ii) in subclause (II) by striking

19       ''4245'' and inserting ''305(e), 4245,''.

20       (B) INTERNAL REVENUE CODE OF 1986.—

21   Section 411(a)(3)(F) of the Internal Revenue

22   Code of 1986 is amended—

23           (i) in clause (i) by striking ''section

24       418D or under section 4281 of the Em-

25       ployee Retirement Income Security Act of

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003643

1339

1        1974" and inserting "section 432(e) or

2        439 or under section 4281 of the Em-

3        ployee Retirement Income Security Act of

4        1974"; and

5           (ii) in clause (ii) by inserting "or

6        432(e)" after "section 418E".

7     (3) ACCRUED BENEFIT REQUIREMENTS.—

8        (A) EMPLOYEE RETIREMENT INCOME SE-

9        CURITY ACT OF 1974.—Section 204(b)(1)(B)(i)

10        of the Employee Retirement Income Security

11        Act of 1974 (29 U.S.C. 1054(b)(1)(B)(i)) is

12        amended by inserting ", including an amend-

13        ment reducing or suspending benefits under

14        section 305(e), 803, 4245 or 4281," after "any

15        amendment to the plan".

16        (B) INTERNAL REVENUE CODE OF 1986.—

17        Section 411(b)(1)(B)(i) of the Internal Revenue

18        Code of 1986 is amended by inserting ", includ-

19        ing an amendment reducing or suspending ben-

20        efits under section 418E, 432(e) or 439, or

21        under section 4281 of the Employee Retirement

22        Income Security Act of 1974," after "any

23        amendment to the plan".

24     (4) ADDITIONAL ACCRUED BENEFIT REQUIRE-

25   MENTS.—

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003644

1340

1    (A) EMPLOYEE RETIREMENT INCOME SE-
2    CURITY ACT OF 1974.—Section 204(b)(1)(H)(v)
3    of the Employee Retirement Income Security
4    Act of 1974 (29 U.S.C. 1053(b)(1)(H)(v)) is
5    amended by inserting before the period at the
6    end the following: ", or benefits are reduced or
7    suspended under section 305(e), 803, 4245, or
8    4281".

9    (B) INTERNAL REVENUE CODE OF 1986.—
10   Section 411(b)(1)(H)(iv) of the Internal Rev-
11   enue Code of 1986 is amended—

12       (i) in the heading by striking "BEN-
13       EFIT" and inserting "BENEFIT AND THE
14       SUSPENSION AND REDUCTION OF CERTAIN
15       BENEFITS"; and

16       (ii) in the text by inserting before the
17       period at the end the following: ", or bene-
18       fits are reduced or suspended under sec-
19       tion 418E, 432(e), or 439, or under sec-
20       tion 4281 of the Employee Retirement In-
21       come Security Act of 1974".

22   (5) ACCRUED BENEFIT NOT TO BE DECREASED
23   BY AMENDMENT.—

24       (A) EMPLOYEE RETIREMENT INCOME SE-
25       CURITY ACT OF 1974.—Section 204(g)(1) of the

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003645

1341

1        Employee Retirement Income Security Act of

2        1974 (29 U.S.C. 1053(g)(1)) is amended by in-

3        serting after "302(d)(2)" the following: ",

4        305(e), 803, 4245,".

5           (B) INTERNAL REVENUE CODE OF 1986.—

6        Section 411(d)(6)(A) of the Internal Revenue

7        Code of 1986 is amended by inserting after

8        "412(d)(2)," the following: "418E, 432(e), or

9        439,".

10 (g) CERTAIN FUNDING RULES NOT APPLICABLE.—

11        (1) EMPLOYEE RETIREMENT INCOME SECURITY

12 ACT OF 1974.—Section 305 of the Employee Retire-

13 ment Income Security Act of 1974 (29 U.S.C. 1085)

14 is amended by adding at the end the following:

15 "(k) LEGACY PLANS.—Sections 302, 304, and 305

16 shall not apply to an employer that has an obligation to

17 contribute to a plan that is a legacy plan within the mean-

18 ing of section 805(a) solely because the employer has an

19 obligation to contribute to a composite plan described in

20 section 801 that is associated with that legacy plan.".

21        (2) INTERNAL REVENUE CODE OF 1986.—Sec-

22        tion 432 of the Internal Revenue Code of 1986 is

23        amended by adding at the end the following:

24 "(k) LEGACY PLANS.—Sections 412, 431, and 432

25 shall not apply to an employer that has an obligation to

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003646

1342

1 contribute to a plan that is a legacy plan within the mean-

2 ing of section 440A(a) solely because the employer has an

3 obligation to contribute to a composite plan described in

4 section 437 that is associated with that legacy plan.''.

5    (h) TERMINATION OF COMPOSITE PLAN.—Section

6 403(d) of the Employee Retirement Income Security Act

7 of 1974 (29 U.S.C. 1103(d) is amended—

8        (1) in paragraph (1), by striking ''regulations

9    of the Secretary.'' and inserting ''regulations of the

10    Secretary, or as provided in paragraph (3).''; and

11        (2) by adding at the end the following:

12        ''(3) Section 4044(a) of this Act shall be ap-

13    plied in the case of the termination of a composite

14    plan by—

15            ''(A) limiting the benefits subject to para-

16        graph (3) thereof to benefits as defined in sec-

17        tion 802(b)(3)(B); and

18            ''(B) including in the benefits subject to

19        paragraph (4) all other benefits (if any) of indi-

20        viduals under the plan that would be guaran-

21        teed under section 4022A if the plan were sub-

22        ject to title IV.''.

23    (i) GOOD FAITH COMPLIANCE PRIOR TO GUID-

24 ANCE.—Where the implementation of any provision of law

25 added or amended by this division is subject to issuance

1343

1 of regulations by the Secretary of Labor, the Secretary

2 of the Treasury, or the Pension Benefit Guaranty Cor-

3 poration, a multiemployer plan shall not be treated as fail-

4 ing to meet the requirements of any such provision prior

5 to the issuance of final regulations or other guidance to

6 carry out such provision if such plan is operated in accord-

7 ance with a reasonable, good faith interpretation of such

8 provision.

**9 SEC. 140006. EFFECTIVE DATE.**

10    Unless otherwise specified, the amendments made by

11 this division shall apply to plan years beginning after the

12 date of the enactment of this Act.

DOC_0003648

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1344

## DIVISION O—EDUCATION PROVISIONS AND OTHER PROGRAMS

TITLE I—HIGHER EDUCATION PROVISIONS

DEFINITIONS

SEC. 150101.

In this title:

(1) AWARD YEAR.—The term "award year" has the meaning given the term in section 481(a) of the Higher Education Act of 1965 (20 U.S.C. 1088(a)).

(2) AUTHORIZING COMMITTEES.—The term "authorizing committees" has the meaning given the term in section 103 of the Higher Education Act of 1965 (20 U.S.C. 1003).

(3) FAFSA.—The term "FAFSA" means an application under section 483 of the Higher Education Act of 1965 (20 U.S.C. 1090) for Federal student financial aid.

(4) INSTITUTION OF HIGHER EDUCATION.—The term "institution of higher education" has the meaning given the term in section 102 of the Higher Education Act of 1965 (20 U.S.C. 1002).

(5) QUALIFYING EMERGENCY.—The term "qualifying emergency" has the meaning given the term in section 3502 of the CARES Act (Public Law 116–136), as amended by this Act.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003649

1345

1    (6) SECRETARY.—The term ''Secretary'' means

2    the Secretary of Education.

3        Subtitle A—CARES Act Amendments

4    APPLICATION OF WAIVER TO PARTICIPATING NONPROFIT

5                    EMPLOYERS

6    SEC. 150102.

7    (a) IN GENERAL.—Section 3503 of the CARES Act

8    (Public Law 116–136) is amended—

9        (1) by redesignating subsection (b) as sub-

10    section (c); and

11        (2) by inserting after subsection (a) the fol-

12    lowing:

13    ''(b) WAIVER OF NON-FEDERAL SHARE REQUIRE-

14    MENT FOR NONPROFIT EMPLOYERS.—Notwithstanding

15    any other provision of law, with respect to funds made

16    available for award years 2019–2020 and 2020–2021, the

17    Secretary shall waive any requirement that a nonprofit

18    employer provide a non-Federal share to match Federal

19    funds provided to such nonprofit employer under an agree-

20    ment under section 443 of the Higher Education Act of

21    1965 (20 U.S.C. 1087–53).''.

22    (b) EFFECTIVE DATE.—The amendments made by

23    subsection (a) shall take effect as if included in the enact-

24    ment of the CARES Act (Public Law 116–136).

g:\VHLC\051220\051220.072.xml        (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003650

1346

1     EXTENSION OF FEDERAL WORK-STUDY DURING A

2             QUALIFYING EMERGENCY

3   SEC. 150103.

4    (a) IN GENERAL.—Section 3505 of the CARES Act

5 (Public Law 116–136) is amended—

6       (1) in subsection (a)—

7          (A) by striking "(not to exceed one aca-

8         demic year)"; and

9          (B) by striking "such academic year" and

10         inserting "such period"; and

11       (2) in subsection (b)—

12          (A) in paragraph (1), by inserting "first"

13         before "occurred"; and

14          (B) in paragraph (3), by striking "for all

15         or part of such academic year".

16    (b) EFFECTIVE DATE.—The amendments made by

17 subsection (a) shall take effect as if included in the enact-

18 ment of the CARES Act (Public Law 116–136).

19     CONTINUING EDUCATION AT AFFECTED FOREIGN

20              INSTITUTIONS

21   SEC. 150104.

22    (a) IN GENERAL.—Section 3510 of the CARES Act

23 (Public Law 116–136) is amended—

24       (1) in subsection (a), by striking "national

25       emergency declared" and inserting "national emer-

26       gency related to the coronavirus declared";

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003651

1347

1    (2) in subsection (b), by striking "qualifying

2  emergency" and inserting "emergency or disaster af-

3  fecting the institution as described in subsection

4  (a)";

5    (3) in subsection (c), by striking "qualifying

6  emergency" and inserting "applicable emergency or

7  disaster as described in subsection (a)"; and

8    (4) in subsection (d)—

9      (A) in paragraph (1)—

10       (i) by striking "for the duration of a

11      qualifying emergency and the following

12      payment period," and inserting "with re-

13      spect to a foreign institution, in the case of

14      a public health emergency, major disaster

15      or emergency, or national emergency re-

16      lated to the coronavirus declared by the

17      applicable government authorities in the

18      country in which the foreign institution is

19      located, or in the case of a qualifying

20      emergency,"; and

21       (ii) by inserting ", for the duration of

22      the applicable emergency or disaster and

23      the following payment period," after

24      "1087a et seq.)"; and

25      (B) in paragraph (4)—

g:\VHLC\051220\051220.072.xml   (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003652

1348

1    (i) by striking "qualifying emergency"
2    and inserting "applicable emergency or dis-
3    aster"; and

4    (ii) by striking the period at the end
5    and inserting ", the name of the institution
6    of higher education located in the United
7    States that has entered into a written ar-
8    rangement with such foreign institution,
9    and information regarding the nature of
10   such written arrangement, including which
11   coursework or program requirements are
12   accomplished at each respective institu-
13   tion.".

14   (b) EFFECTIVE DATE.—The amendments made by
15   subsection (a) shall take effect as if included in the enact-
16   ment of the CARES Act (Public Law 116–136).

17       FUNDING FOR HBCU CAPITAL FINANCING

18   SEC. 150105.

19   (a) IN GENERAL.—Section 3512(d) of the CARES
20   Act (Public Law 116–136) is amended by striking
21   "$62,000,000" and inserting "such sums as may be nec-
22   essary".

23   (b) EFFECTIVE DATE.—The amendment made by
24   subsection (a) shall take effect as if included in the enact-
25   ment of the CARES Act (Public Law 116–136).

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003653

1349

1    WAIVER AUTHORITY FOR INSTITUTIONAL AID

2    SEC. 150106.

3    (a) IN GENERAL.—Section 3517(a)(1)(D) of the

4    CARES Act (Public Law 116–136) is amended by striking

5    ''(b), (c), and (g)'' and inserting ''(b) and (c)''.

6    (b) EFFECTIVE DATE.—The amendment made by

7    subsection (a) shall take effect as if included in the enact-

8    ment of the CARES Act (Public Law 116–136).

9    SCOPE OF MODIFICATIONS TO REQUIRED AND

10   ALLOWABLE USES

11   SEC. 150107.

12   (a) AMENDMENT TO INCLUDE MINORITY SCIENCE

13   AND ENGINEERING IMPROVEMENT PROGRAM.—Sub-

14   section (a) of section 3518 of the CARES Act (Public Law

15   116–136) is amended—

16        (1) by striking ''part A or B of title III,'' and

17        inserting ''part A, part B, or subpart 1 of part E

18        of title III,''; and

19        (2) by inserting ''1067 et seq.;'' after ''1060 et

20        seq.;''.

21   (b) AMENDMENT TO CLARIFY SCOPE OF AUTHOR-

22   ITY.—Section 3518 of the CARES Act (Public Law 116–

23   136) is amended by adding at the end the following new

24   subsection:

25   ''(d) SCOPE OF AUTHORITY.—Notwithstanding sub-

26   section (a), the Secretary may not modify the required or

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003654

1350

1 allowable uses of funds for grants awarded under a statu-

2 tory provision cited in subsection (a) in a manner that

3 deviates from the overall purpose of the grant program,

4 as provided in the general authorization, findings, or pur-

5 pose of the grant program under the applicable statutory

6 provision cited in such subsection.".

7 (c) EFFECTIVE DATE.—The amendments made by

8 this section shall take effect as if included in the enact-

9 ment of the CARES Act (Public Law 116–136).

## Subtitle B—Financial Aid Access

### EMERGENCY FINANCIAL AID GRANTS EXCLUDED FROM

### NEED ANALYSIS

13 SEC. 150108.

14 (a) TREATMENT OF EMERGENCY FINANCIAL AID

15 GRANTS FOR NEED ANALYSIS.—Notwithstanding any

16 provision of the Higher Education Act of 1965 (20 U.S.C.

17 1001 et seq.), emergency financial aid grants—

18      (1) shall not be included as income or assets

19      (including untaxed income and benefits under sec-

20      tion 480(b) of the Higher Education Act of 1965

21      (20 U.S.C. 1807vv(b))) in the computation of ex-

22      pected family contribution for any program funded

23      in whole or in part under the Higher Education Act

24      of 1965 (20 U.S.C. 1001 et seq.); and

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003655

G:\CMTE\AP\16\FY20\_D\HEROES.XML

<center>1351</center>

1     (2) shall not be treated as estimated financial

2   assistance for the purposes of section 471 or section

3   480(j) of the Higher Education Act of 1965 (20

4   U.S.C. 1087kk; 1087vv(j)).

5     (b) DEFINITION.—In this section, the term "emer-

6   gency financial aid grant" means—

7     (1) an emergency financial aid grant awarded

8   by an institution of higher education under section

9   3504 of the CARES Act (Public Law 116–136);

10     (2) an emergency financial aid grant from an

11   institution of higher education made with funds

12   made available under section 18004 of the CARES

13   Act (Public Law 116–136); and

14     (3) any other emergency financial aid grant to

15   a student from a Federal agency, a State, an Indian

16   tribe, an institution of higher education, or a schol-

17   arship-granting organization (including a tribal or-

18   ganization, as defined in section 4 of the Indian

19   Self-Determination and Education Assistance Act

20   (25 U.S.C. 5304)) for the purpose of providing fi-

21   nancial relief to students enrolled at institutions of

22   higher education in response to a qualifying emer-

23   gency.

24   FACILITATING ACCESS TO FINANCIAL AID FOR RECENTLY

25           UNEMPLOYED STUDENTS

26   SEC. 150109.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003656

1352

1    (a) TREATMENT AS DISLOCATED WORKER.—

2      (1) IN GENERAL.—Notwithstanding section

3   479(d)(1) of the Higher Education Act of 1965 (20

4   U.S.C. 1087ss(d)(1)), any individual who has ap-

5   plied for, or who is receiving, unemployment benefits

6   at the time of the submission of a FAFSA for a cov-

7   ered award year shall be treated as a dislocated

8   worker for purposes of the need analysis under part

9   F of title IV such Act (20 U.S.C. 1087kk et seq.)

10   applicable to such award year.

11      (2) INFORMATION TO APPLICANTS AND INSTI-

12   TUTIONS.—The Secretary—

13         (A) in consultation with institutions of

14         higher education, shall carry out activities to in-

15         form applicants for Federal student financial

16         aid under the Higher Education Act of 1965

17         (20 U.S.C. 1001 et seq.)—

18            (i) of the treatment of individuals who

19            have applied for, or who are receiving, un-

20            employment benefits as dislocated workers

21            under paragraph (1); and

22            (ii) of the availability of means-tested

23            Federal benefits for which such applicants

24            may be eligible;

DOC_0003657

1353

1        (B) shall carry out activities to inform in-
2        stitutions of higher education of the authority
3        of such institutions, with explicit written con-
4        sent of an applicant for Federal student finan-
5        cial aid under the Higher Education Act of
6        1965 (20 U.S.C. 1001 et seq.), to provide infor-
7        mation collected from such applicant's FAFSA
8        to an organization assisting the applicant in ap-
9        plying for and receiving Federal, State, local, or
10       tribal assistance in accordance with section 312
11       of the Department of Defense and Labor,
12       Health and Human Services, and Education
13       Appropriations Act, 2019 and Continuing Ap-
14       propriations Act, 2019 (Public Law 115–245);
15       and

16       (C) in consultation with the Secretary of
17       Labor, shall carry out activities to inform appli-
18       cants for, and recipients of, unemployment ben-
19       efits of the availability of Federal student finan-
20       cial aid under the Higher Education Act of
21       1965 (20 U.S.C. 1001 et seq.) and the treat-
22       ment of such applicants and recipients as dis-
23       located workers under paragraph (1).

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003658

1354

1  (3) IMPLEMENTATION.—The Secretary shall

2  implement this subsection not later than 30 days

3  after the date of enactment of this Act.

4  (4) APPLICABILITY.—Paragraph (1) shall apply

5  with respect to a FAFSA submitted on or after the

6  earlier of—

7  (A) the date on which the Secretary imple-

8  ments this subsection under paragraph (3); or

9  (B) the date that is 30 days after the date

10  of enactment of this Act.

11  (b) PROFESSIONAL JUDGMENT OF FINANCIAL AID

12  ADMINISTRATORS.—The guidance of the Secretary titled

13  "Update on the use of 'Professional Judgment' by Finan-

14  cial Aid Administrators" (DCL ID: GEN–09–05), as in

15  effect on May 8, 2009, shall apply—

16  (1) to the exercise of professional judgement by

17  financial aid administrators pursuant to section

18  479A of the Higher Education Act of 1965 (20

19  U.S.C. 1087tt) with respect to any FAFSA for a

20  covered award year; and

21  (2) to the selection of institutions for program

22  reviews pursuant to section 498A of the Higher

23  Education Act of 1965 (20 U.S.C. 1099c–1) for a

24  covered award year.

25  (c) DEFINITIONS.—In this section:

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003659

1355

1   (1) COVERED AWARD YEAR.—The term "cov-
2   ered award year" means—

3       (A) an award year during which there is a
4       qualifying emergency; and

5       (B) the first award year beginning after
6       the end of such qualifying emergency.

7   (2) MEANS-TESTED FEDERAL BENEFIT.—The
8   term "means-tested Federal benefit" includes the
9   following:

10      (A) The supplemental security income pro-
11      gram under title XVI of the Social Security Act
12      (42 U.S.C. 1381 et seq.).

13      (B) The supplemental nutrition assistance
14      program under the Food and Nutrition Act of
15      2008 (7 U.S.C. 2011 et seq.).

16      (C) The free and reduced price school
17      lunch program established under the Richard
18      B. Russell National School Lunch Act (42
19      U.S.C. 1751 et seq.).

20      (D) The program of block grants for
21      States for temporary assistance for needy fami-
22      lies established under part A of title IV of the
23      Social Security Act (42 U.S.C. 601 et seq.).

24      (E) The special supplemental nutrition
25      program for women, infants, and children es-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003660

1356

1 tablished by section 17 of the Child Nutrition

2 Act of 1966 (42 U.S.C. 1786).

3 (F) The Medicaid program under title XIX

4 of the Social Security Act (42 U.S.C. 1396 et

5 seq.).

6 (G) The tax credits provided under the fol-

7 lowing sections of the Internal Revenue Code of

8 1986 (title 26, United States Code):

9 (i) Section 25A (relating to American

10 Opportunity and Lifetime Learning cred-

11 its).

12 (ii) Section 32 (relating to earned in-

13 come).

14 (iii) Section 36B (relating to refund-

15 able credit for coverage under a qualified

16 health plan).

17 (iv) Section 6428 (relating to 2020 re-

18 covery rebates for individuals).

19 (H) Federal housing assistance programs,

20 including tenant-based assistance under section

21 8(o) of the United States Housing Act of 1937

22 (42 U.S.C. 1437f(o)), and public housing, as

23 defined in section 3(b)(1) of such Act (42

24 U.S.C. 1437a(b)(1)).

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003661

1357

1       (I) Such other Federal means-tested bene-
2           fits as may be identified by the Secretary.
3   STUDENT ELIGIBILITY FOR HIGHER EDUCATION EMER-
4       GENCY RELIEF FUND AND OTHER HIGHER EDU-
5       CATION FUNDS
6   SEC. 150110.
7   (a) IN GENERAL.—With respect to student eligibility
8 for receipt of funds provided under section 18004 of the
9 CARES Act (Public Law 116–136) and under title VI of
10 division A of this Act—
11      (1) the Secretary is prohibited from imposing
12          any restriction on, or defining, the populations of
13          students who may receive such funds other than a
14          restriction based solely on the student's enrollment
15          at the institution of higher education; and
16      (2) section 401(a) the Personal Responsibility
17          and Work Opportunity Reconciliation Act of 1996 (8
18          U.S.C. 1611(a)) shall not apply.
19  (b) EFFECTIVE DATE.—Subsection (a) shall take ef-
20 fect as if included in the enactment of the CARES Act
21 (Public Law 116–136), and an institution of higher edu-
22 cation that provided funds to a student before the date
23 of enactment of this Act shall not be penalized if such
24 provision is consistent with such subsection and section
25 18004 of the CARES Act (Public Law 116–136).

1358

DEFINITION OF DISTANCE EDUCATION

Sec. 150111.

(a) In General.—Except as otherwise provided in title IV of the Higher Education Act of 1965 (20 U.S.C. 1070 et seq.), for purposes of such title, the term "distance education" means education that uses technology—

(1) to deliver instruction to students enrolled at an institution of higher education who are separated from the instructor or instructors; and

(2) to support regular and substantive interaction between the students and the instructor or instructors, either synchronously or asynchronously.

