1507

1     Indian lands to request a ballot in a manner avail-

2     able to all other voters in the State.

3         (6) DEFINITIONS.—In this section:

4            (A) ELECTION FOR FEDERAL OFFICE.—

5     The term "election for Federal office" means a

6     general, special, primary or runoff election for

7     the office of President or Vice President, or of

8     Senator or Representative in, or Delegate or

9     Resident Commissioner to, the Congress.

10         (B) INDIAN.—The term "Indian" has the

11     meaning given the term in section 4 of the In-

12     dian Self-Determination and Education Assist-

13     ance Act (25 U.S.C. 5304).

14         (C) INDIAN LANDS.—The term "Indian

15     lands" includes—

16            (i) any Indian country of an Indian

17     Tribe, as defined under section 1151 of

18     title 18, United States Code;

19            (ii) any land in Alaska owned, pursu-

20     ant to the Alaska Native Claims Settle-

21     ment Act (43 U.S.C. 1601 et seq.), by an

22     Indian Tribe that is a Native village (as

23     defined in section 3 of that Act (43 U.S.C.

24     1602)) or by a Village Corporation that is

25     associated with an Indian Tribe (as de-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003812

1508

1     fined in section 3 of that Act (43 U.S.C.
2     1602));

3         (iii) any land on which the seat of the
4     Tribal Government is located; and

5         (iv) any land that is part or all of a
6     Tribal designated statistical area associ-
7     ated with an Indian Tribe, or is part or all
8     of an Alaska Native village statistical area
9     associated with an Indian Tribe, as defined
10     by the Census Bureau for the purposes of
11     the most recent decennial census.

12     (D) INDIAN TRIBE.—The term "Indian
13     Tribe" has the meaning given the term "Indian
14     tribe" in section 4 of the Indian Self-Deter-
15     mination and Education Assistance Act (25
16     U.S.C. 5304).

17     (E) TRIBAL GOVERNMENT.—The term
18     "Tribal Government" means the recognized
19     governing body of an Indian Tribe.

20     (7) ENFORCEMENT.—

21     (A) ATTORNEY GENERAL.—The Attorney
22     General may bring a civil action in an appro-
23     priate district court for such declaratory or in-
24     junctive relief as is necessary to carry out this
25     subsection.

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003813

1509

1    (B) PRIVATE RIGHT OF ACTION.—

2        (i) A person or Tribal Government
3    who is aggrieved by a violation of this sub-
4    section may provide written notice of the
5    violation to the chief election official of the
6    State involved.

7        (ii) An aggrieved person or Tribal
8    Government may bring a civil action in an
9    appropriate district court for declaratory
10   or injunctive relief with respect to a viola-
11   tion of this subsection, if—

12           (I) that person or Tribal Govern-
13       ment provides the notice described in
14       clause (i); and

15           (II)(aa) in the case of a violation
16       that occurs more than 120 days be-
17       fore the date of an election for Fed-
18       eral office, the violation remains and
19       90 days or more have passed since the
20       date on which the chief election offi-
21       cial of the State receives the notice
22       under clause (i); or

23           (bb) in the case of a violation
24       that occurs 120 days or less before
25       the date of an election for Federal of-

g:\VHLC\051220\051220.072.xml        (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003814

1510

1     fice, the violation remains and 20

2     days or more have passed since the

3     date on which the chief election offi-

4     cial of the State receives the notice

5     under clause (i).

6     (iii) In the case of a violation of this

7     section that occurs 30 days or less before

8     the date of an election for Federal office,

9     an aggrieved person or Tribal Government

10     may bring a civil action in an appropriate

11     district court for declaratory or injunctive

12     relief with respect to the violation without

13     providing notice to the chief election offi-

14     cial of the State under clause (i).

15  (b) BILINGUAL ELECTION REQUIREMENTS.—Section

16 203 of the Voting Rights Act of 1965 (52 U.S.C. 10503)

17 is amended—

18    (1) in subsection (b)(3)(C), by striking ''1990''

19   and inserting ''2010''; and

20    (2) by striking subsection (c) and inserting the

21   following:

22 ''(c) PROVISION OF VOTING MATERIALS IN THE LAN-

23 GUAGE OF A MINORITY GROUP.—

24    ''(1) IN GENERAL.—Whenever any State or po-

25   litical subdivision subject to the prohibition of sub-

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003815

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1511

1   section (b) of this section provides any registration

2   or voting notices, forms, instructions, assistance, or

3   other materials or information relating to the elec-

4   toral process, including ballots, it shall provide them

5   in the language of the applicable minority group as

6   well as in the English language.

7       "(2) EXCEPTIONS.—

8           "(A) In the case of a minority group that

9       is not American Indian or Alaska Native and

10      the language of that minority group is oral or

11      unwritten, the State or political subdivision

12      shall only be required to furnish, in the covered

13      language, oral instructions, assistance, trans-

14      lation of voting materials, or other information

15      relating to registration and voting.

16          "(B) In the case of a minority group that

17      is American Indian or Alaska Native, the State

18      or political subdivision shall only be required to

19      furnish in the covered language oral instruc-

20      tions, assistance, or other information relating

21      to registration and voting, including all voting

22      materials, if the Tribal Government of that mi-

23      nority group has certified that the language of

24      the applicable American Indian or Alaska Na-

25      tive language is presently unwritten or the

DOC_0003816

1512

1          Tribal Government does not want written trans-

2          lations in the minority language.

3          ''(3) WRITTEN TRANSLATIONS FOR ELECTION

4          WORKERS.—Notwithstanding paragraph (2), the

5          State or political division may be required to provide

6          written translations of voting materials, with the

7          consent of any applicable Indian Tribe, to election

8          workers to ensure that the translations from English

9          to the language of a minority group are complete,

10         accurate, and uniform.''.

11    (c) EFFECTIVE DATE.—This section and the amend-

12 ments made by this section shall apply with respect to the

13 regularly scheduled general election for Federal office held

14 in November 2020 and each succeeding election for Fed-

15 eral office.

**16 SEC. 160009. PAYMENTS BY ELECTION ASSISTANCE COM-**

**17          MISSION TO STATES TO ASSIST WITH COSTS**

**18          OF COMPLIANCE.**

19    (a) AVAILABILITY OF GRANTS.—Subtitle D of title

20 II of the Help America Vote Act of 2002 (52 U.S.C.

21 21001 et seq.) is amended by adding at the end the fol-

22 lowing new part:

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003817

1513

1    **"PART 7—PAYMENTS TO ASSIST WITH COSTS OF**

2        **COMPLIANCE WITH ACCESS ACT**

3    **"SEC. 297. PAYMENTS TO ASSIST WITH COSTS OF COMPLI-**

4        **ANCE WITH ACCESS ACT.**

5        "(a) AVAILABILITY AND USE OF PAYMENTS.—

6            "(1) IN GENERAL.—The Commission shall

7        make a payment to each eligible State to assist the

8        State with the costs of complying with the American

9        Coronavirus/COVID–19 Election Safety and Secu-

10       rity Act and the amendments made by such Act, in-

11       cluding the provisions of such Act and such amend-

12       ments which require States to pre-pay the postage

13       on absentee ballots and balloting materials.

14           "(2) PUBLIC EDUCATION CAMPAIGNS.—For

15       purposes of this part, the costs incurred by a State

16       in carrying out a campaign to educate the public

17       about the requirements of the American

18       Coronavirus/COVID–19 Election Safety and Secu-

19       rity Act and the amendments made by such Act

20       shall be included as the costs of complying with such

21       Act and such amendments.

22       "(b) PRIMARY ELECTIONS.—

23           "(1) PAYMENTS TO STATES.—In addition to

24       any payments under subsection (a), the Commission

25       shall make a payment to each eligible State to assist

26       the State with the costs incurred in voluntarily elect-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003818

1514

1   ing to comply with the American Coronavirus/
2   COVID–19 Election Safety and Security Act and
3   the amendments made by such Act with respect to
4   primary elections for Federal office held in the State
5   in 2020.

6       ''(2) STATE PARTY-RUN PRIMARIES.—In addi-
7   tion to any payments under paragraph (1), the Com-
8   mission shall make payments to each eligible polit-
9   ical party of the State for costs incurred by such
10   parties to send absentee ballots and return envelopes
11   with prepaid postage to eligible voters participating
12   in such primaries during 2020.

13   ''(c) PASS-THROUGH OF FUNDS TO LOCAL JURISDIC-
14   TIONS.—

15       ''(1) IN GENERAL.—If a State receives a pay-
16   ment under this part for costs that include costs in-
17   curred by a local jurisdiction or Tribal government
18   within the State, the State shall pass through to
19   such local jurisdiction or Tribal government a por-
20   tion of such payment that is equal to the amount of
21   the costs incurred by such local jurisdiction or Trib-
22   al government.

23       ''(2) TRIBAL GOVERNMENT DEFINED.—In this
24   subsection, the term 'Tribal Government' means the
25   recognized governing body of an Indian tribe (as de-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003819

1515

1    fined in section 4 of the Indian Self-Determination

2    and Education Assistance Act (25 U.S.C. 5304).

3    "(d) SCHEDULE OF PAYMENTS.—As soon as prac-

4    ticable after the date of the enactment of this part and

5    not less frequently than once each calendar year there-

6    after, the Commission shall make payments under this

7    part.

8    "(e) COVERAGE OF COMMONWEALTH OF NORTHERN

9    MARIANA ISLANDS.—In this part, the term 'State' in-

10    cludes the Commonwealth of the Northern Mariana Is-

11    lands.

12    "(f) LIMITATION.—No funds may be provided to a

13    State under this part for costs attributable to the elec-

14    tronic return of marked ballots by any voter.

15    **"SEC. 297A. AMOUNT OF PAYMENT.**

16    "(a) IN GENERAL.—Except as provided in section

17    297C, the amount of a payment made to an eligible State

18    for a year under this part shall be determined by the Com-

19    mission.

20    "(b) CONTINUING AVAILABILITY OF FUNDS AFTER

21    APPROPRIATION.—A payment made to an eligible State

22    or eligible unit of local government under this part shall

23    be available without fiscal year limitation.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003820

1516

1 **"SEC. 297B. REQUIREMENTS FOR ELIGIBILITY.**

2 "(a) APPLICATION.—Except as provided in section

3 297C, each State that desires to receive a payment under

4 this part for a fiscal year, and each political party of a

5 State that desires to receive a payment under section

6 297(b)(2), shall submit an application for the payment to

7 the Commission at such time and in such manner and con-

8 taining such information as the Commission shall require.

9 "(b) CONTENTS OF APPLICATION.—Each application

10 submitted under subsection (a) shall—

11      "(1) describe the activities for which assistance

12      under this part is sought; and

13      "(2) provide such additional information and

14      certifications as the Commission determines to be es-

15      sential to ensure compliance with the requirements

16      of this part.

17 **"SEC. 297C. SPECIAL RULES FOR PAYMENTS FOR ELEC-**

18                    **TIONS SUBJECT TO EMERGENCY RULES.**

19 "(a) SUBMISSION OF ESTIMATED COSTS.—If the spe-

20 cial rules in the case of an emergency period under section

21 322(c)(3) apply to an election, not later than the applica-

22 ble deadline under subsection (c), the State shall submit

23 to the Commission a request for a payment under this

24 part, and shall include in the request the State's estimate

25 of the costs the State expects to incur in the administra-

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003821

1517

1 tion of the election which are attributable to the applica-

2 tion of such special rules to the election.

3     "(b) PAYMENT.—Not later than 7 days after receiv-

4 ing a request from the State under subsection (a), the

5 Commission shall make a payment to the State in an

6 amount equal to the estimate provided by the State in the

7 request.

8     "(c) APPLICABLE DEADLINE.—The applicable dead-

9 line under this paragraph with respect to an election is—

10         "(1) with respect to the regularly scheduled

11     general election for Federal office held in November

12     2020, 15 days after the date of the enactment of

13     this part; and

14         "(2) with respect to any other election, 15 days

15     after the emergency or disaster described in section

16     322(c)(3) is declared.

17 **"SEC. 297D. AUTHORIZATION OF APPROPRIATIONS.**

18     "There are authorized to be appropriated for pay-

19 ments under this part—

20         "(1) in the case of payments made under sec-

21     tion 297C, such sums as may be necessary for fiscal

22     year 2020 and each succeeding fiscal year; and

23         "(2) in the case of any other payments, such

24     sums as may be necessary for fiscal year 2020.

DOC_0003822

1518

1 **"SEC. 297E. REPORTS.**

2     "(a) REPORTS BY RECIPIENTS.—Not later than 6

3 months after the end of each fiscal year for which an eligi-

4 ble State received a payment under this part, the State

5 shall submit a report to the Commission on the activities

6 conducted with the funds provided during the year.

7     "(b) REPORTS BY COMMISSION TO COMMITTEES.—

8 With respect to each fiscal year for which the Commission

9 makes payments under this part, the Commission shall

10 submit a report on the activities carried out under this

11 part to the Committee on House Administration of the

12 House of Representatives and the Committee on Rules

13 and Administration of the Senate.".

14     (b) CLERICAL AMENDMENT.—The table of contents

15 of such Act is amended by adding at the end of the items

16 relating to subtitle D of title II the following:

> "PART 7—PAYMENTS TO ASSIST WITH COSTS OF COMPLIANCE WITH
> ACCESS ACT
>
> "Sec. 297. Payments to assist with costs of compliance with Access Act.
> "Sec. 297A. Amount of payment.
> "Sec. 297B. Requirements for eligibility.
> "Sec. 297C. Authorization of appropriations.
> "Sec. 297D. Reports.".

17 **SEC. 160010. GRANTS TO STATES FOR CONDUCTING RISK-**

18           **LIMITING AUDITS OF RESULTS OF ELEC-**

19           **TIONS.**

20     (a) AVAILABILITY OF GRANTS.—Subtitle D of title

21 II of the Help America Vote Act of 2002 (52 U.S.C.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003823

1519

1 21001 et seq.), as amended by section 160009(a), is fur-
2 ther amended by adding at the end the following new part:

### "PART 8—GRANTS FOR CONDUCTING RISK-LIMITING AUDITS OF RESULTS OF ELECTIONS

**"SEC. 298. GRANTS FOR CONDUCTING RISK-LIMITING AUDITS OF RESULTS OF ELECTIONS.**

7 "(a) AVAILABILITY OF GRANTS.—The Commission
8 shall make a grant to each eligible State to conduct risk-
9 limiting audits as described in subsection (b) with respect
10 to the regularly scheduled general elections for Federal of-
11 fice held in November 2020 and each succeeding election
12 for Federal office.

13 "(b) RISK-LIMITING AUDITS DESCRIBED.—In this
14 part, a 'risk-limiting audit' is a post-election process—

15     "(1) which is conducted in accordance with
16     rules and procedures established by the chief State
17     election official of the State which meet the require-
18     ments of subsection (c); and

19     "(2) under which, if the reported outcome of
20     the election is incorrect, there is at least a predeter-
21     mined percentage chance that the audit will replace
22     the incorrect outcome with the correct outcome as
23     determined by a full, hand-to-eye tabulation of all
24     votes validly cast in that election that ascertains

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003824

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1520

1 voter intent manually and directly from voter-
2 verifiable paper records.

3 "(c) REQUIREMENTS FOR RULES AND PROCE-
4 DURES.—The rules and procedures established for con-
5 ducting a risk-limiting audit shall include the following
6 elements:

7 "(1) Rules for ensuring the security of ballots
8 and documenting that prescribed procedures were
9 followed.

10 "(2) Rules and procedures for ensuring the ac-
11 curacy of ballot manifests produced by election agen-
12 cies.

13 "(3) Rules and procedures for governing the
14 format of ballot manifests, cast vote records, and
15 other data involved in the audit.

16 "(4) Methods to ensure that any cast vote
17 records used in the audit are those used by the vot-
18 ing system to tally the election results sent to the
19 chief State election official and made public.

20 "(5) Procedures for the random selection of
21 ballots to be inspected manually during each audit.

22 "(6) Rules for the calculations and other meth-
23 ods to be used in the audit and to determine wheth-
24 er and when the audit of an election is complete.

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003825

1521

1    "(7) Procedures and requirements for testing

2    any software used to conduct risk-limiting audits.

3    "(d) DEFINITIONS.—In this part, the following defi-

4    nitions apply:

5    "(1) The term 'ballot manifest' means a record

6    maintained by each election agency that meets each

7    of the following requirements:

8    "(A) The record is created without reliance

9    on any part of the voting system used to tab-

10    ulate votes.

11    "(B) The record functions as a sampling

12    frame for conducting a risk-limiting audit.

13    "(C) The record contains the following in-

14    formation with respect to the ballots cast and

15    counted in the election:

16    "(i) The total number of ballots cast

17    and counted by the agency (including

18    undervotes, overvotes, and other invalid

19    votes).

20    "(ii) The total number of ballots cast

21    in each election administered by the agency

22    (including undervotes, overvotes, and other

23    invalid votes).

24    "(iii) A precise description of the

25    manner in which the ballots are physically

g:\VHLC\051220\051220.072.xml    (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003826

1522

1  stored, including the total number of phys-
2  ical groups of ballots, the numbering sys-
3  tem for each group, a unique label for each
4  group, and the number of ballots in each
5  such group.

6  ''(2) The term 'incorrect outcome' means an
7  outcome that differs from the outcome that would be
8  determined by a full tabulation of all votes validly
9  cast in the election, determining voter intent manu-
10  ally, directly from voter-verifiable paper records.

11  ''(3) The term 'outcome' means the winner of
12  an election, whether a candidate or a position.

13  ''(4) The term 'reported outcome' means the
14  outcome of an election which is determined accord-
15  ing to the canvass and which will become the official,
16  certified outcome unless it is revised by an audit, re-
17  count, or other legal process.

18  **''SEC. 298A. ELIGIBILITY OF STATES.**

19  ''A State is eligible to receive a grant under this part
20  if the State submits to the Commission, at such time and
21  in such form as the Commission may require, an applica-
22  tion containing—

23  ''(1) a certification that, not later than 5 years
24  after receiving the grant, the State will conduct risk-

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003827

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1523

1 limiting audits of the results of elections for Federal

2 office held in the State as described in section 298;

3 ''(2) a certification that, not later than one year

4 after the date of the enactment of this section, the

5 chief State election official of the State has estab-

6 lished or will establish the rules and procedures for

7 conducting the audits which meet the requirements

8 of section 298(c);

9 ''(3) a certification that the audit shall be com-

10 pleted not later than the date on which the State

11 certifies the results of the election;

12 ''(4) a certification that, after completing the

13 audit, the State shall publish a report on the results

14 of the audit, together with such information as nec-

15 essary to confirm that the audit was conducted prop-

16 erly;

17 ''(5) a certification that, if a risk-limiting audit

18 conducted under this part leads to a full manual

19 tally of an election, State law requires that the State

20 or election agency shall use the results of the full

21 manual tally as the official results of the election;

22 and

23 ''(6) such other information and assurances as

24 the Commission may require.

DOC_0003828

1524

1 **"SEC. 298B. AUTHORIZATION OF APPROPRIATIONS.**

2     "There are authorized to be appropriated for grants

3 under this part $20,000,000 for fiscal year 2020, to re-

4 main available until expended.".

5     (b) CLERICAL AMENDMENT.—The table of contents

6 of such Act, as amended by section 160009(b), is further

7 amended by adding at the end of the items relating to

8 subtitle D of title II the following:

> "PART 8—GRANTS FOR CONDUCTING RISK-LIMITING AUDITS OF RESULTS
> OF ELECTIONS
>
> "Sec. 298. Grants for conducting risk-limiting audits of results of elec-
>    tions.
> "Sec. 298A. Eligibility of States.
> "Sec. 298B. Authorization of appropriations.

9     (c) GAO ANALYSIS OF EFFECTS OF AUDITS.—

10     (1) ANALYSIS.—Not later than 6 months after

11     the first election for Federal office is held after

12     grants are first awarded to States for conducting

13     risk-limiting audits under part 8 of subtitle D of

14     title II of the Help America Vote Act of 2002 (as

15     added by subsection (a)) for conducting risk-limiting

16     audits of elections for Federal office, the Comp-

17     troller General of the United States shall conduct an

18     analysis of the extent to which such audits have im-

19     proved the administration of such elections and the

20     security of election infrastructure in the States re-

21     ceiving such grants.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003829

1525

1    (2) REPORT.—The Comptroller General of the
2    United States shall submit a report on the analysis
3    conducted under subsection (a) to the appropriate
4    congressional committees.

5  **SEC. 160011. ADDITIONAL APPROPRIATIONS FOR THE**
6    **ELECTION ASSISTANCE COMMISSION.**

7    (a) IN GENERAL.—In addition to any funds other-
8  wise appropriated to the Election Assistance Commission
9  for fiscal year 2020, there is authorized to be appropriated
10  $3,000,000 for fiscal year 2020 in order for the Commis-
11  sion to provide additional assistance and resources to
12  States for improving the administration of elections.

13    (b) AVAILABILITY OF FUNDS.—Amounts appro-
14  priated pursuant to the authorization under this sub-
15  section shall remain available without fiscal year limita-
16  tion.

17  **SEC. 160012. DEFINITION.**

18    (a) DEFINITION OF ELECTION FOR FEDERAL OF-
19  FICE .—Title IX of the Help America Vote Act of 2002
20  (52 U.S.C. 21141 et seq.) is amended by adding at the
21  end the following new section:

22  **"SEC. 907. ELECTION FOR FEDERAL OFFICE DEFINED.**

23    "For purposes of titles I through III, the term 'elec-
24  tion for Federal office' means a general, special, primary,
25  or runoff election for the office of President or Vice Presi-

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003830

G:\CMTE\AP\16\FY20\_D\HEROES.XML

<div align="center">1526</div>

1  dent, or of Senator or Representative in, or Delegate or

2  Resident Commissioner to, the Congress.''.

3      (b) CLERICAL AMENDMENT.—The table of contents

4  of such Act is amended by adding at the end of the items

5  relating to title IX the following new item:

"Sec. 907. Election for Federal office defined.".

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003831

G:\CMTE\AP\16\FY20\_D\HEROES.XML

<center>1527</center>

1    # DIVISION Q—COVID–19 HEROES FUND

2    **SEC. 170001. SHORT TITLE.**

3    This Act may be cited as the "COVID–19 Heroes

4    Fund Act of 2020".

5    # TITLE I—PROVISIONS RELATING

6    # TO STATE, LOCAL, TRIBAL,

7    # AND PRIVATE SECTOR WORK-

8    # ERS

9    **SEC. 170101. DEFINITIONS.**

10   In this title:

11   (1) COVID–19 PUBLIC HEALTH EMERGENCY.—

12   The term "COVID–19 Public Health Emergency"

13   means the public health emergency first declared on

14   January 31, 2020, by the Secretary of Health and

15   Human Services under section 319 of the Public

16   Health Service Act (42 U.S.C. 247d) with respect to

17   COVID–19.

18   (2) EMPLOYEE.—Except as provided in para-

19   graph (3)(C)(iii), the term "employee" means an in-

20   dividual (not employed by an entity excluded from

21   the definition of the term "employer" for purposes

22   of this title under paragraph (3)(B)) who is—

23   (A) an employee, as defined in section 3(e)

24   of the Fair Labor Standards Act of 1938 (29

25   U.S.C. 203(e)), except that a reference in such

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003832

1528

1     section 3(e) to an employer shall be considered

2     to be a reference to an employer described in

3     clauses (i)(I) and (ii) of paragraph (3)(A);

4         (B) a State employee described in section

5     304(a) of the Government Employee Rights Act

6     of 1991 (42 U.S.C. 2000e–16c(a)); or

7         (C) an employee of a Tribal employer.

8     (3) EMPLOYER.—

9         (A) IN GENERAL.—The term "employer"

10     means, except as provided in subparagraph (B),

11     a person who is—

12         (i)(I) a covered employer, as defined

13         in subparagraph (C);

14         (II) an entity employing a State em-

15         ployee described in section 304(a) of the

16         Government Employee Rights Act of 1991;

17         or

18         (III) a Tribal employer; and

19         (ii) engaged in commerce (including

20     government), or an industry or activity af-

21     fecting commerce (including government).

22         (B) EXCLUSION OF EXECUTIVE, LEGISLA-

23     TIVE, AND JUDICIAL ENTITIES COVERED UNDER

24     TITLE II.—The term "employer" does not in-

25     clude—

DOC_0003833

1529

1     (i) any agency, as defined in section

2     201(1), except, only as provided in section

3     102(g)(2), the VA Office of Geriatrics &

4     Extended Care of the Veterans Health Ad-

5     ministration; or

6         (ii) the Postal Regulatory Commis-

7     sion.

8     (C) COVERED EMPLOYER.—

9         (i) IN GENERAL.—In subparagraph

10    (A)(i)(I), the term ''covered employer''—

11            (I) means any person engaged in

12        commerce (including government), or

13        in any industry or activity affecting

14        commerce (including government),

15        who employs 1 or more employees;

16            (II) includes—

17                (aa) any person who acts di-

18            rectly or indirectly in the interest

19            of (within the meaning of section

20            3(d) of the Fair Labor Standards

21            Act of 1938 (29 U.S.C. 203(d))

22            an employer in relation to any of

23            the employees of such employer;

24            and

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003834

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1530

1    (bb) any successor in inter-
2    est of an employer;

3    (III) except as provided in sub-
4    paragraph (B), includes any public
5    agency, as defined in section 3(x) of
6    the Fair Labor Standards Act of
7    1938 (29 U.S.C. 203(x));

8    (IV) includes any person de-
9    scribed in subclause (I) who conducts
10    business as a not-for-profit organiza-
11    tion;

12    (V) includes—

13    (aa) an entity or person that
14    contracts directly with a State,
15    locality, Tribal government, or
16    the Federal Government, to pro-
17    vide care (which may include
18    items and services) through em-
19    ployees of such entity or person
20    to individuals under the Medicare
21    program under title XVIII of the
22    Social Security Act (42 U.S.C.
23    1395 et seq.), under a State
24    Medicaid plan under title XIX of
25    such Act (42 U.S.C. 1396 et

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003835

1531

1    seq.) or under a waiver of such

2    plan, or under any other program

3    established or administered by a

4    State, locality, Tribal govern-

5    ment, or the Federal Govern-

6    ment;

7        (bb) a subcontractor of an

8    entity or person described in item

9    (aa);

10        (cc) an individual client (or

11    a representative on behalf of an

12    individual client), an entity, or a

13    person, that employs an indi-

14    vidual to provide care (which may

15    include items and services) to the

16    individual client under a self-di-

17    rected service delivery model

18    through a program established or

19    administered by a State, locality,

20    Tribal government, or the Fed-

21    eral Government; or

22        (dd) an individual client (or

23    a representative on behalf of an

24    individual client) that, on their

25    own accord, employs an indi-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003836

1532

1  vidual to provide care (which may

2  include items and services) to the

3  individual client using the indi-

4  vidual client's own finances;

5   (VI) includes the United States

6  Postal Service;

7   (VII) includes a nonappropriated

8  fund instrumentality under the juris-

9  diction of the Armed Forces; and

10   (VIII) includes, only with respect

11  to section 102(g)(2), the VA Office of

12  Geriatrics & Extended Care of the

13  Veterans Health Administration.

14  (ii) PUBLIC AGENCY.—For purposes

15  of this title, a public agency shall be con-

16  sidered to be a person engaged in com-

17  merce or in an industry or activity affect-

18  ing commerce.

19  (iii) DEFINITION OF EMPLOYEE.—For

20  purposes of clause (i), the term "em-

21  ployee" has the meaning given such term

22  in section 3(e), except such term does not

23  include any individual employed by entity

24  excluded from the definition of the term

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003837

1533

1     ''employer'' for purposes of this title under

2     subparagraph (B).

3     (D) PREDECESSORS.—Any reference in

4     this paragraph to an employer shall include a

5     reference to any predecessor of such employer.

6     (E) DEFINITION OF COMMERCE.—For pur-

7     poses of this paragraph, the terms ''commerce''

8     and ''industry or activity affecting com-

9     merce''—

10        (i) mean any activity, business, or in-

11        dustry in commerce or in which a labor

12        dispute would hinder or obstruct commerce

13        or the free flow of commerce;

14        (ii) include commerce and any indus-

15        try affecting commerce, as such terms are

16        defined in paragraphs (1) and (3) of sec-

17        tion 501 of the Labor Management Rela-

18        tions Act, 1947 (29 U.S.C. 142(1) and

19        (3)); and

20        (iii) include commerce, as defined in

21        section 3(b) of the Fair Labor Standards

22        Act of 1938 (29 U.S.C. 203(b)) and as de-

23        scribed in section 2(a) of such Act (29

24        U.S.C. 202(a)).

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003838

1534

1 　(4) EMPLOYER PAYROLL TAXES.—The term

2 "employer payroll taxes" means—

3 　　　(A) taxes imposed under sections 3111(b),

4 　　3221(a) (but only to the extent attributable to

5 　　the portion of such tax attributable to the tax

6 　　imposed by section 3111(b)), 3221(b), and

7 　　3301 of the Internal Revenue Code of 1986;

8 　　and

9 　　　(B) taxes imposed by a State or local gov-

10 　　ernment on an employer with respect to

11 　　amounts paid by such employer for work by em-

12 　　ployees.

13 　(5) ESSENTIAL WORK.—The term "essential

14 work" means any work that—

15 　　　(A) is performed during the period that be-

16 　　gins on January 27, 2020 and ends 60 days

17 　　after the last day of the COVID–19 Public

18 　　Health Emergency;

19 　　　(B) is not performed while teleworking

20 　　from a residence;

21 　　　(C) involves—

22 　　　　(i) regular in-person interactions

23 　　　with—

24 　　　　　(I) patients;

25 　　　　　(II) the public; or

g:\VHLC\051220\051220.072.xml　　(763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003839

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1535

1               (III) coworkers of the individual

2           performing the work; or

3           (ii) regular physical handling of items

4        that were handled by, or are to be handled

5        by—

6               (I) patients;

7               (II) the public; or

8               (III) coworkers of the individual

9           performing the work; and

10      (D) is in any of the following areas:

11          (i) First responder work, in the public

12       sector or private sector, including services

13       in response to emergencies that have the

14       potential to cause death or serious bodily

15       injury, such as police, fire, emergency med-

16       ical, protective, child maltreatment, domes-

17       tic violence, and correctional services (in-

18       cluding activities carried out by employees

19       in fire protection activities, as defined in

20       section 3(y) of the Fair Labor Standards

21       Act of 1938 (29 U.S.C. 203(y)) and activi-

22       ties of law enforcement officers, as defined

23       in section 1204(6) of the Omnibus Crime

24       Control and Safe Streets Act of 1968 (34

25       U.S.C. 10284(6)).

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003840

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1536

1      (ii) Health care work physically pro-
2   vided in inpatient settings (including hos-
3   pitals and other inpatient post-acute care
4   settings such as nursing homes, inpatient
5   rehabilitation facilities, and other related
6   settings) and other work physically per-
7   formed in such inpatient settings that sup-
8   ports or is in furtherance of such health
9   care work physically provided in inpatient
10  settings.

11      (iii) Health care work physically pro-
12  vided in outpatient settings (including at
13  physician offices, community health cen-
14  ters, rural health clinics and other clinics,
15  hospital outpatient departments, free-
16  standing emergency departments, ambula-
17  tory surgical centers, and other related set-
18  tings), and other work physically per-
19  formed in such inpatient settings that sup-
20  ports or is in furtherance of such health
21  care work physically provided in outpatient
22  settings.

23      (iv) Pharmacy work, physically per-
24  formed in pharmacies, drug stores, or

g:\VHLC\051220\051220.072.xml        (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003841

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1537

1     other retail facilities specializing in medical

2     goods and supplies.

3         (v) Any work physically performed in

4     a facility that performs medical testing and

5     diagnostic services, including laboratory

6     processing, medical testing services, or re-

7     lated activities.

8         (vi) Home and community-based

9     work, including home health care, residen-

10     tial care, assistance with activities of daily

11     living, and any services provided by direct

12     care workers (as defined in section 799B

13     of the Public Health Service Act (42

14     U.S.C. 295p)), personal care aides, job

15     coaches, or supported employment pro-

16     viders, and any other provision of care to

17     individuals in their homes by direct service

18     providers, personal care attendants, and

19     home health aides.

20         (vii) Biomedical research regarding

21     SARS–CoV–2 and COVID–19 that in-

22     volves the handling of hazardous materials

23     such as COVID–19 samples.

24         (viii) Behavioral health work requiring

25     physical interaction with individuals, in-

DOC_0003842

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1538

1    cluding mental health services and sub-
2    stance use disorder prevention, treatment,
3    and recovery services.

4    (ix) Nursing care and residential care
5    work physically provided in a facility.

6    (x) Family care, including child care
7    services, in-home child care services such
8    as nanny services, and care services pro-
9    vided by family members to other family
10   members.

11   (xi) Social services work, including so-
12   cial work, case management, social and
13   human services, child welfare, family serv-
14   ices, shelter and services for people who
15   have experienced intimate partner violence
16   or sexual assault, services for individuals
17   who are homeless, child services, commu-
18   nity food and housing services, and other
19   emergency social services.

20   (xii) Public health work conducted at
21   State, local, territorial, and Tribal govern-
22   ment public health agencies, including epi-
23   demiological activities, surveillance, contact
24   tracing, data analysis, statistical research,

g:\VHLC\051220\051220.072.xml        (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003843

1539

1  health education, and other disease detec-
2  tion, prevention, and response methods.

3  (xiii) Tribal vital services, as defined
4  by the Commissioner of the Administration
5  for Native Americans in consultation with
6  Tribal governments and after conferring
7  with urban Indian organizations.

8  (xiv) Grocery work physically per-
9  formed at grocery stores, supermarkets,
10  convenience stores, corner stores, drug
11  stores, retail facilities specializing in med-
12  ical goods and supplies, bodegas, and other
13  locations where individuals purchase non-
14  prepared food items.

15  (xv) Restaurant work, including carry-
16  out, drive-thru, or food delivery work, re-
17  quiring physical interaction with individ-
18  uals or food products.

19  (xvi) Food production work involving
20  the physical interaction with food products,
21  including all agricultural work, farming,
22  fishing, forestry, ranching, processing, can-
23  ning, slaughtering, packaging, baking,
24  butchering, and other food production
25  work, such as any service or activity in-

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003844

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1540

1  cluded within the provisions of section 3(f)

2  of the Fair Labor Standards Act of 1938

3  (29 U.S.C. 203(f)), or section 3121(g) of

4  the Internal Revenue Code of 1986, and

5  the handling, planting, drying, packing,

6  packaging, processing, freezing, or grading

7  prior to delivery for storage of any agricul-

8  tural or horticultural commodity in its un-

9  manufactured state.

10  (xvii) Transportation work, includ-

11  ing—

12  (I) any services in public trans-

13  portation, as defined in section

14  5302(14) of title 49, United States

15  Code;

16  (II) any private transportation of

17  people, such as transportation pro-

18  vided by air, rail, bus, taxicab, per-

19  sonal car or truck, non-motorized ve-

20  hicle, or otherwise, including all serv-

21  ices performed by individuals working

22  in or on such vehicles, vehicle depots,

23  or transit facilities;

24  (III) any private transportation

25  of goods in bulk, including transpor-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003845

1541

1 tation via heavy or light truck, rail,
2 air, or otherwise;

3 (IV) any public or private trans-
4 portation of mail or packages;

5 (V) any private transportation of
6 food or other goods to individuals, in-
7 cluding in a personal car or truck,
8 non-motorized vehicle, or otherwise;

9 (VI) any services in passenger
10 rail transportation, including com-
11 muter rail, intercity passenger rail, or
12 Amtrak, including services performed
13 by employees of contractors of such
14 entities;

15 (VII) any services in the trans-
16 portation of persons, property, or mail
17 by an aircraft of an air carrier con-
18 ducting operations under part 121 of
19 title 14, Code of Federal Regulations
20 (or successor regulations), or a for-
21 eign air carrier within, to, or from the
22 United States, either on board an air-
23 craft or on the ground at an airport,
24 including services performed by em-
25 ployees of contractors of air carriers,

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003846

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1542

1   or foreign air carriers, as described in

2   section 4111(3) of the CARES Act

3   (Public Law 116–136);

4       (VIII) any services as an aircraft

5   mechanic or technician who performs

6   maintenance, repair, or overhaul work

7   on an aircraft of an air carrier con-

8   ducting operations under such part

9   121 or foreign air carrier within the

10   United States;

11       (IX) services as maritime work-

12   ers who qualify as seamen under sec-

13   tion 10101(3) of title 46, United

14   States Code, and other maritime em-

15   ployees including—

16           (aa) longshoremen, harbor

17       workers and shipbuilders covered

18       under section 2(3) of the

19       Longshore and Harbor Workers'

20       Compensation Act (33 U.S.C.

21       902(3)) involved in the transpor-

22       tation of merchandise or pas-

23       sengers by water; and

24           (bb) shipbuilders and ship

25       repairers who are working for an

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003847

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1543

1             employer performing shipbuilding

2             or ship repair work under con-

3             tract or subcontract to the De-

4             partments of Defense, Energy or

5             Homeland Security for military

6             or other national security pur-

7             poses; and

8             (X) services as maritime trans-

9             portation workers supporting or ena-

10             bling transportation functions, includ-

11             ing such services as—

12             (aa) barge workers, tug op-

13             erators, and port and facility se-

14             curity personnel;

15             (bb) marine dispatchers; and

16             (cc) workers who repair and

17             maintain marine vessels (includ-

18             ing the equipment and infra-

19             structure that enables operations

20             that encompass movement of

21             cargo and passengers).

22             (xviii) Work physically performed in a

23 warehouse or other facility in warehousing

24 (including all services performed by indi-

25 viduals picking, sorting, packing, and ship-

DOC_0003848

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1544

1   ping in warehouses), storage, distribution,
2   or call center support facilities, and other
3   essential operational support functions that
4   are necessary to accept, store, and process
5   goods, and that facilitate the goods' trans-
6   portation and delivery.

7   (xix) Cleaning work and building
8   maintenance work physically performed on
9   the grounds of a facility, including all cus-
10  todial or janitorial services, security serv-
11  ices, and repair and maintenance services.

12  (xx) Work in the collection, removal,
13  transport, storage, or disposal of residen-
14  tial, industrial, or commercial solid waste
15  and recycling, including services provided
16  by individuals who drive waste or recycling
17  trucks, who pick up waste or recycling
18  from residential or commercial locations,
19  or who work at waste or recycling centers
20  or landfills.

21  (xxi) Work in the gathering, proc-
22  essing, disseminating, and delivery of news
23  and information that serves the public in-
24  terest to the public through mass media,
25  including television, radio, and newspapers.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003849

G:\CMTE\AP\16\FY20\_D\HEROES.XML

<div align="center">1545</div>

1       (xxii) Any work performed by an em-
2  ployee of a State, locality, or Tribal gov-
3  ernment, that is determined to be essential
4  work by the highest authority of such
5  State, locality, or Tribal government.

6       (xxiii) Educational work, school nutri-
7  tion work, and other work required to op-
8  erate a school facility, including early
9  childhood programs, preschool programs,
10  elementary and secondary education, and
11  higher education.

12       (xxiv) Laundry work, including work
13  in laundromats, laundry service companies,
14  and dry cleaners.

15       (xxv) Elections work physically per-
16  formed at polling places or otherwise
17  amongst the public, including public-sector
18  elections personnel and private-sector elec-
19  tions personnel.

20       (xxvi) Hazardous materials manage-
21  ment, response, and cleanup work associ-
22  ated with any other essential work covered
23  under this paragraph, including health
24  care waste (including medical, pharma-
25  ceuticals, and medical material produc-

DOC_0003850

1546

1  tion), and testing operations (including

2  laboratories processing test kits).

3      (xxvii) Disinfection work for all facili-

4  ties and modes of transportation involved

5  in other essential work covered under this

6  paragraph.

7      (xxviii) Work in critical clinical re-

8  search, development, and testing necessary

9  for COVID–19 response that involves

10  physical interaction with hazardous mate-

11  rials, such as samples of COVID–19.

12      (xxix) Work in mortuary, funeral, cre-

13  mation, burial, cemetery, and related serv-

14  ices.

15      (xxx) Work requiring physical inter-

16  actions with patients in physical therapy,

17  occupational therapy, speech-language pa-

18  thology, and respiratory therapy and other

19  therapy services.

20      (xxxi) Dental care work requiring

21  physical interaction with patients.

22      (xxxii) Work performed by employees

23  of the U.S. Postal Service.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003851

1547

1         (xxxiii) Work at hotel and commercial

2         lodging facilities that are used for COVID–

3         19 mitigation and containment measures.

4   (6) ESSENTIAL WORKER.—

5         (A) IN GENERAL.—The term "essential

6         worker" means an individual, whose work and

7         duties include essential work, and who is—

8             (i) an employee of an employer; or

9             (ii) an individual performing any serv-

10         ices or labor for remuneration for an em-

11         ployer, regardless of whether the individual

12         is classified as an independent contractor

13         by the employer.

14         (B) IMMIGRATION STATUS.—Such term in-

15         cludes an individual regardless of the individ-

16         ual's immigration status.

17   (7) ESSENTIAL WORK EMPLOYER.—The term

18   "essential work employer" means an employer who

19   employs, or provides remuneration for services or

20   labor to, an essential worker.

21   (8) FLSA TERMS.—The terms "employ", "per-

22   son", "regular rate", and "State" have the mean-

23   ings given the terms in section 3 of the Fair Labor

24   Standards Act of 1938 (29 U.S.C. 203).

1548

1 (9) HIGHLY-COMPENSATED ESSENTIAL WORK-
2 ER.—The term "highly-compensated essential work-
3 er" means an essential worker who is paid the equiv-
4 alent of $200,000 or more per year by an essential
5 work employer.

6 (10) LARGE ESSENTIAL WORK EMPLOYER.—
7 The term "large essential work employer" means an
8 essential work employer who has more than 500 in-
9 dividuals who are employed by the employer or are
10 otherwise providing services or labor for remunera-
11 tion for the employer.

12 (11) SELF-DIRECTED CARE WORKER.—The
13 term "self-directed care worker" means an indi-
14 vidual employed to provide care (which may include
15 items and services) to an individual client—

16 (A) under a self-directed service delivery
17 model through a program established or admin-
18 istered by a State, locality, Tribal government,
19 or the Federal Government; or

20 (B) on the individual client's own accord
21 and using the individual client's own finances.

22 (12) TRIBAL EMPLOYER.—The term "Tribal
23 employer" means—

24 (A) any Tribal government, a subdivision
25 of a Tribal government (determined in accord-

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003853

1549

1 ance with section 7871(d) of the Internal Rev-

2 enue Code), or an agency or instrumentality of

3 a Tribal government or subdivision thereof;

4  (B) any Tribal organization (as the term

5 "tribal organization" is defined in section 4(l)

6 of the Indian Self-Determination and Education

7 Assistance Act (25 U.S.C. 5304(l));

8  (C) any corporation if more than 50 per-

9 cent (determined by vote and value) of the out-

10 standing stock of such corporation is owned, di-

11 rectly or indirectly, by any entity described in

12 subparagraph (A) or (B); or

13  (D) any partnership if more than 50 per-

14 cent of the value of the capital and profits in-

15 terests of such partnership is owned, directly or

16 indirectly, by any entity described in subpara-

17 graph (A) or (B).

18 (13) TRIBAL GOVERNMENT.—The term "Tribal

19 government" means the recognized governing body

20 of any Indian or Alaska Native tribe, band, nation,

21 pueblo, village, community, component band, or com-

22 ponent reservation individually identified (including

23 parenthetically) in the list published most recently as

24 of the date of enactment of this Act pursuant to sec-

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003854

1550

1     tion 104 of the Federally Recognized Indian Tribe

2     List Act of 1994 (25 U.S.C. 5131).

3         (14) WORK.—The term "work" means employ-

4     ment by, or engagement in providing labor or serv-

5     ices for, an employer.

**6 SEC. 170102. PANDEMIC PREMIUM PAY FOR ESSENTIAL**

**7            WORKERS.**

8     (a) IN GENERAL.— Beginning 3 days after an essen-

9 tial work employer receives a grant under section 104

10 from the Secretary of the Treasury, the essential work em-

11 ployer shall—

12         (1) be required to comply with subsections (b)

13     through (h); and

14         (2) be subject to the enforcement requirements

15     of section 105.

16     (b) PANDEMIC PREMIUM PAY.—

17         (1) IN GENERAL.—An essential work employer

18     receiving a grant under section 104 shall, in accord-

19     ance with this subsection, provide each essential

20     worker of the essential work employer with premium

21     pay at a rate equal to $13 for each hour of work

22     performed by the essential worker for the employer

23     from January 27, 2020, until the date that is 60

24     days after the last day of the COVID–19 Public

25     Health Emergency.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003855

1551

1    (2) Maximum amounts.—The total amount of
2    all premium pay under this subsection that an essen-
3    tial work employer is required to provide to an es-
4    sential worker, including through any retroactive
5    payment under paragraph (3), shall not exceed—

6        (A) for an essential worker who is not a
7        highly-compensated essential worker, $10,000
8        reduced by employer payroll taxes with respect
9        to such premium pay; or

10       (B) for a highly-compensated essential
11       worker, $5,000 reduced by employer payroll
12       taxes with respect to such premium pay.

13   (3) Retroactive payment.—For all work
14   performed by an essential worker during the period
15   from January 27, 2020, through the date on which
16   the essential work employer of the worker receives a
17   grant under this title, the essential work employer
18   shall use a portion of the amount of such grant to
19   provide such worker with premium pay under this
20   subsection for such work at the rate provided under
21   paragraph (1). Such amount shall be provided to the
22   essential worker as a lump sum in the next paycheck
23   (or other payment form) that immediately follows
24   the receipt of the grant by the essential work em-
25   ployer. In any case where it is impossible for the em-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003856

1552

1   ployer to arrange for payment of the amount due in

2   such paycheck (or other payment form), such

3   amounts shall be paid as soon as practicable, but in

4   no event later than the second paycheck (or other

5   payment form) following the receipt of the grant by

6   the essential work employer.

7   (4) NO EMPLOYER DISCRETION.—An essential

8   work employer receiving a grant under section 104

9   shall not have any discretion to determine which

10   portions of work performed by an essential worker

11   qualify for premium pay under this subsection, but

12   shall pay such premium pay for any increment of

13   time worked by the essential worker for the essential

14   work employer up to the maximum amount applica-

15   ble to the essential worker under paragraph (2).

16   (c) PROHIBITION ON REDUCING COMPENSATION AND

17   DISPLACEMENT.—

18   (1) IN GENERAL.—Any payments made to an

19   essential worker as premium pay under subsection

20   (b) shall be in addition to all other compensation, in-

21   cluding all wages, remuneration, or other pay and

22   benefits, that the essential worker otherwise receives

23   from the essential work employer.

24   (2) REDUCTION OF COMPENSATION.—An essen-

25   tial work employer receiving a grant under section

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003857

1553

1 104 shall not, during the period beginning on the
2 date of enactment of this Act and ending on the
3 date that is 60 days after the last day of the
4 COVID–19 Public Health Emergency, reduce or in
5 any other way diminish, any other compensation, in-
6 cluding the wages, remuneration, or other pay or
7 benefits, that the essential work employer provided
8 to the essential worker on the day before the date
9 of enactment of this Act.

10    (3) DISPLACEMENT.—An essential work em-
11 ployer shall not take any action to displace an essen-
12 tial worker (including partial displacement such as a
13 reduction in hours, wages, or employment benefits)
14 for purposes of hiring an individual for an equivalent
15 position at a rate of compensation that is less than
16 is required to be provided to an essential worker
17 under paragraph (2).

18 (d) DEMARCATION FROM OTHER COMPENSATION.—
19 The amount of any premium pay paid under subsection
20 (b) shall be clearly demarcated as a separate line item in
21 each paystub or other document provided to an essential
22 worker that details the remuneration the essential worker
23 received from the essential work employer for a particular
24 period of time. If any essential worker does not otherwise
25 regularly receive any such paystub or other document from

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003858

1554

1 the employer, the essential work employer shall provide
2 such paystub or other document to the essential worker
3 for the duration of the period in which the essential work
4 employer provides premium pay under subsection (b).

5 (e) EXCLUSION FROM WAGE-BASED CALCULA-
6 TIONS.—Any premium pay under subsection (b) paid to
7 an essential worker under this section by an essential work
8 employer receiving a grant under section 104 shall be ex-
9 cluded from the amount of remuneration for work paid
10 to the essential worker for purposes of—

11     (1) calculating the essential worker's eligibility
12     for any wage-based benefits offered by the essential
13     work employer;

14     (2) computing the regular rate at which such
15     essential worker is employed under section 7 of the
16     Fair Labor Standards Act of 1938 (29 U.S.C. 207);
17     and

18     (3) determining whether such essential worker
19     is exempt from application of such section 7 under
20     section 13(a)(1) of such Act (29 U.S.C. 213(a)(1)).
21 (f) ESSENTIAL WORKER DEATH.—

22     (1) IN GENERAL.—In any case in which an es-
23     sential worker of an essential work employer receiv-
24     ing a grant under section 104 exhibits symptoms of
25     COVID–19 and dies, the essential work employer

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003859

1555

1    shall pay as a lump sum to the next of kin of the

2    essential worker for premium pay under subsection

3    (b)—

4          (A) for an essential worker who is not a

5    highly-compensated essential worker, the

6    amount determined under subsection (b)(2)(A)

7    minus the total amount of any premium pay the

8    worker received under subsection (b) prior to

9    the death; or

10         (B) for a highly-compensated essential

11    worker, the amount determined under sub-

12    section (b)(2)(B) minus the amount of any pre-

13    mium pay the worker received under subsection

14    (b) prior to the death.

15   (2) TREATMENT OF LUMP SUM PAYMENTS.—

16         (A) TREATMENT AS PREMIUM PAY.—For

17    purposes of this title, any payment made under

18    this subsection shall be treated as a premium

19    pay under subsection (b).

20         (B) TREATMENT FOR PURPOSES OF IN-

21    TERNAL REVENUE CODE OF 1986.—For pur-

22    poses of the Internal Revenue Code of 1986,

23    any payment made under this subsection shall

24    be treated as a payment for work performed by

25    the essential worker.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003860

1556

1    (g) APPLICATION TO SELF-DIRECTED CARE WORK-

2 ERS FUNDED THROUGH MEDICAID OR THE VETERAN-DI-

3 RECTED CARE PROGRAM.—

4        (1) MEDICAID.—In the case of an essential

5    work employer receiving a grant under section 104

6    that is a covered employer described in section

7    101(3)(C)(i)(V) who, under a State Medicaid plan

8    under title XIX of the Social Security Act (42

9    U.S.C. 1396 et seq.) or under a waiver of such plan,

10   has opted to receive items or services using a self-

11   directed service delivery model, the preceding re-

12   quirements of this section, including the require-

13   ments to provide premium pay under subsection (b)

14   (including a lump sum payment in the event of an

15   essential worker death under subsection (f)) and the

16   requirements of sections 104 and 105, shall apply to

17   the State Medicaid agency responsible for the ad-

18   ministration of such plan or waiver with respect to

19   self-directed care workers employed by that em-

20   ployer. In administering payments made under this

21   title to such self-directed care workers on behalf of

22   such employers, a State Medicaid agency shall—

23           (A) exclude and disregard any payments

24       made under this title to such self-directed work-

25       ers from the individualized budget that applies

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003861

1557

1  to the items or services furnished to the indi-
2  vidual client employer under the State Medicaid
3  plan or waiver;

4    (B) to the extent practicable, administer
5  and provide payments under this title directly
6  to such self-directed workers through arrange-
7  ments with entities that provide financial man-
8  agement services in connection with the self-di-
9  rected service delivery models used under the
10  State Medicaid plan or waiver; and

11    (C) ensure that individual client employers
12  of such self-directed workers are provided notice
13  of, and comply with, the prohibition under sec-
14  tion 105(b)(1)(B).

15  (2) VETERAN-DIRECTED CARE PROGRAM.—In
16  the case of an essential work employer that is a cov-
17  ered employer described in section 101(3)(C)(i)(V)
18  who is a veteran participating in the Veteran Di-
19  rected Care program administered by the VA Office
20  of Geriatrics & Extended Care of the Veterans
21  Health Administration, the preceding requirements
22  of this section and sections 104 and 105, shall apply
23  to such VA Office of Geriatrics & Extended Care
24  with respect to self-directed care workers employed
25  by that employer. Paragraph (1) of this subsection

DOC_0003862

1558

1 shall apply to the administration by the VA Office
2 of Geriatrics & Extended Care of payments made
3 under this title to such self-directed care workers on
4 behalf of such employers in the same manner as
5 such requirements apply to State Medicaid agencies.

6 (3) PENALTY ENFORCEMENT.—The Secretary
7 of Labor shall consult with the Secretary of Health
8 and Human Services and the Secretary of Veterans
9 Affairs regarding the enforcement of penalties im-
10 posed under section 105(b)(2) with respect to viola-
11 tions of subparagraph (A) or (B) of section
12 105(b)(1) that involve self-directed workers for
13 which the requirements of this section and sections
14 104 and 105 are applied to a State Medicaid agency
15 under paragraph (1) or the VA Office of Geriatrics
16 & Extended Care under paragraph (2).

17 (h) INTERACTION WITH STAFFORD ACT.—Nothing
18 in this section shall nullify, supersede, or otherwise change
19 a State's ability to seek reimbursement under section 403
20 of the Robert T. Stafford Disaster Relief and Emergency
21 Assistance Act (42 U.S.C. 5170b) for the costs of pre-
22 mium pay based on pre-disaster labor policies for eligible
23 employees.

24 (i) CALCULATION OF PAID LEAVE UNDER FFCRA
25 AND FMLA.—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003863

1559

1   (1) FAMILIES FIRST CORONAVIRUS RESPONSE

2   ACT.—Section 5110(5)(B) of the Families First

3   Coronavirus Response Act (29 U.S.C. 2601 note) is

4   amended by adding at the end the following:

5           "(iii) PANDEMIC PREMIUM PAY.—

6           Compensation received by an employee

7           under section 102(b) of the COVID–19

8           Heroes Fund Act of 2020 shall be included

9           as remuneration for employment paid to

10          the employee for purposes of computing

11          the regular rate at which such employee is

12          employed.".

13  (2) FAMILY AND MEDICAL LEAVE ACT OF

14  1993.—Section 110(b)(2)(B) of the Family and Med-

15  ical Leave Act of 1993 (29 U.S.C. 2620(b)(2)(B)) is

16  amended by adding at the end the following:

17          "(iii) PANDEMIC PREMIUM PAY.—

18          Compensation received by an employee

19          under section 102(b) of the COVID–19

20          Heroes Fund Act of 2020 shall be included

21          as remuneration for employment paid to

22          the employee for purposes of computing

23          the regular rate at which such employee is

24          employed.".

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003864

1560

1 **SEC. 170103. COVID–19 HEROES FUND.**

2  (a) ESTABLISHMENT.—There is established in the

3 Treasury of the United States a fund to be known as the

4 "COVID–19 Heroes Fund" (referred to in this section as

5 the "Fund"), consisting of amounts appropriated to the

6 fund under section 107.

7  (b) FUND ADMINISTRATION.—The Fund shall be ad-

8 ministered by the Secretary of the Treasury.

9  (c) USE OF FUNDS.—Amounts in the Fund shall be

10 available to the Secretary of the Treasury for carrying out

11 section 104.

12 **SEC. 170104. COVID–19 HEROES FUND GRANTS.**

13  (a) GRANTS.—

14   (1) FOR PANDEMIC PREMIUM PAY.—The Sec-

15   retary of the Treasury shall award a grant to each

16   essential work employer that applies for a grant, in

17   accordance with this section, for the purpose of pro-

18   viding premium pay to essential workers under sec-

19   tion 102(b), including amounts paid under section

20   102(f).

21   (2) ELIGIBILITY.—

22    (A) ELIGIBLE EMPLOYERS GENERALLY.—

23    Any essential work employer shall be eligible for

24    a grant under paragraph (1).

25    (B) SELF-DIRECTED CARE WORKERS.—A

26    self-directed care worker employed by an essen-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003865

1561

1 tial work employer other than an essential work
2 employer described in section 102(g), shall be
3 eligible to apply for a grant under paragraph
4 (1) in the same manner as an essential work
5 employer. Such a worker shall provide premium
6 pay to himself or herself in accordance with this
7 section, including the recordkeeping and refund
8 requirements of this section.

9 (b) AMOUNT OF GRANTS.—

10 (1) IN GENERAL.—The maximum amount avail-
11 able for making a grant under subsection (a)(1) to
12 an essential work employer shall be equal to the sum
13 of—

14 (A) the amount obtained by multiplying
15 $10,000 by the number of essential workers the
16 employer certifies, in the application submitted
17 under subsection (c)(1), as employing, or pro-
18 viding remuneration to for services or labor,
19 who are paid wages or remuneration by the em-
20 ployer at a rate that is less than the equivalent
21 of $200,000 per year; and

22 (B) the amount obtained by multiplying
23 $5,000 by the number of highly-compensated
24 essential workers the employer certifies, in the
25 application submitted under subsection (c)(1),

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003866

1562

1    as employing, or providing remuneration to for

2    services or labor, who are paid wages or remu-

3    neration by the employer at a rate that is equal

4    to or greater than the equivalent of $200,000

5    per year.

6    (2) NO PARTIAL GRANTS.—The Secretary of

7    the Treasury shall not award a grant under this sec-

8    tion in an amount less than the maximum described

9    in paragraph (1).

10    (c) GRANT APPLICATION AND DISBURSAL.—

11    (1) APPLICATION.—Any essential work em-

12    ployer seeking a grant under subsection (a)(1) shall

13    submit an application to the Secretary of the Treas-

14    ury at such time, in such manner, and complete with

15    such information as the Secretary may require.

16    (2) NOTICE AND CERTIFICATION.—

17    (A) IN GENERAL.—The Secretary of the

18    Treasury shall, within 15 days after receiving a

19    complete application from an essential work em-

20    ployer eligible for a grant under this section—

21    (i) notify the employer of the Sec-

22    retary's findings with respect to the re-

23    quirements for the grant; and

24    (ii)(I) if the Secretary finds that the

25    essential work employer meets the require-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003867

1563

1     ments under this section for a grant under

2     subsection (a), provide a certification to

3     the employer—

4         (aa) that the employer has met

5         such requirements;

6         (bb) of the amount of the grant

7         payment that the Secretary has deter-

8         mined the employer shall receive

9         based on the requirements under this

10        section; or

11       (II) if the Secretary finds that the es-

12     sential work employer does not meet the

13     requirements under this section for a grant

14     under subsection (a), provide a notice of

15     denial stating the reasons for the denial

16     and provide an opportunity for administra-

17     tive review by not later than 10 days after

18     the denial.

19     (B) TRANSFER.—Not later than 7 days

20     after making a certification under subpara-

21     graph (A)(ii) with respect to an essential work

22     employer, the Secretary of the Treasury shall

23     make the appropriate transfer to the employer

24     of the amount of the grant.

25  (d) USE OF FUNDS.—

DOC_0003868

1564

1    (1) IN GENERAL.—An essential work employer

2    receiving a grant under this section shall use the

3    amount of the grant solely for the following pur-

4    poses:

5       (A) Providing premium pay under section

6       102(b) to essential workers in accordance with

7       the requirements for such payments under such

8       section, including providing payments described

9       in section 102(f) to the next of kin of essential

10      workers in accordance with the requirements

11      for such payments under such section.

12      (B) Paying employer payroll taxes with re-

13      spect to premium pay amounts described in

14      subparagraph (A), including such payments de-

15      scribed in section 102(f).

16   Each dollar of a grant received by an essential work

17   employer under this title shall be used as provided

18   in subparagraph (A) or (B) or returned to the Sec-

19   retary of the Treasury.

20   (2) NO OTHER USES AUTHORIZED.—An essen-

21   tial work employer who uses any amount of a grant

22   for a purpose not required under paragraph (1) shall

23   be—

24      (A) considered to have misused funds in

25      violation of section 102; and

DOC_0003869

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1565

1    (B) subject to the enforcement and rem-

2   edies provided under section 105.

3  (3) REFUND.—

4    (A) IN GENERAL.—If an essential work

5   employer receives a grant under this section

6   and, for any reason, does not provide every dol-

7   lar of such grant to essential workers in accord-

8   ance with the requirements of this title, then

9   the employer shall refund any such dollars to

10   the Secretary of the Treasury not later than

11   June 30, 2021. Any amounts returned to the

12   Secretary shall be deposited into the Fund and

13   be available for any additional grants under this

14   section.

15    (B) REQUIREMENT FOR NOT REDUCING

16   COMPENSATION.—An essential work employer

17   who is required to refund any amount under

18   this paragraph shall not reduce or otherwise di-

19   minish an eligible worker's compensation or

20   benefits in response to or otherwise due to such

21   refund.

22  (e) RECORDKEEPING.—An essential work employer

23 that receives a grant under this section shall—

24    (1) maintain records, including payroll records,

25   demonstrating how each dollar of funds received

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003870

1566

1 through the grant were provided to essential work-

2 ers; and

3     (2) provide such records to the Secretary of the

4 Treasury or the Secretary of Labor upon the request

5 of either such Secretary.

6 (f) RECOUPMENT.—In addition to all other enforce-

7 ment and remedies available under this title or any other

8 law, the Secretary of the Treasury shall establish a process

9 under which the Secretary shall recoup the amount of any

10 grant awarded under subsection (a)(1) if the Secretary de-

11 termines that the essential work employer receiving the

12 grant—

13     (1) did not provide all of the dollars of such

14 grant to the essential workers of the employer;

15     (2) did not, in fact, have the number of essen-

16 tial workers certified by the employer in accordance

17 with subparagraphs (A) and (B) of subsection

18 (b)(1);

19     (3) did not pay the essential workers for the

20 number of hours the employer claimed to have paid;

21 or

22     (4) otherwise misused funds or violated this

23 title.

24 (g) SPECIAL RULE FOR CERTAIN EMPLOYEES OF

25 TRIBAL EMPLOYERS.—Essential workers of Tribal em-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003871

1567

1 ployers who receive funds under title II shall not be eligi-

2 ble to receive funds from grants under this section.

3 (h) TAX TREATMENT.—

4     (1) EXCLUSION FROM INCOME.—For purposes

5     of the Internal Revenue Code of 1986, any grant re-

6     ceived by an essential work employer under this sec-

7     tion shall not be included in the gross income of

8     such essential work employer.

9     (2) DENIAL OF DOUBLE BENEFIT.—

10         (A) IN GENERAL.—In the case of an essen-

11         tial work employer that receives a grant under

12         this section—

13             (i) amounts paid under subsections

14             (b) or (f) of section 102 shall not be taken

15             into account as wages for purposes of sec-

16             tions 41, 45A, 51, or 1396 of the Internal

17             Revenue Code of 1986 or section 2301 of

18             the CARES Act (Public Law 116–136);

19             and

20             (ii) any deduction otherwise allowable

21             under such Code for applicable payments

22             during any taxable year shall be reduced

23             (but not below zero) by the excess (if any)

24             of—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003872

1568

1                (I) the aggregate amounts of

2                grants received under this section;

3                over

4                (II) the sum of any amount re-

5                funded under subsection (d) plus the

6                aggregate amount of applicable pay-

7                ments made for all preceding taxable

8                years.

9        (B) APPLICABLE PAYMENTS.—For pur-

10    poses of this paragraph, the term "applicable

11    payments" means amounts paid as premium

12    pay under subsections (b) or (f) of section 102

13    and amounts paid for employer payroll taxes

14    with respect to such amounts.

15        (C) AGGREGATION RULE.—Rules similar

16    to the rules of subsections (a) and (b) of section

17    52 of the Internal Revenue Code of 1986 shall

18    apply for purposes of this section.

19    (3) INFORMATION REPORTING.—The Secretary

20    of the Treasury shall submit to the Commissioner of

21    Internal Revenue statements containing—

22        (A) the name and tax identification num-

23    ber of each essential work employer receiving a

24    grant under this section;

25        (B) the amount of such grant; and

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003873

1569

1       (C) any amounts refunded under section

2       (d)(3).

3   (i) REPORTS.—

4       (1) IN GENERAL.—Not later than 30 days after

5   obligating the last dollar of the funds appropriated

6   under this title, the Secretary of the Treasury shall

7   submit a report, to the Committees of Congress de-

8   scribed in paragraph (2), that—

9       (A) certifies that all funds appropriated

10      under this title have been obligated; and

11      (B) indicates the number of pending appli-

12      cations for grants under this section that will

13      be rejected due to the lack of funds.

14      (2) COMMITTEES OF CONGRESS.—The Commit-

15  tees of Congress described in this paragraph are—

16      (A) the Committee on Ways and Means of

17      the House of Representatives;

18      (B) the Committee on Education and

19      Labor of the House of Representatives;

20      (C) the Committee on Finance of the Sen-

21      ate; and

22      (D) the Committee on Health, Education,

23      Labor, and Pensions of the Senate.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003874

1570

1 **SEC. 170105. ENFORCEMENT AND OUTREACH.**

2 (a) DUTIES OF SECRETARY OF LABOR.—The Sec-

3 retary of Labor shall—

4 (1) have authority to enforce the requirements

5 of section 102, in accordance with subsections (b)

6 through (e);

7 (2) conduct outreach as described in subsection

8 (f); and

9 (3) coordinate with the Secretary of the Treas-

10 ury as needed to carry out the Secretary of Labor's

11 responsibilities under this section.

12 (b) PROHIBITED ACTS, PENALTIES, AND ENFORCE-

13 MENT.—

14 (1) PROHIBITED ACTS.—It shall be unlawful for

15 a person to—

16 (A) violate any provision of section 102 ap-

17 plicable to such person; or

18 (B) discharge or in any other manner dis-

19 criminate against any essential worker because

20 such essential worker has filed any complaint or

21 instituted or caused to be instituted any pro-

22 ceeding under or related to this title, or has tes-

23 tified or is about to testify in any such pro-

24 ceeding.

25 (2) ENFORCEMENT AND PENALTIES.—

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003875

1571

1　　　　　(A) PREMIUM PAY VIOLATIONS.—A viola-
2　　　　tion described in paragraph (1)(A) shall be
3　　　　deemed a violation of section 7 of the Fair
4　　　　Labor Standards Act of 1938 (29 U.S.C. 207)
5　　　　and unpaid amounts required under this section
6　　　　shall be treated as unpaid overtime compensa-
7　　　　tion under such section 7 for the purposes of
8　　　　sections 15 and 16 of such Act (29 U.S.C. 215
9　　　　and 216).

10　　　　　(B) DISCHARGE OR DISCRIMINATION.—A
11　　　　violation of paragraph (1)(B) shall be deemed a
12　　　　violation of section 15(a)(3) of the Fair Labor
13　　　　Standards Act of 1938 (29 U.S.C. 215(a)(3)).

14　　(c) INVESTIGATION.—

15　　　　(1) IN GENERAL.—To ensure compliance with
16　　the provisions of section 102, including any regula-
17　　tion or order issued under that section, the Sec-
18　　retary of Labor shall have the investigative authority
19　　provided under section 11(a) of the Fair Labor
20　　Standards Act of 1938 (29 U.S.C. 211(a)). For the
21　　purposes of any investigation provided for in this
22　　subsection, the Secretary of Labor shall have the
23　　subpoena authority provided for under section 9 of
24　　such Act (29 U.S.C. 209).

g:\VHLC\051220\051220.072.xml　　　(763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003876

1572

1    (2) STATE AGENCIES.—The Secretary of Labor

2    may, for the purpose of carrying out the functions

3    and duties under this section, utilize the services of

4    State and local agencies in accordance with section

5    11(b) of the Fair Labor Standards Act of 1938 (29

6    U.S.C. 211(b)).

7    (d) ESSENTIAL WORKER ENFORCEMENT.—

8    (1) RIGHT OF ACTION.—An action alleging a

9    violation of paragraph (1) or (2) of subsection (b)

10   may be maintained against an essential work em-

11   ployer receiving a grant under section 104 in any

12   Federal or State court of competent jurisdiction by

13   one or more essential workers or their representative

14   for and on behalf of the essential workers, or the es-

15   sential workers and others similarly situated, in the

16   same manner, and subject to the same remedies (in-

17   cluding attorney's fees and costs of the action), as

18   an action brought by an employee alleging a viola-

19   tion of section 7 or 15(a)(3), respectively, of the

20   Fair Labor Standards Act of 1938 (29 U.S.C. 207,

21   215(a)(3)).

22   (2) NO WAIVER.—In an action alleging a viola-

23   tion of paragraph (1) or (2) of subsection (b)

24   brought by one or more essential workers or their

25   representative for and on behalf of the persons as

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003877

1573

1    described in paragraph (1), to enforce the rights in

2    section 102, no court of competent jurisdiction may

3    grant the motion of an essential work employer re-

4    ceiving a grant under section 104 to compel arbitra-

5    tion, under chapter 1 of title 9, United States Code,

6    or any analogous State arbitration statute, of the

7    claims involved. An essential worker's right to bring

8    an action described in paragraph (1) or subsection

9    (b)(2)(A) on behalf of similarly situated essential

10    workers to enforce such rights may not be subject to

11    any private agreement that purports to require the

12    essential workers to pursue claims on an individual

13    basis.

14    (e) RECORDKEEPING.—An essential work employer

15 receiving a grant under section 104 shall make, keep, and

16 preserve records pertaining to compliance with section 102

17 in accordance with section 11(c) of the Fair Labor Stand-

18 ards Act of 1938 (29 U.S.C. 211(c)) and in accordance

19 with regulations prescribed by the Secretary of Labor.

20    (f) OUTREACH AND EDUCATION.—Out of amounts

21 appropriated to the Secretary of the Treasury under sec-

22 tion 107 for a fiscal year, the Secretary of the Treasury

23 shall transfer, to the Secretary of Labor, an amount equal

24 to 0.50 percent of such funds, of which the Secretary of

25 Labor shall use—

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003878

1574

1     (1) 0.25 percent of such funds for outreach to

2     essential work employers and essential workers re-

3     garding the premium pay under section 102; and

4     (2) 0.25 percent of such funds to implement an

5     advertising campaign encouraging large essential

6     work employers to provide the same premium pay

7     provided for by section 102 using the large essential

8     work employers' own funds and without utilizing

9     grants under this title.

10    (g) CLARIFICATION OF ENFORCING OFFICIAL.—

11    Nothing in the Government Employee Rights Act of 1991

12    (42 U.S.C. 2000e–16a et seq.) or section 3(e)(2)(C) of the

13    Fair Labor Standards Act of 1938 (29 U.S.C.

14    203(e)(2)(C)) shall be construed to prevent the Secretary

15    of Labor from carrying out the authority of the Secretary

16    under this section in the case of State employees described

17    in section 304(a) of the Government Employee Rights Act

18    of 1991 (42 U.S.C. 2000e–16c(a)).

19    **SEC. 170106. FUNDING FOR THE DEPARTMENT OF THE**

20    **TREASURY OFFICE OF INSPECTOR GENERAL.**

21    There is appropriated, out of money in the Treasury

22    not otherwise appropriated, to the Office of the Inspector

23    General of the Department of the Treasury, $1,000,000

24    to carry out audits, investigations, and other oversight ac-

25    tivities authorized under the Inspector General Act of

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003879

1575

1 1978 (5 U.S.C. App.) that are related to the provisions
2 of, and amendments made by, this title, to remain avail-
3 able until December 31, 2022.

**SEC. 170107. AUTHORIZATION AND APPROPRIATIONS.**

5    There is authorized to be appropriated, and there is
6 hereby appropriated, $180,000,000,000 to carry out this
7 title, to remain available until expended, to carry out this
8 title.

# TITLE II—PROVISIONS RELATING TO FEDERAL EMPLOYEES AND COVID–19

**SEC. 170201. DEFINITIONS.**

13    In this title—

14       (1) the term "agency"—

15          (A) means—

16             (i) each agency, office, or other estab-
17          lishment in the executive, legislative, or ju-
18          dicial branch of the Federal Government,
19          including—

20                (I) an Executive agency, as that
21             term is defined in section 105 of title
22             5, United States Code;

23                (II) a military department, as
24             that term is defined in section 102 of
25             title 5, United States Code;

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003880

1576

1            (III) the Federal Aviation Ad-

2      ministration;

3            (IV) the Transportation Security

4      Administration;

5            (V) the Department of Veterans

6      Affairs; and

7            (VI) the Government Account-

8      ability Office;

9            (ii) the District of Columbia courts

10      and the District of Columbia Public De-

11      fender Service; and

12            (iii)(I) an Indian tribe or tribal orga-

13      nization carrying out a contract or com-

14      pact under the Indian Self-Determination

15      and Education Assistance Act (25 U.S.C.

16      5301 et seq.);

17            (II) an Indian tribe or tribal organiza-

18      tion that receives a grant under the Trib-

19      ally Controlled Schools Act of 1988 (25

20      U.S.C. 2501 et seq.); and

21            (III) an urban Indian organization

22      that receives a grant or carries out a con-

23      tract under title V of the Indian Health

24      Care Improvement Act (25 U.S.C. 1651 et

25      seq.); and

DOC_0003881

1577

1     (B) does not include—

2         (i) the United States Postal Service or

3     the Postal Regulatory Commission; or

4         (ii) a nonappropriated fund instru-

5     mentality under the jurisdiction of the

6     Armed Forces;

7     (2) the term "covered duty"—

8         (A) means duty that requires—

9         (i) an employee to have regular or

10     routine contact with the public; or

11         (ii) the reporting of an employee to a

12     worksite at which—

13         (I) social distancing is not pos-

14     sible, consistent with the regularly as-

15     signed duties of the position of the

16     employee; and

17         (II) other preventative measures

18     with respect to COVID–19 are not

19     available; and

20     (B) does not include duty that an employee

21     performs while teleworking from a residence;

22     (3) the term "covered period" means the period

23 beginning on the date on which the Secretary of

24 Health and Human Services declared a public health

25 emergency under section 319 of the Public Health

DOC_0003882

1578

1  Service Act (42 U.S.C. 247d) with respect to

2  COVID–19 and ending on the date that is 60 days

3  after the date on which that public health emergency

4  terminates; and

5      (4) the term ''employee''—

6          (A) means an employee of an agency;

7          (B) includes—

8              (i) any employee of an agency who oc-

9          cupies a position within the General Sched-

10         ule under subchapter III of chapter 53 of

11         title 5, United States Code;

12             (ii) any employee of an agency whose

13         pay is fixed and adjusted from time to

14         time in accordance with prevailing rates

15         under subchapter IV of chapter 53 of title

16         5, United States Code, or by a wage board

17         or similar administrative authority serving

18         the same purpose;

19             (iii) an official or employee of an In-

20         dian tribe, tribal organization, or urban In-

21         dian organization described in paragraph

22         (1)(A)(iii);

23             (iv) each employee of the Department

24         of Veterans Affairs, including an employee

25         appointed under chapter 74 of title 38,

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003883

1579

1    United States Code, without regard to

2    whether section 7421(a) of that title, sec-

3    tion 7425(b) of that title, or any other pro-

4    vision of chapter 74 of that title is incon-

5    sistent with that inclusion; and

6         (v) any other individual occupying a

7    position in the civil service, as that term is

8    defined in section 2101 of title 5, United

9    States Code; and

10   (C) does not include—

11        (i) a member of the uniformed serv-

12   ices, as that term is defined in section

13   2101 of title 5, United States Code;

14        (ii) an employee of an agency who oc-

15   cupies a position within the Executive

16   Schedule under any of sections 5312

17   through 5316 of title 5, United States

18   Code;

19        (iii) an individual in a Senior Execu-

20   tive Service position, unless the individual

21   is a career appointee, as those terms are

22   defined in section 3132(a) of title 5,

23   United States Code;

24        (iv) an individual serving in a position

25   of a confidential or policy-determining

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003884

1580

character under Schedule C of subpart C
of part 213 of title 5, Code of Federal
Regulations, or any successor regulations;

  (v) a member of the Senate or House
of Representatives, a Delegate to the
House of Representatives, or the Resident
Commissioner from Puerto Rico; or

  (vi) an employee of the personal office
of an individual described in clause (v), of
a leadership office of the Senate or the
House of Representatives, of a committee
of the Senate or the House of Representa-
tives, or of a joint committee of Congress.

## SEC. 170202. PANDEMIC DUTY DIFFERENTIAL.

(a) IN GENERAL.—There is established a schedule of
pay differentials for covered duty as follows:

  (1) An employee is entitled to pay for that cov-
ered duty at the rate of basic pay, which includes
any differential or other premium pay paid for regu-
larly scheduled work of the employee other than the
differential established under this section, of the em-
ployee plus premium pay of $13 per hour.

  (2) The total amount of premium pay paid to
an employee under paragraph (1) shall be—

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003885

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1581

1   (A) with respect to an employee whose an-
2   nual rate of basic pay is less than $200,000,
3   not more than $10,000 reduced by employer
4   payroll taxes (as defined in section 101(4)) with
5   respect to such premium pay; and

6   (B) with respect to an employee whose an-
7   nual rate of basic pay is not less than
8   $200,000, not more than $5,000 reduced by
9   employer payroll taxes (as so defined) with re-
10   spect to such premium pay.

11   (b) PAY.—

12   (1) IN GENERAL.—With respect to the covered
13   period, an employee is entitled to be paid the appli-
14   cable differential established under subsection (a) for
15   any period, including any period during the covered
16   period that precedes the date of enactment of this
17   Act, in which the employee is carrying out covered
18   duty, subject to the applicable limitations under that
19   subsection.

20   (2) RETROACTIVE PAYMENT.—With respect to
21   a payment earned by an employee under this section
22   for a period during the covered period that precedes
23   the date of enactment of this Act, the employee shall
24   be paid that payment in a lump sum payment as
25   soon as is practicable after that date of enactment.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003886

1582

1  (c) Guidance and Regulations.—

2     (1) Executive branch.—

3        (A) In general.—The Office of Personnel
4     Management shall develop criteria for agencies
5     in the executive branch of the Federal Govern-
6     ment regarding the means by which to deter-
7     mine the eligibility of an employee in such an
8     agency for the pay differential established
9     under this section, which shall—

10          (i) be based on—

11             (I) the duties performed by the
12          employee;

13             (II) the setting in which the em-
14          ployee performs the duties described
15          in subclause (I); and

16             (III) the interactions with the
17          public required in order for the em-
18          ployee to perform the duties described
19          in subclause (I); and

20          (ii) apply equally to all such agencies.

21        (B) Regulations.—The Office of Per-
22     sonnel Management may prescribe regulations
23     implementing the pay differential under this
24     section with respect to employees in the execu-
25     tive branch of the Federal Government.

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003887

1583

1 (2) OTHER BRANCHES, CERTAIN DC EMPLOY-
2 EES, AND CERTAIN TRIBAL OFFICIALS.—

3 (A) IN GENERAL.—The employing author-
4 ity for each agency that is not in the executive
5 branch of the Federal Government—

6 (i) shall develop criteria regarding the
7 means by which to determine the eligibility
8 of an employee in such an agency for the
9 pay differential established under this sec-
10 tion; and

11 (ii) may prescribe regulations imple-
12 menting the pay differential under this sec-
13 tion with respect to employees in the appli-
14 cable agency.

15 (B) CONSISTENCY WITH OPM GUIDANCE
16 AND REGULATIONS.—Any criteria developed,
17 and regulations prescribed, by an agency under
18 subparagraph (A) shall, to the extent prac-
19 ticable, be comparable to any criteria developed
20 and regulations prescribed by the Office of Per-
21 sonnel Management under paragraph (1).

22 **SEC. 170203. LIMITATION ON PREMIUM PAY.**

23 (a) IN GENERAL.—Notwithstanding subsections (a)
24 and (b) of section 5547 of title 5, United States Code,
25 or a provision of any other Federal, State, or Tribal law

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003888

1584

1 that imposes a limitation on the amount of premium pay
2 (including any premium pay paid under section 202 and
3 any overtime pay paid for covered duty) that may be pay-
4 able to an employee, an employee may be paid such pre-
5 mium pay to the extent that the payment does not cause
6 the aggregate of basic pay and such premium pay for serv-
7 ice performed in that calendar year by that employee to
8 exceed the annual rate of basic pay payable for level II
9 of the Executive Schedule, as of the end of the calendar
10 year.

11     (b) APPLICABILITY OF AGGREGATE LIMITATION ON
12 PAY.—In determining whether a payment to an employee
13 is subject to the limitation under section 5307(a) of title
14 5, United States Code, a payment described in subsection
15 (a) shall not apply.

16     (c) APPLICABILITY OF CARES ACT.—The authority
17 provided under this section shall be considered to be in
18 addition to, and not a replacement for, the authority pro-
19 vided under section 18110 of title VIII of the CARES Act
20 (Public Law 116–136).

21     (d) RETROACTIVE EFFECT.—This section shall take
22 effect as if enacted on the date on which the covered pe-
23 riod began.

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003889

1585

## SEC. 170204. AUTHORIZATION AND APPROPRIATION.

2   There is authorized to be appropriated, and there is

3   hereby appropriated, out of any money in the Treasury

4   not otherwise appropriated, $10,000,000,000, to remain

5   available until expended, for the offices and agencies de-

6   scribed in subsection (b) of this section to carry out sec-

7   tion 170202 and section 170203 of this title and to make

8   transfers authorized under subsection (a) of this section.

9   (a) OFFICES AND AGENCIES.—The offices and agen-

10  cies described in this subsection are—

11        (1) the Office of the Sergeant at Arms and

12     Doorkeeper of the Senate;

13        (2) the Office of the Clerk of the House of Rep-

14     resentatives;

15        (3) the Office of the Sergeant at Arms of the

16     House of Representatives;

17        (4) the Office of the Chief Administrative Offi-

18     cer of the House of Representatives;

19        (5) the Office of the Attending Physician;

20        (6) the Capitol Police;

21        (7) the Office of the Architect of the Capitol;

22        (8) the Library of Congress;

23        (9) the Government Publishing Office;

24        (10) the Government Accountability Office;

25        (11) the Office of Personnel Management;

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003890

1586

1      (12) the Administrative Office of the United

2  States Courts; and

3      (13) the District of Columbia Courts.

4  (b) TRANSFER AUTHORITY.—

5      (1) OPM.—The Office of Personnel Manage-

6  ment may transfer funds made available under this

7  section to other Federal agencies within the execu-

8  tive branch to reimburse such agencies for costs in-

9  curred to implement this title.

10      (2) AOUSC.—The Administrative Office of the

11  United States Courts may transfer funds made

12  available under this section to other entities within

13  the judicial branch to reimburse the entities for

14  costs incurred to implement this title.

15      (3) DC COURTS.—The District of Columbia

16  Courts may transfer funds made available under this

17  section to the District of Columbia Public Defender

18  Service to reimburse the agency for costs incurred to

19  implement this title.

## 20 TITLE III—COORDINATION OF
## 21 BENEFITS WITH OTHER PRO-
## 22 GRAMS AND LAWS

### 23 SEC. 170301. COORDINATION WITH OTHER BENEFITS.

24  (a) DISREGARD FOR PURPOSES OF FEDERAL AND

25  STATE PROGRAMS.—Any payment provided under this

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003891

1587

1 Act shall not be regarded as income and shall not be re-
2 garded as a resource for the month of receipt and the fol-
3 lowing 12 months, for purposes of determining the eligi-
4 bility of the recipient (or the recipient's spouse or family)
5 for benefits or assistance, or the amount or extent of bene-
6 fits or assistance, under any Federal program or under
7 any State or local program financed in whole or in part
8 with Federal funds.

9    (b) AMOUNTS NOT TAKEN INTO ACCOUNT FOR PUR-
10 POSES OF PREMIUM TAX CREDIT.—

11      (1) IN GENERAL.—For purposes of determining
12    modified adjusted gross income under section
13    36B(d)(2)(B) of the Internal Revenue Code of 1986,
14    adjusted gross income shall be reduced by any
15    amounts received under subsection (b), including
16    pursuant to subsection (f), of section 170102 or by
17    reason of section 170202.

18      (2) EXCEPTION.—Paragraph (1) shall not
19    apply to the extent such reduction results in an
20    amount of household income (as defined in section
21    36B(d)(2)(A) of such Code) of a taxpayer that is
22    less than 100 percent of the poverty line (as defined
23    in section 36B(d)(3) of such Code) for a family of
24    the size involved (as determined under the rules of
25    section 36B(d)(1) of such Code).

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003892

1588

1 (3) REPORTING.—

2 (A) IN GENERAL.—Any employer that
3 makes an applicable payment during a calendar
4 year shall include as a separately stated item on
5 any written statement required under section
6 6051 of the Internal Revenue Code of 1986 or
7 any return or statement required by the Sec-
8 retary of the Treasury (or the Secretary's dele-
9 gate) with respect to nonemployee compensation
10 the aggregate amount of each type of applicable
11 payments so made.

12 (B) APPLICABLE PAYMENTS.—For pur-
13 poses of this paragraph, the term "applicable
14 payments" means—

15 (i) amounts paid as premium pay
16 under section 170102(b), including
17 amounts paid pursuant to section
18 170102(f); and

19 (ii) amounts paid by reason of section
20 170202.

21 (c) EMPLOYMENT TAX TREATMENT FOR AMOUNTS
22 PAID THROUGH GRANTS.—

23 (1) IN GENERAL.—For purposes of section
24 3111(a) of the Internal Revenue Code of 1986, any

DOC_0003893

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1589

1  amounts required to be paid by reason of this Act
2  shall not be considered wages.

3      (2) RAILROAD RETIREMENT TAXES.—For pur-
4  poses of section 3221(a) of the Internal Revenue
5  Code of 1986, the amount of tax imposed under
6  such section for any calendar year in which an em-
7  ployer is required to pay amounts under this Act
8  shall be equal to the sum of—

9          (A) the product of the rate in effect under
10     section 3111(a) of such Code and the com-
11     pensation (reduced by any amounts required to
12     be paid by reason of this Act) paid during any
13     calendar year by such employer for services ren-
14     dered to such employer; and

15         (B) the product of the rate in effect under
16     section 3111(b) of such Code and the com-
17     pensation paid during any calendar year by
18     such employer for services rendered to such em-
19     ployer.

20     (3) SELF-EMPLOYED INDIVIDUALS.—

21         (A) IN GENERAL.—In the case of the tax
22     imposed by section 1401(a) of the Internal Rev-
23     enue Code of 1986, the self-employment income
24     for any taxable year in which the individual re-
25     ceived a payment required to be made under

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003894

1590

1     this Act shall be reduced by 50 percent of the

2     amount of payments so made.

3        (B) REGULATORY AUTHORITY.—The Sec-

4     retary of the Treasury (or the Secretary's dele-

5     gate) shall prescribe regulations or other guid-

6     ance for the application of sections 164(f) and

7     1402(a)(12) of the Internal Revenue Code of

8     1986 with respect to amounts to which sub-

9     paragraph (A) applies.

10     (4) TRANSFERS TO TRUST FUNDS.—There are

11 hereby appropriated to the Federal Old Age and

12 Survivors Insurance Trust Fund and the Federal

13 Disability Insurance Trust Fund established under

14 section 201 of the Social Security Act (42 U.S.C.

15 401) and the Social Security Equivalent Benefit Ac-

16 count established under section 15A(a) of the Rail-

17 road Retirement Act of 1974 (45 U.S.C. 231n–1(a))

18 amounts equal to the reduction in revenues to the

19 Treasury by reason of this subsection (without re-

20 gard to this paragraph). Amounts appropriated by

21 the preceding sentence shall be transferred from the

22 general fund at such times and in such manner as

23 to replicate to the extent possible the transfers

24 which would have occurred to such Trust Fund or

25 Account had this section not been enacted.

g:\VHLC\051220\051220.072.xml    (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003895

1591

1  **SEC. 170302. CLARIFICATION OF COORDINATION WITH**
2          **OTHER LAWS.**

3      (a) ESSENTIAL WORKERS RIGHTS AND BENEFITS.—

4  Nothing in this Act shall be construed to allow noncompli-

5  ance with or in any way to diminish, and shall instead

6  be construed to be in addition to, the rights or benefits

7  that an essential worker is entitled to under any—

8      (1) Federal, State, or local law, including regu-

9      lation;

10      (2) collective bargaining agreement; or

11      (3) employer policy.

12      (b) TITLE 5.—Nothing in this Act shall be construed

13  to affect the application of the provisions of sections 5343

14  or 5545 of title 5, United States Code, with respect to

15  pay differentials for duty involving unusual physical hard-

16  ship or hazard, or environmental differentials.

17  **SEC. 170303. APPLICABILITY OF FAIR LABOR STANDARDS**
18          **ACT OF 1938 TO SOVEREIGN TRIBAL EMPLOY-**
19          **ERS.**

20      The receipt of any funds through a grant under sec-

21  tion 104, or any funds under title II, by a sovereign Tribal

22  employer, as defined in section 101(12), shall not expand,

23  constrict, or alter the application of the Fair Labor Stand-

24  ards Act of 1938 (29 U.S.C. 201 et seq.) to such sovereign

25  Tribal employer.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003896

1592

# DIVISION R—CHILD NUTRITION AND RELATED PROGRAMS

**SEC. 180001. SHORT TITLE.**

This division may be cited as the "Child Nutrition and Related Programs Recovery Act".

**SEC. 180002. EMERGENCY COSTS FOR CHILD NUTRITION PROGRAMS DURING COVID–19 PANDEMIC.**

(a) USE OF CERTAIN APPROPRIATIONS TO COVER EMERGENCY OPERATIONAL COSTS UNDER SCHOOL MEAL PROGRAMS.—

(1) IN GENERAL.—

(A) REQUIRED ALLOTMENTS.—Notwithstanding any other provision of law, the Secretary shall allocate to each State that participates in the reimbursement program under paragraph (3) such amounts as may be necessary to carry out reimbursements under such paragraph for each reimbursement month, including, subject to paragraph (4)(B), administrative expenses necessary to make such reimbursements.

(B) GUIDANCE WITH RESPECT TO PROGRAM.—Not later than 10 days after the date of the enactment of this section, the Secretary

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003897

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1593

1    shall issue guidance with respect to the reim-
2    bursement program under paragraph (3).

3    (2) REIMBURSEMENT PROGRAM APPLICA-
4    TION.—To participate in the reimbursement pro-
5    gram under paragraph (3), not later than 30 days
6    after the date described in paragraph (1), a State
7    shall submit an application to the Secretary that in-
8    cludes a plan to calculate and disburse reimburse-
9    ments under the reimbursement program under
10   paragraph (3).

11   (3) REIMBURSEMENT PROGRAM.—Using the
12   amounts allocated under paragraph (1)(A), a State
13   participating in the reimbursement program under
14   this paragraph shall make reimbursements for emer-
15   gency operational costs for each reimbursement
16   month as follows:

17        (A) For each new school food authority in
18        the State for the reimbursement month, an
19        amount equal to 55 percent of the amount
20        equal to—

21             (i) the average monthly amount such
22             new school food authority was reimbursed
23             under the reimbursement sections for
24             meals and supplements served by such new

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003898

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1594

1      school food authority during the alternate
2      period; minus

3           (ii) the amount such new school food
4      authority was reimbursed under the reim-
5      bursement sections for meals and supple-
6      ments served by such new school food au-
7      thority during such reimbursement month.

8      (B) For each school food authority not de-
9      scribed in subparagraph (A) in the State for
10      the reimbursement month, an amount equal to
11      55 percent of—

12           (i) the amount such school food au-
13      thority was reimbursed under the reim-
14      bursement sections for meals and supple-
15      ments served by such school food authority
16      for the month beginning one year before
17      such reimbursement month; minus

18           (ii) the amount such school food au-
19      thority was reimbursed under the reim-
20      bursement sections for meals and supple-
21      ments served by such school food authority
22      during such reimbursement month.

23      (4) TREATMENT OF FUNDS.—

DOC_0003899

1595

1        (A) AVAILABILITY.—Funds allocated to a

2       State under paragraph (1)(A) shall remain

3       available until March 30, 2021.

4        (B) ADMINISTRATIVE EXPENSES.—A State

5       may reserve not more than 1 percent of the

6       funds allocated under paragraph (1)(A) for ad-

7       ministrative expenses to carry out this sub-

8       section.

9        (C) UNEXPENDED BALANCE.—On Sep-

10       tember 30, 2021, any amounts allocated to a

11       State under paragraph (1)(A) or reimbursed to

12       a school food authority or new school food au-

13       thority under paragraph (3) that are unex-

14       pended by such State, school food authority, or

15       new school food authority shall revert to the

16       Secretary.

17     (5) REPORTS.—Each State that carries out a

18     reimbursement program under paragraph (3) shall,

19     not later than September 30, 2021, submit a report

20     to the Secretary that includes a summary of the use

21     of such funds by the State and each school food au-

22     thority and new school food authority in such State.

23   (b) USE OF CERTAIN APPROPRIATIONS TO COVER

24 CHILD AND ADULT CARE FOOD PROGRAM CHILD CARE

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003900

1596

1 OPERATIONAL EMERGENCY COSTS DURING COVID–19

2 PANDEMIC.—

3      (1) IN GENERAL.—

4           (A) REQUIRED ALLOTMENTS.—Notwith-

5      standing any other provision of law, the Sec-

6      retary shall allocate to each State that partici-

7      pates in the reimbursement program under

8      paragraph (3) such amounts as may be nec-

9      essary to carry out reimbursements under such

10      paragraph for each reimbursement month, in-

11      cluding, subject to paragraph (4)(C), adminis-

12      trative expenses necessary to make such reim-

13      bursements.

14           (B) GUIDANCE WITH RESPECT TO PRO-

15      GRAM.—Not later than 10 days after the date

16      of the enactment of this section, the Secretary

17      shall issue guidance with respect to the reim-

18      bursement program under paragraph (3).

19      (2) REIMBURSEMENT PROGRAM APPLICA-

20      TION.—To participate in the reimbursement pro-

21      gram under paragraph (3), not later than 30 days

22      after the date described in paragraph (1), a State

23      shall submit an application to the Secretary that in-

24      cludes a plan to calculate and disburse reimburse-

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003901

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1597

1  ments under the reimbursement program under
2  paragraph (3).

3      (3) REIMBURSEMENT AMOUNT.—Using the
4  amounts allocated under paragraph (1)(A), a State
5  participating in the reimbursement program under
6  this paragraph shall make reimbursements for child
7  care operational emergency costs for each reimburse-
8  ment month as follows:

9          (A) For each new covered institution in the
10      State for the reimbursement month, an amount
11      equal to 55 percent of—

12              (i) the average monthly amount such
13          covered institution was reimbursed under
14          subsection (c) and subsection (f) of section
15          17 of the Richard B. Russell National
16          School Lunch Act (42 U.S.C. 1766) for
17          meals and supplements served by such new
18          covered institution during the alternate pe-
19          riod; minus

20              (ii) the amount such covered institu-
21          tion was reimbursed under such section for
22          meals and supplements served by such new
23          covered institution during such reimburse-
24          ment month.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003902

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1598

1 　　　　(B) For each covered institution not de-
2 scribed in subparagraph (A) in the State for
3 the reimbursement month, an amount equal to
4 55 percent of—

5 　　　　　　(i) the amount such covered institu-
6 tion was reimbursed under subsection (c)
7 and subsection (f) of section 17 of the
8 Richard B. Russell National School Lunch
9 Act (42 U.S.C. 1766) for meals and sup-
10 plements served by such covered institution
11 during the month beginning one year be-
12 fore such reimbursement month; minus

13 　　　　　　(ii) the amount such covered institu-
14 tion was reimbursed under such section for
15 meals and supplements served by such cov-
16 ered institution during such reimbursement
17 month.

18 　　　　(C) For each new sponsoring organization
19 of a family or group day care home in the State
20 for the reimbursement month, an amount equal
21 to 55 percent of—

22 　　　　　　(i) the average monthly amount such
23 new sponsoring organization of a family or
24 group day care home was reimbursed
25 under section 17(f)(3)(B) of the Richard

g:\VHLC\051220\051220.072.xml         (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003903

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1599

1  B. Russell National School Lunch Act (42

2  U.S.C. 1766(f)(3)(B)) for administrative

3  funds for the alternate period; minus

4      (ii) the amount such new sponsoring

5  organization of a family or group day care

6  home was reimbursed under such section

7  for administrative funds for the reimburse-

8  ment month.

9  (D) For each sponsoring organization of a

10  family or group day care home not described in

11  subparagraph (C) in the State for the reim-

12  bursement month, an amount equal to 55 per-

13  cent of—

14      (i) the amount such sponsoring orga-

15  nization of a family or group day care

16  home was reimbursed under section

17  17(f)(3)(B) of the Richard B. Russell Na-

18  tional School Lunch Act (42 U.S.C.

19  1766(f)(3)(B)) for administrative funds for

20  the month beginning one year before such

21  reimbursement month; minus

22      (ii) the amount such sponsoring orga-

23  nization of a family or group day care

24  home was reimbursed under such section

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003904

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1600

1   for administrative funds for such reim-

2   bursement month.

3   (4) TREATMENT OF FUNDS.—

4    (A) AVAILABILITY.—Funds allocated to a

5   State under paragraph (1)(A) shall remain

6   available until March 30, 2021.

7    (B) UNAFFILIATED CENTER.—In the case

8   of a covered institution or a new covered insti-

9   tution that is an unaffiliated center that is

10   sponsored by a sponsoring organization and re-

11   ceives funds for a reimbursement month under

12   subparagraph (A) or (B), such unaffiliated cen-

13   ter shall provide to such sponsoring organiza-

14   tion an amount of such funds as agreed to by

15   the sponsoring organization and the unaffiliated

16   center, except such amount may not be greater

17   be than 15 percent of such funds.

18    (C) ADMINISTRATIVE EXPENSES.—A State

19   may reserve not more than 1 percent of the

20   funds allocated under paragraph (1)(A) for ad-

21   ministrative expenses to carry out this sub-

22   section.

23    (D) UNEXPENDED BALANCE.—On Sep-

24   tember 30, 2021, any amounts allocated to a

25   State under paragraph (1)(A) or reimbursed to

g:\VHLC\051220\051220.072.xml    (763351|3)
May 12, 2020 (12:13 p.m.)

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1601

1       a new covered institution, covered institution,

2       new sponsoring organization of a family or

3       group day care home, or sponsoring organiza-

4       tion of a family or group day care home that

5       are unexpended by such State, new covered in-

6       stitution, covered institution, new sponsoring

7       organization of a family or group day care

8       home, or sponsoring organization of a family or

9       group day care home, shall revert to the Sec-

10      retary.

11      (5) REPORTS.—Each State that carries out a

12      reimbursement program under paragraph (3) shall,

13      not later than September 30, 2021, submit a report

14      to the Secretary that includes a summary of the use

15      of such funds by the State and each new covered in-

16      stitution, covered institution, new sponsoring organi-

17      zation of a family or group day care home, or spon-

18      soring organization of a family or group day care

19      home.

20      (c) DEFINITIONS.—In this section:

21      (1) ALTERNATE PERIOD.—The term ''alternate

22      period'' means the period beginning January 1,

23      2020 and ending February 29, 2020.

24      (2) EMERGENCY OPERATIONAL COSTS.—The

25      term ''emergency operational costs'' means the costs

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003906

1602

1    incurred by a school food authority or new school

2    food authority—

3         (A) during a public health emergency;

4         (B) that are related to the ongoing oper-

5    ation, modified operation, or temporary suspen-

6    sion of operation (including administrative

7    costs) of such school food authority or new

8    school food authority; and

9         (C) except as provided under subsection

10   (a), that are not reimbursed under a Federal

11   grant.

12   (3) CHILD CARE OPERATIONAL EMERGENCY

13   COSTS.—The term "child care operational emergency

14   costs" means the costs under the child and adult

15   care food program under section 17 of the Richard

16   B. Russell National School Lunch Act (42 U.S.C.

17   1766) incurred by a new covered institution, covered

18   institution, new sponsoring organization of a family

19   or group day care home, or sponsoring organization

20   of a family or group day care home—

21        (A) during a public health emergency;

22        (B) that are related to the ongoing oper-

23   ation, modified operation, or temporary suspen-

24   sion of operation (including administrative

25   costs) of such new covered institution, covered

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003907

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1603

1 institution, new sponsoring organization of a
2 family or group day care home, sponsoring or-
3 ganization of a family or group day care home,
4 or sponsoring organization of an unaffiliated
5 center; and

6 (C) except as provided under subsection
7 (b), that are not reimbursed under a Federal
8 grant.

9 (4) COVERED INSTITUTION.—The term "cov-
10 ered institution" means—

11 (A) an institution (as defined in section
12 17(a)(2) of the Richard B. Russell National
13 School Lunch Act (42 U.S.C. 1766(a)(2))); and

14 (B) a family or group day care home.

15 (5) NEW COVERED INSTITUTION.—The term
16 "new covered institution" means a covered institu-
17 tion for which no reimbursements were made for
18 meals and supplements under section 17(c) or (f) of
19 the Richard B. Russell National School Lunch Act
20 (42 U.S.C. 1766) with respect to the previous reim-
21 bursement period.

22 (6) NEW SCHOOL FOOD AUTHORITY.—The term
23 "new school food authority" means a school food au-
24 thority for which no reimbursements were made

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003908

1604

1    under the reimbursement sections with respect to

2    the previous reimbursement period.

3        (7) NEW SPONSORING ORGANIZATION OF A

4    FAMILY OR GROUP DAY CARE.—The term "new

5    sponsoring organization of a family or group day

6    care" means a sponsoring organization of a family

7    or group day care home for which no reimburse-

8    ments for administrative funds were made under

9    section 17(f)(3)(B) of the Richard B. Russell Na-

10    tional School Lunch Act (42 U.S.C. 1766(f)(3)(B))

11    for the previous reimbursement period.

12        (8) PREVIOUS REIMBURSEMENT PERIOD.—The

13    term "previous reimbursement period" means the

14    period beginning March 1, 2019 and ending June

15    30, 2019.

16        (9) PUBLIC HEALTH EMERGENCY.—The term

17    "public health emergency" means a public health

18    emergency declared pursuant to section 319 of the

19    Public Health Service Act (42 U.S.C. 247d) result-

20    ing from the COVID–19 pandemic.

21        (10) REIMBURSEMENT MONTH.—The term "re-

22    imbursement month" means March 2020, April

23    2020, May 2020, and June 2020.

24        (11) REIMBURSEMENT SECTIONS.—The term

25    "reimbursement sections" means—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003909

1605

1      (A) section 4(b), section 11(a)(2), section

2      13, and section 17A(c) of the Richard B. Rus-

3      sell National School Lunch Act (42 U.S.C.

4      1753(b); 42 U.S.C. 1759a(a)(2); 42 U.S.C.

5      1761; 42 U.S.C. 1766a(c)); and

6      (B) section 4 of the Child Nutrition Act

7      (42 U.S.C. 1773).

8      (12) SECRETARY.—The term "Secretary"

9  means the Secretary of Agriculture.

10     (13) STATE.— The term "State" has the mean-

11  ing given such term in section 12(d)(8) of the Rich-

12  ard B. Russell National School Lunch Act (42

13  U.S.C. 1760(d)(8)).

**14 SEC. 180003. AMENDMENTS TO THE PANDEMIC EBT ACT.**

15  Section 1101 of the Families First Coronavirus Re-

16  sponse Act (Public Law 116–127) is amended—

17     (1) in subsection (a)—

18      (A) by striking "fiscal year 2020" and in-

19      serting "fiscal years 2020 and 2021";

20      (B) by striking "during which the school

21      would otherwise be in session"; and

22      (C) by inserting "until the school reopens"

23      after "assistance";

24     (2) in subsection (b)—

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1606

1   (A) by inserting "and State agency plans
2   for child care covered children in accordance
3   with subsection (i)" after "with eligible chil-
4   dren";

5   (B) by inserting ", a plan to enroll chil-
6   dren who become eligible children during a pub-
7   lic health emergency designation" before ", and
8   issuances";

9   (C) by striking "in an amount not less
10   than the value of meals at the free rate over the
11   course of 5 school days" and inserting "in ac-
12   cordance with subsection (h)(1)"; and

13   (D) by inserting "and for each child care
14   covered child in the household" before the pe-
15   riod at the end;

16   (3) in subsection (c), by inserting "or child care
17   center" after "school";

18   (4) by amending subsection (e) to read as fol-
19   lows:

20   "(e) RELEASE OF INFORMATION.—Notwithstanding
21   any other provision of law, the Secretary of Agriculture
22   may authorize—

23   "(1) State educational agencies and school food
24   authorities administering a school lunch program
25   under the Richard B. Russell National School Lunch

DOC_0003911

1607

1 Act (42 U.S.C. 1751 et seq.) to release to appro-

2 priate officials administering the supplemental nutri-

3 tion assistance program such information as may be

4 necessary to carry out this section with respect to el-

5 igible children; and

6 "(2) State agencies administering a child and

7 adult care food program under section 17 of the

8 Richard B. Russell National School Lunch Act (42

9 U.S.C. 1766) to release to appropriate officials ad-

10 ministering the supplemental nutrition assistance

11 program such information as may be necessary to

12 carry out this section with respect to child care cov-

13 ered children.";

14 (5) by amending subsection (g) to read as fol-

15 lows:

16 "(g) AVAILABILITY OF COMMODITIES.—

17 "(1) IN GENERAL.—Subject to paragraph (2),

18 during fiscal year 2020, the Secretary of Agriculture

19 may purchase commodities for emergency distribu-

20 tion in any area of the United States during a public

21 health emergency designation.

22 "(2) PURCHASES.—Funds made available to

23 carry out this subsection on or after the date of the

24 enactment of the Child Nutrition and Related Pro-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003912

1608

1 grams Recovery Act may only be used to purchase
2 commodities for emergency distribution—

3        ''(A) under commodity distribution pro-
4     grams and child nutrition programs that were
5     established and administered by the Food and
6     Nutrition Service on or before the day before
7     the date of the enactment of the Families First
8     Coronavirus Response Act (Public Law 116–
9     127); or

10        ''(B) to Tribal organizations (as defined in
11     section 3 of the Food and Nutrition Act of
12     2008 (7 U.S.C. 2012)), that are not admin-
13     istering the food distribution program estab-
14     lished under section 4(b) of the Food and Nu-
15     trition Act of 2008 (7 U.S.C. 2013(b)).''.

16        (6) by redesignating subsections (h) and (i) as
17     subsections (l) and (m);

18        (7) by inserting after subsection (g) the fol-
19     lowing:

20     ''(h) AMOUNT OF BENEFITS.—

21        ''(1) IN GENERAL.—A household shall receive
22     benefits under this section in an amount equal to 1
23     breakfast and 1 lunch at the free rate for each eligi-
24     ble child or child care covered child in such house-
25     hold for each day.

g:\VHLC\051220\051220.072.xml        (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003913

1609

1       ''(2) TREATMENT OF NEWLY ELIGIBLE CHIL-
2   DREN.—In the case of a child who becomes an eligi-
3   ble child during a public health emergency designa-
4   tion, the Secretary and State agency shall—

5           ''(A) if such child becomes an eligible child
6       during school year 2019–2020, treat such child
7       as if such child was an eligible child as of the
8       date the school in which the child is enrolled
9       closed; and

10          ''(B) if such child becomes an eligible child
11      after school year 2019–2020, treat such child
12      as an eligible child as of the first day of the
13      month in which such child becomes so eligible.

14  ''(i) CHILD CARE COVERED CHILD ASSISTANCE.—

15      ''(1) IN GENERAL.—During fiscal years 2020
16  and 2021, in any case in which a child care center
17  is closed for at least 5 consecutive days during a
18  public health emergency designation, each household
19  containing at least 1 member who is a child care
20  covered child attending the child care center shall be
21  eligible until the schools in the State in which such
22  child care center is located reopen, as determined by
23  the Secretary, to receive assistance pursuant to—

24          ''(A) a State agency plan approved under
25      subsection (b) that includes—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003914

1610

1     "(i) an application by the State agen-
2     cy seeking to participate in the program
3     under this subsection; and
4          "(ii) a State agency plan for tem-
5     porary emergency standards of eligibility
6     and levels of benefits under the Food and
7     Nutrition Act of 2008 (7 U.S.C. 2011 et
8     seq.) for households with child care covered
9     children; or
10          "(B) an addendum application described in
11     paragraph (2).
12     "(2) ADDENDUM APPLICATION.—In the case of
13     a State agency that submits a plan to the Secretary
14     of Agriculture under subsection (b) that does not in-
15     clude an application or plan described in clauses (i)
16     and (ii) of paragraph (1)(A), such State agency may
17     apply to participate in the program under this sub-
18     section by submitting to the Secretary of Agriculture
19     an addendum application for approval that includes
20     a State agency plan described in such clause (ii).
21     "(3) REQUIREMENTS FOR PARTICIPATION.—A
22     State agency may not participate in the program
23     under this subsection if—
24          "(A) the State agency plan submitted by
25     such State agency under subsection (b) with re-

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003915

1611

1    spect to eligible children is not approved by the

2    Secretary under such subsection; or

3    ''(B) the State agency plan submitted by

4    such State agency under subsection (b) or this

5    subsection with respect to child care covered

6    children is not approved by the Secretary under

7    either such subsection.

8    ''(4) AUTOMATIC ENROLLMENT.—

9    ''(A) IN GENERAL.—Subject to subpara-

10    graph (B), the Secretary shall deem a child who

11    is less than 6 years of age to be a child care

12    covered child eligible to receive assistance under

13    this subsection if—

14    ''(i) the household with such child at-

15    tests that such child is a child care covered

16    child;

17    ''(ii) such child resides in a household

18    that includes an eligible child;

19    ''(iii) such child receives cash assist-

20    ance benefits under the temporary assist-

21    ance for needy families program under

22    part A of title IV of the Social Security

23    Act (42 U.S.C. 601 et seq.);

24    ''(iv) such child receives assistance

25    under the Child Care and Development

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003916

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1612

1    Block Grant Act of 1990 (42 U.S.C. 9857

2    et seq.);

3        "(v) such child is—

4            "(I) enrolled as a participant in a

5        Head Start program authorized under

6        the Head Start Act (42 U.S.C. 9831

7        et seq.);

8            "(II) a foster child whose care

9        and placement is the responsibility of

10       an agency that administers a State

11       plan under part B or E of title IV of

12       the Social Security Act (42 U.S.C.

13       621 et seq.);

14           "(III) a foster child who a court

15       has placed with a caretaker house-

16       hold; or

17           "(IV) a homeless child or youth

18       (as defined in section 725(2) of the

19       McKinney-Vento Homeless Assistance

20       Act (42 U.S.C. 11434a(2)));

21       "(vi) such child participates in the

22   special supplemental nutrition program for

23   women, infants, and children under section

24   17 of the Child Nutrition Act of 1966 (42

25   U.S.C. 1786);

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003917

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1613

1         "(vii) through the use of information

2         obtained by the State agency for the pur-

3         pose of participating in the supplemental

4         nutrition assistance program under the

5         Food and Nutrition Act of 2008 (7 U.S.C.

6         2011 et seq.), the State agency elects to

7         treat as a child care covered child each

8         child less than 6 years of age who is a

9         member of a household that receives sup-

10         plemental nutrition assistance program

11         benefits under such Act; or

12         "(viii) the State in which such child

13         resides determines that such child is a

14         child care covered child, using State data

15         approved by the Secretary.

16         "(B) ACCEPTANCE OF ANY FORM OF

17         AUTOMATIC ENROLLMENT.—

18         "(i) ONE CATEGORY.—For purposes

19         of deeming a child to be a child care cov-

20         ered child under subparagraph (A), a State

21         agency may not be required to show that

22         a child meets more than one requirement

23         specified in clauses (i) through (viii) of

24         such subparagraph.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003918

1614

1          "(ii) DEEMING REQUIREMENT.—If a
2      State agency submits to the Secretary in-
3      formation that a child meets any one of
4      the requirements specified in clauses (i)
5      through (viii) of subparagraph (A), the
6      Secretary shall deem such child a child
7      care covered child under such subpara-
8      graph.

9      "(j) EXCLUSIONS.—The provisions of section 16 of
10  the Food and Nutrition Act of 2008 (7 U.S.C. 2025) re-
11  lating to quality control shall not apply with respect to
12  assistance provided under this section.

13      "(k) FEASIBILITY ANALYSIS.—

14          "(1) IN GENERAL.—Not later than 30 days
15      after the date of the enactment of the Child Nutri-
16      tion and Related Programs Recovery Act, the Sec-
17      retary shall submit to the Education and Labor
18      Committee and the Agriculture Committee of the
19      House of Representatives and the Committee on Ag-
20      riculture, Nutrition, and Forestry of the Senate a
21      report on—

22          "(A) the feasibility of implementing the
23      program for eligible children under this section
24      using an EBT system in Puerto Rico, the Com-
25      monwealth of the Northern Mariana Islands,

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003919

1615

1 and American Samoa similar to the manner in
2 which the supplemental nutrition assistance
3 program under the Food and Nutrition Act of
4 2008 is operated in the States, including an
5 analysis of——

6     "(i) the current nutrition assistance
7     program issuance infrastructure;

8     "(ii) the availability of——

9         "(I) an EBT system, including
10         the ability for authorized retailers to
11         accept EBT cards; and

12         "(II) EBT cards;

13     "(iii) the ability to limit purchases
14     using nutrition assistance program benefits
15     to food for home consumption; and

16     "(iv) the availability of reliable data
17     necessary for the implementation of such
18     program under this section for eligible chil-
19     dren and child care covered children, in-
20     cluding the names of such children and the
21     mailing addresses of their households; and

22     "(B) the feasibility of implementing the
23 program for child care covered children under
24 subsection (i) in Puerto Rico, the Common-
25 wealth of the Northern Mariana Islands, and

DOC_0003920

1616

1   American Samoa, including with respect to such

2   program each analysis specified in clauses (i)

3   through (iv) of subparagraph (A).

4   ''(2) CONTINGENT AVAILABILITY OF PARTICIPA-

5   TION.—Beginning 30 days after the date of the en-

6   actment of the Child Nutrition and Related Pro-

7   grams Recovery Act, Puerto Rico, the Common-

8   wealth of the Northern Mariana Islands, and Amer-

9   ican Samoa may each—

10   ''(A) submit a plan under subsection (b),

11   unless the Secretary makes a finding, based on

12   the analysis provided under paragraph (1)(A),

13   that the implementation of the program for eli-

14   gible children under this section is not feasible

15   in such territories; and

16   ''(B) submit a plan under subsection (i),

17   unless the Secretary makes a finding, based on

18   the analysis provided under paragraph (1)(B),

19   that the implementation of the program for

20   child care covered children under subsection (i)

21   is not feasible in such territories.'';

22   (8) in subsection (l), as redesigned by para-

23   graph (7)—

24   (A) by redesignating paragraph (1) as

25   paragraph (3);

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003921

1617

1     (B) by redesignating paragraphs (2) and

2     (3) as paragraphs (5) and (6), respectively;

3          (C) by inserting before paragraph (3) (as

4     so redesignated) the following:

5     ''(1) The term 'child care center' means an or-

6     ganization described in subparagraph (A) or (B) of

7     section 17(a)(2) of the Richard B. Russell National

8     School Lunch Act (42 U.S.C. 1766(a)(2)) and a

9     family or group day care home.

10    ''(2) The term 'child care covered child' means

11    a child served under section 17 of the Richard B.

12    Russell National School Lunch Act (42 U.S.C.

13    1766) who, if not for the closure of the child care

14    center attended by the child during a public health

15    emergency designation and due to concerns about a

16    COVID–19 outbreak, would receive meals under

17    such section at the child care center.''; and

18         (D) by inserting after paragraph (3) (as so

19    redesignated) the following:

20    ''(4) The term 'free rate' means—

21         ''(A) with respect to a breakfast, the rate

22    of a free breakfast under the school breakfast

23    program under section 4 of the Child Nutrition

24    Act of 1966 (42 U.S.C. 1773); and

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003922

1618

1             "(B) with respect to a lunch, the rate of

2         a free lunch under the school lunch program

3         under the Richard B. Russell National School

4         Lunch Act (42 U.S.C. 1771 et seq.)."; and

5         (9) in subsection (m), as redesignated by para-

6 graph (7), by inserting "(including all administrative

7 expenses)" after "this section".

**SEC. 180004. FRESH PRODUCE FOR KIDS IN NEED.**

9     Section 2202(f)(1) of the Families First Coronavirus

10 Response Act (Public Law 116–127) is amended by add-

11 ing at the end the following:

12             "(E) The fresh fruit and vegetable pro-

13         gram under section 19 of the Richard B. Rus-

14         sell National School Lunch Act (42 U.S.C.

15         1769a).".

**SEC. 180005. WIC BENEFIT FLEXIBILITY DURING COVID–19**

17         **ACT.**

18     (a) IN GENERAL.—

19         (1) AUTHORITY TO INCREASE AMOUNT OF

20     CASH-VALUE VOUCHER.—During the COVID–19

21     public health emergency declared under section 319

22     of the Public Health Service Act (42 U.S.C. 247d)

23     and in response to challenges related to such public

24     health emergency, the Secretary may increase the

25     amount of a cash-value voucher under a qualified

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1619

1    food package to an amount less than or equal to

2    $35.

3    (2) APPLICATION OF INCREASED AMOUNT OF

4    CASH-VALUE VOUCHER TO STATE AGENCIES.—

5        (A) NOTIFICATION.—An increase to the

6        amount of a cash-value voucher under para-

7        graph (1) shall apply to any State agency that

8        notifies the Secretary of the intent to use such

9        an increased amount, without further applica-

10       tion.

11       (B) USE OF INCREASED AMOUNT.—A

12       State agency that notifies the Secretary under

13       subparagraph (A) may use or not use the in-

14       creased amount described in such subparagraph

15       during the period beginning on the date of the

16       notification by the State agency under such

17       subparagraph and ending September 30, 2020.

18   (3) APPLICATION PERIOD.—An increase to the

19   amount of a cash-value voucher under paragraph (1)

20   may only apply during the period beginning on the

21   date of the enactment of this section and ending on

22   September 30, 2020.

23   (4) SUNSET.—The authority to make an in-

24   crease to the amount of a cash-value voucher under

25   paragraph (1) or to use such an increased amount

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003924

1620

1 under paragraph (2)(B) shall terminate on Sep-
2 tember 30, 2020.

3 (b) DEFINITIONS.—

4 (1) CASH-VALUE VOUCHER.—The term "cash-
5 value voucher" has the meaning given the term in
6 section 246.2 of title 7, Code of Federal Regula-
7 tions.

8 (2) QUALIFIED FOOD PACKAGE.—The term
9 "qualified food package" means the following food
10 packages under section 246.10(e) of title 7, Code of
11 Federal Regulations:

12 (A) Food Package IV–Children 1 through
13 4 years.

14 (B) Food Package V–Pregnant and par-
15 tially (mostly) breastfeeding women.

16 (C) Food Package VI–Postpartum women.

17 (D) Food Package VII–Fully
18 breastfeeding.

19 (3) SECRETARY.—The term "Secretary" means
20 the Secretary of Agriculture.

21 (4) STATE AGENCY.—The term "State agency"
22 has the meaning given the term in section 17(b) of
23 the Child Nutrition Act of 1966 (42 U.S.C.
24 1786(b)).

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003925

1621

SEC. 180006. CALCULATION OF PAYMENTS AND REIM-
BURSEMENTS FOR CERTAIN CHILD NUTRI-
TION PROGRAMS.

(a) RICHARD B. RUSSELL NATIONAL SCHOOL
LUNCH ACT.—

(1) NUTRITION PROMOTION.—Notwithstanding
any other provision of law, for purposes of making
a payment to a State under section 5 of the Richard
B. Russell National School Lunch Act (42 U.S.C.
1754), the Secretary shall deem the number of
lunches served by school food authorities in such
State during the 2020 period to be equal to the
greater of the following:

(A) The number of lunches served by such
school food authorities in such State during the
2019 period.

(B) The number of lunches served by such
school food authorities in such State during the
2020 period.

(2) COMMODITY ASSISTANCE.—Notwithstanding
any other provision of law, for purposes of providing
commodity assistance to a State under section
6(c)(1)(C) of the Richard B. Russell National School
Lunch Act (42 U.S.C. 1755(c)(1)(C)) or cash assist-
ance in lieu of such commodity assistance under sec-
tion 16 of such Act (42 U.S.C. 1765) the Secretary

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003926

1622

1 shall deem the number of lunches served by school
2 food authorities in such State during the 2020 pe-
3 riod to be equal to the greater of the following:

4 (A) The number of lunches served by such
5 school food authorities in such State during the
6 2019 period.

7 (B) The number of lunches served by such
8 school food authorities in such State during the
9 2020 period.

10 (3) SPECIAL ASSISTANCE PAYMENTS.—Notwith-
11 standing any other provision of law, in determining
12 the number of meals served by a school for purposes
13 of making special assistance payments to a State
14 with respect to a school under subparagraph (B),
15 clause (ii) or (iii) of subparagraph (C), or subpara-
16 graph (E)(i)(II) of section 11(a)(1) of the Richard
17 B. Russell National School Lunch Act (42 U.S.C.
18 1759a(a)(1)), the Secretary shall deem the number
19 of meals served by such school during the 2020 pe-
20 riod to be equal to the greater of the following:

21 (A) The number of meals served by such
22 school during the 2019 period.

23 (B) The number of meals served by such
24 school during the 2020 period.

25 (b) CHILD NUTRITION ACT OF 1966.—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003927

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1623

1    (1) STATE ADMINISTRATIVE EXPENSES.—Not-
2 withstanding any other provision of law, for pur-
3 poses of making payments to a State under section
4 7(a) of the Child Nutrition Act of 1966 (42 U.S.C.
5 1776(a)), the Secretary shall deem the number of
6 meals and supplements served by such school food
7 authorities in such State during the 2020 period to
8 be equal to the greater of the following:

9       (A) The number of meals and supplements
10     served by such school food authorities in such
11     State during the 2019 period.

12      (B) The number of meals and supplements
13     served by such school food authorities in such
14     State during the 2020 period.

15    (2) TEAM NUTRITION NETWORK.—Notwith-
16 standing any other provision of law, for purposes of
17 making allocations to a State under section 19(d) of
18 the Child Nutrition Act of 1966 (42 U.S.C.
19 1788(d)), the Secretary shall deem the number of
20 lunches served by school food authorities in such
21 State during the 2020 period to be equal to the
22 greater of the following:

23      (A) The number of lunches served by such
24     school food authorities in such State during the
25     2019 period.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

1624

1    (B) The number of lunches served by such

2    school food authorities in such State during the

3    2020 period.

4    (c) DEFINITIONS.—In this section:

5    (1) SECRETARY.—The term "Secretary" means

6    the Secretary of Agriculture.

7    (2) 2019 PERIOD.—The term "2019 period"

8    means the period beginning March 1, 2019 and end-

9    ing June 30, 2019.

10    (3) 2020 PERIOD.—The term "2020 period"

11    means the period beginning March 1, 2020 and end-

12    ing June 30, 2020.

13   **SEC. 180007. REPORTING ON WAIVER AUTHORITY.**

14    (a) IN GENERAL.—Not later than 10 days after the

15   date of the receipt or issuance of each document listed

16   in paragraph (1), (2), or (3) of this subsection, the Sec-

17   retary of Agriculture shall make publicly available on the

18   website of the Department of Agriculture the following

19   documents:

20    (1) Any request submitted by State agencies for

21    a qualified waiver.

22    (2) The Secretary's approval or denial of each

23    such request.

24    (3) Any guidance issued by the Secretary with

25    respect to a qualified waiver.

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003929

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1625

1    (b) INCLUSION OF DATE WITH GUIDANCE.—With re-
2 spect to the guidance described in subsection (a)(3), the
3 Secretary of Agriculture shall include the date on which
4 such guidance was issued on the publicly available website
5 of the Department of Agriculture on such guidance.

6    (c) QUALIFIED WAIVER DEFINED.—In this section,
7 the term ''qualified waiver'' means a waiver under section
8 2102, 2202, 2203, or 2204 of the Families First
9 Coronavirus Response Act (Public Law 116–127).

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003930

1626

# DIVISION S—OTHER MATTERS

# TITLE I—HEALTH CARE ACCESS FOR URBAN NATIVE VETERANS ACT

**SEC. 190101. SHORT TITLE.**

This title may be cited as the "Health Care Access for Urban Native Veterans Act".

**SEC. 190102. SHARING ARRANGEMENTS WITH FEDERAL AGENCIES.**

Section 405 of the Indian Health Care Improvement Act (25 U.S.C. 1645) is amended—

(1) in subsection (a)(1), by inserting "urban Indian organizations," before "and tribal organizations"; and

(2) in subsection (c)—

(A) by inserting "urban Indian organization," before "or tribal organization"; and

(B) by inserting "an urban Indian organization," before "or a tribal organization".

# TITLE II—TRIBAL SCHOOL FEDERAL INSURANCE PARITY

**SEC. 190201. SHORT TITLE.**

This title may be cited as the "Tribal School Federal Insurance Parity Act".

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003931

**SEC. 190202. AMENDMENT TO THE INDIAN HEALTH CARE IMPROVEMENT ACT.**

Section 409 of the Indian Health Care Improvement Act (25 U.S.C. 1647b) is amended by inserting "or the Tribally Controlled Schools Act of 1988 (25 U.S.C. 2501 et seq.)" after "(25 U.S.C. 450 et seq.)".

# TITLE III—PRC FOR NATIVE VETERANS ACT

**SEC. 190301. SHORT TITLE.**

This title may be cited as the "Proper and Reimbursed Care for Native Veterans Act" or the "PRC for Native Veterans Act".

**SEC. 190302. CLARIFICATION OF REQUIREMENT OF DEPARTMENT OF VETERANS AFFAIRS AND DEPARTMENT OF DEFENSE TO REIMBURSE INDIAN HEALTH SERVICE FOR CERTAIN HEALTH CARE SERVICES.**

Section 405(c) of the Indian Health Care Improvement Act (25 U.S.C. 1645) is amended by inserting before the period at the end the following: ", regardless of whether such services are provided directly by the Service, an Indian tribe, or tribal organization, through contract health services, or through a contract for travel described in section 213(b)".

1628

# TITLE IV—WILDLIFE-BORNE DISEASE PREVENTION

### SEC. 190401. SHORT TITLE.

This title may be cited as the ''Wildlife-Borne Disease Prevention Act of 2020''.

### SEC. 190402. MEASURES TO ADDRESS SPECIES THAT POSE A RISK TO HUMAN HEALTH.

(a) SPECIES THAT POSE A RISK TO HUMAN HEALTH.—

(1) IN GENERAL.—The Secretaries shall, in consultation with the Director of the Centers for Disease Control, the United States Geological Survey, and other relevant Federal agencies, identify wildlife species (or larger taxonomic groups, if appropriate) that could pose a biohazard risk to human health, and perform a risk analysis with respect to each such species for the purposes of determining whether such species is injurious within the meaning of section 42 of title 18, United States Code.

(2) DRAFT LIST.—The Secretaries shall, not later than 90 days after the date of enactment of this Act, publish a draft of the list required by paragraph (1).

1629

1       (3) FINAL LIST.—The Secretaries shall, not
2    later than 1 year after the date of enactment of this
3    Act, publish a final list required by paragraph (1).

4       (b) INTERNATIONAL ASSISTANCE.—The Secretaries
5    shall, in consultation with the Secretary of State, provide
6    assistance to foreign countries to end the trade of wildlife
7    that poses a risk to humans because of transmission of
8    pathogens that cause disease.

9       (c) INSPECTIONS AND INTERDICTION.—The Sec-
10   retary of the Interior shall complete development on the
11   electronic permitting system of the United States Fish and
12   Wildlife Service and provide for law enforcement inspec-
13   tion and interdiction of any injurious wildlife species.

14      (d) AUTHORIZATION OF APPROPRIATION.—There is
15   authorized to be appropriated $21,000,000 to remain
16   available until expended for fiscal year 2020 to carry out
17   this section.

18      (e) SECRETARIES.—In this section the term ''Secre-
19   taries'' means the Secretary of Commerce, acting through
20   the Assistant Administrator for Fisheries, and the Sec-
21   retary of the Interior, acting through the Director of the
22   United States Fish and Wildlife Service.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003934

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1630

1  **SEC. 190403. TRADE OF INJURIOUS SPECIES AND SPECIES**

2    **THAT POSE A RISK TO HUMAN HEALTH.**

3    Section 42 of title 18, United States Code, is amend-

4  ed—

5        (1) in subsection (a)—

6            (A) in paragraph (1)—

7                (i) by inserting "or any interstate

8            transport between States within the conti-

9            nental United States," after "shipment be-

10           tween the continental United States, the

11           District of Columbia, Hawaii, the Com-

12           monwealth of Puerto Rico, or any posses-

13           sion of the United States,"; and

14               (ii) by striking "to be injurious to

15           human beings, to the interests of agri-

16           culture" and inserting "to be injurious to

17           or to transmit a pathogen that can cause

18           disease in humans, to be injurious to the

19           interests of agriculture"; and

20            (B) by adding at the end the following:

21        "(6) In the case of an emergency posing a sig-

22    nificant risk to the health of humans, the Secretary

23    of the Interior may designate a species by interim

24    final rule. At the time of publication of the regula-

25    tion in the Federal Register, the Secretary shall

26    publish therein detailed reasons why such regulation

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003935

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1631

1    is necessary, and in the case that such regulation

2    applies to a native species, the Secretary shall give

3    actual notice of such regulation to the State agency

4    in each State in which such species is believed to

5    occur. Any regulation promulgated under the au-

6    thority of this paragraph shall cease to have force

7    and effect at the close of the 365-day period fol-

8    lowing the date of publication unless, during such

9    365-day period, the rulemaking procedures which

10   would apply to such regulation without regard to

11   this paragraph are complied with. If at any time

12   after issuing an emergency regulation the Secretary

13   determines, on the basis of the best appropriate data

14   available to the Secretary, that substantial evidence

15   does not exist to warrant such regulation, the Sec-

16   retary shall withdraw it.

17       ''(7) Not more than 90 days after receiving a

18   petition of an interested person under section 553(e)

19   of title 5, United States Code, to determine that a

20   species is injurious under this section, the Secretary

21   of the Interior shall determine whether such petition

22   has scientific merit. If the Secretary determines a

23   petition has scientific merit, such Secretary shall

24   make a determination regarding such petition not

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003936

1632

1 more than 12 months after the date such Secretary

2 received such petition."; and

3      (2) by amending subsection (b) to read as fol-

4    lows:

5 "(b) Any person who knowingly imports, ships, or

6 transports any species in violation of subsection (a) of this

7 section and who reasonably should have known that the

8 species at issue in such violation is a species listed in sub-

9 section (a) of this section, or in any regulation issued pur-

10 suant thereto, shall be fined under this title or imprisoned

11 not more than six months, or both.".

**12 SEC. 190404. NATIONAL WILDLIFE HEALTH CENTER.**

13      (a) WILDLIFE DISEASE SURVEILLANCE.—The Direc-

14 tor shall establish and maintain a national database of

15 wildlife disease, including diseases that cause a human

16 health risk, at the National Wildlife Health Center. The

17 Director, acting through such Center, shall, with respect

18 to wildlife disease—

19      (1) develop, validate, and deploy diagnostic

20    tests;

21      (2) provide diagnostic services to Federal,

22    State, and Tribal natural resource management

23    agencies; and

24      (3) provide confirmatory testing of diagnostic

25    results.

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003937

1633

1    (b) STRATEGIES FOR MITIGATION.—The Director

2    shall—

3         (1) develop a framework for wildlife disease ex-

4    perts in the United States to conduct risk assess-

5    ments of wildlife diseases;

6         (2) communicate risk factors associated with

7    wildlife diseases to the public;

8         (3) develop strategies to mitigate the threat

9    posed by wildlife disease; and

10        (4) in coordination with the Director of the

11   United States Fish and Wildlife Service—

12             (A) monitor wildlife disease threats to

13        evaluate the risk posed by and impact of such

14        diseases on the United States, conduct research

15        and development to create statistically sup-

16        ported sampling frameworks for broad-scale

17        surveillance of wildlife disease threats;

18             (B) conduct research on human dimensions

19        of wildlife disease transmission and on effective

20        outreach to stakeholders to help manage wildlife

21        disease;

22             (C) conduct statistical modeling to under-

23        stand and predict wildlife disease movement;

24        and

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003938

1634

1         (D) make recommendations to the Sec-

2         retary of the Interior on wildlife species to be

3         listed as injurious under section 42 of title 18,

4         United States Code.

5     (c) INTERNATIONAL SURVEILLANCE.—The Director,

6 in coordination with the Administrator for the United

7 States Agency for International Development, may

8 strengthen global capacity for wildlife health monitoring

9 to enhance early detection of diseases that have the capac-

10 ity to jump the species barrier and pose a risk to the

11 United States, including by providing funding for—

12         (1) academic, governmental, and nongovern-

13         mental partner entities working to prevent wildlife

14         disease outbreaks, emerging pathogens of wildlife or-

15         igin, and epidemics or pandemics;

16         (2) building wildlife disease diagnostic capacity

17         and monitoring systems in countries with areas that

18         pose a high risk for animal-to-human transmission

19         of disease; and

20         (3) providing technical assistance through train-

21         ing, data sharing, and performing testing in coun-

22         tries with areas that pose a high risk for animal-to-

23         human transmission of disease.

DOC_0003939

1635

1     (d) DIRECTOR.—In this section, the term "Director"

2 means the Director of the United States Geological Sur-

3 vey.

4     (e) WILDLIFE DISEASE.—In this section, the term

5 "wildlife disease" means a disease-causing agent in wild-

6 life that potentially poses a threat to human health.

7 **SEC. 190405. SURVEILLANCE BY STATES, TRIBES, TERRI-**

8                     **TORIES, AND INSULAR AREAS.**

9     (a) WILDLIFE DISEASE SURVEILLANCE, RESEARCH,

10 MANAGEMENT, AND EDUCATION.—The Director or the

11 United States Fish and Wildlife Service shall establish a

12 grant program to provide onetime funding to the States,

13 the District of Columbia, Tribes, and the territories and

14 insular areas of the United States to conduct epidemiolog-

15 ical surveillance, research, management, and education re-

16 lating to emerging wildlife disease.

# TITLE V—PANDEMIC RELIEF FOR AVIATION WORKERS AND PASSENGERS

20 **SEC. 190501. PANDEMIC RELIEF FOR AVIATION WORKERS.**

21     (a) APPLICABILITY OF ASSURANCE REGARDING FUR-

22 LOUGHS.—Section 4114(a)(1) of the Coronavirus Aid, Re-

23 lief, and Economic Security Act (Public Law 116–136) is

24 amended by striking "September 30, 2020" and inserting

DOC_0003940

1636

1 ''the date on which such financial assistance is fully ex-

2 hausted by the air carrier or contractor''.

3    (b) PROTECTION OF COLLECTIVE BARGAINING

4 AGREEMENT.—Section 4115 of such Act is amended—

5       (1) in subsection (a) by striking ''(a) IN GEN-

6       ERAL.—''; and

7       (2) by striking subsection (b).

**8 SEC. 190502. TRANSPARENCY OF FINANCIAL ASSISTANCE.**

9    (a) DISCLOSURE OF FINANCIAL ASSISTANCE.—Not

10 later than 72 hours after issuance of financial assistance

11 by the Secretary of the Treasury pursuant to section

12 4112(a) of the Coronavirus Aid, Relief, and Economic Se-

13 curity Act (Public Law 116–136), the Secretary shall pub-

14 lish on the website of the Department of the Treasury and

15 shall submit to the congressional committees of jurisdic-

16 tion—

17       (1) a plain-language description of the financial

18       assistance, including the date of application, date of

19       application approval, and identity of the recipient of

20       financial assistance;

21       (2) the amount of the financial assistance; and

22       (3) a copy of any contract or assurances, if ap-

23       plicable, and other relevant documentation regarding

24       the financial assistance.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003941

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1637

1   (b) TRADE SECRETS.—Notwithstanding any other

2   provision of law, the Secretary may redact, from a disclo-

3   sure under subsection (a), any trade secret other than the

4   amount of or conditions attached to the issuance of finan-

5   cial assistance.

6   (c) DEFINITIONS.—In this section:

7   (1) CONGRESSIONAL COMMITTEES OF JURISDIC-

8   TION.—The term "congressional committees of juris-

9   diction" means the Committee on Transportation

10   and Infrastructure and the Committee on Financial

11   Services of the House of Representatives and the

12   Committee on Commerce, Science, and Transpor-

13   tation and the Committee on Banking, Housing, and

14   Urban Affairs of the Senate.

15   (2) TRADE SECRET DEFINED.—The term

16   "trade secret" means any financial or business infor-

17   mation provided by the recipient of financial assist-

18   ance under section 4112(a) of the Coronavirus Aid,

19   Relief, and Economic Security Act (Public Law

20   116–136), if—

21   (A) such recipient has taken reasonable

22   measures to keep such information secret; and

23   (B) the information derives independent

24   economic value, actual or potential, from not

25   being generally known to, and not being readily

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003942

1638

1           ascertainable through proper means by, another

2           person who can obtain economic value from the

3           disclosure or use of the information.

4       (d) SAVINGS PROVISION.—Nothing in this section

5   shall be construed as eliminating or abridging any report-

6   ing requirement under the Coronavirus Aid, Relief, and

7   Economic Security Act (Public Law 116–136).

8   **SEC. 190503. AIR CARRIER MAINTENANCE OUTSOURCING.**

9       (a) IN GENERAL.—A passenger air carrier receiving

10  a loan, loan guarantee, or other investment under section

11  4003 of the Coronavirus Aid, Relief, and Economic Secu-

12  rity Act (Public Law 116–136) may not apply the pro-

13  ceeds of such assistance toward a contract for heavy main-

14  tenance work at a facility located outside of the United

15  States if such contract would increase the ratio of mainte-

16  nance work performed outside of the United States to all

17  maintenance work performed by or on behalf of such air

18  carrier at all locations.

19      (b) DEFINITION OF HEAVY MAINTENANCE WORK.—

20  In this section, the term ''heavy maintenance work'' has

21  the meaning given the term in section 44733(g) of title

22  49, United States Code.

23  **SEC. 190504. NATIONAL AVIATION PREPAREDNESS PLAN.**

24      (a) IN GENERAL.—The Secretary of Transportation,

25  in coordination with the Secretary of Health and Human

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003943

1639

1 Services, the Secretary of Homeland Security, and the
2 heads of such other Federal departments or agencies as
3 the Secretary considers appropriate, shall develop a na-
4 tional aviation preparedness plan for communicable dis-
5 ease outbreaks.

6     (b) CONTENTS OF PLAN.—A plan developed under
7 subsection (a) shall, at a minimum—

8        (1) provide airports and air carriers with an
9        adaptable and scalable framework with which to
10       align the individual plans of such airports and air
11       carriers and provide appropriate guidance as to each
12       individual plan;

13       (2) improve coordination among airports, air
14       carriers, U.S. Customs and Border Protection, the
15       Centers for Disease Control and Prevention, other
16       appropriate Federal entities, and State and local
17       governments or health agencies on developing poli-
18       cies that increase the effectiveness of screening,
19       quarantining, and contact-tracing with respect to in-
20       bound international passengers;

21       (3) ensure that at-risk employees are equipped
22       with appropriate personal protective equipment to
23       reduce the likelihood of exposure to pathogens in the
24       event of a pandemic;

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003944

1640

1    (4) ensure aircraft and enclosed facilities

2    owned, operated, or used by an air carrier or airport

3    are cleaned, disinfected, and sanitized frequently in

4    accordance with Centers for Disease Control and

5    Prevention guidance; and

6    (5) incorporate all elements referenced in the

7    recommendation of the Comptroller General of the

8    United States to the Secretary of Transportation

9    contained in the report titled ''Air Travel and Com-

10   municable Diseases: Comprehensive Federal Plan

11   Needed for U.S. Aviation System's Preparedness''

12   issued in December 2015 (GAO–16–127).

13   (c) CONSULTATION.—When developing a plan under

14   subsection (a), the Secretary of Transportation shall con-

15   sult with aviation industry and labor stakeholders, includ-

16   ing representatives of—

17   (1) air carriers;

18   (2) small, medium, and large hub airports;

19   (3) labor organizations that represent airline pi-

20   lots, flight attendants, air carrier airport customer

21   service representatives, and air carrier maintenance,

22   repair, and overhaul workers;

23   (4) the labor organization certified under sec-

24   tion 7111 of title 5, United States Code, as the ex-

g:\VHLC\051220\051220.072.xml       (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003945

1641

1 clusive bargaining representative of air traffic con-

2 trollers of the Federal Aviation Administration;

3 (5) the labor organization certified under such

4 section as the exclusive bargaining representative of

5 airway transportation systems specialists and avia-

6 tion safety inspectors of the Federal Aviation Ad-

7 ministration; and

8 (6) such other stakeholders as the Secretary

9 considers appropriate.

10 (d) REPORT.—Not later than 30 days after the plan

11 is developed under subsection (a), the Secretary shall sub-

12 mit to the appropriate committees of Congress such plan.

13 (e) DEFINITION OF AT-RISK EMPLOYEES.—In this

14 section, the term "at-risk employees" means—

15 (1) individuals whose job duties require inter-

16 action with air carrier passengers on a regular and

17 continuing basis that are employees of—

18 (A) air carriers;

19 (B) air carrier contractors;

20 (C) airports; and

21 (D) Federal departments or agencies; and

22 (2) air traffic controllers and systems safety

23 specialists of the Federal Aviation Administration.

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003946

## SEC. 190505. WORKING AND TRAVEL CONDITIONS.

For the duration of the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) related to the pandemic of SARS–CoV–2 or coronavirus disease 2019 (COVID–19), an air carrier operating under part 121 of title 14, Code of Federal Regulations, shall—

(1) require each passenger and cabin crewmember to wear a mask or protective face covering while on board an aircraft of the air carrier;

(2) require each flight crewmember to wear a mask or protective face covering while on board an aircraft but outside the flight deck;

(3) submit to the Administrator of the Federal Aviation Administration a proposal to permit flight crew members of the air carrier to wear a mask or protective face covering while at their stations in the flight deck, including a safety risk assessment with respect to such proposal;

(4) provide flight and cabin crewmembers, airport customer service agents, and other employees whose job responsibilities involve interaction with passengers with masks or protective face coverings, gloves, and hand sanitizer and wipes with sufficient alcohol content;

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003947

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1643

1    (5) ensure aircraft, including the cockpit and

2    cabin, operated by such carrier are cleaned, dis-

3    infected, and sanitized after each use in accordance

4    with Centers for Disease Control and Prevention

5    guidance;

6    (6) ensure enclosed facilities owned, operated,

7    or used by such air carrier, including facilities used

8    for flight or cabin crewmember training or perform-

9    ance of indoor maintenance, repair, or overhaul

10   work, are cleaned, disinfected, and sanitized fre-

11   quently in accordance with Centers for Disease Con-

12   trol and Prevention guidance;

13   (7) provide air carrier employees whose job re-

14   sponsibilities involve cleaning, disinfecting, and sani-

15   tizing aircraft or enclosed facilities described in

16   paragraphs (5) and (6) with masks or protective

17   face coverings and gloves, and ensure that each con-

18   tractor of the air carrier provides employees of such

19   contractor with such materials; and

20   (8) establish guidelines, or adhere to applicable

21   guidelines, for notifying employees of a confirmed

22   COVID–19 diagnosis of an employee of such air car-

23   rier and for identifying other air carrier employees

24   whom such employee contacted in the 48-hour period

25   before the employee developed symptoms.

DOC_0003948

1644

## SEC. 190506. PROTECTION OF CERTAIN FEDERAL AVIATION ADMINISTRATION EMPLOYEES.

1  (a) IN GENERAL.—For the duration of the national
2  emergency declared by the President under the National
3  Emergencies Act (50 U.S.C. 1601 et seq.) related to the
4  pandemic of SARS–CoV–2 or coronavirus disease 2019
5  (COVID–19), in order to maintain the safe and efficient
6  operation of the air traffic control system, the Adminis-
7  trator of the Federal Aviation Administration shall—

8     (1) provide air traffic controllers and airway
9        transportation systems specialists of the Administra-
10        tion with masks or protective face coverings, gloves,
11        and hand sanitizer and wipes with sufficient alcohol
12        content;

13     (2) ensure air traffic control facilities are
14        cleaned, disinfected, and sanitized frequently in ac-
15        cordance with Centers for Disease Control and Pre-
16        vention guidance; and

17     (3) provide employees of the Administration
18        whose job responsibilities involve cleaning, dis-
19        infecting, and sanitizing facilities described in para-
20        graph (2) with masks or protective face coverings
21        and gloves, and ensure that each contractor of the
22        Administration provides employees of such con-
23        tractor with such materials.

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003949

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1645

1    (b) SOURCE OF EQUIPMENT.—The items described

2  in subsection (a)(1) may be procured or provided under

3  such subsection through any sources available to the Ad-

4  ministrator.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003950

1646

# TITLE VI—AMTRAK AND RAIL WORKERS

### SEC. 190601. AMTRAK COVID–19 REQUIREMENTS.

(a) IN GENERAL.—For the duration of the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) related to the pandemic of SARS–CoV–2 or coronavirus disease (COVID–19), Amtrak shall—

(1) require each passenger and employee of Amtrak, including engineers, conductors, and on-board service workers, to wear a mask or other protective face covering while onboard an Amtrak train;

(2) take such actions as are reasonable to ensure passenger compliance with the requirement under paragraph (1);

(3) provide masks or protective face coverings, gloves, and hand sanitizer and sanitizing wipes with sufficient alcohol content to—

(A) conductors, engineers, and onboard service workers;

(B) ticket agents, station agents, and red cap agents; and

(C) any other employees whose job responsibilities include interaction with passengers;

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003951

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1647

1       (4) ensure Amtrak trains, including the loco-
2   motive cab and passenger cars, are cleaned, dis-
3   infected, and sanitized frequently in accordance with
4   guidance issued by the Centers for Disease Control
5   and Prevention and ensure that employees whose job
6   responsibilities include such cleaning, disinfecting, or
7   sanitizing are provided masks or protective face cov-
8   erings and gloves;

9       (5) ensure stations and enclosed facilities that
10  Amtrak owns and operates including facilities used
11  for training or the performance of indoor mainte-
12  nance, repair, or overhaul work, are cleaned, dis-
13  infected, and sanitized frequently in accordance with
14  guidance issued by the Centers for Disease Control
15  and Prevention and ensure that employees whose job
16  responsibilities include such cleaning, disinfecting, or
17  sanitizing are provided masks or protective face cov-
18  erings and gloves;

19      (6) take such actions as are reasonable to en-
20  sure that stations or facilities served or used by Am-
21  trak that Amtrak does not own are cleaned, dis-
22  infected, and sanitized frequently in accordance with
23  Centers for Disease Control and Prevention guid-
24  ance;

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003952

1648

1     (7) ensure that each contractor of Amtrak pro-
2  vides masks or protective face coverings and gloves
3  to employees of such contractor whose job respon-
4  sibilities include those described in paragraphs (4)
5  and (5); and

6     (8) establish guidelines, or adhere to existing
7  applicable guidelines, for notifying employees of a
8  confirmed diagnosis of COVID–19 of an employee of
9  Amtrak.

10  (b) AVAILABILITY.—If Amtrak is unable to acquire
11  any of the items necessary to comply with paragraphs (3),
12  (4), and (5) of subsection (a) due to market unavailability,
13  Amtrak shall—

14     (1) prepare and make public documentation
15  demonstrating what actions have been taken to ac-
16  quire such items; and

17     (2) continue efforts to acquire such items until
18  such items become available.

19 **SEC. 190602. ADDITIONAL ENHANCED BENEFITS UNDER**
20 **THE RAILROAD UNEMPLOYMENT INSURANCE**
21 **ACT.**

22  (a) IN GENERAL.—Section 2(a)(5)(A) of the Railroad
23  Unemployment Insurance Act (45 U.S.C. 352(a)(5)(A) is
24  amended—

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003953

1649

1          (1) by striking "July 31, 2020" and inserting

2     "December 31, 2020, and for any registration peri-

3     ods during a period of continuing unemployment

4     which began on or before December 31, 2020"; and

5          (2) by adding at the end "No recovery benefit

6     under this section shall be payable for any registra-

7     tion period beginning on or after July 1, 2021."

8     (b) ADDITIONAL    APPROPRIATIONS.—Section

9     2(a)(5)(B) of the Railroad Unemployment Insurance Act

10    (45 U.S.C. 352(a)(5)(B) is amended by adding at the end

11    the following:

12    "In addition to the amount appropriated by the pre-

13    ceding sentence, out of any funds in the Treasury not oth-

14    erwise    appropriated,    there    are    appropriated

15    $1,000,000,000 to cover the cost of recovery benefits pro-

16    vided under subparagraph (A), to remain available until

17    expended.".

18    (c) DISREGARD OF RECOVERY BENEFITS FOR PUR-

19    POSES OF ALL FEDERAL AND FEDERALLY ASSISTED

20    PROGRAMS.—Section 2(a)(5) of the Railroad Unemploy-

21    ment Insurance Act (45 U.S.C. 352(a)(5)) is amended by

22    adding at the end the following:

23          "(C) A recovery benefit payable under sub-

24          paragraph (A) shall not be regarded as income

25          and shall not be regarded as a resource for the

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003954

1650

1    month of receipt and the following 9 months,
2    for purposes of determining the eligibility of the
3    recipient (or the recipient's spouse or family)
4    for benefits or assistance, or the amount or ex-
5    tent of benefits or assistance, under any Fed-
6    eral program or under any State or local pro-
7    gram financed in whole or in part with Federal
8    funds.''.

9    (d) CLARIFICATION ON AUTHORITY TO USE
10   FUNDS.—Funds appropriated under either the first or
11   second sentence of subparagraph (B) of section 2(a)(5)
12   of the Railroad Unemployment Insurance Act shall be
13   available to cover the cost of recovery benefits provided
14   under such section 2(a)(5) by reason of the amendments
15   made by subsection (a) as well as to cover the cost of such
16   benefits provided under such section 2(a)(5) as in effect
17   on the day before the date of enactment of this Act.

18   **SEC. 190603. TREATMENT OF PAYMENTS FROM THE RAIL-**
19   **ROAD UNEMPLOYMENT INSURANCE AC-**
20   **COUNT.**

21   (a) IN GENERAL.—Section 256(i)(1) of the Balanced
22   Budget and Emergency Deficit Control Act of 1985 (2
23   U.S.C. 906(i)(1)) is amended—

24   (1) in subparagraph (B), by striking ''and'' at
25   the end;

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003955

1651

1    (2) in subparagraph (C), by inserting "and" at

2    the end; and

3    (3) by inserting after subparagraph (C) the fol-

4    lowing new subparagraph:

5    "(D) any payment made from the Railroad Un-

6    employment Insurance Account (established by sec-

7    tion 10 of the Railroad Unemployment Insurance

8    Act) for the purpose of carrying out the Railroad

9    Unemployment Insurance Act, and funds appro-

10   priated or transferred to or otherwise deposited in

11   such Account,".

12   (b) EFFECTIVE DATE.—The treatment of payments

13   made from the Railroad Unemployment Insurance Ac-

14   count pursuant to the amendment made by subsection (a)

15   shall take effect 7 days after the date of enactment of this

16   Act and shall apply only to obligations incurred on or after

17   such effective date for such payments.

18   **SEC. 190604. TECHNICAL CORRECTION FOR EXTENDED UN-**

19   **EMPLOYMENT BENEFITS UNDER THE RAIL-**

20   **ROAD UNEMPLOYMENT INSURANCE ACT.**

21   Section 2(c)(2)(D)(iii) of the Railroad Unemployment

22   Insurance Act (45 U.S.C. 352(c)(2)(D)(iii)) is amended

23   by striking "July 1, 2019" and inserting "July 15, 2019".

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003956

1652

**SEC. 190605. TECHNICAL CORRECTION.**

Section 22002 of Public Law 116–136 is amended by striking ''Railway Retirement Act of 1974'' and inserting ''Railroad Retirement Act of 1974''.

**SEC. 190606. CLARIFICATION OF OVERSIGHT AND IMPLE-**
**MENTATION OF RELIEF FOR WORKERS AF-**
**FECTED BY CORONAVIRUS ACT.**

(a) AUDITS, INVESTIGATIONS, AND OVERSIGHT.— Notwithstanding section 2115 of the Relief for Workers Affected by Coronavirus Act (subtitle A of title II of division A of Public Law 116–136), the authority of the Inspector General of the Department of Labor to carry out audits, investigations, and other oversight activities that are related to the provisions of such Act shall not extend to any activities related to sections 2112, 2113, or 2114 of such Act. Such authority with respect to such sections shall belong to the Inspector General of the Railroad Retirement Board.

(b) OPERATING INSTRUCTIONS OR OTHER GUIDANCE.—Notwithstanding section 2116(b) of the Relief for Workers Affected by Coronavirus Act (subtitle A of title II of division A of Public Law 116–136), the authority of the Secretary of Labor to issue any operating instructions or other guidance necessary to carry out the provisions of such Act shall not extend to any activities related to sections 2112, 2113, or 2114 of such Act. Such author-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003957

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1653

1 ity with respect to such sections shall belong to the Rail-

2 road Retirement Board.

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1654

# TITLE VII—ENERGY AND ENVIRONMENT PROVISIONS

**SEC. 190701. HOME ENERGY AND WATER SERVICE CONTINUITY.**

Any entity receiving financial assistance pursuant to any division of this Act shall, to the maximum extent practicable, establish or maintain in effect policies to ensure that no home energy service or public water system service to a residential customer, which is provided or regulated by such entity, is or remains disconnected or interrupted during the emergency period described in section 1135(g)(1)(B) of the Social Security Act because of nonpayment, and all reconnections of such public water system service are conducted in a manner that minimizes risk to the health of individuals receiving such service. For purposes of this section, the term "home energy service" means a service to provide home energy, as such term is defined in section 2603 of the Low-Income Home Energy Assistance Act of 1981, or service provided by an electric utility, as such term is defined in section 3 of the Public Utility Regulatory Policies Act of 1978, and the term "public water system" has the meaning given that term in section 1401 of the Safe Drinking Water Act. Nothing in this section shall be construed to require forgiveness of any debt incurred or owed to an entity or to absolve

DOC_0003959

1655

1 an individual of any obligation to an entity for service,
2 nor to preempt any State or local law or regulation gov-
3 erning entities that provide such services to residential
4 customers.

**SEC. 190702. ENVIRONMENTAL JUSTICE GRANT PROGRAMS.**

6 (a) ENVIRONMENTAL JUSTICE GRANTS.—The Ad-
7 ministrator of the Environmental Protection Agency shall
8 continue to carry out—

9 (1) the Environmental Justice Small Grants
10 Program and the Environmental Justice Collabo-
11 rative Problem-Solving Cooperative Agreement Pro-
12 gram, as those programs are in existence on the date
13 of enactment of this Act; and

14 (2) the Community Action for a Renewed Envi-
15 ronment grant programs I and II, as in existence on
16 January 1, 2012.

17 (b) USE OF FUNDS FOR GRANTS IN RESPONSE TO
18 COVID–19 PANDEMIC.—With respect to amounts appro-
19 priated by division A of this Act that are available to carry
20 out the programs described in subsection (a), the Adminis-
21 trator of the Environmental Protection Agency may only
22 award grants under such programs for projects that will
23 investigate or address the disproportionate impacts of the
24 COVID–19 pandemic in environmental justice commu-
25 nities.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003960

1656

1    (c) AUTHORIZATION OF APPROPRIATIONS.—There is

2 authorized to be appropriated to carry out the programs

3 described in subsection (a) $50,000,000 for fiscal year

4 2020, and such sums as may be necessary for each fiscal

5 year thereafter.

6    (d) DISTRIBUTION.—Not later than 30 days after

7 amounts are made available pursuant to subsection (c),

8 the Administrator of the Environmental Protection Agen-

9 cy shall make awards of grants under each of the pro-

10 grams described in subsection (a).

**11 SEC. 190703. LOW-INCOME HOUSEHOLD DRINKING WATER**

**12            AND WASTEWATER ASSISTANCE.**

13    (a) AUTHORIZATION OF APPROPRIATIONS.—There is

14 authorized to be appropriated $1,500,000,000 to the Sec-

15 retary to carry out this section.

16    (b) LOW-INCOME HOUSEHOLD DRINKING WATER

17 AND WASTEWATER ASSISTANCE.—The Secretary shall

18 make grants to States and Indian Tribes to assist low-

19 income households, particularly those with the lowest in-

20 comes, that pay a high proportion of household income

21 for drinking water and wastewater services, by providing

22 funds to owners or operators of public water systems or

23 treatment works to reduce rates charged to such house-

24 holds for such services.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003961

1657

1  (c) NONDUPLICATION OF EFFORT.—In carrying out

2  this section, the Secretary, States, and Indian Tribes, as

3  applicable, shall, as appropriate and to the extent prac-

4  ticable, use existing processes, procedures, policies, and

5  systems in place to provide assistance to low-income

6  households, including by using existing application and ap-

7  proval processes.

8  (d) ALLOTMENT.—

9      (1) IN GENERAL.—Except as provided in para-

10     graph (2), the Secretary shall allot amounts appro-

11     priated pursuant to this section to a State or Indian

12     Tribe based on the following:

13         (A) The percentage of households in the

14         State, or under the jurisdiction of the Indian

15         Tribe, with income equal to or less than 150

16         percent of the Federal poverty line.

17         (B) The percentage of such households in

18         the State, or under the jurisdiction of the In-

19         dian Tribe, that spend more than 30 percent of

20         monthly income on housing.

21         (C) The extent to which the State or In-

22         dian Tribe has been affected by the public

23         health emergency, including the rate of trans-

24         mission of COVID–19 in the State or area over

25         which the Indian Tribe has jurisdiction, the

DOC_0003962

1658

1     number of COVID–19 cases compared to the
2     national average, and economic disruptions re-
3     sulting from the public health emergency.

4         (2) RESERVED FUNDS.—The Secretary shall re-
5     serve not more than 10 percent of the amounts ap-
6     propriated pursuant to this section for allotment to
7     States and Indian Tribes based on the economic dis-
8     ruptions to the States and Indian Tribes resulting
9     from the emergency described in the emergency dec-
10     laration issued by the President on March 13, 2020,
11     pursuant to section 501(b) of the Robert T. Stafford
12     Disaster Relief and Emergency Assistance Act (42
13     U.S.C. 5191(b)), during the period covered by such
14     emergency declaration and any subsequent major
15     disaster declaration under section 401 of such Act
16     (42 U.S.C. 5170) that supersedes such emergency
17     declaration.

18     (e) DETERMINATION OF LOW-INCOME HOUSE-
19     HOLDS.—

20         (1) MINIMUM DEFINITION OF LOW-INCOME.—In
21     determining whether a household is considered low-
22     income for the purposes of this section, a State or
23     Indian Tribe—

24             (A) shall ensure that, at a minimum—

DOC_0003963

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1659

1        (i) all households with income equal to
2 or less than 150 percent of the Federal
3 poverty line are included as low-income
4 households; and

5        (ii) all households with income equal
6 to or less than 60 percent of the State me-
7 dian income are included as low-income
8 households;

9    (B) may include households that have been
10 adversely economically affected by job loss or
11 severe income loss related to the public health
12 emergency; and

13    (C) may include other households, includ-
14 ing households in which 1 or more individuals
15 are receiving—

16        (i) assistance under the State pro-
17 gram funded under part A of title IV of
18 the Social Security Act (42 U.S.C. 601 et
19 seq.);

20        (ii) supplemental security income pay-
21 ments under title XVI of the Social Secu-
22 rity Act (42 U.S.C. 1381 et seq.);

23        (iii) supplemental nutrition assistance
24 program benefits under the Food and Nu-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003964

1660

1    trition Act of 2008 (7 U.S.C. 2011 et
2    seq.); or

3        (iv) payments under section 1315,
4        1521, 1541, or 1542 of title 38, United
5        States Code, or under section 306 of the
6        Veterans' and Survivors' Pension Improve-
7        ment Act of 1978.

8    (2) HOUSEHOLD DOCUMENTATION REQUIRE-
9    MENTS.—States and Indian Tribes shall—

10       (A) to the maximum extent practicable,
11       seek to limit the income history documentation
12       requirements for determining whether a house-
13       hold is considered low-income for the purposes
14       of this section; and

15       (B) for the purposes of income eligibility,
16       accept proof of job loss or severe income loss
17       dated after February 29, 2020, such as a layoff
18       or furlough notice or verification of application
19       of unemployment benefits, as sufficient to dem-
20       onstrate lack of income for an individual or
21       household.

22   (f) APPLICATIONS.—Each State or Indian Tribe de-
23   siring to receive a grant under this section shall submit
24   an application to the Secretary, in such form as the Sec-
25   retary shall require.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003965

1661

1 (g) UTILITY RESPONSIBILITIES.—Owners or opera-
2 tors of public water systems or treatment works receiving
3 funds pursuant to this section for the purposes of reducing
4 rates charged to low-income households for service shall—

5     (1) conduct outreach activities designed to en-
6     sure that such households are made aware of the
7     rate assistance available pursuant to this section;

8     (2) charge such households, in the normal bill-
9     ing process, not more than the difference between
10     the actual cost of the service provided and the
11     amount of the payment made by the State or Indian
12     Tribe pursuant to this section; and

13     (3) within 45 days of providing assistance to a
14     household pursuant to this section, notify in writing
15     such household of the amount of such assistance.

16 (h) STATE AGREEMENTS WITH DRINKING WATER
17 AND WASTEWATER PROVIDERS.—To the maximum extent
18 practicable, a State that receives a grant under this sec-
19 tion shall enter into agreements with owners and operators
20 of public water systems, owners and operators of treat-
21 ment works, municipalities, nonprofit organizations asso-
22 ciated with providing drinking water, wastewater, and
23 other social services to rural and small communities, and
24 Indian Tribes, to assist in identifying low-income house-
25 holds and to carry out this section.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003966

1662

1    (i) ADMINISTRATIVE COSTS.—A State or Indian

2 Tribe that receives a grant under this section may use up

3 to 8 percent of the granted amounts for administrative

4 costs.

5    (j) FEDERAL AGENCY COORDINATION.—In carrying

6 out this section, the Secretary shall coordinate with the

7 Administrator of the Environmental Protection Agency

8 and consult with other Federal agencies with authority

9 over the provision of drinking water and wastewater serv-

10 ices.

11    (k) AUDITS.—The Secretary shall require each State

12 and Indian Tribe receiving a grant under this section to

13 undertake periodic audits and evaluations of expenditures

14 made by such State or Indian Tribe pursuant to this sec-

15 tion.

16    (l) REPORTS TO CONGRESS.—The Secretary shall

17 submit to Congress a report on the results of activities

18 carried out pursuant to this section—

19       (1) not later than 1 year after the date of en-

20       actment of this section; and

21       (2) upon disbursement of all funds appropriated

22       pursuant to this section.

23    (m) DEFINITIONS.—In this section:

24       (1) INDIAN TRIBE.—The term "Indian Tribe"

25       means any Indian Tribe, band, group, or community

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003967

1663

1 recognized by the Secretary of the Interior and exer-

2 cising governmental authority over a Federal Indian

3 reservation.

4 (2) MUNICIPALITY.—The term "municipality"

5 has the meaning given such term in section 502 of

6 the Federal Water Pollution Control Act (33 U.S.C.

7 1362).

8 (3) PUBLIC HEALTH EMERGENCY.—The term

9 "public health emergency" means the public health

10 emergency described in section 1135(g)(1)(B) of the

11 Social Security Act (42 U.S.C. 1320b–5).

12 (4) PUBLIC WATER SYSTEM.—The term "public

13 water system" has the meaning given such term in

14 section 1401 of the Safe Drinking Water Act (42

15 U.S.C. 300f).

16 (5) SECRETARY.—The term "Secretary" means

17 the Secretary of Health and Human Services.

18 (6) STATE.—The term "State" means a State,

19 the District of Columbia, the Commonwealth of

20 Puerto Rico, the Virgin Islands of the United States,

21 Guam, American Samoa, and the Commonwealth of

22 the Northern Mariana Islands.

23 (7) TREATMENT WORKS.—The term "treatment

24 works" has the meaning given that term in section

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003968

1664

1    212 of the Federal Water Pollution Control Act (33

2    U.S.C. 1292).

### SEC. 190704. HOME WATER SERVICE CONTINUITY.

4    (a) CONTINUITY OF SERVICE.—Any entity receiving

5    financial assistance under division A of this Act shall, to

6    the maximum extent practicable, establish or maintain in

7    effect policies to ensure that, with respect to any service

8    provided by a public water system or treatment works to

9    an occupied residence, which service is provided or regu-

10   lated by such entity—

11       (1) no such service is or remains disconnected

12       or interrupted during the emergency period because

13       of nonpayment;

14       (2) all reconnections of such service are con-

15       ducted in a manner that minimizes risk to the health

16       of individuals receiving such service; and

17       (3) no fees for late payment of bills for such

18       service are charged or accrue during the emergency

19       period.

20   (b) EFFECT.—Nothing in this section shall be con-

21   strued to require forgiveness of outstanding debt owed to

22   an entity or to absolve an individual of any obligation to

23   an entity for service.

24   (c) DEFINITIONS.—In this section:

g:\VHLC\051220\051220.072.xml      (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003969

1665

1    (1) EMERGENCY PERIOD.—The term "emer-
2   gency period" means the emergency period described
3   in section 1135(g)(1)(B) of the Social Security Act
4   (42 U.S.C. 1320b–5).

5    (2) PUBLIC WATER SYSTEM.—The term "public
6   water system" has the meaning given such term in
7   section 1401 of the Safe Drinking Water Act (42
8   U.S.C. 300f).

9    (3) TREATMENT WORKS.—The term "treatment
10   works" has the meaning given that term in section
11   212 of the Federal Water Pollution Control Act (33
12   U.S.C. 1292).

DOC_0003970

1666

# TITLE VIII—DEATH AND DISABILITY BENEFITS FOR PUBLIC SAFETY OFFICERS IMPACTED BY COVID–19

**SEC. 190801. SHORT TITLE.**

This title may be cited as the "Public Safety Officer Pandemic Response Act of 2020".

**SEC. 190802. DEATH AND DISABILITY BENEFITS FOR PUBLIC SAFETY OFFICERS IMPACTED BY COVID–19.**

Section 1201 of the Omnibus Crime Control and Safe Streets Act of 1968 (34 U.S.C. 10281) is amended by adding at the end the following new subsection:

"(o) For purposes of this part:

"(1) COVID–19 shall be presumed to constitute a personal injury within the meaning of subsection (a), sustained in the line of duty by a public safety officer and directly and proximately resulting in death, unless such officer is shown to have performed no line of duty activity or action within the 45 days immediately preceding a diagnosis of, or positive test for COVID–19.

"(2) The Attorney General shall accept claims, including supplemental claims, under this section from an individual who—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003971

1667

1      ''(A) was serving as a public safety officer

2      and was injured or disabled in the line of duty

3      as a result of the terrorist attacks on the

4      United States that occurred on September 11,

5      2001, or in the aftermath of such attacks devel-

6      oped a condition described in section 3312(a) of

7      the Public Health Service Act (42 U.S.C.

8      300mm–22(a)); and

9      ''(B) was diagnosed with COVID–19 dur-

10     ing the period described in paragraph (3),

11     which, in combination with the injury or dis-

12     ability described in subparagraph (A), perma-

13     nently and totally disabled or directly and

14     proximately resulted in the death of the indi-

15     vidual.

16     In assessing a claim under this paragraph, the pre-

17     sumption of causation described in paragraph (1)

18     shall apply.

19     ''(3) The presumption described in paragraph

20     (1) shall apply with respect to a diagnosis of

21     COVID–19 beginning on January 20, 2020, and

22     ending on the date that is one year after the emer-

23     gency period (as such term is defined in section

24     1135(g) of the Social Security Act (42 U.S.C.

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003972

1668

1     1320b–5(g))) based on the COVID–19 public health

2     emergency ends.

3          ''(4) The term 'COVID–19' means a disease

4     caused by severe acute respiratory syndrome

5     coronavirus 2 (SARS–CoV–2).

6          ''(p) In determining whether the personal injury re-

7     sulting from COVID–19 was a catastrophic injury, the At-

8     torney General's inquiry shall be limited to whether the

9     individual is permanently prevented from performing any

10    gainful work as a public safety officer.''.

# TITLE IX—VICTIMS OF CRIME ACT AMENDMENTS

**SEC. 190901. SHORT TITLE.**

14    This title may be cited as the ''Victims of Crime Act

15    Fix Act of 2020''.

**SEC. 190902. DEPOSITS OF FUNDING INTO THE CRIME VIC-
TIMS FUND.**

18    Section 1402(b) of the Victims of Crime Act of 1984

19    (34 U.S.C. 20101(b)) is amended—

20         (1) in paragraph (4), by striking ''and'' at the

21    end;

22         (2) in paragraph (5), by striking the period at

23    the end and inserting ''; and''; and

24         (3) by adding at the end the following:

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003973

1669

1 &ldquo;(6) any funds that would otherwise be depos-

2 ited in the general fund of the Treasury collected as

3 pursuant to—

4 &ldquo;(A) a deferred prosecution agreement; or

5 &ldquo;(B) a non-prosecution agreement.&rdquo;.

**6 SEC. 190903. WAIVER OF MATCHING REQUIREMENT.**

7 (a) IN GENERAL.—Notwithstanding any other provi-

8 sion of VOCA, during the COVID–19 emergency period

9 and for the period ending one year after the date on which

10 such period expires or is terminated, the Attorney General,

11 acting through the Director of the Office for Victims of

12 Crime, may not impose any matching requirement as a

13 condition of receipt of funds under any program to provide

14 assistance to victims of crimes authorized under the Vic-

15 tims of Crime Act of 1984 (34 U.S.C. 20101 et seq.).

16 (b) DEFINITION.—In this section, the term

17 &ldquo;COVID–19 emergency period&rdquo; means the period begin-

18 ning on the date on which the President declared a na-

19 tional emergency under the National Emergencies Act (50

20 U.S.C. 1601 et seq.) with respect to the Coronavirus Dis-

21 ease 2019 (COVID–19) and ending on the date that is

22 30 days after the date on which the national emergency

23 declaration is terminated.

24 (c) APPLICATION.—This section shall apply with re-

25 spect to—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003974

1670

1  (1) applications submitted during the period de-

2 scribed under subsection (a), including applications

3 for which funds will be distributed after such period;

4 and

5  (2) distributions of funds made during the pe-

6 riod described under subsection (a), including dis-

7 tributions made pursuant to applications submitted

8 before such period.

# TITLE X—JABARA-HEYER NO HATE ACT

**SEC. 191001. SHORT TITLE.**

12 This title may be cited as the "Jabara-Heyer Na-

13 tional Opposition to Hate, Assault, and Threats to Equal-

14 ity Act of 2020" or the "Jabara-Heyer NO HATE Act".

**SEC. 191002. FINDINGS.**

16 Congress finds the following:

17  (1) The incidence of violence known as hate

18 crimes or crimes motivated by bias poses a serious

19 national problem.

20  (2) According to data obtained by the Federal

21 Bureau of Investigation, the incidence of such vio-

22 lence increased in 2017, the most recent year for

23 which data is available.

24  (3) In 1990, Congress enacted the Hate Crime

25 Statistics Act (Public Law 101–275; 28 U.S.C. 534

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003975

1671

1   note) to provide the Federal Government, law en-
2   forcement agencies, and the public with data regard-
3   ing the incidence of hate crime. The Hate Crimes
4   Statistics Act and the Matthew Shepard and James
5   Byrd, Jr. Hate Crimes Prevention Act (division E of
6   Public Law 111–84; 123 Stat. 2835) have enabled
7   Federal authorities to understand and, where appro-
8   priate, investigate and prosecute hate crimes.

9       (4) A more complete understanding of the na-
10   tional problem posed by hate crime is in the public
11   interest and supports the Federal interest in eradi-
12   cating bias-motivated violence referenced in section
13   249(b)(1)(C) of title 18, United States Code.

14       (5) However, a complete understanding of the
15   national problem posed by hate crimes is hindered
16   by incomplete data from Federal, State, and local
17   jurisdictions through the Uniform Crime Reports
18   program authorized under section 534 of title 28,
19   United States Code, and administered by the Fed-
20   eral Bureau of Investigation.

21       (6) Multiple factors contribute to the provision
22   of inaccurate and incomplete data regarding the in-
23   cidence of hate crime through the Uniform Crime
24   Reports program. A significant contributing factor is
25   the quality and quantity of training that State and

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003976

1672

1    local law enforcement agencies receive on the identi-

2    fication and reporting of suspected bias-motivated

3    crimes.

4    (7) The problem of crimes motivated by bias is

5    sufficiently serious, widespread, and interstate in na-

6    ture as to warrant Federal financial assistance to

7    States and local jurisdictions.

8    (8) Federal financial assistance with regard to

9    certain violent crimes motivated by bias enables Fed-

10    eral, State, and local authorities to work together as

11    partners in the investigation and prosecution of such

12    crimes.

13    **SEC. 191003. DEFINITIONS.**

14    In this title:

15    (1) HATE CRIME.—The term "hate crime"

16    means an act described in section 245, 247, or 249

17    of title 18, United States Code, or in section 901 of

18    the Civil Rights Act of 1968 (42 U.S.C. 3631).

19    (2) PRIORITY AGENCY.—The term "priority

20    agency" means—

21    (A) a law enforcement agency of a unit of

22    local government that serves a population of not

23    less than 100,000, as computed by the Federal

24    Bureau of Investigation; or

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003977

1673

1     (B) a law enforcement agency of a unit of

2    local government that—

3       (i) serves a population of not less than

4      50,000 and less than 100,000, as com-

5      puted by the Federal Bureau of Investiga-

6      tion; and

7       (ii) has reported no hate crimes

8      through the Uniform Crime Reports pro-

9      gram in each of the 3 most recent calendar

10     years for which such data is available.

11   (3) STATE.—The term "State" has the mean-

12  ing given the term in section 901 of title I of the

13  Omnibus Crime Control and Safe Streets Act of

14  1968 (34 U.S.C. 10251).

15   (4) UNIFORM CRIME REPORTS.—The term

16  "Uniform Crime Reports" means the reports author-

17  ized under section 534 of title 28, United States

18  Code, and administered by the Federal Bureau of

19  Investigation that compile nationwide criminal sta-

20  tistics for use—

21     (A) in law enforcement administration, op-

22    eration, and management; and

23     (B) to assess the nature and type of crime

24    in the United States.

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003978

1674

1     (5) UNIT OF LOCAL GOVERNMENT.—The term

2     "unit of local government" has the meaning given

3     the term in section 901 of title I of the Omnibus

4     Crime Control and Safe Streets Act of 1968 (34

5     U.S.C. 10251).

6  **SEC. 191004. REPORTING OF HATE CRIMES.**

7     (a) IMPLEMENTATION GRANTS.—

8        (1) IN GENERAL.—The Attorney General may

9     make grants to States and units of local government

10    to assist the State or unit of local government in im-

11    plementing the National Incident-Based Reporting

12    System, including to train employees in identifying

13    and classifying hate crimes in the National Incident-

14    Based Reporting System.

15       (2) PRIORITY.—In making grants under para-

16    graph (1), the Attorney General shall give priority to

17    States and units of local government with larger

18    populations.

19    (b) REPORTING.—

20       (1) COMPLIANCE.—

21          (A) IN GENERAL.—Except as provided in

22       subparagraph (B), in each fiscal year beginning

23       after the date that is 3 years after the date on

24       which a State or unit of local government first

25       receives a grant under subsection (a), the State

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003979

1675

1    or unit of local government shall provide to the

2    Attorney General, through the Uniform Crime

3    Reporting system, information pertaining to

4    hate crimes committed in that jurisdiction dur-

5    ing the preceding fiscal year.

6    (B) EXTENSIONS; WAIVER.—The Attorney

7    General—

8    (i) may provide a 120-day extension

9    to a State or unit of local government that

10    is making good faith efforts to comply with

11    subparagraph (A); and

12    (ii) shall waive the requirements of

13    subparagraph (A) if compliance with that

14    subparagraph by a State or unit of local

15    government would be unconstitutional

16    under the constitution of the State or of

17    the State in which the unit of local govern-

18    ment is located, respectively.

19    (2) FAILURE TO COMPLY.—If a State or unit of

20    local government that receives a grant under sub-

21    section (a) fails to substantially comply with para-

22    graph (1) of this subsection, the State or unit of

23    local government shall repay the grant in full, plus

24    reasonable interest and penalty charges allowable by

25    law or established by the Attorney General.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003980

1676

1  **SEC. 191005. GRANTS FOR STATE-RUN HATE CRIME HOT-**
2      **LINES.**

3  (a) GRANTS AUTHORIZED.—

4      (1) IN GENERAL.—The Attorney General shall

5  make grants to States to create State-run hate

6  crime reporting hotlines.

7      (2) GRANT PERIOD.—A grant made under

8  paragraph (1) shall be for a period of not more than

9  5 years.

10  (b) HOTLINE REQUIREMENTS.—A State shall ensure,

11  with respect to a hotline funded by a grant under sub-

12  section (a), that—

13      (1) the hotline directs individuals to—

14          (A) law enforcement if appropriate; and

15          (B) local support services;

16      (2) any personally identifiable information that

17  an individual provides to an agency of the State

18  through the hotline is not directly or indirectly dis-

19  closed, without the consent of the individual, to—

20          (A) any other agency of that State;

21          (B) any other State;

22          (C) the Federal Government; or

23          (D) any other person or entity;

24      (3) the staff members who operate the hotline

25  are trained to be knowledgeable about—

g:\VHLC\051220\051220.072.xml   (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0003981

1677

1    (A) applicable Federal, State, and local
2    hate crime laws; and
3    (B) local law enforcement resources and
4    applicable local support services; and
5    (4) the hotline is accessible to—
6    (A) individuals with limited English pro-
7    ficiency, where appropriate; and
8    (B) individuals with disabilities.
9    (c) BEST PRACTICES.—The Attorney General shall
10   issue guidance to States on best practices for imple-
11   menting the requirements of subsection (b).

12   **SEC. 191006. INFORMATION COLLECTION BY STATES AND**
13             **UNITS OF LOCAL GOVERNMENT.**

14   (a) DEFINITIONS.—In this section:
15   (1) APPLICABLE AGENCY.—The term "applica-
16   ble agency", with respect to an eligible entity that
17   is—
18   (A) a State, means—
19   (i) a law enforcement agency of the
20   State; and
21   (ii) a law enforcement agency of a
22   unit of local government within the State
23   that—
24   (I) is a priority agency; and

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003982

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1678

1      (II) receives a subgrant from the

2     State under this section; and

3    (B) a unit of local government, means a

4   law enforcement agency of the unit of local gov-

5   ernment that is a priority agency.

6   (2) COVERED AGENCY.—The term "covered

7 agency" means—

8    (A) a State law enforcement agency; or

9    (B) a priority agency.

10   (3) ELIGIBLE ENTITY.—The term "eligible enti-

11 ty" means—

12    (A) a State; or

13    (B) a unit of local government that has a

14   priority agency.

15 (b) GRANTS.—

16   (1) IN GENERAL.—The Attorney General may

17 make grants to eligible entities to assist covered

18 agencies within the jurisdiction of the eligible entity

19 in conducting law enforcement activities or crime re-

20 duction programs to prevent, address, or otherwise

21 respond to hate crime, particularly as those activities

22 or programs relate to reporting hate crimes through

23 the Uniform Crime Reports program, including—

24    (A) adopting a policy on identifying, inves-

25   tigating, and reporting hate crimes;

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003983

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1679

1     (B) developing a standardized system of
2 collecting, analyzing, and reporting the inci-
3 dence of hate crime;

4     (C) establishing a unit specialized in iden-
5 tifying, investigating, and reporting hate
6 crimes;

7     (D) engaging in community relations func-
8 tions related to hate crime prevention and edu-
9 cation such as—

10     (i) establishing a liaison with formal
11 community-based organizations or leaders;
12 and

13     (ii) conducting public meetings or
14 educational forums on the impact of hate
15 crimes, services available to hate crime vic-
16 tims, and the relevant Federal, State, and
17 local laws pertaining to hate crimes; and

18     (E) providing hate crime trainings for
19 agency personnel.

20     (2) SUBGRANTS.—A State that receives a grant
21 under paragraph (1) may award a subgrant to a pri-
22 ority agency of a unit of local government within the
23 State for the purposes under that paragraph.

24     (c) INFORMATION REQUIRED OF STATES AND UNITS
25 OF LOCAL GOVERNMENT.—

DOC_0003984

1680

1     (1) IN GENERAL.—For each fiscal year in
2 which an eligible entity receives a grant under sub-
3 section (b), the eligible entity shall—

4     (A) collect information from each applica-
5 ble agency summarizing the law enforcement
6 activities or crime reduction programs con-
7 ducted by the agency to prevent, address, or
8 otherwise respond to hate crime, particularly as
9 those activities or programs relate to reporting
10 hate crimes through the Uniform Crime Re-
11 ports program; and

12     (B) submit to the Attorney General a re-
13 port containing the information collected under
14 subparagraph (A).

15     (2) SEMIANNUAL LAW ENFORCEMENT AGENCY
16 REPORT.—

17     (A) IN GENERAL.—In collecting the infor-
18 mation required under paragraph (1)(A), an eli-
19 gible entity shall require each applicable agency
20 to submit a semiannual report to the eligible
21 entity that includes a summary of the law en-
22 forcement activities or crime reduction pro-
23 grams conducted by the agency during the re-
24 porting period to prevent, address, or otherwise
25 respond to hate crime, particularly as those ac-

DOC_0003985

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1681

1     tivities or programs relate to reporting hate

2     crimes through the Uniform Crime Reports pro-

3     gram.

4         (B) CONTENTS.—In a report submitted

5     under subparagraph (A), a law enforcement

6     agency shall, at a minimum, disclose—

7         (i) whether the agency has adopted a

8     policy on identifying, investigating, and re-

9     porting hate crimes;

10         (ii) whether the agency has developed

11     a standardized system of collecting, ana-

12     lyzing, and reporting the incidence of hate

13     crime;

14         (iii) whether the agency has estab-

15     lished a unit specialized in identifying, in-

16     vestigating, and reporting hate crimes;

17         (iv) whether the agency engages in

18     community relations functions related to

19     hate crime, such as—

20         (I) establishing a liaison with for-

21     mal community-based organizations or

22     leaders; and

23         (II) conducting public meetings

24     or educational forums on the impact

25     of hate crime, services available to

DOC_0003986

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1682

1    hate crime victims, and the relevant

2    Federal, State, and local laws per-

3    taining to hate crime; and

4        (v) the number of hate crime

5    trainings for agency personnel, including

6    the duration of the trainings, conducted by

7    the agency during the reporting period.

8    (d) COMPLIANCE AND REDIRECTION OF FUNDS.—

9        (1) IN GENERAL.—Except as provided in para-

10   graph (2), beginning not later than 1 year after the

11   date of enactment of this title, an eligible entity re-

12   ceiving a grant under subsection (b) shall comply

13   with subsection (c).

14       (2) EXTENSIONS; WAIVER.—The Attorney Gen-

15   eral—

16           (A) may provide a 120-day extension to an

17       eligible entity that is making good faith efforts

18       to collect the information required under sub-

19       section (c); and

20           (B) shall waive the requirements of sub-

21       section (c) for a State or unit of local govern-

22       ment if compliance with that subsection by the

23       State or unit of local government would be un-

24       constitutional under the constitution of the

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003987

1683

1    State or of the State in which the unit of local
2    government is located, respectively.

### SEC. 191007. REQUIREMENTS OF THE ATTORNEY GENERAL.

4    (a) INFORMATION COLLECTION AND ANALYSIS; RE-
5    PORT.—In order to improve the accuracy of data regard-
6    ing the incidence of hate crime provided through the Uni-
7    form Crime Reports program, and promote a more com-
8    plete understanding of the national problem posed by hate
9    crime, the Attorney General shall—

10    (1) collect and analyze the information provided
11    by States and units of local government under sec-
12    tion 191006 for the purpose of developing policies
13    related to the provision of accurate data obtained
14    under the Hate Crime Statistics Act (Public Law
15    101–275; 28 U.S.C. 534 note) by the Federal Bu-
16    reau of Investigation; and

17    (2) for each calendar year beginning after the
18    date of enactment of this title, publish and submit
19    to Congress a report based on the information col-
20    lected and analyzed under paragraph (1).

21    (b) CONTENTS OF REPORT.—A report submitted
22    under subsection (a) shall include—

23    (1) a qualitative analysis of the relationship be-
24    tween—

DOC_0003988

1684

1        (A) the number of hate crimes reported by

2    State law enforcement agencies or priority

3    agencies through the Uniform Crime Reports

4    program; and

5        (B) the nature and extent of law enforce-

6    ment activities or crime reduction programs

7    conducted by those agencies to prevent, ad-

8    dress, or otherwise respond to hate crime; and

9    (2) a quantitative analysis of the number of

10   State law enforcement agencies and priority agencies

11   that have—

12       (A) adopted a policy on identifying, inves-

13   tigating, and reporting hate crimes;

14       (B) developed a standardized system of

15   collecting, analyzing, and reporting the inci-

16   dence of hate crime;

17       (C) established a unit specialized in identi-

18   fying, investigating, and reporting hate crimes;

19       (D) engaged in community relations func-

20   tions related to hate crime, such as—

21           (i) establishing a liaison with formal

22       community-based organizations or leaders;

23       and

24           (ii) conducting public meetings or

25       educational forums on the impact of hate

1685

1    crime, services available to hate crime vic-

2    tims, and the relevant Federal, State, and

3    local laws pertaining to hate crime; and

4    (E) conducted hate crime trainings for

5    agency personnel during the reporting period,

6    including—

7    (i) the total number of trainings con-

8    ducted by each agency; and

9    (ii) the duration of the trainings de-

10    scribed in clause (i).

**SEC. 191008. ALTERNATIVE SENTENCING.**

12    Section 249 of title 18, United States Code, is

13    amended by adding at the end the following:

14    "(e) SUPERVISED RELEASE.—If a court includes, as

15    a part of a sentence of imprisonment imposed for a viola-

16    tion of subsection (a), a requirement that the defendant

17    be placed on a term of supervised release after imprison-

18    ment under section 3583, the court may order, as an ex-

19    plicit condition of supervised release, that the defendant

20    undertake educational classes or community service di-

21    rectly related to the community harmed by the defendant's

22    offense.".

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003990

1686

# TITLE XI—PRISONS AND JAILS

**SEC. 191101. SHORT TITLE.**

This title may be cited as the "Pandemic Justice Response Act".

**SEC. 191102. EMERGENCY COMMUNITY SUPERVISION ACT.**

(a) FINDINGS.—Congress finds the following:

(1) As of the date of introduction of this Act, the novel coronavirus has spread to all 50 States, the District of Columbia, and 3 territories.

(2) The Centers for Disease Control and Prevention have projected that between 160,000,000 and 214,000,000 people could be infected by the novel coronavirus in the United States over the course of the pandemic.

(3) Although the United States has less than 5 percent of the world's population, the United States holds approximately 21 percent of the world's prisoners and leads the world in the number of individuals incarcerated, with nearly 2,200,000 people incarcerated in State and Federal prisons and local jails.

(4) Studies have shown that individuals age out of crime starting around 25 years of age, and released individuals over the age of 50 have a very low recidivism rate.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003991

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1687

1   (5) According to public health experts, incarcer-

2   ated individuals are particularly vulnerable to being

3   gravely impacted by the novel corona virus pandemic

4   because—

5       (A) they have higher rates of underlying

6       health issues than members of the general pub-

7       lic, including higher rates of respiratory disease,

8       heart disease, diabetes, obesity, HIV/AIDS,

9       substance abuse, hepatitis, and other conditions

10      that suppress immune response; and

11      (B) the close conditions and lack of access

12      to hygiene products in prisons make these insti-

13      tutions   unusually   susceptible   to   viral

14      pandemics.

15  (6) The spread of communicable disease in the

16  United States generally constitutes a serious, height-

17  ened threat to the safety of incarcerated individuals,

18  and there is a serious threat to the general public

19  that prisons may become incubators of community

20  spread of communicable viral disease.

21  (b) DEFINITIONS.—In this section:

22  (1) COVERED HEALTH CONDITION.—The term

23  "covered health condition" with respect to an indi-

24  vidual, means the individual—

25      (A) is pregnant;

DOC_0003992

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1688

1         (B) has chronic lung disease or asthma;

2         (C) has congestive heart failure or coro-

3 nary artery disease;

4         (D) has diabetes;

5         (E) has a neurological condition that weak-

6 ens the ability to cough or breathe;

7         (F) has HIV;

8         (G) has sickle cell anemia;

9         (H) has cancer; or

10         (I) has a weakened immune system.

11     (2) COVERED INDIVIDUAL.—The term "covered

12 individual"—

13         (A) means an individual who—

14             (i) is a juvenile (as defined in section

15         5031 of title 18, United States Code);

16             (ii) is 50 years of age or older;

17             (iii) has a covered health condition; or

18             (iv) is within 12 months of release

19 from incarceration; and

20         (B) includes an individual described in

21 subparagraph (A) who is serving a term of im-

22 prisonment for an offense committed before No-

23 vember 1, 1987.

24     (3) NATIONAL EMERGENCY RELATING TO A

25 COMMUNICABLE DISEASE.—The term "national

DOC_0003993

1689

1 emergency relating to a communicable disease''
2 means—

3     (A) an emergency involving Federal pri-
4     mary responsibility determined to exist by the
5     President under the section 501(b) of the Rob-
6     ert T. Stafford Disaster Relief and Emergency
7     Assistance Act (42 U.S.C. 5191(b)) with re-
8     spect to a communicable disease; or

9     (B) a national emergency declared by the
10     President under the National Emergencies Act
11     (50 U.S.C. 1601 et seq.) with respect to a com-
12     municable disease.

13 (c) PLACEMENT OF CERTAIN INDIVIDUALS IN COM-
14 MUNITY SUPERVISION.—

15     (1) AUTHORITY.—Except as provided in para-
16 graph (2), beginning on the date on which a national
17 emergency relating to a communicable disease is de-
18 clared and ending on the date that is 60 days after
19 such national emergency expires or is terminated—

20     (A) notwithstanding any other provision of
21     law, the Director of the Bureau of Prisons shall
22     place in community supervision all covered indi-
23     viduals who are in the custody of the Bureau of
24     Prisons; and

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003994

1690

1     (B) the district court of the United States

2     for each judicial district shall place in commu-

3     nity supervision all covered individuals who are

4     in the custody and care of the United States

5     Marshals Service.

6     (2) EXCEPTIONS.—

7     (A) BUREAU OF PRISONS.—In carrying out

8     paragraph (1)(A), the Director—

9         (i) may not place in community super-

10        vision any individual determined, by clear

11        and convincing evidence, to be likely to

12        pose a specific and substantial risk of

13        causing bodily injury to or using violent

14        force against the person of another;

15        (ii) shall place in the file of each indi-

16        vidual described in clause (i) documenta-

17        tion of such determination, including the

18        evidence used to make the determination;

19        and

20        (iii) not later than 180 days after the

21        date on which the national emergency re-

22        lating to a communicable disease expires,

23        shall provide a report to Congress docu-

24        menting—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003995

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1691

1         (I) the demographic data (includ-

2       ing race, gender, age, offense of con-

3       viction, and criminal history level) of

4       the individuals denied placement in

5       community supervision under clause

6       (i); and

7         (II) the justification for the deni-

8       als described in subclause (I).

9     (B) DISTRICT COURTS.—In carrying out

10 paragraph (1)(B), each district court of the

11 United States—

12       (i) shall conduct an immediate and ex-

13       pedited review of the detention orders of

14       all covered individuals in the custody and

15       care of the United States Marshals Serv-

16       ice, which may be conducted sua sponte

17       and ex parte, without—

18         (I) appearance by the defendant

19       or any party; or

20         (II) requiring a petition, motion,

21       or other similar document to be filed;

22       (ii) may not place in community su-

23       pervision any individual if the court deter-

24       mines, after a hearing and the attorney for

25       the Government shows by clear and con-

DOC_0003996

1692

vincing evidence based on individualized
facts, that detention is necessary because
the individual's release will pose a specific
and substantial risk that the individual will
cause bodily injury or use violent force
against the person of another and that no
conditions of release will reasonably miti-
gate that risk;

(iii) in carrying out clauses (i) and
(ii), may—

(I) rely on evidence presented in
prior court proceedings; and

(II) if the court determines it
necessary, request additional informa-
tion from the parties to make the de-
termination.

(3) LIMITATION ON COMMUNITY SUPERVISION
PLACEMENT.—In placing covered individuals into
community supervision under this section, the Direc-
tor of the Bureau of Prisons and the district court
of the United States for each judicial district shall
take into account and prioritize placements that en-
able adequate social distancing, which include home
confinement or other forms of low in-person-contact
supervised release.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003997

1693

1    (d) LIMITATION ON PRE-TRIAL DETENTION.—

2       (1) NO BOND CONDITIONS ON RELEASE.—Not-

3 withstanding section 3142 of title 18, United States

4 Code, beginning on the date on which a national

5 emergency relating to a communicable disease is de-

6 clared and ending on the date that is 60 days after

7 such national emergency expires or is terminated, in

8 imposing conditions of release, the judicial officer

9 may not require payment of cash bail, proof of abil-

10 ity to pay an unsecured bond, execution of a bail

11 bond, a solvent surety to co-sign a secured or unse-

12 cured bond, or posting of real property.

13       (2) LIMITATION.—

14          (A) IN GENERAL.—Beginning on the date

15       on which a national emergency relating to a

16       communicable disease is declared and ending on

17       the date that is 60 days after such national

18       emergency expires or is terminated, at any ini-

19       tial appearance hearing, detention hearing,

20       hearing on a motion for pretrial release, or any

21       other hearing where the attorney for the Gov-

22       ernment is seeking the detention or continued

23       detention of any individual, the judicial officer

24       shall order the pretrial release of the individual

25       on personal recognizance or on a condition or

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003998

1694

1 combination of conditions under section 3142(c)

2 of title 18, United States Code, unless the at-

3 torney for the Government shows by clear and

4 convincing evidence based on individualized

5 facts that detention is necessary because the in-

6 dividual's release will pose a specific and sub-

7 stantial risk that the individual will cause bodily

8 injury or use violent force against the person of

9 another and that no conditions of release will

10 reasonably mitigate that risk.

11 (B) REQUIRED CONSIDERATION OF CER-

12 TAIN FACTORS.—If the judicial officer finds

13 that the attorney for the Government has made

14 the requisite showing under subparagraph (A),

15 the judicial officer shall take into consideration,

16 in determining whether detention is necessary—

17 (i) whether the individual's age or

18 medical condition renders them especially

19 vulnerable; and

20 (ii) whether detention will compromise

21 the individual's access to adequate medical

22 treatment, access to medications, or ability

23 to privately consult with counsel and

24 meaningfully prepare a defense.

25 (C) JUVENILES.—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0003999

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1695

1   (i) IN GENERAL.—Beginning on the
2   date on which a national emergency relat-
3   ing to a communicable disease is declared
4   and ending on the date that is 60 days
5   after such national emergency expires or is
6   terminated, notwithstanding sections 5031
7   through 5035 of title 18, United States
8   Code, and except as provided under clause
9   (ii), in the case of a juvenile alleged to
10  have committed an act of juvenile delin-
11  quency, the judicial officer shall release the
12  juvenile to their parent, guardian, custo-
13  dian, or other responsible party (including
14  the director of a shelter-care facility) upon
15  their promise to bring such juvenile before
16  the appropriate court when requested by
17  the judicial officer.

18  (ii) EXCEPTION.—A juvenile alleged
19  to have committed an act of juvenile delin-
20  quency may be detained pending trial only
21  if, at a hearing at which the juvenile is
22  represented by counsel, the attorney for
23  the Government shows by clear and con-
24  vincing evidence based on individualized
25  facts that detention is necessary because

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004000

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1696

1    the juvenile's release will pose a specific

2    and substantial risk that the juvenile will

3    use violent force against a reasonably iden-

4    tifiable person and that no conditions of

5    release will reasonably mitigate that risk,

6    except that in no case may a judicial offi-

7    cer order the detention of a juvenile if it

8    will compromise the juvenile's access to

9    adequate medical treatment, access to

10    medications, or ability to privately consult

11    with counsel and meaningfully prepare a

12    defense.

13    (iii) LEAST RESTRICTIVE DETEN-

14    TION.—In the case that the judicial officer

15    orders the detention of a juvenile under

16    clause (ii), the judicial officer shall order

17    the detention of the juvenile in the least

18    restrictive and safest environment possible,

19    taking the national emergency relating to a

20    communicable disease into consideration.

21    (iv) CONTENTS OF DETENTION

22    ORDER.—In the case that the judicial offi-

23    cer orders the detention of a juvenile under

24    clause (ii), the judicial officer shall issue a

25    written detention order that includes—

g:\VHLC\051220\051220.072.xml    (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0004001

1697

1    (I) findings of fact;

2    (II) the reasons for the deten-

3    tion;

4    (III) a description of the risk

5    identified under clause (ii);

6    (IV) an explanation of why no

7    conditions will reasonably mitigate the

8    risk identified under clause (ii);

9    (V) a statement that detention

10    will not compromise the juvenile's ac-

11    cess to adequate medical treatment,

12    access to medications, or ability to

13    privately consult with counsel and

14    meaningfully prepare a defense; and

15    (VI) a statement establishing

16    that the detention environment is the

17    least restrictive and safest possible in

18    accordance with the requirement

19    under clause (iii).

20    (e) LIMITATION ON SUPERVISED RELEASE.—Begin-

21    ning on the date on which a national emergency relating

22    to a communicable disease is declared and ending on the

23    date that is 60 days after such national emergency expires,

24    the Office of Probation and Pretrial Services of the Ad-

25    ministrative Office of the United States Courts shall take

g:\VHLC\051220\051220.072.xml          (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0004002

1698

1   measures to prevent the spread of the communicable dis-
2   ease among individuals under supervision by—

3   　　　(1) suspending the requirement that individuals
4   　　determined to be a lower risk of reoffending, or any
5   　　other individuals determined to be appropriate by
6   　　the supervising probation officer, report in person to
7   　　their probation or parole officer;

8   　　　(2) identifying individuals who have successfully
9   　　completed not less than 18 months of supervision
10  　　and transferring such individuals to administrative
11  　　supervision or petitioning the court to terminate su-
12  　　pervision, as appropriate; and

13  　　　(3) suspending the request for detention and
14  　　imprisonment as a sanction for violations of proba-
15  　　tion, supervised release, or parole.

16  　(f) PROHIBITION.—No individual who is granted
17  placement in community supervision, termination of su-
18  pervision, placement on administrative supervision, or pre-
19  trial release shall be re-incarcerated, placed on supervision
20  or active supervision, or ordered detained pre-trial only as
21  a result of the expiration of the national emergency relat-
22  ing to a communicable disease.

23  　(g) PROHIBITION ON TECHNICAL VIOLATIONS AND
24  CERTAIN MANDATORY REVOCATIONS OF PROBATION OR
25  SUPERVISED RELEASE.—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004003

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1699

1    (1) RESENTENCING IN CASES OF PROBATION
2    AND SUPERVISED RELEASE.—

3         (A) IN GENERAL.—Beginning on the date
4         on which a national emergency relating to a
5         communicable disease is declared and ending on
6         the date that is 60 days after such national
7         emergency expires, and notwithstanding section
8         3582(b) of title 18, United States Code, a court
9         shall order the resentencing of a defendant who
10        is serving a term of imprisonment resulting
11        from a revocation of probation, or supervised
12        release for a Grade C violation for conduct
13        under section 7B1.1(c)(3)(B) of the United
14        States Sentencing Guidelines, upon motion of
15        the defendant.

16        (B)   RESENTENCING.—The   court   shall
17        order the resentencing of a defendant described
18        in subparagraph (A) as follows:

19             (i) In the case of a revoked sentence
20             of probation, the court shall resentence the
21             defendant to probation, the duration of
22             which shall be equal to the period of time
23             remaining on the term of probation origi-
24             nally imposed at the time the defendant
25             was most recently placed in custody, unless

DOC_0004004

1700

1     the court determines that decreasing the
2     length of the term of probation is in the
3     interest of justice.

4        (ii) In the case of a revoked term of
5     supervised release, the court shall continue
6     the defendant on supervised release, the
7     duration of which shall be equal to the pe-
8     riod of time the defendant had remaining
9     on supervised release when the defendant
10     was most recently placed in custody, unless
11     the court determines that decreasing the
12     term of supervised release is in the interest
13     of justice.

14   (2) RESENTENCING IN CASES OF PAROLE.—

15     (A) IN GENERAL.—Beginning on the date
16     on which a national emergency relating to a
17     communicable disease is declared and ending on
18     the date that is 60 days after such national
19     emergency expires, the court shall order the re-
20     sentencing of a defendant who is serving a term
21     of imprisonment resulting from a technical vio-
22     lation of the defendant's parole.

23     (B) RESENTENCING.—The court shall re-
24     sentence the defendant to parole, the duration
25     of which shall be equal to the period of time re-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004005

1701

1    maining on the defendant's term of parole at

2    the time the defendant was most recently

3    placed in custody, unless the court determines

4    that decreasing the length of the term of parole

5    is in the interest of justice.

6    (3) HEARING.—The court may grant, but not

7    deny, a motion without a hearing under this section.

8    (4) NO MANDATORY REVOCATION.—

9    (A) IN GENERAL.—Beginning on the date

10    on which a national emergency relating to a

11    communicable disease is declared and ending on

12    the date that is 60 days after such national

13    emergency expires, a court is not required to re-

14    voke a defendant's probation or supervised re-

15    lease under sections 3565(b) and 3583(g) of

16    title 18, United States Code, based on a finding

17    that the defendant refused to comply with drug

18    treatment.

19    (B) DISSEMINATION OF POLICY

20    CHANGE.—Not later than 10 days after the

21    date of enactment of this title, the Judicial

22    Conference of the United States shall issue and

23    disseminate to all district courts of the United

24    States a temporary policy change suspending

25    mandatory revocation of probation or super-

1702

1  vised release for refusal to comply with drug

2  testing.

3  (5) PROMPT DETERMINATION.—Any motion

4  under this subsection shall be determined promptly.

5  (6) COUNSEL.—To effectuate the purposes of

6  this subsection, counsel shall be appointed as early

7  as possible to represent any indigent defendant.

8  (7) DEFINITIONS.—In this subsection, the term

9  "defendant" includes individuals adjudicated delin-

10  quent under the Federal Juvenile Delinquency Act

11  and applies to persons serving time in official deten-

12  tion for a revocation of juvenile probation or super-

13  vised release.

14  **SEC. 191103. COURT AUTHORITY TO REDUCE SENTENCES**

15  **AND TEMPORARY RELEASE DURING COVID–**

16  **19 EMERGENCY PERIOD.**

17  (a) COURT AUTHORITY TO REDUCE SENTENCES.—

18  (1) IN GENERAL.—Notwithstanding section

19  3582 of title 18, United States Code, the court shall,

20  during the covered emergency period, upon motion

21  of a covered individual (as such term is defined in

22  section 191102(b)) or on the court's own motion, re-

23  duce a term of imposed imprisonment on that indi-

24  vidual, unless the government shows, by clear and

25  convincing evidence, that the individual poses a risk

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004007

1703

1  of serious, imminent injury to a reasonably identifi-

2  able person.

3      (2) Sentence reduction deemed author-

4  ized.—Any sentence that is reduced under this sub-

5  section is deemed to be authorized under section

6  3582(c)(1)(B) of title 18, United States Code.

7      (3) Rule of construction.—In addition to

8  the reduction of sentences authorized under this

9  subsection, the court may continue to reduce and

10  modify sentences under section 3582 of title 18,

11  United States Code, during the covered emergency

12  period.

13      (4) Special rule.—During the covered emer-

14  gency period, a covered individual who is serving a

15  term of imprisonment for an offense committed be-

16  fore November 1, 1987, who would not otherwise be

17  eligible to file a motion under section 3582(c)(1)(A)

18  of title 18, United States Code, is eligible to file

19  such a motion and for relief under such section. Any

20  motion for relief filed in accordance with this para-

21  graph before the expiration or termination of the

22  covered emergency period shall not disqualify such

23  motion based solely on such expiration or termi-

24  nation.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004008

1704

1    (b) COURT AUTHORITY TO AUTHORIZE TEMPORARY

2 RELEASE OF PERSONS AWAITING DESIGNATION OR

3 TRANSPORTATION TO A BUREAU OF PRISONS FACIL-

4 ITY.—Notwithstanding sections 3582 and 3621 of title 18,

5 United States Code, during the covered emergency period,

6 the court, upon motion of an individual (including individ-

7 uals adjudicated delinquent under the Federal Juvenile

8 Delinquency Act) awaiting designation or transportation

9 to a Bureau of Prisons or other facility for service of sen-

10 tence or official detention, or on the court's own motion,

11 may order the temporary release of the individual, for a

12 limited period ending not later than the expiration or ter-

13 mination of the COVID–19 emergency, if such release is

14 for the purpose of avoiding or mitigating the risks associ-

15 ated with imprisonment during the covered emergency pe-

16 riod, either generally with respect to the individual's place

17 of imprisonment or specifically with respect to the indi-

18 vidual.

19    (c) HEARING REQUIREMENT.—The court may grant,

20 but not deny, a motion without a hearing under this sec-

21 tion. Any motion under this section shall be determined

22 promptly.

23    (d) EFFECTIVE REPRESENTATION DURING NA-

24 TIONAL EMERGENCY.—

DOC_0004009

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1705

1  (1) ACCESS TO COURT.—During the covered

2  emergency period, any procedural requirement under

3  section 3582(c)(1)(A) of title 18, United States

4  Code, that would delay a defendant from directly pe-

5  titioning the court shall not apply, and the defend-

6  ant may petition the court directly for relief.

7  (2) APPOINTMENT OF COUNSEL.—The court

8  shall appoint counsel for indigent defendants or pris-

9  oners, at no cost to the defendant or prisoner, as

10  early as possible to effectuate the purposes of this

11  section and the purposes of section 3582(c)(1)(A) of

12  title 18, United States Code.

13  (3) ACCESS TO MEDICAL RECORDS.—

14  (A) IN GENERAL.—In order to expedite

15  proceedings under this section and proceedings

16  under 3582(c)(1)(A) of title 18, United States

17  Code, during the covered emergency period, the

18  Director of the Bureau of Prisons shall prompt-

19  ly release all medical records in the possession

20  of the Bureau of Prisons to a prisoner who re-

21  quests them on their own behalf, or to the

22  counsel of record for a prisoner upon submis-

23  sion to the court of an affidavit, signed by such

24  counsel under penalty of perjury, that such

25  counsel has reason to believe that the prisoner

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004010

1706

1 has a covered health condition (as such term is

2 defined in section 191102(b)) or a condition

3 that would entitle them to relief under section

4 3582(c)(1)(A) of title 18, United States Code.

5  (B) INDIVIDUALS IN THE CUSTODY OF

6 THE U.S. MARSHALS SERVICE.—In order to ex-

7 pedite proceedings under this section, in the

8 case of an individual who is in the custody or

9 care of the U.S. Marshals Service, the Director

10 of the U.S. Marshals Service shall facilitate the

11 provision of any medical records of the indi-

12 vidual to the individual or the counsel of record

13 of the individual, upon request of the individual

14 or counsel.

15 **SEC. 191104. EXEMPTION FROM EXHAUSTING ADMINISTRA-**

16 **TIVE REMEDIES DURING COVERED EMER-**

17 **GENCY PERIOD.**

18 Section 7 of the Civil Rights of Institutionalized Per-

19 sons Act (42 U.S.C. 1997e) is amended by adding at the

20 end the following:

21 "(i) COVERED EMERGENCY PERIOD.—

22  "(1) RELIEF WITHOUT EXHAUSTING ADMINIS-

23 TRATIVE REMEDIES.—Notwithstanding the other

24 provisions of this section, during the covered emer-

25 gency period, a prisoner may commence, without ex-

1707

1 hausting all administrative remedies, an action relat-

2 ing to conditions of imprisonment under which the

3 prisoner is at significant risk of harm or under

4 which the prisoner's access to counsel has been im-

5 paired. If the court determines the prisoner is rea-

6 sonably likely to prevail, the court may order such

7 appropriate relief, limited in time and scope, as may

8 be necessary to prevent or remedy the significant

9 risk of harm or provide access to counsel.

10 "(2) RETALIATION PROHIBITED.—Section 6

11 shall apply in the case of retaliation against a pris-

12 oner who files an administrative claim or lawsuit

13 during the covered emergency period or attempts to

14 so file.

15 "(3) DEFINITIONS.—For purposes of this sub-

16 section, the term 'covered emergency period' has the

17 meaning given the term in section 12003 of the

18 CARES Act (Public Law 116–136).".

19 **SEC. 191105. INCREASING AVAILABILITY OF HOME DETEN-**

20 **TION FOR ELDERLY OFFENDERS.**

21 (a) GOOD CONDUCT TIME CREDITS FOR CERTAIN

22 ELDERLY NONVIOLENT OFFENDERS.—Section

23 231(g)(5)(A)(ii) of the Second Chance Act of 2007 (34

24 U.S.C. 60541(g)(5)(A)(ii)) is amended by striking "to

25 which the offender was sentenced" and inserting "reduced

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004012

1708

1 by any credit toward the service of the prisoner's sentence

2 awarded under section 3624(b) of title 18, United States

3 Code''.

4    (b) INCREASING ELIGIBILITY FOR HOME DETENTION

5 FOR CERTAIN ELDERLY NONVIOLENT OFFENDERS.—

6 During the covered emergency period an offender who is

7 in the custody of the Bureau of Prisons shall be considered

8 an eligible elderly offender under section 231(g) of the

9 Second Chance Act of 2007 (34 U.S.C. 60541(g)) if the

10 offender—

11        (1) is not less than 50 years of age;

12        (2) has served 1/2 of the term of imprisonment

13        reduced by any credit toward the service of the pris-

14        oner's sentence awarded under section 3624(b) of

15        title 18, United States Code; and

16        (3) is otherwise described in such section

17        231(g)(5)(A).

18 **SEC. 191106. EFFECTIVE ASSISTANCE OF COUNSEL IN THE**

19            **DIGITAL ERA ACT.**

20    (a) PROHIBITION ON MONITORING.—Not later than

21 180 days after the date of the enactment of this title, the

22 Attorney General shall create a program or system, or

23 modify any program or system that exists on the date of

24 enactment of this title, through which an incarcerated per-

25 son sends or receives an electronic communication, to ex-

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004013

1709

1 clude from monitoring the contents of any privileged elec-

2 tronic communication. In the case that the Attorney Gen-

3 eral creates a program or system in accordance with this

4 subsection, the Attorney General shall, upon implementing

5 such system, discontinue using any program or system

6 that exists on the date of enactment of this title through

7 which an incarcerated person sends or receives a privileged

8 electronic communication, except that any program or sys-

9 tem that exists on such date may continue to be used for

10 any other electronic communication.

11    (b) RETENTION OF CONTENTS.—A program or sys-

12 tem or a modification to a program or system under sub-

13 section (a) may allow for retention by the Bureau of Pris-

14 ons of, and access by an incarcerated person to, the con-

15 tents of electronic communications, including the contents

16 of privileged electronic communications, of the person

17 until the date on which the person is released from prison.

18    (c) ATTORNEY-CLIENT PRIVILEGE.—Attorney-client

19 privilege, and the protections and limitations associated

20 with such privilege (including the crime fraud exception),

21 applies to electronic communications sent or received

22 through the program or system established or modified

23 under subsection (a).

24    (d) ACCESSING RETAINED CONTENTS.—Contents re-

25 tained under subsection (b) may only be accessed by a per-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004014

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1710

1 son other than the incarcerated person for whom such con-

2 tents are retained under the following circumstances:

3     (1) ATTORNEY GENERAL.—The Attorney Gen-

4     eral may only access retained contents if necessary

5     for the purpose of creating and maintaining the pro-

6     gram or system, or any modification to the program

7     or system, through which an incarcerated person

8     sends or receives electronic communications. The At-

9     torney General may not review retained contents

10    that are accessed pursuant to this paragraph.

11    (2) INVESTIGATIVE AND LAW ENFORCEMENT

12    OFFICERS.—

13        (A) WARRANT.—

14            (i) IN GENERAL.—Retained contents

15            may only be accessed by an investigative or

16            law enforcement officer pursuant to a war-

17            rant issued by a court pursuant to the pro-

18            cedures described in the Federal Rules of

19            Criminal Procedure.

20            (ii) APPROVAL.—No application for a

21            warrant may be made to a court without

22            the express approval of a United States

23            Attorney or an Assistant Attorney General.

24        (B) PRIVILEGED INFORMATION.—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004015

1711

1         (i) REVIEW.—Before retained con-

2       tents may be accessed pursuant to a war-

3       rant obtained under subparagraph (A),

4       such contents shall be reviewed by a

5       United States Attorney to ensure that

6       privileged electronic communications are

7       not accessible.

8         (ii) BARRING PARTICIPATION.—A

9       United States Attorney who reviews re-

10      tained contents pursuant to clause (i) shall

11      be barred from—

12         (I) participating in a legal pro-

13        ceeding in which an individual who

14        sent or received an electronic commu-

15        nication from which such contents are

16        retained under subsection (b) is a de-

17        fendant; or

18         (II) sharing the retained contents

19        with an attorney who is participating

20        in such a legal proceeding.

21     (3) MOTION TO SUPPRESS.—In a case in which

22    retained contents have been accessed in violation of

23    this subsection, a court may suppress evidence ob-

24    tained or derived from access to such contents upon

25    motion of the defendant.

g:\VHLC\051220\051220.072.xml    (763351|3)
May 12, 2020 (12:13 p.m.)

DOC_0004016

1712

1    (e) DEFINITIONS.—In this section—

2    (1) the term "agent of an attorney or legal rep-

3    resentative" means any person employed by or con-

4    tracting with an attorney or legal representative, in-

5    cluding law clerks, interns, investigators, paraprofes-

6    sionals, and administrative staff;

7    (2) the term "contents" has the meaning given

8    such term in 2510 of title 18, United States Code;

9    (3) the term "electronic communication" has

10   the meaning given such term in section 2510 of title

11   18, United States Code, and includes the Trust

12   Fund Limited Inmate Computer System;

13   (4) the term "monitoring" means accessing the

14   contents of an electronic communication at any time

15   after such communication is sent;

16   (5) the term "incarcerated person" means any

17   individual in the custody of the Bureau of Prisons

18   or the United States Marshals Service who has been

19   charged with or convicted of an offense against the

20   United States, including such an individual who is

21   imprisoned in a State institution; and

22   (6) the term "privileged electronic communica-

23   tion" means—

24        (A) any electronic communication between

25        an incarcerated person and a potential, current,

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004017

1713

1 or former attorney or legal representative of

2 such a person; and

3     (B) any electronic communication between

4 an incarcerated person and the agent of an at-

5 torney or legal representative described in sub-

6 paragraph (A).

## SEC. 191107. COVID–19 CORRECTIONAL FACILITY EMER-

7 

8 GENCY RESPONSE ACT OF 2020.

9 Title I of the Omnibus Crime Control and Safe

10 Streets Act of 1968 (34 U.S.C. 10101 et seq.) is amended

11 by adding at the end the following:

## "PART OO—PANDEMIC CORRECTIONAL FACILITY

12 

13 EMERGENCY RESPONSE

## "SEC. 3061. FINDINGS; PURPOSES.

14 

15 "(a) IMMEDIATE RELEASE OF VULNERABLE AND

16 LOW-RISK INDIVIDUALS.—The purpose of the grant pro-

17 gram under section 3062 is to provide for the testing, ini-

18 tiation and transfer to treatment in the community, and

19 provision of services in the community, by States and units

20 of local government as they relate to preventing, detecting,

21 and stopping the spread of COVID–19 in correctional fa-

22 cilities.

23 "(b) PRETRIAL CITATION AND RELEASE.—

24     "(1) FINDINGS.—Congress finds as follows:

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004018

1714

1        ''(A) With the dramatic growth in pretrial
2    detention resulting in county and city correc-
3    tional facilities regularly exceeding capacity,
4    such correctional facilities may serve to rapidly
5    increase the spread of COVID–19, as facilities
6    that hold large numbers of individuals in
7    congregant living situations may promote the
8    spread of COVID–19.

9        ''(B) While individuals arrested and proc-
10   essed at local correctional facilities may only be
11   held for hours or days, exposure to large num-
12   ber of individuals in holding cells and court-
13   rooms promotes the spread of COVID–19.

14       ''(C) Pretrial detainees and individuals in
15   correctional facilities are then later released
16   into the community having being exposed to
17   COVID–19.

18       ''(2) PURPOSE.—The purpose of the grant pro-
19   gram under section 3065 is to substantially increase
20   the use of risk-based citation release for all individ-
21   uals who do not present a public safety risk.

22   **''SEC. 3062. IMMEDIATE RELEASE OF VULNERABLE AND**
23   **LOW-RISK INDIVIDUALS.**

24       ''(a) AUTHORIZATION.—The Attorney General shall
25   carry out a grant program to make grants to States and

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004019

1715

1 units of local government that operate correctional facili-

2 ties, to establish and implement policies and procedures

3 to prevent, detect, and stop the presence and spread of

4 COVID–19 among arrestees, detainees, inmates, correc-

5 tional facility staff, and visitors to the facilities.

6     "(b) PROGRAM ELIGIBILITY.—

7         "(1) IN GENERAL.—Eligible applicants under

8         this section are States and units of local government

9         that release or have a plan to release the persons de-

10         scribed in paragraph (2) from custody in order to

11         ensure that, not later than 90 days after enactment

12         of this section, the total population of arrestees, de-

13         tainees, and inmates at a correctional facility does

14         not exceed the number established under subsection

15         (c).

16         "(2) PERSONS DESCRIBED.—A person de-

17         scribed in this paragraph is a person who—

18             "(A) does not pose a risk of serious, immi-

19             nent injury to a reasonably identifiable person;

20             or

21             "(B) is—

22                 "(i) 50 years of age or older;

23                 "(ii) a juvenile;

24                 "(iii) an individual with serious chron-

25               ic medical conditions, including heart dis-

1716

1    ease, cancer, diabetes, HIV, sickle cell ane-

2    mia, a neurological disease that interferes

3    with the ability to cough or breathe, chron-

4    ic lung disease, asthma, or respiratory ill-

5    ness;

6         ''(iv) a pregnant woman;

7         ''(v) an individual who is

8    immunocompromised or has a weakened

9    immune system; or

10        ''(vi) an individual who has a health

11    condition or disability that makes them

12    vulnerable to COVID–19.

13    ''(c) TARGET CORRECTIONAL POPULATION.—

14        ''(1) TARGET POPULATION.—An eligible appli-

15    cant shall establish individualized, facility-specific

16    target capacities at each correction facility that will

17    receive funds under this section that reflect the max-

18    imum number of individuals who may be incarcer-

19    ated safely in accordance with the Centers for Dis-

20    ease Control and Prevention guidelines for correc-

21    tional facilities pertaining to COVID–19, with con-

22    sideration given to Centers for Disease Control and

23    Prevention guidelines pertaining to community-based

24    physical distancing, hygiene, and sanitation. A cor-

25    rectional facility receiving funds under this section

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004021

1717

1 may not use isolation in a punitive or non-medical
2 manner as a way of achieving specific target capac-
3 ities established under this paragraph.

4    "(2) CERTIFICATION.—An eligible applicant
5 shall include in its application for a grant under this
6 section a certification by a public health professional
7 who is certified in epidemiology or infectious dis-
8 eases that each correctional facility that will receive
9 funds under this section in its jurisdiction meets the
10 appropriate target capacity standard established
11 under paragraph (1).

12   "(d) AUTHORIZED USES.—Funds awarded pursuant
13 to this section shall be used by grantees (including acting
14 through nonprofit entities) to—

15    "(1) test all arrestees, detainees, and inmates,
16 and initiate treatment for COVID–19, and transfer
17 such an individual for an appropriate treatment at
18 external medical facility, as needed;

19    "(2) test for COVID–19—

20      "(A) correctional facility staff;

21      "(B) volunteers;

22      "(C) visitors, including family members
23 and attorneys;

24      "(D) court personnel that have regular
25 contact with arrestees, detainees, and inmates;

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004022

1718

1    "(E) law enforcement officers who trans-
2    port arrestees, detainees, and inmates; and

3    "(F) personnel outside the correctional fa-
4    cility who provide medical treatment to
5    arrestees, detainees, and inmates;

6    "(3) curtail booking and in-facility processing
7    for individuals who have committed technical parole
8    or probation violations; and

9    "(4) provide transition and reentry support
10    services to individuals released pursuant to this sec-
11    tion, including programs that—

12    "(A) increase access to and participation
13    in reentry services;

14    "(B) promote a reduction in recidivism
15    rates;

16    "(C) facilitate engagement in educational
17    programs, job training, or employment;

18    "(D) place reentering individuals in safe
19    and sanitary temporary transitional housing;

20    "(E) facilitate the enrollment of reentering
21    individuals with a history of substance use dis-
22    order in medication-assisted treatment and a
23    referral to overdose prevention services, mental
24    health services, or other medical services; and

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004023

1719

1           ''(F) facilitate family reunification or sup-

2           port services, as needed.

3    ''(e) AUTHORIZATION OF APPROPRIATIONS.—There

4 is authorized to be appropriated $500,000,000 to carry

5 out this section and section 3065 for each of fiscal years

6 2020 and 2021.

**7 ''SEC. 3063. JUVENILE SPECIFIC SERVICES.**

8    ''(a) IN GENERAL.—The Attorney General, acting

9 through the Administrator of the Office Juvenile Justice

10 and Delinquency Prevention, consistent with section 261

11 of the Juvenile Justice and Delinquency Prevention Act

12 of 1974 (34 U.S.C. 11171), is authorized to make grants

13 to States and units of local government or combinations

14 thereof to assist them in planning, establishing, operating,

15 coordinating, and evaluating projects directly, or through

16 grants and contracts with public and private agencies and

17 nonprofit entities (as such term is defined under section

18 408(5)(A) of the Juvenile Justice and Delinquency Pre-

19 vention Act of 1974 (34 U.S.C. 11296(5)(A))), for the de-

20 velopment of more effective education, training, research,

21 prevention, diversion, treatment, and rehabilitation pro-

22 grams in the area of juvenile delinquency and programs

23 to improve the juvenile justice system, consistent with sub-

24 section (b).

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004024

1720

1      "(b) USE OF GRANT FUNDS.—Grants under this sec-

2  tion shall be used for the exclusive purpose of providing

3  juvenile specific services that—

4          "(1) provide rapid mass testing for COVID–19

5      in juvenile facilities, notification of the results of

6      such tests to juveniles and authorized family mem-

7      bers or legal guardians, and include policies and pro-

8      cedures for non-punitive quarantine that does not in-

9      volve solitary confinement, and provide for examina-

10      tion by a doctor for any juvenile who tests positive

11      for COVID–19;

12         "(2) examine all pre- and post-adjudication re-

13      lease processes and mechanisms applicable to juve-

14      niles and begin employing these as quickly as pos-

15      sible;

16         "(3) provide juveniles in out of home place-

17      ments with continued access to appropriate edu-

18      cation;

19         "(4) provide juveniles with access to legal coun-

20      sel through confidential visits or teleconferencing;

21         "(5) provide staff and juveniles with appro-

22      priate personal protective equipment, hand washing

23      facilities, toiletries, and medical care to reduce the

24      spread of the virus;

DOC_0004025

1721

1     "(6) provide juveniles with frequent and no cost

2     calls home to parents, legal guardians, and other

3     family members;

4     "(7) advance policies and procedures for juve-

5     nile delinquency program proceedings (including

6     court proceedings) and probation conditions so that

7     in-person reporting requirements for juveniles are

8     replaced with virtual or telephonic appearances with-

9     out penalty;

10     "(8) expand opportunities for juveniles to par-

11     ticipate in community based services and social serv-

12     ices through videoconferencing or teleconferencing;

13     or

14     "(9) place a moratorium on all requirements for

15     juveniles to attend and pay for court and probation-

16     ordered programs, community service, and labor,

17     that violate any applicable social distancing or stay

18     at home order.

19 Each element described in paragraph (1) through (9) shall

20 be trauma-informed, reflect the science of adolescent de-

21 velopment, and be designed to meet the needs of at-risk

22 juveniles and juveniles who come into contact with the jus-

23 tice system.

24     "(c) DEFINITIONS.—Terms used in this section have

25 the meanings given such terms in the Juvenile Justice and

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004026

1722

1 Delinquency Prevention Act of 1974. The term 'juvenile'
2 has the meaning given such term in section 1809 of this
3 Act.

4 "(d) AUTHORIZATION OF APPROPRIATIONS.—There
5 is authorized to be appropriated to carry out this section
6 $75,000,000 for each of fiscal years 2020 and 2021.

**"SEC. 3064. RAPID COVID–19 TESTING.**

8 "(a) IN GENERAL.—The Attorney General shall
9 make grants to grantees under section 3062 for the exclu-
10 sive purpose of providing for rapid COVID–19 testing of
11 arrestees, detainees, and inmates who are exiting the cus-
12 tody of a correctional facility prior to returning to the
13 community.

14 "(b) USE OF FUNDS.—Grants provided under this
15 section may be used for any of the following:

16     "(1) Purchasing or leasing medical devices au-
17     thorized by the U.S. Food and Drug Administration
18     to detect COVID–19 that produce results in less
19     than one hour.

20     "(2) Purchasing or securing COVID–19 testing
21     supplies and personal protective equipment used by
22     the correctional facility to perform such tests.

23     "(3) Contracting with medical providers to ad-
24     minister such tests.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004027

1723

1    "(c) AUTHORIZATION OF APPROPRIATIONS.—There

2    is authorized to be appropriated to carry out this section

3    $25,000,000 for each of fiscal years 2020 and 2021.

4    **"SEC. 3065. PRETRIAL CITATION AND RELEASE.**

5    "(a) AUTHORIZATION.—The Attorney General shall

6    make grants under this section to eligible applicants for

7    the purposes set forth in section 3061(b)(2).

8    "(b) PROGRAM ELIGIBILITY.—Eligible applicants

9    under this section are States and units of local government

10   that implement or continue operation of a program de-

11   scribed in subsection (c)(1) and not fewer than 2 of the

12   other programs enumerated in such subsection.

13   "(c) USE OF GRANT FUNDS.—A grantee shall use

14   amounts provided as a grant under this section for pro-

15   grams that provide for the following:

16       "(1) Adopting and operating a cite-and-release

17       process for individuals who are suspected of commit-

18       ting misdemeanor and felony offenses and who do

19       not pose a risk of serious, imminent injury to a rea-

20       sonably identifiable person.

21       "(2) Curtailing booking and in-facility proc-

22       essing for individuals who have committed technical

23       parole or probation violations.

24       "(3) Ensuring that defense counsel is appointed

25       at the earliest hearing that could result in pretrial

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004028

1724

1 detention so that low-risk defendants are not unnec-

2 essarily further exposed to COVID–19.

3 ''(4) Establishing early review of charges by an

4 experienced prosecutor, so only arrestees and detain-

5 ees who will be charged are detained.

6 ''(5) Providing appropriate victims' services

7 supports and safety-focused residential accommoda-

8 tions for victims and community members who have

9 questions or concerns about releases described in

10 this subsection.

11 **''SEC. 3066. REPORT.**

12 ''(a) IN GENERAL.—Not later than 6 months after

13 the date on which grants are initially made under this

14 part, and biannually thereafter during the grant period,

15 the Attorney General shall submit to Congress a report

16 on the program, which shall include—

17 ''(1) the number of grants made, the number of

18 grantees, and the amount of funding distributed to

19 each grantee pursuant to this part;

20 ''(2) the location of each correctional facility

21 where activities are carried out using grant amounts;

22 ''(3) the number of persons in the custody of

23 correctional facilities where activities are carried out

24 using grant amounts, including incarcerated persons

25 released on parole, community supervision, good

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004029

1725

1    time or early release, clemency or commutation, as

2    a result of the national emergency under the Na-

3    tional Emergencies Act (50 U.S.C. 1601 et seq.) de-

4    clared by the President with respect to the

5    Coronavirus Disease 2019 ('COVID–19'),

6    disaggregated by type of offense, age, race, sex, and

7    ethnicity; and

8       ''(4) for each facility receiving funds under sec-

9    tion 3062—

10         ''(A) the total number of tests for COVID–

11       19 performed;

12         ''(B) the results of such COVID–19 tests

13       (confirmed positive or negative);

14         ''(C) the total number of probable

15       COVID–19 infections;

16         ''(D) the total number of COVID–19-re-

17       lated hospitalizations, the total number of in-

18       tensive care unit admissions, and the duration

19       of each such hospitalization;

20         ''(E) recoveries from COVID–19; and

21         ''(F) COVID–19 deaths,

22    disaggregated by race, ethnicity, age, disability, sex,

23    pregnancy status, and whether the individual is a

24    staff member of or incarcerated at the facility.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004030

1726

1     "(b) PRIVACY.—Data reported under this section
2 shall be reported in accordance with applicable privacy
3 laws and regulations.

**"SEC. 3067. NO MATCHING REQUIRED.**

5     "The Attorney General shall not require grantees to
6 provide any matching funds with respect to the use of
7 funds under this part.

**"SEC. 3068. DEFINITION.**

9     "For purposes of this part:

10        "(1) CORRECTIONAL FACILITY.—The term 'cor-
11     rectional facility' includes a juvenile facility.

12        "(2) COVERED EMERGENCY PERIOD.—The term
13     'covered emergency period' has the meaning given
14     the term in section 12003 of the CARES Act (Pub-
15     lic Law 116–136).

16        "(3) COVID–19.—The term 'COVID–19'
17     means a disease caused by severe acute respiratory
18     syndrome coronavirus 2 (SARS–CoV–2).

19        "(4) DETAINEE; ARRESTEE; INMATE.—The
20     terms 'detainee', 'arrestee', and 'inmate' each in-
21     clude juveniles.".

**SEC. 191108. MORATORIUM ON FEES AND FINES.**

23     (a) IN GENERAL.—During the covered emergency pe-
24 riod, and for fiscal years 2020, 2021, and 2022, the Attor-
25 ney General is authorized make grants to State and local

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004031

1727

1 courts that comply with the requirement under subsection

2 (b) to ensure that such recipients are able to continue op-

3 erations.

4     (b) REQUIREMENT TO IMPOSE MORATORIUM ON IM-

5 POSITION AND COLLECTION OF FEES AND FINES.—To be

6 eligible for a grant under this section, a court shall imple-

7 ment a moratorium on the imposition and collection (in-

8 cluding by a unit of local government or a State) of fees

9 and fines imposed by that court—

10        (1) not later than 120 day after the date of the

11        enactment of this section;

12        (2) retroactive to a period beginning 30 days

13        prior the covered emergency period; and

14        (3) continuing for an additional 90 days after

15        the date the covered emergency period terminates.

16     (c) GRANT AMOUNT.—In making grants under this

17 section, the Attorney General shall—

18        (1) give preference to applicants that implement

19        a moratorium on the imposition and collection of

20        fines and fees related to juvenile delinquency pro-

21        ceedings for each of fiscal years 2020 through 2022;

22        and

23        (2) make such grants in amounts that are pro-

24        portionate to the number of individuals in the juris-

25        diction of the court.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004032

1728

1    (d) USE OF FUNDS.—Funds made available under

2  this section may be used to ensure that the recipient is

3  able to continue court operations during the covered emer-

4  gency period.

5    (e) NO MATCHING REQUIREMENT.—There is no

6  matching requirement for grants under this section.

7    (f) DEFINITIONS.—In this section:

8        (1) The term ''fees''—

9            (A) means monetary fees that are imposed

10           for the costs of fine surcharges or court admin-

11           istrative fees; and

12           (B) includes additional late fees, payment-

13           plan fees, interest added if an individual is un-

14           able to pay a fine in its entirety, collection fees,

15           and any additional amounts that do not include

16           the fine.

17       (2) The term ''fines'' means monetary fines im-

18   posed as punishment.

19    (g) AUTHORIZATION OF APPROPRIATIONS.—There is

20  authorized to be appropriated to carry out this section

21  $150,000,000 for each of fiscal years 2020 through 2022.

22  **SEC. 191109. DEFINITION.**

23    In this title, the term ''covered emergency period''

24  has the meaning given the term in section 12003 of the

25  CARES Act (Public Law 116–136).

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004033

1729

**SEC. 191110. SEVERABILITY.**

2   If any provision of this title or any amendment made
3 by this title, or the application of a provision or amend-
4 ment to any person or circumstance, is held to be invalid,
5 the remainder of this title and the amendments made by
6 this title, and the application of the provisions and amend-
7 ments to any other person not similarly situated or to
8 other circumstances, shall not be affected by the holding.

# TITLE XII—IMMIGRATION MATTERS

**SEC. 191201. EXTENSION OF FILING AND OTHER DEAD-LINES.**

13   (a) NEW DEADLINES FOR EXTENSION OR CHANGE
14 OF STATUS OR OTHER BENEFITS.—

15       (1) FILING DELAYS.—In the case of an alien
16   who was lawfully present in the United States on
17   January 26, 2020, the alien's application for an ex-
18   tension or change of nonimmigrant status, applica-
19   tion for renewal of employment authorization, or any
20   other application for extension or renewal of a pe-
21   riod of authorized stay, shall be considered timely
22   filed if the due date of the application is within the
23   period described in subsection (d) and the applica-
24   tion is filed not later than 60 days after it otherwise
25   would have been due.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004034

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1730

1     (2) DEPARTURE DELAYS.—In the case of an
2  alien who was lawfully present in the United States
3  on January 26, 2020, the alien shall not be consid-
4  ered to be unlawfully present in the United States
5  during the period described in subsection (d).

6     (3) SPECIFIC AUTHORITY.—

7         (A) IN GENERAL.—With respect to any
8     alien whose immigration status, employment
9     authorization, or other authorized period of stay
10    has expired or will expire during the period de-
11    scribed in subsection (d), during the one-year
12    period beginning on the date of the enactment
13    of this title, or during both such periods, the
14    Secretary of Homeland Security shall automati-
15    cally extend such status, authorization, or pe-
16    riod of stay until the date that is 90 days after
17    the last day of whichever of such periods ends
18    later.

19        (B) EXCEPTION.—If the status, authoriza-
20    tion, or period of stay referred to in subpara-
21    graph (A) is based on a grant of deferred ac-
22    tion, or a grant of temporary protected status
23    under section 244 of the Immigration and Na-
24    tionality Act (8 U.S.C. 1254a), the extension
25    under such subparagraph shall be for a period

DOC_0004035

1731

1 not less than the period for which deferred ac-
2 tion or temporary protected status originally
3 was granted by the Secretary of Homeland Se-
4 curity.

5 (b) IMMIGRANT VISAS.—

6 (1) EXTENSION OF VISA EXPIRATION.—Not-
7 withstanding the limitations under section 221(c) of
8 the Immigration and Nationality Act (8 U.S.C.
9 1201(c)), in the case of any immigrant visa issued
10 to an alien that expires or expired during the period
11 described in subsection (d), the period of validity of
12 the visa is extended until the date that is 90 days
13 after the end of such period.

14 (2) ROLLOVER OF UNUSED VISAS.—

15 (A) IN GENERAL.—For fiscal years 2021
16 and 2022, the worldwide level of family-spon-
17 sored immigrants under subsection (c) of sec-
18 tion 201 of the Immigration and Nationality
19 Act (8 U.S.C. 1151), the worldwide level of em-
20 ployment-based immigrants under subsection
21 (d) of such section, and the worldwide level of
22 diversity immigrants under subsection (e) of
23 such section shall each be increased by the
24 number computed under subparagraph (B) with
25 respect to each of such worldwide levels.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004036

1732

1     (B) COMPUTATION OF INCREASE.—For

2 each of the worldwide levels described in sub-

3 paragraph (A), the number computed under

4 this subparagraph is the difference (if any) be-

5 tween the worldwide level established for the

6 previous fiscal year under the applicable sub-

7 section of section 201 of the Immigration and

8 Nationality Act (8 U.S.C. 1151) and the num-

9 ber of visas that were, during the previous fiscal

10 year, issued and used as the basis for an appli-

11 cation for admission into the United States as

12 an immigrant described in the applicable sub-

13 section.

14     (C) CLARIFICATIONS.—

15         (i) ALLOCATION AMONG PREFERENCE

16 CATEGORIES.—The additional visas made

17 available for fiscal years 2021 and 2022 as

18 a result of the computations made under

19 subparagraphs (A) and (B) shall be pro-

20 portionally allocated as set forth in sub-

21 sections (a), (b), and (c) of section 203 of

22 the Immigration and Nationality Act (8

23 U.S.C. 1153).

24         (ii) ELIMINATION OF FALL ACROSS.—

25 For fiscal years 2021 and 2022, the num-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004037

1733

1   ber computed under subsection (c)(3)(C) of

2   section 201 of the Immigration and Na-

3   tionality Act (8 U.S.C. 1151), and the

4   number computed under subsection

5   (d)(2)(C) of such section, are deemed to

6   equal zero.

7 (c) VOLUNTARY DEPARTURE.—Notwithstanding sec-

8 tion 240B of the Immigration and Nationality Act (8

9 U.S.C. 1229c), if a period for voluntary departure under

10 such section expires or expired during the period described

11 in subsection (d), such voluntary departure period is ex-

12 tended until the date that is 90 days after the end of such

13 period.

14 (d) PERIOD DESCRIBED.—The period described in

15 this subsection—

16  (1) begins on the first day of the public health

17  emergency declared by the Secretary of Health and

18  Human Services under section 319 of the Public

19  Health Service Act (42 U.S.C. 247d) with respect to

20  COVID–19; and

21  (2) ends 90 days after the date on which such

22  public health emergency terminates.

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004038

1734

**SEC. 191202. TEMPORARY ACCOMMODATIONS FOR NATU-**
**RALIZATION OATH CEREMONIES DUE TO**
**PUBLIC HEALTH EMERGENCY.**

(a) REMOTE OATH CEREMONIES.—Not later than 30 days after the date of the enactment of this title, the Secretary of Homeland Security shall establish procedures for the administration of the oath of renunciation and allegiance under section 337 of the Immigration and Nationality Act (8 U.S.C. 1448) using remote videoconferencing, or other remote means for individuals who cannot reasonably access remote videoconferencing, as an alternative to an in-person oath ceremony.

(b) ELIGIBLE INDIVIDUALS.—Notwithstanding section 310(b) of the Immigration and Nationality Act (8 U.S.C. 1421(b)), an individual may complete the naturalization process by participating in a remote oath ceremony conducted pursuant to subsection (a) if such individual—

(1) has an approved application for naturalization;

(2) is unable otherwise to complete the naturalization process due to the cancellation or suspension of in-person oath ceremonies during the public health emergency declared by the Secretary of Health and Human Services under section 319 of

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004039

1735

1     the Public Health Service Act (42 U.S.C. 247d) with

2     respect to COVID–19; and

3        (3) elects to participate in a remote oath cere-

4     mony in lieu of waiting for in-person ceremonies to

5     resume.

6     (c) ADDITIONAL REQUIREMENTS.—Upon estab-

7 lishing the procedures described in subsection (a), the Sec-

8 retary of Homeland Security shall—

9        (1) without undue delay, provide written notice

10     to individuals described in subsection (b)(1) of the

11     option of participating in a remote oath ceremony in

12     lieu of a participating in an in-person ceremony;

13        (2) to the greatest extent practicable, ensure

14     that remote oath ceremonies are administered to in-

15     dividuals who elect to participate in such a ceremony

16     not later than 30 days after the individual so noti-

17     fies the Secretary; and

18        (3) administer oath ceremonies to all other eli-

19     gible individuals as expeditiously as possible after

20     the end of the public health emergency referred to

21     in subsection (b)(2).

22     (d) AVAILABILITY OF REMOTE OPTION.—The Sec-

23 retary of Homeland Security shall begin administering re-

24 mote oath ceremonies on the date that is 60 days after

25 the date of the enactment of this title and shall continue

DOC_0004040

1736

1 administering such ceremonies until a date that is not ear-
2 lier than 90 days after the end of the public health emer-
3 gency referred to in subsection (b)(2).

4     (e) CLARIFICATION.—Failure to appear for a remote
5 oath ceremony shall not create a presumption that the in-
6 dividual has abandoned his or her intent to be naturalized.

7     (f) REPORT TO CONGRESS.—Not later than 180 days
8 after the end of the public health emergency referred to
9 in subsection (b)(2), the Secretary of Homeland Security
10 shall submit a report to Congress that identifies, for each
11 State and political subdivision of a State, the number of—

12         (1) individuals who were scheduled for an in-
13     person oath ceremony that was cancelled due to such
14     public health emergency;

15         (2) individuals who were provided written notice
16     pursuant to subsection (c)(1) of the option of par-
17     ticipating in a remote oath ceremony;

18         (3) individuals who elected to participate in a
19     remote oath ceremony in lieu of an in-person public
20     ceremony;

21         (4) individuals who completed the naturaliza-
22     tion process by participating in a remote oath cere-
23     mony; and

24         (5) remote oath ceremonies that were conducted
25     within the period described in subsection (d).

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

1737

1 **SEC. 191203. TEMPORARY PROTECTIONS FOR ESSENTIAL**
2     **CRITICAL INFRASTRUCTURE WORKERS.**

3  (a) PROTECTIONS FOR ESSENTIAL CRITICAL INFRA-
4 STRUCTURE WORKERS.—During the period described in
5 subsection (e), an alien described in subsection (d) shall
6 be deemed to be in a period of deferred action and author-
7 ized for employment for purposes of section 274A of the
8 Immigration and Nationality Act (8 U.S.C. 1324a).

9  (b) EMPLOYER PROTECTIONS.—During the period
10 described in subsection (e), the hiring, employment, or
11 continued employment of an alien described in subsection
12 (d) is not a violation of section 274A(a) of the Immigra-
13 tion and Nationality Act (8 U.S.C. 1324a(a)).

14  (c) CLARIFICATION.—Nothing in this section shall be
15 deemed to require an alien described in subsection (d), or
16 such alien's employer—

17      (1) to submit an application for employment
18    authorization or deferred action, or register with, or
19    pay a fee to, the Secretary of Homeland Security or
20    the head of any other Federal agency; or

21      (2) to appear before an agent of the Depart-
22    ment of Homeland Security or any other Federal
23    agency for an interview, examination, or any other
24    purpose.

25  (d) ALIENS DESCRIBED.—An alien is described in
26 this subsection if the alien—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004042

1738

1 (1) on the date of the enactment of this title—

2  (A) is physically present in the United

3 States; and

4  (B) is inadmissible to, or deportable from,

5 the United States; and

6 (2) engaged in essential critical infrastructure

7 labor or services in the United States prior to the

8 period described in subsection (e) and continues to

9 engage in such labor or services during such period.

10 (e) PERIOD DESCRIBED.—The period described in

11 this subsection—

12 (1) begins on the first day of the public health

13 emergency declared by the Secretary of Health and

14 Human Services under section 319 of the Public

15 Health Service Act (42 U.S.C. 247d) with respect to

16 COVID–19; and

17 (2) ends 90 days after the date on which such

18 public health emergency terminates.

19 (f) ESSENTIAL CRITICAL INFRASTRUCTURE LABOR

20 OR SERVICES.—For purposes of this section, the term "es-

21 sential critical infrastructure labor or services" means

22 labor or services performed in an essential critical infra-

23 structure sector, as described in the "Advisory Memo-

24 randum on Identification of Essential Critical Infrastruc-

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004043

1739

1  ture Workers During COVID–19 Response'', revised by

2  the Department of Homeland Security on April 17, 2020.

**SEC. 191204. SUPPLEMENTING THE COVID RESPONSE**
        **WORKFORCE.**

5  (a) EXPEDITED GREEN CARDS FOR CERTAIN PHYSI-

6  CIANS IN THE UNITED STATES.—

7  (1) IN GENERAL.—During the period described

8  in paragraph (3), an alien described in paragraph

9  (2) may apply to acquire the status of an alien law-

10  fully admitted to the United States for permanent

11  residence consistent with section 201(b)(1) of the

12  Immigration and Nationality Act (8 U.S.C.

13  1151(b)(1)).

14  (2) ALIEN DESCRIBED.—An alien described in

15  this paragraph is an alien physician (and the spouse

16  and children of such alien) who—

17  (A) has an approved immigrant visa peti-

18  tion under section 203(b)(2)(B)(ii) of the Immi-

19  gration and Nationality Act (8 U.S.C.

20  1153(b)(2)(B)(ii) and has completed the serv-

21  ice requirements for a waiver under such sec-

22  tion on or before the date of the enactment of

23  this title; and

24  (B) provides a statement to the Secretary

25  of Homeland Security attesting that the alien is

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004044

1740

1    engaged in or will engage in the practice of

2    medicine or medical research involving the diag-

3    nosis, treatment, or prevention of COVID–19.

4    (3) PERIOD DESCRIBED.—The period described

5    in this paragraph is the period beginning on the date

6    of the enactment of this title and ending 180 days

7    after the termination of the public health emergency

8    declared by the Secretary of Health and Human

9    Services under section 319 of the Public Health

10    Service Act (42 U.S.C. 247d), with respect to

11    COVID–19.

12    (b) EXPEDITED PROCESSING OF NONIMMIGRANT PE-

13    TITIONS AND APPLICATIONS.—

14    (1) IN GENERAL.—In accordance with the pro-

15    cedures described in paragraph (2), the Secretary of

16    Homeland Security shall expedite the processing of

17    applications and petitions seeking employment or

18    classification of an alien as a nonimmigrant to prac-

19    tice medicine, provide healthcare, engage in medical

20    research, or participate in a graduate medical edu-

21    cation or training program involving the diagnosis,

22    treatment, or prevention of COVID–19.

23    (2) APPLICATIONS OR PETITIONS FOR NEW EM-

24    PLOYMENT OR CHANGE OF STATUS.—

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004045

1741

1     (A) INITIAL REVIEW.—Not later than 15
2 days after the Secretary of Homeland Security
3 receives an application or petition for new em-
4 ployment or change of status described in para-
5 graph (1), the Secretary shall conduct an initial
6 review of such application or petition and, if ad-
7 ditional evidence is required, shall issue a re-
8 quest for evidence.

9     (B) DECISION.—

10       (i) IN GENERAL.—The Secretary of
11 Homeland Security shall issue a final deci-
12 sion on an application or petition described
13 in paragraph (1) not later than 30 days
14 after receipt of such application or peti-
15 tion, or, if a request for evidence is issued,
16 not later than 15 days after the Secretary
17 receives the applicant or petitioner's re-
18 sponse to such request.

19       (ii) E-MAIL.—In addition to delivery
20 through regular mail services, decisions de-
21 scribed in clause (i) shall be transmitted to
22 the applicant or petitioner via electronic
23 mail, if the applicant or petitioner provides
24 the Secretary of Homeland Security with
25 an electronic mail address.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004046

1742

1   (3) TERMINATION.—This subsection shall take
2   effect on the date of the enactment of this title and
3   shall cease to be effective on the date that is 180
4   days after the termination of the public health emer-
5   gency declared by the Secretary of Health and
6   Human Services under section 319 of the Public
7   Health Service Act (42 U.S.C. 247d), with respect
8   to COVID–19.

9   (c) EMERGENCY VISA PROCESSING.—

10   (1) VISA PROCESSING.—

11   (A) IN GENERAL.—The Secretary of State
12   shall prioritize the processing of applications
13   submitted by aliens who are seeking a visa
14   based on an approved nonimmigrant petition to
15   practice medicine, provide healthcare, engage in
16   medical research, or participate in a graduate
17   medical education or training program involving
18   the diagnosis, treatment, or prevention of
19   COVID–19.

20   (B) INTERVIEW.—

21   (i) IN GENERAL.—The Secretary of
22   State shall ensure that visa appointments
23   are scheduled for aliens described in sub-
24   paragraph (A) not later than 7 business

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004047

1743

1 days after the alien requests such an ap-

2 pointment.

3 (ii) SUSPENSION OF ROUTINE VISA

4 SERVICES.—If routine visa services are un-

5 available in the alien's home country—

6 (I) the U.S. embassy or consulate

7 in the alien's home country shall—

8 (aa) conduct the visa inter-

9 view with the alien via video-tele-

10 conferencing technology; or

11 (bb) grant an emergency

12 visa appointment to the alien not

13 later than 10 business days after

14 the alien requests such an ap-

15 pointment; or

16 (II) the alien may seek a visa ap-

17 pointment at any other U.S. embassy

18 or consulate where routine visa serv-

19 ices are available, and such embassy

20 or consulate shall make every reason-

21 able effort to provide the alien with an

22 appointment within 10 business days

23 after the alien requests such an ap-

24 pointment.

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

1744

1      (2) INTERVIEW WAIVERS.—Except as provided

2 in section 222(h)(2) of the Immigration and Nation-

3 ality Act (8 U.S.C. 1202(h)(2)), the Secretary of

4 State shall waive the interview of any alien seeking

5 a nonimmigrant visa based on an approved petition

6 described in paragraph (1)(A), if—

7      (A) such alien is applying for a visa—

8           (i) not more than 3 years after the

9 date on which such alien's prior visa ex-

10 pired;

11           (ii) in the visa classification for which

12 such prior visa was issued; and

13           (iii) at a consular post located in the

14 alien's country of residence or, if otherwise

15 required by regulation, country of nation-

16 ality; and

17      (B) the consular officer has no indication

18 that such alien has failed to comply with the

19 immigration laws and regulations of the United

20 States.

21      (3) TERMINATION.—This subsection shall take

22 effect on the date of the enactment of this title and

23 shall cease to be effective on the date that is 180

24 days after the termination of the public health emer-

25 gency declared by the Secretary of Health and

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004049

1745

1     Human Services under section 319 of the Public

2     Health Service Act (42 U.S.C. 274d), with respect

3     to COVID–19.

4     (d) IMPROVING MOBILITY OF NONIMMIGRANT

5     COVID–19 WORKERS.—

6         (1) LICENSURE.—Notwithstanding section

7     212(j)(2) of the Immigration and Nationality Act (8

8     U.S.C. 1182(j)(2)), for the period described in para-

9     graph (6), the Secretary of Homeland Security may

10     approve a petition for classification as a non-

11     immigrant described under section

12     101(a)(15)(H)(i)(b) of such Act, filed on behalf of a

13     physician for purposes of performing direct patient

14     care if such physician possesses a license or other

15     authorization required by the State of intended em-

16     ployment to practice medicine, or is eligible for a

17     waiver of such requirement pursuant to an executive

18     order, emergency rule, or other action taken by the

19     State to modify or suspend regular licensing require-

20     ments in response to the COVID–19 public health

21     emergency.

22         (2) TEMPORARY LIMITATIONS ON AMENDED H–

23     1B PETITIONS.—

24             (A) IN GENERAL.—Notwithstanding any

25     other provision of law, the Secretary of Home-

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004050

1746

1   land Security shall not require an employer of
2   a nonimmigrant alien described in section
3   101(a)(15)(H)(i)(b) of the Immigration and
4   Nationality Act (8 U.S.C.
5   1101(a)(15)(H)(i)(b)) to file an amended or
6   new petition under section 214(a) of such Act
7   (8 U.S.C. 1184(a)) if upon transferring such
8   alien to a new area of employment, the alien
9   will practice medicine, provide healthcare, or
10   engage in medical research involving the diag-
11   nosis, treatment, or prevention of COVID–19.

12       (B) CLARIFICATION ON TELEMEDICINE.—
13   Nothing in the Immigration and Nationality
14   Act or any other provision of law shall be con-
15   strued to require an employer of a non-
16   immigrant alien described in section
17   101(a)(15)(H)(i)(b) of the Immigration and
18   Nationality Act (8 U.S.C.
19   1101(a)(15)(H)(i)(b)) to file an amended or
20   new petition under section 214(a) of such Act
21   (8 U.S.C. 1184(a)) if the alien is a physician or
22   other healthcare worker who will provide remote
23   patient care through the use of real-time audio-
24   video communication tools to consult with pa-

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004051

1747

1   tients and other technologies to collect, analyze,

2   and transmit medical data and images.

3   (3) PERMISSIBLE WORK ACTIVITIES FOR J–1

4   PHYSICIANS.—

5       (A) IN GENERAL.—Notwithstanding any

6       other provision of law, the diagnosis, treatment,

7       or prevention of COVID–19 shall be considered

8       an integral part of a graduate medical edu-

9       cation or training program and a nonimmigrant

10      described in section 101(a)(15)(J) of the Immi-

11      gration and Nationality Act (8 U.S.C.

12      1101(a)(15)(J)) who is participating in such a

13      program—

14          (i) may be redeployed to a new rota-

15          tion within the host training institution as

16          needed to engage in COVID–19 work; and

17          (ii) may receive compensation for such

18          work.

19      (B) OTHER PERMISSIBLE EMPLOYMENT

20      ACTIVITIES.—A nonimmigrant described in sec-

21      tion 101(a)(15)(J) of the Immigration and Na-

22      tionality Act (8 U.S.C. 1101(a)(15)(J)) who is

23      participating in a graduate medical education

24      or training program may engage in work out-

25      side the scope of the approved program, if—

DOC_0004052

1748

    (i) the work involves the diagnosis, treatment, or prevention of COVID–19;

    (ii) the alien has maintained lawful nonimmigrant status and has otherwise complied with the terms of the education or training program; and

    (iii) the program sponsor approves the additional work by annotating the non-immigrant's Certificate of Eligibility for Exchange Visitor (J–1) Status (Form DS–2019) and notifying the Immigration and Customs Enforcement Student and Exchange Visitor Program of the approval of such work.

  (C) CLARIFICATION ON TELEMEDICINE.—Section 214(l)(1)(D) of the Immigration and Nationality Act (8 U.S.C. 1184(l)(1)(D)) may be satisfied through the provision of care to patients located in areas designated by the Secretary of Health and Human Services as having a shortage of health care professionals, through the physician's use of real-time audio-video communication tools to consult with patients and other technologies to collect, analyze, and transmit medical data and images.

g:\VHLC\051220\051220.072.xml  (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004053

1749

1     (4) PORTABILITY OF O–1 NONIMMIGRANTS.—A

2 nonimmigrant who was previously issued a visa or

3 otherwise provided nonimmigrant status under sec-

4 tion 101(a)(15)(O)(i) of the Immigration and Na-

5 tionality Act (8 U.S.C. 1101(a)(15)(O)(i)), and is

6 seeking an extension of such status, is authorized to

7 accept new employment under the terms and condi-

8 tions described in section 214(n) of such Act (8

9 U.S.C. 1184(n)).

10     (5) INCREASING THE ABILITY OF PHYSICIANS

11 TO CHANGE NONIMMIGRANT STATUS.—

12     (A) CHANGE OF NONIMMIGRANT CLASSI-

13     FICATION.—Section 248(a) of the Immigration

14     and Nationality Act (8 U.S.C. 1184(l)), is

15     amended—

16         (i) in paragraph (1), by inserting

17         ''and'' after the comma at the end;

18         (ii) by striking paragraphs (2) and

19         (3); and

20         (iii) by redesignating paragraph (4) as

21         paragraph (2).

22     (B) ADMISSION OF NONIMMIGRANTS.—

23     Section 214(l)(2)(A) of the Immigration and

24     Nationality Act (8 U.S.C. 1184(l)(2)(A)) is

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004054

1750

1 amended by striking "Notwithstanding section

2 248(a)(2), the" and inserting "The".

3 (6) TERMINATION.—This subsection shall take

4 effect on the date of the enactment of this title and

5 except as provided in paragraphs (2)(B), (3)(C), (4),

6 and (5), shall cease to be effective on that date that

7 is 180 days after the termination of the public

8 health emergency declared by the Secretary of

9 Health and Human Services under section 319 of

10 the Public Health Service Act (42 U.S.C. 247d),

11 with respect to COVID–19.

12 (e) CONRAD 30 PROGRAM.—

13 (1) PERMANENT AUTHORIZATION.—Section

14 220(c) of the Immigration and Nationality Technical

15 Corrections Act of 1994 (Public Law 103–416; 8

16 U.S.C. 1182 note) is amended by striking "and be-

17 fore September 30, 2015".

18 (2) ADMISSION OF NONIMMIGRANTS.—Section

19 214(l) of the Immigration and Nationality Act (8

20 U.S.C. 1184(l)), is amended—

21 (A) in paragraph (1)(B)—

22 (i) by striking "30" and inserting

23 "35"; and

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004055

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1751

1       (ii) by inserting ", except as provided

2       in paragraph (4)" before the semicolon at

3       the end; and

4       (B) by adding at the end the following:

5       "(4) ADJUSTMENT IN WAIVER NUMBERS.—

6           "(A) INCREASES.—

7               "(i) IN GENERAL.—Except as pro-

8           vided in clause (ii), if in any fiscal year,

9           not less than 90 percent of the waivers

10          provided under paragraph (1)(B) are uti-

11          lized by States receiving at least 5 such

12          waivers, the number of such waivers allot-

13          ted to each State shall increase by 5 for

14          each subsequent fiscal year.

15              "(ii) EXCEPTION.—If 45 or more

16          waivers are allotted to States in any fiscal

17          year, an increase of 5 waivers in subse-

18          quent fiscal years shall be provided only in

19          the case that not less than 95 percent of

20          such waivers are utilized by States receiv-

21          ing at least 1 waiver.

22          "(B) DECREASES.—If in any fiscal year in

23      which there was an increase in waivers, the

24      total number of waivers utilized is 5 percent

25      lower than in the previous fiscal year, the num-

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004056

1752

1 ber of such waivers allotted to each State shall

2 decrease by 5 for each subsequent fiscal year,

3 except that in no case shall the number of waiv-

4 ers allotted to each State drop below 35.''.

5 (f) TEMPORARY PORTABILITY FOR PHYSICIANS AND

6 CRITICAL HEALTHCARE WORKERS IN RESPONSE TO

7 COVID–19 PUBLIC HEALTH EMERGENCY.—

8 (1) IN GENERAL.—Not later than 30 days after

9 the date of the enactment of this title, the Secretary

10 of Homeland Security, in consultation with the Sec-

11 retary of Labor and the Secretary of Health and

12 Human Services, shall establish emergency proce-

13 dures to provide employment authorization to aliens

14 described in paragraph (2), for purposes of facili-

15 tating the temporary deployment of such aliens to

16 practice medicine, provide healthcare, or engage in

17 medical research involving the diagnosis, treatment,

18 or prevention of COVID–19.

19 (2) ALIENS DESCRIBED.—An alien described in

20 this paragraph is an alien who is—

21 (A) physically present in the United

22 States;

23 (B) maintaining lawful nonimmigrant sta-

24 tus that authorizes employment with a specific

25 employer incident to such status; and

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004057

1753

1     (C) working in the United States in a

2 healthcare occupation essential to COVID–19

3 response, as determined by the Secretary of

4 Health and Human Services.

5     (3) EMPLOYMENT AUTHORIZATION.—

6         (A) APPLICATION.—

7             (i) IN GENERAL.—The Secretary of

8 Homeland Security may grant employment

9 authorization to an alien described in para-

10 graph (2) if such alien submits an Applica-

11 tion for Employment Authorization (Form

12 I–765 or any successor form), which shall

13 include—

14                 (I) evidence of the alien's current

15 nonimmigrant status;

16                 (II) copies of the alien's academic

17 degrees and any licenses, credentials,

18 or other documentation confirming

19 authorization to practice in the alien's

20 occupation; and

21                 (III) any other evidence deter-

22 mined necessary by the Secretary of

23 Homeland Security to establish by a

24 preponderance of the evidence that

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004058

1754

1   the alien meets the requirements of
2   paragraph (2).

3   (ii) CONVERSION OF PENDING APPLI-
4   CATIONS.—The Secretary of Homeland Se-
5   curity shall establish procedures for the ad-
6   judication of any employment authoriza-
7   tion applications for aliens described in
8   paragraph (2) that are pending on the date
9   of the enactment of this title, and the
10  issuance of employment authorization doc-
11  uments in connection with such applica-
12  tions in accordance with the terms and
13  conditions of this subsection, upon request
14  by the applicant.

15  (B) FEES.—The Secretary of Homeland
16  Security shall collect a fee for the processing of
17  applications for employment authorization as
18  provided under this paragraph.

19  (C) REQUEST FOR EVIDENCE.—If all re-
20  quired initial evidence has been submitted
21  under this subsection but such evidence does
22  not establish eligibility, the Secretary of Home-
23  land Security shall issue a request for evidence
24  not later than 15 days after receipt of the ap-
25  plication for employment authorization.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004059

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1755

1    (D) DECISION.—The Secretary of Home-

2  land Security shall issue a final decision on an

3  application for employment authorization under

4  this subsection not later than 30 days after re-

5  ceipt of such application, or, if a request for

6  evidence is issued, not later than 15 days after

7  the Secretary receives the alien's response to

8  such request.

9    (E) EMPLOYMENT AUTHORIZATION

10  CARD.—An employment authorization document

11  issued under this subsection shall—

12    (i) be valid for a period of not less

13    than 1 year;

14    (ii) include the annotation "COVID–

15    19"; and

16    (iii) notwithstanding any other provi-

17    sion of law, allow the bearer of such docu-

18    ment to engage in employment during its

19    validity period, with any United States em-

20    ployer to perform services described in

21    paragraph (1).

22    (F) RENEWAL.—Subject to paragraph (5),

23  the Secretary of Homeland Security may renew

24  an employment authorization document issued

DOC_0004060

1756

1  under this subsection in accordance with proce-
2  dures established by the Secretary.
3      (G) CLARIFICATIONS.—
4        (i) MAINTENANCE OF STATUS.—Not-
5  withstanding a reduction in hours or ces-
6  sation of work with the employer that peti-
7  tioned for the alien's underlying non-
8  immigrant status, an alien granted employ-
9  ment authorization under this subsection,
10  and the spouse and children of such alien
11  shall, for the period of such authorization,
12  be deemed—
13        (I) to be lawfully present in the
14  United States; and
15        (II) to have continuously main-
16  tained the alien's underlying non-
17  immigrant status for purposes of an
18  extension of such status, a change of
19  nonimmigrant status under section
20  248 of the Immigration and Nation-
21  ality Act (8 U.S.C. 1258), or adjust-
22  ment of status under section 245 of
23  such Act (8 U.S.C. 1255).

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004061

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1757

(ii) LIMITATIONS.—An employment
authorization document described in sub-
paragraph (E) may not be—

(I) utilized by the alien to engage
in any employment other than that
which is described in paragraph (1);
or

(II) accepted by an employer as
evidence of authorization under sec-
tion 274A(b)(1)(C) of the Immigra-
tion and Nationality Act (8 U.S.C.
1324a(b)(1)(C)), to engage in employ-
ment other than that which is de-
scribed in paragraph (1).

(4) TREATMENT OF TIME SPENT ENGAGING IN
COVID–19-RELATED WORK.—Notwithstanding any
other provision of law, time spent by an alien physi-
cian engaged in direct patient care involving the di-
agnosis, treatment, or prevention of COVID–19
shall count towards—

(A) the 5 years that an alien is required to
work as a full-time physician for purposes of a
national interest waiver under section
203(b)(2)(B)(ii) of the Immigration and Na-
tionality Act (8 U.S.C. 1153(b)(2)(B)(ii)); and

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004062

1758

1    (B) the 3 years that an alien is required

2    to work as a full-time physician for purposes of

3    a waiver of the 2-year foreign residence require-

4    ment under section 212(e) of the Immigration

5    and Nationality Act (8 U.S.C. 1182(e)), as pro-

6    vided in section 214(l) of such Act (8 U.S.C.

7    1184(l)).

8    (5) EXTENSION OR TERMINATION.—The proce-

9    dures described in paragraph (1) shall take effect on

10   the date that is 30 days after the date of the enact-

11   ment of this title and shall remain in effect until

12   180 days after the termination of the public health

13   emergency declared by the Secretary of Health and

14   Human Services under section 319 of the Public

15   Health Service Act (42 U.S.C. 247d), with respect

16   to COVID–19.

17   (g) SPECIAL IMMIGRANT STATUS FOR NON-

18   IMMIGRANT COVID–19 WORKERS AND THEIR FAMI-

19   LIES.—

20   (1) IN GENERAL.—The Secretary of Homeland

21   Security may grant a petition for special immigrant

22   classification to an alien described in paragraph (2)

23   (and the spouse and children of such alien) if the

24   alien files a petition for special immigrant status

25   under section 204 of the Immigration and Nation-

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004063

1759

1 ality Act (8 U.S.C. 1154) for classification under

2 section 203(b)(4) of such Act (8 U.S.C. 1153(b)(4)).

3     (2) ALIENS DESCRIBED.—An alien is described

4 in this paragraph if, during the period beginning on

5 the date that the COVID–19 public health emer-

6 gency was declared by the Secretary of Health and

7 Human Services under section 319 of the Public

8 Health Service Act (42 U.S.C. 247d) and ending

9 180 days after the termination of such emergency,

10 the alien was—

11     (A) authorized for employment in the

12     United States and maintaining a nonimmigrant

13     status; and

14     (B) engaged in the practice of medicine,

15     provision of healthcare services, or medical re-

16     search involving the diagnosis, treatment, or

17     prevention of COVID–19 disease.

18     (3) PRIORITY DATE.—Subject to paragraph (5),

19 immigrant visas under paragraph (1) shall be made

20 available to aliens in the order in which a petition

21 on behalf of each such alien is filed with the Sec-

22 retary of Homeland Security, except that an alien

23 shall maintain any priority date that was assigned

24 with respect to an immigrant visa petition or appli-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004064

G:\CMTE\AP\16\FY20\_D\HEROES.XML

## 1760

1 cation for labor certification that was previously filed

2 on behalf of such alien.

3     (4) PROTECTIONS FOR SURVIVING SPOUSES

4 AND CHILDREN.—

5         (A) SURVIVING SPOUSES AND CHIL-

6         DREN.—Notwithstanding the death of an alien

7         described in paragraph (2), the Secretary of

8         State may approve an application for an immi-

9         grant visa, and the Secretary of Homeland Se-

10        curity may approve an application for adjust-

11        ment of status to lawful permanent resident,

12        filed by or on behalf of a spouse or child of

13        such alien.

14        (B) AGE-OUT PROTECTION.—For purposes

15        of an application for an immigrant visa or ad-

16        justment of status filed by or on behalf of a

17        child of an alien described in paragraph (2), the

18        determination of whether the child satisfies the

19        age requirement under section 101(b)(1) of the

20        Immigration and Nationality Act (8 U.S.C.

21        1101(b)(1)) shall be made using the age of the

22        child on the date the immigrant visa petition

23        under paragraph (1) was approved.

24        (C) CONTINUATION OF NONIMMIGRANT

25        STATUS.—A spouse or child of an alien de-

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004065

1761

1 scribed in paragraph (2) shall be considered to

2 have maintained lawful nonimmigrant status

3 until the earlier of the date—

4 (i) on which the Secretary of Home-

5 land Security accepts for filing, an applica-

6 tion for adjustment of status based on a

7 petition described in paragraph (1); or

8 (ii) that is 2 years after the date of

9 the principal nonimmigrant's death.

10 (5) NUMERICAL LIMITATIONS.—

11 (A) IN GENERAL.—The total number of

12 principal aliens who may be provided special

13 immigrant status under this subsection may not

14 exceed 4,000 per year for each of the 3 fiscal

15 years beginning after the date of the enactment

16 of this title.

17 (B) EXCLUSION FROM NUMERICAL LIMITA-

18 TIONS.—Aliens provided special immigrant sta-

19 tus under this subsection shall not be counted

20 against any numerical limitations under section

21 201(d), 202(a), or 203(b)(4) of the Immigra-

22 tion and Nationality Act (8 U.S.C. 1151(d),

23 1152(a), or 1153(b)(4)).

24 (C) CARRY FORWARD.—If the numerical

25 limitation specified in subparagraph (A) is not

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004066

1762

1  reached during a given fiscal year referred to in
2  such subparagraph, the numerical limitation
3  specified in such subparagraph for the following
4  fiscal year shall be increased by a number equal
5  to the difference between—

6      (i) the numerical limitation specified
7      in subparagraph (A) for the given fiscal
8      year; and

9      (ii) the number of principal aliens pro-
10     vided special immigrant status under this
11     subsection during the given fiscal year.

12  **SEC. 191205. ICE DETENTION.**

13  (a) REVIEWING ICE DETENTION.—During the public

14  health emergency declared by the Secretary of Health and

15  Human Services under section 319 of the Public Health

16  Service Act (42 U.S.C. 247d) with respect to COVID–19,

17  the Secretary of Homeland Security shall review the immi-

18  gration files of all individuals in the custody of U.S. Immi-

19  gration and Customs Enforcement to assess the need for

20  continued detention. The Secretary of Homeland Security

21  shall prioritize for release on recognizance or alternatives

22  to detention individuals who are not subject to mandatory

23  detention laws, unless the individual is a threat to public

24  safety or national security.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004067

1763

1    (b) ACCESS TO ELECTRONIC COMMUNICATIONS AND

2  HYGIENE PRODUCTS.—During the period described in

3  subsection (c), the Secretary of Homeland Security shall

4  ensure that—

5        (1) all individuals in the custody of U.S. Immi-

6     gration and Customs Enforcement—

7          (A) have access to telephonic or video com-

8       munication at no cost to the detained indi-

9       vidual;

10         (B) have access to free, unmonitored tele-

11      phone calls, at any time, to contact attorneys or

12      legal service providers in a sufficiently private

13      space to protect confidentiality;

14         (C) are permitted to receive legal cor-

15      respondence by fax or email rather than postal

16      mail; and

17         (D) are provided sufficient soap, hand san-

18      itizer, and other hygiene products; and

19        (2) nonprofit organizations providing legal ori-

20     entation programming or know-your-rights program-

21     ming to individuals in the custody of U.S. Immigra-

22     tion and Customs Enforcement are permitted broad

23     and flexible access to such individuals—

24         (A) to provide group presentations using

25      remote videoconferencing; and

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004068

1764

1       (B) to schedule and provide individual ori-

2       entations using free telephone calls or remote

3       videoconferencing.

4    (c) PERIOD DESCRIBED.—The period described in

5 this subsection—

6    (1) begins on the first day of the public health

7 emergency declared by the Secretary of Health and

8 Human Services under section 319 of the Public

9 Health Service Act (42 U.S.C. 247d) with respect to

10 COVID–19; and

11    (2) ends 90 days after the date on which such

12 public health emergency terminates.

# TITLE XIII—CORONAVIRUS RELIEF FUND AMENDMENTS

15 **SEC. 191301. CONGRESSIONAL INTENT RELATING TO TRIB-**

16    **AL    GOVERNMENTS    ELIGIBLE    FOR**

17    **CORONAVIRUS RELIEF FUND PAYMENTS.**

18    (a) PURPOSE.—The purpose of this section and the

19 amendments made by subsection (b) is to affirm the April

20 27, 2020, memorandum and decision of the United States

21 District Court for the District of Columbia in *Confederated*

22 *Tribes of the Chehalis Reservation et al* v. *Mnuchin* (Case

23 No. 1:20–cv–01002) and clarify the intent of Congress

24 that only Federally recognized Tribal Governments are eli-

25 gible for payments from the Coronavirus Relief Fund es-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004069

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1765

1 tablished in section 601 of the Social Security Act, as

2 added by section 5001(a) of the Coronavirus Aid, Relief,

3 and Economic Security Act (Public Law 116–136).

4     (b) ELIGIBLE TRIBAL GOVERNMENTS.—Effective as

5 if included in the enactment of the Coronavirus Aid, Re-

6 lief, and Economic Security Act (Public Law 116–136),

7 section 601 of the Social Security Act, as added by section

8 5001(a) of the Coronavirus Aid, Relief, and Economic Se-

9 curity Act, is amended—

10         (1) in subsection (c)(7), by striking ''Indian

11     Tribes'' and inserting ''Tribal Governments''; and

12         (2) in subsection (g)—

13             (A) by striking paragraph (1);

14             (B) by redesignating paragraphs (2)

15         through (5) as paragraphs (1) through (4), re-

16         spectively; and

17             (C) by striking paragraph (4) (as redesig-

18         nated by subparagraph (B)) and inserting the

19         following:

20     ''(4) TRIBAL GOVERNMENT.—The term 'Tribal

21 Government' means the recognized governing body

22 of any Indian or Alaska Native tribe, band, nation,

23 pueblo, village, community, component band, or com-

24 ponent reservation, individually identified (including

25 parenthetically) in the list published most recently as

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004070

1766

1   of the date of enactment of this Act pursuant to sec-

2   tion 104 of the Federally Recognized Indian Tribe

3   List Act of 1994 (25 U.S.C. 5131).''.

4   (c) RULES RELATING TO PAYMENTS MADE BEFORE

5   THE DATE OF ENACTMENT OF THIS ACT.—

6   (1) PAYMENTS MADE TO INELIGIBLE ENTI-

7   TIES.—The Secretary of the Treasury shall require

8   any entity that was not eligible to receive a payment

9   from the amount set aside for fiscal year 2020

10   under subsection (a)(2)(B) of section 601 of the So-

11   cial Security Act, as added by section 5001(a) of the

12   Coronavirus Aid, Relief, and Economic Security Act

13   (Public Law 116–136) and after the application of

14   the amendments made by subsection (a) clarifying

15   congressional intent relating to eligibility for such a

16   payment, to return the full payment to the Depart-

17   ment.

18   (2) DISTRIBUTION OF PAYMENTS RETURNED

19   BY INELIGIBLE ENTITIES.—The Secretary of the

20   Treasury shall distribute payments returned under

21   paragraph (1), without further appropriation or fis-

22   cal year limitation and not later than 7 days after

23   receiving any returned funds as required under

24   paragraph (1) to Tribal Governments eligible for

25   payments under such section 601 of the Social Secu-

DOC_0004071

1767

1   rity Act, as amended by subsection (a), in accord-

2   ance with subsection (c)(7) of such Act.

3       (3) LIMITATION ON SECRETARIAL AUTHOR-

4   ITY.—The Secretary of the Treasury is prohibited

5   from requiring an entity that is eligible for a pay-

6   ment from the amount set aside for fiscal year 2020

7   under subsection (a)(2)(B) of section 601 of the So-

8   cial Security Act, as amended by subsection(a), and

9   that received a payment before the date of enact-

10  ment of this Act, from requiring the entity to return

11  all or part of the payment except to the extent au-

12  thorized under section 601(f) of such Act in the case

13  of a determination by the Inspector General of the

14  Department of the Treasury that the Tribal govern-

15  ment failed to comply with the use of funds require-

16  ments of section 601(d) of such Act.

17 **SEC. 191302. REDISTRIBUTION OF AMOUNTS RECOVERED**

18  **OR RECOUPED FROM PAYMENTS FOR TRIBAL**

19  **GOVERNMENTS;    REPORTING    REQUIRE-**

20  **MENTS.**

21      Effective as if included in the enactment of the

22  Coronavirus Aid, Relief, and Economic Security Act (Pub-

23  lic Law 116–136), section 601(c)(7) of the Social Security

24  Act, as added by section 5001(a) of the Coronavirus Aid,

25  Relief, and Economic Security Act, is amended—

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004072

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1768

1    (1) by striking ''From the amount'' and insert-

2 ing the following:

3     ''(A) IN GENERAL.—From the amount'';

4 and

5    (2) by adding at the end the following:

6     ''(B) REDISTRIBUTION OF FUNDS.—

7      ''(i) REQUIREMENT.—In carrying out

8      the requirement under subparagraph (A)

9      to ensure that all amounts available under

10      subsection (a)(2)(B) for fiscal year 2020

11      are distributed to Tribal governments, the

12      Secretary shall redistribute any amounts

13      from payments for Tribal Governments

14      that are recovered through recoupment ac-

15      tivities carried out by the Inspector Gen-

16      eral of the Department of the Treasury

17      under subsection (f), without further ap-

18      propriation, using a procedure and meth-

19      odology determined by the Secretary in

20      consultation with Tribal Governments, to

21      Tribal Governments that apply for pay-

22      ments from such amounts.

23      ''(ii) REPAYMENT.—In carrying out

24      the recoupment activities by the Inspector

25      General of the Department of the Treasury

DOC_0004073

1769

1 under subsection (f), Treasury shall not

2 impose any additional fees, penalties, or in-

3 terest payments on Tribal Governments as-

4 sociated with any amounts that are recov-

5 ered.

6 ''(C) DISCLOSURE AND REPORTING RE-

7 QUIREMENTS.—

8 ''(i) DISCLOSURE OF FUNDING FOR-

9 MULA AND METHODOLOGY.—Not later

10 than 24 hours before any payments for

11 Tribal Governments are distributed by the

12 Secretary pursuant to the requirements

13 under subparagraph (A) and subparagraph

14 (B), the Secretary shall publish on the

15 website of the Department of the Treas-

16 ury—

17 ''(I) a detailed description of the

18 funding allocation formula; and

19 ''(II) a detailed description of the

20 procedure and methodology used to

21 determine the funding allocation for-

22 mula.

23 ''(ii) REPORT TO CONGRESS.—No

24 later than 7 days after payments for Tribal

25 Governments are distributed by the Sec-

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004074

1770

retary pursuant to the requirements under
subparagraph (A) or subparagraph (B),
the Secretary shall submit to the Committees on Appropriations of the House of
Representatives and the Senate, the Chair
and Ranking Members of the House Committee on Natural Resources and the Chair
and Vice-Chair of the Senate Committee
on Indian Affairs a report summarizing—

"(I) an overview of actions taken
by the Secretary in carrying out the
requirements under subparagraph (A)
and subparagraph (B); and

"(II) the date and amount of all
fund disbursements, broken down by
individual Tribal Government recipients.".

**SEC. 191303. USE OF RELIEF FUNDS.**

Effective as if included in the Coronavirus, Aid, Relief, and Economic Security Act (Public Law 116–136), section 601 of the Social Security Act, as added by section 5001(a) of such Act, is amended by striking subsection (d) and inserting the following:

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004075

1771

1    "(d) USE OF FUNDS.—A State, Tribal government,
2  and unit of local government shall use the funds provided
3  under a payment made under this section to

4        "(1) cover only those costs of the State, Tribal
5      government, or unit of local government that—

6            "(A) Are necessary expenditures incurred
7          due to the public health emergency with respect
8          to the coronavirus disease 2019 (COVID–19);

9            "(B) were not accounted for in the budget
10         most recently approved as of the date of enact-
11         ment of this section for the State or govern-
12         ment; and

13           "(C) were incurred during the period that
14         begins on January 31, 2020, and ends on De-
15         cember 31, 2020; or

16       "(2) Replace lost, delayed, or decreased reve-
17     nues, stemming from the public health emergency
18     with respect to the coronavirus disease (COVID–
19     19).".

# TITLE XIV—RURAL DIGITAL OPPORTUNITY

**SEC. 191401. ACCELERATION OF RURAL DIGITAL OPPOR-**

**TUNITY FUND PHASE I AUCTION.**

24  With respect to the Rural Digital Opportunity Fund

25  Phase I auction (in this section referred to as the "auc-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004076

1772

1 tion'') provided for in the Report and Order in the matter

2 of Rural Digital Opportunity Fund and Connect America

3 Fund adopted by the Federal Communications Commis-

4 sion (in this section referred to as the ''Commission'') on

5 January 30, 2020 (FCC 20–5), the Commission shall

6 modify the framework for the auction adopted in such Re-

7 port and Order as follows:

8      (1) The Commission shall begin accepting long-

9         form applications before the auction, not later than

10        the earlier of the date that is 30 days after the date

11        on which the Commission begins accepting short-

12        form applications or July 31, 2020, from such appli-

13        cants as are willing to commit to the schedule de-

14        scribed in paragraph (3)(B) for deployment of net-

15        works capable of providing symmetrical Gigabit per-

16        formance service.

17      (2) If the long-form applications accepted pur-

18        suant to paragraph (1) indicate that, for any census

19        block or census block group identified in the Prelimi-

20        nary List of Eligible Areas released by the Commis-

21        sion on March 17, 2020, there is only 1 qualified ap-

22        plicant willing to commit to provide symmetrical

23        Gigabit performance service pursuant to the sched-

24        ule described in paragraph (3)(B), the Commission

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004077

1773

1 shall, not later than the earlier of September 30,
2 2020, or 30 days before the start of the auction—

3     (A) award to such applicant Rural Digital
4     Opportunity Fund Phase I support for such
5     census block or census block group, at 100 per-
6     cent of the reserve price (in this paragraph re-
7     ferred to as the ''award'');

8     (B) remove such census block or census
9     block group from the auction; and

10     (C) reduce the budget for the auction by
11     75 percent of the amount of the award and re-
12     duce the budget for the Rural Digital Oppor-
13     tunity Fund Phase II auction provided for in
14     such Report and Order by 25 percent of the
15     amount of the award.

16 (3) The Commission shall require an applicant
17 submitting a long-form application pursuant to para-
18 graph (1) to—

19     (A) not later than 30 days after the date
20     on which such applicant submits such long-form
21     application, provide a letter of commitment
22     from a bank meeting the Commission's eligi-
23     bility requirements stating that the bank would
24     provide a letter of credit to such applicant if

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004078

1774

1 such applicant becomes a winning bidder and is

2 awarded support; and

3  (B) commit to—

4   (i) begin construction not later than 6

5  months following funding authorization;

6  and

7   (ii) begin to make service available not

8  later than 1 year following funding author-

9  ization.

10  (4) If an applicant to which an award of sup-

11 port has been made under paragraph (2)(A) for a

12 census block or census block group fails to meet the

13 requirements of paragraph (3) with respect to such

14 award of support, the Commission shall revoke such

15 award of support and include such census block or

16 census block group for competitive bidding in the

17 Rural Digital Opportunity Fund Phase II auction

18 provided for in such Report and Order.

19  (5) The Commission shall require an applicant

20 to which an award of support has been made under

21 paragraph (2)(A) to meet the deployment schedule

22 to which the applicant committed under paragraph

23 (3)(B).

g:\VHLC\051220\051220.072.xml (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004079

1775

SEC. 191402. ENSURING THE FCC CREATES ACCURATE SERVICE MAPS.

(a) AUTHORIZATION OF APPROPRIATIONS.—Title VIII of the Communications Act of 1934 (47 U.S.C. 641 et seq.) is amended by adding at the end the following:

**"SEC. 807. AUTHORIZATION OF APPROPRIATIONS.**

"There is authorized to be appropriated to the Commission to carry out this title—

"(1) $25,000,000 for fiscal year 2020; and

"(2) $9,000,000 for each of the fiscal years 2021 through 2027.".

(b) DEADLINE FOR CREATION OF MAPS.—Section 802(c)(1) of the Communications Act of 1934 (47 U.S.C. 642(c)(1)) is amended by striking "create" and inserting "create, not later than October 1, 2020".

# TITLE XV—FOREIGN AFFAIRS PROVISIONS

## Subtitle A—Matters Relating to the Department of State

SEC. 191501. MITIGATION PLAN TO ASSIST FEDERAL VOTERS OVERSEAS IMPACTED BY COVID–19.

(a) IN GENERAL.—Not later than 60 days after the date of the enactment of this Act, the Secretary of State, in consultation with the Secretary of Defense, shall submit to the appropriate congressional committees a plan to mitigate the effects of limited or curtailed diplomatic

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004080

1776

1  pouch capacities or other operations constraints at United

2  States diplomatic and consular posts, due to coronavirus,

3  on overseas voters (as such term is defined in section

4  107(5) of the Uniformed and Overseas Citizens Absentee

5  Voting Act (52 U.S.C. 20310(5))) seeking to return ab-

6  sentee ballots and other balloting materials under such

7  Act with respect to elections for Federal office held in

8  2020. Such plan shall include steps to—

9      (1) restore or augment diplomatic pouch capac-

10     ities;

11     (2) facilitate using the Army Post Office, Fleet

12     Post Office, the United States mails, or private

13     couriers, if available;

14     (3) mitigate other operations constraints affect-

15     ing eligible overseas voters; and

16     (4) develop specific outreach plans to educate

17     eligible overseas voters about accessing all available

18     forms of voter assistance prior to the date of the

19     regularly scheduled general election for Federal of-

20     fice.

21  (b) REPORT ON EFFORTS TO ASSIST AND INFORM

22  FEDERAL VOTERS OVERSEAS.—Not later than 90 days

23  before the date of the regularly scheduled general election

24  for Federal office held in November 2020, the Secretary

25  of State, in consultation with the Secretary of Defense,

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004081

1777

1  shall report to the appropriate congressional committees

2  on the implementation of efforts to carry out the plan sub-

3  mitted pursuant to subsection (a).

4      (c) Appropriate Congressional Committees De-

5  fined.—In this section, the term "appropriate congres-

6  sional committees" means—

7          (1) the Committee on Foreign Affairs and the

8      Committee on Armed Services of the House of Rep-

9      resentatives; and

10         (2) the Committee on Foreign Relations and

11     the Committee on Armed Services of the Senate.

12  **SEC. 191502. REPORT ON EFFORTS OF THE CORONAVIRUS**

13                **REPATRIATION TASK FORCE.**

14     (a) In General.—Not later than the date specified

15  in subsection (b), the Secretary of State shall submit to

16  the Committee on Foreign Affairs of the House of Rep-

17  resentatives and the Committee on Foreign Relations of

18  the Senate a report evaluating the efforts of the

19  Coronavirus Repatriation Task Force of the Department

20  of State to repatriate United States citizens and legal per-

21  manent residents in response to the 2020 coronavirus out-

22  break. The report shall identify—

23         (1) the most significant impediments to repa-

24     triating such persons;

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004082

1778

1        (2) the lessons learned from such repatriations;

2    and

3        (3) any changes planned to future repatriation

4    efforts of the Department of State to incorporate

5    such lessons learned.

6    (b) DEADLINE.—The date specified in this subsection

7    is the earlier of—

8        (1) the date that is 90 days after the date on

9    which the Coronavirus Repatriation Task Force of

10   the Department of State is disbanded; or

11       (2) September 30, 2020.

# Subtitle B—Global Health Security Act of 2020

### SEC. 191503. SHORT TITLE.

15   This subtitle may be cited as the "Global Health Se-

16   curity Act of 2020".

### SEC. 191504. FINDINGS.

18   Congress finds the following:

19       (1) In December 2009, President Obama re-

20   leased the National Strategy for Countering Biologi-

21   cal Threats, which listed as one of seven objectives

22   "Promote global health security: Increase the avail-

23   ability of and access to knowledge and products of

24   the life sciences that can help reduce the impact

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004083

1779

1  from outbreaks of infectious disease whether of nat-

2  ural, accidental, or deliberate origin''.

3      (2) In February 2014, the United States and

4  nearly 30 other nations launched the Global Health

5  Security Agenda (GHSA) to address several high-

6  priority, global infectious disease threats. The

7  GHSA is a multi-faceted, multi-country initiative in-

8  tended to accelerate partner countries' measurable

9  capabilities to achieve specific targets to prevent, de-

10  tect, and respond to infectious disease threats,

11  whether naturally occurring, deliberate, or acci-

12  dental.

13      (3) In 2015, the United Nations adopted the

14  Sustainable Development Goals (SDGs), which in-

15  clude specific reference to the importance of global

16  health security as part of SDG 3 ''ensure healthy

17  lives and promote well-being for all at all ages'' as

18  follows: ''strengthen the capacity of all countries, in

19  particular developing countries, for early warning,

20  risk reduction and management of national and

21  global health risks''.

22      (4) On November 4, 2016, President Obama

23  signed Executive Order 13747, ''Advancing the

24  Global Health Security Agenda to Achieve a World

25  Safe and Secure from Infectious Disease Threats''.

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004084

1780

1    (5) In October 2017 at the GHSA Ministerial
2  Meeting in Uganda, the United States and more
3  than 40 GHSA member countries supported the
4  "Kampala Declaration" to extend the GHSA for an
5  additional 5 years to 2024.

6    (6) In December 2017, President Trump re-
7  leased the National Security Strategy, which in-
8  cludes the priority action: "Detect and contain bio-
9  threats at their source: We will work with other
10  countries to detect and mitigate outbreaks early to
11  prevent the spread of disease. We will encourage
12  other countries to invest in basic health care systems
13  and to strengthen global health security across the
14  intersection of human and animal health to prevent
15  infectious disease outbreaks".

16    (7) In September 2018, President Trump re-
17  leased the National Biodefense Strategy, which in-
18  cludes objectives to "strengthen global health secu-
19  rity capacities to prevent local bioincidents from be-
20  coming epidemics", and "strengthen international
21  preparedness to support international response and
22  recovery capabilities".

23  **SEC. 191505. STATEMENT OF POLICY.**

24    It is the policy of the United States to—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004085

1781

1     (1) promote global health security as a core na-
2 tional security interest;

3     (2) advance the aims of the Global Health Se-
4 curity Agenda;

5     (3) collaborate with other countries to detect
6 and mitigate outbreaks early to prevent the spread
7 of disease;

8     (4) encourage other countries to invest in basic
9 resilient and sustainable health care systems; and

10     (5) strengthen global health security across the
11 intersection of human and animal health to prevent
12 infectious disease outbreaks and combat the growing
13 threat of antimicrobial resistance.

14 **SEC. 191506. GLOBAL HEALTH SECURITY AGENDA INTER-**
15       **AGENCY REVIEW COUNCIL.**

16     (a) ESTABLISHMENT.—The President shall establish
17 a Global Health Security Agenda Interagency Review
18 Council (in this section referred to as the "Council") to
19 perform the general responsibilities described in sub-
20 section (c) and the specific roles and responsibilities de-
21 scribed in subsection (e).

22     (b) MEETINGS.—The Council shall meet not less than
23 four times per year to advance its mission and fulfill its
24 responsibilities.

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004086

1782

1   (c) GENERAL RESPONSIBILITIES.—The Council shall
2   be responsible for the following activities:

3       (1)  Provide  policy-level  recommendations  to
4   participating  agencies  on  Global  Health  Security
5   Agenda  (GHSA)  goals,  objectives,  and  implementa-
6   tion.

7       (2)  Facilitate  interagency,  multi-sectoral  en-
8   gagement to carry out GHSA implementation.

9       (3) Provide a forum for raising and working to
10  resolve  interagency  disagreements  concerning  the
11  GHSA.

12      (4)(A) Review the progress toward and work to
13  resolve  challenges  in  achieving  United  States  com-
14  mitments  under  the  GHSA,  including  commitments
15  to assist other countries in achieving the GHSA tar-
16  gets.

17      (B)  The  Council  shall  consider,  among  other
18  issues, the following:

19          (i)  The  status  of  United  States  financial
20      commitments  to  the  GHSA  in  the  context  of
21      commitments  by  other  donors,  and  the  con-
22      tributions  of  partner  countries  to  achieve  the
23      GHSA targets.

24          (ii)  The  progress  toward  the  milestones
25      outlined  in  GHSA  national  plans  for  those

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004087

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1783

1      countries where the United States Government
2      has committed to assist in implementing the
3      GHSA and in annual work-plans outlining
4      agency priorities for implementing the GHSA.

5      (iii) The external evaluations of United
6      States and partner country capabilities to ad-
7      dress infectious disease threats, including the
8      ability to achieve the targets outlined within the
9      WHO Joint External Evaluation (JEE) tool, as
10      well as gaps identified by such external evalua-
11      tions.

12   (d) PARTICIPATION.—The Council shall consist of
13 representatives, serving at the Assistant Secretary level or
14 higher, from the following agencies:

15      (1) The Department of State.

16      (2) The Department of Defense.

17      (3) The Department of Justice.

18      (4) The Department of Agriculture.

19      (5) The Department of Health and Human
20 Services.

21      (6) The Department of Labor.

22      (7) The Department of Homeland Security.

23      (8) The Office of Management and Budget.

24      (9) The United States Agency for International
25 Development.

DOC_0004088

1784

1   (10) The Environmental Protection Agency.

2   (11) The Centers for Disease Control and Pre-

3   vention.

4   (12) The Office of Science and Technology Pol-

5   icy.

6   (13) The National Institutes of Health.

7   (14) The National Institute of Allergy and In-

8   fectious Diseases.

9   (15) Such other agencies as the Council deter-

10   mines to be appropriate.

11   (e) SPECIFIC ROLES AND RESPONSIBILITIES.—

12   (1) IN GENERAL.—The heads of agencies de-

13   scribed in subsection (d) shall—

14   (A) make the GHSA and its implementa-

15   tion a high priority within their respective agen-

16   cies, and include GHSA-related activities within

17   their respective agencies' strategic planning and

18   budget processes;

19   (B) designate a senior-level official to be

20   responsible for the implementation of this Act;

21   (C) designate, in accordance with sub-

22   section (d), an appropriate representative at the

23   Assistant Secretary level or higher to partici-

24   pate on the Council;

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004089

1785

1       (D) keep the Council apprised of GHSA-
2       related activities undertaken within their re-
3       spective agencies;

4       (E) maintain responsibility for agency-re-
5       lated programmatic functions in coordination
6       with host governments, country teams, and
7       GHSA in-country teams, and in conjunction
8       with other relevant agencies;

9       (F) coordinate with other agencies that are
10      identified in this section to satisfy pro-
11      grammatic goals, and further facilitate coordi-
12      nation of country teams, implementers, and do-
13      nors in host countries; and

14      (G) coordinate across GHSA national
15      plans and with GHSA partners to which the
16      United States is providing assistance.

17      (2) ADDITIONAL ROLES AND RESPONSIBIL-
18      ITIES.—In addition to the roles and responsibilities
19      described in paragraph (1), the heads of agencies de-
20      scribed in subsection (d) shall carry out their respec-
21      tive roles and responsibilities described in sub-
22      sections (b) through (i) of section 3 of Executive
23      Order 13747 (81 Fed. Reg. 78701; relating to Ad-
24      vancing the Global Health Security Agenda to
25      Achieve a World Safe and Secure from Infectious

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004090

1786

1 Disease Threats), as in effect on the day before the

2 date of the enactment of this Act.

**SEC. 191507. UNITED STATES COORDINATOR FOR GLOBAL HEALTH SECURITY.**

5 (a) IN GENERAL.—The President shall appoint an in-

6 dividual to the position of United States Coordinator for

7 Global Health Security, who shall be responsible for the

8 coordination of the interagency process for responding to

9 global health security emergencies. As appropriate, the

10 designee shall coordinate with the President's Special Co-

11 ordinator for International Disaster Assistance.

12 (b) CONGRESSIONAL BRIEFING.—Not less frequently

13 than twice each year, the employee designated under this

14 section shall provide to the appropriate congressional com-

15 mittees a briefing on the responsibilities and activities of

16 the individual under this section.

**SEC. 191508. SENSE OF CONGRESS.**

18 It is the sense of the Congress that, given the complex

19 and multisectoral nature of global health threats to the

20 United States, the President—

21 (1) should consider appointing an individual

22 with significant background and expertise in public

23 health or emergency response management to the

24 position of United States Coordinator for Global

25 Health Security, as required by ⟦section

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004091

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1787

1 191505(a)], who is an employee of the National Se-
2 curity Council at the level of Deputy Assistant to the
3 President or higher; and

4     (2) in providing assistance to implement the
5 strategy required under [section 191507(a)],
6 should—

7         (A) coordinate, through a whole-of-govern-
8         ment approach, the efforts of relevant Federal
9         departments and agencies to implement the
10         strategy;

11         (B) seek to fully utilize the unique capa-
12         bilities of each relevant Federal department and
13         agency while collaborating with and leveraging
14         the contributions of other key stakeholders; and

15         (C) utilize open and streamlined solicita-
16         tions to allow for the participation of a wide
17         range of implementing partners through the
18         most appropriate procurement mechanisms,
19         which may include grants, contracts, coopera-
20         tive agreements, and other instruments as nec-
21         essary and appropriate.

22 **SEC. 191509. STRATEGY AND REPORTS.**

23     (a) STRATEGY.—The United States Coordinator for
24 Global Health Security (appointed under [section
25 191505(a)]) shall coordinate the development and imple-

DOC_0004092

1788

1 mentation of a strategy to implement the policy aims de-

2 scribed in 【section 191503】, which shall—

3      (1) set specific and measurable goals, bench-

4      marks, timetables, performance metrics, and moni-

5      toring and evaluation plans that reflect international

6      best practices relating to transparency, account-

7      ability, and global health security;

8      (2) support and be aligned with country-owned

9      global health security policy and investment plans

10     developed with input from key stakeholders, as ap-

11     propriate;

12     (3) facilitate communication and collaboration,

13     as appropriate, among local stakeholders in support

14     of a multi-sectoral approach to global health secu-

15     rity;

16     (4) support the long-term success of programs

17     by building the capacity of local organizations and

18     institutions in target countries and communities;

19     (5) develop community resilience to infectious

20     disease threats and emergencies;

21     (6) leverage resources and expertise through

22     partnerships with the private sector, health organi-

23     zations, civil society, nongovernmental organizations,

24     and health research and academic institutions; and

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004093

1789

1    (7) support collaboration, as appropriate, be-
2    tween United States universities, and public and pri-
3    vate institutions in target countries and communities
4    to promote health security and innovation.

5    (b) COORDINATION.—The President, acting through
6    the United States Coordinator for Global Health Security,
7    shall coordinate, through a whole-of-government approach,
8    the efforts of relevant Federal departments and agencies
9    in the implementation of the strategy required under sub-
10   section (a) by—

11   (1) establishing monitoring and evaluation sys-
12   tems, coherence, and coordination across relevant
13   Federal departments and agencies; and

14   (2) establishing platforms for regular consulta-
15   tion and collaboration with key stakeholders and the
16   appropriate congressional committees.

17   (c) STRATEGY SUBMISSION.—

18   (1) IN GENERAL.—Not later than 180 days
19   after the date of the enactment of this Act, the
20   President, in consultation with the head of each rel-
21   evant Federal department and agency, shall submit
22   to the appropriate congressional committees the
23   strategy required under subsection (a) that provides
24   a detailed description of how the United States in-
25   tends to advance the policy set forth in ⟦section

g:\VHLC\051220\051220.072.xml       (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004094

1790

1 191503] and the agency-specific plans described in

2 paragraph (2).

3     (2) AGENCY-SPECIFIC PLANS.—The strategy re-

4 quired under subsection (a) shall include specific im-

5 plementation plans from each relevant Federal de-

6 partment and agency that describes—

7         (A) the anticipated contributions of the de-

8         partment or agency, including technical, finan-

9         cial, and in-kind contributions, to implement

10         the strategy; and

11         (B) the efforts of the department or agen-

12         cy to ensure that the activities and programs

13         carried out pursuant to the strategy are de-

14         signed to achieve maximum impact and long-

15         term sustainability.

16 (d) REPORT.—

17     (1) IN GENERAL.—Not later than 1 year after

18 the date on which the strategy required under sub-

19 section (a) is submitted to the appropriate congres-

20 sional committees under subsection (c), and not later

21 than October 1 of each year thereafter, the Presi-

22 dent shall submit to the appropriate congressional

23 committees a report that describes the status of the

24 implementation of the strategy.

DOC_0004095

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1791

1　　(2) CONTENTS.—The report required under

2　paragraph (1) shall—

3　　　　(A) identify any substantial changes made

4　　　　in the strategy during the preceding calendar

5　　　　year;

6　　　　(B) describe the progress made in imple-

7　　　　menting the strategy;

8　　　　(C) identify the indicators used to establish

9　　　　benchmarks and measure results over time, as

10　　　well as the mechanisms for reporting such re-

11　　　sults in an open and transparent manner;

12　　　　(D) contain a transparent, open, and de-

13　　　tailed accounting of expenditures by relevant

14　　　Federal departments and agencies to implement

15　　　the strategy, including, to the extent prac-

16　　　ticable, for each Federal department and agen-

17　　　cy, the statutory source of expenditures,

18　　　amounts expended, partners, targeted popu-

19　　　lations, and types of activities supported;

20　　　　(E) describe how the strategy leverages

21　　　other United States global health and develop-

22　　　ment assistance programs;

23　　　　(F) assess efforts to coordinate United

24　　　States global health security programs, activi-

25　　　ties, and initiatives with key stakeholders;

DOC_0004096

1792

1       (G) incorporate a plan for regularly review-
2   ing and updating strategies, partnerships, and
3   programs and sharing lessons learned with a
4   wide range of stakeholders, including key stake-
5   holders, in an open, transparent manner; and

6       (H) describe the progress achieved and
7   challenges concerning the United States Gov-
8   ernment's ability to advance the Global Health
9   Security Agenda across priority countries, in-
10   cluding data disaggregated by priority country
11   using indicators that are consistent on a year-
12   to-year basis and recommendations to resolve,
13   mitigate, or otherwise address the challenges
14   identified therein.

15   (e) FORM.—The strategy required under subsection
16 (a) and the report required under subsection (d) shall be
17 submitted in unclassified form but may contain a classi-
18 fied annex.

19 **SEC. 191510. COMPLIANCE WITH THE FOREIGN AID TRANS-**
20 **PARENCY AND ACCOUNTABILITY ACT OF**
21 **2016.**

22   Section 2(3) of the Foreign Aid Transparency and
23 Accountability Act of 2016 (Public Law 114–191; 22
24 U.S.C. 2394c note) is amended—

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004097

1793

1   (1) in subparagraph (C), by striking "and" at

2   the end;

3   (2) in subparagraph (D), by striking the period

4   at the end and inserting "; and"; and

5   (3) by adding at the end the following:

6   "(E) the Global Health Security Act of

7   2020.".

**SEC. 191511. DEFINITIONS.**

9   In this subtitle:

10   (1) APPROPRIATE CONGRESSIONAL COMMIT-

11   TEES.—The term "appropriate congressional com-

12   mittees" means—

13   (A) the Committee on Foreign Affairs and

14   the Committee on Appropriations of the House

15   of Representatives; and

16   (B) the Committee on Foreign Relations

17   and the Committee on Appropriations of the

18   Senate.

19   (2) GLOBAL HEALTH SECURITY.—The term

20   "global health security" means activities supporting

21   epidemic and pandemic preparedness and capabili-

22   ties at the country and global levels in order to mini-

23   mize vulnerability to acute public health events that

24   can endanger the health of populations across geo-

25   graphical regions and international boundaries.

1794

SEC. 191512. SUNSET.

This subtitle (other than section 191507), and the amendments made by this subtitle, shall cease to be effective on December 31, 2024.

# Subtitle C—Securing America From Epidemics Act

SEC. 191513. FINDINGS.

Congress finds the following:

(1) Due to increasing population and population density, human mobility, and ecological change, emerging infectious diseases pose a real and growing threat to global health security.

(2) While vaccines can be the most effective tools to protect against infectious disease, the absence of vaccines for a new or emerging infectious disease with epidemic potential is a major health security threat globally, posing catastrophic potential human and economic costs.

(3) The 1918 influenza pandemic infected 500,000,000 people, or about one-third of the world's population at the time, and killed 50,000,000 people—more than died in the First World War.

(4) The economic cost of an outbreak can be devastating. The estimated global cost today, should an outbreak of the scale of the 1918 influenza pan-

DOC_0004099

1795

1  demic strike, is 5 percent of global gross domestic

2  product.

3      (5) Even regional outbreaks can have enormous

4  human costs and substantially disrupt the global

5  economy and cripple regional economies. The 2014

6  Ebola outbreak in West Africa killed more than

7  11,000 and cost $2,800,000,000 in losses in the af-

8  fected countries alone.

9      (6) The ongoing novel coronavirus outbreak re-

10  flects the pressing need for quick and effective vac-

11  cine and countermeasure development.

12     (7) While the need for vaccines to address

13  emerging epidemic threats is acute, markets to drive

14  the necessary development of vaccines to address

15  them—a complex and expensive undertaking—are

16  very often critically absent. Also absent are mecha-

17  nisms to ensure access to those vaccines by those

18  who need them when they need them.

19     (8) To address this global vulnerability and the

20  deficit of political commitment, institutional capac-

21  ity, and funding, in 2017, several countries and pri-

22  vate partners launched the Coalition for Epidemic

23  Preparedness Innovations (CEPI). CEPI's mission

24  is to stimulate, finance, and coordinate development

25  of vaccines for high-priority, epidemic-potential

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004100

1796

1     threats in cases where traditional markets do not

2     exist or cannot create sufficient demand.

3         (9) Through funding of partnerships, CEPI

4     seeks to bring priority vaccines candidates through

5     the end of phase II clinical trials, as well as support

6     vaccine platforms that can be rapidly deployed

7     against emerging pathogens.

8         (10) CEPI has funded multiple partners to de-

9     velop vaccine candidates against the novel

10     coronavirus, responding to this urgent, global re-

11     quirement.

12         (11) Support for and participation in CEPI is

13     an important part of the United States own health

14     security and biodefense and is in the national inter-

15     est, complementing the work of many Federal agen-

16     cies and providing significant value through global

17     partnership and burden-sharing.

18 **SEC. 191514. AUTHORIZATION FOR UNITED STATES PAR-**

19             **TICIPATION.**

20     (a) IN GENERAL.—The United States is hereby au-

21 thorized to participate in the Coalition for Epidemic Pre-

22 paredness Innovations.

23     (b) PRIVILEGES AND IMMUNITIES.—The Coalition

24 for Epidemic Preparedness Innovations shall be consid-

25 ered a public international organization for purposes of

g:\VHLC\051220\051220.072.xml   (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004101

1797

1 section 1 of the International Organizations Immunities

2 Act (22 U.S.C. 288).

3    (c) REPORTS TO CONGRESS.—Not later than 180

4 days after the date of the enactment of this Act, the Presi-

5 dent shall submit to the appropriate congressional com-

6 mittees a report that includes the following:

7    (1) The United States planned contributions to

8    the Coalition for Epidemic Preparedness Innovations

9    and the mechanisms for United States participation

10    in such Coalition.

11    (2) The manner and extent to which the United

12    States shall participate in the governance of the Co-

13    alition.

14    (3) How participation in the Coalition supports

15    relevant United States Government strategies and

16    programs in health security and biodefense, to in-

17    clude—

18       (A) the Global Health Security Strategy

19       required by section 7058(c)(3) of division K of

20       the Consolidated Appropriations Act, 2018

21       (Public Law 115–141);

22       (B) the applicable revision of the National

23       Biodefense Strategy required by section 1086 of

24       the National Defense Authorization Act for Fis-

25       cal Year 2017 (6 U.S.C. 104); and

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004102

1798

(C) any other relevant decision-making process for policy, planning, and spending in global health security, biodefense, or vaccine and medical countermeasures research and development.

(d) APPROPRIATE CONGRESSIONAL COMMITTEES.— In this section, the term "appropriate congressional committees" means—

(1) the Committee on Foreign Affairs and the Committee on Appropriations of the House of Representatives; and

(2) the Committee on Foreign Relations and the Committee on Appropriations of the Senate.

## Subtitle D—Other Matters

**SEC. 191515. AUTHORIZATION TO EXTEND MILLENNIUM CHALLENGE COMPACTS.**

Notwithstanding the limitation in section 609(j) the Millennium Challenge Act of 2003 (22 U.S.C. 7708), the Millennium Challenge Corporation may extend any compact in effect as of January 29, 2020, for up to one additional year to account for delays related to the spread of coronavirus, if the Corporation provides to the Committee on Foreign Affairs of the House of Representatives and the Committee on Foreign Relations of the Senate a justification prior to providing any such extension.

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004103

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1799

1      # DIVISION T—ADDITIONAL
2      # OTHER MATTERS

3      **SEC. 200001. APPLICATION OF LAW.**

4      Notwithstanding any other provision of law, the pro-

5      hibition under section 213 of the Public Works and Eco-

6      nomic Development Act of 1965 (42 U.S.C. 3153) shall

7      not apply with respect to applications for grants made

8      under this Act or Public Law 116–136.

9      **SEC. 200002. DISASTER RECOVERY OFFICE.**

10     (a) IN GENERAL.—Section 601(d)(2) of the Public

11     Works and Economic Development Act of 1965 (42

12     U.S.C. 3211(d)(2)) is amended—

13          (1) by striking "(2) RELEASE.—" and inserting

14     the following:

15          "(2) RELEASE.—

16               "(A) IN GENERAL.—"; and

17     (2) by adding at the end the following:

18               "(B) REVOLVING LOAN FUND PROGRAM.—

19          The Secretary may release, subject to terms

20          and conditions the Secretary determines appro-

21          priate, the Federal Government's interest in

22          connection with a grant under section 209(d)

23          not less than 7 years after final disbursement

24          of the grant, if—

DOC_0004104

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1800

1          "(i) the recipient has carried out the

2      terms of the award in a satisfactory man-

3      ner;

4          "(ii) any proceeds realized from the

5      release of the Federal Government's inter-

6      est will be used for one or more activities

7      that continue to carry out the economic de-

8      velopment purposes of this Act; and

9          "(iii) the recipient shall provide ade-

10      quate assurance to the Secretary that at

11      all times after release of the Federal Gov-

12      ernment's interest in connection with the

13      grant, the recipient will be responsible for

14      continued compliance with the require-

15      ments of section 602 in the same manner

16      it was responsible prior to release of the

17      Federal Government's interest and that

18      the recipient's failure to comply shall result

19      in the Secretary taking appropriate action,

20      including, but not limited to, rescission of

21      the release and recovery of the Federal

22      share of the grant.".

23      (b) OFFICE OF DISASTER RECOVERY.—Title V of the

24  Public Works and Economic Development Act of 1965 (42

g:\VHLC\051220\051220.072.xml      (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004105

1801

1 U.S.C. 3191 et seq.) is amended by adding at the end

2 the following:

**"SEC. 508. OFFICE OF DISASTER RECOVERY.**

4    "(a) IN GENERAL.—The Secretary shall create an

5 Office of Disaster Recovery to direct and implement the

6 Agency's post-disaster economic recovery responsibilities

7 pursuant to sections 209(c)(2) and 703.

8    "(b) AUTHORIZATION.—The Secretary is authorized

9 to appoint and fix the compensation of such temporary

10 personnel as may be necessary to implement disaster re-

11 covery measures, without regard to the provisions of title

12 5, United States Code, governing appointments in the

13 competitive service.".

14    (c) CLERICAL AMENDMENT.—The table of contents

15 for the Public Works and Economic Development Act of

16 1965 is amended by inserting after the item relating to

17 section 507 the following new item:

"Sec. 508. Office of Disaster Recovery.".

**SEC. 200003. APPLICATION OF BUY AMERICAN.**

19    Chapter 83 of title 41, United States Code, shall not

20 apply with respect to purchases made in response to the

21 emergency declared by the President on March 13, 2020,

22 under section 501 of the Robert T. Stafford Disaster Re-

23 lief and Emergency Assistance Act (42 U.S.C. 5191) and

24 under any subsequent major disaster declaration under

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004106

1802

1 section 401 of such Act that supersedes such emergency

2 declaration.

**SEC. 200004. PREMIUM PAY AUTHORITY.**

4 (a) IN GENERAL.—If services performed during cal-

5 endar year 2020 or 2021 are determined by the head of

6 the agency to be primarily related to response or recovery

7 operations arising out of an emergency or major disaster

8 declared pursuant to the Robert T. Stafford Disaster Re-

9 lief and Emergency Assistance Act (42 U.S.C. 5121 et

10 seq.), any premium pay that is funded, either directly or

11 through reimbursement, by the Federal Emergency Man-

12 agement Agency shall be exempted from the aggregate of

13 basic pay and premium pay calculated under section

14 5547(a) of title 5, United States Code, and any other pro-

15 vision of law limiting the aggregate amount of premium

16 pay payable on a biweekly or calendar year basis.

17 (b) OVERTIME AUTHORITY.—Any overtime that is

18 funded for such services described in subsection (a), either

19 directly or through reimbursement, by the Federal Emer-

20 gency Management Agency shall be exempted from any

21 annual limit on the amount of overtime payable in a cal-

22 endar or fiscal year.

23 (c) APPLICABILITY OF AGGREGATE LIMITATION ON

24 PAY.—In determining whether an employee's pay exceeds

25 the applicable annual rate of basic pay payable under sec-

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004107

1803

1 tion 5307 of title 5, United States Code, the head of an

2 Executive agency shall not include pay exempted under

3 this section.

4    (d) LIMITATION OF PAY AUTHORITY.—Pay exempted

5 from otherwise applicable limits under subsection (a) shall

6 not cause the aggregate pay earned for the calendar year

7 in which the exempted pay is earned to exceed the rate

8 of basic pay payable for a position at level II of the Execu-

9 tive Schedule under section 5313 of title 5, United States

10 Code.

11    (e) EFFECTIVE DATE.—This section shall take effect

12 as if enacted on January 1, 2020.

**SEC. 200005. COST SHARE.**

14    Assistance provided under the emergency declaration

15 issued by the President on March 13, 2020, pursuant to

16 section 501(b) of the Robert T. Stafford Disaster Relief

17 and Emergency Assistance Act (42 U.S.C. 5191(b)), and

18 under any subsequent major disaster declaration under

19 section 401 of such Act (42 U.S.C. 5170) that supersedes

20 such emergency declaration, shall be at a 100 percent

21 Federal cost share.

**SEC. 200006. CLARIFICATION OF ASSISTANCE.**

23    (a) IN GENERAL.—For the emergency declared on

24 March 13, 2020 by the President under section 501 of

25 the Robert T. Stafford Disaster Relief and Emergency As-

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004108

1804

1   sistance Act (42 U.S.C. 5191), the President may provide

2   assistance for activities, costs, and purchases of States or

3   local governments or the owners or operators of eligible

4   private nonprofit organizations, including—

5       (1) activities eligible for assistance under sec-

6   tions 301, 415, 416, and 426 of the Robert T. Staf-

7   ford Disaster Relief and Emergency Assistance Act

8   (42 U.S.C. 5141, 5182, 5183, 5189d);

9       (2) backfill costs for first responders and other

10  essential employees who are ill or quarantined;

11      (3) increased operating costs for essential gov-

12  ernment services due to such emergency, including

13  costs for implementing continuity plans, and shel-

14  tering or housing for first responders, emergency

15  managers, health providers and other essential em-

16  ployees;

17      (4) costs of providing guidance and information

18  to the public and for call centers to disseminate such

19  guidance and information;

20      (5) costs associated with establishing and oper-

21  ating virtual services;

22      (6) costs for establishing and operating remote

23  test sites;

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004109

1805

1    (7) training provided specifically in anticipation

2    of or in response to the event on which such emer-

3    gency declaration is predicated;

4    (8) personal protective equipment and other

5    critical supplies for first responders and other essen-

6    tial employees;

7    (9) medical equipment, regardless of whether

8    such equipment is used for emergency or inpatient

9    care;

10    (10) public health costs, including provision and

11    distribution of medicine and medical supplies;

12    (11) costs associated with maintaining alternate

13    care facilities or related facilities currently inactive

14    but related to future needs tied to the ongoing pan-

15    demic event;

16    (12) costs of establishing and operating shelters

17    and providing services, including transportation, that

18    help alleviate the need of individuals for shelter, in-

19    cluding individuals transitioning out of detention;

20    and

21    (13) costs of procuring and distributing food to

22    individuals affected by the pandemic through net-

23    works established by State, local, or Tribal govern-

24    ments or other organizations, including restaurants

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004110

1806

1    and farms, and for the purchase of food directly

2    from food producers and farmers.

3    (b) APPLICATION TO SUBSEQUENT MAJOR DIS-

4  ASTER.—The activities described in subsection (a) may

5  also be eligible for assistance under any major disaster de-

6  clared by the President under section 401 of such Act (42

7  U.S.C. 5170) that supersedes the emergency declaration

8  described in such subsection.

9    (c) FINANCIAL ASSISTANCE FOR FUNERAL EX-

10  PENSES.—For any emergency or major disaster described

11  in subsection (a) or subsection (b), the President shall pro-

12  vide financial assistance to an individual or household to

13  meet disaster-related funeral expenses under section

14  408(e)(1) of such Act (42 U.S.C. 5174(e)).

15    (d) ADVANCED ASSISTANCE.—In order to facilitate

16  activities under this section, the Administrator of the Fed-

17  eral Emergency Management Agency may provide assist-

18  ance in advance to an eligible applicant if a failure to do

19  so would prevent the applicant from carrying out such ac-

20  tivities.

21    (e) RULE OF CONSTRUCTION.—Nothing in this sec-

22  tion shall be construed to make ineligible any assistance

23  that would otherwise be eligible under section 403, 408,

24  or 502 of such Act (42 U.S.C. 5170b, 5174, 5192).

g:\VHLC\051220\051220.072.xml    (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004111

1807

### SEC. 200007. SAFETY UPGRADES IN GSA FACILITIES.

1    (a) FACILITY SAFETY UPGRADES.—Not later than
2    60 days after the date of enactment of this Act, the Ad-
3    ministrator of the General Services Administration shall
4    take such actions as are necessary to prevent airborne
5    transmission of COVID–19 through air conditioning,
6    heating, ventilating, and water systems in facilities owned
7    or leased by the General Services Administration to ensure
8    safe and healthy indoor environments for Federal employ-
9    ees.

10    (b) PRIORITIES.—Any projects carried out by the Ad-
11    ministrator to carry out this section shall prioritize indoor
12    air and water environmental quality in facilities and en-
13    ergy-saving building technologies and products.

### SEC. 200008. NON-FEDERAL TENANTS IN GSA FACILITIES.

14    (a) PROHIBITION ON REFERRAL TO DEBT COLLEC-
15    TION AGENCIES.—Administrator of the General Services
16    Administration may not refer any non-Federal tenants of
17    facilities owned by the Administration to a debt collection
18    agency during the national emergency declared by the
19    President under the National Emergencies Act (50 U.S.C.
20    1601 et seq.) relating to COVID–19.

21    (b) REPORT ON RENT DEFERRAL REQUESTS.—Not
22    later than 30 days after the date of enactment of this Act,
23    the Administrator of the General Services Administration
24    shall submit to Congress a report containing all requests

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004112

1808

1  for rent deferrals related to COVID–19 from non-Federal

2  tenants of facilities owned by the Administration.

**SEC. 200009. TRANSIT COVID–19 REQUIREMENTS.**

4    (a) IN GENERAL.—For the duration of the national

5  emergency declared by the President under the National

6  Emergencies Act (50 U.S.C. 1601 et seq.) related to the

7  pandemic of SARS–CoV–2 or coronavirus disease 2019

8  (COVID–19), recipients of funds under section 5307 of

9  title 49, United States Code, that serve an urbanized area

10  with a population of at least 500,000 individuals and that

11  provided a minimum of 20,000,000 unlinked passenger

12  trips in the most recent year for which data is available

13  shall—

14        (1) require each passenger to wear a mask or

15    protective face covering while on board a public

16    transportation vehicle;

17        (2) provide masks or protective face coverings,

18    gloves, and hand santizer and wipes with sufficient

19    alcohol content to operators, station managers, and

20    other employees or contractors whose job respon-

21    sibilities include interaction with passengers;

22        (3) ensure public transportation vehicles oper-

23    ated by such public transportation provider are

24    cleaned, disinfected, and sanitized frequently in ac-

25    cordance with Centers for Disease Control and Pre-

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004113

1809

1  vention guidance and ensure that employees or con-

2  tractors whose job responsibilities involve such clean-

3  ing, disinfecting, or sanitizing are provided masks or

4  protective face coverings and gloves;

5  (4) ensure stations and enclosed facilities

6  owned, operated, or used by such public transpor-

7  tation provider, including facilities used for training

8  or performance of indoor maintenance, repair, or

9  overhaul work, are cleaned, disinfected, and sani-

10  tized frequently in accordance with Centers for Dis-

11  ease Control and Prevention guidance and ensure

12  that employees or contractors whose job responsibil-

13  ities include such cleaning, disinfecting, or sanitizing

14  are provided masks or other protective face cov-

15  erings and gloves; and

16  (5) establish guidelines, or adhere to applicable

17  guidelines, for notifying employees of a confirmed

18  COVID–19 diagnosis of an employee of such public

19  transportation provider.

20  (b) IMPLEMENTATION.—The implementation of the

21  requirement under subsection (a)(1) shall be carried out

22  in a manner determined by the provider of public trans-

23  portation.

24  (c) AVAILABILITY.—If a provider of public transpor-

25  tation is unable to acquire any of the items needed to com-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004114

G:\CMTE\AP\16\FY20\_D\HEROES.XML

1810

1 ply with paragraph (2), (3), or (4) of subsection (a) due

2 to market unavailability, such provider shall—

3     (1) prepare and make public documentation

4     demonstrating what actions have been taken to ac-

5     quire such items; and

6     (2) continue efforts to acquire such items until

7     they become available.

8 **SEC. 200010. REGULATION OF ANCHORAGE AND MOVEMENT**

9         **OF VESSELS DURING NATIONAL EMERGENCY.**

10     Section 70051 of title 46, United States Code, is

11 amended—

12     (1) in the section heading by inserting "**or**

13     **public health emergency**" after "**national**

14     **emergency**";

15     (2) by inserting "or whenever the Secretary of

16     Health and Human Services determines a public

17     health emergency exists," after "international rela-

18     tions of the United States";

19     (3) by inserting "or to ensure the safety of ves-

20     sels and persons in any port and navigable water-

21     way," after "harbor or waters of the United States";

22     (4) by inserting "or public health emergency,"

23     after "subversive activity"; and

24     (5) by inserting "or to ensure the safety of ves-

25     sels and persons in any port and navigable water-

DOC_0004115

1811

1    way,'' after ''injury to any harbor or waters of the

2    United States,''.

**SEC. 200011. MSP OPERATING VESSELS.**

4        Notwithstanding part 296 of title 46, Code of Federal

5    Regulations, until December 31, 2020, or upon the written

6    determination of the Secretary of Transportation until

7    June 31, 2021, the operator of a vessel operating such

8    vessel under an MSP Operating Agreement (as such term

9    is defined in section 296.2 of title 46, Code of Federal

10    Regulations)—

11        (1) shall not be required to comply with any re-

12        quirement with respect to operating days (as such

13        term is defined in such section) contained in such

14        agreement; and

15        (2) shall maintain such vessel in a state of

16        operational readiness, including through the employ-

17        ment of the vessel's crew complement, until the ap-

18        plicable date.

**SEC. 200012. EXTENSION OF PERIOD OF PERFORMANCE**

**FOR LIBRARY OF CONGRESS SEVERABLE**

**SERVICE CONTRACTS.**

22        (a) EXTENSION.—Notwithstanding sections 3902(a)

23    and 3904(b) of title 41, United States Code, if the per-

24    formance or delivery of services procured under a sever-

g:\VHLC\051220\051220.072.xml        (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004116

1812

1  able service contract of the Library of Congress is delayed

2  or otherwise affected by the COVID–19 Pandemic—

3      (1) the period for the performance or delivery

4      of services under the contract may be extended for

5      an additional period not exceeding 12 months; and

6      (2) funds shall remain available for obligation

7      and expenditure under the contract until the per-

8      formance or delivery of the services is completed.

9  (b) CONTRACTS COVERED.—This section applies with

10  respect to contracts for services procured for a period be-

11  ginning in fiscal year 2019 or fiscal year 2020.

12  **SEC. 200013. COVERAGE OF COMMUTING EXPENSES UNDER**

13  **AUTHORITY OF ARCHITECT OF THE CAPITOL**

14  **TO MAKE EXPENDITURES IN RESPONSE TO**

15  **EMERGENCIES.**

16  (a) COVERAGE OF COMMUTING EXPENSES.—Section

17  1305(a)(2) of the Legislative Branch Appropriations Act,

18  2010 (2 U.S.C. 1827(a)(2)) is amended by inserting after

19  "refreshments," the following: "transportation and other

20  related expenses incurred by employees in commuting be-

21  tween their residence and their place of employment,".

22  (b) EFFECTIVE DATE.—The amendment made by

23  subsection (a) shall apply with respect to fiscal year 2020

24  and each succeeding fiscal year.

g:\VHLC\051220\051220.072.xml     (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004117

1813

## SEC. 200014. REPORTS ON SUICIDE AMONG MEMBERS OF THE ARMED FORCES DURING THE COVID–19 PUBLIC HEALTH EMERGENCY.

1 (a) REPORT REQUIRED.—Not later than 90 days
2 after the date of the enactment of this Act, and monthly
3 thereafter through December 31, 2021, the Secretary of
4 Defense shall submit to the congressional defense commit-
5 tees a report on suicide among members of the Armed
6 Forces during the covered public health emergency.

7 (b) ELEMENTS.—Each report under subsection (a)
8 shall include, with respect to the months covered by the
9 report, the following:

10 (1) Incidents of suicide, attempted suicide, and
11 suicidal ideation by a member of the Armed Forces,
12 including the reserve components, listed by Armed
13 Force.

14 (2) The incidents identified under paragraph
15 (1) that occurred during a period of active service by
16 a member in support of—

17 (A) a contingency operation; or

18 (B) an operation in response to a covered
19 public health emergency.

20 (3) With respect to the member involved in
21 each incident identified under paragraph (2):

22 (A) Gender.

23 (B) Age.

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004118

1814

1          (C) Rank.

2          (D) Method of suicide or attempted sui-

3       cide.

4          (4) Elements of a research agenda for the De-

5       partment of Defense to establish suicide prevention

6       treatment and risk communication for members of

7       the Armed Forces that is—

8          (A) evidence-based;

9          (B) effective; and

10         (C) designed to apply to a covered public

11      health emergency.

12   (c) DEFINITIONS.—In this section:

13         (1) The terms ''active service'', ''congressional

14      defense committees'', and ''contingency operation''

15      have the meanings given those terms in section 101

16      of title 10, United States Code.

17         (2) The term ''covered public health emer-

18      gency'' means the declaration—

19             (A) of a public health emergency, based on

20          an outbreak of COVID–19, by the Secretary of

21          Health and Human Services under section 319

22          of the Public Health Service Act (42 U.S.C.

23          247d); or

g:\VHLC\051220\051220.072.xml          (763351l3)
May 12, 2020 (12:13 p.m.)

DOC_0004119

1815

         (B) of a domestic emergency, based on an outbreak of COVID–19, by the President or the Secretary of Homeland Security.

**SEC. 200015. MODIFICATION TO MAINTENANCE OF EFFORT REQUIREMENT FOR TEMPORARY INCREASE IN MEDICAID FMAP.**

         (a) IN GENERAL.—Section 6008(b)(1) of the Families First Coronavirus Response Act (42 U.S.C. 1396d note) is amended by inserting ", or as signed into State law on April 15, 2020, and taking effect in State law on April 3, 2020" after "January 1, 2020".

         (b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect as if included in the enactment of the Families First Coronavirus Response Act.

DOC_0004120

```xml
<?xml version="1.0" encoding="UTF-8"?>

<?xml-stylesheet href="\billres.xsl" type="text/xsl"?>

<!DOCTYPE bill PUBLIC "-//US Congress//DTDs/bill v2.8 20020720//EN"
"http://xml.house.gov/bill.dtd">

<bill bill-stage="Pre-Introduction" dms-id="HEB8900E3427C4BF5BE98CE35ACBC0140" public-
private="public" key="H" bill-type="olc">

<pre-form> <meta-house><holc-filename>G:\CMTE\AP\16\FY20\_D\HEROES.XML</holc-
filename><holc-attorney>XXXXXXXXXXXXXX</holc-attorney><holc-last-author>XXXXXXXX</holc-
last-author><holc-last-saved>5/12/2020 12:10</holc-last-saved><holc-
creator>XXXXXXXXXXXXXX</holc-creator><holc-creation-date>05/12/2020 10:24</holc-
creation-date><version><version-filename>XXXXXXXXXXXXXXXXXXXXXXXXXXXX</version-
filename><version-date>XXXXXXXXXXXXXXXXXX</version-date><version-
creator>XXXXXXXX</version-creator></version> <holc-job-number/><holc-doc-
number>763351|3</holc-doc-number> </meta-house>

<author-note display="no"><?xm-replace_text {author-note}?></author-note>

<running-header display="no">[Discussion Draft]</running-header>

<legis-counsel/> <reintroduction-code display="no"><?xm-replace_text {reintroduction-
code}?></reintroduction-code>

<signature-line display="yes">(Original Signature of Member)</signature-line>

<first-page-header display="no">[DISCUSSION DRAFT]</first-page-header>

<first-page-date><?xm-replace_text {first-page-date}?></first-page-date>

<first-page-desc display="no"><?xm-replace_text {first-page-desc}?></first-page-desc>

</pre-form>

<form>

<distribution-code display="no">I</distribution-code>

<congress>116th CONGRESS</congress> <session>2d Session</session>

<legis-num>H. R. __</legis-num>

<current-chamber>IN THE HOUSE OF REPRESENTATIVES</current-chamber>

<action>

<action-date><?xm-replace_text {action-date}?></action-date>

<action-desc><sponsor name-id="L000480">Mrs. Lowey</sponsor> (for herself, <cosponsor
name-id="E000179">Mr. Engel</cosponsor>, <cosponsor name-id="M000087">Mrs. Carolyn B.
Maloney of New York</cosponsor>, <cosponsor name-id="N000002">Mr. Nadler</cosponsor>,
<cosponsor name-id="P000034">Mr. Pallone</cosponsor>, <cosponsor name-id="S000185">Mr.
Scott of Virginia</cosponsor>, <cosponsor name-id="T000472">Mr. Takano</cosponsor>,
<cosponsor name-id="V000081">Ms. Velázquez</cosponsor>, and <cosponsor name-
id="W000187">Ms. Waters</cosponsor>) introduced the following bill; which was referred
to the Committee on _____</action-desc>

</action>

<legis-type>A BILL</legis-type>

<official-title>Making emergency supplemental appropriations for the fiscal year ending
September 30, 2020, and for other purposes.</official-title>

</form>

<legis-body id="HF4243B19C75D4ED7AF481E758E5FA600" style="appropriations">

<section id="H78A2F76A678B48D89E21DEE438E66575" section-type="section-
one"><enum>1.</enum><header>Short Title</header><text display-inline="no-display-
inline">This Act may be cited as the <quote>Health and Economic Recovery Omnibus
Emergency Solutions Act</quote> or the <quote><short-title>HEROES Act</short-
```

title></quote>.</text></section>

<section id="HF600732082E74EADB1258DACDB642561"><enum>2.</enum><header>Table of Contents</header><text display-inline="no-display-inline">The table of contents is as follows:</text>

<toc container-level="legis-body-container" quoted-block="no-quoted-block" lowest-level="title" regeneration="yes-regeneration" lowest-bolded-level="division-lowest-bolded">

<toc-entry idref="HA72F077CFF3247EDB460902B45096002" level="division">Division Aâ€"Coronavirus Recovery Supplemental Appropriations Act, 2020</toc-entry>

<toc-entry idref="HE0994C3359CD4C83A7F27A688EDC4ECB" level="division">Division Bâ€"Revenue provisions</toc-entry>

<toc-entry idref="H49E85CD55CDC4674AE405BA44B4085E5" level="section">Title Iâ€"Economic stimulus</toc-entry>

<toc-entry idref="HAADE90AE654B4B9AAB8D529FF751548B" level="section">Title IIâ€"Additional relief for workers</toc-entry>

<toc-entry idref="HD1CD736DAF724343AFAD4CE22395A560" level="section">Title IIIâ€"Net operating losses</toc-entry>

<toc-entry idref="H138444CCAF65492BB387BBABDE9AE2F0" level="division">Division Câ€"Health Provisions</toc-entry>

<toc-entry idref="H56086FE2BDD74D11BBD20BD7B0D20B20" level="section">Title Iâ€"Medicaid Provisions</toc-entry>

<toc-entry idref="HEF79628CC45147A7B43046DEBAFE87E8" level="section">Title IIâ€"Medicare Provisions</toc-entry>

<toc-entry idref="HAA46E835D5554603B467E20B02EAE2E3" level="section">Title IIIâ€"Private Insurance Provisions</toc-entry>

<toc-entry idref="H6F635B2EDD64422FB882F4D7584A8E4A" level="section">Title IVâ€"Application to Other Health Programs</toc-entry>

<toc-entry idref="H7FFF8DF85971422DBA772663178BE4A1" level="section">Title Vâ€"Public Health Policies</toc-entry>

<toc-entry idref="H6C97ABAA3BED419E964A9B81B31749DB" level="section">Title VIâ€"Public Health Assistance</toc-entry>

<toc-entry idref="H8288223BC68D4195AD7ECE5395AC97E3" level="division">Division Dâ€"Retirement Provisions</toc-entry>

<toc-entry idref="H2BDE1EF759EE4FECB068B097810DC14B" level="section">Title Iâ€"Relief for Multiemployer Pension Plans</toc-entry>

<toc-entry idref="HA57126E7C0E14E3EBC39563E39349622" level="section">Title IIâ€"Relief for Single Employer Pension Plans</toc-entry>

<toc-entry idref="HD0641906946544E3BBDDE49F63CA8FC6" level="section">Title IIIâ€"Other Retirement Related Provisions</toc-entry>

<toc-entry idref="H68B1FE69E0D84C00B51CB118E2E6F3F5" level="division">Division Eâ€"Continued Assistance to Unemployed Workers</toc-entry>

<toc-entry idref="HD1915CAB00D54DA49796249F17BF6802" level="division">Division Fâ€"Assistance to Agricultural Producers and Other Matters Relating to Agriculture</toc-entry>

<toc-entry idref="H9445461E1C1D4E209A71EACF28B6395B" level="section">Title Iâ€"Livestock </toc-entry>

<toc-entry idref="HBD6C8E3A730143AB93651ED09510D07D" level="section">Title IIâ€"Dairy</toc-entry>

<toc-entry idref="H47A01CFEFB8B4A379B8C92B8447E8B55" level="section">Title IIIâ€"Specialty Crops and Other Commodities</toc-entry>

<toc-entry idref="H255067E960FD4C5D8437450C28CA0B63" level="section">Title IVâ€"Commodity Credit Corporation</toc-entry>

<toc-entry idref="H4DE09269BC064FE5A9E6421E77127262" level="section">Title Vâ€"Conservation</toc-entry>

<toc-entry idref="H13A388CEBBE54831969AB4C3BBAE02A5" level="section">Title VIâ€"Nutrition</toc-entry>

<toc-entry idref="H8BB36C1E5582429A9ED2DFE226EDFDD5" level="division">Division Gâ€"Accountability and Government Operations</toc-entry>

<toc-entry idref="HAFCCC28F1A4440AE9343E62F938B9480" level="section">Title Iâ€"Accountability</toc-entry>

<toc-entry idref="H32DE998B7CF34E7D81C4AEC07B21DE20" level="section">Title IIâ€"Census Matters</toc-entry>

<toc-entry idref="H7DD098A39F584C9FBAB271CFF8D1C153" level="section">Title IIIâ€"Federal Workforce</toc-entry>

<toc-entry idref="HF1E6EE74DF6B4C41BFAA4A4ACAB99E01" level="section">Title IVâ€"Federal Contracting Provisions</toc-entry>

<toc-entry idref="HE4ECE4AC56F74F08ACDC59A29682A1BF" level="section">Title Vâ€"District of Columbia</toc-entry>

<toc-entry idref="H3AAAB5D1B2414744A8B3F2229B0720EF" level="section">Title VIâ€"Other Matters</toc-entry>

<toc-entry idref="HE61D258AAD134F72B2BEB0070D5A70E5" level="division">Division Hâ€"Veterans and Servicemembers Provisions</toc-entry>

<toc-entry idref="H0CEA8028DCF34CC398C54FE09ABB9BEB" level="division">Division Iâ€"Small Business Provisions</toc-entry>

<toc-entry idref="H48AA0242B51C42549BC36CD03764526D" level="division">Division Jâ€"Support for Essential Workers, At-Risk Individuals, Families, and Communities</toc-entry>

<toc-entry changed="not-changed" idref="H0DFC3D32C9A9479296B1C897AB232BEF" level="section">Title Iâ€"Family Care for Essential Workers</toc-entry>

<toc-entry changed="not-changed" idref="H9C9FDF3AB3E4486BBC9B16878E8A0D42" level="section">Title IIâ€"Pandemic Emergency Assistance and Services</toc-entry>

<toc-entry idref="H67E3E6A780C943EB85A473F224A7BD1B" level="section">Title IIIâ€"Program flexibility during the pandemic</toc-entry>

<toc-entry idref="HECD6F85591DD469DBFD223A8EE9272BE" level="division">Division Kâ€"COVIDâ€"19 HERO Act</toc-entry>

<toc-entry idref="H6F1067FB71E4498BACB9C670176A72E1" level="section">Title Iâ€"Providing Medical Equipment for First Responders and Essential Workers</toc-entry>

<toc-entry idref="H749056055B2743BDB97990353520F89F" level="section">Title IIâ€"Protecting Renters and Homeowners from Evictions and Foreclosures</toc-entry>

<toc-entry idref="H09A3873C0FC641FD9865649F2917445F" level="section">Title IIIâ€"Protecting People Experiencing Homelessness</toc-entry>

<toc-entry idref="HD8942584BA52467DA1A80AC93D0EDDBB" level="section">Title IVâ€"Suspending Negative Credit Reporting and Strengthening Consumer and Investor Protections</toc-entry>

<toc-entry idref="HE710E91E76DB49B8B013706BF523C232" level="section">Title Vâ€"Forgiving Student Loan Debt and Protecting Student Borrowers</toc-entry>

<toc-entry idref="H5CE1C586A6A84D46A102523DFBCE18EF" level="section">Title VIâ€"Standing Up For Small Businesses, Minority-Owned Businesses, and Non-Profits</toc-entry>

<toc-entry idref="HF10206FDB7A34E1EB557C0AA6557C830" level="section">Title VIIâ€"Empowering Community Financial Institutions</toc-entry>

```
<toc-entry idref="H74ED5E34D9454CE5A2C5C2C3E90BC5A1" level="section">Title
VIIIâ€"Providing Assistance for State, Territory, Tribal, and Local Governments</toc-
entry>

<toc-entry idref="H5DAF726298B246919017F3BC90135014" level="section">Title
IXâ€"Providing Oversight and Protecting Taxpayers</toc-entry>

<toc-entry idref="H138EA6F4319B4B7EAF7DA63AEABCE45F" level="division">Division
Lâ€"Families, Workers, and Community Support Provisions</toc-entry>

<toc-entry idref="H6FBE7BA01A6D4A229EC897F24F94E9D5" level="section">Title
Iâ€"Amendments to Emergency Family and Medical Leave Expansion Act and Emergency Paid
Sick Leave Act</toc-entry>

<toc-entry idref="HCF061496C15E477DB0673E1254EE0CD6" level="section">Title
IIâ€"COVIDâ€"19 Workforce Development Response Activities</toc-entry>

<toc-entry idref="H9980F261F281451E8238FCCC7C35C581" level="section">Title
IIIâ€"COVIDâ€"19 Every Worker Protection Act of 2020</toc-entry>

<toc-entry idref="H4F9F38FE4C444BB084B7293A2FADA48B" level="section">Title
IVâ€"Community and Family Support</toc-entry>

<toc-entry idref="H60AB94A7871F4E0A9FE8B1B47FA78AB6" level="section">Title
Vâ€"COVIDâ€"19 Protections under Longshore and Harbor Workersâ€™ Compensation Act</toc-
entry>

<toc-entry idref="H87AE4E10E43148BD884E3138BA55FE1F" level="division">Division
Mâ€"Consumer Protection and Telecommunications Provisions</toc-entry>

<toc-entry idref="H289213B71ECB4CBAADF31AF471916659" level="section">Title
Iâ€"COVIDâ€"19 Price Gouging Prevention</toc-entry>

<toc-entry idref="HF4ED2A3611C24B81A24CD301356E2BCD" level="section">Title
IIâ€"Eâ€"Rate Support for Wi-Fi Hotspots, Other Equipment, and Connected Devices</toc-
entry>

<toc-entry idref="HB620586BD56748DB89E836562C948801" level="section">Title
IIIâ€"Emergency Benefit for Broadband Service</toc-entry>

<toc-entry idref="HF4B025B33F954AA29D4514EA0449229F" level="section">Title
IVâ€"Continued Connectivity</toc-entry>

<toc-entry idref="H7E24067A01794B3EAA0E6441E16277DF" level="section">Title Vâ€"Donâ€™t
Break Up the Tâ€"Band</toc-entry>

<toc-entry idref="H82CD792AA8604D548AA34846FAF4AF4E" level="section">Title
VIâ€"National Suicide Hotline Designation</toc-entry>

<toc-entry idref="H9624018422294049A1812570163F2D4A" level="section">Title
VIIâ€"COVIDâ€"19 Compassion and Martha Wright Prison Phone Justice</toc-entry>

<toc-entry idref="H29D09BA3ACFA4B9E8D2BA8EF712550FB" level="section">Title
VIIIâ€"Healthcare Broadband Expansion During COVIDâ€"19</toc-entry>

<toc-entry idref="HFE91D681B92F48368718FF5A16E185BF" level="division">Division
Nâ€"Giving Retirement Options to Workers Act</toc-entry>

<toc-entry idref="H66CEDABF6E9A48478B37683BFBF07BEF" level="division">Division
Oâ€"Education Provisions and Other Programs</toc-entry>

<toc-entry idref="HC3023608B2984565A0D890CB0F9975D3" level="section">Title Iâ€"Higher
Education Provisions</toc-entry>

<toc-entry idref="H6EACF8F35791451EAECBC00C580E620B" level="section">Title IIâ€"Other
Programs</toc-entry>

<toc-entry idref="H7EB54B8C73074D65BB95428B4866B817" level="division">Division
Pâ€"ACCESS Act</toc-entry>

<toc-entry idref="H49468F96DE0447B8AABA7367E6EED1B8" level="division">Division
Qâ€"COVIDâ€"19 Heroes Fund</toc-entry>

<toc-entry idref="H86729DED2BB7491BAC825C55C4B93B32" level="section">Title
```