**JEFF LANDRY**
  **ATTORNEY GENERAL OF LOUISIANA**
JOSEPH S. ST. JOHN (*pro hac vice pending*)
  *Deputy Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 485-2458
stjohnj@ag.louisiana.gov@ag.louisiana.gov
*Attorney for the State of Louisiana*

**LYNN FITCH**
  **ATTORNEY GENERAL OF MISSISSIPPI**
KRISSY C. NOBILE (*pro hac vice forthcoming*)
  *Deputy Solicitor General*
OFFICE OF MISSISSIPPI ATTORNEY
  GENERAL LYNN FITCH
P.O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
krissy.nobile@ago.ms.gov
*Attorney for the State of Mississippi*

**BENBROOK LAW GROUP, P.C.**
BRADLEY A. BENBROOK (CA 177786)
STEPHEN M. DUVERNAY (CA 250957)
400 Capitol Mall, Suite 2530
Sacramento, CA 95814
Tel: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com
*Counsel for State Intervenors*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| NATIONAL URBAN LEAGUE *et al* <br><br> Plaintiffs, <br><br> v. <br><br> WILBUR L. ROSS *et al*, <br><br> Defendants. | No. 5:20-cv-05799-LHK <br><br> **NOTICE OF MOTION AND MOTION TO INTERVENE BY STATES OF LOUISIANA AND MISSISSIPPI** <br><br> Hr'g Date: TBD <br> Hr'g Time: TBD <br> Judge: Hon. Lucy H. Koh <br> Location: San Jose Courthouse, Courtroom 8 <br><br> Action Filed: Aug. 18, 2020 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that pursuant to Local Rule 7-1(b), the States of Louisiana and Mississippi (collectively, "State Intervenors") respectfully move to intervene as Defendants in the above-captioned litigation without oral argument and on an expedited basis. Alternatively, the State Intervenors notice that on October 29, 2020, at 1:30 p.m., before the Hon. Lucy H. Koh, 280 South 1st Street, San Jose, or such other time as the Court may order, the State Intervenors will and do hereby move for the same relief.

This motion is brought pursuant to Federal Rule of Civil Procedure 24. As more fully set forth in the accompanying memorandum, the grounds for the motion are: (a) the motion is timely; (b) the State Intervenors have significant protectable interests; (c) this action has already impeded the State Intervenors' ability to protect those interests, and the disposition of this action could further impede the State Intervenors' ability to protect those interests; (d) the current parties do not adequately represent the interests of the State Intervenors; and (e) a separate lawsuit to protect the State Intervenors' interests would plainly involves common questions of law and fact with this action, and their direct opposition to Plaintiffs' claims satisfies the "common question" requirement for permissive intervention. Federal Courts have repeatedly permitted States to intervene in disputes over the census, *see, e.g.*, *Utah v. Evans*, 536 U.S. 452, 459 (2002), and this Court should do so here.

This motion is based on this motion and the supporting memorandum below; the accompanying Declaration of Joseph S. St. John; and any further papers filed in support of this motion, the argument of counsel, and all pleadings and records on file in this matter.

**PLEASE TAKE FURTHER NOTICE** that counsel for Louisiana contacted counsel for the parties via email on September 22, 2020. Defendants responded: "Defendants consent, but respectfully urge the Court not to delay resolution of Plaintiffs' motion for a preliminary injunction." Plaintiffs responded but did not provide a position. *See* Exh. 16.

**PLEASE TAKE FURTHER NOTICE that State Intervenors urge that this motion not delay the Court's issuance or denial of a preliminary injunction**.

**PLEASE TAKE FURTHER NOTICE** that State Intervenors' proposed answer is attached.

# MEMORANDUM IN SUPPORT

## BACKGROUND

### THE DECENNIAL CENSUS

The Constitution requires the federal government to conduct a census every ten years:

> Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons. The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct.

U.S. Const. art. I, § 2.

