UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

NATIONAL URBAN LEAGUE, et al.,

Plaintiffs,

v.

WILBUR L. ROSS, et al.,

Defendants.

Case No. 20-CV-05799-LHK

**ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION**

Re: Dkt. No. 36

Plaintiffs National Urban League; League of Women Voters; Black Alliance for Just Immigration; Harris County, Texas; King County, Washington; City of Los Angeles, California; City of Salinas, California; City of San Jose, California; Rodney Ellis; Adrian Garcia; National Association for the Advancement of Colored People; City of Chicago, Illinois; County of Los Angeles, California; Navajo Nation; and Gila River Indian Community (collectively, "Plaintiffs") sue Defendants Commerce Secretary Wilbur L. Ross, Jr.; the U.S. Department of Commerce; the Director of the U.S. Census Bureau Steven Dillingham, and the U.S. Census Bureau ("Bureau") (collectively, "Defendants") for violations of the Enumeration Clause and the Administrative Procedure Act ("APA").

Before the Court is Plaintiffs' motion for stay and preliminary injunction ("motion for preliminary injunction"). Having considered the parties' submissions; the parties' oral arguments at the September 22, 2020 hearing and numerous case management conferences; the relevant law; and the record in this case, the Court GRANTS Plaintiffs' motion, STAYS the Replan's September

United States District Court
Northern District of California

30, 2020 and December 31, 2020 deadlines, and preliminarily ENJOINS Defendants from implementing these deadlines.

## I.  BACKGROUND

### A.  Factual Background

The 2020 Census is "a 15.6 billion dollar operation years in the making." Defendants' Opp. to Plaintiffs' Motion for Stay and Preliminary Injunction at 1 ("PI Opp."). As a result, after nearly a decade of preparation, Defendants adopted a final operational plan for the 2020 Census in December 2018 called the Operational Plan Version 4.0. However, in March 2020, shortly after the beginning of data collection, the COVID-19 pandemic upended Defendants' Operational Plan and necessitated more time for census operations. Accordingly, on April 13, 2020, Defendants adopted the COVID-19 Plan, which elongated the schedule for data collection and processing and the Secretary of Commerce's reports of population "tabulations" to the President and the states. *See* 13 U.S.C. § 141(b), (c). On August 3, 2020, Defendants announced the Replan, which reduced the COVID-19 timeframes for data collection and processing by half.

Below, the Court first describes census data collection, data processing, and reporting in general terms. The Court then details the deadlines for these operations under the Operational Plan Version 4.0; the COVID-19 Plan; and the Replan.

### 1.  Deadlines for data collection, data processing, and the Secretary's reports to the President and the states.

As relevant here, there are four key deadlines in the 2020 Census. First is the deadline for self-responses to census questionnaires. At the end of the self-response period, the Census Bureau stops accepting responses to the census.

Second is the deadline on which Non-Response Follow-Up ("NRFU") ceases. NRFU refers to the process of "conduct[ing] in-person contact attempts at each and every housing unit that did not self-respond to the decennial census questionnaire." Fontenot Decl. ¶ 48. "The NRFU Operation is entirely about hard-to-count populations." ECF No. 37-5 at 219. NRFU is thus "the most important census operation to ensuring a fair and accurate count." Thompson Decl. ¶ 15.

2

Together, self-responses and NRFU comprise the census's data collection.

Third is the deadline for data processing after data collection. Data processing refers to the Bureau's "procedures to summarize the individual and household data that [the Bureau] collect[s] into usable, high quality tabulated data products." Fontenot Decl. ¶ 66.

Lastly, at the end of data collection and processing, the Secretary of Commerce issues two reports pursuant to the Census Act: (1) "the tabulation of total population by States" for congressional apportionment to the President by December 31, 2020, *see* 13 U.S.C. § 141(b); and (2) a tabulation of population for redistricting to the states by April 1, 2021, *see id.* § 141(c).

### 2. The Operational Plan Version 4.0, adopted in December 2018, provided a total of 54 weeks for the 2020 Census.

Defendants' sole declarant, Albert E. Fontenot, Jr., Associate Director for Decennial Census Programs at the U.S. Census Bureau,[1] describes the Bureau's extensive work over nearly a decade to develop the Operational Plan Version 4.0 (hereafter, "Operational Plan"). For example, Associate Director Fontenot discusses eight significant census tests the Bureau performed in 2013, 2014, 2015, 2016, and 2018 to improve their field operations. Fontenot Decl. ¶ 71. Associate Director Fontenot describes partnerships with stakeholders such as organizations, tribes, and local governments. *E.g.*, Fontenot Decl. ¶¶ 12, 28. The Operational Plan reflects the conclusions of subject-matter experts such as statisticians, demographers, geographers, and linguists. *See, e.g.*, ECF No. 37-5 at 79, 144 (2020 Census Operational Plan—Version 4.0).

Under the Operational Plan adopted in December 2018, self-responses spanned 20.5 weeks from March 12 to July 31, 2020. NRFU spanned 11.5 weeks from May 13 to July 31, 2020. Data processing spanned 22 weeks from August 1 to December 31, 2020. These operational dates would culminate in the Secretary of Commerce issuing his reports by the statutory deadlines. Specifically, by December 31, 2020, the Secretary would report "the tabulation of total population

---

[1] For an organizational chart of the Census Bureau, *see* Census Bureau Organizational Chart, https://www.census.gov/about/who.html, ECF No. 150-3. Director Steven Dillingham and Deputy Director Ron Jarmin head the Bureau, and their direct reports are Associate Directors.

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

by States" to the President for the purpose of Congressional apportionment. By April 31, 2021, the Secretary would report the tabulation of population to the states for the purpose of redistricting. 13 U.S.C. § 141(b).

### 3. COVID-19 pandemic causes suspension of census operations.

Six days after the self-response period began on March 12, 2020, the Bureau announced on March 18, 2020 that it would suspend all field operations for two weeks because of the COVID-19 pandemic. *See* Press Release, U.S. Census Bureau, *U.S. Census Bureau Director Steven Dillingham on Operational Updates* (Mar. 18, 2020), https://www.census.gov/newsroom/press-releases/2020/operational-update.html.

The Bureau foresaw an eight-week operational delay, according to an internal Bureau document dated March 24, 2020 and sent by the Bureau Deputy Director's Chief Advisor, Enrique Lamas, to senior staff. The document stressed the importance of maintaining an uncompressed schedule. Reasons for maintaining an uncompressed schedule included completing the workload remaining and operations that ensured a complete count of all population groups:

- The document stated that "staff had covered only about 10% of the workload when [the Bureau] had to stop." DOC_7087.
- The document further noted that operations "focused on counting populations not living in traditional housing, such as nursing home residents, college students, the military, prisoners, the homeless, and the transitory populations are being planned and will be conducted as it is safe for Census employees and the public to engage in face-to-face activities. These operations and our nonresponse follow-up operation, all need to be completed before the Census Bureau can begin processing the data to ensure that we have a complete count of the population and not undercount specific population groups." DOC_7088.

In line with the Bureau's expectation of a long delay, the Bureau announced another two-week suspension on March 28, 2020. Press Release, *Census Bureau Update on 2020 Census Field Operations* (Mar. 28, 2020), https://www.census.gov/newsroom/press-releases/2020/update-on-2020-census-field-operations.html. Further delays followed.

Ultimately, the Bureau's projected eight-week delay was nine weeks plus phased restarts.

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

United States District Court
Northern District of California

The Chief of Staff to Secretary Ross, Michael Walsh, analyzed the issues for the Secretary on May 8, 2020. He wrote that "[p]ursuant to OMB guidance, the Census Bureau *completely* suspended decennial field operations for 47 days between March 18 and May 4," and then resumed operations in phases thereafter. DOC_2287 (emphasis in original) ("Operational Timeline" memo). Walsh flagged issues with two operations especially important to avoiding undercounts, enumerator onboarding and "Update Leave":

- Onboarding enumerators "entails recruitment, selection, acceptance and gathering of any additional information, fingerprinting, background checks, onboarding, and training" approximately 340,000–500,000 enumerators. *Id.* "The suspension of field operations curtailed preparation for this [onboarding], as much of it required personal contact." *Id.* After onboarding, enumerators "visit non-responding households and conduct in-person interview to obtain census responses." DOC_2287.

- Update Leave, as Walsh wrote, "helps reach 5 million homes in the USA in rural and remote areas that lack city-style mail." *Id.* Update Leave reaches those homes by having Census "field staff hand-deliver questionnaires," *id.* at 6, to "areas where the majority of the housing units do not have mail delivery . . . or the mail delivery information for the housing unit cannot be verified." Fontenot Decl. ¶ 46. Before the complete suspension of operations, "approximately 10% of the initial [Update Leave] workload had been completed." DOC_2287. By contrast, "[u]nder initial projections, 100% of the Update Leave workload should have been completed by April 17." *Id.*

The May 8, 2020 Operational Timeline memo also foresaw problems with "[d]ata processing and integrity." *Id.* (emphasis omitted). "[T]he pandemic has made impacts that will require additional processing and expertise because populations have temporarily shifted." *Id.* As a result, the memo suggested that the 2018 Operational Plan's provision of 152 days (about 22 weeks) for data processing was not enough. *Id.*

As field operations began restarting under the COVID-19 Plan detailed below, the Bureau encountered COVID-related challenges. In particular, the Bureau had trouble retaining enumerators and conducting in-person visits in NRFU. On retaining enumerators, Associate Director for Field Operations Tim Olson wrote to other senior officials on July 23, 2020 that "[the Bureau] had a huge quit rate from training to deployed in field (and this does not mirror past censuses at all – it is MUCH higher, almost a debilitating higher quit rate). And this translate[d]

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

into much slower production in the field because we have less than half the number of enumerators (38%) we need to get the job done." DOC_7737.

Issues with NRFU visits were flagged in a June 10, 2020 presentation sent by the Chief of Staff to Director Dillingham, Christa Jones, to Deputy Director Jarmin and the Chief of Staff to the Deputy Secretary of Commerce, Dan Risko. DOC_6545. On a slide titled "Risks and Challenges Due to COVID-19," the presentation stated that COVID-19 had "le[]d to new risks and unknowns for the operation." *Id.* Four risks stood out: (1) a lower case resolution rate because respondents "may be less likely to answer their door"; (2) challenges with staffing and training; (3) a complex schedule; (4) and a "de-scoped" early NRFU operation that presumably had been delayed by COVID. *Id.*

By July 30, 2020—by which time the Bureau had already been directed to create the Replan, as discussed below—enumerator staffing was still low. DOC_8623. Many cities across several Area Census Offices had roughly 50% shortfalls in enumerator staffing compared to the Bureau's internal target. *Id.* Plaintiffs' affidavits allude to similar issues with finding enumerators. In Monterey County, California, for instance, the pandemic made it harder to hire and retain enumerators "because traditional applicant groups like senior citizens have concerns about the risk of catching COVID-19." Gurmilan Decl. ¶ 13.

### 4. The COVID-19 Plan, adopted on April 13, 2020, provided 71.5 weeks for the 2020 Census.

As a result, on April 13, 2020, the Bureau issued an adjustment to its Operational Plan to account for the impact of COVID-19 (the "COVID-19 Plan"). ECF No. 37-3 (April 13, 2020 statement of Secretary of Commerce Wilbur Ross and Census Bureau Director Steven Dillingham). The COVID-19 Plan extended the deadlines. Specifically, first, the COVID-19 Plan expanded the deadlines for self-responses from 20.5 weeks to 33.5 weeks (March 12 to October 31, 2020) to account for the pandemic's disruptions to Bureau operations and the public's ability to respond to the census. Second, NRFU likewise expanded from 11.5 weeks (May 13 to July 31, 2020) to 12 weeks (August 11 to October 31, 2020).

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Third, given the pandemic's effects on "the quality of the data, especially for groups that are less likely to self-respond (often hard to count populations)," post-data collection quality control was deemed especially important. ECF No. 37-7 at 18. Data processing for congressional apportionment thus expanded from 22 weeks (August 1 to December 31, 2020) to 26 weeks (November 1, 2020 to April 30, 2021). The processing was to include an independent review of the final address list, analysis by subject-matter experts, and the remediation of software errors. Fontenot Decl. ¶ 89.

Lastly, the press release announcing the COVID-19 Plan stated that "the Census Bureau is seeking statutory relief from Congress of 120 additional calendar days to deliver final apportionment counts." ECF No. 37-3 at 3. The COVID-19 Plan would thus "extend the window for field data collection and self-response to October 31, 2020, which will allow for apportionment counts to be delivered to the President by April 30, 2021, and redistricting data to be delivered to the states no later than July 31, 2021." *Id.*

Although these delays would result in the Bureau missing statutory deadlines, the President of the United States and Bureau officials publicly stated that meeting the December 31, 2020 deadline would be impossible in any event. On the day the COVID-19 Plan was announced, President Donald J. Trump stated, "I don't know that you even have to ask [Congress]. This is called an act of God. This is called a situation that has to be. They have to give it. I think 120 days isn't nearly enough." ECF No. 131-16 at 4.

On May 26, 2020, the Bureau's Associate Director for Field Operations, Timothy Olson, stated that "[w]e have passed the point where we could even meet the current legislative requirement of December 31. We can't do that anymore. We -- we've passed that for quite a while now." Nat'l Conf. of Am. Indians, 2020 Census Webinar: American Indian/Alaska Native at 1:17:30–1:18:30, YouTube (May 26, 2020), https://www.youtube.com/watch?v=F6IyJMtDDgY.

Likewise, on July 8, Associate Director Fontenot, Defendants' sole declarant, confirmed that the Bureau is "past the window of being able to get" accurate counts to the President by December 31, 2020. U.S. Census Bureau, *Operational Press Briefing – 2020 Census Update* at

7

20–21 (July 8, 2020), https://www.census.gov/content/dam/Census/newsroom/press-kits/2020/news-briefing-program-transcript-july8.pdf.

The Bureau's internal view on missing the statutory deadlines was similar. Days after announcing the COVID-19 Plan, the Bureau prepared for a call on April 28, 2020 with Congressman Jamie Raskin, Chair of the House Oversight Subcommittee on Civil Rights and Civil Liberties, which has jurisdiction over the census. In preparation for that call, the Bureau's Chief of Congressional Affairs, Christopher Stanley, circulated a memo to Director Dillingham and other senior officials. *See* DOC_2224. The memo answered possible questions about missed deadlines.

Two questions and answers ("Q&As") stood out. The first Q&A contemplated that any data collection after August 14 would make meeting the deadlines infeasible. The Q&A asked why the Bureau couldn't "collect data after August 14 and still deliver redistricting data on time?" DOC_2227. The answer was that the Bureau had "examined [the] schedule and compressed it as much as [the Bureau] c[ould] without risking significant impacts on data quality. Given the important uses of census data collection processing, it is vital that [the Bureau] not shortcut these efforts or quality assurance steps." *Id.*

The second Q&A asked whether "delaying the apportionment data [was] constitutional?" The answer was that "[t]he proposal underwent a constitutional review, and we believe it is constitutional and that the adjusted schedule will help us fulfill the constitutional requirement of a complete and accurate census. . . . In history, especially for the many of the earlier censuses, data collection and reporting the counts shifted beyond the zero year." DOC_2228. By "counts shifted beyond the zero year," the Bureau presumably was referring to census reports that had been made in the calendar year after the statutory deadline. Those reports were for the censuses of 1810, 1820, 1830, and 1840. ECF No. 203 (explaining examples); *see, e.g.*, Act of Sept. 1, 1841, ch. 15, § 1, 5 Stat. 452, 452 (second *post hoc* extension of September 1, 1841 for original deadline missed by over nine months). In those censuses, after one or more deadlines had passed without the enumeration having been completed, Congress extended the relevant deadlines after the fact. *See*

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

1    ECF No. 203.

2         On May 8, 2020, Secretary Ross's Chief of Staff, Michael Walsh, sent the "Operational

3    Timeline" memo to the Secretary. The Operational Timeline memo found that:

4         If the Census Bureau could fully restart today, under ideal conditions . . . the
          earliest you could finish NRFU, even with the ability to restart immediately every
5         state, is approximately September 1, 2020. By finishing NRFU on September 1,
          2020, apportionment counts could not be delivered until January 31, 2021, already
6         after the statutory deadline. Redistricting information would be provided to states
          by April 30, 2021, already after the statutory deadline.
7

8         **Based on the initial suspension of field activities in line with OMB guidance,
          the Census Bureau can no longer meet its statutory deadlines for delivering**
9         **apportionment and redistricting data, even conducting operations under
          unrealistically ideal conditions.**
10

11   DOC_2288 (emphasis in original) (bullet points omitted).

12        All the above operational concerns were ultimately reflected in the census response data.

13   As of June 2020, "self-response rates var[ied] widely across states and counties," with "markedly

14   different operational environments and challenges" facing the Bureau "from one locale to

15   another." ECF No. 37-7 at 6 (citing self-response rates "below 3 percent" in counties in Alaska,

16   Texas, Utah, and South Dakota).

17        **5.   The Replan, adopted on August 3, 2020, reduced the time for the 2020 Census
               from 71.5 weeks to 49.5 weeks.**
18

19        On July 21, 2020, President Trump issued a memorandum declaring the United States'

20   policy to exclude undocumented immigrants from the congressional apportionment base.

21        On July 23, 2020, Associate Director Fontenot started an email thread with several senior

22   Bureau officials, including Deputy Director Ron Jarmin and Associate Director for Field

23   Operations Timothy Olson. Associate Director Fontenot began the thread by stating that on July

24   27, he would tell the Department of Commerce about the "reality of the COVID Impacts and

25   challenges":

26        On Monday at DOC [Department of Commerce] I plan to talk about the difference
          between goal and actual case enumeration (Currently a shortfall (11 % goal vs 7%
27        actual) and attribute it to the higher drop out rate and (ideally with reasons) and

28
     Case No. 20-CV-05799-LHK
     ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

what we are going to do to address the technology drop outs.)

I think it is critical to lay the groundwork for the reality of the COVID Impacts and challenges.

Does anyone have any problems with my approach?

DOC_7737. In response, Associate Director Olson "agree[d] that elevating the reality is critical, especially in light of the push to complete NRFU asap for all the reasons we know about." DOC_7738. Those reasons are not in the administrative record.

Associate Director Olson then "sound[ed] the alarm" on "deliver[ing] apportionment by 12/31" in the strongest possible terms:

We need to sound the alarm to realities on the ground – people are afraid to work for us and it is reflected in the number of enumerators working in the 1a ACOs [Area Census Offices]. And this means it is ludicrous to think we can complete 100% of the nation's data collection earlier than 10/31 and any thinking person who would believe we can deliver apportionment by 12/31 has either a mental deficiency or a political motivation.

*Id.* One reason that accelerating the schedule would be "ludicrous," Associate Director Olson stated, was the "awful deploy rate" of enumerators about 62% below target. *Id.* Driving that shortfall was "almost a debilitating higher quit rate":

Another tack is to provide crystal clear numbers by the 1a ACOs that shows the awful deploy rate - field selected the right number (big number) to training, training show rate was on par with prior censuses (albeit a few points lower ... but overall in line with past censuses). And then we had a huge quit rate from training to deployed in field (and this does not mirror past censuses at all - it is MUCH higher, almost a debilitating higher quit rate). And this translates into much slower production in the field because we have less than half the number of enumerators (38%) we need to get the job done.

DOC_7737.

On the same day as Associate Director Olson's email (July 23, 2020), the Chief of Decennial Communications and Stakeholder Relationships, Kathleen Styles, shared a so-called "Elevator Speech" memo with GAO official Ty Mitchell and senior Bureau officials. *See* DOC_8026 (sending to GAO). The purpose of the Elevator Speech, Chief Styles wrote, was "to explain, in layman's terms, why we need a schedule extension." The Speech begins with a "High

10

Level Message," which in its entirety reads:

> Curtailing census operations will result in a census that is of unacceptable quality. The Census Bureau needs the full 120 days that the Administration originally requested from Congress to have the best chance to produce high quality, usable census results in this difficult time. Shortening the time period to meet the original statutory deadlines for apportionment and redistricting data will result in a census that has fatal data quality flaws that are unacceptable for a Constitutionally-mandated activity.

