JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
ALEXANDER K. HAAS
Branch Director
DIANE KELLEHER
BRAD P. ROSENBERG
Assistant Branch Directors
M. ANDREW ZEE
ALEXANDER V. SVERDLOV
STEPHEN EHRLICH
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Telephone: (202) 305-0550

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| NATIONAL URBAN LEAGUE, *et al.*, | Case No. 5:20-cv-05799-LHK |
| Plaintiff, | **FOURTH DECLARATION OF ALBERT E. FONTENOT JR.** |
| v. | |
| WILBUR L. ROSS, JR., *et al.*, | |
| Defendants. | |

1    I, Albert E. Fontenot, Jr., make the following declaration pursuant to 28 U.S.C. § 1746, and

2    state under penalty of perjury the following is true and correct to the best of my knowledge and

3    belief:

4    1.  I am making this declaration, my fourth in this case, in response to the Court's direction

5        to, (Oct. 6, 2020 Hr'g Tr. 20:1-21:12):

6        a.  Explain what information is contained in the Census Bureau's completion rates

7            for the nonresponse follow-up ("NRFU") operation published at

8            https://2020census.gov/en/response-rates.html, which are referenced in

9            paragraphs 16 and 17 of Director Dillingham's October 5, 2020 declaration,

10           ECF No. 300-1;

11       b.  Explain how this information was collected; and,

12       c.  Explain the quality assurance processes behind this information.

13                           **Census Bureau Completion Rates**

14   2.  For the first time ever, the Census Bureau is publishing NRFU completion information

15       online for the 2020 Census while data collection remains ongoing; historically we have

16       made this information available only in assessments released after completion of the

17       census.  The FAQs on the Census Bureau website provide significant detail on what is

18       included in the NRFU completion information, https://2020census.gov/en/response-

19       rates/nrfu.html.

20   3.  The first set of statistics listed on the Census Bureau website at

21       https://2020census.gov/en/response-rates/self-response.html is the "Self-Response

22       Rates Map."  This map lists the percentage of households that have self-responded to

23       the 2020 Census through internet, phone, email, or Mobile Questionnaire Assistance

24       Centers.  The map reports self-response rates down to the census tract level (census

25       tract sizes vary, but the optimal size is about 4000 people).

26   4.  The next set of statistics listed on the Census Bureau website at

27       https://2020census.gov/en/response-rates/nrfu-completion.html—and discussed in ¶ 16

28       of Director Dillingham's declaration—is "Nonresponse Followup Completion Rates."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5.  Briefly, let me reiterate that in the NRFU operation, census field staff, known as enumerators, attempt to contact non-responding addresses to determine whether each address in the Master Address File is vacant, occupied, or does not exist; and when occupied, to collect census response data to enumerate  the occupants of the housing unit.  Multiple contact attempts to non-responding addresses may be needed to determine the housing unit status and, if occupied, to collect decennial census response data for the occupants.

6.  The basic structure of the 2020 NRFU operation is described in detail in paragraphs 48 to 58 of my first declaration in this case filed on September 4, ECF No. 81-1.  I also note that this information is contained in the Thirteenth Declaration of James Christy, filed in this Court on October 6, 2020, ECF No. 307-1.  I will not repeat this detail, but rather will summarize that cases are resolved in the NRFU operation through:

    a.  Enumeration of the housing unit by an enumerator making contact with a resident and recording information about the individuals living there;

    b.  Enumeration of the housing unit by an enumerator making contact with a proxy respondent (such as a landlord or neighbor) and recording information about the individuals living in the housing unit in question;

    c.  Enumeration of the housing unit—after one unsuccessful in-person attempt—using high-quality administrative records, where such records are available[1];

    d.  Classification, based on the enumerator's observation that the housing unit is vacant, non-existent, or unoccupied;

7.  Other than the use of high quality administrative records where available, the use of these statuses is largely consistent with how NRFU operations were conducted in prior censuses, including 2000 and 2010.  As indicated later, the decision to use high quality

---

[1] We consider administrative records to be of high quality if they are corroborated with multiple sources.  Examples of high-quality administrative records include Internal Revenue Service Individual Tax Returns, Internal Revenue Service Information Returns, Center for Medicare and Medicaid Statistics Enrollment Database, Social Security Number Identification File, and 2010 Census data.

1        administrative records predates both the COVID-19 plan and the Replan and was based

2        on testing conducted over the course of the last decade.

3    8.   An address is resolved—and counted as "completed" for purposes of Director

4        Dillingham's declaration and the NRFU statistics on the website—if the housing unit is

5        determined to be vacant, or, if the housing unit is occupied, information about the

6        household is obtained through one of the NRFU methods listed above.  If a housing

7        unit is determined to be occupied but no information has been obtained, then it is *not*

8        considered "completed" for purposes of Director Dillingham's declaration and the

9        website.

