1   LATHAM & WATKINS LLP
      Sadik Huseny (Bar No. 224659)
2     sadik.huseny@lw.com
      Steven M. Bauer (Bar No. 135067)
3     steven.bauer@lw.com
      Amit Makker (Bar No. 280747)
4     amit.makker@lw.com
      Shannon D. Lankenau (Bar No. 294263)
5     shannon.lankenau@lw.com
      505 Montgomery Street, Suite 2000
6   San Francisco, CA 94111
      Telephone: 415.391.0600
7
      LATHAM & WATKINS LLP
8     Melissa Arbus Sherry (admitted *pro hac vice*)
      melissa.sherry@lw.com
9     Richard P. Bress (admitted *pro hac vice*)
      rick.bress@lw.com
10    Anne W. Robinson (admitted *pro hac vice*)
      anne.robinson@lw.com
11    Tyce R. Walters (admitted *pro hac vice*)
      tyce.walters@lw.com
12    Gemma Donofrio (admitted *pro hac vice*)
      gemma.donofrio@lw.com
13  555 Eleventh Street NW, Suite 1000
    Washington, D.C. 20004
14  Telephone: 202.637.2200

      LAWYERS' COMMITTEE FOR
      CIVIL RIGHTS UNDER LAW
        Kristen Clarke (*pro hac vice*)
          kclarke@lawyerscommittee.org
        Jon M. Greenbaum (Bar No. 166733)
          jgreenbaum@lawyerscommittee.org
        Ezra D. Rosenberg (*pro hac vice*)
          erosenberg@lawyerscommittee.org
        Dorian L. Spence (*pro hac vice to come*)
          dspence@lawyerscommittee.org
        Ajay P. Saini (*pro hac vice*)
          asaini@lawyerscommittee.org
        Maryum Jordan (Bar No. 325447)
          mjordan@lawyerscommittee.org
        Pooja Chaudhuri (Bar No. 314847)
          pchaudhuri@lawyerscommittee.org
      1500 K Street NW, Suite 900
      Washington, D.C. 20005
      Telephone:  202.662.8600
      Facsimile:  202.783.0857

      *Additional counsel and representation
      information listed in signature block*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| NATIONAL URBAN LEAGUE; LEAGUE OF WOMEN VOTERS; BLACK ALLIANCE FOR JUST IMMIGRATION; HARRIS COUNTY, TEXAS; KING COUNTY, WASHINGTON; CITY OF LOS ANGELES, CALIFORNIA; CITY OF SALINAS, CALIFORNIA; CITY OF SAN JOSE, CALIFORNIA; RODNEY ELLIS; ADRIAN GARCIA; THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; CITY OF CHICAGO, ILLINOIS; COUNTY OF LOS ANGELES, CALIFORNIA; NAVAJO NATION; and GILA RIVER INDIAN COMMUNITY, <br><br> Plaintiffs, <br><br> v. <br><br> WILBUR L. ROSS, JR., in his official capacity as Secretary of Commerce; U.S. DEPARTMENT OF COMMERCE; STEVEN DILLINGHAM, in his official capacity as Director of the U.S. Census Bureau; and U.S. CENSUS BUREAU, <br> Defendants. | CASE NO. 20-cv-5799-LHK <br><br> **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION AND SUMMARY**

1.      This lawsuit challenges the unconstitutional and illegal decision by Secretary of Commerce Wilbur Ross and Census Bureau (the "Bureau") Director Steven Dillingham, to sacrifice the accuracy of the 2020 Census by forcing the Bureau to compress eight and a half months of vital data collection and data processing into four and a half months, against the judgment of the Bureau's staff and in the midst of a once-in-a-century pandemic.

2.      This Second Amended Complaint concerns two related periods of time: (1) Defendants' announcement and initial implementation of the census "Replan" (which acceded to improper political pressure and abandoned a decade of planning and analysis on how to conduct a fair, complete, and accurate census), and (2) the last two months of litigation in this case, (where Defendants' conduct and ever-changing rationales, and Defendants' new, misleading reliance on its alleged "99% completion" rate, demonstrate that Defendants have violated the federal government's constitutional and statutory obligations to secure a fair, complete, and accurate census).

3.      Plaintiffs' initial complaint focused on the Replan decision, announcement, and initial implementation.  Plaintiffs file this Second Amended Complaint, pursuant to Court order and agreement between the parties, to show why recent developments require expedited resolution on the merits and a final judgment of permanent injunctive and declaratory relief.  In short,  Defendants have maintained their Replan scheme to cut in half the amount of time for conducting the decennial census.  Only expedited permanent relief from this Court can ensure a fair, accurate, and complete 2020 Census.

4.      The Defendants' attempt to rush the census count poses a grave threat to the vital functions that rely on census data, from reapportioning the United States House of Representatives and redrawing state and local electoral districts, to equitably distributing over $1.5 trillion annually in federal funds that support basic needs such as food, health care, and education.  *See* George Washington University Institute of Public Policy, *Counting for Dollars 2020: The Role of the Decennial Census in the Geographic Distribution of Federal Funds, Brief 7: Comprehensive Accounting of Census-Guided Federal Spending* (April 2020).  Undercounted

cities, counties, and municipalities will lose representation in Congress and tens of millions of dollars in funding.  And communities of color, threatened with a massive undercount, will lose core political power and vital services.  In contrast to these dire stakes, the immediate solution to this problem is simple: set aside and permanently enjoin implementation of the impossibly-shortened Replan, and allow the Census Bureau to implement the rest of the plan that it had designed to fulfill its constitutional duties during the pandemic.

**(A) The Replan violated Defendants' constitutional and statutory obligations to make decisions that are reasonably related to achieving a fair and accurate count**

5.      The Census Bureau's staff spent most of the past decade developing a final operational plan for the 2020 Census that reflected the Bureau's understanding of the best methods for counting everyone once and in the right place (the "Final Operational Plan").

6.      The COVID-19 pandemic upended all census field operations, many of which the Bureau designed to enumerate populations that it has long struggled to count, including racial and ethnic minorities, non-English speakers, and undocumented persons.  Among the disrupted census operations was the largest, most time-consuming operation undertaken to count the country's hard-to-count communities—the "Non-Response Follow Up" operation.  During Non-Response Follow Up, the Bureau sends its employees to knock on the doors of households that have not yet responded to the census and perform other vital data-collecting functions.

7.      The Bureau's staff responded to the pandemic—and the impossibility of conducting house visits during widespread lockdowns—by making necessary adjustments to the timeline in the Final Operational Plan.  This revised operational plan, the "COVID-19 Plan" issued on April 13, 2020, was intended to ensure that hard-to-count communities would be enumerated and the health and safety of Bureau employees and the public would be protected. This plan adjusted the deadlines of, but did not shorten the time for, critical operations.  Under this plan—which experts and census stakeholders alike endorsed as a scientifically sound approach for minimizing the pandemic's potential damage to the accuracy of the count—the Bureau extended its data-collection deadlines to October 31, 2020 and its data-processing deadlines into the second quarter of 2021.  Critically, the COVID-19 Plan delayed door-

knocking by three months, pushing it from May–July 2020 to August–October 2020.  But the COVID-19 Plan acknowledged that the Bureau must spend the same amount of time—around eleven and a half weeks—on door-knocking, just as it had planned to do before the pandemic. The COVID-19 Plan also incorporated the same methods and techniques contemplated in the Final Operational Plan that the Bureau had spent years developing.

8.     Indeed, the only respect in which the COVID-19 Plan altered the amount of time devoted to operations set out in the Final Operational Plan was a requirement that the Bureau spend *more* time than originally planned in *processing* the data it collected—that is, performing the necessary, critical second part of its work, to transform over 100 million individual census forms into high-quality, reliable, and legitimate data.  This additional investment in data-processing reflected daunting new challenges the COVID-19 pandemic posed to an accurate count, including massive displacements of people that would introduce problems of duplicate responses, responses without unique census identifiers, and other complex data issues.

9.     The Department of Commerce and the Census Bureau also recognized that the impact of COVID-19 had made it impossible to meet certain statutory deadlines for reporting census results to Congress.  Commerce Secretary Wilbur Ross and Census Bureau Director Steven Dillingham announced that the Bureau was seeking relief from Congress to formally extend two statutory deadlines: first, the deadline for reporting the state-population totals used to calculate the congressional apportionment to the President, which Congress was asked to extend from December 31, 2020 to April 30, 2021; and, second, the deadline for reporting redistricting data to the states, which Congress was asked to extend from March 31, 2021, to July 31, 2021. Commenting on the statutory-deadline extensions, President Trump publicly stated on April 13, 2020, "I don't know that you even have to ask [Congress].  This is called an act of God.  This is called a situation that has to be.  They have to give in.  I think 120 days isn't nearly enough." Hansi Lo Wang, *Trump Officials Ask to Delay Census Data for Voting Districts, House Seats*, NPR (Apr. 13, 2020), https://www.npr.org/2020/04/13/833546675/trump-officials-ask-to-delay-census-data-for-voting-districts-house-seats.

10.     Recognizing that more time was necessary to complete an accurate census, and consistent with the President's statement, the Bureau proceeded immediately under its COVID-19 Plan.  The Bureau delayed its door-knocking operation to late summer, with the declared intention of completing it by October 31, 2020.  And understanding that a successful census is dependent on thousands of public and private entities and individuals working together, the Bureau publicized its definitive COVID-19 plan to the public, as well as to government and non-profit partners involved in the years-long and multi-million-dollar public education campaign to ensure public trust and encourage public participation in the census.

11.     No one challenged the Bureau's COVID-19 Plan or its extended timelines.  All understood that a more than three-month freeze caused by a global pandemic meant, by definition, that a like amount of time (or more) was needed to knock on tens of millions of doors and count everyone, once and in the right place.

12.     And the Bureau was vocal about the need for additional time.  Throughout the summer, Bureau officials repeatedly stated that the pandemic had rendered it impossible for the Bureau to complete a reasonably accurate count by December 31, 2020.  Internally, everyone at the Bureau stated and acted upon the same.  To comply with its constitutional and statutory obligations to conduct a fair, complete and accurate census, the Bureau continued collecting data on the timelines set in the COVID-19 Plan, which extended the Bureau's data processing into 2021.

13.     But on August 3, everything suddenly changed.  Nearly four months into implementing its COVID-19 Plan—in the face of a pandemic that had only grown worse, and in disregard of the Bureau's constitutional and statutory duties to conduct an actual enumeration of the entire population—Secretary Ross and Director Dillingham abruptly abandoned the COVID-19 Plan.  Without explanation, they announced a new "Replan" for the 2020 Census, including shortening the Bureau's data-collection operation by one month to September 30, 2020, and requiring the Bureau to process and report the apportionment data to President Trump by December 31, 2020.  The Replan cut a crucial *four weeks* out from the 11.5 week data-collection operation: over a third of the time required for and planned for that work.  It cut *three months*

from the critical data-processing portion of the census— half the amount of time required for and planned for that work.  And it disregarded the Bureau's own prior conclusions that such a mad rush would render it impossible for the Bureau to fulfil its constitutional obligation to ensure reasonable quality and accuracy of the 2020 Census.

14.     In short, the Replan required the Bureau to complete eight and a half months of data collection and data processing in half the time.  It ignored the multi-month delay in census data-collection that the COVID-19 pandemic caused.  And it compelled a final date for delivering census apportionment data to the President that Bureau officials have repeatedly asserted they cannot meet with constitutional, fit-for-purpose data.

15.     Defendants' decision to abandon the COVID-19 Plan in favor of the Replan does not satisfy the Supreme Court's clear command that any decision relating to the census bear a "reasonable relationship" to producing an accurate count.  *See Wisconsin v. City of N.Y.*, 517 U.S. 1, 20 (1996).  As demonstrated by Defendants' own prior statements, the challenged decision cannot be justified by any legitimate interest in conducting an accurate census, and in fact will introduce several inaccuracies in the count, chief among them major undercounts of communities of color.

16.     The reason for this abrupt change of position was not apparent on the face of the press release announcing the Replan or any other subsequently issued statements or publications from the federal government.  The Bureau has refused requests from Congress and at least one Plaintiff in this action to provide one.

17.     The announcement of the Replan did reference two developments that occurred between the adoption of the COVID-19 Plan and the announcement of the Bureau's intent to adopt the Replan.  But neither of these developments can justify Defendants' actions.

18.     First, the announcement referred to the Secretary of Commerce's direction to the Bureau to comply with the statutory deadline of December 31, 2020 for completing the apportionment count.  But this statutory deadline cannot justify an unconstitutional decision to cut short crucial operations and fail to satisfy its constitutional obligation.  A statutory deadline, particularly one that was set without a global pandemic in mind, cannot override the federal

government's constitutional duty to accomplish an accurate census; there is "nothing sacred in the due date of the filing [of apportionment data], especially when the work of the Census Bureau... is incomplete." *Carey v. Klutznick*, 637 F. 2d 834, 837 (2d Cir. 1980).  Moreover, the Bureau was cognizant of this deadline even as it designed and implemented the COVID-19 Plan, including delaying crucial field operations by several months.  And Bureau officials have repeatedly made clear that because of the impediments introduced by COVID-19, together with the multi-month delay, it is *already* too late to satisfy these pre-COVID-19 deadlines.

19.     Second, both the text of the Replan announcement and the timing of the decision suggested that the federal government's motivation for the Replan is to facilitate another illegal act: suppressing the political power of communities of color by excluding undocumented people from the final apportionment count.  On July 21, 2020—just a few weeks earlier—President Trump issued a Presidential Order titled "Memorandum Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census" (the "Apportionment Exclusion Order")— which expressly stated the President's determination to exclude undocumented people from the population count used for apportionment.  To increase the chance that the President can fully effectuate the Apportionment Exclusion Order, he must receive the population totals while he is still in office, and he ordered the Secretary of Commerce to provide him with 2020 decennial census information by December 31, 2020 to carry out his objective.

20.     The President's Apportionment Exclusion Order (currently being challenged as unconstitutional and unlawful in a number of lawsuits filed in jurisdictions around the country, including in this District) represents only the most recent of Defendants' serial attempts to manipulate the 2020 Census to suppress the political power of communities of color.  These attempts started with a campaign to introduce a historically unprecedented and untested citizenship question onto the 2020 Census questionnaire to advantage—in the words of a deceased Republican redistricting consultant—"Republicans and non-Hispanic whites."  Michael Wines, *Deceased G.O.P. Strategist's Hard Drives Reveal New Details on the Census Citizenship Question*, N.Y. Times (May 30, 2019), https://www.nytimes.com/2019/05/30/us/census-citizenship-question-hofeller.html.  Since the Supreme Court blocked the question, Defendants

have looked for other means to achieve that same end, including collecting data on citizenship from administrative records and, now, cutting the census short.

> **(B) Defendants' conduct since the Replan announcement and throughout this litigation, and the effects of the Replan on census data collection, demonstrate the need for expedited resolution of the merits of Plaintiffs' claims**

21.     Developments since the initial complaint was filed in this case have shown that Plaintiffs' concerns in bringing this lawsuit were more than justified.

22.     For context, it is important to see how exactly Defendants were characterizing these issues around the time Plaintiffs' initial complaint was filed.  On August 14, 2020, Secretary Ross wrote an op-ed aimed at bolstering confidence in the Replan:

Wilbur Ross

The U.S. Census Bureau is well on its way to delivering a complete and accurate 2020 Census. I am proud to oversee this essential activity which is clearly outlined in the United States Constitution.

Critics claim incorrectly that the Census Bureau is shortchanging the count. This is not an accurate depiction of the current state of the 2020 Census, which is on its way to delivering a successful count in every community across the nation.

Last week, the Census Bureau announced an updated plan to complete data collection by September 30, 2020, in order to meet the statutory deadline of December 31, 2020.

The Census Bureau's plan adapts the important field operation that follows up with nonresponding households, and it increases the number of hours worked per week to accomplish the same amount of work in a shorter time period and meet the statutory deadline, without sacrificing quality.

Under this plan, the Census Bureau will meet or exceed the standard for data collection set in previous decennial censuses.

So, while the critics have said this plan is being "cut-off" too soon, in reality, it has been strengthened in order to get the complete and accurate count on time.

Over 100 million households have already responded to the 2020 census across all our operations, ahead of our projections for this point.

This week we fully engage the 2020 census's important non-response follow-up operation, where census-takers go door-to-door to obtain responses from the just over 50 million households who have not yet responded.

FOR IMMEDIATE RELEASE
Friday, August 14, 2020

**Office of Public Affairs**

(202) 482-4883
publicaffairs@doc.gov℠

23.     Secretary's Ross's assertions about the quality and processes of the Replan were incorrect when made, and have proven to be definitively incorrect over time.  In implementing the Replan, the Census Bureau had altered its non-response follow up ("NRFU") processes and methods—including how it would measure a household unit as "complete" or "enumerated"—in

1   a manner that would increase speed but would sacrifice quality, weaken the data collection

2   process, and would not "meet or exceed the standard of data collection set in previous decennial

3   censuses." U.S. Dept. of Commerce, *Op-Ed by Commerce Secretary Wilbur L. Ross: The*

4   *Census Bureau is Not Shortchanging the Count*, Aug. 14, 2020,

5   https://www.commerce.gov/news/op-eds/2020/08/op-ed-commerce-secretary-wilbur-l-ross-

6   census-bureau-not-shortchanging-count ("Ross Op-Ed").  The changes made by Defendants

7   would ensure that many communities across the nation would suffer in Defendants' efforts to try

8   and get to a broad-brush "99% completion rate" metric for the census overall—yet  Defendants

9   would still come nowhere close to meeting that "99% completion rate" under the Replan's

10  deadlines.   This is shown by, among other things, the following developments.

11       24.   *Corroborating internal documents*.  Internal documents and materials obtained

12  after the filing of the complaint demonstrate that in fact Plaintiffs' allegations and concerns about

13  the Replan—and the constitutional and statutory failings regarding its announcement,

14  implementation, and threatened harms—were true.  For instance, a presentation by the Bureau to

15  Secretary Ross on August 3, 2020—released during this litigation—identified a number of steps

16  the Bureau would need to take under the Replan to speed up the NRFU process.  Many of these

17  steps were expected to decrease accuracy.  AR DOC_0008779.  The presentation also warned

18  that all of the activities outlined to speed up backend processing "represent abbreviated processes

19  or eliminated activities that will reduce accuracy."

20       25.   *Undisclosed plan to begin unprecedented wind-down of data collection on*

21  *September 11, 2020.*  Unbeknownst to Plaintiffs, in furtherance of the September 30 operations

22  shutdown, Defendants had secretly planned to allow every census office in the nation to start

23  winding down and initiate closeout procedures beginning on September 11 at the discretion of

24  the regional director—regardless of how far along they were.  In fact, Defendants had already

25  started to wind down in some undisclosed portions of the country.  To put this issue in

26  perspective, as of September 11, approximately 9%, or approximately 13.5 million, of the

27  household units in the nation had not been counted.  Despite this, each census office would have

28  become eligible for early closeout where, among other things, the office would become eligible

1   for such mechanisms as "pop count only" where census workers would cease trying to obtain full

2   demographic data from the household and instead seek only a "population count" alone.  This

3   was an unprecedented and massive change from previous censuses, where such limiting closeout

4   procedures would generally not be implemented until roughly 1% or less of the housing units

5   were still to be counted.

6        26.     *Failure to reach minimum completion levels by the Replan's September 30 data*

7   *collection deadline, even assuming the completion percentages were true*.  The data also show

8   that Defendants' claims that they would have reached a 99% completion rate in every state by

9   the Replan's new data-collection shutdown date of September 30 was also not correct.  Even

10  assuming that the "completion" metrics being used by Defendants were materially identical to

11  the standards used in previous censuses, *16 states plus the District of Columbia* were below the

12  99% threshold on September 30, and millions of individuals would have been shut out of the

13  count if field operations had ceased then.  U.S. Census Bureau, 2020 Census Housing Unit

14  Enumeration Progress by State, Sept. 30, 2020, https://2020census.gov/content/dam/2020census/

15  news/daily-nrfu-rates/nrfu-rates-report-09-30.pdf

16       27.     The overall completion metrics, or even the state-by-state completion metrics,

17  also hide a bigger problem: differential undercounts at the local census CFS office level.  As

18  Defendants themselves realized, in internal documents from September, numerous CFS areas

19  were far below target.  In two Census ACOs (Shreveport, Louisiana and Window Rock,

20  Arizona), actual completion rates on September 28th were below 75% even though the targeted

21  completion rate was over 95%.  Another 22 Census offices reported completion rates of under

22  90% on September 28th compared to a targeted completion rate of over 95%.  There was also

23  very low completion rates in tribal lands.

24       28.     *No realistic ability to reach their claimed Oct 15 completion rates under the same*

25  *standards and processes used for previous censuses.* The context of the 2020 data-collection

26  period, in addition to how it played out in practice, make clear that Defendants never had a

27  realistic ability to reach true 99% completion rates in every state by September 30 or even

28  October 15—let alone while trying to reach hard-to-count populations—without significant,

1   accuracy-reducing changes in the Bureau's standards, processes and metrics.  These changes

2   significantly altered and weakened NRFU and the Bureau's measurement of it:  a deliberate

3   sacrifice of accuracy for speed.

4      29. The 2010 Census scheduled 10 weeks of NRFU to resolve ~47,200,000 million

5   household units.  *See* U.S. Dept. of Commerce, Office of Inspector General, *Census 2010: Final*

6   *Report to Congress* (June 2011) at 49.  The 2020 Census Final Operational Plan scheduled 11.5

7   weeks of NRFU to resolve ~64,000,000 housing units.  *Thus,* the Census was already planning to

8   be far more efficient, in 2020, than in 2010—because it added only 10 days more to handle an

9   additional ~17 million housing units.  And it spent a decade honing these efficiencies,

10   conducting tests essentially every single year, and refining various advancements, including the

11   use of sophisticated software, assignment optimization, advancements in review technology, the

12   use of iPhones instead of paper technology, and so on.

13      30. With all of these advancements and tests, the Bureau projected enumerator

14   productivity to be around 1.55 resolved cases/hour: an enormous and self-identified "substantial

15   increase" over the 1.05 resolved cases per hour during the 2010 Census.  U.S. Census Bureau,

16   *Final Census Test Proves Successful*, Sept. 5, 2018,

17   https://www.census.gov/newsroom/blogs/director/2018/09/final-census-test-proves-

18   successful.html.  And there was no indication that the Bureau could squeeze out greater

19   productivity from its enumerators, even using all of this new technology and software

20   optimization, while still reasonably maintaining accuracy.

21      31. In order to squeeze in 62 million housing unit enumerations into an 11.5 week

22   period, the Bureau also closely calculated the number of enumerators it would need, based on the

23   projected enumerator per-hour productivity and per-week workload.  After a decade of study

24   preparing for the 2020 Census, Defendants had initially projected needing around 260,000

25   enumerators to perform NRFU operations.  That number then increased to above 300,000

26   enumerators as a result of the COVID-19 pandemic.

27      32. The Bureau never hired and trained the more than 300,000 enumerators that

28   officials said they needed.  Instead, they claim that enumerator productivity rates somehow

1   skyrocketed—during a once-in-a-century pandemic, and during a huge and wide array of natural

2   disasters—to a level they never could achieve after a decade of testing.  Using all the same

3   technology and optimizations already built in, enumerator rates shot from 1.55 cases/hour to 2.32

4   cases/hour.

5        33.    This wasn't an August miracle.   Instead, the Replan resulted in a massive

6   decrease in in-person visits and a corresponding increase in the use of administrative records,

7   proxies, and changed information requirements (i.e., pop-counts).  And it was those changes—

8   along with even more troubling charges of enumerators being told to act improperly and cut

9   corners, as discussed below—that led to the impossible jump in enumerator productivity.

