# EXHIBIT 3

1

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1                    NOTICE

2        PLEASE READ BEFORE USING REALTIME ROUGH DRAFT

3     THIS IS A REALTIME ROUGH DRAFT TRANSCRIPT.  IT

4     IS NOT CERTIFIED BY THE DEPOSITION OFFICER,

5     PURSUANT TO THE ILLINOIS SUPREME COURT RULES.

6     IT MAY NOT BE USED, CITED, OR TRANSCRIBED AS A

7     CERTIFIED TRANSCRIPT OF THE DEPOSITION

8     PROCEEDINGS.  THE ROUGH DRAFT TRANSCRIPT MAY NOT

9     BE CITED OR USED IN ANY WAY OR AT ANY TIME TO

10    REBUT OR CONTRADICT THE CERTIFIED TRANSCRIPT OF

11    THE DEPOSITION PROCEEDINGS AS PROVIDED BY THE

12    DEPOSITION OFFICER.

13        BY ACCEPTING A ROUGH DRAFT TRANSCRIPT, I AM

14    ORDERING A FINAL CERTIFIED TRANSCRIPT.  I AGREE

15    NOT TO SHARE, GIVE, COPY, SCAN, FAX, OR IN ANY

16    WAY DISTRIBUTE THE REALTIME ROUGH DRAFT IN ANY

17    FORM (WRITTEN OR COMPUTERIZED) TO ANY PARTY.

18        HOWEVER, MY OWN EXPERTS, CO-COUNSEL, CLIENTS

19    AND STAFF MAY HAVE INTERNAL USE OF THE SAME WITH

20    THE UNDERSTANDING THAT I AGREE TO DESTROY ALL

21    REALTIME ROUGH DRAFTS AND/OR/COMPUTERIZED FORMS,

22    IF ANY, AND REPLACE SAME WITH THE FINAL

23    TRANSCRIPT AND/OR COMPUTERIZED FORM, UPON IT'S

24     COMPLETION.

25

                    UNCERTIFIED ROUGH DRAFT - T. ADAMS

1          THE VIDEOGRAPHER:  We're now on the record.

2     Here begins tape number one in the videotaped

3     deposition of Tamara Adams.  It's taken in the

4     matter of National Urban League, et al, versus

5     Wilber L. Ross, Jr., et al.

6          Today's date, December 17, 2020.  The

7     time on the video monitor is 9:42 a.m. Eastern

8     Standard Time.  My name is Armando Forte.  I am

9     the videographer representing Planet Depos.

10         All parties are attending this

11    deposition remotely.  Will counsel please

12    identify themselves and who they represent?

13    Ms. Robinson.

14         MS. ROBINSON:  Sure.  My name is Anne

15    Robinson from Latham & Watkins, counsel for

16    plaintiffs.  With me today are Shannon Lankenau

17    and Amit Makker also from Latham & Watkins.

18         THE VIDEOGRAPHER:  Mr. Sverdlov.

19         MR. SVERDLOV:  Morning.  Alexander Sverdlov

20    from the U.S. Department of Justice Civil

21    Division representing the defendants in this

22   action and the Census Bureau in this deposition.

23   With me are a number of my colleagues from the

24   U.S. Department of Justice and the Commerce

25   Department whose names I believe have been read

3

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    prior to the opening of this transcript.

2         THE VIDEOGRAPHER:  Other appearances will be

3    noted on the transcript.  Our court reporter for

4    today is Cheryl Sandecki representing Planet

5    Depos.  She will now swear or affirm the witness

6    and we will proceed.

7         THE COURT REPORTER:  Ma'am, please raise your

8    hand.

9                   (Witness administered an oath.)

10                    TAMARA ADAMS,

11   having been first administered an oath, was

12   examined and testified as follows:

13        THE VIDEOGRAPHER:  Please begin.

14                      EXAMINATION

15   BY MS. ROBINSON:

16        Q.   Great.  Good morning, Ms. Adams.  Thank

17   you so much for joining us today.

18        A.   You bet.

19        Q.   So I'll just start with a few

20    introductory questions and some basic ground

21    rules to begin before jumping into more

22    substantive questions.

23         So can you please state your name for

24    the record one more time?

25         A.   Tamara Adams.

                                              4
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     Q.   And what is your current business

2     address?

3     A.   4600 Silver Hill Road, Suitland,

4     Maryland.

5     Q.   And what's your job title?

6     A.   Mathematical statistician.

7     Q.   For the Census Bureau?

8     A.   At the Census Bureau, yes.

9     Q.   Okay.  And how long have you had that

10    position?

11    A.   I've been at census for 22 years; in my

12    current position for two.

13    Q.   What position did you hold before that?

14    A.   I have been a mathematical statistician

15    since.

16    Q.   I'm sorry.  Since -- were you going to

17    give a year?

18      A.   1998.

19      Q.   Okay.  But what was your job title

20   prior to the one you currently have?

21      A.   My job title has remained similar.  I

22   have changed positions within the Bureau.

23      Q.   So what position did you hold before

24   your current position?

25      A.   The same job in a different division of

5

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1   the Bureau.

2      Q.   So what division are you in now and

3   what division were you in previously?

4      A.   I was in the research and methods

5   director before.  I'm now in decennial.

6      MR. SVERDLOV:  I'm sorry.  I just need to

7   state an objection on the record.  Objection,

8   compound.

9      MS. ROBINSON:  Okay.

10   BY MS. ROBINSON:

11      Q.   Have you ever taken a deposition

12   before?

13      A.   No.

14      Q.   This is your first time being deposed?

15      A.   Yes.

16      Q.   Okay.  And you understand that even

17   though you're in your house, not in a courtroom,

18   that you're under oath today and need to testify

19   truthfully?

20      A.   Yes.

21      Q.   Okay.  And I'm sure counsel discussed

22   this with you.  But there's a just a few basic

23   ground rules we say before all depositions so

24   I'll just go over them now.

25           If you don't understand a question,

                                                    6
                 UNCERTIFIED ROUGH DRAFT - T. ADAMS

 1   please ask me.  If you answer a question, I will

 2   assume you understood it.

 3      MR. SVERDLOV:  Objection, misleading.

 4   BY MS. ROBINSON:

 5      Q.   We have a court reporter who is taking

 6   down everything we say.  And to make it easier

 7   for her, please let me finish my question before

 8   you start answering the question.  And I will

 9   let you finish your answers before I begin

10   asking the next question.

11           Does that make sense?

12      A.   Yes.

13      Q.   Great.  If your attorney objects to my

14    question like Mr. Sverdlov just did, you must

15    still answer it unless he specifically instructs

16    you not to.

17            Does that make sense?

18    A.    Yes.

19    Q.    Is there any reason you cannot provide

20    truthful and complete testimony today?

21    A.    No.

22    Q.    Are you on any medications that would

23    affect your ability to give testimony today?

24    A.    No.

25    Q.    Great.  So if at any point you need a

                                                    7
            UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    break, please let me know and we will take a

2    break.  However, if there is a pending question

3    before you, if I've asked a question, please

4    answer it before asking for the break.

5    A.    Okay.

6    Q.    And one final thing about the breaks is

7    please, and this is kind of a reminder to you

8    and to everyone on the call here, given we have

9    such a large group, please do not discuss the

10    substance of your testimony with anyone during

11    the breaks.  So that can either be testimony

12    you've already given or what you might give in

13    the future.

14         A.   Okay.

15         Q.   Is that clear?

16         A.   Yes.

17         Q.   Okay.  Great.  So I'm going to now turn

18    to a few questions about the preparation for the

19    deposition today.  When did you first learn

20    about this litigation?

21         A.   Several months ago.

22         Q.   Okay.  And what has your involvement

23    been prior to preparing for this deposition in

24    the litigation?

25         A.   Minimal.  I've likely given information

                                                    8
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     for others at the Bureau to use.

2          Q.   What type of information?

3          A.   Answers to questions that I may have

4     been asked.

5          Q.   On what topics?

6          A.   Data collection.

7          MR. SVERDLOV:  Objection, beyond the scope.

8          MS. ROBINSON:  I'm not asking this in her

9     30(b)(6) capacity.  I'm just trying to get a

10    sense for what the witness knows and doesn't

11    know with the litigation.

12        MR. SVERDLOV:  So in light of my objection,

13    the witness will answer in her personal

14    capacity.

15        MS. ROBINSON:  That's fine.

16    BY MS. ROBINSON:

17        Q.   So I'm sorry, you were saying,

18    Ms. Adams, questions about data sets?

19        A.   Our data collection, operations and

20    systems.

21        Q.   For the census or your data collection

22    for producing information in the litigation?

23        A.   For the census.

24        Q.   Okay.  Thank you.  If we -- if we could

25    bring up Exhibit 1, please, which is the amended

                                                    9
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    deposition notice.

2        TECHNICIAN WERT:  Sure.  Stand by one moment.

3    And mark this as Exhibit 1, Counsel; is that

4    correct?

5        MS. ROBINSON:  Oh, yes, thank you.

6        TECHNICIAN WERT:  Sure thing.

7                    (Whereupon, Adams Deposition

8                     Exhibit 1 was marked for

9                     identification.)

10       TECHNICIAN WERT:  Exhibit 1 is on screen now.

11   BY MS. ROBINSON:

12       Q.   Ms. Adams, can you see that okay --

13       A.   Yes.

14       Q.   -- that document?  Okay.  I believe

15   you've seen this before.  This is the amended

16   deposition notice?

17       A.   Yep.  Can you scroll down, please?

18       Q.   Yes.  Yeah, and if you could actually

19   keep scrolling down until we get to the topics

20   page.  Perfect.

21            Okay.  So have you seen this document

22   before?

23       A.   Yes.

24       Q.   And you've reviewed it?

25       A.   Yes.

                                        10
                 UNCERTIFIED ROUGH DRAFT - T. ADAMS

1        Q.   And you generally understand the topics

2    listed here?

3        A.   Yes.

4        Q.   Great.  So for the questions I ask

5    today on those topics I will assume that you are

6      answering on behalf of the defendants unless you

7      indicate otherwise.

8              Does that make sense?

9      MR. SVERDLOV:  Objection, misleading and also

10     inconsistent with the notice and our

11     representations that this witness is being

12     proffered on behalf of the Census Bureau.

13     BY MS. ROBINSON:

14     Q.   You may answer.

15     A.   Can you ask your question again?

16     Q.   Yeah, sure.  So for the questions --

17     yeah.  So for the questions that I ask you

18     today, I'll, you know, say that in relation to

19     the topics that you are testifying on today as

20     opposed to the next witness, your answers will

21     be on behalf of the defendants unless you

22     indicate others.

23     A.   My answers are on behalf of the Census

24     Bureau only.

25     Q.   Okay.  Great.

                                              11
                  UNCERTIFIED ROUGH DRAFT - T. ADAMS

1              So looking at topic number one first,

2      the Census Bureau's retention, organization and

3      management of documents.

4      A.   Yes.

5      Q.   Did you prepare to testify about this

6  topic today?

7      A.   Yes.

8      Q.   What did you do to prepare testifying

9  on this topic?

10      A.   Reviewed documents that have been

11  provided as part of the collection efforts and

12  discussed them with counsel.

13      Q.   Okay.  How long were your meetings with

14  counsel, approximately, and how many were there?

15      A.   We met Tuesday and Wednesday, probably

16  six hours each day.

17      Q.   Okay.  Were those meetings in person,

18  virtual?

19      A.   Virtual.

20      Q.   Did you take any notes during those

21  meetings?

22      A.   No.

23      Q.   Did you review any documents other than

24  what has already been produced this morning?

25      A.   No.

                                              12
              UNCERTIFIED ROUGH DRAFT - T. ADAMS


1      Q.   Did you speak to anyone other than

2      those meetings with counsel?

3           A.   No.

4           MR. SVERDLOV:  Objection, vague.

5      BY MS. ROBINSON:

6           Q.   Okay.  So moving on to topic two, did

7      you prepare to testify today about topic two?

8           A.   Yes.

9           Q.   Did you use the same preparation

10     process we just discussed for topic one?

11          A.   Yes.

12          Q.   Did you do anything in addition to that

13     preparation process?

14          MR. SVERDLOV:  Objection, vague.

15          THE WITNESS:  No, no.

16     BY MS. ROBINSON:

17          Q.   Okay.  Are you prepared today to

18     testify about topic three?

19          A.   Yes.

20          Q.   And did you prepare for it in the same

21     way you prepared for topics one and two?

22          A.   Yes.

23          Q.   Did you talk to anybody outside of

24     counsel to prepare for topic three?

25          MR. SVERDLOV:  Objection, vague.  And to the

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    extent that -- to the extent that this question

2    verges into the nature and substance of the

3    preparations that the witness had with counsel,

4    I will instruct the witness not to answer.

5        MS. ROBINSON:  Just to be clear, I said

6    outside of counsel.  So I'm not asking about

7    what was discussed with counsel.  I'm asking if

8    she spoke with anybody to prepare for topic

9    three beyond speaking with counsel.

10       MR. SVERDLOV:  I will -- I will maintain the

11   same objection.  I will instruct the witness to

12   answer to the extent she had any meetings or

13   conversations where counsel was not also

14   present.

15       THE WITNESS:  I did not have any meetings

16   where counsel was not present.

17   BY MS. ROBINSON:

18       Q.   For the meetings with counsel, who else

19   was present?

20       A.   Can you clarify?

21       Q.   Sure.  So you met with counsel to

22   prepare for this deposition today, correct?

23       A.   Correct.

24       Q.   Who was at those meetings?  Can you

25     just give me the names, please?

                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     A.    Yeah, let me think.

2     Q.    Sure.  Take your time.

3     A.    Hold on.  Kathleen Styles.

4     Q.    Okay.

5     A.    And then we asked several people to

6     join us.  James Christy, Marianne Chapin, David

7     Ragland.

8     Q.    Okay.  And then who -- what counsel was

9     there?  Mr. Sverdlov?

10    A.    Yes.

11    Q.    Anyone else?

12    A.    A whole series of attorneys from DOJ

13    and commerce whose names I do not know.  I'm

14    sorry.

15    Q.    Understood.  No problem at all.

16    A.    There's a lot of people on that list.

17    Q.    Right.  That same group was at the

18    meeting both days; is that right?

19    MR. SVERDLOV:  Objection, misleading.

20    THE WITNESS:  To the extent that I can

21    recognize voices on the phone, yes.

22    BY MS. ROBINSON:

23     Q.   Okay.  Thank you.

24          Okay.  And just to clarify, you will

25     not be testifying today on topics four, five,

15

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     and six, correct?

2          A.   Correct.

3          Q.   Okay.  Great.  Thank you.  That's all

4     with this exhibit, if you wouldn't mind taking

5     it down.  Great.

6          So Ms. Adams, now I'm going to turn to

7     a few questions about the data and organization

8     of data at the Census Bureau.

9          A.   Sure.

10         Q.   So perhaps it makes sense to start at a

11    high level.  Can you please provide an overview

12    of the Census Bureau's data systems including

13    the data information that is accessible on those

14    systems that is related to the census?

15         MR. SVERDLOV:  Objection.  Vague and

16    compound.

17         THE WITNESS:  All right.  So let's break that

18    down quite a bit.  So I think the first thing

19    you asked are about the data systems at the

20    Census Bureau, correct?

21    BY MS. ROBINSON:

22         Q.   Uh-huh.

23         A.   Okay.  You've been provided with a

24    slide deck that lists out the 52 systems that

25    the census uses to collect decennial data and

                                                    16
                   UNCERTIFIED ROUGH DRAFT - T. ADAMS

 1    process.  Within those 52 systems, we accomplish

 2    all of the tasks we need to do to collect and

 3    process data, hire our staff, pay them.

 4              Each of those systems has some method

 5    of storing the data, if necessary.  Let's see,

 6    so you asked about the systems.  You asked about

 7    the data that are underneath them, correct?

 8         Q.   Yes.  We can go through the 52 if that

 9    is a more organized fashion to proceed in.

10         A.   No, we don't need to go through -- if

11    you'd like to go through each of the 52 systems

12    we can, but if I remember your question right,

13    you asked about the systems that we have and the

14    data that we store within them.

15         Q.   Uh-huh.

16         A.   Okay.  For those 52 systems, where

17    appropriate, we have some sort of data -- some

18    sort of mechanism with which we store data.

19    Often it is a database, sometimes it's a

20    different method.

21         For the relevant systems that we have

22    discussed in the last few days, each of those

23    systems has one or many databases that underlie

24    that system that store our data.

25         MS. ROBINSON: If we could please pull up

                                                        17
                UNCERTIFIED ROUGH DRAFT - T. ADAMS


1    Exhibit 2.

2                        (Whereupon, Adams Deposition

3                         Exhibit 2 was marked for

4                         identification.)

5         TECHNICIAN WERT:  Stand by one moment.

6    BY MS. ROBINSON:

7         Q.   So Ms. Adams, as he is pulling that up,

8    I have not reviewed the documents that you --

9    your counsel produced this morning.  But I do

10   have the list of 52 from a PMR deck here so I do

11   think, just so we're all talking about the same

12   thing, given how technical this topic is, I just

13   think it might be helpful to have the names up,

14   if that makes sense.

15        A.   Absolutely.

16        Q.   Great.  So if we can scroll down to,

17     it's page 147 on the bottom of the screen there.

18     There we go.  Great.

19          So if I could ask some questions about

20     some specific systems as they are called on this

21     slide.

22     A.   Sure.

23     Q.   Great.  So -- well, as an initial

24     matter, I'll ask a few larger topic questions

25     and we can scroll through.  There's just a

                                                    18
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1      couple pages of these.

2           My first question is, are all of these

3      52 systems being used currently?

4      MR. SVERDLOV:  Objection, vague, compound,

5      and I will also object on the basis of

6      foundation since counsel is referencing a

7      document and we are not clear what the

8      provenance of that document is.

9      BY MS. ROBINSON:

10     Q.   Ms. Adams, you can go ahead and answer

11     the question.

12     A.   Okay.  Let's go ahead and scroll -- can

13     you scroll through each of them?  Let me take a

14     look at them real quick.

15      Q.   Sorry, there we go.  And you can also

16   ask for control, Ms. Adams, so you can actually

17   scroll through this at your leisure just to make

18   sure that it's the right list.

19      A.   Okay.  So some of these systems have

20   since been decommissioned.

21      Q.   Uh-huh.

22      A.   Because they're no longer in use for

23   our data collection.

24      Q.   Yeah.  So which of the 52 are, in fact,

25   not being used?

                                              19
                 UNCERTIFIED ROUGH DRAFT - T. ADAMS

1       A.   We can get that information for you.  I

2    can't produce a list off the top of my head.

3       Q.   So sitting here today, you're not able

4    to testify about which specific systems are in

5    use currently at the Census Bureau?

6       MR. SVERDLOV:  Objection, misleading.

7    BY MS. ROBINSON:

8       Q.   You can answer.

9       A.   Correct.  We would need to gather a

10   list of those.

11      Q.   Okay.  Can you tell me which systems

12   are in use, to the best of your knowledge?

13          A.   I can get -- if we want to know which

14     systems aren't in use, we can get that list.   If

15     I don't know which once aren't in use, I can't

16     know totally which ones are; it's just the

17     converse.

18          Q.   Okay.  Do you know, for example, if

19     number seven, the Census Data Lake is in use?

20          A.   Yes, it is.

21          Q.   Which other systems do you know are in

22     use today?

23          A.   Do we want to go line by line?

24          Q.   Please.

25          A.   The 2020 website, ATAC.  I'm not

                                                    20
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     certain about BARCA.  CAES.  CaRDS.  CBS.  CDL.

2     CEDSCI.  I don't know about CEM.  I do not know

3     about CENDOCS.  Centurion for decennial purposes

4     is not in use any more.

5             CHEC is still in use.  CHRIS.  CIRA.  I

6     do not know if CQA is still fully -- has any

7     pieces remaining.  I do not about CRM.  DAPPS is

8     in use.  I don't know about Desktop Services or

9     the Data Management Platform.  DRPS is in use.

10     I don't know about DPACS.

11          Decennial Service Center is in use.

12     ECaSE Enum is in use.  ECaSE FLD OCS is in use.

13     ECaSE ISR is not.  I do not know if ECaSE OCS is

14     still in use.  I do not know about Geospacial

15     Services or GUPS.  iCADE is no longer being used

16     for decennial purposes.  IDMS is in use.

17          I do not know about ILMS.  IPTS is in

18     use.  LiMA is not in use for decennial purposes.

19     MaCS is not in use for decennial purposes.

20          MAF/TIGER is still being used.  MCM I

21     do not know.  MOJO Optimizer is no longer in

22     use.  MOJO Field Processing is.  NPC is not for

23     decennial purposes.  I do not know about OneForm

24     Designer Plus.  I do not know about PEARSIS.

25          Okay.  Hold on.  Let me read these

                                              21
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     close.  42 in use.  43 is in use.  44 is in use.

2     I do not know about 45.  46 -- I do not about

3     46.  47 is in use.  SOA is in use.  I do not

4     about 49.  50 is still in use.  51 is still in

5     use.  And I do not know about 52 from a

6     decennial standpoint.

7          Q.   Okay.  Thank you so much.

8          A.   You bet.

9       Q.   Are there any systems that are in use

10   that do not appear on this list?

11       MR. SVERDLOV:  Objection, vague.

12       THE WITNESS:  This is a comprehensive list of

13   all of the systems for the decennial census.  So

14   if your a system in the decennial system, you

15   need to be on this list.

16   BY MS. ROBINSON:

17       Q.   So there are no systems being used in

18   the decennial census that do not appear on this

19   list?

20       MR. SVERDLOV:  Objection, vague and

21   misleading.

22   BY MS. ROBINSON:

23       Q.   You can answer.

24       A.   So this is the comprehensive list of

25   the 52 decennial systems we've used for data

                                              22
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1   collection and processing.

2       Q.   Understood.  But just to clarify, even

3   though this is a comprehensive list, your

4   testimony is that there are not any systems

5   being used that do not appear on this list?

6       MR. SVERDLOV:  Objection, asked and answered

7    and misleading.

8    BY MS. ROBINSON:

9        Q.    Okay.  So to start, I would like to ask

10   you a few questions about the Census Data Lake.

11       A.    Sure.

12       Q.    Could you please tell me what is on

13   that system and what it's used for?

14       A.    Sure.

15       MR. SVERDLOV:  Objection, vague -- sorry.

16   Objection, vague and compound.

17   BY MS. ROBINSON:

18       Q.    Please go ahead.

19       A.    Okay.  So let's start with what it's --

20   what is in there and then we'll talk about what

21   it's used for.  So what is in there is any

22   census data that's response data, and paradata.

23   And paradata are those data that are about our

24   operations.  Any of those data that need to be

25   retained are in the Census Data Lake.  So I

                                                    23
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    think that was question one, what is in there.

2            What it is used for is to generate

3    reports for any ad hoc analysis that needs to

4    happen and it is used to transmit data to other

5    systems to be used to -- for post processing.