(b) Technology.—For purposes of subsection (a), the technologies that may be used to offer distance education include—

(1) the internet;

(2) one-way and two-way transmissions through open broadcast, closed circuit, cable, microwave, broadband lines, fiber optics, satellite, or wireless communications devices;

(3) audio conferencing; and

(4) other media used in a course in conjunction with any of the technologies listed in paragraphs (1) through (3).

g:\VHLC\051220\051220.072.xml       (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003663

1359

1  (c) INSTRUCTOR.—For purposes of subsection (a), an
2  instructor is an individual responsible for delivering course
3  content and who meets the qualifications for instruction
4  established by the institution of higher education's accred-
5  iting agency.

6  (d) SUBSTANTIVE INTERACTION.—For purposes of
7  subsection (a), substantive interaction is engaging stu-
8  dents in teaching, learning, and assessment, consistent
9  with the content under discussion, and also includes at
10  least two of the following:

11  (1) Providing direct instruction.

12  (2) Assessing or providing feedback on a stu-
13  dent's coursework.

14  (3) Providing information or responding to
15  questions about the content of a course or com-
16  petency.

17  (4) Facilitating a group discussion regarding
18  the content of a course or competency.

19  (5) Other instructional activities approved by
20  the institution of higher education's or program's ac-
21  crediting agency.

22  (e) REGULAR INTERACTION.—For purposes of sub-
23  section (a), an institution ensures regular interaction be-
24  tween a student and an instructor or instructors by, prior
25  to the student's completion of a course or competency—

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003664

1360

1    (1) providing the opportunity for substantive

2    interactions with the student on a predictable and

3    regular basis commensurate with the length of time

4    and the amount of content in the course or com-

5    petency; and

6    (2) monitoring the student's academic engage-

7    ment and success and ensuring that an instructor is

8    responsible for promptly and proactively engaging in

9    substantive interaction with the student when need-

10    ed, on the basis of such monitoring, or upon request

11    by the student.

12    (f) EFFECTIVE DATE.—This section shall be effective

13 for any semester (or the equivalent) that begins on or after

14 August 15, 2020, and shall cease to be effective at the

15 end of the 2020–2021 award year.

16    INSTITUTIONAL STABILIZATION PROGRAM

17    SEC. 150112.

18    (a) AUTHORITY TO PARTICIPATE.—Notwithstanding

19 paragraph (1) or (2) of section 498(c) of the Higher Edu-

20 cation Act of 1965 (20 U.S.C. 1099c(c)), an eligible insti-

21 tution described in subsection (b) may, in lieu of submit-

22 ting a letter of credit in accordance with section

23 498(c)(3)(A) of such Act, submit an application under

24 subsection (c)(1) to enter into a COVID–19 provisional

25 program participation agreement in accordance with sub-

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003665

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1361

1 section (d) to provide the Secretary with satisfactory evi-

2 dence of its financial responsibility.

3     (b) ELIGIBLE INSTITUTION DESCRIBED.—An eligible

4 institution described in this subsection is a private non-

5 profit institution of higher education that—

6     (1) either—

7         (A) has a composite score of less than 1.0

8         for the institutional fiscal year ending in 2019,

9         as determined under section 668.171(b)(1) of

10         title 34, Code of Federal Regulations; or

11         (B) on the date of an application under

12         subsection (c)(1), has (or anticipates having) a

13         composite score of less than 1.0 for the institu-

14         tional fiscal year ending in 2020, as determined

15         under section 668.171(b)(1) of title 34, Code of

16         Federal Regulations;

17     (2) during award year 2018–2019—

18         (A) offered on-campus classes; and

19         (B) qualified for participation in a pro-

20         gram under title IV of the Higher Education

21         Act of 1965 (20 U.S.C. 1070 et seq.); and

22     (3) on the date of the application under sub-

23 section (c)(1), has a liquidity level of less than or

24 equal to 180 days.

25     (c) APPLICATION.—

g:\VHLC\051220\051220.072.xml    (763351l3)<br>May 12, 2020 (12:13 p.m.)

DOC_0003666

1362

1    (1) IN GENERAL.—An eligible institution desir-
2    ing to enter into a COVID–19 provisional program
3    participation agreement under subsection (d), shall,
4    not later than December 31, 2020, submit to the
5    Secretary an application that includes—
6        (A) the estimated liquidity level of the eli-
7        gible institution on the date of the application
8        and an assurance that such liquidity level will
9        be attested to in accordance with paragraph
10       (2);
11       (B) an assurance that such eligible institu-
12       tion will submit a record-management plan in
13       accordance with paragraph (3); and
14       (C) an assurance that such eligible institu-
15       tion will submit a teach-out plan in accordance
16       with paragraph (4); and
17       (D) an assurance that such eligible institu-
18       tion will submit reports on teach-out agree-
19       ments and sufficient progress made on such
20       agreements in accordance with subsection
21       (d)(3), as applicable.
22   (2) AUDITOR ATTESTATION.—Not later than 60
23   days after submitting an application under para-
24   graph (1), an eligible institution shall submit to the
25   Secretary an auditor attestation of the liquidity level

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003667

1363

1    of such eligible institution on the date such institu-

2    tion submitted such application pursuant to an audit

3    conducted by a qualified independent organization or

4    person in accordance with standards established by

5    the American Institute of Certified Public Account-

6    ants.

7        (3) RECORD-MANAGEMENT PLAN.—

8            (A) IN GENERAL.—Not later than 60 days

9        after submitting an application under para-

10       graph (1), an eligible institution shall submit to

11       the Secretary a record-management plan ap-

12       proved by the accrediting agency of such eligi-

13       ble institution that includes—

14               (i) a plan for the custody, including

15           by the State authorizing agency, and the

16           disposition of—

17                   (I) a teach-out plan and teach-

18               out agreement records, as applicable;

19               and

20                   (II) student records, including

21               student transcripts, billing, and finan-

22               cial aid records;

23               (ii) an estimate of the costs necessary

24           to carry out such record-management plan;

25           and

g:\VHLC\051220\051220.072.xml        (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003668

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1364

1         (iii) a financial plan to provide fund-

2         ing for such costs.

3     (B) ASSURANCE.—An eligible institution

4 that submits a record-management plan under

5 subparagraph (A) shall include an assurance to

6 the Secretary that, in the case of the closure of

7 such eligible institution, such eligible institu-

8 tion—

9         (i) will release all financial holds

10         placed on student records; and

11         (ii) for the 3-year period beginning on

12         the date of the closure of such eligible in-

13         stitution, will not require a student en-

14         rolled in such eligible institution on the

15         date of such closure (and students with-

16         drawn from such eligible institution in the

17         120 days prior to such date) who requests

18         the student records of such student to pur-

19         chase such records or otherwise charge

20         such student a fee with respect to such

21         records.

22     (C) REPORT.—Not later than 60 days

23 after submitting an application under para-

24 graph (1), an eligible institution shall submit

25 the record-management plan required under

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003669

1365

1       subparagraph (A) and the assurance under sub-

2       paragraph (B) to the accrediting agency and

3       State authorizing agency of such eligible insti-

4       tution.

5       (4) TEACH-OUT PLAN.—Not later than 60 days

6   after submitting an application under paragraph (1),

7   an eligible institution shall submit a teach-out plan

8   approved by the accrediting agency of such eligible

9   institution to the Secretary and the State author-

10   izing agency of such eligible institution.

11       (5) LETTER OF CREDIT DURING PENDING AP-

12   PLICATION.—Notwithstanding section 498(c)(3)(A)

13   of the Higher Education Act of 1965 (20 U.S.C.

14   1099c(c)(3)(A)), the Secretary may not use the com-

15   posite score of an eligible institution (as determined

16   under section 668.171(b)(1) of title 34, Code of

17   Federal Regulations) to require the eligible institu-

18   tion to submit a new letter of credit or increase the

19   value of an existing letter of credit while the institu-

20   tion has an application pending under paragraph

21   (1).

22       (6) NOTIFICATION OF APPLICATION AND STA-

23   TUS.—The eligible institution shall notify the accred-

24   iting agency and State authorizing agency of such

25   institution—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003670

1366

1             (A) that the institution has submitted an

2           application under paragraph (1) to the Sec-

3           retary not later than 10 days after submitting

4           such application; and

5             (B) of the final acceptance or denial of

6           such application not later than 5 days after re-

7           ceiving a final decision from the Secretary.

8        (7) APPLICATION DECISION.—The Secretary

9    shall accept or deny an application under paragraph

10    (1) not later than 10 days after the date on which

11    an eligible institution completes all of the submission

12    requirements under paragraphs (2), (3), and (4).

13    (d) COVID–19 PROVISIONAL PROGRAM PARTICIPA-

14    TION AGREEMENT.—

15    (1) AUTHORITY TO ENTER AGREEMENT.—The

16    Secretary may enter into a COVID–19 provisional

17    program participation agreement under this sub-

18    section with an eligible institution that submits an

19    application under subsection (c)(1) on or before De-

20    cember 31, 2020, only if the Secretary has re-

21    ceived—

22        (A) an auditor attestation under subsection

23        (c)(2) that such eligible institution has a liquid-

24        ity level of less than or equal to 180 days on

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003671

1367

1   the date of the application of such eligible insti-

2   tution under subsection (c)(1);

3   (B) a record-management plan with re-

4   spect to such eligible institution in accordance

5   with subsection (c)(3); and

6   (C) a teach-out plan with respect to such

7   eligible institution in accordance with sub-

8   section (c)(4).

9   (2) PARTICIPATION REQUIREMENTS.—In enter-

10  ing into a COVID–19 provisional program participa-

11  tion agreement with an eligible institution under this

12  subsection, the Secretary shall require such eligible

13  institution—

14  (A) if such eligible institution has a liquid-

15  ity level of less than or equal to 90 days on the

16  date of the application of such eligible institu-

17  tion under subsection (c)(1), to submit a teach-

18  out agreement (or teach-out agreements, as ap-

19  plicable) to the Secretary and to the accrediting

20  agency and State authorizing agency of the in-

21  stitution in accordance with paragraph (3);

22  (B) to report to the Secretary in accord-

23  ance with paragraph (4);

24  (C) to meet the administrative capacity re-

25  quirements under section 498(d) of the Higher

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003672

1368

1 Education Act of 1965 (20 U.S.C. 1099c(d));
2 and

3   (D) to meet the cash reserves requirements
4 under section 498(c)(6)(A) of the Higher Edu-
5 cation Act of 1965 (20 U.S.C. 1099c(c)(6)(A)).
6 (3) TEACH-OUT AGREEMENTS.—

7   (A) SUFFICIENT PROGRESS.—Not later
8 than 30 days after the date on which an eligible
9 institution described in paragraph (2)(A) enters
10 into a COVID–19 provisional program partici-
11 pation agreement under this subsection, such
12 eligible institution shall submit to the Secretary
13 an interim teach-out agreement that provides
14 for the equitable treatment of at least 75 per-
15 cent of enrolled students and a reasonable op-
16 portunity for such students to complete their
17 program of study.

18   (B) ADDENDUM REPORTS.—Not later than
19 15 days after the date on which an eligible in-
20 stitution submits an interim teach-out agree-
21 ment in accordance with subparagraph (A), and
22 every 15 days thereafter, such eligible institu-
23 tion shall submit to the Secretary a report that
24 includes—

g:\VHLC\051220\051220.072.xml (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003673

1369

(i) the percentage of students enrolled in such eligible institution that are covered by a teach-out agreement;

(ii) the increase in the percentage of students covered by such an agreement, as compared to the most recently submitted report; and

(iii) such other information as the Secretary or accrediting agency of the eligible institution may require, including the progress of such eligible institution in meeting any benchmarks set by such accrediting agency related to the percentage of students that should be covered by such an agreement.

(C) TEACH-OUT AGREEMENT REQUIRED.—On the date agreed to by the eligible institution, the accrediting agency of such eligible institution, and the Secretary under a COVID–19 provisional program participation agreement under this subsection, such eligible institution shall submit to the Secretary and to the accrediting agency and State authorizing agency of the institution a teach-out agreement (or agreements, as applicable) that—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003674

1370

1　　　　　　　(i) provides for the equitable treat-
2　　　　　ment of all enrolled students and a reason-
3　　　　　able opportunity for such students to com-
4　　　　　plete their program of study;

5　　　　　　(ii) includes—

6　　　　　　　　(I) a list of all students enrolled
7　　　　　　in such eligible institution on the date
8　　　　　　such eligible institution submitted an
9　　　　　　application under subsection (c)(1)
10　　　　　(and students withdrawn from such
11　　　　　eligible institution in the 120 days
12　　　　　prior to such date), including the
13　　　　　name, contact information, program
14　　　　　of study, program requirements com-
15　　　　　pleted, and estimated date of program
16　　　　　completion of each such student;

17　　　　　　　(II) the amount of any unearned
18　　　　　tuition, account balances, student
19　　　　　fees, and refunds due to each such
20　　　　　student;

21　　　　　　　(III) a plan to notify each such
22　　　　　student, in the case of the closure of
23　　　　　such eligible institution, of—

24　　　　　　　　(aa) the process for obtain-
25　　　　　　　ing a closed school discharge

DOC_0003675

1371

under section 437(c)(1) of the
Higher Education Act of 1965
(20 U.S.C. 1087(c)(1)), using
standard language developed by
the Secretary under subsection
(f), and the benefits and con-
sequences of such discharge;

(bb) if applicable, informa-
tion on institutional and State
refund policies;

(cc) the teach-out institution
or institutions available to enroll
such student;

(dd) the tuition and fees of
the educational program offered
by each such teach-out institution
and the number and types of
credit each such teach-out insti-
tution will accept prior to the en-
rollment of such student; and

(ee) the record-management
plan submitted in accordance
with subsection (c)(3).

(D) DECREASE IN LIQUIDITY.—In the case
of an eligible institution that enters into a

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003676

1372

1  COVID–19 provisional program participation
2  agreement under this subsection and has a li-
3  quidity level of greater than 90 days on the
4  date of the application of such eligible institu-
5  tion under subsection (c)(1), if the Secretary
6  determines such eligible institution has declined
7  such that the liquidity level of such eligible in-
8  stitution is consistently less than or equal to 90
9  days, the Secretary may require such eligible in-
10  stitution to submit a teach-out agreement (or
11  agreements, as applicable) to the Secretary in
12  accordance with subparagraph (C).

13  (4) REPORTING REQUIREMENTS.—

14  (A) ELIGIBLE INSTITUTIONS WITH A LI-
15  QUIDITY LEVEL OF LESS THAN OR EQUAL TO 90
16  DAYS.—In the case of an eligible institution de-
17  scribed in paragraph (2)(A), the Secretary shall
18  require such eligible institution to report to the
19  Secretary the liquidity level and total student
20  enrollment of such eligible institution not less
21  than once every 15 days, until such eligible in-
22  stitution closes or no longer participates in a
23  COVID–19 provisional program participation
24  agreement under this subsection.

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003677

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1373

1          (B) ELIGIBLE INSTITUTIONS WITH A LI-
2      QUIDITY LEVEL OF GREATER THAN 90 DAYS.—
3      In the case of an eligible institution that enters
4      into a COVID–19 provisional program partici-
5      pation agreement under this subsection and has
6      a liquidity level of greater than 90 days on the
7      date of the application of such eligible institu-
8      tion under subsection (c)(1), the Secretary shall
9      require such eligible institution to report to the
10     Secretary the liquidity level and total student
11     enrollment of such eligible institution not less
12     than once every 30 days, until such eligible in-
13     stitution closes or no longer participates in a
14     COVID–19 provisional program participation
15     agreement under this subsection.

16         (C) ALL ELIGIBLE INSTITUTIONS.—All eli-
17     gible institutions that enter into a COVID–19
18     provisional program participation agreement
19     under this subsection shall comply with the re-
20     porting requirements under paragraph (2) of
21     section 668.175(d) of title 34, Code of Federal
22     Regulations (as such paragraph is in effect on
23     the date of enactment of this section).

24     (5) LETTER OF CREDIT DURING AGREEMENT.—
25 The Secretary may not require an eligible institution

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003678

that enters into a COVID–19 provisional program participation agreement under this subsection to submit a new letter of credit or increase the value of an existing letter of credit for the duration of the agreement.

(6) DURATION OF AGREEMENT.—A COVID–19 provisional program participation agreement under this subsection may only be entered into for a period less than or equal to the period—

(A) beginning on the first date of the agreement; and

(B) ending on the last day of the first full award year that begins after the date described in subparagraph (A).

(7) RENEWAL.—

(A) IN GENERAL.—A COVID–19 provisional program participation agreement under this subsection may be renewed for 1 award year subsequent to the award year described in paragraph (6)(B), and shall expire no later than June 30, 2022.

(B) AUTHORITY TO EXTEND RENEWAL PERIOD.—Notwithstanding subparagraph (A), if the Secretary determines that an extension of renewal authority is in the best interest of the

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1375

1    eligible institutions with a COVID–19 provi-
2    sional program participation agreement under
3    this subsection, the Secretary may permit
4    COVID–19 provisional program participation
5    agreement under this subsection to be renewed,
6    on an annual basis, for not more than 3 total
7    consecutive award years subsequent to the
8    award year described in paragraph (6)(B), pro-
9    vided that no agreement under this subsection
10   shall expire later than June 30, 2024.

11       (C) RECALCULATION OF LIQUIDITY.—An
12   eligible institution desiring to renew a COVID–
13   19 provisional program participation agreement
14   shall—

15           (i) submit to the Secretary the liquid-
16       ity level of the institution on the last day
17       of the most recent fiscal year of the eligible
18       institution, to be used for purposes of such
19       an agreement; and

20           (ii) not later than 60 days after sub-
21       mitting such liquidity level under clause
22       (i), have such liquidity level attested to in
23       accordance with subsection (c)(2).

24       (8) DISCONTINUATION OF AGREEMENT.—The
25   participation of an eligible institution in a COVID–

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003680

1376

1    19 provisional program participation agreement

2    under this subsection—

3         (A) may be discontinued at any time at the

4         request of the eligible institution;

5         (B) shall be discontinued by the Secretary

6         if such eligible institution receives a composite

7         score of 1.0 or greater for the most recent insti-

8         tutional fiscal year, as determined under section

9         668.171(b)(1) of title 34, Code of Federal Reg-

10        ulations; and

11         (C) shall have no affect on the eligibility of

12         the institution to participate in a program par-

13         ticipation agreement under section 487(a) of

14         the Higher Education Act of 1965 (20 U.S.C.

15         1094) after the COVID–19 provisional program

16         participation agreement under this subsection

17         has expired or been discontinued.

18    (9) GRANTS TO PARTICIPATING INSTITU-

19    TIONS.—From the amounts authorized to be avail-

20    able, subject to appropriation, under subsection (j),

21    the Secretary may award a grant to an eligible insti-

22    tution that enters into a COVID–19 provisional pro-

23    gram participation agreement under this subsection

24    to carry out the requirements of such agreement and

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003681

1     provide for the increased economic stability of such

2     eligible institution.

3     (10) REGULATORY AUTHORITY.—Except as

4     otherwise provided in this subsection, the Secretary

5     shall have the same authority with respect to a

6     COVID–19 provisional program participation agree-

7     ment under this subsection as the Secretary has

8     with respect to a program participation agreement

9     under subparagraphs (B), (F), and (G) of section

10     487(c)(1) (20 U.S.C. 1099(c)(1)).

11     (e) PARTICIPATION IN TITLE IV PROGRAM.—An eli-

12 gible institution that enters into a COVID–19 provisional

13 program participation agreement under subsection (d)

14 may participate in programs under title IV of the Higher

15 Education Act of 1965 (20 U.S.C. 1070 et seq.) only if

16 such eligible institution submits to the Secretary (and the

17 accrediting agency of such eligible institution, as applica-

18 ble) the agreements and reports applicable to such eligible

19 institution under paragraphs (3) and (4) of subsection (d).

20     (f) STANDARD LANGUAGE.—Not later than 30 days

21 after the date of the enactment of this section, the Sec-

22 retary shall publish standard language relating to closed

23 school discharges for purposes of subsection

24 (d)(3)(C)(ii)(III)(aa).

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003682

1378

1  (g) REPORTS TO CONGRESS.—Not later than 90 days
2  after the date of the enactment of this section and every
3  90 days thereafter until the date on which every COVID–
4  19 provisional program participation agreement under this
5  subsection has expired or been terminated, or until June
6  30, 2024, whichever is earlier, the Secretary shall submit
7  to the authorizing committees a report that includes a
8  summary of each COVID–19 provisional program partici-
9  pation agreement entered into or renewed in the preceding
10  90 days by the Secretary under this section, including the
11  name, total student enrollment, and liquidity level of the
12  institution.

13  (h) AUTOMATIC CLOSED SCHOOL DISCHARGE.—

14  (1) AUTOMATIC DISCHARGE REQUIRED.—With
15  respect to a borrower described in paragraph (2),
16  the Secretary shall, without any further action by
17  the borrower, discharge the liability of the borrower
18  with respect to each of the borrower's loans (includ-
19  ing the interest and collection fees) described in
20  paragraph (2)(A) in accordance with this subsection.

21  (2) BORROWER REQUIREMENTS.—A borrower
22  described in this subparagraph is a borrower who—

23  (A) was enrolled for a period of enrollment
24  at an eligible institution that was participating

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003683

1379

1     in a COVID–19 provisional program participa-

2     tion agreement under subsection (d), and—

3             (i) was unable to complete such period

4             of enrollment due to the closure of the in-

5             stitution; or

6             (ii) withdrew from the eligible institu-

7             tion—

8                 (I) not more than 120 days be-

9                 fore the closure of the eligible institu-

10                 tion; or

11                 (II) if the Secretary determines

12                 an extension of the 120-day period de-

13                 scribed in subclause (I) is necessary

14                 due to exceptional circumstances re-

15                 lated to the closure of the institution,

16                 during the extended period deter-

17                 mined by the Secretary;

18     (B) has one or more loans—

19             (i) made under title IV of the Higher

20             Education Act of 1965 (20 U.S.C. 1070 et

21             seq.) for a program of study at the eligible

22             institution described in subparagraph (A);

23             and

24             (ii) that have not been discharged by

25             the Secretary pursuant to section

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003684

1380

437(c)(1) or section 464(g)(1) of the High-
er Education Act of 1965 (20 U.S.C.
1087(c)(1); 1087dd(g)(1)); and

(C) during the 3-year period beginning on
the date of the closure of the eligible institution
described in subparagraph (A), has not enrolled
in any institution of higher education that par-
ticipates in a program under title IV of the
Higher Education Act of 1965 (20 U.S.C. 1070
et seq.).