Consistent with its express constitutional authority to regulate the "manner" of the census, Congress requires that the Secretary of Commerce, with the aid of the Census Bureau, "**shall**, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April." 13 U.S.C. § 141(a) (emphasis added). The resulting "tabulation of total population by States . . . **shall** be completed within 9 months after the census date and reported by the Secretary to the President of the United States." *Id.* at § 141(b) (emphasis added). The President must then transmit to Congress the tabulation of total population and the number of representatives to which each State is entitled:

> On the first day, or within one week thereafter, of the first regular session of the Eighty-second Congress and of each fifth Congress thereafter, the President **shall** transmit to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the seventeenth and each subsequent decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions, no State to receive less than one Member.

2 U.S.C. § 2a (emphasis added). Additional apportionment and redistricting-related tabulations "**shall** . . . be completed, reported, and transmitted to each respective State within one year after the decennial census date." 13 U.S.C. § 141(c) (emphasis added). In short, Congress has imposed a series of clear, mandatory deadlines, starting December 31, 2020, for the Secretary and the President to provide census tabulations to Congress and the States.

THE 2020 CENSUS

On or about December 31, 2018, the Census Bureau released Version 4.0 of its Operation Plan. Exh. 1. The plan contemplated ceasing census data collection at the end of July 2020, *id.* at 108, 129, followed by post-processing. But the plan also contemplated "late operational design changes," *i.e.*, "design changes [that] are required following the completion of key planning and development milestones." *Id.* at 175. The announced mitigation strategies for such late design changes included "[p]repar[ing] for rapid response to address potential changes and make decisions based on the results of the change-control process." *Id.* at 176. The plan further contemplated impacts from exogenous limitations on staffing and operations, and included mitigation strategies for those limitations, too. *Id.* at 141, 176.

Consistent with its Operation Plan, the Census Bureau began data collection in 2020. But on March 13, the President declared a national emergency based on the outbreak of COVID-19 and the resulting strain on the Nation's healthcare system. *Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19) Outbreak*, 85 Fed. Reg. 15337 (Mar. 18, 2020). On March 15, the Census Bureau announced it was "adjusting some operations" to protect "the health and safety of our staff and the public" while fulfilling its "statutory requirement to deliver the 2020 Census counts to the President on schedule." Exh. 2. The Census Bureau noted the "planned completion date for data collection for the 2020 Census is July 31, 2020," but "**that date can and will be adjusted if necessary as the situation evolves** . . . ." *Id.* (emphasis added).

A few days later, the Census Bureau announced that "2020 Census field operations [would] be suspended" due to the ongoing COVID-19 pandemic. Exh. 3. The Census Bureau explained it was doing so "to protect the health and safety of the American public, Census Bureau employees, and everyone going through the hiring process for temporary census taker positions." *Id.* Then, on April 13, the Census Bureau announced:

> [T]he Census Bureau is seeking statutory relief from Congress of 120 additional calendar days to deliver final apportionment counts.
>
> Under this plan, the Census Bureau would extend the window for field data collection and self-response to October 31, 2020, which will allow for apportionment counts to be delivered to the President by April 30, 2021, and redistricting data to be delivered to the states no later than July 31, 2021.

4

Exh. 5. Such a delay would cause significant downstream disruption to States vis-à-vis redistricting and upcoming elections, would likely trigger costly special legislative sessions, and would yield a morass of litigation. *See* Exhs. 6, 7, 14, 15, 16. Not surprisingly, although legislation was introduced, *see, e.g.*, H.R. 6800 § 70201, Congress has thus-far declined to provide relief from the statutory deadlines it had previously established.[1] Accordingly, on August 3, the Census Bureau announced a further update to its plan that includes "enumerator awards and the hiring of more employees to accelerate the completion of data collection and apportionment counts by [the] statutory deadline of December 31, 2020 . . . ." Exh. 8. To satisfy they statutory deadline, the Census Bureau announced that it would end field data collection by September 30, 2020. *Id.*

PLAINTIFFS SEEK TO PAD THE CENSUS COUNT IN CERTAIN JURISDICTIONS

On August 18, 2020, Plaintiffs — represented by a platoon of attorneys — filed suit seeking to vacate the Census Bureau's August 3 plan, reinstate the April plan, and enjoin various federal Defendants from implementing the August 3 plan. Compl. (ECF 1). Plaintiffs' theories are that the August 3 plan violates the Enumeration Clause, Section 2 of the Fourteenth Amendment, and the Administrative Procedure Act. *Id.* ¶¶ 330-354. Plaintiffs proceed under the remarkable theory that a federal district court can command federal officers to violate clear statutory law on a subject that the Constitution expressly assigns to Congressional regulation. *Id.* ¶ 13. In terms of the Administrative Procedure Act, Plaintiffs urge that a federal district court can set aside an agency action that it finds arbitrary and capricious and mandate an agency action that is clearly contrary to law.