DOC_8070.

On July 31, 2020, the Bureau removed from its website the October 31, 2020 deadline for data collection without any announcement or explanation. *Compare* ECF No. 37-8 (July 30 Operational Adjustments Timeline), *with* ECF No. 37-9 (July 31 Operational Adjustments Timeline).

By August 1, 2020, the Bureau had prepared several versions for a presentation to Secretary Ross on Monday, August 3, 2020 ("August 3 Presentation"). The parties identify one version as a key document. ECF Nos. 161 at 2 (Defendants' identification of DOC_10275), 190 at 6 (Plaintiffs' identification of same). The Presentation's very first slide, titled "Overview," concludes that "to achieve an acceptable level of accuracy, at least 99% of Housing Units in every state must be resolved":

> Due to COVID-19 impacts, the conclusion of field operations for the 2020 Census was previously scheduled to end on October 31. In order to meet the statutory date of December 31, 2020 for apportionment, field operations must now conclude no later than September 30, 2020. Accelerating the schedule by 30 days introduces significant risk to the accuracy of the census data. In order to achieve an acceptable level of accuracy, at least 99% of Housing Units in every state must be resolved.

DOC_10275–76.

On August 3, 2020, the Bureau issued a press release announcing a "new plan," which the Bureau called the "Replan." U.S. Census Bureau, *Statement from U.S. Census Bureau Director Steven Dillingham: Delivering a Complete and Accurate 2020 Census Count* (Aug. 3, 2020), ECF No. 37-1 ("August 3 Press Release"). In his declaration, Associate Director Fontenot avers that the Secretary approved the Replan on the day it was announced. Fontenot Decl. ¶ 85.

United States District Court
Northern District of California

1    In the words of the August 3 Press release, the Replan "accelerate[d] the completion of

2    data collection and apportionment counts by our statutory deadline of December 31, 2020, as

3    required by law and directed by the Secretary of Commerce." ECF No. 37-1. The time for the

4    2020 Census was reduced from 71.5 weeks to 49.5 weeks. Specifically, self-response compressed

5    from 33.5 weeks to 29 weeks, with the deadline advancing from October 31 to September 30.

6    Fontenot Decl. ¶ 100. NRFU compressed from 11.5 weeks to 7.5 weeks, with the deadline

7    advancing from October 31 to September 30. Lastly, data processing was halved from 26 weeks to

8    13 weeks, with the deadline advancing from April 30, 2021 to December 31, 2020.

9    As of August 3, 2020, less than 63% of households had responded to the 2020 Census.

10   ECF No. 37-1.

### 6.   The Government Accountability Office found that the Replan increases the risks to obtaining a complete and accurate 2020 Census.

12   In June 2020, the Government Accountability Office ("GAO") issued a Report on the 2020

13   Census entitled, "COVID-19 Presents Delays and Risks to Census Count," in which the GAO

14   noted, among other things, that staffing shortages were experienced at the Bureau's call centers

15   and at the Bureau's contractor responsible for printing the six mail-in self-response forms.[2] ECF

16   No. 37-7 at 8 (GAO, COVID-19 Presents Delays and Risks to Census Count (June 2020)). The

17   Report also noted that as of June 1, 2020, counties in Alaska, Texas, Utah, and South Dakota had

18

19   [2] The Court may take judicial notice of matters that are either "generally known within the trial

20   court's territorial jurisdiction" or "can be accurately and readily determined from sources whose

21   accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts take judicial notice of

22   information, such as reports of the Government Accountability Office ("GAO"), Census Scientific Advisory Committee ("CSAC"), and Department of Commerce Office of Inspector General

23   ("OIG"), which are found on government agency websites. *See Paralyzed Veterans of Am. v. McPherson*, 2008 WL 4183981, at *5–6 (N.D. Cal. Sept. 9, 2008) (citing circuit and district court

24   cases). However, to the extent any facts in the documents subject to judicial notice are subject to

25   reasonable dispute, the Court will not take judicial notice of those facts. *See Lee v. City of L.A.*,

26   250 F.3d 668, 689 (9th Cir. 2001) ("A court may take judicial notice of matters of public record . . . . But a court may not take judicial notice of a fact that is subject to reasonable dispute.")

27   (internal quotation marks omitted), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

28

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

United States District Court
Northern District of California

1    reported self-response rates below 3 percent. *Id.* at 9.[3]

2         In August 2020, the GAO issued a Report on the 2020 Census entitled "Recent Decision to

3    Compress Census Timeframes Poses Additional Risks to an Accurate Count."

4    https://www.gao.gov/assets/710/709015.pdf. The Report stated: "Delays to data collection

5    operations, public reluctance to participate in door-to-door interviews, and compressed timeframes

6    for data collection and processing response data may affect the accuracy, completeness, and

7    quality of the count." *Id.* at ii (cover memo). The Report also noted that implementation of

8    untested procedures and continuing challenges such as COVID-19 could "undermine the overall

9    quality of the count." *Id.* at 1.

### 7. The Bureau's Scientific Advisory Committee unanimously supports extension of the census schedule.

11        Associate Director Fontenot's September 22, 2020 declaration states: "In the midst of

12   major West Coast fires and air quality issues that have accelerated since September 11, and the

13   current impacts of Hurricane Sally across the states of Louisiana, Mississippi, Alabama, the

14   Florida panhandle area, parts of Georgia, and South Carolina, I stated publicly on September 17,

15   2020 in the Census Scientific Advisory Committee meeting that I did not know whether Mother

16   Nature would allow us to meet the September 30 date." ECF No. 196-1 ¶ 14.

17        The next day, on September 18, 2020, the Census Scientific Advisory Committee

18   ("CSAC") unanimously concluded that the Census schedule should be extended. *See* Allison

19   Plyer, Census Scientific Advisory Committee Chair*, Recommendations and Comments to the*

20   *Census Bureau from the Census Scientific Advisory Committee Fall 2020 Meeting* (September 18,

21   2020), https://www.documentcloud.org/documents/7213520-Recommendations-and-Comments-

22

23   _____

24   [3] The reports of the GAO, CSAC, and OIG are not in the administrative record. However, the
     Court is permitted to go outside the administrative record "for the limited purpose of background

25   information." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989). The Court thus

26   considers those reports for background information alone. The Court does not consider the reports
     for APA analysis. That said, many of the documents on which the OIG Report is based are

27   included in the partial administrative record, which is the basis of the Court's APA analysis.

28
     Case No. 20-CV-05799-LHK
     ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

to-the-Census.html#document/p2/a581794. Specifically, the CSAC found the following:

> To ensure a successful completion of the 2020 Census in a way that is consistent with its mandate of counting everyone once and in the right place, and based on its scientific and methodological expertise, CSAC recommends that the 2020 Census operational timeline be extended per the Bureau's April 2020 request. Counting everyone once and in the right place, using untested and never-before-used technologies, that must work together with precision, requires time. When the weather isn't right, we postpone the launching of rockets into space. The same should be true of the decennial enumeration, the results of which will impact apportionment, redistricting, funding decisions, legal mandates and regulatory uses of decennial Census data over the next decade.

*Id.* at 2.

### 8. The Commerce Department's Office of Inspector General found that the Replan increases the risks to obtaining a complete and accurate 2020 Census.

On September 21, 2020, the Department of Commerce's Office of Inspector General ("OIG") released a report entitled "The Acceleration of the Census Schedule Increases the Risks to a Complete and Accurate 2020 Census." Final Management Alert No. OIG-20-050-M (Sept. 18, 2020), https://www.oig.doc.gov/OIGPublications/OIG-20-050-M.pdf. The Report drew upon Bureau and Commerce Department documents that were produced to the OIG (the "OIG production" stated below), as well as interviews with senior Bureau officials and Director Steven Dillingham. *Id.* at 2. The report made two findings. First, "[t]he decision to accelerate the Census schedule was not made by the Census Bureau." Information Memorandum for Secretary Ross from Peggy E. Gustafson at 1 (Sept. 18, 2020). Second, "[t]he accelerated schedule increases the risks to obtaining a complete and accurate 2020 Census." *Id.*

On the first finding, the report detailed that:

> As of mid-July 2020, the Bureau still viewed the statutory extension as necessary in order to conduct the 2020 Census completely and accurately. This view is consistent with previous public statements made by senior Bureau officials that the Bureau would no longer be able to meet the December 31, 2020, statutory deadline.

> Then, in the late afternoon of Wednesday, July 29, 2020, a senior Department official told the Bureau to put together options for meeting the apportionment deadline of December 31, 2020, and brief the Secretary on those options on Monday morning, August 3, 2020.

United States District Court
Northern District of California

*Id.* at 7. On the second finding, the report detailed that "senior Bureau officials believed that the largest risk to data collection posed by the accelerated plan was the decreased time to recover from possible external contingencies affecting local areas or regions." *Id.* at 8.

As of September 21, 2020, the Census Bureau had resolved 99% of housing units in only four states. ECF No. 196-1 ¶ 13. The Bureau had stated internally in its August 3 Presentation that "[i]n order to achieve an acceptable level of accuracy, at least 99% of Housing Units in every state must be resolved." DOC_1026.[4]

### B. Procedural History

The procedural history of this case highlights why the instant Order is based on a stipulated but incomplete administrative record. At first, Defendants stated that no administrative record existed. Defendants then disclosed that there are documents that were considered by agency decisionmakers at the time of the decision to adopt the Replan. The Court subsequently ordered production of the administrative record. Despite the order, Defendants did not produce the administrative record. Because of the exigency of the motion for preliminary injunction and the imminent September 30, 2020 deadline for data collection, the parties stipulated to an incomplete administrative record for purposes of the instant motion. The Court details each event in turn.

### 1. At first, Defendants stated that no administrative record existed.

On August 18, 2020, Plaintiffs filed suit to challenge the Census Bureau's August 3, 2020 Replan, which advanced the 2020 Census deadlines for self-responses to Census questionnaires, Non-Response Follow-Up ("NRFU") field operations, data processing, and reporting Census counts to the President and the states.

To allow Plaintiffs to effectively challenge the Replan, including the September 30, 2020 end of data collection, the parties stipulated to a briefing schedule and hearing date of September

---

[4] The Court notes these later extra-record developments for context, but does not weigh them in its APA analysis. *But cf. Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) ("It is rare to review a record as extensive as the one before us when evaluating informal agency action—and it should be. . . . [B]ut we are 'not required to exhibit a naiveté from which ordinary citizens are free.'" (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.))).

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

17, 2020 on Plaintiffs' motion for preliminary injunction. ECF No. 35. Pursuant to that schedule, Plaintiffs filed a motion for a preliminary injunction on August 25, 2020 based on their claims under the Enumeration Clause and the APA. ECF No. 36.

On August 26, 2020, the Court held a case management conference, at which Defendants repeatedly denied the existence of an administrative record. *E.g.*, ECF No. 65 at 9:22–24 (The Court: "Is there an administrative record in this case?" Defendants: "No, Your Honor. On behalf of the Defendants, no, there's not."), 10:17–18 ("[A]t this point there is no administrative record."). Rather, Defendants suggested that the only document that provided the contemporaneous reasons for the Replan was the Bureau's August 3, 2020 press release. *Id.* at 20:6–7 ("[A]t this point I'm not aware of any other documents, but I would propose that I check with my client . . . ."). Even so, the Court instructed Defendants that "[i]f there's an administrative record, it should be produced. [The Court] will need it to make a decision in this case." *Id.* at 10:13–14.

### 2. Defendants then disclosed that there are documents considered by agency decisionmakers at the time the Replan was adopted.

At the September 4, 2020 hearing on the September 3, 2020 motion for a temporary restraining order ("TRO"), ECF No. 66, Defendants reiterated their position that no administrative record existed. ECF No. 82 at 10:21–23, 33:13–15. However, Defendants disclosed that there were documents considered by agency decisionmakers at the time the Replan was adopted. Defendants stated:

> The Census Bureau generates documents as part of its analysis and as part of its decisions and as part of its deliberations. And there are documents that the Replan was not cooked up in a vacuum, it was part of the agency's ongoing deliberations. And so certainly there are going to be documents that reflect those documents [sic].

*Id.* at 33:2–7. That said, Defendants stated they would only have to submit the documents "if there is an administrative record on final agency action, which is there is [sic] none here." *Id.* at 33:14–16. In Defendants' view, the lack of final agency action meant that "the documents that fed into the operational plans and the operational decisions are internal documents that are subject to the deliberative process privilege." *Id.* at 32:13–16.

Only a few minutes later, however, Defendants retracted their assertion of deliberative process privilege. *Id.* at 36:15–17 ("[T]o be clear, we are not asserting the deliberative process privilege because there is no record and there's nothing to consider."). Defendants conceded that "[i]f there is final agency action that is reviewable and the APA applies, we would have an obligation to produce the administrative record." *Id.* at 35:24–36:1. However, Defendants urged the Court to rely solely on Associate Director Fontenot's declaration that Defendants would file that evening with Defendants' opposition to the motion for preliminary injunction. *E.g.*, *id.* at 16:21–23 ("We will not be filing documents in addition to the declaration."). Indeed, when Defendants filed their opposition that night, Defendants' only evidence was Associate Director Fontenot's declaration. ECF No. 81. After full briefing and the hearing, the Court issued a TRO on September 5, 2020. ECF No. 84.

### 3. The Court ordered production of the administrative record.

At the September 8, 2020 case management conference, Defendants again stated that "there is no administrative record in this case because there is no APA action." ECF No. 98 at 62:15–16. Even so, Defendants confirmed their statements from the TRO hearing that the Replan is "indeed codified." *Id.* at 21:7. The Replan simply was "not necessarily codified in one particular document." *Id.* at 21:9–10. Accordingly, Plaintiffs asked the Court to order Defendants to produce the administrative record. *E.g.*, *id.* at 44:10–13.

After full briefing, the Court issued its Order to Produce the Administrative Record, which addressed threshold arguments before ordering production. ECF No. 96. However, because of the competing need to resolve the motion for preliminary injunction as quickly as possible, the Court ordered a narrowed portion of the administrative record to be produced on September 13 and 16, 2020, before the September 17, 2020 preliminary injunction hearing. *Id.* at 21. Given these production deadlines, the Court continued the deadline for Plaintiffs' reply in support of their motion for preliminary injunction from September 10 to September 15, 2020.

### 4. Despite the Court's order, Defendants did not produce the administrative record.

Twelve hours before the production deadline on September 13, 2020, Defendants produced 58 unredacted documents and 14 heavily redacted documents. ECF No. 105; *see* ECF No. 177 (providing number of documents in September 13 Production). Many of the redacted documents contained little information other than the email metadata that Defendants included in their privilege log. *See, e.g.*, ECF No. 105-1 at 37 (DOC_225: heavily redacted email); id. at 65 (DOC_253: same); *id.* at 173 (DOC_361: same); *id.* at 177 (DOC_365: same). Defendants also stated that "[r]eview of the remaining documents remains ongoing" and that "[b]ecause review of the remaining documents remains ongoing, and due to the volume of documents involved, Defendants will be unable to produce or log any additional documents today." *Id*. Moreover, Defendants did not identify when they would complete the September 13 Production.

At the September 14, 2020 case management conference, Defendants stated that their next production would be on September 16, 2020, but that they "d[id] not anticipate" completing the September 13, 2020 Production on September 16, 2020. ECF No. 126 at 22:6. Moreover, Defendants stated that they were still collecting documents for the September 16 Production and did not know how many documents would be responsive. *See, e.g.*, *id.* at 20:6–10. Overall, Defendants stated that they would be unable to comply with the Court's Order to Produce the Administrative Record because compliance would be "a physical impossibility." *Id.* at 41:16–17.

### 5. The parties stipulated to an incomplete administrative record for purposes of the motion for preliminary injunction.

In response to Defendants' failure to comply with the Court's order on September 13, 2020, Plaintiffs filed the Department of Commerce Inspector General's August 13, 2020 Information Memorandum for Secretary of Commerce Wilbur Ross, which included the following Request for Information:

To assist the OIG ["Office of Inspector General"] in its oversight responsibilities, please provide all documents or communications, including but not limited to email, instant messages, and text messages:

    1. Discussing or referring in any manner to the decision to accelerate the

2020 Census schedule as described in the August 3, 2020 press release.

2. Detailing the persons involved, and their respective involvement, in the decision to accelerate the 2020 Census schedule.

3. Detailing the reasons for the decision to accelerate the 2020 Census schedule.

Please provide all requested documents and communications by close of business Monday, August 17, 2020. You may also produce any additional documentation or information you deem relevant to this request for information.

ECF No. 111-2 at 5. Plaintiffs also noted that Associate Director Fontenot's declaration had averred that the Census Bureau had produced many documents to the OIG. ECF No. 111 at 5 (citing Fontenot Decl., ECF No. 81-1 at 36 ¶ 103). Associate Director Fontenot did not disclose the OIG's Request for Information about the Replan, but rather spoke in more general terms: "We produce a massive amount of documents and other information to the Office of Inspector General and the General Accounting Office every week, and these organizations interview Census Bureau staff on almost a daily basis." ECF No. 81-1 at 36 ¶ 103. In other words, Defendants had neither disclosed to the Court the OIG's Request for Information nor produced the OIG documents in response to the Court's Order to Produce the Administrative Record. *See* ECF No. 111-2 at 5.

Given the exigency, both parties ultimately agreed that "in the short term, focusing on the OIG documents for purposes of getting to a PI ruling and whatever appeal follows makes sense." *Id.* at 72:19–21; *see id.* at 33:14–22, 41:6–9 (Defendants' agreement). The Court thus ordered Defendants to produce the OIG documents that would constitute the administrative record or would be included in the administrative record, stayed the Order to Produce the Administrative Record until a case management conference after the impending preliminary injunction decision, and continued the preliminary injunction hearing to Tuesday, September 22, 2020. *Id.* at 71–77; *see* ECF No. 132. As the Court found, both the parties and the Court were "running out of time." ECF No. 141 at 38:6, 71:14.

On September 15, 2020, Plaintiffs filed their reply, for which they only had the benefit of Defendants' incomplete September 13, 2020 production of the administrative record as described above. ECF No. 130 ("Reply").

19

1   On September 18, 2020, Defendants produced the OIG documents. Over the weekend on

2   September 19 and 20, 2020, after full briefing, United States Magistrate Judges Nathanael

3   Cousins, Susan van Keulen, and Thomas Hixson resolved the parties' privilege disputes.

4   Defendants produced the documents that the judges had deemed non-privileged on September 19,

5   20, and 21, 2020.[5] The resulting set of all non-privileged OIG documents comprise the

6   administrative record for the instant motion.

7   The Court allowed the parties to file supplemental briefs on the motion for preliminary

8   injunction to address Defendants' productions. Specifically, on September 20, 2020, the parties

9   filed supplemental briefs that addressed Defendants' September 18, 2020 production. *See* ECF No.

10  176 ("Defs. 1st Supp. Br."); ECF No. 178 ("Pls. 1st Supp. Br."). On September 22, 2020, the

11  parties filed supplemental briefs that addressed Defendants' September 19, 20, and 21, 2020

12  productions. ECF Nos. 196 ("Defs. 2nd Supp. Br."); ECF No. 197 ("Pls. 1st Supp. Br."). However,

13  on September 22, 2020, Defendants also filed another Associate Director Fontenot declaration that

14  discussed injunction harms to Defendants that Associate Director Fontenot did not include in his

15  September 5, 2020 declaration in support of Defendants' opposition to the motion for preliminary

16  injunction. ECF No. 196-1. The Court held a hearing on the motion for preliminary injunction on

17  September 22, 2020.

18  **II.    LEGAL STANDARD**

19  "A plaintiff seeking a preliminary injunction must establish that [she] is likely to succeed

20  on the merits, that [she] is likely to suffer irreparable harm in the absence of preliminary relief,

21  that the balance of equities tips in [her] favor, and that an injunction is in the public interest."