10    9.   The last set of statistics listed on the Census Bureau website at

11        https://2020census.gov/en/response-rates/nrfu.html—and discussed in ¶ 17 of Director

12        Dillingham's declaration—is "Total Response Rates by State."  These statistics convey

13        the total enumeration percentage for each State and for the whole country.  The listed

14        "Enumerated" percentage combines the percentage of households that have self-

15        responded and the percentage of households counted through NRFU.  A housing unit is

16        counted as "enumerated" or "completed" (for purposes of Director Dillingham's

17        declaration and the website) if the housing unit is determined to be vacant, or, if the

18        housing unit is occupied, information about the household is obtained through self-

19        response or one of the NRFU methods listed above.  If a housing unit is determined to

20        be occupied but no count information has been obtained, then it is *not* considered

21        "enumerated" or "completed."

22    10.  As of October 7, 2020, the Census Bureau has enumerated 99.8% of the nation's

23        housing units, with 48 states and D.C. over 99%. Of the 2 remaining states, Mississippi

24        is at 98.8%, and Louisiana at 98.1%. The 2010 Census had an enumeration rate of

25        99.6% while the 2000 Census had an enumeration rate of 99.45%.  In the 2000 Census,

26        45 States reached a 99% enumeration rate.  While we have not published NRFU

27        completion rates from prior censuses, we have published information about count

28        imputation rates.  Because we rely on count imputation to account for  households for

1    which we have no information, the inverse of the count imputation rate is a good

2    approximation of the NRFU completion rate.

3    11. Aside from the fact that field data collection was delayed by COVID-19, the Census

4    Bureau has no indication at this point that the data it has collected in the NRFU

5    operation is of inferior quality to prior censuses.  I also note again for the Court that the

6    Census Bureau is watching quality indicators closely, and that we formed a Data

7    Quality Executive Guidance Group to provide direction and approvals about quality

8    assessments of changes to the operational plans and of the 2020 Census data during and

9    after the data collection process.

10   12. The Court has posed questions about proxy rates for the 2020 Census.  The Census

11   Bureau has seen nothing in our operational data to give us concern on this point.  While

12   we do not publish proxy rates prior to completion because they will decrease during

13   post processing, I will note that as of the date of this declaration the proxy rate for

14   occupied NRFU housing units in the NRFU workload is 23.9%.  The equivalent proxy

15   rate for occupied NRFU housing units in the 2010 Census was 23.8% (as stated in the

16   2010 Census Operations Follow Assessment).  The 2020 final proxy rate, after post

17   processing, can be expected to be lower than that observed thus far because we will

18   resolve cases where we receive duplicate responses.  For example, if an apartment

19   dweller filled out the census online after her landlord had already provided a proxy

20   response for that individual's apartment unit.

21   13. As of the date of this declaration, 13.9% of the NRFU workload has been completed via

22   administrative records.  As I explained in paragraphs 54-58 in my September 5

23   declaration, ECF No. 86-1, using administrative records was a central feature of the

24   2020 Census design, which long predated the Replan.

25   14. In accordance with our 2020 Census Operational Plan v.4 (Dec. 2018), we also are

26   using high quality administrative records to resolve housings units as vacants and

27   deletes. If a knowledgeable person cannot be found to confirm a status of vacant or

28   non-existent, use of administrative records may provide confirmation of the

1    enumerator's assessment.  The Census Bureau does not rely on a single administrative

2    records source to determine whether an address is vacant or non-existent.  Rather,

3    multiple sources are necessary in this instance to provide the confidence and

4    corroboration before administrative records are used.  When used in combination with

5    an enumerator's assessment of vacant or non-existent, corroborated administrative

6    records provide the second confirmation that a nonresponding address is vacant or non-

7    existent.

8    15. If, after the first in-person contact attempt, the enumerator believes the address is

9    occupied, but no knowledgeable person is available to complete the enumeration, the

10   Census Bureau will use consistent and high-quality administrative records from trusted

11   sources as the response for the household and no further contact will be attempted.

12   16. The operational design for NRFU evolved over the course of the decade.  Use of

13   administrative records, field management structures, systems, procedures, data

14   collection tools and techniques were proven in tests occurring in 2013, 2014, 2015,

15   2016, and 2018.