10   Contrary to Secretary Ross's promises, the 2020 data collection process did not meet or exceed

11   the standards of the previous census, or strengthen those standards and processes.  The math only

12   worked because it slashed prior standards.

13        34.    *The claimed 99% completion rates as of October 15 are misleading and fail to*

14   *measure up adequately to past censuses.*  Defendants' claim that they had reached completion

15   rates of 99% in every state of the country as of October 15, better than previous censuses, is

16   misleading and untrue.  There are in fact glaring differences between the 2020 decennial

17   censuses and previous censuses.

18        35.    First, the 99% completion metrics are inflated because Defendants appear to have

19   kept the denominator of total nationwide housing units to be enumerated artificially low.  They

20   have done so by not including additional housing units identified through the NRFU process.

21   Specifically, Defendants' internal spreadsheets—through which they derive the daily completion

22   rate percentages—use a total housing unit number of ~149 million, while the Census Bureau has

23   itself said that the total number of housing units is ~152 million.  On information and belief if

24   Defendants were to add, to the denominator, the additional housing units (identified through the

25   NRFU process or otherwise), the rates for the country overall would decrease below 99%.  In

26   addition, depending on the location of the additional housing units artificially excluded, the

27   completion percentages for some states and local census offices might be significantly below

28   99%.

36.     <u>Second</u>, Defendants' October 15 completion rate metrics, provided on an October 21 media call by Bureau executives Albert Fontenot and Tim Olson, only relate to occupied housing units and provide no information about any units marked as vacant or deleted. *See* U.S. Census Bureau, *2020 Census Operational Press Briefing* (Oct. 21, 2020), https://www.census.gov/newsroom/press-kits/2020/2020-census-operational-press-briefing-october21.html.  This appears to be deliberate: Defendants have provided no data about the millions of housing units that are marked vacant or deleted from the registry—where they are, how they were characterized as such, or anything else.  They have not even provided the overall number of NRFU housing units marked as vacant or deleted.

37.     <u>Third</u>, Defendants' decision to only provide limited information about NRFU results, restricted to occupied housing unit metrics, appears to be an effort to inflate the metrics so as to convey the image that the 2020 decennial census NRFU process resulted in numbers equivalent to or better than previous censuses, and particularly as to the number of enumerations resolved by in-person interviews.  In fact, the numbers are far worse.  Once again, on information and belief—and by reading between the lines and triangulating from other data Defendants have provided—the 2020 census data collection period has ended with what appears to be the following glaring results when compared to prior censuses:

- **Of the total housing units in the nation** (from Defendants' Master Address File or MAF), which Defendants have stated equal ~152,000,000, Defendants have enumerated *over a quarter*— approximately 27%— through administrative records or proxies only.  This is unprecedented in recent census history and is a dereliction of the Bureau's duty and promise to count every person once and in the right place.  And it cannot be understated: Plaintiffs estimate that over ***over 41 million households and anywhere from ~80 to 100 million people*** (assuming 2-3 persons per housing unit)***,*** have not been directly spoken with in this 2020 census.

- **Of the total housing units in the NRFU process**, which Defendants have stated equal ~64,000,000, Defendants have conducted in-person household enumeration of only ~36%, compared to ~47% in the 2010 Census.  If Defendants had just matched the 2010 census, it appears that they would have conducted household in-person enumerations of *~7 million more housing units*.

- **Of the total <u>occupied</u> housing units in the NRFU process**, which on information and belief totals ~41,700,000, Defendants have conducted in-person household enumeration of only ~55%,

compared to ~75% in the 2010 Census.  If Defendants had just matched the 2010 census, it appears that they would have conducted household in-person enumerations of *~8 million more housing units*. Additionally, it appears that Defendants enumerated far more household units (perhaps millions more) via administrative records then even they had previously estimated or considered—and Defendants have not disclosed how they softened or altered their administrative record protocols and standards to result in such a significant increase.

38.     From these limited numbers alone (never revealed directly by Defendants), it is clear how Defendants have been able to claim they "finished" data collection with a "99%" completion rate and reached such high "productivity" rates for census enumerators.  They stopped counting people live—in massive amounts—and simply changed the definition of "complete" or "enumerated" when compared to other recent censuses.  But word-play does not change the substance or the massive constitutional failing of this sort of count.

39.     <u>Fourth</u>, as indicated by the numerous Census employees who wrote to the Court, the completion numbers themselves are riddled with potential problems, ranging from enumerators pressured or told to provide false data or guesswork to enumerations being marked complete after minimal or no visits.  These issues are compounded by Defendants (1) not providing any information on numbers/types of in-person visits, (2) not providing any information on the specific sorts of administrative records or proxies used, and in what quantity, (3) abandoning random re-interview quality control checks for large swaths of the data collection period, and not providing any specific information regarding their re-interview quality control checks, and (4) especially, not providing any information whatsoever by local CFS area, so as to preclude the public and Plaintiffs from assessing how Defendants' various efforts at rushing data collection may have led to significant differential undercounts and other data-quality problems.

40.     On August 14, Secretary Ross stated publicly that critics of the Replan had nothing to fear, and that the Census Bureau would meet the September 30 data collection deadline with a NRFU program stronger than before, equaling or surpassing accuracy metrics from previous censuses.  As the above indicates, this simply was not true.  Plaintiffs have already been able to deduce or ascertain some of Defendants' significant failings in this respect, based on limited information currently available, and on information and belief will be able to more fully

analyze the failings of the data collection portion of the 2020 Census upon receipt of the information Defendants have yet to provide the public and Plaintiffs.

41.     _Defendants have admitted repeatedly that they cannot obtain an accurate and constitutionally fit census through a data processing portion that must finish by the statutory deadline of December 31._  Throughout this litigation, Defendants unequivocally stated that data-processing operations could not be shortened beyond the three months to which they were compressed under the Replan, and data processing must therefore begin no later than October 1. After the Court's preliminary injunction order, Defendants announced a new drop-dead date of October 6.  But Defendants did _not_ begin data-processing operations until October 16, at the earliest—because data collection did not end until October 15.

42.     Defendants' statements that that they nonetheless intend to deliver census-based apportionment numbers by December 31 or shortly thereafter, are therefore extremely troubling, and an admission that the numbers will be definition be constitutionally and statutorily infirm. As Defendants' own statements—and a host of outside experts—make clear, the Bureau cannot accomplish five months of data processing in ten weeks.

43.     Defendants also repeatedly claimed that they were obligated to meet the December 31 statutory deadline for reporting apportionment counts to the President.  And they repeatedly relied on this statutory reporting deadline as the only reason for adopting and defending the Replan.

44.     Defendants' recent statements, however, suggest that they no longer view the December 31 deadline as binding.  There are good reasons to think that the new (not yet revealed) target date will depend on the results of the upcoming election.  If President Trump does not win, Plaintiffs believe that the Secretary will ultimately submit his report _after_ the December 31 statutory deadline but _before_ January 10—so that _this_ President is able to implement the Presidential Memorandum and submit that revised apportionment count before he leaves office.  The latest change in position only further confirms that the statutory deadline was mere pretext.  The true motivation for the severely truncated deadlines in the Replan is and has always been a timeline that gives this President control over the final apportionment numbers.

1                              \*      \*      \*

2       45.      Plaintiffs are local governments, civil rights and civic organizations, and

3 individuals whose communities will almost certainly be inaccurately represented and

4 underrepresented in the final census count if the administration succeeds in truncating the census.

5       46.      Plaintiffs seek declaratory relief affirming that Defendants' actions violate the

6 Enumeration Clause and the Administrative Procedure Act.  Plaintiffs additionally seek to set

7 aside and enjoin implementation or effectuation of the illegal Replan, thereby permitting the

8 Bureau to implement and effectuate the preexisting COVID-19 Plan it carefully designed to

9 ensure a complete and accurate count.  This relief will allow the Bureau to conduct the 2020

10 Census on the timeline and in the manner it has repeatedly asserted is necessary to complete a

11 full, fair, and accurate census

12       47.      Without such relief, Plaintiffs and the communities they represent will suffer

13 irreparable harm for at least another decade, until the next census is conducted.

14                            **JURISDICTION AND VENUE**

15       48.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1346(a), and

16 1361.

17       49.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) and (e)(1).

18 Defendants are United States officers or agencies sued in their official capacities, a substantial

19 part of the events or omissions giving rise to this action have occurred or will occur in this

20 district, and one or more Plaintiffs reside in this district.

21       50.      This Court may grant declaratory and injunctive relief under 28 U.S.C. §§ 2201

22 and 2202.

23       51.      The proper intradistrict assignment for this action is the San Jose Division, in light

24 of the location of Plaintiffs City of San Jose and members of the League of Women Voters.

25                                   **PARTIES**

26 **I.**    **Plaintiffs**

27       52.      The National Urban League ("Urban League") is a civil-rights organization with

28 over 90 affiliates serving 300 communities in 37 states and the District of Columbia.  Founded in

1910, the Urban League is headquartered in New York City.  The mission of the Urban League
is to help African Americans and others in underserved communities achieve their highest
human potential and secure economic self-reliance, parity, power, and civil rights.

53.     For the 2020 Census, the Urban League has expended substantial resources
developing programs designed to encourage self-response and cooperation with Census Bureau
offices in historically undercounted communities.  Specifically, the organization has engaged in
efforts to educate the public about the census through various methods, including virtual town
halls, production and distribution of toolkits, workshops for locally based get-out-the-count
organizations, and publication and upkeep of a website, www.MakeBlackCount.org, to
disseminate critical information about the census.  The Urban League has also worked with
Census Bureau regional offices to encourage enumerator recruitment, and the organization uses
social media to encourage 2020 Census participation.

54.     Plaintiff Black Alliance for Just Immigration ("BAJI") is a nonprofit organization
organized and existing under the laws of California, with offices and members across the
country, including in Oakland, California, Miami, Florida, Atlanta, Georgia, and New York City.
BAJI collaborates with African Americans and Black immigrants to organize and advocate for
equal and just laws in their communities.  BAJI campaigns to advance racial justice and provides
partner organizations with varied assistance—particularly on immigration policy—and it spends
significant resources educating its partner organizations, individuals, and other constituents
through presentations, workshops, publications, technical assistance, and trainings.  BAJI is a
membership organization, and its members either pay dues or volunteer their time to support the
organization.  Members also actively participate in BAJI's self-governance and decision-making
at the local level.

55.     For the 2020 Census, BAJI has worked to ensure non-responsive households in
Black and immigrant communities are counted.  BAJI has hired additional staff dedicated to
engaging local communities on the census, and has engaged in outreach using social media and
mailers to bolster self-response.  In addition, since the outbreak of the COVID-19 pandemic,
BAJI staff have regularly participated in webinars and virtual events to provide the public more

information about the census, with a specific focus on encouraging participation in Black and immigrant communities.

56.     The League of Women Voters is a nonprofit civic organization that encourages informed and active participation in government.  Founded in 1920, the League of Women Voters is headquartered in Washington, D.C. The League of Women Voters has over 800 state and local affiliates, located in all 50 states and in 764 specific communities, including affiliates with members in San Francisco and Monterey County, California, Detroit, Michigan, Miami, Florida, Philadelphia, Pennsylvania, and New York City.  The League of Women Voters seeks to empower voters and defend democracy.  The League of Women Voters has over 65,000 members nationwide, and its members either pay dues or volunteer their time to support the organization.

57.     The League of Women Voters has engaged in significant efforts to ensure historically undercounted communities are enumerated during the 2020 Non-Response Follow Up operation.  Prior to the outbreak of COVID-19 in the United States, the League of Women Voters and its affiliates participated in public events across the country aimed at providing information about the census to undercounted communities.  Since March of this year, the League of Women Voters has shifted to a digital public-education campaign, encouraging education and participation through social media, email listservs, webinars, and blog posts. Affiliates in Kansas, South Carolina and Maine have also participated in state Complete Count Committees that seek to increase awareness of the 2020 Census, improve participation, and coordinate with Census Bureau officials.

58.     Harris County, Texas is a political subdivision of the State of Texas.  With over 4.7 million residents, Harris County is the third largest county in the United States.  The county's population is over 43% Latino, 20% Black, over 7% Asian, and over 28% non-Hispanic White. During the 2010 Census, 65.1% of households in Harris County self-responded to the census.  As of August 14, 2020, 58.3% of households in Harris County had self-responded to the 2020 Census.  This response rate in Harris County was well below the national response rate on that date, 63.6%.

59.     For the 2020 Census, officials in Harris County have engaged in extensive efforts to encourage participation in the County.  County officials formed a Complete Count Committee with city officials in Houston that engaged in public education about the census, and built partnerships with local Census Bureau officials to coordinate outreach efforts.  In addition, in 2019, the County approved a budget of nearly $4 million dollars to conduct outreach during the 2020 Census.  To that end, the County has contracted with vendors to conduct surveys about the opinions and attitudes of non-responsive populations and develop a digital advertising campaign on Facebook and Instagram to encourage 2020 Census participation.  And the County receives substantial federal funding tied to census data.

60.     King County is a political subdivision of the State of Washington.  Over 2.2 million people live in King County, making it the most populous county in Washington.  As of August 14, 2020, 26.1% of households in King County had not responded to the 2020 Census.  The county has large populations of historically undercounted communities.  For instance, according to the Department of Housing and Urban Development, King County had nearly 12,000 residents experiencing homelessness, the third highest total of any locale in the country.  The Seattle metro area, which includes King County, is estimated to have 140,000 undocumented immigrant residents.

61.      King County worked in partnership with local cities to provide $1.17 million to community-based organizations serving historically undercounted communities.  Specifically, King County sought to fund organizations that work with communities that are Limited English Proficient.  Through this funding, these organizations have produced public education materials related to the 2020 Census, and developed campaigns to get-out-the-count.  And King County, too, receives substantial federal funding tied to census data.

62.     The City of Los Angeles, California is a municipal corporation organized and existing under the laws of the State of California, and is a charter city pursuant to Article XI of the California Constitution.  The City of Los Angeles is home to roughly 4 million people, is the second largest city in the United States, and is located in the county recognized by the Census Bureau as the hardest to count in the nation.  The city's population is a large contributor to the

1   County's hard-to-count status as more than half of the city's residents live in census tracts that

2   are hard to count.  As of August 14, 2020, only 53.8% of the city's households had responded to

3   the 2020 Census—well below the statewide average of 65.1% and even further below the city's

4   own 2010 self-response rate of 68 percent.

5          63.     As a result of its hard-to-count status, the City of Los Angeles has engaged in

6   years of planning and devoted significant resources to developing a strategy for an accurate

7   count, tailored to the unique challenges of the city's population.  To fund these efforts, the city

8   has overseen distribution of roughly $2 million dollars to community-based organizations and

9   the investment of almost $1.5 million of both city general fund and grant money in its own

10  efforts.  And the City of Los Angeles also receives substantial federal funding tied to census

11  data.

12         64.     The City of Salinas, California is a political subdivision of the State of California.

13  Salinas is the most populous city in and the government seat of the County of Monterey.  The

14  city is home to more than 150,000 people, including 38.5% of the county's "hard-to-count"

15  population.  As of August 14, 2020, 57.2% of all households in Salinas have responded to the

16  2020 Census, which is 422nd out of all 482 California cities.  The current response rate is 7.9

17  percentage points below California's statewide average for self-responses and more than 10

18  percentage points below Salinas's self-response rate from the 2010 Census.

19         65.     Salinas has dedicated significant resources to funding and staffing its "Census

20  Action Team," which is composed of city staff and representatives from the County of

21  Monterey's "Complete Count Committee," as well as community-based organizations, school

22  districts, and local businesses.  The city's population is more than 75% Latino, and more than 1

23  in 5 households have limited English-language proficiency.  As part of its outreach, the Salinas

24  Census Action Team engages religious and community organizations, such as local food banks,

25  to assist with enumeration efforts in the Latino community and all communities of color as these

26  organizations are able to assist with trust and communication barriers that can make these groups

27  hard to count.  The City of Salinas also receives substantial federal funding tied to census data.

28

66.     The City of San Jose is a political subdivision of the State of California.  San Jose has over 1 million residents, making it the largest city in Northern California, and the tenth largest city in the United States.  San Jose's population is 32% Latino, and 35% Asian, and nearly 40% of residents are foreign born.  As of August 14, 2020, 28% of households in San Jose had not responded to the census.  San Jose has large populations of historically undercounted communities.  For instance, according to the Department of Housing and Urban Development, in 2019, San Jose had over 6,000 residents experiencing homeless.  In addition, the San Jose metro area is estimated to have over 150,000 undocumented immigrant residents.

67.     The City of San Jose has engaged in extensive public-education and get-out-the-count efforts during the 2020 Census.  San Jose has formed a Complete Count Committee with Santa Clara County, and nearly 90 community-based organizations.  The Committee focuses on raising awareness of the census in historically undercounted communities.  San Jose has disseminated information about the census to the public through city departments and offices, and has worked closely with the Census Bureau to recruit qualified bilingual enumerators.  The City of San Jose receives substantial federal funding tied to census data.

68.     Plaintiff Rodney Ellis is the Commissioner for Precinct One on the Harris County Commissioners Court.  He is a resident and citizen of Harris County, where he is registered to vote and regularly exercises his right to vote.  Commissioner Ellis regularly drives on roads and highways in Harris County.

69.     Plaintiff Adrian Garcia is the Commissioner for Precinct Two on the Harris County Commissioners Court.  He is a life-long resident and citizen of Harris County, where he is registered to vote and regularly exercises his right to vote.  Commissioner Garcia also regularly drives on roads and highways in Harris County.

70.     The National Association for the Advancement of Colored People ("NAACP") is the nation's oldest and largest grassroots-based civil rights organization.  The NAACP is headquartered in Baltimore, Maryland, and has over 2000 units across the country, including units in all 50 states and the District of Columbia.  The NAACP's units are predominantly located in states and metropolitan areas with large Black populations, and NAACP members are

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   more likely than the average resident of the United States to reside in a hard-to-count

2   community.  The NAACP has membership and active units in cities like Detroit, Cleveland, and

3   Newark—all places where, as of August 28, 2020, the Census Bureau reported a lower than 50

4   percent self-response rate to the 2020 Census.

5        71.    The NAACP has made considerable efforts—and expended significant

6   resources—to ensure that the 2020 Non-Response Follow Up operation successfully enumerates

7   hard-to-count communities.  Prior to the outbreak of COVID-19, the NAACP and its units

8   launched a "Be Counted" campaign to inform NAACP membership and undercounted

9   communities about the 2020 Census.  The NAACP and its local units participated in public

10   events around the country; the NAACP hosted townhalls and published materials and posts

11   describing the importance of the census and the historical undercount of Black communities; and

12   NAACP local units assumed leadership rules in a variety of Complete Count Committees.  To

13   get out the count in the face of COVID-19, the NAACP has published a number of posts and

14   articles, hosted an all-online "Black Census Week," partnered with CBS and other organizations

15   to create 2020 Census digital "PSAs," and built new youth programming to make use of social

16   media.

17        72.    The City of Chicago is a municipal corporation and home rule unit organized and

18   existing under the constitution and laws of the State of Illinois.  With over 2.7 million residents,

19   Chicago is the third largest city in the United States.  Chicago's population is 30% Black, 29%

20   Latino, over 6.4% Asian, and over 32% non-Hispanic White.  During the 2010 Census, 62.4% of

21   households in Chicago self-responded to the census.  As of August 28, 2020, 58.1% of

22   households in Chicago had self-responded to the 2020 Census.  This response rate was well

23   below the national response rate on that date, 64.7%.

24        73.    For the 2020 Census, officials in the City of Chicago designated $2.7 million for

25   promotion of census participation.  Chicago established a complete count committee with

26   businesses and nonprofits to stimulate participation, provided grants to organizations engaging

27   with hard-to-count communities, and encouraged responses through public service

28   announcements on radio, social media, billboards and newspapers.  In addition, Chicago has sent

1   paid staff into communities with low response rates to encourage participation, as well as engage

2   in phone banking and texting campaigns.  Chicago receives federal funding under several federal

3   programs that allocate resources based on census-derived information, including the Community

4   Development Block Grant program, the Low Income Home Energy Assistance Program,

5   Workforce Innovation and Opportunity Act grants and others.

6           74.     The County of Los Angeles is a political subdivision of the State of California.

7   The County of Los Angeles is the largest county in the nation, with more than 10 million

8   residents.  It is also one of the country's most diverse counties, with millions of immigrants

9   calling it home.  According to the U.S. Census Bureau, 34.2% of Los Angeles County residents

10  are foreign-born and 48.6% are of Latino descent. Given a high concentration of hard to count

11  populations, Los Angeles is among the hardest to count counties in the United States.  As of

12  August 28, 2020, 62.2% of households in the County of Los Angeles, had responded to the 2020

13  Census, well below both the California average self-response rate of 66.9% and the national self-

14  response rate of 64.7% on that date.

15          75.     To ensure a more accurate count in the 2020 Census, the County of Los Angeles

16  has engaged in significant expenditures.  The County of Los Angeles instigated a notice

17  campaign to all residents informing them of the previous, October 31, 2020, Self-Response

18  deadline, and has had to reprint materials, distribute them to residents, and address any confusion

19  regarding the change in dates.  The County of Los Angeles has also created an extensive

20  outreach and promotional campaign including but not limited to in-store signage at grocery

21  stores and pharmacies, print and digital advertising, and social media editorial calendars and

22  content.  The County of Los Angeles developed these plans specifically incorporating the

23  October 31, 2020, Self-Response deadline under the COVID-19 Plan, and has had to revise these

24  campaigns to account for a new, shortened Self-Response deadline.

25          76.     The Navajo Nation is the largest Indian Nation in the United States with a

26  reservation spanning 27,000 square miles across the states of Arizona, New Mexico, and Utah.

27  The 2010 Census recorded a population of 327,726 for the Navajo Nation.  During the 2010

28  Census, 29.4% of households in the Navajo Nation responded to the census.  As of August 28,

2020, only 18% of households in the Navajo Nation had self-responded to the 2020 Census. Many households in Navajo Nation have limited access to regular mail, and internet.  As a result, the primary method for enumerating households in the Navajo Nation is through census field operations.

77.     For the 2020 Census, the Navajo Nation sought to ensure that every resident was counted.  To that end, the Navajo Nation engaged in outreach efforts such as posting public service announcements on social media, radio, television and in newspapers.  The Navajo Nation also worked with advocates to speak at community events, and provide informational flyers during food distribution events, during senior shopping hours at grocery stores, and at checkpoint stops for those entering and leaving the Nation.  Outreach was conducted in both English and Diné.  The Navajo Nation ultimately depends on accurate census data for a number of essential government functions, including determining the appropriate location for healthcare facilities and services on the reservation, and projecting population needs to assist in determination of water rights claims.  In addition, the Navajo Nation federal funding under several programs that allocate resources on the basis of census-derived data, including the Tribal Transportation Program which provides essential resources for maintenance of roads, bridges and airports on reservations.

78.     The Gila River Indian Community is a sovereign Indian nation composed of members of the Pima and Maricopa Tribes, traditionally known as the Akimel O'otham and Pee-Posh.  It is organized and federally recognized pursuant to § 16 of the Indian Reorganization Act of June 18, 1934, 25 U.S.C. § 5123. The Gila River Indian Reservation, an area of over 372,000 acres, is located in south-central Arizona south of Phoenix.  Most of the reservation is rural, and many households are identifiable only by a post office box.  Also, many households lack access to high-speed internet.  Consequently, in-person interaction with census enumerators is critical to ensuring an accurate census count of the Gila River Indian Community.  As of August 28, 2020, only 9.5% of households had self-responded to the 2020 Census.