6         Q.    Thank you.

7         A.    You bet.

8         Q.    How long is the data retained on that

9    system?

10        MR. SVERDLOV:  Objection, vague.

11        THE WITNESS:  If the question is are the data

12   still there, yes, they are.  The time frame by

13   which it is -- the time frame that we maintain

14   that data actively, we would need to go and find

15   that answer for you.

16   BY MS. ROBINSON:

17        Q.    Was that system used in prior censuses?

18        A.    No.

19        Q.    So turning to the general reports that

20   you mentioned --

21        A.    Uh-huh.

22        Q.    -- what -- what are those reports that

23   come out of the Census Data Lake?

24        A.    Sure.  So can we scroll all the way to

25   the --

                                              24
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1         MR. SVERDLOV:  Tammy, one second.  I

2    apologize.  Objection, vague.

3          Please continue.

4          THE WITNESS:  Sure.  So the Census Data Lake

5     houses the data and performs computations.

6     System number 51, the Unified Tracking System,

7     or UTS, is the business intelligence vehicle by

8     which we display our reports and access them.

9          So the reports that are used to manage

10    the census at headquarters are generated in CDL,

11    and UTS is a pair of systems.

12    BY MS. ROBINSON:

13    Q.    Just to make sure I understand, so the

14    data comes from the CDL but the reports are

15    viewed in UTS?

16    A.    Exactly.

17    Q.    Okay.  I got it.  Great.  And what are

18    the reports in UTS that draw on the data from

19    CDL?

20    MR. SVERDLOV:  Objection, vague.

21    THE WITNESS:  There are a -- for each

22    operation that occurs in the census there is a

23    series of predefined reports.  Those reports

24    touch on topics like the progress of the census,

25    that particular operation within the census, the

1    cost of that operation in the census, the

2    quality of that operation.

3         So all of the things that we want to

4    use to manage that operation from a headquarters

5    perspective are generally included in the UTS.

6    BY MS. ROBINSON:

7         Q.   Okay.  And is there a document that

8    provides a list of all of those reports?

9         A.   Yes.

10        MR. SVERDLOV:  Objection, vague.

11   BY MS. ROBINSON:

12        Q.   What is that document called?

13        MR. SVERDLOV:  Objection, assumes facts not

14   in evidence.

15        MS. ROBINSON:  The witness just said yes.

16        MR. SVERDLOV:  In that case, objection,

17   misleading.  That was not the witness's

18   testimony.

19        MS. ROBINSON:  I can ask again.

20   BY MS. ROBINSON:

21        Q.   Is there a document that lists the

22   reports that are available from UTS?

23        A.   There is a requirements document for

24   UTS.

25        Q.   Okay.  And does that requirements

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    document list the reports available in UTS?

2         A.   Yes.

3         Q.   Was that document produced this

4    morning?

5         A.   Is that question for me?

6         Q.   Uh-huh, if you know.

7         A.   I do not know.

8         Q.   Did you use that document to prepare

9    for the deposition today?

10        A.   No.

11        Q.   Okay.  About how many reports are

12   listed on that document?

13        MR. SVERDLOV:  Objection, vague and

14   foundation.

15        THE WITNESS:  Without the document in front

16   of me, I wouldn't even try to guess how many

17   there are.

18   BY MS. ROBINSON:

19        Q.   Can you provide an approximation.  Is

20   it five reports or 500 reports?

21        A.   Something between five and 500.

22        Q.   Okay.  How about between 300 and 500?

23        A.   I don't know.  We would have to get a

24    number for you.

25         Q.   Okay.  And are those reports that we're

27

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    talking about only the ones that are tied to the

2    CDL data?

3         MR. SVERDLOV:  Objection, vague.

4         THE WITNESS:  Can you reask your question?

5    BY MS. ROBINSON:

6         Q.   I can, yeah.

7         A.   I want to make sure I hear it.

8         Q.   It's very technical stuff and I don't

9    have the documents in front of me.  So I

10   appreciate your patience here.

11        A.   You bet.

12        Q.   In my mind I'm picturing this

13   requirements document that pertains to the UTS.

14   And we know there is some set of reports that

15   can be generated from UTS.  We don't know the

16   exact number.

17             I'm wondering if that requirements

18   document and those reports from UTS are just

19   related to data from the CDL or does UTS pull in

20   data from other systems as well?

21        MR. SVERDLOV:  Objection, vague and --

22          THE WITNESS:  No, the --

23          MR. SVERDLOV:  Objection, vague and compound.

24          THE WITNESS:  UTS uses data only from CDL.

25

                    UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    BY MS. ROBINSON:

2          Q.   Thank you.  Okay.  Makes sense.

3               The reports that come from UTS, who

4    receives those reports?

5          MR. SVERDLOV:  Objection, vague.

6          THE WITNESS:  So do you want a type of person

7    who would receive those reports, groups of

8    people?  What kind of information are you

9    looking for?

10   BY MS. ROBINSON:

11         Q.   All of the above.  If it's divisions

12   that receive them on a regular basis.  I'd like

13   to know that.  Whoever receives those reports.

14         A.   It is those people who are involved in

15   managing that particular operation at

16   headquarters.  So any of the executive staffs,

17   any of the people working on that operation

18   would receive the report.

19               In addition, there are some reports

20    that are sent to oversight.  So they can also

21    see how the census is progressing.

22         Q.   Okay.  How about Mr. Dillingham, what

23    reports does he receive?

24         MR. SVERDLOV:  Objection, vague.

25         THE WITNESS:  We can get a list for you but I

                                                        29
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    couldn't tell you off the top of my head.

2    BY MS. ROBINSON:

3         Q.   He receives reports on a regular basis?

4         MR. SVERDLOV:  Objection, vague.

5         THE WITNESS:  Again, we'd have to get a list.

6    BY MS. ROBINSON:

7         Q.   Who would have that list?

8         MR. SVERDLOV:  Objection, misleading.

9         THE WITNESS:  So you're specifically asking

10   about reports from UTS, correct?

11   BY MS. ROBINSON:

12        Q.   Right.

13        A.   Then we'd have to get that list from

14   the people who manage UTS.

15        Q.   Okay.  And what group is that?

16        A.   The people who manage UTS.

17        Q.   Is there a --

18      A.   UTS team.

19      Q.   Fair enough.  Okay.  Is there a certain

20  individual?

21      A.   They've got a team of people who manage

22  the UTS and we could get the information from

23  them.

24      Q.   Okay.  So you don't know anyone's name

25  who is on the UTS team?

                                        30
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1       A.   There is many people on that team.  We

2   get it from whomever is most appropriate that

3   day.

4       Q.   Okay.  Do the reports issued from UTS

5   have to go to the disclosure review board before

6   being released?

7       A.   No, they're accessed within a system

8   and when you authenticate to that system you

9   accept that you can see data that are Title 13.

10      Q.   Okay.  Are all of the reports --

11      A.   There are also reports that are emailed

12  out, but they are at sufficient level that they

13  do not contain any Title 13 data.

14      Q.   Okay.  What reports are those?

15      MR. SVERDLOV:  Objection, vague.

16          THE WITNESS:  We'd need to get a list of

17     every report that's emailed.  They are generally

18     high level reports about the progress of a given

19     operation.

20     BY MS. ROBINSON:

21          Q.   Do you know about how many reports can

22     be emailed?

23          A.   Not without seeing --

24          MR. SVERDLOV:  Objection, vague.

25          THE WITNESS:  Yeah, not without a list.

                                              31
              UNCERTIFIED ROUGH DRAFT - T. ADAMS


1     BY MS. ROBINSON:

2          Q.   Okay.  And that would be the same list

3     that you need to get from the UTS team?

4          A.   Correct.

5          Q.   Okay.  So UTS generates a series of

6     reports, some of which have to be viewed in the

7     system because they have confidential

8     information; is that right?

9          A.   They have to be viewed in the system

10    because that is how we are set up and it allows

11    you -- one, there can be lower level information

12    that would be considered title data.  It also

13    allows the ability for a user to interact with

14    the system and request information.  I want to

15    see completion as of 12/17 versus I want to see

16    completion as of 12/16.

17         Q.   Do you know if Mr. Dillingham reviews

18    those reports in the system?

19         A.   I do not know.  We would have to ask.

20         MR. SVERDLOV:  I want to object to the last

21    question as vague -- on the basis that it's

22    vague as to time.

23    BY MS. ROBINSON:

24         Q.   So you provided a high level

25    description of the type of data that's in the

                                                32
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     CDL.  Can we get a bit more granular and could

2     you please provide the names of all of the

3     columns that are in CDL?

4          MR. SVERDLOV:  Objection, vague and

5     foundation.

6          THE WITNESS:  If -- we would need to get a

7     document for you that has that if you would like

8     to see the column names.  I can describe the

9     types of data that are in there.  And I could

10    name very many columns, but we would be here

11    quite some time.

12   BY MS. ROBINSON:

13        Q.   If you could please describe the types

14   of data in CDL on the most granular level that

15   you are able to.

16        A.   Sure.  So the data -- let's divide it

17   into categories.  I think that's probably the

18   easiest way to describe it, and we'll go through

19   it in kind of a set of chunks that touch each of

20   our operations.

21             So likely the thing people are most

22   familiar with is response data and those are

23   data that we -- those are the data that we ask

24   on our questionnaires from our respondents.

25             Things like a roster of people living

                                                    33
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    in a house on census day, their names, their

2    ages, their sex, relationship to household or

3    race, Hispanic origin.  These are familiar to

4    many people who have responded to the census.

5    It's the same kinds of things you may have put

6    into your own form.

7             All of those data that were collected

8    from a respondent live in the CDL.  So that's

9    response data.  And that's kind of the first

10    thing.  For anybody who responded to the census,

11    we've got their data in the CDL.

12              We also have paradata.  Paradata varies

13    by operation and by data collection method.

14    Paradata is the data we collect about our data

15    collection.  So it can vary by the different

16    data collection methods.  For something like the

17    internet self-response, we can know things like

18    it took somebody one minute to answer this

19    question or they were using a Firefox browser.

20    Those kind -- that kind data would be collected

21    for each operation.

22              For something like the nonresponse

23    follow-up we would collect things like where

24    the -- how long screen transitions took, whether

25    or not -- I'm trying to think of types of

34

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    information that would be interesting and that

2    we will likely talk about later.

3         Q.   Yeah.

4         A.   You know, how long did the interview

5    take.

6         Q.   Uh-huh.

7         A.   Did somebody say they don't know to a

8        question or something of that nature.

9            Because we've got online handheld

10       instruments and internet instruments now, we

11       collect -- we have far more data than we ever

12       had before to both manage, use our operations,

13       manage or data collection and to use in

14       post-processing.  So that's great.

15            We also have data about every time that

16       we contact a respondent, especially during the

17       nonresponse follow-up.  If we knock on a door we

18       have a record of that.  If we sent a case out

19       for an assignment, we have a record for that.

20       That's also kind of part of our -- it's -- while

21       it's not listed on this slide, maybe you can

22       consider it paradata.  It is also part of the

23       data that we store in the CDL.  So that's a lot

24       of things about how we collect data.

25            We also store how often people work.

                                                    35
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS

1        Their time sheet data are stored in there so

2        that we can do reports about how many hours

3        people have worked, that sort of thing.  All of

4        those data are also stored in the Census Data

5        Lake.  Our workloads are stored there.

6          So those are the universe that we use

7     for each of our operations.  These IDs are

8     eligible for internet self-response.  This set

9     of units is eligible for the nonresponse

10    follow-up.  This set of units is going to

11    reinterview.  All of that is also stored in the

12    Census Data Lake.

13         Q.   Great.  Thank you.  Very helpful.

14         A.   Yes.

15         Q.   Any other categories of data in the CDL

16    that you didn't already cover?

17         MR. SVERDLOV:  Objection, vague.

18         THE WITNESS:  If there are, I'm not

19    remembering them right at the moment.  If we

20    were to look at a list, I could probably give

21    you more.  But that covers likely the broad

22    categories of data that are in the CDL.

23    BY MS. ROBINSON:

24         Q.   Great.  Is there a list of the

25    categories of data in the CDL?

36

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1         MR. SVERDLOV:  Objection, vague.

2         THE WITNESS:  Categories, no.  The data that

3    CDL receives and stores, yes.

4    BY MS. ROBINSON:

5         Q.   What is that document called?

6         MR. SVERDLOV:  Objection, vague and

7    misleading.

8         THE WITNESS:  I don't know that there is a

9    name of it.  It could be generated from the lake

10   itself or there is various documents that talk

11   about the data transfers that go to the lake.

12   BY MS. ROBINSON:

13        Q.   Are those manuals?

14        A.   Not manuals as you might think of them.

15   They are -- between systems we have

16   interconnection documents that document what

17   data transfer between systems so that we know

18   exactly what data are going where.

19        Q.   Understood.

20             Do some of the other systems on this

21   list of 52 feed into the CDL?

22        A.   Many of them.

23        MR. SVERDLOV:  Objection, vague.

24   BY MS. ROBINSON:

25        Q.   Okay.  Which ones?

                                            37
                 UNCERTIFIED ROUGH DRAFT - T. ADAMS


1         A.   This is likely a question best answered

2    by getting a very comprehensive list.  Would it

3    be easiest for me to answer those that will be

4    relevant to many of the questions that were in

5    the request for production?

6        Q.   Yes.  Thank you.

7        A.   Okay.  Let's do it that way.

8             All right.  So the -- based on the

9    request for production, I'm going to describe

10   the systems that I -- that are relevant that we

11   should -- that we'll talk about in those

12   questions.  This should not be taken to be a

13   comprehensive list of everything that gives data

14   to the lake.  I think that would be a little --

15   in order to do a comprehensive list, we would

16   want it written down rather than me telling you.

17            So the systems that are going to be

18   relevant to our conversation today, let's go

19   down to -- let's skip to, let's see -- the

20   systems that are largely relevant to what we

21   will discuss today, let's go down one more,

22   please.

23            So ECaSE FLD OCS provides data to the

24   lake.  That is a large part of the data that

25   creates reports for the nonresponse

38

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    follow-follow up.  ECaSE FLD OCS is the system

2    that we use to manage all OF our field

3    assignments to transmit data to the enumerator

4    device and it's where we receive the data back

5    from the enumerator device.  So that's what

6    pumps data to CDL to make nonresponse follow-up

7    reports.  Let's go down --

8        Q.   Sorry, can I ask you one question

9    before you move off of that?

10       A.   You can ask me many questions.

11       Q.   What is the enumerator device?

12       A.   So if you look at line 23 ECaSE Enum I

13   think we've all probably seen pictures of the

14   iPhones.  Each enumerator is issued an iPhone

15   and it has Enum.  Often it's called FDC.  That's

16   what it's called on devise.  The system itself

17   is called ECaSE Enum and it's an application

18   that lives on the device and that's what the

19   enumerator interacts with to both collect data,

20   to provide their availability, and to input

21   their time and expenses.

22       Q.   Thank you.

23       A.   You bet.

24       Q.   So I think you were going to move to

25    another system that feeds into CDL.

39

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1        MR. SVERDLOV:  Objection.  There's no

2    question.

3        THE WITNESS:  So based on the -- what we'll

4    discuss today, the ECaSE FLD OCS is the -- is

5    the system that provides most of the data for

6    the nonresponse follow-up reports that we'll

7    likely talk about.

8             There is one more system.  If you

9    scroll down just one more, please.  Thank you so

10   much.

11            System number 47, SMaRCS, the Sample,

12   Matching, Reviewing and Coding System.  SMaRCS

13   is the system that is used to choose cases for

14   our quality control operations for nonresponse

15   follow-up.  So when we see things like NRFU RI

16   or reinterview in reports and if documents,

17   those cases are selected by SMaRCS.

18            So it does send some information,

19   largely via field OCS, as it's kind of the route

20   that it takes.  But it's relevant to the

21   conversations that we'll be having.

22   BY MS. ROBINSON:

23      Q.    Thank you.

24            What do you mean by field OCS?

25      A.    ECaSE FLD OCS.  So if we scroll back up

                                                    40
                  UNCERTIFIED ROUGH DRAFT - T. ADAMS

 1      a couple.  I don't remember the numbers of the

 2      system.

 3      Q.    24.

 4      A.    24.

 5      Q.    Right.  I'm sorry.  Yes, the ECaSE.

 6      A.    And I will try really hard not to use

 7      acronyms, but just remind me if I do.

 8      Q.    Thank you.

 9            Any other systems we should cover that

10      feed into CDL?

11      MR. SVERDLOV:  Objection, vague and compound.

12      THE WITNESS:  For the purposes of what we're

13      likely to discuss today, those are the

14      highlights.  We can discuss system number 26

15      ECaSE OCS.  It sends the workloads so the

16      universes for each operation it sends to CDL and

17      so that will -- when we discuss things like

18      self-response, completion rates and response

19      rates, those come from a combination of ECaSE --

20      largely from ECaSE OCS.

21   BY MS. ROBINSON:

22        Q.   Any other systems?

23        MR. SVERDLOV:  Objection, vague.

24        THE WITNESS:  Not that we are likely to

25   discuss today.  If we get into a spot where we

                                              41
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    start going -- where you need more information,

2    we can go through a specific system and how it

3    interacts.

4    BY MS. ROBINSON:

5         Q.   Okay.  Thank you.

6         A.   You bet.

7         Q.   As far as querying the data, coming up

8    with rates, is that done in CDL?

9         MR. SVERDLOV:  Objection.

10        THE WITNESS:  Yes.

11        MR. SVERDLOV:  Objection, vague and compound.

12   BY MS. ROBINSON:

13        Q.   Thank you.  Can you describe how that's

14   done in CDL, please?

15        MR. SVERDLOV:  Objection, vague.

16        THE WITNESS:  So can we choose a particular

17   rate you want to discuss and we can talk about

18   how that one is done?  Because I think that's a

19   -- it helps us get on a very concrete path.

20   BY MS. ROBINSON:

21        Q.   Sure.  Does CDL -- does CDL contain the

22   percentages of NRFU housing unit numbers

23   enumerated by proxy?

24        A.   Right.  So the way that happens is each

25   night after midnight a series of scripts are run

                                                42
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    within the CDL and it runs automatically there

2    is not a human that pushes a button every night

3    that uses a set of predefined criteria to

4    compute in this -- in this case something like

5    the number of -- let's go with number of NRFU

6    cases completed since it's reasonably

7    straightforward, right.  If we want -- every

8    night CDL churns there is a series of scripts

9    and it computes at various levels, whatever

10   levels we specify the number of units that are

11   completed, let's say for an 8.  We're all

12   interested in how ECaSE EO is progressing.  Once

13   those are precomputed, they're stored within

14   CDL.  UTS accesses them and when a user wants to

15   see the data.  It's available via the web

16   interface in UTS.

17          So precomputation happens in the Census

18     Data Lake and then it's displayed in UTS for

19     users to see.

20          Q.   Okay.  Understood.  So reports are not

21     generated in CDL?

22          MR. SVERDLOV:  Objection, vague.

23          THE WITNESS:  The data that feed the reports

24     are generated in CDL.  UTS then accesses that

25     data to display it to the user.

                                              43
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS

1      BY MS. ROBINSON:

2           Q.   Okay.  So?

3           A.   Think of CDL and UTS as sister systems.

4      They work together to display data for us.

5           Q.   Okay.  Okay.  That's helpful.  So how

6      often is the data in CDL updated?

7           MR. SVERDLOV:  Objection, vague.

8           THE WITNESS:  The answer is it depends on the

9      data that we are talking about and at which

10     stage of processing we are discussing.  So can

11     you choose a specific type of data that you are

12     interested in and I can describe how that works.

13     BY MS. ROBINSON:

14          Q.   Yes how about the NRFU completion rates

15    to use your example?

16         A.    I figure that was what you would pick.

17              So the public rates we display are a

18    different discussion.  So let's talk about a

19    very specific component of it.  Let's talk about

20    the number of NRFU cases that have been

21    completed.

22              So the data for those are sent as an --

23    as an enumerator transmits their data back so

24    that kind of happens in the background, field

25    OCS receives, it and sends it to CDL.  CDL

                                              44
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    receives it as fast as it can transit each of

2    the systems that it has to go through, CDL

3    received that data.  CDL then has a series of

4    processes that run multiple times during the day

5    to bring that data into the data lake.  However

6    we don't create reports except once a day and we

7    do that overnight after midnight.  And the

8    reason that we do that is that way each day we

9    can compare from day-to-day exactly the same

10    time period so that we're making our management

11    decisions based on the same amount of data.  So

12    even though the data are updated more frequently

13    for that particular data source, we only compute

14    the reports once per day.

15        Q.    Understood.  And then that when you are

16    using those reports to do your comparison, are

17    you viewing that in CDL or in UTS?

18        A.    Generally in UTS.  The reports are

19    generally viewed in UTS.  It's a -- it's

20    actually a very pleasant interface to use.

21        Q.    User friendly?

22        A.    So it's generally people use the

23    reports in UTS.

24        Q.    Okay.  That's helpful.

25              What divisions have access to the data

                                                    45
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    in CDL?

2        MR. SVERDLOV:  Objection, foundation.

3        THE WITNESS:  I can give you a list of -- a

4    noncomprehensive list if you'd like.  If we want

5    a comprehensive list of every division, we would

6    need to provide that to you.

7    BY MS. ROBINSON:

8        Q.    Understood.  Whatever you are able to

9    tell me today would be helpful?

10        A.    Okay.  So the staff who administer CDL

11    and ADSD have access.  The decennial statistical

12    studies division has access.  Staff and the

13    research and methods directorate, staff in DMCD,

14    Decennial Census Management Division.  I guess I

15    do, so staff who are in ADDC.

16         Q.   Can you say what ADDC stands for?

17         A.   Associate Director Decennial Census.

18         Q.   Thank you.

19         A.   No problem.  I had to think hard on

20    that one.  And I'm certain there is other

21    divisions but to do a comprehensive list we want

22    to make sure we get a list of -- the divisions

23    who actually do have access.

24         Q.   Understood.  Are there productivity

25    rates of enumerators in CDL?

                                             46
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1         MR. SVERDLOV:  Objection, vague.

2         THE WITNESS:  Is there a specific metric that

3    you -- that has been delivered that you want to

4    ask about in one of the slide decks.

5    BY MS. ROBINSON:

6         Q.   Yes.  I can get to that later if that

7    would be helpful to look at something specific?

8         A.   It would, it would.  I want to make

9    sure I answer the question correctly so that I

10   don't mislead you.

11        Q.   Okay.  Okay.  Turning back to the

12   reports that are available in UTS?

13        A.   Uh-huh.

14        Q.   What are the format of the reports that

15   are disseminated via email?

16        MR. SVERDLOV:  Objection, vague.

17        THE WITNESS:  Yeah, when we get an email

18   that -- it's got very high level information in

19   it and it varies by operation.  So it will

20   generally have some -- some numbers about

21   completion or cost or whatever the thing that's

22   been specified.  And some slight graphics to

23   tell you the state of the operation at that

24   point.