(3) REPORT.—Beginning on the date that is 3
years after the date of enactment of this Act and
every 180 days thereafter, the Secretary shall report
to the authorizing committees the number of loans
discharged in accordance with this subsection, and
any amounts recovered by the Secretary in accord-
ance with the authority of the Secretary to pursue
claims under section 437(c)(1) or section 464(g)(1)
of the Higher Education Act of 1965 (20 U.S.C.
1087(c)(1); 1087dd(g)(1)).

(i) DEFINITIONS.—In this section:

(1) LIQUIDITY LEVEL.—The term "liquidity
level" means, with respect to an eligible institution,
the number of days such eligible institution can op-
erate based on available resources, as determined in

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003685

1381

1 accordance with the Financial Accounting Standards
2 Board update entitled "No. 2016–14 Not-for-Profit
3 Entities (Topic 958)" and dated August, 2016.

4 (2) TEACH-OUT AGREEMENT.—The term
5 "teach-out agreement" means a written agreement
6 between an eligible institution and one or more
7 teach-out institutions that is in accordance with the
8 requirements in section 496(c)(6) of the Higher
9 Education Act of 1965 (20 U.S.C. 1099b(c)(6)) and
10 that provides for the equitable treatment of students
11 and a reasonable opportunity for students to com-
12 plete their program of study if such eligible institu-
13 tion, or an institutional location that provides 100
14 percent of at least one program offered by such eli-
15 gible institution, ceases to operate or plans to cease
16 operations before all such enrolled students have
17 completed their program of study.

18 (3) TEACH-OUT INSTITUTION.—The term
19 "teach-out institution" means an institution of high-
20 er education that—

21    (A) is not subject to a COVID–19 provi-
22    sional program participation agreement under
23    this section;

24    (B) shows no evidence of significant prob-
25    lems (including financial responsibility or ad-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003686

G:\CMTE\AP\16\FY20\_D\HEROES.XML

<center>1382</center>

1    ministrative capability) that affect, as deter-

2    mined by the Secretary, the institution's ability

3    to administer a program under title IV of the

4    Higher Education Act of 1965 (20 U.S.C. 1070

5    et seq.);

6    (C) is not required to pay any material

7    debt, as determined by the Secretary, or incur

8    any material liability, as determined by the Sec-

9    retary, arising from a judgment in a judicial

10    proceeding, an administrative proceeding or de-

11    termination, or settlement;

12    (D) is not involved in a lawsuit by a Fed-

13    eral or State authority for financial relief on

14    claims related to the making of loans under

15    part D of title IV of the Higher Education Act

16    of 1965 (20 U.S.C. 1087a et seq.);

17    (E) has the necessary experience, re-

18    sources, and capacity, including support serv-

19    ices, to enroll students and provide an edu-

20    cational program of acceptable quality that is

21    reasonably similar in content and delivery, and

22    to the extent practicable, scheduling, to that

23    provided by the eligible institution that enters

24    into an agreement with such teach-out institu-

25    tion; and

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003687

1383

(F) during the five most recent award
years, has not been subject to a denial, with-
drawal, suspension, or termination of accredita-
tion by an accrediting agency or association rec-
ognized by the Secretary.

(4) TEACH-OUT PLAN.—The term ''teach-out
plan'' means a written plan developed by an eligible
institution that provides for the equitable treatment
of students if such eligible institution, or an institu-
tional location that provides 100 percent of at least
one program offered by the eligible institution,
ceases to operate or plans to cease operations before
all enrolled students have completed their program
of study.

(j) AUTHORIZATION OF APPROPRIATIONS.—There is
authorized to be appropriated $300,000,000 to carry out
subsection (d)(9).

Subtitle C—Federal Student Loan Relief

PART A—TEMPORARY RELIEF FOR FEDERAL
STUDENT BORROWERS UNDER THE CARES ACT

EXPANDING LOAN RELIEF TO ALL FEDERAL STUDENT
LOAN BORROWERS

SEC. 150113.

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003688

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1384

1    Section 3502(a) of division A of the Coronavirus Aid,

2  Relief, and Economic Security Act (Public Law 116–136)

3  is amended—

4    (1) by redesignating paragraphs (2) through

5  (5) as paragraphs (3) through (6), respectively; and

6    (2) by inserting after paragraph (1) the fol-

7  lowing:

8    "(2) FEDERAL STUDENT LOAN.—The term

9  'Federal student loan' means a loan—

10    "(A) made under part D, part B, or part

11    E of title IV of the Higher Education Act of

12    1965 (20 U.S.C. 1070 et seq.), and held by the

13    Department of Education;

14    "(B) made, insured, or guaranteed under

15    part B of such title, or made under part E of

16    such title, and not held by the Department of

17    Education; or

18    "(C) made under—

19    "(i) subpart II of part A of title VII

20    of the Public Health Service Act (42

21    U.S.C. 292q et seq.); or

22    "(ii) part E of title VIII of the Public

23    Health Service Act (42 U.S.C. 297a et

24    seq.).".

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003689

1385

1 EXTENDING THE LENGTH OF BORROWER RELIEF DUE TO

2 THE CORONAVIRUS EMERGENCY

3 SEC. 150114.

4 Section 3513 of division A of the Coronavirus Aid,

5 Relief, and Economic Security Act (Public Law 116–136)

6 is amended—

7 (1) by amending subsection (a) to read as fol-

8 lows:

9 "(a) SUSPENSION OF PAYMENTS.—

10 "(1) IN GENERAL.—During the period begin-

11 ning on March 13, 2020, and ending on September

12 30, 2021, the Secretary or, as applicable, the Sec-

13 retary of Health and Human Services, shall suspend

14 all payments due on Federal student loans.

15 "(2) TRANSITION PERIOD.—For one additional

16 30-day period beginning on the day after the last

17 day of the suspension period described in subsection

18 (a), the Secretary or, as applicable, the Secretary of

19 Health and Human Services, shall ensure that any

20 missed payments on a Federal student loan by a

21 borrower during such additional 30-day period—

22 "(A) do not result in collection fees or pen-

23 alties associated with late payments; and

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003690

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1386

1            "(B) are not reported to any consumer re-

2 porting agency or otherwise impact the bor-

3 rower's credit history.

4       "(3) PAYMENT REFUND IN LIEU OF RETRO-

5 ACTIVE APPLICABILITY.—

6            "(A) IN GENERAL.—By not later than 60

7 days after the date of enactment of the HE-

8 ROES Act, the Secretary or, as applicable, the

9 Secretary of Health and Human Services, shall,

10 for each Federal student loan defined in sub-

11 paragraph (B) or (C) of section 3502(a)(2)—

12                 "(i) determine the amount of principal

13 due on such loan (or that would have been

14 due in the absence of being voluntarily

15 paid by the holder of such loan) during the

16 period beginning March 13, 2020, and

17 ending on such date of enactment; and

18                 "(ii) refund the amount of principal

19 calculated under subparagraph (A), by—

20                     "(I) paying the holder of the loan

21 the amount of the principal calculated

22 under subparagraph (A), to be applied

23 to the loan balance for the borrower

24 of such loan; or

DOC_0003691

1387

1       "(II) if there is no outstanding

2       balance or payment due on the loan

3       as of the date on which the refund is

4       to be provided, providing a payment

5       in the amount of the principal cal-

6       culated under subparagraph (A) di-

7       rectly to the borrower.

8     "(B) PRINCIPAL.—In this paragraph, the

9 term 'principal' includes any late charges or

10 fees.

11     "(4) RECERTIFICATION.—A borrower who is re-

12 paying a Federal student loan pursuant to in an in-

13 come-contingent repayment plan under section

14 455(d)(1)(D) of the Higher Education Act of 1965

15 (20 U.S.C. 1087e(d)(1)(D)) or an income-based re-

16 payment plan under section 493C of such Act (20

17 U.S.C. 1098e) shall not be required to recertify the

18 income or family size of the borrower under such

19 plan prior to December 31, 2021.";

20     (2) in subsection (c), by striking "part D or B

21 of title IV of the Higher Education Act of 1965 (20

22 U.S.C. 1087a et seq.; 1071 et seq.)" and inserting

23 "part B, D, or E of title IV of the Higher Education

24 Act of 1965 (20 U.S.C. 1087a et seq.; 1071 et seq.;

25 1087aa et seq.)";

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003692

1388

1      (3) in subsection (d), by striking "During the

2    period in which the Secretary suspends payments on

3    a loan under subsection (a), the Secretary" and in-

4    serting "During the period in which payments on a

5    Federal student loan are suspended under subsection

6    (a), the Secretary or, as applicable, the Secretary of

7    Health and Human Services";

8      (4) in subsection (e), by striking "During the

9    period in which the Secretary suspends payments on

10    a loan under subsection (a), the Secretary" and in-

11    serting "During the period in which payments on a

12    Federal student loan are suspended under subsection

13    (a), the Secretary or, as applicable, the Secretary of

14    Health and Human Services"; and

15      (5) in subsection (f), by striking "the Sec-

16    retary" and inserting "the Secretary or, as applica-

17    ble, the Secretary of Health and Human Services,"."

18               NO INTEREST ACCRUAL

19    SEC. 150115.

20    Section 3513(b) of division A of the Coronavirus Aid,

21   Relief, and Economic Security Act (Public Law 116–136)

22   is amended to read as follows:

23    "(b) PROVIDING INTEREST RELIEF.—

24      "(1) NO ACCRUAL OF INTEREST.—

25        "(A) IN GENERAL.—During the period de-

26        scribed in subparagraph (D), interest on a Fed-

1389

1 eral student loan shall not accrue or shall be
2 paid by the Secretary (or the Secretary of
3 Health and Human Services) during—

4       "(i) the repayment period of such
5       loan;

6       "(ii) any period excluded from the re-
7       payment period of such loan (including any
8       period of deferment or forbearance);

9       "(iii) any period in which the bor-
10       rower of such loan is in a grace period; or

11       "(iv) any period in which the borrower
12       of such loan is in default on such loan.

13 "(B) DIRECT LOANS AND DEPARTMENT OF
14 EDUCATION HELD FFEL AND PERKINS
15 LOANS.—For purposes of subparagraph (A), in-
16 terest shall not accrue on a Federal student
17 loan described in section 3502(a)(2)(A).

18 "(C) FFEL AND PERKINS LOANS NOT
19 HELD BY THE DEPARTMENT OF EDUCATION
20 AND HHS LOANS.—For purposes of subpara-
21 graph (A)—

22       "(i) in the case of a Federal student
23       loan defined in section 3502(a)(2)(B), the
24       Secretary shall pay, on a monthly basis,
25       the amount of interest due on the unpaid

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003694

1390

1     principal of such loan to the holder of such

2     loan, except that any payments made

3     under this clause shall not affect payment

4     calculations under section 438 of the High-

5     er Education Act of 1965 (20 U.S.C.

6     1087–1); and

7         ''(ii) in the case of a Federal student

8     loan defined in section 3502(a)(2)(C), the

9     Secretary of Health and Human Services

10     shall pay, on a monthly basis, the amount

11     of interest due on the unpaid principal of

12     such loan to the holder of such loan.

13     ''(D) PERIOD DESCRIBED.—

14         ''(i) IN GENERAL.—The period de-

15     scribed in this clause is the period begin-

16     ning on March 13, 2020, and ending on

17     the later of—

18         ''(I) September 30, 2021; or

19         ''(II) the day following the date

20     of enactment of the HEROES Act

21     that is 2 months after the national U–

22     5 measure of labor underutilization

23     shows initial signs of recovery.

24         ''(ii) DEFINITIONS.—In this subpara-

25     graph:

DOC_0003695

1391

"(I) NATIONAL U–5 MEASURE OF LABOR UNDERUTILIZATION.—The term 'national U–5 measure of labor underutilization' means the seasonally-adjusted, monthly U–5 measure of labor underutilization published by the Bureau of Labor Statistics.

"(II) INITIAL SIGNS OF RECOVERY.—The term 'initial signs of recovery' means that the average national U–5 measure of labor underutilization for months in the most recent 3-consecutive-month period for which data are available—

"(aa) is lower than the highest value of the average national U–5 measure of labor underutilization for a 3-consecutive-month period during the period beginning in March 2020 and the most recent month for which data from the Bureau of Labor Statistics are available by an amount that is equal to or great-

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003696

1392

1      er than one-third of the dif-

2      ference between—

3           ''(AA) the highest value

4           of the average national U–5

5           measure of labor under-

6           utilization for a 3-consecu-

7           tive-month period during

8           such period; and

9           ''(BB) the value of the

10          average national U–5 meas-

11          ure of labor underutilization

12          for the 3-consecutive-month

13          period ending in February

14          2020; and

15          ''(bb) has decreased for each

16         month during the most recent 2

17         consecutive months for which

18         data from the Bureau of Labor

19         Statistics are available.

20      ''(E) OTHER DEFINITIONS.—In this para-

21   graph:

22      ''(i) DEFAULT.—The term 'default'—

23         ''(I) in the case of a Federal stu-

24         dent loan made, insured, or guaran-

25         teed under part B or D of the Higher

1393

1 Education Act of 1965, has the mean-
2 ing given such term in section 435(l)
3 of the Higher Education Act of 1965
4 (20 U.S.C. 1085);

5      ''(II) in the case of a Federal
6 student loan made under part E of
7 the Higher Education Act of 1965,
8 has the meaning given such term in
9 section 674.2 of title 34, Code of Fed-
10 eral Regulations (or successor regula-
11 tions); or

12      ''(III) in the case of a Federal
13 student loan defined in section
14 3502(a)(2)(C), has the meaning given
15 such term in section 721 or 835 of
16 the Public Health Service Act (42
17 U.S.C. 292q, 297a), as applicable.

18      ''(ii) GRACE PERIOD.—The term
19 'grace period' means—

20      ''(I) in the case of a Federal stu-
21 dent loan made, insured, or guaran-
22 teed under part B or D of the Higher
23 Education Act of 1965, the 6-month
24 period after the date the student
25 ceases to carry at least one-half the

DOC_0003698

1394

1      normal full-time academic workload,

2      as described in section 428(b)(7) of

3      the Higher Education Act of 1965 (20

4      U.S.C. 1078(b)(7));

5      "(II) in the case of a Federal

6      student loan made under part E of

7      the Higher Education Act of 1965,

8      the 9-month period after the date on

9      which a student ceases to carry at

10      least one-half the normal full-time

11      academic workload, as described in

12      section 464(c)(1)(A) of the Higher

13      Education Act of 1965 (20 U.S.C.

14      1087dd(c)(1)(A)); and

15      "(III) in the case of a Federal

16      student loan defined in section

17      3502(a)(2)(C), the 1-year period de-

18      scribed in section 722(c) of the Public

19      Health Service Act (42 U.S.C.

20      292r(c)) or the 9-month period de-

21      scribed in section 836(b)(2) of such

22      Act (42 U.S.C. 297b(b)(2)), as appli-

23      cable.

24      "(iii) REPAYMENT PERIOD.—The

25      term 'repayment period' means—

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003699

1395

1    "(I) in the case of a Federal stu-
2    dent loan made, insured, or guaran-
3    teed under part B or D of the Higher
4    Education Act of 1965, the repayment
5    period described in section 428(b)(7)
6    of the Higher Education Act of 1965
7    (20 U.S.C. 1078(b)(7));

8    "(II) in the case of a Federal
9    student loan made under part E of
10   the Higher Education Act of 1965,
11   the repayment period described in sec-
12   tion 464(c)(4) of the Higher Edu-
13   cation Act of 1965 (20 U.S.C.
14   1087dd(c)(4)); or

15   "(III) in the case of a Federal
16   student loan defined in section
17   3502(2)(C), the repayment period de-
18   scribed in section 722(c) or 836(b)(2)
19   of the Public Health Service Act (42
20   U.S.C. 292r(c), 297b(b)(2)), as appli-
21   cable.

22   "(2) INTEREST REFUND IN LIEU OF RETRO-
23   ACTIVE APPLICABILITY.—By not later than 60 days
24   after the date of enactment of the HEROES Act,
25   the Secretary or, as applicable, the Secretary of

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003700

1396

1    Health and Human Services, shall, for each Federal

2    student loan defined in subparagraph (B) or (C) of

3    section 3502(a)(2)—

4         ''(A) determine the amount of interest due

5    (or that would have been due in the absence of

6    being voluntarily paid by the holder of such

7    loan) on such loan during the period beginning

8    March 13, 2020, and ending on such date of

9    enactment; and

10        ''(B) refund the amount of interest cal-

11    culated under clause (i), by—

12            ''(i) paying the holder of the loan the

13        amount of the interest calculated under

14        subparagraph (A), to be applied to the

15        loan balance for the borrower of such loan;

16        or

17            ''(ii) if there is no outstanding balance

18        or payment due on the loan as of the date

19        on which the refund is to be provided, pro-

20        viding a payment in the amount of the in-

21        terest calculated under clause (i) directly

22        to the borrower.

23    ''(3) SUSPENSION OF INTEREST CAPITALIZA-

24    TION.—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003701

1397

1          "(A) IN GENERAL.—With respect to any
2     Federal student loan, interest that accrued but
3     had not been paid prior to March 13, 2020, and
4     had not been capitalized as of such date, shall
5     not be capitalized.

6          "(B) TRANSITION.—The Secretary or, as
7     applicable, the Secretary of Health and Human
8     Services, shall ensure that any interest on a
9     Federal student loan that had been capitalized
10    in violation of subparagraph (A) is corrected
11    and the balance of principal and interest due
12    for the Federal student loan is adjusted accord-
13    ingly.".

14          NOTICE TO BORROWERS

15    SEC. 150116.

16    Section 3513(g) of division A of the Coronavirus Aid,
17    Relief, and Economic Security Act (Public Law 116–136)
18    is amended—

19          (1) in the matter preceding paragraph (1), by
20    striking "the Secretary" and inserting "the Sec-
21    retary or, as applicable, the Secretary of Health and
22    Human Services,";

23          (2) in paragraph (1)(D), by striking the period
24    and inserting a semicolon;

25          (3) in paragraph (2)—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003702

1398

1  (A) in the matter preceding subparagraph

2  (A), by striking "August 1, 2020" and insert-

3  ing "August 1, 2021"; and

4  (B) by amending subparagraph (B) to read

5  as follows:

6  "(B) that—

7  "(i) a borrower of a Federal student

8  loan made, insured, or guaranteed under

9  part B or D of title IV of the Higher Edu-

10  cation Act of 1965 may be eligible to enroll

11  in an income-contingent repayment plan

12  under section 455(d)(1)(D) of the Higher

13  Education Act of 1965 (20 U.S.C.

14  1087e(d)(1)(D)) or an income-based repay-

15  ment plan under section 493C of such Act

16  (20 U.S.C. 1098e), including a brief de-

17  scription of such repayment plans; and

18  "(ii) in the case of a borrower of a

19  Federal student loan defined in section

20  3502(a)(2)(C) or made under part E of

21  title IV of the Higher Education of 1965,

22  the borrower may be eligible to enroll in

23  such a repayment plan if the borrower con-

24  solidates such loan with a loan described in

25  clause (i) of this subparagraph, and re-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003703

1399

1   ceives a Federal Direct Consolidation Loan

2   under part D of the Higher Education of

3   1965 (20 U.S.C. 1087a et seq.); and''; and

4   (C) by adding at the end the following:

5   ''(3) in a case in which the accrual of interest

6   on Federal student loans is suspended under sub-

7   section (b)(1) beyond September 30, 2021, during

8   the 2-month period beginning on the date on which

9   the national U–5 measure of labor underutilization

10   shows initial signs of recovery (as such terms are de-

11   fined in subsection (b)(1)(D)) carry out a program

12   to provide not less than 6 notices by postal mail,

13   telephone, or electronic communication to bor-

14   rowers—

15   ''(A) indicating when the interest on Fed-

16   eral student loans of the borrower will resume

17   accrual and capitalization; and

18   ''(B) the information described in para-

19   graph (2)(B).''.

20   WRITING DOWN BALANCES FOR FEDERAL STUDENT LOAN

21   BORROWERS

22   SEC. 150117.

23   Section 3513 of division A of the Coronavirus Aid,

24   Relief, and Economic Security Act (Public Law 116–136),

25   as amended by this part, is further amended by adding

26   at the end the following:

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003704

1400

1 "(h) WRITING DOWN BALANCES FOR FEDERAL STU-
2 DENT LOAN BORROWERS.—

3    "(1) IN GENERAL.—Not later than 30 days
4 after the date of enactment of the HEROES Act,
5 the Secretary shall cancel or repay an amount on
6 the outstanding balance due (including the unpaid
7 principal amount, any accrued interest, and any fees
8 or charges) on the Federal student loans defined in
9 subparagraphs (A) and (B) of section 3502(a)(2) of
10 a borrower that is equal to the lesser of—

11        "(A) $10,000; or

12        "(B) the total outstanding balance due on
13    such loans of the borrower.

14    "(2) APPLICATION.—Unless otherwise re-
15 quested by the borrower in writing, a cancellation or
16 repayment under paragraph (1) shall be applied —

17        "(A) in the case of a borrower whose loans
18    have different applicable rates of interest, first
19    toward the outstanding balance due on the loan
20    with the highest applicable rate of interest
21    among such loans; and

22        "(B) in the case of a borrower of loans
23    that have the same applicable rates of interest,
24    first toward the outstanding balance of prin-

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003705

1401

1 cipal due on the loan with the highest principal

2 balance among such loans.

3 ''(3) DATA TO IMPLEMENT.—Contractors of the

4 Secretary, and holders of Federal student loans,

5 shall report, to the satisfaction of the Secretary the

6 information necessary to carry out this subsection.

7 ''(4) TAXATION.—For purposes of the Internal

8 Revenue Code of 1986, in the case of any cancella-

9 tion or repayment of indebtedness under this sub-

10 section with respect to any borrower:

11     ''(A) EXCLUSION FROM GROSS INCOME.—

12     No amount shall be included in the gross in-

13     come of such borrower by reason of such can-

14     cellation or repayment.

15     ''(B) WAIVER OF INFORMATION REPORT-

16     ING REQUIREMENTS.—Amounts excluded from

17     gross income under subparagraph (A) shall not

18     be required to be reported (and shall not be

19     taken into account in determining whether any

20     reporting requirement applies) under chapter

21     61 of such Code.''.

22                    IMPLEMENTATION

23 SEC. 150118.

24 Section 3513 of division A of the Coronavirus Aid,

25 Relief, and Economic Security Act (Public Law 116–136),

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003706

1402

1 as amended by this part, is further amended by adding

2 at the end the following:

3     ''(i) IMPLEMENTATION.—

4         ''(1) INFORMATION VERIFICATION.—

5             ''(A) IN GENERAL.—To facilitate imple-

6         mentation of this section, information for the

7         purposes described in subparagraph (B), shall

8         be reported—

9                 ''(i) by the holders of Federal student

10            loans defined in section 3502(a)(2)(B) to

11            the satisfaction of the Secretary; and

12                ''(ii) by the holders of Federal student

13            loans defined in section 3502(a)(2)(C) to

14            the satisfaction of the Secretary of Health

15            and Human Services.