On September 5, the Court granted Plaintiffs' motion for a temporary restraining order until a September 17 hearing on Plaintiffs' motion for a preliminary injunction. Order (ECF 84) ("TRO"). The TRO enjoined the federal Defendants from implementing their current plan for the census. *Id.* at 6-7. The status quo would have been an orderly wind-down of census operations in jurisdictions with adequate enumeration rates, with Census Bureau resources re-directed to jurisdictions — like Louisiana and Mississippi — that have lagging enumeration rates, followed by cessation of data

---

[1] The Census Bureau also sought $1 billion in additional funding. To the extent the cost census operations exceed the authorized appropriation, the responsible officers or employee of the United States Government may be subject to criminal sanctions. 31 U.S.C. §§ 1341, 1350.

collection so as to facilitate post-processing of the collected data. Fontenot Decl. (ECF 81-1) ¶¶ 66-67, 95-97.

That status quo has now been upended. *See id.* at ¶¶ 93-97. The Census Bureau made clear that if data collection is extended beyond September 30, "the Census Bureau would be unable to meet its statutory deadlines to produce apportionment counts prior to December 31, 2020 and redistricting data prior to April 1, 2021." *Id.* ¶ 100. Yet the TRO included no analysis of the impact on non-parties, including the vast financial impact of special legislative sessions and litigation resulting from delayed census reporting and corresponding delays in reapportionment and redistricting. More pointedly, time has marched toward the Secretary's statutory deadlines, and Census Bureau resources have been expended in jurisdictions that have acceptable enumeration rates rather than redirected to Louisiana and Mississippi. The effective result – even if the Court vacates the TRO or the Court is reversed on appeal – is the picking of jurisdictional winners by inflating the enumeration in certain jurisdictions while suppressing the enumeration in others by preventing the planned shift in Census Bureau resources.

On September 17, the Court extended the TRO "until the Court issues its decision on the preliminary injunction motion or through September 24, 2020, whichever is sooner." Order (ECF 142) ("TRO Extension"). Once again, the Court included no analysis of the impact on non-parties. *See id.* Louisiana learned of this suit and the TRO Extension that afternoon, retained local counsel, and appeared the same day. *See* Notice of Appearance (ECF 144). Recognizing the fast pace of this litigation, Louisiana filed a Notice of Intent to Intervene the next morning. Notice (ECF 146).[2] That Notice detailed certain of the harms to Louisiana resulting from the Court's order; generally set forth grounds for intervention; and directed the Court to analogous cases in which the Supreme Court made clear that district courts should not disrupt complex government operations with last-minute injunctions, even when fundamental rights are at stake. *Id.* Given the rapid pace of this litigation,

---

[2] Rule 24(c) requires that a motion to intervene "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24; *see also* Fed. R. Civ. P. 24(a) (listing pleadings). It was impracticable for Louisiana to prepare an answer to Plaintiffs' 370 paragraph Amended Complaint prior to the September 18 status conference. Louisiana therefore filed an abbreviated Notice of Intent to Intervene and asked to participate in order to protect its interests.

Louisiana also requested permission to participate in a Status Conference and any subsequent conferences or hearings until it could formally move to intervene. *Id.*

At a status conference later that day, the Court implicitly denied Louisiana's request to participate. *See* St. John Decl. ¶¶ 10-11. When the federal Defendants attempted to raise the harms apparent from Louisiana's Notice, the Court stated that Louisiana had neither a motion to intervene nor an amicus brief pending. This motion to intervene follows.