22  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking the injunction

23  bears the burden of proving these elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201

24  (9th Cir. 2009). "A preliminary injunction is 'an extraordinary and drastic remedy, one that should

25

26  _____

    [5] To minimize any intrusion into Defendants' privileges, this Court only reviewed documents in
27  the OIG Production that the United States Magistrate Judges deemed non-privileged. The Court
    did not itself review *in camera* the OIG Production.

28  
    Case No. 20-CV-05799-LHK
    ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

United States District Court
Northern District of California

1   not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v.*

2   *Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

3   **III.     REVIEWABILITY**

4          Defendants argue that Plaintiffs are not entitled to a preliminary injunction both because

5   the instant case is unreviewable due to a number of threshold issues, PI Opp. at 4–23, and because

6   the four relevant factors weigh against issuance of a preliminary injunction, *id.* at 23–35. The

7   Court first considers the threshold reviewability questions before turning to the four preliminary

8   injunction factors.

9          Defendants argue that the instant case is unreviewable on five grounds: (1) the Replan

10   presents a political question; (2) Plaintiffs lack standing; (3) the Replan is not agency action;

11   (4) the Replan is not "final"; and (5) the Replan is committed to agency discretion by law. The

12   Court addresses each ground in turn and then briefly addresses the APA requirements that

13   Defendants do not address, namely that Plaintiffs lack an adequate alternative to judicial review

14   and suffer prejudice from the Replan.

15          **A.  The Replan does not present a political question.**

16          Defendants argue that Plaintiff's Administrative Procedure Act claim is not justiciable

17   because it presents a political question. PI Opp. at 4–9. The Court disagrees.

18          A "political question" is one which is "outside the courts' competence and therefore

19   beyond the courts' jurisdiction." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019). Tellingly,

20   Defendants fail to offer a case that finds that the political question doctrine bars review of

21   decisions regarding the administration of the census. Instead, Defendants point the Court to two

22   defining hallmarks of a political question: "[1] a textually demonstrable constitutional

23   commitment of the issue to a coordinate political department; or [2] a lack of judicially

24   discoverable and manageable standards for resolving" the dispute. *Baker v. Carr*, 369 U.S. 186,

25   217 (1962); *accord Vieth v. Jubelirer*, 541 U.S. 267, 277–78 (2004). Defendants argue that both

26   are present here because (1) the Enumeration Clause vests Congress with the authority to conduct

27   "actual Enumeration," PI Opp. at 5–6, and (2) there is no evident standard by which the Court

28   
Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

United States District Court
Northern District of California

United States District Court
Northern District of California

could evaluate the Bureau's decision. PI Opp. at 6–7. Neither argument is convincing.

First, Defendants cite no case—and the Court is aware of none—in which a court declined jurisdiction over a census case on political question grounds. To the contrary, the Supreme Court and lower courts have repeatedly rejected the argument that the political question doctrine bars review of census-related decisionmaking. *See, e.g.*, *U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 458–59 (1992) (holding that the "political question doctrine presents no bar"); *Franklin v. Massachusetts*, 505 U.S. 788, 801 n.2 (1992) (noting that the Court "recently rejected a similar argument" in *Montana* that "the courts have no subject-matter jurisdiction over this case because it involves a 'political question'"); *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (per curiam) (rejecting the Census Bureau's argument that "allegations as to mismanagement of the census made in the complaint involve a political question," and holding the case reviewable under the Constitution and APA) (quotation omitted); *New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 791 (S.D.N.Y. 2018) (rejecting political question doctrine in citizenship question litigation; and collecting cases); *Young v. Klutznick*, 497 F. Supp. 1318, 1326 (E.D. Mich. 1980) (rejecting political question doctrine), *rev'd on other grounds*, 652 F.2d 617 (6th Cir. 1981); *City of Philadelphia v. Klutznick*, 503 F. Supp. 663, 674 (E.D. Pa. 1980) (same); *Texas v. Mosbacher*, 783 F. Supp. 308, 312 (S.D. Tex. 1992) (same); *District of Columbia v. U.S. Dep't of Commerce*, 789 F. Supp. 1179, 1185 (D.D.C. 1992) (same); *City of N.Y. v. U.S. Dep't of Commerce*, 739 F. Supp. 761, 764 (E.D.N.Y. 1990) (same); *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 95 (D.D.C. 1998) (three-judge court) (same; and stating "the court sees no reason to withdraw from litigation concerning the census"), *aff'd*, 525 U.S. 316 (1999); *see also Utah v. Evans*, 536 U.S. 452 (2002) (engaging in review without noting any jurisdictional defect stemming from political question doctrine); *Wisconsin v. City of N.Y.*, 517 U.S. 1 (1996) (same); *Morales v. Daley*, 116 F. Supp. 2d 801 (S.D. Tex. 2000) (same), *aff'd sub nom. Morales v. Evans*, 275 F.3d 45 (5th Cir. 2001) (unpublished); *Prieto v. Stans*, 321 F. Supp. 420, 421 (N.D. Cal. 1970) (finding jurisdiction over a motion to preliminarily enjoin the census's "mail-out, mail-back procedure" and "community education and follow-up procedures").

Second, precedent supports the determination that there is a discoverable and manageable standard by which the Court can review the agency action at issue here. For example, the Census Act "imposes 'a duty to conduct a census that is accurate and that fairly accounts for the crucial representational rights that depend on the census and the apportionment.'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (quoting *Franklin*, 505 U.S. at 819–820 (Stevens, J., concurring in part and concurring in judgment)) (discussing 2 U.S.C. § 2a). Similarly, the text, structure, and history of the Constitution evinces "a strong constitutional interest in accuracy." *Utah*, 536 U.S. at 455–56.

Thus, in its decision on the census citizenship question last year, the Supreme Court rejected Defendants' claim that there is "no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Commerce v. New York*, 139 S. Ct. at 2568 (quoting *Weyerhaeuser Co. v. United States Fish and Wildlife Serv.*, 139 S. Ct. 361, 370 (2018)). The standard is provided by the Census Act, the Constitution, and APA. Accordingly, it is no surprise that Defendants do not cite, and the Court could not find, a case in which the political question doctrine barred judicial review of census-related decisionmaking.

In sum, the political question doctrine does not bar the Court from reviewing the instant case.

**B.  Plaintiffs have standing to challenge the Replan.**

"To have standing, a plaintiff must 'present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling.'" *Dep't of Commerce v. New York*, 139 S. Ct. at 2565. Plaintiffs here allege—and support with affidavits—the same four injuries that the Supreme Court found supported standing in the citizenship question case: "diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources." *Id.* at 2565 (upholding findings as not clearly erroneous). The Court discusses each of Plaintiffs' four alleged injuries.

**1.  Plaintiffs are likely to lose federal funds that turn on census data.**

The administrative record shows that the Replan will likely lead to an undercount that

23

results in "loss of crucial federal funds for programs that affect [Plaintiffs'] daily life." A. Garcia Decl. ¶ 4. The Supreme Court has specifically agreed that the loss of federal funding "is a sufficiently concrete and imminent injury to satisfy Article III." *Dep't of Commerce v. New York*, 139 S. Ct. at 2565. Thus, the Court agrees that the possible loss of federal funds is a sufficient injury to establish Article III standing as explained below.

Local government Plaintiffs are recipients of multiple sources of federal funding that turn on census data. King County, Washington; the City of Los Angeles; and Harris County, Texas are leading examples. The Replan's shortened schedule for data collection and processing will likely diminish each locality's funding because each locality has many hard to count persons who risk being undercounted. M. Garcia Decl. ¶¶ 7–8; Dively Decl. ¶ 5; Briggs Decl. ¶¶ 7, 11; *see also* Hillygus Decl. ¶¶ 12, 19, 39 (explaining the statistics of undercounting subpopulations). Specifically, the Court notes the following:

- In King County, three-quarters of the County's record population growth of 15% since 2010 is attributable to "populations that are less likely to self-respond to the census." Dively Decl. ¶ 5. As a result, "[s]hortening the enumeration period risks creating a population undercount." *Id.* Any undercount would reduce King County's allocation of funds "proportionately disbursed by census population counts." *Id.* ¶ 7. These funds include Community Development Block Grants, HOME Investment Partnership Program, and Emergency Solutions Grants from the U.S. Department of Housing and Urban Development. *Id.* ¶ 7. Transit Formula Grants to the Seattle region, of which King County is a part, also turn on census data, and totaled $108 million in fiscal year 2019.

- Los Angeles County is "the hardest to count in the nation." M. Garcia Decl. ¶ 7. 57% of the residents in the City of Los Angeles, which is home to roughly 4 million people, live in census block groups that are hard or very hard to count. *Id.* As a result, Los Angeles' self-response rate of 54.5% (as of August 19, 2020) is well below the city's 2010 response rate of 68% and the state's 2020 response rate of 65.9%.

- "[T]he City of Los Angeles receives tens of millions of dollars from the federal government each year based upon the ratio of population derived from the decennial census." Westall Decl. ¶ 35. In times of national emergency, cities such as Los Angeles receive relief based on census population. *Id.* ¶ 34 (discussing $20 million received under the Coronavirus Aid, Relief, and Economic Security Act, or CARES Act).

- In Harris County, the Replan's shortening of the self-response and NRFU timelines risks causing "unprecedented undercounts in the 2020 Census." Briggs Decl. ¶ 11.

24

"[A]pproximately $90,529,359 of the grants expended by Harris County in FY2019 depended on accurate census data." Wilden Decl. ¶ 5. Among the grants affected are those that enable "sustainable financing of local health departments" such as Harris County Public Health, which has helped manage COVID-19 for approximately 4.7 million people. Shah Decl. ¶¶ 4, 8.

An undercount in any locality matters greatly. Even a *small* undercount of a *subset* of the hard to count population would result in the loss of federal funding. *See Dep't of Commerce v. New York*, 139 S. Ct. at 2565 ("[I]f noncitizen households are undercounted by as little as 2% . . . [states] will lose out on federal funds"). Thus, like in *Department of Commerce v. New York*, Plaintiffs that receive federal funds based on census population suffer "a sufficiently concrete and imminent injury to satisfy Article III." *Id.*

### 2.   Plaintiffs will likely be deprived of their fair share of political representation.

Plaintiffs allege that the undercount resulting from the Replan will likely result in an unfair apportionment that will deprive local government Plaintiffs, individual Plaintiffs, and members of organizational Plaintiffs of their fair share of representation. The resulting "threat of vote dilution," whether Congressional or intrastate, is an injury in fact. *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331–32 (1999).

For example, given the historically low census response rates in the City of Los Angeles and City of Salinas in California, the Replan creates a substantial risk that their residents will not be counted, and a substantial risk of diminished political representation. *See* M. Garcia Decl. ¶¶ 8–15; Gurmilan Decl. ¶¶ 6, 8–14. Specifically:

- In the City of Los Angeles, the Replan "will result in extreme inaccuracy" because it would leave "just over six weeks to complete enumeration of roughly half of the exceptionally diverse households of the nation's second-most-populous city—in the midst of a once-in-a-lifetime pandemic." M. Garcia Decl. ¶ 8; *see* Westall Decl. ¶ 36 (stating it is "likely" that undercounts will "disproportionally impact Los Angeles" and "cause the City to miss out on a portion of [] funding for an entire decade").

- Similarly, the City of Salinas comprises 38.5% of Monterey County's hard to count population, and the City's response rate is 9.5% below its response rate from the 2010 Census and 8% below the current state average. Gurmilan Decl. ¶ 6.

The undercount wrought by the Replan will not only "compromise the success of the apportionment count" for Congressional representation, but also "severely compromise the quality of the redistricting data" for state and local representation. Louis Decl. ¶ 43; *see* Thompson Decl. ¶ 23. In fact, it is undisputed that census data is used to redraw district boundaries for federal, state, and local legislatures, and that drawing districts with unequal population can be unlawful. *See, e.g.*, Westall Decl. ¶¶ 14–29. An undercount from a truncated self-response period, lower-quality NRFU, and rushed data processing all mean that Plaintiffs' federal, state, and local political representation will be diminished. *See, e.g.*, Westall Decl. ¶¶ 27 ("[R]esidents in Council Districts with large concentrations of undercounted residents would be denied equal representation."); Soto Decl. ¶ 11 (same); Ellis ¶ 12 ("An undercount on the 2020 Census will also put me at serious risk of political underrepresentation in the U.S. Congress, and in the Texas legislature.").

### 3. The Replan will likely degrade census data that Plaintiffs use to deploy services and allocate capital.

The local government Plaintiffs allege that the Replan will degrade granular census data that they rely on to deploy services and allocate capital. "[B]y virtue of the Constitution and the Census Act, it is, of course, the federal government's job to collect and distribute accurate federal decennial census data." *New York v. Trump*, No. 20-CV-5770, 2020 WL 5422959, at *18 (S.D.N.Y. Sept. 10, 2020) (three-judge court); *see also* Departments of Commerce, Justice, and State, The Judiciary, and Related Agencies Appropriations Act, 1998, § 209, Pub. L. No. 105-119, 111 Stat. 2440, 2481 (1997) ("1998 Appropriations Act") (codified at 13 U.S.C. § 141 note) ("Congress finds that . . . it is essential that the decennial enumeration of the population be as accurate as possible, consistent with the Constitution and laws of the United States . . . .").

The degradation of data is thus an informational injury analogous to those that have supported Article III standing. *See New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 611 (S.D.N.Y. 2019) (finding that "degradation in the quality of census data" supported standing), *aff'd in part, rev'd in part and remanded sub nom. Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019); *see also, e.g.*, *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) (collecting

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

United States District Court
Northern District of California

United States District Court
Northern District of California

cases finding that "deprivation of information" supports standing); *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1114 (9th Cir. 2017) (finding standing partly because a statute, 15 U.S.C. § 1681e(b), requires "follow[ing] reasonable procedures to assure maximum possible accuracy" of information). For instance, King County, Los Angeles, and Harris County all rely on granular census data:

- King County, Washington uses census data to place public health clinics, plan transportation routes, and mitigate hazards. Dively Decl. ¶ 6.

- The City of Los Angeles uses "reliable, precise, and accurate population count data" to deploy the fire department, schedule trash-pickups, and acquire or improve park properties. Westall Decl. ¶ 32.

- Recently, Harris County has used census data "to estimate the impact of COVID-19 to specific communities at a granular level," which has helped the county tailor "communications in multiple languages with audience and age-specific prevention messaging and share information about availability of testing or vaccine sites." Shah Decl. ¶ 7. Inaccurate or incomplete data would "increase risk of misinterpreting the prevalence of the disease in disproportionately impacted communities." *Id.*

In sum, the Replan's harm to the accuracy of census data will harm Plaintiffs' concrete uses of the data.

> **4. Plaintiffs have diverted and will continue diverting resources to mitigate the undercount that will likely result from the Replan.**

Plaintiffs will divert resources to mitigate the undercounting that will likely result from the Replan. The result is "concrete and demonstrable injury to [Plaintiffs'] activities—with the consequent drain on [their] resources." *New York*, 2020 WL 5422959, at *19 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also Am. Diabetes Ass'n v. U.S. Dep't of Army*, 938 F.3d 1147, 1154 (9th Cir. 2019) (discussing *Havens Realty*, and finding injury in fact where plaintiffs "had altered their resource allocation" that they would have spent on some other organizational purpose).

The City of Salinas, Harris County, Black Alliance for Just Immigration, League of Women Voters, and National Urban League detail many examples of diverted resources:

- The City of Salinas already promoted the October 31 deadline "on social media and in thousands of paper flyers." Gurmilan Decl. ¶¶ 11–12. Thus, "some residents who received the City's messaging will fail to respond before the R[eplan] deadline because the City has limited remaining resources to correct what is now misinformation." *Id.* ¶ 12. Moreover, the City "is still advertising for census enumerator job listings because traditional applicant groups like senior citizens have concerns about the risk of catching COVID-19. With fewer enumerators working, every extra day the City has to use [] existing staff to support the count . . . ." *Id.* ¶ 13.

- Harris County "participated in over 150 events," including "food distribution events," during which it "announced the October 31, 2020 deadline for the 2020 Census." Briggs Decl. ¶ 12. Consequently, "Harris County will be forced to expend additional resources to clear confusion about the last date for self-response during the Census, to ensure that people who have not responded are counted in time." *Id.* ¶ 16.

- The Black Alliance for Just Immigration already "publicized the October 31 deadline for self-response during digital events between April and July" and is diverting resources to publicize the new September 30 deadline. Gyamfi Decl. ¶¶ 13–14.

- The League of Women Voters "has already had to spend time and financial resources" developing and distributing public education materials on the Replan timeline. Stewart Decl. ¶ 12.

- The National Urban League has similarly had "to divert resources from other programs and projects" to "alleviate the confusion" about the change in deadlines. Green Decl. ¶ 15.

Indeed, even now, the Census Bureau boasts of how its communications program was "more integrated than ever before" with Plaintiffs such as National Urban League. Fontenot Decl. ¶ 40. Mitigating those now-counterproductive education campaigns and a likely undercount will only be harder in the midst of a pandemic. *E.g.*, M. Garcia Decl. ¶¶ 14–15; Gurmilan Decl. ¶¶ 11–14; Briggs Decl. ¶¶ 11–12, 15–17. The result that Plaintiffs have diverted and will continue to divert resources from their organization mission to mitigate the effects of the Replan.

### 5.  Plaintiffs' injuries are fairly traceable to the Replan and redressable by a stay of the Replan.

The above harms are "concrete, particularized, and actual or imminent." *Dep't of Commerce v. New York*, 139 S. Ct. at 2565 (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008)). They are also "fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling.'" *Id.* (quoting *Davis*, 554 U.S. at 733). As the Supreme Court

stressed last year, "Article III 'requires no more than de facto causality.'" *Id.* at 2566 (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)). "[T]he defendant's conduct need not be 'the very last step in the chain of causation.'" *New York*, 2020 WL 5422959, at *21 (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).

Here, Plaintiffs' theory of standing rests "on the predictable effect of Government action on the decisions of third parties"—specifically, the predictable harms of accelerating census deadlines and curtailing key operations, without warning, after months of publicly operating under a plan tailored to COVID-19. *Id.* Accordingly, enjoining the implementation of the Replan's September 30, 2020 deadline for data collection and December 31, 2020 deadline for reporting the population tabulations to the President would redress those harms. *See, e.g.*, *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. at 328–34 (affirming injunction against the planned use of statistical sampling to prevent apportionment harms, among others); *New York v. United States Dep't of Commerce*, 351 F. Supp. 3d at 675 (issuing injunction to prevent "the loss of political representation and the degradation of information").

All told, Plaintiffs suffer injuries in fact that are fairly traceable to the Replan and redressable by the relief Plaintiffs seek. Plaintiffs thus have Article III standing.

**C. The Replan constitutes agency action.**

Defendants' three remaining arguments against reviewability arise under the APA, not the Constitution. To start, Defendants argue that the Replan is not reviewable because it is not a discrete "agency action." PI Opp. at 17. They thus claim that Plaintiffs' suit is "an improper, programmatic attack on the Bureau's efforts to conduct the 2020 Census." *Id.* The Court disagrees. The Replan is agency action.

"The bite in the phrase 'final action' . . . is not in the word 'action,' which is meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 478 (2001) (citations omitted). Thus, agency action is broadly defined to include "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Each word in that definition

1   has its own expansive definition. A "rule," for example, includes "the whole or a part of an agency

2   statement of general or particular applicability and future effect designed to implement, interpret,

3   or prescribe law or policy or describing the organization, procedure, or practice requirements of an

4   agency." *Id.* § 551(4).