16                              **Quality Assurance Procedures in NRFU**

17   17. As I explained in paragraphs 59 to 65 in my first declaration in this lawsuit, filed on

18   September 4, 2020 at ECF No. 81-1, the Census Bureau is committed to a quality

19   NRFU operation and has in place several programs to monitor and promote quality,

20   such as the NRFU Reinterview Program, the Decennial Field Quality Monitoring

21   Operation, and the Coverage Improvement Operation.

22   18. The use of technology in the Nonresponse Followup data collection has allowed the

23   Census Bureau to build in real-time measures to ensure data quality.  Unlike a paper-

24   form environment used in previous Decennial Censuses—which relies on enumerator

25   compliance with instructions for proper completion—the 2020 Census incorporates a

26   series of automated checks and confirmations directly in the data-collection process.

27   Further, the availability of real-time information from the enumeration devices (such as

28   the enumerator's physical location at the time of the interview, the length of the

1    interview, and the time spent on each question) allows us to intervene to address any

2    data quality issues that may arise.  For example, we use a series of "system alerts"

3    where supervisors are notified and act to correct outliers on things like proxy rates, pace

4    of work, and payroll issues.  Ensuring we collect quality data on the 2020 Census is

5    embedded directly in the field data collection process as originally planned, used in the

6    COVID-19 plan, and used in the Replan.

7    19. The NRFU Reinterview Program involves contacting between 2.5% and 3% of the total

8    households in the NRFU workload to conduct another interview to help us ensure that

9    enumerators are conducting their jobs correctly and are not falsifying responses.

10   Falsification of responses by enumerators occurs in relatively rare instances where an

11   enumerator improperly attempts to report and be paid for enumerations they have not,

12   in fact, conducted.  The program as originally planned included both a randomly-

13   selected component and an analytically-selected component.  For the analytically-

14   selected component, we use data from the enumerators' mobile devices to tell us where

15   the enumerators were physically located while they were conducting the interviews,

16   how long they spent on each question in the interview, time of day of the interview, and

17   other detail data about the interview process.  Having this information—much of which

18   is new for the 2020 Census—has provided management with information on how the

19   census takers are doing their jobs, and allowed us to select reinterview cases in a

20   targeted fashion.  The random component involves simply sending randomly-selected

21   cases for reinterview.

22   20. In developing the Replan, the Census Bureau reevaluated all of its operations, including

23   the random component of the NRFU Reinterview Program.  As a result of this

24   reevaluation, the Replan contemplated the elimination of the random component, based

25   on the belief that that the analytic component of the program would provide better

26   information to help ensure that enumerators were conducting their jobs correctly.  As of

27   the date of this declaration we have conducted 605,481 random reinterviews and

28

1    923,575 analytic reinterviews.  This is a substantially higher percentage of random

2    reinterviews (38.1%) than that contemplated by the COVID-19 Plan.

3    21. We ceased sending random reinterview cases on September 25 because, as noted

4    above, we determined that the analytic component of the program was more effective

5    and, therefore, we decided to focus our resources on that aspect of the program.  The

6    Census Bureau historically has made dynamic adjustments of this type.

7    22. A second quality check program, new for the 2020 Census, is the Decennial Field

8    Quality Monitoring operation which has been part of our plan prior to COVID.  This

9    operation monitors overall adherence to field procedures in order to identify unusual

10    patterns.  The goal of the program is to identify and investigate potential quality issues.

11    In this program we examine data from individual enumerators and larger scale data,

12    scanning for the possibility of both individual and systemic data quality problems.  The

13    program monitors outlier metrics, and produces reports that we analyze on a daily basis.

14    Management staff use these reports to investigate anomalous activities and follow up as

15    needed.

16    23. Another quality check operation, the Coverage Improvement Operation, seeks to

17    resolve erroneous enumerations (people who were counted in the wrong place or

18    counted more than once) and omissions (people who were missed) from all housing

19    unit data.  Coverage Improvement has helped us resolve potential coverage issues

20    identified in responses from the Internet Self-Response, Census Questionnaire

21    Assistance, and NRFU operations, as well as from the paper questionnaires.  This

22    operation has been part of our plan since before COVID-19 disrupted operations.

23    24. The Census Bureau believes that the embedded quality measures in the data collection

24    process and these quality programs (Reinterview, Decennial Field Quality Monitoring,

25    and Coverage Improvement), taken together, provide a robust quality check for our data

26    collection operations.  We believe that our quality program remains an effective

27    deterrent to poor performance, and an appropriate method to identify enumerators who

28    fail to follow procedures, superior to the quality-control measures used in prior

1    censuses.  None of these programs, to date, reveals a pattern of substandard data

2    collection.

3

4  I have read the foregoing and it is all true and correct.

5  DATED this ___ day of October, 2020

6

7  _____

8  Albert E. Fontenot, Jr.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28