79.     The Gila River Indian Community had planned census-response rallies and activities for 2020, as well as a door-to-door effort to make sure all individuals and households

on the Reservation are counted. But for the past five months the Gila River Indian Community has been under shelter-in-place orders, making most of those efforts impossible.  Federal funding for the Gila River Indian Community is based largely on census numbers. An undercount will result in significant underfunding of tribal programs, including Indian Health Service Funding, Indian Housing Block Grants, the Tribal Transportation Program, Violence Against Women Programs, Family Violence Prevention and Services Grants (for battered women shelters), Native American Employment and Training programs, Head Start, Temporary Assistance to Needy Families, and Special Programs for the Aging – tribal grants.

**II.     Defendants**

80.     Defendant Wilbur L. Ross is the Secretary of the U.S. Department of Commerce and is sued in his official capacity.  Secretary Ross oversees the U.S. Department of Commerce and the Census Bureau.  Congress has delegated the responsibility for carrying out the decennial census to the Secretary of Commerce. 13 U.S.C. § 141(a).

81.     Defendant U.S. Department of Commerce is a cabinet agency within the Executive Branch responsible for administering the decennial census.

82.     Defendant Steven Dillingham is the Director of the U.S. Census Bureau and is sued in his official capacity.

83.     Defendant U.S. Census Bureau is an agency within the Department of Commerce responsible for planning and administering the decennial census. 13 U.S.C. § 2.

<u>**ALLEGATIONS**</u>

**III.     Defendants' Constitutional and Statutory Obligations**

84.     Under the United States Constitution, the federal government must conduct an "actual Enumeration" of the population once every ten years.  U.S. Const. art.  I, § 2.

85.     The population totals produced by the decennial enumeration are used to apportion congressional representatives to the various states.  *Id*.  Census figures are also used in state and local redistricting and in the distribution of federal funds to communities across the United States.

86.     The Enumeration Clause requires that decisions relating to the census bear a "reasonable relationship" to the constitutional purpose of the enumeration. *Wisconsin*, 517 U.S. at 20.

87.     Similarly, the Census Act imposes a mandatory duty on the Secretary of Commerce to "conduct a census that is accurate and that fairly accounts for the crucial representational rights that depend on the census and the apportionment." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (citation omitted).

88.     Consequently, the Secretary of Commerce and the Census Bureau are constitutionally and statutorily obligated to make decisions in conducting the census that are reasonably related to achieving a fair and accurate calculation of the population of the United States.

## IV.     The Census Bureau's Pre-COVID-19 Operational Plans for the 2020 Census

89.     For the 2020 Census, the Census Bureau spent the better part of a decade designing operations to fulfill its constitutional and statutory mandate, including: soliciting and incorporating feedback from seasoned experts, advisors, and community groups; testing various features of its data-collection and data-processing operations; and ensuring that its decisions for conducting the census reflected sound, scientifically based judgment.

90.     To this end, the Bureau created an operational plan to guide its efforts, including its efforts to collect data from census respondents and to process that data into usable forms for constitutionally and statutorily mandated purposes, including reapportionment and redistricting.

91.     On December 31, 2018, the Bureau promulgated the final version of its operational plan, which the Bureau called "Version 4.0" (hereinafter referred to as the "Final Operational Plan"). *See* U.S. Census Bureau, Final Operational Plan (Dec. 2018), https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan4.pdf.  In the Final Operational Plan, the Census Bureau stated that its goal for the 2020 Census is to "count everyone once, only once, and in the right place."

92.     Under the Paperwork Reduction Act, the Office of Management and Budget must review and approve the plans for any federal survey, including the decennial census, to ensure

1  that those surveys meet government standards, minimize respondent burden, and maximize the

2  utility of the collected information. 44 U.S.C. § 3504(c).

3       93.     The Office of Management and Budget formally reviewed and approved the

4  Census Bureau's pre-COVID-19 plans for the decennial census, including the Final Operational

5  Plan.

6       94.     The Final Operational Plan includes over 200 pages of detailed and transparent

7  conclusions for achieving the 2020 Census's objective of an accurate count.

8       95.     The Final Operational Plan reflects the conclusions of various experts including

9  survey methodologists, statisticians, demographers, geographers, linguists, and mathematicians.

10       96.     The Final Operational Plan states that it "reflects and supports evidence-based

11  decision-making" about the operations necessary to gather and process census responses from

12  every household in the country.

13       97.     The Final Operational Plan states that it was "informed through research, testing,

14  and analysis conducted from 2012 through 2018."

15       98.     The Bureau conducted at least fifteen tests between 2012 and December 31, 2018,

16  when it published its Final Operational Plan.

17       99.     Career Bureau staff developed the Final Operational Plan following substantial

18  consultation with outside experts and census stakeholders, including members of the Census

19  Scientific Advisory Committee and the National Advisory Committee.

20       100.     The Census Bureau also produced a series of "detailed operational plans," which

21  supplement the Final Operational Plan, and provide more parameters for the individual

22  operations that, together, comprise the 2020 Census.

23       101.     The detailed operational plans likewise reflect the conclusions of various subject-

24  matter experts regarding how to complete an accurate count.

25       102.     The Bureau's Final Operational Plan contains several major categories of

26  operations.  Two of those categories are particularly important for purposes of this lawsuit: data-

27  collection and data-processing.

28

103.    "Data-collection" refers to operations through which the Bureau obtains information from and about all the people living in the United States.

104.    "Data-processing" refers to operations through which the Bureau fills in any gaps in the personal information that it collects from people, transforms the resulting data into usable forms, checks those results for accuracy and other aspects of data quality, and publishes those results, among other things.

105.    The Bureau must thoroughly, fully, and correctly perform both categories of operations—collection and processing—to achieve its stated goal of counting everyone once, only once, and in the right place.

**A. Census Data Collection**

106.    During the census, the Bureau attempts both to determine the number of people in the country and their characteristics, such as their race and ethnicity.

107.    Although the Census Bureau planned to deploy many methods during the 2020 Census to collect counts and characteristics from households around the country, the Bureau contemplated, in both the Final Operational Plan, and in the supplemental detailed operational plans, that three methods would account for the overwhelming majority of census responses: the "Self-Response" method; the "Update Leave" method; and the "Non-Response Follow Up" method. *See* U.S. Census Bureau, *2020 Census Detailed Operational Plan for: 18. Non-Response Follow Up Operation* (July 15, 2019), https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/NRFU-detailed-operational-plan_v20.pdf.

108.    The Self-Response method was the "primary methodology for the 2020 Census." Under this method, heads of households would provide their 2020 Census responses directly to the Census Bureau by mailing back a paper census form, filling out a digital form on the Bureau's online census portal, or calling into telephone hotlines to provide their responses to Bureau employees operating those hotlines.

109.    The Update Leave method was the methodology for reaching housing units that could not receive physical mail or did not have verifiable mailing addresses.  Under this method,

Bureau employees would travel throughout both rural and urban areas, leaving invitations to participate and paper census questionnaires at these housing units, so that the people living in those locations could respond themselves.

110.     The Self-Response method and the Update Leave method are crucial for obtaining accurate information about the number of people in the country and their characteristics, because data people report about themselves and the members of their housing units is the highest quality data that the census collects.

111.     But for the tens of millions of households that do not report their personal data through the Self-Response or Update Leave method, the Bureau's next-best source of personal data is data it collects directly from people through the Non-Response Follow Up method.

112.     As part of the Non-Response Follow Up method, the Bureau sends its employee enumerators directly to housing units so that they can attempt to speak with a person occupying each unit and obtain information about everyone who should be counted in that unit.

113.     The Bureau requires enumerators to record their responses for each household through iPhones that the Bureau specifically contracted and customized for this purpose.  The enumerators' iPhones include software designed to lead enumerators consistently and reliably to solicit information from people at their doors.  The enumerators' iPhones also include software to ensure that any data collected from housing units remains confidential as it is being transmitted to the Bureau.  The limited supply of these customized iPhones places a limit on the number of enumerators that the Bureau can deploy in the field.

114.     The Bureau's Detailed Operational Plan for Non-Response Follow Up, which supplements the Final Operational Plan, sets out a specific protocol for conducting Non-Response Follow Up.

115.     Under the Detailed Operational Plan, each housing unit assigned for a visit from an enumerator was eligible for up to six "contact days."  A "contact day" could include more than one attempted contact per day.

116.     The Bureau concluded it could pursue less than six contact days only under certain scenarios.

117.     One scenario that would allow the Bureau to pursue fewer than six contact days was the existence of high-quality administrative records for the housing unit.  The Census Bureau has collected data from federal administrative agencies, such as the Social Security Administration, the Internal Revenue Service, and the Department of Housing and Urban Renewal, among others, as well as data from states, which it uses to provide information about the count and characteristics of non-responsive households.

118.     If the Bureau had located administrative data from more than one source of federal and/or state administrative records and concluded that those records contained accurate demographic data for the occupants of a housing unit, the Bureau's enumerators would attempt only one contact with that unit.  If—during that contact attempt—the enumerator did not succeed in finding a live person at the unit, then the Bureau would use the information in the administrative records to fill in the census responses for that unit during the data-processing phase of the 2020 Census.

119.     A second scenario that would allow the Bureau to pursue less than six contact days would arise if the Bureau identified a proxy—a person such as a neighbor or landlord that the enumerator could ask for information about the occupants of the housing unit in question.  After a third failed contact attempt, a unit would become eligible for being counted through proxy.

120.     Proxies can produce many types of data.  For instance, proxies are useful for helping the Bureau identify whether a housing unit is vacant—and thus should be marked "vacant" in the Master Address File that the Bureau uses to keep track of the overwhelming majority of housing units that it must enumerate—or non-existent—and thus should be deleted from the Master Address File.  For the 2020 Census, the Bureau was planning to use administrative records, such as the United States Postal Service's directory of non-deliverable addresses, to identify vacant housing, but proxies are generally more accurate for this purpose.  Finally, proxies provide vital data for other operations that the Bureau undertakes during its data-processing phase, described further below.

121.   If the Bureau is unable to enumerate a household after six contact days, in most cases, it will resort to less accurate methods for determining the count and characteristics of the household during its data-processing phase, described below.

122.   The Bureau performs several other vital operations in addition to door-knocking during the Non-Response Follow Up period, including a series of operations to ensure the quality of the data that it collects in the field.

123.   During the Non-Response Follow Up process, the Bureau: follows up with people who self-responded to the census online but did not enter their unique census identification number to ensure that they are counted in the right place (a process known as "Field Verification"); and corrects information reported erroneously or omitted from previously submitted census forms (a process known as "Coverage Improvement").

124.   In addition, the Bureau re-collects census responses in select instances to ensure that the original submissions were accurate (a process known as "Self-Response Quality Assurance").  This operation protects against enumerators falsifying the information that they provide to the Bureau.  Specifically, the Bureau conducts quality control reinterviews of a sample of households.  This component is designed to deter and detect cases where enumerators have provided false information about the housing units they are assigned to canvass.

125.   Quality control reinterviews are part of a broader set of protocols that the Bureau has developed to guard against factors that endanger the accuracy of the count.  Non-Response Follow Up is thus important not only for collecting information, but also for ensuring that the information that is collected is accurate.  These two components—gathering data and ensuring its accuracy—must both occur for the Bureau to get a fair and accurate count.

126.   The Bureau anticipated that approximately 60% of housing units nationally would respond to the 2020 Census through Self-Response and Update Leave, potentially making up to 40% of housing units targets for Non-Response Follow Up.

127.   A Non-Response Follow Up universe of 40% of the housing units in the country would have been the largest follow up universe on a percentage basis since at least 1970.

128.     The Census Bureau did not anticipate that the Non-Response Follow Up universe in 2020 would mirror the demographic makeup of the nation's population as a whole.

129.     Instead, the Census Bureau anticipated that the Non-Response Follow Up universe in 2020 would contain a disproportionate number of people who belong to communities that the Bureau calls "hard-to-count."

130.     The Final Operational Plan describes hard-to-count populations as including, but not limited to, the following populations: young children; highly mobile persons; racial and ethnic minorities; non-English speakers; low-income persons; persons experiencing homelessness; undocumented immigrants; persons who have distrust in the government; lesbian, gay, bisexual, transgender, and questioning/queer (LGBTQ) persons; persons with mental and physical disabilities; and persons who do not live in traditional housing.

131.     Historically, these populations have had low self-response rates and have, thus, made up disproportionate shares of households that must receive contact days during Non-Response Follow Up.

132.     Consequently, the Final Operational Plan acknowledges, "[t]he NRFU Operation is entirely about hard-to-count populations."

133.     The Final Operational Plan also acknowledges that hard-to-count populations may require more outreach than the Non-Response Follow Up method would normally provide, and the Bureau designed its Final Operational Plan accordingly.

134.     The Final Operational Plan states that "[w]hile most cases receive a maximum of six attempts, cases in hard-to-count areas may receive more than six attempts to achieve a consistent response rate for all geographic areas."

135.     Accurate data about the size, location, and characteristics of communities of color is necessary to equitably distribute political power through congressional reapportionment and redistricting at the state and local levels, enforce civil-rights laws that affect basic needs like housing and employment, and conduct effective research, including on pressing issues like public health.

**B.  Census Data Processing**

136.    After collection activities are complete, the Census Bureau must process the data.

137.    Census data-processing cannot begin until census data-collection concludes.

138.    Census data is unusable for its intended purposes until it has been processed.

139.    The Census Bureau's data-processing operations transform tens of millions of census responses into usable products, including the population totals used to reapportion seats in the U.S. House of Representatives and to create electoral districts.

140.    The Bureau uses its data-processing operations to, among other things, ensure that data received from different data-collection methods are all in a single format allowing them to be processed together.

141.    The Bureau uses its data-processing operations to "unduplicate responses"—meaning to resolve conflicts of information among multiple forms attributable to the same housing unit.

142.    The Bureau uses its data-processing operations to help determine the final status of a housing unit—such as vacant or inhabited—and determine the total number of people that should be attributed to any apparently inhabited unit that was not counted through Self-Response, Update Leave, or Non-Response Follow Up.

143.    The Bureau also uses its data-processing operations to help ensure that Bureau data products accurately report respondents' characteristics, such as age, race, and ethnicity.

144.    The Bureau uses administrative records and statistical imputation during the data-processing phase to fill in both missing people and their characteristics.  But administrative records—especially low-quality administrative records—and statistical imputation are generally less accurate than self-response data.

145.    For many households, administrative data provides only low quality information, replete with inaccuracies and incomplete information.  This is especially the case for particular communities that are underrepresented in administrative records, including communities of color, immigrants, and low-income families.  Use of this low-quality data to fill in missing information for non-responsive households produces less accurate information.

146.     Imputation involves the Bureau using information from surrounding responsive households to infer the count and characteristics of a non-responsive household.  Imputation thus assumes the existence of other data points gathered through other data-collection methods—such as self-response, proxies, and administrative records—and generates more accurate results when it can be triangulated against those data points.  The processes that the Bureau uses to collect and process self-response data, proxy data, and administrative records are thus critical and inextricably linked to the Bureau's ability to impute data accurately.

147.     At various phases of the Bureau's data-processing operations, Census Bureau personnel must review the quality of files in-process before those files can be sent to the subsequent steps in the data-processing operation.  These reviews include personnel with subject-matter expertise from several different divisions of the Bureau.

148.     The Bureau's data-processing operations help ensure that people are not missed, that other people are not counted multiple times, and that people's characteristics are accurately reported.  These processes help eliminate or reduce undercounts, among other kinds of data-quality issues.

## C.  The Final Operational Plan's Timeline for the 2020 Census

149.     The Bureau's Final Operational Plan called for data-collection to run from January 21, 2020, to July 31, 2020, for a total of more than six months.

150.     In that window, the Self Response method was scheduled to run from March 12, 2020 to July 31, 2020, and the Update Leave method was scheduled for March 15, 2020 to April 17, 2020.

151.     The Bureau also scheduled several special operations to occur early in its census taking process.  The Service-Based Enumeration, which counts people experiencing homelessness, was scheduled for March 30, 2020 to April 1, 2020, and Group Quarters Enumeration, which counts people living in group housing such as nursing homes, was scheduled from April 2, 2020 to June 5, 2020.

152.     The Bureau scheduled the Non-Response Follow Up method to run from May 13, 2020 to July 31, 2020, for a total of approximately eleven and a half weeks.

153.     The Bureau scheduled up to five months—from July 31, 2020 to December 31, 2020—to process census data for the congressional reapportionment report.

154.     The Bureau also scheduled an additional three months—from January 1, 2021 to March 30, 2021—to process census data for redistricting.

155.     The Bureau's timelines for implementing the Final Operational Plan reflect the Bureau's scientifically informed understanding of the time necessary to complete its operations and generate an accurate count.

**V.     The Census Bureau's COVID-19 Plan**

**A.     The COVID-19 Pandemic Disrupts the 2020 Census**

156.     On January 21, 2020, the Bureau began 2020 Census data-collection in remote Alaska.

157.     On March 10, 2020, the Bureau began to accept self-responses on its website.

158.     Shortly thereafter, many parts of the nation rapidly began to shut down due to the COVID-19 pandemic.

159.     The Census Bureau quickly concluded that it could not continue to engage in operations safely.  On March 18, 2020, the Bureau announced that it would suspend all field operations for two weeks in order to "help protect the health and safety of the American public." Press Release, U.S. Census Bureau, *U.S. Census Bureau Director Steven Dillingham on Operational Updates* (Mar. 18, 2020), https://www.census.gov/newsroom/press-releases/2020/operational-update.html.

160.     On March 28, 2020, the Bureau announced yet another two-week suspension until April 15, 2020, as the coronavirus pandemic made it impossible to engage in operations.

161.     The suspension disrupted several field operations, including Update/Leave method, the Service Based Enumeration counting people experiencing homelessness, and the Group Quarters Enumeration counting people living in group housing.

162.     In addition, the Bureau halted all hiring and training of the hundreds of thousands of enumerators it needs to conduct Non-Response Follow Up.  This included halting any and all background checks and fingerprinting of enumerators that were conditionally hired at that time.

1     163.    The Bureau also decreased office staff at regional centers responsible for

2    processing mail-in self-response forms and at the Bureau's call centers.

3    **B.  Changes to the Final Operational Plan in the COVID-19 Plan**

4     164.    On April 13, 2020, the Bureau issued an adjustment to its Final Operational Plan

5    to account for the long-term impact of the COVID-19 pandemic.  The new plan included a

6    shifted timeline for data-collection and data-processing operations that corresponded with the

7    delays in operations that the pandemic has caused (the "COVID-19 Plan").

8     165.    Adjustments to plans approved by the Office of Management and Budget under

9    the Paperwork Reduction Act must be re-submitted for approval. 44 U.S.C. § 3507(h)(3).  The

10   Census Bureau submitted the COVID-19 Plan to the Office of Management and Budget on

11   April 30, 2020.  The changes were approved on May 11, 2020.

12     166.    The COVID-19 Plan was designed to "[e]nsure a complete and accurate count of

13   all communities," "[p]rotect the health and safety of the American public and Census Bureau

14   employees," and "[i]mplement guidance from federal, state, and local authorities regarding

15   COVID-19."  Press Release, U.S. Census Bureau, *2020 Census Operational Adjustments Due to*

16   *COVID-19 Fact Sheet* (Apr. 27, 2020).

17     167.    The COVID-19 Plan reflected the conclusions of various experts for how best to

18   proceed with completing an accurate count during the current pandemic.  These experts include

19   survey methodologists, statisticians, demographers, geographers, linguists, and mathematicians.

20     168.    Under the COVID-19 Plan, the Bureau suspended 2020 Census field operations

21   for several months, including those operations that were designed to ensure a full count of

22   traditionally undercounted communities.

23     169.    The COVID-19 Plan provided that the Bureau would start the nationwide Non-

24   Response Follow Up operation on August 11, 2020, and continue the door-knocking process

25   through October 31, 2020.

26     170.    Thus, the COVID-19 Plan delayed the start of most door-knocking by three

27   months while maintaining the same amount of time spent undertaking the process—

28   approximately eleven and a half weeks—as the Final Operational Plan had required.

171.     Under the COVID-19 Plan, the Bureau also delayed the start of other operations that enumerate traditionally undercounted populations, including the enumeration of the country's homeless population, which the Bureau shifted from March 30, 2020 to September 22, 2020.

172.     And the COVID-19 Plan permitted households to submit self-response data to the Bureau until October 31, 2020, extending the deadline under which private persons were able to submit their responses to be counted by more than one month.

173.     The Bureau also granted itself one additional month to process data under its COVID-19 Plan, extending the data-processing leg of its operations to nine months given the pandemic.  Under this plan, the Bureau would have up to six months to process the data for the apportionment count (between October 31, 2020 and April 30, 2021) and three months to process the data for redistricting (between April 30, 2021 and July 31, 2021).

174.     The Bureau's timelines for implementing the COVID-19 Plan reflect a scientifically informed understanding of the time necessary to appropriately and fully complete its operations and generate an accurate count.

**C.  Expert and Stakeholder Response to the COVID-19 Plan**

175.     The Census Bureau solicited feedback on the COVID-19 Plan from relevant area experts and interested stakeholders, including state and local governments and national and community-based non-profit partners.

176.     For instance, four former Census Bureau Directors—who served under both Democratic and Republican administrations—issued a statement saying that they had "discussed these operational and schedule adjustments with senior career leadership at the Census Bureau." Press Release, Vincent Barabba et al., *Statement by Former U.S. Census Bureau Directors* (Apr. 14, 2020), https://www.documentcloud.org/documents/6838166-Statement-by-Former-Census-Bureau-Directors-04.html.

177.     These four former Census Bureau Directors further asserted: "Based on (1) our extensive experience in planning, executing, and often adjusting operations of previous decennial censuses, and (2) our firm conclusion that the extension of the field operations reflect careful

1  analysis by the technical, scientific, and operational staff at the Census Bureau, we support the

2  decision and urge Congress to act in concert with it."  Press Release, Vincent Barabba et al.,

3  *Statement by Former U.S. Census Bureau Directors* (Apr. 14, 2020),

4  https://www.documentcloud.org/documents/6838166-Statement-by-Former-Census-Bureau-

5  Directors-04.html.

6  178.  Prominent civil-rights groups endorsed the COVID-19 Plan.  Vanita Gupta,

7  President and CEO of The Leadership Conference on Civil and Human Rights and The

8  Leadership Conference Education Fund, stated that her organization "support[ed] the Census

9  Bureau's updated timeline."  Press Release, Leadership Conference Education Fund, *Census*

10  *Timeline Must Protect Health, Ensure Fair Count* (Apr. 13, 2020),

11  https://civilrights.org/edfund/2020/04/13/census-timeline-must-protect-health-ensure-fair-count/.

12  **D.  Implementation of the COVID-19 Plan**

13  179.  When announcing the COVID-19 Plan, Secretary Ross and Director Dillingham

14  issued a statement indicating that the Bureau requested that Congress extend by 120 days the

15  December 31, 2020 statutory deadline for reporting the state-population totals to the President

16  for purposes of calculating the state apportionments, and extend by 120 days the March 30, 2021

17  statutory deadline for delivering redistricting data to the states.

18  180.  That same day, President Trump suggested this request was unnecessary, stating:

19  181.  "I don't know that you even have to ask them.  This is called an act of God.  This

20  is called a situation that has to be.  They have to give in.  I think 120 days isn't nearly enough."

21  Hansi Lo Wang, *Trump Officials Ask to Delay Census Data for Voting Districts, House Seats*,

22  NPR (Apr. 13, 2020), https://www.npr.org/2020/04/13/833546675/trump-officials-ask-to-delay-

23  census-data-for-voting-districts-house-seats.