25

                                        47

           UNCERTIFIED ROUGH DRAFT - T. ADAMS


1    BY MS. ROBINSON:

2         Q.   Are they PDFs, excels?

3         A.   Within the email it's simply an email

4    that HTML based email that we receive.  If you

5    want more information, you have to log into the

6    UTS.

 7      Q.   Okay.  So every one who is getting that

 8   more granular information that is not available

 9   in email has to log into UTS to view it?

10      MR. SVERDLOV:  Hold on one second.

11   Objection, form.

12      THE WITNESS:  So if you want to see the

13   original UTS report yourself then you log into

14   the UTS.  What often happens is someone

15   downloads it you can download into an Excel

16   spreadsheet and that gets sent around via email.

17   BY MS. ROBINSON:

18      Q.   Okay.  So there is let's see two

19   different formats that are emailed around, the

20   HTML email plus Excel attachments?

21      MR. SVERDLOV:  Objection, vague, compound,

22   and misleading.

23      THE WITNESS:  Right.  So there is a

24   predefined set of reports that go to a

25   predefined set of people that are emailed by the

                                                48
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

 1   UTS itself.  And again this isn't a human that

 2   emails it.  The system itself sends out the an

 3   email as it's programmed to do.  Those are HTML

 4   based reports that email receive each day.

```
 5            However, often people will download
 6     them and I believe you guys have been provided
 7     with a very, very long document of lots and lots
 8     of numbers.  Many of those come from the UTS,
 9     right.  So we download perhaps combined with a
10     handful of other reports, whatever, and sends it
11     on.  We reformat them for our bosses, that sort
12     of thing.
13     BY MS. ROBINSON:
14         Q.   Okay.  Can we flip to Exhibit 6,
15     please.  This might be helpful?
16         TECHNICIAN WERT:  And counsel just to clarify
17     you would like to mark this as Exhibit 6,
18     correct?
19         MS. ROBINSON:  I'm sorry.  If you could pull
20     up Exhibit 6.  This can be marked as Exhibit 2.
21         TECHNICIAN WERT:  Okay.  One moment.
22     Counsel, I apologize.  My screen froze real
23     quick.  And while I do that, the chart we were
24     doing that I think you had referenced as
25     Exhibit 2.  Did you want that marked as
```

                                                     49
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS

```
 1     Exhibit 2?
 2         MS. ROBINSON:  Yes, thank you.
```

3        TECHNICIAN WERT:  So this document Exhibit 6

4    will be marked as exhibit.

5        MS. ROBINSON:  Three.

6        TECHNICIAN WERT:  Exhibit 3.  Thank you very

7    much.

8        MS. ROBINSON:  Thank you.

9        MR. SVERDLOV:  While we are waiting for the

10   exhibit to come up, we have been going for about

11   an hour so I think we would like to take a break

12   for a few minutes within the next opportunity.

13   While this is going on maybe we can take a break

14   now.

15       MS. ROBINSON:  Sure, that's fine with me.

16       THE VIDEOGRAPHER:  Okay.  We are going off

17   the video record at 10:44.

18                  (Whereupon, a recess was had at

19                  10:44 a.m. after which the

20                  deposition was resumed at

21                  11:01 a.m. as follows:)

22       THE VIDEOGRAPHER:  And we are back on the

23   video record at 11:00 a.m.  Please continue.

24   BY MS. ROBINSON:

25       Q.   Ms. Adams, on that break did you speak

                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1   with anyone about the substance of your

2   testimony?

3        A.   Only with Mr. Sverdlov.

4        Q.   And what did you talk about with

5   Mr. Sverdlov?

6        MR. SVERDLOV:  Objection.  I will instruct

7   the witness not to answer about the details of

8   the conversation given that it is protected by

9   attorney-client privilege.

10       MS. ROBINSON:  On what basis is it protected

11   by attorney-client privilege?

12       MR. SVERDLOV:  I'm only instructing the

13   witness not to get into specifics.  She can

14   discuss the general -- the general topics.

15   BY MS. ROBINSON:

16       Q.   Okay.  What topics were discussed with

17   Mr. Sverdlov on the break?

18       A.   Largely that I need to slow down and

19   not speak so fast.

20       Q.   Was anything of substance discussed?

21       A.   About the things that I have said?

22       Q.   Yes.

23       A.   No, no.

24       Q.   Were there any discussions of CDL?

25       A.   No.

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1      Q.    Were there any discussions of any other

2    databases?

3      A.    No.

4      Q.    Were there any discussions of what you

5    might testify to after the break?

6      A.    No.

7      Q.    Okay.  If we could turn to Exhibit 6,

8    please.

9      TECHNICIAN WERT:  On screen now marked as

10   Exhibit 3.

11                  (Whereupon, Adams Deposition

12                   Exhibit 3 was marked for

13                   identification.)

14     MS. ROBINSON:  Okay.  And would you be able

15   to give Ms. Adams control of this exhibit so she

16   could scroll through it?

17     TECHNICIAN WERT:  Absolutely.  So Ms. Adams,

18   if you just click on the document on the screen

19   that will give you control of my keyboard and

20   mouse.  You can zoom, scroll at your own pace.

21     THE WITNESS:  Okay.

22   BY MS. ROBINSON:

23     Q.    So is this document is very long.  It's

24    605 pages.  We will not go through every page.

25        A.    Thank you.

52

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1        Q.    But can you -- can you tell me, is this

2    data generated from CDL?

3        MR. SVERDLOV:  Objection, vague.

4        THE WITNESS:  Which pieces of data?

5    BY MS. ROBINSON:

6        Q.    Okay.

7        A.    Can you clarify for me?

8        Q.    Sure.  Why don't you walk me through

9    the document, and my question is, where does the

10    data in this document come from?

11        MR. SVERDLOV:  Object to form.

12        THE WITNESS:  Okay.  So there is 605 pages of

13    data here.

14    BY MS. ROBINSON:

15        Q.    Sure.

16        A.    Can you clarify which pieces you are

17    talking about?

18        Q.    Yes.  Let's start with page 1.

19        A.    Okay.

20        Q.    Where is this from?

21        A.    All right.  Let me blow it up so I can

22   see it.

23        Q.   Uh-huh.

24        A.   The data in this document come from the

25   CDL or data that -- the data in this table come

                                                    53
                   UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    from the CDL.

2         Q.   And does the table itself come from the

3    CDL?

4         MR. SVERDLOV:  Objection.

5         THE WITNESS:  It does not.

6    BY MS. ROBINSON:

7         Q.   Where does the table itself come from?

8         A.   The table itself is an Excel

9    spreadsheet.

10        Q.   Is the Excel spreadsheet downloaded

11   from UTS?

12        A.   Pieces of it are.

13        Q.   Okay.  So how does this Excel

14   spreadsheet get generated?

15        A.   The various pieces of data that are

16   combined together are collated from either the

17   UTS or from special tabulations from CDL and are

18   then put into a spreadsheet together each

19   morning.

20      Q.   Is this one of the reports from UTS

21  that we were talking about earlier or something

22  different?

23      MR. SVERDLOV:  Objection, vague.

24      THE WITNESS:  This spreadsheet is not -- you

25  don't just pick an item and download it from

                                                54

                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1   UTS.

2   BY MS. ROBINSON:

3       Q.   Okay.  This gets -- this Excel

4   spreadsheet is generated every day?

5       A.   During data collection, yes.

6       Q.   Okay.  And what system generates it?

7       MR. SVERDLOV:  Objection, foundation.

8       THE WITNESS:  So there isn't a system that

9   generates it.

10  BY MS. ROBINSON:

11      Q.   Okay.

12      A.   The data sources are combined into one

13  Excel spreadsheet.

14      Q.   Okay.  Who makes the Excel spreadsheet?

15      A.   Staff in DCMD.

16      Q.   What does DCMD stand for?

17      A.   Decennial Census Management Division.

18      Q.   Okay.  So an individual pulls the data

19   from CDL and UTS every day to generate this

20   Excel?

21      A.   Yes.

22      Q.   Okay.  Is it a specific individual in

23   DCMD who does this?

24      A.   It is a staff that's charged with doing

25   that.

                                                55
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1      Q.   The DCMD staff or something more

2   specific?

3      A.   The DCMD NRFU staff.

4      Q.   NRFU staff.  Okay.  How many people are

5   on the NRFU staff?

6      A.   Something greater than three, but less

7   than 15.

8      Q.   Thank you.

9      A.   Yeah.

10      Q.   And what is the DCMD NRFU staff's

11   general responsibility?

12      MR. SVERDLOV:  Objection, vague.

13      THE WITNESS:  Can you clarify, please?

14   BY MS. ROBINSON:

15      Q.   Sure.  What do they do?  What are their

16     job duties?

17          A.   They manage the NRFU operation from a

18     project management standpoint.

19          Q.   Okay.  Do these reports have a name?

20          MR. SVERDLOV:  Objection, vague.

21          THE WITNESS:  The page 1, right?

22     BY MS. ROBINSON:

23          Q.   Uh-huh, yes.  Yes, these Excels that

24     are populated by the NRFU staff.

25          A.   They are the state-based completion

                                                    56
                 UNCERTIFIED ROUGH DRAFT - T. ADAMS

1      rates.

2           Q.   Okay.  Okay state-based completion

3      rates.

4                And who receives these Excels every

5      day?

6           MR. SVERDLOV:  Objection, foundation.

7           THE WITNESS:  An email list of -- a list of

8      people on an email thread.

9      BY MS. ROBINSON:

10          Q.   Okay.  Who is on that email list?

11          A.   We'd have to get the definitive list

12     for you.  It's generally those people who are

13     working on the nonresponse follow-up operation

14    at that point.

15        Q.   Does management receive this

16    spreadsheet?

17        MR. SVERDLOV:  Objection, vague.

18        THE WITNESS:  Which component of management

19    or who specifically?

20    BY MS. ROBINSON:

21        Q.   Anyone at the management level.

22        A.   Yes.

23        MR. SVERDLOV:  Objection, vague.

24        THE WITNESS:  Yeah, various managers receive

25    it.

                                          57
            UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    BY MS. ROBINSON:

2        Q.   Okay.  Which managers are those?

3        A.   Like I said before, we would have to

4    get you a definitive list.

5        Q.   Does it go to a list serve or is it

6    individual people's addresses?

7        A.   Individual people's addresses.

8        Q.   Okay.  Can you approximate about how

9    many people receive this?

10        A.   Not well.

11        Q.   Do you think it's upwards of 50?

12        A.   I honestly don't know.  We would have

13   to get a count for you.

14        Q.   Okay.  Do you know if Mr. Dillingham

15   receives this?

16        A.   I do not.  We would have to, again,

17   look at the list of people who were sent it each

18   day.

19        Q.   Do you know if anyone outside the

20   Census Bureau receives this?

21        A.   I do not know.

22        Q.   Okay.  So this data is by state,

23   correct?

24        A.   Yes.

25        Q.   Can it also be pulled by city?

                                              58
               UNCERTIFIED ROUGH DRAFT - T. ADAMS

1        MR. SVERDLOV:  Objection, form.

2        THE WITNESS:  No, we did not do that.

3   BY MS. ROBINSON:

4        Q.   But can this type of data be pulled at

5   the city level?

6        MR. SVERDLOV:  Objection, form.

7        THE WITNESS:  I'm thinking.  Give me a

8   second.

9             I don't think so.  There are -- and in

10    order to give a really great answer, remember,

11    I'm an statistician.  Numbers matter very deeply

12    to me.  There would have to be -- I don't know

13    that it could be done at the city level.  I'd

14    have to have -- we'd have to have conversations

15    with people who are experts in each of these

16    components to determine if it could be done at

17    the city level.

18    BY MS. ROBINSON:

19        Q.   Okay.  Are the spreadsheets kept

20    somewhere?

21        MR. SVERDLOV:  Objection, vague.

22        THE WITNESS:  Yes.  I mean, they are clearly

23    an email because we all got emailed them each

24    day.  That would be, you know, an incredibly

25    easy way to get them.

                                                      59

               UNCERTIFIED ROUGH DRAFT - T. ADAMS

1             As for a single repository, yes.

2    BY MS. ROBINSON:

3        Q.   Okay.  And can you identify that

4    repository for me?

5        A.   I can get the -- we can get the

6    specific location for you.

7        Q.   Okay.  Do you know if it's on a certain

8   drive shared location?

9       A.   Like I said, we would have to get the

10  specific location for you.

11      Q.   Okay.  So just to make sure I

12  understand, if a person was looking for this

13  type of information at a more granular,

14  geographic level, whether that's ACO, tracked,

15  county, what would be possible to provide?

16      MR. SVERDLOV:  Objection, vague and compound.

17      THE WITNESS:  How do you mean?

18  BY MS. ROBINSON:

19      Q.   How granularly could this data be

20  pulled by geography?

21      MR. SVERDLOV:  Objection, vague.

22      THE WITNESS:  I'd want to talk to -- like I

23  said, I would want to talk to the people who are

24  experts in each of these components to make sure

25  that there is not some nuance that I'm missing

                                              60
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1   on what level we could actually use.

2   BY MS. ROBINSON:

3       Q.   And who are those people that are the

4   experts?

5       A.   Likely people in DCMD who run each of

6    the operations.

7        Q.   Okay.  But you don't think that CDL

8    would have this data more granularly by

9    geography?

10       A.   It -- it isn't a matter of whether CDL

11   has the data more granularly by geography.  It

12   is that I would want -- before I answer a

13   question like that, I would want to make sure

14   there is not some nuance that I'm missing that

15   would cause us to have an inaccurate answer by

16   making the data very granular.

17       Q.   Okay.

18       A.   So it's not a matter of can we pull it.

19   It's more a matter of --

20       Q.   Right.

21       A.   -- is it appropriate to do so in order

22   to provide the best answer we can.

23       Q.   What do you mean by appropriate to do

24   so?

25       A.   Is there anything in combining these

                                          61
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    data at a lower geography that would cause us to

2    provide an answer that's misleading or

3    incorrect.

4        Q.    Okay.  How would the answer be

5    misleading?

6        A.    If we were to provide a -- an estimate

7    for a certain day and there was a -- the answer

8    is, I don't know and I would prefer to actually

9    give a very concrete definitive answer than to

10    make one up while we -- while we chat.

11        Q.    Okay.  Understood.

12              Picking one data field, self-response

13    in the NRFU universe, that's column H.

14        A.    Yes.

15        Q.    Does that data come from CDL?

16        A.    Yes.

17        Q.    And is that data maintained on a

18    tracked level?

19        A.    These data aren't maintained at the

20    tracked level because we don't compute them that

21    way.  Rather, CDL receives data.  It's a lake.

22    A data lake merely has records of data.  We then

23    choose what level we are going to compute it.

24    We've chosen the state level for this.  So it's

25    computed at the state level.  It can be computed

                                                    62
                UNCERTIFIED ROUGH DRAFT - T. ADAMS


1    at other levels, should we so desire.

2      Q.   So the data in column H could be

3   computed at the tracked level?

4      A.   As far as I know, yes.

5      Q.   Let's look at page 4, please.

6      A.   Okay.

7      Q.   Okay.  So please tell me where -- how

8   these reports are generated.

9      MR. SVERDLOV:  Objection, form.

10     THE WITNESS:  Presume -- I think I got all

11  messed up here.  One moment, please.  There is a

12  very nice lag between me taking an action and

13  the document moving.

14         So for the document -- for page 4,

15  presumably it's an Excel spreadsheet.

16  BY MS. ROBINSON:

17     Q.   Uh-huh.

18     A.   I do not know the data source.

19     Q.   Okay.  Does this look like a UTS

20  download?

21     MR. SVERDLOV:  Objection, calls for

22  speculation.

23     THE WITNESS:  No.

24  BY MS. ROBINSON:

25     Q.   Have you ever seen this type of report

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    before?

2        MR. SVERDLOV:  Objection, vague.

3        THE WITNESS:  Before late in the day,

4    yesterday, no, I don't think I've seen this one

5    before.

6    BY MS. ROBINSON:

7        Q.   But you think you saw it late in the

8    day yesterday?

9        A.   Yes.

10       Q.   Okay.  So you reviewed this in

11   preparation for the deposition?

12       A.   Yes.

13       Q.   Okay.  So what can you tell me about

14   it?

15       MR. SVERDLOV:  Objection, form.

16       THE WITNESS:  Can you be more specific?

17   BY MS. ROBINSON:

18       Q.   What system generates this spreadsheet?

19       A.   I do not know.  We'd have to go find

20   out what the -- pardon me, who the source of it

21   was and where they pulled the data from.

22       Q.   Who receives this spreadsheet?

23       A.   I do not know.

24       Q.   How often is it generated?

25      A.   I don't know.  Again, we would have to

                                                    64
                   UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    go find the person who generated it and how

2    frequently -- where they got the data.

3         Q.   Okay.  So you reviewed this document

4    yesterday.  But you're not able to provide any

5    testimony about it?

6         MR. SVERDLOV:  Objection, misleading.

7         THE WITNESS:  I reviewed the 605 pages that

8    are in this document yesterday and we did not

9    discuss the source of the data for this

10   particular page.

11   BY MS. ROBINSON:

12        Q.   Okay.  Understood.

13             Let's flip to page 6.

14        A.   I'm trying.  I really am.

15        Q.   Okay.  So how is this spreadsheet

16   generated?

17        MR. SVERDLOV:  Objection, vague.

18        THE WITNESS:  Staff and field fill out each

19   column each day when they have updates.

20   BY MS. ROBINSON:

21        Q.   What system do they use to provide

22   those updates?

23     A.   So there is actually very little

24 system-generated data in here.  The impetus of

25 this report are the RCC actions to the right.

65

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1      Q.   How does the text get inputted into the

2 table?

3      A.   The various regional offices provide

4 the data to field headquarters.

5      Q.   And field headquarters inputs the data

6 into a spreadsheet?

7      A.   Yes.

8      Q.   Is this an Excel spreadsheet?

9      A.   Yes.

10     Q.   And it's not maintained through a

11 database or system?

12     A.   No.

13     Q.   So there is a single Excel spreadsheet

14 that field management uses to enter the

15 information?

16     MR. SVERDLOV:  Objection, misleading.

17     THE WITNESS:  Yes.

18 BY MS. ROBINSON:

19     Q.   Where is this Excel spreadsheet

20 maintained?

21      A.   I don't know.  We could find out for

22   you.

23      Q.   Who views this spreadsheet?

24      MR. SVERDLOV:  Objection, vague.

25      THE WITNESS:  Staff and field headquarters.

                                          66
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

 1   BY MS. ROBINSON:

 2      Q.   Okay.  What's the name of this

 3   spreadsheet?

 4      MR. SVERDLOV:  Objection.  Assumes facts not

 5   in evidence.

 6      THE WITNESS:  Oh, I don't know.  It's an

 7   exhibit here.

 8   BY MS. ROBINSON:

 9      Q.   Okay.  So it's an Excel spreadsheet

10   used by the field headquarters and staff.  And

11   is there any other information you can tell me

12   about it?

13      MR. SVERDLOV:  Objection, form.

14      THE WITNESS:  How do you mean?

15   BY MS. ROBINSON:

16      Q.   Does it get emailed out to anyone?

17      A.   I don't know.

18      Q.   How is it used by the field

19   headquarters?

20       MR. SVERDLOV:  Objection.  I'm going to

21   object to that question on the basis of scope

22   because it exceeds the scope of the topics

23   noticed for the deposition.  And also --

24       MS. ROBINSON:  I'm just asking.  Sorry.

25   Please go ahead.  I apologize.

                                              67
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1       MR. SVERDLOV:  The specific substance of the

2   document, which is what we seem to be discussing

3   now, is far afield from the general topics that

4   have been noticed in the deposition.  And so to

5   the extent the witness answers that question, it

6   will be in her personal -- personal knowledge

7   and personal capacity, not on behalf of the

8   Census Bureau.

9       MS. ROBINSON:  Well, I disagree with that.

10   I'm just trying to get at the purpose of this

11   data spreadsheet, which is clearly in scope, but

12   we can put that dispute aside and I will ask

13   again.

14   BY MS. ROBINSON:

15       Q.   What is the purpose of this

16   spreadsheet?

17          MR. SVERDLOV:  Objection, vague and obviously

18     the same objection as before.

19          THE WITNESS:  The purpose of the spreadsheet

20     is to track the actions we're taking for -- that

21     have been taken in ACOs where there is a reason

22     to track what they are doing, so in order to

23     make sure that we're managing our ACOs properly.

24     BY MS. ROBINSON:

25          Q.   Okay.  And can you be a little more

                                                        68
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS

1      specific on when you said what the ACOs are

2      doing?

3           MR. SVERDLOV:  Objection, form.

4           THE WITNESS:  So in the column that says RCC

5      actions --

6      BY MS. ROBINSON:

7           Q.   Yes.

8           A.   -- there's updates about the management

9      actions they are taking each day.

10          Q.   Uh-huh.  Okay.  Let's turn to page 17,

11     please.

12          TECHNICIAN WERT:  Ms. Adams, I know there is

13     a lag, so if you need help from the technician

14     just navigating from one page to the next, let

15    me know.

16         THE WITNESS:  Go for it.

17         MS. ROBINSON:  That's fine.  We can give the

18    control back.  I thought it would be more

19    helpful for you to go back and forth.  But let's

20    go with someone else.

21         TECHNICIAN WERT:  You still have control but

22    you are on page 17 now.

23    BY MS. ROBINSON:

24         Q.   Okay.  Do you recognize this

25    spreadsheet?

                                              69
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS

1          A.   From my review yesterday, yes.

2          Q.   Okay.  Does it have a name?

3          A.   I don't know.

4          Q.   Okay.  What system generates this

5    spreadsheet?

6          MR. SVERDLOV:  Objection, vague.

7          THE WITNESS:  It is not system generated.

8    BY MS. ROBINSON:

9          Q.   Okay.  Is this an Excel?

10         A.   Yes.

11         Q.   And how is the -- how does the Excel

12    get populated with information?

13      A.   Staff would need to fill out each

14  field.

15      Q.   And what staff fills out the fields?

16      A.   Staff in the RCC, our field

17  headquarters.

18      Q.   Okay.  So this is another spreadsheet

19  used by field headquarters?

20      A.   Yes.

21      Q.   Okay.  Are these spreadsheets kept in a

22  central repository?

23      A.   I don't know.

24      Q.   How often is this spreadsheet

25  generated?

                                        70
            UNCERTIFIED ROUGH DRAFT - T. ADAMS

1       A.   I don't know.

2       Q.   Okay.

3       A.   I can find those answers for you if you

4   would like.  But I don't know them right now.

5       Q.   If we could look at page 23, please.

6            Do you recognize this spreadsheet?

7       A.   Yes.

8       Q.   Is it generated from a system?

9       A.   No.

10      Q.   This is manually composed?

11      A.    There is -- there is not a system that

12   has all of these pieces of data.