16            ''(B) PURPOSES.—The purposes of the in-

17        formation reported under subparagraph (A) are

18        to—

19                ''(i) verify, at the borrower level, the

20            payments that are provided or suspended

21            under this section; and

22                ''(ii) calculate the amount of any in-

23            terest due to the holder for reimbursement

24            of interest under subsection (b).

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003707

1403

1     "(2) COORDINATION.—The Secretary shall co-
2 ordinate with the Secretary of Health and Human
3 Services to carry out the provisions of this section
4 with respect to Federal student loans defined in sec-
5 tion 3502(a)(2)(C).".

6     EFFECTIVE DATE

7 SEC. 150119.

8     This part, and the amendments made by this part,
9 shall take effect as if enacted as part of the Coronavirus
10 Aid, Relief, and Economic Security Act (Public Law 116–
11 136).

12 PART B—CONSOLIDATION LOANS AND PUBLIC
13     SERVICE LOAN FORGIVENESS

14 SPECIAL RULES RELATING TO FEDERAL DIRECT
15     CONSOLIDATION LOANS

16 SEC. 150120.

17     (a) SPECIAL RULES RELATING TO FEDERAL DIRECT
18 CONSOLIDATION LOANS AND PSLF.—

19     (1) PUBLIC SERVICE LOAN FORGIVENESS OP-
20     TION ON CONSOLIDATION APPLICATION.—

21         (A) IN GENERAL.—During the period de-
22         scribed in subsection (e), the Secretary shall—
23             (i) include, in any application for a
24             Federal Direct Consolidation Loan under
25             part D of title IV of the Higher Education
26             Act of 1965 (20 U.S.C. 1087a et seq,), an

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003708

1404

1       option for the borrower to indicate that the

2       borrower intends to participate in the pub-

3       lic service loan forgiveness program under

4       section 455(m) of such Act (20 U.S.C.

5       1087e(m)); and

6               (ii) for each borrower who submits an

7       application for a Federal Direct Consolida-

8       tion Loan, without regard to whether the

9       borrower indicates the intention described

10      in clause (i)—

11                      (I) request that the borrower

12              submit a certification of employment;

13              and

14                      (II) after receiving a complete

15              certification of employment—

16                              (aa) carry out the require-

17                      ments of paragraph (2); and

18                              (bb) inform the borrower of

19                      the number of qualifying monthly

20                      payments made on the compo-

21                      nent loans before consolidation

22                      that shall be deemed, in accord-

23                      ance with paragraph (2)(D), to

24                      be qualifying monthly payments

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003709

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1405

1    made on the Federal Direct Con-

2    solidation Loan.

3    (B) HOLD HARMLESS.—The Secretary

4    may not change or otherwise rescind a calcula-

5    tion made under paragraph (2)(D) after in-

6    forming the borrower of the results of such cal-

7    culation under subparagraph (A)(ii)(II)(bb).

8    (2) PROCESS TO DETERMINE QUALIFYING PAY-

9    MENTS FOR PURPOSES OF PSLF.—Upon receipt of a

10    complete certification of employment under para-

11    graph (1)(A)(ii)(II) of a borrower who receives a

12    Federal Direct Consolidation Loan described in

13    paragraph (1)(A), the Secretary shall—

14    (A) review the borrower's payment history

15    to identify each component loan of such Federal

16    Direct Consolidation Loan;

17    (B) for each such component loan—

18    (i) calculate the weighted factor of the

19    component loan, which shall be the factor

20    that represents the portion of such Federal

21    Direct Consolidation Loan that is attrib-

22    utable to such component loan; and

23    (ii) determine the number of quali-

24    fying monthly payments made on such

25    component loan before consolidation;

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003710

1406

1  (C) calculate the number of qualifying

2  monthly payments determined under subpara-

3  graph (B)(ii) with respect to a component loan

4  that shall be deemed as qualifying monthly pay-

5  ments made on the Federal Direct Consolida-

6  tion Loan by multiplying—

7      (i) the weighted factor of such compo-

8      nent loan as determined under subpara-

9      graph (B)(i), by

10      (ii) the number of qualifying monthly

11      payments made on such component loan as

12      determined under subparagraph (B)(ii);

13      and

14  (D) calculate the total number of quali-

15  fying monthly payments with respect to the

16  component loans of the Federal Direct Consoli-

17  dation Loan that shall be deemed as qualifying

18  monthly payments made on such Federal Direct

19  Consolidation Loan by—

20      (i) adding together the result of each

21      calculation made under subparagraph (C)

22      with respect to each such component loan;

23      and

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003711

1407

1     (ii) rounding the number determined

2         under clause (i) to the nearest whole num-

3         ber.

4     (3) DEFINITIONS.—For purposes of this sub-

5 section:

6     (A) CERTIFICATION OF EMPLOYMENT.—

7         The term "certification of employment", used

8         with respect to a borrower, means a certifi-

9         cation of the employment of the borrower in a

10         public service job (as defined in section

11         455(m)(3)(B) of the Higher Education Act of

12         1965) on or after October 1, 2007.

13     (B) COMPONENT LOAN.—The term "com-

14         ponent loan", used with respect to a Federal

15         Direct Consolidation Loan, means each loan for

16         which the liability has been discharged by the

17         proceeds of the Federal Direct Consolidation

18         Loan, which—

19             (i) may include a loan that is not an

20             eligible Federal Direct Loan (as defined in

21             section 455(m)(3)(A) of the Higher Edu-

22             cation Act of 1965); and

23             (ii) in the case of a subsequent con-

24             solidation loan, only includes loans for

25             which the liability has been directly dis-

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003712

1408

1     charged by such subsequent consolidation

2     loan.

3     (C) FEDERAL DIRECT CONSOLIDATION

4     LOAN.—The term "Federal Direct Consolida-

5     tion Loan" means a Federal Direct Consolida-

6     tion Loan made under part D of title IV of the

7     Higher Education Act of 1965 (20 U.S.C.

8     1087a et seq.).

9     (D) QUALIFYING MONTHLY PAYMENT.—

10          (i) COMPONENT LOAN.—The term

11          "qualifying monthly payment", used with

12          respect to a component loan, means a

13          monthly payment on such loan made by a

14          borrower, during a period of employment

15          in a public service job (as defined in sec-

16          tion 455(m)(3)(B) of the Higher Edu-

17          cation Act of 1965 (20 U.S.C.

18          1087e(m)(3)(B)) on or after October 1,

19          2007, pursuant to—

20               (I) a repayment plan under part

21               B, D, or E of title IV of the Higher

22               Education Act of 1965 (20 U.S.C.

23               1071 et seq.; 1087a et seq.; 1087aa et

24               seq.); or

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003713

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1409

1          (II) in the case of a loan made

2      under subpart II of part A of title VII

3      of the Public Health Service Act or

4      under part E of title VIII of the Pub-

5      lic Health Service Act, a repayment

6      plan under title VII or VIII of such

7      Act.

8          (ii) FEDERAL DIRECT CONSOLIDATION

9      LOAN.—The term "qualifying monthly pay-

10     ment", used with respect to a Federal Di-

11     rect Consolidation Loan, means a monthly

12     payment on such loan that counts as 1 of

13     the 120 monthly payments described in

14     section 455(m)(1)(A) of the Higher Edu-

15     cation Act of 1965 (20 U.S.C.

16     1087e(m)(3)(B)).

17     (b) SPECIAL RULES RELATING TO FEDERAL DIRECT

18 CONSOLIDATION LOANS AND ICR AND IBR.—

19     (1) IN GENERAL.—During the period described

20 in subsection (e), with respect to a borrower who re-

21 ceives a Federal Direct Consolidation Loan and who

22 intends to repay such loan under an income-contin-

23 gent repayment plan under section 455(d)(1)(D) of

24 the Higher Education Act of 1965 (20 U.S.C.

25 1087e(d)(1)(D)) or an income-based repayment plan

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003714

1410

1    under section 493C of such Act (20 U.S.C. 1098e),

2    the Secretary shall—

3        (A) review the borrower's payment history

4        to identify each component loan of such Federal

5        Direct Consolidation Loan;

6        (B) for each such component loan—

7            (i) calculate the weighted factor of the

8            component loan, which shall be the factor

9            that represents the portion of such Federal

10            Direct Consolidation Loan that is attrib-

11            utable to such component loan; and

12            (ii) determine the number of quali-

13            fying monthly payments made on such

14            component loan before consolidation;

15        (C) calculate the number of qualifying

16        monthly payments determined under subpara-

17        graph (B)(ii) with respect to a component loan

18        that shall be deemed as qualifying monthly pay-

19        ments made on the Federal Direct Consolida-

20        tion Loan by multiplying—

21            (i) the weighted factor of such compo-

22            nent loan as determined under subpara-

23            graph (B)(i), by

24            (ii) the number of qualifying monthly

25            payments made on such component loan as

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003715

1411

1    determined under subparagraph (B)(ii);

2    and

3    (D) calculate and inform the borrower of

4    the total number of qualifying monthly pay-

5    ments with respect to the component loans of

6    the Federal Direct Consolidation Loan that

7    shall be deemed as qualifying monthly payments

8    made on such Federal Direct Consolidation

9    Loan by—

10    (i) adding together the result of each

11    calculation made under subparagraph (C)

12    with respect to each such component loan;

13    and

14    (ii) rounding the number determined

15    under clause (i) to the nearest whole num-

16    ber.

17    (2) HOLD HARMLESS.—The Secretary may not

18    change or otherwise rescind a calculation made

19    under paragraph (1)(D) after informing the bor-

20    rower of the results of such calculation under such

21    paragraph.

22    (3) DEFINITIONS.—In this subsection:

23    (A) COMPONENT LOAN; FEDERAL DIRECT

24    CONSOLIDATION LOAN.—The terms "component

25    loan" and "Federal Direct Consolidation Loan"

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003716

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1412

1  have the meanings given the terms in sub-

2  section (a).

3  (B) QUALIFYING PAYMENT.—

4  (i) COMPONENT LOANS.—Subject to

5  clause (ii), the term "qualifying monthly

6  payment", used with respect to a compo-

7  nent loan, means a monthly payment on

8  such loan made by a borrower pursuant

9  to—

10  (I) a repayment plan under part

11  B, D, or E of title IV of the Higher

12  Education Act of 1965 (20 U.S.C.

13  1071 et seq., 1087a et seq., 1087aa et

14  seq.); or

15  (II) in the case of a loan made

16  under subpart II of part A of title VII

17  of the Public Health Service Act (42

18  U.S.C. 292q et seq.) or under part E

19  of title VIII of the Public Health

20  Service Act (42 U.S.C. 297a et seq.),

21  a repayment plan under title VII or

22  VIII of such Act.

23  (ii) CLARIFICATION.—

24  (I) ICR.—For purposes of deter-

25  mining the number of qualifying

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003717

1413

1 monthly payments made on a compo-
2 nent loan pursuant to an income-con-
3 tingent repayment plan under section
4 455(d)(1)(D) of the Higher Education
5 Act of 1965 (20 U.S.C.
6 1087e(d)(1)(D)), each month a bor-
7 rower is determined to meet the re-
8 quirements of section 455(e)(7)(B)(i)
9 of such Act with respect to such loan
10 shall be treated as such a qualifying
11 monthly payment.

12 (II) IBR.—For purposes of de-
13 termining the number of qualifying
14 monthly payments made on a compo-
15 nent loan pursuant to an income-
16 based repayment plan under section
17 493C of such Act (20 U.S.C. 1098e),
18 each month a borrower was deter-
19 mined to meet the requirements of
20 subsection (b)(7)(B) of such section
21 493C with respect to such loan shall
22 be treated as such a qualifying month-
23 ly payment.

24 (iii) FEDERAL DIRECT CONSOLIDA-
25 TION LOANS.—The term "qualifying

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003718

1414

1    monthly payment'', used with respect to a

2    Federal Direct Consolidation Loan, means

3    a monthly payment on such loan that

4    counts as a monthly payment under an in-

5    come-contingent repayment plan under sec-

6    tion 455(d)(1)(D) of the Higher Education

7    Act of 1965 (20 U.S.C. 1087e(d)(1)(D)),

8    or an income-based repayment plan under

9    section 493C of the Higher Education Act

10   of 1965 (20 U.S.C. 1098e).

11  (c) NOTIFICATION TO BORROWERS.—

12       (1) IN GENERAL.—During the period described

13  in subsection (e), the Secretary and the Secretary of

14  Health and Human Services shall undertake a cam-

15  paign to alert borrowers of a loan described in para-

16  graph (2)—

17       (A) on the benefits of consolidating such

18       loans into a Federal Direct Consolidation Loan,

19       including the benefits of the special rules under

20       subsections (a) and (b) of this section; and

21       (B) under which servicers and holders of

22       Federal student loans shall provide to bor-

23       rowers such consumer information, and in such

24       manner, as determined appropriate by the Sec-

25       retaries, based on conducting consumer testing

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003719

1415

1       to determine how to make the information as

2       meaningful to borrowers as possible.

3       (2) FEDERAL STUDENT LOANS.—A loan de-

4       scribed in this paragraph is—

5           (A) a loan made under subpart II of part

6           A of title VII of the Public Health Service Act

7           or under part E of title VIII of such Act; or

8           (B) a loan made under part E of the High-

9           er Education Act of 1965.

10      (d) SPECIAL RULE FOR INTEREST ON FEDERAL DI-

11    RECT CONSOLIDATION LOANS.—Any Federal Direct Con-

12    solidation Loan for which the application is received dur-

13    ing the period described in subsection (e), shall bear inter-

14    est at an annual rate as calculated under section

15    455(b)(8)(D) of the Higher Education Act of 1965 (20

16    U.S.C. 1087e(b)(8)(D)), without regard to the require-

17    ment to round the weighted average of the interest rate

18    to the nearest higher one-eighth of one percent.

19    (e) PERIOD.—The period described in this clause is

20    the period beginning on the date of enactment of this Act,

21    and ending on the later of—

22      (1) September 30, 2021; or

23      (2) the day following the date of enactment of

24      this Act that is 2 months after the national U–5

25      measure of labor underutilization shows initial signs

1416

1  of recovery (as such terms are defined in section

2  3513(b) of the Coronavirus Aid, Relief, and Eco-

3  nomic Security Act (Public Law 116–136), as

4  amended by this Act)).

5  (f) GAO STUDY ON IMPLEMENTATION OF SPECIAL

6  RULES ON CONSOLIDATION.—Not later than 6 months

7  after the date of enactment of this Act, the Comptroller

8  General of the United States shall submit a report to the

9  authorizing committees (defined in section 103 of the

10  Higher Education Act of 1965 (20 U.S.C. 1003) on the

11  implementation of this section, which shall include—

12  (1) information on borrowers who apply for or

13  receive a Federal Direct Consolidation Loan under

14  part D of the Higher Education Act of 1965 during

15  the period described in subsection (e),

16  disaggregated—

17  (A) by borrowers who intend to participate

18  in the public service loan forgiveness program

19  under section 455(m) of such Act (20 U.S.C.

20  1087e(m)); and

21  (B) by borrowers who intend to repay such

22  loans on an income-contingent repayment plan

23  under section 455(d)(1)(D) of the Higher Edu-

24  cation Act of 1965 (20 U.S.C. 1087e(d)(1)(D))

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003721

1417

1   or an income-based repayment plan under sec-
2   tion 493C of such Act (20 U.S.C. 1098e);

3   (2) the extent to which the Secretary has estab-
4   lished procedures for carrying out subsections (a)
5   and (b);

6   (3) the extent to which the Secretary and the
7   Secretary of Health and Human Services have car-
8   ried out the notification to borrowers required under
9   subsection (c); and

10   (4) recommendations on improving the imple-
11   mentation of this section to ensure increased bor-
12   rower participation.

13               TREATMENT OF PSLF

14   SEC. 150121.

15   (a) EXCEPTION FOR PURPOSES OF PSLF LOAN
16   FORGIVENESS.—Section 455(m)(1)(B) of the Higher
17   Education Act of 1965 (20 U.S.C. 1087e(m)(1)(B)) shall
18   apply as if clause (i) were struck.

19   (b) HEALTH CARE PRACTITIONER.—In section
20   455(m)(3)(B)(i) of the Higher Education Act of 1965 (20
21   U.S.C. 1087e(m)(3)(B)(i)), the term "full-time profes-
22   sionals engaged in health care practitioner occupations"
23   includes an individual who—

24   (1) has a full-time job as a health care practi-
25   tioner;

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003722

1418

1    (2) provides medical services in such full-time

2    job at a nonprofit hospital or public hospital or other

3    nonprofit or public health care facility; and

4    (3) is prohibited by State law from being em-

5    ployed directly by such hospital or other health care

6    facility.

7    PART C—EMERGENCY RELIEF FOR

8                DEFRAUDED BORROWERS

9    EMERGENCY RELIEF FOR DEFRAUDED BORROWERS

10   SEC. 150122.

11   (a) EMERGENCY RELIEF.—An eligible borrower shall

12   be entitled to relief on an eligible loan pursuant to this

13   section.

14   (b) DEFINITIONS.—In this section:

15   (1) ELIGIBLE BORROWER.—The term "eligible

16   borrower" means an individual—

17        (A) who—

18            (i) borrowed an eligible loan to fi-

19        nance the cost of enrollment at an institu-

20        tion of higher education that, according to

21        findings by the Department of Education

22        made on or before the date of enactment

23        of this Act, made a false or misleading rep-

24        resentation with the respect to the job

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003723

1419

1 placement rates of such institution of high-

2 er education; and

3     (ii) has not received the relief de-

4 scribed in subsection (c)(1) on such eligible

5 loan; or

6 (B) who—

7     (i) borrowed an eligible loan to fi-

8 nance the cost of enrollment at an institu-

9 tion of higher education that, according to

10 findings by the Department of Education

11 made on or before the date of enactment

12 of this Act, made a false or misleading rep-

13 resentation with respect to guaranteed em-

14 ployment or transferability of credits of

15 such institution of higher education;

16     (ii) in an application to the Secretary

17 for a defense to repayment of such eligible

18 loan, has asserted that the borrower (or

19 the dependent student on whose behalf the

20 eligible borrowed such eligible loan) relied

21 on such false or misleading representation

22 in deciding to enroll in such institution of

23 higher education; and

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003724

1420

1     (iii) has not received the relief de-
2     scribed in subsection (c)(1) on such eligible
3     loan.

4     (2) ELIGIBLE LOAN.—The term ''eligible loan''
5     means a loan made, insured, or guaranteed under
6     part B or D of title IV of the Higher Education Act
7     of 1965 (20 U.S.C. 1071 et seq.; 1087a et seq.).

8     (c) RELIEF.—With respect to each eligible borrower,
9     the Secretary shall—

10     (1) not later than 45 days after the date of en-
11     actment of this Act, with respect to each eligible
12     loan of the borrower described in subsection (b)(1)—

13         (A) cancel or repay the full balance of in-
14         terest and principal (including fees and
15         charges) due on such loan; and

16         (B) return to the borrower an amount
17         equal to the total amount of payments (includ-
18         ing voluntary and involuntary payments) made
19         on the loan by the borrower;

20     (2) not later than 60 days after the date of en-
21     actment of this section, report the cancellation or re-
22     payment under paragraph (1)(A) of each eligible
23     loan to each consumer reporting agency to which the
24     Secretary previously reported the status of the loan,

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003725

1421

1  so as to delete all adverse credit history assigned to

2  the loan; and

3  (3) not later than 60 days after the date of en-

4  actment of this Act, no longer consider a borrower

5  who has defaulted on a loan cancelled or repaid

6  under this subsection to be in default on such loan.

7  (d) NOTIFICATION.—Not later than 30 days after the

8  date of enactment of this section, the Secretary shall no-

9  tify (in writing) each eligible borrower of—

10  (1) the relief to which the borrower is entitled

11  pursuant to subsection (c), and when the borrower

12  will receive such relief;

13  (2) the borrower's eligibility to receive assist-

14  ance under title IV of the Higher Education Act of

15  1965 (20 U.S.C. 1070 et seq.) after receiving relief

16  pursuant to subsection (c); and

17  (3) any further relief to such borrower as the

18  Secretary determines is appropriate.

19  (e) EXPEDIENT ADJUDICATION OF STATE ATTORNEY

20  GENERAL CLAIMS RELATING TO DEFENSE TO REPAY-

21  MENT OF A LOAN.—

22  (1) IN GENERAL.—The Secretary shall carry

23  out the requirements of paragraph (2) with respect

24  to each claim submitted to the Secretary on or be-

25  fore the date of enactment of this Act by a State at-

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003726

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1422

1 torney general on behalf of one or more individuals

2 who—

3         (A) allege that the individual borrowed an

4     eligible loan to finance the cost of enrollment at

5     an institution of higher education whose act or

6     omission the individual may assert as a defense

7     to repayment on such loan under the Higher

8     Education Act of 1965 (20 U.S.C. 1001 et

9     seq.) or under applicable State law; and

10        (B) has not received the relief described in

11     paragraph (2)(B) on such eligible loan.

12 (2) REQUIREMENTS.—The Secretary shall carry

13 out the following with respect to each claim de-

14 scribed in paragraph (1):

15        (A) Not later than 180 days after the date

16     of enactment of this Act, adjudicate each such

17     claim.

18        (B) For each claim for which the State at-

19     torney general proves the facts described in

20     paragraph (1) by a preponderance of the evi-

21     dence, with respect to each individual on whose

22     behalf the claim was submitted, provide the fol-

23     lowing:

24            (i) Not later than 45 days after the

25        date on which such claim is adjudicated,

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003727

1423

1    with respect to each eligible loan described

2    in paragraph (1) of the individual—

3         (I) cancel or repay the full bal-

4         ance of interest and principal (includ-

5         ing fees and charges) due on such

6         loan; and

7         (II) return to the borrower an

8         amount equal to the total amount of

9         payments (including voluntary and in-

10        voluntary payments) made on the loan

11        by the borrower.

12    (ii) Not later than 60 days after the

13    date on which such claim is adjudicated,

14    report the cancellation or repayment under

15    clause (i) of each eligible loan to each con-

16    sumer reporting agency to which the Sec-

17    retary previously reported the status of the

18    loan, so as to delete all adverse credit his-

19    tory assigned to the loan.

20    (iii) Not later than 60 days after the

21    date on which such claim is adjudicated,

22    no longer consider a borrower who has de-

23    faulted on a loan cancelled or repaid under

24    this subparagraph to be in default on such

25    loan.