**LEGAL STANDARDS**

With respect to intervention as of right, "[o]n timely motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a). "An applicant seeking to intervene as of right under Rule 24 must demonstrate that four requirements are met: (1) the intervention application is timely; (2) the applicant has a significant protectable interest relating to the property or transaction that is the subject of the action; (3) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the existing parties may not adequately represent the applicant's interest." *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011). "[T]he requirements are broadly interpreted in favor of intervention." *Id.*

With respect to permissive intervention, "[o]n timely motion, the court may permit anyone to intervene who. . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). Additionally, "the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on . . . a statute or executive order administered by the officer or agency." *Id.* at 24(b)(2). Thus, "permissive intervention requires (1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and fact between the movant's claim or defense and the main action." *Freedom from Religion Found. v. Geithner*, 644 F.3d 836, 843 (9th Cir. 2011).

**INTERESTS AND GROUNDS FOR INTERVENTION**

**I.   The Court should grant intervention as of right.**

   **A.   The motion is timely.**

Plaintiffs filed their complaint last month. *See Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (finding a motion was timely when filed three months after plaintiff's complaint). The proposed intervention poses no prejudice to the parties, and the State Intervenors have acted promptly after learning of this litigation and the orders imperiling their interests. This motion is therefore timely. *See United States v. Oregon*, 745 F.2d 550, 552 (9th Cir. 1984) (listing considerations for timeliness and finding district court abused its discretion in denying intervention in fifteen year old litigation where litigant's actions and court order implicated changed circumstances); *see also United States v. Alcan Aluminum, Inc.,* 25 F.3d 1174, 1182-83 (3d Cir. 1994) (finding intervention in four year old litigation timely where intervention was sought 43 days after intervenor became aware its interests were imperiled).

   **B.   The State Intervenors have significant protectable interests.**

The State Intervenors have clear and substantial protectable interests at stake in this action. The "property" that is the subject of this action — particularly given Plaintiffs' request for nationwide relief — includes the size of the State Intervenors' Congressional delegations, their proportionate allocation of limited federal resources, and the Equal Protection rights of their citizens. *See* Am. Compl. ¶¶ 304-333. In particular, Plaintiffs seek to boost the census enumeration of their own jurisdictions at the expense of jurisdictions – like Louisiana and Mississippi – with lagging enumeration. *Cf. Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 n.8 (9th Cir. 1995) (abrogated on other grounds) ("By allowing parties with a *practical* interest in the outcome of a particular case to intervene, we often prevent or simplify future litigation involving related issues; at the same time, we allow an additional interested party to express its views before the court.").

### C. The disposition of this action could impede the State Intervenors' ability to protect their interests.

The risk this action poses to the State Intervenors' interests is readily apparent. According to the Census Bureau, Mississippi's self-response rate as of September 19 is only 59.6%, and Louisiana's is only 59.3% (placing Mississippi and Louisiana 44th and 46th of the 50 States, respectively). Exh. 10. Likewise, Mississippi's overall enumeration rate is only 89.6%, and Louisiana's overall enumeration rate is only 89.1% (placing them 46th and 48th of the 50 states, respectively). *Id.*

That lagging enumeration is compounded by the Intervenor States' demographics. Census Bureau estimates that Mississippi's population is 37.8% African American, with 19.6% of Mississippi's population living in poverty.[3] Louisiana's population is similar: 32.8% African American, with 19.0% of Louisiana's population living in poverty.[4] And 26% of Mississippi's population and 25.5% of Louisiana's population did not self-report in the 2010 Census, representing hard to count populations. Exhs. 12, 13. Plaintiffs allege those populations are underrepresented in administrative records, such that using administrative data to fill in missing information for non-responsive households will produce a less accurate census. *See* Compl. ¶ 106. Further, Plaintiffs argue that jurisdictions — like Mississippi and Louisiana — with high numbers of hard-to-count citizens suffer disproportionately when compared to areas with low numbers of these same groups. Reply (ECF 130) at ECF p.11. Under Plaintiffs' theory, diversion of Census Bureau resources to increase the count in jurisdictions with adequate enumeration directly imperils the interests of the Intervenor States and their residents, who are lagging in enumeration.