5       To be sure, a reviewable agency action must be one that is "circumscribed" and "discrete."

6   *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62–63 (2004). This requirement "precludes [a]

7   broad programmatic attack" on an agency's operations. *Id.* at 64. Defendants thus analogize this

8   case to *NAACP v. Bureau of the Census*, 945 F.3d 183 (4th Cir. 2019), and *Lujan v. National*

9   *Wildlife Federation*, 497 U.S. 871, 893 (1990).

10      In *NAACP*, the plaintiffs brought a challenge in 2018 to the census "methods and means,"

11   and "design choices." *NAACP*, 945 F.3d at 186. The *NAACP* plaintiffs challenged as insufficient

12   the numbers of enumerators, the networks of area census offices, the Bureau's plan to rely on

13   administrative records, and partnership program staffing. *Id.* at 190. The Fourth Circuit found that

14   "'[s]etting aside' one or more of these 'choices' necessarily would impact the efficacy of the

15   others, and inevitably would lead to court involvement in 'hands-on' management of the Census

16   Bureau's operations." *Id.* (citing *S. Utah Wilderness All.*, 542 U.S. at 66–67). In concluding that

17   there was not final agency action, the Fourth Circuit emphasized that its holding was "based on the

18   broad, sweeping nature of the allegations that the plaintiffs have elected to assert under the APA."

19   *Id.* at 192.

20      *NAACP* is inapposite for two reasons. First, the relief Plaintiffs seek here would not

21   "inevitably [] lead to court involvement in 'hands-on' management of the Census Bureau[]." *Id.* at

22   191. Plaintiffs do not ask the Court to manage the Bureau's day-to-day operations or to enforce

23   free-floating standards of "sufficiency." *See NAACP*, 945 F.3d at 191 (quoting claims of

24   "insufficient network of area census offices," "insufficient partnership program staffing,"

25   "insufficient testing of 'new protocols,'" and more). Rather, Plaintiffs challenge the Defendants'

26   failure to consider important aspects of the problem and lack of reasoned explanation for the

27   Bureau's change in position. Reply at 14. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

28

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

United States District Court
Northern District of California

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (finding that agency's explanation for rescission was not the product of reasoned decisionmaking); *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (setting aside agency's "change in position" for lacking reasoned explanation).

Second, the Replan is a circumscribed, discrete agency action. Indeed, Defendants treated the Replan accordingly. Defendants named it the "Replan" or "Replanned Operational Schedule." *E.g.*, DOC_10276 (version of August 3, 2020 slide deck identified as key by the parties); DOC_8929 (July 30, 2020 email from Barbara LoPresti, Chief of the Decennial Information Technology Division, to senior officials discussing "this proposed replan"); DOC_10066 (email thread titled "Replan" with senior officials); DOC_11918 (August 3, 2020 email to the Chief of Staff for the Deputy Secretary of Commerce with subject "Revised Replan Deck").

The Secretary directed the Bureau to develop the Replan. *See, e.g.*, August 3 Press Release, ECF No. 37-1 ("directed by the Secretary"). In response to the Secretary's direction, the Bureau presented the Replan to the Secretary in a single slide deck. *See, e.g.*, DOC_10276. The Secretary made an explicit decision to adopt the Replan. Fontenot Decl. ¶ 85. Census Bureau Director Dillingham announced the Replan in a single press release on August 3, 2020. ECF No. 37-1. Defendants consistently treated the Replan as a circumscribed, discrete agency action.

Defendants' comparison to *Lujan v. National Wildlife Federation* is also misplaced. *See* PI Opp. at 17. In *Lujan*, plaintiffs challenged a "so-called 'land withdrawal review program'"—"so-called" because the term "land withdrawal review program" was "simply the name by which [the agency] [] occasionally referred to the continuing (and thus constantly changing) operations of the" agency. *Lujan*, 497 U.S. at 890. The term was "not derived from any authoritative text." Any "land withdrawal review program" in fact comprised at least "1250 or so individual classification terminations and withdrawal revocations." *Id.*

The *Lujan* plaintiffs recognized as much. In their complaint, the *Lujan* plaintiffs challenged: (1) reclassification of some withdrawn lands; (2) the return of other lands to the public domain; (3) petitioners' failure to develop, maintain, and revise land use plans; (4) petitioners' failure to submit recommendations as to withdrawals in the 11 Western States to the President;

31

1   (5) petitioner's failure to consider multiple uses for disputed lands; (6) petitioners' failure to

2   provide public notice of decisions; and (7) petitioners' failure to provide a detailed environmental

3   impact statement in every recommendation or report on major federal actions significantly

4   affecting the quality of the human environment. *Id.* at 879. Moreover, the *Lujan* plaintiffs

5   "[a]ppended to the amended complaint . . . a schedule of specific land-status determinations" that

6   listed several land status-determinations that were each identified by a listing in the Federal

7   Register. *Id.*

8        By contrast, Plaintiffs here challenge a circumscribed, discrete agency action: the Replan.

9   "Replan" is not an "occasional[]" informal name for "constantly changing" operations, *id.* at 890,

10   but is a codified term for the agency action directed and adopted by the Secretary. *E.g.*,

11   DOC_11918. Nor is the Replan a disconnected series of hundreds of individual determinations

12   with enough independent significance to be published in the Federal Register like the program in

13   *Lujan*. Rather, the Replan is a census operational plan that replaced the COVID-19 Plan. As *Lujan*

14   held plainly, though, judicial "intervention may ultimately have the effect of requiring a

15   regulation, a series of regulations, or even a whole 'program' to be revised by the agency in order

16   to avoid the unlawful result that the court discerns." *Lujan*, 497 U.S. at 894.

17        Again, in sum, as Justice Scalia stated: "[t]he bite in the phrase 'final action' . . . is not in

18   the word 'action,' which is meant to cover comprehensively every manner in which an agency

19   may exercise its power. It is rather in the word 'final.'" *Whitman*, 531 U.S. at 478 (citations

20   omitted). It is to that finality requirement that the Court now turns.

21       **D.  The Replan constitutes final agency action.**

22        Defendants argue that even if the Replan were agency action, "it is not 'final' agency

23   action that is subject to judicial review under § 704." PI Opp. at 19. "To maintain a cause of action

24   under the APA, a plaintiff must challenge 'agency action' that is 'final.'" *Wild Fish Conservancy v.*

25   *Jewell*, 730 F.3d 791, 800 (9th Cir. 2013) (citing *Norton*, 542 U.S. at 61–62).

26        An agency's action is final if two conditions are met. First, the action "must mark the

27   consummation of the agency's decisionmaking process—it must not be of a merely tentative or

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

interlocutory nature." *Bennett*, 520 U.S. at 177–78. Second, the action "must be one by which 'rights or obligations have been determined,' or from 'which legal consequences will flow.'" *Id.* (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). Five years earlier, the Supreme Court found that the same two requirements applied in a census case. *Franklin*, 505 U.S. at 797 (the central question "is [1] whether the agency has completed its decisionmaking process, and [2] whether the result of that process is one that will directly affect the parties."). Courts should take a "'pragmatic' approach" to finality. *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1815 (2016) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)).

The Court finds the Replan is final agency action for purposes of APA review because the Replan meets both criteria, each of which the Court addresses in turn.[6]

### 1. The Census Bureau completed its decisionmaking process: Defendants have adopted and implemented the Replan.

As to the first factor of final agency action, which is "whether the agency has completed its decisionmaking process," *Franklin*, 505 U.S. at 797, the Replan marks the consummation of the Bureau's and Department of Commerce's decisionmaking process because the Replan is "not subject to further agency review." *Sackett v. EPA.*, 566 U.S. 120, 127 (2012); *see also Hawkes*, 136 S. Ct. at 1813–14 (holding that an agency action was final because the determination was "typically not revisited"); *Fairbanks North Star Borough v. U.S. Army Corps of Engineers*, 543 F.3d 586, 593 (9th Cir. 2008) (holding that an agency's action was final where "[n]o further agency decisionmaking on the issue can be expected"). The Secretary made an explicit decision to adopt the Replan. August 3 Press Release; *see* Fontenot Decl. ¶ 85. The Bureau has implemented

---

[6] In *Hawkes Co.*, the Supreme Court expressly reserved whether an agency action that satisfies only the first condition—consummation of the agency's decisionmaking process—can still be final. 136 S. Ct. at 1813 n.2. The Court did not reach that question in *Hawkes Co.* because the agency action under review "satisfie[d] both prongs of *Bennett*." *Id.* Similarly, the Replan satisfies both prongs. Thus, the Court need not decide whether the first condition alone would suffice to constitute a "final" agency action.

33

the Replan. No further agency decisionmaking will be conducted on the Replan.

*Norton v. Southern Utah Wilderness Alliance*, a decision cited by Defendants, is readily distinguishable from the instant case. *See* Defs. 1st Supp. Br. at 1 (citing *Norton*, 542 U.S. at 61–62). In *Norton*, the United States Supreme Court found that the plaintiffs' challenges to the Bureau of Land Management's land use plans failed. The *Norton* Court reasoned that the plans were not a "legally binding commitment" that were enforceable under the APA. 542 U.S. at 72. Specifically, the plaintiffs claimed that BLM "failed to comply with certain provisions in its land use plans," which "describe[], for a particular area, allowable uses, goals for future condition of the land, and specific next steps." 542 U.S. at 59, 67. The Federal Land Policy and Management Act of 1976 "describes land use plans as tools by which 'present and future use is *projected*.'" *Id.* at 69 (emphasis in original) (quoting 43 U.S.C. § 1701(a)(2)).

Thus, the *Norton* Court observed that "[t]he implementing regulations make clear that land use plans are a *preliminary* step in the overall process of managing public lands—designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses." *Id.* (emphasis added). As a result, "a land use plan is not ordinarily the medium for affirmative decisions that implement the agency's 'project[ions].'" *Id.* (quoting 43 U.S.C. § 1712(e)). Similarly, "the regulation defining a land use plan declares that a plan 'is not a final implementation decision on actions which require further specific plans, process steps, or decisions under specific provisions of law and regulations.'" *Id.* at 69–70. In sum, by contrast to a "final" agency action, the type of land use plan challenged by the *Norton* plaintiff "is generally a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them." *Id.* at 71.

Here, the Replan was not a "preliminary step" toward deciding the Census schedule. Nor was the Replan a "statement of priorities" that merely "guides and constrains actions." *See id.* at 69, 71. Instead, the Replan constitutes a commitment to terminate the collection of data, analyze that data, and report "[t]he tabulation of total population" to the President by December 31, 2020. 13 U.S.C. § 141(b).

34

United States District Court
Northern District of California

Moreover, termination of data collection is practically irreversible. In his September 5, 2020 declaration, Defendants' own declarant, Associate Director Fontenot, requests that if the Court enjoins Defendants, the Court do so earlier than later because it is difficult to rehire field staff who have been terminated:

> Lack of field staff would be a barrier to reverting to the COVID Schedule were the Court to rule later in September. The Census Bureau begins terminating staff as operations wind down, even prior to closeout. Based on progress to date, as is standard in prior censuses, we have already begun terminating some of our temporary field staff in areas that have completed their work. It is difficult to bring back field staff once we have terminated their employment. Were the Court to enjoin us tomorrow we would be able to keep more staff on board than were the Court to enjoin us on September 29, at which point we will have terminated many more employees.

Fontenot Decl. at ¶ 98.

In sum, the Replan provides that all data collection, including field operations, cease by September 30, and truncated data processing begin the next day. Absent a preliminary injunction, those practically irrevocable steps are only days away. The Replan is thus the completion of Defendants' decisionmaking process on how the 2020 Census will be conducted.

### 2. The Replan directly affects the parties.

As to the second factor of final agency action, which is whether an agency action "will directly affect the parties," the Replan certainly does affect the parties and will continue to do so. *Franklin*, 505 U.S. at 797; *see also Bennett*, 520 U.S. at 177–78 (holding that, "[a]s a general matter," a final action "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow'" (citation omitted)). The Court analyzes the Replan's effect on the Plaintiffs and Defendants then distinguishes Defendants' main case, *Franklin v. Massachusetts*.

### a. The Replan's undercount will directly affect and harm Plaintiffs.

The Replan "will directly affect" Plaintiffs and result in "legal consequences." *Franklin*, 505 U.S. at 797; *Bennett*, 520 U.S. at 177–78. Specifically, the Replan will directly affect Plaintiffs in three ways: (1) by undercounting hard to count populations; (2) barring governmental

35

Plaintiffs' constituents and organizational Plaintiffs' members from participating in the 2020 Census after September 30, 2020; and (3) exposing those same people to violations of federal law and fines.

First, the Replan will likely undercount hard to count populations in the decennial census. This undercount necessarily affects the Secretary's "tabulation of total population by States" and the President's apportionment calculations, which "must be based on decennial census data alone." *New York*, 2020 WL 5422959, at \*26 (discussing text, legislative history, and the Executive's longstanding understanding of 13 U.SC. § 141(a) and 2 U.S.C. § 2a(a)). In other words, the Replan will likely result in an undercount in both the numbers that the Secretary reports to the States and the numbers that the President—who must draw on "decennial census data"—reports to Congress.

That undercount, as discussed in the Court's standing analysis above, injures Plaintiffs in legally cognizable ways. For instance, an undercount harms the "crucial representational rights that depend on the census," *Dep't of Commerce v. New York*, 139 S. Ct. at 2569, and deprives local government Plaintiffs of federal funds they are entitled to, *cf. City of Kansas City, Mo. v. U.S. Dep't of Hous. & Urban Dev.*, 861 F.2d 739, 745 (D.C. Cir. 1988) (discussing procedural rights arising under Community Development Block Grants, which at least King County and Los Angeles receive). These harms and others will last through 2030, if not later. Congress has determined as much by finding that:

> the decennial enumeration of the population is a complex and vast undertaking, and if such enumeration is conducted in a manner that does not comply with the requirements of the Constitution or laws of the United States, it would be impracticable for the States to obtain, and the courts of the United States to provide, meaningful relief after such enumeration has been conducted.

1998 Appropriations Act, § 209(a)(8), 111 Stat. at 2480–81. Thus, because the Replan will likely result in an inaccurate enumeration, the Replan is an action from which legal consequences will flow.

Second, the Replan bars people who seek to participate in the Census—such as

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

United States District Court
Northern District of California

governmental Plaintiffs' constituents and organizational Plaintiffs' members—from participating after September 30, 2020. *See Sackett*, 566 U.S. at 126 (holding that an agency action determined rights and obligations of property owners where it "severely limit[ed] [the owners'] ability to obtain a permit . . . from [the agency]"); *Alaska, Dep't of Environmental Conservation v. EPA*, 244 F.3d 748, 750 (9th Cir. 2001) (holding that an agency action determined rights and obligations where its effect was to halt construction at a mine facility). These people will be unable to participate despite their potential reliance on the Census Bureau's previous, widely publicized representations that they could participate until October 31, 2020. For example:

- The League of Women Voters has over 65,000 members across 800 state and local affiliates. Stewart Decl. ¶ 4. Thus, "[w]hen the Census Bureau extended the deadline for counting operations to October 31, 2020," the League of Women Voters "published blog posts advertising the new timeline," "shared numerous letters with [] state and local affiliates providing information about the new timeline," and "publicized the deadline in letters and [emails]." *Id.* ¶ 11.

- The City of Los Angeles is home to about 4 million people. M. Garcia Decl. ¶ 7. The City "conducted a public education campaign publicizing the October 31, 2020 date for self-response." *Id.* ¶ 14. For example, the City announced the date in bus shelter posters and social media toolkits. *Id.*

- National Urban League has 11,000 volunteers across 90 affiliates in 37 states. Green Decl. ¶ 4. "[W]hen the Census Bureau announced its extension of the timeline for collecting responses to the 2020 Census, the National Urban league informed all members of the 2020 Census Black Roundtable that the deadline had become October 31, 2020. The members in turn conveyed to their own networks and constituents, causing a cascading effect." *Id.* ¶ 14.

Third, the Replan exposes the same people—people who believe that October 31, 2020 is still the Census deadline—to fines and violations of federal law. By way of background, the Census Act imposes a "clear legal duty to participate in the decennial census." *California v. Ross*, 362 F. Supp. 3d 727, 739 (N.D. Cal. 2018) (Seeborg, J.) (citing 13 U.S.C. § 221). Specifically, 13 U.S.C. § 221(a) provides that any adult who "refuses or willfully neglects . . . to answer, to the best of his knowledge, any of the questions on" the census "shall be fined not more than $100." 13 U.S.C. § 221(a). "[E]ach unanswered question" risks an additional fine. *Morales v. Daley*, 116 F.

Supp. 2d at 809; *accord United States v. Little*, 317 F. Supp. 1308, 1309 (D. Del. 1970)

("Presumably there could be a separate violation for each unanswered question."). The 2020

Census form has nine questions for the first person in a household and seven questions for each

additional person. *See* U.S. Census Bureau, *2020 Census Questionnaire* (last revised Mar. 7,

2020), https://www.census.gov/programs-surveys/decennial-census/technical-

documentation/questionnaires/2020.html. The resulting liability for "refus[ing] or willfully

neglect[ing]" to answer an entire Census questionnaire is thus significant. 13 U.S.C. § 221(a).

Because of the excellent publicizing of the COVID-19 Plan, the Replan increases the risk

that people will incur that liability. Before the Replan was announced on August 3, 2020, the

Bureau and its partners (such as Plaintiff National Urban League) advertised for months that the

deadline for census responses was October 31, not September 30, 2020. *See supra* Section III-B-4.

Now, some people may refuse to respond to the questionnaire—or an enumerator's non-response

follow-up—on the misunderstanding that they still have another month to comply. This "increase

[in] *risk* of incurring penalties in a future enforcement proceeding" still "constitute[s] 'legal

consequences' under *Bennett*." *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 957–59

(D.C. Cir. 2019) (emphasis in original) (holding also that "the agency's exercise of prosecutorial

discretion" is not enough to render agency action non-final).

### b. The Replan directly affects Defendants by binding them for 10 years to a less accurate tabulation of total population.

For Defendants, the Replan gives rise to legal consequences because it effectively binds

Defendants—for the next decade—to a less accurate "tabulation of total population by States"

under the "decennial census." 13 U.S.C. § 141(b). The Replan does this by committing Defendants

to compressing census self-response from 33.5 weeks to 29 weeks; Non-Response Follow Up

("NRFU") from 11.5 weeks to 7.5 weeks; and data processing from 26 weeks to 13 weeks. *See,*

*e.g.*, *Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 319–20 (D.C. Cir. 2011) ("[T]he Guidance binds

EPA regional directors and thus qualifies as final agency action.").

The result of this significant compression in these extraordinary times will be inaccuracies

in the "tabulation of total population." Inaccuracies in the tabulation harm constitutional and statutory interests. *See, e.g.*, *Evans*, 536 U.S. at 478 (finding a "strong constitutional interest in accuracy"); 1998 Appropriations Act, § 209, 111 Stat. at 2481 ("Congress finds that . . . it is essential that the decennial enumeration of the population be as accurate as possible . . . ."). Those constitutional and statutory harms—and Defendants' choice of speed over accuracy—will endure until 2030.

A less weighty and more easily revocable constraint on the Government was found final in *Hawkes Co.*, 136 S. Ct. at 1814. There, an internal memorandum of agreement between two federal agencies provided that the Army Corps of Engineers could issue "jurisdictional determinations" ("JDs") that were generally "binding on the Government" for five years. *Id.* The Supreme Court held that the JDs were final agency action under *Bennett v. Spear* even though (1) the JDs could be appealed and "revisited," *see id.* at 1813–14; and (2) the JDs' source of authority, the memorandum of agreement, never went through notice and comment and was represented as *non*-binding by the United States. *See id.* at 1817 (opinions of Kennedy, J., concurring; and Ginsburg, J., concurring in part and concurring in the judgment). By contrast, here (1) Defendants do not waver in their commitment to end data collection by September 30, 2020 and to report population data to the President by December 31, 2020; and (2) there is no doubt that the Replan will bind the United States to this Census and "tabulation of total population" until 2030.