24  182.  Indeed, the Census Bureau did not wait for Congress to act before beginning

25  implementation of the COVID-19 Plan.  And the Bureau continued implementation of the

26  COVID-19 Plan for over three months through the end of July 2020.

27  183.  During the entirety of this period of time, the Bureau implemented the COVID-19

28  Plan and did not indicate any concern, or act in a manner indicating any concern, that Congress

1  had not passed an extension of the December 31, 2020 deadline.  Nor did the Bureau change any

2  of its processes, or put in place any alternative plans, should Congress not act.

3      184.    In all respects, the Bureau acted as if the COVID-19 plan was not contingent in

4  any respect on Congress acting.  Instead, the Bureau itself recognized that it would be impossible

5  to fulfil its constitutional and statutory duties to produce fair and accurate apportionment

6  numbers to the President by December 31, 2020, and simply implemented the COVID-19 Plan

7  and its timelines.

8      185.    For instance, on May 27, 2020, Tim Olson, head of field operations for the 2020

9  Census, stated during a May 26, 2020 webinar organized by the National Congress of American

10 Indians that, "[w]e have passed the point where we could even meet the current legislative

11 requirement of December 31st.  We can't do that anymore."  Nat'l Conf. of Am.  Indians, *2020*

12 *Census Webinar: American Indian/Alaska Native*, YouTube (May 26, 2020),

13 https://www.youtube.com/watch?v=F6IyJMtDDgY&feature=youtu.be&t=4689.

14     186.    Similarly, on July 8, 2020, Al Fontenot, Jr., Associate Director for Decennial

15 Census Programs and a top Census Bureau official, affirmed that the Bureau is "past the window

16 of being able to get" accurate counts to the President by December 31, 2020.  U.S. Census

17 Bureau, *Operational Press Briefing – 2020 Census Update* at 21 (July 8, 2020),

18 https://www.census.gov/content/dam/Census/newsroom/press-kits/2020/news-briefing-program-

19 transcript-july8.pdf.

20     187.    In line with the Bureau's full implementation of the COVID-19 plan, Bureau field

21 operations remained suspended through May 2020, and the Bureau only began re-opening a few

22 limited operations, such as the Update Leave method, on a phased basis through mid-June 2020,

23 over two months after the operation was originally planned to occur in the Final Operational

24 Plan.

25     188.    The Bureau did not undertake any Non-Response Follow Up operations in most

26 of the country between May 13, 2020 and July 31, 2020, the timeframe originally set out in the

27 Final Operational Plan.

28     189.    Instead, while the Bureau "soft-launched" door-knocking in select regions of the

country in mid-July 2020, the COVID-19 Plan did not call for door-knocking across the country until August 11, 2020, at the earliest.

190.     The Bureau ultimately opened six area census offices for Non-Response Follow Up on July 16, 2020, six more on July 23, 2020, thirty-five on July 30, 2020, and forty additional offices on August 6, 2020.

191.     The remaining 161 stateside offices remained unopened until August 9, 2020, including offices in many states and localities with relatively low response rates such as the entire southeastern United States, Texas, New Mexico, Arizona, and Southern California.

192.     All along the Bureau continually communicated to the public, and to important local partners, including local governments and national and community based non-profit organizations, that self-responses would be accepted until October 31, 2020, and that Non-Response Follow Up would continue until at least that date.

193.     Census partners, stakeholders, and state and local governments relied on the new deadlines set forth in the COVID-19 Plan to redirect their outreach efforts.

194.     For example, Plaintiffs Urban League and BAJI, publicized the October 31, 2020 deadline, letting their constituents, members and local organizations know that households had until that time to self-respond.  Urban League representatives informed coalition partners participating in the Black Census Roundtable of the new deadlines, and spoke of the deadlines on webinars and other public events.  Officials at BAJI publicized the deadlines at public events, including webinars in July 2020, and as part of the organization's social media campaign.

195.     Similarly, officials in City of Los Angeles, Harris County, King County, City of San Jose, and City of Salinas, publicized the new deadline while conducting 2020 Census outreach efforts.

196.     These public education efforts were significant because they were directed at the general public and at local non-profits that do not primarily work on census issues.  The latter often rely on information about the census provided by Plaintiff national non-profits and local governments when communicating with their constituents.  Plaintiffs, by disseminating the

1    October 31, 2020 deadline for nearly three months to the public, were largely successful in

2    spreading the understanding that communities had until at least that time to complete the count.

3        197.    For example, the City of Los Angeles announced this date on its own social media

4    platforms and in a social media toolkit that it developed for partner organizations.  Los Angeles

5    is deeply concerned that residents had already received information about the October 31, 2020

6    self-response date and, as a result, failed to respond before the newly shortened deadline,

7    especially given the Bureau's own minimal efforts at explanation and outreach around the new

8    deadline.

9    **VI.    The Census Bureau's Sudden Replan**

10       **A.    The Announcement of the Replan**

11       198.    On August 3, 2020, at the behest of the Secretary of Commerce, Director

12   Dillingham abruptly and without explanation abandoned the COVID-19 Plan and announced the

13   Replan.

14       199.    The Replan drastically shortened the timelines for multiple operations set out in

15   the COVID-19 Plan.

16       200.    The Replan took the form of a short press release on the Census Bureau's website.

17   The press release included a statement from Director Dillingham, which did not provide an

18   explanation for Defendants' decision to suddenly abandon the COVID-19 Plan that the Bureau

19   had adopted and implemented for approximately three and a half months.  Nor did it provide any

20   specifics as to why the Bureau no longer believed the timelines called for in the COVID-19 Plan

21   were necessary to ensure an accurate count.

22       201.    The statement noted that the Bureau was taking this action at the direction of the

23   Secretary of Commerce.  But the Secretary made no statement explaining his reason for giving

24   this directive.

25       202.    The Director's statement was largely silent on specific adjustments the Bureau

26   would need to make in order to reengineer its field operations to meet its new, artificially

27   compressed schedule.  The statement included proposals for enumerator "awards" and

28

1    maximizing enumerators' phone and tablet usage, but it did not provide any details about

2    adjustments to the detailed operations provided in the Final Operational Plan.

3           203.    The only adjustments announced under the Replan were severely truncated

4    timelines for conducting data-collection and data-processing operations.

5           204.    Under the Replan, data-collection was set to end on September 30, 2020, one

6    month earlier than contemplated in the Bureau's COVID-19 Plan.

7           205.    While the Bureau's pre-COVID-19 Final Operational Plan provided 79 days for

8    the nationwide door-knocking stage of the census, and the COVID-19 Plan provided 81 days, the

9    Replan provided just 52 days of nationwide door-knocking.

10          206.    The Replan also cut post-collection data processing for the apportionment report

11   from up to 5 months as originally provided in the Final Operational Plan, and up to 6 months as

12   provided in the COVID-19 Plan, to less than 3 months.

13          207.    The Replan also shortened the time under which households could self-respond,

14   providing that self-responses delivered after September 30, 2020—which would have been

15   timely under the October 31, 2020 deadline then in effect by the Bureau—would no longer be

16   counted.

17          208.    While the Replan required the Bureau to accelerate its operations to complete the

18   2020 Census by the same deadline contemplated in the Final Operational Plan, it ignored the

19   multiple-month pause in operations, beginning in mid-March 2020, caused by the initial outbreak

20   of COVID-19 in the United States.

21          209.    The decision to rescind the COVID-19 Plan and adopt the Replan was announced

22   without consultation with important stakeholders.

23          210.    As noted above, as late as July 8, 2020, senior Bureau officials were still publicly

24   confirming that it was impossible to complete an accurate count by December 31, 2020.

25          211.    Internally, senior Bureau official were saying the same thing—but even more

26   starkly.

27          212.    For example, in mid-April 2020, internally the Bureau acknowledged that "[t]he

28   reality is that we can't make the [December 31, 2020] deadline as of right now."

213.    Similarly, on or around May 8, 2020, internally the Bureau acknowledged that even if they "could snap restart everywhere," which was not possible due to COVID-19 closure in various states, the Bureau still could not meet the statutory deadlines.  Likewise, the Bureau acknowledged that even if the Bureau could restart operations on May 8, "which it cannot," "apportionment counts could not be delivered until January 31, 2021."

214.    On July 21, 2020, the same day President Trump issued his Apportionment Exclusion Order, Bureau staff shared internally an "Elevator Speech" summary with the "High Level Message" that "[c]urtailing census operations will result in a census that is of unacceptable quality."

215.    On July 23, 2020, Tim Olson, head of field operations for the 2020 Census, said internally that the Bureau "need[ed] to sound the alarm to realities on the ground," which showed that "it is ludicrous to think we can complete 100% of the nation's data collection earlier than 10/31 and any thinking person who would believe we can deliver apportionment by 12/31 has either a mental deficiency or a political motivation."

216.    Just an hour later, the "Elevator Speech" was updated to further highlight that "[s]hortening the time period to meet the original statutory deadlines for apportionment and redistricting will result in a census that has fatal data quality flaws that are unacceptable for a Constitutionally-mandated national activity."

217.    In addition, until July 30, 2020, just four days before the Bureau announced its decision to abandon the COVID-19 Plan, the Bureau was informing respondents on its website that it would engage in Non-Response Follow-Up until October 31, 2020 and that non-responsive households would have until that date to self-respond.  Those references were deleted from the website on or about July 31, 2020 and were replaced with the shortened timeframe after the August 3, 2020 announcement.

218.    An official at the Government Accountability Office confirmed that Bureau officials told his office that they were given "hours rather than days or weeks" to adjust their plans to finish counting by September 2020.  Hansi Lo Wang, *'Not Enough Time': Census Workers Fear Rushing Count Could Botch Results*, NPR (Aug. 11, 2020),

1   https://www.npr.org/2020/08/11/901202892/not-enough-time-census-workers-fear-rushing-

2   count-could-botch-results.

3        219.    While the Census Bureau's decisions, even during the COVID-19 emergency,

4   have often involved consultations with scientific advisory committees, the Committee on

5   National Statistics in the National Academies of Science, other external experts and local

6   government officials, and the thousands of organizations partnering with the Bureau to conduct

7   crucial outreach to historically undercounted communities, no such consultation was made

8   before the Bureau announced its abandonment of the COVID-19 Plan.

9        220.    Census stakeholders immediately denounced the Replan, including stakeholders

10  who had endorsed the COVID-19 Plan.

11       221.    The same four former Census Bureau Directors who endorsed the COVID-19

12  Plan issued a statement saying that "our expert opinion is that failing to extend the deadlines to

13  April 30, 2021 will result in seriously incomplete enumerations in many areas across our

14  country."  Press Release, Former Census Bureau Directors, *On the Importance of Extending the*

15  *2020 Census Statutory Deadlines to Achieve a Fair and Accurate Enumeration of the United*

16  *States* (Aug. 4, 2020), https://www.documentcloud.org/documents/7013550-Aug-4-2020-

17  Statement-By-Former-U-S-Census-Bureau.html.

18       222.    These four former Census Bureau Directors further asserted: "The Census Bureau

19  will not be able to carry out the NRFU fully and will be forced to take steps such as fewer in-

20  person visits and rely instead on the use of administrative records or statistical techniques on a

21  much larger scale tha[n] in previous census.  The end result will be under-representation of those

22  persons that NRFU was expected to reach and, at even greater rates for traditionally hard-to-

23  count populations and over-representation of all other populations with potentially extreme

24  differential undercounts."  Press Release, Former Census Bureau Directors, *On the Importance*

25  *of Extending the 2020 Census Statutory Deadlines to Achieve a Fair and Accurate Enumeration*

26  *of the United States* (Aug. 4, 2020), https://www.documentcloud.org/documents/7013550-Aug-

27  4-2020-Statement-By-Former-U-S-Census-Bureau.html.

28

223.    The President of the American Statistical Association, the world's largest professional organization of statisticians, issued a statement saying "[t]here is no scientific rationale to curtail the data-collection period for this constitutionally mandated activity, and the premature cessation of census enumeration will produce flawed counts."  Letter from Rob Santos, President of the American Statistical Association, to Mitch McConnell, U.S. Senate Majority Leader (Apr. 5, 2020), https://www.amstat.org/asa/files/pdfs/POL-CensusSenateAugust.pdf.

224.    Nearly 450 nonpartisan philanthropic organizations who "rely on accurate census data to help identify community needs and to prioritize grantmaking" issued a letter to Secretary Ross and Director Dillingham urging the Bureau to revert to its COVID-19 Plan.  Letter from U.S. Philanthropy Leaders to Wilbur Ross, Secretary of the U.S. Dep't of Commerce (Aug. 5, 2020), https://funderscommittee.org/wp-content/uploads/2020/08/Letter-Philanthropic-Leaders-on-Census-Being-Cut-Short-8-5.pdf.

225.    Prominent civil-rights groups condemned the Replan.  Vanita Gupta, President and CEO of The Leadership Conference on Civil and Human Rights and The Leadership Conference Education Fund, stated that "[c]urtailing operations is an obvious ploy to guarantee the Census Bureau won't be able to finish counting millions of people—especially those hit hardest by the pandemic."  Press Release, Leadership Conference on Civil and Human Rights, *Trump Plans to Sabotage 2020 Census by Cutting Short Operations* (July 31, 2020), https://civilrights.org/2020/07/31/trump-plans-to-sabotage-2020-census-by-cutting-short-operations/.

226.    And the Census Bureau's own field workers repeatedly confirmed the impossibility of this new timeline, explaining that the Replan means that the count—in effect for the next 10 years—will not be accurate.  For example, the Replan caused a census field supervisor in Florida to respond: "It just doesn't seem logical to push this with all of these odds against us.  You're looking at all this and you're just thinking, 'Are we working on the same team?'" "It does not feel like we have the same mission in mind.  We're trying to get a complete count.  I'm not sure everyone on the team has the same mission."  *See, e.g.*, Hansi Lo Wang,

*'Not Enough Time': Census Workers Fear Rushing Count Could Botch Results*, NPR (Aug. 11, 2020), https://www.npr.org/2020/08/11/901202892/not-enough-time-census-workers-fear-rushing-count-could-botch-results.  A census field supervisor in California said, "I know for the next 10 years, it won't be an accurate count.  I don't know what we can do about it."  *Id.*

### B. The Replan Failed to Appropriately Account for Key Factors Affecting the Data Collection Period

227.    The Replan failed to account for several important factors affecting the 2020 Census Non-Response Follow Up operation.  These factors are discussed below as of the time of the Replan decision and initial weeks of implementation.  Section VII below discusses how these unexamined and unanalyzed problems later led, in practice, to a fundamentally flawed and inaccurate data collection period, in violation of Defendants' constitutional and statutory obligations.

228.    *First, the Replan did not adequately account for the large number of households in the Non-Response Follow Up universe*.

229.    Under the Replan, the Census Bureau had to count approximately the same number of households during Non-Response Follow Up as it anticipated counting in its pre-COVID-19 Final Operational Plan, but with four weeks fewer than provided in that plan to complete the operation.  In other words, the Bureau had to complete the same amount of work in just 65% of the time it had originally scheduled to complete that work.

230.    As of the beginning of the NRFU period in all regions, over 37% of households nationwide were non-responsive, and several states had even higher percentages of households in the Non-Response Follow Up universe, including New Mexico (46.1%), South Carolina (42.4%), Texas (41.3%), and Georgia (40.8%).

231.    While soft-launches of Non-Response Follow Up began in select locations in mid-July 2020, the operation did not begin in any of these states, with large amounts of non-responsive households, until August 9, 2020.

232.    Within states, and in particular cities and localities, there were even higher Non-Response Follow Up workloads.  For instance, in Plaintiff Harris County, as of August 18

enumerators still had to visit over 41% of households.  In the City of Los Angeles, over 46% of households remained for enumeration as of August 18.  The self-response rate in Los Angeles at that time was approximately 14 percentage points below the final self-response rate the City attained during the 2010 Census.  Counting in these jurisdictions also did not begin until August 9, 2020.

233.    Moreover, given the time constraints placed by the Replan, counting was to be conducted while these and many other jurisdictions struggled to control a surge in COVID-19 cases.

234.    While the Bureau announced on August 11, 2020 that it was "training census takers to follow up with households by phone" in light of the pandemic, that change in Non-Response Follow Up operations was not anticipated in the Final Operational Plan.  Press Release, U.S. Census Bureau, *Door-to-Door Visits Begin Nationwide for 2020 Census* (Aug. 11, 2020), https://www.census.gov/newsroom/press-releases/2020/door-to-door-visits-begin-nationwide.html.

235.    Given the traditionally low response rates for phone surveys in the wireless era, following up by phone was unlikely to materially increase response rates.

236.    A recent Bureau survey running in parallel with the 2020 Census demonstrates the difficulty in obtaining responses via phone or email.  This past spring, the Bureau began conducting a "Household Pulse Survey" to measure household experiences under the COVID-19 pandemic.  This survey solicited participation through emails and text messages.  Over the first twelve weeks of this survey, response rates were meager, ranging from 1.3% to 3.8%.

237.    *Second, the Replan did not account for the staffing challenges of the Bureau, many of which are directly related to the ongoing pandemic*.

238.    As demonstrated in the soft-launch of NRFU in select locales, the Bureau was already experiencing staffing shortages and retention problems with enumerators.

239.    In the midst of the ongoing pandemic, prospective enumerators, many of whom are elderly and at high risk of contracting a severe COVID-19 related illness, were less willing to engage in the required door-to-door canvassing.

240.     Indeed, Tim Olson, head of field operations for the 2020 Census, stated at a July 8, 2020 press briefing that "[a]bout a third of our [enumerator] applicants [are] older persons considered high risk of the virus."  U.S. Census Bureau, *Operational Press Briefing – 2020 Census Update* at 21 (July 8, 2020), https://www.census.gov/content/dam/Census/ newsroom/press-kits/2020/news-briefing-program-transcript-july8.pdf.

241.     And Deborah Stempowski, the Census Bureau's Assistant Director for Decennial Programs, noted the Bureau's difficulty retaining enumerators in early August 2020, confirming that potential enumerators were "a little hesitant because of the COVID environment."  Mike Schneider, *Census Bureau Drop-Outs Complicate Door-Knocking Efforts*, Associated Press (Aug. 8, 2020), https://www.usnews.com/news/us/articles/2020-08-08/census-bureau-drop-outs-complicate-door-knocking-efforts.

242.     In testimony before Congress on July 28, 2020, Director Dillingham confirmed that the Bureau believed that "the pandemic is estimated to increase the number of no shows to training sessions, as well as the number of employees who complete training but decline to show up for work."  *Id.*

243.     According to reports from census-operations staff working in the field, these predictions came to pass.  One census field supervisor working in the mid-Atlantic noted that, given the new rushed timeline and lack of sufficient staff, "[w]e're just sending bodies out regardless of whether they're ready or not."  Hansi Lo Wang, *'Not Enough Time': Census Workers Fear Rushing Count Could Botch Results*, NPR (Aug. 11, 2020), https://www.npr.org/ 2020/08/11/901202892/not-enough-time-census-workers-fear-rushing-count-could-botch-results.

244.     In addition to enumerator low-count and hesitancy, another source of staffing issues involved delays in processing background checks on enumerator applicants and in enumerator onboarding.

245.     A June 2020 GAO report on the 2020 Census delays COVID-19 has caused, and the risks the pandemic has exacerbated, noted that the Bureau "will have to quickly hire and onboard sufficient staff to conduct its operations" to reach adequate staffing levels.  U.S. Gov't

1   Accountability Office, *COVID-19 Presents Delays and Risks to Census Count* (June 2020),

2   https://www.gao.gov/assets/710/707456.pdf.

3       246.    That same report also noted that, once potential enumerators accept a job offer

4   from the Bureau, the new hires "must wait a minimum of 60 days before they can begin training,

5   a time period during which they must complete fingerprinting and a background check." *Id.*

6       247.    Reports from hired enumerators confirm that the Bureau faced these technical

7   challenges as well, under the compressed timeline.  One hire in Boulder, Colorado noted that he

8   lost six potential days of door-knocking because he was unable to complete the Bureau's online

9   training module.

10       248.    Thus, under the Replan, the Bureau was not able to hire and train sufficient

11   enumerators.

12       249.    Even if it were possible for the Bureau to hire all of the enumerators it would

13   need, the Bureau would also need time and funding to obtain additional equipment for any

14   additional enumerators it hires beyond its initial estimates of equipment.  For example, the

15   Bureau would need more of the iPhones discussed above that the Bureau specifically contracted

16   and customized for 2020 Census enumerators.

17       250.    With fewer enumerators in the field, in addition to training and equipment issues,

18   the Bureau was unable to ensure that non-responsive households would receive the requisite

19   number of visits, as contemplated in the Final Operational Plan, and the Bureau would therefore

20   be required to cut corners and reduce the quality of the count so as to meet the Replan's

21   truncated timeline.

22       251.    Thus, instead of providing additional enumerators, the Bureau's Replan was likely

23   to result in a smaller number of enumerators shouldering larger-than-planned workloads.

24   Increasing workloads for enumerators over a short period of time can result in errors and

25   inaccuracies in counting but it cannot make up for the time lost to the Replan.

26       252.    *Third, the Replan failed to account for factors relevant to efficient enumeration,*

27   *such as the time when enumerators visit households*.

28       253.    For instance, under the Final Operational Plan, enumerators were to visit

1  households at specific times of day and on specific days of the week, depending on when

2  residents were likely to answer.

3       254.    Under the Replan, enumerators were under pressure to complete their work in a

4  tightly constrained timeframe.  As a result, ensuring that non-responsive households receive the

5  requisite number of enumerator visits at the most opportune times for enumeration became

6  exceedingly difficult, if not impossible.  Instead, the Replan increases the likelihood that

7  households would either receive visits at less opportune times, or simply receive fewer visits

8  altogether.

9       255.    *Fourth, the Replan failed to account for the additional crucial operations that*

10  *enumerators had to conduct, as contemplated in the Bureau's final plans for the 2020 Census*.

11       256.    Apart from visiting households upwards of six times, enumerators also were

12  supposed to engage in a host of additional quality control activities.  As noted above,

13  enumerators were expected to visit the households of persons that self-responded to the census

14  online but did not enter the unique identifier provided on census mailers.  This "non-ID

15  processing" is necessary to verify the address information provided by respondents.  While this

16  process only requires a single visit to a household, it nevertheless had to be completed in the

17  compressed timeline provided for under the Replan.

18       257.    Similarly, the Bureau had to conduct quality control reinterviews of a sample of

19  households during Non-Response Follow Up.  This operation was designed to deter and detect

20  enumerator falsification.  Detecting such falsifications would be especially important under the

21  Replan which required individual enumerators to shoulder a heavier workload.  The use of

22  enumerators to conduct these reinterviews would, under the Replan, place additional strain on

23  the Bureau's already stretched labor resources.

24       258.    Cutting any one of these functions would cause errors and inaccuracies to affect

25  the final 2020 Census data.  By reversing the COVID-19 Plan and shortening the timeframe for

26  conducting Non-Response Follow Up by a month, the Bureau would likely need to make cuts to

27  one or more of these operations.

28

259.    By reducing the amount of time and resources necessary to perform the kinds of quality-control measures that the Bureau originally planned for Non-Response Follow Up, the Replan actively dismantled processes that the Bureau had specifically developed over the course of time as checks against falsified census responses.  The Replan thus threatens census accuracy not only by reducing the Bureau's time to *collect* data, but also by reducing the Bureau's time to ensure that the data it has collected has been collected *properly* and *truthfully*.