13      Q.    So how is this document generated?

14      A.    Someone generated it on the frequency

15   with which they wished to generate it.

16      Q.    Is it an Excel?

17      A.    Presumably, yes.

18      Q.    Who generates this?

19      A.    I don't know.

20      Q.    Who uses this?

21      MR. SVERDLOV:   Objection, vague.

22      THE WITNESS:   I can't speak to who would use

23   it or who uses this in their daily lives.

24   BY MS. ROBINSON:

25      Q.    Do you know who receives this document?

                                          71
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1       A.    These were provided by either Jamie

2    Christy or Al Fontinow.  So either one of the

3    two of them.

4       Q.    Provided to whom?

5       A.    Counsel at DOC.

6       Q.    Provided to counsel at DOC for this

7    litigation?

8       A.    Yes.

9        Q.   Okay.  So if we wanted to know anything

10   about these reports, we should talk to

11   Mr. Christy or Mr. Fontinow?

12        A.   Yes.

13        Q.   Okay.  Do you know what the goal column

14   refers to?

15        MR. SVERDLOV:  Objection.  I'm going to,

16   again, object on grounds of scope and because

17   that question is outside the scope of the topics

18   noticed for the deposition.  The witness will

19   testify in her personal knowledge or capacity,

20   not on behalf of the Census Bureau.

21        MS. ROBINSON:  Again, I reserve my same

22   objection which is it's clearly in scope.  I'm

23   simply asking about the type of data that's

24   maintained by the Census Bureau.  This is a

25   piece of data that's maintained by the Census

                                                72
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    Bureau and I would like to know what the goal

2    column means.

3         MR. SVERDLOV:  I will just say that the

4    meaning of a column is the substance of the

5    document and that is not the topics that are

6    noticed in the deposition.  But we can reserve

7     that and move on.

8         MS. ROBINSON:  Yeah, because I'm not asking

9     what the significance of what the goal meant to

10    Mr. Fontinow, for example.  I'm just asking from

11    a data perspective what over what gives you 2.9.

12    From a data perspective, what does goal refer

13    to.

14        MR. SVERDLOV:  I maintain the objection.

15    BY MS. ROBINSON:

16    Q.    Okay.  Ms. Adams, please answer.

17    A.    I don't know.

18    Q.    Do you know what "off goal by" means?

19    A.    No.

20    Q.    And do you know what the number

21    "active" means?

22    A.    No.

23    Q.    Okay.  Let's go to page 101, please.

24        Have you seen this report before?

25    A.    Yes.

                                            73
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     Q.    How is it generated?

2     A.    Can we scroll over a little bit,

3     please?

4         TECHNICIAN WERT:  Sure.  Ms. Adams, you

5    actually still have control if you want to

6    scroll over.

7         THE WITNESS:  Go ahead and do it.  Perfect.

8    Thank you.

9              Can you please reask your question?

10   BY MS. ROBINSON:

11        Q.   Sure.  How is this report generated?

12        A.   It is a combination of data from UTS

13   and --

14        Q.   I'm sorry, I thought you were still

15   answering the question.

16        A.   No, I'm sorry I was waiting for you.

17        Q.   Oh, I'm sorry.  I thought you were

18   saying it's a combination of data from UTS

19   and --

20        A.   Oh, I must have broken up.  MOJO

21   Hermes.

22        Q.   Okay.  Is the spreadsheet itself

23   exported from UTS?

24        MR. SVERDLOV:  Objection, vague.

25        THE WITNESS:  Yeah.  I mean, I can't speak to

                                                    74
                 UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    the mechanics of how whomever put it together

2    did that.

3   BY MS. ROBINSON:

4       Q.   Okay.  I'm a little confused then.  So

5   you can scroll through.  It's 400 pages long.

6   Is this a download from a system or is it

7   manually put together?

8       MR. SVERDLOV:  Objection, vague.

9       THE WITNESS:  Can you do me a favor and

10  scroll down for a little bit?

11      TECHNICIAN WERT:  Sure.

12  BY MS. ROBINSON:

13      Q.   It goes until page 500 -- let's see, I

14  have it here with me.

15      A.   Don't go all the way to the bottom.

16  Just scroll for a little bit.

17      Q.   It goes to 191 ^ ck all the way

18  through.

19      A.   Okay.  Hold on.  Yeah.  So while the --

20  it looks like it's many, many, many, many pages

21  long.  It's a series of reports over days.  So

22  it looks a little more daunting than I think it

23  is.

24      Q.   Uh-huh.  Okay.  So what group maintains

25  this spreadsheet?

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1          A.    To be honest, I don't know.  We would

2     have to ask.

3          Q.    Who would know?

4          A.    Either Al Fontenow or Jamie Christy,

5     whomever this came from.

6          Q.    Okay.  Do you know what this

7     spreadsheet is used for?

8          MR. SVERDLOV:  Objection.  I'm going to

9     object based on scope again.  And so same

10    instruction -- or same qualification that the

11    witness will answer not on behalf of the Census.

12         MS. ROBINSON:  Same response.

13    BY MS. ROBINSON:

14         Q.    Do you know what this spreadsheet is

15    used for?

16         A.    Do I know what somebody used the

17    spreadsheet for?  No.

18         Q.    Do you know who receives this

19    spreadsheet on a regular basis?

20         A.    No.

21         MR. SVERDLOV:  Objection.  Foundation.

22    BY MS. ROBINSON:

23         Q.    Do you know if a spreadsheet like

24    this -- well, strike that.  Let's move on.

25               So if we could go back to CDL, I

↑

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     thought that the spreadsheets in this exhibit

2     were going to be good examples of CDL or UTS

3     spreadsheets, so that's why I turned to that.

4     So I thought it would be helpful in our

5     conversation to walk through this just to --

6     just so you know why I flipped to that and then

7     am going back.  So that's the context.

8          A.   Okay.

9          Q.   Let's see.  So turning back to CDL and

10    UTS, I have a few questions about whether

11    specific calculations can be done in those

12    databases.

13         A.   Okay.

14         Q.   Okay.  So --

15         A.   Yep.

16         Q.   Could you calculate percentages of NRFU

17    housing unit numbers enumerated by proxy?

18         A.   Yes.

19         Q.   Okay.  Can you calculate the unit

20    numbers enumerated by proxy but excluding vacant

21    and nonexisting housing?

22         A.   Yes.

23         Q.   Does that calculation occur in CDL?

24     MR. SVERDLOV:  Objection, vague.

25     THE WITNESS:  It -- hold on.  Let me think

77
UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     for just a second.

2     BY MS. ROBINSON:

3     Q.   Of course.  Take your time.

4     A.   Yes, it occurs within CDL with -- it

5     occurs in the CDL system with the data that is

6     in CDL.

7     Q.   If you wanted to generate a report of

8     that data, would you generate that report out of

9     UTS?

10     A.   No.

11     Q.   Would you generate it from CDL?

12     A.   Yes.

13     Q.   Why couldn't you generate it from UTS?

14     A.   UTS are predesignated reports, so if we

15     chose to have a report with exactly that, you

16     had a lot of things on there, right?

17     Q.   Yes.

18     A.   And then it could absolutely be done in

19     UTS.

20     Q.   Okay.

21     A.   However, we purpose -- CDL can be used

22      to generate reports, the aggregates for reports,

23      and it can also be used for ad hoc analyses.

24      That would be one of them.

25          Q.   Understood.  Okay.

                                                      78
                     UNCERTIFIED ROUGH DRAFT - T. ADAMS

1           So UTS conceivably could be used, but

2       you'd have to come up with a whole report.  So

3       it would just be more efficient to use CDL?

4           A.   UTS we pre-specify.

5           Q.   Right.  But I'm thinking you could add

6       one more report where you prespecified some sort

7       of new calculation, right?

8           A.   Sure.  If that's the route we chose to

9       take, yes.

10          Q.   Okay.  But it would be quicker to query

11      that information directly from CDL?

12          A.   Yes.

13          Q.   Have you done that calculation?

14          MR. SVERDLOV:  Objection, vague.

15      BY MS. ROBINSON:

16          Q.   I can say it again.  The NRFU housing

17      unit numbers and percentages enumerated by proxy

18      but excluding vacant and nonexistent housing.

19          MR. SVERDLOV:  Same objection.

20        THE WITNESS:  There are estimates of proxies.

21   We would need to look at definitions and what

22   has been done to determine if the vacant and do

23   not exists are excluded.

24   BY MS. ROBINSON:

25        Q.   Okay.  And by estimates of proxies,

                                              79
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    what do you mean by that?

2         A.   The calculations.

3         Q.   Okay.  So --

4         A.   Sorry, I'm a statistician.  I use

5    estimates a lot.

6         Q.   Okay.  So there are calculations of by

7    proxy in CDL; is that correct?

8         A.   Uh-huh.

9         Q.   And it's possible to exclude vacant and

10   nonexisting housing, correct?

11        A.   Yes.

12        Q.   But you are not sure if that's been

13   done?

14        A.   Correct.

15        Q.   Okay.  Thank you.

16             How long -- if you wanted to run that

17   calculation, how long would it take to do so?

18      A.    A day or two.

19      Q.    Okay.  What about NRFU housing unit

20   numbers and percentages enumerated by population

21   count only, is that possible to do in CDL?

22      A.    Yes.

23      Q.    Has that been done?

24      A.    I don't know.

25      Q.    Okay.  Do you know if it's been done to

                                              80
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1   respond to any of the requests in this

2   litigation?

3      MR. SVERDLOV:  Objection, vague.

4      THE WITNESS:  I do not know -- I mean, I

5   don't know.

6   BY MS. ROBINSON:

7      Q.    Yeah.  Understood.

8            Okay.  And how long would it take to

9   run that calculation?

10      A.    The same.  Each of these are kind of

11   several day sorts of things to ensure that they

12   are calculated properly.

13      Q.    Okay.  And to view that information --

14   and I apologize if I have asked this before, I'm

15   just trying to get a handle on all of this -- so

16      to view that information, you would generate a

17      report from CDL?

18           A.    Can you define what you mean by report?

19      I want to make sure we don't mix up

20      terminologies.

21           Q.    I thought you said that CDL itself -- I

22      know UTS has reports and they are the

23      predesignated ones.  But I thought you said CDL

24      also has reports.

25           A.    CDL is a data lake.  It doesn't have

                                                          81
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS

1       reports like you're thinking about it.  You can

2       query things.  You can create numbers.  It

3       doesn't -- the things you put in front of me a

4       little bit ago in 605 pages, you don't just make

5       an Excel spreadsheet like that, right?  You

6       query data and then you create a report out of

7       it.

8                 So you might type a whole bunch of

9       computer code and then have numbers, and then I

10      would put it into some format that I could share

11      with others to report about.

12           Q.    Right.  Okay.  And what is that format

13      that comes out of CDL so you can share with

14    others?

15         MR. SVERDLOV:  Objection, vague.

16         THE WITNESS:  It is up to the particular

17    person who is creating the code.

18    BY MS. ROBINSON:

19         Q.   So you could -- it could be an Excel?

20         A.   Yes.

21         Q.   Okay.  Is there a typical format that's

22    used to share the information from CDL?

23         MR. SVERDLOV:  Objection, vague.

24         THE WITNESS:  I agree that is vague.  It

25    depends on the number being created and how a

                                              82
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     particular data analyst is going to share it or

2     what's been requested of them.

3     BY MS. ROBINSON:

4          Q.   Okay.  I'll ask it this way.  What are

5     the possibilities?

6          A.   Okay.

7          Q.   Excel?

8          A.   Excel.

9          Q.   What else is used?

10         A.   CSV.  CES data set.  That's not an

11    exhaustive list, but that would be kind of the

12    big ways that one would create what you're

13    terming a report.

14        Q.   Okay.  Or what word should I use?  I'll

15    ask it that way.  A download?

16        MR. SVERDLOV:  Objection, form.

17        THE WITNESS:  It's fine.  It's fine.

18    BY MS. ROBINSON:

19        Q.   Okay.  So it would take a couple of

20    days to generate an Excel of the NRFU

21    calculations we discussed earlier?

22        MR. SVERDLOV:  Objection, vague.

23        THE WITNESS:  Something of that nature, yes.

24    BY MS. ROBINSON:

25        Q.   Thank you.

                                          83
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1             Could you do those calculations based

2     on an ACO level?

3         A.   Yes.

4         Q.   Could you do it based on a tracked

5     level?

6         A.   As far as I know, yes, but with the

7     same condition that we talked about when we were

8     looking at the first page of the 605-page

9     document.

10     Q.   Yes?

11     A.   I want to make sure there's not some

12   nuance I'm missing.

13     Q.   Yes.  Okay.  Understood.

14          What about at a city level?

15     A.   The same idea.  I would want to make

16   sure that, again, there is not some nuance that

17   I just -- that -- I don't understand and would

18   give you a misleading answer.

19     Q.   Right.  But you can do calculations by

20   city in the CDL?

21     MR. SVERDLOV:  Objection, vague.

22     THE WITNESS:  I don't know.  I would have to

23   look at some very detailed data to figure out --

24   to determine.

25

                                                84
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1   BY MS. ROBINSON:

2     Q.   Okay.  I'll ask it this way then.

3     A.   No --

4     Q.   What are -- withdrawing.

5          What are the geographic levels that are

6   in CDL?

7     MR. SVERDLOV:   Objection, vague.

8       THE WITNESS:  Yeah, like I said, I would have

9    to actually look to determine what data are in

10    there.  I can't answer it without doing that.

11    BY MS. ROBINSON:

12       Q.   Okay.  Is there a document like a

13    manual that would list out that -- those fields?

14       A.   There are -- there are documents called

15    ICDs, Inter Connection Control Documents, that

16    talk about the data that flow between systems.

17    One of those documents would have in it the data

18    that flowed between -- that flowed into CDL and

19    what kinds of fields are in it.

20       Q.   Okay.  And would you have to look at a

21    number of different ICDs for that information or

22    would a single ICD have that?

23       A.   It's in many.

24       Q.   So you would have to look at several to

25    piece it all together?

                                                    85
            UNCERTIFIED ROUGH DRAFT - T. ADAMS

1       A.   Yes.

2       Q.   Okay.  Okay.  Are there any reports in

3    UTS that provide the population count only

4    enumerations?

5       MR. SVERDLOV:  Objection, vague.

6          THE WITNESS:  I don't remember.  I would have

7     to look at a list of the reports.

8     BY MS. ROBINSON:

9          Q.   Okay.

10         A.   I'm sorry.

11         Q.   No, that's fine.

12              What about the -- are there UTS reports

13    that include the percentages enumerated by

14    proxy?

15         A.   I believe there are, but, again, I

16    would want to confirm by looking at a list.

17         Q.   Okay.  What about by proxy excluding

18    vacant and nonexisting housing?

19         A.   It's the same idea.  I don't want to

20    give you information that's incorrect.

21         Q.   What about NRFU percentage enumerated

22    using administrative records?  Is that -- are

23    you able to calculate that in CDL?

24         A.   So that question -- hold on.  Let me

25    put together a really good answer for you.

                                              86
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1          Q.   Okay.  Take your time.

2          A.   Thank you.  So we don't actually

3     enumerate people in administrative records as

4       we're doing the NRFU, right?  That happens

5       during our post-processing as we gather all the

6       data from NRFU from internet self-response, from

7       paper returns.  So that -- we wouldn't enumerate

8       a person by administrative records during NRFU.

9       That would come after our post-processing.

10          Q.   Okay.  And so what database would you

11      use to reflect the administrative record had

12      been used?

13          MR. SVERDLOV:  Objection.

14          THE WITNESS:  Not until DRF2, CUF or CEF

15      would that truly be available.

16      BY MS. ROBINSON:

17          Q.   So which of the 52 systems would --

18          MR. SVERDLOV:  Objection.

19          THE WITNESS:  System-wise -- sorry about

20      that.  I'm trying to behave.  System wise it

21      would be DRPS.

22      BY MS. ROBINSON:

23          Q.   Okay.  Sorry.  You said that and I

24      didn't realize that was one of these.  DRPS, let

25      me just -- oh, okay.  Great.  Number 20.  Okay.

                 UNCERTIFIED ROUGH DRAFT - T. ADAMS

1            Yeah, so on the administrative record

2    topic for one second, I had seen that PEARSIS

3    had mentioned administrative records in the

4    definition.  Is that system used for this

5    purpose?

6         A.   PEARSIS processes the data from

7    administrative records and then provides it to

8    DRPS to be used in the actual census

9    tabulations.

10        Q.   Understood.  Okay.  And is PEARSIS

11   being used in this census?

12        A.   Yes.

13        MR. SVERDLOV:  Objection, vague.

14   BY MS. ROBINSON:

15        Q.   Okay.  Thank you.

16             So if we wanted to know how many units

17   were being counted through administrative

18   records, that would be a calculation from DRPS?

19        A.   Yes.

20        Q.   Okay.  And so --

21        A.   Specifically -- go ahead.

22        Q.   Sorry, please.

23        A.   No, you're good.

24        Q.   You were going to say and specifically?

25        A.   No, you first, you first.

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     Q.   Okay.  Well, I was going to ask you the

2   questions then about how the data from DRPS is

3   downloaded, what --

4     MR. SVERDLOV:  Objection, form.

5     THE WITNESS:  What do you mean?  That one I

6   need some help with.

7   BY MS. ROBINSON:

8     Q.   How did you get the information out of

9   the system so you can view it?

10    A.   The DRPS produces data files.  There is

11  not a reporting system from it or anything like

12  that.  It's product our census data files.

13  Those files are on servers and you perform

14  calculations on those using computer code.

15    Q.   Okay.  You perform the calculations on

16  the files themselves or the data in DRPS?

17    A.   Generally on the files that result from

18  DRPS.

19    Q.   Okay.

20    A.   And those we've referred to as DRF.

21  CUF, CEF.

22    Q.   What do those stand for?

23    A.   Decennial Response File, Census

24  Unedited File and Census Edited File.  Sorry

25    about that.  I try with the acronyms.

89

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     Q.   That's okay.  And so I'm sorry, what

2  was the first acronym?  DRF?

3     A.   Yes, Decennial Response File.

4     Q.   Okay.  And so is the DRF the first

5  stage and then there is certain metrics

6  performed and then it's the CUF?

7     A.   Yeah, they're sequential in the order

8  that I listed.

9     Q.   Okay.  And so at what point is -- do

10  the administrative -- I'll start again.

11        At what point are the administrative

12  records reflected in that data?

13     MR. SVERDLOV:  I'm sorry.  Hold on one

14  second.  I'm going to object to form.

15        You can go ahead.

16     THE WITNESS:  I'm thinking.

17  BY MS. ROBINSON:

18     Q.   Sure.  Take your time.

19     A.   I don't know which of those two or

20  which of those three.  It is one of them and I

21  don't want to give you an incorrect answer.

22     Q.   Okay.  But in one of those three

23    files --

24         A.    Yes.

25         Q.    -- there would be a column indicating

                                                        90
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS


1    that an administrative record was used --

2         A.    Right.

3         Q.    -- for (inaudible)?

4         A.    I believe it is DRF1 but I'm not

5    certain.

6         Q.    Okay.  And has that occurred yet?

7         A.    DRF1 is currently being produced.

8         Q.    So would it be possible today to figure

9    out how many instances the administrative record

10   is being used?

11        MR. SVERDLOV:  Objection, vague.

12        THE WITNESS:  Preliminary estimates, yes, but

13   until all the census processes are actually done

14   and the data are ready for tabulation, you

15   wouldn't have a final estimate.  You could only

16   have preliminaries.

17   BY MS. ROBINSON:

18        Q.    And how would you pull that preliminary

19   data?

20        A.    How do you mean?

21      Q.   How would you find the answer?

22      A.   Sorry.  I don't understand.

23      Q.   No, no, I'm sorry.  And my questions

24   are -- this is not what I do for a living.

25           So if -- I understand that it would

                                                       91
           UNCERTIFIED ROUGH DRAFT - T. ADAMS

 1   just be preliminary.  But --

 2      A.   Uh-huh.

 3      Q.   -- if you, today, were to figure out

 4   how many times the administrative record was

 5   used in the count, how would you go about doing

 6   that?  What system would you use?

 7      A.   We would have an analyst write some

 8   computer code to perform an ad hoc tabulation to

 9   do so --

10      Q.   Okay.

11      A.   -- on the -- on the files that DRPS

12   produces.

13      Q.   Okay.  DRPS is a system?  Oh, yes,

14   that's number 20.

15      A.   Decennial Response Processing System.

16      Q.   Okay.  And can you give me an estimate

17   how long it would take to write that code and do

18   that tabulation?

19        A.   Again, several days in order to ensure

20   that the tabulations are done correctly.

21        Q.   Okay.   Thank you.

22             Are there -- in the DRPS data on

23   administrative records, are there divisions

24   between high quality and low quality?

25             MR. SVERDLOV:  Objection, vague and

                                              92
                 UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    foundation.

2         THE WITNESS:  Wait, could you ask that again,

3    please?

4    BY MS. ROBINSON:

5         Q.   Sure.  Are there divisions in the

6    administrative record data between high quality

7    and low quality?

8         MR. SVERDLOV:  Same objections.

9         THE WITNESS:  There is a -- yeah, sorry about

10   that.  There are those that we deem acceptable

11   for use --

12   BY MS. ROBINSON:

13        Q.   Okay.

14        A.   At various points in the process.

15        Q.   Uh-huh.

16        A.   And that's how we make that.  It's less

17    high quality, low quality as this is of

18    sufficient quality for us to use for a given

19    purpose.

20        Q.   And is that data kept somewhere?

21        MR. SVERDLOV:  Objection, vague.

22    BY MS. ROBINSON:

23        Q.   The data that shows which ARs are of

24    sufficient quality to use and which ARs are not?

25        MR. SVERDLOV:  Objection, form.

                                              93
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1         THE WITNESS:  Yes.

2     BY MS. ROBINSON:

3         Q.   Is that in DRPS?

4         A.   No.

5         Q.   Where is that kept?

6         A.   It would be kept in a combination of --

7     it would be in CAES and could have it may be in

8     PEARSIS.  CAES is C-A-E-S.

9         Q.   And then does DRPS only reflect the

10    administrative records that have been deemed

11    sufficiently acceptable?

12        A.   Correct.

13        Q.   Okay.  And you think we would have to

14    query both PEARSIS and CAES to fine --

15      A.   I believe --

16      Q.   -- to fine the number -- that's fine --

17 to find the number of ARs that were deemed not

18 sufficiently acceptable?

19      MR. SVERDLOV:  Objection, form.

20      THE WITNESS:  Yeah, I believe so.

21 BY MS. ROBINSON:

22      Q.   Okay.  Do you know if a code would have

23 to be written to figure out that information in

24 PEARSIS and CAES?

25      A.   I don't know, but presumably, yes.

                                              94
            UNCERTIFIED ROUGH DRAFT - T. ADAMS

1      Q.   Okay.  And if that is the case, would

2 it take -- case, case -- would it take two to

3 three days in your estimation?