DOC_0003728

1424

1    (C) Not later than 10 days after the date
2    of adjudication under subparagraph (A), with
3    respect to each claim submitted on behalf of not
4    less than 20 individuals, provide detailed re-
5    ports to the authorizing committees, which shall
6    include—

7        (i) any evidence submitted by the
8        State attorney general, which the Secretary
9        relied upon in adjudicating the claim;

10       (ii) any evidence submitted by the
11       State attorney general, which the Secretary
12       did not rely upon in adjudicating the
13       claim;

14       (iii) any other evidence the Secretary
15       relied upon in adjudicating the claim;

16       (iv) a summary of all efforts to co-
17       ordinate with the State attorney general to
18       ensure a fair adjudication; and

19       (v) a detailed legal rationale for the
20       Secretary's adjudication.

21    (D) For the duration of the adjudication of
22    each claim—

23       (i) suspend any payments owed on
24       any eligible loan that is the subject of such

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003729

1425

1    claim, including a suspension of any cap-

2    italization of interest;

3        (ii) suspend any involuntary collec-

4    tions on such loan, including collections

5    under—

6            (I) a wage garnishment author-

7        ized under section 488A of the Higher

8        Education Act of 1965 (20 U.S.C.

9        1095a) or section 3720D of title 31,

10       United States Code;

11           (II) a reduction of tax refund by

12       amount of debt authorized under sec-

13       tion 3720A of title 31, United States

14       Code, or section 6402(d) of the Inter-

15       nal Revenue Code of 1986;

16           (III) a reduction of any other

17       Federal benefit payment by adminis-

18       trative offset authorized under section

19       3716 of title 31, United States Code

20       (including a benefit payment due to

21       an individual under the Social Secu-

22       rity Act (42 U.S.C. 301 et seq.) or

23       any other provision described in sub-

24       section (c)(3)(A)(i) of such section);

25       or

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003730

1426

1     (IV) any other involuntary collec-
2     tion activity by the Secretary; and
3     (iii) suspend any interest accrual on
4     such loan.
5     (E) Not later than 10 days after the date
6 of adjudication for which relief is provided
7 under subparagraph (B), notify (in writing)
8 each individual with respect to whom relief is
9 provided of—
10     (i) the relief to which the individual is
11     entitled pursuant to subparagraph (B),
12     and when the individual will receive such
13     relief;
14     (ii) the individual's eligibility to re-
15     ceive assistance under title IV of the High-
16     er Education Act of 1965 (20 U.S.C. 1070
17     et seq.) after receiving relief pursuant to
18     subparagraph (B); and
19     (iii) any further relief to such bor-
20     rower as the Secretary determines is ap-
21     propriate.
22 (f) INSTITUTIONAL ACCOUNTABILITY.—With respect
23 to each loan cancelled or repaid under this section, the
24 Secretary shall initiate an appropriate proceeding to re-
25 quire the institution of higher education whose act or

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003731

1427

1   omission resulted in such cancellation or repayment to

2   repay to the Secretary the amount so cancelled or repaid.

3       (g) TAXATION.—For purposes of the Internal Rev-

4   enue Code of 1986, in the case of any relief provided under

5   subsection (c)(1) or (e)(2)(B) with respect to a borrower:

6           (1) EXCLUSION FROM GROSS INCOME; NO RE-

7       CAPTURE OF TAX BENEFITS.—No amount shall be

8       included in the gross income of such borrower by

9       reason of such relief and section 111(b) such Code

10      shall not apply with respect to such relief.

11          (2) WAIVER OF INFORMATION REPORTING RE-

12      QUIREMENTS.—Amounts excluded from gross in-

13      come under paragraph (1) shall not be required to

14      be reported (and shall not be taken into account in

15      determining whether any reporting requirement ap-

16      plies) under chapter 61 of such Code.

17      Subtitle D—Notifications and Reporting

18   NOTIFICATIONS AND REPORTING RELATING TO HIGHER

19                      EDUCATION

20   SEC. 150123.

21   (a) NOTIFICATION OF NON-CARES ACT FLEXIBILI-

22   TIES.—

23          (1) NOTICE TO CONGRESS.—

24              (A) IN GENERAL.—Not later than two

25          days before the date on which the Secretary

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003732

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1428

1     grants a flexibility described in paragraph (4),

2     the Secretary shall—

3          (i) submit to the authorizing commit-

4     tees a written notification of the Sec-

5     retary's intent to grant such flexibility; and

6          (ii) publish the notification on a pub-

7     licly accessible website of the Department

8     of Education.

9     (B) ELEMENTS.—Each notification under

10    subparagraph (A) shall—

11         (i) identify the provision of law, regu-

12    lation, or subregulatory guidance to which

13    the flexibility will apply;

14         (ii) identify any limitations on the

15    flexibility, including any time limits;

16         (iii) identify the statutory authority

17    under which the flexibility is provided;

18         (iv) identify the class of covered enti-

19    ties to which the flexibility will apply;

20         (v) identify whether a covered entity

21    will need to request the flexibility or

22    whether the flexibility will be applied with-

23    out request;

24         (vi) in the case of a flexibility that re-

25    quires a covered entity to request the flexi-

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003733

1429

bility, identify the factors the Secretary
will consider in approving or denying the
flexibility;

  (vii) explain how the flexibility is ex-
pected to benefit the covered entity or class
of covered entities to which it applies; and

  (viii) explain the reasons the flexibility
is necessary and appropriate due to
COVID–19.

 (2) QUARTERLY REPORTS.—Not later than 10
days after the end of each fiscal quarter for the du-
ration of the qualifying emergency through the end
of the first fiscal year beginning after the conclusion
of such qualifying emergency, the Secretary shall
submit to the authorizing committees a report that
includes, with respect to flexibilities described in
paragraph (4) that have been issued by the Sec-
retary in the most recently ended fiscal quarter, the
following:

  (A) In the case of a flexibility that was
issued by the Secretary without request from a
covered entity, an explanation of all require-
ments, including reporting requirements, that
the Secretary imposed on the covered entity as
a condition of the flexibility.

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003734

1430

1    (B) In the case of a flexibility for which a
2    covered entity requested and received specific
3    approval from the Secretary—
4        (i) identification of the covered entity
5        that received the flexibility;
6        (ii) an explanation of the specific rea-
7        sons for approval of the request;
8        (iii) a detailed description of the
9        terms of the flexibility, including—
10            (I) a description of any limita-
11            tions on the flexibility; and
12            (II) identification of each provi-
13            sion of law (including regulation and
14            subregulatory guidance) that is waived
15            or modified and, for each such provi-
16            sion, the statutory authority under
17            which the flexibility was provided; and
18        (iv) a copy of the final document
19        granting the flexibility.
20    (C) In the case of any request for a flexi-
21    bility that was denied by the Secretary—
22        (i) identification of the covered entity
23        or entities that were denied a flexibility;
24        (ii) a detailed description of the terms
25        of the request for the flexibility; and

DOC_0003735

1431

1 (iii) an explanation of the specific rea-

2 sons for denial of the request.

3 (3) REPORT ON FLEXIBILITIES GRANTED BE-

4 FORE ENACTMENT.—Not later than 30 days after

5 the date of enactment of this Act, the Secretary

6 shall submit to the authorizing committees a report

7 that—

8 (A) identifies each flexibility described in

9 paragraph (4) that was granted by the Sec-

10 retary between March 13, 2020, and the date

11 of enactment of this Act; and

12 (B) with respect to each such flexibility,

13 provides the information specified in paragraph

14 (1)(B).

15 (4) FLEXIBILITY DESCRIBED.—A flexibility de-

16 scribed in this paragraph is modification or waiver

17 of any provision of the Higher Education Act of

18 1965 (20 U.S.C. 1001 et seq.) (including any regu-

19 lation or subregulatory guidance issued under such

20 a provision) that the Secretary determines to be nec-

21 essary and appropriate to modify or waive due to

22 COVID–19, other than a provision of the Higher

23 Education Act of 1965 that the Secretary is specifi-

24 cally authorized to modify or waive pursuant to the

25 CARES Act (Public Law 116–136).

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003736

1432

1  (5) PRIVACY.—The Secretary shall ensure that

2  any report or notification submitted under this sub-

3  section does not reveal personally identifiable infor-

4  mation about an individual student.

5  (6) RULE OF CONSTRUCTION.—Nothing in this

6  subsection shall be construed to authorize the Sec-

7  retary to waive or modify any provision of law.

8  (b) REPORTS ON EXERCISE OF CARES ACT WAIV-

9  ERS BY INSTITUTIONS OF HIGHER EDUCATION.—Not

10  later than 30 days after the date of enactment of this Act,

11  each institution of higher education that exercises an au-

12  thority provided under section 3503(c) (as redesignated

13  by section 150102 of this Act), section 3504, section 3505,

14  section 3508(d), section 3509, or section 3517(b) of the

15  CARES Act (Public Law 116–136) shall submit to the

16  Secretary a report that describes the nature and extent

17  of the institution's exercise of such authorities, including

18  the number of students and amounts of aid provided under

19  title IV of the Higher Education Act of 1965 (20 U.S.C.

20  1070 et seq.) affected by the exercise of such authorities,

21  as applicable.

22  (c) REPORTS ON CHANGES TO CONTRACTS AND

23  AGREEMENTS.—Not later than 10 days after the end of

24  each fiscal quarter for the duration of the qualifying emer-

25  gency through the end of the first fiscal year beginning

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003737

1433

1    after the conclusion of such qualifying emergency, the Sec-
2    retary shall submit to the authorizing committees a report
3    that includes, for the most recently ended fiscal quarter—

4           (1) a summary of all modifications to any con-
5        tracts with Department of Education contractors re-
6        lating to Federal student loans, including—

7               (A) the contractual provisions that were
8            modified;

9               (B) the names of all contractors affected
10           by the modifications; and

11              (C) estimates of any costs or savings re-
12           sulting from the modifications;

13          (2) a summary of all amendments, addendums,
14       or other modifications to program participation
15       agreements with institutions of higher education
16       under section 487 of the Higher Education Act of
17       1965 (20 U.S.C. 1094), any provisional program
18       participation agreements entered into under such
19       section, and any COVID–19 provisional program
20       participation agreements entered into under section
21       150112 of this Act, including—

22              (A) any provisions of such agreements that
23           were modified by the Department of Education;
24           and

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003738

1434

1    (B) the number of institutions of higher

2    education that received such modifications or

3    entered into such provisional agreements,

4    disaggregated by—

5        (i) status as a four-year, two-year, or

6        less-than-two-year public institution, pri-

7        vate nonprofit institution, or proprietary

8        institution; and

9        (ii) each category of minority-serving

10       institution described in section 371(a) of

11       the Higher Education Act (20 U.S.C.

12       1067q); and

13    (3) sample copies of program participation

14    agreements (including provisional agreements), se-

15    lected at random from among the agreements de-

16    scribed in paragraph (2), including at least one

17    agreement from each type of institution (whether a

18    public institution, private nonprofit institution, or

19    proprietary institution) that received a modified or

20    provisional agreement.

21    (d) REPORT TO CONGRESS.—

22    (1) IN GENERAL.—Not later than 90 days after

23    the date of enactment of this Act, the Secretary

24    shall submit to the authorizing committees a report

25    that includes the following:

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003739

1435

1       (A) A summary of the reports received by

2 the Secretary under subsection (b).

3       (B) A description of—

4           (i) the Secretary's use of the authority

5 under section 3506 of the CARES Act

6 (Public Law 116–136) to adjust subsidized

7 loan usage limits, including the total num-

8 ber of students and the total amount of

9 subsidized loans under title IV of the

10 Higher Education Act of 1965 (20 U.S.C.

11 1070 et seq.) affected by the Secretary's

12 use of such authority;

13           (ii) the Secretary's use of the author-

14 ity under section 3507 of the CARES Act

15 (Public Law 116–136) to exclude certain

16 periods from the Federal Pell Grant dura-

17 tion limit, including the total number of

18 students and the total amount of Federal

19 Pell Grants under section 401 of the High-

20 er Education Act of 1965 (20 U.S.C.

21 1070a) affected by the Secretary's use of

22 such authority;

23           (iii) the Secretary's use of the author-

24 ity under section 3508 of the CARES Act

25 (Public Law 116–136) to waive certain re-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003740

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1436

1 quirements for the return of Federal

2 funds, including—

3   (I) in the case of waivers issued

4   to students under such section, the

5   total number of students and the total

6   amount of aid under title IV of the

7   Higher Education Act of 1965 (20

8   U.S.C. 1070 et seq.) affected by the

9   Secretary's use of such authority; and

10   (II) in the case of waivers issued

11   to institutions of higher education

12   under such section, the total number

13   of students and the total amount of

14   aid under title IV of the Higher Edu-

15   cation Act of 1965 (20 U.S.C. 1070

16   et seq.) affected by the Secretary's

17   use of such authority.

18  (C) A summary of the information re-

19 quired to be reported to the authorizing com-

20 mittees under sections 3510 and 3512 of the

21 CARES Act (Public Law 116–136), as amend-

22 ed by this Act, regardless of whether such infor-

23 mation has previously been reported to such

24 committees as of the date of the report under

25 this subsection.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003741

1437

1          (D) Information relating to the temporary

2    relief for Federal student loan borrowers pro-

3    vided under section 3513 of the CARES Act

4    (Public Law 116–136), including—

5          (i) with respect to the notifications re-

6    quired under subsection (g)(1) of such sec-

7    tion—

8          (I) the total number of individual

9    notifications sent to borrowers in ac-

10    cordance    with    such    subsection,

11    disaggregated by electronic, postal,

12    and telephonic notifications;

13          (II) the total number of notifica-

14    tions described in clause (i) that were

15    sent within the 15-day period speci-

16    fied in such subsection; and

17          (III) the actual costs to the De-

18    partment of Education of making the

19    notifications under such subsection;

20          (ii) the projected costs to the Depart-

21    ment of Education of making the notifica-

22    tions required under subsection (g)(2) of

23    such section;

24          (iii) the number of Federal student

25    loan borrowers who have affirmatively

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003742

1438

1     opted-out of payment suspension under

2     subsection (a) of such section;

3         (iv) the number of individual notifica-

4     tions sent to employers directing the em-

5     ployers to halt wage garnishment pursuant

6     to subsection (e) of such section,

7     disaggregated by electronic, postal, and tel-

8     ephonic notifications;

9         (v) the number of Federal student

10     loan borrowers who have had their wages

11     garnished pursuant to section 488A of the

12     Higher Education Act of 1965 (20 U.S.C.

13     1095a) or section 3720D of title 31,

14     United States Code, between March 13,

15     2020, and the date of the date of enact-

16     ment of this Act;

17         (vi) the number of Federal student

18     loan borrowers subject to interest capital-

19     ization as a result of consolidating Federal

20     student loans since March 13, 2020, and

21     the total amount of such interest capital-

22     ization;

23         (vii) the average daily call wait times

24     and call drop rates, disaggregated by stu-

25     dent loan servicer, for the period between

DOC_0003743

1439

1    March 13, 2020, and the date of enact-
2    ment of this Act; and

3        (viii) the estimated or projected sav-
4    ings to the Department of Education for
5    student loan servicing activities for the pe-
6    riod beginning on March 13, 2020, and
7    ending on September 30, 2020, due to
8    lower reimbursement or contract costs per
9    account for student loan servicers and pri-
10   vate collection agencies resulting from the
11   suspension of Federal student loan pay-
12   ments and halt to collection activities
13   under the CARES Act (Public Law 116–
14   136).

15   (E) Information relating to the special
16   rules relating to Federal Direct Consolidation
17   Loans under section 150120 of this Act, includ-
18   ing—

19       (i) the number of borrowers who sub-
20   mitted an application for a Federal Direct
21   Consolidation Loan;

22       (ii) the number of borrowers who re-
23   ceived a Federal Direct Consolidation
24   Loan; and

DOC_0003744

1440

1    (iii) the wait time between submitting

2    an application and receiving a Federal Di-

3    rect Consolidation Loan.

4   (F) A summary of the information re-

5   quired to be reported to the authorizing com-

6   mittees under section 3517(c) and section

7   3518(c) of the CARES Act (Public Law 116–

8   136), as amended by this Act, regardless of

9   whether such information has previously been

10   reported to such committees as of the date of

11   the report under this subsection.

12   (G) A copy of any communication from the

13   Department of Education to grantees and Fed-

14   eral student loan borrowers eligible for rights

15   and benefits under section 3519 of the CARES

16   Act (Public Law 116–136) to inform such

17   grantees and borrowers of their eligibility for

18   such rights and benefits.

19  (2) DUTY OF HHS.—The Secretary of Health

20  and Human Services shall provide to the Secretary

21  of Education the information necessary for the Sec-

22  retary of Education to comply with paragraph

23  (1)(D).

24  (e) AMENDMENTS TO CARES ACT REPORTING RE-

25 QUIREMENTS.—

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003745

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1441

1     (1) REPORTING REQUIREMENT FOR HBCU CAP-
2     ITAL    FINANCING    LOAN    DEFERMENT.—Section
3     3512(c) of the CARES Act (Public Law 116–136)
4     is amended by striking the period at the end and in-
5     serting ", the terms of the loans deferred, and the
6     schedule   for   repayment   of   the   deferred   loan
7     amount."

8     (2) REPORTING REQUIREMENT FOR INSTITU-
9     TIONAL   AID   MODIFICATIONS.—Section   3517(c)   of
10    the CARES Act (Public Law 116–136) is amended
11    by striking the period at the end and inserting ",
12    identifies the statutory provision waived or modified,
13    and describes the terms of the waiver or modifica-
14    tion received by the institution."

15    (3) REPORTING REQUIREMENT FOR GRANT
16    MODIFICATIONS.—Section   3518(c)   of   the   CARES
17    Act (Public Law 116–136) is amended by striking
18    the period at the end and inserting "and describes
19    the terms of the modification received by the institu-
20    tion or other grant recipient."

21    (f) DEFINITIONS.—In this section:

22    (1) The term "covered entity" means an insti-
23    tution of higher education, a Federal contractor, a
24    student, or any other entity that is subject to the

g:\VHLC\051220\051220.072.xml      (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003746

1442

1　Higher Education Act of 1965 (20 U.S.C. 1001 et

2　seq.).

3　(2) The term "Federal student loan" means a

4　loan described in section 3502(a)(2) of the CARES

5　Act (Public Law 116–136), as amended by this Act.

6　TITLE II—OTHER PROGRAMS

7　Subtitle A—Carl D. Perkins Career and Technical Edu-

8　cation Act of 2006 and Adult Education and Lit-

9　eracy COVID–19 National Emergency Response

10　DEFINITIONS

11　SEC. 150201.

12　In this subtitle:

13　(1) APPRENTICESHIP; APPRENTICESHIP PRO-

14　GRAM.—The terms "apprenticeship" and "appren-

15　ticeship program" mean an apprenticeship program

16　registered under the Act of August 16, 1937 (com-

17　monly known as the "National Apprenticeship Act")

18　(50 Stat. 664, chapter 663; 29 U.S.C. 50 et seq.),

19　including any requirement, standard, or rule promul-

20　gated under such Act, as such requirement, stand-

21　ard, or rule was in effect on December 30, 2019.

22　(2) CORONAVIRUS.—The term "coronavirus"

23　means coronavirus as defined in section 506 of the

24　Coronavirus Preparedness and Response Supple-

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003747

1443

1  mental Appropriations Act, 2020 (Public Law 116–

2  123).

3  (3) COVID–19 NATIONAL EMERGENCY.—The

4  term "COVID–19 national emergency" means the

5  national emergency declared by the President under

6  the National Emergencies Act (50 U.S.C. 1601 et

7  seq.) on March 13, 2020, with respect to the

8  coronavirus.

9  (4) SECRETARY.—The term "Secretary" means

10  the Secretary of Education.

11  COVID–19 CAREER AND TECHNICAL EDUCATION

12  RESPONSE FLEXIBILITY

13  SEC. 150202.

14  (a) RETENTION OF FUNDS.—Notwithstanding sec-

15  tion 133(b)(1) of the Carl D. Perkins Career and Tech-

16  nical Education Act of 2006 (29 U.S.C. 2353(b)(1)), with

17  respect to an eligible recipient that, due to the COVID–

18  19 national emergency, does not expend all of the amounts

19  that the eligible recipient is allocated for academic year

20  2019–2020 under section 131 or 132 of the Carl D. Per-

21  kins Career and Technical Education Act of 2006 (20

22  U.S.C. 2351; 2352), the eligible agency that allocated

23  such funds to the eligible recipient—

24  (1) may authorize the eligible recipient to retain

25  such amounts to carry out, during academic year

26  2020–2021, any activities described in the applica-

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003748

1444

1    tion of eligible recipient submitted under section

2    134(b) of such Act (29 U.S.C. 2354(b)) that such

3    eligible recipient had intended to carry out during

4    academic year 2019–2020; and

5        (2) shall ensure that a retention of amounts by

6    an eligible recipient under paragraph (1) has no im-

7    pact on the allocation of amounts to such eligible re-

8    cipient under section 131 or 132 of the Carl D. Per-

9    kins Career and Technical Education Act of 2006

10   (20 U.S.C. 2351; 2352) for academic year 2020–

11   2021.

12   (b) POOLING OF FUNDS.—An eligible recipient may,

13   in accordance with section 135(c) of the Carl D. Perkins

14   Career and Technical Education Act of 2006 (20 U.S.C.

15   2355(c)), pool a portion of funds received under such Act

16   with a portion of funds received under such Act available

17   to one or more eligible recipients to support the transition

18   from secondary education to postsecondary education or

19   employment for CTE participants whose academic year

20   was interrupted by the COVID–19 national emergency.

21   (c) PROFESSIONAL DEVELOPMENT.—During the

22   COVID–19 national emergency, section 3(40)(B) of the

23   Carl D. Perkins Career and Technical Education Act of

24   2006 (20 U.S.C. 2302(40)(B)) shall apply as if "sustained

25   (not stand-alone, 1-day, or short-term workshops), inten-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003749

1445

1 sive, collaborative, job-embedded, data-driven, and class-

2 room-focused,'' were struck.

3    (d) DEFINITIONS.—Except as otherwise provided, the

4 terms in this section have the meanings given the terms

5 in section 3 of the Carl D. Perkins Career and Technical

6 Education Act of 2006 (20 U.S.C. 2302).

7 ADULT EDUCATION AND LITERACY RESPONSE ACTIVITIES

8    SEC. 150203.

9    (a) ONLINE SERVICE DELIVERY OF ADULT EDU-

10 CATION AND LITERACY ACTIVITIES.—During the

11 COVID–19 national emergency, an eligible agency may

12 use funds available to such agency under paragraphs (2)

13 and (3) of section 222(a) of the Workforce Innovation and

14 Opportunity Act (20 U.S.C. 3302(a)) for the administra-

15 tive expenses of the eligible agency related to transitions

16 to online service delivery of adult education and literacy

17 activities.