As explained in Louisiana's Notice, last-minute interference with large government undertakings itself creates serious disruption and harm. Not surprisingly, the Supreme Court has repeatedly rejected such last-minute judicial disruption, especially on a PI or TRO record, even when fundamental rights are affected. *See, e.g., Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006); *Williams v. Rhodes*, 393 U.S. 23, 34-35 (1968). The COVID-19 pandemic has not changed that rule. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020). And the census is a vastly larger and more

---

[3] https://www.census.gov/quickfacts/fact/table/MS/BZA210218
[4] https://www.census.gov/quickfacts/LA

1  complex operation than the elections where the rule is most commonly applied. *See* Fontenot Decl.
2  (ECF 81-1) ¶ 66-67, 101. Indeed, the Intervenor States respectfully submit that the relief demanded
3  by the Plaintiffs (and to an extent granted by the TRO) will largely serve to deplete Census Bureau
4  resources that could otherwise be expended finalizing the census in the Intervenor States, *see id.* ¶ 96,
5  and that continued micromanagement and delay irreparably harm those States. Indeed, this Court's
6  TRO itself implicates serious Equal Protection concerns vis-à-vis the Intervenor States' citizens. *See*
7  *Bush v. Gore*, 531 U.S. 98, 105 (2000). And even if this Court is reversed on appeal, those harms will
8  have occurred and be irremediable. On the other hand, if Plaintiffs succeed, any significant delay in
9  enumeration will necessarily have major impacts on states like Louisiana that have state constitutional
10 or statutory deadlines for redistricting. Exhs. 6, 7, 11, 14-17; *see also, e.g.*, La. Const. art. I sec. 6.
11 Indeed, massive amounts of litigation — including by Plaintiffs — is likely to follow any such delay.

**D.     The parties do not adequately represent the interests of the State Intervenors.**

       **1.     Neither Plaintiffs nor the federal Government represent the interests of the State Intervenors.**

Unlike Plaintiffs, the State Intervenors believe the December 31, 2020, statutory deadline is clear, mandatory, and constitutional; and that the April COVID Plan was contrary to law to the extent it would necessarily require violation of that deadline. To that end, the State Intervenors believe the August Re-Plan is adequately supported and was effectively required once it became clear that Congress was unlikely to grant relief from the December 31 deadline. Plaintiffs attacking the August Re-Plan clearly do not represent the State Intervenors' interests.

The federal Defendants do not represent the State Intervenors' interests, either. Although the federal Defendants have urged the Court to reject the Am. Complaint, they have made only passing reference to the vast and irreparable harm the TRO and any PI are likely to cause the States vis-à-vis suppressed enumeration and impacts to State deadlines. The federal Defendants also cannot respond to the Plaintiffs' arguments in the same manner the State Intervenors can: as sovereign States in our federal form of government. *See Sagebrush Rebellion*, 713 F.2d at 528 (stating that courts assessing the adequacy of representation consider whether the intervenor offers a necessary element to the proceedings that would be neglected).

"In assessing the adequacy of representation, the focus should be on the 'subject of the action,' not just the particular issues before the court at the time of the motion." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 823 (9th Cir. 2001) (citing *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983)). "[T]he burden of showing inadequacy is 'minimal,' and the applicant[s] need only show that representation of its interests by existing parties 'may be' inadequate." *Id.* (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)). The Intervenor States and their distinct sovereign interests easily satisfy that standard.

### 2. This Court's findings regarding the conduct of the federal Defendants compellingly reinforce that they are inadequate to represent the interests of the State Intervenors.

This Court's findings vis-à-vis the federal Defendants make clear that their representation is inadequate in-fact. This Court faulted the federal Defendants for the lack of progress in this case, and – implicitly – the corresponding harm to the State Intervenors from the resulting delay. Indeed, this Court found that the federal "Defendants' repeated denial of the existence of an administrative record and failure to make any attempt to collect the administrative record . . . have necessitated delay of the preliminary injunction hearing and extension of the TRO." TRO Extension at 13-14. The Court concluded:

> based on Defendants' violation of the Court's Order to Produce the Administrative Record as discussed above, an extension of the TRO is necessary for Defendants to produce the OIG production and a privilege log; for the parties to litigate objections to at least four different grounds of privilege; for United States Magistrate Judges to resolve the parties' privilege disputes; for the parties to file supplemental briefs on the motion for preliminary injunction addressing the OIG production; and for the Court to hold a hearing on the motion for preliminary injunction and to issue a reasoned decision.