Thus, because the Replan determines rights and obligations and gives rise to legal consequences, the Replan constitutes final agency action.

### c. *Franklin v. Massachusetts* shows why the Replan is final agency action.

To argue that the Replan does not constitute final agency action, Defendants rely on the Supreme Court's decision in *Franklin v. Massachusetts*, 505 U.S. 788 (1992). PI Opp. 19–20. That case concerned the Secretary of Commerce's transmission of the census report to the President. *Franklin*, 505 U.S. at 797–98. There, the data presented to the President—the allocation of overseas military personnel to states based on their "home of record"—was still subject to

United States District Court
Northern District of California

correction by the Secretary. *Id*. In addition, the President could instruct the Secretary to reform the census. *Id*. at 798. The Secretary's report to the President thus was a "moving [target]" or a "tentative recommendation," rather than a "final and binding determination." *Id.* It carried "no direct consequences for the reapportionment." *Id*. Based on these characteristics, the transmission of the census report was not final agency action. *Id*. at 798.

*Franklin* underscores why the Replan constitutes final agency action. The Replan is neither a "tentative recommendation" nor a decision that will be reviewed by a higher official. *Id.* Rather, the Secretary directed the Bureau to develop the Replan on July 29, 2020 and approved the Replan on August 3, 2020. Moreover, as a practical matter, no time remains for agency reconsideration. The Replan's field operations will irreversibly wind down on September 30, 2020. Fontenot Decl. ¶ 98.

The Replan also has "direct consequences for the reapportionment." *Id.* The Replan determines when data collection will end—past which people can no longer participate in the census—and solidifies an undercount that will carry through to Congressional reapportionment, federal funding, and more for a decade. By contrast, in *Franklin*, the data the Secretary reported could have had zero effect. The President could have "reform[ed] the census" and allocated already-counted servicemembers not by "home of record," but by "legal residence," "last duty station," or no "particular State[]." *Id.* at 792, 794; *see also U.S. House of Reps. v. U.S. Dep't of Commerce*, 11 F. Supp. 2d at 93 (distinguishing *Franklin* on the same ground).

In any event, "[e]ven in the [*Franklin*] Court's view, the Secretary's report of census information to recipients other than the President would certainly constitute 'final agency action.'" *Franklin*, 505 U.S. at 815 n.14 (Stevens, J., concurring in part and concurring in the judgment). That is because only the President may order the Secretary "to reform the census, even after the data are submitted to him." *Id.* at 798. Data recipients such as the states can do no such thing. Accordingly, the Secretary's reporting of "counts as they are used for intra-state *redistricting* and for *federal fund allocation* . . . is final agency action for purposes of APA review." *City of New York v. U.S. Dep't of Commerce*, 822 F. Supp. 906, 918–19 (E.D.N.Y. 1993) (emphasis in original)

40

(challenging guidelines that led Secretary not to adjust undercount), *vacated on non-APA grounds*, 34 F.3d 1114 (2d Cir. 1994), *rev'd sub nom. Wisconsin v. City of New York*, 517 U.S. at 12 n.7 (noting that "[plaintiffs] did not appeal the District Court's treatment of their statutory claims" to the Second Circuit). Plaintiffs here likewise challenge the Replan's undercount as it will be used in intra-state redistricting and federal fund allocation.

Last year's citizenship question cases further underscore why the Replan is final agency action. In those cases, the United States conceded that adding the citizenship question to the census questionnaire constituted final agency action. *See New York*, 351 F. Supp. 3d at 645; *Kravitz v. Dep't of Commerce*, 336 F. Supp. 3d 545, 566 n.13 (D. Md. 2018). There is no reason that a memorandum announcing the addition of a question would mark the agency "complet[ing] its decisionmaking process" and "directly affect[ing] the parties," *Franklin*, 505 U.S. at 797, but the Replan would not. In both cases, the Secretary directed the development of and adopted the Replan; the Bureau viewed the Secretary's decision as binding; and the decision directly affects the parties. In sum, the Replan is final agency action.

### E.  The Replan is not committed to agency discretion by law.

Defendant's last argument on reviewability is that the administration of the census—including the Replan—is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Court disagrees.

The APA creates a "strong presumption favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 489 (2015). One exception includes those actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). However, courts have read this exception quite narrowly. This exception encompasses situations where Congress explicitly precludes review, or "'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Weyerhaeuser*, 139 S. Ct. at 370 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). This latter exception has generally been limited to "certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion . . . such as a decision not to

institute enforcement proceedings . . . or a decision by an intelligence agency to terminate an employee in the interest of national security." *Dep't of Commerce*, 139 S. Ct. at 2568 (citations and quotation marks omitted) (citing *Hecker v. Chaney*, 470 U.S. 821, 831–32 (1985) and *Webster v. Doe*, 486 U.S. 592, 600–01 (1988)).

*Department of Commerce v. New York* controls. There, the Supreme Court concluded that "[t]he taking of the census is not one of those areas traditionally committed to agency discretion." 139 S. Ct. at 2568. Collecting case law, the Supreme Court noted that "courts have entertained both constitutional and statutory challenges to census-related decisionmaking." *Id.* (citing, *e.g.*, *Carey*, 637 F.2d at 839, in which the Second Circuit concluded that the Bureau's decision not to use "Were You Counted" forms or to compare census records with records of Medicaid-eligible people "was not one of those 'rare instances' where agency action was committed to agency discretion"); *see also City of Los Angeles v. U.S. Dep't of Commerce*, 307 F.3d 859, 869 n.6 (9th Cir. 2002) (rejecting argument that the Bureau's decision not to adopt statistically adjusted population data was committed to agency discretion by law). The Supreme Court explained that there were meaningful standards against which to judge the taking of the census, including the Census Act, which requires that the agency "conduct a census that is accurate and that fairly accounts for the crucial representational rights that depend on the census and the apportionment." *Id.* at 2568–69 (quoting *Franklin*, 505 U.S. at 819–20 (Stevens, J., concurring in part and concurring in judgment)).

Here, Plaintiffs challenge the Replan—a set of deadlines for "the taking of the census." *Id.* at 2568. Plaintiffs' claims, like those in *Department of Commerce v. New York*, arise under the Enumeration Clause and the APA. Here too, the Census Act provides a meaningful standard against which to judge Defendants' action. The Replan's change in deadlines affects the accuracy of the enumeration, as did the decision to omit certain records in *Carey* or reinstate the citizenship question in *New York*. Accordingly, the Replan is not committed to agency discretion.

United States District Court
Northern District of California

**F. Plaintiffs lack an adequate alternative to judicial review and suffer prejudice from the Replan.**

To avoid any doubt that the instant case is reviewable, the Court briefly addresses two remaining APA requirements even though Defendants waive one and forfeit the other. *See generally United States v. Olano*, 507 U.S. 725, 733 (1993) ("[F]orfeiture is the failure to make the timely assertion of a right; waiver is the 'intentional relinquishment or abandonment of a known right.'" (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938))).

The first is that "an agency action is reviewable under the APA only if there are no adequate alternatives to APA review in court." *Hawkes Co.*, 136 S. Ct. at 1815 (citing 5 U.S.C. § 704). Defendants waived this argument at the September 22, 2020 preliminary injunction hearing, and for good reason. Tr. of Sept. 22, 2020 Preliminary Injunction Hearing, ECF No. 207, at 41:13–17 (The Court: "But you are not arguing that they have an adequate alternative to APA review in Court; is that correct?" Defendants: "That is not an argument that we have presented in our papers, Your Honor."). The effects of a census undercount now would irrevocably reverberate for a decade. Congress has reached the same conclusion. *See* 1998 Appropriations Act, § 209, 111 Stat. at 2481 (providing that if "enumeration is conducted in a manner that" is unlawful, it would be impracticable for the "courts of the United States to provide[] meaningful relief after such enumeration has been conducted").

The second APA requirement is that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706; *accord Organized Vill. of Kake v. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015) (en banc) ("[N]ot every violation of the APA invalidates an agency action; rather, it is the burden of the opponent of the action to demonstrate that an error is prejudicial."). Defendants do not raise this argument in their briefs and so forfeit it. In any event, as the above analysis of Plaintiffs' injuries shows, *see supra* Section III-B, the Replan's violation of the APA prejudices Plaintiffs in four ways. First, Plaintiffs risk losing important federal funding from undercounting. Second, Plaintiffs state that an inaccurate apportionment will violate their constitutional rights to political representation. Third, Plaintiffs will need to expend resources to mitigate the undercounting that will result from the Replan. Lastly, local government Plaintiffs' costs will

43

increase because those Plaintiffs rely on accurate granular census data to deploy services and allocate capital. Thus, an APA error would be prejudicial.

## IV.    MERITS

A party seeking a preliminary injunction must show (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20. The Court concludes that Plaintiffs meet all four factors and discusses each factor in turn below.[7]

### A.    Plaintiffs are likely to succeed on the merits of their claim that the Replan was arbitrary and capricious in violation of the APA.

Plaintiffs argue that they are likely to succeed on the merits with respect to their constitutional claim, which is brought under the Enumeration Clause, Mot. at 25–28, as well as their statutory arbitrary and capricious claim and pretext claim, which are both brought under the APA, *id.* at 14–25. Although Plaintiffs' constitutional and statutory claims overlap substantially because they both challenge the extent to which the Replan can accomplish a "full, fair, and accurate" count, Plaintiffs' constitutional and statutory claims present distinct bases on which the Court may grant injunctive relief.

Because the Court holds below that Plaintiffs are likely to succeed on the merits of their APA arbitrary and capricious claim, the Court need not reach Plaintiffs' Enumeration Clause claim or APA pretext claim. *See, e.g.*, *New York*, 2020 WL 5422959, at *2 (finding that the plaintiffs were entitled to a permanent injunction on their statutory claim and thus declining to "reach the

---

[7] Under Ninth Circuit precedent, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *accord Short v. Brown*, 893 F.3d 671675 (9th Cir. 2018) (holding that these factors are "on a sliding scale"). Thus, "when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious questions going to the merits.'" *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019) (quoting *All. for the Wild Rockies*, 632 F.3d at 1135). In the instant case, the Court finds not only serious questions going to the merits, but also a likelihood of success on the merits.

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

overlapping, albeit distinct, question of whether the [challenged action] constitutes a violation of the Constitution itself").

Before discussing Plaintiffs' APA arbitrary and capricious claim, though, the Court addresses the scope of its review. As the procedural history sets forth, Defendants have resisted producing the administrative record. Defendants also have explicitly conceded that if the Court finds that the Replan constitutes final agency action, then Defendants lose on likelihood of success on the merits. ECF No. 88 at 4. Defendants even "ask[ed] that the Court simply enter the TRO as a preliminary injunction" on September 8, 2020. ECF No. 98 at 65:18–20. Defendants have made these statements repeatedly:

- September 8, 2020 brief regarding whether Defendants must produce the administrative record:

  - "[W]ere the Court to brush past the threshold justiciability and jurisdiction bars, and conclude, contrary to the Fourth Circuit's holding in *NAACP*, that the Replan is discrete, circumscribed final agency action subject to the APA—then the appropriate course would be to consider Mr. Fontenot's declaration, and to find against the Defendants on the likelihood of success on the merits prong if that declaration is insufficient." ECF No. 88 at 4.

- September 8, 2020 further case management conference:

  - "Your Honor, we ask that the Court simply enter the TRO as a preliminary injunction at this point. I think that will serve everybody's interests best." ECF No. 98 at 65:18–20.

  - "Our position is that if the Court rejects the five threshold arguments that we have made, determines that there was final agency action and determines that an explanation was required under the APA and finds that Mr. Fontenot's declaration does not provide that explanation, then the conclusion would have to be that the Government loses on the likelihood of success on the merits prong of the PI." ECF No. 98 at 55:6–13.

*Accord* Tr. of Sept. 14, 2020 Further Case Management Conference, ECF No. 126 at 35:20–36:6 (conceding same); Tr. of Sept 15, 2020 Hearing on Allegations of Potential Non-Compliance with TRO, ECF No. 141 at 52:24–53:8, 62:10–13 (conceding same).

The Court has found that the Replan is reviewable final agency action. Thus, if the Court

45

United States District Court
Northern District of California

1    finds that Associate Director Fontenot's declaration is insufficient, Defendants have conceded that

2    Defendants lose on likelihood of success on the merits.

3          Associate Director Fontenot's declaration is facially insufficient to serve as a basis for APA

4    review of whether the agency action was arbitrary and capricious. APA review "is limited to 'the

5    grounds that the agency invoked when it took the action.'" *Dep't of Homeland Sec. v. Regents of*

6    *the Univ. of Ca.*, 140 S. Ct. 1891, 1913 (2020). To assess those grounds, "the focal point for

7    judicial review should be the administrative record." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

8    Litigation affidavits are "merely 'post hoc' rationalizations which have traditionally been found to

9    be an inadequate basis for review." *Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1972) (quoting

10   *Burlington Truck Lines v. United States*, 371 U.S. 156, 168–169 (1962)); *accord Cmty. for

11   Creative Non-Violence v. Lujan*, 908 F.2d 992, 998 (D.C. Cir. 1990) (R. Ginsburg, Thomas,

12   Sentelle, JJ.)) (holding that "[t]he use of an affidavit by the agency decisionmaker was manifestly

13   inappropriate for a case" under the APA); *see also Regents*, 140 S. Ct. at 1909 (rejecting Secretary

14   of Homeland Security's post-litigation memorandum). The Court thus views Plaintiffs' claims

15   through the lens of the administrative record.[8]

16         On review of the administrative record, the Court agrees that Plaintiffs are likely to

17   succeed on the merits of their APA arbitrary and capricious claim for five reasons: (1) Defendants

18   failed to consider important aspects of the problem, including their constitutional and statutory

19   obligations to produce an accurate census; (2) Defendants offered an explanation that runs counter

20   to the evidence before them; (3) Defendants failed to consider alternatives; (4) Defendants failed

21   to articulate a satisfactory explanation for the Replan; and (5) Defendants failed to consider

22   reliance interests. Although likelihood of success on the merits of one of the five reasons would

23   support a preliminary injunction, the Court finds that Plaintiffs are likely to succeed on all five.

24   Below, the Court analyzes the five reasons in turn.

25   _____

26   [8] As stated in the procedural history, the administrative record for the purposes of the preliminary
     injunction comprises Defendants' non-privileged OIG documents. United States Magistrate Judges
27   adjudicated Defendants' assertions of privilege after *in camera* review.

28
Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

**1. Plaintiffs are likely to succeed on the merits of their claim that Defendants failed to consider important aspects of the problem.**

Plaintiffs argue that, by failing to adequately provide for the fulfillment of its constitutional and statutory duty to conduct an accurate enumeration, Defendants neglected to consider important aspects of the problem in violation of the APA. Mot. at 18–21.

The arbitrary and capricious standard requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). In order to meet this requirement, the agency must consider the "important aspect[s]" of the problem before it. *State Farm*, 463 U.S. at 43.

The Court concludes that Defendants failed to consider "important aspect[s]" of the problem before them. *State Farm*, 463 U.S. at 43. Rather, Defendants adopted the Replan to further one alleged goal alone: meeting the Census Act's statutory deadline of December 31, 2020 for reporting congressional apportionment numbers to the President. In the process, Defendants failed to consider how Defendants would fulfill their statutory and constitutional duties to accomplish an accurate count on such an abbreviated timeline.

Defendants' constitutional and statutory obligations are "important aspects" of the problem before them. *See Oregon Natural Resources Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996) ("Whether an agency has overlooked 'an important aspect of the problem,' . . . turns on what [the] relevant substantive statute makes 'important.'"); *see, e.g.*, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383–84 (2020) ("If the Department did not look to [the Religious Freedom Restoration Act's] requirements or discuss [RFRA] at all when formulating their solution, they would certainly be susceptible to claims that the rules were arbitrary and capricious for failing to consider an important aspect of the problem."). Here, the relevant constitutional and statutory provisions focus first and foremost on the obligation to produce an accurate census.

As a constitutional matter, the Enumeration Clause evinces a "strong constitutional interest in [the] accuracy" of the census. *Evans*, 536 U.S. at 478. This interest in accuracy is driven by "the

47

1    constitutional purpose of the census, [which is] to determine the apportionment of the

2    Representatives among the States." *Wisconsin v. City of New York*, 517 U.S. at 20.

3          In turn, the Census Act imposes a statutory duty of accuracy. "[B]y mandating a population

4    count that will be used to apportion representatives, *see* § 141(b), 2 U.S.C. § 2(a), the [Census] Act

5    imposes 'a duty to conduct a census that is accurate and that fairly accounts for the crucial

6    representational rights that depend on the census and the apportionment.'" *Dep't of Commerce v.*

7    *New York*, 139 S. Ct. at 2568–69 (quoting *Franklin*, 505 U.S. at 819–20 (Stevens, J., concurring in

8    part and concurring in the judgment)). Congress has underscored this duty in legislation amending

9    the Census Act. *See* 1998 Appropriations Act, § 209(a), 111 Stat. at 2480–81 (codified at 13

10   U.S.C. § 141 note) (finding that "it is essential that the decennial enumeration of the population be

11   as accurate as possible, consistent with the Constitution and laws of the United States"). Thus, the

12   Census Act requires the Defendants to produce an accurate census.

13         Defendants failed to sufficiently consider these constitutional and statutory obligations

14   when adopting the Replan. As the administrative record shows, the Replan will decrease the

15   census's accuracy and undercount historically undercounted individuals. The Replan cuts Non-

16   Response Follow Up ("NRFU") from 11.5 weeks to 7.5 weeks. The Replan cuts data processing

17   from 26 weeks to 13 weeks. The effect of this shorter timeframe will be particularly pronounced

18   due to the pandemic. COVID-19 has not only made it more difficult to hire enumerators, but also

19   made it more difficult for enumerators to conduct safe and effective NRFU. ECF No. 37-7 at 8, 18.

20   After all, the goal of NRFU is to "conduct in-person contact attempts at each and every housing

21   unit that did not self-respond to the decennial census questionnaire." Fontenot Decl. ¶ 48.

22         The record before the agency demonstrates the effect of these significant cuts on census

23   accuracy. Several internal Bureau documents are especially illustrative.

24         First, a March 24, 2020 set of talking points explained the effect of reducing operations on

25   accuracy. These talking points were circulated by Enrique Lamas, Chief Advisor to Deputy

26   Director Ron Jarmin, to senior Bureau officials as late as July 21, 2020 on "urgent" notice.

27   DOC_7085–86. "Call me please," he wrote to Senior Advisor for Decennial Affairs, James B.

28

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

United States District Court
Northern District of California

Treat. DOC_7075. The talking points stated: "The 2020 Census operations are designed to cover specific populations for a complete count of the population. If specific operation are cut or reduced, the effect would be to miss specific parts of the population [and] lead to an undercount of specific groups. That is why operations like Update Leave targeting rural populations or group quarters enumeration are critical to full coverage and need to be done in specific orders." DOC_7086.

A set of April 17, 2020 talking points regarding the COVID-19 Plan, which were drafted by Assistant Director for Decennial Programs Deborah Stempowski, stated: "We have examined our schedule and compressed it as much as we can without risking significant impacts on data quality." DOC_265. Bureau officials repeated this statement to Congressman Jamie Raskin, who chairs the House Subcommittee on Civil Rights and Civil Liberties, which has jurisdiction over the census. *See* DOC_2224.

On July 23, 2020, the Chief of Decennial Communications and Stakeholder Relationships, Kathleen Styles, shared a so-called "Elevator Speech" memo with GAO official Ty Mitchell and senior Bureau officials. *See* DOC_8026 (sending to GAO). The purpose of the Elevator Speech, Chief Styles wrote, was "to explain, in layman's terms, why we need a schedule extension." The Speech begins with a "High Level Message," which in its entirety reads:

> Curtailing census operations will result in a census that is of unacceptable quality. The Census Bureau needs the full 120 days that the Administration originally requested from Congress to have the best chance to produce high quality, usable census results in this difficult time. Shortening the time period to meet the original statutory deadlines for apportionment and redistricting data will result in a census that has fatal data quality flaws that are unacceptable for a Constitutionally-mandated activity.