*260.    Fifth, the Replan failed to account for the other field operations enumerators need to conduct at the same time as they attempt to speed through door-knocking operations.*

261.    Under the Final Operational Plan, the Bureau planned to finish specialized operations for counting people experiencing homelessness, and people living in group housing in April 2020, before engaging in nationwide door-knocking**.**  After suspending operations due to COVID-19, the Bureau moved these operations to September 2020, well-before the October 31, 2020 deadline the Bureau set for completing the Non-Response Follow Up operation.

262.    The new Replan required the Bureau to conduct these specialized operations at the same time as it was scrambling to complete Non-Response Follow Up.  This further stretched the Bureau's limited resources and increased the likelihood of missing information.

                                    *        *        *

263.    For these and other reasons, Census Bureau officials knew that truncating data collections meant an accurate census was impossible—and that any census produced would not be constitutionally sound or fit for purpose.  On July 23, for instance, Associate Director Timothy Olson emphasized the "need to sound the alarm to realities on the ground," explaining that "it is ludicrous to think we can complete 100% of the nation's data collection earlier than 10/31."

264.    Similarly, Bureau Chief Kathleen Styles explained that "[s]hortening the time period to meet the original statutory deadlines for apportionment and redistricting data will result in a census that has fatal data quality flaws that are unacceptable for a Constitutionally-mandated activity."

265.    They were not alone.  Senior Advisor for Decennial Affairs, James Treat wrote that "[a]ny effort to concatenate or eliminate processing and review steps to reduce the timeframes will significantly reduce the accuracy of the apportionment counts and the redistricting data products."

266.    And the Bureau's own documents while devising the Replan warned that all of the backend processing changes "represent an abbreviated process that is likely to reduce the accuracy of the 2020 Census and threaten the fitness for use."

## C.  The Replan Also Failed to Appropriately Account for Key Factors Affecting the Data Processing Period

267.    The Replan also failed to account for several important factors affecting the 2020 Census data processing period, including the additional strain on data-processing operations resulting from the consequences of the COVID-19 pandemic.  Again, these factors are discussed below as of the time of the Replan decision.  Section VII below discusses Defendants' more recent contradictory statements and conduct regarding census data processing and its link to data collection, and how these independently demonstrate Defendants' violation of their constitutional and statutory obligations.

268.    Defendants have long recognized that a long data processing period was critical to ensuring the fairness, completeness, and accuracy of the decennial census.  The Operational Plan provided 5 months for this complex but vital period—and the COVID-19 Plan expanded that to 6 months, given the added complications from the pandemic that the Bureau knew would result in messy data collections that would have to be appropriately processed and understood.

269.    For example, following the outbreak of COVID-19 in the United States in mid-March 2020, colleges and universities across the country closed, and students moved out of on-campus and off-campus housing.  Similarly, many residents of cities, especially those living in COVID-19 hotspots, moved to locations where the virus was less prevalent.  In a recent study, three percent of people surveyed reported that they had moved permanently or temporarily as a result of the pandemic.

1    270.    This significant movement of people coincided with Census Day, April 1, 2020,

2    and has and will lead to confusion about what residence should be listed on responses.

3    271.    It is likely that the Bureau has received an increased amount of duplicate

4    responses, which will, in turn, require more time and Bureau resources to review and correct.

5    272.    The Replan also failed to account for the Bureau's inability to timely obtain and

6    process all the administrative-records data crucial for completing an accurate count.

7    273.    The Bureau relies heavily but not solely on Title 26 data—that is, tax returns that

8    individuals file with the Internal Revenue Service ("IRS")—for some of the administrative

9    records it uses to fill in missing people.

10    274.    Because this year's tax filing deadline was July 15, 2020, and the IRS generally

11    requires three months to transfer Title 26 data to the Census Bureau, the Bureau will not possess

12    all the Title 26 data it is planning to use until mid-October 2020, at the earliest, and potentially

13    much later.  Once the Bureau has possession of that Title 26 data, it will have to undertake a

14    time-consuming round of additional review and processing, further delaying its ability to use the

15    data for its planned purposes.  These delays will compel the data-processing phase of 2020

16    Census operations to proceed more slowly than the Replan contemplates or would allow.

17    275.    As with truncating data collections, Top Bureau officials were well aware of the

18    harm that would be caused by curtailing data-processing operations at the time the Replan was

19    promulgated.  As the Bureau explained, "[E]ach and every step in post processing is necessary

20    and eliminating any step would result in a diminished data product. . . [N]o step can be

21    eliminated or overlap with another step."

22    276.    And the August 3 presentation to Secretary Ross that unveiled the Replan itself

23    warned that "[a]ll of these activities represent abbreviated processes or eliminated activities that

24    will reduce the accuracy of the 2020 Census"; that the "compressed review period creates risk for

25    serious errors not being discovered in the data—thereby significantly decreasing data quality"; 

26    and that those "serious errors" if discovered "may not be fixed" due to lack of time in data

27    processing.  PI Order 55, 58 (quoting DOC_9496; DOC_10285).

28

277.    The Department of Commerce's Office of Inspector General, too, concluded that the "streamlined data processing under the accelerated plan poses a myriad of risks to accuracy and completeness."  Department of Commerce Office of Inspector General, "The Acceleration of the Census Schedule Increases Risks to a Complete and Accurate 2020 Census."

278.    Ultimately, the solution to alleviate each of these problems was articulated in the COVID-19 Plan: provide the Bureau's limited number of enumerators with additional time to conduct the data-collection operations necessary to ensure a complete and accurate census, and provide Bureau staff with additional time to conduct the data-processing operations necessary to ensuring the same.  The Replan failed to address these issues, explain why the Bureau's prior conclusions were incorrect, or explain how cutting in half the time for data processing would not create fatal flaws in data quality.

**D.  The Replan Did Not Account for Federal Statistical Guidelines**

279.    In replacing the COVID-19 Plan with the Replan, Defendants departed from federal government statistical standards that promote the accuracy of information collected and disseminated by the agencies.

280.    Under the Paperwork Reduction Act, the Office of Management and Budget is responsible for coordinating the federal statistical system, including the development and implementation of "Governmentwide policies, principles, standards, and guidelines" "concerning [] statistical collection procedures and methods." 44 U.S.C. § 3504(e)(3) (A).

281.    The Office of Management and Budget is responsible for issuing guidelines that provide "procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility and integrity of information (including statistical information) disseminated by Federal agencies."  Consolidated Appropriations Act, FY 2001, Pub. L. No. 106-554, § 515, 114 Stat. 2763 (2000).

282.    One such guideline issued by the Office of Management and Budget provides specific standards to agencies like the Census Bureau, in ensuring the quality and utility of federal statistical surveys, such as the decennial census.  Office of Mgmt. & Budget, Standards and Guidelines for Statistical Surveys § 2 (2006).

283.     Under these standards, agencies are required to develop "realistic timetable[s]" for surveys.  *Id.* § 1.2.

284.     The Bureau failed to take this basic requirement into account when it decided to implement the Replan.  The Replan compressed the timeline for counting operations despite evidence of staffing shortages and heavier workload.  The Replan attempts to accomplish an idea—delivery of results by December 31, 2020, half the time previously allotted—that the Bureau had already characterized in various ways as "impossible" and "ludicrous" and "mentally deficien[t]."

285.     The standards also require agencies, including the Census Bureau, to "[e]ncourage respondents to participate to maximize response rates and improve data quality."  Office of Mgmt. & Budget, Standards and Guidelines for Statistical Surveys § 2.3.2.  This requires that the Census Bureau "[e]nsure that the data collection period is of adequate and reasonable length."

286.     Again, the Replan did not account for these standards.  The Final Operational Plan and the COVID-19 Plan provided for over eleven weeks of Non-Response Follow Up, and up to five and six months, respectively, of post-collection data processing for the apportionment report.  The Replan, on the other hand, cut the time allotted for counting by four weeks, without explaining how it will encourage more efficiency in collecting responses than the plan it reversed.

287.     The standards also require the Bureau to plan for "an adequate number of contact attempts" to the respondent and to establish protocols for minimizing enumerator falsification, including "reinterviewing respondents."  Office of Mgmt. & Budget, Standards and Guidelines for Statistical Surveys, Directive No. 2, § 2.3.3.

288.     With the Replan significantly cutting the time available to conduct Non-Response Follow Up, the Bureau had to significantly alter particular Non-Response Follow Up processes. This included reducing the number of housing unit visits it earlier deemed necessary to enumerate a non-responsive household, eliminating enumerator reinterviews, and so on.  *See* Section VII *infra.*  And these conflict with the Bureau's obligation to abide by federal statistical standards.

**E.  Plaintiffs Have Spent Time and Money Counteracting Confusion from the Replan**

289.    The new plan to rush completion of the 2020 Census also creates additional confusion about census operations at a critical moment in the census-taking process.

290.    The Census Bureau's abrupt change will require groups and local governments engaging in Get Out the Count campaigns, including Plaintiff localities and Plaintiff organizations, to expend resources to correct confusion about the 2020 Census.

291.    As noted above, Plaintiff organizations and localities engaged in extensive public information campaigns that publicized the October 31, 2020 deadline.

292.    The Replan required Plaintiffs to expend additional resources in order to update existing public materials, distribute new materials, and engage in more public-facing efforts to educate the public, their constituents, their members and/or constituents, and local organizations.

293.    For instance, in Harris County, officials ordered a mailing to constituents informing them that they had until October 31, 2020 to respond to the census.  That order occurred before the August 3, 2020 decision to implement the Replan.  In light of the new plan, the officials were forced to order stickers to cover the reference to October 31, 2020 on the mailer and to dedicate office staff to spend time affixing those stickers and updating the mailer. Similarly, Plaintiffs the City of Los Angeles, BAJI, and Urban League had to deal with advertisements on social media to correct previous communications that referenced the October 31, 2020 deadline.

294.    Apart from correcting misinterpretations arising from earlier statements Plaintiffs made in reliance on the Bureau's COVID-19 Plan, Plaintiffs have also been forced to engage in more, unanticipated outreach to educate the public about the Census Bureau's Replan decision, including developing new plans to reach more households and encourage more census participation.

**F.  The Replan Will Ultimately Lead to Low Quality and Inaccurate Data**

295.    Ultimately, Defendants' decision to rush completion of the 2020 Census will produce a significantly less accurate census than the COVID-19 Plan.

296.     By cutting down the time allotted for door-knocking, the Replan will result in fewer contact days by enumerators to non-responsive households, and less data collected by enumerators about those households.

297.     The concerns about inaccuracy resulting from shortening time for Non-Response Follow Up are real and verified.  A GAO review of the 2010 Non-Response Follow Up operation determined that local census offices with "higher percentages" of "less complete house-hold data" were more likely to have completed their Non-Response Follow Up in 53 days or less as compared to those offices that took a longer period of time.  U.S. Gov't Accountability Office, *2010 Census: Data Collection Operations Were Generally Completed as Planned, but Long-Standing Challenges Suggest Need for Fundamental Reforms* (Dec. 2010), https://www.gao.gov/new.items/d11193.pdf.

298.     As noted above, after the Bureau exhausts attempts to enumerate households through methods that render more accurate results, such as self-response and enumerator interviews, the Bureau turns to less accurate sources of data and statistical methods as a last resort to fill in missing information.

299.     By curtailing Non-Response Follow Up, the Replan has forced the Bureau to resort to less accurate methods of data collection, well before the exhaustion of more accurate methods.  Consequently, the Replan has led to the production of lower-quality information.

300.     For instance, under the Final Operational Plan, the Bureau would not consider low-quality administrative data before conducting the requisite number of contact days for a particular type of housing unit.  By reducing the number of enumerator contact days, the Replan has led to reliance on these types of lower-quality data sources prior to exhausting the more accurate methods contemplated in the Final Operational Plan.  Consequently, the Replan has led to more inaccuracies in the data.

301.     Based upon past practices, the Bureau may also use whole-count imputation to calculate missing household data but to an extent and in ways not used previously.  Imputation involves the Bureau using information from surrounding responsive households to infer the count and characteristics of a non-responsive household.

302.     In the 2010 census, the Bureau imputed approximately 0.3% of households nationwide, left over after exhausting its Non-Response Follow Up efforts.  Under the time constraints of the Replan, the Bureau will need to turn to imputation before exhausting its in-person enumeration efforts.  One former Census Bureau Director has estimated that, under the Replan, the Bureau may end up imputing up to 10% of households.  Depending on the quality of the data collected—and whether it can appropriately be used to deem a household truly enumerated or not—imputation levels may vary, and may end up being significantly higher than expected from looking at claimed completion rates alone.

303.     Since data produced through the Bureau's current imputation methods are less accurate than data collected from enumerator interviews, Defendants' decision to rush completion of the 2020 Census will result in significantly less accurate total-population data than would have been produced under the COVID-19 Plan.  This decline in accuracy will affect both the census's calculations of the total number of people living in the country and the census's recording of the characteristics of those people, and such inaccurate data will not meet the constitutional minimum for conducting the decennial enumeration or satisfy the "strong constitutional interest in accuracy" of the Census.  *Utah v. Evans*, 536 U.S. 452, 478 (2002).

304.     The Replan will also disrupt the post-collection data processing operations, described above.  As noted by Secretary Ross and Director Dillingham in mid-April 2020, following Non-Response Follow Up the Bureau engages in "lengthy, thorough and scientifically rigorous" data processing, which is essential to ensuring an accurate census.

305.     In announcing the new plan to rush the completion of the 2020 Census, Director Dillingham stated that the Bureau would "streamline" these operations in order to meet the December 31, 2020 deadline.

306.     While the Director has not specified what this "streamlining" means for post-collection operations, the bottom line is that the Bureau cannot fully engage in the operations as contemplated in its Final Operational Plan on the shortened timeframe.  As a result, the Bureau will have to cut or reduce its efforts to review and process collected data to ensure accuracy.

### G. The Replan Will Lead to Undercounting of Minorities

307.    The new plan to rush completion of the 2020 Census will exacerbate undercounting of Black, Latino, and Native American communities.

308.    As noted above, Non-Response Follow Up, is specifically designed to ensure that traditionally hard-to-count communities, including Black, Latino, and Native American communities are fully counted.  By cutting Non-Response Follow Up short, the administration is disrupting the operation most essential to ensuring an accurate count for these communities.

309.    For the 2020 Census, Black, Latino and Native American populations make up a disproportionate share of the population in tracts with the lowest self-response rates in the United States.  For instance, as of July 23, 2020, one in five residents living in census tracts with the lowest self-response rates was Black, and one in four was Hispanic, far larger proportions than Black and Hispanic shares of the general population.

310.    Consequently, Black, Latino, and Native American households made up a disproportionate share of the Non-Response Follow Up universe.

311.    Given the challenges of the shortened Non-Response Follow Up timeline, Black, Latino, and Native American households have a high likelihood of being missed, or inaccurately enumerated through administrative records and imputation.  As noted above, these alternative methods for enumeration will result in lower quality data for these groups.

312.    The problem, however, is even more serious because it replicates and exacerbates problems the Census Bureau has found in prior censuses and has striven to correct in subsequent censuses.  Data from previous censuses shows that Black, Latino, and Native Americans have historically been undercounted.  Over-reliance on alternative methods of data to enumerate a disproportionate share of the population in these groups will further exacerbate potential undercounting in these groups during the 2020 Census.

313.    Accurate data about the size, location, and characteristics of communities of color is necessary to equitably distribute political power through congressional reapportionment and redistricting at the state and local levels, enforce civil-rights laws that affect basic needs like

1    housing and employment, and conduct effective research, including on pressing issues like

2    public health.

3           314.    Truncating Non-Response Follow Up will exacerbate undercounts of

4    communities of color in at least two ways: first, by missing members of those communities

5    entirely; or, second, by recording their characteristics incorrectly, such that the census results

6    will not register them as members of communities of color.  In either instance, data regarding

7    communities of color will be inaccurate.  This inaccuracy then deprives communities of color

8    federal funding, all the material support that flows from federal funding, the protections of the

9    law, and political power at the federal, state, and local levels.

10          315.    This undercounting will be significantly exacerbated by the shortened data-

11   processing timeline.

12          316.    All evidence suggests that much of the underlying data collected by Defendants

13   was collected through administrative records and proxies—and the "quality of the data that the

14   Census Bureau collects... is degraded by the number of households with no directly-collected

15   information."  Louis Decl. ¶ 21.  Shortening data-processing operations will prevent the Bureau

16   from finding and fixing these errors, as the Bureau itself has acknowledged.  *See* PI Order 55, 58.

17          317.    The harms are particularly obvious in the use of imputation. "[T]he statistical

18   methods that the Census Bureau uses for whole person imputation rely on using information

19   from the resolved housing units," so "any undercounts that are in the resolved housing units will

20   be carried forward and not corrected."  Thompson Decl. ¶ 20.  And because imputation will be

21   accomplished in part based on the use of administrative records, and such records for hard-to-

22   count populations are generally lower quality, "the imputed values are likely to be less accurate

23   for hard-to-count groups than for the relatively easy to count."  Louis Decl. ¶ 39.

24          318.    Relatedly, the "compressed time frame for Quality Control and data processing"

25   is likely to "contribute to an even larger overcount of the white population" and undercount of

26   the Hispanic and immigrant population.  Hillygus Decl. ¶¶ 20, 37.  That is in part because white

27   households are likely to have much better administrative records (and thus are likely to be

28   double-counted at multiple addresses), while Hispanics and immigrants have larger household

sizes on averages (and are thus likely to be undercounted when imputation is used to estimate household sizes).  *Id.*  Time and attention are needed to identify and fix these errors when they occur.  Louis Decl. ¶¶ 22, 25-37.  And under the Replan and Defendants' new announcements, that time is not available.

### H.  The Replan Has No Legitimate Justification

319.    In announcing the Replan, Defendants provided no express justification. Defendants stated in passing, however, that reporting of apportionment data to the President by December 31, 2020 is required by statute.  And in this litigation, they have settled on that rationale, raising it repeatedly and solely.

320.    But there is "nothing sacred in the due date of the filing [of apportionment data], especially when the work of the Census Bureau... is incomplete."  *Carey v. Klutznick*, 637 F. 2d 834, 837 (2d Cir. 1980).

321.    The Supreme Court thus determined that the government can and should substitute apportionment counts that have already been filed and certified with "newer, more accurate version[s]."  *Utah v. Evans*, 536 U.S. 452, 462 (2002).

322.    Defendants have also recognized that, in the event of a conflict between the two, the constitutional requirement of a fair and accurate enumeration, rather than the statutory deadline, is the controlling legal requirement.  With the COVID-19 pandemic threatening the health and safety of communities across the country, Defendants adjusted 2020 Census operations in the COVID-19 Plan, shifting the timeline by several months.  Defendants did not wait for Congress to act to implement this plan, recognizing that the Plan was necessary to protect enumerators and respondents, and to ensure an accurate count.

323.    Because of those delays, as the Bureau itself recognized, it was no longer possible for Defendants to produce data by December 31, 2020 that fulfilled their constitutional and statutory mandate.  Specifically, the Bureau could not simultaneously pursue an accurate 2020 Census, and speed through completion of census-taking in order to report numbers to the President by the end of the year.

324.     Several senior officials charged with actually conducting the 2020 Census confirmed the impossibility of this task throughout the summer, including approximately four weeks before Defendants' abruptly announced their decision to adopt the Replan.

325.     The Census Bureau thus never stated, neither publicly nor internally, that the statutory deadline was sacrosanct and compelled the Replan.  No one at the Census Bureau ever stated that a statutory deadline compelled their submission of census counts that they knew were incomplete, inaccurate, unconstitutional, or unfit for purpose.

326.     The statutory deadline at issue is not mandated by the Constitution.  Taking the modest additional time necessary to ensure an accurate census, should not prevent a timely reapportionment, as elections for congressional seats impacted by reapportionment will not occur until 2022.

327.     Ultimately, Defendants cannot sacrifice their mandatory *constitutional* obligation to make decisions reasonably related to producing an accurate count in order to claim, pretextually, that they must comply with a pro forma *statutory* deadline no matter what—and no matter what product they deliver.  Congress clearly could not, for instance, satisfy its constitutional obligations by providing the Census Bureau with a single week in which to conduct the census.  Strictly adhering to the December 31, 2020 deadline, as applied in extraordinary circumstances of the ongoing pandemic, would be equally unconstitutional.

**I.    Implementation of the Apportionment Exclusion Order**

328.     The Replan cannot be justified on the basis of artificial statutory deadlines.  Instead, the timing of the abandonment and internal documents strongly suggest that the decision was influenced by a desire to implement the President's Executive Memorandum excluding undocumented immigrants from the apportionment count, thereby undercutting the contribution of communities of color to the calculations for equal representation for purposes of congressional apportionment (the "Apportionment Exclusion Order").

329.     In late June 2020, the White House took the unprecedented step of adding two political appointees to Census Bureau staff with unspecified job duties.  Neither appointee had an expertise in statistics, and both had a demonstrated history of partisan activity.  These unusual

1   appointees had previously engaged with the Census Bureau on questions about changing

2   operations and methodology.

3       330.    In mid-July 2020, White House officials reportedly asked congressional

4   appropriators to include $1 billion in the next coronavirus stimulus bill for the purpose of

5   completing the 2020 Census by the December 31, 2020 deadline.

6       331.    This abrupt change in policy coincided with and was motivated by the President's

7   July 21, 2020 issuance of the unconstitutional Apportionment Exclusion Order declaring that it is

8   the policy of the United States to remove undocumented persons from the apportionment count,

9   and requiring the Secretary of Commerce to produce estimates of the number of undocumented

10  persons in the United States when reporting total population counts to the President.  As noted,

11  the Apportionment Exclusion Order is currently being challenged as unconstitutional and

12  unlawful in a number of lawsuits filed in jurisdictions around the country, including in this

13  District.

14      332.    Shortening the census timeline increases the likelihood that, regardless of the

15  outcome of the November 2020 election, this President will have the opportunity to implement

16  his Apportionment Exclusion Order.  Delaying reporting until spring—as the COVID-19 Plan

17  issued by the Census Bureau and Department of Commerce previously did—leaves open the

18  possibility that the President will no longer be in office when data is provided, and thus will be

19  unable to effectuate the Apportionment Exclusion Order.

20      333.    Defendants did not justify their sudden, unexplained reversal of position with any

21  evidence that Bureau officials had been wrong in stating, repeatedly, that it would be impossible

22  to produce accurate counts by December 31, 2020.  There is also no evidence that the decision to

23  cut short counting operations was driven by the scientifically based judgment of Bureau

24  personnel or external experts.

25      334.    To the extent that Defendants' are motivated by a desire to implement the

26  President's Apportionment Exclusion Order, that motivation is improper.  It bears no reasonable

27  relationship to the achievement of a fair and accurate census, and, under the circumstances

28

1  currently facing the count, implementing the Apportionment Exclusion Order will undermine

2  that goal.

3       335.    Moreover, that Memorandum is just the latest attempt by the President and

4  Secretary Ross to manipulate the census along racial and ethnic lines.  Beginning in 2017,

5  Secretary Ross attempted to add an untested citizenship question to the 2020 Census, claiming

6  that the question was necessary to better enforce the Voting Rights Act.  In reality, the

7  administration was seeking block-level citizenship data so states could draw district lines in a

8  manner that would disadvantage Black and Latino communities.

9       336.    Defendant Ross's decision was litigated, and enjoined by three district courts.

10  One of those cases ultimately ended up before the Supreme Court.  There the Court found that

11  Defendant Ross's stated Voting Rights Act rationale to support the addition of a citizenship

12  question to the 2020 Census was "contrived" and vacated Defendant Ross's decision.  *Dep't of*

13  *Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019).