4      MR. SVERDLOV:  Objection, calls for

5 speculation.

6      THE WITNESS:  Something of that nature.

7 BY MS. ROBINSON:

8      Q.   Okay.  Thank you.

9      A.   Multiple days, let's go with that.

10      Q.   Yeah, understood.

11           So I have a couple more of these.  NRFU

12 housing unit numbers and percentages missing

13    certain information such as name or date of

14    birth?

15         A.   Okay.

16         Q.   Is that information in CDL?

17         MR. SVERDLOV:  Objection, vague.

18         THE WITNESS:  It is.

19    BY MS. ROBINSON:

20         Q.   Do you know if it's in any of the UTS

21    reports?

22         A.   I don't believe it is.

23         Q.   Okay.  What about information regarding

24    total in-person household enumerations?

25         MR. SVERDLOV:  Objection.

                                          95
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1         THE WITNESS:  Total in-person household.  I'm

2    struggling a little bit with that one --

3    BY MS. ROBINSON:

4         Q.   Okay.

5         A.   -- and what you mean by it.

6         Q.   So I would like to know if CDL could

7    provide a calculation of in-person household

8    enumerations versus enumerations by proxy?

9         MR. SVERDLOV:  Objection, form.

10        THE WITNESS:  Yeah, preliminary estimates,

11    yes.

12    BY MS. ROBINSON:

13        Q.   Why would they be preliminary?

14        A.   Because the census hasn't been the --

15    the census post processes haven't been run yet,

16    so you would only be able to tell for a given

17    operation how many were with household members

18    versus with a proxy.  You wouldn't be able to

19    tell across the operations because the processes

20    haven't been done net.

21    BY MS. ROBINSON:

22        Q.   Thank you.

23             And by operations do you mean different

24    geographic operations?

25        A.   No, the census is composed of a series

                                              96
                 UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     of operations.  Examples include internet

2     self-response, paper data capture, nonresponse

3     follow-up, update leave.  So each of those is a

4     different way that people can submit their data.

5         Q.   Okay.  Could you do the calculation of

6     enumerations in person versus proxy for 2010 in

7     CDL?

8         A.   No, no.

```
 9        MR. SVERDLOV:  Objection, vague.

10        THE REPORTER:  Counsel, did you say

11   objection, vague.

12        MR. SVERDLOV:  I did.

13        THE WITNESS:  I'm trying, I promise.

14   BY MS. ROBINSON:

15        Q.   You can answer.  Why not?

16        A.   CDL contains data from 2020.

17   BY MS. ROBINSON:

18        Q.   Okay.  Was CDL used in 2010?

19        A.   No.

20        Q.   Where is the data maintained for 2010?

21        MR. SVERDLOV:  Objection, foundation.

22        THE WITNESS:  In the census data warehouse.

23   BY MS. ROBINSON:

24        Q.   Is that an archived system?

25        MR. SVERDLOV:  Objection, vague.
```

                                        97
           UNCERTIFIED ROUGH DRAFT - T. ADAMS

```
 1        THE WITNESS:  It's a -- yeah, so it's -- the

 2   data are -- in the census data warehouse as part

 3   of the research and methods directorate and our

 4   stored in -- I'm thinking.  Give me a second.

 5   Yes, I know that they are in the census data

 6   warehouse.
```

7    BY MS. ROBINSON:

8         Q.    Okay.  Can the census data warehouse be

9    queried?

10        A.    Yes.

11        Q.    Okay.  Does the census data warehouse

12   keep the data at a similar level of granularity

13   as the CDL?

14        A.    Yes.

15        Q.    Is there any data related to the 2010

16   census that is not kept in the CDW?

17        MR. SVERDLOV:  Objection, vague.

18        THE WITNESS:  Yeah, it -- I -- what kind

19   of -- I need a little more --

20   BY MS. ROBINSON:

21        Q.    Sure.

22        A.    -- specifics on that one.

23        Q.    Yeah, I understand.

24             So if we wanted to do comparisons of

25   some of the metrics we just discussed such as

                                        98
                   UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    proxy, proxy excluding vacant houses or

2    nonexisting addresses and compared those same

3    metrics to the ones from 2010, would all of the

4    2010 data be in the CDW?

5          MR. SVERDLOV:  Objection, form.

6          THE WITNESS:  To compare to final -- to

7    compare to final data, yes.

8    BY MS. ROBINSON:

9          Q.   Okay.

10         A.   If we're comparing to -- many of the

11   summary counts are in published assessments

12   already that we would refer back to.

13         Q.   Okay.  But do you know if a published

14   assessment includes for 2010 the number of

15   proxies excluding vacant or nonexisting

16   households?

17         A.   Yes.

18         Q.   There are published assessments that

19   have that metric?

20         A.   Uh-huh.  And not to cut you off, but

21   are we going to take a break here pretty soon?

22         MS. ROBINSON:  We can take a break now if you

23   need one, yes.  Yeah, I'm happy to.

24         THE WITNESS:  If we need to finish a little

25   set, that's fine.  But at some point we need to

                                           99
               UNCERTIFIED ROUGH DRAFT - T. ADAMS


1    take a little pause.

2          MS. ROBINSON:  If you'd like a break now,

3      let's do it.

4          THE WITNESS:  Great.

5          MS. ROBINSON:  Yes, yes.  Any time, please

6      ask me.  I don't want to make this more painful.

7          THE WITNESS:  It's not painful.  Just we need

8      a break.

9          MS. ROBINSON:  That's fine.  Actually, it's

10     12:10.  The time has flown.  Should we take, you

11     know, 20 minutes for lunch or what makes sense?

12         THE WITNESS:  That would be great.

13         MS. ROBINSON:  Great.  So we will go back on

14     at 12:30, sorry.

15         MR. SVERDLOV:  One second.  Could we take

16     half an hour?  There is something I need to take

17     care of as well.  And just come back at 12:40.

18         MS. ROBINSON:  12:40 it is.  Sounds great.

19     Thank you both.

20         THE VIDEOGRAPHER:  Okay.  Going off the video

21     record at 12:11.

22                         (Whereupon, a recess was had at

23                          12:11 p.m. after which the

24                          deposition was resumed at

25                          12:50 p.m. as follows:)

                                          100
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     THE VIDEOGRAPHER:  And we're back on the

2     record at 12:49.  Please continue.

3     BY MS. ROBINSON:

4         Q.   Great.  Ms. Adams, did you talk to

5     anyone about the substance of your testimony

6     during that break?

7         A.   No.

8         Q.   So back to the 2010 data in the CDW, is

9     that maintained on a tracked level?

10        MR. SVERDLOV:  Objection, vague.

11        THE WITNESS:  What kind of information do you

12    want to know about the data?  Can you clarify

13    for me.

14    BY MS. ROBINSON:

15        Q.   Sure.  For example.  The proxy data,

16    how many households were enumerated by proxy?

17        A.   The data there are the equivalent of

18    the Decennial Response Files, the CUF, the CEF.

19    So it would be maintained on a record-by-record

20    granularity.

21        Q.   All right.  Could you query the

22    database to figure out that statistic on a tract

23    basis?

24        A.   Presumably, yes.

25        Q.   Okay.  Do you know if you would have to

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    write a script to query the database in that

2    way?

3         A.   Yes, somebody would have to write code.

4         Q.   Are there any reports that are

5    accessible from that CDW database?

6         A.   No.

7         Q.   And to download the information from

8    the CDW database, do you download it to an

9    Excel?

10        MR. SVERDLOV:  Objection, vague.

11        THE WITNESS:  Whomever writes the script

12   would create an output file such that it could

13   be used for whatever reporting purposes are

14   needed.  Excel is one option; comma separated.

15   BY MS. ROBINSON:

16        Q.   Great.  Okay.

17             Turning back to the 2020 census and the

18   data available in the CDL, is it possible to

19   calculate the percentage of addresses in the

20   NRFU universe that were obtained during the

21   closeout phase?

22        A.   It is actually not possible to do that

23   calculation in CDL.

24      Q.    Could you do it in another database?

25      A.    Yes.

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1       Q.    Which one?

2       A.    We would use MOJO Hermes to perform

3    that calculation on the field OCS data.

4       Q.    And what is the field OCS?

5       A.    Do you remember how -- when we talked

6    about the systems and there was ECaSE FLD OCS?

7       Q.    Yes.

8       A.    That.

9       Q.    What does OCS stand for again?

10      A.    Operational Control System.

11      Q.    Okay.  And if we wanted to know when

12   addresses were added to the master address file,

13   how would you figure that out?

14      MR. SVERDLOV:  Objection, form.

15      THE WITNESS:  Let me think for a second.  So

16   we would ask geography division how many

17   addresses got added to the master address file

18   as a result of whatever process we cared about

19   that added addresses.

20   BY MS. ROBINSON:

21      Q.    Can you give me an example of the

22   process?

23       MR. SVERDLOV:  Objection, form.

24       THE WITNESS:  That one I'm going to need a

25   little more clarification for, please.

                                                    103
                 UNCERTIFIED ROUGH DRAFT - T. ADAMS

 1   BY MS. ROBINSON:

 2       Q.   What I'm trying to ask is can you

 3   figure out by date when an address is added to

 4   the master address file?

 5       A.   So -- so -- yes.  The answer to that is

 6   yes, we can.

 7       Q.   Okay.  And what system would you use to

 8   do that?

 9       A.   I would use -- let's flip back to the

10   list of systems we had up.

11       Q.   That's Exhibit 2.  If someone can pull

12   that up.

13       A.   System number 35, MAF/TIGER.

14       Q.   Okay.  Does MAF/TIGER also provide data

15   on how each address is enumerated?

16       MR. SVERDLOV:  Objection, vague.

17       THE WITNESS:  Yeah, can you ask me that a

18   little differently?  I think I do need a little

19   clarification there.

20    BY MS. ROBINSON:

21        Q.    Sure.

22        A.    Thanks.

23        Q.    Does MAF/TIGER reflect which addresses

24    were enumerated by proxy?

25        MR. SVERDLOV:  Objection, vague.

↑

                                                       104
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS

1        THE WITNESS:  Yeah.  No, it doesn't.

2    MAF/TIGER is a list of addresses.

3    BY MS. ROBINSON:

4        Q.    Okay.

5        A.    So it does not have that information

6    with it.

7        Q.    It also has the date in which each

8    address was entered into the file; is that

9    right?

10        A.    I would have to check specifically

11    which date it would carry with it and if we

12    would have to use a combination of data to

13    determine exactly what date addresses were

14    added.

15        Q.    Okay.  Understood.

16        What database would you use to

17    calculate the percent of addresses that were

18    unresolved after data collection concluded?

19        MR. SVERDLOV:  Objection, speculation.

20        THE WITNESS:  The data from DRPS.  So what --

21    one of the later response files, the CUF or the

22    CEF.

23        MR. SVERDLOV:  For the record, my objection

24    was to foundation.  I think it didn't reflect

25    accurately in the live transcript.

                                                      105
                  UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    BY MS. ROBINSON:

2        Q.   And does that DRPS file have a field or

3    column to indicate which addresses were

4    unresolved after data collection concluded?

5        A.   I don't know that it has a specific

6    column to tell you this one is resolved or this

7    one is not resolved.  It has information that

8    allows us to know that.

9        Q.   What information is that?

10        A.   To provide a list of fields I would

11    need to look at the specific fields that are in

12    each file.

13        Q.   Could you give me a couple examples?

14        MR. SVERDLOV:  Objection, vague.

15        THE WITNESS:  Again, not without looking at

16    specifically what's -- what is in each file as

17    they're specified.

18    BY MS. ROBINSON:

19        Q.    And what are the files?

20        A.    The DRF-2, CUF and CEF.

21        Q.    Right.  Okay.

22              About how many fields do those

23    spreadsheets have or files have?

24        MR. SVERDLOV:  Objection, vague.

25

                                              106
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    BY MS. ROBINSON:

2        Q.    You can answer.

3        A.    We would want to look at the

4    documentation to provide a good answer.

5        Q.    Can you provide me an approximation?

6    Is it more than a thousand?

7        A.    I don't think so.  But, again, I would

8    want to look at the documentation.

9        Q.    Okay.  Did you review those files

10   before the deposition?

11       A.    No.

12       Q.    Okay.  Okay.  Does the CDL calculate

13   the number and percent of NRFU addresses

14    enumerated as vacant housing units?

15        A.    Yes.

16        Q.    Okay.  Does it calculate the number and

17    percent of NRFU vacant housing unit

18    enumerations -- I'm sorry.  I've asked you this

19    about administrative records.  We've already

20    been over that.

21            Does the CDL calculate the vacancy rate

22    based on the total number of occupied and vacant

23    addresses?

24        MR. SVERDLOV:  Objection, form and

25    foundation.

                                                107
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1        THE WITNESS:  I'm not certain if it

2    calculates that exact rate.  Again, I would want

3    to look at documentation to make certain I'm

4    telling you the right answer.

5    BY MS. ROBINSON:

6        Q.    And the documentation you would look at

7    are the ICDs?

8        A.    No.  I would look at the requirements

9    for the UTS reports.

10        Q.    Okay.  But the CDL can do more

11    calculations than just what's reflected in the

12  UTS reports, correct?

13      MR. SVERDLOV:  Objection, form and

14  foundation.

15      THE WITNESS:  Someone can write scripts to

16  form additional calculations, yes.

17  BY MS. ROBINSON:

18      Q.   Okay.  I thought that the CDL could be

19  queried in ways other than how the UTS reports

20  are structured.

21      A.   It can.

22      MR. SVERDLOV:  Objection, form

23  BY MS. ROBINSON:

24      Q.   Okay.  So do you think the CDL could be

25  queried to determine the vacancy rate calculated

                                        108
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1  based on the total number of occupied and vacant

2  addresses?

3      A.   Preliminary numbers, yes.  But for

4  final answers, you have to wait until the

5  decennial post processing is done.

6      Q.   Okay.  Okay.

7          What about reinterview data, is that in

8  CDL?

9      MR. SVERDLOV:  Objection, vague.

10        THE WITNESS:  Yeah, I do need you to be a

11   little more specific about that, please.

12   BY MS. ROBINSON:

13        Q.   Sure.  Well, how -- I'll ask this.

14   What types of data is kept on the reinterview

15   process?

16        MR. SVERDLOV:  Objection, foundation.

17        THE WITNESS:  So it depends on which part of

18   the process that we're discussing.  Can you be

19   really specific about kind of what you want to

20   know about?

21   BY MS. ROBINSON:

22        Q.   Maybe you can walk me through the

23   processes.  I'm interested in how they get

24   triggered and what the results are and where

25   that data is kept.

                                            109
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1        MR. SVERDLOV:  Objection.  Form of the

2   question, vague and compound.

3        THE WITNESS:  All right.  Let's start with

4   how cases are triggered.

5   BY MS. ROBINSON:

6        Q.   Okay.

7        A.   Okay.  A series of data goes from FOCS

8    to SMaRCS.  These are two systems we talked

9    about before.  And there is a series of tests

10   performed on those data to determine if it is --

11   if that case or that -- if that case is likely

12   to have issues or if a given enumerator is

13   likely to have issues.

14         It also uses administrative records in

15   a different -- we match the responses to

16   administrative records to determine if they are

17   likely to be falsified.  And a series of checks

18   are performed largely using paradata.  So that's

19   data about the interviewing process itself.

20         And if a case is likely enough to be

21   falsified, it is more likely to be selected for

22   a reinterview than if a case is not likely to

23   have been falsified or to have issues.  They are

24   all about the selection process.  Those data are

25   kept in SMaRCS.

                                        110
                  UNCERTIFIED ROUGH DRAFT - T. ADAMS

1          So I think the second part of your

2    question was about, what about the results of

3    noninterview -- sorry, reinterview.

4          Q.   Of the reinterview.

5          A.   So each case is sent out to the field

6       and the results of the reinterview are kept in

7       the same way that the results of any other NRFU

8       interview are kept.  They come back to FOCS.

9       They are transmitted to CDL.  They are also

10      transmitted to SMaRCS.

11              The results in SMaRCS are then

12      post-processed and if needed a clerk will review

13      the information to determine if there is any

14      sorts of problems with the original interview.

15      And if there are, they can suggest that -- that

16      that enumerator's work be failed.  And all of

17      those data are kept within SMaRCS.

18      Q.   Okay.  Thank you.

19           So --

20      A.   Yep.

21      Q.   And the data in SMaRCS can be queried?

22      MR. SVERDLOV:  Objection, vague.

23      THE WITNESS:   The SMaRCS data is stored in

24      an Oracle database so it can be queried as any

25      other Oracle database could.

                                                    111
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS

1       BY MS. ROBINSON:

2       Q.   And you can export data from an Excel

3       into it?

4          A.    If the data are summarized enough, yes.

5          Q.    Could the re -- could the reinterviewed

6     data indicating which cases have been selected

7     for reinterview be exported into an Excel?

8          A.    One second.  I'm doing calculations in

9     my head.  If you want record-by-record, it would

10    have to be put into many Excels.  If you want

11    summary tabulations, then you would be okay.

12    How many --

13         Q.    Would the summary tabulations be by

14    tract?

15         A.    They can be.

16         Q.    What program is used to assign the

17    enumerators their work?

18         MR. SVERDLOV:  Objection, foundation.

19         THE WITNESS:  Sorry, Alex.

20         MR. SVERDLOV:  That was it.  Thanks for

21    waiting.  Objection, foundation.  But I'll add a

22    form objection as well.

23    BY MS. ROBINSON:

24         Q.    So you can answer.  Yeah, sorry.

25         A.    MOJO Route Optimizer.

                                        112
                 UNCERTIFIED ROUGH DRAFT - T. ADAMS

1          Q.    Okay.  Is that the MOJO Field

2    Processing or MOJO Optimizer Modeling?

3        A.   MOJO Optimizer Modeling.

4        Q.   Oh, that one is still in use.  Okay.

5        MR. SVERDLOV:  Objection, form.

6    BY MS. ROBINSON:

7        Q.   Does MOJO Optimizer Modeling track the

8    enumerator's progress?

9        MR. SVERDLOV:  Objection, vague.

10        THE WITNESS:   Yeah.  So I need you to ask

11    specifically what you mean by that.

12    BY MS. ROBINSON:

13        Q.   Sure.  Is the productivity of each

14    enumerator tracked?

15        MR. SVERDLOV:  Objection, vague.

16        THE WITNESS: Not in the optimizer itself.

17    BY MS. ROBINSON:

18        Q.   Where is it tracked?

19        A.   The productivity -- so let me -- I do

20    need a lot of clarification on this.

21             Like which measure are you talking

22    about, which -- I want to make sure I give you

23    the right source information.

24        Q.   So the Census Bureau has released

25    productivity rates.

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     A.   Okay.

2     Q.   Where does that -- where is that data

3   stored?

4     MR. SVERDLOV:  Objection, vague and

5   foundation.

6     THE WITNESS:   And I'm sorry to be pedantic

7   about this.  I just want to make sure I give you

8   the right answer.  Can you show me a source of

9   this data so -- so I can make sure that I tell

10  you right?  As we saw, 605 pages of numbers flew

11  around.  I want to make sure I get this right.

12  BY MS. ROBINSON:

13    Q.   So I think I will in one of the

14  exhibits coming up.  But I did think in the

15  beginning of the overview on CDL, you mentioned

16  that paradata such as productivity rates were

17  maintained in CDL.

18    MR. SVERDLOV:  Objection, form.  Go ahead.

19    THE WITNESS:  I was going to say what I said

20  was paradata such as the enumerators' pay

21  records are stored there, not their

22  productivity.  So the number of hours they work

23  are stored in CDL.

24  BY MS. ROBINSON:

25      Q.   Okay.  But if you wanted to know of

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1   their assigned workload on a given day, how much

2   of it was completed, what database would you

3   look in?

4        MR. SVERDLOV:   Objection, form and

5   foundation.

6        THE WITNESS: So let me repeat back to you.

7   Of the work they were assigned that day, how

8   much of it was completed?

9   BY MS. ROBINSON:

10       Q.   Uh-huh.

11       A.   Yes, you can look in CDL.

12       Q.   Okay.  Can you tell me what optimizer

13  data is?

14       A.   I can tell you what the optimizer is.

15  I can tell you what data is.  I'm not certain --

16  can you clarify what you mean by optimizer data?

17       Q.   Yeah, or the optimizer software?

18       A.   Okay.  The optimizer software is a

19  piece of software that uses the enumerator's

20  home location.  Special skills they may have

21  such as language, their ability to speak other

22  languages.  The work that's available in their

23    area, the amount of time that they've said

24    they're available, the hours they say they are

25    available and a series of priorities given to

115

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    each case to determine the most optimal route,

2    not for that individual enumerator, but for the

3    group of enumerators in a given area.

4         Q.   Okay.  Does that software take into

5    account hard-to-count populations?

6         MR. SVERDLOV:  Objection, vague.

7         THE WITNESS:   Yeah, cam you describe what

8    you -- not what you mean by hard-to-count

9    populations but by take into account?

10   BY MS. ROBINSON:

11        Q.   Does it account for whether -- when the

12   optimizer is providing that route information,

13   is that determined or related to which

14   populations in the area are hard to count?

15        MR. SVERDLOV:  Objection, vague.

16        THE WITNESS:  The optimizer uses -- if the

17   enumerator speaks another language and if the

18   respondent has already said that they speak a

19   different language, it will match those up.  It

20   does not take into account the -- any of the

21    hard to enumerate scores.

22    BY MS. ROBINSON:

23        Q.   Uh-huh.  Where are the

24    hard-to-enumerate scores or -- I'll rephrase.

25            What data system of the 52 uses the

                                                    116
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     hard-to-count scores?

2         MR. SVERDLOV:  Objection, assumes facts not

3     in evidence.

4         THE WITNESS:   I'm trying to think through

5     the list of where that would be used.  And I

6     think to best satisfy that answer, it would

7     behoove us to actually provide some

8     documentation.  Off the top of my head, I

9     couldn't tell you who uses it and who doesn't.

10    BY MS. ROBINSON:

11        Q.   Okay.  Do you know if it's in CDL?

12        A.   Actually, I don't.

13        Q.   Okay.  Do you know if it's -- do you

14    know if it is in any UTS reports?

15        A.   I don't know.

16        Q.   Okay.  What about Geo data, what

17    database is that kept in?

18        MR. SVERDLOV:  Objection to form and

19    foundation.

20        THE WITNESS:  I need a little help with what

21    you mean by Geo data.

22    BY MS. ROBINSON:

23        Q.   My understanding is that -- well, I

24    think you said at the beginning that some of the

25    data that -- that CDL kept was data as far as

                                                    117
                UNCERTIFIED ROUGH DRAFT - T. ADAMS


1    where the enumerators were at all times so you

2    could tell how long an enumerator was standing

3    at someone's front door, for example.