18    (b) SECRETARIAL RESPONSIBILITIES.—Not later

19 than 30 days after the date of enactment of this Act, the

20 Secretary shall, in carrying out section 242(c)(2)(G) of the

21 Workforce Innovation and Opportunity Act (29 U.S.C.

22 3332(c)(2)(G)), identify and disseminate to States strate-

23 gies and virtual proctoring tools to—

24      (1) assess the progress of learners in adult edu-

25      cation programs based upon valid research, as ap-

26      propriate, and;

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003750

1446

1   (2) measure the progress of such programs in

2   meeting the State adjusted levels of performance de-

3   scribed in section 116(b)(3) of the Workforce Inno-

4   vation and Opportunity Act (29 U.S.C. 3141(b)(3)).

5   (c) DEFINITIONS.—Except as otherwise provided, the

6 terms in this section have the meanings given the terms

7 in section 203 of the Workforce Innovation and Oppor-

8 tunity Act (29 U.S.C. 3272).

9   GENERAL PROVISIONS

10   SEC. 150204.

11   Notwithstanding any other provision of law, if deter-

12 mined necessary and appropriate due to the COVID–19

13 national emergency by the Secretary, the Secretary may

14 waive, for a period not to exceed academic year 2019–

15 2020—

16   (1) upon the request of a State or Indian Tribe

17   receiving funds under title I of the Carl D. Perkins

18   Career and Technical Education Act of 2006 (20

19   U.S.C. 2321 et seq.), the requirements under section

20   421(b) of the General Education Provisions Act (20

21   U.S.C. 1225(b)) for the State or Indian Tribe with

22   respect to such funds; and

23   (2) upon the request of an eligible agency re-

24   ceiving funds under the Adult Education and Family

25   Literacy Act (29 U.S.C. 3271 et seq.), the require-

26   ments under section 421(b) of the General Edu-

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003751

1447

1  cation Provisions Act (20 U.S.C. 1225(b)) for that

2  eligible agency with respect to such funds.

3  Subtitle B—Corporation for National and Community

4  Service COVID–19 Response Activities

5  CORPORATION FOR NATIONAL AND COMMUNITY SERVICE

6  PROVISIONS

7  SEC. 150205.

8  Section 3514(a)(2)(B) of the CARES Act is amended

9  by inserting ", or the full value of the stipend under sec-

10  tion 105(a) of title I of the Domestic Volunteer Service

11  Act of 1973 (42 U.S.C. 4955), as amended," after "such

12  subtitle".

13  NATIONAL SERVICE EXPANSION FEASIBILITY STUDY

14  SEC. 150206.

15  (a) STUDY REQUIRED.—The Corporation for Na-

16  tional and Community Service shall conduct a study on

17  the feasibility of increasing the capacity of national service

18  programs across the country to respond to the COVID–

19  19 national emergency, the corresponding public health

20  crisis, and the economic and social impact to communities

21  across the country.

22  (b) SCOPE OF STUDY.—The Corporation for National

23  and Community Service shall examine new and existing

24  programs, partnerships, organizations and grantees that

25  could be utilized to respond to the COVID–19 national

26  emergency as described in subsection (a), including—

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003752

1448

1    (1) service opportunities related to food secu-
2    rity, education, economic opportunity, and disaster
3    or emergency response;

4    (2) partnerships with the Department of Health
5    and Human Services, the Centers for Disease Con-
6    trol and Prevention, and public health departments
7    in all 50 states and territories to respond to public
8    health needs related to COVID–19 such as testing,
9    contact tracing, or related activities; and

10   (3) the capacity and ability of the State Com-
11   missions on National and Community Service to re-
12   spond to the needs of state and local governments in
13   each state or territory in which such State Commis-
14   sion is in operation.

15   (c) REQUIRED ASPECTS OF THE STUDY.—In per-
16   forming the study described in this section, the Corpora-
17   tion for National and Community Service shall examine
18   the following aspects for each of the new or existing pro-
19   grams, partnerships, organizations and grantees as de-
20   scribed in subsection (b), including—

21   (1) the cost and resources necessary related to
22   expansion as described in paragraphs (1), (2) and
23   (3) of subsection (b);

24   (2) the timeline for implementation of any ex-
25   panded partnerships or expanded capacity as de-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003753

1449

1    scribed in paragraphs (1), (2) and (3) of subsection

2    (b);

3        (3) options to use existing corps programs over-

4    seen by the Corporation for National and Commu-

5    nity Service for expanding such capacity, and the

6    role of programs, such as AmeriCorps, AmeriCorps

7    VISTA, AmeriCorps National Civilian Community

8    Corps, or Senior Corps, for expanding capacity as

9    described in paragraphs (1), (2) and (3) of sub-

10    section (b);

11        (4) the ability to increase diversity, including

12    economic, racial, ethnic, and gender diversity,

13    amongst national service volunteers and programs as

14    part of any expansion activities;

15        (5) the geographic distribution of demand by

16    state due to the economic or health related impacts

17    of COVID–19 for national service volunteer opportu-

18    nities across the country and the additional volun-

19    teer capacity needed to meet this demand, com-

20    paring existing demand for volunteer opportunities

21    to expected or realized increases as a result of

22    COVID–19; and

23        (6) whether any additional administrative ca-

24    pacity is needed to respond to increases in demand

25    as described in paragraph (5), including through

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003754

1450

1  grantee organizational capacity or at the Corpora-
2  tion for National and Community Service.

3  (d) REPORTS TO CONGRESSIONAL COMMITTEES.—
4  Not later than 30 days after the date of enactment of this
5  Act, the Chief Executive Officer of the Corporation for
6  National and Community Service shall prepare and submit
7  a report to the Committee on Education and Labor and
8  the Committee on Appropriations of the House of Rep-
9  resentatives, and the Committee on Health, Education,
10  Labor, and Pensions and the Committee on Appropria-
11  tions of the Senate, with recommendations on the role for
12  the Corporation for National and Community Service in
13  responding to the COVID–19 national emergency, includ-
14  ing any recommendations for legislative, regulatory, and
15  administrative changes based on findings related to the
16  topics identified under subsection (b).

17                           DEFINITIONS

18  SEC. 150207.

19  In this subtitle, the following definitions apply:

20  (1) DVSA TERMS.—The terms ''Director'' and
21  ''poverty line for a single individual'' have the mean-
22  ing given such terms in section 421 of the Domestic
23  Volunteer Service Act of 1973 (42 U.S.C. 5061).

24  (2) COVID–19 NATIONAL EMERGENCY.—The
25  term ''COVID–19 national emergency'' means the
26  national emergency declared by the President under

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003755

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1451

1    the National Emergencies Act (50 U.S.C. 1601 et

2    seq.) on March 13, 2020, with respect to COVID–

3    19.

4        (3) GRANTEE.—The term ''grantee'' means a

5    recipient of a grant under the Domestic Volunteer

6    Service Act of 1973 (42 U.S.C. 4950 et seq.) or the

7    National and Community Service Act of 1990 (42

8    U.S.C. 12501 et seq.) to run a program.

9        (4) PROGRAM.—The term ''program'' means a

10   program funded under the Domestic Volunteer Serv-

11   ice Act of 1973 (42 U.S.C. 4950 et seq.) or the Na-

12   tional and Community Service Act of 1990 (42

13   U.S.C. 12501 et seq.).

14       (5) STATE COMMISSION ON NATIONAL AND

15   COMMUNITY SERVICE.—The term ''State Commis-

16   sion on National and Community Service'' has the

17   meaning given such term in section 101 of the Na-

18   tional and Community Service Act (42 U.S.C.

19   12511).

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003756

1452

# DIVISION P—ACCESS ACT

**SEC. 160001. SHORT TITLE; TABLE OF CONTENTS.**

This Act may be cited as the "American Coronavirus/
COVID–19 Election Safety and Security Act" or the "AC-
CESS Act".

**SEC. 160002. REQUIREMENTS FOR FEDERAL ELECTION
CONTINGENCY PLANS IN RESPONSE TO NAT-
URAL DISASTERS AND EMERGENCIES.**

(a) IN GENERAL.—

(1) ESTABLISHMENT.—Not later than 30 days
after the date of the enactment of this Act, each
State and each jurisdiction in a State which is re-
sponsible for administering elections for Federal of-
fice shall establish and make publicly available a
contingency plan to enable individuals to vote in
elections for Federal office during a state of emer-
gency, public health emergency, or national emer-
gency which has been declared for reasons includ-
ing—

(A) a natural disaster; or

(B) an infectious disease.

(2) UPDATING.—Each State and jurisdiction
shall update the contingency plan established under
this subsection not less frequently than every 5
years.

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003757

1453

1    (b) REQUIREMENTS RELATING TO SAFETY.—The
2  contingency plan established under subsection (a) shall in-
3  clude initiatives to provide equipment and resources need-
4  ed to protect the health and safety of poll workers and
5  voters when voting in person.

6    (c) REQUIREMENTS RELATING TO RECRUITMENT OF
7  POLL WORKERS.—The contingency plan established
8  under subsection (a) shall include initiatives by the chief
9  State election official and local election officials to recruit
10  poll workers from resilient or unaffected populations,
11  which may include—

12        (1) employees of other State and local govern-
13    ment offices; and

14        (2) in the case in which an infectious disease
15    poses significant increased health risks to elderly in-
16    dividuals, students of secondary schools and institu-
17    tions of higher education in the State.

18    (d) ENFORCEMENT.—

19        (1) ATTORNEY GENERAL.—The Attorney Gen-
20    eral may bring a civil action against any State or ju-
21    risdiction in an appropriate United States District
22    Court for such declaratory and injunctive relief (in-
23    cluding a temporary restraining order, a permanent
24    or temporary injunction, or other order) as may be

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003758

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1454

1    necessary to carry out the requirements of this sec-

2    tion.

3    (2) PRIVATE RIGHT OF ACTION.—

4    (A) IN GENERAL.—In the case of a viola-

5    tion of this section, any person who is aggrieved

6    by such violation may provide written notice of

7    the violation to the chief election official of the

8    State involved.

9    (B) RELIEF.—If the violation is not cor-

10    rected within 20 days after receipt of a notice

11    under subparagraph (A), or within 5 days after

12    receipt of the notice if the violation occurred

13    within 120 days before the date of an election

14    for Federal office, the aggrieved person may, in

15    a civil action, obtain declaratory or injunctive

16    relief with respect to the violation.

17    (C) SPECIAL RULE.—If the violation oc-

18    curred within 5 days before the date of an elec-

19    tion for Federal office, the aggrieved person

20    need not provide notice to the chief election of-

21    ficial of the State involved under subparagraph

22    (A) before bringing a civil action under sub-

23    paragraph (B).

24    (e) DEFINITIONS.—

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003759

1455

(1) Election for federal office.—For purposes of this section, the term "election for Federal office" means a general, special, primary, or runoff election for the office of President or Vice President, or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress.

(2) State.—For purposes of this section, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, and the Commonwealth of the Northern Mariana Islands.

(f) Effective Date.—This section shall apply with respect to the regularly scheduled general election for Federal office held in November 2020 and each succeeding election for Federal office.

**SEC. 160003. EARLY VOTING AND VOTING BY MAIL.**

(a) Requirements.—Title III of the Help America Vote Act of 2002 (52 U.S.C. 21081 et seq.) is amended by adding at the end the following new subtitle:

# "Subtitle C—Other Requirements

**"SEC. 321. EARLY VOTING.**

"(a) Requiring Allowing Voting Prior to Date of Election.—

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003760

1456

1       "(1) IN GENERAL.—Each State shall allow indi-

2    viduals to vote in an election for Federal office dur-

3    ing an early voting period which occurs prior to the

4    date of the election, in the same manner as voting

5    is allowed on such date.

6       "(2) LENGTH OF PERIOD.—The early voting

7    period required under this subsection with respect to

8    an election shall consist of a period of consecutive

9    days (including weekends) which begins on the 15th

10    day before the date of the election (or, at the option

11    of the State, on a day prior to the 15th day before

12    the date of the election) and ends on the date of the

13    election.

14    "(b) MINIMUM EARLY VOTING REQUIREMENTS.—

15  Each polling place which allows voting during an early vot-

16  ing period under subsection (a) shall—

17       "(1) allow such voting for no less than 10 hours

18    on each day;

19       "(2) have uniform hours each day for which

20    such voting occurs; and

21       "(3) allow such voting to be held for some pe-

22    riod of time prior to 9:00 a.m (local time) and some

23    period of time after 5:00 p.m. (local time).

24    "(c) LOCATION OF POLLING PLACES.—

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003761

1457

1     "(1) PROXIMITY TO PUBLIC TRANSPOR-
2     TATION.—To the greatest extent practicable, a State
3     shall ensure that each polling place which allows vot-
4     ing during an early voting period under subsection
5     (a) is located within walking distance of a stop on
6     a public transportation route.

7     "(2) AVAILABILITY IN RURAL AREAS.—The
8     State shall ensure that polling places which allow
9     voting during an early voting period under sub-
10    section (a) will be located in rural areas of the State,
11    and shall ensure that such polling places are located
12    in communities which will provide the greatest op-
13    portunity for residents of rural areas to vote during
14    the early voting period.

15    "(d) STANDARDS.—

16    "(1) IN GENERAL.—The Commission shall issue
17    standards for the administration of voting prior to
18    the day scheduled for a Federal election. Such
19    standards shall include the nondiscriminatory geo-
20    graphic placement of polling places at which such
21    voting occurs.

22    "(2) DEVIATION.—The standards described in
23    paragraph (1) shall permit States, upon providing
24    adequate public notice, to deviate from any require-
25    ment in the case of unforeseen circumstances such

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003762

1458

1    as a natural disaster, terrorist attack, or a change

2    in voter turnout.

3    "(e) BALLOT PROCESSING AND SCANNING REQUIRE-

4    MENTS.—

5        "(1) IN GENERAL.—The State shall begin proc-

6        essing and scanning ballots cast during early voting

7        for tabulation at least 14 days prior to the date of

8        the election involved.

9        "(2) LIMITATION.—Nothing in this subsection

10       shall be construed to permit a State to tabulate bal-

11       lots in an election before the closing of the polls on

12       the date of the election.

13   "(f) EFFECTIVE DATE.—This section shall apply

14   with respect to the regularly scheduled general election for

15   Federal office held in November 2020 and each succeeding

16   election for Federal office.

17   **"SEC. 322. PROMOTING ABILITY OF VOTERS TO VOTE BY**

18               **MAIL.**

19   "(a) UNIFORM AVAILABILITY OF ABSENTEE VOTING

20   TO ALL VOTERS.—

21       "(1) IN GENERAL.—If an individual in a State

22       is eligible to cast a vote in an election for Federal

23       office, the State may not impose any additional con-

24       ditions or requirements on the eligibility of the indi-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003763

1459

1 vidual to cast the vote in such election by absentee

2 ballot by mail.

3     "(2) ADMINISTRATION OF VOTING BY MAIL.—

4         "(A) PROHIBITING IDENTIFICATION RE-

5         QUIREMENT AS CONDITION OF OBTAINING BAL-

6         LOT.—A State may not require an individual to

7         provide any form of identification as a condition

8         of obtaining an absentee ballot, except that

9         nothing in this paragraph may be construed to

10         prevent a State from requiring a signature of

11         the individual or similar affirmation as a condi-

12         tion of obtaining an absentee ballot.

13         "(B) PROHIBITING REQUIREMENT TO PRO-

14         VIDE NOTARIZATION OR WITNESS SIGNATURE

15         AS CONDITION OF OBTAINING OR CASTING BAL-

16         LOT.—A State may not require notarization or

17         witness signature or other formal authentica-

18         tion (other than voter attestation) as a condi-

19         tion of obtaining or casting an absentee ballot.

20         "(C) DEADLINE FOR RETURNING BAL-

21         LOT.—A State may impose a deadline for re-

22         questing the absentee ballot and related voting

23         materials from the appropriate State or local

24         election official and for returning the ballot to

25         the appropriate State or local election official.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003764

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1460

1     "(3) APPLICATION FOR ALL FUTURE ELEC-
2 TIONS.—At the option of an individual, a State shall
3 treat the individual's application to vote by absentee
4 ballot by mail in an election for Federal office as an
5 application to vote by absentee ballot by mail in all
6 subsequent Federal elections held in the State.

7 "(b) DUE PROCESS REQUIREMENTS FOR STATES
8 REQUIRING SIGNATURE VERIFICATION.—

9     "(1) REQUIREMENT.—

10         "(A) IN GENERAL.—A State may not im-
11 pose a signature verification requirement as a
12 condition of accepting and counting an absentee
13 ballot submitted by any individual with respect
14 to an election for Federal office unless the
15 State meets the due process requirements de-
16 scribed in paragraph (2).

17         "(B) SIGNATURE VERIFICATION REQUIRE-
18 MENT DESCRIBED.—In this subsection, a 'sig-
19 nature verification requirement' is a require-
20 ment that an election official verify the identi-
21 fication of an individual by comparing the indi-
22 vidual's signature on the absentee ballot with
23 the individual's signature on the official list of
24 registered voters in the State or another official

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003765

1461

1 record or other document used by the State to

2 verify the signatures of voters.

3 "(2) DUE PROCESS REQUIREMENTS.—

4 "(A) NOTICE AND OPPORTUNITY TO CURE

5 DISCREPANCY.—If an individual submits an ab-

6 sentee ballot and the appropriate State or local

7 election official determines that a discrepancy

8 exists between the signature on such ballot and

9 the signature of such individual on the official

10 list of registered voters in the State or other of-

11 ficial record or document used by the State to

12 verify the signatures of voters, such election of-

13 ficial, prior to making a final determination as

14 to the validity of such ballot, shall—

15 "(i) make a good faith effort to imme-

16 diately notify the individual by mail, tele-

17 phone, and (if available) electronic mail

18 that—

19 "(I) a discrepancy exists between

20 the signature on such ballot and the

21 signature of the individual on the offi-

22 cial list of registered voters in the

23 State, and

24 "(II) if such discrepancy is not

25 cured prior to the expiration of the

DOC_0003766

1462

1     10-day period which begins on the

2     date the official notifies the individual

3     of the discrepancy, such ballot will not

4     be counted; and

5       "(ii) cure such discrepancy and count

6     the ballot if, prior to the expiration of the

7     10-day period described in clause (i)(II),

8     the individual provides the official with in-

9     formation to cure such discrepancy, either

10     in person, by telephone, or by electronic

11     methods.

12    "(B) NOTICE AND OPPORTUNITY TO PRO-

13  VIDE MISSING SIGNATURE.—If an individual

14  submits an absentee ballot without a signature,

15  the appropriate State or local election official,

16  prior to making a final determination as to the

17  validity of the ballot, shall—

18     "(i) make a good faith effort to imme-

19     diately notify the individual by mail, tele-

20     phone, and (if available) electronic mail

21     that—

22       "(I) the ballot did not include a

23     signature, and

24       "(II) if the individual does not

25     provide the missing signature prior to

1463

1           the expiration of the 10-day period

2           which begins on the date the official

3           notifies the individual that the ballot

4           did not include a signature, such bal-

5           lot will not be counted; and

6           ''(ii) count the ballot if, prior to the

7           expiration of the 10-day period described

8           in clause (i)(II), the individual provides the

9           official with the missing signature on a

10          form proscribed by the State.

11       ''(C) OTHER REQUIREMENTS.—An election

12 official may not make a determination that a

13 discrepancy exists between the signature on an

14 absentee ballot and the signature of the indi-

15 vidual who submits the ballot on the official list

16 of registered voters in the State or other official

17 record or other document used by the State to

18 verify the signatures of voters unless—

19           ''(i) at least 2 election officials make

20           the determination; and

21           ''(ii) each official who makes the de-

22           termination has received training in proce-

23           dures used to verify signatures.

24   ''(3) REPORT.—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003768

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1464

1    "(A) IN GENERAL.—Not later than 120
2    days after the end of a Federal election cycle,
3    each chief State election official shall submit to
4    Congress a report containing the following in-
5    formation for the applicable Federal election
6    cycle in the State:

7        "(i) The number of ballots invalidated
8        due to a discrepancy under this subsection.

9        "(ii) Description of attempts to con-
10       tact voters to provide notice as required by
11       this subsection.

12       "(iii) Description of the cure process
13       developed by such State pursuant to this
14       subsection, including the number of ballots
15       determined valid as a result of such proc-
16       ess.

17       "(B) FEDERAL ELECTION CYCLE DE-
18       FINED.—For purposes of this subsection, the
19       term 'Federal election cycle' means the period
20       beginning on January 1 of any odd numbered
21       year and ending on December 31 of the fol-
22       lowing year.

23   "(c) METHODS AND TIMING FOR TRANSMISSION OF
24   BALLOTS AND BALLOTING MATERIALS TO VOTERS.—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003769

1465

1       "(1) METHOD FOR REQUESTING BALLOT.—In

2 addition to such other methods as the State may es-

3 tablish for an individual to request an absentee bal-

4 lot, the State shall permit an individual to submit a

5 request for an absentee ballot online. The State shall

6 be considered to meet the requirements of this para-

7 graph if the website of the appropriate State or local

8 election official allows an absentee ballot request ap-

9 plication to be completed and submitted online and

10 if the website permits the individual—

11       "(A) to print the application so that the

12 individual may complete the application and re-

13 turn it to the official; or

14       "(B) request that a paper copy of the ap-

15 plication be transmitted to the individual by

16 mail or electronic mail so that the individual

17 may complete the application and return it to

18 the official.

19       "(2) ENSURING DELIVERY PRIOR TO ELEC-

20 TION.—If an individual requests to vote by absentee

21 ballot in an election for Federal office, the appro-

22 priate State or local election official shall ensure

23 that the ballot and relating voting materials are re-

24 ceived by the individual prior to the date of the elec-

25 tion so long as the individual's request is received by

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003770

1466

1   the official not later than 5 days (excluding Satur-
2   days, Sundays, and legal public holidays) before the
3   date of the election, except that nothing in this para-
4   graph shall preclude a State or local jurisdiction
5   from allowing for the acceptance and processing of
6   ballot requests submitted or received after such re-
7   quired period.
8       ''(3) SPECIAL RULES IN CASE OF EMERGENCY
9   PERIODS.—
10          ''(A) AUTOMATIC MAILING OF ABSENTEE
11      BALLOTS TO ALL VOTERS.—If the area in which
12      an election is held is in an area in which an
13      emergency or disaster which is described in sub-
14      paragraph (A) or (B) of section 1135(g)(1) of
15      the Social Security Act (42 U.S.C. 1320b-
16      5(g)(1)) is declared during the period described
17      in subparagraph (C)—
18              ''(i) paragraphs (1) and (2) shall not
19          apply with respect to the election; and
20              ''(ii) not later than 2 weeks before the
21          date of the election, the appropriate State
22          or local election official shall transmit by
23          mail absentee ballots and balloting mate-
24          rials for the election to all individuals who
25          are registered to vote in such election or,

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003771

1467

1   in the case of any State that does not reg-

2   ister voters, all individuals who are in the

3   State's central voter file (or if the State

4   does not keep a central voter file, to all in-

5   dividuals who are eligible to vote in such

6   election).