TRO Extension at 17. The Court made a similar finding at yesterday's preliminary injunction hearing, concluding that any delay in the preliminary injunction hearing was caused by the federal Defendants' non-compliance with the Court's orders. Where the State Intervenors are suffering irreparable harm as a result of delay and the Court has attributed that delay to the federal Defendants' non-compliance with Court orders, those same federal Defendants clearly cannot be said to adequately represent the State Intervenors' interests.

**II.     Alternatively, the Court should permit permissive intervention pursuant to Rule 24(b).**

Even if this Court does not grant intervention as of right, the Court should permit the State Intervenors to intervene permissively pursuant Rule 24(b). Because the Court's jurisdiction is based on federal questions raised by Plaintiffs and the applicants for intervention do not assert additional claims, the requirement for an independent ground for jurisdiction does not apply. *Freedom from Religion Found.*, 644 F.3d at 844. This application is timely for the reasons argued above.

Louisiana and Mississippi could partially protect their interests by filing a separate action to compel compliance with the statutory deadline for completing the census and the existing enumeration plan. *See Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 599-600 (2020) (Gorsuch, J., concurring) (reviewing multiple district court litigations and noting that "[u]niversal injunctions have little basis in traditional equitable practice"). But such relief would inherently be partial given the effect of the TRO on other localities, which necessarily depletes Census Bureau resources. Additionally, the delay inherent in pursuing a separate action would adversely affect Louisiana's and Mississippi's interests while census resources continue to be misallocated or depleted. Such an action would, however, clearly involve common questions of law and fact with this one.

Moreover, with respect to remedies, the lagging enumeration in the State Intervenors' jurisdictions and the harms articulated by State Intervenors will provide a "helpful, alternative viewpoint" to those offered by Plaintiffs that have pursued litigation causing those very harms, thereby "contribut[ing] to full development of the underlying factual issues and to the just and equitable adjudication of the legal questions presented." *Pickup v. Brown*, 2012 WL 6024387, at *4 (E.D. Cal. Dec. 4, 2012).

## **CONCLUSION**

Federal Courts have repeatedly permitted States to intervene in disputes over the census. *See, e.g., Utah v. Evans*, 536 U.S. 452, 459 (2002). For the foregoing reasons, the State Intervenors request the Court do so here and grant their motion to intervene as a matter of right under Rule 24(a) or, alternatively for permissive intervention under Rule 24(b).

Dated: September 23, 2020

Respectfully submitted,

**BENBROOK LAW GROUP, P.C.**

/s/ Bradley A. Benbrook
_____
BRADLEY A. BENBROOK (CA 177786)
STEPHEN M. DUVERNAY (CA 250957)
BENBROOK LAW GROUP, P.C.
400 Capitol Mall, Suite 2530
Sacramento, CA 95814
Tel: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

*Counsel for State Intervenors*

**JEFF LANDRY**
  **ATTORNEY GENERAL OF LOUISIANA**

/s/ Joseph S. St. John
_____
JOSEPH S. ST. JOHN (*pro hac vice* pending)
  *Deputy Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
stjohnj@ag.louisiana.gov

*Attorney for the State of Louisiana*

**LYNN FITCH**
  **ATTORNEY GENERAL OF MISSISSIPPI**

/s/ Krissy C. Nobile
_____
KRISSY C. NOBILE (*pro hac vice* forthcoming)
  *Deputy Solicitor General*
OFFICE OF MISSISSIPPI ATTORNEY
  GENERAL LYNN FITCH
P.O. Box 220
Jackson, MS 39205
Tel: (601) 359-3680
krissy.nobile@ago.ms.gov

*Attorney for the State of Mississippi*