ECF No. 155-8 at 295, 332 (DOC_8070).

The rest of the Speech makes three overarching points that are similarly grim. The first point is that "[s]hortening field data collection operations will diminish data quality and introduce risk." The main reason is that "COVID-19 presents an unprecedented challenge to field data collection. . . . Areas that are now low risk for COVID will become high risk and vice versa, and

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

the Census Bureau will need to adapt NRFU on an almost daily basis to conduct data collection using the Administration's gating criteria." *Id.* Other necessary adaptations include "development of systems for an outbound telephone operation," "significantly increasing selections for field positions to compensate for a much higher dropout rate from enumerator training," and finding ways to count people who lived in group quarters and in college. *Id.* "All of these adapted operations are intended to produce the most accurate census possible, and cannot be rushed without diminishing data quality or introducing unacceptable risk to either operations or field staff." *Id.*

The second point is that "[s]hortening post processing operations will diminish data quality and introduce risk." *Id.* "[I]t is not possible to shorten the schedule appreciably without directly degrading the quality of the results and introducing great risk." *Id.* The reason is that "[e]ach and every step in post processing is necessary and eliminating any step would result in a diminished data product. . . . [N]o step can be eliminated or overlap with another step." For instance:

> Some of these steps provide for quality reviews. While it may be tempting to think that quality reviews can be shortened, through decades of experience[,] the Census Bureau has learned that quality reviews are essential to producing data products that do not need to be recalled, products that stand the test of time. [The Bureau] routinely discover[s] items that need to be corrected during data review and appreciably shortening data review would be extremely unwise.

*Id.* Furthermore, "[t]he Census Bureau needs 30 [more] days for risk mitigation." Risks include natural disasters, "e.g., a hurricane, or a COVID outbreak," and "to account for additional processing steps and reviews made necessary by the COVID adaptations (e.g., extra time for processing responses related to college students)." *Id.*

The Elevator Speech's last overarching point is that "[c]urtailing either field operations or post-processing may result in loss of public confidence in the census results such that census results would be unusable regardless of quality." DOC_8071. Specifically, "[t]he administration already requested 120 days and Census officials have repeatedly said we need this time." *Id.* Changing tack could "result in great skepticism about the numbers and unwillingness to use them." *Id.* That is because "[t]here are always winners and losers in census results." *Id.* As a result,

50

United States District Court
Northern District of California

"[c]ensus results have always been about confidence . . . confidence in the Census Bureau's ability to produce high quality, impartial data, free from political interference. In this sense being seen to produce politically-manipulated results is as much of a danger as low quality data." *Id.*

Many of the fears expressed in the Elevator Speech were borne out by the time the Replan was ordered, adopted, and announced:

- The Secretary directed the Bureau to develop a plan with an accelerated schedule within days, which led to the drafting of the Replan. *See* DOC_10183.

- The Replan shortened both data collection and data processing.

- Four days before the Replan was announced, enumerator staffing was roughly 50 percent of the Bureau's target at some sites within major regions such as the Los Angeles Region. *See* DOC_8631.

- On the date of the Replan's announcement, COVID-19 had resurged in much of the country, Hurricane Hanna had hit Texas, and Hurricane Isaias had almost made landfall in North Carolina.[9]

On July 23, 2020, the same day that the Bureau circulated the Elevator Speech, several senior Bureau officials, including Deputy Director Ron Jarmin, Defendants' sole declarant Associate Director Fontenot, and Associate Director for Field Operations Timothy Olson, conferred in an email thread. Associate Director Fontenot began the thread by stating he would soon tell the Department of Commerce about the "reality of the COVID Impacts and challenges":

> On Monday at DOC [Department of Commerce] I plan to talk about the difference between goal and actual case enumeration (Currently a shortfall (11 % goal vs 7% actual) and attribute it to the higher drop out rate and (ideally with reasons) and what we are going to do to address the technology drop outs.)

---

[9] The Court may take judicial notice of matters that are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Accordingly, the Court takes judicial notice that Hurricane Hanna hit Texas on July 25, 2020, while Hurricane Isaias made landfall on the coast of North Carolina on August 3, 2020 at 11 pm Eastern Time. *See Hurricane Hanna*, https://www.weather.gov/crp/Hurricane_Hanna; *Hurricane Isaias*, https://www.weather.gov/mhx/HurricaneIsaias080420#:~:text=Isaias%20marked%20the%20earliest%20ninth,peak%20intensity%20of%2085%20mph.&text=Across%20eastern%20North%20Carolina%2C%20Isaias,minor%20storm%20surge%20and%20tornadoes.

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

I think it is critical to lay the groundwork for the reality of the COVID Impacts and challenges.

Does anyone have any problems with my approach?

DOC_7737. In response, Associate Director Olson "agree[d] that elevating the reality is critical, especially in light of the push to complete NRFU asap for all the reasons we know about." DOC_7738.

"All the reasons we know about" are not described in the administrative record. Olson does allude, however, to the reason of "political motivation." DOC_7737. In doing so, he "sound[s] the alarm" on "deliver[ing] apportionment by 12/31" in the strongest possible terms:

We need to sound the alarm to realities on the ground – people are afraid to work for us and it is reflected in the number of enumerators working in the 1a ACOs. And this means it is ludicrous to think we can complete 100% of the nation's data collection earlier than 10/31 and any thinking person who would believe we can deliver apportionment by 12/31 has either a mental deficiency or a political motivation.

*Id.* One reason that accelerating the schedule would be "ludicrous," Associate Director Olson stated, was the "awful deploy rate" of enumerators about 62% below target. *Id.* Driving that shortfall was an "almost [] debilitating quit rate":

Another tack is to provide crystal clear numbers by the 1a ACOs that shows the awful deploy rate - field selected the right number (big number) to training, training show rate was on par with prior censuses (albeit a few points lower ... but overall in line with past censuses). And then we had a huge quit rate from training to deployed in field (and this does not mirror past censuses at all - it is MUCH higher, almost a debilitating higher quit rate). And this translates into much slower production in the field because we have less than half the number of enumerators (38%) we need to get the job done.

DOC_7559.[10] The email thread thus showed senior Bureau officials' serious concerns

---

[10] At the preliminary injunction hearing, Defendants had no comment on Associate Director Olson's email or other documents in the administrative record. In response to Associate Director Olson's email, for instance, Defendants stated: "to the extent that the Court does undertake some sort of APA or record review, then in an APA case the Court acts as an appellate tribunal and reviews the record[,] and the record speaks for itself." Tr. of Sept. 22, 2020 Preliminary Injunction

52

United States District Court
Northern District of California

about the Replan only days before July 29, 2020, the day Associate Director Fontenot

asserts that the Secretary ordered the development of the Replan. The staffing shortfall

persisted. In the Bureau's July 30, 2020 Periodic Performance Management Reports

slideshow, the Bureau acknowledged that "[s]taffing remains a challenge." DOC_9423.

Like field operations, data processing also needed more time in order to yield an accurate

census. On July 24, 2020, a memo titled "2020 Decennial Census – Apportionment Data

Processing" was circulated by Chief of Decennial Communcations Stakeholder Relationships

Kathleen Styles to senior staff, including Associate Director Fontenot and Assistant Director

Stempowski. DOC_8019. The Apportionment Data Processing memo explained that "[t]he time

spent on data processing is essential to ensuring an accurate and complete count." DOC_8019. The

Bureau further acknowledged that "[t]he three month delay in the largest field data collection

operations, which impacted more than 35 percent of all responding households, will require

additional data processing to ensure people are accurately counted in the correct location." *Id*. The

Bureau explained the shortfalls to accuracy that would result if data processing were cut short:

- Actions that would condense or remove parts of [data processing] run the risk of:

    o Incorrect geographic placement of housing units or missing units that were added through peak field operations.

    o Duplicative or conflicting data for certain households.

    o Unreliable characteristic data for redistricting files.

    o Additional legal challenges of apportionment counts, redistricting results, or other data products as a result of diminished quality of decennial data.

DOC_8019.

Despite the Bureau's conclusions that it needed more time, the Bureau was directed just

---

Hearing, at 13:25–14:3, ECF No. 207; *accord id.* at 18:20–19:1 (The Court: "Would [Defendants] like to comment on this document [the 'Elevator Speech']?" Defendants: "No, I don't have any further comment, Your Honor. I think for the reasons we said that the documents speak for themselves.").

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

before or on July 30, 2020[11] to create the Replan and present it to the Secretary on August 3, 2020. *Cf.* Fontenot Decl. ¶ 81 ("July 29, the Deputy Director informed us that the Secretary had directed us . . . ."). Although the Bureau had taken nearly a decade to develop the Operational Plan Version 4.0 for the 2020 Census, the Bureau developed the Replan in the span of 4 or 5 days at most. On July 30, 2020, the Chief of the Population Division, Karen Battle, sent an email with the subject "EMERGENCY MEETING on 12_31 Delivery of Appo__." DOC_8364. Thereafter, senior Bureau officials met at 11 a.m., and again at 5:00 p.m. that day. The officials then conferred in an email thread that extended to at least 10:57 p.m. DOC_8353. In the thread, the Chief of the Geography Division, Deirdre Bishop, thanked fellow senior officials for "exhibiting patience and kindness as we brainstormed and adjusted the schedule." DOC_8356.

Even as the Bureau began to develop the Replan at the Secretary's direction, the Bureau continued to acknowledge that the Replan would present an unacceptable level of accuracy. On July 31, 2020, the Chief of the Decennial Statistical Studies Division, Patrick Cantwell, sent an email to senior Bureau officials that mentioned "global risks":

- "Many of these changes delay activities required for developing the remaining data products following apportionment, some of them (but not all) until after 12/31/20, increasing the risk that they will not be completed on time, whatever that schedule becomes."

- "Many of these changes, separately or in combination, have not been previously studied or analyzed for their effects on data quality. We risk decreasing the accuracy of apportionment counts and other statistics released later."

- "With these changes to the original operational plan and schedule, we increase the chance of subsequent data concerns. For example, it may be necessary to release tabulations later that are not all completely consistent."

DOC_9073–74.

---

[11] The administrative record does not contain any communications from Deputy Director Jarmin on July 29, 2020, let alone a specific communication between Deputy Director Jarmin and Associate Director Fontenot. Because Associate Director Fontenot's declaration is not the administrative record, the Court relies on the July 30 "EMERGENCY MEETING" email discussed below and subsequent communications for the latest date of the Secretary's order.

54

In a later July 31, 2020 email chain, senior Bureau officials, including Victoria Velkoff, the Associate Director for Demographic Programs; Christa Jones, the Chief of Staff to Director Dillingham; John Maron Abowd, Associate Director for Research & Methodology; Michael T. Thieme, Assistant Director for Decennial Census Programs (Systems & Contracts), and Benjamin J. Page, Chief Financial Officer, signed off on the following document describing the Replan:

> All of the changes below, taken together, reduce the time required for post-processing such that, when combined with the operational changes above in this document, make it possible to deliver the apportionment package in time to meet the current statutory deadline. All of these activities represent abbreviated processes or eliminated activities that will reduce the accuracy of the 2020 Census. Additionally, the downstream effect of separating apportionment and redistricting processing activities could not be assessed. This results in additional risk to the delivery of the redistricting products in order to meet the statutory deadline and will have a negative impact on the accuracy of the redistricting data.

DOC_9496.

Because of the Replan's negative impact on accuracy, top Bureau staff hesitated to "own" the Replan. On August 1, 2020, Christa Jones, Chief of Staff to Director Dillingham, wrote in an email to other senior officials: "I REALLY think we need to say something on page 2 [of the Bureau's presentation on the Replan] that this is what we've been directed to do or that we are presenting these in response to their direction/request. This is not our idea and we shouldn't have to own it." DOC_10183. Jones also wrote that "I think we need to include the language about the quality that we have on the Word document. We really shouldn't give this as a presentation without making this clear up front." That Word document, "Options to meet September 30_v11," was circulated to senior Bureau officials by the Chief of the Decennial Census Management Division, Jennifer Reichert. The document stated that "accelerating the schedule by 30 days introduces significant risk to the accuracy of the census data. In order to achieve an acceptable level of accuracy, at[ ]least 99% of Housing Units in every state must be resolved." DOC_9951; *accord* DOC_8779 (another version of "Options to meet September 30" circulated by Assistant Director Stempowski on July 31, 2020, that states "[a]cceptable quality measure: 99% if HUs

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

1  resolved (similar to 2010)").

2      The same significant concerns were presented to Secretary Ross on August 3, 2020

3  ("August 3 Presentation").[12] That presentation began, like the Elevator Speech and the "Options to

4  meet September 30" document, with a tough assessment: "Accelerating the schedule by 30 days

5  introduces significant risk to the accuracy of the census data. In order to achieve an acceptable

6  level of accuracy, at least 99% of Housing Units in every state must be resolved." DOC_10276.

7  The August 3 Presentation then described the many changes in field operations that the Replan

8  will necessitate, such as reducing the number of NRFU visits from six to three or one.[13] *See*

9  DOC_10281–82.

10      In addition to detailing those changes in field operations, the August 3 Presentation also

11  details the Replan's impact on data processing. Among these impacts is possible harm to a

12  different statutory deadline—the deadline for the Secretary's report of redistricting data to the

13  states:

14      Additionally, the downstream effect of separating apportionment and redistricting
        processing activities could not be assessed, but we anticipate it will, at a minimum,
15      reduce the efficiency in data processing and could further reduce the accuracy of
        the redistricting data if there is a similar requirement to deliver that data by the
16      current statutory deadline of March 31, 2021 [sic; should be April 1, 2021].

17  DOC_10281. The August 3 Presentation thus contemplated sacrificing not only the accuracy of the

18  December 31, 2020 congressional apportionment figures, but also the accuracy and timeliness of

19

20  _____

21  [12] Like Defendants had done with the Elevator Speech, Defendants produced several versions of
    the August 3 Presentation as non-privileged and not pre-decisional. However, the parties identified
22  one version, DOC_10275, as a key document. ECF Nos. 161, 190. The Court thus mainly analyzes
    that version of the document. *See* 5 U.S.C. § 706 ("[T]he court shall review the whole record or
23  those parts of it cited by a party . . . .").

24  [13] On September 8, 2020, Defendants sua sponte filed a notice regarding compliance with the
    Court's September 5, 2020 TRO. ECF No. 86. The notice attached the "Guidance for Field
25  Managers related to Action Required following the 9/5 Court Order" in which Defendants stated
    that the Replan reduced the number of visits from six to one. ECF No. 86 Attachment C ("We will
26  resume making six contact attempts to confirm vacant housing units, instead of the one contact
27  attempt set forth in the Replan").

28
Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

United States District Court
Northern District of California

the April 1, 2021 redistricting numbers.

In sum, the Bureau concluded internally that trying to get the count done by the December 31, 2020 statutory deadline would be unacceptable to the Bureau's statutory and constitutional interests in accuracy. These conclusions were consistently and undisputedly reflected in documents leading up to the August 3 Press Release, including in the contemporaneous August 3, 2020 Presentation.

However, Director Dillingham's August 3 Press Release, which is less than one and a half pages, did not consider how the Replan would feasibly protect the same essential interests that the Bureau had identified. Rather, the August 3 Press Release based its decision on one statutory deadline and the Secretary's direction. The August 3 Press Release "accelerate[d] the completion of data collection and apportionment counts by our statutory deadline of December 31, 2020, *as required by law and directed by the Secretary of Commerce*." *Id.* (emphasis added).

The August 3 Press Release then asserts that the Replan's shortening of data collection and processing will not affect census accuracy: "We will improve the speed of our count without sacrificing completeness. . . . Under this plan, the Census Bureau intends to meet a similar level of household responses as collected in prior censuses, including outreach to hard-to-count communities." *Id.* To support these assertions, the August 3 Press Release tersely mentions three operational changes related to enumerators conducting NRFU; data processing; and staffing:

- [*Enumerators conducting NRFU*] "As part of our revised plan, we will conduct additional training sessions and provide awards to enumerators in recognition of those who maximize hours worked. We will also keep phone and tablet computer devices for enumeration in use for the maximum time possible."

- [*Data processing*] "Once we have the data from self-response and field data collection in our secure systems, we plan to review it for completeness and accuracy, streamline its processing, and prioritize apportionment counts to meet the statutory deadline."

- [*Staffing*] "In addition, we plan to increase our staff to ensure operations are running at full capacity."

These announcements, and nothing more, comprised the August 3 Press Release's explanation of changes that would ensure an accurate count. The August 3 Press Release thus did not grapple

57

United States District Court
Northern District of California

1    with the Bureau's contemporaneous, detailed, and unqualified internal concerns.

2        Moreover, the Bureau's internal documents undermine the August 3 Press Release's claims

3    of efficiency. As to enumerators and staffing, the Bureau's head of field operations had "sound[ed]

4    the alarm" on July 23, 2020. DOC_7738. "Crystal clear numbers" showed that "people are afraid

5    to work for us." DOC_7738. Specifically, the Bureau had an "awful deploy rate" and "less than

6    half the number of enumerators (38%) [it] need[ed] to get the job done." *Id.* How "awards" and

7    "additional training sessions" in the midst of a pandemic would close that 62% gap was unclear. A

8    week later, the "High-Level Summary Status" dated July 30, 2020 confirmed the staffing shortfall.

9    In sites and Area Census Offices across the county, the Bureau lacked about half of the

10   enumerators "compared to [its] goal." DOC_8623.

11       As for data processing, senior Bureau officials had received on July 29, 2020 a "High

12   Level Summary of the Post-Data Collection" from the Director's Senior Advisor for Decennial

13   Affairs, James Treat. DOC_8337. The High Level Summary unambiguously concluded that:

14       Any effort to concatenate or eliminate processing and review steps to reduce the
         timeframes will significantly reduce the accuracy of the apportionment counts and
15       the redistricting data products. Decades of experience have demonstrated that these
         steps and time are necessary to produce data products that do not need to be
16       recalled, meet data user expectations and needs, [are] delivered on time, and stand
         the test of time.
17

18   *Id.*; *accord* DOC_8086 (July 27, 2020 memo from Treat with similar language).

19       Similarly, in the very August 3 Presentation on the Replan, the Bureau found that a

20   "compressed review period creates risk for serious errors not being discovered in the data –

21   thereby significantly decreasing data quality. Additionally, serious errors discovered in the data

22   may not be fixed." DOC_10285.

23       Although the Operational Plan Version 4.0 took nearly a decade to develop, the Replan was

24   developed in four to five days. All told, in the four or five days that the Bureau developed the

25   Replan, Defendants did not sufficiently consider how the Replan would fulfill their statutory and

26   constitutional duty to conduct an accurate census. Rather, the Bureau followed the Secretary's

27   orders even though "[s]hortening the time period to meet the original statutory deadlines for

28                                                          58

United States District Court
Northern District of California

apportionment and redistricting data w[ould] result in a census that has fatal data quality flaws that are unacceptable for a Constitutionally-mandated activity." DOC_8022.

### 2. Defendants offered an explanation that runs counter to the evidence before the agency.

An agency action is "arbitrary and capricious if the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. "Reliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking." *Mo. Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1075 (D.C. Cir. 2003). If an agency has offered an explanation that runs counter to the evidence before the agency, the agency's action is arbitrary and capricious. *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 851–52 (9th Cir. 2020) (concluding that an agency's rule was arbitrary and capricious because the agency's reasoning "runs counter to the evidence before the agency"); *Mo. Pub. Serv. Comm'n.*, 337 F.3d at 1075 (concluding that the agency's action was arbitrary and capricious because the agency "had adopted a new rationale premised on old facts that were no longer true").