14       337.    On July 5, 2019, following the Supreme Court's decision, President Trump

15  confirmed the real rationale—and fully justified the Supreme Court's holding that the

16  administration's rationale for this census decision was pretextual—when he stated that the

17  administration sought a citizenship question, not to enforce the Voting Rights Act, but rather "for

18  districting" and "for appropriations."  Remarks by President Trump Before Marine One

19  Departure (July 5, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-

20  trump-marine-one-departure-51/.

21       338.    Indeed, further evidence that Defendants' actions were pretextual arose from files

22  of a prominent redistricting strategist, Thomas Hofeller.  In 2015, Hofeller prepared a study titled

23  "The Use of Citizen Voting Age Population in Redistricting."  In the study, Hofeller

24  recommended adding a citizenship question to the census so that states could use citizen voting-

25  age population rather than total population to redistrict.  This change in the redistricting base, in

26  Hofeller's words, would be advantageous to "Non-Hispanic Whites" and would undercut the

27  political power of Hispanics.

28

339.    It was later revealed that Hofeller was involved in drafting portions of the memorandum from the Department of Justice to Defendant Commerce seeking addition of a citizenship question on the 2020 Census, including sections relating to the pretextual reason for requesting the question.  *See* Ex. 8 to NYIC Pls.' Mot. for Sanctions at 124-31, *New York v. U.S. Dep't of Commerce*, No. 1:18-cv-2921-JMF (S.D.N.Y. July 16, 2019), ECF No. 635-1; Defs.' Opp. to Letter Mot. to Compel at 3, *New York v. U.S. Dep't of Commerce*, No. 1:18-cv-2921-JMF (S.D.N.Y. Oct. 30, 2018), ECF No. 451.

340.    Shortly after the Supreme Court's decision, President Trump issued an executive order, demanding executive agencies provide the Census Bureau with administrative records sufficient to allow the Bureau to determine "the number of citizens and noncitizens in the country."  Exec. Order No. 13,880, § 1, 84 Fed. Reg. 33,821, 33,821 (July 16, 2019).  The Executive Order explicitly states that the reason this data is necessary is to design "legislative districts based on the population of voter-eligible citizens," instead of total population.  *Id.* at 33,823-84.

341.    In light of that history, the Apportionment Exclusion Order, and the near-contemporaneous decision to cut counting operations short, represent yet another attempt by the administration to manipulate the 2020 Census and potentially undercut the political power of communities of color.  Defendants cannot rely on this memorandum as justification to support their decision to undermine the accuracy of the census.

## VII.    Defendants' Post-Replan Conduct and the Effects of the Replan to Date Show That the Replan and the Numbers It Will Produce are Flawed and Unconstitutional

342.    For all the reasons set forth above, the Replan was constitutionally and statutorily flawed when announced.  The passage of time and real-world developments since the initial filing of this lawsuit now provide further support that the Replan is unlawful.

343.    As stated, on August 14, 2020, Secretary Ross made various public assertions about the quality and processes of the Replan that were not true at the time, and have been shown to be definitively not true over time, including:

- "The 2020 Census…is on its way to delivering a successful count in every community across the nation"

- The "updated plan to complete data collection by September 30, 2020…increases the number of hours worked per week to accomplish the same amount of work in a shorter time period and meet the statutory deadline, without sacrificing quality."

- "Under this plan, the Census Bureau will meet or exceed the standard of data collection set in previous decennial censuses"

- "So, while the critics have said this plan is being 'cut-off' too soon, in reality, it has been strengthened."

- "This week we fully engage the 2020 census's important non-response follow-up operation, where census-takers go door-to-door to obtain responses from the just over 50 million households who have not yet responded."

344.    The falsity of some of the preceding statements was demonstrated by an internal document that was revealed only later: the August 3 "Replan" presentation that was provided to the public by Congress on September 2, 2020.  AR DOC_10275.  In the presentation, and in other materials later disclosed, Defendants made clear that the Replan had in fact lowered their standards for data collection and sought to gain time by cutting corners.  Among other things, Defendants (i) significantly reduced the number of contact attempts or visits required in various situations; (ii) increased reliance on non-contact methods such as enumeration through administrative records; (iii) eliminated the random re-interview process (an important part of previous censuses); and (iv) changed the nature of the "count" information collected by enumerators, removing the requirement that demographic information be collected and allowing "population count" information alone in wider circumstances.  The Bureau believed that these steps would reduce the NRFU workload of ~64M cases by 8.5 million cases.

345.    In addition, Defendants' post-Replan conduct, and the real-world effects of the Replan, would show that these mechanisms and others were in fact used in the data collection period, leading to a flawed set of numbers that, as of October 16, Defendants plan to start using in the data processing period.

346.     Notwithstanding all this, Defendants have claimed publicly, to this Court, to the Ninth Circuit, and to the Supreme Court that by reaching a 99% completion rate nationwide (and as of October 15, in every state), Defendants have obtained a data collection count that is as good as prior censuses, and sufficient.

347.     This assertion, just like Secretary Ross's assertions of August 14, is incorrect, for each of the following reasons discussed in detail below.

348.     _First_, real world developments have in fact shown that data collection was nowhere near adequate as of (1) September 11, when data collection operations became eligible nationwide for closeout, under the Replan, or  (2) September 30, when data collection was to have fully ended under the Replan,.  But for this Court's TRO and preliminary injunction, the Replan would have had catastrophic effects on the 2020 decennial census.

349.     _Second_, the data shows that Defendants had no ability, in the context and circumstances of the last few months, to have reached completion rates of 99% in every state absent a massive shift in their internal metrics and processes.  Accordingly, the 99%-in-every-state number they tout cannot justify the Replan.

350.     _Third_, the metrics and numbers that Defendants have provided to date, carefully analyzed, demonstrate that this level of claimed completion is misleading and nothing like the completion metrics obtained by prior censuses.  Properly understood, these numbers show that Plaintiffs' concerns about the Replan's deleterious and unlawful effects have, in fact, been borne out.

**A.     Defendants' Plan to Start Winding Down Data Collections by September 11, and End on September 30 Per the Replan Would Have Had Catastrophic and Unprecedented Effects on the Census if Not Preliminarily Enjoined**

351.     Defendants failed to reach a complete and accurate census data collection count by the deadlines set forth by the Replan—or come anywhere close.  Indeed, it has only been this litigation—and more, specifically, this Court's initial orders on preliminary relief—that prevented a full and catastrophic failure of the 2020 data collection period.

352.     Defendants repeatedly stated publicly and to this Court, including via sworn testimony, that under the Replan they would "complete data collection by

September 30…without sacrificing quality."  Ross. Op-Ed.  And when Defendants opposed Plaintiffs' request for a TRO in this case, they claimed that a TRO was not necessary because Defendants were on track to reach an accurate census, with completion rates of 99% in every state by September 30.

353.    As an initial matter, reaching 99% completion in every state is *not* the sole "accuracy" goal of the census.  The goal is to count every person once, in the right place—and that means, in particular, fully enumerating hard-to count populations that have been historically underrepresented in past censuses.

354.    But even so, the Replan utterly failed to meet this numerical statewide "completion" goal, with respect to two of its key dates: its September 11 date to start closeout procedures regardless of completion rate, and its September 30 date to end all data collection.

### *September 11 Wind-Down Date*

355.    In the September 5, 2020 Fontenot Declaration, Defendants first revealed that regional offices could enter the closeout phase on September 11, regardless of completion rate.

356.    This meant that Defendants had the ability to start winding down NRFU operations in every single CFS area, no matter the completion rate of the CFS, as of September 11—at the discretion of the regional manager—in order to meet the Replan's September 30 NRFU shutdown date.

357.    This in turn would have allowed the CFS areas to engage in a number of tactics and actions to try and maximize "completions"—including, but not limited to, allowing housing units in NRFU to be deemed complete and enumerated by "Pop Count" only.

358.    This is important.  When counting a housing unit, the Census Bureau attempts to gather data not just on the total number of people, but on important characteristics, including race/ethnicity and age.

359.    However, as a last resort, at the very end of the data collection period, the Bureau will accept an enumeration of just the population count for a housing unit in order to complete the unit.  The Bureau can accept that information from someone in the housing unit or, more

likely, from a proxy respondent.  The use of "pop count only" has, historically, been extremely limited.

360.    The Bureau has historically made limited use of "pop count only" numbers is because of the significant adverse impacts of such a practice.  Failure to collect any information about a household aside from a count increases the likelihood that characteristic data, such as race/ethnicity or age, will have to be imputed—even if the count itself does not.  And imputation is effectively an educated guess about the housing unit, far less accurate than other forms of enumeration.  Dkt. 36-3, Hillygus Decl. ¶¶ 36-38; Dkt. 36-2, Thompson Decl. ¶ 20(d).

361.    Moreover, inaccurate race and ethnicity data can have a deleterious effect on states' ability to draw lines that comply with the Voting Rights Act; and inaccurate age data can disrupt the amount of federal resources states and local school districts receive under important federal education funding programs.

362.    These issues fall more heavily on hard-to-count groups, who are overrepresented in the NRFU universe vis-à-vis the entire census address file (MAF).  This lays the groundwork for differential undercounts, including along racial and ethnic lines.

363.    Notwithstanding those concerns, and in furtherance of the September 30 operations shutdown, Defendants had planned to allow every census office in the nation to start winding down and initiate closeout procedures beginning on September 11—regardless of how far along they were.

364.    Again, to put the issue in real numbers: as of September 11, *over 13.5 million household units in the nation*, or at reasonable assumptions ~25-30 million individuals, had not been counted.  And each would have become subject to early closeout procedures.  This mechanism to obtain a "census lite" for upwards of 30 million individuals (and/or not personally enumerate them at all) affected every single state.  Below are a few examples:

1      • *Alabama*: ~450,000 HUs uncounted (~1-1.5 million individuals)

2      • *Arizona*: ~500,000 HUs uncounted (~1-1.5 million individuals)

3      • *California*: ~960,000 HUs uncounted (~2-3 million individuals)

4      • *Florida*: ~1,400,000 HUs uncounted (~3-4 million individuals)

5      • *Georgia*: ~800,000 HUs uncounted (~1.5-2.5 million individuals)

6      • *Illinois*: ~330,000 HUs uncounted (~600k - 1 million individuals)

7      • *Michigan*: ~430,000 HUs uncounted (~900k-1.3 million individuals)

8      • *New York*: ~860,000 HUs uncounted (~2-3 million individuals)

9      • *North Carolina*: ~730,000 HUs uncounted (~2-3 million individuals)

10     • *Pennsylvania*: ~430,000 HUs uncounted (~1-1.5 million individuals)

11     • *South Carolina*: ~415,000 HUs uncounted (~1-1.5 million individuals)

12     • *Texas*: ~1,300,000 HUs uncounted (~2.5- million individuals)

13     365.   This would have been drastically different than the previous censuses.  In the

14   2010 Census, for example, Defendants had reached approximately 99% completion three weeks

15   before NRFU ended.  So on information and belief closeout procedures, including pop-count

16   only changes, were put in place for at most 1-2 million housing units (or even a few hundred

17   thousand housing units), compared to the 13.7 million household units Defendants would have

18   subjected to closeout under the Replan.   The following chart is illuminating:

19

20

21

22

23

24

25

26

27

28

| Area | ~Total Housing Units[1] | Completion %: 9/12 CB Report[2] | ~Housing Units *Not* Counted | Completion %: 10/1 CB Report[2] | ~Housing Units *Not* Counted |
|---|---|---|---|---|---|
| *US Total* | *149,755,969* | *90.80%* | *13,777,549* | *98.90%* | *1,647,316* |
| Alabama | 2,551,113 | 82.30% | 451,547 | 94.90% | 130,107 |
| Alaska | 343,602 | 93.10% | 23,709 | 99.90% | 344 |
| Arizona | 3,263,115 | 83.90% | 525,362 | 98.00% | 65,262 |
| Arkansas | 1,560,289 | 94.30% | 88,936 | 99.90% | 1,560 |
| California | 15,301,327 | 93.70% | 963,984 | 99.60% | 61,205 |
| Colorado | 2,642,421 | 90.90% | 240,460 | 98.60% | 36,994 |
| Connecticut | 1,593,286 | 95.80% | 66,918 | 99.90% | 1,593 |
| Delaware | 467,096 | 88.80% | 52,315 | 98.90% | 5,138 |
| DC | 384,626 | 88.80% | 43,078 | 98.30% | 6,539 |
| Florida | 10,338,788 | 86.00% | 1,447,430 | 98.00% | 206,776 |
| Georgia | 4,844,483 | 83.10% | 818,718 | 96.80% | 155,023 |
| Hawaii | 594,089 | 97.60% | 14,258 | 99.90% | 594 |
| Idaho | 798,954 | 99.10% | 7,191 | 99.90% | 799 |
| Illinois | 5,673,995 | 94.10% | 334,766 | 99.40% | 34,044 |
| Indiana | 3,086,263 | 96.40% | 111,105 | 99.90% | 3,086 |
| Iowa | 1,495,626 | 88.10% | 177,979 | 99.10% | 13,461 |
| Kansas | 1,353,266 | 96.50% | 47,364 | 99.80% | 2,707 |
| Kentucky | 2,153,348 | 88.50% | 247,635 | 98.40% | 34,454 |
| Louisiana | 2,277,553 | 83.50% | 375,796 | 95.80% | 95,657 |
| Maine | 791,620 | 96.70% | 26,123 | 99.90% | 792 |
| Maryland | 2,631,918 | 92.80% | 189,498 | 99.30% | 18,423 |
| Massachusetts | 3,194,810 | 93.50% | 207,663 | 99.40% | 19,169 |
| Michigan | 4,828,763 | 90.90% | 439,417 | 99.00% | 48,288 |
| Minnesota | 2,593,423 | 95.00% | 129,671 | 99.60% | 10,374 |
| Mississippi | 1,467,455 | 83.10% | 248,000 | 96.40% | 52,828 |
| Missouri | 3,099,997 | 94.10% | 182,900 | 99.40% | 18,600 |
| Montana | 571,279 | 83.20% | 95,975 | 96.60% | 19,423 |
| Nebraska | 890,301 | 92.10% | 70,334 | 99.60% | 3,561 |
| Nevada | 1,325,391 | 90.00% | 132,539 | 99.50% | 6,627 |
| New Hampshire | 668,120 | 92.90% | 47,437 | 99.90% | 668 |
| New Jersey | 3,891,496 | 90.70% | 361,909 | 99.60% | 15,566 |
| New Mexico | 1,018,320 | 84.60% | 156,821 | 98.10% | 19,348 |
| New York | 9,113,163 | 90.50% | 865,750 | 99.30% | 63,792 |
| North Carolina | 5,086,710 | 85.60% | 732,486 | 97.80% | 111,908 |
| North Dakota | 407,240 | 91.60% | 34,208 | 99.60% | 1,629 |
| Ohio | 5,527,092 | 93.00% | 386,896 | 99.40% | 33,163 |
| Oklahoma | 1,909,950 | 88.10% | 227,284 | 98.60% | 26,739 |
| Oregon | 1,955,562 | 96.10% | 76,267 | 99.50% | 9,778 |
| Pennsylvania | 6,074,730 | 92.80% | 437,381 | 99.10% | 54,673 |
| Rhode Island | 498,245 | 92.10% | 39,361 | 99.50% | 2,491 |
| South Carolina | 2,600,548 | 84.00% | 416,088 | 96.50% | 91,019 |
| South Dakota | 417,560 | 89.50% | 43,844 | 98.10% | 7,934 |
| Tennessee | 3,299,381 | 91.70% | 273,849 | 98.90% | 36,293 |
| Texas | 12,349,756 | 89.30% | 1,321,424 | 99.50% | 61,749 |
| Utah | 1,209,969 | 93.50% | 78,648 | 99.90% | 1,210 |
| Vermont | 357,230 | 94.50% | 19,648 | 99.90% | 357 |
| Virginia | 3,779,137 | 91.60% | 317,448 | 99.20% | 30,233 |
| Washington | 3,352,194 | 97.40% | 87,157 | 99.90% | 3,352 |
| West Virginia | 976,904 | 98.70% | 12,700 | 99.90% | 977 |
| Wisconsin | 2,854,820 | 96.30% | 105,628 | 99.80% | 5,710 |
| Wyoming | 289,645 | 88.20% | 34,178 | 99.00% | 2,896 |
| Puerto Rico | 1,554,207 | 90.80% | 142,987 | 99.90% | 1,554 |

(1) 9/25 Bureau spreadsheet; total HU numbers appear to non-materially vary over time. ECF 233-1 at 40 of 81
(2) https://2020census.gov/en/response-rates/nrfu.html#dd234650384-co.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

CASE NO. 20-CV-05799-LHK
SECOND AMENDED COMPLAINT

366.    A comparison of these numbers, with the Bureau's own chart setting forth NRFU completion in 2010, is stark:

**Table 11: NRFU Housing Units Completed By Week[23]**

| Week | | Housing Units Completed | Percent | Cumulative Percent |
|---|---|---|---|---|
| 4/01 - 4/03 | | 8,522 | <0.1% | <0.1% |
| 4/04 - 4/10 | | 21,649 | <0.1% | 0.1% |
| 4/11 - 4/17 | | 35,633 | 0.1% | 0.1% |
| 4/18 - 4/24 | | 42,776 | 0.1% | 0.2% |
| 4/25 - 4/30 | | 897,485 | 1.9% | 2.1% |
| 5/01 - 5/08 | Start of NRFU | 10,488,338 | 22.2% | 24.4% |
| 5/09 - 5/15 | | 9,799,293 | 20.8% | 45.1% |
| 5/16 - 5/22 | | 8,853,582 | 18.8% | 63.9% |
| 5/23 - 5/29 | | 6,809,268 | 14.4% | 78.3% |
| 5/30 - 6/05 | | 4,452,359 | 9.4% | 87.7% |
| 6/06 - 6/12 | | 3,240,081 | 6.9% | 94.6% |
| 6/13 - 6/19 | | 1,592,457 | 3.4% | 98.0% |
| 6/20 - 6/26 | | 642,469 | 1.4% | 99.3% |
| 6/27 - 7/03 | | 142,321 | 0.3% | 99.6% |
| 7/04 - 7/10 | End of NRFU | 16,841 | <0.1% | 99.7% |
| 7/11 - 7/17 | | 4,437 | <0.1% | 99.7% |
| 7/18 - 7/24 | | 4,144 | <0.1% | 99.7% |
| 7/25 - 7/31 | | 3,690 | <0.1% | 99.7% |
| 8/01 - 8/07 | | 19,080 | <0.1% | 99.7% |
| 8/08 - 8/14 | | 16,548 | <0.1% | 99.8% |
| 8/15 - 8/21 | | 12,897 | <0.1% | 99.8% |
| 8/22 - 8/28 | | 8,763 | <0.1% | 99.8% |
| 8/29 - 9/04 | | 1,649 | <0.1% | 99.8% |
| Missing/Out of Range | | 83,123 | 0.2% | 100.0% |
| **Total Housing Units** | | **47,197,405** | **100.0%[24]** | **100.0%** |

367.    The data also show that Defendants' claims that they would have reached a 99% completion rate in every state by the Replan's new data collection shutdown date of September 30—using a "strengthened" data collection plan that "will meet or exceed the standard of data collection set in previous decennial censuses," was also not correct.  Even assuming that the "completion" metrics being used by Defendants were materially identical to or stronger than the standards used in previous censuses, *16 states plus the District of Columbia* were below the 99% threshold on September 30, and millions of Americans would have been shut out of the count.

368.    The overall completion metrics, or even the state-by-state completion metrics, also hide a bigger problem: the differential undercounts, when looking at the local CFS areas. As Defendants themselves realized, in internal documents from September, numerous CFS areas

at that time were far below target.  In two Census ACOs (Shreveport, Louisiana and Window

Rock, Arizona), actual completion rates on September 28th were below 75% even though the

targeted completion rate was over 95%.  Another 22 Census offices reported completion rates of

under 90% on September 28th compared to a targeted completion rate of over 95%.  A review of

the limited Census Bureau internal documents indicates declining enumerator productivity

during September, and a deceleration rather than acceleration of the rate at which NRFU could

be completed, in many of these offices.  It also indicates extremely low completion rates in tribal

lands.  Any forced closing by September 30 would have thus resulted in massive undercounts.

The public, however, would not necessarily have had access to this information—because

contrary to Defendants' assurances, Defendants had already engaged in, and were planning

further, to shift their metrics and processes so as to mark "complete" housing units with a bare

minimum of work.

> **B.      Defendants Had No Realistic Ability to Reach A True 99% Completion Rate in All States—Not By September 30 or Even October 15—So They Altered and Weakened Standards and Processes Vital to an Accurate Census**

369.     Defendants never had a realistic ability to reach true 99% completion rates in

every state by September 30 or even October 15—let alone while trying to reach hard-to-count

populations—without significant, accuracy-reducing changes to the census's standards,

processes and metrics.

370.     To start, a comparison with 2010 is illuminating.  The 2010 Census scheduled 10

weeks of NRFU to resolve ~47,200,000 million household units.  *See* U.S. Dept. of Commerce,

Office of Inspector General, *Census 2010: Final Report to Congress* (June 2011) at 49.  The

2020 Census Final Operational Plan scheduled 11.5 weeks of NRFU to resolve ~64,000,000

housing units.  *See* Final Operational Plan.

371.     Although NRFU caseload completions are not linear on a week to week basis

(with the harder cases that remain at the end of NRFU taking longer to complete), the numbers

make clear that the Bureau was already planning to be far more efficient in 2020 than in 2010—

because it added only 10 days more to handle an additional ~17 million housing units.

372.    The Bureau spent a decade making sure it could cover that massive load by honing these efficiencies.  The advancements it came up with were essential to its ability to squeeze an extra 17 million housing units into a period only 1.5 weeks longer than in 2010—but those plans left no spare room.  This is critical to Defendants' assertions now.  The Operational Plan—and the COVID-19 Plan, which built on the Operational Plan and adjusted it to appropriately account for the COVID-19 pandemic—had *already built in* all of the technological and process advancements the Bureau was expecting to use during the NRFU period.  The Bureau conducted numerous tests in 2012, 2013, 2014, 2015, 2016, 2017, 2018, and 2019, leading up to the 2020 Census, including these advancements, such as the use of advanced software, assignment optimization, advancements in review technology (while still providing for the critical random reinterviews), the use of iPhones instead of paper technology, and more.  *See, e.g.*, Dkt. 37-5 at 31-55.

373.    With all of these advancements and tests, the Bureau projected enumerator productivity to be around 1.55 resolved cases per hour.  *See* Dkt. 81-1 at ¶ 75; Dkt. 170-2 at ¶ 51 (Feb. 11, 2020), *National Association for the Advancement of Colored People v. Bureau of the Census*, No. 8:18-cv-00891-PWG (D.  Md.); *see also* U.S. Census Bureau, *Final Census Test Proves Successful*, Sept. 5, 2018, https://www.census.gov/newsroom/blogs/director/2018/09/final-census-test-proves-successful.html (describing 2018 end-to-end test and stating, "[p]erhaps most encouraging is that we have observed a substantial increase in enumerator productivity from adoption of technology and automation"); U.S. Census Bureau, *U.S. Census Bureau Demonstrates Readiness for the 2020 Census*, Sept. 5, 2020, https://www.census.gov/newsroom/press-releases/2018/census-demonstrates-readiness-for-2020-census.html.  This was a "substantial increase" over the 1.05 resolved cases per hour during the 2010 Census.  U.S. Census Bureau, *Final Census Test Proves Successful*, Sept. 5, 2018, https://www.census.gov/newsroom/blogs/director/2018/09/final-census-test-proves-successful.html.   And there was no indication—ever, by anyone—that the Bureau could squeeze out greater productivity from its enumerators, even using all of this new technology and software optimization, while still reasonably maintaining accuracy.