4        A.   Oh, okay.

5        MR. SVERDLOV:  Objection, Foundation and

6    form.

7    BY MS. ROBINSON:

8        Q.   Is that Geo data kept in CDL?

9        A.   If it is not in CDL, it is in FOCS.

10       Q.   Okay.  So it might be in CDL?

11       A.   Correct.  Field by field I would want

12   to look at documentation before I answered you.

13       Q.   Okay.  And what is FOCS?

14       A.   Field Operational Control System.

15       Q.   Okay.  I don't see that on the list.

16       A.   ECaSE FLD OCS.

17      Q.   Oh, ECaSE.  Thank you.

18      A.   I want to say it's like 20 something.

19      Q.   Yes, ECaSE.  Thank you.

20           Okay.  I have a couple other questions

21    about the master address file and MAF/TIGER.  Is

22    the DCF extracted from MAF/TIGER?

23           MR. SVERDLOV:  Objection, vague.

24           THE WITNESS:  DCF?  Can you define?

25

                                              118
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     BY MS. ROBINSON:

2          Q.   The (inaudible) -- sure.  It's the

3     control file, the decennial control file that

4     we've been talking about.  Or DRF.  I'm sorry.

5     DRF.

6          A.   Okay.

7          Q.   That's all the acronyms.  Is the DRF an

8     extract from MAF/TIGER?

9          A.   It is not an extract from MAF/TIGER.

10    It uses data from MAF/TIGER.

11         Q.   Okay.  Is the DRF an extract from a

12    system?

13           MR. SVERDLOV:  Objection, vague.

14           THE WITNESS: The -- no.  It's not an extract

15   from a single system.

16   BY MS. ROBINSON:

17      Q.   Okay.  What systems are used to compile

18   it?

19      MR. SVERDLOV:  Objection, vague.

20      THE WITNESS:  It uses data from MAF/TIGER,

21   CARDS, CDL, I believe PEARSIS, and we would want

22   to check documentation to make sure I didn't

23   miss anything else.

24   BY MS. ROBINSON:

25      Q.   Okay.  Thank you.

                                              119
                 UNCERTIFIED ROUGH DRAFT - T. ADAMS

 1         How are the -- I should ask it this

 2   way.  In the DRF, is every address listed?

 3      MR. SVERDLOV:  Objection, vague.

 4      THE WITNESS:  Yeah, that one I need a little

 5   help with.

 6   BY MS. ROBINSON:

 7      Q.   Sure.  I'm trying to understand the

 8   granularity of the DRF pile -- file.  And I'm

 9   wondering if it's based on an address-by-address

10   basis?

11      A.   Yes, it is.

12      Q.   Okay.  And are any addresses not

13    included in that total file?

14        MR. SVERDLOV:  Objection, vague.

15        THE WITNESS:  Yeah, help me out a little bit

16    with that one, please.

17    BY MS. ROBINSON:

18        Q.   Sure.  So we -- certain addresses, if

19    they're determined to be vacant, for example,

20    are those still included in the DRF?

21        A.   Yes.

22        Q.   Okay.  Is there any filtering out of

23    addresses that are considered not sufficient in

24    some way --

25        MR. SVERDLOV:  Objection, vague.

                                        120
                 UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    BY MS. ROBINSON:

2        Q.   -- when completing the DRF?

3        MR. SVERDLOV:  Objection, vague.

4        THE WITNESS: I need a little help with that,

5    please.

6    BY MS. ROBINSON:

7        Q.   Sure.  So we talked about when you were

8    doing administrative records that certain ones

9    were not sufficient to include.  I'm wondering

10   if there is a similar quality check processes on

11    the addresses.

12         MR. SVERDLOV:  Objection, vague.

13         THE WITNESS:  As long as an address is in the

14    MAF, the decennial MAF, it's eligible to be

15    included in the DRF.

16    BY MS. ROBINSON:

17         Q.   Okay.  And you said eligible.  But is

18    it -- are all of them included automatically?

19         A.   Yeah, sorry.

20         Q.   That's okay.

21         A.   That was poor terminology on my part.

22         Q.   I figured.  Thanks.

23              Okay.  A couple questions on SMaRCS.

24         A.   Sure.

25         Q.   My understanding is that it applies

                                                   121
                  UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    quality control algorithms?

2         A.   Correct.

3         Q.   What are those?  Which ones does it

4    apply?

5         MR. SVERDLOV:  Objection, compound.

6         THE WITNESS:  Yeah I -- I do need that broken

7    down a little bit more, if you could.

8    BY MS. ROBINSON:

9        Q.   Oh, I was just saying the same thing.

10   Which algorithms apply?

11        MR. SVERDLOV:  Objection, vague.

12        THE WITNESS:  In -- in what vein do you mean

13   which algorithms does it apply?  As in --

14   BY MS. ROBINSON:

15        Q.   Well, the document says that SMaRCS

16   applies quality control algorithms.

17        A.   Can you get me back there so I can see

18   it?

19        Q.   Yeah, yeah, we can switch back.  That's

20   the description of what the database is, so I

21   was just reading that.

22        A.   Okay.

23        Q.   See number 47?

24        A.   Yes.

25        Q.   So which ones are those, which kind of

                                              122
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1   quality control is going on there?

2        MR. SVERDLOV:  Objection, compound.

3        THE WITNESS:  Did somebody say something?

4        MR. SVERDLOV:  I objected.

5   BY MS. ROBINSON:

6        Q.   But you can answer.

7     A.   Okay.  So we talked about SMaRCS

8   selecting cases, receiving the results and

9   performing a clerical match, right?

10     Q.   Yes.

11     A.   So when this is saying SMaRCS applies

12   quality control algorithms, that's what it's

13   talking about.

14     Q.   Well, I remember the rereview process

15   but are there other quality control processes

16   that it performs?

17     MR. SVERDLOV:  Objection, foundation.

18     THE WITNESS:  So we enact our quality control

19   in NRFU by selecting cases for reinterview.  So

20   when we say, you know, a reinterview case,

21   that's part of our quality control algorithms.

22   BY MS. ROBINSON:

23     Q.   Yep.

24     A.   Right?  So when we discussed that

25   SMaRCS uses things like administrative records

123

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1   and paradata to determine cases more likely to

2   be falsified and then selects those for

3   reinterview, and then receives the data so that

4   it can compare the original interview to the

5    reinterview, all of those things we talked about

6    are the quality control algorithms that SMaRCS

7    applies.

8         Q.   Okay.  Understood.  Are there any

9    others besides that process?

10        A.   Are we talking about nonresponse

11   follow-up or are we talking about address

12   canvassing?

13        Q.   Let's start with address canvassing.

14        A.   So for address canvassing, the --

15   rather than interviewing an individual house,

16   the lister canvasses a block and makes updates

17   to the address list.

18             So, similarly, SMaRCS receives the data

19   from, in this case LiMA, about the individual

20   blocks that have been canvassed and performs a

21   series of tests to determine if that block is

22   likely to have been falsified -- to have lower

23   quality work.

24        Q.   Okay.

25        A.   And then selects cases for QC work, for

                                          124
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    quality control work that are based on the

2    results of those tests.

3      Q.   Okay.  And what about for NRFU, what is

4   done on that?

5      MR. SVERDLOV:  Objection.

6      THE WITNESS:  For NRFU it's a very similar

7   process but we already went through that one.

8      MR. SVERDLOV:  I'm sorry, I'm going to put an

9   objection.  I don't mean to interrupt.  I'm

10  going to object to form on that.

11  BY MS. ROBINSON:

12      Q.   Could you please explain what the

13  quality control process is for NRFU that's in

14  SMaRCS?

15      MR. SVERDLOF:  Objection, foundation.

16      THE WITNESS:  So like we discussed, SMaRCS

17  receives data from FOCS about the original

18  interview.  It -- there is a match to

19  administrative records that uses the paradata to

20  determine if the case is likely to have lower

21  quality results or be falsified, and then it

22  selects cases more likely to be falsified more

23  frequently.

24          Those cases -- and that generates a

25  reinterview case.  The case is reinterviewed in

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    the field.  It comes back to SMaRCS.  SMaRCS

2    compares the two interviews, the original

3    interview and the reinterview.  And if there are

4    issues, it goes to a clerk who can recommend

5    that there were problems with that case or with

6    that enumerator, and if action needs to be taken

7    on those -- that enumerator.

8    BY MS. ROBINSON:

9        Q.   Okay.  Is the decennial directorate the

10   division responsible for maintaining all the

11   data and systems that support the census?

12       MR. SVERDLOV:  Objection, foundation.

13       THE WITNESS:  Sorry, I think I need a little

14   bit of help with that one.

15   BY MS. ROBINSON:

16       Q.   What's the group that's responsible --

17   I'm sorry, just trying to get a sense of which

18   group or division is responsible for all these

19   data and data systems and databases.

20       MR. SVERDLOV:  Objection, vague and compound

21   and form.

22       THE WITNESS:  So the decennial directorate is

23   responsible for what each system is going to do.

24   Some of the systems lie within the decennial

25   directorate and are part of the organization

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    that is the decennial directorate.  Some of the

2    systems are outside of the decennial directorate

3    and live elsewhere.  They are used either --

4    they are in a variety of places throughout the

5    Bureau.

6    BY MS. ROBINSON:

7         Q.   Okay.  Thank you.  Is the CDL in the

8    decennial directorate?

9         A.   No.

10        Q.   Okay.  Is UTS?

11        A.   No.

12        Q.   Where is the CDL housed?

13        A.   ADSD.

14        Q.   Would you mind telling me what that

15   stands for?  And apologies if you have already

16   done that.

17        A.   Hold on.  I got to think hard.

18        Q.   We can also look it up.

19        A.   Yeah.  It's Application something

20   something Division.

21        Q.   Okay.  And where is the UTS housed?

22        A.   Same place, ADSD.

23        Q.   Great.

24      A.   Now, we should be very clear, it's

25   organizationally housed there.

                 UNCERTIFIED ROUGH DRAFT - T. ADAMS

1      Q.   Yes.

2      A.   The actual infrastructure and data are

3   housed as part of the -- one of the decennial

4   contracts.

5      Q.   Okay.  Thank you.

6           Could we look at Exhibit 3, please.

7      TECHNICIAN WERT:  Sure.  And, Counsel, to

8   clarify, is that the document that we marked as

9   Exhibit 3 or the file name Exhibit 3?

10      MS. ROBINSON:  The file name Exhibit 3,

11   please.

12      TECHNICIAN WERT:  Sure.  Stand by one moment.

13   And we will mark this as Exhibit 4; is that

14   correct?

15      MS. ROBINSON:  Yes.

16                  (Whereupon, Adams Deposition

17                   Exhibit 4 was marked for

18                   identification.)

19      MS. ROBINSON:  That sounds right.  So could

20   you scroll down so Ms. Adams can see the whole

21   document.  I think maybe the bottom might be

22    helpful.  Great.  And then back up to the first

23    page.

24    BY MS. ROBINSON:

25        Q.   Have you seen this document before?

                                                    128
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS

1         A.   Yes.

2         Q.   Okay.  Can you tell me what database is

3     used to generate the data in the three columns?

4         MR. SVERDLOV:  Objection, assumes facts not

5     in evidence.

6         THE WITNESS:  It is generated from page 1 of

7     the 605 page document that you showed me

8     earlier.

9     BY MS. ROBINSON:

10        Q.   I'm sorry, can you be more clear?  What

11    is -- it's generated -- it's not generated from

12    a system?

13        MR. SVERDLOV:  Objection, form.

14        THE WITNESS:  It is -- it comes from the

15    spreadsheet we talked through earlier.

16    BY MS. ROBINSON:

17        Q.   And who maintains that spreadsheet?

18        A.   DCM NRFU.

19        Q.   Okay.  How are calculations like these

20    run on that spreadsheet?

21        MR. SVERDLOV:  Objection, vague and assumes

22    facts not in evidence.

23        THE WITNESS:  So each of the columns -- each

24    of the pieces of source data are taken from UTS

25    reports, special tabulations from CDL.  They are

                                              129
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    put into that spreadsheet and then the numbers

2    that we see here are generated from that

3    spreadsheet.

4    BY MS. ROBINSON:

5        Q.   Okay.  So the data is from UTS and CDL.

6    It goes in to the NRFU staff spreadsheet?

7        A.   Yes.

8        Q.   And then the NRFU staff spreadsheet is

9    used to calculate the numbers on this page?

10        A.   Yes.

11        Q.   Okay.  Thank you.  Very helpful.

12        A.   You bet.

13        Q.   Would -- how often is a document like

14    this created?

15        MR. SVERDLOV:  Objection, vague.

16        THE WITNESS:  Yeah, could you -- could you be

17    a little more specific?

18      BY MS. ROBINSON:

19          Q.   Sure.  So this document says report

20      date, 9/29/20.  Are these reports generated

21      every day?

22          A.   Yes.

23          Q.   Okay.  And who generates them?

24          A.   DCMD NRFU staff.

25          Q.   Are they always on a state level or are

                                        130
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1       they done at a more granular geographic level?

2           MR. SVERDLOV:  Objection, compound.

3           THE WITNESS:  State.

4       BY MS. ROBINSON:

5           Q.   Who receives these documents?

6           MR. SVERDLOV:  Objection, vague and assumes

7       facts not in evidence.

8           THE WITNESS:  Like we talked about with the

9       spreadsheet before, we need to look to determine

10      who was on that "to" list.  And this document is

11      available to the public.

12      BY MS. ROBINSON:

13          Q.   Uh-huh.  Okay.  Are these reports

14      maintained in a central repository?

15          MR. SVERDLOV:  Objection, vague.

16        THE WITNESS:  Yeah.  I mean, they were in

17   email for sure and they are maintained in a

18   repository.  And like we talked about before,

19   we'd have to find out the exact name for you.

20   BY MS. ROBINSON:

21        Q.   Okay.  Thanks.  Could we turn to the

22   file name that's called Exhibit 4, please.

23        TECHNICIAN WERT:  Sure.  Stand by one moment.

24   And, Counsel, are we marking this as Exhibit 5?

25        MS. ROBINSON:  Yes.

131

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1                     (Whereupon, Adams Deposition

2                      Exhibit 5 was marked for

3                      identification.)

4   BY MS. ROBINSON:

5        Q.   So this is a declaration from

6   Mr. Christy.  And if we could turn the page,

7   please, I would like to direct your attention to

8   paragraph four.

9        A.   Okay.

10        Q.   The second sentence I'll just read it

11   if that's okay.  It says, "As of 8:21 p.m.

12   Mountain on October 2, 2020, this census field

13   supervisor area was 95.63 percent complete."

14      A.    Okay.

15      Q.    So what database reflects the

16   completion percentages in a given census field

17   supervisor area?

18      MR. SVERDLOV:  I'm going to -- I'm going to

19   object on the basis of foundation and also to

20   the extent that the questions concern a document

21   that is the statement of Mr. Christy.  I'm going

22   to object on the basis of scope such that the --

23   scope of the notice such that the witness would

24   be testifying in her personal knowledge, not on

25   behalf of the Census Bureau.

                                            132
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1       MS. ROBINSON:  And I will renew my response.

2    This is squarely from the scope of the notice.

3    Obviously the Census Bureau has the data in its

4    possession that allowed it to make -- that

5    allowed, excuse me, Mr. Christy to make a

6    statement that a census field supervise area was

7    95.63 percent complete on a certain day at a

8    certain time and the scope of the notice

9    provides that we are here to find out what that

10   data is and where it resides.

11      MR. SVERDLOV:  I don't intend to take up your

12    time with arguments about the scope.  So I have

13    noted my objection for the record.

14         MS. ROBINSON:  Yes.

15         MR. SVERDLOV:  And that's what it is.

16         MS. ROBINSON:  Noted.

17    BY MS. ROBINSON:

18         Q.   Okay.  If you can please answer the

19    question.

20         A.   MOJO Hermes.

21         Q.   Okay.  Thank you.

22              So MOJO Hermes reflects this rate by

23    census field supervisor area.  Does it also

24    reflect this rate by city?

25         A.   No.

                                          133
              UNCERTIFIED ROUGH DRAFT - T. ADAMS


1         Q.   Does it reflect the rate by tract?

2         A.   No.

3         Q.   Does it reflect the rate by state?

4         A.   No.

5         Q.   Okay.  Okay.  If I could direct your

6    attention to paragraph seven which is on the

7    next page of this document, please.

8              He says -- Mr. Christy says, I'll just

9    read it here, "that he pulled the metrics on

10    various case completion rates to determine

11    whether there were significant differences in

12    the manner for which cases were completed in the

13    CFS area."  And then he discusses the completion

14    rates per the CFS area.

15            Is this data also kept in MOJO Hermes?

16        MR. SVERDLOV:  I'm going to -- I'm going to

17    renew my objection as to scope.

18        MS. ROBINSON:  Okay.  Noted.

19        THE WITNESS: Yes.

20    BY MS. ROBINSON:

21        Q.    Okay.  Is there a field completed cases

22    per attempt in MOJO Hermes?

23        A.    Yes.

24        Q.    Okay.  Is this the same -- does

25    completed cases per attempt mean the same thing

                                              134
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     as closure rates?

2        MR. SVERDLOV:  Objection, vague and compound.

3        THE WITNESS:  Could you please define closure

4     rates for me.

5     BY MS. ROBINSON:

6        Q.    Sure.  So it's -- well, a live -- let's

7     sure, I'm not sure if it's in this document.

8        But we talk about completion rates and closure

9    rates that the Census Bureau does.

10            And so my question is whether

11    completion rates is the same as completed cases

12    per attempt?

13        A.   No.

14        MR. SVERDLOV:  Objection, form.

15    BY MS. ROBINSON:

16        Q.   And there was another field in MOJO

17    Hermes called completed cases per hour?

18        A.   Yes.

19        Q.   And that metric is kept on a CFS area

20    basis?

21        A.   Yes.

22        Q.   And is that updated every day?

23        MR. SVERDLOV:  Objection, vague.

24        THE WITNESS:  It's updated approximately --

25    so, yes.

                                        135
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    BY MS. ROBINSON:

2        Q.   Okay.

3        A.   While you flip, can we take just a

4    couple minute break, please?

5        MS. ROBINSON:  Of course, of course.  Be back

6   at 1:45.

7       THE WITNESS: Perfect.

8       THE VIDEOGRAPHER:  Going off the record at

9   1:40.

10                      (Whereupon, a recess was had at

11                       1:40 p.m., after which the

12                       deposition was resumed at

13                       1:47 p.m. as follows:)

14      THE VIDEOGRAPHER:  And we are back on the

15   record at 1:47.

16   BY MS. ROBINSON:

17      Q.   Thank you.  If we could please pull up

18   Exhibit 7.

19      TECHNICIAN WERT:  Sure, stand by.  It is on

20   screen now.  And, Counsel, this will be marked

21   as Exhibit 6, correct?

22                      (Whereupon, Adams Deposition

23                       Exhibit 6 was marked for

24                       identification.)

25      MS. ROBINSON:  Yes.  Thank you.

                                          136
                UNCERTIFIED ROUGH DRAFT - T. ADAMS


1       TECHNICIAN WERT:  Thank you.

2   BY MS. ROBINSON:

3      Q.   Ms. Adams, have you seen this document

4    before?

5         A.    Yes.

6         Q.    Okay.  I would like to understand a

7    little bit how the metrics on this page are

8    calculated.  What data --

9         A.    Okay.

10        Q.    What data is used to calculate the

11   metric that 99.9 percent of addresses nationwide

12   were accounted for in the 2020 census?

13        MR. SVERDLOV:  Objection, vague.

14        THE WITNESS:  Like the exhibit we just talked

15   about that looks kind of like this one, the same

16   spreadsheet on the 650 page document is where

17   these come from.  Those, in turn, are calculated

18   from feeder data from CDL and UTS.

19   BY MS. ROBINSON:

20        Q.    Okay.  And do you know what field is

21   used to determine how many addresses have been

22   accounted for?

23        MR. SVERDLOV:  Objection, vague.

24        THE WITNESS:  Yeah, the -- what do you mean

25   by which field?

                                                    137
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS


1    BY MS. ROBINSON:

2        Q.    Well, there is a numerator and

3    denominator to make this calculation.  And I'm

4    wondering what field or column is used for the

5    numerator and the numerator is described as

6    addresses nationwide that have been accounted

7    for?

8        MR. SVERDLOV:  Objection, form.

9        THE WITNESS:  So there isn't one single field

10   that says, yes, this is done or, no, this isn't.

11   It's not quite that straightforward.  It's based

12   on whether a given address in our census

13   universe has provided a response in an operation

14   in which -- in which it was included.

15            So it would be disingenuous of me to

16   say that there is a field; rather has that

17   address been responded in any operation.

18   BY MS. ROBINSON:

19       Q.    Yes.  Okay.  And is that data that

20   feeds into that being pulled from CDL?

21       A.    Yes.

22       Q.    Great.  Do you know which fields in CDL

23   are being queried to come up with that number?

24       MR. SVERDLOV:  Objection, vague.

25       THE WITNESS:  Yeah.  There -- it's not just

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    one or two fields.  And so we need to go

2    through -- we need to go through the

3    documentation to determine exactly which fields

4    are included here.

5    BY MS. ROBINSON:

6        Q.    Okay.  Looking down the page, there is

7    a sentence that's bolded at the beginning of the

8    third paragraph that says, "As of October 16th,

9    approximately 24.1 percent of occupied housing

10   units in the NRFU workload have been enumerated

11   by proxy response."

12           How is that percent derived?

13       MR. SVERDLOV:  Objection, vague and compound.

14   And I'm also going to renew my scope objection.

15   Scope objection.

16   BY MS. ROBINSON:

17       Q.    You can answer.

18       A.    Based on data from the CDL.

19       Q.    The sentence also says that the percent

20   is similar to the 2010 rate.  Is that

21   information pulled from the CDW?

22       MR. SVERDLOV:  Objection -- same objection as

23   before.

24       THE WITNESS:  No.  It would have been in a

25    2010 -- the 2010 NRFU assessment.

                                                        139
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    BY MS. ROBINSON:

2         Q.    Is the 2010 NRFU assessment a document?

3         A.    Yes.

4         Q.    Is it a PDF?

5         A.    I believe so.

6         Q.    Do you know where it's maintained?

7         A.    You can find it on the internet.

8         Q.    Okay.  Is the data in that assessment

9    pulled from the CDW?

10        A.    I would have to --

11        MR. SVERDLOV:  Objection.

12        THE WITNESS:  Sorry, Alex.

13        MR. SVERDLOV:  Objection, vague.  Continue.

14        THE WITNESS:  I'd have to look at the 2010

15   assessment to see the source data that they used

16   then.

17   BY MS. ROBINSON:

18        Q.    Okay.  The next paragraph down states

19   that "5.6 percent of addresses nationwide have

20   been completed using high quality administrative

21   records, which is 13.9 percent of the NRFU

22   workload."