7   ''(B) AFFIRMATION.—If an individual re-

8   ceives an absentee ballot from a State or local

9   election official pursuant to subparagraph (A)

10   and returns the voted ballot to the official, the

11   ballot shall not be counted in the election unless

12   the individual includes with the ballot a signed

13   affirmation that—

14   ''(i) the individual has not and will

15   not cast another ballot with respect to the

16   election; and

17   ''(ii) acknowledges that a material

18   misstatement of fact in completing the bal-

19   lot may constitute grounds for conviction

20   of perjury.

21   ''(C) PERIOD DESCRIBED.—The period de-

22   scribed in this subparagraph with respect to an

23   election is the period which begins 120 days be-

24   fore the date of the election and ends 30 days

25   before the date of the election.

1468

1        "(D) APPLICATION TO NOVEMBER 2020

2    GENERAL ELECTION.—Because of the public

3    health emergency declared pursuant to section

4    319 of the Public Health Service Act (42

5    U.S.C. 247d) resulting from the COVID–19

6    pandemic, the special rules set forth in this

7    paragraph shall apply with respect to the regu-

8    larly scheduled general election for Federal of-

9    fice held in November 2020 in each State.

10    "(d) ACCESSIBILITY FOR INDIVIDUALS WITH DIS-

11  ABILITIES.—The State shall ensure that all absentee bal-

12  lots and related voting materials in elections for Federal

13  office are accessible to individuals with disabilities in a

14  manner that provides the same opportunity for access and

15  participation (including with privacy and independence) as

16  for other voters.

17    "(e) UNIFORM DEADLINE FOR ACCEPTANCE OF

18  MAILED BALLOTS.—A State may not refuse to accept or

19  process a ballot submitted by an individual by mail with

20  respect to an election for Federal office in the State on

21  the grounds that the individual did not meet a deadline

22  for returning the ballot to the appropriate State or local

23  election official if—

24        "(1) the ballot is postmarked, signed, or other-

25    wise indicated by the United States Postal Service to

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003773

1469

1 have been mailed on or before the date of the elec-
2 tion; and

3 ''(2) the ballot is received by the appropriate
4 election official prior to the expiration of the 10-day
5 period which begins on the date of the election.

6 ''(f) ALTERNATIVE METHODS OF RETURNING BAL-
7 LOTS.—

8 ''(1) IN GENERAL.—In addition to permitting
9 an individual to whom a ballot in an election was
10 provided under this section to return the ballot to an
11 election official by mail, the State shall permit the
12 individual to cast the ballot by delivering the ballot
13 at such times and to such locations as the State may
14 establish, including—

15 ''(A) permitting the individual to deliver
16 the ballot to a polling place on any date on
17 which voting in the election is held at the poll-
18 ing place; and

19 ''(B) permitting the individual to deliver
20 the ballot to a designated ballot drop-off loca-
21 tion.

22 ''(2) PERMITTING VOTERS TO DESIGNATE
23 OTHER PERSON TO RETURN BALLOT.—The State—

24 ''(A) shall permit a voter to designate any
25 person to return a voted and sealed absentee

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003774

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1470

1    ballot to the post office, a ballot drop-off loca-
2    tion, tribally designated building, or election of-
3    fice so long as the person designated to return
4    the ballot does not receive any form of com-
5    pensation based on the number of ballots that
6    the person has returned and no individual,
7    group, or organization provides compensation
8    on this basis; and

9        ''(B) may not put any limit on how many
10    voted and sealed absentee ballots any des-
11    ignated person can return to the post office, a
12    ballot drop off location, tribally designated
13    building, or election office.

14    ''(g) BALLOT PROCESSING AND SCANNING REQUIRE-
15    MENTS.—

16        ''(1) IN GENERAL.—The State shall begin proc-
17    essing and scanning ballots cast by mail for tabula-
18    tion at least 14 days prior to the date of the election
19    involved.

20        ''(2) LIMITATION.—Nothing in this subsection
21    shall be construed to permit a State to tabulate bal-
22    lots in an election before the closing of the polls on
23    the date of the election.

24    ''(h) RULE OF CONSTRUCTION.—Nothing in this sec-
25    tion shall be construed to affect the authority of States

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003775

1471

1 to conduct elections for Federal office through the use of

2 polling places at which individuals cast ballots.

3 "(i) NO EFFECT ON BALLOTS SUBMITTED BY AB-

4 SENT MILITARY AND OVERSEAS VOTERS.—Nothing in

5 this section may be construed to affect the treatment of

6 any ballot submitted by an individual who is entitled to

7 vote by absentee ballot under the Uniformed and Overseas

8 Citizens Absentee Voting Act (52 U.S.C. 20301 et seq.).

9 "(j) EFFECTIVE DATE.—This section shall apply

10 with respect to the regularly scheduled general election for

11 Federal office held in November 2020 and each succeeding

12 election for Federal office.

**13 "SEC. 323. ABSENTEE BALLOT TRACKING PROGRAM.**

14 "(a) REQUIREMENT.—Each State shall carry out a

15 program to track and confirm the receipt of absentee bal-

16 lots in an election for Federal office under which the State

17 or local election official responsible for the receipt of voted

18 absentee ballots in the election carries out procedures to

19 track and confirm the receipt of such ballots, and makes

20 information on the receipt of such ballots available to the

21 individual who cast the ballot, by means of online access

22 using the Internet site of the official's office.

23 "(b) INFORMATION ON WHETHER VOTE WAS

24 COUNTED.—The information referred to under subsection

25 (a) with respect to the receipt of an absentee ballot shall

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003776

1472

1 include information regarding whether the vote cast on the

2 ballot was counted, and, in the case of a vote which was

3 not counted, the reasons therefor.

4     "(c) USE OF TOLL-FREE TELEPHONE NUMBER BY

5 OFFICIALS WITHOUT INTERNET SITE.—A program estab-

6 lished by a State or local election official whose office does

7 not have an Internet site may meet the requirements of

8 subsection (a) if the official has established a toll-free tele-

9 phone number that may be used by an individual who cast

10 an absentee ballot to obtain the information on the receipt

11 of the voted absentee ballot as provided under such sub-

12 section.

13     "(d) EFFECTIVE DATE.—This section shall apply

14 with respect to the regularly scheduled general election for

15 Federal office held in November 2020 and each succeeding

16 election for Federal office.

17 **"SEC. 324. RULES FOR COUNTING PROVISIONAL BALLOTS.**

18     "(a) STATEWIDE COUNTING OF PROVISIONAL BAL-

19 LOTS.—

20         "(1) IN GENERAL.—For purposes of section

21         302(a)(4), notwithstanding the precinct or polling

22         place at which a provisional ballot is cast within the

23         State, the appropriate election official shall count

24         each vote on such ballot for each election in which

25         the individual who cast such ballot is eligible to vote.

DOC_0003777

1473

1      "(2) EFFECTIVE DATE.—This subsection shall

2    apply with respect to the regularly scheduled general

3    election for Federal office held in November 2020

4    and each succeeding election for Federal office.

5      "(b) UNIFORM AND NONDISCRIMINATORY STAND-

6  ARDS.—

7      "(1) IN GENERAL.—Consistent with the re-

8    quirements of section 302, each State shall establish

9    uniform and nondiscriminatory standards for the

10    issuance, handling, and counting of provisional bal-

11    lots.

12      "(2) EFFECTIVE DATE.—This subsection shall

13    apply with respect to the regularly scheduled general

14    election for Federal office held in November 2020

15    and each succeeding election for Federal office.

16  **"SEC. 325. COVERAGE OF COMMONWEALTH OF NORTHERN**

17          **MARIANA ISLANDS.**

18      "In this subtitle, the term 'State' includes the Com-

19  monwealth of the Northern Mariana Islands.

20  **"SEC. 326. MINIMUM REQUIREMENTS FOR EXPANDING**

21          **ABILITY OF INDIVIDUALS TO VOTE.**

22      "The requirements of this subtitle are minimum re-

23  quirements, and nothing in this subtitle may be construed

24  to prevent a State from establishing standards which pro-

25  mote the ability of individuals to vote in elections for Fed-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003778

1474

1 eral office, so long as such standards are not inconsistent
2 with the requirements of this subtitle or other Federal
3 laws.".

4    (b) CONFORMING AMENDMENT RELATING TO
5 ISSUANCE OF VOLUNTARY GUIDANCE BY ELECTION AS-
6 SISTANCE COMMISSION.—Section 311(b) of such Act (52
7 U.S.C. 21101(b)) is amended—

8        (1) by striking "and" at the end of paragraph
9    (2);

10       (2) by striking the period at the end of para-
11    graph (3) and inserting "; and"; and

12       (3) by adding at the end the following new
13    paragraph:

14        "(4) in the case of the recommendations with
15    respect to subtitle C, June 30, 2020.".

16 (c) ENFORCEMENT.—

17       (1) COVERAGE UNDER EXISTING ENFORCE-
18    MENT PROVISIONS.—Section 401 of such Act (52
19    U.S.C. 21111) is amended by striking "and 303"
20    and inserting "303, and subtitle C of title III".

21       (2) AVAILABILITY OF PRIVATE RIGHT OF AC-
22    TION.—Title IV of such (52 U.S.C. 21111 et seq.)
23    is amended by adding at the end the following new
24    section:

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003779

1475

1 **"SEC. 403. PRIVATE RIGHT OF ACTION FOR VIOLATIONS OF**
2 **CERTAIN REQUIREMENTS.**

3 "(a) IN GENERAL.—In the case of a violation of sub-
4 title C of title III, section 402 shall not apply and any
5 person who is aggrieved by such violation may provide
6 written notice of the violation to the chief election official
7 of the State involved.

8 "(b) RELIEF.—If the violation is not corrected within
9 20 days after receipt of a notice under subsection (a), or
10 within 5 days after receipt of the notice if the violation
11 occurred within 120 days before the date of an election
12 for Federal office, the aggrieved person may, in a civil ac-
13 tion, obtain declaratory or injunctive relief with respect
14 to the violation.

15 "(c) SPECIAL RULE.—If the violation occurred within
16 5 days before the date of an election for Federal office,
17 the aggrieved person need not provide notice to the chief
18 election official of the State involved under subsection (a)
19 before bringing a civil action under subsection (b).".

20 (d) CLERICAL AMENDMENT.—The table of contents
21 of such Act is amended—

22 (1) by adding at the end of the items relating
23 to title III the following:

"Subtitle C—Other Requirements

"Sec. 321. Early voting.
"Sec. 322. Promoting ability of voters to vote by mail.
"Sec. 323. Absentee ballot tracking program.
"Sec. 324. Rules for counting provisional ballots.

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003780

"Sec. 325. Coverage of Commonwealth of Northern Mariana Islands.
"Sec. 326. Minimum requirements for expanding ability of individuals to vote.";
and

(2) by adding at the end of the items relating to title IV the following new item:

"Sec. 403. Private right of action for violations of certain requirements.".

**SEC. 160004. PERMITTING USE OF SWORN WRITTEN STATEMENT TO MEET IDENTIFICATION REQUIREMENTS FOR VOTING.**

(a) PERMITTING USE OF STATEMENT.—Subtitle C of title III of the Help America Vote Act of 2002, as added by section 160003(a), is amended—

(1) by redesignating sections 325 and 326 as sections 326 and 327; and

(2) by inserting after section 324 the following new section:

**"SEC. 325. PERMITTING USE OF SWORN WRITTEN STATEMENT TO MEET IDENTIFICATION REQUIREMENTS.**

"(a) USE OF STATEMENT.—

"(1) IN GENERAL.—Except as provided in subsection (c), if a State has in effect a requirement that an individual present identification as a condition of casting a ballot in an election for Federal office, the State shall permit the individual to meet the requirement—

1477

1       ''(A) in the case of an individual who de-
2 sires to vote in person, by presenting the appro-
3 priate State or local election official with a
4 sworn written statement, signed by the indi-
5 vidual under penalty of perjury, attesting to the
6 individual's identity and attesting that the indi-
7 vidual is eligible to vote in the election; or

8       ''(B) in the case of an individual who de-
9 sires to vote by mail, by submitting with the
10 ballot the statement described in subparagraph
11 (A).

12     ''(2) DEVELOPMENT OF PRE-PRINTED VERSION
13 OF STATEMENT BY COMMISSION.—The Commission
14 shall develop a pre-printed version of the statement
15 described in paragraph (1)(A) which includes a
16 blank space for an individual to provide a name and
17 signature for use by election officials in States which
18 are subject to paragraph (1).

19     ''(3) PROVIDING PRE-PRINTED COPY OF STATE-
20 MENT.—A State which is subject to paragraph (1)
21 shall—

22       ''(A) make copies of the pre-printed
23 version of the statement described in paragraph
24 (1)(A) which is prepared by the Commission
25 available at polling places for election officials

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003782

1478

1        to distribute to individuals who desire to vote in
2        person; and

3                "(B) include a copy of such pre-printed
4                version of the statement with each blank absen-
5                tee or other ballot transmitted to an individual
6                who desires to vote by mail.

7        "(b) REQUIRING USE OF BALLOT IN SAME MANNER
8   AS INDIVIDUALS PRESENTING IDENTIFICATION.—An in-
9   dividual who presents or submits a sworn written state-
10  ment in accordance with subsection (a)(1) shall be per-
11  mitted to cast a ballot in the election in the same manner
12  as an individual who presents identification.

13       "(c) EXCEPTION FOR FIRST-TIME VOTERS REG-
14  ISTERING BY MAIL.—Subsections (a) and (b) do not apply
15  with respect to any individual described in paragraph (1)
16  of section 303(b) who is required to meet the requirements
17  of paragraph (2) of such section.".

18      (b) REQUIRING STATES TO INCLUDE INFORMATION
19  ON USE OF SWORN WRITTEN STATEMENT IN VOTING IN-
20  FORMATION MATERIAL POSTED AT POLLING PLACES.—
21  Section 302(b)(2) of such Act (52 U.S.C. 21082(b)(2)),
22  is amended—

23               (1) by striking "and" at the end of subpara-
24               graph (E);

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003783

1479

1      (2) by striking the period at the end of sub-
2    paragraph (F) and inserting "; and"; and

3      (3) by adding at the end the following new sub-
4    paragraph:

5            "(G) in the case of a State that has in ef-
6          fect a requirement that an individual present
7          identification as a condition of casting a ballot
8          in an election for Federal office, information on
9          how an individual may meet such requirement
10         by presenting a sworn written statement in ac-
11         cordance with section 303A.".

12    (c) CLERICAL AMENDMENT.—The table of contents
13 of such Act, as amended by section 160003, is amended—

14      (1) by redesignating the items relating to sec-
15    tions 325 and 326 as relating to sections 326 and
16    327; and

17      (2) by inserting after the item relating to sec-
18    tion 324 the following new item:

"Sec. 325. Permitting use of sworn written statement to meet identification re-
quirements.".

19    (d) EFFECTIVE DATE.—The amendments made by
20 this section shall apply with respect to elections occurring
21 on or after the date of the enactment of this Act.

22 **SEC. 160005. VOTING MATERIALS POSTAGE.**

23    (a) PREPAYMENT OF POSTAGE ON RETURN ENVE-
24 LOPES.—

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003784

1480

1      (1) IN GENERAL.—Subtitle C of title III of the

2    Help America Vote Act of 2002, as added by section

3    160003(a) and as amended by section 160004(a), is

4    further amended—

5           (A) by redesignating sections 326 and 327

6      as sections 327 and 328; and

7           (B) by inserting after section 325 the fol-

8      lowing new section:

9    **"SEC. 326. PREPAYMENT OF POSTAGE ON RETURN ENVE-**

10            **LOPES FOR VOTING MATERIALS.**

11    "(a) PROVISION OF RETURN ENVELOPES.—The ap-

12    propriate State or local election official shall provide a

13    self-sealing return envelope with—

14           "(1) any voter registration application form

15      transmitted to a registrant by mail;

16           "(2) any application for an absentee ballot

17      transmitted to an applicant by mail; and

18           "(3) any blank absentee ballot transmitted to a

19      voter by mail.

20    "(b) PREPAYMENT OF POSTAGE.—Consistent with

21    regulations of the United States Postal Service, the State

22    or the unit of local government responsible for the admin-

23    istration of the election involved shall prepay the postage

24    on any envelope provided under subsection (a).

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003785

1481

1     "(c) NO EFFECT ON BALLOTS OR BALLOTING MATE-

2 RIALS TRANSMITTED TO ABSENT MILITARY AND OVER-

3 SEAS VOTERS.—Nothing in this section may be construed

4 to affect the treatment of any ballot or balloting materials

5 transmitted to an individual who is entitled to vote by ab-

6 sentee ballot under the Uniformed and Overseas Citizens

7 Absentee Voting Act (52 U.S.C. 20301 et seq.).".

8         (2) CLERICAL AMENDMENT.—The table of con-

9         tents of such Act, as amended by section 160004(c),

10         is amended—

11            (A) by redesignating the items relating to

12            sections 326 and 327 as relating to sections

13            327 and 328; and

14            (B) by inserting after the item relating to

15            section 325 the following new item:

"Sec. 326. Prepayment of postage on return envelopes for voting materials".

16     (b) ROLE OF UNITED STATES POSTAL SERVICE.—

17         (1) IN GENERAL.—Chapter 34 of title 39,

18         United States Code, is amended by adding after sec-

19         tion 3406 the following:

20 **"§ 3407. Voting materials**

21     "(a) Any voter registration application, absentee bal-

22 lot application, or absentee ballot with respect to any elec-

23 tion for Federal office shall be carried expeditiously, with

24 postage on the return envelope prepaid by the State or

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1482

1 unit of local government responsible for the administration

2 of the election.

3     "(b) As used in this section—

4         "(1) the term 'absentee ballot' means any ballot

5 transmitted by a voter by mail in an election for

6 Federal office, but does not include any ballot cov-

7 ered by section 3406; and

8         "(2) the term 'election for Federal office' means

9 a general, special, primary, or runoff election for the

10 office of President or Vice President, or of Senator

11 or Representative in, or Delegate or Resident Com-

12 missioner to, the Congress.

13     "(c) Nothing in this section may be construed to af-

14 fect the treatment of any ballot or balloting materials

15 transmitted to an individual who is entitled to vote by ab-

16 sentee ballot under the Uniformed and Overseas Citizens

17 Absentee Voting Act (52 U.S.C. 20301 et seq.).".

18       (2) CLERICAL AMENDMENT.—The table of sec-

19 tions for chapter 34 of such title is amended by in-

20 serting after the item relating to section 3406 the

21 following:

"3407. Voting materials.".

g:\VHLC\051220\051220.072.xml     (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003787

1483

1 SEC. 160006. REQUIRING TRANSMISSION OF BLANK ABSEN-

2           TEE BALLOTS UNDER UOCAVA TO CERTAIN

3           VOTERS.

4     (a) IN GENERAL.—The Uniformed and Overseas

5 Citizens Absentee Voting Act (52 U.S.C. 20301 et seq.)

6 is amended by inserting after section 103B the following

7 new section:

8 "SEC. 103C. TRANSMISSION OF BLANK ABSENTEE BALLOTS

9           TO CERTAIN OTHER VOTERS.

10     "(a) IN GENERAL.—

11         "(1) STATE RESPONSIBILITIES.—Subject to the

12     provisions of this section, each State shall transmit

13     blank absentee ballots electronically to qualified indi-

14     viduals who request such ballots in the same manner

15     and under the same terms and conditions under

16     which the State transmits such ballots electronically

17     to absent uniformed services voters and overseas vot-

18     ers under the provisions of section 102(f), except

19     that no such marked ballots shall be returned elec-

20     tronically.

21         "(2) REQUIREMENTS.—Any blank absentee bal-

22     lot transmitted to a qualified individual under this

23     section—

24             "(A) must comply with the language re-

25         quirements under section 203 of the Voting

26         Rights Act of 1965 (52 U.S.C. 10503); and

1484

1    ''(B) must comply with the disability re-
2    quirements under section 508 of the Rehabilita-
3    tion Act of 1973 (29 U.S.C. 794d).

4    ''(3) AFFIRMATION.—The State may not trans-
5    mit a ballot to a qualified individual under this sec-
6    tion unless the individual provides the State with a
7    signed affirmation in electronic form that—

8        ''(A) the individual is a qualified individual
9    (as defined in subsection (b));

10       ''(B) the individual has not and will not
11   cast another ballot with respect to the election;
12   and

13       ''(C) acknowledges that a material
14   misstatement of fact in completing the ballot
15   may constitute grounds for conviction of per-
16   jury.

17   ''(4) CLARIFICATION REGARDING FREE POST-
18   AGE.—An absentee ballot obtained by a qualified in-
19   dividual under this section shall be considered bal-
20   loting materials as defined in section 107 for pur-
21   poses of section 3406 of title 39, United States
22   Code.

23   ''(5) PROHIBITING REFUSAL TO ACCEPT BAL-
24   LOT FOR FAILURE TO MEET CERTAIN REQUIRE-
25   MENTS.—A State shall not refuse to accept and

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003789

1485

1 process any otherwise valid blank absentee ballot
2 which was transmitted to a qualified individual
3 under this section and used by the individual to vote
4 in the election solely on the basis of the following:

5     ''(A) Notarization or witness signature re-
6 quirements.

7     ''(B) Restrictions on paper type, including
8 weight and size.

9     ''(C) Restrictions on envelope type, includ-
10 ing weight and size.

11 ''(b) QUALIFIED INDIVIDUAL.—

12     ''(1) IN GENERAL.—In this section, except as
13 provided in paragraph (2), the term 'qualified indi-
14 vidual' means any individual who is otherwise quali-
15 fied to vote in an election for Federal office and who
16 meets any of the following requirements:

17     ''(A) The individual—

18         ''(i) has previously requested an ab-
19 sentee ballot from the State or jurisdiction
20 in which such individual is registered to
21 vote; and

22         ''(ii) has not received such absentee
23 ballot at least 2 days before the date of the
24 election.

25     ''(B) The individual—

DOC_0003790

1486

1      "(i) resides in an area of a State with

2      respect to which an emergency or public

3      health emergency has been declared by the

4      chief executive of the State or of the area

5      involved within 5 days of the date of the

6      election under the laws of the State due to

7      reasons including a natural disaster, in-

8      cluding severe weather, or an infectious

9      disease; and

10         "(ii) has not previously requested an

11     absentee ballot.

12         "(C) The individual expects to be absent

13     from such individual's jurisdiction on the date

14     of the election due to professional or volunteer

15     service in response to a natural disaster or

16     emergency as described in subparagraph (B).

17         "(D) The individual is hospitalized or ex-

18     pects to be hospitalized on the date of the elec-

19     tion.

20         "(E) The individual is an individual with a

21     disability (as defined in section 3 of the Ameri-

22     cans with Disabilities Act of 1990 (42 U.S.C.