Defendants' alleged justification for the Replan is the need to meet the December 31, 2020 statutory deadline for the Secretary of Commerce to report to the President "the tabulation of total population by States" for congressional apportionment because Congress failed to grant an extension. However, before the adoption of the Replan, the President and multiple Bureau officials repeatedly stated, publicly and internally, that the Bureau could not meet the December 31, 2020 statutory deadline. For instance:

- On April 3, 2020, the day the COVID-19 Plan was announced, President Donald J. Trump publicly stated, "I don't know that you even have to ask [Congress]. This is called an act of God. This is called a situation that has to be. They have to give it. I think 120 days isn't nearly enough." ECF No. 131-16 at 4.

- On May 7 and 8, 2020, Associate Director for Communications Ali Ahmad wrote to Secretary Ross's Chief of Staff and other senior officials. Ahmad stated that "[his memo] shows that if we could snap restart everywhere we would still need legislative fix. It also then explains why we can't [snap restart] and estimates when we can start in the last places, getting us to the October 31, 2020 end date for data collection, and then explains

59

why we need an additional 30 for risk mitigation." DOC_365. Risks included "another system shock, such as a Hurricane hitting the [S]outh during NRFU." *Id.*

- On May 8, 2020, Secretary Ross's Chief of Staff sent the Secretary a memo that among other things stated, "**Based on the initial suspension of field activities in line with OMB guidance, the Census Bureau can no longer meet its statutory deadlines for delivering apportionment and redistricting data, even conducting operations under unrealistically ideal conditions.**" DOC_2287 (emphasis in original).

- On May 26, 2020, the head of census field operations, Tim Olson, publicly stated that "[w]e have passed the point where we could even meet the current legislative requirement of December 31. We can't do that anymore. We – we've passed that for quite a while now." Nat'l Conf. of Am. Indians, 2020 Census Webinar: American Indian/Alaska Native at 1:17:30–1:18:30, YouTube (May 26, 2020), https://www.youtube.com/watch?v=F6IyJMtDDgY.

- On July 8, 2020, Associate Director Fontenot publicly confirmed that the Bureau is "past the window of being able to get" accurate counts to the President by December 31, 2020. U.S. Census Bureau, *Operational Press Briefing – 2020 Census Update* at 20–21 (July 8, 2020), https://www.census.gov/content/dam/Census/newsroom/press-kits/2020/news-briefing-program-transcript-july8.pdf.

As the Replan's adoption drew near, the Bureau found that they could potentially miss even the COVID-19 Plan's data collection deadline of October 31, 2020—to say nothing of the Replan's data collection deadline of September 30, 2020.

- On July 23, 2020, Chief of Decennial Communications and Stakeholder Relationships, Kathleen Styles, shared the "Elevator Speech" memo with GAO. *See* DOC_8026 (sending to GAO). The Elevator Speech echoed Associate Director Ahmad's concerns about natural disasters: "[t]he Census Bureau needs [] 30-days for risk mitigation[] in case we are not able to complete data collection operations everywhere by October 31 (e.g., a hurricane, or a COVID outbreak)." DOC_8022.

- Also on July 23, 2020, several senior officials stated internally that meeting the deadline was impossible. Associate Director Fontenot identified "the difference between goal and actual case enumeration[,] [c]urrently a shortfall (11% goal vs 7% actual)." DOC_7739. He thus thought it "critical to lay the groundwork for the reality of the COVID Impacts and challenges" in an upcoming meeting with the Department of Commerce. Associate Director of Field Operations Olson agreed. He concluded that "any thinking person who would believe we can deliver apportionment by 12/31 has either a mental deficiency or a political motivation." DOC_7737.

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

United States District Court
Northern District of California

- On July 27, 2020, the Director Dillingham's Senior Advisor for Decennial Affairs, James B. Treat, circulated a memo intended for Deputy Director Jarmin and authored by Associate Director Fontenot. The memo stated that "appreciably shortening the quality checks and reviews would be extremely unwise. Each and every step in post data collection processing is necessary." DOC_8085. Furthermore, hurricane season, early snow events, and COVID-19 all "increased the risk of our ability to complete the field data collection operations by the [COVID-19 Plan] deadline of October 31, 2020." DOC_8086.

- On July 29, 2020, the Senior Advisor for Decennial Affairs to Director Dillingham, James Treat, circulated to Associate Director Fontenot and other senior officials a "High Level Summary of the Post-Data Collection." DOC_8337. The High Level Summary repeated the Bureau's strong concerns. It stressed that "[d]ecades of experience have demonstrated that [processing and review] steps and time are necessary to produce data products that do not need to be recalled, meet data user expectations and needs, [are] delivered on time, and stand the test of time." DOC_8337.

Even less than two weeks before the Replan's September 30, 2020 data collection deadline, the Bureau expressed uncertainty about its ability to meet the September 30 deadline. One reason was that the natural disasters about which Bureau officials had warned had come to pass. On September 17, 2020 at a meeting of the Census Scientific Advisory Committee, Associate Director Fontenot, Defendants' sole declarant, stated "that [he] did not know whether Mother Nature would allow us to meet the September 30 date." ECF No. 196-1 at ¶ 14 (Fontenot's September 22, 2020 declaration). Mother Nature had wreaked "major West Coast fires," "air quality issues," and "Hurricane Sally across the states of Louisiana, Mississippi, Alabama, the Florida panhandle area, parts of Georgia, and South Carolina." *Id.*

The timing of Congressional *action* further belies Defendants' claim that Congressional inaction on the deadline justified the Replan. In the weeks and days leading up to Secretary Ross's direction to develop the Replan, Congress took major steps toward extending statutory deadlines. On May 15, 2020, the House passed a bill extending deadlines, The Heroes Act. *See* H.R. 6800, https://www.congress.gov/bill/116th-congress/house-bill/6800.[14] On June 1, 2020, the Senate

---

[14] The Court takes judicial notice of the congressional hearing dates. The Court may take judicial notice of matters that are either "generally known within the trial court's territorial jurisdiction" or

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

placed The Heroes Act on the legislative calendar. On July 23, 2020 at 10 a.m. Eastern, the Senate's Small Business and Entrepreneurship Committee held a hearing on The Heroes Act.

Yet during that hearing, senior Bureau officials were strategizing how to resist the Department of Commerce's ongoing pressure to accelerate census operations. On July 23, 2020, Associate Director Fontenot wrote at 10:31 a.m. that "[o]n Monday at DOC I plan to talk about the difference between goal and actual case enumeration[,] [c]urrently a shortfall (11% goal vs 7% actual). . . . [I]t is critical to lay the groundwork for the reality of the COVID Impacts and challenges." DOC_7739. Associate Director Olson responded at 11:19 a.m., "agree[ing] that elevating the reality is critical, especially in light of the push to complete NRFU asap for all the reasons we know about." DOC_7738. Lastly, by 11:48 a.m., Associate Director Olson "sound[ed] the alarm to realities on the ground." *Id.*

In fact, the Commerce Department's pressure on the Bureau had started at least a few days earlier. Three days before the July 23, 2020 Senate hearing, the Bureau's Chief Financial Officer, Ben Page, asked other senior officials whether the Bureau still supported Congressional extension of the statutory deadlines. DOC_6852 (July 20, 2020 email to Director Dillingham et al.). Page wrote:

> Among the first questions I am getting is "Does the Census bureau still need the change in the statutory dates?" Can we find a time to discuss how we should respond to that question? Given that the Senate may introduce a bill today or tomorrow, I anticipate we'll need a set answer for discourse over the next 24-48 hours.

*Id.* The answer to Page's question was, of course, no.

By July 28, 2020, the Bureau asked Congress for $448 million for a timely completion of the Census without an extension of the statutory deadline. DOC_8037 (July 28, 2020 email from Secretary Ross's Director of Public Affairs, Meghan Burris, to Secretary Ross).

---

"can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). As stated above, the Court is permitted to go outside the administrative record "for the limited purpose of background information." *Thompson*, 885 F.2d at 555.

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

United States District Court
Northern District of California

1    Moreover, at the House Oversight and Reform hearing on July 29, 2020, Director

2  Dillingham did not support extending the statutory deadline. Rather, he sidestepped questions

3  about whether the "Administration has [] reversed direction on [the extension], and is now

4  suggesting that they want the Census to be wrapped up quickly so that th[e] tabulation . . . could

5  actually happen before the end of the year." Oversight Committee, *Counting Every Person* at

6  3:50:42–3:51:40, YouTube (July 29, 2020), https://youtu.be/SKXS8e1Ew7c?t=13880 (questions

7  by Congressman John Sarbanes). Director Dillingham's response was that "I'm not aware of all

8  the many reasons except to say that the Census Bureau and others really want us to proceed as

9  rapidly as possible." *Id.* at 3:51:48–3:52:02.

10    Accordingly, Defendants' explanation—that the Replan was adopted in order to meet the

11  December 31, 2020 statutory deadline because Congress failed to act—runs counter to the facts.

12  Those facts show not only that the Bureau could not meet the statutory deadline, but also that the

13  Bureau had received pressure from the Commerce Department to cease seeking an extension of

14  the deadline. In other words, Defendants "adopted a new rationale premised on old facts that were

15  no longer true": assumptions that the Bureau could possibly meet the deadline and that Congress

16  would not act. *Mo. Pub. Serv. Comm'n.*, 337 F.3d at 1075. Thus, because Defendants "offered an

17  explanation for its decision that runs counter to the evidence before the agency," Plaintiffs are

18  likely to succeed on the merits of their claim that Defendants' decision is arbitrary and capricious.

19  *State Farm*, 463 U.S. at 43.

20    **3.  Defendants failed to consider an alternative.**

21    In order to meet APA standards, an agency "must consider the 'alternative[s]' that are

22  'within the ambit of the existing [policy].'" *Dep't of Homeland Sec. v. Regents of the Univ. of

23  California*, 140 S. Ct. 1891, 1913 (2020) (alterations in original) (quoting *State Farm*, 463 U.S. at

24  51). An agency that fails to consider alternatives may have acted arbitrarily and capriciously. *See

25  Regents*, 140 S. Ct. at 1913 (concluding that the DACA Termination was arbitrary and capricious

26  because the Secretary, confronted with DACA's illegality, failed to consider alternative actions

27  short of terminating DACA, such as eliminating DACA benefits); *State Farm*, 463 U.S. at 43

28  
Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

(holding that the National Highway Traffic Safety Administration had acted arbitrarily and capriciously by not considering airbags as an alternative to automatic seatbelts).

Defendants similarly failed to consider an alternative here: not adopting the Replan while striving in good faith to meet statutory deadlines. By adopting the Replan, Defendants sacrificed adequate accuracy for an uncertain likelihood of meeting one statutory deadline. Defendants "did not appear to appreciate the full scope of [their] discretion." *Regents*, 140 S. Ct. at 1911. Specifically, Defendants could have taken measures short of terminating the census early only to *possibly* meet the deadline. These measures could have included good faith efforts to meet the deadline coupled with an operational plan that would—at least in the Bureau's view—generate results that were not "fatal[ly]" or "unacceptabl[y]" inaccurate. Elevator Speech, DOC_8070.

Because agencies must often fulfill statutory obligations apart from deadlines, case law is replete with agency actions that missed statutory deadlines but nevertheless survived judicial review. *See, e.g.*, *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 157, 171–72 (2003) (upholding the Social Security Commissioner's late assignment of beneficiaries to coal companies despite the fact that it "represent[ed] a default on a statutory duty, though it may well be a wholly blameless one"); *Newton Cty. Wildlife Ass'n v. U.S. Forest Serv.*, 113 F.3d 110, 112 (8th Cir. 1997) ("Absent specific statutory direction, an agency's failure to meet a mandatory time limit does not void subsequent agency action"); *Linemaster Switch Corp. v. EPA*, 938 F.3d 1299, 1304 (D.C. Cir. 1991) (explaining that the Court did not want to restrict the agency's powers "when Congress . . . has crafted less drastic remedies for the agency's failure to act").[15]

In fact, single-mindedly sacrificing statutory objectives to meet a statutory or judicial

---

[15] Defendants cite *Forest Guardians v. Babbitt*, which explains that "when Congress . . . sets a specific deadline for agency action, neither the agency nor any court has discretion." 174 F.3d 1178, 1190 (10th Cir. 1999). But *Forest Guardians* addresses the question of whether a court can compel an agency's late action, not the question of whether an agency's late action can be upheld by a court. Under the Supreme Court's reasoning in *Barnhart*, the Bureau's action after the deadline could be upheld by a court. *See, e.g.*, *Barnhart*, 537 U.S. at 157, 171–72 (upholding the Social Security Commissioner's late assignment despite the fact that "represent[ed] a default on a statutory duty, though it may well be a wholly blameless one").

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

deadline can itself violate the APA. Examples abound because the Census Act is far from the only statute that sets a deadline for agency action. Environmental regulation and occupational safety are just two illustrative examples.

Environmental statutes have set hundreds of deadlines, of which only a fraction have been met. *See* Richard J. Lazarus, *The Tragedy of Distrust in the Implementation of Federal Environmental Law*, Law & Contemp. Probs., Autumn 1991, at 311, 323–28 (noting that "EPA has met only about 14 percent of the congressional deadlines imposed"). For example, in *Environmental Defense Fund v. Environmental Protection Agency*, the D.C. Circuit set a "court-imposed schedule" after the EPA violated statutory deadlines for studying and designating hazardous mining wastes. 852 F.2d 1316, 1331 (D.C. Cir. 1988); *see id.* at 1319–31 (discussing interlocking deadlines). The D.C. Circuit set judicial deadlines that were years *after* the missed statutory deadlines. *See id.*[16] The D.C. Circuit's order thus allowed the EPA to continue violating the statutory deadlines so that the EPA could fulfill its other statutory duties.

Moreover, when the EPA promulgated a rule to comply with the judicial deadlines—and to stanch the ongoing violation of statutory deadlines—the D.C. Circuit set that rule aside. *See Am. Min. Cong. v. EPA*, 907 F.2d 1179, 1191–92 (D.C. Cir. 1990). The D.C. Circuit reasoned that the rule was unsupported by the data. *See id.* at 1191. It was immaterial that the rule lacked support only because the EPA felt compelled to comply with the deadlines. "That an agency has only a brief span of time in which to comply with a court order cannot excuse its obligation to engage in reasoned decisionmaking under the APA." *Id.* at 1192.

In the area of occupational safety, the Occupational Safety and Health Act of 1970 set a "statutory timetable" in "mandatory language" for rulemaking. *Nat'l Cong. of Hispanic Am.*

---

[16] The deadlines at issue in *Environmental Defense Fund v. EPA* were complicated. In simple terms, the statutory deadlines were for the EPA to conduct studies by October 21, 1983, and to list wastes under Subtitle C of the Resource Conversation and Recovery Act within six months of completing those studies. *See* 852 F.2d at 1319–20. The D.C. Circuit set deadlines of July 31, 1989 for completion of the studies, and August 31, 1988 for relisting of six specific wastes. *See id.* at 1331.

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

*Citizens (El Congreso) v. Marshall*, 626 F.2d 882, 883–84 & n.3 (D.C. Cir. 1979) (discussing 29 U.S.C. § 655(b)(1)–(4), which provides that the Secretary "shall publish" rules within certain numbers of days). When the Secretary of Labor missed those deadlines, a "14-year struggle to compel the Secretary of Labor" to promulgate a rule ensued. *Farmworker Justice Fund, Inc. v. Brock*, 811 F.2d 613, 614 (D.C. Cir.), *vacated sub nom. as moot*, *Farmworkers Justice Fund, Inc. v. Brock*, 817 F.2d 890 (D.C. Cir. 1987).

        As relevant here, when the Secretary of Labor first missed the deadlines, the district court ordered him to follow them. *See id.* at 884. Despite even the "mandatory language" of the statutory deadline, the D.C. Circuit reversed. The D.C. Circuit held that "the mandatory language of the Act did not negate the 'implicit acknowledgement that traditional agency discretion to alter priorities and defer action due to legitimate statutory considerations was preserved.'" *Id.* (quoting *National Congress of Hispanic American Citizens v. Usery*, 554 F.2d 1196, 1200 (D.C. Cir. 1977) (Clark, J.)). The D.C. Circuit reasoned that the Secretary could "giv[e] priority to the most severe hazards" rather than those demanded by the statutory deadline. *Id.* at 891 & n.44. Agencies cannot and should not ignore their full range of legal obligations to prioritize meeting statutory deadlines at all costs.

        So too here. Secretary Ross and the Census Bureau could have given priority to avoiding "fatal data quality flaws that are unacceptable for a Constitutionally-mandated national activity." ECF No. 155-8 at 332 (Bureau's Elevator Speech). The Census Act's "mandatory language" of "shall" on deadlines did not displace Defendants' duty to consider other express statutory and constitutional interests. *Compare, e.g.*, 1998 Appropriations Act, § 209, 111 Stat. at 2481 ("Congress finds that . . . it is essential that the decennial enumeration of the population be as accurate as possible . . . ."), *and Utah*, 536 U.S. at 478 (finding a "strong constitutional interest in [the] accuracy" of the census), *with, e.g.*, 29 U.S.C. § 655(b)(1)–(4) ("shall publish" rules within certain timetable), *and Nat'l Cong. of Hispanic Am. Citizens*, 554 F.2d at 1198 (reversing order to follow deadlines and finding "traditional agency discretion to alter priorities" despite statutory deadlines because the statute provided feebly that "in determining the priority for establishing

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

1   standards . . . the Secretary shall give due regard to the urgency of the need" (quoting 29 U.S.C.

2   § 655(g))).

3       Indeed, in analyzing the COVID-19 Plan—but never the Replan—the Bureau itself

4   concluded that missing the statutory deadline was constitutional and in line with historical

5   precedent. Bureau officials included these conclusions in their notes for their April 28, 2020 call

6   with Congressman Jamie Raskin, Chair of the House Oversight Subcommittee on Civil Rights and

7   Civil Liberties, which has jurisdiction over the census. DOC_2224. The notes stated that the

8   COVID-19 proposal "underwent a constitutional review, and we believe it is constitutional."

9   DOC_2228; *see also* DOC_1692 (preparation materials for April 19, 2020 briefing with House

10  Oversight Committee, stating that the COVID-19 plan "went through inter-agency review,

11  including review by the Department of Justice," and "[t]heir view is that there is not a

12  constitutional issue with the proposal").

13      The notes further stated that "in history, especially for [] many of the earlier censuses, data

14  collection and reporting in the counts shifted beyond the zero year." DOC_2228. Officials in

15  charge of the census have previously missed statutory deadlines imposed by Congress. Assistants

16  conducting four different censuses failed to transmit returns to marshals or the Secretary of State

17  within the deadline imposed by Congress. In each case, only after the deadline had passed without

18  the required transmission did Congress act by extending the statutory deadlines. This post-

19  deadline extension took place in four censuses: the 1810, 1820, 1830, and 1840 Censuses. ECF

20  No. 203 (explaining examples); *see, e.g.*, Act of Sept. 1, 1841, ch. 15, § 1, 5 Stat. 452, 452 (1841)

21  (*post hoc* extension of September 1, 1841 for original deadline missed by over nine months).

22      Defendants' failure "to appreciate the full scope of [their] discretion" also resembles the

23  Secretary of Homeland Security's decisionmaking in *Regents*, 140 S. Ct. 1891. There, the

24  Secretary terminated the DACA program by relying on the Attorney General's determination that

25  DACA was unlawful. *Id.* at 1903. The government argued that the decision was not arbitrary and

26  capricious because it was based on the Attorney General's binding legal conclusion. The Supreme

27  Court agreed that the Attorney General's conclusion was binding but set aside the Secretary's

28

67

decision anyway. *Id*. at 1910. The Court held that the Secretary failed to consider the full scope of her discretion, which would have permitted her to take measures short of terminating the program to address the illegality of the program. *Id*. at 1911.

Like the Secretary in *Regents*, Defendants argue that binding law compels their decision. Similarly, the Court agrees that the Census Act's statutory deadlines bind Defendants. Even so, Defendants should have "appreciate[d] the full scope of their discretion" to preserve other statutory and constitutional objectives while striving to meet the deadlines in good faith. *Regents*, 140 S. Ct. at 1911. By not appreciating their discretion, Defendants failed to consider important aspects of the problem before them. That failure was likely arbitrary and capricious under the APA.