374.     In order to squeeze in 62 million housing unit enumerations in an already-short 11.5 week period, the Bureau also closely calculated the number of enumerators it would need, based on the projected enumerator per-hour productivity and per-week workload.  After a decade of study preparing for the 2020 Census, Defendants had initially projected needing around 260,000 enumerators to perform NRFU operations.  *See* Dkt. 37-15 at 90.

375.     But as the COVID-19 pandemic began to ramp up in the United States, Defendants projected needing to hire more than 300,000 enumerators, depending on enumerator performance and self-response rate before NRFU began.  *See* Dkt. 170-2 at ¶¶ 50-51 (Feb. 11, 2020), *National Association for the Advancement of Colored People v. Bureau of the Census*, No. 8:18-cv-00891-PWG (D. Md.).  There was no attempt to squeeze additional hours from enumerators, or attempt to force enumerators to be more productive than the already-heightened productivity increase of 1.55 resolved cases per hour.

376.     The problem for Defendants, of course, is that they were *unable* to hire additional enumerators or train them in time.  When NRFU was completely underway by August 11, 2020, the Bureau still had many tens of thousands fewer enumerators than it had projected, even absent the COVID-19 pandemic.  For example, the Bureau's total number of temporary workers, which includes more than just enumerators, totaled only 288,204 during the span of August 9 to August 15, 2020.  U.S. Census Bureau, *2020 Census Paid Temporary Workers*, https://www.census.gov/content/dam/Census/newsroom/press-kits/2020/2020-census-weekly-hires.pdf.  On August 17, 2020, the Office of the Inspector General reported the Bureau had only 220,000 enumerators, and that Bureau officials stated they needed above 300,000 enumerators.  *See* Dkt. 37-13 at 2.  The Bureau, in fact, never reached the 300,000 or more enumerators that officials admitted they needed.  Instead, as Tim Olson, Associate Director for Field Operations explained on July 23, 2020, the numbers at the beginning of NRFU showed "the awful deploy rate" of enumerators, as well as an "almost debilitating higher quit rate" than past censuses.  AR DOC_0007737.

377.     Instead, enumerator productivity rates somehow started to skyrocket.  On September 1, 2020, Mr. Fontenot reported that despite the shortfall in the number of necessary

1  enumerators, the progress levels indicated Defendants would "nonetheless be able to complete

2  NRFU before September 30." Dkt. 81-1 at ¶ 74. This was because, despite the numerous tests

3  over the previous decade that showed enumerator productivity would be around 1.55 resolved

4  cases per hour, enumerators were miraculously resolving 2.32 cases per hour. *Id.* ¶ 75.

5       378.    After a decade of planning, and tests over repeated years using the exact same

6  technology and optimizing mechanisms and software, the Bureau had squeezed productivity

7  from 1.05 cases/hour to 1.55 cases/hr – an amazing ~53% increase in efficiency. And yet

8  somehow, in the space of about a week, Defendants had been able to *more than double that gain,*

9  and in fact increase productivity by 121%, from 1.05 to 2.32 an hour. And they were able to do

10  so in the face of the ever-present COVID-19 pandemic and attendant restrictions throughout the

11  country. And they were able to maintain it despite hurricanes and major storms in the South and

12  East Coast, and wildfires in the West. *See* Dkt. 266-1 ¶ 17. And according to Secretary Ross, it

13  was all apparently done by meeting or exceeding the standards of the previous census, and in fact

14  by *strengthening* those standards and processes.

15       379.    Math and human productivity do not work in such fashion. The real answer was

16  that by September 1, 2020, the Replan had been in effect for nearly a month—along with its

17  accuracy-slicing alterations to data collections processes. *See, e.g.*, Aug. 3 Presentation, Dkt.

18  131-7 at 7; AR DOC_0008779. It was these significant alterations—resulting in a massive

19  decrease in in-person visits and a corresponding increase in the use of administrative records,

20  proxies, and changed information requirements (i.e., pop-counts), along with more serious

21  charges of enumerators being told to act improperly and cut corners—that led to the impossible

22  jump in enumerator productivity.

23       380.    Dozens of enumerators complained directly-- including to the Court. Through

24  these complaints and others, Plaintiffs are aware of numerous instances across the country that

25  demonstrate that in sacrificing accuracy for speed, and rushing toward "completion" rates so as

26  to forestall and then overturn the preliminary injunction in this case, Defendants cut many

27  corners and made decisions that do not bear a reasonable relationship to the accomplishment of

28  an actual enumeration.

381.    These corner-cutting operations, as relayed by employees involved, fall into the following categories of conduct:

382.    ***Dramatically increased use of non-direct enumeration, including telephone calls, proxies, and use of administrative records***.  Dkt. 233 at 106-111.  For example, a CFS in Southern California reported that after only one attempt, thousands and thousands of households are being marked complete in at least Southern California and Southern Texas without any enumeration.  Whereas other households were receiving as many as 26 actual attempts to close.  Dkt. 220.  As the CFS explained, this was for reasons that a "manager stated" were "political," and no corrective action was taken.  *Id.* at 2.  Another census worker corroborated the story, noting that "multiple Census Field Managers" acknowledged that these cases were not properly closed.  Dkt. 221 at 2.

383.    Assistant Director for Field Operations James Christy of the Bureau explained that these were normal procedures and that units were closed through use of Administrative Records, a form of non-direct enumeration.  *See* Dkt. 244-1 ¶¶ 4-6.  Yet Bureau employees above the CFS level agreed that these cases were coded in error, and the Regional Office agreed that use of administrative records were appropriate for only a portion of these households.  *See* Dkt. 285.

384.    There are more.  According to a CFS in the Baltimore ACO, thousands of cases were manually marked completed without explanation, and removed from the NRFU workload, after only one contact attempt.  According to CFSs in North Carolina and Massachusetts, many households were closed out in those states with 0 or 1 contact attempt.  In North Carolina, cases were closed out by improperly identifying addresses as incorrect addresses, and those addresses were not enumerated.  Bureau employees above the CFS level were aware of this, and when raised by certain CFMs, those CFMs ultimately resigned after failed attempts to have the situation resolved.  In Northern California, in areas hit by wildfires, at least one enumerator was told to contact the county tax assessor and use the information from property deeds for enumeration.

385.    Such non-direct enumeration methods are less accurate and have a profound effect on immigrants and minorities—the hard-to-count populations.  *See, e.g.*, Dkt. 36-2 ¶ 22; Dkt. 36-3 ¶¶ 23, 38.

386.    The dramatically increased use of administrative records and proxies—and the changed mechanisms and protocols as to when they could be utilized—was not part of the Operational Plan or COVID-19 plan, and as discussed below, was far in excess of anything considered to be a standard and appropriate part of the data collection period.

387.    ***Undue pressure to close cases quickly***.  There are also numerous reports of enumerators being pressured by census field supervisors and census field managers to close cases as quickly as possible.

388.    A CFS in San Francisco was "verbally instructed to take further accuracy reducing shortcuts to get the work completed ASAP," contrary to the Bureau's own manuals. Dkt. 222.  He also noted other "shortcut processes... communicated orally" outside the normal channels to get done quickly.  *Id.*

389.    An enumerator in the Spokane District of Washington reported on September 29 that the supervisors were making "a large push" "to complete cases as quickly as possible."  Dkt. 238 at 3.  The enumerator reported "grave concerns on accuracy" because enumerators were being told "to close down remaining cases by whatever means necessary," likely leading to "cases prematurely or inaccurately handled."  *Id.*

390.    Cases were closed early even when those cases could have been directly enumerated.  *See* Dkt. 316.

391.    An enumerator in Northern California, in areas hit by wildfires, reported a marked difference in enumeration standards in the three days leading up to September 30, 2020, specifically that enumerators were told to close cases no matter what and just get a population count.  The enumerator reported being told to just be very vague in the definitions used when entering information into the app for enumeration.

392.    When enumerators traveled to other locations to enumerate, they were pressured to close cases as quickly as possible.

393.     For example, in North Carolina, at least one traveling enumerator told local enumerators that the traveling enumerator was closing 25 cases per hour despite working in a rural area where doing more than 2 cases an hour was considered great work.  Coincident with the use of traveling enumerators, the relevant ACO's completion rate went up roughly 3% in one day, when the area typically struggled to go up 1 or 2% in a day.

394.     On or around September 30, 2020, in North Carolina, enumerators were told to leave a notice of visit for a housing unit they were visiting for the first time during NRFU, and told to seek a proxy the same day.

395.     On or around September 30, 2020, in North Carolina, a CFM placed notes on every case assigned to enumerators to "complete" the case.  According to at least one CFS working with such enumerators, the instruction caused enumerators to question the ethical implications of completing cases, and enumerators were feeling extra pressure to complete cases without actual data.

396.     Instructions such as those identified above suggested to enumerators that they should falsify data to close cases quickly.

397.     Moreover, the financial incentives to close cases similarly motivated enumerators to falsify data to close cases quickly in order to collect the monetary awards provided under the Replan.  *See, e.g.*, OIG-20-052-M, OIG Memorandum, The Census Bureau's Program to Provide Awards to Nonresponse Followup Enumerators and Field Supervisors May Require Additional Quality Assurance of Cases to Ensure Data Accuracy (Sept. 28, 2020), https://www.oig.doc.gov/Pages/2020-Census-Alert-The-Census-Bureaus-Program-to-Provide-Awards-to-Nonresponse-Followup-Enumerators-and-Field-Supervisors-M.aspx.

398.     ***Falsification of Data***.  Defendants' employees also directed enumerators to falsify data in order to close cases and so that Defendants could report better than 99% completion; such instructions were often given only verbally.

399.     Defendants pushed enumerators and supervisors to rush the completion of enumeration activities by directing CFSs and enumerators to "put population 1 or 2, select male or female for each and close out all the remaining cases in their list this way."  Dkt. 285 at 7.

1  They were also instructed to enter the rest of the data as "refused" or "don't know" in the

2  enumerator app. *Id.*

3      400.    In North Carolina, on September 30, 2020, on a conference call between CFSs

4  and a CFM, the CFSs were directed to tell their enumerators to close cases and mark them as a

5  "dangerous address," regardless of actual status, so that those cases would go to supervisor

6  review and the CFM could mark those cases completed without a count.

7      401.    In North Carolina, enumerators were given the instruction described in the

8  previous paragraph.

9      402.    In North Carolina, enumerators were also told to operate as their own proxy and

10  to guess how many people lived in a housing unit without any input from someone at the house

11  or someone otherwise familiar with the housing unit.

12      403.    Enumerators traveling to Alabama were told to close cases by following a set of

13  instructions that would allow them to put in a fictitious name for a proxy respondent and to close

14  cases by simply putting in a "1" for number of people living in the household.

15      404.    An enumerator in Northern California, in areas hit by wildfires, was told that if a

16  visited house was totally empty, to mark in the app that there was a "refusal" to provide

17  identifying information, and to simply enter a population count of one for the housing unit.

18      405.    A CFS in San Francisco was "verbally instructed to take further accuracy

19  reducing shortcuts to get the work completed ASAP," contrary to the Bureau's own manuals.

20  Dkt. 222.  He also noted other "shortcut processes... communicated orally" outside the normal

21  channels to get done quickly.  *Id.*

22      406.    In many instances, enumerators were told to perform these falsifying operations

23  while near the housing unit.  On information and belief, this instruction was given because the

24  Bureau's enumerator software was recording enumerators' geographic locations and an

25  enumeration undertaken too far from the housing unit in question would indicate an potentially

26  anomaly subject to investigation.

27      407.    Moreover, it appears that Defendants made no attempts to recount the numerous

28  households that were closed for enumeration purposes—and contributed to Defendants' 99%

completion rates—through the improper methods of the Replan.  This is despite Defendants'

knowledge that the Replan methods of enumeration were *expected* to be less accurate than the

original operational plan.  *See, e.g.*, Aug. 3 Presentation, Dkt. 131-7 at 7; AR DOC_0008779.

408.     ***Poor Handling of Relocated Populations.***  Many people were displaced or

relocated for various reasons during the 2020 Census.  The COVID-19 pandemic, hurricanes and

major storms in the South and East Coast, and wildfires in the West, hampered the Bureau's

enumeration efforts.  *See* Dkt. 266-1 ¶ 17.

409.     For example, many students who normally would have been at locations close to

college and university campuses returned to their parents' homes in light of school closures due

to the COVID-19 pandemic.  This led to the Bureau undercounting off-campus student

households.  *See, e.g.*, OIG-20-044-M, OIG Memorandum re The Census Bureau May Not

Accurately Count College and University Students Living Off-Campus During the 2020 Census

(Aug. 27, 2020), https://www.oig.doc.gov/Pages/2020-Census-Alert-The-Census-Bureau-May-

Not-Accurately-Count-College-and-University-Students-Living-Off-Campus-During-the-2.aspx.

Moreover, the Bureau did not have a plan to use off-campus student data.  *See id.*

410.     As another example, in New York City, many people left their city addresses and

relocated.  It was difficult or impossible for enumerators to get into buildings to enumerate.

Even when enumerators were able to get in, housing units were often closed out for max

attempts because no one was home to be enumerated.

411.     As another example, in Northern California, in areas hit by wildfires, an

enumerator reported lack of coordination and planning in trying to enumerate locations subject to

road closures, making it impossible to visit addresses in the region.

C.     **Defendant' 99% Completion Rate Metrics Are Misleading, And True
Metrics Indicate That the Replan Is Leading to A Fatally Flawed and
Inaccurate Census, as Predicted**

412.     *The claimed 99% completion rates as of October 15 are misleading and fail to
measure up adequately to past censuses.*  Defendants' claim that they had reached completion

rates of 99% in every state of the country by October 15—better than previous censuses—is

misleading and untrue.  There are, instead, glaring differences between the 2020 Census and previous censuses.  Among other things:

413.  <u>First</u>, the 99% completion metrics are inflated.  Defendants have apparently not included additional housing units identified through NRFU in their calculations, thus keeping the denominator of their "completion" rate artificially low.  Defendants appear to calculate completion percentages by using a total housing unit number of ~149 million—yet the Census Bureau has previously said that the total number of housing units is ~152 million.  If this discrepancy were fixed, the rates for the country overall would, on information and belief, decrease below 99%.

414.  <u>Second</u>, Defendants' "completion" rate, as provided on October 21 by Associate Directors Fontenot and Olson, only relate to occupied housing units and provide no information about any units marked as vacant or delete.  In fact, Defendants have provided no data about the millions of housing units that are marked vacant or deleted from the registry, or even provided the overall number of NRFU housing units marked as vacant or deleted.  On information and belief, Plaintiffs estimate that there are approximately 22,300,000 such units.

415.  <u>Third</u>, Defendants' attempt to limit information about NRFU results appears to be an effort to convey the image that this year's NRFU resulted in numbers equivalent to or better than previous censuses—particularly as to the number of enumerations resolved by in-person interviews.  But in fact:

- **Of the total housing units in the nation** (from Defendants' Master Address File or MAF), which Defendants have stated equal ~152,000,000, Defendants have enumerated *over a quarter*— approximately 27%— through administrative records or proxies only.  This is unprecedented in recent census history: over a quarter of Americans, ***over 41 million households and anywhere from approximately 80 to 100 million people*** (assuming 2-3 persons per housing unit)**,** have not been directly spoken to or from in this 2020 census.

- **Of the total housing units in the NRFU process**, which Defendants have stated equal ~64,000,000, Defendants have conducted in-person household enumeration of only ~36%, compared to ~47% in the 2010 Census.  If Defendants had just matched the 2010 census, it appears that they would have conducted household in-person enumerations of *~7 million more housing units*.

- **Of the total <u>occupied</u> housing units in the NRFU process**, which on information and belief totals ~41,700,000, Defendants have conducted in-person household enumeration of only ~55%, compared to ~75% in the 2010 Census.  If Defendants had just matched the 2010 census, it appears that they would have conducted household in-person enumerations of *~8 million more housing units*. Additionally, it appears that Defendants enumerated far more household units (perhaps millions more) via administrative records then even they had previously estimated or considered—and Defendants have not disclosed how they softened or altered their administrative record protocols and standards to result in such a significant increase.

416.    <u>Fourth</u>, a stream of Census employees have warned the Court that Defendants' completion numbers themselves are riddled with potential problems, ranging from enumerators pressured or told to provide false data or guesswork to enumerations being marked complete on minimal or no visits.  And it is impossible to know just how bad the problem is, as Defendants have not (1) provided any information on the numbers or types of in-person visits, (2) provided any information on the specific sorts of administrative records or proxies used, and in what quantity, or (3) provided any information whatsoever at the local CFS area, which would allow the public and Plaintiffs to assess how Defendants' various efforts at rushing data collections may have led to significant differential undercounts.

### D.    Further Shortening Data Processing Will Compound The Negative and Unlawful Effects of the Replan

417.    Throughout the course of this litigation, Defendants made clear—repeatedly, recently, unequivocally, and under oath—that data-processing operations could not be shortened beyond the three months to which they were compressed under the Replan, and data processing must therefore begin no later than October 1.

418.    Associate Director Fontenot "swore under penalty of perjury that the Census Bureau could not meet the December 31, 2020 statutory deadline if data collection were to extend past September 30, 2020."  Dkt. 288 at 12; *see* Sept. 5 Fonenot Decl. (¶ 100); Declaration of Albert E. Fontenot, Jr. ¶ 107, *La Union del Pueblo Entero v. Trump* (*LUPE*), No. 19-02710 (D. Md.), Dkt. 117-1.  And Defendants' counsel "emphasize[d]" to this Court that "extending the timeline of the count past September 30th would make it impossible for the Bureau to comply with Section 141's statutory deadline."  Dkt. 98 (Sept. 8, 2020 Tr. 9:6-9).  The reason: "the post

1   processing deadlines for the Replan Schedule are tight, and extending the data collection

2   deadline would, of necessity, cause the Census Bureau to fail to be able to process the response

3   data in time to meet its statutory obligations." Dkt. 81-1 ¶ 100.  In short, as Associate Director

4   Fontenot acknowledged, "[w]e have already compressed the post processing schedule from 5

5   months to only 3 months.. . .  We simply cannot shorten post processing beyond the already

6   shortened 3-month period." *Id.*

7        419.    After the Court's preliminary injunction order issued, Defendants changed their

8   position and announced a *new* drop-dead date by which data-processing operations would have

9   to begin: October 6.  But Defendants were just as unequivocal that they could not stay in the

10  field a single day past October 5 and still meet the statutory deadline.  On September 28, the

11  Secretary asked top Bureau officials the following: "I would like to make sure that I understood

12  correctly that your team's opinion is that if we stay in the field beyond October 5, we would not

13  be able to meet the statutory deadline of December 31." Dkt. 256-1.  As Defendants told the

14  Supreme Court, Deputy Director Jarmin's answer was "that the Bureau must 'finish field work

15  on 10/5 if we are to have enough time (assuming all goes well) to finish the processing of the

16  resident population, federally affiliated overseas and, if requested, unlawful aliens in ICE

17  Detention Centers by 12/31 [pursuant to the Presidential Memorandum].'" Appellants' Supp.

18  Br. 4-5, *Trump v. New York,* No. 20-366 (citation omitted).  Defendants similarly told this Court

19  that the Bureau "need[s] to conclude field operations by October 5 in order to keep open the

20  possibility of meeting the deadline Congress set for reporting census figures to the President."

21  Dkt. 284 at 4.

22       420.    Defendants, of course, did *not* begin data-processing operations on October 6.

23  Defendants' statements that that they nonetheless intend to deliver census-based apportionment

24  numbers by December 31 or shortly thereafter, are therefore extremely troubling, and an

25  admission that the numbers will be definition be constitutionally and statutorily infirm.  As

26  Defendants' own statements—and a host of outside experts—make clear, the Bureau cannot

27  accomplish five months of data processing in ten weeks.

28

421.    Defendants also repeatedly claimed that they were obligated to meet the December 31 statutory deadline for reporting apportionment counts to the President.  And they repeatedly relied on this statutory reporting deadline as the only reason for adopting and defending the Replan.

422.    Defendants' recent statements, however, suggest that they no longer view the December 31 deadline as binding.  There are good reasons to think that the new (not yet revealed) target date will depend on the results of the upcoming election.  If President Trump does not win, Plaintiffs believe that the Secretary will ultimately submit his report *after* the December 31 statutory deadline but *before* January 10—so that *this* President is able to implement the Presidential Memorandum and submit that revised apportionment count before he leaves office.  The latest change in position only further confirms that the statutory deadline was mere pretext.  The true motivation for the severely truncated deadlines in the Replan is and has always been a timeline that gives this President control over the final apportionment numbers.

**VIII.    Harm to Plaintiffs.**

423.    Plaintiffs and Plaintiff non-profits' members and/or constituents reside in locales that will suffer harm as a result of Defendants' decision because that decision is very likely to cause these locales to be more disproportionately undercounted in the 2020 Census than they otherwise would have been.

424.    On August 9, 2020, at the beginning of the Non-Response Follow Up operation, Plaintiff City of Los Angeles, had a response rate of just 53.1%, which was significantly lower than the 64.5% statewide response rate in California on that same date.

425.    The Urban League, League of Women Voters, and BAJI have affiliates, constituents, and members in major cities across the United States.  This includes cities where response rates were lower than their corresponding statewide response rates on the first day of Non-Response Follow Up including San Francisco (61.4%) and Monterey (60.5%) as compared to California (64.5%), Miami (49.6%) as compared to Florida (60.1%), Philadelphia (52%) as compared to Pennsylvania (65.5%), Detroit (48.7%) as compared to Michigan (68.9%), and New York City (54.9%) as compared to New York State (58.9%).

426.     Plaintiffs Ellis and Garcia are residents of Houston, Texas.  The response rate in Houston at the beginning of Non-Response Follow Up was 54%, which was lower than the statewide response rate for Texas on that date, 58.2%.

427.     Defendants inappropriate NRFU machinations discussed above have ensured the inadequacy of an actual count.

428.     As noted above, Defendants' decision will result in fewer enumerations through Non-Response Follow Up, increased reliance on low-quality administrative data, and increased imputation.  Consequently, Defendants' decision will result in cities' with higher rates of non-response (1) having less accurate data; and (2) experiencing higher rates of undercounting.

429.     Because these cities have a higher proportion of households in the Non-Response Follow Up universe than their corresponding states, these cities have a substantially higher likelihood of being undercounted because of Defendants' decision than surrounding communities in their states.  These disproportionate undercounts will be exacerbated and reinforced by inadequate data processing, and will ultimately cause Plaintiffs to suffer both fiscal and representational harm.

**A. Funding Harms**

430.     The Replan will result in loss of federal funding for Plaintiffs Harris County, City of Salinas, and the City of Los Angeles and the communities where members of Plaintiff non-profits reside, including Miami, Detroit, Philadelphia and New York.

431.     Over 130 programs and 675 billion dollars are allocated to states and localities on the basis of census-derived information.  This includes funding to states for federal transportation planning purposes, education, and healthcare.

432.     Many important federal programs, including Title I Grants under the Every Student Succeeds Act, require states to distribute funds to localities on the basis of census-derived information.

433.     State Education Agencies must allocate Title I Grants, at least in part, on the number of children aged 5-17 living in poverty in a local education agency's jurisdiction.

434.     Given that members of Plaintiff non-profits reside in cities that are likely to be more undercounted under the Replan relative to surrounding communities in their states, including San Francisco, Miami, Detroit, Philadelphia, and New York City, Defendants' decision will likely deprive the communities where these members reside of Title I Grant funding they would have otherwise received.  Similarly, Defendants' decision places Plaintiffs Ellis and Garcia's community at higher risk of deprivation of Title I Grant funding.