23          What data would have been used to

24   calculate that percentage?

25          MR. SVERDLOV:  Same set of objections as

                                        140
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    before.

2          THE WITNESS:  Yeah, I'm not certain.  I would

3    have to go back and ask the people who wrote

4    this where they drew their source data from.

5    BY MS. ROBINSON:

6          Q.   Okay.  Do you know if there is a

7    database that reflects the number of high

8    quality administrative records used for

9    completion?

10         MR. SVERDLOV:  Objection -- I'm sorry.  I

11   didn't mean to interrupt you.

12         MS. ROBINSON:  Sorry.

13         MR. SVERDLOV:  Objection, compound.

14         MS. ROBINSON:  Should I repeat it?

15         MR. SVERDLOV:  Yeah.  Yeah, we can do that.

16   Let's try it again.

17   BY MS. ROBINSON:

18         Q.   So my question is, do you know if there

19   is a database that stores the number of high

20   quality administrative records that has been

21    used for completion?

22        MR. SVERDLOV:  Okay.  So objection, vague and

23    compound.

24    BY MS. ROBINSON:

25        Q.    You may answer.

                                                    141
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1         A.    Yeah.  Well mI do need clarification

2     because it --

3         Q.    Sure,

4         A.    -- it actually is compound.

5         Q.    I'm just reading the sentence.  It's

6     providing a calculation, --

7         A.    Okay.

8         Q.    -- of the percent of addresses that

9     have been completed using high quality

10    administrative records.

11            So I'm just asking if you know of any

12    database that contains data related to the

13    number of high quality administrative records

14    used for completion.

15        MR. SVERDLOV:  Objection, vague.

16        THE WITNESS:  So the answer I would give is,

17    yes.  However, I don't know the source of this

18    particular number and I would want to find out

19    what that source is before I say definitively

20    where it came from.

21    BY MS. ROBINSON:

22         Q.   Well, can you please provide your best

23    guess then?

24         MR. SVERDLOV:  Objection.  Calls for

25    speculation.

                                          142
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1         THE WITNESS:  All right.  It is either CDL or

2    CAES and I don't know which of the two they

3    pulled this from.

4    BY MS. ROBINSON:

5         Q.   Okay.  But CDL and CAES reflect data

6    regarding administrative records?

7         MR. SVERDLOV:  Objection, form and

8    foundation.

9         THE WITNESS: Yeah, I mean, I think -- like I

10    said, the best answer would come from if we

11    could go find the correct answer rather than me

12    speculating.  There is one of two places that

13    this number could have been derived from and I

14    actually would like to be able to find out where

15    that is instead of guessing.  I don't know that

16    that's necessarily appropriate.

17     BY MS. ROBINSON:

18          Q.   If we could move on to Exhibit 8,

19     please.

20          TECHNICIAN WERT:  Stand by one moment.  And,

21     Counsel, this will be marked as Exhibit 7,

22     correct?

23          MS. ROBINSON:  Yes.

24                    (Whereupon, Adams Deposition

25                     Exhibit 7 was marked for

                                              143
               UNCERTIFIED ROUGH DRAFT - T. ADAMS

1                     identification.)

2     BY MS. ROBINSON:

3          Q.   So this is a transcript of the -- a

4     news briefing by the Census Bureau.

5          A.   Okay.

6          Q.   I would like to turn to page 7.  But

7     certainly if you need to read any of it, let me

8     know.  But if you could scroll to page 7.

9     Great.

10          So, yeah, in that last paragraph there

11     that has the yellow highlighting, the first

12     sentence says, "Were able to achieve a numerator

13     productivity number of 1.92 cases per hour

14     versus a 2010 number of 1.01 cases per hour."

15          Do you know what databases or systems

16   would be used to derive those numbers?

17      MR. SVERDLOV:  Objection, foundation, form

18   and scope.  And after -- after witness answers I

19   think it might be appropriate to have maybe an

20   off-the-record conversation between counsel.

21      MS. ROBINSON:  Sure.

22      THE WITNESS:  Yeah.  So the 1.92, the

23   numerator productivity number of 1.92 came from

24   MOJO Hermes.  The 2010 number would have come

25   from 2010 assessments.

                                              144
               UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    BY MS. ROBINSON:

2        Q.   Is that the 2010 NRFU assessment

3    document you referred to?

4        A.   Yes.

5        Q.   Okay.

6        MS. ROBINSON:  Okay.  We can go off the

7    record, Mr. Sverdlov, if you want to.

8        MR. SVERDLOV:  Yes, please.  Just for a

9    minute.

10       THE VIDEOGRAPHER:  Going off the record at

11   1:59.

12                 (Whereupon, a recess was had at

13                    1:59 p.m. after which the

14                    deposition was resumed at

15                    2:03 p.m. as follows:)

16        THE VIDEOGRAPHER:  We are back on the video

17    record at 2:03.

18    BY MS. ROBINSON:

19        Q.   If we could pull up, please, the same

20    exhibit.

21             Okay.  On the next page, page 8,

22    please, there is a sentence in the middle,

23    there's a paragraph that says some of the

24    questions.  And if you could maybe make it just

25    a tiny bit bigger for Ms. Adams.  It's quite

                                                  145
                 UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     small.  Perfect.  Great.

2              So it's that 24.1 percent, just direct

3     your attention.  But the statement says, "As of

4     October 16th when we completed field operations,

5     approximately 24.1 percent of all enumerated

6     occupied housing units were enumerated using

7     information from a proxy."

8              So would data regarding how many

9     enumerated occupied housing units were

10    enumerated using information from a proxy be

11    found in the CDL?

12        A.   Yes.

13        Q.   Would it be found in any other

14    databases?

15        A.   You can also calculate it from FOCS,

16    the Field Operational Control System.

17        Q.   Great.   Thank you.

18        A.   Yeah.

19        Q.   The next sentence provides a

20    23.8 percent final proxy number in the 2010

21    census.

22        A.   Uh-huh.

23        Q.   Are final proxy numbers from the 2010

24    census reflected in the 2010 NRFU assessment

25    document?

                                              146
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1         A.   Yes.   It should be.

2         Q.   Okay. Thank you.

3         A.   Yep, you bet.

4         Q.   The top of the next page, please.

5              This statement at the very top, once

6    again, addresses how many have been -- how many

7    addresses have been completed using high quality

8    administrative records.

9          Do you know where that data would be

10   kept?

11        MR. SVERDLOV:  Objection, form.

12        THE WITNESS:  Yeah, like we talked about

13   before, I think it is in CDL, but if it isn't,

14   it's in CAES.

15   BY MS. ROBINSON:

16        Q.   Thank you.

17        A.   Yeah.

18        Q.   If we could go to page 10, please.

19   Great.  The paragraph at the bottom that starts

20   "for example," states a figure for how many SBEs

21   were enumerated in 2010.  Would the number of

22   SBE's enumerated for 2010 be found in the 2010

23   NRFU assessment document?

24        A.   Not in the NRFU assessment.  It would

25   be in a different assessment of the SBE process

                                           147
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    itself.

2         Q.   Where is that assessment located?

3         MR. SVERDLOV:  Objection, foundation.

4         THE WITNESS:  It would also -- sorry.  Did I

5    hear somebody's voice?

6         MR. SVERDLOV:  Continue.

7        THE WITNESS:  Oh, okay.

8            Presumably it's located in the same

9    location online as the NRFU assessment.

10   BY MS. ROBINSON:

11       Q.   Besides being online, do you know where

12   in the Census Bureau those assessments are

13   maintained?

14       MR. SVERDLOV:  Objection, foundation.

15       THE WITNESS:  Yeah, I don't know.  We would

16   have to go get a location for you.

17   BY MS. ROBINSON:

18       Q.   Okay.  This sentence also provides the

19   SBE number for the 2020 census.  Where is that

20   data maintained?

21       A.   That would be in CDL.

22       Q.   Thank you.

23       A.   Yeah.

24       Q.   The sentence also provides metrics on

25   TNSOLs, Targeted Nonsheltered Outdoor Locations.

                                          148
            UNCERTIFIED ROUGH DRAFT - T. ADAMS


1    Is that data also for 2020 in the CDL?

2        A.   Yes.

3        Q.   Where is it for 2010?

4        MR. SVERDLOV:  Objection, foundation.

5        THE WITNESS:  Yeah, it would also be in an

6    assessment somewhere.

7    BY MS. ROBINSON:

8        Q.   Okay.  So it would be in a separate

9    TNSOL assessment?

10       A.   Honest, I don't --

11       MR. SVERDLOV:  Objection.

12       THE WITNESS:  Sorry Alex.

13       MR. SVERDLOV:  Objection, form.

14       THE WITNESS:   Yeah, I don't know if it's in

15   a separate assessment or if they are combined.

16   BY MS. ROBINSON:

17       Q.   If it were combined, would the -- would

18   it be combined with the SBE assessment?

19       A.   It could be.  Like I said, I'm not

20   certain.  There is a whole cadre of assessments

21   from 2010.

22       Q.   Could you please go to page 23.  So the

23   second paragraph that starts "Because," it says

24   in the second line, "We could tell on the phone

25   how long an enumerator took on every question.

149
UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    We could tell how long they took when they did

2    the interview, where they were -- where they

3    were when they took the interview," and they

4    were enumerating because the Geo codes match.

5    Where is this type of data maintained?

6         A.   The CDL.

7         Q.   Okay.  Thank you.

8              I would like to ask a few questions

9    about the field, the field personnel and field

10   management system.

11             Could you please provide an overview of

12   the field's management structure?

13        MR. SVERDLOV:  Objection, vague and outside

14   the scope of the deposition.

15        THE WITNESS:   Okay.  So a little more

16   specific.

17   BY MS. ROBINSON:

18        Q.   Sure.

19        A.   At what level -- what are you hunting

20   for here?

21   BY MS. ROBINSON:

22        Q.   I'm interested in how the field -- the

23   various levels in the field communicate with

24   each other and submit data to one another.  So I

25   thought it might help to start with the

1    different levels of field management.

2         MR. SVERDLOV:  Objection, form.

3         THE WITNESS:  Okay.  All right.  So there is

4    an enumerator.  The enumerators work for census

5    field supervisors.  Census field supervisors

6    work for census field managers.  Census field

7    managers work for area census office managers.

8    Area census office managers work for area

9    managers.  Area managers work for ARCMs,

10   assistant regional census manager.

11        They work for -- and then by that point

12   we're in the regional office staff.  Do you need

13   more granular than that or does that get you

14   high enough?

15   BY MS. ROBINSON:

16        Q.   No, that's very helpful.

17        A.   Okay.

18        Q.   And then where do the field regional

19   directors fit into that?

20        A.   They are a couple of levels above the

21   ARCM.

22        Q.   Okay.

23        THE COURT REPORTER:  Counsel, sorry to

24   interrupt.  Could anybody not speaking put

25   yourself on mute.

                        UNCERTIFIED ROUGH DRAFT - T. ADAMS

1   BY MS. ROBINSON:

2       Q.   And what system is used to assign the

3   work to the enumerators?

4       A.   So in what fashion?

5       Q.   To assign the -- to assign enumerators

6   what households they should visit, everything

7   else they do during NRFU?

8       MR. SVERDLOV:  Objection, vague and compound.

9       THE WITNESS:  FOCS sends the cases to the

10  enumeration device.

11  BY MS. ROBINSON:

12      Q.   Okay.

13      A.   Assignments can either come as part of

14  the optimization process or they can be directly

15  assigned by a census field manager or someone

16  else with equivalent permissions.

17      Q.   Okay.  And are all communications

18  between the census field manager and the

19  enumerator -- I'll ask it again.

20          How do the census field managers

21  communicate with the enumerators?

22      A.   They can call them.  They can text

23  them.

24      Q.   Okay.

25      A.   We're fairly limited because we --

152

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1   enumerators do not have email.

2       Q.   Okay.  What is the process for field

3   personnel, meaning enumerators or census field

4   supervisors, to lodge complaints with their

5   supervisors or the Census Bureau?

6       MR. SVERDLOV:  Objection, vague.

7       THE WITNESS:  Which -- which -- one question,

8   please.

9   BY MS. ROBINSON:

10      Q.   Sure, I'll ask another way.

11      A.   Okay.

12      Q.   Is there a system that logs complaints

13  from field personnel?

14      A.   Not a single system, no.

15      Q.   Okay.  What are the systems that

16  reflect the complaints?

17      A.   There are -- there is various ways that

18  they can lodge complaints.  They can call their

19  supervisor and complain.  They can call higher

20  up in the chain and complain.  They can send

21  emails from their personal email accounts and

22    complain.  There is even public addresses that

23    they can complain to, you know, complain to.

24    And then they have all the normal routes that an

25    employee could -- could complain and we give

                                                      153
               UNCERTIFIED ROUGH DRAFT - T. ADAMS

 1    them that information.  They can call these

 2    inspector general.  They can call the office of

 3    special counsel.  They can call the EEO office.

 4    All of those places can lodge complaints.  So

 5    there is no one single place we can go to find

 6    complaints.

 7        Q.   Let's look at an example.  Before I do

 8    that, is there a correspondence management

 9    system?

10        MR. SVERDLOV:  Objection, vague.

11        THE WITNESS:  How do you mean?

12    BY MS. ROBINSON:

13        Q.   Is there a system called the

14    correspondence management system that you know

15    of?

16        A.   I don't know.

17        Q.   Okay.  Do you know if the complaint --

18        A.   It's not on the list.

19        Q.   I know it's not on the list.

20          Do you know if the complaints are kept

21     in the communications directorate?

22          A.   Depending on the route in which they

23     come in to the Bureau, they can be logged there.

24     So if it comes in through the routes that the

25     communications director logs, yes, they would be

                                             154
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1      logged there.  If it comes in via one of those

2      other routes, not necessarily.

3           Q.   And what are the routes that the

4      communications directorate logs?

5           A.   I don't know.  We would have to go find

6      that information for you.

7           Q.   Okay.  Do you know if complaints are

8      maintained by the regional offices?

9           A.   I do not.

10          Q.   If complaints are elevated to the

11     Census Bureau headquarters, do you know how

12     those are documented?

13          MR. SVERDLOV:  Objection, vague.

14          THE WITNESS:  Where in headquarters?

15     BY MS. ROBINSON:

16          Q.   The director, for example.

17          A.   Email.

18        Q.    Okay.  Do you know of any central

19    database or repository where the complaints are

20    stored?

21        A.    No.

22        Q.    Do you know who at the Bureau has

23    responsibility for field personnel complaints?

24        A.    I don't know that I understand the

25    question.

155

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1         Q.    I'm wondering if someone like Timothy

2     Olson or James Christy or someone under them

3     would be charged with the responsibility of

4     field personnel complaints?

5         MR. SVERDLOV:  Objection, form.

6         THE WITNESS:  I don't know.  I'm sorry.

7     BY MS. ROBINSON:

8         Q.    That's fine.

9              Do you know of any processes or

10    procedures determining when a complaint should

11    be elevated to a manager?

12        MR. SVERDLOV:  I'm going to object based on

13    scope.

14        THE WITNESS:  How -- could you clarify a

15    little bit, please?

16    BY MS. ROBINSON:

17         Q.   Sure.  Do you know of any process

18    documents that explain when a complaint should

19    be provided to a manager?

20         A.   I don't.

21         Q.   Okay.

22         MS. ROBINSON:  Could we go to Exhibit 8,

23    please.

24         TECHNICIAN WERT:  Sure.  Stand by one moment.

25         MS. ROBINSON:  No, I'm sorry.  We've already

                                                        156
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    done Exhibit 8.   We don't need to go to that.

2    BY MS. ROBINSON:

3         Q.   Could we talk a little bit about

4    post-data collection processing.  Is there

5    something called a universe control and

6    management system that was developed to track

7    the enumeration activities of the 2010 census?

8         A.   Yes.

9         Q.   Okay.  Does that system exist today?

10         A.   No.

11         Q.   Is the data from that system now in the

12    CDW?

13         A.   The outputs from that system would be.

14    I don't know if the databases themselves from

15    there would be in the database warehouse.

16         Q.   Would they be archived somewhere else?

17         A.   I don't know.

18         Q.   Okay.  Can the Bureau compare how many

19    housing units were resolved via administrative

20    record in a given ACO in 2000 and 2010?

21         A.   We didn't use administrative records in

22    2000 and 2010.

23         Q.   Okay.  What about by proxy?  And I'll

24    ask the question again.

25              Can the Bureau compare how many housing

                                                 157
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    units were resolved via proxy in a given ACO in

2    2000 and 2010?

3         A.   The ACO structure is different, so we

4    couldn't make a comparison between the 2010 ACO

5    and a 2020 ACO.

6         Q.   Okay.  What about by tract?

7         A.   I don't know.  Remember how when we

8    talked about tract-based estimates before and I

9    said I would want to talk to others to determine

10    if there is some subtle nuance I'm not missing?

11    Same answer here.

12       Q.   Okay.  But the data for 2000 and 2010

13   was maintained on a tract basis?

14       A.   The data were main -- are records like

15   we talking about before, so address-by-address

16   records, so presumably, yes, they would be

17   tract-based for at least for 2010.

18            For 2000, again, I would want to go

19   check documentation.

20       Q.   Okay.  And do the tracts change from

21   2000, 2010, 2020?

22       A.   Yes, they can.

23       Q.   They do.  Okay.

24       MS. ROBINSON:  Can we now, please, move to

25   Exhibit 13.

                                            158
            UNCERTIFIED ROUGH DRAFT - T. ADAMS

1        TECHNICIAN WERT:  Stand by one moment.

2        MS. ROBINSON:  Actually I'm going to ask a

3    few questions before we put that up.

4    BY MS. ROBINSON:

5        Q.   Are you familiar with the term data

6    anomalies as it is used by the Census Bureau?

7        A.   Yes.

8        Q.   Okay.  So the Census Bureau keeps

9    records of data anomalies?

10          MR. SVERDLOV:  Objection, misleading.

11     BY MS. ROBINSON:

12          Q.   Does the Census Bureau keep records of

13     data anomalies?

14          A.   Yes.

15          Q.   Okay.  Where are those records

16     maintained?

17          A.   There is a tract -- there is a

18     spreadsheet that they have been using to track

19     them for post-processing.

20          Q.   Okay.  What is that spreadsheet called?

21          A.   I don't know the name of it.

22          Q.   Who maintains it?

23          A.   It's a good question.  We could find

24     out.

25          Q.   Where is it located?

                                              159
               UNCERTIFIED ROUGH DRAFT - T. ADAMS

1           MR. SVERDLOV:  Objection, vague.

2           THE WITNESS:  Again, we can find out.

3      BY MS. ROBINSON:

4           Q.   Where is the spreadsheet that has the

5      data anomalies located?  You can answer.

6           A.   I don't know.  We could find out.

7           Q.   Okay.  Do you know if it's an Excel

8      spreadsheet?

9          A.   Sorry, my computer just almost shut

10     down on me.  That would be inconvenient.

11              Presumably, it's Excel.

12         Q.   Okay.  Okay.

13              And do you know if the spreadsheet is

14     being populated manually or is it being

15     populated by data from a system like CDL?

16         A.   Manually.

17         Q.   Okay. And how is the data anomaly

18     information being reported to the group that is

19     then filling out the spreadsheet?

20         MR. SVERDLOV:  Objection, form and

21     foundation.

22         THE WITNESS:  So I'm not certain.

23     BY MS. ROBINSON:

24         Q.   Okay.

25         MS. ROBINSON:  Okay, if we could go to

                                        160
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1      Exhibit 13 now, please.

2          TECHNICIAN WERT:  And, Counsel, this will be

3      Exhibit 8, correct?

4          MS. ROBINSON:  Yes, right, right.  These are

5      from file document.

6          TECHNICIAN WERT:  Okay.  Great.  Thank you

7     very much.

8                    (Whereupon, Adams Deposition

9                     Exhibit 8 was marked for

10                    identification.)

11    BY MS. ROBINSON:

12         Q.   So Ms. Adams, have you seen this

13    document before?

14         A.   Yes.

15         Q.   Okay.  Can you tell me what it is,

16    please?

17         A.   DRF1 anomaly summary.

18         Q.   Okay.  And do you know where this data

19    came from?

20         MR. SVERDLOV:  Objection, vague.

21         THE WITNESS:  From the issue tracker that

22    they are using to track issues with the DRF1.

23    BY MS. ROBINSON:

24         Q.   I'm sorry, the DRF1?

25         A.   Yes.

                                         161
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1          Q.   What is the DRF1?

2          A.   Decennial Response File, number 1.

3          Q.   Okay.  Right.

4          So is the issue tracker the same thing

5     as what I was just calling the Excel, or is that

6     a different document?

7          A.   Same thing.

8          Q.   Okay.

9          A.   And to be fair, I don't know that it's

10    Excel.  There is some method of tracking it.

11         Q.   Okay.  Understood.  We'll call it

12    tracker if that makes sense.

13         A.   There you go.

14         Q.   Okay.  Thank you.

15         Do you know how often the tracker is

16    updated?

17         A.   I do not.

18       MR. SVERDLOV:  Objection, foundation.

19    BY MS. ROBINSON:

20         Q.   Do you know what group put this anomaly

21    summary together?

22         A.   No.

23         Q.   Okay.  Okay.

24       MS. ROBINSON:  Could we put up Exhibit 14,

25    please.

                                            162
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS


1     TECHNICIAN WERT:  Sure.  Stand by one moment.

2        Okay.  It's on screen now and this will be

3    marked as Exhibit 9.

4                        (Whereupon, Adams Deposition

5                         Exhibit 9 was marked for

6                         identification.)

7    BY MS. ROBINSON:

8        Q.   Okay.  If you can go to the next page,

9    please.

10            Have you seen this document before,

11   Ms. Adams?

12       A.   Yeah, can you scroll through it for me,

13   please.

14            I've at least seen a version of it, if

15   not this exact version.

16       Q.   Okay.  Fair enough.

17            So this document is titled 2020 Census

18   Post-Collection Processing.  And can you tell me

19   what source reflects the data on this document?

20       MR. SVERDLOV:  Objection, form.

21       THE WITNESS:  There is not a data source for

22   it.  This is the --

23   BY MS. ROBINSON:

24       Q.   Okay.

25       A.   -- a list of activities that need to

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    happen in order -- that happen as we go through

2    our post-collection processing.

3        Q.   Do you know what group authored this

4    document?

5        A.   I am not certain.

6        Q.   Okay.  Do you know how this document is

7    used at the Bureau?

8        MR. SVERDLOV:  Objection, vague.

9        THE WITNESS:  Presumably to track whether

10   activities are being completed and to capture

11   status as people discuss them.

12   BY MS. ROBINSON:

13       Q.   Okay.

14       MS. ROBINSON:  Can we turn to Exhibit 15,

15   please.