23     12102)) and resides in a State which does not

24     offer voters the ability to use secure and acces-

25     sible remote ballot marking. For purposes of

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003791

1487

1    this subparagraph, a State shall permit an indi-
2    vidual to self-certify that the individual is an in-
3    dividual with a disability.

4    "(2) EXCLUSION OF ABSENT UNIFORMED SERV-
5    ICES AND OVERSEAS VOTERS.—The term 'qualified
6    individual' shall not include an absent uniformed
7    services voter or an overseas voter.

8    "(c) STATE.—For purposes of this section, the term
9    'State' includes the District of Columbia, the Common-
10   wealth of Puerto Rico, Guam, American Samoa, the
11   United States Virgin Islands, and the Commonwealth of
12   the Northern Mariana Islands.

13   "(d) EFFECTIVE DATE.—This section shall apply
14   with respect to the regularly scheduled general election for
15   Federal office held in November 2020 and each succeeding
16   election for Federal office.".

17   (b) CONFORMING AMENDMENT.—Section 102(a) of
18   such Act (52 U.S.C. 20302(a)) is amended—

19       (1) by striking "and" at the end of paragraph
20       (10);

21       (2) by striking the period at the end of para-
22       graph (11) and inserting "; and"; and

23       (3) by adding at the end the following new
24       paragraph:

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003792

1488

1       "(12) meet the requirements of section 103C

2       with respect to the provision of blank absentee bal-

3       lots for the use of qualified individuals described in

4       such section.".

5      (c) CLERICAL AMENDMENTS.—The table of contents

6 of such Act is amended by inserting the following after

7 section 103:

    "Sec. 103A. Procedures for collection and delivery of marked absentee ballots
          of absent overseas uniformed services voters.
    "Sec. 103B. Federal voting assistance program improvements.
    "Sec. 103C. Transmission of blank absentee ballots to certain other voters.".

## 8 SEC. 160007. VOTER REGISTRATION.

9     (a) REQUIRING AVAILABILITY OF INTERNET FOR

10 VOTER REGISTRATION.—

11       (1) REQUIRING AVAILABILITY OF INTERNET

12       FOR REGISTRATION.—The National Voter Registra-

13       tion Act of 1993 (52 U.S.C. 20501 et seq.) is

14       amended by inserting after section 6 the following

15       new section:

## 16 "SEC. 6A. INTERNET REGISTRATION.

17     "(a) REQUIRING AVAILABILITY OF INTERNET FOR

18 ONLINE REGISTRATION.—

19       "(1) AVAILABILITY OF ONLINE REGISTRATION

20       AND CORRECTION OF EXISTING REGISTRATION IN-

21       FORMATION.—Each State, acting through the chief

22       State election official, shall ensure that the following

23       services are available to the public at any time on

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003793

1489

1 the official public websites of the appropriate State
2 and local election officials in the State, in the same
3 manner and subject to the same terms and condi-
4 tions as the services provided by voter registration
5 agencies under section 7(a):

6       ''(A) Online application for voter registra-
7       tion.

8       ''(B) Online assistance to applicants in ap-
9       plying to register to vote.

10       ''(C) Online completion and submission by
11       applicants of the mail voter registration applica-
12       tion form prescribed by the Election Assistance
13       Commission pursuant to section 9(a)(2), includ-
14       ing assistance with providing a signature as re-
15       quired under subsection (c).

16       ''(D) Online receipt of completed voter reg-
17       istration applications.

18 ''(b) ACCEPTANCE OF COMPLETED APPLICATIONS.—
19 A State shall accept an online voter registration applica-
20 tion provided by an individual under this section, and en-
21 sure that the individual is registered to vote in the State,
22 if—

23       ''(1) the individual meets the same voter reg-
24       istration requirements applicable to individuals who
25       register to vote by mail in accordance with section

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003794

1490

1    6(a)(1) using the mail voter registration application

2    form prescribed by the Election Assistance Commis-

3    sion pursuant to section 9(a)(2); and

4        ''(2) the individual meets the requirements of

5    subsection (c) to provide a signature in electronic

6    form (but only in the case of applications submitted

7    during or after the second year in which this section

8    is in effect in the State).

9    ''(c) SIGNATURE REQUIREMENTS.—

10       ''(1) IN GENERAL.—For purposes of this sec-

11    tion, an individual meets the requirements of this

12    subsection as follows:

13          ''(A) In the case of an individual who has

14    a signature on file with a State agency, includ-

15    ing the State motor vehicle authority, that is

16    required to provide voter registration services

17    under this Act or any other law, the individual

18    consents to the transfer of that electronic signa-

19    ture.

20          ''(B) If subparagraph (A) does not apply,

21    the individual submits with the application an

22    electronic copy of the individual's handwritten

23    signature through electronic means.

24          ''(C) If subparagraph (A) and subpara-

25    graph (B) do not apply, the individual executes

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003795

1491

1    a computerized mark in the signature field on

2    an online voter registration application, in ac-

3    cordance with reasonable security measures es-

4    tablished by the State, but only if the State ac-

5    cepts such mark from the individual.

6    "(2) TREATMENT OF INDIVIDUALS UNABLE TO

7    MEET REQUIREMENT.—If an individual is unable to

8    meet the requirements of paragraph (1), the State

9    shall—

10   "(A) permit the individual to complete all

11   other elements of the online voter registration

12   application;

13   "(B) permit the individual to provide a sig-

14   nature at the time the individual requests a bal-

15   lot in an election (whether the individual re-

16   quests the ballot at a polling place or requests

17   the ballot by mail); and

18   "(C) if the individual carries out the steps

19   described in subparagraph (A) and subpara-

20   graph (B), ensure that the individual is reg-

21   istered to vote in the State.

22   "(3) NOTICE.—The State shall ensure that in-

23   dividuals applying to register to vote online are noti-

24   fied of the requirements of paragraph (1) and of the

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003796

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1492

1    treatment of individuals unable to meet such re-
2    quirements, as described in paragraph (2).

3    "(d) CONFIRMATION AND DISPOSITION.—

4        "(1) CONFIRMATION OF RECEIPT.—Upon the
5    online submission of a completed voter registration
6    application by an individual under this section, the
7    appropriate State or local election official shall send
8    the individual a notice confirming the State's receipt
9    of the application and providing instructions on how
10   the individual may check the status of the applica-
11   tion.

12       "(2) NOTICE OF DISPOSITION.—Not later than
13   7 days after the appropriate State or local election
14   official has approved or rejected an application sub-
15   mitted by an individual under this section, the offi-
16   cial shall send the individual a notice of the disposi-
17   tion of the application.

18       "(3) METHOD OF NOTIFICATION.—The appro-
19   priate State or local election official shall send the
20   notices required under this subsection by regular
21   mail and—

22           "(A) in the case of an individual who has
23       provided the official with an electronic mail ad-
24       dress, by electronic mail; and

DOC_0003797

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1493

1         ''(B) at the option of an individual, by text

2         message.

3   ''(e) PROVISION OF SERVICES IN NONPARTISAN

4 MANNER.—The services made available under subsection

5 (a) shall be provided in a manner that ensures that, con-

6 sistent with section 7(a)(5)—

7         ''(1) the online application does not seek to in-

8         fluence an applicant's political preference or party

9         registration; and

10         ''(2) there is no display on the website pro-

11         moting any political preference or party allegiance,

12         except that nothing in this paragraph may be con-

13         strued to prohibit an applicant from registering to

14         vote as a member of a political party.

15   ''(f) PROTECTION OF SECURITY OF INFORMATION.—

16 In meeting the requirements of this section, the State shall

17 establish appropriate technological security measures to

18 prevent to the greatest extent practicable any unauthor-

19 ized access to information provided by individuals using

20 the services made available under subsection (a).

21   ''(g) ACCESSIBILITY OF SERVICES.—A state shall en-

22 sure that the services made available under this section

23 are made available to individuals with disabilities to the

24 same extent as services are made available to all other in-

25 dividuals.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1494

1 "(h) USE OF ADDITIONAL TELEPHONE-BASED SYS-
2 TEM.—A State shall make the services made available on-
3 line under subsection (a) available through the use of an
4 automated telephone-based system, subject to the same
5 terms and conditions applicable under this section to the
6 services made available online, in addition to making the
7 services available online in accordance with the require-
8 ments of this section.

9 "(i) NONDISCRIMINATION AMONG REGISTERED VOT-
10 ERS USING MAIL AND ONLINE REGISTRATION.—In car-
11 rying out this Act, the Help America Vote Act of 2002,
12 or any other Federal, State, or local law governing the
13 treatment of registered voters in the State or the adminis-
14 tration of elections for public office in the State, a State
15 shall treat a registered voter who registered to vote online
16 in accordance with this section in the same manner as the
17 State treats a registered voter who registered to vote by
18 mail.".

19 (2) SPECIAL REQUIREMENTS FOR INDIVIDUALS
20 USING ONLINE REGISTRATION.—

21 (A) TREATMENT AS INDIVIDUALS REG-
22 ISTERING TO VOTE BY MAIL FOR PURPOSES OF
23 FIRST-TIME VOTER IDENTIFICATION REQUIRE-
24 MENTS.—Section 303(b)(1)(A) of the Help
25 America Vote Act of 2002 (52 U.S.C.

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003799

1495

1    21083(b)(1)(A) is amended by striking "by
2    mail" and inserting "by mail or online under
3    section 6A of the National Voter Registration
4    Act of 1993".

5        (B) REQUIRING SIGNATURE FOR FIRST-
6    TIME VOTERS IN JURISDICTION.—Section
7    303(b) of such Act (52 U.S.C. 21083(b)) is
8    amended—

9            (i) by redesignating paragraph (5) as
10        paragraph (6); and

11            (ii) by inserting after paragraph (4)
12        the following new paragraph:

13    "(5) SIGNATURE REQUIREMENTS FOR FIRST-
14    TIME VOTERS USING ONLINE REGISTRATION.—

15        "(A) IN GENERAL.—A State shall, in a
16    uniform and nondiscriminatory manner, require
17    an individual to meet the requirements of sub-
18    paragraph (B) if—

19            "(i) the individual registered to vote
20        in the State online under section 6A of the
21        National Voter Registration Act of 1993;
22        and

23            "(ii) the individual has not previously
24        voted in an election for Federal office in
25        the State.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003800

1496

1     ''(B)  Requirements.—An  individual

2 meets the requirements of this subparagraph

3 if—

4     ''(i) in the case of an individual who

5    votes in person, the individual provides the

6    appropriate State or local election official

7    with a handwritten signature; or

8     ''(ii) in the case of an individual who

9    votes by mail, the individual submits with

10   the ballot a handwritten signature.

11    ''(C)  Inapplicability.—Subparagraph

12 (A) does not apply in the case of an individual

13 who is—

14     ''(i) entitled to vote by absentee ballot

15    under the Uniformed and Overseas Citi-

16    zens Absentee Voting Act (52 U.S.C.

17    20302 et seq.);

18     ''(ii) provided the right to vote other-

19    wise than in person under section

20    3(b)(2)(B)(ii) of the Voting Accessibility

21    for the Elderly and Handicapped Act (52

22    U.S.C. 20102(b)(2)(B)(ii)); or

23     ''(iii) entitled to vote otherwise than

24    in person under any other Federal law.''.

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003801

1497

1        (C) CONFORMING AMENDMENT RELATING

2        TO EFFECTIVE DATE.—Section 303(d)(2)(A) of

3        such Act (52 U.S.C. 21083(d)(2)(A)) is amend-

4        ed by striking "Each State" and inserting "Ex-

5        cept as provided in subsection (b)(5), each

6        State".

7    (3) CONFORMING AMENDMENTS.—

8        (A) TIMING OF REGISTRATION.—Section

9        8(a)(1) of the National Voter Registration Act

10       of 1993 (52 U.S.C. 20507(a)(1)) is amended—

11            (i) by striking "and" at the end of

12           subparagraph (C);

13            (ii) by redesignating subparagraph

14           (D) as subparagraph (E); and

15            (iii) by inserting after subparagraph

16           (C) the following new subparagraph:

17        "(D) in the case of online registration

18        through the official public website of an election

19        official under section 6A, if the valid voter reg-

20        istration application is submitted online not

21        later than the lesser of 28 days, or the period

22        provided by State law, before the date of the

23        election (as determined by treating the date on

24        which the application is sent electronically as

25        the date on which it is submitted); and".

g:\VHLC\051220\051220.072.xml    (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003802

1498

1    (B) INFORMING APPLICANTS OF ELIGI-
2    BILITY REQUIREMENTS AND PENALTIES.—Sec-
3    tion 8(a)(5) of such Act (52 U.S.C.
4    20507(a)(5)) is amended by striking "and 7"
5    and inserting "6A, and 7".

6    (b) USE OF INTERNET TO UPDATE REGISTRATION
7    INFORMATION.—

8        (1) UPDATES TO INFORMATION CONTAINED ON
9    COMPUTERIZED STATEWIDE VOTER REGISTRATION
10   LIST.—

11       (A) IN GENERAL.—Section 303(a) of the
12   Help America Vote Act of 2002 (52 U.S.C.
13   21083(a)) is amended by adding at the end the
14   following new paragraph:

15       "(6) USE OF INTERNET BY REGISTERED VOT-
16   ERS TO UPDATE INFORMATION.—

17           "(A) IN GENERAL.—The appropriate State
18       or local election official shall ensure that any
19       registered voter on the computerized list may at
20       any time update the voter's registration infor-
21       mation, including the voter's address and elec-
22       tronic mail address, online through the official
23       public website of the election official responsible
24       for the maintenance of the list, so long as the
25       voter attests to the contents of the update by

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003803

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1499

1    providing a signature in electronic form in the

2    same manner required under section 6A(c) of

3    the National Voter Registration Act of 1993.

4        "(B) PROCESSING OF UPDATED INFORMA-

5    TION BY ELECTION OFFICIALS.—If a registered

6    voter updates registration information under

7    subparagraph (A), the appropriate State or

8    local election official shall—

9        "(i) revise any information on the

10       computerized list to reflect the update

11       made by the voter; and

12        "(ii) if the updated registration infor-

13       mation affects the voter's eligibility to vote

14       in an election for Federal office, ensure

15       that the information is processed with re-

16       spect to the election if the voter updates

17       the information not later than the lesser of

18       7 days, or the period provided by State

19       law, before the date of the election.

20        "(C) CONFIRMATION AND DISPOSITION.—

21        "(i) CONFIRMATION OF RECEIPT.—

22       Upon the online submission of updated

23       registration information by an individual

24       under this paragraph, the appropriate

25       State or local election official shall send

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003804

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1500

1    the individual a notice confirming the

2    State's receipt of the updated information

3    and providing instructions on how the indi-

4    vidual may check the status of the update.

5        "(ii) NOTICE OF DISPOSITION.—Not

6    later than 7 days after the appropriate

7    State or local election official has accepted

8    or rejected updated information submitted

9    by an individual under this paragraph, the

10   official shall send the individual a notice of

11   the disposition of the update.

12       "(iii) METHOD OF NOTIFICATION.—

13   The appropriate State or local election offi-

14   cial shall send the notices required under

15   this subparagraph by regular mail and—

16           "(I) in the case of an individual

17       who has requested that the State pro-

18       vide voter registration and voting in-

19       formation through electronic mail, by

20       electronic mail; and

21           "(II) at the option of an indi-

22       vidual, by text message.".

23   (B) CONFORMING AMENDMENT RELATING

24   TO EFFECTIVE DATE.—Section 303(d)(1)(A) of

25   such Act (52 U.S.C. 21083(d)(1)(A)) is amend-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003805

1501

1 ed by striking "subparagraph (B)," and insert-

2 ing "subparagraph (B) and subsection (a)(6),".

3 (2) ABILITY OF REGISTRANT TO USE ONLINE

4 UPDATE TO PROVIDE INFORMATION ON RESI-

5 DENCE.—Section 8(d)(2)(A) of the National Voter

6 Registration Act of 1993 (52 U.S.C.

7 20507(d)(2)(A)) is amended—

8 (A) in the first sentence, by inserting after

9 "return the card" the following: "or update the

10 registrant's information on the computerized

11 Statewide voter registration list using the online

12 method provided under section 303(a)(6) of the

13 Help America Vote Act of 2002"; and

14 (B) in the second sentence, by striking

15 "returned," and inserting the following: "re-

16 turned or if the registrant does not update the

17 registrant's information on the computerized

18 Statewide voter registration list using such on-

19 line method,".

20 (c) SAME DAY REGISTRATION.—

21 (1) IN GENERAL.—Subtitle C of title III of the

22 Help America Vote Act of 2002, as added by section

23 160003(a) and as amended by sections 160004(a)

24 and 160005(a), is further amended—

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1502

1       (A) by redesignating sections 327 and 328

2       as sections 328 and 329; and

3       (B) by inserting after section 326 the fol-

4       lowing new section:

5   **"SEC. 327. SAME DAY REGISTRATION.**

6   "(a) IN GENERAL.—

7       "(1) REGISTRATION.—Each State shall permit

8   any eligible individual on the day of a Federal elec-

9   tion and on any day when voting, including early

10  voting, is permitted for a Federal election—

11      "(A) to register to vote in such election at

12      the polling place using a form that meets the

13      requirements under section 9(b) of the National

14      Voter Registration Act of 1993 (or, if the indi-

15      vidual is already registered to vote, to revise

16      any of the individual's voter registration infor-

17      mation); and

18      "(B) to cast a vote in such election.

19      "(2) EXCEPTION.—The requirements under

20  paragraph (1) shall not apply to a State in which,

21  under a State law in effect continuously on and after

22  the date of the enactment of this section, there is no

23  voter registration requirement for individuals in the

24  State with respect to elections for Federal office.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003807

1503

1    ''(b) ELIGIBLE INDIVIDUAL.—For purposes of this
2  section, the term 'eligible individual' means, with respect
3  to any election for Federal office, an individual who is oth-
4  erwise qualified to vote in that election.

5    ''(c) EFFECTIVE DATE.—Each State shall be re-
6  quired to comply with the requirements of subsection (a)
7  for the regularly scheduled general election for Federal of-
8  fice occurring in November 2020 and for any subsequent
9  election for Federal office.''.

10    (2) CLERICAL AMENDMENT.—The table of con-
11      tents of such Act, as added by section 160003 and
12      as amended by sections 160004 and 160005, is fur-
13      ther amended—

14      (A) by redesignating the items relating to
15        sections 327 and 328 as relating to sections
16        328 and 329; and

17      (B) by inserting after the item relating to
18        section 326 the following new item:

''Sec. 327. Same day registration.''.

19    (d) PROHIBITING STATE FROM REQUIRING APPLI-
20  CANTS TO PROVIDE MORE THAN LAST 4 DIGITS OF SO-
21  CIAL SECURITY NUMBER.—

22    (1) FORM INCLUDED WITH APPLICATION FOR
23      MOTOR   VEHICLE   DRIVER'S   LICENSE.—Section
24      5(c)(2)(B)(ii) of the National Voter Registration Act
25      of 1993 (52 U.S.C. 20504(c)(2)(B)(ii)) is amended

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003808

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1504

1     by striking the semicolon at the end and inserting

2     the following: '', and to the extent that the applica-

3     tion requires the applicant to provide a Social Secu-

4     rity number, may not require the applicant to pro-

5     vide more than the last 4 digits of such number;''.

6         (2) NATIONAL MAIL VOTER REGISTRATION

7     FORM.—Section 9(b)(1) of such Act (52 U.S.C.

8     20508(b)(1)) is amended by striking the semicolon

9     at the end and inserting the following: '', and to the

10     extent that the form requires the applicant to pro-

11     vide a Social Security number, the form may not re-

12     quire the applicant to provide more than the last 4

13     digits of such number;''.

14         (3) EFFECTIVE DATE.—The amendments made

15     by this subsection shall apply with respect to the

16     regularly scheduled general election for Federal of-

17     fice held in November 2020 and each succeeding

18     election for Federal office.

19 **SEC. 160008. ACCOMMODATIONS FOR VOTERS RESIDING IN**

20                **INDIAN LANDS.**

21     (a) ACCOMMODATIONS DESCRIBED.—

22         (1) DESIGNATION OF BALLOT PICKUP AND COL-

23     LECTION LOCATIONS.—Given the widespread lack of

24     residential mail delivery in Indian Country, an In-

25     dian Tribe may designate buildings as ballot pickup

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003809

G:\CMTE\AP\16\FY20\_D\HEROES.XML

<div align="center">1505</div>

1    and collection locations with respect to an election

2    for Federal office at no cost to the Indian Tribe. An

3    Indian Tribe may designate one building per pre-

4    cinct located within Indian lands. The applicable

5    State or political subdivision shall collect ballots

6    from those locations. The applicable State or polit-

7    ical subdivision shall provide the Indian Tribe with

8    accurate precinct maps for all precincts located with-

9    in Indian lands 60 days before the election.

10    (2) PROVISION OF MAIL-IN AND ABSENTEE

11    BALLOTS.—The State or political subdivision shall

12    provide mail-in and absentee ballots with respect to

13    an election for Federal office to each individual who

14    is registered to vote in the election who resides on

15    Indian lands in the State or political subdivision in-

16    volved without requiring a residential address or a

17    mail-in or absentee ballot request.

18    (3) USE OF DESIGNATED BUILDING AS RESI-

19    DENTIAL AND MAILING ADDRESS.—The address of a

20    designated building that is a ballot pickup and col-

21    lection location with respect to an election for Fed-

22    eral office may serve as the residential address and

23    mailing address for voters living on Indian lands if

24    the tribally designated building is in the same pre-

25    cinct as that voter. If there is no tribally designated

DOC_0003810

1506

1    building within a voter's precinct, the voter may use

2    another tribally designated building within the In-

3    dian lands where the voter is located. Voters using

4    a tribally designated building outside of the voter's

5    precinct may use the tribally designated building as

6    a mailing address and may separately designate the

7    voter's appropriate precinct through a description of

8    the voter's address, as specified in section

9    9428.4(a)(2) of title 11, Code of Federal Regula-

10    tions.

11    (4) LANGUAGE ACCESSIBILITY.—In the case of

12    a State or political subdivision that is a covered

13    State or political subdivision under section 203 of

14    the Voting Rights Act of 1965 (52 U.S.C. 10503),

15    that State or political subdivision shall provide ab-

16    sentee or mail-in voting materials with respect to an

17    election for Federal office in the language of the ap-

18    plicable minority group as well as in the English lan-

19    guage, bilingual election voting assistance, and writ-

20    ten translations of all voting materials in the lan-

21    guage of the applicable minority group, as required

22    by section 203 of the Voting Rights Act of 1965 (52

23    U.S.C. 10503), as amended by subsection (b).

24    (5) CLARIFICATION.—Nothing in this section

25    alters the ability of an individual voter residing on

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003811