### 4. Plaintiffs are likely to succeed on the merits of their claim that Defendants failed to articulate a satisfactory explanation for the Replan.

Plaintiffs argue that the Defendants failed to articulate a satisfactory explanation for its decision to adopt the Replan. The Court concludes that Plaintiffs are likely to succeed on the merits of this claim.

An agency must "examine the relevant data and articulate a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. The agency must have "considered the relevant factors, weighed [the] risks and benefits, and articulated a satisfactory explanation for [its] decision." *Dep't of Commerce*, 139 S. Ct. at 2570. In evaluating agency action, the Court must ensure that "the process by which [the agency] reache[d] its result [was] logical and rational." *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). "[T]he agency's explanation [must be] clear enough that its 'path may reasonably be discerned.'" *Encino Motorcars*, 136 S. Ct. at 2125 (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286 (1974)). "[W]e may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* at 2127 (quoting *State Farm*, 463 U.S. at 43).

When an agency changes position, the agency must provide a "reasoned explanation" why

United States District Court
Northern District of California

it has done so. *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). At a minimum, this explanation must "display awareness that [the agency] is changing position" and "show that there are good reasons for the new policy." *Fox Television*, 556 U.S. at 515. In addition, "sometimes [an agency] must" "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.*

More detail is required "when, for example, [the agency's] new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Id.* "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Encino Motorcars*, 136 S. Ct. at 2126 (quoting *Fox Television*, 556 U.S. at 515–16); *see also Organized Vill. of Kake*, 795 F.3d at 968 ("[A]n agency may not simply discard prior factual findings without a reasoned explanation."). "It follows that an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Encino Motorcars*, 136 S. Ct. at 2126 (alteration in original) (*quoting Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)); *see, e.g.*, *Humane Society v. Locke*, 626 F.3d 1040, 1049–50 (9th Cir. 2010) (concluding that an agency acted arbitrarily and capriciously where the agency took a "seemingly inconsistent approach" with the approach it had taken previously).

Defendants took an inconsistent approach that failed to "articulate a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. The facts before the Defendants included the COVID-19 pandemic, its significant effect on census operations, and the inability to conduct an accurate count by September 30, 2020. *See supra* Section IV-A-1 (contemporaneous statements from Bureau officials explaining how it was impossible to complete an accurate count by the statutory deadline); Section IV-A-2 (contemporaneous statements from Bureau officials explaining how they were past the point of being able to finish the count by the statutory deadline, even if they replanned the census).

69

United States District Court
Northern District of California

Defendants never articulated a satisfactory explanation between these facts and the decision to adopt the Replan. All Defendants offer is the August 3, 2020 Press Release, which is less than one-and-a-half pages in length. *See* Tr. of August 26, 2020 Case Management Conference, ECF No. 65 at 20 (The Court: "[T]he Plaintiffs point to a press release as the reason for advancing the date and -- are there other documents that provide the contemporaneous reasons for advancing the date, other than the press release?" Defendants: "Your Honor, at this point I'm not aware of any other documents, but I would propose that I check with my client and answer that in the September 2nd filing.").[17] In less than a page and a half, the August 3 Press Release simply asserts that Defendants planned to deliver an accurate census in time for the statutory deadline. *See* Section IV-A-1 (analyzing the assertions in the press release and determining that they contradicted the facts before the Bureau). The August 3 Press Release never explains why Defendants are "required by law" to follow a statutory deadline that would sacrifice constitutionally and statutorily required interests in accuracy. ECF No. 37-1.

The August 3 Press Release stands in stark contrast to Secretary Ross's memorandum on adding a citizenship question to the 2020 Census. *See Dep't of Commerce*, 139 S. Ct. at 2569. In that memorandum, Secretary Ross outlined the four options available to him and the benefits and drawbacks of each option. *See* Ross Memorandum at 2–5, *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y. 2019), ECF No. 173 at 1314–17. He also explained the potential impact of each option on depressing 2020 Census response rates, drew on empirical evidence available to the Bureau, and weighed concerns voiced by census partners. *Id.* at 1317–19. Finally, he explained how his decision followed from the evidence and relevant considerations. *Id.* at 1319–20. The Supreme Court held that the memorandum provided adequate explanation because the Secretary "considered the relevant factors, weighed risks and benefits, and articulated a satisfactory explanation for his decision." *Dep't of Commerce*, 139 S. Ct. at 2570.

The August 3 Press Release contains nowhere close to the same level of reasoned

---

[17] Defendants did not mention any other documents in their September 2, 2020 filing. ECF No. 63.

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

explanation. Here, Defendants failed to explain the options before them, failed to weigh the risks and benefits of the various options, and failed to articulate why they chose the Replan. In other words, Defendants failed to "articulate a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. Specifically, Defendants failed to explain why they disregarded the facts and circumstances that underlay their previous policy: the COVID-19 Plan. The facts underlaying the COVID-19 Plan include the rapid spread of the coronavirus pandemic across the United States and its significant effect on Census operations, which are well-documented throughout the record. *See, e.g.*, DOC_2287 ("Operational Timeline" memo from Secretary Ross's Chief of Staff, Michael Walsh, to the Secretary on May 8, 2020).

In fact, in the August 3, 2020 Press Release, Defendants never acknowledged or mentioned the COVID-19 Plan or COVID-19, let alone the ongoing pandemic. It follows that this "'[u]nexplained inconsistency' in agency policy" renders the Replan arbitrary and capricious. *Encino Motorcars*, 136 S. Ct. at 2126 (quoting *Brand X*, 545 U.S. at 981).

### 5. Plaintiffs are likely to succeed on the merits of their claim that Defendants failed to consider reliance interests.

Plaintiffs also argue that the Replan was arbitrary and capricious in violation of the APA because Defendants failed to consider the reliance interests of their own partners, who relied on the October 31 deadline and publicized it to their communities. The Court concludes that Plaintiffs are likely to succeed on the merits of this claim.

When an agency is reversing a prior policy, the agency must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars*, 136 S. Ct. at 2126 (quoting *Fox Television*, 556 U.S. at 515). "It would be arbitrary and capricious [for the agency] to ignore such matters." *Fox Television*, 556 U.S. at 515. An agency reversing a prior policy must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 140 S. Ct. at 1913.

Where an agency fails to consider reliance interests, its action is arbitrary and capricious.

71

*Regents*, 140 S. Ct. at 1913 (holding that termination of the Deferred Action for Childhood Arrivals ("DACA") policy was arbitrary and capricious because the agency failed to consider reliance interests); *see also Encino Motorcars*, 136 S. Ct. at 2126 (declining to defer to the Department of Labor's regulation because of failure to consider the reliance interests of car dealerships when newly permitting service advisors to receive overtime pay). In fact, reliance interests should be considered even where the document giving rise to reliance expressly disclaims conferring any rights. *See Regents*, 140 S. Ct. at 1913–14 (holding that "disclaimers are surely pertinent in considering the strength of any reliance interests, but that consideration must be undertaken by the agency in the first instance").

Defendants ignored reliance interests when Defendants developed and adopted the Replan. Defendants' COVID-19 Plan had engendered serious reliance interests on the part of municipalities and organizations who encouraged people to be counted and publicized the COVID-19 Plan's October 31, 2020 deadline for data collection.

Defendants themselves acknowledge the important role that their partners play in encouraging participation in the Census. Associate Director Fontenot describes at length the Bureau's partnerships with community organizations—including Plaintiffs such as National Urban League. He explains that the Bureau "depend[s] on [its] partners to seal the deal with communities that may be fearful or distrustful of the government"; to supplement and verify address lists; and to identify locations to best count people experiencing homelessness. Fontenot Decl. ¶¶ 40–42; *see id.* ¶¶ 12, 22. Overall, the Bureau engages in "[e]xtensive partnerships." *Id.* ¶ 28.

Accordingly, when the COVID-19 pandemic began to spread in March 2020, Defendants concluded that "[t]he virus will cause operational changes for the census, and may necessitate changes in our planned communications approach." DOC_970 (March 13, 2020 "COVID-19 Contingency Planning" sent by Program Analyst Christopher Denno to Director Dillingham et al.). Defendants thus stated that they would "[d]evelop[] talking points to share with our partners" about the pandemic. *Id.* Once Defendants adopted the COVID-19 Plan, Defendants' partners began to rely on the extended deadlines. For instance:

72

- The City of Los Angeles is home to about 4 million people. M. Garcia Decl. ¶ 7. The City "conducted a public education campaign publicizing the October 31, 2020 date for self-response." *Id.* ¶ 14. For example, the City announced the date in bus shelter posters and social media toolkits. *Id.*

- Harris County, Texas "participated in over 150 events," including "food distribution events," during which it "announced the October 31, 2020 deadline for the 2020 Census." Briggs Decl. ¶ 12.

- The City of Salinas promoted the October 31, 2020 deadline "on social media and in thousands of paper flyers." Gurmilan Decl. ¶¶ 11–12.

- The League of Women Voters has over 65,000 members across 800 state and local affiliates. Stewart Decl. ¶ 4. Thus, "[w]hen the Census Bureau extended the deadline for counting operations to October 31, 2020," the League of Women Voters "published blog posts advertising the new timeline," "shared numerous letters with [] state and local affiliates providing information about the new timeline," and "publicized the deadline in letters and [emails]." *Id.* ¶ 11.

- National Urban League has 11,000 volunteers across 90 affiliates in 37 states. Green Decl. ¶ 4. "[W]hen the Census Bureau announced its extension of the timeline for collecting responses to the 2020 Census, the National Urban League informed all members of the 2020 Census Black Roundtable that the deadline had become October 31, 2020. The members in turn conveyed to their own networks and constituents, causing a cascading effect." *Id.* ¶ 14.

However, Defendants quietly removed the October 31 deadline from its website on July 31, 2020 without any explanation or announcement. *Compare* ECF No. 37-8 (July 30 Operational Adjustments Timeline), *with* ECF No. 37-9 (July 31 Operational Adjustments Timeline). Then on August 3, 2020, the Bureau advanced data collection deadlines to September 30.

As a result, people who believe they could submit their census responses in October and try to do so would not be counted. *See, e.g.*, Gurmilan Decl. ¶ 12 ("some residents who received the City [of Salinas]'s messaging will fail to respond before the R[eplan] deadline because the City has limited remaining resources to correct what is now misinformation."). Moreover, Plaintiffs' efforts to mitigate the widely advertised the Bureau's October 31 deadline and now-counterproductive education campaigns will only be harder in the midst of a pandemic. *E.g.*, M. Garcia Decl. ¶¶ 14–14; Gurmilan Decl. ¶¶ 11–14; Briggs Decl. ¶¶ 11–12, 15–17.

Accordingly, "[i]n light of the serious reliance interests at stake, [Defendants'] conclusory

73

statements do not suffice to explain [their] decision." *Encino Motorcars*, 136 S. Ct. at 2127. The Replan is thus arbitrary and capricious on this ground as well.

### B.  Plaintiffs will suffer irreparable harm without an injunction.

As to irreparable harm, Plaintiffs identify and support with affidavits four potential irreparable harms that Plaintiffs will suffer as a result of inaccurate census data. First, Plaintiffs risk losing important federal funding from undercounting. Second, Plaintiffs state that an inaccurate apportionment will violate their constitutional rights to political representation. Third, Plaintiffs will need to expend resources to mitigate the undercounting that will result from the Replan. Lastly, local government Plaintiffs' costs will increase because those Plaintiffs rely on accurate granular census data to deploy services and allocate capital.

These harms are potentially irreparable in two ways. First, at least part of the harms may be constitutional in nature, and "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Second, to the extent the harm involves expending money or resources, "[i]f those expenditures cannot be recouped, the resulting loss may be irreparable." *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers).

Plaintiffs aver that implementation of the Replan deadlines would lead to an undercount of their communities. PI Mot. at 28. Because the decennial census is at issue here, an inaccurate count would not be remedied for another decade. An inaccurate count would affect the distribution of federal and state funding, the deployment of services, and the allocation of local resources. Similar harms have thus justified equitable relief in previous census litigation. *See, e.g., Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. at 328–34 (affirming injunction against the planned use of statistical sampling in census and citing apportionment harms, among others); *New York v. United States Dep't of Commerce*, 351 F. Supp. 3d at 675 (issuing injunction and finding irreparable "the loss of political representation and the degradation of information"). Accordingly, the Court concludes that Plaintiffs have demonstrated that they are likely to suffer irreparable harm in the absence of a stay of the Replan. *Winter*, 555 U.S. at 22.

United States District Court
Northern District of California

### C.  The balance of the hardships tips sharply in Plaintiffs' favor.

Plaintiffs would suffer several irreparable harms without a preliminary injunction. In his September 5, 2020 declaration, Defendants' own declarant, Associate Director Fontenot, stated that the sooner the Court enjoined Defendants, the fewer field staff Defendants would terminate and not be able to rehire:

> Lack of field staff would be a barrier to reverting to the COVID Schedule were the Court to rule later in September. The Census Bureau begins terminating staff as operations wind down, even prior to closeout. Based on progress to date, as is standard in prior censuses, we have already begun terminating some of our temporary field staff in areas that have completed their work. It is difficult to bring back field staff once we have terminated their employment. Were the Court to enjoin us tomorrow we would be able to keep more staff on board than were the Court to enjoin us on September 29, at which point we will have terminated many more employees.

Fontenot Decl. at ¶ 98. Thus, Fontenot's declaration underscores Plaintiffs' claims of irreparable harm because Defendants would have difficulty rehiring terminated field staff.[18]

Furthermore, Defendants' stated reason for the August 3, 2020 Replan is to get the Census count to the President by December 31, 2020 instead of April 30, 2021 as scheduled in the COVID-19 Plan. Fontenot Decl. ¶ 81. However, the President, Defendants' sole declarant, and other senior Bureau officials have stated, even as recently as September 17, 2020, that meeting the statutory deadline is impossible. *See supra* Section IV-A-2; ECF No. 196-1 ¶ 14. These statements show that the hardship imposed on Defendants from a stay—missing a statutory deadline they had expected to miss anyway—would be significantly less than the hardship on Plaintiffs, who will suffer irreparable harm from an inaccurate census count.

Thus, the Court finds that the balance of hardships tips sharply in favor of Plaintiffs.

### D.  A preliminary injunction is in the public interest.

As to the public interest, when the government is a party, the analysis of the balance of the

---

[18] Associate Director Fontenot's untimely September 22, 2020 declaration, ECF No. 196-1, claims that the Court's TRO dictates case assignments to enumerators. Neither the Court's TRO nor the instant Order dictate case assignments to enumerators.

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

1    hardships and the public interest merge. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092

2    (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). As the United States Supreme

3    Court recognized, Congress has codified the public's interest in "a census that is accurate and that

4    fairly accounts for the crucial representational rights that depend on the census and the

5    apportionment." *Dep't of Commerce v. New York*, 139 S. Ct. at 2569 (quoting *Franklin*, 505 U.S. at

6    819–820 (Stevens, J., concurring in part and concurring in judgment)) (discussing the Census Act,

7    2 U.S.C. § 2a). Other courts have held that "the public interest . . . requires obedience to the

8    Constitution and to the requirement that Congress be fairly apportioned, based on accurate census

9    figures" and that "it is in the public interest that the federal government distribute its funds . . . on

10   the basis of accurate census data." *Carey*, 637 F.2d at 839. Thus, an injunction is in the public

11   interest.

12            **E.       The scope of the injunction is narrowly tailored.**

13            The Bureau has explained that data processing cannot begin until data collection operations

14   are completed nationwide. Because the steps are sequential, the Bureau cannot grant relief to

15   particular geographic regions and not others. Specifically, the Bureau explained in its Elevator

16   Speech, circulated to high level Bureau officials and to the GAO, "[n]or can post processing

17   operations begin until data collection operations are completed everywhere. There is no option,

18   e.g., to begin post processing in one region or state of the country while other areas are still

19   collecting data." Elevator Speech, DOC_8071.

20            Associate Director Fontenot's September 22, 2020 declaration affirmed this point: "[P]ost

21   data collection processing is a particularly complex operation, and the steps of the operation must

22   generally be performed consecutively. . . . It is not possible, however, to begin final census

23   response processing in one region of the country while another region is still collecting data."

24   Fontenot Decl. ¶ 19–20.

25            The Court is aware of the ongoing debate regarding nationwide injunctions and their

26   scope. *See U.S. Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J.,

27

28
                                                      76

concurring) (criticizing the "routine issuance of universal injunctions").[19] Nevertheless, the Supreme Court has upheld nationwide injunctions in the limited circumstance in which they are necessary to provide relief to the parties. *See, e.g., Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080, 2088–89 (leaving in place a nationwide injunction with respect to the parties and non-parties that are similarly situated). The Supreme Court has followed this practice in past cases involving the census. *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. at 343–44 (affirming district court's nationwide injunction against the Census Bureau's proposed use of statistical sampling for apportionment purposes in the 2000 Census). This reflects the longstanding principle that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The Court finds that this is an instance in which the injunction must be nationwide in order to grant necessary relief to the Plaintiffs.

Moreover, although Plaintiffs' motion for preliminary injunction sought to stay Defendants' August 3, 2020 Replan and to enjoin Defendants from implementing the August 3, 2020 Replan, at the September 22, 2020 preliminary injunction hearing, Plaintiffs narrowed their request to a stay and injunction of the August 3, 2020 Replan's September 30, 2020 and December 31, 2020 deadlines. Specifically, Plaintiffs stated:

> So I want to be clear about this. Our APA action challenges the timelines in the Replan. It is very discrete in that respect.
>
> The final agency action is the announcement on August 3rd that they are going to shorten the deadlines for completing the Census, two deadlines in particular, leaving the October 31st one to September 30th for data collection and moving the April date to December 31st for reporting to the President. That is our APA

---

[19] *Compare, e.g.*, Hon. Milan D. Smith Jr., *Only Where Justified: Toward Limits and Explanatory Requirements for Nationwide Injunctions*, 95 Notre Dame L. Rev. 2013 (2020) (criticizing the rise in universal injunctions, but acknowledging that they are justified in certain contexts), *with* Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. ___ (forthcoming 2020), https://papers.ssrn.com/sol3/Papers.cfm?abstract_id=3599266 (arguing that the APA § 706's provision that "[t]he reviewing court shall . . . hold unlawful and set aside agency action" permits universal vacatur).

Case No. 20-CV-05799-LHK
ORDER GRANTING PLAINTIFFS' MOTION FOR STAY AND PRELIMINARY INJUNCTION

United States District Court
Northern District of California

challenge, the moving and shortening and accelerating of those particular deadlines. Tr. of Sept. 22, 2020 Preliminary Injunction Hearing at 23:21–24:5, ECF No. 207. Plaintiffs may narrow the scope of their requested injunctive relief. *See Vasquez v. Rackauckas*, 734 F.3d 1025, 1037 (9th Cir. 2013) (recognizing that plaintiffs "clarified and narrowed" the injunctive relief that they sought). Thus, the Court grants Plaintiffs' narrowed requested relief. By this order, the Court in no way intends to manage or direct the day-to-day operations of Defendants.

## V.    CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED THAT, effective as of the date of this Order: The U.S. Census Bureau's August 3, 2020 Replan's September 30, 2020 deadline for the completion of data collection and December 31, 2020 deadline for reporting the tabulation of the total population to the President are stayed pursuant to 5 U.S.C. § 705; and Defendants Commerce Secretary Wilbur L. Ross, Jr.; the U.S. Department of Commerce; the Director of the U.S. Census Bureau Steven Dillingham, and the U.S. Census Bureau are enjoined from implementing these two deadlines.

**IT IS SO ORDERED.**


Dated: September 24, 2020

_Lucy H. Koh_
LUCY H. KOH
United States District Judge

United States District Court
Northern District of California