435.     Several additional federal programs require states to use census-derived information to distribute funds directly to cities and counties, based on their share of a relevant population.  For instance, the Low Income Home Energy Assistance Program, the Workforce Innovation and Opportunity Act program, and the Community Services Block Grant Program, all require states to distribute funds to cities and counties, at least in part, on the proportion of a state's low-income residents living in those cities and counties.  This data is derived from information collected during the decennial census.

436.     Both Harris County and the City of Los Angeles receive funds under these programs.  Consequently, disproportionate undercounting of Harris County and the City of Los Angeles, as compared to their states, is likely to result in loss of funds under these and similar programs.

437.     Several federal funding programs provide funding directly to cities and counties based on census-derived information.  For instance, the Community Development Block Grant program, and the Emergency Solutions Grant, allocate funding to cities and counties based, at least in part, on their share of the overall population count relative to other metropolitan areas.

438.     Of cities with over 500,000 people, the City of Los Angeles had the fourth lowest response rate in the country, just behind Detroit and Philadelphia.  Consequently, Los Angeles will likely lose Community Development Block Grant funds because of Defendants' decision.

439.     Similarly, members of Plaintiff non-profits live in major metropolitan areas with some of the lowest response rates in the country, such as Miami, Detroit and Philadelphia.  Defendants' decision will likely deprive these members' communities of funding under the Community Development Block Grant program.

440.    Finally, the allocation of federal transportation including the Surface Transportation Block Grant Program, and the Metropolitan and Statewide Nonmetropolitan Transportation Planning Programs are based on the population of urbanized areas in a state compared to those of other states, as determined by the decennial census.

441.    Plaintiffs Ellis and Garcia regularly drive on highways and roads in Texas. Disproportionate undercounting of urbanized areas in Texas during the 2020 Census will result in reduced transportation funding for Texas under federal transportation programs.

**B.  Representational Harm**

442.    Defendants' decision will also likely result in representational harm to individual Plaintiffs and to the members of Plaintiff organizations.

443.    Plaintiffs Ellis and Garcia reside in Houston, Texas.  In terms of self-response rates, Texas ranks 39th in the United States.  Approximately four million Texas households are in the Non-Response Follow Up universe, which is more households than any state other than California.

444.    Consequently, Defendants' decision will not only cause a substantial undercount in Texas, but that undercount will likely be disproportionate as compared to other states.  Texas will likely be deprived of its fair share of representation in the next congressional apportionment.

445.    As a result, Defendants' decision is likely to result in reduction of voting power and representation for Plaintiffs Ellis and Garcia, because it will likely cause the loss of a seat in Texas, and will result in fewer Representatives spread out over the state of Texas.

446.    As for Plaintiff City of Los Angeles, at least one study has predicted that, were California to lose a congressional seat because of the final census count, that seat is very likely to come from a district that includes portions of South Los Angeles, thus reducing the city's representational delegation.

447.    Defendants' decision will also cause Plaintiff Ellis and members of Plaintiff non-profits to experience a loss of intrastate voting power.

448.    By causing disproportionate undercounting of communities in Houston, Detroit, Philadelphia, and Miami, as compared to their corresponding states, Defendants' decision will

1  result in drawing of district lines that do not accurately represent the population of the state, and

2  disadvantage Plaintiffs Ellis and Garcia, and members of Plaintiff organizations that live in

3  undercounted communities.

4  **C.  Inaccurate Data**

5      449.    Plaintiff local governments will suffer harm from the adverse impact Defendants'

6  decision will have the accuracy of population counts produced by the Census Bureau.  Plaintiff

7  local governments often rely on accurate information collected by the Census Bureau for crucial

8  public planning purposes, including planning for how to respond to emergencies.

9      450.    For example, local governments often rely on a Social Vulnerability Index to

10  identify communities that are at high risk during a particular emergency.  Government officials

11  rely on this index to determine where to allocate resources before and during emergencies.  A

12  Social Vulnerability Index use census data to identify specific populations that may be

13  vulnerable to a particular emergency, including data relating to age, housing density, income

14  status, and race and ethnicity.  Inaccurate census data would make disaster planning and

15  emergency response more difficult, and could disrupt important public programs.

16      451.    In Harris County, officials used the Center for Disease Control's Social

17  Vulnerability Index to inform decisions about proper distribution of COVID-19 Relief Funds.

18  The funds were allocated to provide relief to Harris County residents most impacted by the

19  global pandemic.  That Social Vulnerability Index, which was based on census data, was used to

20  identify census tracts with the most vulnerable residents, and applications from residents from

21  those tracts were prioritized and given higher chances of acceptance for funds.  Without accurate

22  census data, Harris County would struggle to ensure that crucial relief funds were reaching the

23  communities most in need of them.

24      452.    Similarly, King County relies on accurate census data to inform its public-policy

25  decision making.  For instance, the county uses census data to plan public-transit service, and to

26  ensure priority populations have transit access, and to site public health clinics.

27      453.    The low-quality data and undercounting that Defendants' decision will cause will

28  also harm Plaintiffs.  For instance, undercounting of Black, Latino, Native American, and

immigrant communities will negatively affect the Urban League, League of Women Voters and BAJI by undermining these organizations' core missions of promoting equal and just laws and empowering vulnerable communities through building coalitions and initiating campaigns with African Americans and Black immigrants, and fostering racial, economic, and social equality for the communities they serve.

**D. Expending Additional Resources**

454.    Plaintiff organizations, the Urban League, the League of Women Voters, and BAJI, and Plaintiff local governments, City of San Jose, Harris County, King County, City of Salinas, and City of Los Angeles will need to expend additional resources and divert resources from planned programs and projects in order to address the adverse consequences of Defendants' decision to abandon the COVID-19 Plan, and implement the Replan.

455.    Plaintiffs' planned efforts to ensure the effective enumeration of historically undercounted communities were based on the understanding that the Census Bureau would implement the Non-Response Follow Up operation contemplated in the Final Operational Plan and adjusted in the COVID-19 Plan.

456.    The abrupt reversal of the COVID-19 Plan, and the implementation of curtailed Non-Response Follow Up in the Bureau's Replan will adversely affect Plaintiffs' plans.

457.    Plaintiff organizations and local governments will likely need to adjust plans, and divert resources from other planned activities and programs in order to ensure the communities they serve are adequately counted.  Specifically, Plaintiffs will need to recruit and train staff to engage in increased and expanded outreach to potential non-responsive households in order to make up for fewer enumerator visits, or to other aspects of the Non-Response Follow Up program, such as the reinterview process.

458.    For instance, Plaintiff BAJI is planning significant adjustments to its 2020 Census outreach plans in light of Defendants' decision, that include diversion of resources from other sources, and significant expenditures.  In order to engage in effective outreach, BAJI needs organizing staff dedicated to civic engagement.  With Non-Response Follow Up occurring from August 11, 2020 through October 31, 2020, BAJI anticipated that it could spread its staffing

resources over that timeframe to ensure it was meeting its goals within the organization's budget. However, on a shorter timeframe, BAJI needs additional staff on a shorter timeframe, which will require adjusting the organization's budget and priorities for the next several months.

459.    The adjustment is also challenging for BAJI as the organization caters to immigrant communities with a variety of language needs.  Increasing staffing on a short timeframe poses significant challenges for the organization, because it must locate staff that can communicate with the particular community that the organization is targeting for outreach efforts.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of the Enumeration Clause, and Fourteenth Amendment**
**(U.S. Const. art.  I, § 2; U.S. Const. amend.  XIV, § 2)**

460.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

461.    Under the Enumeration Clause of the U.S. Constitution, Congress, and, by delegation, the Secretary of Commerce, must conduct an "actual Enumeration" of the population. This clause requires that decisions relating to census-taking bear "a reasonable relationship to the accomplishment of an actual enumeration of the population."  *Wisconsin v. City of N.Y.*, 517 U.S. 1, 20 (1996).

462.    The COVID-19 pandemic severely disrupted the 2020 Census, resulting in months of suspended operations and significant delays in crucial counting processes.  Moreover, the public-health crisis, which is unabated and appears to be in resurgence, has continued to impact census operations.

463.    To navigate this emergency, the Bureau took necessary action to adjust its operational timelines in the COVID-19 Plan while seeking to maintain the operations and processes included in the Final Operational Plan that had been designed to help ensure a complete and accurate count.

464.    Abruptly and without explanation, on August 3, 2020, Defendants abandoned the COVID-19 Plan and implemented the Replan.  The Replan does not bear "a reasonable

1    relationship to the accomplishment of an actual enumeration of the population."  After delaying

2    all operations for months, the Bureau and its staff repeatedly recognized that it was impossible to

3    produce counts consistent with their duties to ensure a full, fair, and accurate count by

4    December 31, 2020.  Indeed, current conditions demonstrate that it is infeasible to obtain a fair

5    and accurate count by the end of the year.  Nevertheless, the Defendants abandoned their

6    constitutionally mandated pursuit of fair and accurate data, in favor of the speed of the Replan,

7    and the inaccurate data it will produce.

8         465.    Under these circumstances, the decision to curtail crucial 2020 Census operations

9    violates the Enumeration Clause of the United States Constitution.

10        466.    These constitutional violations have caused, are causing, and will continue to

11   cause harm to Plaintiffs as alleged above, and there is a substantial likelihood that the requested

12   relief will redress this harm.

**SECOND CLAIM FOR RELIEF**
**Violation of Administrative Procedure Act—Arbitrary and Capricious**
**(5 U.S.C. § 706(2)(A))**

15        467.    Plaintiffs incorporate by reference the allegations set forth in the preceding

16   paragraphs.

17        468.    The APA, 5 U.S.C. § 706(2), provides that a court shall hold unlawful and set

18   aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

19   accordance with law.  The Replan is final agency action because it marks the consummation of

20   the agency's decision-making process, and it is one by which rights or obligations have been

21   determined, or from which legal consequences will flow.  *Bennett v. Spear,* 520 U.S. 154, 177-78

22   (1997).

23        469.    In determining whether an action violates the APA, courts consider whether the

24   agency examined relevant data and articulated a satisfactory explanation for its decision,

25   including formulating a rational connection between the facts found and the choice made.  *Motor*

26   *Vehicle Mfrs.  Ass'n of U.S., Inc. v. State Farm Mut.  Auto.  Ins.  Co.*, 463 U.S. 29, 43 (1983).

27   Where an agency wishes to depart from an earlier decision, it must acknowledge that change and

28

1    any reliance interests its previous actions engendered.  *See Perez v. Mortg.  Bankers Ass'n*, 575

2    U.S. 92, 105-06 (2015).

3        470.     The Bureau spent several years developing its Final Operational Plan for the 2020

4    Census.  That plan carefully determined the required length of each operation, including the

5    appropriate length for data-collection and data-processing.  It also included details about the

6    implementation of the various operations.

7        471.     The COVID-19 pandemic disrupted census operations, and the Bureau responded

8    by adjusting its operations in its COVID-19 Plan.  That plan involved retaining the details and

9    the length of time of various operations laid out in the Final Operational Plan, but shifting the

10    timeline for counting several months into the future to account for both the necessity of those

11    operations and the public-health emergency.

12        472.     The Bureau began implementing the plan, and critical operations were suspended

13    and delayed through the summer.  Bureau officials publicly and expressly recognized that it was

14    no longer possible to comply with the December 31, 2020 deadline if the Bureau intended to

15    fulfill its constitutional and statutory obligation of producing reasonably accurate population

16    counts.

17        473.     Without explanation and without citing any evidence, Defendants suddenly

18    changed their position and issued a new plan with shortened timelines.  Among other things, that

19    change conclusively changed the legal rights and obligations of private households, who now

20    have substantially less time to respond if they wish to be counted in the 2020 Census.

21    Defendants have provided no evidence to support rescinding the COVID-19 Plan, have failed to

22    acknowledge or explain their departure from their previous conclusions as to the length of time

23    necessary for an accurate census, and have cited no evidence that they could obtain accurate

24    counts on the shortened timeframe.  Defendants' unexplained and unjustifiable reversal is

25    precisely the sort of arbitrary and capricious agency action that the Administrative Procedure Act

26    forbids.

27        474.     Defendants' decision also fails to account for several factors relevant to the

28    decision, including the multiple-month long suspension in operations and delay of crucial census

1    operations, the staffing shortages facing the Bureau, the meticulously designed and tested

2    technical requirements for effective enumeration included in the Bureau's Final Operational

3    Plan, and the various quality-control measures the Bureau must engage in to ensure that its

4    reported data is accurate.

5         475.    Consequently, Defendants' action is arbitrary and capricious.

6         476.    This unlawful action has caused, is causing, and will continue to cause harm to

7    Plaintiffs as alleged above, and there is a substantial likelihood that the requested relief will

8    redress this harm.

## THIRD CLAIM FOR RELIEF
### Violation of Administrative Procedure Act—Pretext
### (5 U.S.C. § 706)

11        477.    Plaintiffs incorporate by reference the allegations set forth in the preceding

12   paragraphs.

13        478.    Under the Administrative Procedure Act, agencies are required to disclose the

14   "genuine justification[] for important decisions." *Dep't of Commerce*, 139 S. Ct. at 2569, 2575-

15   76.  Courts will not accept "contrived reasons" provided by agencies as that would defeat the

16   purpose of judicial review.  *Id*. at 2576.  Moreover, agencies cannot simply avoid providing

17   reasoning for their decision-making altogether.

18        479.    Defendants have decided to cut crucial operations in order to produce 2020

19   Census population results to the President by December 31, 2020.  In announcing that decision,

20   Defendants provided no legitimate justification for abandoning the COVID-19 Plan and

21   implementing the Replan.

22        480.    Any attempt by the Defendants to rely on the reporting deadline provided under

23   the Census Act as justification for their decision is mere pretext. 13 U.S.C § 141(b).

24        481.    For months, Defendants implemented the COVID-19 Plan, the timeline for which

25   necessarily assumed the statutory deadlines could not defeat the constitutional duty to conduct an

26   accurate enumeration, as applied to the extraordinary circumstances at hand.  Defendants made

27   significant adjustments, including months-long delays of census operations, on the assumption

28   that the Bureau could and would conduct a full and robust count through the end of October 31,

1    2020.  Since mid-April 2020, Defendants have expressly and publicly recognized that the Bureau

2    could not provide a complete and accurate count by December 31, 2020.  And President Trump

3    maintained that the statutory deadlines need not be followed.

4          482.    Defendants' reversal of position on the 2020 Census timeline appears driven by

5    Defendants' efforts to ensure implementation of the President's unconstitutional Apportionment

6    Exclusion Order, which attempts to exclude undocumented persons from the apportionment

7    count and continues a long-running pattern of racially discriminatory and improperly politically

8    motivated conduct of the 2020 Census.

9          483.    In light of these considerations, Defendants' purported justification is pretextual

10   and, thus, arbitrary and capricious under the Administrative Procedure Act.

11         484.    Defendants' unlawful action has caused, is causing, and will continue to cause

12   harm to Plaintiffs as alleged above, and there is a substantial likelihood that the requested relief

13   will redress this harm.

## **PRAYER FOR RELIEF**

15         485.    Plaintiffs respectfully request that this Court:

16         486.    Declare that Defendants' promulgation of the Replan, and corresponding

17   revocation of the COVID-19 Plan is unconstitutional under the Enumeration Clause, and

18   unlawful under the Administrative Procedure Act.

19         487.    Vacate the Replan, thereby reinstating the COVID-19 Plan.

20         488.    Enjoin Defendants from implementing or effectuating the Replan or its

21   constituent parts and enjoin Defendants from unlawfully interfering with the implementation or

22   effectuation of the COVID-19 Plan or its constituent parts.

23         489.    Award Plaintiffs costs, expenses, and reasonable attorneys' fees.

24         490.    Award any other relief the Court deems just and proper.

1

Dated: October 27, 2020

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LATHAM & WATKINS** LLP

By:  */s/ Sadik Huseny*
Steven M. Bauer (Bar No. 135067)
steven.bauer@lw.com
Sadik Huseny (Bar No. 224659)
sadik.huseny@lw.com
Amit Makker (Bar No. 280747)
amit.makker@lw.com
Shannon D. Lankenau (Bar. No. 294263)
shannon.lankenau@lw.com
**LATHAM & WATKINS** LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone:  415.391.0600
Facsimile:  415.395.8095

Richard P. Bress (*pro hac vice*)
rick.bress@lw.com
Melissa Arbus Sherry (*pro hac vice*)
melissa.sherry@lw.com
Anne W. Robinson (*pro hac vice*)
anne.robinson@lw.com
Tyce R. Walters (*pro hac vice*)
tyce.walters@lw.com
Gemma Donofrio (*pro hac vice*)
gemma.donofrio@lw.com
**LATHAM & WATKINS** LLP
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Telephone:  202.637.2200
Facsimile:  202.637.2201

*Attorneys for Plaintiffs National Urban League;*
*League of Women Voters; Black Alliance for*
*Just Immigration; Harris County, Texas; King*
*County, Washington; City of San Jose,*
*California; Rodney Ellis; Adrian Garcia; and*
*the NAACP*

1

2      Dated: October 27, 2020                    By: /s/ Jon M. Greenbaum
                                                      Kristen Clarke (*pro hac vice*)
3                                                     kclarke@lawyerscommittee.org
                                                      Jon M. Greenbaum (Bar No. 166733)
4                                                     jgreenbaum@lawyerscommittee.org
                                                      Ezra D. Rosenberg (*pro hac vice*)
5                                                     erosenberg@lawyerscommittee.org
                                                      Ajay Saini (*pro hac vice*)
6                                                     asaini@lawyerscommitee.org
                                                      Maryum Jordan (Bar No. 325447)
7                                                     mjordan@lawyerscommittee.org
                                                      Pooja Chaudhuri (Bar No. 314847)
8                                                     pchaudhuri@lawyerscommittee.org
9                                                     **LAWYERS' COMMITTEE FOR CIVIL**
                                                      **RIGHTS UNDER LAW**
10                                                    1500 K Street NW, Suite 900
                                                      Washington, DC 20005
11                                                    Telephone:  202.662.8600
                                                      Facsimile:  202.783.0857
12

13                                                    *Attorneys for Plaintiffs National Urban League;*
                                                      *City of San Jose, California; Harris County,*
14                                                    *Texas; League of Women Voters; King County,*
                                                      *Washington; Black Alliance for Just*
15                                                    *Immigration; Rodney Ellis; Adrian Garcia; the*
                                                      *NAACP; and Navajo Nation*
16

17                                                    Wendy R. Weiser (*pro hac vice*)
                                                      weiserw@brennan.law.nyu.edu
18                                                    Thomas P. Wolf (*pro hac vice*)
                                                      wolft@brennan.law.nyu.edu
19                                                    Kelly M. Percival (*pro hac vice*)
                                                      percivalk@brennan.law.nyu.edu
20                                                    **BRENNAN CENTER FOR JUSTICE**
                                                      120 Broadway, Suite 1750
21                                                    New York, NY 10271
                                                      Telephone: 646.292.8310
22                                                    Facsimile: 212.463.7308

23                                                    *Attorneys for Plaintiffs National Urban League;*
                                                      *City of San Jose, California; Harris County,*
24                                                    *Texas; League of Women Voters; King County,*
                                                      *Washington; Black Alliance for Just*
25                                                    *Immigration; Rodney Ellis; Adrian Garcia; the*
                                                      *NAACP; and Navajo Nation*
26

27

28

1

2                            Mark Rosenbaum (Bar No. 59940)

3                            mrosenbaum@publiccounsel.org
**PUBLIC COUNSEL**

4                            610 South Ardmore Avenue
Los Angeles, California 90005

5                            Telephone:  213.385.2977
Facsimile:  213.385.9089

6                            *Attorneys for Plaintiff City of San Jose*

7

8                            Doreen McPaul, Attorney General
dmcpaul@nndoj.org

9                            Jason Searle (admitted *pro hac vice*)
jasearle@nndoj.org

10                          **NAVAJO NATION DEPARTMENT OF JUSTICE**

11                          P.O. Box 2010
Window Rock, AZ 86515

12                          Telephone: (928) 871-6345

13                          *Attorneys for Navajo Nation*

14 Dated: October 27, 2020       By: /s/ Danielle Goldstein
Michael N. Feuer (Bar No. 111529)

15                          mike.feuer@lacity.org
Kathleen Kenealy (Bar No. 212289)

16                          kathleen.kenealy@lacity.org
Danielle Goldstein (Bar No. 257486)

17                          danielle.goldstein@lacity.org
Michael Dundas (Bar No. 226930)

18                          mike.dundas@lacity.org
**CITY ATTORNEY FOR THE CITY OF**

19                          **LOS ANGELES**

20                          200 N. Main Street, 8th Floor
Los Angeles, CA 90012

21                          Telephone: 213.473.3231
Facsimile: 213.978.8312

22                          *Attorneys for Plaintiff City of Los Angeles*

23 Dated: October 27, 2020       By: /s/ Michael Mutalipassi
Christopher A. Callihan (Bar No. 203010)

24                          legalwebmail@ci.salinas.ca.us
Michael Mutalipassi (Bar No. 274858)

25                          michaelmu@ci.salinas.ca.us
**CITY OF SALINAS**

26                          200 Lincoln Avenue

27                          Salinas, CA 93901
Telephone: 831.758.7256

28                          Facsimile: 831.758.7257

*Attorneys for Plaintiff City of Salinas*

Dated: October 27, 2020

By: */s/ Rafey S. Balabanian*
Rafey S. Balabanian (Bar No. 315962)
rbalabanian@edelson.com
Lily E. Hough (Bar No. 315277)
lhough@edelson.com
**EDELSON P.C.**
123 Townsend Street, Suite 100
San Francisco, CA 94107
Telephone: 415.212.9300
Facsimile: 415.373.9435

Rebecca Hirsch (*pro hac vice*)
rebecca.hirsch2@cityofchicago.org
**CORPORATION COUNSEL FOR THE
CITY OF CHICAGO**
Mark A. Flessner
Stephen J. Kane
121 N. LaSalle Street, Room 600
Chicago, IL 60602
Telephone: (312) 744-8143
Facsimile: (312) 744-5185

*Attorneys for Plaintiff City of Chicago*

Dated: October 27, 2020

By: */s/ Donald R. Pongrace*
Donald R. Pongrace (*pro hac vice*)
dpongrace@akingump.com
**AKIN GUMP STRAUSS HAUER & FELD
LLP**
2001 K St., N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: 202-887-4288

Dario J. Frommer (Bar No. 161248)
dfrommer@akingump.com
**AKIN GUMP STRAUSS HAUER & FELD
LLP**
1999 Avenue of the Stars, Suite 600
Los Angeles, CA  90067-6022
Phone:  213.254.1270
Fax: 310.229.1001

*Attorneys for Plaintiff Gila River Indian
Community*

Dated: October 27, 2020

By: _/s/ David I. Holtzman_
David I. Holtzman (Bar No. 299287)
David.Holtzman@hklaw.com
**HOLLAND & KNIGHT LLP**
Daniel P. Kappes
Jacqueline N. Harvey
50 California Street, 28th Floor
San Francisco, CA 94111
Telephone: (415) 743-6970
Fax: (415) 743-6910

*Attorneys for Plaintiff County of Los Angeles*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTESTATION**

I, Sadik Huseny, am the ECF user whose user ID and password authorized the filing of this document.  Under Civil L.R. 5-1(i)(3), I attest that all signatories to this document have concurred in this filing.

Dated: October 27, 2020

**LATHAM & WATKINS** LLP

By:  */s/ Sadik Huseny*
Sadik Huseny

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

100

CASE NO. 20-CV-05799-LHK
SECOND AMENDED COMPLAINT