16       TECHNICIAN WERT:  Sure.  Stand by one moment.

17   And it's on screen now.  Counsel, would you like

18   this marked as well?  It will be Exhibit 10?

19       MS. ROBINSON:  Yes, thank you.

20                    (Whereupon, Adams Deposition

21                     Exhibit 10 was marked for

22                     identification.)

23       TECHNICIAN WERT:  Thank you

24   BY MS. ROBINSON:

25      Q.   And if we could scroll to the next

164

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1   page, please.  Is this the tracker we were just

2   discussing of anomalies?

3      A.   This is a document of those anomalies

4   which require patches.

5      Q.   Okay.  Is this -- are the anomalies on

6   this document pulled from the tracker?

7      A.   Yes.

8      Q.   Okay.  Thank you.

9      A.   Yep, you bet.  So I have a question

10   back.  How long are we going to go?  If we are

11   going to be done in 15 minutes I don't want to

12   stop.  If it's going to be another 45 minutes or

13   an hour, I'd want to stop and take a quick

14   break.

15      Q.   So I was hoping to be done at 3.  But

16   it could be 3:15, so I'm fine if you want to

17   take a five-minute break.

18      THE WITNESS:   Yeah, can we do five quick?

19      MS. ROBINSON:  Yes.

20      THE WITNESS: Thank you.

21      THE VIDEOGRAPHER:  Going off the record at

22   2:32.

23                    (Whereupon, a recess was had at

24                    2:32 p.m., after which the

25                    deposition was resumed at

                                                        165
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1                    2:39 p.m. as follows:)

2        THE VIDEOGRAPHER:  Back on the record, 2:39.

3    BY MS. ROBINSON:

4        Q.    Okay.  Ms. Adams, can you tell me what

5    the CUF quality indicators are?

6        A.    By that do you mean a series of quality

7    metrics drive once the CUF is created?

8        Q.    Yes.

9        A.    Can you give me examples thereof?

10       Q.    Yes.

11       A.    To make sure we're using the same

12   words.

13       Q.    Identified as duplicate enumerations

14   across different addresses; records that do not

15   contain information sufficient for

16   deduplication; records that require status or

17   count imputation.

18            Should I keep going?

19       A.    No, no.  I understand what you're

20   talking about now.  So those are a series of

21    indicators that -- that can tell us information

22    about the quality of the census.

23        Q.   And where are those applied to the

24    data?

25        MR. SVERDLOV:  Objection, vague.

166

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1        THE WITNESS:  So they aren't applied.  They

2    are computed.

3    BY MS. ROBINSON:

4        Q.   Okay.

5        A.   These are indicators, metrics, one

6    might say, that are computed after the CUF is

7    created that would tell us information about how

8    the census went.

9        Q.   Okay.

10        A.   What the -- what the end result looks

11    like.

12        Q.   And is there a system that's used to

13    calculate those?

14        A.   They are calculated off of the census

15    unedited file.

16        Q.   Are they queried in the file?

17        MR. SVERDLOV:  Objection, vague.

18        THE WITNESS:  Analysts write code to

19    calculate them.

20    BY MS. ROBINSON:

21        Q.    Okay.  After they are calculated, where

22    are they reflected?

23        MR. SVERDLOV:  Objection, vague.

24        THE WITNESS:  Yeah, how do you mean?

25    BY MS. ROBINSON:

                                                167
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1         Q.    Are they reflected in the CUF file

2     itself?

3         A.    Oh, okay.  No.  No.  They would be --

4     they would be published as part of a document.

5         Q.    What document would that be?

6         A.    Part of the data quality group that is

7     producing information.  It would be part of a

8     series of -- of documents that would be

9     produced.

10        Q.    Okay.  So do you know if quality --

11    those quality indicators can be searched by

12    tract?

13        MR. SVERDLOV:  Objection, vague.

14        THE WITNESS:  Yeah, I don't know what level

15    they are planning to create the quality

16    indicators at yet.

17     BY MS. ROBINSON:

18        Q.   Were they -- were the quality

19     indicators by tract in the 2010 census?

20        A.   I don't know.

21        Q.   Okay.  Okay.

22             So sitting here today, could you run a

23     search to determine how many records in a city

24     were duplicates?

25        MR. SVERDLOV:  Objection, vague.

                                               168
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1         THE WITNESS:  No.

2     BY MS. ROBINSON:

3         Q.   Why not?

4         A.   Because we haven't run the duplication

5     processes.  We would need to wait for the CUF to

6     do that.

7         Q.   Could you run a search to determine how

8     many records in a certain county were missing a

9     name?

10        A.   Yeah.  So we can do preliminary

11    estimates of those kinds of things, but they are

12    preliminary until the proper post-collection

13    processes are run.

14        Q.   And for those preliminary estimates

15    what database is used to run those?

16         A.   One second.  So you can use CDL.  You

17    could also use the DRF1 that's been produced

18    when its ready.

19         Q.   Are any of those -- have any of those

20    preliminary estimates been run?

21         A.   Which ones, from -- give me a list of

22    those that you are interested in.

23         Q.   Sure.

24         A.   Okay, cool.

25         Q.   It's really any of the CUF quality

                                        169
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    indicators but some more examples are ones

2    that inquire -- excuse me, ones that required

3    item imputation for race, Hispanic origin, sex

4    and age from administrative records --

5         A.   Yeah.

6         Q.   -- lacking complete names or date of

7    birth.

8         A.   Preliminary estimates have been run on

9    the DRF1.

10         Q.   And what format is that estimate data

11    in?

12         A.   You mean how do we present that to

13    people?  Is that what you mean?

14        Q.    Exactly.  Is it in Excel?

15        A.    Yeah, there is a PowerPoint deck with

16    some of the information if it.

17        Q.    Okay.

18        A.    A couple of PowerPoint decks.

19        Q.    And who maintains those decks?

20        A.    It depends on the analyst who is doing

21    the work and at what time.  So, for example, the

22    item imputation for, I think you said race and

23    Hispanic origin, there is a slide deck as part

24    of the data quality group.  Some preliminary

25    estimates were run and are part of the CIG

                                          170
            UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    decks.  So there is a couple of different places

2    where we have been monitoring this over time.

3        Q.    Okay.  Are there names for those

4    PowerPoints if we wanted to identify them?

5        A.    I knew you were going to ask that.  I

6    don't know what the actual name of the file is.

7    The data quality has a slide deck that has item

8    missing imputation rates, and they are part of

9    the CIG decks over time.

10        Q.    You said they are part of CIG decks?

11      A.   Yes.

12      Q.   Great.  I have a couple questions on

13  CIG.  So let's do that now?

14      Q.   Do you know when -- well, I'll ask this

15  way.  So when you say they are part of the CIG

16  decks, what do you mean by that?

17      A.   So we're talking about something like

18  item imputation, right?

19      Q.   Uh-huh.

20      A.   Okay.  So once -- once a week we --

21  there was a CIG -- there was a CIG presentation

22  from the realtime analysis of data group.

23  And --

24      Q.   Okay.

25      A.   -- sometimes it would include things

                                            171
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1   like item imputation.

2       Q.   Okay.  So the census integration group

3   receives briefings on a weekly basis?

4       A.   Roughly weekly, yes.

5       Q.   And is there a central repository for

6   all of those briefings?

7       A.   Yes.

8       Q.   What is that?

9       A.    It's on a share point site.

10      Q.    Okay.  And do you know if those

11   briefings have to be reviewed by the disclosure

12   review board before being made public?

13      A.    Yes.

14      Q.    All of them have to be reviewed by the

15   disclosure review board before being made

16   public?

17      A.    Yes.

18      Q.    Okay.  Do all of the briefings have

19   confidential information in them?

20      A.    I don't know if all of them do.

21      Q.    Okay.

22      A.    There was recently an effort to review

23   all of the decks so that they can be provided.

24      Q.    Thank you.

25      A.    Yes.

                                        172
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1      MS. ROBINSON:  Could we please look at

2   Exhibit 17?

3      TECHNICIAN WERT:  Sure.  Stand by one moment.

4      MS. ROBINSON:  Thank you.

5      TECHNICIAN WERT:  And, Counsel, do you want

6   this marked as well?

7        MS. ROBINSON:  Yes.  Thank you.

8        TECHNICIAN WERT:  This will be Exhibit 11 and

9    it is on screen now.

10                   (Whereupon, Adams Deposition

11                    Exhibit 11 was marked for

12                    identification.)

13        MS. ROBINSON:  And if you can go to the next

14    page, please.

15    BY MS. ROBINSON:

16        Q.   So this is an Operational -- and it's a

17    PowerPoint, I think a slide deck, entitled

18    Operational and Processing Options to Meet

19    Statutory Date of December 31st, 2020, For

20    Apportionment dated August 3rd, 2020.

21             I'm going ask if this document looks

22    familiar, but I will have the tech scroll

23    through it before I ask you that.

24        MS. ROBINSON:  If you could please scroll

25    through.

                                              173
                   UNCERTIFIED ROUGH DRAFT - T. ADAMS

1        TECHNICIAN WERT:  Sure thing.

2        MS. ROBINSON:  Thank you.

3        THE WITNESS: Yes, it looks familiar.

4        MS. ROBINSON:  Great.

 5    BY MS. ROBINSON:

 6        Q.   Could you please go to page 12 and it

 7    might be page -- oh, yes, that's the one.  Okay,

 8    great.

 9             So I'm asking these questions only from

10    a data processing perspective just to put that

11    context out there.  But this document says,

12    first of all, and you can -- I'll give you a

13    minute to read the page maybe and then I'll ask

14    you a couple questions.

15        A.   Okay.

16        Q.   So what steps is the Bureau taking with

17    regards to data to effectuate the presidential

18    memo described here?

19        MR. SVERDLOV:  Hold on one second.  I'm going

20    to object on the basis of scope.

21             I fail to see how this line of

22    questions is at all within the scope of the

23    topics that the plaintiffs have noticed for this

24    deposition.  So the witness's testimony on this

25    line of questions will be solely from her

                                                  174
                UNCERTIFIED ROUGH DRAFT - T. ADAMS


 1    knowledge and not on behalf of the Census

 2    Bureau.

3        MS. ROBINSON:  And I'll renew my objection

4   that plaintiff's view it's squarely within the

5   topics because I'm asking about data that

6   resides with the Census Bureau.

7        MR. SVERDLOV:  I'm sorry, one second.  Maybe

8   it will be helpful to go off the record because

9   that is not how the question was phrased.

10       THE VIDEOGRAPHER:  Would you like to go off

11  the record, Mr. Sverdlov?  Is that what you just

12  said?

13       MS. ROBINSON:  That's fine with me.

14       THE VIDEOGRAPHER:  Okay.  Going off the

15  record at 2:52.

16                  (Whereupon, a recess was had at

17                   2:52 p.m., after which the

18                   deposition was resumed at

19                   2:57 p.m. as follows:)

20       THE VIDEOGRAPHER:  And we are back on the

21  record at 2:57.  Please continue.

22  BY MS. ROBINSON:

23       Q.   Okay.  So what, if any, data sources

24  are being used to effectuate the president's

25  memorandum described on this slide?

                                        175
            UNCERTIFIED ROUGH DRAFT - T. ADAMS

1       A.   I don't know the data sources.  In

2   order to provide those, we'd need to get a list

3   from the team that's working on it.

4       Q.   Okay.  And who is that team?

5       A.   It is led by Dr. Abowd.

6       Q.   Are the data sources that Dr. Abowd is

7   using including in the list of 52 that we

8   discussed earlier?

9       MR. SVERDLOV:  Objection, foundation and

10  form.

11      THE WITNESS:  Yeah, I don't know what sources

12  they are using.  So I can't answer whether they

13  are in a list of 52.

14  BY MS. ROBINSON:

15      Q.   Do you know if there -- well, let's

16  see.  The second bullet references using

17  administrative records.

18      A.   Correct.

19      Q.   Do you know how Dr. Abowed's group is

20  using administrative records in this process?

21      MR. SVERDLOV:  I'm going to object on the

22  basis of scope on this testimony.  And so the

23  witness would not be testifying on behalf of the

24  Census Bureau.  She is testifying in her

25  personal capacity.

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1       THE WITNESS:  I don't know.  We need to get

2   that information from Dr. Abowd.

3   BY MS. ROBINSON:

4       Q.   Abowd.  Thank you.

5            The first bullet says that work was

6   already done based on Executive Order 13380.

7            Do you know -- or please tell me which

8   data sources were used to perform that work.

9       A.   Yeah, again, I don't know.  We would

10  have to get that information.

11      Q.   Okay.  A few questions regarding the

12  Census Bureau's process for collecting documents

13  in response to document requests.

14           Is that process the same for both

15  litigation and responding to congressional

16  inquiries?

17      MR. SVERDLOV:  Objection, vague.

18      THE WITNESS:  Yeah, is there a specific

19  incident -- set of collections you are asking

20  about?

21  BY MS. ROBINSON:

22      Q.   Just generally, does the Census Bureau

23  have a process for responding to litigation

24    requests?

25         MR. SVERDLOV:  Objection, vague.

                                        177
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1         THE WITNESS:  I guess I don't understand the

2    substance of the question.

3    BY MS. ROBINSON:

4         Q.    Is there a team that handles responding

5    to litigations requests on behalf of the Census

6    Bureau?

7         A.    Yes.

8         Q.    What is that team?

9         A.    Are we talking about the decennial

10   census now?

11        Q.    I'm referencing litigation requests

12   that are issued to the Census Bureau.  What team

13   is responsible for responding to those?

14        A.    Yeah, I don't know if there is one team

15   that responds to every litigation, to all

16   litigation requests from a central location.

17        Q.    Do you know the team that responds to

18   congressional inquiries on behalf of the Census

19   Bureau?

20        A.    I do not know the name of the team.

21        Q.    Do you know the name of the group that

22    responds on behalf of the Census Bureau to GAO

23    inquiries?

24         A.   So, again, are we -- are we talking

25    about the decennial census itself, inquiries

                                                      178
                  UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     about the decennial?

2          Q.   Yes.

3          A.   Then, yes, it goes to the decennial

4     census communications office when we can.

5          Q.   Is that office charged with responding

6     to inquiries from Congress?

7          A.   I don't know.

8          Q.   What group is in charge with responding

9     to the recent requests for information from the

10    House Oversight Committee?

11         A.   I don't know the name of the group.

12         Q.   Do you know the name of a person?

13         A.   No.

14         MS. ROBINSON:  Could we please go to

15    Exhibit 24.

16         TECHNICIAN WERT:  Sure.  Stand by one moment.

17    And would you like this marked as well?

18         MS. ROBINSON:  Yes, thank you.

19         TECHNICIAN WERT:  Okay, this will be

20    Exhibit 12, one moment.

21              (Whereupon, Adams Deposition

22              Exhibit 12 was marked for

23              identification.)

24    TECHNICIAN WERT:  Exhibit 12 is on screen now

25

179

UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    BY MS. ROBINSON:

2        Q.   Are you familiar with this document

3    from the House?

4        A.   No.

5        Q.   Are you familiar with an -- I should

6    say, are you prepared to testify today about the

7    Census Bureau's response to the House Oversight

8    Committee's request for documents and subpoena?

9        A.   Do you have a specific question you

10    want me to answer?

11        Q.   Yeah.  Are you prepared today to talk

12    at all -- I'm sorry.  Are you prepared today to

13    testify about that topic?

14        A.   Not in any sort of detail, no.

15        Q.   Okay.

16    MS. ROBINSON:  So Mr. Sverdlov, one of the

17    topics that you actually had agreed to provide a

18    witness on was the status of the Census Bureau's

19    responses to document requests from the House

20    Oversight Committee.

21         Is that Ms. Adams or is that the

22    Department of Commerce witness?

23    MR. SVERDLOV:  So that is Ms. Adams.  And I

24    think if Ms. Adams were allowed to consult any

25    of the reference materials that we provided, she

                                              180
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    might be in a position to answer your questions.

2    MS. ROBINSON:  Are those the reference

3    materials that you produced this morning to us?

4    MR. SVERDLOV:  Those are the ones I sent to

5    you this morning, yes.

6    MS. ROBINSON:  Okay.  Well, I'll ask a few

7    more questions here.

8    BY MS. ROBINSON:

9    Q.   Is the Census Bureau planning to

10    provide any -- any additional document

11    productions to the House?

12    A.   I don't know.

13    Q.   Could you please look at one of the

14    reference documents in order to answer that

15    question?

16      A.   Sure.

17      MR. SVERDLOV:  So just as a technical matter,

18 how would you like to handle Ms. Adams viewing

19 the materials?  I had -- we had provided that

20 material to her in the course of preparation.

21 So I imagine that she might have it in her

22 possession right now.

23      But I -- given the peculiarities of the

24 online system, I wanted to be sure that we're

25 not crossing wires in terms of what you want her

                                            181
            UNCERTIFIED ROUGH DRAFT - T. ADAMS

1 to be looking at and...

2      MS. ROBINSON:  Right.  Frankly, I don't know.

3 Because we haven't -- I haven't been able to

4 look at those documents, given when they were

5 produced.  So I would like some testimony on

6 this topic.

7      MR. SVERDLOV:  Yeah.  I mean, I can -- I can

8 direct your attention to the reference sheet

9 that I believe Ms. Adams may be testifying from.

10 If I'm incorrect, Ms. Adams can correct me.

11      MS. ROBINSON:  I think -- why don't we do

12 this.  Why don't we not have Ms. Adams look at

13 any documents right now.  That will give us a

14    chance to review them and decide which, if any,

15    we actually want to put in exhibits for.  I'll

16    ask a few more questions and see if she's able

17    to provide any other testimony on this topic

18    today.

19        MR. SVERDLOV:  So you're welcome to do that,

20    but I will note that the witness has -- has a

21    right and opportunity to consult reference

22    materials that were used in the course of

23    preparing her for a 30(b)(6) deposition.

24        And so to the extent that you do not

25    permit her to look at those materials and want

                                                182
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    testimony without those materials, I want that

2    reflected in the record and I want it to be

3    clear that any inability or -- ability or

4    inability she has to answer these questions is

5    on the basis of her not being given access to

6    the documents.

7        MS. ROBINSON:  Yeah, and I would state that

8    our position is that if she wanted to use

9    reference documents they should have been

10   provided to us far in advance so we could review

11   them and decide whether we thought it was

12    appropriate and they could be entered as

13    exhibits in the deposition.

14          But since we haven't had an opportunity

15    to do that, we don't view it as equitable to

16    have her testify from documents.

17    MR. SVERDLOV:  That's a novel position.  I'm

18    not familiar with any basis for that position.

19    You are welcome to ask her questions about those

20    documents.  You are welcome to authenticate

21    them, to ask her in general terms about the

22    course of their preparation.

23          But as this is 30(b)(6) deposition, I

24    am aware of no rule, order or procedure that

25    would have required me to run the documents used

                                                  183
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1    in the course of preparing the witness by

2    opposing counsel first.

3    MS. ROBINSON:  No.  But to have her reference

4    and testify.  I don't even know if they are

5    written by her.  I haven't even had a chance to

6    view them.

7          So I will just ask her the questions I

8    have and we can go from there.

9    BY MS. ROBINSON:

10      Q.   Ms. Adams, are you aware that there

11   were document requests issued from the House

12   Committee on Oversight and Reform on

13   November 19, 2020, to the Census Bureau?

14      A.   Yes.

15      Q.   What did the Census Bureau do at that

16   time to identify and produce responsive

17   information?

18      A.   I don't know.

19      Q.   What is the process by which the Census

20   Bureau is collecting, reviewing, and producing

21   documents responsive to the House Committee's

22   requests now?

23      A.   I don't know.

24      Q.   Do you know what databases are being

25   used to identify responsive information?

                                             184
                UNCERTIFIED ROUGH DRAFT - T. ADAMS

1      A.   No.

2      Q.   Do the documents that you reviewed in

3   preparation for this deposition have that

4   information on them?

5      A.   No.

6      Q.   Do you know if documents were

7   identified for production to that request from

8        the House before November 24th?

9        A.   I do not.

10       Q.   Do the documents that you used to

11       prepare for this deposition have that

12       information on them?

13       A.   Not that I remember.

14       Q.   Were documents identified for

15       production in response to the House request and

16       then provided to the general counsel for

17       clearance?

18       A.   I don't know.

19       Q.   Were the documents you were provided in

20       preparation for the deposition -- or did the

21       documents you were provided in preparation for

22       the deposition have that information on them?

23       A.   Not that I remember.

24       Q.   Do you know how many productions have

25       been made to the House thus far?

                                                185
                   UNCERTIFIED ROUGH DRAFT - T. ADAMS

1        A.   No.

2        Q.   Were you provided that information

3        before the deposition?

4        A.   Not that I remember.

5        Q.   Do you know if those productions went

6     to the disclosure review board?

7          A.   I don't know.

8          Q.   And do you know if the Census Bureau

9     intends to make any future productions to the

10    House Committee on Oversight?

11         A.   I don't know.

12         Q.   I have a couple questions about the

13    document productions in this matter.

14              Are you prepared to testify on those?

15         A.   To the extent that I know the answers.

16         Q.   Well, as a 30(b)(6) witness, you're

17    supposed to know the answers.  So have you been

18    prepared to testify about the document

19    productions made in this litigation?

20    MR. SVERDLOV:  I'm going to renew by

21    objection on the basis of the fact that the

22    witness is not being given access to the

23    reference materials by counsel.  So she is

24    answering these without the benefit of being

25    able to consult those materials.

                                              186
              UNCERTIFIED ROUGH DRAFT - T. ADAMS

1     MS. ROBINSON:  Okay.  Mr. Sverdlov, why don't

2     you point out to me which of the documents you

3     sent this morning would have information for her

```
 4   about the productions in this matter.

 5       MR. SVERDLOV:  Yes, I'm happy to.  So in

 6   the -- give me one second.  In the zip file that

 7   I transmitted to you, the document that has

 8   the -- that bears the name reference sheet is a

 9   sheet that contains information related to that

10   topic.

11       MS. ROBINSON:  Okay.

12   BY MS. ROBINSON:

13       Q.   And Ms. Adams, are you prepared to

14   testify to anything beyond what is in this

15   document that your counsel just described?

16       MR. SVERDLOV:  Objection.

17       THE WITNESS:  No.

18       MR. SVERDLOV:  I'm sorry.  Objection.  I'm

19   going to object on that question on the basis of

20   vagueness and mischaracterizing the prior

21   several hours of testimony.

22       MS. ROBINSON:  Okay.  Those are all the

23   questions I have.  Thank you, Ms. Adams.

24       THE VIDEOGRAPHER:  Anything, Mr. Sverdlov?

25       MR. SVERDLOV:  We reserve the right to read
```

                                                187
                    UNCERTIFIED ROUGH DRAFT - T. ADAMS

```
 1   and sign the transcript.
```

2          THE VIDEOGRAPHER:   Then this then concludes

3     the deposition.   The time is 3:15 p.m.   We are

4     going off the video record.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25